1  **RANDY J. RISNER**
   Interim City Attorney, SBN 172552
2  **BY:    MEERA H. BHATT**
   Assistant City Attorney, SBN 259203
3  **KATELYN M. KNIGHT**
   Assistant City Attorney, SBN 264573
4  **FARRAH HUSSEIN**
   Deputy City Attorney, SBN 305726
5  **CITY OF VALLEJO**, City Hall
6  555 Santa Clara Street, 3rd Floor
   Vallejo, CA  94590
7  Tel:    (707) 648-4545
   Fax:    (707) 648-4687
8  Email: Meera.Bhatt@cityofvallejo.net
9  Katelyn.Knight@cityofvallejo.net
   Farrah.Hussein@cityofvallejo.net
10

11 Attorneys for Defendants CITY OF VALLEJO and JARRETT TONN

12

13            UNITED STATES DISTRICT COURT

14      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

15

16 | NEFTALI MONTERROSA, individually and | Case No:   2:20-cv-01563-TLN-DB |
   | as co-successor-in-interest to Decedent SEAN | |
17 | MONTERROSA; NORA MONTERROSA, | **DEFENDANTS' NOTICE OF MOTION** |
   | individually and as co-successor-in-interest to | **AND MOTION FOR ORDER** |
18 | Decedent      SEAN      MONTERROSA; | **GRANTING INTRA- DISTRICT** |
   | MICHELLE MONTERROSA, individually; | **TRANSFER OF VENUE TO FRESNO** |
19 | ASHLEY MONTERROSA, individually, | **DIVISION OF EASTERN DISTRICT;** |
   | | **MEMORANDUM OF POINTS AND** |
20 | Plaintiff, | **AUTHORITIES; AND DECLARATION** |
   | | **OF KATELYN KNIGHT IN SUPPORT** |
21 | | **THEREOF** |
   | vs. | |
22 | | |
   | CITY     OF     VALLEJO,    a    municipal | **Date:    December 3, 2020** |
23 | corporation; JARRETT TONN, individually, | **Time:    2:00 p.m.** |
   | and, Vallejo police officers DOES 1-25, | **Crtrm: 2** |
24 | inclusive, | |
25 | | |
   | Defendants. | |
26

27

28

---

**Case No. 2:20-cv-01563-TLN-DB**          **MOTION FOR INTRA-DISTRICT**
                                            **TRANSFER OF VENUE**

Table of Contents

I. INTRODUCTION AND BACKGROUND ............................................................................ 7

II. ARGUMENT ...................................................................................................................... 8

A.   An Intra-District Transfer is Required to Protect Defendants' Constitutional Rights to a Fair Trial by an Impartial Jury, Rights which the Court Should Safeguard ............................... 8

B.   Prejudicial Publicity has Saturated the Community, Requiring Intra-District Transfer to Protect Defendants' Due Process Rights .................................................................................. 11

i.   A Change in Venue is Required When a Case Has Been Politicized, as Here .................. 11

ii.   The Community's Response Makes a Change in Venue Necessary ................................ 16

iii.   A Change in Venue is Required due to the Media's Depiction of the Vallejo Chief of Police's Statements as Admissions ........................................................................................ 19

iv.   Intra-District Transfer Should Not Be Delayed as *Voir Dire* is Not an Effective Cure Against Pervasive Prejudicial Publicity, and Transfer Before *Voir Dire* Serves Judicial Economy ................................................................................................................................ 20

C.   Intra-District Transfer to the Fresno Division of this District is Appropriate under 28 U.S.C. Section 1404 and Local Rule 120 ............................................................................... 22

IV. CONCLUSION ................................................................................................................ 24

1

2

## Table of Authorities

3

## Cases

*Balawager v. Scott,* 160 F.3d 1066, 1067 (5th. Cir. 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bankers Trust Co. v. Crawford,* 559 F. Supp. 1359, 1363 (W.D.N.Y. 1983)(" . . . . . . . . . . . . . . . . . . . . . . . 23

*Bruton v. United States,* 391 U.S. 123, 128-130 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bruton v. United States,* 391 U.S. 123, 135 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Chance v. E.I Du Point de Nemours & Co.,* 371 F.Supp. 439 (E.D.N.Y. 1974). . . . . . . . . . . . . . . . . . . . . . 24

*Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1516 (10th. Cir. 1991). . . . . . . . . . . . . . . . . 23

*Coleman v. Kemp,* 778 F.2d 1487 (11th. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Corona v. Superior Court,* 24 Cal.App.3d 872, 877-878 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Daniel v. Woodford,* 428 F.3d 1181, 1211-1212 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Delaney v. United States,* 199 F.2d 107, 112-113 (1st Cir. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Edwards v. Sanyo Mfg. Corp.,* No. 3:05CV00293-WRV U.S. Dist. LEXIS 98123 (E.D. Ark. Feb 27, 2007); . . . 23

*Foley v. Parker,* 488 F.3d 377 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Frazier v. Superior Court,* 5 Cal.3d 287 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Goins v. McKeen,* 605 F.2d 947, 953-954 (6th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hayley v. Blue Ridge Transfer Co.,* 802 F.2d 1532, 1535 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Irvin v. Dowd,* 366 U.S. 717, 72 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Irvin v. Dowd,* 366 U.S. 717, 720 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Irvin v. Dowd,* 366 U.S. 717, 724-725 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Irvin v. Dowd,* 366 U.S. 717, 729-30 (1961)( . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Johnson v. Burlington-Northern, Inc.,* 480 F. Supp.259, 260 (W.D. Mo. 1979 . . . . . . . . . . . . . . . . . . . . . . 23

*Maine v. Superior Court* (1968) 68 Cal.2d 374, 378-379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Maine v. Superior Court,* 68 Cal.2d 374, 387 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Marshall v. United States,* 360 U.S. 310, 312 (1959 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Marshall v. United States,* 360 U.S. 310, 312-313 (1959); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Martinez v. Superior Court of Placer County,* 29 Cal.3d 574, 578 (1981)( . . . . . . . . . . . . . . . . . . . . . . 9, 11

1   *McCoy v. Goldston,* 652 F.2d 654, 657 (6th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

2   *Moore v. Teflon Communications Corp.,* 589 F.2d 959 (9th. Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . .   24

