Exhibit 1

Exhibit 1: See Thumb Drive Titled "Monterrosa 2:20-cv-01563-TLN-DB" under file name "Exhibit 1 June 2 Vallejo PD Press Conf. Video Monterrosa"

Exhibit 2



# VALLEJO POLICE OFFICERS' ASSOCIATION

**FOR IMMEDIATE RELEASE**
June 5, 2020
Contact: info@vallejopoa.org

## Vallejo Police Officers' Association Responds
## To Officer Involved Shooting

**Vallejo, CA** – Our society asks officers to respond to dangerous, unpredictable situations where they have to make split-second decisions with lives hanging in the balance. Tragically, one of our members was faced with such a circumstance following unprecedented looting and violence throughout the City of Vallejo. Throughout the night officers were responding to groups of armed looters all over the city. Seconds before this confrontation in the parking lot of a Walgreens, an officer put on the radio that it appeared the looters were armed. As officers arrived, Mr. Monterrosa was attempting to flee with others in a vehicle. Rather than continuing his escape, Mr. Monterrosa chose to engage the responding officers. Mr. Monterrosa abruptly pivoted back around toward the officers, crouched into a tactical shooting position, and grabbed an object in his waistband that appeared to be the butt of a handgun. At no time did Mr. Monterrosa make any movements consistent with surrendering. Fearing that Mr. Monterrosa was about to open fire on the officers in the vehicle, the officer was forced to fire multiple rounds through his windshield. The officer used deadly force as a last resort because he had no other reasonable option to prevent getting shot.

Now, after protecting himself and fellow officers from imminent death or great bodily injury, the officer is facing multiple death threats to him and his children. We ask the public to support this officer and the good work the overwhelming majority of all officers perform to keep our communities safe. The Vallejo Police Officers' Association proudly supports all the men and women that serve and protect the citizens of Vallejo.

For further media inquiries, please contact David P. Mastagni at Mastagni Holstedt, A.P.C. at
dmastagni@mastagni.com.

The Vallejo Police Officers' Association (VPOA) was incorporated in 1957.  The VPOA is the recognized bargaining unit between all Vallejo Police Officers and the City of Vallejo. Members include all ranks of officers – Captains, Lieutenants, Sergeants, Corporals and Officers.  The VPOA does not represent the Chief of Police. The business function of the VPOA is to protect the collective interests of the members of the Vallejo Police Department and provide benefits to its members.
The VPOA is also committed to the safety and security of the citizens of Vallejo and the protection of life and property.
For more information, please visit www.vallejopoa.org

###

Exhibit 3



FOR IMMEDIATE RELEASE
DATE: July 8, 2020
MEDIA CONTACT: Brittany K. Jackson, Public Information Officer -
Vallejo Police Department - VallejoPolicePIO@cityofvallejo.net

## VALLEJO PD TO HOLD PRESS CONFERENCE ON THE RELEASE OF FOOTAGE FROM JUNE 2ND OFFICER-INVOLVED SHOOTING

**VALLEJO** - Today, the Vallejo Police Department (VPD) will be holding a private press conference at 3:00pm in the VPD Classroom regarding the release of body-worn camera footage from the June 2, 2020 officer-involved shooting. Chief Shawny Williams will host the conference, and the media is invited to attend to ask questions regarding the video release.

For additional information, please contact Vallejo Police Department's Public Information Officer, Brittany K. Jackson by phone at (707) 651-7147  or by email at VallejoPolicePIO@cityofvallejo.net.

###



Exhibit 4

Exhibit 4: See Thumb Drive Titled "Monterrosa 2:20-cv-01563-TLN-DB" under file name "Exhibit 4 VPD Press Conference Video Monterrosa"

Exhibit 5

Exhibit 5: See Thumb Drive Titled "Monterrosa 2:20-cv-01563-TLN-DB" under file name "Exhibit 5 Body Cam Video with Press Statements Monterrosa"

Exhibit 6

# JOHN L. BURRIS

www.johnburrislaw.com

John L. Burris

Ben Nisenbaum

Adanté D. Pointer

DeWitt M. Lacy

Lateef H. Gray

James A. Cook

Melissa C. Nold

john.burris@johnburrislaw.com

bnisenbaum@gmail.com

adante.pointer@johnburrislaw.com

dewitt.lacy@johnburrislaw.com

lateef.gray@johnburrislaw.com

james.cook@johnburrislaw.com

melisssa.nold@iohnburrislaw.com

06/05/2020

Randy Risner, Esq.
Interim City Attorney
City Attorney's Office
555 Santa Clara Street
Vallejo, California 94591

Re: Preservation of Evidence: Sean Monterrosa

Dear City Attorney Risner,

We have been retained by the family of Sean Monterrosa, who was shot and killed by one or more Vallejo Police Department employees, on June 2, 2020. This is a formal notice of your legal requirement to preserve evidence related to this incident. Please be advised that this letter constitutes written, formal demand that your office and/or the Vallejo Police department and/or any agent(s) acting on behalf of the City of Vallejo, preserve, protect, gather, secure, save or otherwise refrain from disposing of any relevant documents or other tangible evidence. This list includes but is in no way limited to the following items: the full names of the involved officers, any and all video footage, body mounted camera footage, patrol car dash cam footage, cell phone footage, any and all video footage, blood samples, physical evidence, tests, notes, handwritten notes, records, reports, tapes, any and all memorandums, messages, recordings, photographs of the crime scene, journals, logs, tape transcripts, Ampex radio tape broadcasts, investigations, examinations, any and all property seized or removed from the crime scene, reports and statements taken from witnesses regarding the incident, and any and all documents prepared, and any other written material concerning this incident.

Your office and the Vallejo Police Department are also hereby put on notice that your department and/ or agency may be held civilly or criminally liable for the destruction and/ or loss of any of the above- referenced items of evidence. If you have any questions, please let us know.

Sincerely,

Melissa C. Nold, Esq.

Exhibit 7

Case 2:20-cv-01563-TLN-DB   Document 17-2   Filed 11/19/20   Page 14 of 56

 Gmail                                                        **Crystal Mackey <crystal.mackey@johnburrislaw.com>**

---

## Fwd: Monterrosa Meet and Confer: Rule 11 issues

**Ben Nisenbaum** <bnisenbaum@gmail.com>                                        Mon, Nov 16, 2020 at 12:22 PM
To: Crystal Mackey <crystal.mackey@johnburrislaw.com>

    and my meet and confer and their response to it.

    ---------- Forwarded message ---------
    From: **Katelyn Knight** <Katelyn.Knight@cityofvallejo.net>
    Date: Tue, Nov 3, 2020 at 10:46 AM
    Subject: RE: Monterrosa Meet and Confer: Rule 11 issues
    To: bnisenbaum@gmail.com <bnisenbaum@gmail.com>
    Cc: john.burris@johnburrislaw.com <john.burris@johnburrislaw.com>, burris@lmi.net <burris@lmi.net>, Randy J. Risner
    <Randy.Risner@cityofvallejo.net>, Meera Bhatt <Meera.Bhatt@cityofvallejo.net>, Farrah Hussein <Farrah.Hussein@cityofvallejo.net>, Rachel
    Carranza <Rachel.Carranza@cityofvallejo.net>


    Mr. Nisenbaum:


    Not only is the motion for protective order meritorious, it is clear that such an order is necessary in this case to protect Defendants' right to a
    fair trial.


    The City of Vallejo's limited release of information related to the underlying incident is fundamentally different from the extensive media
    campaign led by your office, both in its aim and scope.  The City's release of information related to the underlying incident has been driven by
    its obligations under the Public Records Act and its duty of transparency as a public entity.  The press conference you reference on July 8,
    2020 took place following the release of video footage depicting the incident, which was required to be released within 45 days of the
    incident pursuant to Government Code Section 6254(f)(4)(A)(ii).  The press conference was held for the purpose of answering questions
    about the video release (*see* https://vallejopd.net/common/pages/DisplayFile.aspx?itemId=16985922).


    Video footage showing the destruction of the exterior Walgreens video camera days before the incident was released to demonstrate why
    there was no exterior footage from Walgreens cameras depicting the shooting.  The footage is clearly identified by date and the compilation
    video released by the City expressly stated that the security camera in question was destroyed in a previous looting incident
    (https://vimeo.com/436510158 at 3:52).  The City has never suggested that Monterrosa was involved in the prior looting incident.


    The City has released basic information about what occurred and has responded to questions from the public and media, while reiterating
    that the investigation into the matter is in its early stages and only limited information could be shared.  These releases do not have any
    bearing on Defendants' need for a protective order.  By contrast, your office has spoken at length about the evidence and the background and
    character of the parties, given multiple press interviews, and even held a 46-minute press conference with demonstrative exhibits explaining
    what Plaintiffs would establish at trial.  Clearly, your office hopes to influence the outcome of this matter by creating extensive media
    coverage.  The limited statements made by the City and the extensive media campaign waged by the Plaintiffs are not comparable.


    To the extent that you think there is an issue of fairness present, Defendants would be happy to stipulate to a protective order binding all
    counsel from making statements as outlined in our motion.  Please let me know if you would be amenable to such a stipulation.


    Finally, you have suggested that the motions filed by defense counsel may have been motivated either by an antipathy toward Plaintiffs'
    former counsel Melissa Nold or due to pressure from the Vallejo Police Officers' Association.  I find both suggestions offensive.  Defendants'
    motions are motivated entirely by our desire to protects Defendants' right to a fair trial.  We have had no discussions with the VPOA and have
    no idea what their views are respecting the motions.  Further, we have no antipathy toward Ms. Nold and have no concern about her feelings
    on this matter one way or the other.

Rule 11 provides that a signatory certifies to any motion presented to the court that it is not being presented for an improper purpose, the legal contentions are warranted by existing law, and that the factual contentions and denials have evidentiary support.  For the reasons discussed above, and as is evident from Defendants' motion for protective order and supporting exhibits, the motion meets each of these requirements.


