1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11  NEFTALI MONTERROSA; NORA              No. 2:20-cv-01563-TLN-DB
    MONTERROSA; MICHELLE
12  MONTERROSA; and ASHLEY
    MONTERROSA,
13                                        **ORDER**
                    Plaintiffs,
14
         v.
15
    CITY OF VALLEJO and JARRETT
16  TONN,

17                  Defendants.

18

19         This matter is before the Court pursuant to Defendants City of Vallejo ("the City") and

20  Jarrett Tonn's ("Tonn") (collectively, "Defendants") Motions to Dismiss and Strike, Motion to

21  Transfer Venue, and Motion for Protective Order.  (ECF Nos. 5, 6, 7.)  Plaintiffs Neftali

22  Monterrosa ("Neftali"), Nora Monterrosa ("Nora"), Michelle Monterrosa ("Michelle"), and

23  Ashley Monterrosa ("Ashley") (collectively, "Plaintiffs") have filed oppositions to each of

24  Defendants' motions (ECF Nos. 16, 17, 18), and Defendants have filed replies (ECF Nos. 22, 23,

25  24).  Also before the Court is Plaintiffs' Motion for Sanctions.  (ECF No. 19.)  Defendants have

26  filed an opposition (ECF No. 30) and Plaintiffs have filed a reply (ECF No. 31).

27         For the reasons set forth herein, Defendants' Motions to Dismiss and Strike are hereby

28  GRANTED.  (ECF No. 5.)  Defendants' Motion to Transfer Venue is DENIED.  (ECF No. 6.)

Defendants' Motion for Protective Order is DENIED.  (ECF No. 7.)  Plaintiffs' Motion for Sanctions is DENIED.  (ECF No. 19.)

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are a grieving family who allege Tonn, a Vallejo Police Department officer, shot and killed Sean Monterrosa ("Monterrosa") on June 2, 2020, at about 12:37 a.m.  (*See generally* ECF No. 29.)  The police responded to a report of possible looting at a Walgreen's store on the 1000 block of Redwood Street in Vallejo.  (*Id.* at ¶ 12.)  Tonn allegedly did not see Monterrosa exit the Walgreen's.  (*Id.*)  Monterrosa was a suspect in this possible looting, "but when shot and killed, he had nothing in his hands" and "[n]o warnings were given that lethal force, or any force, would be used."  (*Id.* at ¶ 11.)

Plaintiffs allege Tonn "was holding his AR-15 semi-automatic rifle at the ready while in the backseat of an unmarked Vallejo Police Department vehicle" and "[a]ll [of Tonn's] shots were fired through the front windshield of the unmarked vehicle," which struck and killed Monterrosa.  (*Id.*)  Only a hammer was recovered from Monterrosa and Plaintiffs allege "[h]e had not pulled it out of his sweatshirt pocket during his encounter with the police."  (*Id.* at ¶ 12.)

Plaintiffs allege police officers with the Vallejo Police Department gave differing accounts of the events that unfolded on June 2, 2020.  (*Id.* at 2.)  Vallejo Chief of Police Shawny Williams ("Chief Williams") "initially described the shooting as happening when [Monterrosa] was on his knees, with his hands at waist level — meaning nothing was in his hands."  (*Id.* at ¶ 12.)  Chief Williams later changed his description of the shooting, allegedly "at the prompting of the police union . . . to line up with the police union's claims that [Monterrosa] was in a crouched position as if he were attacking the patrol vehicle [Tonn] fired his AR-15 from."  (*Id.*)  Plaintiffs allege the City has not explained the basis for the change in Chief Williams's position.  (*Id.*)

Plaintiffs further allege Tonn and the officer who drove the unmarked police vehicle "activated their body [cameras] after the shooting," and according to the City, there is no video footage of Monterrosa being shot.  (*Id.* at ¶ 13.)  Audio is only available for the body camera recordings "begin[ning] shortly after the shooting [when] the officers exit[ed] the patrol vehicle."  (*Id.*)  Tonn allegedly asked another officer, "What did he point at us?" and the other officer

responded, "I don't know man." (*Id.* at ¶ 14.)  Tonn allegedly then told bystanders, "Hey, he

pointed a gun at us!"  (*Id.*)

Plaintiffs allege Tonn was talking to himself after the shooting, saying either "I'm stupid,"

or "fucking stupid," while the body camera continued to record.  (*Id.* at ¶ 15.)  Tonn allegedly

then stated "[Monterrosa] came around, came right at us," and "[t]his is not what I fucking

needed tonight."  (*Id.*)  Tonn allegedly told another officer he "thought that fucking axe was a

gun," and the other officer responded, "I thought he was armed too.  I saw him going like this.  I

was on the radio."  (*Id.*)  A Vallejo police captain at the scene of the shooting allegedly told Tonn,

"you're gonna be alright man.  You've been through this before."  (*Id.*)

Plaintiffs allege Tonn has been involved in "at least three other" officer-involved

shootings over the past five years.  (*Id.* at ¶ 16.)  Plaintiffs also note Tonn was sued for excessive

force in 2018 for an incident that occurred during a minor traffic stop.  (*Id.* at ¶ 17.)  Plaintiffs

allege Tonn "was never disciplined and never subject to re-training or remediation following the

three earlier shootings and the alleged use of excessive force," even though the City "was on

notice that [Tonn] accounted for nearly 10% of the 32 people shot by [Vallejo] police officers

since 2010 and repeatedly demonstrated a propensity to use excessive force in his capacity as a

police officer."  (*Id.* at ¶ 18.)

Plaintiffs further allege the City interfered in the investigation and anticipated litigation

"by intentionally destroying relevant evidence after Plaintiffs demanded [the City] preserve the

evidence."  (*Id.* at ¶ 19.)  Plaintiffs were "deprived of the opportunity for a reconstruction expert

of their own" to inspect and examine the windshield of the police vehicle through which Tonn

fired his AR-15 (which Plaintiffs suggest has been returned to active duty).  (*Id.*)

On August 6, 2020, Plaintiffs filed the instant suit, seeking damages and attorneys' fees.  (ECF

No. 1.)  On October 6, 2020, Defendants filed the instant Motions to Dismiss and Strike, to

Transfer Venue, and for a Protective Order.  (ECF Nos. 5, 6, 7.)  On November 19, 2020,

Plaintiffs filed the instant Motion for Sanctions.  (ECF No. 19.)  On December 22, 2020, the

Court granted the parties' stipulation for Plaintiffs to file a First Amended Complaint ("FAC"),

1    which is now the operative complaint in this case.[1]  (*See* ECF Nos. 27–29.)  The Court will first

2    evaluate Defendants' Motions to Transfer Venue to decide whether to keep the case within the

3    Sacramento Division.  The Court will next turn to the Defendants' Motions to Dismiss and Strike

4    and Motion for Protective Order, and then finally address Plaintiffs' Motion for Sanctions.

