IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEFTALI MONTERROSA, et al., | : |
| | : |
| Plaintiffs, | : |
| v. | : Civil Action No. 2:20-cv-01563 |
| | : |
| CITY OF VALLEJO, et al., | : |
| | : |
| Defendants. | : |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGEMENT FILED BY DEFENDANT JARRETT TONN AND DEFENDANT THE CITY OF VALLEJO**

Plaintiffs Neftali and Nora Monterrosa hereby respond in opposition to Defendants Jarrett Tonn's and the City of Vallejo's Motions for Summary Judgement. In support thereof, Plaintiff relies on the following memorandum of points and authorities.

Respectfully submitted,

/s/ John J. Coyle
John J. Coyle, Esq.
Mark V. Maguire, Esq.
Danielle N. Purtell, Est.
MCELDREW PURTELL
123 South Broad Street
Suite 2250
Philadelphia, PA 19109

Carla M. Wirtschafter, Esq.
REED SMITH LLP
1901 Avenue of the Stars
Suite 700
Los Angeles, CA 90067

Date: December 6, 2024

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND.................................................................................................. 2

   A.   Factual Background .......................................................................................... 2

      i.    Vallejo's Complete Lack of Oversight.................................................... 2

      ii.   The Shooting of Sean Monterrosa .........................................................7

   B.   Procedural Background .................................................................................. 9

III.  LEGAL STANDARD ..........................................................................................10

   A.   Summary Judgment Standard.........................................................................10

   B.   Qualified Immunity......................................................................................... 11

IV.   ARGUMENT .....................................................................................................12

   A.   Defendant Tonn violated the Fourth Amendment when he shot Sean Monterrosa ...........12

   B.   The 4th Amendment right at issue was clearly established.........................................13

   C.   Defendant Tonn violated a clearly established Fourteenth Amendment right by killing Sean Monterrosa ..................................................................... 14

   D.   The City is liable under Monell for the Fourth and Fourteenth Amendment violations...15

   E.   Evidence Exists to Support a Bane Act Claim .............................................................17

   F.   State Law Battery and Negligence Claim ...................................................................19

V.    CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Smalls v. City of Tacoma*, 2023 U.S. Dist. LEXIS 72144 at *25-26; W.D. Wa. No. 3:22-cv-5043 (W.D. Wa. April 25, 2023) ............................................................................................................. 13

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) .......................................................... 11

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) .............................................................................. 11

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ......................................................... 10, 13

*Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2078 (2011) ............................................................................ 11

*Atabekova-Michaelidis v. City of Los Angeles,* 2023 U.S.Dist. LEXIS 209740, at * 17; C.D.Cal. No. 2:22-cv-05620 (C.D.Cal. August 14, 2023) ........................................................................................ 15

*Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 882 (2007) .............................. 18

*Brown v. Rainsweiler*, 171 Cal. App. 4th 516, 528, fn. 11 (2009) ..................................................... 20

*Cameron v. Craig,* 713 F.3d 1012, 1022 (9th Cir. 2013) ................................................................... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). ......................................................................... 10

*Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 769 (2017) ............................. 17

*Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ..................................................... 14

*Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) .................................................... 15

*Gahn v. Fujino*, 1994 U.S.App. LEXIS 30018, at *3; C.A.9 Nos. 93-35525, 93-35535 (9th Cir. October 21, 1994) ............................................................................................................................. 12

*Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) ...................................................... 12

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................................................................ 12

*Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982) .......................................................................... 11

*Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011) ......................................... 15

*Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998) ............................................................................ 18

*Larez v. Los Angeles*, 946 F.2d 630, 646-647 (9th Cir. 1991) ......................................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-590 (1986) ........................ 10

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) .................................................................................... 11

*Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) ............................................................. 15

*Pearson v. Callahan*, 129 S. Ct. 808 (2009) ..................................................................................... 11

*Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) .............................................19

*Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018)...............................................15, 16

*Saucier v. Katz*, 121 S. Ct. 2151 (2001) ........................................................................................11

*Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1126 (2016) .............................................19

*Smith v. Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987) ..........................................................14

*Tennessee v. Garner*, 471 U.S. 1, 3, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) ....................12, 13, 14

*Torres*, 648 F.3d at 1128 ...............................................................................................................14

*Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) .............................................13

*Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) .........................16, 17

*Venegas v. County of Los Angeles*, 32 Cal.4th 820, 841–843 (2004) ......................................18

*White v. Pauly*, 137 S.Ct. 548, 551 (2017) .................................................................................11

**Statutes**

Cal. Civ. Code § 52.1..................................................................................................................18

**Other Authorities**

Schwartz, J., *Shielded: How the Police Became Untouchable*, (1 ed. 2023) .............................. 2

**Rules**

Fed.R.Civ.P. 56(c)......................................................................................................................10

1          I.          INTRODUCTION

2     On June 2, 2020, Defendant Jarrett Tonn shot Sean Monterrosa in the back of the head as he

3     ran away.  Sean was unarmed. The 22-year-old died at the scene leaving behind his mother Nora,

4     his father Neftali, and his sisters Ashley and Michelle. It was Tonn's fourth shooting in less than

5     six years on the force.

6     Tonn's completely unjustified fatal shooting was the culmination of years of deficient

7     oversight and disciplinary failure by the Vallejo police department.  The Vallejo police department

8     has a documented history of nearly no oversight and accountability.  It's internal affairs and

9     Critical Incident Review Board (CIRB) programs are perfunctory in nature with former Police

10    Chiefs admitting that they did not even read reports before approving them.  This feckless and

11    lawless manner of leadership led to investigations by the OIR Group and a collaborative reform

12    agreement and stipulated judgment with the California Department of Justice.

13    Vallejo's wild west style of policing is reflected by the practice of badge bending by Vallejo

14    police officers. Starting in 2000, Vallejo officers began bending their badges to commemorate

15    police shootings. City Manager Greg Nyhoff described the practice as "celebrating the death of a

16    human being." But despite Vallejo leadership knowing this subculture norm existed as early as

17    2016, the issue was wholly ignored. The inevitable result was Vallejo officers believing that the

18    leadership supported the conduct and culture.

19    Badge bending infected nearly every aspect of Vallejo police culture and undermined the

20    reliability of core systems.  Badge benders held roles as supervisors, firearms instructors, field

21    training officers, and even internal affairs sergeants.  Badge benders were responsible for

22    conducting investigations into officer involved shootings, serving as reviewers on the critical

23    incident review board, only to turn around and subsequently bend the badges of the very officers

24    they investigated.

1    The cowboy culture of the Vallejo police department allowed Jarrett Tonn to shoot at three

2    prior individuals – none of whom possessed a weapon – without ever even experiencing a rigorous

3    investigation, let alone discipline or retraining.   Unsurprisingly then, Tonn leaned into the

4    gunslinger mentality, having his badge bent by then Lieutenant Kent Tribble.

5    Vallejo completely failed at oversight and accountability and that failure allowed Defendant

6    Tonn to shoot an unarmed man in the back of the head as he ran away.  Summary judgment should

7    be denied on all counts and this matter should proceed to trial.

8    II.    BACKGROUND

9    *A. Factual Background*

10    i.    **Vallejo's Complete Lack of Oversight**

11    For decades, the City of Vallejo has operated one of the most violent police departments in the

12    United States. UCLA Law Professor Joanna Schwartz's review of the City found that between

13    2010 and 2020, Vallejo police officers killed 19 people – more than 13 people per 100,000 Vallejo

14    residents. *See* Schwartz, J., *Shielded: How the Police Became Untouchable*, (1 ed. 2023) at p. 176. "More

15    people are shot by Vallejo police officers, per capita, than officers in any other city in Northern

16    California." *Id.* "A Pew Research Center survey… found that 27 percent [of officers nationwide]

17    had ever fired their weapons while on duty… By contrast, as of August 2019, nearly 40 percent of

18    the approximately 100 officers on the Vallejo police force had been involved in at least one

19    shooting, ***and more than one-third had been involved in two or more.***" *Id.* at 177 (emphasis

20    added).   In 2012, Vallejo police officer shootings were responsible for nearly one-third of all

21    homicides in the City. *Id.* at 180. The City has done nothing to stop the police violence and indeed

22    fueled the deadly culture by celebrating police shootings with ritualistic badge bending.

23    *1.   Internal Affairs and CIRB Failures*

24    The City of Vallejo did not have a standing procedure to conduct CIRB evaluations of officer

involved shootings in a manner that is generally accepted by police standards. (PSMF at 23.) Indeed its internal affairs system as a whole was substandard. Prior to 2011, the VPD did not have any type of formalized use of force review system at all. (*Id.* at 25.) From 2014 through 2020, the Department – despite owning and utilizing software ("IA Pro") that had a built-in capability to detect patterns of use of force by individual officers and provide the department with early warning or early intervention notices – failed to implement any types of policies or procedures that implement an early intervention program. (*Id.* at 26.) Even when an officer used deadly force multiple times in a constrained period, like Defendant Tonn, there was no mechanism for enhanced review, retraining, or requalification. (*Id.* at 27.)  An officer involved in a shooting was simply put back out on the street, usually within a few days and long before the administrative review or criminal investigation was finalized. (*Id.*)

Even the CIRB process itself was lackluster.  Memos generated by the CIRB and produced to the Chief for review for discipline or approval were "quite short in their summary of the underlying Board discussion," often times including only two paragraphs summarizing the shooting. (*Id.* at 28.)  The CIRB would not consider prior incidents or shootings by an officer when analyzing a subsequent shooting – even if there were multiple shootings in a short period. (*Id.* at 29.)  When CIRB findings were presented to the Chief, the Chief was not provided with the full investigation narrative report, only the short summary contained in the CIRB report. (*Id.* at 30.) This process severely undercut the Chiefs ability to analyze the incident for approval or discipline – if the Chief was inclined to review the incident at all. Former Chief Andrew Bidou (Chief from 2014-2019) stated that he did not even read the entire summaries and sometimes he didn't read the summaries at all. (*Id.* at 31.)  As a result of this process, accountability was non-existent – no officer was disciplined for a shooting or critical incident in at least the 20 years, in fact no officer

1  was disciplined for any inappropriate use of force between 2014 and 2020. (*Id.* at 32-33.)

2      Vallejo's pathetic accountability practices came into clearer focus when in the summer of 2019,

3  new Police Chief Shawny Williams retained the OIR Group to do a comprehensive evaluation of

4  the Vallejo Police Department. (*Id.* at 35.) The OIR Group's review of internal affairs and CIRB

5  processes found "an apparent reticence when it came to finding fault." (*Id.* at 36.)  The review

6  further noted that despite officers being equipped with body cameras for years, it was not until

7  November of 2019 that activating the body cameras became mandatory.  Thus, removing a

8  departmental tool for "meaningful accountability." (*Id.* at 37.) The report noted that the CIRB

9  process demonstrated a "lack of consistency and some significant missed opportunities, along

10  with a seeming reticence to criticize shortcomings in performance." (*Id.* at 38.)  Even when CIRB

11  review found opportunities for additional training, there was no plan to implement that training,

12  "or even clarity as to whether the recommendation was directed at involved personnel or the

13  agency as a whole." (*Id.* at 39.)  Importantly, in the rare occasion when the CIRB review found an

14  apparent violation of Department policy, there was no "responsive action item of any kind,

15  including potential disciplinary consequences." (*Id.* at 40.)  Effectively, OIR Group concluded that

16  Vallejo's CIRB process was perfunctory and that discipline for policy violations was an option in

17  name only.

