**EXHIBIT "C"**
**Deposition transcript of Wesley Pitman**

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4     _____
                                 )
5     NEFTALI MONTERROSA, et al., )
                                 )
6              Plaintiffs,        )
                                 )
7        vs.                      )  CIVIL ACTION NO.:
                                 )  2:20-cv-01563
8     CITY OF VALLEJO, et al.,    )
                                 )
9              Defendants.        )
      _____ )

10

11

12

13      VERITEXT VIRTUAL ZOOM DEPOSITION OF WESLEY PITTMAN

14             Philadelphia, Pennsylvania

15              Tuesday, January 24, 2023

16                    Volume I

17

18

19

20

21     Reported by:

22     SUSAN SHANSTROM

23     CSR No. 13526

24     Job No. 5608851

25     Pages 1 - 61

```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4      _____
                                   )
 5      NEFTALI MONTERROSA, et al.,  )
                                   )
 6                    Plaintiffs,   )
                                   )
 7          vs.                     )   CIVIL ACTION NO.:
                                   )   2:20-cv-01563
 8      CITY OF VALLEJO, et al.,    )
                                   )
 9                    Defendants.   )
        _____ )
10

11

12              Veritext Virtual Zoom Deposition of WESLEY

13      PITTMAN, Volume I, taken on behalf of Plaintiff at 123

14      South Broad Street, Suite 2250, Philadelphia,

15      Pennsylvania, beginning at 3:35 p.m. EST and ending at

16      4:52 p.m. EST, on Tuesday, January 24, 2023, before

17      Susan Shanstrom, Certified Shorthand Reporter No. 13526.

18

19

20

21

22

23

24

25
```

Page 3

```
1       APPEARANCES:
2       For Plaintiff:
3            (By Zoom videoconference)
4            McELDREW PURTELL
5            BY:  JOHN J. COYLE
6            Attorney at Law
7            123 South Broad Street, Suite 2250
8            Philadelphia, Pennsylvania  19109
9            (215) 545-8800
10           jcoyle@mceldrewyoung.com
11
12      For Defendant City of Vallejo:
13           (By Zoom videoconference)
14           CITY OF VALLEJO OFFICE OF THE CITY ATTORNEY
15           BY:  KATELYN M. KNIGHT
16           Attorney at Law
17           555 Santa Clara Street
18           Vallejo, California  94590-5922
19           (707) 648-4388
20           katelyn.knight@cityofvallejo.net
21
22
23
24
25
```

Page 4

1    APPEARANCES (continued):

2    For Jarrett Tonn:

3        (By Zoom videoconference)

4        ANGELO KILDAY & KILDUFF

5        BY:  DERICK E. KONZ

6        Attorney at Law

7        601 University Avenue, Suite 150

8        Sacramento, California  95825

9        (916) 564-6100

10        dkonz@akk-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
1                          INDEX

2    WITNESS                              EXAMINATION

3    WESLEY PITTMAN

4    Volume I

5                              BY MR. COYLE          6

6                              BY MR. KONZ          50

7

8                          EXHIBITS

9    NUMBER         DESCRIPTION                    PAGE

10   No Exhibits Marked

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 6

```
 1        Philadelphia, Pennsylvania, Tuesday, January 24, 2023

 2                        3:35 p.m. EST

 3

 4                       WESLEY PITTMAN,

 5        having been administered an oath, was examined and

 6        testified as follows:

 7                             - - -

 8                        EXAMINATION

 9     BY MR. COYLE:

10     Q       Good afternoon, Officer Pittman.  My name is

11     John Coyle from McEldrew Purtell.  We're here for your

12     deposition.  Have you ever had your deposition taken

13     before?

14     A       No.

15     Q       Okay.  I'll go through a series of instructions

16     to make this go as smoothly and quickly as possible.  So

17     first and foremost you're under oath.  So just like in a

18     court of law, you're obligated to tell the truth.  Do

19     you understand that?

20     A       Yes.

21     Q       Okay.  Second, the court reporter is taking a

22     written record of everything we say here today so keep a

23     few things in mind.  First, things like uh-huh, huh-uh,

24     nods of the head, shrugs of the shoulders, they don't

25     translate to a written record very well so you have to
```

1   use words like "yes" and "no".  Do you understand?

2   A      I do.

3   Q      Second, it's very much human nature to

4   anticipate my question and want to chime in and answer

5   it, but that leads to a really messy record.  So try to

6   wait until I'm done to begin your answer and I'll,

7   likewise, do the same.  All right?

8   A      Sounds good to me.

9   Q      This isn't a memory test here today.  If you

10  can't remember something or you don't recall something,

11  saying I don't remember or I don't recall is a perfectly

12  acceptable answer.  If you're going to estimate

13  something, be it time or distance, I only ask that you

14  warn us that you're estimating and say I'm estimating

15  that it was 20 feet, something like that.

16  A      Sounds good.

17  Q      I don't think we'll be here really long,

18  probably under two hours, but at any point in time if

19  you need to take a break, use the restroom, take a walk,

20  whatever it may be, that's perfectly fine.  I only ask

21  that if I've asked a question you answer it before you

22  take that break.  All right?

23  A      Okay.

24  Q      Okay.  If at any point in time you want to

25  change one of your answers or elaborate on one of your

1    answers that you've already given you're allowed to do

2    that.  Just let me know, say I was thinking about that

3    question and I want to clarify or I want to add

4    something.  You're allowed to do that.  All right?

5    A      Okay.

6    Q      I ask this and I mean no disrespect by it, but I

7    ask everyone this question: Is there any reason, be it

8    medication, drugs, alcohol, physical condition or

9    psychological condition that would impact your ability

10   to testify truthfully and accurately here today?

11   A      No.

12   Q      Okay.  Have you had the opportunity to speak to

13   counsel before we get started?

14   A      Yes.

15   Q      Were you able to review any documents prior to

16   this deposition to prepare yourself?

17   A      Yes.

18   Q      What documents did you review?

19   A      I reviewed our department's use of force policy,

20   our department's body camera policy, the OIR report, my

21   notice of discipline from Chief Williams, and my

22   transcript from my criminal interview of the incident.

23   Q      Did you speak with either Detective Wagoner or

24   Detective Tonn in preparation for this deposition?

25   A      No.

1    Q       Do you have any questions before we get started?

2    A       Do you mind if I intermittently take a drink of

3    water?  I'll try not to distract anybody.

4    Q       Take a drink whenever you need.  You'll not

5    distract us at all.  I'm going to do the same thing with

6    my plastic cup.  All right.  What's your full name for

7    the record?

8    A       Wesley Pittman.

9    Q       And your date of birth?

10           MS. KNIGHT:  Objection.  Privacy.  The witness

11   can answer how old he is.

12           MR. COYLE:  That's fine.

13   BY MR. COYLE:

14   Q       How old are you?

15   A       39 years old.

16   Q       What's your highest level of education?

17   A       I've attended some college.

18   Q       I usually ask where people live and the purpose

19   for that is that, you know, if we go to trial we would

20   need to subpoena you so you can come testify.  My

21   understanding is you're still employed by the Vallejo

22   Police Department, correct?

23   A       I am.

24   Q       Okay.  Are you willing to allow Ms. Knight and

25   the Vallejo Law Department to accept the subpoena on

```
 1       your behalf so we can avoid the need for your address

 2       and that sort of thing?

 3       A       Yes.

 4       Q       Okay.  Perfect.  Sir, if you decide to quit your

 5       job and run off somewhere you've got to promise to let

 6       Ms. Knight know where you're going.  All right?

 7       A       I will do that.

 8       Q       Some college.  Where did you go?

 9       A       Excuse me.  I attended Sacramento City College,

10       American River College and San Joaquin Delta College.

11       Q       Okay.  Can you just walk me through when you

12       went to each?

13       A       I could give you rough estimates of years.

14       Q       That's fine.  Just a year.

15       A       Sacramento City College would have been 2003 to

16       2004.  Delta College would have been 2004 to 2005, the

17       end of 2005.  And American River College would have been

18       from about 2006 to 2007, I guess.

19       Q       Okay.  Did you have one major throughout those

20       time periods?

21       A       I had a couple of different areas where I was --

22       no declared major but I had a couple areas where I was

23       studying.

24       Q       What sort of things were you focusing on?

25       A       At Delta College it was landscape architecture
```

Page 11

```
 1    and drafting, and then later the Police Academy.  At
 2    Sacramento City College it was aeronautics, airplane
 3    mechanic, and power plant.  And at American River
 4    College it was primarily continued professional training
 5    throughout the public safety center.
 6    Q      Okay.  What year did you graduate high school?
 7    A      2002.
 8    Q      Okay.  When did you first begin your career in
 9    law enforcement?
10    A      In February of 2006.
11    Q      And who was that with?
12    A      The City of Galt Police Department.
13    Q      Can you spell that for me?
14    A      Yes, it's G-a-l-t.
15    Q      Okay.  When I say for me, I really mean for the
16    court reporter.
17           And so you went to the Police Academy at Delta
18    River College?
19    A      San Joaquin Delta College.
20    Q      And when did you graduate from the Police
21    Academy.
22    A      October of 2005.
23    Q      And how long were you with the City of Gault?
24    A      About 11 years.  Almost 11 years spot on.
25    Q      And then your next employment was with the City
```

**EXHIBIT "C"**
**Deposition transcript of Wesley Pitman**

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4      _____

                                    )

5      NEFTALI MONTERROSA, et al.,   )

                                    )

6                    Plaintiffs,     )

                                    )

7         vs.                        )  CIVIL ACTION NO.:

                                    )  2:20-cv-01563

8      CITY OF VALLEJO, et al.,      )

                                    )

9                    Defendants.     )

       _____  )

10

11

12

13        VERITEXT VIRTUAL ZOOM DEPOSITION OF WESLEY PITTMAN

14                   Philadelphia, Pennsylvania

15                   Tuesday, January 24, 2023

16                          Volume I

17

18

19

20

21      Reported by:

22      SUSAN SHANSTROM

23      CSR No. 13526

24      Job No. 5608851

25      Pages 1 - 61

Page 2

1                UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4      _____

                                    )

5      NEFTALI MONTERROSA, et al.,   )

                                    )

6                    Plaintiffs,     )

                                    )

7          vs.                       )   CIVIL ACTION NO.:

                                    )   2:20-cv-01563

8      CITY OF VALLEJO, et al.,       )

                                    )

9                    Defendants.     )

       _____   )

10

11

12            Veritext Virtual Zoom Deposition of WESLEY

13     PITTMAN, Volume I, taken on behalf of Plaintiff at 123

14     South Broad Street, Suite 2250, Philadelphia,

15     Pennsylvania, beginning at 3:35 p.m. EST and ending at

16     4:52 p.m. EST, on Tuesday, January 24, 2023, before

17     Susan Shanstrom, Certified Shorthand Reporter No. 13526.

18

19

20

21

22

23

24

25

Page 3

1       APPEARANCES:

2       For Plaintiff:

3            (By Zoom videoconference)

4            McELDREW PURTELL

5            BY:  JOHN J. COYLE

6            Attorney at Law

7            123 South Broad Street, Suite 2250

8            Philadelphia, Pennsylvania  19109

9            (215) 545-8800

10           jcoyle@mceldrewyoung.com

11

12      For Defendant City of Vallejo:

13           (By Zoom videoconference)