3   *New York v. Gen. Motors Corp.,* 357 F. Supp.327, 328 (S.D.N.Y 1973). . . . . . . . . . . . . . . . . . . . . . .   23

4   *Norwood v. Kirkpatrick,* 329 U.S. 29 (1955);   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

5   *Pamplin v. Mason,* 364 F.2d 1, 5-6 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

6   *Patton v. Yount,* 467 U.S. 1025, 1031 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

7   *Powell v. Superior Court,* 232 Cal.App.3d 785 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

8   *Pratt v. Rowland,* 769 F.Supp.1128 (N.D. Cal 1991)("  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

9   *Regents of Univ. of Cal. V. Eli Lily & Co.,* 119 F.3d 1559, 1565 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . .   23

10   *Rideau v. Louisiana,* 373 U.S. 723 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

11   *Rideau v. Louisiana*, 373 U.S. 723, 729  (1963)(  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

12   *SB Designs v. Reebok Int'l, Ltd.,* 305 F. Supp. 288 (N.D. Ill 2004  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

13   *Sheppard v. Maxwell,* 384 U.S. 333, 351 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 21

14   *Sheppard v. Maxwell,* 384 U.S. 333, 363 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

15   *Skaggs v. Otis Elevator Co.,* 164 F.3d 511, 514-515 (10th. Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . .   9

16   *Smith v. Superior Court of Los Angeles County*, 276 Cal.App.2d 145 (1969).   . . . . . . . . . . . . . . . . . . . . . .   11

17   *State v. Shawan,* 77 N.M. 354, 358 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

18   *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28 (1988); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

19   *United States v.  Crow Dog,* 532 F.2d 1182, 1187 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

20   *United States v. Dreitzler,* 577 F.2d 539, 552  (9th Cir. 1978);   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

21   *United States v. Ebens,* 654 F. Supp.144 (E.D. March 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

22   *United States v. Engleman,* 489 F.Supp. 48, 50 (E.D. Mo. 1980  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

23   *United States v. Tokars,* 839 F.Supp. 1578, 1581 (N.D. Ga 1993)( . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

24   *United States v. Williams,* 586 F.2d 464, 469 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

25   *Wash. Pub. Utilities Group. v. U.S. Distr. Court,* 843 F.2d 319, 326 (9th Cir. 1987). . . . . . . . . . . . . . . . . . .   24

26   **Statutes**

27   28 U.S.C. § 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

28   28 U.S.C. § 1404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Case No. 2:20-cv-01563-TLN-DB                    **MOTION FOR INTRA-DISTRICT**
                                                  **TRANSFER OF VENUE**

Under 28 U.S.C. section 1404 subdivision (c), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Other Authorities

*Authoritarianism, Pretrial Publicity, and Awareness of Bias in Simulated Jurors*, 37 Psychol. Reps. 1299, 1301

   (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review*, 23 Law and Human Behavior No. 219

   (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Rules

Local Rule 120(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

2    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3        **PLEASE TAKE NOTICE** that on December 3, 2020 at 2:00 p.m. in Courtroom 2 of the

4    United States Courthouse located at 501 I Street, Sacramento, California, Defendants City of

5    Vallejo and Vallejo Police Officer Jarrett Tonn (collectively, "Defendants"), by and through their

6    counsel of record, will move the Court for an order granting this motion for an intra-district

7    transfer to the Fresno division of the Eastern District and awarding any different or further relief

     the Court deems equitable and just.

8        This motion is based upon Defendants' constitutional rights to a fair trial by an impartial

9    jury and 28 USC section 1404 and is made on the grounds that an intra-district transfer is

10   required to safeguard Defendants' due process rights; this case has become widely politicized

11   and has incited public passion; the media's depiction of the Vallejo Chief of Police's statements

12   as admissions; as *voir dire* is not an effective cure against pervasive prejudicial publicity; and as

13   transfer serves the interests of justice and judicial economy.

14       This motion is further based upon this notice of motion and motion, the memorandum of

15   points and authorities, the Declaration of Katelyn Knight, the pleadings and other matters on file

16   in this case, and any argument or evidence as may be presented to the Court at the hearing of this

17   matter.

18

19   DATED:  October 6, 2020                    Respectfully submitted,

20

21                                              */s/ Meera Bhatt*
                                                MEERA BHATT
22                                              KATELYN M. KNIGHT
                                                FARRAH HUSSEIN
23                                              Attorneys for Defendants
                                                CITY OF VALLEJO and JARRETT TONN
24

25

26

27

28

---

## MEMORANDUM OF POINTS & AUTHORITIES

### I.

### INTRODUCTION AND BACKGROUND

This case arises from an officer-involved shooting of Sean Monterrosa that took place on June 2, 2020.  In the wake of the civil unrest following the George Floyd killing, the Black Lives Matter movement, and public outcry for police reform, caravans of looters targeted the City of Vallejo, systematically burglarizing pharmacies, marijuana dispensaries, and gun stores before fleeing from officers at high speeds.  Portions of Vallejo City Hall were set on fire.

Like most other Bay Area cities and counties[1], Vallejo declared a local emergency and imposed a curfew.  Despite the curfew, the City endured an unprecedented onslaught of coordinated criminal activity on the night of the incident.  Even with support from allied agencies, the City's police force was overwhelmed.

Just after midnight on June 2, 2020, a police captain on patrol saw a group of looters breaking into the Walgreens at 1050 Redwood Street in downtown Vallejo.  The Vallejo Police Department had received multiple 911 calls reporting criminal activity at that location and had already responded to two burglaries in progress.  The captain called for backup and detectives from the Vallejo Police Department's specialized crime reduction unit responded in an unmarked police car.  Together, the team developed a plan to approach the parking lot from both sides to block in the looters' vehicles and take them into custody.

As the officers pulled into the parking lot, the captain saw one of the looters acting as a lookout with one hand to his mouth and his arm extended down, holding what appeared to be a weapon.  The captain broadcast over the radio that the suspects were "armed, possibly armed".  The officers in the unmarked SUV activated their police lights.  As they entered the parking lot, looters immediately began piling into two vehicles to flee the scene.  At that moment, the officers in the SUV saw Monterrosa—one of the suspects—run from the Walgreens toward a

---

[1] Including City of Oakland, City of San Jose, City of Palo Alto, City of Santa Clara, City of Pittsburg, City of Walnut Creek, City of Lafayette, City of Moraga, City of Orinda, City of Fremont, City of San Francisco, City of Berkeley, City of Alameda, City of Hayward, City of San Leandro, City of Antioch, City of Danville, City of Pleasant Hill, City of Concord, City of American Canyon, City of Santa Rosa, City of Windsor, Napa County, Solano County, Contra Costa County, San Mateo County, and Alameda County.