Sincerely,


**Katelyn M. Knight**

**Assistant City Attorney**

*City of Vallejo | City Attorney's Office*

*555 Santa Clara Street*

*Vallejo, CA 94590*

*707.648.4388 |* *katelyn.knight@cityofvallejo.net*





---

**From:** Ben Nisenbaum [mailto:bnisenbaum@gmail.com]
**Sent:** Tuesday, October 27, 2020 2:29 PM
**To:** Meera Bhatt <Meera.Bhatt@cityofvallejo.net>; Katelyn Knight <Katelyn.Knight@cityofvallejo.net>; Farrah Hussein <Farrah.Hussein@cityofvallejo.net>
**Cc:** John Burris <John.burris@johnburrislaw.com>; John Burris <burris@lmi.net>
**Subject:** Monterrosa Meet and Confer: Rule 11 issues


Counsel,


I'm reviewing your motion for a gag order. It is meritless and in my view violates Rule 11. In fact, On July 8, 2020, more than 1 month after your clients were notified Plaintiffs were represented by instant counsel, and certainly aware there would be litigation in this case, Chief Williams held a press conference (footage of which is still available on line), in which he asserted certain factual claims as "that's accurate, that's factual", including a claim that Mr. Monterrosa "was in a crouching, half kneeling position. His hands were towards his waistband when turned towards the officers. The officers perceived the butt of a gun and they shot. That's accurate, that's factual."


Of course, since Defendants also claim there is no direct video of Mr. Monterrosa at that time, it is unclear how the Chief could know this information is accurate or factual.  Your clients also released video footage designed to improperly and knowingly falsely disparage Mr. Monterrosa in showing subjects, none of whom are identifiable as Mr. Monterrosa, apparently vandalizing a security camera. This did not occur during the shooting, and the pretext for showing this act of destruction apparently unrelated to Defendants' conduct and Mr. Monterrosa, was to explain that this surveillance camera was not working.  It was obviously inflammatory to show this video of the vandalism of the ATM and had no bearing on the subject-incident shooting.


It is clear that the press conference held by Chief Williams on July 8 was an effort to condition members of the public to Defendants' false propaganda, knowing that Plaintiffs were represented by counsel and that there would be litigation forthcoming.  Of course, we are at least 2 years (and possibly much longer) from a trial, and the likelihood that anyone in the jury pool will remember these press conferences is likely very low.


However, Defendants intentionally omit Chief Williams press conference and the video presentation released publicly from their motion. It is galling that Defendants accuse Plaintiffs of doing exactly what Defendants have themselves done, and totally omitted Defendants' own public statements from their motion. In our view, this is a material, intentional omission sanctionable under Rule 11.


Correct the omission of Defendants public statements immediately. Your motion is substantively and materially misleading without such inclusion.  If that is not done in short order, I will file a motion for sanctions for violating Rule 11 along with our oppositions when they are due.

It may be, based on the declarations submitted in your motions and its conspicuous activities, that the Vallejo POA has pressured you into filing these motions (for a protective order and change of venue). That does present not a good-faith basis for filing these motions.


Also, be advised that Ms. Nold is no longer with our office, but I am well-aware of the Vallejo POA's antipathy toward her. It seems that these motions do not come from a well-considered place.


Before I invest significant time in opposing them, I ask that you withdraw both your Motion for Protective Order and your Change of Venue Motion. They are both sorely wanting. Defendants do not get to be the only party that speaks publicly. The effort to impose prior restraint and infringe on Plaintiffs' First Amendment rights, while the Defense has wantonly exercised its own First Amendment rights in this case, is unconscionable and baseless, particularly in light of Defendants own actions and conduct.


Consider this my effort to meet and confer. I do think your material omissions are sanctionable. They put your motion in a totally different light than how you misrepresent it to the Court.


yours truly,
Ben


****************** This is an EXTERNAL EMAIL. Stop and think before clicking links or opening attachments. ******************

Exhibit 8

**NEWS** › **CRIME AND PUBLIC SAFETY** • News

# Exclusive: Vallejo officer who killed SF man had three prior shootings as a policeman

Officer mistook hammer for a gun, police say

By **DAVID DEBOLT** | ddebolt@bayareanewsgroup.com, **NATE GARTRELL** | ngartrell@bayareanewsgroup.com and **JOHN GLIDDEN** | Bay Area News Group
PUBLISHED: June 5, 2020 at 6:03 a.m. | UPDATED: June 5, 2020 at 10:25 p.m.

VALLEJO — The Vallejo police officer who shot and killed 22-year-old Sean Monterrosa in the early morning hours of June 2 has been identified by multiple law enforcement sources as a longtime cop who has fired his duty weapon on three previous occasions since 2015.

The officer, Jarrett Tonn, shot and killed Monterrosa a little after 12:30 a.m. Tuesday, after reportedly mistaking a hammer in Monterrosa's sweatshirt pocket for a gun. Vallejo Police Chief Shawny Williams said Wednesday the officer fired through the windshield of his own patrol car at Monterrosa; he fired a total of five shots, but police have not said how many times Monterrosa was struck.

Tuesday's shooting marks the fourth time in five years that Tonn has fired his gun at a person while on duty, including two shootings within six weeks in 2017, and a shooting in 2015 where he fired 18 times. None of the three prior shootings resulted in a death; internal investigations cleared Tonn of wrongdoing each time.

Williams said at a news conference that Monterrosa was shot while in a "half-kneeling position," which the officer interpreted as Monterrosa readying himself to shoot. Monterrosa's family have told reporters they believe he was surrendering to police when the officer fired.



"They executed him. There was no reason for them to kill my brother like that," Monterrosa's sister, Ashley Monterrosa, told ABC7 News.

On Friday evening the Vallejo police union put out a news release saying that Monterrosa didn't surrender but, "abruptly pivoted back around toward the officers, crouched into a tactical shooting position," and that the hammer "appeared to be the butt of a gun. It adds that the officer fired, "as a last resort." The news release doesn't refer to Tonn by name.

The officer who fired his weapon has been placed on paid administrative leave, along with an unspecified number of other "witness officers," police said.

Tonn could not be reached for comment. Vallejo police officials have also refused to identify the officer and said releasing the names of officers in such incidents threatens their safety, as well as that of officers in the department not involved in the shooting.

The police union news release also says that the officer and his family are receiving death threats, and, "we ask the public to support this officer and the good work the overwhelming majority of all officers perform to keep our communities safe."

Tonn and the other officers were responding to reports of looting at a Walgreens on the 1000 block of Redwood Street in Vallejo. Monterrosa was one of about a dozen people present in the parking lot, several of whom began to flee when officers arrived, police said. Williams said police were called to the Walgreens multiple times that morning and the prior evening, in response to looting that occurred across the city in the wake of protests over the killing of George Floyd in Minneapolis.

On Wednesday, Williams said that the officer who shot Monterrosa "responded to a perceived threat," but refused to say if he thought the officer's shooting constituted excessive force. Williams said the looting in Vallejo Monday night and Tuesday morning was the worst he'd seen in his law enforcement career. Earlier in the evening, an officer had been injured in the same Walgreens parking lot after a sedan rammed into a responding patrol car.

Vallejo police waited more than 24 hours after Monterrosa's death to publicly confirm that a person had been killed by a police officer. The National Guard arrived in Vallejo on Tuesday, at the request of the city manager and police chief.

Over the past decade, Vallejo cops have shot 32 people, 18 of them fatally; no officer has been fired for their role in a police shooting in that time.

"The administration, chief and the command staff ratifies the conduct of the police officers, therefore making them think they have a level of immunity," civil right attorney John Burris, who has called for police reform measures in Vallejo since 2019, said Friday. "There's a classic code of silence that exists, all for one and one for all. You can't trust the internal affairs department and I don't. You can't trust this department."

California Attorney General Xavier Becerra announced Friday his office is opening a review of the Vallejo police force dating back to 2013.

"Our communities are safer when our police departments can build public trust through good policies, practices, and training. This review and reform agreement we announce today with the City of Vallejo represents a critical step the Vallejo Police Department must take to build trust with people who have lost faith in them," Becerra said in a statement.

U.S. Congressman Mike Thompson and state Assemblyman Tim Grayson had both called for an independent investigation into the shooting. Grayson said it was "absolutely unacceptable" police waited so long to confirm Monterrosa's death.

# Four shootings in five years

In May 2018, Tonn was sued by Vallejo resident Robert Strong, who alleges Tonn put him in a chokehold, took him to the ground and scraped his head against the concrete after Strong tried to film the officer with his cell phone. Strong was being pulled over for a minor traffic violation and Tonn activated his body camera moments before pulling Strong from the car, according to the suit.

On May 31, 2017, Tonn and another officer — Sean Kenney — shot and wounded Kevin DeCarlo while attempting to arrest DeCarlo on a felony warrant. The officers later testified DeCarlo rammed Kenney's car, and that they believed he was reaching for a weapon. Several officers on scene had body cameras, but they weren't activated until after the shooting.

Less than two months later, after returning to duty, Tonn chased a suspect following a violent carjacking and fired at him three times, believing the man, 33-year-old Victor Hurtado, had a gun. The bullets did not strike anyone and Hurtado was arrested later that day.

In 2015, Tonn was one of two officers identified as shooting and wounding Gerald Brown, 23, after he allegedly rammed a police vehicle with a car. Following the shooting, a Critical Incident Board of Review cleared Tonn and Officer Gary Jones in the incident.

The incident began when officers attempted to pull over Brown, who was driving a stolen vehicle. After a short pursuit, Brown allegedly backed up his car into the officers' cruiser as the pair were exiting the car. The officers fired a total of 19 shots — 18 by Tonn, and one by Jones — in two seconds. Brown was struck by the gunfire but survived and was booked into jail.

Tonn began his law enforcement career in 2007 with the Galt police department, according to public records. In 2013, his cousin and fellow Galt policeman, Officer Kevin Tonn, was shot and killed. Jarrett Tonn was one of the first officers at the scene, and spoke at his cousin's funeral. The following year, he transferred to the Vallejo Police Department.