5           **II.    MOTION TO TRANSFER VENUE**

6                  A.    Legal Standard

7           "For the convenience of parties and witnesses, in the interest of justice, a district court

8    may transfer any civil action to any other district or division where it might have been brought or

9    to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  The purpose

10   of 28 U.S.C. § 1404(a) ("§ 1404(a)") "is to prevent the waste 'of time, energy and money' and 'to

11   protect litigants, witnesses, and the public against unnecessary inconvenience and

12   expense[.]'"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Continental Grain Co. v.*

13   *Barge FBL-585*, 364 U.S. 19, 26–27 (1960)).  In considering a transfer pursuant to § 1404(a), the

14   district court undertakes an "individualized, case-by-case consideration of convenience and

15   fairness."  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (internal citation

16   omitted).

17          In a § 1404(a) analysis, the Court first determines whether the case could have been

18   brought in the transferee forum and then considers the convenience of the parties and witnesses

19   and the interest of justice.  28 U.S.C. § 1404(a).  Courts looks to several factors to determine

20   where the interests of justice and convenience lie, including "(1) plaintiff's choice of forum, (2)

21   convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence,

22   (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation of other

23   claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of

24   trial in each forum."  *Barnes & Noble, Inc. v. LSI Corp.*, 823 F. Supp. 2d 980, 993 (N.D. Cal.

25   2011) (citing *Vu v. Ortho-McNeil Pharm., Inc.*, 602 F. Supp. 2d 1151, 1156 (N.D. Cal. 2009));

26   *see also Jones*, 211 F.3d at 498–99.  "No single factor is dispositive, and a district court has broad

27   _____

28          [1]      Pursuant to the Stipulation, Defendants' motions pertaining to the original Complaint are
     construed as effective against the FAC.  (ECF No. 28 at 3.)

4

1   discretion to adjudicate motions for transfer on a case-by-case basis." *Ctr. for Biological*

2   *Diversity v. Kempthorne*, No. C 08-1339 CW, 2008 WL 4543043, at *2 (N.D. Cal. Oct. 10, 2008)

3   (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Sparling v. Hoffman Constr.*

4   *Co., Inc.*, 864 F.2d 635, 639 (9th Cir. 1988)).

5           B.      <u>Analysis</u>

6         Defendants argue an intra-district transfer to the Eastern District of California's Fresno

7   Division is required to protect Defendants' constitutional rights to a fair trial and due process.

8   (*See generally* ECF No. 6.)  Defendants also argue an intra-district transfer is appropriate under §

9   1404 and Local Rule 120.  (*See id.*)  The Court will first evaluate the constitutional arguments and

10  then evaluate the § 1404 argument.

11          *i.*      *Constitutional Rights to a Fair Trial and Due Process*

12        Defendants assert they have a constitutional right "to a fair trial by impartial jury,"

13  protected by the Fifth Amendment right to due process and the Seventh Amendment's right to

14  trial by jury.  (ECF No. 6 at 8.)  Defendants contend the constitutional standard requires a change

15  in venue "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a

16  fair trial."  (*Id.* at 9 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966)).)  They also note that

17  "[i]n some cases, pretrial publicity may give rise to the presumption that a defendant cannot

18  receive a fair trial by an impartial jury," and prejudice is presumed "where publicity causes a

19  wave of public passion" or "when the record shows the community is saturated with prejudicial

20  and inflammatory media."  (*Id.* at 10 (citing *Patton v. Yount*, 467 U.S. 1025, 1031 (1984); *Harris*

21  *v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1989)).)

22        In opposition, Plaintiffs assert Defendants must demonstrate presumed prejudicial pretrial

23  publicity, citing the same standard as Defendants.  (ECF No. 17 at 7.)  Plaintiffs argue media

24  publicity has not been sufficiently extreme to invoke this presumed prejudice rule, as there is no

25  evidence the community has been saturated.  (*Id.* at 9.)

26        The Supreme Court has held "a fair trial in a fair tribunal is a basic requirement of due

27  process."  *In re Murchison*, 349 U.S. 133, 136 (1955); *see also Aetna Life Ins. Co. v. Lavoie*, 475

28  U.S. 813, 822–25 (1986) (finding violation of appellant's due process rights due to an Alabama

Supreme Court Justice's participation in a class action on behalf of all state employees insured under a group plan by Blue Cross-Blue Shield, where all of the issues in appellant's case were present in the Blue Cross-Blue Shield suit). "Due process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard*, 384 U.S. at 362 (finding state trial judge did not fulfill his duty to protect defendant from "the inherently prejudicial publicity which saturated the community"). The Supreme Court has clarified, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id.* at 363. Additionally, the Seventh Amendment's guarantee of the right of trial by jury includes the basic principle of impartiality of jury selection in both civil and criminal cases. *See id.* (finding that pretrial publicity in a criminal case undermined juror impartiality); *Thiel v. Southern Pac. Co.*, 328 U.S. 217 (1946) (overturning a civil judgment when federal judge had not allowed daily wage earners to serve on the jury).

The case law cited by both parties is on point. To support a change of venue motion, a defendant must demonstrate actual or presumed prejudice. *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005) (citing *Harris*, 885 F.3d at 1360). Prejudice is presumed only in extreme instances "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* (citing *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998)); *see also Harris*, 885 F.3d at 1361.

The Ninth Circuit has articulated three factors to consider when determining presumed prejudice: "(1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial." *Daniels*, 428 F.3d at 1211. Further, it is within the trial judge's discretion "whether a change of venue is compelled by pervasive prejudicial publicity." *Wash. Pub. Utilities Group v. U.S. Dist. Court*, 843 F.2d 319, 324 (9th Cir. 1987).

///

6

In *Sheppard v. Maxwell*, the petitioner sought habeas review of his conviction for the second-degree murder of this wife.  384 U.S. at 335.  In granting the petition, the Supreme Court held the petitioner did not receive a fair trial consistent with the Due Process Clause of the Fourteenth Amendment due to "the trial judge's failure to protect [him] sufficiently from the massive, pervasive and prejudicial publicity that attended his prosecution."  *Id.*  Based on the totality of the circumstances, the Supreme Court found the procedures employed by the State "involve[d] such a probability that prejudice [would] result that it [was] deemed inherently lacking in due process."  *Id.* at 352.  The Court examined in great detail the media fanfare surrounding the death of the petitioner's pregnant wife:

> [The petitioner] was not granted a change of venue to a locale away from where the publicity originated[,] nor was his jury sequestered . . . For months the virulent publicity about [the petitioner] and the murder had made the case notorious.  Charges and countercharges were aired in the news media besides those for which [the petitioner] was called to trial.  In addition, only three months before trial, [the petitioner] was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl.  The inquest was televised live from a high school gymnasium seating hundreds of people.  Furthermore, the trial began two weeks before a hotly contested election at which both Chief Prosecutor Mahon and Judge Blythin were candidates for judgeships.