18      In sum, OIR Group found failures in the CIRB process related to a constrained scope of

19  review, a limited administrative investigation, lengthy review processes that could drag for years,

20  lack of concrete follow-through, and the involvement of legal counsel in the discussions. (*Id.* at

21  41.)  The result of the investigation was a report issued in May 2020 (less than one month prior to

22  the shooting of Sean Monterrosa) making 45 recommendations designed to bring the department

23  in line with national standards – including 8 recommendations related to the CIRB process. (*Id.*

1    at 42.)  Due to the ongoing failures of the Vallejo Police Department, the California DOJ began

2    discussion and eventually entered into a collaborative reform agreement requiring Vallejo to

3    implement the 45 recommendations in the OIR Group Report. (*Id.* at 43.) That Agreement was

4    later replaced by a stipulated judgment. (*Id.*)

5            2.  *Badge Bending Infects the Department*

6          This pattern of lax oversight and a culture that is loathe to push back on misconduct or

7    inappropriate police shootings is further highlighted by the cultural tradition of badge bending

8    to celebrate and commemorate a police shooting and the death of a human being. (*Id.* at 44.) The

9    practice of badge bending to celebrate police shootings began in the Vallejo Police Department in

10   2003. (*Id.* at 45.) The practice became known to departmental leadership as early as 2016. (*Id.* at

11   46.) In 2016, former Captain Lee Horton was informed that badge bending may be occurring by

12   former Chief Andrew Bidou's executive assistant Shellyne Darst. (*Id.* at 47.) Ms. Darst informed

13   Captain Horton that Kent Tribble may have information about the practice. (*Id.* at 48.) Captain

14   Horton then asked Tribble and was told "if it is happening and I'm not saying it is, it's probably

15   not what you think it is." (*Id.* at 49.) Despite this tacit admission, no investigation into the practice

16   was implemented. (*Id.* at 50.)

17         By 2019, badge bending grew to be a well-known practice of the department among its

18   leadership, as well as by the Vallejo City Manager and Mayor. (*Id.* at 51.) Despite its wide-spread

19   knowledge among City and Department leadership, neither Chief Bidou nor Chief Allio

20   investigated the practice or administered any discipline. (*Id.* at 52.) The message from leadership

21   in the City and the Department was clear – bending your badge to celebrate a police shooting was

22   ok.

23         The infection of badge bending spread throughout the department, undermining even the

1    most core responsibilities.  Individuals involved permeated the Vallejo police department and its

2    command staff. (*Id.* at 53.) Kent Tribble who originated badge bending at Vallejo in 2003 was

3    subsequently promoted to Corporal, then Sergeant, and Lieutenant. (*Id.*) He also served as a

4    firearms instructor for the department from 2007 onward. (*Id.*) Former Corporal, now Captain

5    Sanjay Ramrakha joined the badge bending brotherhood in the early 2000s. (*Id.* at 57.)  Ramrakha

6    was later promoted through the ranks to Captain and served as a field training officer and an

7    instructor. (*Id.* at 58.)

8        The trustworthiness and quality of the CIRB and Internal Affairs processes were likewise

9    undermined. Kent Tribble was a member of the CIRB panel that reviewed a shooting by Officers

10   Komoda and McLaughlin. (*Id.* at 54.)  In fact, Tribble was designated as the use of force subject

11   matter expert on the CIRB panel. (*Id.* at 55.)  After opining that Komoda and McLaughlin's use of

12   deadly force was justified, Tribble honored Komoda and McLaughlin by bending the tips of their

13   badges for their involvement in the shooting. (*Id.* at 55-56.)  After having his badge tip bent,

14   Ramrakha served as the internal affairs sergeant where he was responsible for investigating police

15   discharges and sat on the CIRB when it met to review such critical incidents. (*Id.* at 58-59.)

16        *3.   Jarrett Tonn's Checkered History and Bent Badge*

17        Defendant Jarrett Tonn was an active participant in this badge bending ritual. Kent

18   Tribble testified that he personally bent Tonn's badge following one of his prior shootings. (*Id.* at

19   60.) Defendant Tonn began as a Vallejo police officer in August of 2014. (*Id.* at 61.) In the less than

20   six years Tonn was on the force, he was involved in 3 prior shootings and had five prior excessive

21   force incidents. (*Id.* at 62.) He was the target of three excessive force lawsuits, all of which settled.

22   (*Id.* at 63.)  In each of his three shootings prior to Sean Monterrosa, the target of the shooting was

1    not armed with a weapon. (*Id.* at 64.) On February 22, 2015, Tonn shot Gerald Brown while he

2    was in his vehicle.  No weapon was recovered. (*Id.* at 64.)  On May 31, 2017, Tonn shot Kevin

3    DeCarlo. Again, no weapon was recovered. (*Id.* at 65.)

4          Just 38 days after the DeCarlo shooting, on July 8, 2017, Tonn shot at Victor Hurtado as he

5    fled.  Tonn claimed Hurtado pointed a gun at him, but despite an exhaustive search, no weapon

6    was ever recovered. (*Id.* at 66.)  The Hurtado shooting in particular highlights the lack of

7    accountability in the CIRB process.  Body camera footage shows Defendant Tonn shooting at Mr.

8    Hurtado's back as he runs away. (*Id.*)  The footage shows Mr. Hurtado to be more than a block

9    away, and he never turns to face Defendant Tonn. (*Id.*)  Furthermore, the footage captures no

10   evidence of a weapon. (*Id.*)  After review and despite neither body camera or the exhaustive search

11   turning up evidence of a weapon, the CIRB approved Tonn's discharge and in fact, actually

12   encourage Tonn to shoot sooner. (*Id.* at 67.)  Shockingly, the perfunctory CIRB process never

13   disciplined Tonn following any of these incidents.

14          ii.    **The Shooting of Sean Monterrosa**

15                 *1.  Overview*

16          Sean Monterrosa was unarmed at the time he was shot. (*Id.* at 1.)  He was shot in the back

17   of the head. (*Id.* at 2.) He was not suspected of a violent crime, rather when Defendant Tonn

18   responded to the Walgreens, it was in response to a burglary in progress call.  There was no report

19   of a violent crime occurring at the location. (*Id.* at 3.) Following the shooting, Vallejo employed

20   the OIR Group to review the shooting. (*Id.* at 4.) After reviewing the evidence, OIR Group

21   concluded that Jarrett Tonn's use of deadly force violated departmental policy and "was not

22   objectively reasonable under the totality of the circumstances." (*Id.* at 5.) Following his review of

23   the incident, Vallejo Police Chief Shawny Williams informed Jarrett Tonn of his intent to

1    terminate Tonn for violation of policy. Williams stated that based on his analysis as the

2    policymaker for the Vallejo Police Department, Tonn "did not have an objectively reasonable belief

3    that Mr. Monterrosa was an imminent threat in the moment when [he] shot him." (*Id.* at 6.)

4              2.    *Scientific analysis demonstrates Monterrosa was shot as he ran away*

5         When Dets. Tonn, Wagoner, and Pittman entered the Walgreens parking lot, Sean

6    Monterrosa was running away from the Walgreens towards a black sedan. (*Id.* at 7.) Monterrosa

7    briefly attempted to get into the sedan. (*Id.* at 8.)  This is the last time he is captured on body

8    camera prior to the shooting – halfway into the sedan. (*Id.* at 9.) This occurs 0.8 seconds prior to

9    the first shot being fired by Defendant Tonn. (*Id.* at 10.) The last shot is fired 1.1 seconds after the

10   first shot. (*Id.* at 11.) This leaves 1.9 seconds for Monterrosa to travel from the car to the location

11   where he was shot in the back of the head and fell. (*Id.* at 12.)

12        Scene reconstruction and 3D Laser analysis demonstrates that Monterrosa fell 13.5 feet

13   from the car, meaning he travelled approximately 10 feet away from the officers before he was shot

14   in the back of the head and fell. (*Id.* at 13.)



15   (Ex. H: Neale Report at Fig. 32.)

1    Given these parameters, Monterrosa was moving away from the officers, with his back towards

2    them when he was shot, and if shot by the first bullet, he was averaging 8.5 mph, which is

3    consistent with running. (PSMF at 14.) If he was shot by the last bullet, Mr. Monterrosa was

4    moving away from the officers, with his back towards them when he was shot at an average pace

5    of 3.5 mph, which is consistent with walking. (*Id.* at 15.) The total time and average speeds do not

6    include the additional time required for Monterrosa to get up from a seated position. (*Id.* at 16.)

7        The fact that Monterrosa was running away – not taking a kneeling tactical shooting

8    position when Defendant Tonn began firing is further supported by the autopsy, his physical

9    positioning, the biomechanical analysis, and the trajectory analysis. The autopsy shows that

10   Monterrosa was shot in the back center of his head and the bullet passed forward with little to

11   no upward or downward deviation. (*Id.* at 2.)  After being shot, he fell positioned face down with

12   his feet closest to the truck and his head furthest away. (*Id.* at 17.) Biomechanical analysis by Dr.

13   Young conclusively demonstrates that it is scientifically impossible for Monterrosa to have left

14   the sedan, taken a kneeling position as claimed by the officers, then stood, turned, and traveled 10

15   feet during the 1.9 seconds from when he is last seen until he is shot. (*Id.* at 18.)  To accomplish

16   those activities would require a minimum of 3.05 seconds. (*Id.* at 19.)  Trajectory analysis

17   demonstrates that the bullet entered Mr. Monterrosa's head at approximately 58.5" (5'10.5")

18   thereby demonstrating Monterrosa was not kneeling at the time of the shooting.

19       The forensic and scientific evidence make clear that Defendant Tonn shot an unarmed

20   Sean Monterrosa in the back of the head as he ran away.

21   *B. Procedural Background*

22       Following the killing of Sean Monterrosa, his parents' Neftali and Nora Monterrosa initiated

23   this lawsuit through the filing of a complaint. (ECF No. 1.) Following initial motion practice, the

1  operative Second Amended Complaint was filed on March 11, 2021. (ECF No. 34.) Defendants

2  Tonn and the City of Vallejo filed an Answer in response. (ECF No. 35.)  The operative Second

3  Amended Complaint presents five causes of action: (1) Excessive Force in violation of the 4th

4  Amendment against Jarrett Tonn; (2) a *Monell* claim for violation of the 4th Amendment against

5  the City of Vallejo; (3) a 14th Amendment Substantive Due Process violation against Jarrett

6  Tonn; (4) a violation of California Civil Code § 52.1 against Tonn and the City; and (5) a state

7  law Wrongful Death – Negligence and Battery claim against Tonn and the City. (*Id.*)

8      Following the close of discovery, Defendant Tonn filed a Motion for Summary Judgment or

9  in the Alternative, Summary Adjudication seeking judgment in his favor on all claims. (ECF No.