14           CITY OF VALLEJO OFFICE OF THE CITY ATTORNEY

15           BY:  KATELYN M. KNIGHT

16           Attorney at Law

17           555 Santa Clara Street

18           Vallejo, California  94590-5922

19           (707) 648-4388

20           katelyn.knight@cityofvallejo.net

21

22

23

24

25

```
                                                    Page 4

 1       APPEARANCES (continued):

 2       For Jarrett Tonn:

 3            (By Zoom videoconference)

 4            ANGELO KILDAY & KILDUFF

 5            BY:  DERICK E. KONZ

 6            Attorney at Law

 7            601 University Avenue, Suite 150

 8            Sacramento, California  95825

 9            (916) 564-6100

10            dkonz@akk-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                          INDEX

2     WITNESS                              EXAMINATION

3     WESLEY PITTMAN

4     Volume I

5                            BY MR. COYLE         6

6                            BY MR. KONZ          50

7

8                          EXHIBITS

9     NUMBER          DESCRIPTION                 PAGE

10    No Exhibits Marked

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          Philadelphia, Pennsylvania, Tuesday, January 24, 2023

2                              3:35 p.m. EST

3

4                              WESLEY PITTMAN,

5          having been administered an oath, was examined and

6          testified as follows:

7                                 - - -

8                              EXAMINATION

9          BY MR. COYLE:

10         Q       Good afternoon, Officer Pittman.  My name is

11         John Coyle from McEldrew Purtell.  We're here for your

12         deposition.  Have you ever had your deposition taken

13         before?

14         A       No.

15         Q       Okay.  I'll go through a series of instructions

16         to make this go as smoothly and quickly as possible.  So

17         first and foremost you're under oath.  So just like in a

18         court of law, you're obligated to tell the truth.  Do

19         you understand that?

20         A       Yes.

21         Q       Okay.  Second, the court reporter is taking a

22         written record of everything we say here today so keep a

23         few things in mind.  First, things like uh-huh, huh-uh,

24         nods of the head, shrugs of the shoulders, they don't

25         translate to a written record very well so you have to

```
 1    use words like "yes" and "no".  Do you understand?

 2    A     I do.

 3    Q     Second, it's very much human nature to

 4    anticipate my question and want to chime in and answer

 5    it, but that leads to a really messy record.  So try to

 6    wait until I'm done to begin your answer and I'll,

 7    likewise, do the same.  All right?

 8    A     Sounds good to me.

 9    Q     This isn't a memory test here today.  If you

10    can't remember something or you don't recall something,

11    saying I don't remember or I don't recall is a perfectly

12    acceptable answer.  If you're going to estimate

13    something, be it time or distance, I only ask that you

14    warn us that you're estimating and say I'm estimating

15    that it was 20 feet, something like that.

16    A     Sounds good.

17    Q     I don't think we'll be here really long,

18    probably under two hours, but at any point in time if

19    you need to take a break, use the restroom, take a walk,

20    whatever it may be, that's perfectly fine.  I only ask

21    that if I've asked a question you answer it before you

22    take that break.  All right?

23    A     Okay.

24    Q     Okay.  If at any point in time you want to

25    change one of your answers or elaborate on one of your
```

```
 1    answers that you've already given you're allowed to do
 2    that.  Just let me know, say I was thinking about that
 3    question and I want to clarify or I want to add
 4    something.  You're allowed to do that.  All right?
 5    A       Okay.
 6    Q       I ask this and I mean no disrespect by it, but I
 7    ask everyone this question: Is there any reason, be it
 8    medication, drugs, alcohol, physical condition or
 9    psychological condition that would impact your ability
10    to testify truthfully and accurately here today?
11    A       No.
12    Q       Okay.  Have you had the opportunity to speak to
13    counsel before we get started?
14    A       Yes.
15    Q       Were you able to review any documents prior to
16    this deposition to prepare yourself?
17    A       Yes.
18    Q       What documents did you review?
19    A       I reviewed our department's use of force policy,
20    our department's body camera policy, the OIR report, my
21    notice of discipline from Chief Williams, and my
22    transcript from my criminal interview of the incident.
23    Q       Did you speak with either Detective Wagoner or
24    Detective Tonn in preparation for this deposition?
25    A       No.
```

1    Q       Do you have any questions before we get started?

2    A       Do you mind if I intermittently take a drink of

3    water?  I'll try not to distract anybody.

4    Q       Take a drink whenever you need.  You'll not

5    distract us at all.  I'm going to do the same thing with

6    my plastic cup.  All right.  What's your full name for

7    the record?

8    A       Wesley Pittman.

9    Q       And your date of birth?

10           MS. KNIGHT:  Objection.  Privacy.  The witness

11   can answer how old he is.

12           MR. COYLE:  That's fine.

13   BY MR. COYLE:

14   Q       How old are you?

15   A       39 years old.

16   Q       What's your highest level of education?

17   A       I've attended some college.

18   Q       I usually ask where people live and the purpose

19   for that is that, you know, if we go to trial we would

20   need to subpoena you so you can come testify.  My

21   understanding is you're still employed by the Vallejo

22   Police Department, correct?

23   A       I am.

24   Q       Okay.  Are you willing to allow Ms. Knight and

25   the Vallejo Law Department to accept the subpoena on

Page 10

```
1      your behalf so we can avoid the need for your address
2      and that sort of thing?
3      A       Yes.
4      Q       Okay.  Perfect.  Sir, if you decide to quit your
5      job and run off somewhere you've got to promise to let
6      Ms. Knight know where you're going.  All right?
7      A       I will do that.
8      Q       Some college.  Where did you go?
9      A       Excuse me.  I attended Sacramento City College,
10     American River College and San Joaquin Delta College.
11     Q       Okay.  Can you just walk me through when you
12     went to each?
13     A       I could give you rough estimates of years.
14     Q       That's fine.  Just a year.
15     A       Sacramento City College would have been 2003 to
16     2004.  Delta College would have been 2004 to 2005, the
17     end of 2005.  And American River College would have been
18     from about 2006 to 2007, I guess.
19     Q       Okay.  Did you have one major throughout those
20     time periods?
21     A       I had a couple of different areas where I was --
22     no declared major but I had a couple areas where I was
23     studying.
24     Q       What sort of things were you focusing on?
25     A       At Delta College it was landscape architecture
```

Page 11

1    and drafting, and then later the Police Academy.  At

2    Sacramento City College it was aeronautics, airplane

3    mechanic, and power plant.  And at American River

4    College it was primarily continued professional training

5    throughout the public safety center.

6    Q      Okay.  What year did you graduate high school?

7    A      2002.

8    Q      Okay.  When did you first begin your career in

9    law enforcement?

10   A      In February of 2006.

11   Q      And who was that with?

12   A      The City of Galt Police Department.

13   Q      Can you spell that for me?

14   A      Yes, it's G-a-l-t.

15   Q      Okay.  When I say for me, I really mean for the

16   court reporter.

17          And so you went to the Police Academy at Delta

18   River College?

19   A      San Joaquin Delta College.

20   Q      And when did you graduate from the Police

21   Academy.

22   A      October of 2005.

23   Q      And how long were you with the City of Gault?

24   A      About 11 years.  Almost 11 years spot on.

25   Q      And then your next employment was with the City

Page 12

```
1      of Vallejo?

2      A       Correct.

3      Q       What made you decide to move from Galt to

4      Vallejo?

5      A       Galt was a very small department with limited

6      opportunities and limited opportunities to promote.  I

7      had worked a number of special assignments.  I was ready

8      to move on to another agency.

9      Q       When you left the City of Galt were you still a

10     police officer?

11     A       Yes.

12     Q       Prior to starting with the City of Galt did you

13     have any other law enforcement employment?  By that I

14     mean corrections, sheriffs, anything like that?

15     A       No.

16     Q       How about security jobs?

17     A       No.

18     Q       Did you leave the City of Galt on good terms?

19     A       Yes.

20     Q       And by on good terms I mean you were not

21     terminated?

22     A       Correct.

23     Q       While you were at the City of Galt were you the

24     defendant in any lawsuits?

25     A       No.
```

Page 13

1    Q       Have you been the defendant in any lawsuits

2    while you were at the City of Vallejo?

3    A       No.

4    Q       We'll just look at the ten year period from 2010

5    to 2020.  Were you disciplined either by the City of

6    Galt or the City of Vallejo?  And that's excluding the

7    reprimand in this case.

8    A       No.

9    Q       You said you were -- you had a number of

10   assignments or opportunities while you were with the

11   City of Galt.  Can you tell me what those were and what

12   you mean by that?

13   A       Yes.  I was initially assigned to patrolling and

14   then moved into a narcotic investigator's detective

15   spot, then moved into a gang investigator's position,

16   which is a countywide task force in Sacramento County.

17   I then worked an on a crime suppression team and I

18   rotated back to patrol after that.

19   Q       And you mentioned that Galt was a smaller

20   department.  How big is the City of Galt?

21   A       Population-wise or department-wise?

22   Q       Both if you know.

23   A       Population, estimating about 25,000 people.

24   Q       Okay.

25   A       The department size is under 40 officers.

Page 14

1    Q       Okay.  And they had multiple sort of -- you

2    mentioned it was Countywide.  I'm surprised there were

3    so many different groups in a department that's so

4    small.  That's why I was confused for a second.

5           When you joined the City of Vallejo you said you

6    were seeking some new opportunities.  What type of

7    opportunities did you seek out when you first came over?

8    A       I just wanted to broaden my horizons and

9    investigate different types of crimes.  Galt was a

10   fairly small community.  It was relatively repetitive, I

11   guess, in what we were investigating and I just felt I

12   was getting a little stale and stagnant there.  I wanted

13   to move on to a bigger department into a city that had

14   more challenging investigations.

15   Q       At some point in time you became a member of the

16   SWAT team with Vallejo, correct?

17   A       Yes.

18   Q       What year was that?

19   A       2018.

20   Q       So you were the same SWAT class as Detective

21   Wagoner?

22   A       I believe he got on a few months before me.

23   Q       Okay.

24   A       I believe he got on at the beginning of the year

25   and I was sometime in the middle of the year.

Page 15

```
 1     Q       Okay.  How many SWAT classes does Vallejo run a

 2     year?

 3     A       We don't run our own SWAT classes.

 4     Q       Yeah, I apologize.  How many opportunities are

 5     there to take the SWAT class as a Vallejo officer here?

 6     A       If you're referring to the testing process, we

 7     generally test once every year.

 8     Q       Okay.  Were you a member of the CRT?

 9     A       Yes.

10     Q       When did you join CRT?

11     A       In May of 2020.

12     Q       So just about a month or maybe just a few weeks

13     before the shooting of Mr. Monterrosa?

14     A       Correct.

15     Q       Were you a member of any other teams or task

16     forces with the Vallejo Police Department?

17     A       No.

18     Q       Can you explain to me what your understanding of

19     your duties with the CRT were?

20     A       We had a number of different duties.  We engage

21     in surveillance.  We engage in gang enforcement, gang

22     investigations, narcotics investigations, fugitive

23     apprehensions.  Those are generally -- those are our

24     major duties.