**MOTION FOR INTRA-DISTRICT TRANSFER OF VENUE**

1    black sedan waiting in the parking lot.

2        Instead of entering the vehicle, the suspect Monterrosa abruptly stopped and turned

3    toward the officers in a crouching down half-kneeling position as if preparing to shoot.

4    Monterrosa moved his hands toward what looked like the butt of a handgun near his waist.  The

5    officer seated in the rear of the SUV fired five shots at the suspect through the windshield.  One

6    of those shots hit the suspect, who was found to have the butt of a hammer protruding from the

7    front pocket of his hooded sweatshirt.  At the same time, the black sedan fled the scene and

8    rammed into the police captain's vehicle, causing the airbag to deploy.  The day of the incident,

9    the National Guard was deployed to the City, where troops remained for nearly a week.

10        Since the incident, the Monterrosa shooting has become the focus of national and local

11   politics and a relentless PR campaign waged by Plaintiffs' counsel and buoyed by the media.

12   Monterrosa is a political bull horn rallying the Bay Area in support of social justice, Black Lives

13   Matter, George Floyd, and the need for large-scale police reform — key issues in the upcoming

14   election.  These are important causes, as is a defendant's constitutional right to a fair trial by an

15   impartial jury.  As detailed below, prejudicial publicity has saturated the community and tainted

16   the jury pool, jeopardizing Defendant's due process rights.

17                                        **III.**

18                                     **ARGUMENT**

19   **A.    An Intra-District Transfer is Required to Protect Defendants' Constitutional**
         **Rights to a Fair Trial by an Impartial Jury, Rights which the Court Should**
20       **Safeguard**

21        The right to a fair trial by an impartial jury is enshrined in the Fifth Amendment's

22   guarantee that "no person shall be denied life, liberty or property without due process of law"

23   and the Seventh Amendment's guarantee of the right to trial by jury.  *McCoy v. Goldston,* 652

24   F.2d 654, 657 (6th Cir. 1981).  These rights apply to both criminal and civil cases.  *See Hayley v.*

25   *Blue Ridge Transfer Co.,* 802 F.2d 1532, 1535 (4th Cir. 1986) ( "It is fundamental that every

26   litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent

27   practicable from extraneous influences that may subvert the fact-finding process.").  The right to

28   a jury trial is an illusion without an impartial jury.  *Skaggs v. Otis Elevator Co.,* 164 F.3d 511,

---

**Case No. 2:20-cv-01563-TLN-DB**                    **MOTION FOR INTRA-DISTRICT**
                                                       **TRANSFER OF VENUE**

514-515 (10th. Cir. 1998).  This Court now stands as the protector of Defendants' constitutional rights.

The Supreme Court has warned of the ways in which pretrial publicity may render these rights illusory:

> How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when before they entered the jury box, their minds were saturated by press and radio for months preceding by matters designed to establish the guilt of the accused? A [verdict] so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

*Irvin v. Dowd,* 366 U.S. 717, 729-30 (1961)(Frankfurter, J., concurring).

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Sheppard v. Maxwell,* 384 U.S. 333, 351 (1966).  While freedom of discussion should be given a wide range, "it must not be allowed to divert … from the very purpose of a court system, to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom….".  *Id.* at 362.  In *Sheppard v. Maxwell,* the Supreme Court overturned a conviction on the grounds that the trial court judge had not fulfilled his duty to protect the defendant from the inherently prejudicial publicity that saturated the community.  The Supreme Court instructed that venue must be changed "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *Id.*  This precept is well-established.

The California Supreme Court states:

> A motion for change of venue … *shall* be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had …. An actual showing of prejudice shall not be required. The phrase 'reasonable likelihood' denotes a *lesser standard of proof than 'more probable than not.'*

*Martinez v. Superior Court of Placer County,* 29 Cal.3d 574, 578 (1981)(emphasis added).  The Ninth Circuit states, "[i]n recognition of [the right to an impartial jury], it is well-established that pretrial publicity may have had such an impact upon the populace from which the jury is drawn as to create a probability or at least a 'reasonable likelihood' that this right of impartiality has been violated."  *United States v. Crow Dog,* 532 F.2d 1182, 1187 (9th Cir. 1976).  When pretrial

publicity "jeopardizes [the right to a fair trial by an impartial jury] the trial court should grant the defendant a change in venue." *Foley v. Parker,* 488 F.3d 377 (6th Cir. 2007).

In some cases, pretrial publicity may give rise to a presumption that a defendant cannot receive a fair trial by an impartial jury. Prejudice is presumed where publicity causes a wave of public passion, thus depriving defendants of the right to a fair trial by an impartial jury. *Patton v. Yount,* 467 U.S. 1025, 1031 (1984). Prejudice is also presumed when the record shows the community is saturated with prejudicial and inflammatory media. *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir. 1989).

Even when the presumed prejudice bar is not met, federal courts hold broad supervisory power whereby they retain great discretion in reviewing requests to transfer venue. The Supreme Court has noted federal courts "have a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial." *Marshall v. United States,* 360 U.S. 310, 312 (1959). Here, the bar is much lower than the "presumed prejudice" bar. It is clear that a party need not show that publicity has caused a wave of passion or that the community is saturated with prejudicial and inflammatory media to justify a transfer of venue. "[T]he *Marshall* rule is considerably broader than the constitutional standard and provides more protection against prejudice." *United States v. Williams,* 586 F.2d 464, 469 (5th Cir. 1978). In *Rideau v. Louisiana*, Justice Clark noted the "very significant difference between matters within the scope of our supervisory power and matters which reach the level of constitutional dimension." *Rideau v. Louisiana*, 373 U.S. 723, 729  (1963)(Clark, J., dissenting); *see also United States v. Tokars,* 839 F.Supp. 1578, 1581 (N.D. Ga 1993)(applying both the presumed prejudice and *Marshall* standards in granting a change of venue).