111 Amador Street in Vallejo, CA

Report an error
Policies and Standards
Contact Us

Ⓣ The Trust Project

Tags:   **Police Killing**,   **Regional**

**David DeBolt** | Senior breaking news reporter

David DeBolt is a senior breaking news reporter for the San Jose Mercury News and the East Bay Times of Oakland. Over the past decade, DeBolt has covered

the deadly San Bruno PG&E pipeline explosion, police and government corruption, California wildfires and Oakland City Hall. He was part of the East Bay Times staff honored with the 2017 Pulitzer Prize for coverage of the Ghost Ship warehouse fire.

ddebolt@bayareanewsgroup.com

Follow David DeBolt @daviddebolt



# Nate Gartrell | Contra Costa County courts reporter

Nate Gartrell covers crime and corruption in Contra Costa County. He joined the Bay Area News Group in 2014.

ngartrell@bayareanewsgroup.com

Follow Nate Gartrell @NateGartrell



# John Glidden

## SUBSCRIBE TODAY!
### ALL ACCESS DIGITAL OFFER FOR JUST 99 CENTS!

Exhibit 9

LETTER FROM CALIFORNIA NOVEMBER 23, 2020 ISSUE

# HOW A DEADLY POLICE FORCE RULED A CITY

*After years of impunity, the police in Vallejo, California, took over the city's politics and threatened its people.*

**By Shane Bauer**

November 16, 2020



*The sisters of Sean Monterrosa, who was killed by the police, hold his portrait.*   Photograph by Carolyn Drake / Magnum for The New Yorker / Painting by Andrew Durgin-Barnes

▶                        0:00 / 48:38

**Audio:** Listen to this article. To hear more, download Audm for iPhone or Android.

hree police officers in an unmarked pickup truck pulled into the parking lot of a Walgreens in Vallejo, California, responding to a call of looting in progress. It was just after midnight on June 2nd, and a group of people who had gathered around a smashed drive-through window quickly fled in two cars. Sean Monterrosa, a twenty-two-year-old from San Francisco, was left behind. As the police truck closed in on Monterrosa, Jarrett Tonn, a detective who had been with the Vallejo police force for six years, was in the back seat, aiming a rifle. No one told Monterrosa to freeze or to put his hands up, but he fell to his knees anyway. As the truck came to a stop, Tonn fired five rounds at Monterrosa through the windshield.

A week earlier, a police officer in Minneapolis had killed George Floyd. Now the Bay Area was in the throes of an anti-police uprising. People marched, drove in caravans, and painted tributes to Floyd on walls and boarded-up windows. Police in Oakland, about thirty miles from Vallejo, launched tear gas at protesters, who gathered in intersections, blocked traffic on the freeway, looted stores, and lit fires in two banks. A man linked to the far-right Boogaloo movement was charged with killing a security officer outside a federal building. People ransacked malls in San Francisco, San Leandro, and the wealthy suburb of Walnut Creek, stealing from Best Buys, Home Depots, video-game stores, small businesses, and marijuana dispensaries. More than seventy cars were taken from a dealership; a gun shop was robbed of twenty-nine firearms. A curfew was instituted in Vallejo, but many people defied it. When Monterrosa got to the Walgreens, the store had already been looted.

Forty-seven minutes before Monterrosa was killed, he sent a text message to his two sisters, asking them to sign a petition calling for justice for Floyd. Monterrosa, whose parents emigrated from Argentina, had been critical of the police since, at the age of thirteen, he received citations for selling hot dogs outside night clubs. As teen-agers, Monterrosa and his sisters went to protests for people killed by cops in San Francisco: Jessica Williams, Alex Nieto, Mario Woods. In 2017, Monterrosa was arrested on weapons charges, for allegedly shooting into a building; he returned from jail covered in bruises. (The case was dismissed after his death.) He told his family that the police had smacked his head against the concrete in his cell.

When Monterrosa was young, the neighborhood where he grew up, Bernal Heights, was largely Black and brown, but as tech companies moved in San Francisco became richer and whiter. Now, Monterrosa's mother says, their family are the only Latinos on the block. Sean encouraged her to know her rights as a documented immigrant. His mother generally thought that the police were a force for good, but Sean disagreed, saying they were out to get Black and brown people.

Monterrosa loved San Francisco, but he couldn't afford to live there. Since the age of eighteen, he'd moved back and forth between the suburbs and his parents' place, working a variety of jobs. He got a carpentry position two months before the Bay Area issued shelter-in-place orders in response to the coronavirus, then he was laid off. He moved in with a new girlfriend. A couple of days later, he came to the Walgreens.

After Tonn shot Monterrosa, he got out of the truck and turned his body camera on.

"What did he point at us?" Tonn asked.

*When Monterrosa got to the Walgreens, the store had already been looted.*   Photograph by Carolyn Drake / Magnum for The New Yorker

"I don't know, man," an officer said.

"He pointed a gun at us!" Tonn shouted.

"Do not move!" the officers yelled, training their weapons on Monterrosa, who lay limp on the pavement in a pool of blood. Two of them reached down and rolled him over, revealing a hammer sticking out of his pocket.

"Oh, fuck," Tonn exclaimed.

"You're good, man," an officer said.

The officers cuffed Monterrosa.

"Fucking stupid!" Tonn shouted. He kicked the truck. "This is not what I fucking needed tonight," he told a captain. "I thought that fucking axe was a gun."

"Calm down," the captain said. "Take some deep breaths."

Tonn inhaled deep and slow.

"You're going to be all right," the captain said. "We've been through this before."

Since the killing of Michael Brown in <u>Ferguson, Missouri</u>, in 2014, protest movements have pushed big cities to reform their policies on when a police officer can use force. According to the database Mapping Police Violence, homicides by police in America's thirty largest cities have declined by about thirty per cent since the year before the Ferguson protests. Yet they have not

decreased nationwide. In rural and suburban areas, police killings have been on the rise for years, and roughly three-quarters of police homicides now occur in those areas. The killing of Monterrosa received some national media attention, because of the moment in which it occurred. But in Vallejo it was one more in an ongoing litany of police killings.

Vallejo, a postindustrial city of a hundred and twenty-two thousand people, is best known for its Six Flags amusement park and for its musicians: E-40, Mac Dre, H.E.R. Its per-capita income is less than half that of San Francisco, and its population is more diverse, split among whites, African-Americans, Latinos, and Asians. Its police force, however, consists largely of white men who live elsewhere. Since 2010, members of the Vallejo Police Department have killed nineteen people—a higher rate than that of any of America's hundred largest police forces except St. Louis's. According to data collected by the anti-police-brutality group Campaign Zero, the V.P.D. uses more force per arrest than any other department in California does. Vallejo cops have shot at people running away, fired dozens of rounds at unarmed men, used guns in off-duty arguments, and beaten apparently mentally ill people. The city's police records show that officers who shoot unarmed men aren't punished—in fact, some of the force's most lethal cops have been promoted.

The failure to hold police officers accountable has been an issue in Vallejo for as long as anyone can remember. According to confidential city documents, twenty-five years ago one officer shot another while drinking in a bar, and wasn't fired. A cop with a drug problem kept his job even after he was caught stealing from evidence lockers and was arrested for prescription fraud. Twenty years ago, a lieutenant told a new officer named Joseph Iacono that, when a suspect runs away, the officer should use enough force to put the man in the emergency room. To see if Iacono could fight, he was placed in a holding cell with an uncoöperative suspect. Iacono is now the department's Lead Force Options Instructor and, according to the documents, likes to say, "It can't be awful if it's lawful."

In the past ten years, Vallejo has paid nearly sixteen million dollars in legal settlements involving the police, many thousands of dollars more per officer than America's largest police departments. None of that money has come from officers; it is paid by Vallejo and its insurers. Police violence has cost the city so much money that, in 2018, the statewide insurance pool that helped pay its legal fees took the unprecedented step of raising Vallejo's annual deductible, from five hundred thousand dollars to $2.5 million, prompting the city to find another insurer. Vallejo is currently facing at least twenty-four use-of-force cases, which it estimates could cost some fifty million dollars.

"Vallejo police have been acting as if they own Vallejo for a long time," Stephanie Gomes, a former city-council member, told me. In 1969, two weeks after the Zodiac killer shot a couple in Vallejo, officers staged the first-ever strike by law enforcement in California. They had been receiving "top salary," one newspaper wrote, but, after refusing to work for five days, they won a seven-per-cent wage increase.

At the time, Vallejo was a relatively prosperous city. A naval shipyard provided thousands of jobs, and the median income was on a par with San Francisco's. But, in the mid-nineties, the shipyard closed, and Vallejo lost its main source of revenue. In the following years, the city became less white, and poverty increased. Fearing cuts, the police union, the Vallejo Police Officers' Association, identified city-council candidates who were friendly to its interests. The V.P.O.A. contributed money to their campaigns and launched attacks against those who opposed them.

The V.P.O.A.'s strategy, Gomes told me, was to try to "elect a majority of people who will vote for lucrative contracts and pretty much whatever they want." When Gomes ran for city council in 2005, she met with representatives of Vallejo's unions, including

police and firefighters. She said that one of them asked her, "If you win, will you stay bought?" The Vallejo P.D.'s approach seemed successful. Between 2000 and 2007, the police received a fifty-five-per-cent wage increase. Vallejo had one of the lowest per-capita incomes in the Bay Area but the best-paid police force.

After the housing bubble burst in the mid-two-thousands, the city's finances deteriorated further. In 2007, it had an eight-million-dollar deficit, which was projected to double within a year. In the hope of avoiding collapse, Vallejo hired a new city manager, Joe Tanner. To Tanner, the source of Vallejo's financial problems was clear: three-quarters of its general fund was going to police and firefighters. Gomes led an effort to reduce their pay, but the unions defeated the city in arbitration, forcing it to limit street repairs and to eliminate funding for the senior center and the library. "Every citizen of Vallejo works to pay the salaries of the police and fire unions," a resident wrote to the local paper. "All we talk about is cutting services to feed the greed and avarice of the public safety unions."