*Id.* at 352–54.  The Court noted "[m]uch of the material printed or broadcast during the trial was never heard from the witness stand" and "[a]s the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incriminated [the petitioner], and often drew unwarranted inferences from testimony."  *Id.* at 356–57.

The Court found there was no "doubt that this deluge of publicity reached at least some of the jury," given that when the jury was questioned for the only time, "two jurors admitted in open court to hearing the highly inflammatory charge that a prison inmate claimed [the petitioner] was the father of her illegitimate child."  *Id.* at 357.  The trial judge rejected requests by defense counsel for the jurors to be asked "whether they had read or heard specific prejudicial comment[s] about the case."  *Id.*  The jurors "were subjected to newspaper, radio and television coverage of the trial while not taking part in the proceedings" and "were allowed to go their separate ways outside of the courtroom, without adequate directions not to read or listen to anything concerning

the case." *Id.* at 353.  The judge gave "suggestions" and "requests" to the jurors "[a]t intervals during the trial" to refrain from commenting upon the case, but "the jurors were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers." *Id.* Finally, in concluding that the petitioner was denied a fair trial due to pervasive and prejudicial publicity, the Court identifies a litany of procedural safeguards the trial judge could have employed to control the publicity about the trial.  *Id.* at 357–62.

Elaborating on the Supreme Court's ruling, the Ninth Circuit further emphasized that the presumed prejudice principle is "rarely applicable," and is reserved for "an extreme situation." *See Harris*, 885 F.2d at 1361.  In *Daniels v. Woodford*, the Ninth Circuit found the petitioner's due process rights were violated due to the state court rejecting his change of venue motion "in light of the extensive pretrial publicity surrounding the murders of the two police officers."  428 F.3d at 1210.  Applying the three factors articulated above to determine presumed prejudice, the Ninth Circuit found the "factors compel a finding that the venue [wa]s saturated with prejudicial and inflammatory media about the crime" sufficient to presume prejudice.  *Id.* at 1211 (internal quotations omitted).  The court notes the news "described the perpetrator as a Black paraplegic, and [the petitioner] was identified in press accounts as the killer from the very beginning."  *Id.* Even though publicity waned after the petitioner's arrest, it restarted before the trial began.  *Id.* For example, three months before trial, news articles covered a proposal "to rename a football stadium in honor of" one of the fallen police officers, and one month before trial, "a statue commemorating fallen police officers was unveiled by the county."  *Id.*  "[T]he public's response to this publicity clearly amounted to a 'huge' wave of public passion . . . police stations were 'deluged' with calls from citizens offering tips on the investigation and offering to establish a memorial fund."  *Id.*  About 3,000 people attended the officers' funerals, and the officers became "posthumous celebrities."  *Id.*  Most tellingly, 87 percent of the jury pool "recognized the case from the media coverage."  *Id.*  "Two-thirds of those empaneled remembered the case from the press accounts — some recalled that the suspect was a Black paraplegic, others recalled that police officers were shot, and two jurors remembered Daniels by name."  *Id.* at 1211–12.  The news contained not only factual details, but also editorials calling for the petitioner's execution

8

and echoes of the prosecution's theory of the petitioner's "desire to escape justice." *Id.* at 1212.

In *Harris v. Pulley*, conversely, the Ninth Circuit rejected the petitioner's Sixth Amendment arguments that he was denied a fair trial by an impartial jury, finding there was no presumed prejudice.  885 F.3d at 1365.  The court noted the standards of presumed prejudice or actual prejudice derive from the Due Process Clause of the Fourteenth Amendment, "which safeguards a defendant's Sixth Amendment right to be tried by a panel of impartial, indifferent jurors." *Id.* at 1361 (internal quotations omitted).  The Ninth Circuit found the record of publicity in the months prior to, and at the time of, the trial "does not reveal the barrage of inflammatory publicity . . . to warrant presumption that jurors were prejudiced." *Id.* at 1362.  Upon review of "the 136 exhibits introduced" in support of the motion to transfer venue, the court noted the "vast majority of media accounts are largely factual in nature." *Id.*  Furthermore, the court reasoned that while some accounts referred to the petitioner's prior criminal record and the alleged confession of each brother, these were published within the two weeks immediately following the homicides — the number of news reports "dissipated considerably by the time of jury selection." *Id.*  Moreover, the public disputes between the District Attorney's office and the U.S. Attorney's office cited by the petitioner merely pertained to which agency would prosecute the case and the merits of each criminal system — they did not involve "a prejudgment by either office" as to the petitioner's guilt. *Id.* at 1363.

In the instant case, the Court has reviewed the 35 exhibits submitted by Defendants in support of their motion to transfer, the 12 exhibits submitted by Plaintiffs in opposition to Defendants' motion, and the nine exhibits in Defendants' reply.  Upon evaluation of these press accounts, the Court finds the facts of the instant case more closely parallel the facts of *Harris* than the facts of *Sheppard* or *Daniels*.  Here, there have been no "charges and countercharges . . . aired in the news media," nor has there been a live televised inquest that resulted in a public brawl.  *See Sheppard*, 384 U.S. at 354.  As Plaintiffs correctly note, there is no public dispute or "political grandstanding" with respect to which office will prosecute the case.  (*See* ECF No. 17 at 11); *see also Harris*, 885 F.3d at 1362–63.  Nor has a videotaped confession been broadcasted by the local media for potential jurors to see. *Cf. Rideau v. Louisiana*, 373 U.S. 723 (1963) (finding media

1    publicity sufficiently extreme to invoke presumed prejudice where the defendant's confession to

2    robbing a bank, kidnapping employees, and killing one of them was videotaped and broadcast

3    three times by a local television station).  Although Monterrosa's picture has appeared on a

4    billboard near the Vallejo Police Department (*see* ECF No. 6 at 13; ECF No. 6-1 at 155–161) and

5    there were protests after his death with hundreds of people (*see generally* ECF Nos. 6-1, 17-2,

6    24), neither party has submitted evidence showing the public's response amounted to a "huge

7    wave of public passion," with police stations or news media being "deluged" with calls from

8    citizens with investigation tips or offers to set up a memorial fund, nor have the parties

9    demonstrated that this case has reached thousands of people.  *Cf. Daniels*, 428 F.3d at 1211.

10         Moreover, the Court agrees with Plaintiffs that the community has not been so saturated

11   with publicity surrounding this incident as to rise to the level of "inflammatory" media coverage.

12   (ECF No. 17 at 9–10.)  The 56 exhibits presented by both parties are "largely factual in nature,"

13   rather than inflammatory.  (*Id.* at 10; *see also generally* ECF Nos. 6-1, 17-2, 24); *see Harris*, 885

14   F.3d at 1362 (finding the 136 exhibits introduced were "largely factual in nature," despite

15   referring to the petitioner's prior criminal record and the alleged confession of each brother).