10  104.) Likewise, Defendant the City of Vallejo  filed its Motion for Summary Judgment, or in the

11  Alternative Partial Summary Judgment seeking judgment in its favor on all claims. (ECF No.

12  105.)  As the Motions by Defendant Tonn and Defendant Vallejo involve large amounts of

13  overlapping factual and legal issues, Plaintiffs file this consolidated response in opposition to

14  both Motions.

15                  III.    LEGAL STANDARD

16  *A.  Summary Judgment Standard*

17      Summary judgment is only appropriate if the movant demonstrates that there is no genuine

18  issue of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp.*

19  *v. Catrett*, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable

20  to the nonmoving party. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

21  574, 586-590 (1986). "The evidence of the non-movant is to be believed, and all justifiable

22  inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986). The

23  moving party must carry the burden of establishing both the absence of a genuine issue of material

1    fact and that such party is entitled to judgment as a matter of law. *Matsushita*, 475 U.S. at 586-90.

2    **B.   *Qualified Immunity***

3    Qualified immunity does not protect officers who are plainly incompetent or who knowingly

4    violate the law.  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).  The doctrine of qualified immunity

5    affords protection against individual liability for civil damages to officials "insofar as their conduct

6    does not violate clearly established statutory or constitutional rights of which a reasonable person

7    would have known." *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982).  A right qualifies as clearly

8    established if its "contours . . . are sufficiently clear that every reasonable official would have

9    understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2078 (2011)

10   (citations and quotations omitted).  A clearly established right exists if it is one that is sufficiently

11   clear that a "reasonable official would understand that what he is doing violates that right."

12   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Although Supreme Court precedent does not

13   require a case directly on point, existing precedent must place the statutory or constitutional

14   question beyond debate. *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

15   In resolving a government official's qualified immunity claim, the District Court must decide

16   (1) whether the record evidence makes out a violation of a constitutional right, and (2) if so,

17   whether that right was clearly established at the time of the defendant's alleged misconduct.

18   *Saucier v. Katz*, 121 S. Ct. 2151 (2001).  These two issues may be resolved in the sequence most

19   appropriate for the particular case at bar.  *Pearson v. Callahan*, 129 S. Ct. 808 (2009).

20   Where a genuine issue of fact exists, qualified immunity is inappropriate and the case must

21   proceed to trial. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  Indeed, when "the

22   reasonableness of an officer's actions depends on whether a seizure involved excessive force... a

23   jury question will often exist when the facts are in dispute as to the officer's or claimant's actual

1  conduct. *Gahn v. Fujino*, 1994 U.S.App. LEXIS 30018, at *3; C.A.9 Nos. 93-35525, 93-35535 (9th Cir.

2  October 21, 1994).

3  IV.    ARGUMENT

4  *A. Defendant Tonn violated the Fourth Amendment when he shot Sean Monterrosa*

5  Sean Monterrosa was unarmed and running away from Defendant Tonn when he was shot in

6  the back of the head. Defendant Tonn's use of deadly force is the quintessential violation of the

7  Fourth Amendment's prohibition on excessive force. A Fourth Amendment claim that law

8  enforcement officers have used excessive force is analyzed under a reasonableness standard.

9  *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness inquiry in an excessive force case is an

10 objective one: 'whether the officers' actions are 'objectively reasonable' in light of the facts and

11 circumstances confronting them.'" *Id.* at 397 (citations omitted). In *Graham*, the Supreme Court

12 outlined factors to be used in weighing reasonableness in excessive force cases, including 'the

13 severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

14 officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

15 flight.' *Id..* at 396. The threat element is the most important consideration, and an "officer's use of

16 deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses

17 a significant threat of death or serious physical injury to the officer or others.'" *Gonzalez v. City of*

18 *Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S. Ct. 1694,

19 85 L. Ed. 2d 1 (1985)). The question on summary judgment "is whether a reasonable jury would

20 necessarily find that [the officer] perceived an immediate threat of death or serious physical injury

21 at the time he shot" the decedent. *Id.*, 747 F.3d at 794.

22 "It has been well-settled for almost forty years that an officer may not use deadly force on a

23 fleeing, unarmed suspect who poses no immediate threat." *Smalls v. City of Tacoma*, 2023 U.S. Dist.

1   LEXIS 72144 at *25-26; W.D. Wa. No. 3:22-cv-5043 (W.D. Wa. April 25, 2023) (citing *Garner*, 471

2   U.S. at 4). "Few things in our case law are as clearly established as the principle that an officer

3   may not seize an unarmed, nondangerous suspect by shooting him dead in the absence of probable

4   cause to believe that the fleeing suspect poses a threat of serious physical harm, either to the officer

5   or to others." *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (cleaned up).

6       In this matter, there is a clear dispute of fact between Defendant's story and Plaintiff's

7   scientific evidence.  Plaintiff's scientific evidence, coupled with the autopsy and body camera

8   footage demonstrate that Sean Monterrosa was in fact unarmed and running away from

9   Defendant Tonn when he was shot in the back of the head. The facts of this case, in the light most

10   favorable to the Plaintiffs, are precisely those forbidden by *Garner* and its progeny – Defendant

11   Tonn shot an unarmed fleeing individual in the back of the head.  Therefore, summary judgment

12   should be denied as to the Excessive Force claim.

13   *B.  The 4ᵗʰ Amendment right at issue was clearly established.*

14       Defendant Tonn argues that he is entitled to qualified immunity because the right was not

15   clearly established – he does so arguing from the facts in the light most favorable to him, that is

16   that Monterrosa stopped, took a kneeling shooting position and pull an object from his

17   waistband.  However, those are not the facts the Court must use in its analysis.  The Court must

18   view the facts in the light most favorable to the Plaintiffs. *Liberty Lobby*,  477 U.S. at 255.  As

19   described at length above, the facts in the light most favorable to the Plaintiffs are that Sean

20   Monterrosa never turned to the officers, kneeled, and took a shooting position, rather he exited

21   the sedan turned and ran directly away from the officers when he was shot in the back of the head.

22   In 1985, *Garner* itself clearly establishes that such conduct violates the Fourth Amendment. There,

23   officers encountered Mr. Garner as he was fleeing the scene of an alleged burglary in progress.

1    *Garner*, 471 U.S. at 3. The officers followed as he ran across a back yard and attempted to climb a

2    fence to escape. *Id.* at 4-5. Officer Hymon then shot Garner in the back of the head. *Id.* at 4. Garner

3    was unarmed. *Id.* at 3. The Supreme Court found that such conduct violated the Fourth

4    Amendment and that deadly force may not be used on an unarmed, nondangerous suspect. *Id.* at

5    11. As noted above, this principle has been regularly repeated over the years, so much so that in

6    2011 the Ninth Circuit stated that "few things in our case law are as clearly established as the

7    principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead

8    in the absence of probable cause to believe that the fleeing suspect poses a threat of serious

9    physical harm, either to the officer or to others." *Torres*, 648 F.3d at 1128. It is clear that the right

10   at issue in this matter was clearly established and summary judgment is inappropriate.

11      **C. *Defendant Tonn violated a clearly established Fourteenth Amendment right by***
12         ***killing Sean Monterrosa***

13        By shooting and killing an unarmed and nonthreatening Sean Monterrosa in the back of the

14   head as he fled, Defendant Tonn engaged in conscious shocking behavior that violates the

15   Fourteenth Amendment. Familial association is a liberty interest cognizable under the

16   Fourteenth Amendment. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) Indeed, a

17   parent-child relationship "is sufficiently weighty by itself to constitute a cognizable liberty

18   interest." *Id.* (citing *Smith v. Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987). Since at least 1991 in *Curnow*,

19   the 9th Circuit has recognized that a police officer who uses deadly force on a non-threatening

20   fleeing person and kills them, violates the Fourteenth Amendment liberty interest of the

21   decedent's parent. *Id.* To prevail on this Fourteenth Amendment claim, Plaintiffs must

22   demonstrate that the officer's use of deadly force is conscious shocking.[1] *Ochoa v. City of Mesa*, 26

---

[1] The Claim also requires "an enduring relationship reflecting an assumption or parental responsibility."

1    F.4th 1050, 1056 (9th Cir. 2022).  In situations such as the one at bar, the "purpose-to-harm" test

2    applies. *Id.* Here, there exists a question for the jury as to whether Tonn's action in shooting an

3    unarmed, fleeing Monterrosa who had his back turned was a legitimate purpose or whether the

4    use of lethal force was with an "ulterior, illegitimate purpose." *See, e.g. Atabekova-Michaelidis v. City of*

5    *Los Angeles*, 2023 U.S.Dist. LEXIS 209740, at * 17; C.D.Cal. No. 2:22-cv-05620 (C.D.Cal. August 14,

6    2023).  Therefore, summary judgment should be denied as to the Fourteenth Amendment claim.

7    **D.  *The City is liable under Monell for the Fourth and Fourteenth Amendment***
8        ***violations***

9        Defendant City of Vallejo's years of toothless oversight and disciplinary practices in both their

10    internal affairs and CIRB programs permitted officers to use force with impunity and was a

11    moving force of Defendant Tonn's unconstitutional killing of Sean Monterrosa. To demonstrate a

12    failure to adequately supervise under *Monell*, a plaintiff must demonstrate that the municipality

13    was "deliberately indifferent" to the rights of persons with whom the police come into contact.

14    *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S.

15    378 (1989)). The 9th Circuit has explicitly held that a plaintiff may prove municipal liability

16    "though evidence of a 'failure to investigate and discipline employees in the face of widespread

17    constitutional violations.'" *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018) (quoting *Hunter*

18    *v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011)). The Circuit held that "it is sufficient

19    under our case law to prove a custom of encouraging excessive force to provide evidence that

20    personnel have been permitted to use force with impunity." *Id.*  Indeed, a *Monell* claim is properly

21    supported where there is evidence to show the municipality ignored or condoned excessive force

22    by engaging in incomplete or ineffective investigations, failing to use force-tracking systems, and

---

*Wheeler v. Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018).  However, this aspect of the claim is not in dispute as it was not raised in Defendants' Motions for Summary Judgment.

1  perpetuating a culture where excessive force was encouraged. *See, e.g. Rodriguez*, 891 F.3d at 803.