25     Q       And am I correct that CRT is primarily a plain
```

Page 16

```
 1    clothes job?

 2    A       Primarily, yes.

 3    Q       Except for maybe when you're serving a warrant

 4    or trying to take down a fugitive, something like that?

 5    A       That's correct.

 6    Q       And what is the qualification process to become

 7    a member of the CRT?

 8    A       There was a -- we submitted a written

 9    application or -- I don't know what we call it

10    necessarily, but application or a letter of interest or

11    something like that that you would submit through your

12    supervisor.  There was an interview with the

13    investigations sergeant and the investigations

14    lieutenant.

15    Q       The investigations sergeant and lieutenant, was

16    that for the CRT team?

17    A       That was for -- yes.  I'm sorry, it was actually

18    the investigations sergeant and the CRT sergeant, not

19    the lieutenant.

20    Q       Okay.  And what type of things were talked about

21    during that interview?

22    A       We discussed training and experience, what we

23    anticipated the job was going to entail, the roles and

24    responsibilities, kind of background cases that we've

25    investigated.  You know, do we have a firm understanding
```

1    of the investigative technique and case law and that

2    kind of stuff.

3    Q      Was there any specialized training for the CRT

4    team?

5    A      To get on the team or after -- after being

6    assigned to the team?

7    Q      So first we'll say to get on the team.  Like

8    SWAT, you have to go to SWAT school, right?  Is there a

9    CRT school?

10   A      No.

11   Q      Was there any specialized training after you

12   became a member of team?

13   A      Yes.

14   Q      What was that?

15   A      We -- there is a number of different training

16   courses that we individually attended or attended as a

17   group, and they were everything from search warrant

18   writing, cell phone investigations, surveillance

19   training, asset forfeiture training.  Really kind of a

20   span of whatever our duties were there was something

21   relevant to those and we attended the training course.

22   Q      Am I correct that the majority of the CRT

23   specific training was aimed towards the investigative

24   side of policing?

25   A      Yes.

Page 18

1    Q      I want to switch gears and talk about your SWAT

2    experience.  What was the process of joining the SWAT

3    team?

4    A      There was the letter of interest or submission

5    of letter of interest through the chain of command.

6    There is a physical agility test.  There was a range

7    qualification and finally an interview, an interview

8    process.

9    Q      And you had to go to SWAT school, correct?

10   A      Once -- once we were on the team we were sent to

11   SWAT school.

12   Q      Okay.  And how long was SWAT school?

13   A      Two weeks.

14   Q      And did you do that out of Pinnacle Tactical?

15   A      Yes.

16   Q      My understanding is that on the date of

17   Mr. Monterrosa's shooting you were equipped out like you

18   would be for a SWAT operation; is that accurate?

19   A      Yes.

20   Q      Okay.  Can you walk me through what your

21   equipment loadout was on that day?

22   A      Yes.  Sorry.  Let me correct myself there.  It

23   was a hybrid of gear that we would wear on CRT, and some

24   gear that we would wear on the SWAT deployment.

25   Q      As you walk me through what your loadout was,

1    let me know whether it's CRT specific or for SWAT

2    specific.

3    A       There is a lot of crossover in what we --

4    Q       Sure.

5    A       -- carry.

6    Q       Sure.

7    A       Generally we carry a handgun; pistol magazine;

8    handcuffs; a TASER; a radio; essentially a rifle

9    magazine; identifying patches, so like a police patch

10   and a police badge or a cloth badge; and maybe just some

11   administrative gear, notepad, pencil, that kind of

12   stuff.

13   Q       Okay.  On the date of Mr. Monterrosa's shooting

14   were you equipped with a rifle?

15   A       I may have had it in the vehicle but I was not

16   deploying it.

17   Q       How about a gas grenade?

18   A       I was carrying a flashbang for noise and flash

19   distraction.

20   Q       Okay.  The SWAT rifle in 2020, do you remember

21   what your SWAT rifle was?

22   A       Yes.

23   Q       Can you tell me the manufacturer and the

24   specifications?

25   A       It was a Colt Commando, which was an AR-15 style

 1    rifle.

 2    Q      And the Commando model had a toggle that allowed

 3    you to go between automatic and semiautomatic?

 4    A      Yes.

 5    Q      And it was equipped with a suppressor, correct?

 6    A      Correct.

 7    Q      And was that the standard rifle for all members

 8    of the SWAT team at that point in time?

 9    A      Yes.

10    Q      During your time with the City of Galt did you

11    ever discharge your firearm in line of duty?  And when I

12    say in the line of duty I don't mean at the range.  I

13    mean in policing activities outside the range.

14    A      I had to shoot a dog one time.

15    Q      Okay.  Do you remember what year that was?

16    A      Maybe 2009.

17    Q      How about while you were with the City of

18    Vallejo, did you ever have to discharge your firearm in

19    the line of duty?

20    A      No.

21    Q      While you were with the City of Vallejo have you

22    been present at the scene while another officer

23    discharged their firearm in the line of duty --

24    A      No?

25    Q      -- other than the incident with Mr. Monterrosa?

Page 21

1    A       No.

2    Q       You may have seen in the media and in the press

3    some allegations that came out around the time of

4    Mr. Monterrosa's death about a tradition or custom --

5    alleged tradition or custom of badge bending within the

6    Vallejo Police Department.  Do you remember hearing

7    about those allegations?

8    A       Yes.

9    Q       Were they discussed among members of the Police

10   Department?

11   A       They were not.  I was unaware of the allegations

12   until they came forward in the media.

13   Q       Sure.  That was a very clunky question.  I

14   apologize.  I mean, when the media released the story

15   did it become a topic of conversation within the Police

16   Department?

17   A       Yes.

18   Q       Did you speak to any officers who admitted to

19   knowing about that practice before the investigation?

20   A       No.

21   Q       Did you have any knowledge of that practice

22   prior to the investigation -- prior to the media

23   reports?

24   A       No.

25   Q       It's my understanding that Detective Tonn had

Page 22

1    been a member of the Department for nearly as long as

2    you.  Had you worked closely with him prior to June of

3    2020?

4    A       I had worked assisting CRT on occasion in the

5    year leading up to this but it was no -- there was no

6    regularity or frequency with it.

7    Q       So he wasn't a regular partner or teammate in

8    the years before?

9    A       With the exception of being on SWAT, no.

10   Q       Okay.  And how often would you be deployed

11   together on SWAT?

12   A       I could give you an estimate of --

13   Q       That's fine.

14   A       -- less than ten deployments a year.

15   Q       And to the best of your knowledge how many

16   members of the SWAT team were there during your time on

17   the team?

18   A       At the time?

19   Q       Yeah.

20   A       Maybe 12 or 14.

21   Q       Prior to the shooting of Mr. Monterrosa

22   Detective Tonn had a number of other shootings.  Did you

23   ever discuss any of those other prior shootings with

24   him?

25   A       I'm sure I have, yes.

Page 23

1    Q       Do you remember which ones you spoke to him

2    about?

3    A       No.

4    Q       Were those conversations substantive about what

5    happened or just, you know, kind of, hey, how are you

6    doing?

7    A       It was more of just a generalized conversation

8    about the incident.

9    Q       Did your shifts change when you went from patrol

10   to the CRT team in May of 2020?

11   A       Yes.

12   Q       Okay.  So when you started with CRT in May of

13   2020, what was your -- did you have a standard shift?

14   A       Yes.  It would have been Tuesday through Friday

15   and I think we were generally working 8:00 to 5:00 or

16   8:00 to 6:00.

17   Q       Is that 8:00 a.m. to 5:00 p.m., or 8:00 p.m. to

18   5:00 a.m.?

19   A       The first one.  I'm sorry.  8:00 a.m. to 5:00 or

20   6:00 p.m.

21   Q       Day shift?

22   A       Day shift, yes.

23   Q       Did you have a standard partner or group that

24   you worked with?

25   A       Not a standard partner, no.

Page 24

1    Q       My understanding is that when you're on the CRT

2    team you have your own assigned undercover vehicle?

3    A       That is correct.

4    Q       So take-home vehicle is with you all the time?

5    A       Yes.

6    Q       Do you keep your SWAT gear in that vehicle?

7    A       Yes.

8    Q       In the days leading up to the shooting of

9    Mr. Monterrosa there was some unrest in -- well, across

10   the country but also in Vallejo, in the Bay area.  Would

11   you agree with that?

12   A       Yes.

13   Q       Walk me through what you remember happening in

14   the days leading up to the Monterrosa shooting?

15   A       So I think one of the ones that really stands

16   out to me was the -- I believe this was a day or two

17   prior to that shooting, was the federal officer that was

18   shot in downtown Oakland during a protest or riot.

19   Generally I was aware of the unrest and violence that

20   was occurring all over the country.

21           Specific to Vallejo, the day before there was a

22   large protest at the Police Department.  They attempted

23   to overtake the Police Department and force their way

24   into the doors before being eventually repelled.

25   Q       Were you on duty when that happened?

Page 24

1    Q      My understanding is that when you're on the CRT

2    team you have your own assigned undercover vehicle?

3    A      That is correct.

4    Q      So take-home vehicle is with you all the time?

5    A      Yes.

6    Q      Do you keep your SWAT gear in that vehicle?

7    A      Yes.

8    Q      In the days leading up to the shooting of

9    Mr. Monterrosa there was some unrest in -- well, across

10   the country but also in Vallejo, in the Bay area.  Would

11   you agree with that?

12   A      Yes.

13   Q      Walk me through what you remember happening in

14   the days leading up to the Monterrosa shooting?

15   A      So I think one of the ones that really stands

16   out to me was the -- I believe this was a day or two

17   prior to that shooting, was the federal officer that was

18   shot in downtown Oakland during a protest or riot.

19   Generally I was aware of the unrest and violence that

20   was occurring all over the country.

21          Specific to Vallejo, the day before there was a

22   large protest at the Police Department.  They attempted

23   to overtake the Police Department and force their way

24   into the doors before being eventually repelled.

25   Q      Were you on duty when that happened?

Page 25

1    A       No.

2    Q       Had you been called in for any extra shift in

3    the days prior to Mr. Monterrosa's shooting?

4    A       No.

5    Q       Okay.  Was it your normal shift on January

6    2nd -- sorry.  It's been a long day.  It's nearly 4:00

7    on the East Coast -- on June 2nd, 2020?

8    A       No, that was not my standard shift.

9    Q       Okay.  Thank you.  Do you remember what time of

10   day it was that you got the call that they needed you to

11   come in?

12   A       It was early in the evening.  I'm going to

13   estimate 5:00 to 6:00 p.m.

14   Q       Do you remember who called you?

15   A       I do not.

16   Q       Do you remember when they called you whether you

17   were being called in for a CRT shift or a SWAT shift?

18   A       We were being called in for SWAT.

19   Q       So when you come in where do you report to?

20   A       We initially responded to our CRT office where

21   we collected some gear and then we responded out to the

22   command post located at Best Buy.

23   Q       And that's in the -- the Gateway Plaza?

24   A       That's correct.

25   Q       When you were at the CRT office my

1    understanding, in talking to Detective Wagoner, was that

2    there really wasn't any assignment of who rides with

3    who; it was just kind of an ad hoc process.  Is that

4    your recollection, as well?

5    A       That's correct.

6    Q       Do you remember how you ended up with Detective

7    Wagoner and Detective Tonn?

8    A       Well, all three of us were on the SWAT team.

9    There was one remaining member of CRT who was not on

10   SWAT.  So we knew that we were going to be going to the

11   SWAT command post, so we all just road up there

12   together.

13   Q       Okay.  The other SWAT officers that were called

14   in that night, they didn't report to a CRT headquarters

15   first, did they?

16   A       They did not.

17   Q       They reported, you know, maybe to headquarters,

18   but eventually you all gathered up at the Best Buy?

19   A       That's correct.

20   Q       Okay.  I know it was Detective Wagoner's car so

21   that's why he was driving, but was there any discussion

22   as to who sat in the front or the back?

23   A       Not that I recall.

24   Q       Okay.  When you get out to the command post of

25   the Best Buy what do you recall happening?

Page 27

1    A        Lieutenant Bob Knight, who is our SWAT

2    commander, gave a briefing, outlined what the situation

3    was and what the -- generally what the mission of the

4    night was and designated some assignments and that's the

5    extent of what I remember.

6    Q        Okay.  What do you recall the mission of the

7    night to be?

8    A        I don't recall specifically what it was.

9    Q        Okay.  Do you recall whether you were tasked

10   with any particular assignment during that briefing?

11   A        From my recollection Lieutenant Knight was

12   handing out small assignments to check certain high

13   value businesses, gun stores, pharmacies that kind of

14   stuff.  Other officers -- other SWAT officers had

15   different assignments.  That was one that he assigned us

16   to take care of.

17   Q        He assigned you to go check to a gun store?

18   A        That was one -- that was our first assignment,

19   was to verify that this gun store was -- there was a

20   report that it was being looted and he asked us to go

21   check it.

22   Q        Do you remember how that report came in?  Was it

23   a 911 call or an officer radio or --

24   A        I believe it was a 911 call.

25   Q        Okay.  And when you got to the gun store was it

**EXHIBIT "C"**
**Deposition transcript of Wesley Pitman**

Page 25

1    A        No.

2    Q        Had you been called in for any extra shift in

3    the days prior to Mr. Monterrosa's shooting?

4    A        No.

5    Q        Okay.  Was it your normal shift on January

6    2nd -- sorry.  It's been a long day.  It's nearly 4:00

7    on the East Coast -- on June 2nd, 2020?

8    A        No, that was not my standard shift.

9    Q        Okay.  Thank you.  Do you remember what time of

10   day it was that you got the call that they needed you to

11   come in?

12   A        It was early in the evening.  I'm going to

13   estimate 5:00 to 6:00 p.m.

14   Q        Do you remember who called you?

15   A        I do not.

16   Q        Do you remember when they called you whether you

17   were being called in for a CRT shift or a SWAT shift?

18   A        We were being called in for SWAT.

19   Q        So when you come in where do you report to?

20   A        We initially responded to our CRT office where

21   we collected some gear and then we responded out to the

22   command post located at Best Buy.

23   Q        And that's in the -- the Gateway Plaza?

24   A        That's correct.

25   Q        When you were at the CRT office my

Page 26