Although Defendants are not required to meet both standards, they have done so, as shown by the numerous examples of prejudicial pretrial publicity which has saturated the community. (Knight Decl. Exs. 1-33).[2] Moreover, when a motion for change in venue is based

---

[2] The Declaration of Katelyn Knight is hereinafter referred to as "Knight Decl."

on potentially prejudicial pretrial publicity and brought before trial, any doubt as to the necessity of transfer should be resolved in favor of venue change. *Martinez v. Superior Court of Placer County*, 29 Cal.3d 574, 578 (1981) (directing the trial court to grant petitioner's motion for change of venue and recognizing a duty to resolve all doubts related to venue change in favor of granting the petition); *see also Maine v. Superior Court* (1968) 68 Cal.2d 374, 378-379, directing the trial court to grant petitioner's motion for change of venue and recognizing "our duty to resolve all doubts [related to venue change] in favor of petitioner." *Fain v. Superior Court* (1970) 2d. 3d 56, 54.

**B.    Prejudicial Publicity has Saturated the Community, Requiring Intra-District Transfer to Protect Defendants' Due Process Rights**

The line of cases in which courts have transferred venue or recognized a basis for transferring venue based on adverse pretrial publicity is long. Granting an intra-district transfer to the Fresno division of this District is both appropriate and in line with established precedent.

**i.   A Change in Venue is Required When a Case Has Been Politicized, as Here**

"Political factors have no place in a … proceeding, and when they are likely to appear, they constitute an independent reason for a venue change." *Maine v. Superior Court*, 68 Cal.2d 374, 387 (1968). In *Powell v. Superior Court*, the Court of Appeal issued a writ directing the trial court to transfer venue as knowledge of the Rodney King arrest and resulting political controversy had saturated the community. The Court recognized that potential jurors could not try the case based solely upon the evidence presented in court, depriving the defendants of their rights to a fair trial by an impartial jury. *Powell v. Superior Court,* 232 Cal.App.3d 785 (1991). In *Smith v. Superior Court*, the Court of Appeal issued a writ directing the lower court to transfer venue to a county in which a fair and impartial trial could be had. *Smith v. Superior Court of Los Angeles County*, 276 Cal.App.2d 145 (1969). In so ruling, the Court concluded that a fair trial could not be had in Los Angeles County because of pervasive publicity. Specifically, the Court noted that the petitioner was the subject of serious accusations that if true, involved a betrayal of public trust and if believed, were likely to evoke public outrage. *Id.* at 148.

The Monterrosa shooting has sparked a political firestorm, intensified in the wake of George Floyd. This political firestorm has spread through every level of government. House

Speaker Nancy Pelosi issued a press release on July 17, 2020, referring to the shooting as a "homicide" and a "horrible act of brutality that continues to shake our Bay Area community," whereby a national leader effectively condemned Vallejo Police Officers as murderers.  Speaker Pelosi expressly linked Monterrosa to support for police reform legislation.  Specifically, the press release described reports of the alleged destruction of evidence related to the Monterrosa shooting as "deeply disturbing" and highlighting an "urgent need for the Senate to pass the House-passed George Floyd Justice in Policing Act, which will fundamentally transform the culture of policing in America." (Knight Decl., Ex. 26).  Speaker Pelosi also called for an FBI investigation into reports of evidence destruction. (Knight Decl., Ex. 26).  Senator Bill Dodd who represents Vallejo in the Senate echoed Speaker Pelosi:

> A thorough, independent investigation is absolutely essential…. Sean… his loved ones, and the entire Vallejo community deserve no less. I thank Speaker Pelosi for her leadership in requesting an FBI investigation. I've also been calling for an independent review, which should include examination of the destruction of evidence by Vallejo police.

(Knight Decl., Ex. 27).

In response, Plaintiffs' counsel, Law Offices of John Burris, reportedly released a public statement that it "was thankful that [Pelosi demanded an FBI investigation] into Sean's murder and this corrupt police agency".  (Knight Decl. Ex. 32).  The Department of Justice is currently investigating the alleged destruction of evidence by the Vallejo Police Department.  Attorney General Becerra explained this decision, "[O]ur communities, particularly Black Americans and people of color during this time of social upheaval, deserve to know we are listening and doing our part to take action."  (Knight Decl., Ex. 28).  Mr. Becerra's announcement followed the Solano County District Attorney's recusal from investigating the Monterrosa shooting and Vallejo City Attorney Randy Risner's public letter to the District Attorney stating, "Vallejo … cannot allow a political dispute between you and the Attorney General to interfere in the administration of justice…."  (Knight Decl., Ex. 33).

The Monterrosa shooting has politicized and mobilized the Bay Area.  As Plaintiff Michelle Monterrosa put it, "It's not just Vallejo's fight. It's the whole Bay Area's fight."

(Knight Decl., Ex. 21).  In the wake of Monterrosa, mass protests, an outpour of public demands to defund the Vallejo Police Department and fire officers, riots, attacks on police, and looting has rocked the Bay Area.  Suspects set fire to City Hall, protestors condemned the Vallejo Police Department as "corrupt," and criticized the "ongoing refusal to prosecute [Vallejo officers]." (Knight Decl., Ex. 31).

The City has had to impose curfews and request help from the National Guard to ensure public safety.  The City commissioned investigations of the Vallejo Police Department, which findings have been widely publicized with the media reporting that Vallejo's policing is a symptom of systemic racism.  In September 2020, the community financially contributed to a large billboard that reads "Justice for Sean Monterrosa" along with an illustration of Sean Monterrosa just a block from the Vallejo Police Department.  (Knight Decl., Ex. 34).  Mass crowds commemorated the billboard's installation, with demands of police reform and defunding the police. (Knight Decl., Ex. 34).  On October 6, 2020, Council will consider issuing an emergency declaration in response to the police crisis and community reaction.  (See October 6, 2020 Special Council Meeting Agenda[3]).