Tanner and Gomes saw no choice for the city but to declare bankruptcy and renegotiate the unions' contracts. The problem, Tanner told me, was that "the cops owned the council." The majority of city-council members were endorsed by the public-safety unions, and they refused to vote in favor of bankruptcy. One day, Tanner said, a Vallejo cop approached him in a restaurant in a nearby town and told him, "You're gonna get yours." An anonymous caller threatened to burn his house down. His Jeep was keyed several times and its tires were slashed. Eventually, Tanner threatened to declare a state of emergency and lay off the entire police and fire departments. The council gave in, and, in May, 2008, Vallejo became the largest city in California ever to declare bankruptcy.

By 2011, owing to retirements and a hiring freeze, the police force had shrunk to ninety officers, around sixty per cent of its pre-bankruptcy size, and the police budget had been cut by about a third. The union had warned that the cuts would lead to an increase in crime—a billboard in the city read "PUBLIC SAFETY IS DISAPPEARING"—but, in the two years following Vallejo's bankruptcy, violent crime decreased by a quarter.

Police in other parts of the country worried that Vallejo's approach could spread. In 2008, the magazine *American Police Beat* published an article, titled "TIME TO CIRCLE THE WAGONS," which warned police departments that, as the country fell into a recession, "highly compensated law enforcement agencies" should be worried. Police unions should be prepared to "identify the vocal critics and make them feel your pain. Somehow this seems to be where the unions get queasy and weak-kneed." The article went on, "It is often difficult to convince yourself or the members to picket some councilman's business, put their home telephone numbers up on billboards, and in general make their lives a living hell. . . . Get dirty and fight to win."

A s Vallejo was arguing for bankruptcy in court, Gomes told me, police cars and motorcycles drove by her house multiple times a day, and officers revved their engines and looked into her front window. One officer, Steve Darden, wrote a rap song about Gomes and posted it online. It included these lines:

I'm plain sick and tired of all the trash you're talkin'
When the truth comes out we gonna send you walkin' . . .
You're the worst kind causing all these problems
When it starts heating up you run and hide in your closet . . .
Be careful what you wish for it could come true
As we all watch the plan backfire on you

Darden has produced a number of albums about being a cop in Vallejo. A common theme is the unfair treatment of police. Yet Darden has a long history of disturbing behavior. In 2010, he told a defendant in court that if he didn't stop glaring at him he would knock him out and make him "leave on a gurney." In 2011, Darden responded to a 911 call from a man who said he'd been beaten and robbed by his housemates. The man identified himself as a U.S. soldier and scolded Darden for taking forty-five minutes to arrive. Darden hit him in the face and took him to the ground, shouting, "You are talking to a United States marine!" According to an investigation by Open Vallejo, a nonprofit news Web site, Darden is one of a group of officers who have bent the tips of their badges to commemorate fatal shootings—an accusation that Darden has denied. He has been the primary shooter in two killings, and a recent photograph appears to show two bent tips on his badge. This year, he was promoted to lieutenant.

When Gomes arrived home one day, her neighbor told her, "Something really dirty just happened." The alarm on Gomes's house had been tripped, and two police officers had responded. The neighbor had seen them pry open a window and spend at least twenty minutes inside. Hours later, on the blog of a local newspaper, anonymous accounts posted about her personal items, including a satirical collage made by a friend that depicted Gomes as the mastermind behind the city's bankruptcy and police cuts. Gomes complained to the city, and the police chief ordered the cops to stop driving by her house.

If the police were willing to harass Gomes so persistently, she wondered what they did to people who had no power. After she was reëlected, in 2009, she proposed forming a citizens' advisory committee to review complaints against the police. When she presented her proposal at City Hall, cops filled the chamber and booed. One said that Gomes was "scapegoating" the police. Another said that the force was being "subjected to hate and tyranny."

*The steps outside the Vallejo police station.*  Photograph by Carolyn Drake / Magnum for The New Yorker

Although the committee was ultimately approved by the city council, its duties were watered down to producing a report of nonbinding recommendations. Its seven voting members were white, and three of them were former police officers.

Shortly after Sean Monterrosa was killed, the V.P.O.A. issued a statement saying that, before he was shot, he "abruptly pivoted back around toward the officers, crouched into a tactical shooting position, and grabbed an object in his waistband that appeared to be the butt of a handgun." The statement, which neglected to say that Monterrosa had not been armed, asserted that "the officer used deadly force as a last resort because he had no other reasonable option to prevent getting shot." Each week, people

marched from City Hall to protest Monterrosa's killing. The V.P.O.A., on its Facebook page, condemned the "screaming angry mob mentality and profound anger directed at the police."

Nationwide, more than eighty per cent of police officers are represented by unions, and a 2006 report by the Bureau of Justice Statistics found that unionized police departments received complaints about their members' use of force at a rate thirty-six per cent higher than that of non-unionized departments. In 2019, a University of Chicago study of sheriff's deputies in Florida found that, when the deputies unionized, their violent misconduct increased by forty per cent.

Strong police unions also make it harder for cops to be punished. Officers can appeal sanctions through multiple reviews, and most departments allow appeals to be heard by an arbiter selected in part by the police union. According to a 2017 examination by the Washington *Post*, among departments that coöperated with its survey, roughly a quarter of cops fired for misconduct since 2006 were reinstated after an appeal. (In San Antonio, the share was seventy per cent.)

Five months before Monterrosa was killed, the V.P.O.A. had replaced its president, Detective Mat Mustard, who had run the union for ten years. Mustard was notorious in Vallejo for the investigation he led into the kidnapping of a woman named Denise Huskins, in 2015. Someone broke into the house where she and her boyfriend were sleeping, blindfolded and drugged them, and put her in the trunk of a car. When the boyfriend reported the crime, Mustard suspected that he had killed Huskins and invented the kidnapping story. At the police station, the boyfriend said, officers dressed him in jail clothes, then Mustard and others interrogated him for eighteen hours, calling him a murderer. Huskins, who was being held a hundred and sixty miles away, was raped repeatedly. After she was released, the Vallejo police publicly accused her and her boyfriend of faking the kidnapping, comparing the situation to the movie "Gone Girl." The police threatened to press charges against the couple, and after the rapist e-mailed the San Francisco *Chronicle*, confessing to the kidnapping, the police accused Huskins and her boyfriend of writing the e-mail. Soon, the rapist was arrested in South Lake Tahoe, after trying to repeat the crime. Even then, the Vallejo police insisted that Huskins and her boyfriend were lying. The couple sued Mustard and the city, eventually winning a $2.5-million settlement. In a show of defiance, the police department named Mustard officer of the year.

The new president of the V.P.O.A., Michael Nichelini, had been on the police force in Oakland before he joined the Vallejo P.D., in 2006. In 2003, he participated in the suppression of an antiwar demonstration, in which police shot wooden dowels and rubber bullets at people who were blocking traffic in the city's industrial port. Nichelini, along with other traffic officers, used his motorcycle to push back the protesters, striking at least one person.

According to an article in the Berkeley *Daily Planet*, youth of color in Oakland called Nichelini "Mussolini," because of his reputation for racism. At least four civil-rights complaints were filed against him to the Oakland Citizens' Police Review Board. In 2004, the board found that he had used excessive force after stopping a seventeen-year-old boy driving a truck on a suspended license. The boy claimed that Nichelini asked, "Are you a nigga or *ese*?," and the board found that he used his knees to hit the back of the teen-ager's head against the pavement.

Nichelini's father, Robert, was Vallejo's chief of police when his son joined the force. Robert Nichelini, who had also come from the Oakland Police Department, assured the Vallejo *Times-Herald* that his son had a "perfect record." Vallejo is "such a family oriented city," he told the paper. "What is wrong with a son following a father's footsteps in the Vallejo Police Department?"

In 2019, eighteen-year-old Carlos Yescas and his twelve-year-old brother drove to a food market in a car with no license plate. According to a complaint that Yescas filed with the city, Michael Nichelini, who was in plain clothes, approached them and told

Yescas, "You know you fucked up, right?" Yescas said that Nichelini didn't identify himself as a police officer but insisted on seeing Yescas's I.D. Nichelini then told him that "he was going to take his car and keep it." He reached into the car, grabbed the keys, and cuffed Yescas. As Yescas's brother filmed, Nichelini pulled Yescas from the vehicle, even though he was wearing a seat belt. Yescas called Nichelini a "white piece of shit," and Nichelini threw him to the ground and knelt on his back as Yescas repeatedly said, "I can't breathe." Yescas's car was confiscated, and the police department told his family that it couldn't be located. Then the department auctioned it off.

Melissa Nold, an attorney who specializes in police use-of-force cases, filed the complaint. Two months later, she and Nichelini were at a city-council meeting in which the police were requesting a change to their contract. They wanted a clause deleted that allowed the city to order an officer to be drug-tested after firing his weapon. The clause had not been enforced for years, but Vallejo's first Black police chief, Shawny Williams, was about to take office, and there was a presumption that he would be a reformer. Nichelini stood at the back of the room and filmed Nold. The clause was deleted and, two months later, Nichelini became the president of the V.P.O.A.

A few days after Monterrosa was killed, police replaced the windshield that Tonn had fired through. For possible involvement in the destruction of evidence, Nichelini was suspended by Williams. He maintains that he had nothing to do with the windshield replacement.

One spate of killings by police in Vallejo can be traced back to 2011, when an officer named Jim Capoot was shot and killed while chasing a suspected bank robber. He was the first cop to be killed in Vallejo in eleven years. The following year, police killed six people, accounting for nearly a third of the homicides in the city. Half the killings were committed by an officer named Sean Kenney.