16   While the articles Defendants highlight may contain "inflammatory" remarks by Plaintiffs'

17   counsel (*see* ECF No. 6 at 17–19 (citing ECF No. 6-1 at 7–28, 68–88)), it must also be

18   acknowledged that those articles equally contain Defendants' public statements or statements

19   from the police union regarding Defendants' justification for the shooting.  (*See, e.g.*, ECF No. 6-

20   1 at 9–12, 13–17, 34–38, 39–44, 50–53, 58–62, 78–80, 81–88, 99–104, 105–111, 112–118.)

21         It is similarly telling that the majority of the news accounts about the shooting were

22   published within weeks of Monterrosa's death and have "dissipated considerably" with the

23   passage of time.  (*See* ECF No. 17 at 11.)  For example, the 35 exhibits Defendants present "were

24   published within weeks of the shooting and/or on the same day as Defendants held press

25   conferences or issued press releases regarding the case."  (*See* ECF No. 6-1 at 7–166.)  As for the

26   nine news articles attached to Defendants' reply, which were published in October and November

27   of 2020 (*see* ECF No. 24 at 14–104), these later-published articles do not pertain directly to the

28   shooting, but instead cover the arrest of Monterrosa's sisters while protesting outside Governor

1  Gavin Newsom's home, Governor Newsom's response, and the meeting of Monterrosa's sisters

2  with the Biden-Harris transition team.  (*Id.*)  The Court finds that this news coverage is only

3  tangentially related to the incident and Defendants' concerns that publicity will not die down (*see*

4  ECF No. 24 at 3–4) lacks support.

5          Defendants argue the case must be transferred because it has been politicized, citing

6  comments by House Speaker Nancy Pelosi and State Senator Bill Dodd, as well as Plaintiffs'

7  counsel "align[ing] Monterrosa with the Black Lives Matter movement" and posting statements

8  on social media.  (ECF No. 6 at 11–16.)  But Defendants do not demonstrate changing venue

9  would alleviate any prejudice generated by comments made on a statewide or national platform,

10 or on the internet.  Indeed, the Court agrees with Plaintiffs that Defendants have not shown "that

11 media attention has permeated beyond the southern portion of Solano County."  (ECF No. 17 at

12 9–10.)  The Court is additionally persuaded by Plaintiffs' argument that a change in venue based

13 on "protests in honor of the Black Lives Matter movement and commemorating George Floyd's

14 death" is "unsustainable," as such protests have also occurred within the Fresno Division.  (*Id.* at

15 12.)  The parties have also stipulated to a protective order with respect to sensitive information

16 contained in discovery documents, which will likely mitigate the risk of future prejudicial

17 publicity.  (*See* ECF Nos. 25–26.)

18         Defendants additionally maintain a change in venue is required due to the media's

19 publications of Chief Williams's "misstatements" that Monterrosa "was in a kneeling position

20 with his hands raised when shot and killed," which "will lead the community to mistakenly

21 assume the City has admitted liability."  (ECF No. 6 at 19.)  The Court does not necessarily agree

22 with Plaintiffs that Chief Williams's statements published by the media are admissible because

23 they were "uttered at his own press conferences."  (*See* ECF No. 17 at 12 (citing *Daniels*, 428

24 F.3d at 1211).)  It is arguable whether these statements would be admissible at a trial and depends

25 on a number of factors, primarily whether Chief Williams testifies.  The Court finds this argument

26 of Defendants' to be neutral.

27 ///

28 ///

11

Finally, Defendants contend voir dire will not be effective enough to guard against prejudicial publicity.  (ECF No. 6 at 20–21.)  Nevertheless, the Court agrees with Plaintiffs that the procedures of voir dire and "courtroom-control measures" can adequately "defuse prejudicial pre-trial publicity," "[e]ven if a few members of the potential jury venire may have been exposed to the media coverage identified by Defendants." (*See* ECF No. 17 at 14.)  In addition to voir dire, the Court is persuaded that the procedural safeguards outlined by the Supreme Court in *Sheppard* can sufficiently guard against prejudicial publicity: limiting the presence of the press; insulating witnesses; controlling the release of information to the press by police officers witnesses, and counsel; or requesting city and county officials to regulate the dissemination of information regarding the case by their employees.  *See Sheppard*, 384 U.S. at 357–62.

For each of the foregoing reasons, the Court finds the instant case does not constitute "an extreme situation" that calls for the application of presumed prejudice.  *Harris*, 885 F.3d at 1361. Accordingly, the Court finds that denying Defendants' motion for an intra-district transfer to the Eastern District of California's Fresno Division will not violate Defendants' constitutional rights to a fair trial and due process.

*ii.*     *28 U.S.C. § 1404 and Local Rule 120*

Defendants argue that "[a]dverse publicity is a factor a court may consider in evaluating a request to transfer under [§] 1404."  (ECF No. 6 at 23.)  Defendants assert "the bombardment of prejudicial publicity threatens Defendants' due process rights," which necessitates the intra-district transfer to the Fresno Division.  (*Id.* at 24.)  Conversely, Plaintiffs maintain evaluation of the § 1404(a) factors do not favor a transfer in venue, as Plaintiffs' choice of forum deserves weight and "Defendants have not presented any evidence that judicial economy regarding these factors is best served by a change of venue."  (ECF No. 17 at 8.)

As noted previously, in a § 1404(a) analysis, the Court first determines whether the case could have been brought in the transferee forum and then considers the convenience of the parties and witnesses and the interest of justice.  28 U.S.C. § 1404(a).

///

///

12

1       Here, Defendants seek an intra-district transfer to the Fresno Division — as the fatal

2   shooting of Monterrosa occurred in the Eastern District of California, it is thus undisputed that

3   this action could have been brought in either the Sacramento Division or Fresno Division.  As

4   Defendants do not request a transfer of venue outside the Eastern District of California, some of

5   the § 1404(a) factors do not weigh more heavily in favor of proceeding in either Division, such as

6   "familiarity of each forum with the applicable law" and "the relative court congestion and time of

7   trial in each forum."  *See Barnes & Noble, Inc.*, 823 F. Supp. 2d at 993.

8       Regarding the convenience of the parties and witnesses, Defendants contend that "most of

9   the witnesses in this action are likely to be Vallejo Police Officers who travel as a regular part of

10   their jobs" and "Plaintiffs have ample time to make arrangements for trial."  (ECF No. 6 at 24.)

11   Defendants also note that "the reality of modern times, the ease and availability of transportation,

12   and the use of remote options (e.g., Zoom) already used in the Fresno [D]ivision allay [any]

13   inconvenience."  (*Id.*)  In opposition, Plaintiffs importantly note that transfer would not be in the

14   interest of judicial economy.  (ECF No. 17 at 8.)  The Court agrees on this point.  Plaintiffs live in

15   San Francisco, which is an hour commute from Sacramento, and Defendants, who work in the

16   Vallejo, face a shorter commute.  (*Id.*)  Plaintiffs maintain that a trial in Fresno would require

17   counsel "to incur the expense of hotel stays, as [a] 3-hour plus commute each way is untenable."