2  Furthermore, "general evidence of departmental treatment of complaints and of the use of force

3  can support the plaintiff's theory that [the] disciplinary and complaint processes contributed to

4  the police excesses complained of because the procedures made clear to the officer that he could

5  get away with anything." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015) (cleaned

6  up) (citing *Larez v. Los Angeles*, 946 F.2d 630, 646-647 (9th Cir. 1991)).

7      The evidence here demonstrates the exact type of lackluster discipline and oversight

8  operations cited above as the basis for municipal liability.  Prior to 2011, the City had no type of

9  formalized use of force system at all. Furthermore, they had a use of force tracking system but did

10  not use it at all. *Compare* PSMF at 26 *with Rodriguez*, 891 F.3d at 803.  The CIRB system was so

11  perfunctory and pointless that at times the Chief of Police – tasked with the duty to review

12  shootings for approval or discipline – did not even read the CIRB summaries or only read parts of

13  them. The oversight and disciplinary processes were so poor that not a single officer was

14  disciplined for a police shooting in the 20 years prior to Sean Monterrosa's death. And not a single

15  officer was found to have engaged in any type of excessive force in at least the six years prior to

16  his death. All of this despite Vallejo's officers using deadly force at a rate that far exceeded

17  anything expected by a department of their size.  This non-existent accountability continued

18  through the time of Sean's death until the OIR Group and California Department of Justice

19  stepped in.

20      It was not only the complete lack of oversight, the City also perpetuated a culture where

21  deadly force was celebrated. *Rodriguez*, 891 F.3d at 803.  Officers began celebrating police shootings

22  with the bending of badge tips in 2003. This violent ritual was known to Vallejo command staff

23  in 2016 and to the Mayor and City Manager in 2019, and despite this knowledge, nothing was ever

1    done to stop it.  City leadership communicated to its officers that there would be no ramifications

2    for the use of force and that rituals celebrating deadly force were completely acceptable.

3        Defendant Tonn was well-aware of all this.  Tonn had four shootings in less than six years on

4    the force. His badge was bent in celebration of these shootings by Kent Tribble.  His own firsthand

5    experience with the CIRB process taught him "that he could get away with anything." *See*

6    *Velazquez,* 793 F.3d at 1027.  Tonn's shooting of Victor Hurtado was emblematic of it all.  Tonn shot

7    at a man who had his back turned and was running away at a distance of more than half a city

8    block.  Tonn claimed that this was because Hurtado pulled a gun, but neither an investigative

9    sweep or his own body camera footage turned up any evidence of a weapon.  Nonetheless, his

10   conduct was not only approved by the CIRB, he was encouraged to shoot faster and sooner.

11   Clearly, Tonn headed this advice when he shot an unarmed, fleeing Sean Monterrosa in the back

12   of the head.   The City's deliberate indifference demonstrated through its complete lack of

13   accountability and oversight was the moving force behind Defendant Tonn's shooting of Sean

14   Monterrosa, therefore the City's Motion for Summary Judgment as to the Fourth and Fourteenth

15   Amendment claims should be denied.

16       *E.  Evidence Exists to Support a Bane Act Claim*

17       As demonstrated above, the facts read in the light most favorable to the Plaintiffs support a

18   violation of the Fourth and Fourteenth Amendments and thereby also support a claim under the

19   Bane Act. The Tom Bane Civil Rights Act (Bane Act) was enacted in 1987 as part of a

20   comprehensive legislative package to combat hate crimes. The Bane Act is enforceable criminally,

21   under Pen. Code, § 422.6, and civilly, under Civ. Code, § 52.1. *Cornell v. City and County of San*

22   *Francisco*, 17 Cal. App. 5th 766, 769 (2017). Under the Tom Bane Civil Rights Act,

23       (b) If a person or persons, whether or not acting under color of law, interferes by threat,
24       intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion,

1    with the exercise or enjoyment by any individual or individuals of rights secured by the
2    Constitution or laws of the United States, or of the rights secured by the Constitution or
3    laws of this state
4    . . . .
5    (c) Any individual whose exercise or enjoyment of rights secured by the Constitution or
6    laws of the United States, or of rights secured by the Constitution or laws of this state,
7    has been interfered with, or attempted to be interfered with, as described in subdivision
8    (b), may institute and prosecute in their own name and on their own behalf a civil action
9    for damages, including, but not limited to, damages under Section 52, injunctive relief,
10    and other appropriate equitable relief to protect the peaceable exercise or enjoyment of
11    the right or rights secured, including appropriate equitable and declaratory relief to
12    eliminate a pattern or practice of conduct as described in subdivision (b).

14    Cal. Civ. Code § 52.1. The elements of a cause of action under Civil Code section 52.1 are stated in

15    CACI No. 3066: 1) That the defendant interfered with or attempted to interfere with the plaintiff's

16    constitutional or statutory right by threatening or committing violent acts; 2) That the plaintiff

17    reasonably believed that if he exercised his constitutional right the defendant would commit

18    violence against him or his property; That the defendant injured the plaintiff or his property to

19    prevent him from exercising his constitutional right or retaliate against the plaintiff for having

20    exercised his constitutional right; 3) That the plaintiff was harmed; and 4) That the defendant's

21    conduct was a substantial factor in causing the plaintiff's harm. *Austin B. v. Escondido Union School*

22    *Dist.*, 149 Cal. App. 4th 860, 882 (2007).

23        Civil Code section 52.1 requires "an attempted or completed act of interference with a legal

24    right, accompanied by a form of coercion." *Id.* (citing *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998)).

25    To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with

26    discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's

27    constitutional rights by the requisite threats, intimidation, or coercion. *Id.* (citing *Venegas v. County*

28    *of Los Angeles*, 32 Cal.4th 820, 841–843 (2004) (emphasis added). The word "interferes" as used in

29    Section 52.1 has been construed as "violates." *Cornell*, 17 Cal. App. 5th at 791. (See also *Jones, supra*,

30    17 Cal.4th at p. 338 [California Supreme Court equates "interfere" with "violate"].)

1    Most courts interpreting and applying Section 52.1 have concluded that these respective

2    statutes are state law analogues to Section 1983. *Id.* at 792 (citing *Cameron v. Craig,* 713 F.3d 1012,

3    1022 (9th Cir. 2013) ("[T]he elements of the excessive force claim under § 52.1 are the same as

4    under § 1983.")) "The majority of federal district courts in California have held that [w]here Fourth

5    Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is

6    at issue, there is no need for a plaintiff to allege a showing of coercion independent from the

7    coercion inherent in the seizure or use of force." *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1126

8    (2016).  Once Plaintiffs demonstrate a Fourth Amendment violation, they then must also

9    demonstrate that the violation occurred with "specific intent." *Reese v. Cty. of Sacramento*, 888 F.3d

10   1030, 1045 (9th Cir. 2018).  To survive summary judgment, Plaintiffs must present facts from

11   which a jury could conclude that the defendants "intended not only the force, but its

12   unreasonableness, its character as 'more than necessary under the circumstances." *Id.* (citations

13   omitted).  This standard is met if there are facts from which a jury could conclude there existed

14   "a reckless disregard for a person's constitutional rights" because this reckless disregard is

15   "evidence of a specific intent to deprive that person of those rights." *Id.*  In the instant matter, a

16   reasonable jury could conclude that Defendant Tonn acted with reckless disregard when he shot

17   an unarmed, fleeing Sean Monterrosa in the back of the head.  Therefore, the Motions for Summary

18   Judgment should be denied.

19   ### F.  State Law Battery and Negligence Claim

20   Because Plaintiffs have successfully demonstrated facts which support their Fourth

21   Amendment claim, their state law battery and wrongful death claims succeed as well. "A state law

22   battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must

23   prove that the peace officer's use of force was unreasonable." *Brown v. Rainsweiler*, 171 Cal. App. 4th

1  516, 528, fn. 11 (2009) ("Because federal civil rights claims of excessive use of force are the federal

2  counterpart to state battery and wrongful death claims, federal cases are instructive in this area.").

3  For the reasons stated above, Plaintiff has successfully made out a Fourth Amendment violation,

4  therefore the Motion for Summary Judgment on this count should be denied.

5                                    V.        CONCLUSION

6         Wherefore, for the reasons stated herein, Plaintiffs respectfully request the Court deny in full

7  both Defendant Tonn's and Defendant Vallejo's Motions for Summary Judgment and permit this

8  matter to proceed to a jury trial.

9                                                      Respectfully submitted,

10                                                      /s/ John J. Coyle
11                                                      John J. Coyle, Esq.
12                                                      Mark V. Maguire, Esq.
13                                                      Danielle N. Purtell, Est.
14                                                      McEldrew Purtell
15                                                      123 South Broad Street
16                                                      Suite 2250
17                                                      Philadelphia, PA 19109
18
19                                                      Carla M. Wirtschafter, Esq.
20                                                      Reed Smith LLP
21                                                      1901 Avenue of the Stars
22                                                      Suite 700
23                                                      Los Angeles, CA 90067
24
25  Date: December 6, 2024
26

1                                AFFIDAVIT OF COUNSEL

2          I, John J. Coyle, hereby certify that the Exhibits attached to this Response in Opposition to

3    the Defendants' Motions for Summary Judgment are true and correct copies of the following:

4          A.  Tonn Deposition Transcript

5          B.  Wagoner Deposition Transcript

6          C.  Pittman Deposition Transcript

7          D.  Tonn Bodycamera footage

8          E.  Wagoner Bodycamera footage

9          F.  Pittman Bodycamera footage

10         G.  William Neale Declaration

11         H.  William Neale Expert Report and Appendices

12         I.   William Neale Supplemental Report

13         J.   Dr. Douglas Young Declaration

14         K.  Dr. Douglas Young Expert Report

15         L.   Dr. Douglas Young Rebuttal Report

16         M. Autopsy Report

17         N.  Tonn Statement to Investigators (COV000263-273)

18         O.  Pittman Statement to Investigators (COV000257-000262)

19         P.  Pittman OIR Group Interview (COV002255)

20         Q.  Plaintiffs Amended Rule 26 disclosures

21         R.  Matthew Noedel Expert Report

22         S.   Tonn's Responses to Plaintiffs' Request for Admissions

23         T.   Vallejo's Responses to Plaintiffs' Request for Admissions

24         U.  Williams Memo of Termination to Tonn (COV002447-2454)

1      V.   Frank Fernandez Declaration

2      W.  Frank Fernandez Expert Report

3      X.   Lee Horton Deposition Transcript

4      Y.   Corporate Designee Knight Deposition Transcript

5      Z.   Chief Bidou Deposition Transcript

6      AA.        Corporate Designee Ramrakha Deposition Transcript

7      BB. May 2020 OIR Group Report

8      CC.        California DOJ Collaborative Reform Agreement

9      DD.        California DOJ Stipulated Judgment

10     EE. Nyhoff Deposition Transcript

11     FF. Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208,

12          March 22, 2022 Morning Session

13     GG.        Transcript - *California v. Milano*, Superior Court of Solano County, Case No.

14          VCR233208, March 22, 2022 Afternoon Session

15     HH.        Kent Tribble Deposition Transcript

16     II.  Anthony Felix Incident Report (COV000050-000067)

17     JJ.  Gerald Brown CIRB Report

18     KK.        Jose Villalobos First Amended Complaint

19     LL. Kevin DeCarlo CIRB Report

20     MM.        Mychael Nelson Incident Report (COV000068-000096)

21     NN.        Robert Strong Complaint

22     OO.        Tino Armstrong Second Amended Complaint

23     PP. Victor Hurtado CIRB Report

1     QQ.     Synced Video of Shooting of Victor Hurtado

2                     Respectfully submitted,

3                     /s/ John J. Coyle

4

1                              CERTIFICATE OF SERVICE

2          I certify that the foregoing Response in Opposition to Defendants' Motion for Summary

3   Judgment was filed with the Court via electronic filing and thereby served upon all parties of

4   record.  All video exhibits required to be filed separately were served via dropbox.