```
 1   understanding, in talking to Detective Wagoner, was that
 2   there really wasn't any assignment of who rides with
 3   who; it was just kind of an ad hoc process.  Is that
 4   your recollection, as well?
 5   A       That's correct.
 6   Q       Do you remember how you ended up with Detective
 7   Wagoner and Detective Tonn?
 8   A       Well, all three of us were on the SWAT team.
 9   There was one remaining member of CRT who was not on
10   SWAT.  So we knew that we were going to be going to the
11   SWAT command post, so we all just road up there
12   together.
13   Q       Okay.  The other SWAT officers that were called
14   in that night, they didn't report to a CRT headquarters
15   first, did they?
16   A       They did not.
17   Q       They reported, you know, maybe to headquarters,
18   but eventually you all gathered up at the Best Buy?
19   A       That's correct.
20   Q       Okay.  I know it was Detective Wagoner's car so
21   that's why he was driving, but was there any discussion
22   as to who sat in the front or the back?
23   A       Not that I recall.
24   Q       Okay.  When you get out to the command post of
25   the Best Buy what do you recall happening?
```

Page 27

```
 1    A       Lieutenant Bob Knight, who is our SWAT
 2    commander, gave a briefing, outlined what the situation
 3    was and what the -- generally what the mission of the
 4    night was and designated some assignments and that's the
 5    extent of what I remember.
 6    Q       Okay.  What do you recall the mission of the
 7    night to be?
 8    A       I don't recall specifically what it was.
 9    Q       Okay.  Do you recall whether you were tasked
10    with any particular assignment during that briefing?
11    A       From my recollection Lieutenant Knight was
12    handing out small assignments to check certain high
13    value businesses, gun stores, pharmacies that kind of
14    stuff.  Other officers -- other SWAT officers had
15    different assignments.  That was one that he assigned us
16    to take care of.
17    Q       He assigned you to go check to a gun store?
18    A       That was one -- that was our first assignment,
19    was to verify that this gun store was -- there was a
20    report that it was being looted and he asked us to go
21    check it.
22    Q       Do you remember how that report came in?  Was it
23    a 911 call or an officer radio or --
24    A       I believe it was a 911 call.
25    Q       Okay.  And when you got to the gun store was it
```

**EXHIBIT "C"**
**Deposition transcript of Wesley Pitman**

Page 1

1                  UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4       _____

                                    )

5       NEFTALI MONTERROSA, et al.,  )

                                    )

6                      Plaintiffs,   )

                                    )

7            vs.                     )  CIVIL ACTION NO.:

                                    )  2:20-cv-01563

8       CITY OF VALLEJO, et al.,     )

                                    )

9                      Defendants.   )

        _____ )

10

11

12

13       VERITEXT VIRTUAL ZOOM DEPOSITION OF WESLEY PITTMAN

14                  Philadelphia, Pennsylvania

15                  Tuesday, January 24, 2023

16                         Volume I

17

18

19

20

21       Reported by:

22       SUSAN SHANSTROM

23       CSR No. 13526

24       Job No. 5608851

25       Pages 1 - 61

Page 2

1                    UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4       _____

                                        )

5       NEFTALI MONTERROSA, et al.,     )

                                        )

6                        Plaintiffs,    )

                                        )

7            vs.                        )   CIVIL ACTION NO.:

                                        )   2:20-cv-01563

8       CITY OF VALLEJO, et al.,        )

                                        )

9                        Defendants.    )

        _____    )

10

11

12                   Veritext Virtual Zoom Deposition of WESLEY

13      PITTMAN, Volume I, taken on behalf of Plaintiff at 123

14      South Broad Street, Suite 2250, Philadelphia,

15      Pennsylvania, beginning at 3:35 p.m. EST and ending at

16      4:52 p.m. EST, on Tuesday, January 24, 2023, before

17      Susan Shanstrom, Certified Shorthand Reporter No. 13526.

18

19

20

21

22

23

24

25

Page 3

1      APPEARANCES:

2      For Plaintiff:

3              (By Zoom videoconference)

4              McELDREW PURTELL

5              BY:  JOHN J. COYLE

6              Attorney at Law

7              123 South Broad Street, Suite 2250

8              Philadelphia, Pennsylvania  19109

9              (215) 545-8800

10             jcoyle@mceldrewyoung.com

11

12     For Defendant City of Vallejo:

13             (By Zoom videoconference)

14             CITY OF VALLEJO OFFICE OF THE CITY ATTORNEY

15             BY:  KATELYN M. KNIGHT

16             Attorney at Law

17             555 Santa Clara Street

18             Vallejo, California  94590-5922

19             (707) 648-4388

20             katelyn.knight@cityofvallejo.net

21

22

23

24

25

```
                                              Page 4

 1      APPEARANCES (continued):

 2      For Jarrett Tonn:

 3            (By Zoom videoconference)

 4            ANGELO KILDAY & KILDUFF

 5            BY:  DERICK E. KONZ

 6            Attorney at Law

 7            601 University Avenue, Suite 150

 8            Sacramento, California  95825

 9            (916) 564-6100

10            dkonz@akk-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                               INDEX

2     WITNESS                                   EXAMINATION

3     WESLEY PITTMAN

4     Volume I

5                             BY MR. COYLE           6

6                             BY MR. KONZ            50

7

8                           EXHIBITS

9     NUMBER          DESCRIPTION                   PAGE

10    No Exhibits Marked

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          Philadelphia, Pennsylvania, Tuesday, January 24, 2023

2                          3:35 p.m. EST

3

4                          WESLEY PITTMAN,

5          having been administered an oath, was examined and

6          testified as follows:

7                              - - -

8                          EXAMINATION

9          BY MR. COYLE:

10         Q      Good afternoon, Officer Pittman.  My name is

11         John Coyle from McEldrew Purtell.  We're here for your

12         deposition.  Have you ever had your deposition taken

13         before?

14         A      No.

15         Q      Okay.  I'll go through a series of instructions

16         to make this go as smoothly and quickly as possible.  So

17         first and foremost you're under oath.  So just like in a

18         court of law, you're obligated to tell the truth.  Do

19         you understand that?

20         A      Yes.

21         Q      Okay.  Second, the court reporter is taking a

22         written record of everything we say here today so keep a

23         few things in mind.  First, things like uh-huh, huh-uh,

24         nods of the head, shrugs of the shoulders, they don't

25         translate to a written record very well so you have to

1    use words like "yes" and "no".  Do you understand?

2    A       I do.

3    Q       Second, it's very much human nature to

4    anticipate my question and want to chime in and answer

5    it, but that leads to a really messy record.  So try to

6    wait until I'm done to begin your answer and I'll,

7    likewise, do the same.  All right?

8    A       Sounds good to me.

9    Q       This isn't a memory test here today.  If you

10   can't remember something or you don't recall something,

11   saying I don't remember or I don't recall is a perfectly

12   acceptable answer.  If you're going to estimate

13   something, be it time or distance, I only ask that you

14   warn us that you're estimating and say I'm estimating

15   that it was 20 feet, something like that.

16   A       Sounds good.

17   Q       I don't think we'll be here really long,

18   probably under two hours, but at any point in time if

19   you need to take a break, use the restroom, take a walk,

20   whatever it may be, that's perfectly fine.  I only ask

21   that if I've asked a question you answer it before you

22   take that break.  All right?