As shown, the Monterrosa shooting has become a political battle cry in the Bay Area. Like national leaders, the City's local leaders have called for political reform in the wake of the shooting. Council member and mayoral candidate Robert McConnell reportedly attended a "Justice for Monterrosa" protest where he encouraged demonstrators to advocate for change in the Vallejo Police Department, stating "[t]here are certain things the city council can do, and certain things it can't do, but we can't do anything without your support, your involvement." (Knight Decl., Ex. 26).  Council member McConnell condemned the reports of evidence destruction in the Monterrosa shooting, releasing a public statement, "… I was livid…. It is both a violation of the California Penal Code and an independent personal wrong, actionable under the law…. Investigation of this needs to be swift, complete, and result in repercussions." (Knight Decl., Ex. 26).   Council member McConnell's statements are prominently featured on John

---

[3]  https://www.cityofvallejo.net/city_hall/departments___divisions/city_manager/city_clerk/city_agendas___videos

1   Burris' website.[4]

2       Following the Monterrosa shooting, Vallejo Mayor Bob Sampayan, Council member and

3   mayoral candidate Hakeem Brown, the head of the local NAACP chapter, and Police Chief

4   Williams launched an initiative, Operation PEACE. Operation PEACE partners with other law

5   enforcement agencies and is designed to reduce crime and create better relationships between the

6   police and community. (Knight Decl., Ex. 35).   Council member Brown publicly commented,

7   "… we're at crossroads here. This city we've watched descend into a city where people no

8   longer feel safe…. This is affecting our children, and this is affecting working-class families."

9   (Knight Decl., Ex. 35).   The words "Defund the VPD," "F-VPD," "Black Lives Matter," and

10  "coon" were later painted on Council member Brown's office.  This was investigated as a hate

11  crime. (Knight Decl., Ex. 29).

12      Plaintiffs' counsel has stoked the political firestorm through a multitude of press

13  conferences, podcasts, rallies, Black Lives Matters marches, and press releases, all of which have

14  gone "viral" and saturated the Bay Area in this digital age.  Counsel has aligned Monterrosa with

15  the Black Lives Matter movement.  When asked by a reporter whether the Monterrosa shooting

16  was a tipping point in the nation for Black Lives Matter, Mr. Burris responded that "we have a

17  moment that could turn into momentum if we have local public leaders moved by the

18  predicament and moved in such a way that they want to make some decisions to figure out what

19  can be done to the [Vallejo Police Department]." (Knight Decl., Ex. 24).

20      During press conferences, Mr. Burris has criticized the Vallejo Police Department as

21  "unable to police itself" and stated that the Police Department should be under an "independent

22  monitor to evaluate whether the department is in compliance with any court-ordered or agreed

23  upon changes." (Knight Decl., Ex. 20)  Other examples of counsel's politicization of this case

24  include but are not limited to the following:

25      • A rally on or about June 14, 2020 in which protesters paraded Black Lives Matter and

26          "#Justice4Sean" signs, in which an attorney from the Burris firm states, "the last text

27  _____

28  [4]  https://johnburrislaw.com/sean-monterrosa/

[Monterrosa] sent out was to get people to sign a petition regarding George Floyd. So he was a young man that was cognizant of the social justice issues that unbeknownst to him minutes later – he was going to you know – his memory was going to be a part of changing police violence." (Knight Decl., Ex. 10.)  John Burris recited a similar narrative to the San Francisco Chronicle a few days later. (Knight Decl., Ex. 11.)

- At the same rally, a Burris attorney stated, "these families have been screaming at the [Vallejo] City Council meetings for ten years… If you notice none of our City Council, they're not here with us. They don't come because they've turned their back on us. If they would have stood up and done the right thing in 2012, and not waited until 2020, Sean would still be alive. (Knight Decl., Ex. 25).

- Statements by Burris' law firm telling "everyone to call District Attorney Krishna Abrams …. Last year we saw her flying a Blue Lives Matter flag, that tells us she doesn't give a f-about us." (Knight Decl., Ex. 25).

- An inflammatory twitter campaign against the City and its Police Department in which a Burris attorney's tweets included, among others: a tweet on July 16, 2020 "It's time for the City of Vallejo to enter a reform plan, with a federal monitor for compliance;" a tweet on July 17, 2020 fyi@SpeakerPelosi. Vallejo PD has been murdering people, destroying evidence and covering up their own crimes for decades. This isn't a new problem. Justice for [Seat Monterrosa, Willie McCoy, Angel Ramos] and so on and on.  (Knight Decl., Ex. 19.)

The intense political turmoil which has mobilized and permeated the Bay Area is unlikely to dissipate before trial.  The City also has twenty-three active civil rights cases related to police action pending and many of its civil rights cases and settlements are well publicized, including a recent $5.7 million settlement.  Further litigation will continue the media frenzy and inflame the community against Vallejo Police Officers.  This year, the former President of the Vallejo Police Officers resigned after ten years, explaining the community hostility towards Vallejo police officers: "I quit reading the negative things that you write about me and other Vallejo police officers. When was the last time you wrote a positive story about a police officer? Do you really

1   think that we are all corrupt racists?"  (Knight Decl., Ex. 30).

2        Defendants urge this Court to consider this request to transfer not in a vacuum but against

3   the political climate of this age.  George Floyd's killing and the words "I can't breathe" have

4   drawn thousands to protest for police reform and Black Lives Matter in the Bay Area.  Both

5   locally and nationally, Monterrosa's shooting has been linked to Black Lives Matter and George

6   Floyd – two of the most seismic political and cultural catalysts of our era.

7        At every level, the Monterrosa case has been politicized.  In this climate and given the

8   publicity that has saturated the Bay Area, it strains credulity to believe that Defendants could

9   have a fair trial by an impartial jury here.  It is unrealistic to believe that jurors can render a

10  verdict solely based on evidence presented in court, uninfluenced by the pervasive political

11  turmoil, their own political convictions, or the prospect of outrage by their loved ones.  *See* Neil

12  Vidmar, *Trial by Jury Involving Persons Accused of Terrorism in Law and Psychology* (Freeman

13  ed. 2006)(examining jury responses on a questionnaire and discovering that jurors were

14  "cognizant that a not guilty verdict might be met with outrage by some friends, families, and co-

15  workers.").

16       Transfer is justified under law.  As in *Powell*, knowledge of the Monterrosa case and

17  resulting political controversy has permeated the Bay Area and much of the publicity involves

18  matters that would never be admissible at trial.  There is more than a reasonable likelihood that a

19  jury would not try this case impartially or based solely upon evidence presented in court.  As one

20  of the jurors put it in *Irvin v. Dowd*, "you can't forget what you hear and see."  *Irvin v. Dowd*,

21  366 U.S. 717, 720 (1961).  The effect of exposure to publicity on juror deliberations "may be

22  substantial even though it is not perceived by a juror himself, and a juror's good faith cannot

23  counter this effect."  *Goins v. McKeen*, 605 F.2d 947, 953-954 (6th Cir. 1979).