Early on the morning of May 28, 2012, a forty-one-year-old Black man named Anton Barrett, Sr., whose nineteen-year-old son was also in the car, pulled out of a parking lot with his headlights off and ran a red light. He was drunk, and when cops tried to stop him he drove off. Then his car got a flat tire, and he and his son jumped out and ran in different directions through an apartment complex. Kenney began chasing Barrett, and, though he was carrying pepper spray and a Taser, he chose to draw his gun. Seconds later, he saw Barrett running toward him and fired five times. Kenney claimed that Barrett had started to pull a black object out of his pocket—it turned out to be a wallet. As Barrett lay on the ground dying, another officer Tased him. Barrett's family sued, and the city eventually paid a settlement of two hundred and thirty-five thousand dollars.

Three months later, Kenney shot Mario Romero, a twenty-three-year-old Black man, who was returning home after a night out with his sister's boyfriend, Joseph Johnson. When the men pulled up to the house, Johnson called Romero's sister and asked her to let him in. Kenney and Dustin Joseph, who were responding to a call about a burglary in the neighborhood, shone a spotlight on the men.

Kenney said that Romero got out of the car and reached for his waistband. Then, he said, when the officers yelled for the men to put their hands up Romero crouched "into a firing position," prompting Kenney and his partner to begin shooting. Johnson, however, said that the cops began firing at him and Romero while they sat in the car.

Romero's sisters were watching from their living-room window, and said that they saw Kenney jump onto the hood of the car and unload his clip through the windshield into Romero, who was sitting in the driver's seat. Johnson corroborated this account. Kenney admitted that he'd stood on the hood but insisted that he hadn't fired from there. Romero was shot thirty times. After his

Case 2:20-cv-01563-TLN-DB   Document 17-2   Filed 11/19/20   Page 33 of 56

body was removed, Kenney searched the car. He said that he found an airsoft gun on the floor, wedged between the driver's seat and the center console.

Seven weeks later, an autistic man named Jeremiah Moore and his boyfriend were smashing car windows and trying to set their home on fire during a psychotic episode. When the police arrived, Moore grabbed an antique rifle and Kenney shot and killed him. Moore's family sued, and won a two-hundred-and-fifty-thousand-dollar settlement.

The Romero family, along with other community members, attended sessions of the newly created citizens' advisory committee, which met for several hours every couple of weeks. But the issues the committee debated were modest: a small reduction in wages, requiring cops to use body cameras, creating a position for a civilian auditor who would respond to complaints of police misconduct. The former officers who sat on the committee regularly objected to these proposals, raising the spectre of lawsuits by the V.P.O.A. should the city try to interfere with police work.

In the end, the committee's recommendations included installing more surveillance cameras, establishing a daytime curfew for youths, increasing enforcement of parking violations, and using money from a new public-services tax to hire more cops.

Three years after the death of Romero, his family won a two-million-dollar settlement. Later that year, the police department completed its review of the case and declared that the shooting was justified. Officers told Open Vallejo that Kenney was initiated into the badge-bending group. In 2011, he was made a detective. One of his new duties was to investigate officer-involved shootings.

Reformers who have succeeded in getting rogue cops censured or fired often come up against a frustrating reality: because there are no national and few statewide indexes that track police terminations and disciplinary infractions, tainted officers often find new jobs in different jurisdictions. A recent study published in the *Yale Law Journal* found that about three per cent of officers serving in Florida had been fired from other state agencies. These cops, who typically moved to smaller forces that were desperate for experienced officers, were more likely than others to be charged with misconduct in their new departments. Sometimes a cop will resign before he is fired, thus avoiding any consequences. Before Timothy Loehmann, the officer who killed twelve-year-old Tamir Rice, in Cleveland, joined the city's police force, he had resigned from his previous job, in Independence, Ohio, where supervisors noted his insubordination, lying, and emotional immaturity.

Officers can also transfer in order to escape reforms. In the past year, large numbers of cops in Seattle, Buffalo, Atlanta, and San Francisco have left. After four cops were charged with killing George Floyd, about two hundred officers in Minneapolis filed to quit the department, citing "post-traumatic stress." Law Enforcement Move, a company founded in the wake of the recent protests, says that it helps officers "escape anti-police cities, and live in America, again!" Since June, its founder told me, the company has been contacted by more than a thousand cops, or their spouses, who are interested in relocating to more "police-friendly" communities.

Some of Vallejo's most notorious officers transferred from Oakland, where a lawsuit brought on behalf of a hundred and nineteen plaintiffs claimed that police had routinely kidnapped, beaten, and planted evidence on people. In 2014, a court-appointed overseer announced that he would be tightening oversight on uses of force, and punishing officers who didn't report misconduct by their colleagues. Within four months, six officers had left for Vallejo. Three of them were eventually involved in lethal shootings. All six were sued for excessive use of force.

Two of the former Oakland officers were the twin brothers Ryan and David McLaughlin, who often searched men of color in Vallejo on the ground that they smelled marijuana, even after it had been legalized. The brothers justified these searches as "compliance checks," meant to make sure that people weren't carrying more than the legal limit. "That's maybe how they roll in certain other nations," a judge later said in court. "But that is not probable cause."

In 2018, David McLaughlin, while off duty, got into a heated confrontation with a man celebrating his son's birthday at a pizzeria in Walnut Creek. He pointed his service gun at the man, then tackled him and punched and elbowed him until his face was bloody. (McLaughlin maintains that he acted within professional boundaries.) Five months later, McLaughlin pulled over a man on a motorcycle for speeding, then drew his gun on him. The man's cousin, an African-American marine veteran named Adrian Burrell, filmed the encounter from his front porch. McLaughlin ordered Burrell to retreat. Burrell refused, resulting in a struggle that, he alleges, gave him a concussion. McLaughlin faces lawsuits in both cases.

Jarrett Tonn, Monterrosa's shooter, joined the Vallejo force the same year as the Oakland cops. Tonn had been an officer in Galt, California, where he worked with his cousin, Kevin Tonn. One day in 2013, Kevin confronted a man who he thought, incorrectly, was a suspect in a robbery. The man pulled out a gun and shot Kevin, then shot himself. Jarrett rushed to the scene, but his cousin was dying.

*A memorial for Sean Monterrosa in San Francisco, where he was from.*   Photograph by Carolyn Drake / Magnum for The New Yorker

Transferring to Vallejo might have seemed like an unlikely career move. Crime was high, the city was just a few years out of bankruptcy, and the school system had recently emerged from state receivership. But Tonn wasn't going to live there. Even after the bankruptcy, Vallejo officers were some of the highest paid in California. Tonn's base pay during his first full year in Vallejo was a hundred thousand dollars—thirty-six thousand dollars more than he made in Galt. This didn't account for overtime and benefits.

Case 2:20-cv-01563-TLN-DB   Document 17-2   Filed 11/19/20   Page 35 of 56

In 2018, he made twenty-seven thousand dollars in overtime and thirty-one thousand dollars in "other pay," and received twenty-two thousand dollars' worth of benefits. In addition, his pension was funded with fifty-eight thousand dollars.

The year after Tonn started working in Vallejo, he chased an unarmed man who was driving a stolen car. The man crashed into someone's front yard, then reversed into Tonn's car. Tonn doesn't remember feeling the impact, but in two seconds he shot eighteen rounds from his Glock into the car, injuring the man.

The officer who wrote the police review of the shooting was Kent Tribble, who once, when responding to a domestic dispute, went to the house of a Black man by mistake, Tased him through his bedroom window after the man shouted profanities at him, and later charged him with resisting arrest. On another occasion, when he was off duty, he pulled a gun on two men in Bend, Oregon, during a drunken confrontation after leaving a bar. (Tribble did not respond to a request for comment.) A couple of years later, Tribble was promoted to lieutenant. When he reviewed Tonn's shooting, he wrote that Tonn had acted in accordance with his training.

In 2017, Tonn was paired with Sean Kenney, the officer who killed three people in 2012. One day, Tonn and Kenney were pursuing Kevin DeCarlo, a suspect in a pawnshop robbery that had ended in a homicide. (He was never charged in connection with the crime.) When DeCarlo stopped at a stop sign, Kenney rammed his car. DeCarlo rammed Kenney back, then got stuck in a ditch. Tonn fired at least eight rounds with a rifle at DeCarlo; other officers, including Kenney, fired at him as well. A witness told police that the scene resembled an execution. DeCarlo suffered four broken ribs, a collapsed lung, and the loss of two fingers. Tonn told investigators that he thought DeCarlo was reaching for a firearm, but DeCarlo had no weapon. (Tonn did not respond to a request for comment.)

According to the Pew Research Center, only a quarter of cops ever fire their weapon on duty, but this was Kenney's fifth shooting in five years. A year and a half later, he retired. He started a consulting firm called Line Driven Strategies, which conducts training courses for police departments on the use of force and on how to investigate shootings by the police. Kenney declined an interview, saying that there was "too much negativity and hate in this climate."

Five weeks after shooting DeCarlo with Kenney, Tonn chased a carjacking suspect down an alley, then fired at him from half a block away. Tonn claimed that the man was carrying a gun, but no weapon was found. The policeman who wrote the internal report of the shooting, Jared Jaksch, was one of the officers who had shot at DeCarlo. Jaksch is also on the board of the V.P.O.A. He wrote that Tonn had done nothing wrong, but recommended that adjustments be made to training "to ensure officers know that they must react in self defense without consideration for potential future civil unrest."

I wanted to learn how Vallejo police officers viewed the perception that they act with impunity. Though no one on the police force agreed to talk to me on the record, I did find a body-camera recording in which an officer revealed his thoughts. On July 7, 2016, Josh Coleman and a partner were on patrol in Vallejo when they saw some twenty Black people standing in an intersection. For a documentary about Bay Area hip-hop, a Viceland reporter was interviewing Nef the Pharaoh, a protégé of E-40. Coleman assumed that they were shooting a rap video. He later told a court that, since he had seen guns used in rap videos, he thought this was sufficient cause to detain and search as many of the men as he could.

As an officer began to arrest a man with a handgun, Coleman ordered a group of onlookers to move across the street. (A judge later dismissed the charges, saying that there was no probable cause for a search.) A twenty-one-year-old woman, whom I'll call Aliya, ignored him, so Coleman threw her against his car and arrested her.