18   (*Id.*)  Plaintiffs assert if the parties require lay witnesses or subject-matter experts, "requiring

19   them to travel to Fresno will be costly and perhaps serve as an impediment to witness

20   cooperation."  (*Id.*)  Given the foregoing and the additional difficulties presented by the COVID-

21   19 pandemic, it appears that Sacramento provides the minimum level of inconvenience to the

22   parties and possible witnesses — especially if the case goes to trial.  The Court therefore finds

23   these factors weigh in favor of Plaintiffs.

24       Regarding the initial choice of forum, Plaintiffs argue this factor deserves "some weight"

25   as it is "the forum in which the injuries occurred."  (*Id.*)  Defendants do not address this factor in

26   their reply brief.  (*See* ECF No. 24.)  The Court finds this factor weighs in favor of Plaintiffs.

27   ///

28   ///

1        Regarding local interest in the controversy, Defendants essentially raise the same

2   arguments they previously asserted in their constitutional argument, and the Court finds Plaintiffs

3   have the better argument for the reasons previously discussed.  (*See* ECF No. 6 at 23–24.)

4   Defendants' reliance on *Wash. Pub. Utilities Group* is misguided because it is not factually

5   analogous to the instant matter.  In *Wash. Pub. Utilities Group*, "a substantial number of potential

6   jurors" had "a financial interest in the outcome of the case," as "most of the potential jurors had

7   been subjected to media publicity about the [utility defendants'] bond default and many were

8   concerned that a judgment against the utility defendants in this case would affect their utility

9   rates."  843 F.2d at 326–27.  Here, by contrast, while Defendants have pointed to media accounts

10  they consider to be "inflammatory," the Court finds these accounts to also be "largely factual in

11  nature."  Activity relating to these media accounts seems to have been at its peak in the weeks

12  immediately after Monterrosa's death and have largely dissipated since, with the exception of the

13  nine news articles published in October and November.  (*See generally* ECF No. 6-1.)

14  Furthermore, none of the parties submitted argument that any potential jury members have a

15  financial interest in the outcome of this case.  *Cf. Wash. Pub. Utilities Group*, 843 F.2d at 327.

16  Thus, this last factor also weighs in favor of Plaintiffs.

17       Accordingly, the Court finds that denying Defendants' motion is convenient for the parties

18  and witnesses and does not conflict with the interests of justice.  For this reason, as well as the

19  fact that it does not violate Defendants' constitutional rights, the Court DENIES Defendants'

20  Motion to Transfer Venue.

21       **III.**     **MOTIONS TO DISMISS AND STRIKE**

22              A.     Legal Standards

23                     i.      *Motion to Dismiss*

24       A motion to dismiss for failure to state a claim upon which relief can be granted under

25  Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of a complaint.

26  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a) requires that a pleading contain

27  "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See*

28  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Under notice pleading in federal court, the

1    complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon

2    which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

3    "This simplified notice pleading standard relies on liberal discovery rules and summary judgment

4    motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*

5    *v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

6         On a motion to dismiss, the factual allegations of the complaint must be accepted as true.

7    *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give the plaintiff the benefit of every

8    reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail*

9    *Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege

10   "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to

11   relief." *Twombly*, 550 U.S. at 570.

12        Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

13   factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir.

14   1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an

15   unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  A

16   pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

17   elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678

18   ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

19   statements, do not suffice.").  Moreover, it is inappropriate to assume the plaintiff "can prove

20   facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not

21   been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

22   U.S. 519, 526 (1983).

23        Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough

24   facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting

25   *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

26   content that allows the court to draw the reasonable inference that the defendant is liable for the

27   misconduct alleged." *Id.* at 680.  While the plausibility requirement is not akin to a probability

28   requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully."

*Id.* at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

In ruling on a motion to dismiss, a court may only consider the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201.  *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'"  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)).

### ii.      Motion to Strike

Rule 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  A court will only consider striking a defense or allegation if it fits within one of these five categories.  *Yursik v. Inland Crop Dusters Inc.*, No. CV-F-11-01602-LJO-JLT, 2011 WL 5592888, at *3 (E.D. Cal. Nov. 16, 2011) (citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973–74 (9th Cir. 2010)).  "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  However, Rule 12(f) motions are "generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic."  *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003).  "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court."  *Id.*  Unless it would prejudice the opposing party, courts freely grant leave to amend stricken pleadings.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973); *see also* Fed. R. Civ. P. 15(a)(2).  If the court is in doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, leaving the assessment of the sufficiency of the allegations for adjudication on the merits after proper development of the factual nature of the

1    claims through discovery.  *See generally Whittlestone*, 618 F.3d at 974–75.

2            Where a defendant seeks to challenge the sufficiency of factual allegations in a complaint,

3    it must do so through a Rule 12(b)(6) motion, not a Rule 12(f) motion.  *Kelley v. Corr. Corp. of*

4    *Am.*, 750 F. Supp. 2d 1132, 1146 (E.D. Cal. 2010) (citing *Consumer Solutions REO, LLC v.*

5    *Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009)).  "[W]here a motion is in substance a Rule

6    12(b)(6) motion, but is incorrectly denominated as a Rule 12(f) motion, a court may convert the

7    improperly designated 12(f) motion into a Rule 12(b)(6) motion."  *Id.* (citing *Consumer*

8    *Solutions*, 658 F. Supp. 2d at 1021).

9            B.    Analysis

10           Plaintiffs' FAC alleges five claims: (1) violation of Monterrosa's First, Fourth, Fifth, and

11   Fourteenth Amendment constitutional rights; (2) *Monell* liability against the City, for allowing

12   Tonn and other police officers to serve while the City knew or should have known the officers

13   were "untrained or improperly trained" and for maintaining deficient customs in the use of force;

14   (3) violation of Plaintiffs' Fourteenth Amendment right to a familial relationship with

15   Monterrosa; (4) violation of Michelle and Ashley's First Amendment right of association with

16   Monterrosa; and (5) wrongful death.  (*See* ECF No. 29.)  Defendants move to dismiss the third

17   and fourth claims for failure to state a claim upon which relief may be granted and move to strike

18   paragraph four of Plaintiffs' prayer for relief as it seeks relief for statutory violations that have not

19   been pleaded.  (*See* ECF No. 5.)