5                                        /s/ John J. Coyle

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| NEFTALI MONTERROSA, et al.,<br><br>                       Plaintiffs,<br><br>v.<br><br>CITY OF VALLEJO, et al.,<br><br>                       Defendants. | :<br>:<br>:<br>:<br>:<br>:   Civil Action No. 2:20-cv-01563<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENTS OF UNDISPUTED
MATERIAL FACTS AND COUNTER-STATEMENT OF MATERIAL FACTS**

Plaintiffs Neftali and Nora Monterrosa submit this Response to Defendants' Statements

of Undisputed Material Facts and Counter-Statement of Material facts in support of their

Response in Opposition to Defendants' Motions for Summary Judgment.

**RESPONSE TO DEFENDANT TONN'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

|  | Defendant Tonn's Material Fact | Plaintiff's Response | Plaintiff's Evidence in Contradiction |
|---|---|---|---|
| 1. | Detective Jarrett Tonn is a detective and police officer with the Vallejo Police Department. | Admitted. | None. |
| 2. | He has been a police officer since 2007. | Admitted. | None. |
| 3. | On the evening of June 1, 2020, he and fellow Detectives Bretton Wagoner and Wesley Pittman were called in to respond to the civil unrest following the killing of George Floyd on May 25, 2020. | Admitted. | None. |
| 4. | The City of Vallejo was experiencing large-scale looting, vandalism, and criminal activity. | Admitted. | None. |
| 5. | As Det. Tonn drove in to work, he heard radio broadcasts describing | Admitted. | None. |

| | | | |
|---|---|---|---|
| | vehicle and foot pursuits, robberies, and shots-fired alerts. | | |
| 6. | Det. Tonn had never before witnessed or heard of so many simultaneous reports of violent criminal activity during his entire tenure as a police officer. | Admitted. | None. |
| 7. | At the start of their shift, Detectives Tonn, Wagoner, and Pittman met at VPD's Crime Reduction Team (CRT) office and then rode together in an unmarked CRT truck to a briefing led by Lieutenant Bob Knight at a command post in the City of Vallejo. | Admitted. | None. |
| 8. | Lt. Knight assigned Detectives Tonn, Wagoner, and Pittman to verify a report of looting at a gun store and shortly afterward, they responded to a report of a shooting at a dispensary. | Admitted. | None. |
| 9. | A little after midnight, they received a radio broadcast alerting them to an in-progress looting occurring at a Walgreens pharmacy. | Admitted. | None. |
| 10. | They responded in the CRT truck and met with Cpt. Horton across the street from the Walgreens. | Admitted. | None |
| 11. | They observed apparent looting in progress at the Walgreens, with individuals going in and out of the pharmacy's drive through window. | Admitted. | None. |
| 12. | Cpt. Horton instructed them to enter the parking lot from the south and advised that he would enter from the north. | Admitted. | None. |
| 13. | Det. Tonn was seated in the middle back seat of the CRT truck, Det. Wagoner was driving, and Det. Pittman was in the front passenger seat. | Admitted. | None. |
| 14. | As the team approached the parking lot, Det. Tonn heard a radio | Admitted. | None. |

| | | | |
|---|---|---|---|
| | broadcast from Cpt. Horton, who stated, "They're armed, possibly armed" referring to the individuals fleeing the Walgreens parking lot. | | |
| 15. | Wagoner activated the lights and sirens on the CRT truck as they approached. | Admitted. | None. |
| 16. | The officers observed several individuals running from the Walgreens  and into cars parked in the Walgreens parking lot. | Admitted. | None. |
| 17. | Det. Tonn's attention was immediately drawn to an individual, now known to be Sean Monterrosa, whom he observed "running with his hands down at his waist area in a manner that you would do to prevent something from falling out of your waistband." | Admitted. | None. |
| 18. | Based on his experience, Det. Tonn interpreted Monterrosa's movements as consistent with an individual carrying a firearm. | Admitted that Det. Tonn interpreted Monterrosa's movements as such. By way of further response, Sean Monterrosa was not carrying a firearm. | Ex. A: Tonn Dep. at 113:5-10; Ex. B: Wagoner Dep. at 52:08-53:07; Ex. C: Pittman Dep. at 41:15-42:09. |
| 19. | Det. Tonn observed Monterrosa run toward a black sedan, lean into the vehicle, and then abruptly get out. | Admitted that Sean Monterrosa ran toward and attempted to get into the vehicle. Body camera footage demonstrates that Monterrosa was either sitting or squatting at the driver's door. | Ex. F: Pittman Body camera footage at 00:36:31; Ex. I – Neale Rebuttal Report at pp. 1-2. |
| 20. | Monterrosa took "a step or two away from the sedan and "turned and spun back in the direction of the CRT truck. | **Denied.** After exiting the vehicle, Monterrosa turned and began running away from the CRT truck until the time he was shot in the back of the head.  Based upon scientific analysis, there was insufficient time for Monterrosa to have spun back in the direction of the truck, take a kneeling | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. M: Autopsy Report |

| | | position, respond to the first shot and turn to run he approximately 10 feet to where he fell. | |
|---|---|---|---|
| 21. | At that moment, Det. Tonn "saw a-what at the time I believed to be the handle of a firearm" protruding from Monterrosa's front pocket near his waistband. | Admitted that Tonn saw an object near Sean Monterrosa's waist band. However, it is denied the object was a firearm. It is further denied that Det. Tonn's sequencing of Sean Monterrosa's actions was accurate. | Ex. A: Tonn Dep. at 113:5-10; Ex. B: Wagoner Dep. at 52:08-53:07; Ex. C: Pittman Dep. at 41:15-42:09; Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. M: Autopsy Report |
| 22. | Det. Tonn described the object as being three to four inches long and shaped like a firearm handle. | Admitted that Tonn described the object as such. However, the evidence demonstrates that Mr. Monterrosa was only carrying a hammer. | Ex. A: Tonn Dep. at 113:5-10; Ex. B: Wagoner Dep. at 52:08-53:07; Ex. C: Pittman Dep. at 41:15-42:09. |
| 23. | It is undisputed that Monterrosa was carrying a hammer with a wooden handle partially visible near his waistband that Det. Tonn believed to be a firearm. | Admitted. | None. |
| 24. | According to Det. Tonn, Monterrosa moved his hand down toward his waist and "grabbed the object." | Denied. Sean Monterrosa could not have stopped and taken a kneeling shooting position and grabbed the object as Tonn testified because there was insufficient time for him to do so and still travel the approximately 10 feet to where he fell when he was shot in the back of the head. For Monterrosa to fall where he did after being shot, he needed to be moving away from the car the entire time until he was shot at a speed of between 3.5 and 8.5 miles per hour. | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28. |
| 25. | Det. Tonn perceived this as Monterrosa in the process of drawing a firearm. | Denied. Sean Monterrosa could not have stopped and taken a kneeling shooting position | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at |

| | | and grabbed the object as Tonn testified because there was insufficient time for him to do so and still travel the approximately 10 feet to where he fell when he was shot in the back of the head. For Monterrosa to fall where he did after being shot, he needed to be moving away from the car the entire time until he was shot at a speed of between 3.5 and 8.5 miles per hour. | pp. 4-6. |
|---|---|---|---|
| | | Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
| 26. | In response, Det. Tonn immediately fired five consecutive shots in one burst from his rifle through the windshield of the truck and at Monterrosa. | Admitted that Tonn fired five shots in approximately 1.1 seconds through the vehicle and at Monterrosa. It is denied that this action was taken in response to Monterrosa kneeling and grabbing at his waistband. | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28. |
| 27. | All five shots were fired within approximately 1.04 seconds. | Admitted. | None. |
| 28. | After the shots were fired and Monterrosa was on the ground, the detectives approached him and discovered the hammer with a wooden handle protruding from his front pocket. | Denied. Pittman testified that the hammer "was concealed by the sweatshirt, but shoved down the front of his pants." | Ex. C: Pittman Dep. at 42:3-5 |
| 29. | All witnesses, both civilian and police, consistently testified that Monterrosa left the sedan, turned toward the detectives truck and moved his hand toward his waistband just before the single | Denied. The officers testified that Monterrosa moved towards the truck, stopped, and took a kneeling shooting position | Ex. A: Tonn Dep. at 93:18-94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman |

| | | |
|---|---|---|
| burst of shots were fired. | before shots were fired.<br><br>This testimony is incompatible with the scientific evidence and is demonstrably false as Monterrosa's body was found approximately 10 feet away from the CRT truck, face down, with his feet towards the truck and head away. Furthermore, Monterrosa would not have physically have been able to take such a position, get up, and cover the necessary ground in the time elapsed. Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | Statement to Investigators (COV000257-000262); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |
| 30. | Monterrosa was struck with one bullet that entered the back of his head. | Admitted. | |
| 31. | In the time between the first shot and the final shot (approximately 1.04 seconds), a person is capable of turning their head away and exposing the back of their head to the shooter. | Admitted.<br><br>However, it is denied that this occurred in this case. As noted above, Monterrosa had to travel a distance between 10 and 13.6 feet from his location at the sedan to where he fell. He could not have done so without moving away from the CRT truck the entire | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | time at a speed of 3.5 to 8.5 mph.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
|---|---|---|---|
| 32. | At no time did Det. Tonn fire at Monterrosa while observing Monterrosa running away of in a position of surrender. | Denied.<br>From the time Monterrosa exited the sedan, he was moving away from Det. Tonn the entire time at a speed of 3.5 to 8.5 mph. The time period during which he was running away encompasses the entirety of the time the shots were fired.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