23   A       Okay.

24   Q       Okay.  If at any point in time you want to

25   change one of your answers or elaborate on one of your

Page 8

```
 1      answers that you've already given you're allowed to do
 2      that.  Just let me know, say I was thinking about that
 3      question and I want to clarify or I want to add
 4      something.  You're allowed to do that.  All right?
 5      A      Okay.
 6      Q      I ask this and I mean no disrespect by it, but I
 7      ask everyone this question: Is there any reason, be it
 8      medication, drugs, alcohol, physical condition or
 9      psychological condition that would impact your ability
10      to testify truthfully and accurately here today?
11      A      No.
12      Q      Okay.  Have you had the opportunity to speak to
13      counsel before we get started?
14      A      Yes.
15      Q      Were you able to review any documents prior to
16      this deposition to prepare yourself?
17      A      Yes.
18      Q      What documents did you review?
19      A      I reviewed our department's use of force policy,
20      our department's body camera policy, the OIR report, my
21      notice of discipline from Chief Williams, and my
22      transcript from my criminal interview of the incident.
23      Q      Did you speak with either Detective Wagoner or
24      Detective Tonn in preparation for this deposition?
25      A      No.
```

```
 1    Q       Do you have any questions before we get started?
 2    A       Do you mind if I intermittently take a drink of
 3    water?  I'll try not to distract anybody.
 4    Q       Take a drink whenever you need.  You'll not
 5    distract us at all.  I'm going to do the same thing with
 6    my plastic cup.  All right.  What's your full name for
 7    the record?
 8    A       Wesley Pittman.
 9    Q       And your date of birth?
10            MS. KNIGHT:  Objection.  Privacy.  The witness
11    can answer how old he is.
12            MR. COYLE:  That's fine.
13    BY MR. COYLE:
14    Q       How old are you?
15    A       39 years old.
16    Q       What's your highest level of education?
17    A       I've attended some college.
18    Q       I usually ask where people live and the purpose
19    for that is that, you know, if we go to trial we would
20    need to subpoena you so you can come testify.  My
21    understanding is you're still employed by the Vallejo
22    Police Department, correct?
23    A       I am.
24    Q       Okay.  Are you willing to allow Ms. Knight and
25    the Vallejo Law Department to accept the subpoena on
```

```
 1       your behalf so we can avoid the need for your address

 2       and that sort of thing?

 3       A       Yes.

 4       Q       Okay.  Perfect.  Sir, if you decide to quit your

 5       job and run off somewhere you've got to promise to let

 6       Ms. Knight know where you're going.  All right?

 7       A       I will do that.

 8       Q       Some college.  Where did you go?

 9       A       Excuse me.  I attended Sacramento City College,

10       American River College and San Joaquin Delta College.

11       Q       Okay.  Can you just walk me through when you

12       went to each?

13       A       I could give you rough estimates of years.

14       Q       That's fine.  Just a year.

15       A       Sacramento City College would have been 2003 to

16       2004.  Delta College would have been 2004 to 2005, the

17       end of 2005.  And American River College would have been

18       from about 2006 to 2007, I guess.

19       Q       Okay.  Did you have one major throughout those

20       time periods?

21       A       I had a couple of different areas where I was --

22       no declared major but I had a couple areas where I was

23       studying.

24       Q       What sort of things were you focusing on?

25       A       At Delta College it was landscape architecture
```

Page 11

```
 1       and drafting, and then later the Police Academy.  At

 2       Sacramento City College it was aeronautics, airplane

 3       mechanic, and power plant.  And at American River

 4       College it was primarily continued professional training

 5       throughout the public safety center.

 6       Q       Okay.  What year did you graduate high school?

 7       A       2002.

 8       Q       Okay.  When did you first begin your career in

 9       law enforcement?

10       A       In February of 2006.

11       Q       And who was that with?

12       A       The City of Galt Police Department.

13       Q       Can you spell that for me?

14       A       Yes, it's G-a-l-t.

15       Q       Okay.  When I say for me, I really mean for the

16       court reporter.

17               And so you went to the Police Academy at Delta

18       River College?

19       A       San Joaquin Delta College.

20       Q       And when did you graduate from the Police

21       Academy.

22       A       October of 2005.

23       Q       And how long were you with the City of Gault?

24       A       About 11 years.  Almost 11 years spot on.

25       Q       And then your next employment was with the City
```

**EXHIBIT "C"**
**Deposition transcript of Wesley Pitman**

Page 1

1                     UNITED STATES DISTRICT COURT

2                FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4        _____

                                      )

5        NEFTALI MONTERROSA, et al.,  )

                                      )

6                        Plaintiffs,  )

                                      )

7              vs.                    )  CIVIL ACTION NO.:

                                      )  2:20-cv-01563

8        CITY OF VALLEJO, et al.,     )

                                      )

9                        Defendants.  )

         _____  )

10

11

12

13          VERITEXT VIRTUAL ZOOM DEPOSITION OF WESLEY PITTMAN

14                    Philadelphia, Pennsylvania

15                     Tuesday, January 24, 2023

16                            Volume I

17

18

19

20

21        Reported by:

22        SUSAN SHANSTROM

23        CSR No. 13526

24        Job No. 5608851

25        Pages 1 - 61

Page 2

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4     _____
                                    )
5     NEFTALI MONTERROSA, et al.,   )
                                    )
6                    Plaintiffs,    )
                                    )
7         vs.                       )  CIVIL ACTION NO.:
                                    )  2:20-cv-01563
8     CITY OF VALLEJO, et al.,      )
                                    )
9                    Defendants.    )
      _____   )

10

11

12              Veritext Virtual Zoom Deposition of WESLEY

13    PITTMAN, Volume I, taken on behalf of Plaintiff at 123

14    South Broad Street, Suite 2250, Philadelphia,

15    Pennsylvania, beginning at 3:35 p.m. EST and ending at

16    4:52 p.m. EST, on Tuesday, January 24, 2023, before

17    Susan Shanstrom, Certified Shorthand Reporter No. 13526.

18

19

20

21

22

23

24

25

Page 3

```
 1      APPEARANCES:

 2      For Plaintiff:

 3           (By Zoom videoconference)

 4           McELDREW PURTELL

 5           BY:  JOHN J. COYLE

 6           Attorney at Law

 7           123 South Broad Street, Suite 2250

 8           Philadelphia, Pennsylvania  19109

 9           (215) 545-8800

10           jcoyle@mceldrewyoung.com

11

12      For Defendant City of Vallejo:

13           (By Zoom videoconference)

14           CITY OF VALLEJO OFFICE OF THE CITY ATTORNEY

15           BY:  KATELYN M. KNIGHT

16           Attorney at Law

17           555 Santa Clara Street

18           Vallejo, California  94590-5922

19           (707) 648-4388

20           katelyn.knight@cityofvallejo.net

21

22

23

24

25
```

Page 4

1    APPEARANCES (continued):

2    For Jarrett Tonn:

3         (By Zoom videoconference)

4         ANGELO KILDAY & KILDUFF

5         BY:  DERICK E. KONZ

6         Attorney at Law

7         601 University Avenue, Suite 150

8         Sacramento, California  95825

9         (916) 564-6100

10        dkonz@akk-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                              INDEX

2    WITNESS                                    EXAMINATION

3    WESLEY PITTMAN

4    Volume I

5                                BY MR. COYLE          6

6                                BY MR. KONZ          50

7

8                              EXHIBITS

9    NUMBER          DESCRIPTION                      PAGE

10   No Exhibits Marked

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          Philadelphia, Pennsylvania, Tuesday, January 24, 2023

2                              3:35 p.m. EST

3

4                          WESLEY PITTMAN,

5          having been administered an oath, was examined and

6          testified as follows:

7                                  - - -

8                              EXAMINATION

9          BY MR. COYLE:

10         Q       Good afternoon, Officer Pittman.  My name is

11         John Coyle from McEldrew Purtell.  We're here for your

12         deposition.  Have you ever had your deposition taken

13         before?

14         A       No.

15         Q       Okay.  I'll go through a series of instructions

16         to make this go as smoothly and quickly as possible.  So

17         first and foremost you're under oath.  So just like in a

18         court of law, you're obligated to tell the truth.  Do

19         you understand that?

20         A       Yes.

21         Q       Okay.  Second, the court reporter is taking a

22         written record of everything we say here today so keep a

23         few things in mind.  First, things like uh-huh, huh-uh,

24         nods of the head, shrugs of the shoulders, they don't

25         translate to a written record very well so you have to

Page 7

1   use words like "yes" and "no".  Do you understand?

2   A       I do.

3   Q       Second, it's very much human nature to

4   anticipate my question and want to chime in and answer

5   it, but that leads to a really messy record.  So try to

6   wait until I'm done to begin your answer and I'll,

7   likewise, do the same.  All right?

8   A       Sounds good to me.

9   Q       This isn't a memory test here today.  If you

10  can't remember something or you don't recall something,

11  saying I don't remember or I don't recall is a perfectly

12  acceptable answer.  If you're going to estimate

13  something, be it time or distance, I only ask that you

14  warn us that you're estimating and say I'm estimating

15  that it was 20 feet, something like that.

16  A       Sounds good.

17  Q       I don't think we'll be here really long,

18  probably under two hours, but at any point in time if

19  you need to take a break, use the restroom, take a walk,

20  whatever it may be, that's perfectly fine.  I only ask

21  that if I've asked a question you answer it before you

22  take that break.  All right?

23  A       Okay.

24  Q       Okay.  If at any point in time you want to

25  change one of your answers or elaborate on one of your

Page 8

1    answers that you've already given you're allowed to do
2    that.  Just let me know, say I was thinking about that
3    question and I want to clarify or I want to add
4    something.  You're allowed to do that.  All right?
5    A       Okay.
6    Q       I ask this and I mean no disrespect by it, but I
7    ask everyone this question: Is there any reason, be it
8    medication, drugs, alcohol, physical condition or
9    psychological condition that would impact your ability
10   to testify truthfully and accurately here today?
11   A       No.
12   Q       Okay.  Have you had the opportunity to speak to
13   counsel before we get started?
14   A       Yes.
15   Q       Were you able to review any documents prior to
16   this deposition to prepare yourself?
17   A       Yes.
18   Q       What documents did you review?
19   A       I reviewed our department's use of force policy,
20   our department's body camera policy, the OIR report, my
21   notice of discipline from Chief Williams, and my
22   transcript from my criminal interview of the incident.
23   Q       Did you speak with either Detective Wagoner or
24   Detective Tonn in preparation for this deposition?
25   A       No.

1    Q        Do you have any questions before we get started?

2    A        Do you mind if I intermittently take a drink of

3    water?  I'll try not to distract anybody.

4    Q        Take a drink whenever you need.  You'll not

5    distract us at all.  I'm going to do the same thing with

6    my plastic cup.  All right.  What's your full name for

7    the record?

8    A        Wesley Pittman.

9    Q        And your date of birth?

10           MS. KNIGHT:  Objection.  Privacy.  The witness

11   can answer how old he is.