24                    **ii.  The Community's Response Makes a Change in Venue Necessary**

25       It is well established that a change of venue is required when adverse publicity evokes a

26  strong emotional response from the community, including an atmosphere of hostility towards

27  defendants. *Coleman v. Kemp,* 778 F.2d 1487 (11th. Cir. 1985).  In *Daniels v. Woodford,* the

28  Ninth Circuit held the lower court's denial of a change in venue violated due process, noting the

---

**Case No. 2:20-cv-01563-TLN-DB**                                   **MOTION FOR INTRA-DISTRICT**
                                                                     **TRANSFER OF VENUE**

1    barrage of inflammatory publicity and a wave of public passion.  *Daniel v. Woodford,* 428 F.3d

2    1181, 1211-1212 (9th Cir. 2005).  In *Corona v. Superior Court*, the Court of Appeal directed the

3    trial court to transfer venue, explaining that the massive outpouring of incriminatory publicity

4    and community involvement created a reasonable likelihood of an unfair trial.  A reasonable

5    likelihood of unfairness existed even when the media coverage was neither inflammatory nor

6    overtly hostility when it "aroused community attention." *Corona v. Superior Court,* 24

7    Cal.App.3d 872, 877-878 (1972).

8        In *United States v. Ebens,* the District Court transferred venue where officials and civil

9    rights groups had been "quoted by the news media uniformly to the effect that defendant must be

10   punished," holding that factors such as comments and castigation of public figures, the intensity

11   and duration of publicity, its inflammatory tone or content, and repeated factual recitations

12   justified change of venue. *United States v. Ebens,* 654 F. Supp.144 (E.D. March 1987).  In

13   *Pamplin v. Mason*, the Fifth Circuit noted that evidence of pervasive community prejudice was

14   sufficient for reversal, even without the showing of a clear nexus between community feeling

15   and jury feeling. *Pamplin v. Mason,* 364 F.2d 1, 5-6 (5th Cir. 1996).

16       Plaintiffs' counsel has inflamed the community, spread false material information, and

17   vilified the City and Police Department, tainting potential jurors.  Examples of this include, but

18   are not limited to, statements:

19   • Plaintiffs' counsel made the day after the shooting that "this young man was shot

20       multiple times while … on his knees and appeared to be trying to surrender" and that

21       you "don't get to arbitrarily shoot someone in a panic, just because the situation is

22       excitable".  (Knight Decl., Exs. 2-3.). News articles and other Burris attorneys

23       repeated this same narrative. (Knight Decl., Exs. 4, 5). The statement that Monterrosa

24       was shot on his knees and while surrendering is unsupported by any evidence and is

25       false.

26   • to the Guardian that the Vallejo Police Department has a track record of

27       "misrepresenting the circumstances of killings."  (Knight Decl., Ex. 4.)

28   • that impugn the Police Chief's credibility. Plaintiffs' counsel has falsely and

repeatedly claimed without basis that the Police Chief gave a description of the incident he said came from a video and is now stating there is no video showing Monterrosa at the time of the shooting.  (Knight Decl., Ex. 14.)

- accusing the City and the Police Department of destroying evidence and the President of the Vallejo Police Officers Association of trying to "misdirect" the criminal investigation. (Knight Decl., Ex. 14, 15, 16, 17).

- That became the basis for the San Francisco Chronicle article published on July 13, 2020 entitled, "One thing clear from video of Sean Monterrosa shooting: Public can't trust Vallejo police to be transparent".  (Knight Decl., Ex. 18.)

On August 6, 2020, Plaintiffs' counsel held a forty-six-minute press conference replete with comments that were intended to incite the community, besmirch Defendants, saturate the public with matters that would be inadmissible at trial, and influence public opinion.  For example, Plaintiffs' counsel stated:

- "This case is uh, very very disturbing, uh, to us, in many many ways because the shooting took place by an officer who has this history of using deadly force under circumstances that are that are quite questionable." (Knight Decl., Ex. 1 at :48-1:04)

- "This is a trigger-happy officer, and potentially a homicidal officer."  (Knight Decl., Ex. 1 at 15:16-15:22)

- "I don't know if you can give the benefit of the doubt to an officer who has had three prior officer-involved shootings within literally five years."  (Knight Decl., Ex. 1 at 16:15-16:23)

- "From what the Chief initially said, he was on his knees, that he was running and he stopped and went to his knees and that he was surrendering and his hands were coming up like this, and he got shot."  (Knight Decl., Ex. 1 at 26:48-26:59)

- "Because this officer in my view was a panicky guy who had been involved in three other shootings, that he was scared to death by any little thing, shooting at anything that moved with a rifle, uh, you know that's, that's unconscionable, for me." (Knight Decl., Ex. 1 at 29:03-29:18)

- "This is a situation where the police department itself should have taken this man's gun away from him awhile ago.  He should not be on the streets of Vallejo policing the community with a gun.  Desk job if you're going to keep him, but certainly keep him away from the streets and particularly against black and brown people.  Ok, find a neighborhood where there are not black and brown people, let him do that, but he clearly is not a person that should be in a black and brown neighborhood." (Knight Decl., Ex. 1 at 37:12-38:37)

- "The question though is, right now we don't know who the next person that he's going to shoot or kill is.  We don't know when that will happen, but the odds are

very good there is going to be another person, and probably more than one if it keeps it up." (Knight Decl., Ex. 1 at 38:38-38:52)

- "The Captain says 'you've been here before, it's gonna all be alright'. That is a message that clearly had been sent to this officer before. It's gonna be alright, don't worry about it, we've got your back, don't worry." (Knight Decl., Ex. 1 at 39:12-39:24)

At the press conference, counsel used and referred to four large demonstrative poster-board exhibits to present their case to the media as though before a jury. Counsel further discussed the evidence involved in this incident and made arguments for how that evidence should be perceived and weighed. (Knight Decl., Ex. 1 at 15:50-16:12.) Plaintiffs' counsel discussed specific statements by the involved officer and others on scene that were made following the incident and raised arguments about the meaning and context (Knight Decl., Ex. 1 at 15:25-16:15, 18:15-18:50).