Coleman spotted a rapper known as Cousin Fik, with whom he went to high school. Coleman believes that the main reason for street violence is "the music, plain and simple." He admonished Cousin Fik for delivering a detrimental message. "Until men like you and people like I start delivering the same exact message, we are not going to be able to do anything," Coleman said. "People are still going to get killed."

At the police station, Coleman put Aliya in an interrogation room and asked her why she had refused to cross the street.

"Because that's my baby daddy, and I don't want nothing to happen to him," she said. "All these police officers want to shoot a Black person. If you're going to shoot him, I'm going to be right with him."

"In the political climate today, do you think any police officer really wants to shoot a Black person?" Coleman asked.

"So why do they?"

"We're protecting our lives."

"O.K., you're cool today, but another officer would have had his gun out and automatically just shot him."

"No, that doesn't happen. Seriously, think about it logically. You think a police officer is willing to risk his one-hundred-thousand-a-year job, all of his medical benefits, because he wants to shoot somebody who's Black and be on the news, and be accused of being a murderer, and now he has to live the rest of his life being a UPS driver because he can't be a cop anymore?"

"I'm not saying you do, but you never know what these—"

"You're not processing," Coleman said.

"I'm just telling you I'm scared for him."

"You're processing this emotion out of an unrealistic fear."

Coleman once shot a man at a bar when he mistook a can of Steel Reserve 211 beer tucked into the man's waistband for a gun. On another occasion, he wrote in a police report that he had stopped a Black man when the man turned to look at his patrol car after Coleman drove past. "In some circumstances," Coleman wrote, he found such behavior "to be an indicator of wrong doing." "You've got to stop swallowing dope," Coleman said he shouted after the man appeared to put something in his mouth. "It's going to give you a tummy ache." The man yelled back at him. Coleman then pulled across several lanes of traffic, got out of the patrol car, and tackled the man. Coleman noted in the report that, although the man was not carrying drugs, he had cash denominations "consistent with street level sales." The man was carrying forty-eight dollars.

"I understand what you think," Coleman said to Aliya. "I went to college. I remember being in my twenties and thinking that all these things are examples of police brutality, 'cause I didn't understand what it's like to be a police officer."

"The fact that you just pull your guns out scares people," she said.

"I wish we didn't have to have firearms," Coleman responded. He said that he wished there were an iPhone app that enabled him to make people freeze without endangering their lives.

"Ain't that what y'all have the Tasers for?" Aliya asked.

"Tasers don't work."

*Police officers in Vallejo are largely white men who live elsewhere.*  Photograph by Carolyn Drake / Magnum for The New Yorker

Months earlier, Coleman had been dispatched to a post office to deal with a homeless man who had threatened to harm himself. Coleman wrote in a police report that, as he was approaching, he wondered if the man might have a "more sinister purpose," such as launching a terrorist attack. In order to disrupt the man's ability to "secure the location" or take hostages, Coleman rushed in and Tased him.

Case 2:20-cv-01563-TLN-DB   Document 17-2   Filed 11/19/20   Page 38 of 56

"The crux of the issue is that there is a lack of respect for law now in this young culture," Coleman told Aliya. "The young culture believes that they can do whatever they want. . . . Martin Luther King wasn't smoking weed. Martin Luther King wasn't hanging out at a rap-video shoot with a bunch of people with guns talking about how the police are killing Black people. . . . What happened to Malcolm X? What happened to Marcus Garvey? What happened to real men who stood for real values? What happened to Oprah Winfrey? I would say Bill Cosby, but he messed that up."

Soon, Coleman said, "Do you want to go home today?"

"Yeah."

"I want you to apologize to me," he said.

"Sorry," Aliya said, sounding surprised.

"That is a bad apology. I want you to really apologize."

"Sorry."

"That's the best you have? One word?"

"Sorry for being in your scene."

Willie McCoy, a twenty-year-old rapper, was the last person to be killed by Vallejo police before Sean Monterrosa. In February, 2019, the police got a call from a Taco Bell, saying that a man was unconscious in his car. A group of officers arrived and saw McCoy asleep in the driver's seat. One officer noticed that he had a gun in his lap, with the magazine removed. Another officer said that he was going to open the door and grab the gun. "If he reaches for it, you know what to do," he said. But the door was locked. The police had been standing around the car for more than four minutes when McCoy scratched his shoulder and leaned forward, seeming dazed. Suddenly, six cops fired fifty-five bullets at him.

One of the officers, Ryan McMahon, had stopped a Black man a year earlier for bicycling without lights. McMahon beat the man, Ronell Foster, with his flashlight until Foster wrested it from him and attempted to run. McMahon shot him in the head and the back from several feet away, killing him. The V.P.O.A. posted on its Facebook page that killings like this could be avoided "if those that come into contact with the police follow their commands." McMahon was cleared of wrongdoing by prosecutors, but Foster's family sued the city and won a $5.7-million settlement, the largest that Vallejo has paid.

Since June, activists in Vallejo have been calling for the city to "fire the fatal fourteen," referring to officers on the force who have been involved in multiple shootings. In September, Williams, the department chief, broke with precedent and fired McMahon. Williams didn't claim that the shooting of McCoy was unjustified; instead, he said that McMahon had violated "safety norms" by shooting while his partner was standing near the line of fire.

In a closed city-council meeting in October, Williams said that he is also pursuing disciplinary action against officers who recently kicked in the door of a house and Tased a man who they wrongly believed was suspected of domestic violence. In addition, Williams vowed to punish an officer who held his foot on a man's head for at least a minute and a half while the man was handcuffed. Recent confidential city documents suggest that Williams is unpopular within the department. Officers have accused him of getting the job because he's Black. "He thinks he is Black Jesus," one said. Nichelini, the head of the V.P.O.A., has said

that Williams can't speak English, and that he won't follow the chief's orders if he doesn't like them, according to the documents. "Chiefs come and go," Nick Filloy, a public defender for fourteen years who works in Vallejo, told me. "It's the sergeants and the shift lieutenants and the captains that really control the tenor of the department and that resist change."

If Vallejo is an example of what can happen in a small city with a strong police union, it may also prove to be a test case of a city attempting to break the union's power. In another closed city-council meeting in October, the mayor, Bob Sampayan, a former police officer, said, "I'm just absolutely done with the V.P.O.A. running the show. We need to show V.P.O.A. that they are not in control." The city has created a position for a civilian auditor to review police investigations and complaints against officers. The council, including its union-endorsed members, unanimously approved a proposal by the mayor, the chief, and the city manager to declare a public-safety emergency. This will allow them to implement police reforms without consulting the V.P.O.A., and to create non-union positions for assistant chiefs, who they hope will help rein in the police department. In response, the union said that the city was trying to "create a dictatorship . . . to circumvent state and local laws and regulations."

The fight to break the union could go on for years, or it could fade away. In the meantime, the Monterrosa and McCoy families have sued the city. If these cases end in large payouts, insurance providers could refuse to continue the city's coverage, which would force it to disband its police department, as has happened in a few other small cities, including Lincoln Heights, Ohio, and Maywood, California.

Monterrosa's sisters and local activists recently put up a billboard facing the police station, where Jarrett Tonn is back at work. It shows Monterrosa, a slight smile on his lips. "We wanted to remind the police that Sean can't be forgotten," Ashley, one of Monterrosa's sisters, told me. "We want to make sure Jarrett Tonn sees the person he killed every single day." ♦

## RACE, POLICING, AND BLACK LIVES MATTER PROTESTS

- The death of George Floyd, in context.
- The civil-rights lawyer Bryan Stevenson examines the frustration and despair behind the protests.
- Who, David Remnick asks, is the true agitator behind the racial unrest?
- A sociologist examines the so-called pillars of whiteness that prevent white Americans from confronting racism.
- The Black Lives Matter co-founder Opal Tometi on what it would mean to defund police departments, and what comes next.
- The quest to transform the United States cannot be limited to challenging its brutal police.

*Published in the print edition of the November 23, 2020, issue, with the headline "An Unstoppable Force."*

---

*Shane Bauer, the author of "American Prison," is at work on a book about Americans who fought in Syria.*

---

More:   Police Brutality   Police   California   Racial Discrimination   Racism   Latinos   Police Shootings   Unions   Politics   Activists

---

Exhibit 10

JOHN L. BURRIS, ESQ., SBN 69888
BENJAMIN NISENBAUM, ESQ., SBN 222173
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:  (510) 839-5200
Facsimile: (510) 839-3882
john.burris@johnburrislaw.com
bnisenbaum@hotmail.com
lateef.gray@johnburrislaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

|  |  |
|---|---|
| ESTATE OF TINDLE, et al., | CASE NO.: 18-cv-05755-YGR |
| Plaintiffs, | **DECLARATION OF BENJAMIN NISENBAUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |
| v. | |
| JOSEPH MATEU, III, et al., | DATE:  January 5, 2021 |
| Defendants. | TIME:  2:00 p.m. |
| | COURTROOM: 1 |
| | Hon. Yvonne G. Rogers |

I, BENJAMIN NISENBAUM, attest and declare as follow:

1.      I write this declaration in support of Plaintiffs' motion for reasonable attorneys' fees in this matter.

**BACKGROUND AND QUALIFICATIONS:**

2.      I am an attorney licensed to practice law before all the courts of the State of California, as well as Federal Courts in the Northern District of California, Eastern District of

California, Southern District of California, the Ninth Circuit Court of Appeals, and the United States Supreme Court.