20           i.      *Claim Three: Fourteenth Amendment Right to Familial*

21                   *Relationship*

22           Plaintiffs incorporate by reference the allegations of all preceding claims and facts in this

23   claim and allege Tonn deprived them of their Fourteenth Amendment right "to a familial

24   relationship with [Monterrosa] by use of unreasonable, unjustified deadly force and violence,

25   causing injuries which resulted in [Monterrosa's] death, all without provocation."  (ECF No. 29 at

26   ¶¶ 37–38.)  Plaintiffs further allege Tonn "acted with an intent to harm [Monterrosa] unrelated to

27   legitimate law enforcement purposes in killing [Monterrosa]."  (*Id.*)

28   ///

1    Defendants argue Plaintiffs' third claim asserted by Monterrosa's siblings, Michelle and

2    Ashley, should be dismissed for three reasons: (1) Monterrosa's siblings do not have a

3    constitutionally protected interest in their companionship with Monterrosa; (2) Plaintiffs' FAC

4    does not allege Defendants intended to interfere with Monterrosa's right to familial relationships;

5    (3) and qualified immunity applies to Defendants.  As the Court finds Monterrosa's siblings are

6    unable to establish a constitutionally-protected right under the Fourteenth Amendment, the Court

7    will address Defendants' first argument only and does not reach Defendants' remaining

8    arguments.[2]

9    Constitutional law protects "two distinct forms of freedom of association" — "(1)

10   freedom of intimate association, protected under the Substantive Due Process Clause of the

11   Fourteenth Amendment, and (2) freedom of expressive association, protected under the Freedom

12   of Speech Clause of the First Amendment."  *Erotic Service Provider Legal Education and*

13   *Research Project v. Gascon*, 880 F.3d 450, 458 (9th Cir. 2018).  Although the Ninth Circuit has

14   held "claims under both the First and Fourteenth Amendments for unwarranted interference with

15   the right to familial association could survive a motion to dismiss," the Ninth Circuit has also held

16   "siblings do not possess a cognizable liberty interest to assert a loss of familial association claim

17   under the Fourteenth Amendment."  *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir.

18   2001); *J.P. v. County of Alameda*, 803 F. App'x 106, 109 (9th Cir. 2020), *reh'g en banc denied*

19   (9th Cir. Jun. 12, 2020) (citing *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1992)).

20   Defendants correctly argue the Ninth Circuit has held that "siblings do not retain

21   constitutionally protected rights to a familial relationship with each other."  (ECF No. 5 at 10

22   (citing *Ward*, 967 F.2d at 284); *see also* ECF No. 23 at 2.)  In opposition, Plaintiffs assert their

23   relationships with Monterrosa fit the description of relationships accorded protection by the

24   Fourteenth Amendment because Monterrosa lived with Ashley and Michelle, as well as their

25   parents Neftali and Nora, for his entire life and they "were a very tight knit family."  (ECF No. 18

26   at 10–11 (citing *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1193 (9th Cir. 1988) (the

27   _____

28   [2]    The Court explicitly notes here that while it dismisses Monterrosa's siblings' 14th
     Amendment claims, the 14th Amendment claims asserted by Monterrosa's parents still stand.

1  Fourteenth Amendment protects "those that attend the creation and sustenance of a family and

2  similar 'highly personal relationships.'")); *see also* ECF No. 1 at ¶ 5.)

3       However, *IDK, Inc.* predates the Ninth Circuit's decision in *Ward* and was therefore

4  overruled by *Ward* to the extent that it supported a Fourteenth Amendment right of familial

5  association for adult siblings. *Compare IDK, Inc.*, 836 F.2d at 1193, *with Ward*, 967 F.2d at 284.

6  As Michelle and Ashley are adult siblings attempting to plead a § 1983 claim for violations of

7  their right to familial association under the Fourteenth Amendment, their claim is foreclosed by

8  the Ninth Circuit's holding in *Ward*. Accordingly, the Court GRANTS Defendants' Motion to

9  Dismiss Plaintiffs' third claim with respect to Plaintiffs Michelle and Ashley. Furthermore,

10 because amendment would be futile, the dismissal as to these Plaintiffs is without leave to amend.

11 *Lopez*, 203 F.3d at 1130.

12                    *ii.       Claim Four: First Amendment Right of Association*

13      Plaintiffs additionally incorporate by reference the allegations of all preceding claims and

14 facts in this claim and claim Tonn deprived Michelle and Ashley of their First Amendment rights

15 of association with Monterrosa. (*See* ECF No. 29 at ¶¶ 40–41.) Defendants argue Plaintiffs'

16 fourth claim is inadequately pleaded and qualified immunity applies to Defendants. As the Court

17 finds here as well that Monterrosa's siblings are unable to establish a constitutionally-protected

18 right under the First Amendment, the Court will address Defendants' first argument only and does

19 not reach Defendants' qualified immunity argument.

20      Defendants argue the FAC does not adequately state a claim for the violation of the right

21 "to associate for the purpose of engaging in those activities protected by the First Amendment,"

22 as a claim that "Defendants impermissibly interfered with their right to maintain a relationship

23 with [Monterrosa] against undue intrusion" fails as a matter of law and Plaintiffs fail to allege

24 "any expressive purpose to the siblings' associations with [Monterrosa] or reveal any political,

25 social, [or] economic . . . cause to their associations with [Monterrosa]." (ECF No. 5 at 15–16.)

26 Defendants clarify further that the Ninth Circuit has held "siblings do not have a cognizable right

27 to familial association under the First Amendment." (ECF No. 23 at 5 (citing *Mann v. City of*

28 *Sacramento*, 748 F. App'x 112, 115 (9th Cir. 2018)).)

In opposition, Plaintiffs maintain the Supreme Court has identified cohabitation with relatives as an intimate relationship that is given constitutional protection and the Ninth Circuit has clarified that a claim under the First and Fourteenth Amendments "for unwarranted interference with the right to familial association could survive a motion to dismiss." (ECF No. 18 at 12 (citing *Board of Dir. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545–46 (1987); *Mann*, 748 F. App'x at 114).)  Plaintiffs again highlight that they pleaded Monterrosa, Ashley, and Michelle lived together for Monterrosa's "entire life" and that all Plaintiffs "were a very tightly knit family."  (*Id.* at 13.)

The Ninth Circuit has expressly stated that "[n]o viable loss-of-familial-association claim exists for siblings under the First Amendment," and thus far, the loss of familial association claims have been limited to the parent-child relationship.  *J.P.*, 803 F. App'x at 109.  The Ninth Circuit noted in *Ward* that it "explicitly ruled that siblings do not possess a cognizable liberty interest to assert a loss of familial association claim under the Fourteenth Amendment" and "[n]o basis exists to disregard this precedent simply because the claim is raised under the First Amendment rather than the Fourteenth Amendment."  *Id.*  For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss Plaintiffs Michelle and Ashley's fourth claim.  As amendment would be futile here as well, the dismissal is without leave to amend.  *Lopez*, 203 F.3d at 1130.