## RESPONSE TO DEFENDANT CITY OF VALLEJO'S STATEMENT OF UNDISPUTED MATERIAL FACTS

| | Defendant Vallejo's Material Fact | Plaintiff's Response | Plaintiff's Evidence in Contradiction |
|---|---|---|---|
| 1. | This case arises from an officer-involved shooting incident that took place on June 2, 2020. | Admitted. | None. |

| 2. | On June 1, 2020, the City of Vallejo declared a City-wide emergency and imposed a curfew. | Admitted. | None. |
|---|---|---|---|
| 3. | Just after midnight on June 2, 2020, Captain Lee Hoston saw a group of looters breaking into the Walgreens at 1050 Redwood Street in Vallejo, CA. | Admitted. | None. |
| 4. | Captain Horton called for assistance and three detectives from the Vallejo Police Department's specialized crime reduction unit in an unmarked police vehicle responded. | Admitted. | None. |
| 5. | The officers developed a plan to approach the parking lot from both sides to block in the looter's vehicles. | Admitted. | None. |
| 6. | Detective Bretton Wagoner was seated in the driver's side, Detective Wesley Pittman was seated in the front passenger seat, and Detective Jarrett Tonn was seated I the rear passenger seat of the unmarked vehicle, while Captain Horton drove separately. | Admitted. | None. |
| 7. | As the officers were approaching, Captain Horton saw one of the looters acting as a lookout with one hand to his mouth and his arm extended down holding what appeared to be a weapon. | Admitted. | None. |
| 8. | Captain Horton broadcast over the radio that the suspects were "wearing all black and it looks like they're armed, possibly armed." | Admitted. | None. |
| 9. | Officer Tonn hear Captain | Admitted. | None. |

|     | Horton's "wearing all black" and "armed, possibly armed" broadcast as the unmarked vehicle was pulling into the parking lot. |                                                                                                                                                                                                                                                                                    |                                                                                                                                                                                                                                                                                                                                                   |
| --- | --- | --- | --- |
| 10. | Detective Wagoner activated his vehicle's red and blue police lights as he was entering the Walgreens parking lot. | Admitted. | None. |
| 11. | As the officers entered the Walgreens parking lot, the looters immediately began piling into two vehicles to flee the scene. | Admitted. | None. |
| 12. | Detective Tonn saw Sean Monterrosa run from the Walgreens toward a black sedan waiting in the parking lot. | Admitted. | None. |
| 13. | Detective Tonn saw Monterrosa running with his hands around his waist area, consistent with how he's observed individuals with firearms run. | Admitted that Det. Tonn interpreted Monterrosa's movements as such. By way of further response, Sean Monterrosa was not carrying a firearm. | Ex. A: Tonn Dep. at 113:5-10; Ex. B: Wagoner Dep. at 52:08-53:07; Ex. C: Pittman Dep. at 41:15-42:09. |
| 14. | After moving partially into the backseat of the sedan, Monterrosa moved away from the sedan. | Admitted. | None. |
| 15. | Monterrosa stopped and quickly turned toward the Detectives. | Denied.<br>The officers testified that Monterrosa moved towards the truck, stopped, and took a kneeling shooting position before shots were fired.<br><br>This testimony is incompatible with the scientific evidence and is demonstrably false as Monterrosa's body was found approximately 10-13 feet away from the sedan in | Ex. A: Tonn Dep. at 93:18-94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman Statement to Investigators (COV000257-000262); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | | |
|---|---|---|---|
| | | the direction opposite the CRT truck, face down, with his feet towards the truck and head away. Furthermore, Monterrosa would not have physically been able to take such a position, get up, and cover the necessary ground in the time elapsed.  Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell. | |
| | | Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
| 16. | Monterrosa moved at least one of his hands toward his waist area. | Denied. The officers testified that Monterrosa moved towards the truck, stopped, and took a kneeling shooting position before shots were fired.

This testimony is incompatible with the scientific evidence and is demonstrably false as Monterrosa's body was found approximately 10–13 feet away from the sedan in the direction opposite the CRT truck, face down, with his feet towards the truck and head away. Furthermore, Monterrosa would not have physically been able to take such a position, get up, and cover the necessary ground in the | Ex. A: Tonn Dep. at 93:18–94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman Statement to Investigators (COV000257-000262); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | | |
|---|---|---|---|
| | | time elapsed. Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
| 17. | Officer Tonn saw an object at Monterrosa's waist area that he perceived to be the butt of a handgun. | Denied.<br>The officers testified that Monterrosa moved towards the truck, stopped, and took a kneeling shooting position before shots were fired.<br><br>This testimony is incompatible with the scientific evidence and is demonstrably false as Monterrosa's body was found approximately 10-13 feet away from the sedan in the direction opposite the CRT truck, face down, with his feet towards the truck and head away. Furthermore, Monterrosa would not have physically been able to take such a position, get up, and cover the necessary ground in the time elapsed. Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell.<br><br>Furthermore, trajectory | Ex. A: Tonn Dep. at 93:18-94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman Statement to Investigators (COV000257-000262); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
|---|---|---|---|
| 18. | After the shooting, Monterrosa was found to have a hammer in the front pocket of his hoodie with the handle protruding. | Denied.<br>Pittman testified that the hammer "was concealed by the sweatshirt, but shoved down the front of his pants." | Ex. C: Pittman Dep. at 42:3-5 |
| 19. | Officer Tonn fired five shots through the windshield at Monterrosa. | Admitted. | None. |
| 20. | One of the five shots struck Monterrosa in the back of the head. | Admitted. | None. |
| 21. | Detective Pittman perceived Monterrosa to present a deadly threat at the time of the shooting. | Denied.<br><br>The officers' testimony that Monterrosa presented a deadly threat is based upon their scientifically disproven testimony that Monterrosa stopped, turned to face them, took a kneeling shooting position, and pointed the hammer at them as if it were a firearm.<br><br>This is scientifically impossible as Monterrosa's body was found approximately 10-13 feet away from the sedan in the direction opposite the CRT truck, face down, with his feet towards the truck and head away. | Ex. A: Tonn Dep. at 93:18-94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman Statement to Investigators (COV000257-000262); Ex. P: Pittman OIR Group Interview (COV002255); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | | |
|---|---|---|---|
| | | Furthermore, Monterrosa would not have physically been able to take such a position, get up, and cover the necessary ground in the time elapsed. Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
| 22. | Detective Wagoner perceived Monterrosa to be carrying a firearm at the time of the shooting. | The officers' testimony that Monterrosa presented a deadly threat is based upon their scientifically disproven testimony that Monterrosa stopped, turned to face them, took a kneeling shooting position, and pointed the hammer at them as if it were a firearm.<br><br>This is scientifically impossible as Monterrosa's body was found approximately 10-13 feet away from the sedan in the direction opposite the CRT truck, face down, with his feet towards the truck and head away. Furthermore, Monterrosa would not have physically been able to take such a position, get up, and cover | Ex. A: Tonn Dep. at 93:18-94:23, 97:4-8; Ex. N: Tonn Statement to Investigators (COV000263-273); Ex. C: Pittman Dep. at 36:14-37:09; Ex. O: Pittman Statement to Investigators (COV000257-000262); Ex. P: Pittman OIR Group Interview (COV002255); Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

|  |  | the necessary ground in the time elapsed. Monterrosa would need to move immediately and directly away from the sedan at a rate of 3.5 to 8.5 mph to fall where his body fell.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. |  |
|---|---|---|---|
| 23. | The Second Amended Complaint is the operative complaint. | Admitted. | None. |
| 24. | The Second Amended Complaint asserts causes of acton against Detective Tonn under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments, a cause of action against the City of Vallejo for those same violations under *Monell*, and causes of action against both Detective Tonn and the City of Vallejo for violation of the Bane Act and for wrongful death. | Admitted. | None. |
| 25. | On the night of the Monterrosa shooting, there was extensive criminal activity throughout the City of Vallejo, including criminal activity with armed suspects. | Admitted. | None. |
| 26. | Less than 15 seconds elapsed between the time that the Detectives entered the Walgreens parking lot and Detective Tonn fired his weapon. | Admitted. | None. |

| | | | |
|---|---|---|---|
| 27. | Monterosa was wearing all black at the time of the shooting. | Admitted. | None. |
| 28. | The total elapsed time between Detective Tonn's first and last shots was approximately 1.04 seconds. | Admitted. | None. |
| 29. | Research has shown that individuals can rotate their head a full 180 degrees in less than half a second. | Admitted.<br><br>However, it is denied that this occurred in this case. As noted above, Monterrosa had to travel a distance between 10 and 13.6 feet from his location at the sedan in a direction away from the CRT truck eventually to the location where he fell when shot. He could not have done so without moving away from the CRT truck the entire time at a speed of 3.5 to 8.5 mph.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |
| 30. | After conducting controlled tests wit four individuals, Detective Tonn's biomechanical expert found that those individuals completed a full 180 degree turn of their head in an average time of .73 seconds. | Admitted.<br><br>However, it is denied that this occurred in this case. As noted above, Monterrosa had to travel a distance between 10 and 13.6 feet from his location at the sedan in a direction away from the CRT truck eventually to the location where he fell when shot. He | Ex. I – Neale Supplemental Report at pp. 5-6; Ex. K – Young Report at pp. 26-28; Ex. R: Report of Noedel at pp. 4-6. |

| | | could not have done so without moving away from the CRT truck the entire time at a speed of 3.5 to 8.5 mph.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | |
|---|---|---|---|
| 31. | The physical evidence in this case is not sufficient to allow an expert to determine Monterrosa's position or movements at the time Detective Tonn decided to fire. | Denied.<br><br>As noted above, Monterrosa had to travel a distance between 10 and 13.6 feet from his location at the sedan in a direction away from the CRT truck eventually to the location where he fell when shot. He could not have done so without moving away from the CRT truck the entire time at a speed of 3.5 to 8.5 mph.<br><br>Furthermore, trajectory analysis evidence indicates that Mr. Monterrosa could not have been kneeling at the time he was shot. Rather, he needed to be standing as the path of the bullets crossed the point at which he fell at 58.5 inches above the ground. | Ex. H: Neale Report; Ex. I Neale Supplemental Report; Ex. K: Young Report; Ex. L: Young Rebuttal Report; Ex. R: Report of Noedel at pp. 4-6. |
| 32. | In response to a written interrogatory requesting all facts supporting Plaintiffs' cause of action under the Fourteenth Amendment, Plaintiffs provided the following substantive | Admitted. | None. |

| | | | |
|---|---|---|---|
| | response:<br>"Defendants TONN and DOES 1-10 acting under color of law, and without due process of law deprived Plaintiffs of their right to a familial relationship with decedent by use of unreasonable, unjustified deadly force and violence, causing injuries which resulted in decedent's death, all without provocation, in violation of the Fourteenth Amendment to the United States Constitution. Defendants TONN and DOES 1-10 acted with an intent to harm Decedent unrelated to legitimate law enforcement purposes in killing Decedent." | | |
| 33. | In response to interrogatories seeking all witnesses and documents supporting these facts, Plaintiffs identified no witnesses except themselves and their daughters, and no documents except the First Amended Complaint and Sean Monterrosa's death certificate. | Admitted.<br><br>By way of further response, the interrogatories were served when Plaintiffs were represented by prior counsel and before document discovery in this matter. All documents supporting Plaintiffs' claims were in the custody and control of the City of Vallejo at that juncture in litigation.<br><br>Plaintiffs served on Defendants Amended Rule 26 disclosures identifying more than 30 witnesses with representations of relevant information those witnesses may have. | Ex. Q: Plaintiffs' Amended Rule 26 Disclosures. |
| 34. | In response to a written interrogatory requesting all facts supporting Plaintiff's cause of | Admitted.<br><br>By way of further | Ex. Q: Plaintiffs' Amended Rule 26 Disclosures. |

action under *Monell*, Plaintiffs provided the following substantive response:

"Plaintiffs are informed and believe and thereon allege that high-ranking City of Vallejo officials, including Chief Williams, high ranking police supervisors, DOES 11 through 25, and/or each of them, knew and/or reasonably should have known about the repeated acts of misconduct by Defendant Officers TONN and DOES 1-10, and/or each of them.