12           MR. COYLE:  That's fine.

13   BY MR. COYLE:

14   Q        How old are you?

15   A        39 years old.

16   Q        What's your highest level of education?

17   A        I've attended some college.

18   Q        I usually ask where people live and the purpose

19   for that is that, you know, if we go to trial we would

20   need to subpoena you so you can come testify.  My

21   understanding is you're still employed by the Vallejo

22   Police Department, correct?

23   A        I am.

24   Q        Okay.  Are you willing to allow Ms. Knight and

25   the Vallejo Law Department to accept the subpoena on

Page 10

```
 1      your behalf so we can avoid the need for your address

 2      and that sort of thing?

 3      A       Yes.

 4      Q       Okay.  Perfect.  Sir, if you decide to quit your

 5      job and run off somewhere you've got to promise to let

 6      Ms. Knight know where you're going.  All right?

 7      A       I will do that.

 8      Q       Some college.  Where did you go?

 9      A       Excuse me.  I attended Sacramento City College,

10      American River College and San Joaquin Delta College.

11      Q       Okay.  Can you just walk me through when you

12      went to each?

13      A       I could give you rough estimates of years.

14      Q       That's fine.  Just a year.

15      A       Sacramento City College would have been 2003 to

16      2004.  Delta College would have been 2004 to 2005, the

17      end of 2005.  And American River College would have been

18      from about 2006 to 2007, I guess.

19      Q       Okay.  Did you have one major throughout those

20      time periods?

21      A       I had a couple of different areas where I was --

22      no declared major but I had a couple areas where I was

23      studying.

24      Q       What sort of things were you focusing on?

25      A       At Delta College it was landscape architecture
```

Page 11

```
 1    and drafting, and then later the Police Academy.  At
 2    Sacramento City College it was aeronautics, airplane
 3    mechanic, and power plant.  And at American River
 4    College it was primarily continued professional training
 5    throughout the public safety center.
 6    Q      Okay.  What year did you graduate high school?
 7    A      2002.
 8    Q      Okay.  When did you first begin your career in
 9    law enforcement?
10    A      In February of 2006.
11    Q      And who was that with?
12    A      The City of Galt Police Department.
13    Q      Can you spell that for me?
14    A      Yes, it's G-a-l-t.
15    Q      Okay.  When I say for me, I really mean for the
16    court reporter.
17           And so you went to the Police Academy at Delta
18    River College?
19    A      San Joaquin Delta College.
20    Q      And when did you graduate from the Police
21    Academy.
22    A      October of 2005.
23    Q      And how long were you with the City of Gault?
24    A      About 11 years.  Almost 11 years spot on.
25    Q      And then your next employment was with the City
```

Page 12

```
 1      of Vallejo?

 2      A       Correct.

 3      Q       What made you decide to move from Galt to

 4      Vallejo?

 5      A       Galt was a very small department with limited

 6      opportunities and limited opportunities to promote.  I

 7      had worked a number of special assignments.  I was ready

 8      to move on to another agency.

 9      Q       When you left the City of Galt were you still a

10      police officer?

11      A       Yes.

12      Q       Prior to starting with the City of Galt did you

13      have any other law enforcement employment?  By that I

14      mean corrections, sheriffs, anything like that?

15      A       No.

16      Q       How about security jobs?

17      A       No.

18      Q       Did you leave the City of Galt on good terms?

19      A       Yes.

20      Q       And by on good terms I mean you were not

21      terminated?

22      A       Correct.

23      Q       While you were at the City of Galt were you the

24      defendant in any lawsuits?

25      A       No.
```

Page 13

1    Q       Have you been the defendant in any lawsuits

2    while you were at the City of Vallejo?

3    A       No.

4    Q       We'll just look at the ten year period from 2010

5    to 2020.  Were you disciplined either by the City of

6    Galt or the City of Vallejo?  And that's excluding the

7    reprimand in this case.

8    A       No.

9    Q       You said you were -- you had a number of

10   assignments or opportunities while you were with the

11   City of Galt.  Can you tell me what those were and what

12   you mean by that?

13   A       Yes.  I was initially assigned to patrolling and

14   then moved into a narcotic investigator's detective

15   spot, then moved into a gang investigator's position,

16   which is a countywide task force in Sacramento County.

17   I then worked an on a crime suppression team and I

18   rotated back to patrol after that.

19   Q       And you mentioned that Galt was a smaller

20   department.  How big is the City of Galt?

21   A       Population-wise or department-wise?

22   Q       Both if you know.

23   A       Population, estimating about 25,000 people.

24   Q       Okay.

25   A       The department size is under 40 officers.

Page 14

```
 1   Q       Okay.  And they had multiple sort of -- you
 2   mentioned it was Countywide.  I'm surprised there were
 3   so many different groups in a department that's so
 4   small.  That's why I was confused for a second.
 5           When you joined the City of Vallejo you said you
 6   were seeking some new opportunities.  What type of
 7   opportunities did you seek out when you first came over?
 8   A       I just wanted to broaden my horizons and
 9   investigate different types of crimes.  Galt was a
10   fairly small community.  It was relatively repetitive, I
11   guess, in what we were investigating and I just felt I
12   was getting a little stale and stagnant there.  I wanted
13   to move on to a bigger department into a city that had
14   more challenging investigations.
15   Q       At some point in time you became a member of the
16   SWAT team with Vallejo, correct?
17   A       Yes.
18   Q       What year was that?
19   A       2018.
20   Q       So you were the same SWAT class as Detective
21   Wagoner?
22   A       I believe he got on a few months before me.
23   Q       Okay.
24   A       I believe he got on at the beginning of the year
25   and I was sometime in the middle of the year.
```

Page 15

```
1    Q       Okay.  How many SWAT classes does Vallejo run a

2    year?

3    A       We don't run our own SWAT classes.

4    Q       Yeah, I apologize.  How many opportunities are

5    there to take the SWAT class as a Vallejo officer here?

6    A       If you're referring to the testing process, we

7    generally test once every year.

8    Q       Okay.  Were you a member of the CRT?

9    A       Yes.

10   Q       When did you join CRT?

11   A       In May of 2020.

12   Q       So just about a month or maybe just a few weeks

13   before the shooting of Mr. Monterrosa?

14   A       Correct.

15   Q       Were you a member of any other teams or task

16   forces with the Vallejo Police Department?

17   A       No.

18   Q       Can you explain to me what your understanding of

19   your duties with the CRT were?

20   A       We had a number of different duties.  We engage

21   in surveillance.  We engage in gang enforcement, gang

22   investigations, narcotics investigations, fugitive

23   apprehensions.  Those are generally -- those are our

24   major duties.

25   Q       And am I correct that CRT is primarily a plain
```

Page 16

1      clothes job?

2      A       Primarily, yes.

3      Q       Except for maybe when you're serving a warrant

4      or trying to take down a fugitive, something like that?

5      A       That's correct.

6      Q       And what is the qualification process to become

7      a member of the CRT?

8      A       There was a -- we submitted a written

9      application or -- I don't know what we call it

10     necessarily, but application or a letter of interest or

11     something like that that you would submit through your

12     supervisor.  There was an interview with the

13     investigations sergeant and the investigations

14     lieutenant.

15     Q       The investigations sergeant and lieutenant, was

16     that for the CRT team?

17     A       That was for -- yes.  I'm sorry, it was actually

18     the investigations sergeant and the CRT sergeant, not

19     the lieutenant.

20     Q       Okay.  And what type of things were talked about

21     during that interview?

22     A       We discussed training and experience, what we

23     anticipated the job was going to entail, the roles and

24     responsibilities, kind of background cases that we've

25     investigated.  You know, do we have a firm understanding

Page 17

1    of the investigative technique and case law and that

2    kind of stuff.

3    Q      Was there any specialized training for the CRT

4    team?

5    A      To get on the team or after -- after being

6    assigned to the team?

7    Q      So first we'll say to get on the team.  Like

8    SWAT, you have to go to SWAT school, right?  Is there a

9    CRT school?

10   A      No.

11   Q      Was there any specialized training after you

12   became a member of team?

13   A      Yes.

14   Q      What was that?

15   A      We -- there is a number of different training

16   courses that we individually attended or attended as a

17   group, and they were everything from search warrant

18   writing, cell phone investigations, surveillance

19   training, asset forfeiture training.  Really kind of a

20   span of whatever our duties were there was something

21   relevant to those and we attended the training course.

22   Q      Am I correct that the majority of the CRT

23   specific training was aimed towards the investigative

24   side of policing?

25   A      Yes.

Page 18

1   Q     I want to switch gears and talk about your SWAT
2   experience.  What was the process of joining the SWAT
3   team?
4   A     There was the letter of interest or submission
5   of letter of interest through the chain of command.
6   There is a physical agility test.  There was a range
7   qualification and finally an interview, an interview
8   process.
9   Q     And you had to go to SWAT school, correct?
10  A     Once -- once we were on the team we were sent to
11  SWAT school.
12  Q     Okay.  And how long was SWAT school?
13  A     Two weeks.
14  Q     And did you do that out of Pinnacle Tactical?
15  A     Yes.
16  Q     My understanding is that on the date of
17  Mr. Monterrosa's shooting you were equipped out like you
18  would be for a SWAT operation; is that accurate?
19  A     Yes.
20  Q     Okay.  Can you walk me through what your
21  equipment loadout was on that day?
22  A     Yes.  Sorry.  Let me correct myself there.  It
23  was a hybrid of gear that we would wear on CRT, and some
24  gear that we would wear on the SWAT deployment.
25  Q     As you walk me through what your loadout was,

1    let me know whether it's CRT specific or for SWAT

2    specific.

3    A        There is a lot of crossover in what we --

4    Q        Sure.

5    A        -- carry.

6    Q        Sure.

7    A        Generally we carry a handgun; pistol magazine;

8    handcuffs; a TASER; a radio; essentially a rifle

9    magazine; identifying patches, so like a police patch

10   and a police badge or a cloth badge; and maybe just some

11   administrative gear, notepad, pencil, that kind of

12   stuff.

13   Q        Okay.  On the date of Mr. Monterrosa's shooting

14   were you equipped with a rifle?

15   A        I may have had it in the vehicle but I was not

16   deploying it.

17   Q        How about a gas grenade?

18   A        I was carrying a flashbang for noise and flash

19   distraction.

20   Q        Okay.  The SWAT rifle in 2020, do you remember

21   what your SWAT rifle was?

22   A        Yes.

23   Q        Can you tell me the manufacturer and the

24   specifications?

25   A        It was a Colt Commando, which was an AR-15 style

1    rifle.

2    Q        And the Commando model had a toggle that allowed

3    you to go between automatic and semiautomatic?

4    A        Yes.

5    Q        And it was equipped with a suppressor, correct?

6    A        Correct.

7    Q        And was that the standard rifle for all members

8    of the SWAT team at that point in time?

9    A        Yes.

10   Q        During your time with the City of Galt did you

11   ever discharge your firearm in line of duty?  And when I

12   say in the line of duty I don't mean at the range.  I

13   mean in policing activities outside the range.

14   A        I had to shoot a dog one time.

15   Q        Okay.  Do you remember what year that was?

16   A        Maybe 2009.

17   Q        How about while you were with the City of

18   Vallejo, did you ever have to discharge your firearm in

19   the line of duty?

20   A        No.

21   Q        While you were with the City of Vallejo have you

22   been present at the scene while another officer

23   discharged their firearm in the line of duty --

24   A        No?

25   Q        -- other than the incident with Mr. Monterrosa?

Page 21

1    A       No.

2    Q       You may have seen in the media and in the press

3    some allegations that came out around the time of

4    Mr. Monterrosa's death about a tradition or custom --

5    alleged tradition or custom of badge bending within the

6    Vallejo Police Department.  Do you remember hearing

7    about those allegations?

8    A       Yes.

9    Q       Were they discussed among members of the Police

10   Department?

11   A       They were not.  I was unaware of the allegations

12   until they came forward in the media.

13   Q       Sure.  That was a very clunky question.  I

14   apologize.  I mean, when the media released the story

15   did it become a topic of conversation within the Police

16   Department?

17   A       Yes.

18   Q       Did you speak to any officers who admitted to

19   knowing about that practice before the investigation?