Although the Department has not identified the involved officer in compliance with a temporary restraining order and preliminary injunction prohibiting the City from disclosing the names of involved officers, Plaintiff's counsel discussed prior officer-involved shootings and civil lawsuits that Officer Tonn was involved in—the officer they believe was the shooting officer in this case. Officer Tonn became the subject of death threats. (Knight Decl., Ex. 1 at 14:57-15:25, 16:15-18:12).

Based on the authority, an intra-district transfer is required given the community's intense emotional reaction as shown by rallies, protests, public demands to defund the police and hold Vallejo Police Officers accountable, leaders' castigation of the Vallejo Police Department, the indelible link in the community to the Monterrosa shooting, Black Lives Matter, and George Floyd, and the relentless media storm.

### iii. A Change in Venue is Required due to the Media's Depiction of the Vallejo Chief of Police's Statements as Admissions

The media has repeatedly publicized purported admissions by Chief Williams that Sean Monterrosa was in a kneeling position with his hands raised when shot and killed These misstatements do not accurately reflect the circumstances surrounding the Monterrosa shooting. They will lead the community to mistakenly assume the City has admitted liability. With such

"admissions," potential jurors are likely to consider the "case closed" and will not base their verdicts upon the evidence presented at trial.

These purported admissions have saturated the local community.  (Decl. Knight, Exs. 1-3, 4-5, 10).  Where purported admissions have been publicized, "a change of venue motion should be granted."  In *Rideau v. Louisiana*, the Supreme Court held the denial of a defendant's motion for change in venue deprived him of due process after his confession was repeatedly broadcast to the community from which the jury was drawn.  *Rideau v. Louisiana,* 373 U.S. 723 (1963).  The Supreme Court cautioned, "a prospective juror who has read or heard of the confession or statement repeatedly in the news may well be unable to form an independent judgment as to the guilt or innocence from the evidence adduced at trial." *Nebraska Pres Asso. v. Stuart,* 423 U.S. 1327, 1333 (1975).  This is exactly the case here.

In the context of purported admissions, "the risk that the jury will not, or cannot follow instructions is so great, and the consequences of failure so vital to the defendant that the practical and human limitations of the jury system cannot be ignored."  *Bruton v. United States,* 391 U.S. 123, 135 (1968).  Simply put, the bell cannot be unrung.  When a defendant's purported admission is publicized, a change of venue "should be granted whenever requested" because voir dire "cannot cure the effect" of an admission.  *Oliver v. State,* 250 So. 2d 888, 890 (1971).

### iv.   Intra-District Transfer Should Not Be Delayed as *Voir Dire* is Not an Effective Cure Against Pervasive Prejudicial Publicity, and Transfer Before *Voir Dire* Serves Judicial Economy

District courts retain broad discretion in deciding motions to transfer which will not be reversed absent abuse of discretion.  *United States v. Dreitzler,* 577 F.2d 539, 552  (9th Cir. 1978); *Balawager v. Scott,* 160 F.3d 1066, 1067 (5th. Cir. 1998).  A large body of law casts doubt on *voir dire* as an effective measure against prejudicial publicity. The Supreme Court explains:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father.

*Irvin v. Dowd,* 366 U.S. 717, 72 (1961).

The law is not ignorant of the limits of human nature, especially in so charged a political climate.  The remedy for this is pre *voir dire* transfer.

In *Frazier v. Superior Court*, the California Supreme Court issued a writ directing the trial court to grant a motion to change venue based on defendant being identified as a hippie and the community's antagonism towards hippies.

> It would fly in the face of human nature to presume that jurors drawn from the Santa Cruz area, despite eventual claims of impartiality on voir dire, would not be affected in their deliberations, consciously or otherwise, by this pervasive community attitude with respect to hippies. There may not be, as the trial court found, hostility toward this particular defendant as an individual; but so long as there is hostility towards the group or subculture with which he is identified, he runs the very real risk of being judged not for what he has done but for what he is, or what he appears to be. We fashioned in *Maine* the remedy of a pretrial change of venue precisely to obviate such a risk.

*Frazier v. Superior Court,* 5 Cal.3d 287 (1971).

The Court of Appeal recognized, "[t]he average juror is not so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.  *Delaney v. United States,* 199 F.2d 107, 112-113 (1st Cir. 1952).  When prejudicial publicity has been injected into jurors' consciousness, the courts do not give dispositive effect to assurance of impartiality. *Sheppard v. Maxwell,* 384 U.S. 333, 351 (1966); *Marshall v. United States,* 360 U.S. 310, 312-313 (1959); *Irvin v. Dowd,* 366 U.S. 717, 724-725 (1961).  "To expect a juror to confess prejudice is not always a reliable practice. A juror can be completely honest in denying prejudice. In the words of Alexander Pope, 'All looks yellow to the jaundiced eye." *State v. Shawan,* 77 N.M. 354, 358 (1967). It is unrealistic to expect that jurors can insulate their verdicts from prejudicial publicity and inadmissible knowledge. *Bruton v. United States,* 391 U.S. 123, 128-130 (1968).

The science shows just how unrealistic this expectation is. A meta-analysis of 44 empirical tests representing 5,775 subjects concluded that subjects exposed to negative pretrial publicity were significantly more likely to judge a defendant guilty compared to subjects

exposed to less or to no negative pretrial publicity.  (Steblay, Nancy, Besirevic, Jasmina, Fulero, Solomon, Jimenz-Lorente, Belia, *The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytic Review*, 23 Law and Human Behavior No. 219 (1999).  Additionally, 53% percent of jurors exposed to damaging pretrial publicity voted to convict, despite claims they had not been biased by publicity, versus 23% percent of jurors not exposed to pretrial publicity.  (Stanley, Sue, Ronald E. Smith, *Authoritarianism, Pretrial Publicity, and Awareness of Bias in Simulated Jurors*, 37 Psychol. Reps. 1299, 1301 (1975).

Defendants recognize that there are cases suggesting the Court should wait until voir dire to ferret out bias.  However, the law does not always keep pace with science. Nor does it capture the gravity of this political climate. As the Supreme Court instructs "reversals are but palliatives" and the "cure lies in those remedial measures that will prevent the prejudice at its inception." *Sheppard v. Maxwell,* 384 U.S. 333, 363 (1966).

Transfer pre voir dire also preserves judicial resources.  Courts recognize that "effective and economic judicial administration is not well served by calling an inordinate and unweidly number of [potential jurors] to see if an unbiased jury might be obtained." *United States v. Engleman,* 489 F.Supp. 48, 50 (E.D. Mo. 1980).