3.      I have worked on Civil Rights cases since my second year of law school in 2001, when I was hired as a law clerk at the Law Offices of John L. Burris and was assigned to work on the Riders lawsuit against the City of Oakland, a case in which we represented 119 plaintiffs who were victims of Civil Rights violations by numerous Oakland Police Department Officers, resulting in an ongoing Negotiated Settlement Agreement requiring Court supervision of the Oakland Police Department.  After graduating Law School in June 2002, I took and passed the July 2002 California Bar Exam.  I continued working on Civil Rights cases at the Burris firm while waiting for bar exam results.  I was admitted to the California State Bar in December 2002, and have carried a caseload of approximately 30 to 40 cases at any given time since then, with the bulk of these cases being Civil Rights police misconduct cases.  As a lawyer, I participated in my first trial, a Section 1983 Civil Rights case, in November 2003, as second chair to John Burris, in Federal Court.  In 2005, I tried, as sole trial counsel, two criminal defense cases, both misdemeanor "contempt of cop" type Penal Code Section 148 and 148/243-type cases.  These two cases subsequently resulted in settlements to those clients. Also in 2005, I was second chair to Mr. Burris in a civil matter in defense of retired NFL star receiver (the no. 1 overall draft pick in 1995) Keyshawn Johnson, in a civil trial resulting in a defense verdict.  Subsequently, in 2007, I handled two Section 1983 Civil Rights cases as lead counsel without Mr. Burris. The first resulted in a defense verdict, while the second resulted in a significant Plaintiff's verdict on behalf of Torry Smith (*Smith v. City of Oakland, et al.* CAND North. Dist. Case No. C 05-04045 EMC), an Oakland parolee in Oakland who was awarded $6 million for violation of his civil rights by two well-respected Oakland Police officers who falsified evidence against him and maliciously prosecuted him. Though the award was remitted to $3.5 million, the 9th Circuit Court of Appeals affirmed the remitted award. In 2015, along with Mr. Burris, I tried to an $11.3 million plaintiff's verdict in *Lam v. City of San Jose.* Defendants in that case stipulated to my rate of $650 per hour.  The verdict was upheld in a published 9th Circuit opinion, which I argued in June 2017. In total, I have tried to verdict more than 30 cases, almost all of which have been jury trials. I have been lead trial counsel on approximately 12 of these cases. While most of my trials have been in the

Northern District, I have also tried cases in the Eastern District and in Alameda County Superior Court.  I won a trial in 2009 for the Excessive Force Section 1983 wrongful death of Ramiro Garcia in the Fresno venue of the Eastern District Federal Court in which I was the sole lawyer for the Plaintiffs.  In addition to the cases I have tried, I have had countless cases that have resulted in substantial settlements for my clients.  These far exceed the number of cases I have tried. In reviewing Pacer, my name appears as counsel of record in numerous cases in the Northern and Eastern Districts, and one case in the Southern District of California Federal Court.  I have argued before the 9th Circuit Court of Appeals approximately five times.  In March 2015, I appeared before the United States Supreme Court for argument in a case which the 9th Circuit, as a matter of first impression, applied the Americans with Disabilities Act (ADA) to arrests of subjects by police officers.  The Supreme Court remanded the case after argument, leaving the ADA claim intact.  All of these cases have been in my capacity as an attorney with the Law Offices of John L. Burris. I have presented on matters of police misconduct and Section 1983 cases on three CLE panels, primarily with a focus on 14th Amendment Malicious Prosecution claims against police officers who fabricate or falsify evidence, and recently authored a CEB practice guide section on Federal Court practice (2020).

4.      In addition to my background and education in law, I have relied extensively in my legal practice on my background in psychology.  I graduated from the University of California, Santa Cruz (UCSC) in 1997 with a bachelor's degree in psychology.  Areas of study I focused upon included memory and cognition, language psychology, and human factors (applied cognitive psychology). I also worked as a research assistant conducting experiments for a Language Psychology professor at UCSC.  This background has been very helpful in deposing and examining opposing expert witnesses.

**RESPONSIBILITIES IN THIS CASE:**

5.      I had primary litigation responsibility in this case.  I supervised the initial investigation and drafting of litigation documents, including supervising the work of firm associate Lateef Gray. I was at the scene of the incident with our investigator, Juan Sigler, when we first began investigating, after being retained shortly after the incident occurred.  I met with our clients along with Mr. Burris

and Mr. Gray when we were retained. I sent the video of the shooting to our expert Gregg Stutchman's associate, Steve Buller, when it was initially publicly released for enhancement and still-photo purposes. I reviewed discovery requests as they went out, and all the discovery as it came in. In preparing for depositions, I reviewed all discovery closely, in particular Defendant Mateu's post-shooting OIS interview.  I deposed Defendant Mateu, recognizing the facts that needed to be developed for trial and to defeat defendant's anticipated motion for summary judgment. I consulted with our police practices expert, Roger Clark, to ensure we had sufficient evidence for his Rule 26 report and to defeat any qualified immunity claim. I consulted with firm associate Ayana Curry in her preparation of our opposition to Defendants' Motion for Summary Judgment, which I argued along with Mr. Burris and Mr. Gray.  When defendants attempted to file an interlocutory appeal after the Court denied their motion for Qualified Immunity and stay the trial, I prepared and filed an opposition to their motion to stay, and I requested the Court certify their interlocutory appeal as frivolous since Qualified Immunity was denied because of material fact disputes. The Court agreed and did not grant Defendants' requested stay.  I selected witnesses and exhibits for trial and prepared Plaintiffs' pre-trial documents. In preparing for trial, I prepared and delivered opening statements and summations in both phases of both trials, and examined Defendant Mateu in both trials, along with Mr. Stutchman's examination, and Defendants' expert Mr. Fries. In the re-trial, since Mr. Gray left our firm, my responsibilities expanded to include examining the Alameda County medical examiner who performed the autopsy of Decedent, Dr. Iocco, who I had previously deposed in an unrelated case, with an effort to focus on the damages caused by the gunshot wounds to Mr. Tindle.

6.      The trial preparation of this case was intensive. Preparing a re-trial within days of the mistrial of the first trial required total focus and re-evaluation, without the benefit of the trial transcript from the first trial which we did not order.  Teamwork was critical in both trials, but especially in preparing for the re-trial, in which we approached the case differently than the first trial.

7.      Firm associate Ayana Curry prepared the instant Motion for Reasonable Attorneys' Fees, Plaintiffs' oppositions to the post-trial motions in this case, along with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. While I worked with Ms. Curry in her preparation of these motions, Ms. Curry had primary responsibility for these motions.

**HOURS WORKED AND NON-TAXABLE COSTS:**

8.      In sum, I worked 308.9 hours in this case, as detailed in my timesheets.  While we had a settlement conference in the case, we never expected this case to settle. We knew we would have to win the motion for summary judgment and ward off an assertion of qualified immunity, and we prepared the case accordingly, as set forth in my timesheets. Likewise, identifying Defendant Mateu's relevant prior statements and preparing his examination in a manner that his relevant prior statements could be played back immediately following his answer to the relevant question was extraordinarily time-consuming and required significant attention to detail.

9.      I have worked additional countless hours on the instant case which I did not track and which are not included in my billing, from: making phone calls; reviewing records and documents; watching the video and stills repeatedly; figuring out how to approach the examinations of Defendant Mateu and how to switch up the trial strategy from the first to the second trial, to conferring with Mr. Burris and other firm associates and expert witnesses. Since I would not charge a client paying an hourly rate for these activities, I have exercised discretion by not including them in the instant fee petition.

10.      I have maintained contemporaneous time records reflecting the work, activity, and time spent on this case. I have exercised billing judgment, and I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client. A true and correct copy of my time records for this case is attached hereto as "Exhibit A" and "Exhibit B".

11.      Plaintiffs' reasonable costs and other out-of-pocket expenses also are fully-documented and total $2731.96, see Exhibit C attached to this Declaration.  These out-of-pocket expenses do not include the thousands of dollars in expert witness fees that the Law Offices of John L. Burris have paid as they are not recoverable.

**HOURLY FEE:**

12.      The only time my fee has been set by a court was in a sanctions matter in 2010 when Judge Breyer accepted my then fee-rate of $495 an hour on a sanctions matter following a jury trial in which I was lead counsel without Mr. Burris. See *Joya v. City of Hayward, et al.* USDC-CAND case no. 3:07-cv-04739 CRB, Dkt. Nos. 141, 143, and 144.  Since then, I have had numerous trials and

have appeared at the United States Supreme Court in *Sheehan*, in which Plaintiff's ADA claim against police who shot her at the threshold of her apartment door while failing to accommodate her known psychiatric condition survived the Court's grant of certiorari after the Ninth Circuit overturned Judge Breyer's grant of summary judgment to Defendants in that case. As discussed above, San Jose did not object to a rate of $650 an hour, agreed to in 2017. I have had four jury trials since *Lam*, including the re-trial of the instant case bringing the total number of trials (including my very first trial in traffic court fighting a speeding ticket during my first week of law school in 1999) to 35.

13.     I have maintained contemporaneous time records reflecting the work, activity, and time spent on this case. I have exercised billing judgment, and I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client. A copy of my time records for this case is attached hereto as "Exhibit A".

**RISKS OF REPRESENTATION:**

14.     It goes without saying this case presented an extraordinary challenge for Plaintiffs. On its face, an officer running toward the sound of gunshots he heard, seeing the gun in Mr. Tindle's hand, and a struggle over the gun, and with the after-the-fact information that Mr. Tindle had apparently shot the other man, is not a case that many attorneys would have accepted representation. Once Plaintiffs had the video analyzed, it became clear there was a narrow path to proving liability: one that would require bifurcation in order to exclude prejudicial evidence unknown to Defendant Mateu. The fact that the first trial ended in a mistrial only illustrates just how difficult this case was and how high risk the case was.

15.     Additionally, we knew when we accepted representation that there would be no realistic settlement negotiations without a Plaintiffs' verdict, which meant a massive devotion of time for trial preparation and trial would be required, as well as the investment in expert witnesses, along with the typical litigation of Section 1983 Excessive Force cases generally. To underscore the point, Defendants have made no offer of settlement to date.

16.     Our firm is a small firm (even smaller now without Mr. Gray and Ms. Ramirez) operating on essentially all contingency fee Section 1983 cases. We seek to provide a voice through our representation to those who have been victims of police misconduct, whether in smaller injuries

or in major injuries or deaths, where there is a viable legal mechanism for redress. The more time devoted to one case means less time to other cases. Most cases settle before trial. We knew when we saw the video of this shooting that this case would need to be tried, that defendants would never offer settlement without a verdict, and that we would have to work to the best of our capacities as a team to obtain justice for the family of Mr. Tindle.