### iii.    Motion to Strike

Defendants move to strike paragraph four of Plaintiffs' prayer for relief, as it "seeks relief for violation of California Civil Code [§§] 52 and 52.1, statutory damages, and reasonable attorney's fees," but Plaintiffs' FAC does not state a claim under those statues (identified as the Tom Bane Civil Rights Act ("Bane Act") and the Unruh Civil Rights Act ("Unruh Act"), respectively).  (ECF No. 5 at 16–17 (internal quotations omitted).)  Defendants therefore argue paragraph four must be stricken as "immaterial matter . . . that has no bearing on the controversy before the Court."  (*Id.* at 16; *see also* ECF No. 23 at 7.)  In opposition, Plaintiffs maintain they have adequately pleaded a violation of the Bane Act (Cal. Civ. Code § 52.1).  (ECF No. 18 at 16–17.)

1    Case law has clarified that a plaintiff need not specify the legal theory for his or her

2    claims.  *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11–12 (2014); *see also Kirkpatrick v.*

3    *County of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016) (claim factually asserting violation of

4    constitutional rights not inadequate because it failed to refer specifically to the Fourth

5    Amendment); *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir.

6    1990) (finding the complaint put defendant on notice of a claim against it for unfair competition,

7    even though the complaint did not include an explicit claim entitled "unfair competition," as

8    plaintiff referred to unfair competition in its jurisdictional statement, in both copyright

9    infringement claims, and prayer for relief.  However, plaintiffs should plead the requisite facts

10   establishing the elements of any claims they wish to argue.  *Iqbal*, 556 U.S. at 675.

11   As to the Unruh Act, Plaintiffs do not address Defendants' argument that they have not

12   pleaded a violation of this law in their reply, and therefore that point is conceded.  Furthermore,

13   Plaintiffs have not expressly asserted a cause of action for violations of the Bane Act or the Unruh

14   Act.  (*See* ECF No. 29.)  It is not clear whether Plaintiffs intended to assert a Bane Act claim.

15   However, since Plaintiffs seek Bane Act damages, out of an abundance of caution, the Court

16   GRANTS Defendants' Motion to Strike with leave to amend to assert a Bane Act claim.

17   **IV.    MOTION FOR PROTECTIVE ORDER**

18   Defendants request a protective order from this Court to prohibit Plaintiffs' counsel from

19   making further public statements during the pendency of the instant action regarding:

20          (1) the character, credibility, or reputation of a party; (2) the identity
            of a witness or the expected testimony of a party or a witness; (3) the
21          contents of any pretrial confession, admission, or statement given by
            a party or that person's refusal or failure to make a statement; (4) the
22          identity or nature of physical evidence expected to be presented or
            the absence of such physical evidence; (5) the strengths or
23          weaknesses of the case of either party; (6) the character, credibility,
            or reputation of the Vallejo Police Department; and (7) any other
24          information counsel knows or reasonably should know is likely to be
            inadmissible as evidence and would create a substantial risk of
25          prejudice if disclosed.

26   (ECF No. 7 at 4.)  Defendants argue a protective order "is necessary to ensure that Defendants

27   receive a fair trial by an impartial jury."  (ECF No. 7 at 17.)  Defendants contend they can meet

28   the requirements articulated by the Ninth Circuit to impose restraints on an attorney's speech

1    during the pendency of a lawsuit.  (*Id.* at 15–16 (citing *Levine v. U.S. Dist. Court for the Central*

2    *Dist. of Cal.*, 764 F.2d 590, 591 (9th Cir. 1985)).)  Defendants cite California Rule of

3    Professional Conduct 3.6 in support of their assertion that "attorneys have a fiduciary

4    responsibility not to engage in public debate that will redound to the detriment of the accused or

5    that will obstruct the fair administration of justice."  (*Id.* at 15.)

6         In opposition, Plaintiffs assert Defendants' motion infringes on their First Amendment

7    right to free speech.  (ECF No. 16 at 10.)  Plaintiffs note that "[o]rders which restrict or preclude

8    a citizen from speaking in advance are known as 'prior restraints' and are disfavored and

9    presumptively invalid."  (*Id.*)  Plaintiffs maintain the "danger of prejudice" to Defendants is to

10   "be balanced against the competing First Amendment rights of the attorneys publicizing the

11   case."  (*Id.* at 10–11.)  Plaintiffs cite a California Court of Appeal case to articulate the

12   requirements to impose restraints on an attorney's speech during the pendency of a lawsuit

13   (which are nearly identical to those identified by Defendants).  (*Id.* at 11 (citing *Hurvitz v.*

14   *Hoefflin*, 84 Cal. App. 4th 1232, 1238 (2000)).)  Plaintiffs also emphasize that they have not

15   violated the California Rules of Professional Conduct, as "Defendants[] cannot prove that

16   Plaintiffs' counsel's words caused any prejudice, as opposed to body-cam[era] footage and

17   inconsistent statements by police officials," nor can Defendants demonstrate "any material

18   prejudice that would subject them to an unfair trial."  (*Id.* at 15.)

19        As an initial matter, the Court notes Defendants' motion for protective order is more

20   properly construed as a motion for a temporary restraining order ("TRO") or preliminary

21   injunction, as the requested relief does not seek to limit the scope or method of discovery under

22   Rule 26.  By contrast, the parties have stipulated to a protective order with respect to sensitive

23   information contained in discovery documents.  (*See* ECF Nos. 25–26.)  Here, Defendants ask the

24   Court to restrain Plaintiffs' counsel from making specific statements during the pendency of the

25   instant action.  The Ninth Circuit case that Defendants cite also specifically pertains to a

26   restraining order that was found to be an appropriate remedy for excessive trial publicity.  *See*

27   *Levine*, 764 F.2d at 600–01.  Most importantly, Local Rule 231(c) requires other documents to be

28   filed in conjunction with a TRO — documents Defendants have not submitted.  For the foregoing

1   reasons, the Court DENIES Defendants' Motion for Protective Order without prejudice to refiling

2   as a motion for a TRO or preliminary injunction in compliance with the Local Rules.

3        V.     **MOTION FOR SANCTIONS**

4        A.    <u>Legal Standard</u>

5   Rule 11 allows sanctions under the following circumstances:

6        By presenting to the court a pleading, written motion, or other
7   paper . . . an attorney or unrepresented party certifies that to the best
    of the person's knowledge, information, and belief, formed after an
    inquiry reasonable under the circumstances: (1) it is not being
8   presented for any improper purpose, such as to harass, cause
    unnecessary delay, or needlessly increase the cost of litigation; (2)
9   the claims, defenses, and other legal contentions are warranted by
    existing law or by a nonfrivolous argument for extending, modifying,
10  or reversing existing law or for establishing new law; [and] (3) the
    factual contentions have evidentiary support or, if specifically so
11  identified, will likely have evidentiary support after a reasonable
    opportunity for further investigation or discovery . . . If, after notice
12  and a reasonable opportunity to respond, the court determines that
    Rule 11(b) has been violated, the court may impose an appropriate
13  sanction on any attorney, law firm, or party that violated the rule . . .