Plaintiffs are further informed and believe and thereon allege allege that high-ranking City of Vallejo officials, including Chief Williams, high ranking police supervisors, DOES 11 through 25, and/or each of them, knew and/or reasonably should have known that their police officers, including Defendants TONN and DOES 1-10, were either untrained or improperly trained and that Defendant CITY maintained deficient customs in the use of force in the following areas:

A. Permitting police officers who demonstrate a pattern of using unreasonable force, such as Defendant TONN who had three prior officer-involved shootings in five years and a separate non-shooting excessive force complaint, to continue on patrol and pose a danger to the public of continuing to use excessive force without remediation, retraining,

response, the interrogatories were served when Plaintiffs were represented by prior counsel and before document discovery in this matter. All documents supporting Plaintiffs' claims were in the custody and control of the City of Vallejo at that juncture in litigation.

Plaintiffs served on Defendants Amended Rule 26 disclosures identifying more than 30 witnesses with representations of relevant information those witnesses may have.

Additionally, further discovery yielded the production of more than 4400 pages of documents, videos, and more than 20 depositions.

or discipline.

B. That reasonable available less lethal weapons are required to be used against subjects who do not pose an imminent threat of serious injury or harm even if one less-lethal weapon has been used unsuccessfully;

C. That where reasonable opportunities for de-escalation of potentially threatening subjects exist, include the reasonable deployment and/or relocation of police officers; the use of effective communication that is not confrontational, escalating, or demanding; reasonably creating time and distance to help de-escalate, to allow the use of effective communication, and to allow the continuing opportunity to use less lethal weapons, they must be employed to defuse a potential threat in place of lethal force.

D. Plaintiffs allege the destruction of relevant evidence and the premature return of the unmarked vehicle to service were ordered by high-ranking City of Vallejo police command staff who knew or should have known the windshield and unmarked vehicle were relevant evidence, and happened only after

| | | | |
|---|---|---|---|
| | Plaintiffs notified Defendant City that they are represented by counsel in the instant matte and demanded in writing preservation of all relevant evidence in this matter. Said conduct is demonstrative of policy, practice and training within the Vallejo Police Department that engages in and conducts the destruction and or misuse of evidence for purposes of covering up overt misconduct by Vallejo police officers. These policy, practice and training failures were a substantial and moving force in the violation of Mr. Monterrosa's rights culminating in his shooting death on June 2, 2020 by Defendant Officers. | | |
| 35. | In response to interrogatories seeking all witnesses and documents supporting these facts, Plaintiffs identified no witnesses except Police Chief Shawny Williams, and no documents except the First Amended Complaint, Sean Monterrosa's death certificate, and tree press conference videos. | Admitted. By way of further response, the interrogatories were served when Plaintiffs were represented by prior counsel and before document discovery in this matter.  All documents supporting Plaintiffs' claims were in the custody and control of the City of Vallejo at that juncture in litigation. Plaintiffs served on Defendants Amended Rule 26 disclosures identifying more than 30 | Ex. Q: Plaintiffs' Amended Rule 26 Disclosures. |

|  |  | witnesses with representations of relevant information those witnesses may have.<br><br>Additionally, further discovery yielded the production of more than 4400 pages of documents, videos, and more than 20 depositions. |  |
|---|---|---|---|
| 36. | Plaintiffs have not served any supplemental or amended responses to interrogatories. | Admitted.<br><br>By way of further response, the interrogatories were served when Plaintiffs were represented by prior counsel and before document discovery in this matter.  All documents supporting Plaintiffs' claims were in the custody and control of the City of Vallejo at that juncture in litigation.<br><br>Plaintiffs served on Defendants Amended Rule 26 disclosures identifying more than 30 witnesses with representations of relevant information those witnesses may have.<br><br>Additionally, further discovery yielded the production of more than 4400 pages of documents, videos, and more than 20 depositions. | Ex. Q: Plaintiffs' Amended Rule 26 Disclosures. |

## PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS

|  | Plaintiffs' Material Fact | Plaintiffs' Evidence in Support | Defendants' Response |
|---|---|---|---|
| 1. | Sean Monterrosa was unarmed at the time he was shot. | Ex. S: Tonn's Responses to Requests for Admissions at # 1. |  |
| 2. | Sean Monterrosa was shot in the back of the head. | Ex. S: Tonn's Responses to Requests for Admissions at # 2. |  |
| 3. | Sean Monterrosa was not suspected of a violent crime, rather when Defendant Tonn responded to the Walgreens, it was in response to a burglary in progress call. There was no report of a violent crime occurring at the location. | Ex. A: Dep. of Tonn at 86:18-19. |  |
| 4. | Following the shooting, Vallejo employed the OIR Group to review the shooting. | Ex. T: Vallejo Responses to Requests for Admissions at #1. |  |
| 5. | After reviewing the evidence, OIR Group concluded that Jarrett Tonn's use of deadly force violated departmental policy and "was not objectively reasonable under the totality of the circumstances." | Ex. T: Vallejo Responses to Requests for Admissions at #2. |  |
| 6. | Following his review of the incident, Vallejo Police Chief Shawny Williams informed Jarrett Tonn of his intent to terminate Tonn for violation of policy. Williams stated that based on his analysis as the policymaker for the Vallejo Police Department, Tonn "did not have an objectively reasonable belief that Mr. Monterrosa was an imminent threat in the moment when [he] shot him." | Ex. U: Tonn Termination Memo at p. 5 (COV002451) |  |

| 7. | When Dets. Tonn, Wagoner, and Pittman entered the Walgreens parking lot, Sean Monterrosa was running away from the Walgreens towards a black sedan. | Ex. A: Tonn Dep. at 92:11-15; Ex. B: Wagoner Dep. at 47:06-47:15; Ex. C: Pittman Dep. at 34:19-22. | |
|---|---|---|---|
| 8. | Monterrosa briefly attempted to get into the sedan. | Ex. A: Tonn Dep. at 92:11-15; Ex. B: Wagoner Dep. at 47:06-47:15; Ex. C: Pittman Dep. at 34:19-22. | |
| 9. | The last time Sean Monterrosa is captured on body camera prior to the shooting is when he is halfway into the sedan. | Ex. H: Neale Report at p. 18; Ex. D-F: Body Camera Videos | |
| 10. | Monterrosa is last seen on body camera 0.8 seconds prior to the first shot being fired by Defendant Tonn. | Ex. H: Neale Report at p. 18; Ex. D-F: Body Camera Videos | |
| 11. | The last shot is fired 1.1 seconds after the first shot. | Ex. I: Neale Supplemental Report at p. 5. | |
| 12. | This leaves 1.9 seconds for Monterrosa to travel from the car to the location where he was shot in the back of the head and fell. | *Cf.* Ex. H: Neale Report at p. 18; Ex. D-F: Body Camera Videos and Ex. I: Neale Supplemental Report at p. 5. | |
| 13. | Scene reconstruction and 3D Laser analysis demonstrates that Monterrosa fell 13.5 feet from the car, meaning he travelled approximately 10 feet away from the officers before he was shot in the back of the head and fell. | Ex. H: Neale Report at pp. 20-21. | |
| 14. | Given these parameters, Monterrosa was moving away from the officers, with his back towards them when he was shot, and if shot by the first bullet, he was averaging 8.5 mph, which is consistent with running. | Ex. H: Neale Report at 20. | |

| | | |
|---|---|---|
| 15. | If he was shot by the last bullet, Mr. Monterrosa was moving away from the officers, with his back towards them when he was shot at an average pace of 3.5 mph, which is consistent with walking. | Ex. H: Neale Report at p. 20. | |
| 16. | The total time and average speeds do not include the additional time required for Monterrosa to get up from a seated position. | Ex. H: Neale Report at p. 20. | |
| 17. | Monterrosa fell face down with his feet closest to the CRT truck and his head furthest away. | Ex. D-F: Body Camera Videos | |
| 18. | It is scientifically impossible for Monterrosa to have left the sedan, taken a kneeling position as claimed by the officers, then stood, turned, and traveled 10 feet during the 1.9 seconds from when he is last seen until he is shot. | Ex. K: Young Report at p. 26. | |
| 19. | To accomplish that physical action would require a minimum of 3.05 seconds. | Ex. K: Young Report at p. 26. | |
| 20. | Monterrosa was not kneeling at the time he was shot. | Ex. R: Noedel Report at pp. 4-6. | |
| 21. | Thus, the scientific evidence demonstrates that Monterrosa exited the sedan and began moving away from the officers until such time as he was shot in the back of the head. | Ex. H: Neale Report at p. 20; Ex. K: Young Report at p. 26; Ex. R: Noedel Report at pp. 4-6. | |
| 22. | The Vallejo Police Department Critical Incident Review Board (CIRB) which reviews police shooting is largely perfunctory and fails to address unreasonable force by holding officers and supervisors accountable for not | Ex. W: Fernandez Expert Report at p. 3. | |

| | | | |
|---|---|---|---|
| | identifying, adequately investigating, or addressing force as unreasonable or otherwise contrary to VPD Policy. | | |
| 23. | The City of Vallejo did not have a standing procedure to conduct CIRB evaluations of officer involved shootings in a manner that is generally accepted by police standards. | Ex. W: Fernandez Expert Report at p. 4. | |
| 24. | Vallejo was woefully ill-equipped to track frequency of uses of force, to utilize early warning or intervention systems, and to translate learning opportunities from CIRB events into actual training improvements. | Ex. W: Fernandez Expert Report at p. 5. | |
| 25. | Prior to 2011, the VPD did not have any type of formalized use of force review system at all. | Ex. X: Horton Dep. at 37:14-39:11. | |
| 26. | From 2014 through 2020, the Department – despite owning and utilizing software ("IA Pro") that had a built in capability to detect patters of use of force by individual officers and provide the department with early warning or early intervention notices – failed to implement any types of policies or procedures that implement an early intervention program. | Ex. Y: Corp. Designee Knight Dep. at 40:1-41:16 | |
| 27. | Even when an officer used deadly force multiple times in a constrained period, like Detective Tonn, there was no mechanism for enhanced review, retraining, or requalification. | Ex. Z: Bidou Dep. at 34:11-17; Ex. AA: Corp. Designee Ramrakha Dep. at 54:4-18. | |