20   A       No.

21   Q       Did you have any knowledge of that practice

22   prior to the investigation -- prior to the media

23   reports?

24   A       No.

25   Q       It's my understanding that Detective Tonn had

Page 22

```
 1    been a member of the Department for nearly as long as
 2    you.  Had you worked closely with him prior to June of
 3    2020?
 4    A      I had worked assisting CRT on occasion in the
 5    year leading up to this but it was no -- there was no
 6    regularity or frequency with it.
 7    Q      So he wasn't a regular partner or teammate in
 8    the years before?
 9    A      With the exception of being on SWAT, no.
10    Q      Okay.  And how often would you be deployed
11    together on SWAT?
12    A      I could give you an estimate of --
13    Q      That's fine.
14    A      -- less than ten deployments a year.
15    Q      And to the best of your knowledge how many
16    members of the SWAT team were there during your time on
17    the team?
18    A      At the time?
19    Q      Yeah.
20    A      Maybe 12 or 14.
21    Q      Prior to the shooting of Mr. Monterrosa
22    Detective Tonn had a number of other shootings.  Did you
23    ever discuss any of those other prior shootings with
24    him?
25    A      I'm sure I have, yes.
```

Page 23

1    Q     Do you remember which ones you spoke to him

2    about?

3    A     No.

4    Q     Were those conversations substantive about what

5    happened or just, you know, kind of, hey, how are you

6    doing?

7    A     It was more of just a generalized conversation

8    about the incident.

9    Q     Did your shifts change when you went from patrol

10   to the CRT team in May of 2020?

11   A     Yes.

12   Q     Okay.  So when you started with CRT in May of

13   2020, what was your -- did you have a standard shift?

14   A     Yes.  It would have been Tuesday through Friday

15   and I think we were generally working 8:00 to 5:00 or

16   8:00 to 6:00.

17   Q     Is that 8:00 a.m. to 5:00 p.m., or 8:00 p.m. to

18   5:00 a.m.?

19   A     The first one.  I'm sorry.  8:00 a.m. to 5:00 or

20   6:00 p.m.

21   Q     Day shift?

22   A     Day shift, yes.

23   Q     Did you have a standard partner or group that

24   you worked with?

25   A     Not a standard partner, no.

Page 24

1    Q      My understanding is that when you're on the CRT

2    team you have your own assigned undercover vehicle?

3    A      That is correct.

4    Q      So take-home vehicle is with you all the time?

5    A      Yes.

6    Q      Do you keep your SWAT gear in that vehicle?

7    A      Yes.

8    Q      In the days leading up to the shooting of

9    Mr. Monterrosa there was some unrest in -- well, across

10   the country but also in Vallejo, in the Bay area.  Would

11   you agree with that?

12   A      Yes.

13   Q      Walk me through what you remember happening in

14   the days leading up to the Monterrosa shooting?

15   A      So I think one of the ones that really stands

16   out to me was the -- I believe this was a day or two

17   prior to that shooting, was the federal officer that was

18   shot in downtown Oakland during a protest or riot.

19   Generally I was aware of the unrest and violence that

20   was occurring all over the country.

21          Specific to Vallejo, the day before there was a

22   large protest at the Police Department.  They attempted

23   to overtake the Police Department and force their way

24   into the doors before being eventually repelled.

25   Q      Were you on duty when that happened?

Page 25

1    A       No.

2    Q       Had you been called in for any extra shift in

3    the days prior to Mr. Monterrosa's shooting?

4    A       No.

5    Q       Okay.  Was it your normal shift on January

6    2nd -- sorry.  It's been a long day.  It's nearly 4:00

7    on the East Coast -- on June 2nd, 2020?

8    A       No, that was not my standard shift.

9    Q       Okay.  Thank you.  Do you remember what time of

10   day it was that you got the call that they needed you to

11   come in?

12   A       It was early in the evening.  I'm going to

13   estimate 5:00 to 6:00 p.m.

14   Q       Do you remember who called you?

15   A       I do not.

16   Q       Do you remember when they called you whether you

17   were being called in for a CRT shift or a SWAT shift?

18   A       We were being called in for SWAT.

19   Q       So when you come in where do you report to?

20   A       We initially responded to our CRT office where

21   we collected some gear and then we responded out to the

22   command post located at Best Buy.

23   Q       And that's in the -- the Gateway Plaza?

24   A       That's correct.

25   Q       When you were at the CRT office my

Page 26

1    understanding, in talking to Detective Wagoner, was that

2    there really wasn't any assignment of who rides with

3    who; it was just kind of an ad hoc process.  Is that

4    your recollection, as well?

5    A       That's correct.

6    Q       Do you remember how you ended up with Detective

7    Wagoner and Detective Tonn?

8    A       Well, all three of us were on the SWAT team.

9    There was one remaining member of CRT who was not on

10   SWAT.  So we knew that we were going to be going to the

11   SWAT command post, so we all just road up there

12   together.

13   Q       Okay.  The other SWAT officers that were called

14   in that night, they didn't report to a CRT headquarters

15   first, did they?

16   A       They did not.

17   Q       They reported, you know, maybe to headquarters,

18   but eventually you all gathered up at the Best Buy?

19   A       That's correct.

20   Q       Okay.  I know it was Detective Wagoner's car so

21   that's why he was driving, but was there any discussion

22   as to who sat in the front or the back?

23   A       Not that I recall.

24   Q       Okay.  When you get out to the command post of

25   the Best Buy what do you recall happening?

Page 27

1    A        Lieutenant Bob Knight, who is our SWAT

2    commander, gave a briefing, outlined what the situation

3    was and what the -- generally what the mission of the

4    night was and designated some assignments and that's the

5    extent of what I remember.

6    Q        Okay.  What do you recall the mission of the

7    night to be?

8    A        I don't recall specifically what it was.

9    Q        Okay.  Do you recall whether you were tasked

10   with any particular assignment during that briefing?

11   A        From my recollection Lieutenant Knight was

12   handing out small assignments to check certain high

13   value businesses, gun stores, pharmacies that kind of

14   stuff.  Other officers -- other SWAT officers had

15   different assignments.  That was one that he assigned us

16   to take care of.

17   Q        He assigned you to go check to a gun store?

18   A        That was one -- that was our first assignment,

19   was to verify that this gun store was -- there was a

20   report that it was being looted and he asked us to go

21   check it.

22   Q        Do you remember how that report came in?  Was it

23   a 911 call or an officer radio or --

24   A        I believe it was a 911 call.

25   Q        Okay.  And when you got to the gun store was it

```
 1     a founded call?

 2     A       No, not as far as I could tell.

 3     Q       Do you remember whether you made any other

 4     response calls prior to the call that brought you to the

 5     Walgreens?

 6     A       I don't remember.  I don't think so.

 7     Q       Detective Wagoner mentioned a prior call to --

 8     he wasn't whether it was a CVS or Walgreens, but it

 9     wasn't the one where Mr. Monterrosa was shot.  Do you

10     remember going to a different CVS or Walgreens?

11     A       I don't remember.

12     Q       Do you remember how the call came across for you

13     to go to the Walgreens where Mr. Monterrosa was

14     eventually shot?

15     A       Yes.

16     Q       How did it come out?

17     A       Captain Horton was the one that was watching it

18     occur and he broadcast over the radio what he was

19     seeing.

20     Q       Was it common for Captain Horton to be out on

21     patrol?

22     A       No, that was not common.  But given everything

23     that was occurring and the amount of crime that was

24     occurring I think it was a necessity for him to be out

25     there.
```

Page 29

```
 1    Q       Do you remember what he said when he came out

 2    over the radio?

 3    A       He just said that there was looting going on at

 4    the Walgreens on Redwood.

 5    Q       Did he request units to respond?

 6    A       I don't remember specifically.

 7    Q       Okay.  Was there any discussion between you and

 8    Detective Wagoner and Detective Tonn about responding to

 9    the captain's call?

10    A       I believe so.  I don't recall specifically what

11    the conversation was, though.

12    Q       Okay.  It's my understanding that the captain

13    was in an unmarked car parked by the railroad tracks; is

14    that accurate?

15    A       That's correct.

16    Q       Okay.  When you were responding to his call why

17    did you go to him as opposed to the Walgreens?

18    A       Well, we were already on Redwood Street,

19    somewhere in the area of Redwood Street and Tuolumne,

20    Tuolumne Street.  And that's about a mile from where

21    Captain Horton was and it just so happened that we saw

22    him as we drove down Redwood Street.

23    Q       Okay.  So you saw him before you got to the

24    Walgreens?

25    A       Yes.  He was parked at the intersection.  I
```

Page 30

1    don't remember if he stated where he was, but I just

2    remember seeing his car there.

3    Q        Okay.  And he was in an unmarked Ford Explorer?

4    A        Yes.

5    Q        Do you remember whether the captain was in

6    uniform?

7    A        I believe he was, yes.

8    Q        When you pull up to where the captain is parked

9    do you have any conversation with him?

10    A        We had a very brief conversation.

11    Q        Okay.  What's very brief?  Ten seconds?  30

12    seconds?  A minute?

13    A        Five to ten seconds maximum.

14    Q        Okay.  And what was said in that five to ten

15    second conversation?

16    A        I can't recall specifically, but he pointed to

17    the Walgreens.  He told us there was looting going on,

18    which was obvious because we could see people in the

19    parking lot.  He said I'm going to go this way and he

20    made a motion that he was going to go north on Broadway.

21    And he said I want you guys to go that way, and motioned

22    that we should continue driving on Redwood.  And then he

23    drove away.

24    Q        And this conversation happened your window to

25    his window?

Page 31

1    A        Correct.

2    Q        While you're having the conversation you said

3    you could see people in the parking lot looting,

4    correct?

5    A        Yes.

6    Q        So by that you could see people carrying objects

7    out of the Walgreens?

8    A        I believe so, yes.

9    Q        Okay.  While you were sitting there did you

10   observe anyone with firearms?

11   A        Not in that very brief moment, no.

12   Q        Okay.  When you were driving how long did it

13   take for you to get from where you were talking to the

14   captain to the entrance of the Walgreens parking lot?

15   A        Ten seconds or less.

16   Q        Are you looking at the parking lot while that's

17   going on?

18   A        That's one of the things I'm looking at, yes.

19   Q        You said earlier that you may have had your

20   rifle in the truck but you didn't have it on you.  What

21   made you make the decision, you know, not to carry your

22   rifle on you?

23   A        It can be a little cumbersome in the front seat.

24   And that's for me specifically.  I'm a bigger guy.

25   Sometimes having that rifle up in my workspace in the

Page 32

```
 1    front seat can be just more of a hindrance than help.
 2            I also had determined that I was going to be
 3    deploying a flashbang.  Since I was in the front right
 4    side that would be the most logical place to deploy it
 5    from.  So having a rifle at my feet or between my legs
 6    while having a flashbang and attempting to get out of
 7    the car I figured could be cumbersome.
 8    Q       When did you make the decision that you were
 9    going to deploy the flashbang?
10    A       We had discussed it at some point earlier in the
11    night, given the level of violence and coordination with
12    all the groups, that they're -- it may be applicable or
13    maybe a good idea to try to deploy one.
14    Q       I'll come back to that.  So ten seconds.  As
15    you're driving, after you spoke with the captain, to the
16    entrance and you're looking at the parking lot do you
17    observe anyone with firearms during that portion of the
18    drive?
19    A       Not that exact moment, no.
20    Q       Okay.  When you enter the parking lot and from
21    there until the time that Detective Wagoner puts lights
22    and sirens on, about how much time passes?
23    A       Less than ten seconds.
24    Q       During that point in time were you observing
25    people in the Walgreens parking lot?
```

Page 33

1    A      Yes.  At that point I think the only person that

2    I was observing was Mr. Monterrosa.

3    Q      Okay.  What was Mr. Monterrosa doing during that

4    period of time?