Given the publicity that has saturated the community, this Court/counsel will need to conduct thorough, detailed, and time-consuming exams of a multitude of potential jurors to assure an impartial jury.  This trial is also likely to capture the community's attention and rally those calling to defund the police, hold officers accountable, and uphold the Black Lives Matter cause.  Given the climate, a juror may promise impartiality for the chance to render a verdict.  A verdict may be rendered from a conscious or unknown desire to enact social change and hold Vallejo Police Officers accountable for historical wrongs.  Human nature, the limits of *voir dire*, and judicial economy justify pre voir dire transfer.

**C.    Intra-District Transfer to the Fresno Division of this District is Appropriate under 28 U.S.C. Section 1404 and Local Rule 120**

Local Rule 120(f) permits the Court to transfer this action to another venue within the District for good cause. Under 28 U.S.C. section 1404 subdivision (c), a district court may order any civil action to be tried at any place within the division in which it is pending. The Court may

1  transfer this action "upon motion" … "in the discretion of the court" from the division in which

2  [it is] pending to any other division in the same district."  28 U.S.C. § 1404(b).  Courts have

3  broad discretion in considering requests to transfer under section 1404 which will not be

4  disturbed absent abuse of discretion.  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28 (1988);

5  *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1516 (10th. Cir. 1991).

6          "For the convenience of parties and witnesses" and "in the interest of justice" a district

7  court may transfer any civil action to any other … division where it might have been brought."

8  28 U.S.C. § 1404(a).  While Courts often apply the factors set forth in section 1404(a), intra-

9  district transfers are judged by a "less rigorous" standard.  *Edwards v. Sanyo Mfg. Corp*., No.

10  3:05CV00293-WRV U.S. Dist. LEXIS 98123 (E.D. Ark. Feb 27, 2007); *Johnson v. Burlington-*

11  *Northern, Inc.,* 480 F. Supp.259, 260 (W.D. Mo. 1979).

12          Courts consider the following factors in determining whether to transfer a case under

13  section 1404(a): (1) plaintiff's choice of forum; (2) the convenience of witnesses; (3) the

14  accessibility of witnesses and other sources of proof; (4) the possibility of obtaining a fair trial;

15  and (5) all other practical considerations that make a trial easy, expeditious, and economical,

16  including congested dockets.  *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509,

17  1516 (10th. Cir. 1991).  However, the "interest of justice" is the most important and decisive

18  consideration.  *Bankers Trust Co. v. Crawford,* 559 F. Supp. 1359, 1363 (W.D.N.Y. 1983)("the

19  paramount consideration [under 1404(a)] is the interest of justice"); *SB Designs v. Reebok Int'l*,

20  *Ltd.,* 305 F. Supp. 288 (N.D. Ill 2004)(the "interest of justice is a separate component of [section

21  1404(a)] … and may be determinative in a particular case, even if convenience of parties and

22  witnesses might call for a different result;"); *Pratt v. Rowland,* 769 F.Supp.1128 (N.D. Cal

23  1991)("fairness consideration may be decisive in ruling on a transfer motion, even when

24  convenience of witnesses and parties points the other way."); *Regents of Univ. of Cal. V. Eli Lily*

25  *& Co*., 119 F.3d 1559, 1565 (Fed. Cir. 1997).

26          Adverse publicity is a factor a court may consider in evaluating a request to transfer

27  under section 1404.  *New York v. Gen. Motors Corp.,* 357 F. Supp.327, 328 (S.D.N.Y 1973).  As

28  the Ninth Circuit states, "[w]hen the trial judge becomes aware through massive news coverage

1   that a fair trial cannot be had in the place where the action was filed, the judge has a duty to

2   protect the Defendant's rights to a fair trial." *Wash. Pub. Utilities Group. v. U.S. Distr. Court,*

3   843 F.2d 319, 326 (9th Cir. 1987). Here, the bombardment of prejudicial publicity threatens

4   Defendants' due process rights. This cardinal factor requires transfer.

5       Regarding a plaintiff's choice of forum, it is a single factor among others and should not

6   be given disproportionate weight, especially when weighed against constitutional guarantees.

7   *Norwood v. Kirkpatrick,* 329 U.S. 29 (1955); *Chance v. E.I Du Point de Nemours & Co.,* 371

8   F.Supp. 439 (E.D.N.Y. 1974). A court may justifiably find the effect of plaintiff's choice of

9   forum to be outweighed by more compelling considerations. *Moore v. Teflon Communications*

10  *Corp.,* 589 F.2d 959 (9th. Cir. 1978).

11      Regarding witnesses' convenience and accessibility of proof, most of the witnesses in

12  this action are likely to be Vallejo Police Officers who travel as a regular part of their jobs.

13  Plaintiffs have ample time to make arrangements for trial. To the extent any inconvenience

14  exists, the reality of modern times, the ease and availability of transportation, and the use of

15  remote options (e.g., Zoom) already used in the Fresno division allay such inconvenience. Most

16  importantly, some inconvenience cannot outweigh Defendants' due process rights, which rights

17  this Court is charged with protecting.

18                                  **IV.**

19                              **CONCLUSION**

20      Defendants respectfully request this Court protect its constitutional rights to a fair trial by an

21  impartial jury by issuing an order granting this motion for an intra-district transfer, transferring

22  this case to the Fresno division of this District, and awarding any different or further relief

23  deemed equitable.

24      Defendants have more than met their burden of proof. Intra-district transfers are judged by a

25  less rigorous standard than are motions to transfer venue There is a reasonable likelihood that a

26  fair trial cannot be had. As noted, this standard is less than "more probable than not" and all

27  doubts are resolved in favor of transfer. Alternatively, if for whatever reason the Court inclines

28  towards denying Defendants' request to transfer, Defendants request the Court permit oral

---

**Case No. 2:20-cv-01563-TLN-DB**                    **MOTION FOR INTRA-DISTRICT**
                                                      **TRANSFER OF VENUE**

argument.


DATED:  October 6, 2020                    Respectfully submitted,


                                           */s/ Meera Bhatt*
                                           MEERA BHATT
                                           KATELYN M. KNIGHT
                                           FARRAH HUSSEIN
                                           Attorneys for Defendants
                                           CITY OF VALLEJO and JARRETT TONN