To that end, Plaintiffs' counsel requests a fee multiplier in the amount of 1.3.


Respectfully submitted,

Dated: November 6, 2020          **LAW OFFICES OF JOHN BURRIS**


_/s/Benjamin Nisenbaum_____
Ben Nisenbaum
Attorney for Plaintiffs

Exhibit 11

JOHN L. BURRIS, ESQ., SBN 69888
BENJAMIN NISENBAUM, ESQ., SBN 222173
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:  (510) 839-5200
Facsimile: (510) 839-3882
john.burris@johnburrislaw.com
bnisenbaum@hotmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| YOLANDA BANKS-REED, et al., | CASE NO.: 18-cv-05755-YGR |
| Plaintiffs, | **DECLARATION OF AYANA CURRY IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS** |
| v. | |
| BAY AREA RAPID TRANSIT, et al., | |
| Defendants. | DATE:  January 5, 2021 |
| | TIME:  2:00 p.m. |
| | COURTROOM: 1 |
| | Hon. Yvonne G. Rogers |

Declaration of Ayana Curry in Support of Plaintiffs' Motion for Attorney's Fees
*Banks-Reed, et al. v. BART, et al.*, 18-cv-05755-YGR

1

1            I, AYANA CURRY, hereby declare that:

2          1.     I make this declaration of facts in support of Plaintiffs' Motion for Award of

3 Reasonable Attorneys' Fees and Costs based on my personal knowledge and, if called, can testify

4 competently thereto.

5 **BACKGROUND AND QUALIFICATIONS:**

6          2.     I am a member in good standing of the State Bar of California and State Bar of

7 Georgia. I am admitted to practice in all of the state courts of California and Georgia, as well as the

8 Ninth Circuit Court of Appeals, and the United States Supreme Court

9          3.     After receiving my B.A. degree from Columbia University in 1997, I graduated

10 from UC Davis, School of Law in 2000. I passed the July 2000 California Bar examination. While

11 awaiting bar exam results, I worked on civil rights cases as an associate with the Law Offices of

12 John L. Burris where my primary assignment was *Mack, Allen, Higgs, et al. v. City of Oakland, et*

13 *al.*, C00-4599 TEH, "The Riders" lawsuit in which we represented 119 plaintiffs who were victims

14 of Civil Rights violations by numerous Oakland Police Department Officers, resulting in an

15 ongoing Negotiated Settlement Agreement requiring Court supervision of the Oakland Police

16 Department. Interestingly, this year, I opposed a Community members' motion to intervene into

17 the litigation and subsequent appeal of the denial of that motion.

18         4.     I was admitted to the California State Bar in December 2000. I was an Assistant

19 Deputy Attorney General with the State of California Department of Justice, Office of the Attorney

20 General in the Criminal Appeals, Writs and Trial Division from 2001-2004. There, I handled over

21 one hundred appeals and related habeas proceedings on criminal law matters ranging from white

22 collar crime to homicide. I was lead Deputy responsible for defending successful criminal

23 prosecutions for the entire appellate process, including researching and preparing appellate briefs

24 and presenting oral argument to First and Sixth Districts of the California Courts of Appeal.

25         5.     I became a member of the Georgia State Bar in February 2005. I was a Senior

26 Assistant District Attorney in the Fulton County District Attorney's Office in the Appellate

27

Declaration of Ayana Curry in Support of Plaintiffs' Motion for Attorney's Fees
*Banks-Reed, et al. v. BART, et al.*, 18-cv-05755-YGR

Division from 2005-2007. There, I handled all manner of criminal prosecution post-verdict, including preparing and arguing new trial motions and complex sentencing matters, authored and argued dozens of appeals in Georgia Court of Appeal, resulting in dozens of published opinions. In addition, I served as the appellate and primary research attorney on several high profile prosecutions during the trial phase.

6.  I resumed my Civil Rights practice in 2008, when I rejoined the Law Offices of John L. Burris as the lone appellate attorney. I perform most of the significant dispositive law and motion work in our office and I am responsible for all post-verdict motions and appeals. I handle a wide variety of civil appeals, including cases brought under 42 U.S.C. Section 1983, cases involving federal law and/or the California Tort Claims Act, and many employment-related cases, including discrimination, retaliation, and wrongful termination matters.

7.  I have prepared briefing and/or appeared before the Ninth Circuit Court of Appeals in over a dozen cases. A representative sample of my most significant work is as follows:

- *Sheehan v. City and County of San Francisco*, 743 F.3d 1211 (9th Cir. 2013), in which the Ninth Circuit found, as a matter of first impression, that the Americans with Disabilities Act applies to arrests of subjects by police officers. This matter was taken up on certiorari by the U.S. Supreme Court which determined it had improvidently granted cert on the ADA issue (in *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015)).

- *Deocampo v. Potts*, 836 F.3d 1134 (9th Cir. 2016), reaffirming that Section 1983 claims are against officers as individuals and judgments resulting therefrom are to be assessed against the officer's personal assets and declining to allow Plaintiff's judgment via jury verdict be subject to the City of Vallejo's bankruptcy plan.

- *Hung Lam v. City of San Jose*, 869 F.3d 1077 (9th Cir. 2017) holding that an officer forfeits the qualified immunity defense by failing to follow proscribed procedures to preserve the defense and that qualified immunity should not be considered for the first time on appeal.

---

Declaration of Ayana Curry in Support of Plaintiffs' Motion for Attorney's Fees
*Banks-Reed, et al. v. BART, et al.*, 18-cv-05755-YGR

- *Mackey v. Board of Trustees of the California State University,* 31 Cal.App.5th 640 (2019) determining that a race discrimination claim under Title VI and the Unruh Act applies to coaches in evaluating race discrimination claims brought by college athletes and finding that the college athletes established material fact questions regarding whether their coach discriminated and retaliated against them, thus allowing the matter to go to trial.

- *Tan Lam v. City of Los Banos,* 976 F.3d 986 (9th Cir. 2020), finding, as a matter of first impression, that evidence of officer's post-traumatic stress disorder diagnosis to be relevant to his credibility and properly admitted at trial, and upholding jury verdict of Fourth Amendment violation for unreasonable use of deadly force.

**RESPONSIBILITIES AND HOURS WORKED IN THIS CASE:**

8.      Regarding the instant matter, I have maintained contemporaneous time records reflecting the work activity and time spent on this case. I have exercised billing judgment, and I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client. A copy of my time records for this case is attached hereto as Exhibit "A".

9.      I spent a considerable amount of time researching the qualified immunity and *Graham* factor issues at every stage of the litigation in this case. Qualified immunity jurisprudence, in particular, is dynamic, contentious, and proves to be a considerable hurdle in our firm's cases. The qualified immunity question involved in this litigation is no exception. Knowing that this Court, and any subsequent court, would require exacting legal analysis on the difficult facts presented by this case, I spent far more hours than I claim on my timesheet reading and re-reading case law authorities that I believed would satisfy any court that qualified immunity is properly denied under these circumstances.

10.      I am seeking payment for 195.3 hours for my work on this case opposing Defendants' Motion for Summary Judgment, legal research during trial, the post-verdict motions, and 63 hours for the time I spent preparing the instant Plaintiffs' Motion for Reasonable Attorneys' fees - for a total of 258.3 hours.

Declaration of Ayana Curry in Support of Plaintiffs' Motion for Attorney's Fees
*Banks-Reed, et al. v. BART, et al.*, 18-cv-05755-YGR

11.     I seek $750 per hour for my work on this case. I believe this rate is a reasonable hourly rate for my level of written and appellate advocacy and is at or below market rates for attorneys of comparable skill and experience (20 years of practice) in the San Francisco Bay Area.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed this __4th__ day of November 2020 at Oakland, California.


By: _____/s/ *Ayana Curry*_____
                Ayana Curry

Declaration of Ayana Curry in Support of Plaintiffs' Motion for Attorney's Fees
*Banks-Reed, et al. v. BART, et al.*, 18-cv-05755-YGR

5

Exhibit 12

# Ayana Curry

# INVOICE

**Bill to:** The Law Offices of John L. Burris
7677 Oakport St, ste. 1120
Oakland, CA 94621

Invoice #:   1

| DATE | DESCRIPTION | Monterrosa Change of Venue, MTD, Santions, etc. Filings | | | | |
|------|-------------|------|---|---|---|---|
| 11/11/20 | PC w/ BN, JC re: status of 3 motions | 0.20 | | | | |
| | review Def MTD and JC draft Opp | | | | | |
| 11/12/20 | review Def mtn for change of venue, outline mtn | 4.00 | | | | |
| 11/13/20 | LR on change of venue pretrial publicity standard; review CD memo re: East District demographics research | 3.00 | | | | |
| 11/16/20 | review BN draft of Opp to Gag Order request, PC and EC w/ BN re: edits to Gag Order Opp | 0.80 | | | | |
| | begin draft of Change of Venue motion: Intro and Legal Standard sections | 4.50 | | | | |
| 11/17/20 | PC w/ CC re: Def. Declaration and Exhibits attached thereto, review exhibits | 0.50 | | | | |
| | draft arg section of Opp: pervasive media coverage, factual news articles, tweets and blog vs. news accounts | 6.60 | | | | |
| 11/18/20 | con't draft arg. Section: politization vs. impartial news, 1404(a) factors, social media posts, sent draft to BN | 6.30 | | | | |
| 11/19/20 | edit COV draft, finalize COV Opp create tables | 3.00 | | | | |
| | edit MTD Opp, finalize draft, create tables | | | | | |
| | review and finalize motion for sanctions | 0.50 | | | | |
| | | | | | | |
| Subtotal Hours | | 29.40 | - | - | - | - |

| | |
|---|---|
| TOTAL HOURS | 29.40 |
| Hourly Rate | $   750.00 |
| **AMOUNT DUE** | **$ 22,050.00** |