14  Fed. R. Civ. P. 11(b), (b)(1)–(3), (c)(1).

15       Rule 11 "is designed to deter attorneys and unrepresented parties from violating their

16  certification that any pleading, motion or other paper presented to the court is supported by an

17  objectively reasonable legal and factual basis; no showing of bad faith or subjective intent is

18  required." *Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169, 173–74 (C.D. Cal. 2002).

19  Rather, Rule 11 is governed by an objective standard of reasonableness. *See*, *e.g.*, *Conn v. CSO*

20  *Borjorquez*, 967 F.2d 1418, 1421 (9th Cir. 1992). "The central purpose of Rule 11 is to deter

21  baseless filings." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971

22  F.2d 244, 254 (9th Cir. 1992) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)).

23  Thus, where a party "pursues causes of action for which there is no legal basis whatsoever,"

24  sanctions may be warranted. *Bhambra v. True*, No. 09-cv-4685-CRB, 2010 WL 1758895, at *3

25  (N.D. Cal. Apr. 30, 2010).

26  ///

27  ///

28

1    Rule 11 allows a party to move for sanctions if the moving party serves the motion on the

2    non-moving party pursuant to Rule 5.  *See* Fed. R. Civ. P. 11(c)(2).  A moving party must allow

3    21 days after service or within another time the court sets for the challenged paper, claim,

4    defense, contention, or denial to be corrected.  *See id.*  In the Ninth Circuit, this "safe harbor"

5    provision is strictly enforced.  *See Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1988) ("It would

6    therefore wrench both the language and purpose of the amendment [of Rule 11] to permit an

7    informal warning to substitute for service of a motion."); *see also Radcliffe v. Rainbow Const.*

8    *Co.*, 254 F.3d 772, 789 (9th Cir. 2001) (finding violation of Rule 11's "safe harbor" provision

9    when the defendant did not serve the plaintiff with a copy of the motion for sanctions, even

10    though the plaintiff had informal notice that the defendant intended to move for sanctions).

11    Hence, "[i]t is the service of the motion that gives notice to a party and its attorneys that they

12    must retract or risk sanctions."  *Radcliffe*, 254 F.3d at 789.  Moreover, "the failure to comply with

13    the mandatory procedural requirements makes Rule 11 sanctions inappropriate."  *More v. Chase,*

14    *Inc.*, No. 1:14-cv-01178-SKO, 2016 WL 928671, at *7 (E.D. Cal. Mar. 10, 2016).

15    B.    Analysis

16    Plaintiffs move for Rule 11 sanctions against Defendants' counsel for "necessitating the

17    instant Oppositions" to Defendants' Motions for Protective Order and to Transfer Venue, which

18    they deem "are both frivolous and both materially mislead the Court."  (ECF No. 19 at 1, 6.)

19    Plaintiffs set forth three main arguments: (1) the arguments of Defendants' counsel are frivolous

20    and in bad faith, as they "omitted their own [preemptive] media efforts from the Motion, . . .

21    which demonstrated an effort to malign [Monterrosa]"; (2) Defendants' counsel withheld

22    evidence from the Court in the form of the content of "Defendants' press conferences," which

23    contradicted their motions and "continued media efforts"; and (3) Defendants' counsel failed to

24    correct or withdraw their motions when Plaintiffs' counsel "specifically requested" they do so on

25    October 27, 2020.  (*Id.* at 7–10.)

26    In opposition to Plaintiffs' motion, Defendants argue the motion must be denied because it

27    was not served 21 days prior to filing as required by Rule 11 and the relief requested in their

28    motions for protective order and to transfer venue is warranted by existing law.  (ECF No. 30 at

6–8.)  Defendants stress that "a meet and confer letter or other informal warning is not sufficient to satisfy the procedural requirements of Rule 11."  (*Id.* at 7.)  Defendants also request attorneys' fees of $2,725 to be awarded to them "as the prevailing parties to compensate for the cost of opposing this motion" pursuant to Rule 11(c)(2).  (*Id.* at 12–13.)

Plaintiffs note in reply that they sent Defendants "a draft of their sanctions motion" and "a draft of their arguments regarding the defects in Defendants['] motions" that were the same arguments presented in their final Rule 11 motion.  (ECF No. 31 at 2–3.)  Plaintiffs assert these drafts were sufficient to comply with the mandates of Rule 11.  (*Id.* at 3.)  Plaintiffs request in the alternative for leave to refile their motion for sanctions and make a vague argument about the infeasibility of the 21-day safe harbor because their opposition briefs to Defendants' motions were due.  (*Id.* at 5.)

The Court disagrees with the arguments set forth by Plaintiffs.  This Court has previously stated it is bound by the Ninth Circuit's strict interpretation of Rule 11's "safe harbor" provision and has emphasized compliance with Rule 11 requires the non-moving party to be served with a *motion*.  *See Nan Hanks & Assocs., Inc. v. Original Footwear Co., Inc*., No. 2:17-cv-00027-TLN-KJN, 2018 WL 3155247, at *4 (E.D. Cal. Jun. 26, 2018) (citing Fed R. Civ. P. 11(c)(2); *Radcliffe*, 254 F.3d at 789).  Plaintiffs' drafts are clearly not motions within the meaning of Rule 11.  *Id.*; *Woods v. Truckee Meadows Water Auth.*, No. 3:06-CV-0189-LRH (VPC), 2007 WL 2264509, at *3 (D. Nev. Aug. 6, 2007) (precluding sanctions because of noncompliance with Rule 11's safe harbor provision even though the party complied with the rule "in spirit" with a letter).  The Court therefore declines to evaluate Plaintiffs' arguments for Rule 11 sanctions because these procedural flaws are fatal and Plaintiffs' motion is DENIED.[3]  *See Radcliffe*, 245 F.3d at 789.

///

///

///

---

[3]      Nevertheless, the Court does not find the defects in Plaintiffs' motion warrant an award of sanctions to Defendants and therefore declines to grant Defendants' request.

## VI.   CONCLUSION

Accordingly, the following is hereby ORDERED:

1. Defendants' Motion to Dismiss (ECF No. 5) Plaintiffs Michelle and Ashley Monterrosa's third and fourth claims is GRANTED without leave to amend;

2. Defendants' Motion to Strike (ECF No. 5) is GRANTED with leave to amend;

3. Defendants' Motion to Transfer Venue (ECF No. 6) is DENIED;

4. Defendants' Motion for Protective Order (ECF No. 7) is DENIED; and

5. Plaintiffs' Motion for Sanctions (ECF No. 19) is DENIED.

Plaintiffs may file an amended complaint consistent with this Court's ruling not more than 30 days from the electronic filing of this Order.  Defendants shall file a response to the amended complaint in accordance with the Local Rules and Federal Rules of Civil Procedure.

IT IS SO ORDERED.

DATED:  February 10, 2021

Troy L. Nunley
United States District Judge