| | | |
|---|---|---|
| | An officer involved in a shooting was simply put back out on the street, usually within a few days and long before the administrative review or criminal investigation was finalized. | | |
| 28. | Even the CIRB process was lackluster. The memos generated by the CIRB and produced to the Chief for review for discipline were "quite short in their summary of the underlying Board discussion," often times including only two paragraphs summarizing the shooting. | Ex. Z: Dep. of Bidou, Ex. 1 – CIRB Report of Shooting by Tonn involving Victor Hurtado | |
| 29. | The CIRB would not consider prior incidents or shootings by an officer when analyzing a subsequent shooting – even if there were multiple shootings in a short period. | Ex. AA: Ramrakha Dep. at 63:2-5. | |
| 30. | When CIRB findings were presented to the Chief, the Chief was not provided with the full investigation narrative report, only the short summary contained in the CIRB report. | Ex. Z: Bidou Dep. at 35:11-36:2. | |
| 31. | Despite the CIRB summaries being very limited, Police Chief Andrew Bidou (Chief from 2014-2019) stated that he did not even read the entire summaries and sometimes he didn't read the summaries at all. | Ex. Z: Bidou Dep. at 36:1-11. | |
| 32. | As a result of this deficient process, no police officer in Vallejo had been disciplined for a police shooting or critical incident in the last 20 years. | Ex. X: Horton Dep. at 21:14-21; 12:2-15. | |

| | | |
|---|---|---|
| 33. | During Defendant Tonn's time on the force, he cannot recall anyone ever being disciplined for a use of force. | Ex. A: Tonn Dep. at 129:20-130:2. | |
| 34. | These failures have been the subjects of reports by the OIR Group, a California DOJ Collaborative Reform Agreement, and a California DOJ Stipulated Judgment, | Ex. W: Fernandez Report at p. 7; Ex. BB: May 2020 OIR Group Report; Ex. CC: California DOJ Collaborative Reform Agreement; Ex. DD: California DOJ Stipulated Judgment | |
| 35. | In the summer of 2019, new Vallejo Police Chief Shawny Williams retained the OIR Group to do a comprehensive evaluation of the Vallejo Police Department. | Ex. BB: 2020 OIR Group Report at p. 5. | |
| 36. | The OIR Group's review of internal affairs and CIRB processes found "an apparent reticence when it came to finding fault." | Ex. BB: 2020 OIR Group Report at p. 7. | |
| 37. | OIR Group noted that despite officers being equipped with body cameras for years, it was not until November of 2019 that activating the body cameras became mandatory.  Thus, removing a departmental tool for "meaningful accountability." | Ex. BB: 2020 OIR Group Report at p. 22-23. | |
| 38. | The Report noted that the CIRB process demonstrated a "lack of consistency and some significant missed opportunities, along with a seeming reticence to criticize shortcomings in performance." | Ex. BB: 2020 OIR Group Report at p. 28. | |
| 39. | Even when CIRB review found opportunities for additional training, there was no plan to | Ex. BB: 2020 OIR Group Report at p. 29. | |

| | | |
|---|---|---|
| | implement that training, "or even clarity as to whether the recommendation was directed at involved personnel or the agency as a whole." | |
| 40. | And even when the CIRB review found an apparent violation of Department policy, there was no "responsive action item of any kind, including potential disciplinary consequences." | Ex. BB: 2020 OIR Group Report at p. 30. |
| 41. | In sum, OIR Group found failures in the CIRB process related to a constrained scope of review, a limited administrative investigation, lengthy review processes that could drag for years, lack of concrete follow-through, and the involvement of legal counsel in the discussions. | Ex. BB: 2020 OIR Group Report at pp. 30-31. |
| 42. | As a result of the OIR Group review, in May 2020 (less than one month prior to the shooting of Sean Monterrosa) they released a report making 45 recommendations, including 8 designed to bring the CIRB process alone up to appropriate standards. | Ex. BB: 2020 OIR Group Report *generally*. |
| 43. | Due to the ongoing failures of the Vallejo Police Department, they were forced to enter into a collaborative reform agreement – and later a stipulated judgment – with the California Department of Justice ensuring that they would bring the Department up to compliance with the recommendations. | Ex. CC: California DOJ Collaborative Reform Agreement; Ex. DD: California DOJ Stipulated Judgment |
| 44. | This pattern of lax oversight and a culture that is loathe to push back on misconduct or inappropriate police shootings is | Ex. EE: Nyhoff Dep. at 45:23-48:20 (City Manager Nyhoff describes badge bending |

| | | | |
|---|---|---|---|
| | further highlighted by the cultural tradition of badge bending to celebrate and commemorate a police shooting and the death of a human being. | as "celebrating the death of a human being.") | |
| 45. | The practice of badge bending to celebrate police shootings began in the Vallejo Police Department in 2003. | Ex. FF: Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Morning Session Testimony of Kent Triblle at 67:6-14 | |
| 46. | The practice was known to Police Department leadership as early as 2016. | Ex. X: Horton Dep. at 23:17-24:13. | |
| 47. | In 2016, former Captain Lee Horton was informed that badge bending may be occurring by former Chief Andrew Bidou's executive assistant Shellyne Darst. | Ex. X: Horton Dep. at 23:17-24:13. | |
| 48. | Ms. Darst informed Captain Horton that Kent Tribble may have information about the practice. | Ex. X: Horton Dep. at 23:17-24:13. | |
| 49. | Horton then asked Tribble and was told "if it is happening and I'm not saying it is, it's probably not what you think it is." | Ex. X: Horton Dep. at 25:4-7. | |
| 50. | Despite this tacit admission, no investigation into the practice was implemented. | Ex. X: Horton Dep. at 25:10-13. | |
| 51. | By 2019, badge bending grew to be a well-known practice of the department among its leadership, as well as by the Vallejo City Manager and Mayor. | Ex. X: Horton Dep. at 25:14-26:13; Ex. EE: Nyhoff Dep. at 32:16-35:4. | |
| 52. | Despite its wide-spread knowledge among City and Department leadership, neither Chief Bidou or Chief Allio investigated the practice or administered any discipline. | Ex. X: Horton Dep. at 40:15-22. | |
| 53. | Individuals involved in this ritual celebration of police shootings permeated the Vallejo police | Ex. FF: Transcript – *California v. Milano*, | |

| | | |
|---|---|---|
| | department and its command staff. Kent Tribble who originated badge bending at Vallejo in 2003 was subsequently promoted to Corporal, then Sergeant, and Lieutenant. He also served as a firearms instructor for the department from 2007 onward. | Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Morning Session Testimony of Kent Tribble at 85:7-14, 72:14-14. | |
| 54. | The practice of badge bending also undermines the trustworthiness and quality of the CIRB and Internal Affairs processes. Kent Tribble was a member of the CIRB panel that reviewed a shooting by Officers Komoda and McLaughlin. | Ex. GG: Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Afternoon Session Testimony of Kent Tribble at 10:5-11:2. | |
| 55. | Tribble was designated as the use of force subject matter expert on the CIRB panel. | Ex. GG: Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Afternoon Session Testimony of Kent Tribble at 10:5-11:2. | |
| 56. | Tribble also bent the badges of Komoda and McLaughlin for their involvement in the shooting. | Ex. GG: Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Afternoon Session Testimony of Kent Tribble at 10:5-11:2. | |
| 57. | Tribble testified that he believed he bent the badge of (now Captain) Sanjay Ramrakha in the early 2000s. | Ex. GG: Transcript – *California v. Milano*, Superior Court of Solano County, Case No. VCR233208, March 22, 2022 Afternoon Session Testimony of Kent Tribble at 14:27-15:3. | |
| 58. | Ramrakha later served as a | Ex. AA: Ramrakha Dep. | |

| | | |
|---|---|---|
| | corporal and field training officer in 2013, an instructor, and a sergeant in Internal Affairs. | 15:8-16:4, 17:6-8. | |
| 59. | As the internal affairs sergeant, Ramrakha was responsible for investigating police discharges and sat on the CIRB when it met to review discharges. | Ex. AA: Ramrakha Dep. 21:10-14, 22:19-23:18. | |
| 60. | Defendant Jarrett Tonn was an active participant in this badge bending ritual. Kent Tribble testified that he personally bent Tonn's badge following one of his prior shootings. | Ex. HH: Tribble Dep. at 57:18-19. | |
| 61. | Defendant Tonn began as a Vallejo police officer in August of 2014 | Ex. A: Tonn Dep. at 23:16-18. | |
| 62. | In the less than six years Tonn was on the force, he was involved in 3 prior shootings and had five prior excessive force incidents. | Ex. II through PP. | |
| 63. | Tonn was also the subject of three lawsuits alleging excessive force, each of which was settled. | Ex. QQ: Email in lieu of production by Attorney Knight. | |
| 64. | In all three of Defendant Tonn's prior shootings, the target of the shooting was not armed with a weapon. On February 22, 2015, Tonn shot Gerald Brown while he was in his vehicle. No weapon was recovered. | Ex. JJ: Brown CIRB Report | |
| 65. | On May 31, 2017, Tonn shot Kevin DeCarlo. No weapon was recovered. | Ex. LL: DeCarlo CIRB Report | |
| 66. | Just 38 days later on July 8, 2017, Tonn shot at Victor Hurtado as he fled. Tonn claimed Hurtado pointed a gun at him, but no weapon was ever recovered. Body camera footage from the incident shows Tonn firing at Hurtado's back as he runs away, but no evidence at all of Hurtado | Ex. PP: Hurtado CIRB Report (Note the CIRB Report incorrectly lists the date as 2018, the correct date is on the incident sheet on the final page.); Ex. A: Tonn Dep. at 59:12; Exhibit QQ: Synced video of | |

| | | Hurtado Shooting | |
|---|---|---|---|
| being armed. | | | |
| 67. | Despite no gun being recovered and no evidence to demonstrate Hurtado was ever armed, the CIRB actually encouraged Tonn to shoot sooner. | Ex. PP: Hurtado CIRB Report. | |
| 68. | Tonn was never disciplined following any of these incidents. | Ex. A: Tonn Dep. at 130:22-132:2. | |

Respectfully submitted,

/s/ John J. Coyle
John J. Coyle, Esq.
Mark V. Maguire, Esq.
Danielle N. Purtell, Est.
MCELDREW PURTELL
123 South Broad Street
Suite 2250
Philadelphia, PA 19109

Carla M. Wirtschafter, Esq.
REED SMITH LLP
1901 Avenue of the Stars
Suite 700
Los Angeles, CA 90067

Date: December 6, 2024