5    A      He was moving from the main building of

6    Walgreens towards a car in the parking lot.

7    Q      A sedan?

8    A      Yes.

9    Q      Okay.  Walk me through what happens, in your

10   observation, from the time that you pull into the

11   parking lot and until Mr. Monterrosa is shot.

12   A      So as we pull into the parking lot I could see

13   Mr. Monterrosa moving from the main Walgreens building

14   out to the vehicles or out towards the sedan in the

15   parking lot.  As we weaved through the parking lot

16   making our approach towards them I would estimate less

17   than a hundred feet and three to five seconds prior to

18   us contacting him Captain Horton put out over the radio

19   that the subjects were armed.

20   Q      Okay.  I imagine you continued driving?

21   A      At that point we were in very close proximity to

22   Mr. Monterrosa.  Like I said, we were driving at a

23   normal speed, but we were a hundred feet or less from

24   him and we were in a wide open parking lot.  So, yes, we

25   continued.

Page 34

1    Q        Okay.  When did the lights and sirens go?

2    A        Just before we stopped.  A second or two before

3    we stopped.

4    Q        Okay.  What's Mr. Monterrosa doing when Captain

5    Horton puts out on the radio that they're armed?

6    A        He is approaching the sedan that was in the

7    parking lot.

8    Q        Are the doors to the sedan open?

9    A        The back left door was open.

10   Q        By the back left you mean back driver's side?

11   A        Correct.

12   Q        Okay.  Did you believe that he was going to get

13   into that back left driver's side door?

14   A        It looked as though that may have been his

15   intent.

16   Q        Walk me through what you observe from

17   Mr. Monterrosa, from him running from the building until

18   he dies.

19   A        As we're approaching and Detective Wagoner has

20   activated his overhead lights, this is all occurring

21   within five seconds or less.  Mr. Monterrosa is running

22   up to the black sedan.  It looks like he throws

23   something in the backseat, potentially tries to get into

24   the backseat.  And the vehicle takes off.  And by that I

25   mean it drives forward maybe ten to fifteen feet.  He

Page 35

1    tries to catch up to it, possibly tries to get into the

2    backseat again, at which point the Altima then just

3    speeds off.  And as it did that it was about the time

4    that Detective Wagoner was activating his overhead

5    lights.

6            And as we were approaching Mr. Monterrosa then

7    he immediately spun towards us.  He went down to his

8    right knee.  So his right knee was down and his left

9    knee was towards the ground.  He spun towards us and

10   fully faced our vehicle.

11           I saw he had something in his right hand that

12   was up near his chest.  He was holding -- I thought it

13   was a firearm because it was dark in color, and he was

14   holding it like you would hold a firearm.  And this is

15   all occurring, like I said, within three to five

16   seconds.  This also was occurring as I'm attempting to

17   get out of the truck.

18   Q    I'm going to back up and break that down a

19   little bit.  So he runs out to the sedan, threw

20   something in the backseat.  As he's running out to the

21   sedan is he carrying anything?  You know, we're talking

22   about the looters carrying objects.  Are you seeing him

23   carrying anything to the sedan.

24   A      He had a backpack on and he had a hoodie on with

25   the hood up.  I couldn't see anything specifically but

1    he was wearing a hoodie.

2    Q       Did he throe the backpack into the car?

3    A       I don't know.

4    Q       Okay.  So he tries to get into the car.  The car

5    moves forward ten feet and then he runs forward and

6    tries to get in again?

7            MS. KNIGHT:  Objection.  Misstates testimony.

8            MR. COYLE:  I'm sorry.  That's -- I mean that as

9    a question.  I'm trying to make sure that I understand

10   the picture of what happened.

11           THE WITNESS:  After the car took off the first

12   time he tried to catch up to the car.  I can't say what

13   his intent was but he tried to catch up to the car and

14   he was near the backseat and then the car ultimately

15   just took off.

16   BY MR. COYLE:

17   Q       Okay.  And you said when the car took off he

18   then turns towards your vehicle?

19   A       Yes.

20   Q       Is your vehicle stopped at that point?

21   A       It is either -- we're doing three to five miles

22   an hour or we're fully stopped or somewhere right in

23   between there.

24   Q       And you said he dropped to a knee?

25   A       Well, he was -- he spun towards us, fully faced

Page 37

1      our car, and then went to one knee.  So one knee down

2      and one knee up.

3      Q      And you said his right knee was on the ground?

4      A      Yes.

5      Q      And as he's spinning I know you testified that

6      he raised an object to chest level.  Was the object

7      already raised as he's spinning or does he raise it as

8      he's spinning?

9      A      It was already up near his chest as he's

10     spinning.

11     Q      And was it your belief that he was pointing the

12     object at you?

13     A      It was pointed, yes, at our -- generally our

14     car, yes.

15     Q      How long after Mr. Monterrosa spins and points

16     the object at your car does Detective Tonn discharge?

17     A      Within a second or two.

18     Q      Did he say anything before discharging?

19     A      Not that I remember.

20     Q      When he discharges do you remember how many

21     shots were fired?

22     A      I think at the time I recalled seven, but I know

23     that it was only five.

24     Q      And when they were fired was it in one burst or

25     was there gaps in between?

Page 38

```
 1    A       It was in one consistent burst or one continuous

 2    burst.

 3    Q       And about how long did it take for him to fire

 4    those five shots?

 5    A       A second and a half maybe.

 6    Q       As Detective Tonn begins discharging,

 7    Mr. Monterrosa is directly facing your vehicle?

 8    A       Yes.

 9    Q       Were you watching Mr. Monterrosa as the shots

10    were fired?

11    A       I was actually in the process of two separate

12    things.  I had a flashbang in my hand and I was kind

13    of -- not fumbling.  I think that's the wrong word, but

14    I was moving it from hand to hand.  I was also

15    functioning the door and attempting to get out of the

16    car and plant my feet firmly from the vehicle.  So there

17    was a time from where I was getting out of the car to

18    where I was on the ground and flat footed that I could

19    not see Mr. Monterrosa.

20    Q       Okay.  Did that time period coincide with while

21    the shots were being fired?

22    A       Yes.

23    Q       The flashbang that you had in your hand is --

24    I've never seen a flashbang.  Is it like a grenade where

25    you pull a pin out and then you hold the thing down and
```

Page 39

1   then when you throw out and release it it's like on a

2   timer?

3   A       That's correct, yes.

4   Q       Cartoons is my only understanding.  I apologize.

5   Was the pin pulled out of the flashbang?

6   A       No.

7   Q       Okay.  I know you said you were getting out of

8   the car as the shots were happening.  Were you looking

9   at Mr. Monterrosa when the shots began?

10  A       I don't remember.

11  Q       Okay.  When you get out of the car and you get

12  your feet on the ground and you look at Mr. Monterrosa

13  have the shots stopped?

14  A       Yes.

15  Q       What is Mr. Monterrosa doing?

16  A       He was lying on the ground.

17  Q       Is he facedown or on his back or on his side?

18  A       Somewhere between facedown and on his right

19  side.

20  Q       And is his head towards the vehicle, away from

21  the vehicle or perpendicular with the vehicle?

22  A       Away from the vehicle.

23  Q       What do you do after the shots stopped?

24  A       Well, so during this I'm obviously -- this is a

25  very dynamic event, right?  This is two to three seconds

1    maximum.  So the shots are occurring as I'm getting out

2    of the car.  I'm also perceiving what his actions are at

3    the time of him spinning, presenting that object which I

4    thought looked to be a gun in his right hand.  So by the

5    time I actually planted my feet on the ground from a

6    vehicle that had just been moving, I determined that was

7    a lethal force situation and I drew my gun.

8    Q      Do you hear Detective Tonn say anything?

9    A      No.

10   Q      Do you hear Detective Wagoner say anything?

11   A      No.

12   Q      After you draw your gun do you say anything to

13   Detective Tonn or Detective Wagoner?

14   A      Not at that moment, no.

15   Q      Okay.  What do you recall happening next?

16   A      The black sedan that he -- that Mr. Monterrosa

17   was trying to get into was in the parking lot and

18   collided head on with Captain Horton and I thought it

19   was going to be disabled, but it was actually able to

20   squeeze by him and get out onto Broadway Street.  In

21   anticipation of the vehicle becoming disabled I ran out

22   to Broadway Street to have to address that situation, if

23   there was a disabled vehicle or somebody ran on foot or

24   something like that.

25   Q      So you were not present when Detective Wagoner

Page 41

```
 1    approached Mr. Monterrosa and he was handcuffed?

 2    A        No, I was.

 3    Q        You were.  Okay.  So you run out to Broadway

 4    Street and you see that the car gets away.  What

 5    happened next?

 6    A        I turn back towards Mr. Monterrosa and Detective

 7    Tonn and Detective Wagoner.  I could see

 8    Mr. Monterrosa -- I tried to put out some radio traffic

 9    about shots being fired, our belief that he was armed

10    and several vehicles taking off at the same time.  I

11    requested a medic and then I tell Detective Tonn and

12    Detective Wagoner to -- let's make an approach to

13    Mr. Monterrosa.

14    Q        When you approach Mr. Monterrosa is he moving?

15    A        No.

16    Q        Who placed him in handcuffs?

17    A        Detective Wagoner and I both placed him in

18    handcuffs.

19    Q        Is a search of Mr. Monterrosa done at that time?

20    A        Yes.

21    Q        What do you uncover?

22    A        We found a large framing hammer that was down

23    the front of his pants or in his sweatshirt.  There is a

24    knife in his pocket and I think that's the extent of

25    what I remember pulling off of him.
```

Page 42

```
 1    Q       So you said the framing hammer was either down
 2    the pants or in his sweatshirt?
 3    A       I believe it was concealed by the sweatshirt,
 4    but shoved down the front of his pants.
 5    Q       So it was inside sort of the waistband of his
 6    pants?
 7    A       That was my recollection, yes.
 8    Q       And am I correct that no firearm was recovered?
 9    A       Correct.
10    Q       You said you recovered a knife?
11    A       I believe there was a knife in one of his
12    pockets, yes.
13    Q       Okay.  What kind of knife?
14    A       My recollection is that it was a small folding
15    knife.
16    Q       Okay.  After you searched Mr. Monterrosa and
17    he's handcuffed what do you recall happening next?
18    A       I evaluated his injuries.  I determined that I
19    probably needed to start CPR based on the nature of the
20    injury.  We then un-handcuffed Monterrosa and I began
21    CPR.
22    Q       Do you recall how long it took for the captain
23    to get to where Mr. Monterrosa had fallen?
24    A       I believe that he probably arrived about the
25    same time we did.
```