PART THREE:  Internal Review Systems:
                          Assessments and Suggestions

## VPD and Body Cameras

We were interested to learn that VPD officers on patrol had been equipped with body-worn cameras for several years – well before they became a focal point of the movement toward greater transparency and accountability for law enforcement.  But the VPD approach is a reminder that the advent of affordable, reliable camera technology has at times made for strange bedfellows:  for every activist who sees the cameras as an overdue method for preventing unchecked abuse of police authority, there is an officer who considers the recordings a welcome safeguard against malicious complaints from the public.  Put another way, the concept of cameras on officers has received both internal and external support, but the underlying rationales are often quite distinct.

The VPD experience to date has seemingly been more about assisting officers in their work than holding them to established standards or addressing potential performance issues.  While the "assistance" feature is certainly a worthwhile one, the best camera programs are ones that encompass *all* the potential appeals of the technology.  VPD's policy and philosophy have historically been limited in this regard.  But that is changing for the better.

At the heart of this shift is the policy that governs when and for how long officers are expected to activate the recorders in a given encounter.  The version of the policy that prevailed until very recently framed the activation as something the officers "should" do as a precursor to engaging in enforcement activity, traffic stops, or contacts with the public that become adversarial at some point.  This standard expresses a clear preference, but it also falls well short of imposing a concrete obligation.  The new policy, on the other hand, removes any potential ambiguity:  it states that the officers "shall" activate in the same set of situations.  Making this shift aligns the VPD policy with numerous other law enforcement agencies, and is more consistent with best practices in this arena.

It was the Chief who identified this as an issue after taking over in November of 2019; he quickly expressed his intentions to revise the policy, and he met with association representatives and his own leadership team in an effort to achieve this in a purposeful fashion. Recently, the updated version was adopted. The importance of this is best understood with a look back at how the previous version was interpreted in practice, as articulated by some of the officers we met and corroborated by our own review of various materials that VPD provided.

The officers' position went something like this: at its best, the body-worn camera helps officers do their jobs by providing valuable evidence and creating a record of matters that might be disputed for various reasons. In their view, the "should" language in the former policy served this objective well. It created a default obligation to activate that both provided guidance and recognized the possibility that an officer might well have a rational basis for not conforming in a given context. In short, "should" created a reasonable exception that kept the requirement from being burdensome – or even unsafe in a rapidly unfolding encounter.

Anything more stringent than that, went the officers' reasoning, would be an attempt to placate adversaries whose agenda was less about objective transparency and more about embarrassing officers for their off-the-cuff remarks, or seeing them disciplined over peripheral and trivial transgressions. The new "shall" requirement took away discretion. And it reflected a lack of trust in the accuracy of any representations not reinforced with a recording.

While the officers' concerns made sense, we disagree with the notion that the change is either inherently hostile or unwarranted. In fact, the prior approach as practiced tipped past reasonability in the *opposite* direction. Officers' justifications for why they didn't or couldn't activate their cameras were accepted so broadly as to border on the "exception that swallowed the rule." And managers were discouraged from formal intervention when body-camera recordings did reveal peripheral issues of potential misconduct or poor performance that were not directly related to the evidence or issue at hand.

Such leeriness about not wanting rank and file personnel to resent or fear the cameras might come from an understandable place, but it can easily be taken too far. The reality is, multiple agencies throughout the state and nation that have body-worn cameras follow the more stringent approach, and have done so for years without their personnel being subject to relentless "gotcha" scenarios. Presumably, VPD management will and should enforce the new policy in a way that puts an emphasis on transparency and *meaningful* accountability.

22

More significant to the importance of the new policy, though, are the gaps we noticed in our review of incidents for which recordings would have been quite beneficial. This included one of the recent officer-involved shooting cases for which we requested investigative materials. In that incident, an officer shot and killed a young man in defense of a third party when responding to reports of a large-scale fight. What factors shaped the officer's perception of a deadly threat became a matter of dispute, and remains so for family members of the decedent and others. While there was evidence that supported the officers' version, the absence of a recording meant that a source of potentially dispositive information was lost.

This is corrosive from a public trust perspective. We recognize that the *existence* of body-worn camera recordings has hardly ended debate about the legitimacy of certain police actions; in a dynamic encounter, the angles are often imperfect, inconclusive, or even misleading as a representation of what the officer saw and what occurred. But part of the cameras' value is the *signaling* that they represent: that the police are willing to be accountable and to stand by their actions by capturing them to the extent possible. When a recording is expected but not actually created, it obviously nullifies that signal and instead provokes skepticism – even if the involved officer's lapse was justified or inadvertent. For that reason, it is important for agencies to set a high standard for compliance and to reinforce that with their personnel so that activation becomes second nature.

Moreover, the episodes of unrecorded contacts were apparently not restricted to critical incidents. For example, we requested all available materials for a small sampling of use of force cases chosen at random and that occurred in 2019. VPD provided us with body-camera recordings from three such incidents. These encounters each included multiple officers and multiple force options (including one Taser use and one carotid control hold). But only one of the three incidents produced recordings that captured the force itself, and even this was limited to one of the several officers involved and did not provide a useful vantage point. From this admittedly small sample size, our takeaway was that officers did not incline toward recording in a way that suggested the "should activate" language sufficed as guidance.

> RECOMMENDATION 9: The Department should use the adoption of a new, stricter activation requirement as the foundation for a new approach to its body-worn camera technology.

RECOMMENDATION 10: The Department should implement a graduated program of accountability to ensure that officers are complying with the expectations of the new policy.

RECOMMENDATION 11: The Department's management should consider body-worn camera recordings as, among other things, a forum for identifying performance and training issues and addressing them constructively and progressively – and not through automatic formal discipline for minor issues.

# Officer-Involved-Shootings & Critical Incident Review

When VPD has an officer-involved shooting in which the subject is wounded or killed, a number of responsive processes are initiated right away, both within and outside of the Department. In this respect, the model in Vallejo and Solano County shares much in common with jurisdictions throughout California and even nation-wide. Taking precedence at the outset is a criminal investigation into both the underlying incident and the police use of deadly force. The actions of each officer who shot are scrutinized for their legality; at the end of the process, the District Attorney's Office renders a decision as to whether a basis exist for prosecution exists.

While the review of the completed case, and the ultimate decision about legality, is the purview of the District Attorney, VPD detectives play an active role in the evidence-gathering process. Indeed, VPD and the District Attorney follow a memorandum of understanding about their respective responsibilities.

In reviewing several case files from recent VPD officer-involved shootings, our focus was primarily related to the *administrative* processes we discuss in detail below. These are the Department's internal assessments, not only of officer performance (in terms of compliance with policy and training), but also other aspects of the incident that may have implications for operational effectiveness. These might include officer tactics, equipment, supervision, communication, and elements of post-incident response including medical aid and community outreach. They are also the parts over which the Department has control and sole responsibility.

The assessment of legality under criminal law is of course a critically important element of accountability in these matters. It is also the question to which the public tends to ascribe the most significance. But, for a variety of reasons (including high standards for establishing illegality), the prosecution of officers for their deadly force is extremely rare, and often unsuccessful even when cases do go to trial. Accordingly, a police agency's internal evaluations and adjustments are potentially more influential in terms of accountability, learning opportunities and impacts on future operations.

While expanding on those thoughts in detail below, we do wish to highlight a couple of aspects of the criminal investigation process as it unfolds in Vallejo. Both relate to the interview of the involved officer – obviously a key piece of evidence. The first is the timing of the interviews with the involved officer, and the second relates to whether the officer is afforded the opportunity to review body camera recordings from the relevant incident prior to being questioned.

As for the timing of the voluntary interviews that officers give to criminal investigators (including one or more VPD detectives and a representative from the District Attorney's investigations team), it was noteworthy to see that – at least in the examples we reviewed – these occurred prior to the involved personnel going "off shift" on the day the incident occurred. This is consistent with best investigative practice in terms of promoting the cleanest recollection of events – and minimizing the chances of interference (inadvertent or otherwise) with the purity of that statement. And it is not something that occurs in every agency. Instead, we know of several departments where the officers don't provide an initial statement for days after being involved in a shooting. VPD's approach is better, and we expect it will continue.

While we hesitate to "fix what isn't broken" in terms of current VPD dynamics, we encourage the Department to memorialize this practice by ensuring in policy that this same shift interview will continue to occur – either in the form of a voluntary statement to criminal investigators or a compelled one to the Department administrative reviewers. Like anyone else, officers have a constitutional right not to make statements when they are the focus of a potential criminal case. Important to the nature of the interview that VPD officers currently provide is that it is voluntary for this reason – which means the officer could decline to participate. In our view, though, the timing of this statement matters so much to the integrity of the review that the agency should be prepared to compel an administrative interview if the declination should occur. The officer would be

obligated to participate as a condition of employment (though that statement would be excluded as evidence in the criminal case).

Current policy language focuses on the criminal interview, and includes a reference to the possibility that the officer may not be physically, emotionally, or otherwise not in a position to provide a voluntary statement"; in such an instance, the guidance is to give "consideration" to a later scheduling. We recognize that extraordinary circumstances could militate in favor of delay in rare cases, such as when an officer is seriously injured as a result of the incident and needs medical treatment. However, we advocate a clear emphasis on "same shift" interviews as the standard, even if they are administrative in nature.

> RECOMMENDATION 12: The Department should ensure that officers involved in a shooting are interviewed – either criminally or administratively – prior to the end of the shift in which the shooting occurred.

Another debated issue relevant to Vallejo is whether officers should be allowed to review body camera evidence *prior* to offering their initial statement. The practice in VPD appears to be that the officers are invited to "view first." (Interestingly, not all the officers chose to in the cases we looked at.) There is a tension between the value of refreshing an officer's recollection vs. the value of a "pure" statement that is not influenced by outside information. The latter is more consistent with best investigative practice. Officers can and should review recordings immediately after providing a pure statement in an interview setting, and then make any corrections that might be prompted. But their initial statements should be based exclusively on their own recollections about what happened and their own state of mind.

We are informed that the Solano County Fatal Incident Protocol, of which the City of Vallejo is a signatory, provides that officers be afforded to view their own body camera videos prior to being interviewed. However, that provision of the Solano County protocol does not conform with best practices and is in conflict with other County-wide protocols in the Northern California area.[9] Vallejo should use its membership to urge revisiting of this issue.

---

[9] See, for example, Santa Clara County Police Chiefs' Association Officer Involved Incident Guidelines (involved officers to provide statement before reviewing video accounts of incident).

26

> RECOMMENDATION 13:  The Department should obtain
> a pure statement in an interview setting from officers
> involved in a shooting prior to their initial viewing of any
> recorded evidence from the incident and work to change any
> County-wide protocols that are in conflict with best
> practices.

## Administrative Review Process

The Department's "Critical Incident Review Board" ("CIRB") is the current
method by which some significant force events are subjected to formal scrutiny.
Per policy, the Board will be convened "when the use of force by a member
results in very serious injury or death to another."  It is to be comprised of a
captain, a representative from Professional Standards, a representative from
Training, and two "subject matter experts" (sergeant or above) in the force option
at issue.  The role of the Board is to conduct an administrative review of the
incident and to make recommendations to the Chief as to potential further action
in the areas of "Policy, Tactics, and Training."

This is promising on its face.  It reflects the notion that the Department recognizes
the value of careful and thorough scrutiny of such events, and we have seen
similar models in other agencies work quite well.  At their best, these boards offer
a forum for comprehensive issue-spotting and productive discussion – or even
debate.  They can ensure that individual performance concerns are addressed as
needed, and that the larger lessons to be gleaned from the incident are
disseminated to all personnel.  It's a combination that contributes to future
effectiveness and corresponds to the gravity of the underlying incidents
themselves.

Unfortunately, though, a process that achieves this constructive result can be
easier to devise than to execute.  The impulse to be supportive in the aftermath of
a deadly force incident is as strong in some agencies as it is understandable.  The
majority of officers are never involved in a shooting, and the trauma can be real
and long-lasting for those who do go through the experience.[10]  This reality can

---

[10] A very different dynamic that merits consideration by management is when officers are
involved in *more* than one shooting in their careers.  Vallejo has a few such officers
amongst its current personnel.  There are certainly many pitfalls to simplistic reactions to
such a circumstance.  At the same time, though, it behooves the agency and the involved
officers to make sure that this anomalous situation has been assessed collectively as well
as individually.

easily lead to a "circle the wagons" mindset that treats deference to the shooting officers as a sort of default. And this inclination is only reinforced against a societal backdrop of heightened scrutiny and skepticism. Concerns about civil liability comprise another factor that, in many jurisdictions, militates against robust internal review.

The result of all this can be a culture in which careful evaluation is perceived as morale-harming "Monday morning quarterbacking," and any criticism or accountability comes across as a problematic lack of support. Accordingly, some agencies steer away from rigorous administrative review and content themselves with a narrow focus on whether the deadly force was "in policy" – an analysis that leans heavily on the criminal investigation and leaves other matters either unexplored or unaddressed.

As for VPD, the current process brings the panel together at some point – usually several months – after the incident occurs. In advance of the meeting, participants have the opportunity to review available materials from the underlying criminal investigation, including reports and recorded evidence. One member of the Board guides a discussion, and the group makes collective assessments across the major subject areas of policy, tactics and training. It then reaches consensus and makes a collective recommendation as to a single, overarching finding about the event. After the meeting, one attendee is entrusted with putting a draft summary together, which is then circulated to the participants for feedback or editing before the document is finalized and submitted for executive approval. After different members of the command staff have the opportunity to review, it is the Chief who issues the final word on the case (usually by adopting the Board's recommendation without further comment).

We looked at several memos that summarized Critical Incident Review Board discussions and outcomes. This sampling of documents (as well as our discussions with individuals involved in the process) gave us some basic understanding of how – and whether – the process works in Vallejo. Both procedurally and substantively, we saw glimmers of potential. But we also noted a lack of consistency and some significant missed opportunities, along with a seeming reticence to criticize shortcomings in performance. The memos were generally quite short in their summary of the underlying Board discussion. And even when astute observations did emerge, the mechanisms for responding to them were often unclear. Moreover, accountability in the form of administrative consequences was rarely a menu option the Board pursued.

28

One example from a 2017 case was illustrative of both strengths and limitations. Multiple officers had responded to 911 calls about a party that had devolved into a disturbance. Upon arriving at the residence, the officers encountered individuals fighting outside; one of the officers perceived a deadly threat to a third party and fatally shot the aggressor. Additional issues arose in the aftermath of the shooting in terms of stabilizing the scene and dealing with various upset individuals.

The CIRB met to discuss the case several months later, and produced its memorandum some four months after that. The Chief's signature closing the review occurred four months after that: 17 months after the incident and more than six months after the District Attorney formally declined to prosecute the use of deadly force.[11]

Per the three-page memo, the CIRB recommended "Administrative Approval" of the overall response.[12] (This was the outcome in almost all the analyses we reviewed.) However, and to the Board's credit, the substance of the memo was more nuanced. It featured at least a quick mention of a few different very specific tactical concerns in terms of how officers had communicated with each other and the individuals they encountered, the formation with which they went up an outdoor stairway, the way one officer had handled his weapon and a flashlight at the same time, and the post-shooting response by supervision in terms of command and control of the scene. But the only apparent upshot of this was a concise listing of issues that the Department should address through training. There was no accompanying plan for doing so, or even clarity as to whether the recommendation was directed at involved personnel or the agency as a whole.

---

[11] We are familiar with a dynamic in which an agency delays its formal administrative process – or at least its ultimate findings – until after the resolution of the criminal review into the legality of deadly force. There is some justification for this deference to the District Attorney's process, in terms of not wanting to complicate a potential prosecution. Ideally, though, the agency will move forward in the interim with those parts of its response, if any, that are more time sensitive (such as an identified equipment or training issue, or a gap in policy). And in VPD's case, the timing (or slowness) of its CIRB process did not seem directly or consistently related to the status of the parallel criminal investigation.

[12] As stated in the Department policy, the other choices available to the Board include identifying a concern in the area of "Tactics/Decision Making," raising of "Policy/Training" issues, or finding that the force should be met with "Administrative Disapproval" for deviations from policy and VPD expectations. This last category is expressly reserved for "the most serious failures."

Moreover, and significantly, the Board noted that the shooting officer had failed to activate his body-worn camera in apparent violation of Department policy. But this did not lead to a responsive action item of any kind, including a potential disciplinary consequence. Instead, the relevant sentence was quickly followed by one emphasizing that the officer's "tactics and immediate action" had saved the life of the vulnerable third party. This latter fact may well be true. However, the juxtaposition suggests that it makes a moot point of the body-worn camera issue, and this "either/or" approach strikes us as overly simplistic and flawed.

In short, we see a number of ways that the CIRB model does not take full advantage of its structural potential or the analytical skills of its participants. These include the following:

- *Constrained Scope of Review*:  The Board often appears to focus on the use of force itself in narrow ways that limit learning opportunities and accountability options in the aftermath of critical incidents.  The menu of findings available to the Board is also problematically limited and collective in nature, which flattens assessments into an "all or nothing" approach at the expense of productive nuance.[13]

- *Limited Administrative Investigation*:  The lack of a separate administrative investigation process – including separate interviews with involved personnel to complement materials from the criminal case – inhibits the Board's ability to make effective judgements across the optimal range.  It has seemingly also contributed to a paradigm in which appropriate accountability for policy violations is rare in the context of a critical incident.

- *Timing Concerns*:  As discussed above, the different phases of the process can take months to unfold, with gaps not only before the meeting but also in the subsequent stages.  With no clear guidance in policy and no discernible protocols for when

---

[13] Our understanding is that a representative from Internal Affairs monitors the interviews that involved officers give as part of the criminal investigation process, and has the opportunity to submit supplemental questions bearing on administrative matters as needed.  This strikes us as better than nothing – but also as inherently awkward.  We encourage a process that features separate administrative interviews as a standard practice.

the different phases will happen,[14] there are long and avoidable delays before the administrative review is finalized. This vitiates the effectiveness of the review in a couple of ways: by leaving involved officers in an unwelcome state of uncertainty, and by slowing the implementation of agreed-upon remedial measures that could influence the whole Department.

- *Lack of Concrete Follow-Through*: Even on those occasions when the Board identified specific concerns with implications for training, supervision, and individual officer performance, the documentation was generally lacking in terms of concrete actions items and subsequent corroboration. We do not rule out the possibility that beneficial interventions occurred. But, in our experience, a protocol for memorializing particular ideas and then confirming that they came to fruition is very helpful in actualizing good intentions, especially in an agency where the press of daily business could easily allow things to slip through cracks.

- *Role of Legal Counsel*: The terse nature of the memos produced by the CIRB perhaps reflects concerns that more detail (and a more wide-ranging or pointed evaluation) would be problematic in terms of liability exposure – a dynamic that may also relate to the regular (but not automatic) participation of a representative from the City Attorney's office in the meetings themselves. We recognize the potential benefits of having a lawyer monitoring the process and serving as a resource for the Board's deliberations. However, our view is that the best role for counsel in this context is as an advisor, rather than a shaper of the discussion's parameters and consequences. To the extent the Vallejo model is deviating from this, we would encourage the Department and City to reconsider.

We strongly advocate a shift in philosophy that would make holistic, rigorous assessment of the *entirety* of an officer-involved shooting (or other critical incident) a routine and expected component of VPD's administrative response. This would include looking at all aspects of a given encounter with an eye toward issues that merit further investigation or redress. Such a review should necessarily

---

[14] An exception is for the command level approval process once the memo has been finalized by the CIRB. That cover sheet expressly calls for – and tracks – a two-day turnaround for each listed person, which we find to be a simple and effective approach.

encompass the pre-event planning/decision-making, the tactics leading up to the climactic moments themselves, and the effectiveness of any post-incident responses, including the timely provision of medical assistance and crime scene integrity.[15]

Ideally, in our view, the Department would consider the implications of each critical incident through a phased response. Members of its Professional Standards Division would put together an initial presentation for Board members and executives (including the Chief) within a week or two of the incident; the goal at this stage would be to focus less on individual accountability[16] than on identification of potential issues in policy, training, supervision, tactics, or community response that are time sensitive and/or broadly relevant to agency operations. These are matters that could and should be addressed quickly – even during the pendency of the criminal review. This meeting should generate individual "action items" that are assigned to specific people for completion, a process that the Professional Standards Division could help track.

A second phase of more comprehensive administrative investigation – again, performed by Professional Standards Division personnel – could then address individual accountability. Performance issues that implicate policy – even if separate from the legitimacy or justification of the force itself – should be addressed through the discipline process. And administrative interviews of involved personnel should be utilized as a supplement to the criminal investigation and to provide a fuller picture of tactics, decision-making, supervision, and other relevant aspects of the case.

The next gathering of the CIRB – at the completion of the administrative investigation – could be used as a final opportunity to assess the full incident and to craft the different aspects of the Department's response. Moving away from the current paradigm of limited choices would preserve the flexibility needed to address each incident's particulars in appropriately tailored ways.

---

[15] One example of this latter category would be involved personnel's responses to "rescue mode" after the incapacitation of a subject. The counter-intuitive aspects of this transition – from reacting to a perceived threat to providing aid for that threat's source – make it especially important for an agency to train and reinforce this concept where possible.

[16] The exception would be for an incident that quickly exposed clear issues about officer actions as a matter of law, policy, or fitness for duty.

32

With due respect to officer sensitivity and concerns about deleterious "second-guessing," we believe critical incidents such as shootings are intrinsically worthy of the highest levels of attention from law enforcement – as much for the sake of future operations as past accountability. And we believe that the process can be undertaken in a way that removes stigma and promotes constructive reinforcement and remediation.

Importantly, the CIRB memos from two more recent cases reflect a significant shift in paradigm and a move toward the comprehensive evaluations we endorse. In one, the then-Chief rejected the recommendation of "Administration Approval" that the Board had agreed upon, and cited two specific areas in which the evidence showed potential policy violations on the part of the officer. The first related to activation of the body-worn camera, and the other to the requirements for conducting a foot pursuit. While these matters were distinct from the deadly force's justification, there were key issues in their own right – the sorts of thing that might contribute to how confrontations unfold and whether there were realistic alternatives to the ultimate consequence.

In the other case, the Board itself produced a memo that transcended its predecessors in striking ways. While covering a vehicle pursuit that involved several officers and ended in the fatal shooting of an armed and aggressive subject, the Board members found the officers to have acted within policy. But they identified several tactical elements that deviated from training and/or compromised officer safety. It also recognized potential training opportunities for the involved personnel and the Department as a whole. Finally, it offered concrete and applicable recommendations for managerial responses.

While some of this may be a function of that incident's own unique dynamics (not all cases are the same in their level of situational complexity or tactical nuance), it is interesting to note that the memo was written – and approved – within a few weeks of the new Chief's arrival.[17] While we believe that further structural adjustments would be beneficial, and urge the Department to consider them, the apparent new vision for the CIRB is a step in the right direction.

---

[17] Also interesting is that the Board's initial meeting about the case had occurred approximately one year earlier. While the delay in finalizing the memo is curious (and something we discuss below), it also suggests that other panel discussions over the years may have featured similarly thoughtful dialogue – but did not lead to documented consequences or a comparable level of responsive action.

RECOMMENDATION 14: The Department should change its protocol for reviewing critical incidents by empowering Professional Standards Division, working in conjunction with the Critical Incident Review Board, to conduct a holistic review and evaluation of all critical incidents to encompass the performance of involved personnel (including non-force users) as well as issues of policy, training, tactics, supervision, equipment, and/or incident aftermath.

RECOMMENDATION 15: The Department should guide the CIRB's analysis by requiring specific findings in each of the following categories: pre-event planning and decision-making, tactics, and post-event response (including timely transition to rescue mode).

RECOMMENDATION 16: The Department should provide the CIRB with greater flexibility to tailor its outcome recommendations across a range of possible categories, rather than limiting it to a blanket finding about the incident as a whole.

RECOMMENDATION 17: The Department should consider ways to conduct its critical incident review in time-appropriate phases, beginning with an initial debrief and issue-spotting and continuing to a more thorough examination of administrative issues including officer performance.

RECOMMENDATION 18: The Department should set specific goals in writing for the timely completion of different phases of the critical incident review process, to make sure that the appropriate responses and remediations are occurring in as meaningful and productive a way as possible.

RECOMMENDATION 19: The Department should develop a separate administrative investigative package, including separate administrative interviews of involved personnel, to help the CIRB to identify and resolve issues related not only to the use of force but also collateral matters that merit formal attention.

34

RECOMMENDATION 20: The CIRB should play a direct role in the identification and resolution of individual policy violations or other performance issues associated with a critical incident.

RECOMMENDATION 21: VPD and the City should clarify the role of legal counsel in the CIRB process, so that input on questions of law and liability does not come at the expense of rigorous analysis and necessary remedial measures.

# Other Uses of Force

Although deadly force events are understandably in a category of their own in terms of the scrutiny they receive, *every* use of physical force constitutes an exercise of police power that warrants attention and some level of accountability. This observation is, or should be, an unremarkable one. Law enforcement's job is a challenging and often dangerous one, and the ability to use a reasonable level of force in order to overcome resistance or protect self or others against a physical threat is a necessary component of officers' authority. By its very nature, though, force constitutes a significant imposition on those individuals who are subjected to it.

The deadly force incidents we discuss above are the most obvious manifestations of this concept. They deserve the distinctive attention that they received from the public and the justice system, and our recommendations are consistent with that reality. But *any* use of force – no matter how minor or how fully warranted – is something that a contemporary officer is expected to report, document, and take ownership of. And when there are questions about the necessity or extent of a given force application, those matters deserve careful investigation and, where applicable, responsive consequences.

What we would add to that baseline assessment is the notion that all force incidents deserve at least some level of *holistic* scrutiny that goes beyond legality or technical compliance with policy (as crucial as both those standards are). We have reviewed many hundreds of force incidents over the years. The overwhelming majority of them have been deemed by their agencies to be "in policy" – and we frequently concur with those findings. At the same time, though, a much larger percentage of those cases raise one or more issues that are deserving of, or would benefit from, some sort of managerial feedback. This

could be related to supervision, officer tactics, teamwork and coordination, choice of force option, equipment, policy, or some combination of the above.

In other words, we encourage agencies to push past the simple dichotomy of "in policy or not" when it comes to managerial intervention. The point is not to undermine officers or strain for ways to criticize them. Instead, it is to reinforce important notions that law enforcement should always bear in mind: that force matters, that avoiding it when possible through de-escalation or effective tactics is good, and that there is value to reinforcing effective performance and remediating where appropriate.

There is room for improvement in both thoroughness and consistency in VPD's use of force review processes. Some of this is a casualty of the strains on time and resources we note elsewhere. Some of it, though, is a managerial judgment that the officers are not "heavy-handed," and that the volume and nature of the force incidents is an expected by-product of the encounters with volatile individuals that the officers regularly have.

The following impressions emerged from the various parts of our evaluation:

- VPD officers use force regularly, and consider it more a function of their challenging work environment than a philosophy or culture of physical aggression.[18]

- VPD officers are conscious of and well-trained about the various legal and policy justifications for force.

- These principles provide guidance in the field and inform the officers' framing of their own conduct in reports.

- The supervisory review of force incidents is less formally robust and consistent than it could be.

One Internal Affairs investigation we reviewed is illustrative. The case involved a supervisor who responded to an unfolding incident and used force to take an individual into custody, but failed to report it; the force came to the Department's attention as a result of the man's complaint. A VPD force expert formally reviewed the incident as part of the Internal Affairs case – and determined that

---

[18] As one high-ranking member of the agency explained it, "A lot of people want to fight us." Assuming this is true, the challenge for contemporary officers is to use skills to prevent belligerent individuals from dictating that result.

there had been technical justification for what occurred. This analysis was consistent with the case's final outcome, in which the force allegation ended up being "exonerated" while the supervisor was disciplined for the failure to report.

The memo prepared by the VPD force expert is thoughtful, detailed, and convincing. And it does what it was asked to do: make an assessment of the "objective reasonableness" of the force given the totality of the circumstances. In our view, though, this case raised issues of tactics and decision-making that merited attention – and that the narrow emphasis on justifications left unresolved. These included the supervisor's assertive and "hands-on" insertion of himself into the response and some of the communication choices that ended up antagonizing the subject.

Another case involving allegations of improper force, this time involving an officer's off-duty confrontation with a belligerent individual – followed a similar path: a force expert conducted a meticulous and plausible assessment of the officer's physical actions and the justification for each, but left aside "bigger picture" issues about the advisability of engaging physically in the first place.

In fairness, it should be noted that the memos in question were deliberately narrow in focus and were only components of broader investigations – ones that did find other policy violations apart from the force. But they also correlated with our larger impressions of how supervisors viewed force events. The technical aspects of the justification analysis were indeed persuasive. However, there is a "can't see the forest through the trees" quality when the larger context – including communication skills, judgment, tactics, and other options – is not regularly pursued.

As with other areas we evaluated, any limitations in the Department's approach seem to be about culture and practice rather than capability. Our sense is that VPD's *ability* to train and to critically review force is considerable – as reflected in the "Force Options Team" that has emerged over the years as a valued resource for patrol personnel. This group, which is overseen by a high-ranking Department member, consists of some 15 individuals who have gone through extensive training and developed expertise in matters related to force. They serve on the team as a collateral to their regular assignments.

As members, they assess individual incidents and extract lessons for the development of training scenarios; these are shared with Department members during several designated windows throughout the year. The Force Options Team's influence is also reflected in the training curricula that they compile for

VPD personnel's mandatory sessions throughout the year; we had the opportunity to review several of the "lesson plans" that were developed for these blocks of instruction and found them to be thorough and thoughtful. We were especially impressed, for example, by how often "de-escalation" principles were emphasized.[19]

This concept promotes a mindset in which officers look for opportunities to reduce the potential for physical intervention in a given encounter through a range of techniques that emphasize caution, patience, effective communication, and sound tactics. It recognizes that just because officers *can* assert their authority physically in a given situation doesn't mean that they *have* to, or should. And, increasingly, efforts at de-escalation have become an expectation that comprises part of the analysis as to a force application's "reasonableness" under law and policy.

The Department's emphasis on these skills in its training cycles is a positive development. And, to its credit, it has very recently changed its Use of Force policy to give unequivocal prominence to de-escalation principles. The new section on De-Escalation (Policy 300.4) seems exemplary in the philosophy it articulates and the responsibility it imposes on officers to help "avoid physical confrontations and increase the likelihood of voluntary compliance or cooperation" where possible. Our collateral hope is that a focus on these concepts will also become a regular part of VPD's supervisorial assessment of individual incidents; it has not seemed to be a point of emphasis in the past.

Finally, it is also our understanding that the Force Options Team members perform the collateral function of consulting with officers who have used force, assisting them with the documentation of their actions. Our review did not extend to comparing officers' written accounts with other available evidence in the context of specific lower level force incidents. From a distance, though, we see this as a coin with two sides: the benefit of expertise when it comes to producing detailed descriptions of what happened and why, and the potential pitfalls of "coaching" that focuses on justifications and does not necessarily encompass or promote broader scrutiny.

---

[19] The robust training component stands in significant contrast to the currently less formally robust review component; i.e., whether the use of force being assessed was consistent with training and Departmental expectations. We advocate for discussion and application of how officers are trained regarding de-escalation principles to whether that training was a component of any use of force in the field.

We did not see formalized examples of this scrutiny occurring at other levels of the Department. Our understanding is that force incidents *are* subject to review "up the chain"; supervisors up to the captain level are notified and given the chance to assess force applications, and can direct further investigation or other interventions at their discretion. Moreover, Department policy 300.7 expressly sets forth a number of duties under the heading of "Supervisor Responsibility" that promote evidence-gathering and assessment in potentially effective ways. But our requests for examples of any "Use of Force Report" that emerged from this process did not produce any specific responsive materials from VPD. And Department executives that we spoke to, while confident that force events did receive worthwhile attention, acknowledged that the process was not as routinized, rigorous, or comprehensive at it might be.

The Department also would benefit from standardizing – and building upon – its existing approaches when it comes to the review of individual force uses by its officers. Ensuring that force is not excessive (or otherwise unjustified) is extremely important as a baseline, but less than optimal as a stopping point. Accordingly, we recommend a protocol that looks at individual force events more holistically and with a broader range of potential interventions.

We recognize the challenges of limited resources, and the commitment that any additional mandates can represent. But we also believe that a great deal of good can emerge from a higher level of formalization and consistency – and from a cultural approach that looks at review as an opportunity rather than as a burden or a sign of distrust.

> RECOMMENDATION 22: The Department should develop a protocol for standardizing a specific and documented supervisorial evaluation of every use of force.

> RECOMMENDATION 23: The Department should ensure that the assistance of the Force Options team with officer report-writing does not become a tool for retroactive justification of questionable force deployments or a basis for truncating appropriate scrutiny.

> RECOMMENDATION 24: The Department's analysis of each use of force should include affirmative managerial determinations as to whether the force was in policy, and whether training, tactical, or other considerations were identified.

RECOMMENDATION 25: Each use of force should be reviewed and evaluated to determine whether de-escalation techniques were considered or implemented prior to the application of force, and/or why they were not.

RECOMMENDATION 26: The Department should incorporate its current policies for supervisory review, including detailed evidence gathering by supervisors where applicable, into this process.

RECOMMENDATION 27: The Department should create formal mechanisms for documenting and tracking any action items that emerge from this process, in order to ensure appropriate follow-through.

# Complaints and Allegations of Misconduct

One of the hallmarks of a police agency's effectiveness and community standing is its responsiveness to allegations of officer misconduct. There are several components that contribute to the substance of this responsiveness. They include the following:

- Does the agency facilitate the acceptance of complaints from the public through clear communication and an inclusive intake system?

- Does the agency investigate allegations of misconduct in thorough, fair, and appropriate ways?

- Does the agency uphold its own standards apart from external prompting or allegations?

- Does the agency view its discipline process as a source of potentially useful feedback that extends beyond individual accountability determinations?

- Does the agency promote trust through transparency and notification regarding its processes and the outcome of complaints?

As discussed below, we found the Department's process to be sound in many of the above respects, while noting occasional concerns and areas for potential improvement.

In reaching these impressions, we looked at approximately 40 samples of completed misconduct cases from recent years. These were in three main categories: "Internal Affairs" investigations of more serious allegations (whether initiated by the Department or a member of the public), "Citizen Complaints," and "Inquiry Resolutions" – a category reserved for the handling of complaints that do not warrant further investigation because, as alleged, are not matters of misconduct but rather service concerns.

## Intake of/Receptivity to External Complaints

It's a lot to expect of police agencies that they *embrace* the citizen complaint process: the most legitimate complaints are the product of regrettable mistakes (or worse), while the less legitimate ones are often asserted with the most persistence and enthusiasm. Each of them represents extra work and an aggrieved member of the public – neither of which is desirable for any organization.

Ideally, though, police agencies take a deep breath and make the best of this process. They accept the importance of the responsibility, execute it with integrity and diligence, *and* recognize its potential benefits as a source of useful feedback.

The *number* of complaints a police agency receives from members of the public can be difficult to interpret in terms of significance. In short, fewer is not inherently better – a small number might be less a matter of overall "customer satisfaction" or flawless policing than a lack of awareness about (or trust in) the process – or even resistance on the part of the agency to accepting the complaints in the first place. Accordingly, we look instead at the extent to which a department seems to solicit feedback and makes it easy for people to share a concern; then we assess the legitimacy of the subsequent investigation and resolution.

To its credit, Vallejo's approach to external complaints is inclusive and reasonably well-publicized. It allows members of the public a variety of methods to share their issues, makes written forms (complete with explanatory information) available in the lobby of headquarters, and accepts anonymous complaints (while acknowledging – with justification – that such matters can be more difficult to investigate or otherwise pursue). And the Department's website features a dedicated link to the complaint process.

VPD also takes a reasonable approach to addressing public concerns through direct communication and explanation where applicable. This arena is

41

documented most clearly in the "Inquiry Resolution" files we reviewed. These memos capture the nature of the complaint and explain in sufficient detail how the matter was addressed by the handling supervisor. Importantly, these individuals are taking responsibility for their determination and the basis for it.

When it comes to interacting with an unhappy member of the public, there can be a fine line between a constructive conversation that clarifies misunderstanding and a "smoothing over" or "stonewalling" session that may successfully neutralize the complainant but doesn't address an underlying problem. In our view, the complainant's subjective frame of mind should be important but not wholly determinative of the agency's response. A legitimate complaint or misconduct issue deserves attention even if the watch commander somehow mollifies the individual reporting party; similarly, an unreasonable complaint only merits so much investigation, no matter how insistent the citizen. For this reason, the documentation within an "Inquiry Resolution" strikes us as a fine balance between efficiency and accountability. And we are largely in agreement with the appropriateness of the outcomes as explained.

We also noted one case in which a woman strongly objected to VPD's handling of a custody exchange that she was involved with – an encounter that ended in her arrest. In this incident, though, body-camera footage appeared to support the officers' actions. When the investigator afforded her the chance to watch the recording and offer her perspective in more detail, she was notably chastened by the video and the way it deviated from her recollection – a factor that presumably made her more accepting when the officers were ultimately exonerated.

In short, several of the complaints we reviewed not only "got to the right place" in terms of outcome, but also featured constructive, clarifying interactions between the involved party and VPD. This is not always attainable. But it should certainly be an underlying goal of the complaint process, and VPD should continue to nurture this aspect of its response.

## Notification Letters

Part of any police agency's statutory obligation in responding to citizen complaints is to notify the complainant in writing of the outcome within 30 days of the investigation's completion. At the same time, though, confidentiality protections for officers limit the amount of information and detail that can be shared. (For example, if an allegation is "sustained," the agency must say so – but cannot elaborate on the specific consequence that the officer received.)

Some agencies have responded to these limitations by issuing concise letters that meet legal obligations but are even less personalized and detailed than they might be. This can leave complainants understandably frustrated. Filing an earnest complaint, waiting for several months, and then receiving a short notification that the investigation ultimately was Unfounded (with no further explanation) is a recipe for dissatisfaction.

Accordingly, we encourage police agencies to make the effort to "show their work" to the extent possible, and at least take steps that can help assure complainants their concerns were understood and taken seriously. This could include a recounting of the allegation itself (which obviously helps to personalize the response), generalized description of the investigative steps that provided the basis for the outcome (which helps to show due diligence) and some effort at conveying a recognition of the complainant's perspective.

Vallejo's notification letters were often quite good in this regard. This was not, however, universally the case. There were occasional disconnects between the outcome of the investigation and the notification that was provided (Such as an "Unfounded" notice for a case that could not be fully pursued because of a lack of identified subjects.) Others of the letters were notably terse. And, in at least a couple of instances, we saw the presumably well-intentioned but curious phrasing "Again, on behalf of the police department, I apologize *you felt* you had a bad experience." (Emphasis added.) At least two of these appeared in letters about a complaint that was sustained, which meant the experience was *objectively* bad. In another, the allegations were refuted, which suggests that the apology was unwarranted (and therefore potentially condescending).

More positively, we saw other examples of letters that made reference to specific allegations, descriptions of the investigation, and/or a sincere straightforward apology. These are small but creditable gestures that are worth the investment in time. And we encourage the Department to achieve this even more comprehensively and consistently with future complaints.

> RECOMMENDATION 28: The Department should build
> on its intermittently successful efforts to make complaint
> notification letters as detailed and useful to recipients as
> possible.

Along these same lines, we would also encourage the Department to share with the public more information about the number of complaints and internal investigations, the nature of the allegations, and the outcomes of its cases each

year. Transparency in this regard has traditionally been quite limited across law enforcement, stemming from both the confidentiality rights of officers and a perception that sharing this data (and the attendant acknowledgement of shortcomings) does not redound to an agency's benefit. But this is changing for a few reasons. Not only is the public's scrutiny and expectation level higher than before, but law enforcement is increasingly recognizing that more openness can be a vehicle for increased trust. Accordingly, VPD should look for ways to offer the public more insight into its internal processes.

This same commitment to transparency should also exist with regard to uses of force. VPD should follow other police agencies by regularly publishing the number and types of uses of force periodically.

> RECOMMENDATION 29: The Department should compile and periodically publicly produce aggregate data about the number of complaints received, the number of internal investigations conducted, and the number and type of uses of force so as to offer greater insight into the nature and effectiveness of its accountability measures.

## Investigative Issues

In the cases we assessed, there were numerous individual moments of effective, resourceful investigation and thoughtful analysis of the accumulated evidence. We saw instances in which misconduct allegations were sustained and appropriate consequences administered. On the other hand, some case files revealed limitations in the scoping of issues, thoroughness of investigation, and timeliness or efficacy of resolution. Occasionally, attributes and deficiencies were discernible within the same case.

One such example began with an arrestee's complaint of an item that had been lost by the Department at some point after the booking process. Within two weeks, the investigator had conducted interviews, reviewed surveillance camera video and documentary evidence, confirmed that the item had existed and was missing, identified the handling officer, and determined that there had been gaps in the Department's required protocol for collecting and recording of property. The summary memo documents the officer's own "corrective action" plan of learning from the incident and recording future such transactions on body camera – a useful corrective measure of the sort that effective systems emphasize. Finally, and impressively, the case memo also recounts a timely conversation with

the complainant in which the loss was acknowledged and the Department's
assistance with the City claim process was offered.

Still, there were curious aspects to VPD's overall approach in the same matter.
For one, the possibility that the item had been *taken* (instead of simply not logged
properly and misplaced) was seemingly never considered and was not an apparent
component of the investigation.  Secondly, the case was not finalized (in the form
of written notification to the complainant and a responsive consequence for the
officer) until some eight months later.  The reasons for this delay were not at all
discernible from the case file.

Nor was this the only example of this timeliness concern.  For instance, it took
approximately nine months in one case to sustain an allegation of negligent
evidence handling – for an investigation which consisted primarily of one
interview in which the subject took full responsibility for the mistake.  In another
case, an officer's failure to conduct a pat down search of a suspect (who was later
determined to be carrying a firearm as well as contraband) took seven months to
finalize *after* the completion of the investigation.

It is true that, per state statute, agencies have a full year to potentially issue
discipline from the time they first become aware of an allegation.  Meeting this
deadline has been an issue in other agencies we have evaluated; it should be noted
that we are not aware of instances in which VPD forfeited its right to impose a
consequence.  But, absent an investigation of such complexity that the whole time
is needed for effective evidence-gathering and review, a Department should
prioritize the efficient resolution of its investigations.

Here, while the investigative work appears to be getting done in a relatively
timely way, the final phases of the process unfold quite slowly and for reasons
that are not readily apparent.  And even if they were explainable, it nonetheless
weakens some of the constructive value of a discipline case when so much time
passes between the problem and the ultimate resolution or consequence.[20]

---

[20] In the training we regularly do with police managers from agencies all over the state,
they consistently cite the slow pace of administrative investigations as a key factor in
undermining the rank and file's attitudes toward the discipline process.  Even when the
allegations are ultimately not sustained, officers describe the experience of being "under
a cloud" as inherently stressful – and the mere pendency of investigations can disrupt
hopes for assignment changes or promotions.  And, on the other side of the coin, an
untimely resolution can also contribute to a complainant's suspicion that the agency is
not taking the matter seriously.

As a result, agencies have developed internal deadlines for completion of investigations and the review process. In particularly complex cases or where there is unavoidable cause for delay, the deadlines can be overridden by supervisory approval.

> RECOMMENDATION 30: The Department should develop written internal deadlines to complete an investigation and review process and require supervisory approval for deviation from those deadlines.

## Thoroughness of Investigation/Scope of Review

In our review of individual case files, we saw investigative work that was often thoughtful and meticulous. At times, though, we also noted gaps in thoroughness that potentially undermined the outcomes of cases. One recent example involved a juvenile subject who contacted the Department after being confronted and searched by a pair of VPD officers. In spite of describing a particular date and time – and specifying that it had been one male and one female officer– the complainant's information went nowhere, and the case was ultimately closed out with a finding of "Unfounded." It is true that the complainant and his father did not respond to several attempts at re-contacting them, and that there was no documentation of any such contact to support the claim. Still, it was curious that more effort had not been made to match the duty roster for the day with those details that *were* available, and thereby ensure that officers were performing in a manner consistent with VPD expectations.

We also noted two separate instances in which witness officers were not interviewed about encounters that had produced complaints of excessive force. Even though relevant body-camera evidence was available, the perspective of these individuals would presumably have been instructive.

Due diligence is an obvious component of credible and effective investigation. We reiterate that VPD's work in this arena was often solid and even impressive. But we also advocate a commitment to rigor and thoroughness in the framing and resolution of issues.

> RECOMMENDATION 31: The Department should evaluate its individual misconduct investigations to ensure that all relevant issues are identified and pursued to a reasonable extent, including a written standard requiring formal interviews with witness officers.

## Level of Discipline

We noted several examples of cases in which the Department properly established that allegations were sustained by the evidence and that a consequence was warranted. However, the *nature* of that consequence was at times surprisingly minor.[21] This included low-level suspensions – or less, including "documented counseling" or mere training recommendations – for lapses that seemed fairly significant.

It is true that discipline is intended to be corrective instead of punitive, and that – short of a violation for which termination or demotion are necessary outcomes – the severity of the remedial measure is a matter of discretion, appropriately subject to a range of factors. Nor is our inclination toward more significant consequences a matter of hostility or retribution. But we do think there are ways in which outcomes that seem lenient can be problematic.

One concern is that the agency is narrowing its options for progressive discipline in response to similar future offenses that might arise: a low baseline for remediation not only makes less of an impression the first time but has an impact on the potential severity of a subsequent intervention. And "light" discipline also has a messaging function that may not be consistent with management's goals for conveying its standards and expectations.

We recognize that this dynamic is partly cultural and a reflection of overall perceptions about the discipline process. We are familiar with some agencies in which written reprimands are commonplace and taken in stride, and with others that consider a written reprimand a disconcerting rebuke. It depends in part on what officers are used to, and it is possible that VPD is accomplishing it goals under the current paradigm. But we are concerned that the light level of discipline at VPD is less about the gravity of the misconduct than a reluctance to alienate or discourage the involved officers – and their peers. This is not entirely consistent with a healthy process – one that takes accountability seriously, administers proportional discipline, and recognizes such interventions as necessary and constructive.[22]

---

[21] The actual impact of suspensions in Vallejo is further mitigated by the option officers have to use vacation days or compensatory time to "serve" their discipline.

[22] Some agencies have developed disciplinary matrices that set out the expected discipline range as an effort to build consistency and notice to employees about what discipline might be expected based on the nature of the transgression.

> RECOMMENDATION 32: The Department should
> evaluate its levels of discipline for sustained policy
> violations to ensure that the proper amount of remediation is
> occurring.

# Other Review Protocols

## Civil Claims

When a person wishes to be compensated for a loss of any kind that was caused by the allegedly improper actions of a government entity, the submitting of a legal claim for damages is a first step. This doesn't always resolve the issue. But, in part because the goal is to settle such matters as efficiently as possible, it is at least a required precursor to filing a lawsuit in state court.[23]

When such claims involve the actions of law enforcement, different jurisdictions have different models for what happens next. The police agency generally has *some* role, at least in information-gathering. But there's a wide range in terms of how much the agency's insights and analyses shape the jurisdiction's legal response – and how much the agency itself treats the claim as a forum for self-scrutiny.

We recognize that legal counsel and risk managers need to maintain ultimate control over the decision-making in such instances; it is their area of expertise, after all, and their distance from the law enforcement perspective is often advantageous in terms of objectivity. But we do think there is value in soliciting meaningful input from the police before that decision is made. And we have long advocated a model in which the police themselves treat legal claims as a form of public feedback that merits attention – a sort of "complaint with a price tag" attached.

To their shared credit, the City and VPD appear to have a refined protocol for formally engaging the Department once a relevant claim is made. We looked at five samples of their process from recent filings. Once received by the City, the claim is forwarded to the Department and assigned to an Internal Affairs

---

[23] By statute, the government entity has a set amount of time to respond to a claim, and can either accept it, deny it, or do nothing (which has the effect of a denial and allows the claimant to proceed to litigation). Should the aggrieved choose federal court as the venue, there is no corresponding claim requirement; he/she may file a complaint in court immediately.

reviewer, who has a set deadline to conduct an assessment and submit a recommendation memo. That memo is copied to the various City individuals with risk management responsibilities (including someone in the City Attorney's Office).

The claims we looked at covered an interesting range. In one, the reviewer looked into the matter, corroborated the claimant's version, and recommended a refund of impound fees. At the other end of the spectrum involving a claim for considerable damages for an alleged false arrest, the Department had already conducted a formal administrative investigation and determined – with the assistance of body-camera recordings – that the involved personnel had acted properly in handling the claimant's arrest. A denial of the claim was accordingly recommended.

Both results made sense to us, and seemingly featured the collateral benefit of prompting useful introspection on the part of VPD. It's a paradigm that ideally is repeated across the board. But in one of the five samples we looked at, an allegation of false arrest resulted in no determination – and no documented effort at assessing the underlying circumstances or the claim's legitimacy. Instead, the memo cited guidance from the City Attorney' Office in refraining from weighing in.

There may well be some strategic merit to this approach on those occasions when it is used. However, we consider it critically important that concerns about liability exposure do not undermine or interfere with a police agency's willingness and rigor in taking a hard look at its own actions – and following up with individual accountability or other remedial measures as needed. In the same way that legal counsel can benefit the CIRB process but should not constrain it, we encourage the City and VPD to ensure that the Department's role in the civil claim process is appropriately balancing legal concerns with internal rigor and necessary reform.

> RECOMMENDATION 33: The Department should continue to use the civil claims process as a vehicle for assessment of its own performance, and should refrain from allowing liability concerns impede the rigor and thoroughness of this process.

## Evaluations

A couple of protocols that, in our experience, are difficult to execute effectively relate to the formal evaluation of employees in a police agency. Various obstacles to meaningful feedback exist. The process is labor-intensive when done well, and the constant flow of other work in conjunction with the various incentives to avoid contention often result in perfunctory end products that have little real value. Worse, they can create a record that glosses over actual performance issues and makes it harder for the agency to take responsive action if and when it needs to in the future.

Our familiarity with the tepid efforts of other agencies means that VPD's robust approach is especially noteworthy. Specifically, we refer to annual performance evaluations that all employees receive, and the extensive daily assessments that trainee officers receive from their field training officers in the early stages their employment. We looked at recent examples of each and were impressed by what we saw.

As for the annual performance evaluations, VPD's format combines different elements in the service of a specific, personalized, and constructive profile. There are pages that call for a supervisor with direct knowledge of the employee to make individual "check the box" findings across several different categories, a narrative section that seemed thoughtful and nuanced, and opportunities for the officers themselves to recount their accomplishments and share goals.

The samples we looked at had several strengths – and largely avoided familiar pitfalls such as "grade inflation" as a path of least resistance.[24] While several officers received overall ratings of "Exceeds Expectations," not all did – and supervisors who gave the higher marks tended to support them with persuasive explanation rather than letting the checks speak for themselves. Individual strengths as well as potential improvement areas were highlighted, and seemingly provided recipients with a genuinely useful document. We hope the examples we saw were representative of VPD's standards, and that the Department will keep up the excellent work.

As for the ongoing training evaluations of new officers as they acclimate to patrol, VPD's approach is as structured, rigorous, and thorough as any we've seen. The Field Training Officer ("FTO") cadre provides lengthy reports in which an

---

[24] The annual evaluations also appear to have been completed in a timely fashion, which is a common problem area that VPD has done well to avoid.

individual day's calls for service and specific training focal points are recounted in detail, along with candid assessments of the trainee's performance. There are also "end of segment" reports which offer a more cumulative assessment before a trainee moves on to a new phase.

The FTOs come across on the page as knowledgeable, dedicated, and exacting. These are obviously assets when it comes to preparing new officers to succeed. The mix of compliments and critiques was nicely balanced – and appeared to be constructive in spirit and useful in practice for the trainees and Department management.

In all, we had a high regard for this program, from what we could glean, and commend VPD accordingly.

This page intentionally left blank.

PART FOUR:  Other Operational Issues

# Officer-Involved Shootings:
# Community Outreach and Transparency

There is no police activity that has a greater potential for community division, upheaval, and erosion of trust than the use of deadly force. Legacies of racial discrimination that persevere in contemporary life have particular resonance in the justice system. When combined with decades of problematic enforcement history in minority communities, the recent series of high-profile national cases involving police shootings has contributed to heightened tensions – and expectations for greater accountability.

It's also true each police shooting – whether notorious or not – has potentially traumatic effects on the involved subject's family, friends, and wider neighborhood. It raises fears, questions, and larger concerns – particularly when the incident involves a person of color.

As discussed above, Vallejo has not been immune to this dynamic. Controversial deadly force incidents have resulted in demonstrations that reflect fundamental perceptions: that officers are too willing to shoot, that they treat minority subjects more harshly, and that they are immune from objective investigation or punishment. Above, we have discussed our recommendations about VPD's *internal* review processes at some length, in part with the goal of reducing the likelihood of future uses of deadly force. However, there is also room for improvement in how VPD and the City respond publicly to such incidents when they occur. We made the following observations and recommendations:

## Designate a Family Liaison

When a deadly force incident occurs, there is obviously a significant amount of responsive activity – including the important initial steps of the various investigations. Just as obviously, a shooting brings upheaval and urgency of various kinds to the family members of the subject. Their need for information

and answers is understandable, but interaction with the law enforcement officials who might have those answers is potentially fraught for a number of reasons. At best, detectives and other personnel are often too busy for the kind of patient, thoughtful exchanges that are required; at worst, insensitivity or even interrogation of the family as witnesses can compound the difficulties they are experiencing.

Recognizing the potential for this dynamic, some agencies assign an individual to serve as a "family liaison" in the aftermath of a deadly force incident and beyond. Free from other responsibilities and with a different orientation (and perhaps even some relevant training), an individual designated to perform this role is helpful both to an agency's investigative personnel and to its ability to deal effectively and compassionately with aggrieved family members.

> RECOMMENDATION 34: The Department should develop a "family liaison" protocol in which, after a shooting or other critical incident, a designated individual will focus on providing family members with information and updates about medical status and subsequent procedural matters.

## Reach Out to Impacted Family Members

In addition to assigning a liaison to impacted family members, as a part of post-shooting protocols, the Chief should reach out to the family and offer to meet with them shortly after the incident. Whenever a person is killed or injured as a result of the use of officer deadly force, it is a tragic outcome, regardless of the circumstances. An offer to meet with the family to offer condolences for the loss or injury of their loved one and explain the investigative and review process is an important outreach. The Chief's expression of such sentiment does not equate to an admission of any liability or a lack of support for his or her personnel. Rather, it is a recognition of the human toll of any deadly force incident.

> RECOMMENDATION 35: The Chief should plan to offer to meet with family members in the aftermath of an officer-involved shooting as a way of acknowledging loss and sending a broader message of empathy and accountability to the community.

## Objectively Disseminate Public Information

After an officer-involved shooting, there is an immediate and understandable public demand for information about the details of the event. In the face of this, police and city officials must struggle to find the right balance between speed and accuracy – a tension that is only complicated by the sensitivity of the subject matter and the ways in which important investigative details can emerge in piecemeal fashion. Nonetheless, and given the credibility and public trust issues that are magnified in this context, all jurisdictions would benefit by following certain key principles.

Foremost among these is making sure that any information disseminated is correct. In our experience, we have seen multiple instances in which aspects of initial reports turn out to be wrong as more or better information is gathered. Often, these are details about weapons or alleged subject behavior that are favorable to the officers' decision to use deadly force and are released in an effort to defuse criticism or accusation. These mistakes of fact, however innocent, can compromise public perception of the official response, to the point where even justified shootings are shadowed by doubt in some circles.

Similarly, the *selective* distribution of evidence can also be problematic. The control that law enforcement has over the information relating to a critical incident means that it has an inherent ability to shape public perception that it must exercise with care. Even accurate information can lead to a perception of bias and pre-determination when it is shared selectively or when the jurisdiction's approach is inconsistent.[25]

> RECOMMENDATION 36: The Department should review its information-sharing protocols after officer-involved shootings to ensure that its approach is giving proper weight to accuracy, consistency, and objectivity.

## Conduct Neighborhood Meetings

Whenever an officer-involved shooting occurs, it is a significant event in the neighborhood where it has taken place. Police agencies who recognize the interest in providing information to those neighborhoods will schedule a community meeting within a few days of the event. To publicize the gathering,

---

[25] We are familiar from different agencies with a dynamic in which "favorable" evidence is released promptly, while more problematic details are withheld.

police officials prepare and distribute flyers and use the City's social media outlets. At the meeting, preliminary information can be conveyed as well as the information about the investigative and review process, but the primary purpose is for the attendees to raise any concerns or questions and for the police department to be responsive to them to the extent possible. If answers are not yet available, police leadership can commit to providing those answers when they become available, particularly since state legislation has provided police agencies greater leeway to discuss officer-involved shooting events.

These events can be difficult. Tensions are often high, and some individuals can seem determined to be angry regardless of the presentation's substance or merits. But the Department's willingness to conduct this type of outreach and accept negative reaction sends a powerful, constructive message about its commitment to the community at large.

> RECOMMENDATION 37: The Department should schedule community meetings within days of an officer-involved shooting as part of its standard incident response.

## Commit to Transparency

Evolving public sentiments have led to changes in the amount of transparency in law enforcement investigations that is both expected and legally required. To its credit, VPD has responded with diligence since new laws took effect in 2019: its website features responsive materials – including body-camera footage – relating to years' worth of incidents that are covered by mandated disclosure statutes. While commending the Department for those efforts, we also encourage it to look beyond the floor of those requirements and embrace an even greater degree of openness and candor.

For example, recent state legislation requires video of an officer-involved shooting to be released within 45 days of an incident, subject to certain exceptions. Progressive police agencies are using the state law as the *outer* requirement of releasing such evidence and have striven to release information sooner in recognition of intense public interest. Doing so enhances the jurisdiction's reputation for transparency.

We also hope that the new requirement to release investigative materials at the conclusion of a shooting investigation will be a forum for the Department to reveal the fullness of its administrative responses – including any necessary corrective actions it identified and implemented. Doing so would provide an

important supplement to the District Attorney's notifications about criminal review; these public letters were a step forward when they emerged in the last several years, but inevitably have a narrow focus, end in a decision not to file charges, and can be unsatisfying to interested observers in terms of substance as well as result.

> RECOMMENDATION 38: The Department should strive to exceed the newly established requirements for transparency with regard to officer-involved shootings, by releasing video evidence as soon as it is practicable and by offering detailed explanations to the public about the scope, nature, and outcomes of its internal reviews.

## Keep Litigation Issues Separate from the Official Department Response

In many jurisdictions that have struggled with controversial incidents involving the police, lawyers advocating for the subjects of those incidents (or for their families) often assume a high profile, and their criticism can lead to unwelcome media attention. There is no easy way to handle this dynamic. But one approach we recognize as *less* productive is when agencies or jurisdictions yield to the temptation to blame the lawyers for instigating negative public reaction or unrest.

There are different pitfalls to this tendency. One is that it tends to miss a key point: if there were fewer questionable incidents, there would presumably be less for the plaintiff's bar to be concerned about. More centrally, though, a preoccupation with legal defensiveness or posturing can impede an agency's ability to engage in the productive self-critiques we describe above.

This is not to say that litigation doesn't matter, or that the publication of one-sided versions of sensitive events isn't frustrating. Instead, it is a recognition that the unique challenges of addressing lawsuits and dealing with the plaintiff's bar or the media should be kept separate from the Department and City's public positions about the non-adversarial investigative and review processes that require objective attention.

In the same way, jurisdictions – including Vallejo – should avoid commissioning and then publicly disseminating expert reports that render opinions about the propriety of a shooting prior to the completion of both the criminal and administrative review. In at least one case where the expert found nothing in the officers' decision-making to criticize, the full report was placed on the City website before either the District Attorney or VPD had an opportunity to complete

their own investigation and review.[26]  By assigning an expert to conduct a review before the criminal justice and administrative process had been completed and by then disseminating the findings, it potentially compromised those other processes and set up a possibility of contrary and competing findings.

> RECOMMENDATION 39:  The Department and other City officials should consider new and less contentious ways of dealing with its critics, particularly in the context of pending litigation, and should work to ensure that its litigation posture does not interfere with the rigor and objectivity of its administrative reviews.

# Transparency and Community Engagement

## Department Website

As mentioned above, the Department's website offers a significant amount of new information related to prior officer-involved shootings and other critical incidents. This is a response to new state law requirements.  Similarly, another state bill that recently took effect requires police agencies to post their manuals and training materials on-line.  VPD has met this new obligation as well.

That said, the current website configuration makes it difficult for a member of the general public to locate the information.  Unless an individual was familiar with the relevant statutes or the number of the legislation behind the new transparency mandates, readily finding on-line information is a difficult chore.  The police website – and the public – would benefit from addressing this through a re-organization.  Clear headings and explanatory materials would make the site easier to navigate, and would reflect a recognition of the spirit as well as the letter of these new laws.

Indeed, we would also encourage the Department to consider additional ways it could use its website to increase public engagement and awareness.  Potential examples include offering aggregate data about uses of force and misconduct allegations, and promoting different agency initiatives that might benefit from public involvement.  By going beyond requirements and affirmatively sharing

---

[26] It seems unlikely that a report finding a shooting out of policy or critical of the officers' performance would have been disseminated the same way.

information about its operations, VPD could not only make itself more accountable but also potentially enhance appreciation for its work.

> RECOMMENDATION 40:  The Department should enhance the clarity and accessibility of its website in terms of required information, and should consider ways to further utilize the site as a vehicle for informing and engaging the public.

## Community Engagement in Promotional Process

We discussed above how Vallejo's public was very involved in providing feedback to City leadership during the recent Chief selection process.  The community should be similarly invited to engage in promotional decisions at all ranks.  Community members outside VPD's culture provide insight and a fresh perspective on candidates that the Department already knows.  Moreover, during the interviews, community representatives will likely focus on issues such as the candidate's ability to productively engage with the public.  VPD would be well-served to bring community members into this discussion as these important decisions are being made to select the supervisors and leaders of its organization.

> RECOMMENDATION 41:  VPD should engage community members at the interview stage of its promotional process.

## Surveys and other Feedback

The idea of "customer outreach" is of course widespread in private industry; companies value it so much that they persist in asking for survey responses and even offer incentives for people to do so.  Public entities have less of a tradition in this regard, but it is nonetheless an avenue worth exploring.

In part because of the recent controversy surrounding uses of deadly force, the City has stepped up its public outreach town hall meetings and providing a way for its community to learn more and engage about police affairs through the City website.  In addition to what has already been done, there are a variety of new approaches to this that agencies around the country are trying, and that might prove useful in Vallejo.  For example, there are "text messaging-based" approaches that facilitate quick feedback from people who have just encountered the police in one context or another.  A related initiative could take advantage of technology to automatically generate a short survey for individuals whose contact

information is in a police report – as reporting parties, witnesses, victims, and even arrestees.

In addition to endeavoring to seek feedback from a broader array of individuals in the Vallejo community, VPD should also target input from its criminal justice and social services partners. VPD officers regularly interact with prosecutors, jail supervisors, judges, public defenders, juvenile justice administrators, probation officers, and social workers. Because of those interactions, individuals in these other agencies have significant insight into the performance of individual officers and VPD as an organization. We urge VPD to actively and regularly seek such feedback from these professionals.

> RECOMMENDATION 42: VPD should devise additional ways to solicit and encourage feedback from all of its communities regarding the performance of the Department.

> RECOMMENDATION 43: VPD should devise a feedback loop for its criminal justice partners (including the District Attorney, Sheriff, Judges, Public Defenders, Juvenile Justice Administrators, Probation Officers, and Social Workers) regarding the performance of its officers and the Department as a whole.

# Independent Oversight

One pillar of President Obama's Task Force on 21st Century Policing addressed the importance of oversight and community collaboration and recommended that law enforcement agencies establish civilian oversight mechanisms: "Some form of civilian oversight of law enforcement is important in order to strengthen trust with the community. Every community should define the appropriate form and structure of civilian oversight to meet the needs of that community." (Recommendation 2.8)

This call for formal oversight reflects a growing sentiment in the United States, where the outcomes of individual high-profile incidents in recent years have heightened a sense of division between police and segments of the public. Expanding public involvement – and increasing the extent to which police officers are accountable to entities outside their own agency – is an important way of bridging gaps of distrust, alienation, and misunderstanding.

Jurisdictions throughout the country have addressed their distinctive needs by creating models of oversight that range in name, size, budget, scope of authority, and specific roles. But these different forms of oversight share the same basic goal – finding ways to give the public a greater voice in how the police operate within their communities.

One mechanism that we have seen used successfully is the creation of a Chief's Advisory Board that meets regularly and provides informal advice to Department leadership. Comprised of a diverse cross-section of the community – including those who historically have been critical of law enforcement as well as traditional supporters – the board can be an important source of information and an effective sounding board on subjects such as public safety strategies, critical policy development, and hiring and promotions.

Beyond this type of community-based board, many jurisdictions also have a layer of outside scrutiny and input in various forms of professional oversight. With knowledge of progressive police practices and experience with conducting qualitative audits of sensitive police responsibilities, an independent police monitor or auditor can advise on policy changes, recommend training initiatives, identify trends or issues of concern, work with the agency to create solutions, and report to the public in a substantive way. Effective monitors build collaborative relationships with both the police department and various communities – and serve as a bridge between the two – to enhance transparency, increase accountability, and improve public awareness and involvement.

As President Obama's Task Force recognized, every community should evaluate its own needs to define to form of oversight that will work best in the context of its particular challenges and concerns. We cannot say which model best suits Vallejo, but given the level of tension between the police and community – indeed, the reason we were engaged to prepare this report – we can say with confidence that the City and the Department will benefit from adopting some form of independent outside review. VPD should welcome this development. A police agency oriented toward giving a greater voice to its community on how best to perform its public safety responsibilities will increase the public's trust in its performance and operations.

> RECOMMENDATION 44: VPD should develop a way to obtain feedback and input from its community when contemplating major policy changes or public safety strategies.

RECOMMENDATION 45: VPD should work with City leadership to create a model of independent oversight specifically tailored to meet the needs of Vallejo.

# Conclusion

As the Covid-19 crisis continues with no definitive end in sight, any effort at projecting into the near future – in any arena – becomes that much more complicated. The City of Vallejo, its residents, and its Police Department are grappling like everyone else with health concerns, new paradigms for interaction, and daunting financial setbacks. We submit this report in the midst of a very unusual time, and we acknowledge that the circumstances that shaped our various recommendations are shifting with unusual levels of speed and uncertainty. Some key components of our analysis – including the City's commitment of significant resources to VPD staffing and infrastructure – are potentially affected by that uncertainty.

In another way, though, the disruption created by the pandemic creates opportunities for positive innovation amidst the hardships. Individual people, organizations, institutions, and whole communities are being called upon to adapt – to evaluate their priorities and find new ways of achieving them. There is nothing welcome about the *need* to do this, or the suffering and loss that are the persistent backdrop for this time period. Nonetheless, and however much timelines need to be re-imagined or priorities reconsidered, the current challenges need not completely derail whatever constructive initiatives remain viable.

As we have tried to convey throughout this report, our belief is that VPD now has the leadership, the potential, the support, and even the desire to change longstanding dynamics for the better. Many of these are dependent on money for hiring and other neglected supports; we hope that the concrete plans to accomplish this can still be realized in spite of the pandemic's tremendous strain on City coffers. Others, though, are matters of culture and enforcement philosophy that relate to resource allocation without depending on it completely. And some are matters of internal policy that could happen as quickly as VPD has the institutional will to do so.

In speaking with current Department leadership and reviewing their policies and protocols, we saw a real potential for implementing meaningful reform, and for changing the fundamental relationship with the Vallejo community into something more trusting and collaborative in both directions. A very thoughtful member of the command staff spoke to us about the important distinction between police actions that are technically lawful and/or "in policy," and those that build

equity in the community. The concepts are not mutually exclusive, of course, but they are also not inherently in sync. We offer the above recommendations in a spirit of helping to close gaps to the extent possible. We extend our thanks for the full cooperation we received. And we send good wishes to VPD and the Vallejo community as both move forward in this difficult time.

# Recommendations

1   The Department should persevere with the City in its efforts to develop the proposed new headquarters facility, and look for ways to enhance community access and engagement.

2   In considering requests for staffing, the City should pay particular attention to requests designed to add civilians to assist with making police services more accessible such as the lobby and more timely calls for service.

3   The City should ensure that VPD has sufficient resources to properly maintain and audit its retained stores of evidence and property.

4   The Department should explore ways to expose officers to a range of possible work experiences by changing to a rotational system for designated special assignments.

5   The Department should commit to strengthening the range and responsiveness of its workforce by continuing to focus on racial, gender, and ethnic diversity in its recruiting efforts.

6   The Department should find ways to provide promotional opportunities and mentoring for female officers and officers of color.

7   As additional resources become available, VPD should develop and deploy crime prevention strategies involving problem solving and community engagement.

8   As additional resources become available, VPD should consider assigning officers to neighborhoods and beats and empower them to devise crime prevention strategies to keep their assigned neighborhoods safe.

9    The Department should use the adoption of a new, stricter activation requirement as the foundation for a new approach to its body-worn camera technology.

10    The Department should implement a graduated program of accountability to ensure that officers are complying with the expectations of the new policy.

11    The Department's management should consider body-worn camera recordings as, among other things, a forum for identifying performance and training issues and addressing them constructively and progressively – and not through automatic formal discipline for minor issues.

12    The Department should ensure that officers involved in a shooting are interviewed – either criminally or administratively – prior to the end of the shift in which the shooting occurred.

13    The Department should obtain a pure statement in an interview setting from officers involved in a shooting prior to their initial viewing of any recorded evidence from the incident and work to change any County-wide protocols that are in conflict with best practices.

14    The Department should change its protocol for reviewing critical incidents by empowering Professional Standards Division, working in conjunction with the Critical Incident Review Board, to conduct a holistic review and evaluation of all critical incidents to encompass the performance of involved personnel (including non-force users) as well as issues of policy, training, tactics, supervision, equipment, and/or incident aftermath.

15    The Department should guide the CIRB's analysis by requiring specific findings in each of the following categories:  pre-event planning and decision-making, tactics, and post-event response (including timely transition to rescue mode).

16    The Department should provide the CIRB with greater flexibility to tailor its outcome recommendations across a range of possible categories, rather than limiting it to a blanket finding about the incident as a whole.

17    The Department should consider ways to conduct its critical incident review in time-appropriate phases, beginning with an initial debrief and issue-spotting and continuing to a more thorough examination of administrative issues including officer performance.

18    The Department should set specific goals in writing for the timely completion of different phases of the critical incident review process, to make sure that the appropriate responses and remediations are occurring in as meaningful and productive a way as possible.

19    The Department should develop a separate administrative investigative package, including separate administrative interviews of involved personnel , to help the CIRB to identify and resolve issues related not only to the use of force but also collateral matters that merit formal attention.

20    The CIRB should play a direct role in the identification and resolution of individual policy violations or other performance issues associated with a critical incident.

21    VPD and the City should clarify the role of legal counsel in the CIRB process, so that input on questions of law and liability does not come at the expense of rigorous analysis and necessary remedial measures.

22    The Department should develop a protocol for standardizing a specific and documented supervisorial evaluation of every use of force.

23    The Department should ensure that the assistance of the Force Options team with officer report-writing does not become a tool for retroactive justification of questionable force deployments or a basis for truncating appropriate scrutiny.

24    The Department's analysis of each use of force should include affirmative managerial determinations as to whether the force was in policy, and whether training, tactical, or other considerations were identified.

25  Each use of force should be reviewed and evaluated to determine whether de-escalation techniques were considered or implemented prior to the application of force, and/or why they were not.

26  The Department should incorporate its current policies for supervisory review, including detailed evidence gathering by supervisors where applicable, into this process.

27  The Department should create formal mechanisms for documenting and tracking any action items that emerge from this process, in order to ensure appropriate follow-through.

28  The Department should build on its intermittently successful efforts to make complaint notification letters as detailed and useful to recipients as possible.

29  The Department should compile and periodically publicly produce aggregate data about the number of complaints received, the number of internal investigations conducted, and the number and type of uses of force so as to offer greater insight into the nature and effectiveness of its accountability measures.

30  The Department should develop written internal deadlines to complete an investigation and review process and require supervisory approval for deviation from those deadlines.

31  The Department should evaluate its individual misconduct investigations to ensure that all relevant issues are identified and pursued to a reasonable extent, including a written standard requiring formal interviews with witness officers.

32  The Department should evaluate its levels of discipline for sustained policy violations to ensure that the proper amount of remediation is occurring.

33  The Department should continue to use the civil claims process as a vehicle for assessment of its own performance, and should refrain from allowing liability concerns impede the rigor and thoroughness of this process.

68

34    The Department should develop a "family liaison" protocol in
      which, after a shooting or other critical incident, a designated
      individual will focus on providing family members with
      information and updates about medical status and subsequent
      procedural matters.

35    The Chief should plan to offer to meet with family members in
      the aftermath of an officer-involved shooting as a way of
      acknowledging loss and sending a broader message of empathy
      and accountability to the community.

36    The Department should review its information-sharing protocols
      after officer-involved shootings to ensure that its approach is
      giving proper weight to accuracy, consistency, and objectivity.

37    The Department should schedule community meetings within
      days of an officer-involved shooting as part of its standard
      incident response.

38    The Department should strive to exceed the newly established
      requirements for transparency with regard to officer-involved
      shootings, by releasing video evidence as soon as it is practicable
      and by offering detailed explanations to the public about the
      scope, nature, and outcomes of its internal reviews.

39    The Department and other City officials should consider new and
      less contentious ways of dealing with its critics, particularly in
      the context of pending litigation, and should work to ensure that
      its litigation posture does not interfere with the rigor and
      objectivity of its administrative reviews.

40    The Department should enhance the clarity and accessibility of
      its website in terms of required information, and should consider
      ways to further utilize the site as a vehicle for informing and
      engaging the public.

41    VPD should engage community members at the interview stage
      of its promotional process.

42   VPD should devise additional ways to solicit and encourage
     feedback from all of its communities regarding the performance
     of the Department.

43   VPD should devise a feedback loop for its criminal justice
     partners (including the District Attorney, Sheriff, Judges, Public
     Defenders, Juvenile Justice Administrators, Probation Officers,
     and Social Workers) regarding the performance of its officers and
     the Department as a whole.

44   VPD should develop a way to obtain feedback and input from its
     community when contemplating major policy changes or public
     safety strategies.

45   VPD should work with City leadership to create a model of
     independent oversight specifically tailored to meet the needs of
     Vallejo.

70

Exhibit B

| | | | | | |
|---|---|---|---|---|---|
|  | **Recommendation Topic: Staffing & Infrastructure** |

| # | Initial Recommendation | | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| 1 | The Department should persevere with the City in its efforts to develop the proposed new headquarters facility and look for ways to enhance community access and engagement.<br><br>**NOTE:** CalDOJ will not evaluate nor track progress on the Headquarters facility. | 1 | Identify barriers to community access to VPD facilities to include review of hours, location, language, and other factors that limit access. | 1. Evidence of review of community concerns regarding access to VPD buildings and services<br>2. Evidence of consideration of survey and/or other planning processes to consider residents<br>3. Summary of the barriers to residents | |
| | | 2 | Consult with CAB and other stakeholders to identify barriers and other issues faced by the community issues for access to VPD facilities. Determine whether remote locations support the engagement goals and identified barriers to access. | 1. Evidence of consultation with CAB and others regarding barriers<br>2. Discussion regarding the value to the community regarding remote locations versus one location<br>3. Review of the barriers identified here and above to determine best options for enhancing access to VPD | |
| | | 3 | Evaluate and implement options to address the barriers and issues raised including review of digital access options. | 1. Identified options for the barriers identified<br>2. Evidence of review of options<br>3. Evidence of review of digital access options<br>4. Decisions based on barriers identified<br>5. Consistent with CM1.3, share decisions with residents on decisions regarding improvements<br>6. Implement improvements based on evaluation of options | |
| | | 4 | Develop a customer service plan to better facilitate community access to VPD service. | 1. Customer service plan built to address barriers<br>2. Implementation strategy to support the plan | |
| | | 5 | Work with the City to identify options to improve facilities and to identify potential remote service locations. | 1. Consistent with other CMs, engage City services to assess whether remote location needs exist<br>2. Evaluate location, operating hours and access to facilities to address barriers identified<br>3. Determine improvements needed to facilities to address barriers identified in these compliance measures | |
| | | 6 | Develop and implement a communications plan to help inform the public about where and how to access VPD services. | 1. Consistent with CM#4, develop a communications plan to inform the public about how and where to access the whole of VPD services<br>2. Ensure plan is focused on multiple communication platforms to include web, social media, public meetings and public posting<br>3. Evidence of communication plan being implemented | |
| 2 | In considering requests for staffing, the City should pay particular attention to requests designed to add civilians to assist with making police services more accessible such as the lobby services and more timely calls for service.<br><br>**NOTE:** CalDOJ will not evaluate how the City addresses staffing requests, but rather the placement and utilization of staff. | 1 | Analyze the use and peaks for public reporting and service requirements at the lobby service area. | 1. Develop and analyze data regarding public engagement with lobby reporting<br>2. Use data including reports generated and other contacts at the public lobby<br>3. Assess whether the barrier analysis identified from Recommendation 1 identified any challenges for lobby access and reporting<br>4. Identify and report the customer flow for the lobby by day of week and time | |
| | | 2 | Align staffing with the demand. | 1. Develop a staffing model that ensures staffing aligns with peak demands<br>2. Identify needs to support the staffing demands | |
| | | 3 | Identify potential remote service locations. | 1. Consistent with 1.2 and 1.5, determine whether remote service locations will alleviate peak demand | |
| | | 4 | Evaluate staffing needs, including times of service, for remote community service locations. | 1. Identify whether staffing at remote locations will reduce demand at the lobby<br>2. Assess whether staffing at remote locations, if implemented, is warranted at specific times<br>3. Determine what hours and service would address the public need | |
| | | 5 | Assess the use of professional (civilian) staff to support public access and reporting functions. | 1. Evaluate the value of using professional staff to staff lobby and remote services<br>2. Consider use of cadets and other such personnel to support lobby work demands<br>3. Evidence of a focused review on whether such personnel are viable and helpful to include time, fiscal and legal analysis | |
| | | 6 | Assess the use of light duty staff to intake telephone reports and other alternative reporting, including use of an appointment systems and online reporting for non-emergency reporting. | 1. Expand the use of limited duty staff to support law enforcement specific activities of the lobby staff<br>2. Evidence of evaluation of an appointment system for the public to access to set-up times for engagement rather than waiting in the lobby<br>3. Evidence of evaluation of use of an online reporting system for non-emergency reporting to include fiscal and technology analysis | |
| | | 7 | Use professional staff to enter and upload reports. | 1. Use professional staff to enter and upload reports<br>2. Re-assignment/tasking of sworn staff currently performing this work<br>3. Evidence of re-assignment | |
| 3 | The City should ensure that VPD has sufficient resources to properly maintain and audit its retained stores of evidence and property.<br><br>**NOTE:** Management of the system is addressed in these compliance measures as well as the City's role in providing resource support. | 1 | VPD should establish policies and protocols for control, access and oversight of evidence and property, including an appropriate destruction schedule. | 1. Evidence of review of staffing standards and practices for evidence and property storage for similarly sized departments, including any best practice<br>2. Policy tasks specific role with control of the property and evidence storage<br>3. Policy limits access to the facility and require logged entry and exit<br>4. Policy establishes a storage process for each type of property/evidence -e.g., bio, physical, firearms<br>5. Policy establishes a retention schedule for each type of property/evidence<br>6. Policy requires evidence to follow established legal | |

| | | | | Proofs | |
|---|---|---|---|---|---|
| | | | | standards for chain of custody with documentati... each point of transfer | |
| | | | 7. | Policy requires signature of transfer and receipt for each transfer point for property | |
| | | | 8. | Policy requires prior to removing any evidence or property, a supervisor's written approval or a court order is presented and logged with the evidence file | |
| | | | 9. | Consideration be given to placing currency not specifically needed as evidence in an identified bank account | |
| | | | 10. | Policy tasks specific person/entity with responsibility for destruction and notification of property | |
| | 2 | VPD should conduct annual audit of evidence and property. | | Annual Review of Policy Requirements including: | |
| | | | 1. | Inventorying officer to identify where recovered and what the property/evidence is needed | |
| | | | 2. | Ensure the property intake identifies – in a database or other trackable system- when the normal destruction date is for the property received | |
| | | | 3. | | |
| | | | 4. | Notifications to inventorying officers when property is within 60 days of destruction with requirement to return status of property/evidence | |
| | | | 5. | Adherence to the destruction process for firearms, narcotics, funds, evidence and all other property | |
| | | | 6. | Task PSB with annual audit of property and evidence storage | |
| | 3 | VPD should affix responsibility for security of facility. | 1. | Policy tasks individual with security of facility | |
| | | | 2. | Policy defines processes to support security | |
| | 4 | Consideration should be given to creating an electronic tracking system for evidence intake, storage, production, and destruction. | 1. | Evidence of review of automated tracking systems to support timely and defined evidence and property management | |
| | | | 2. | Evaluation of applicability, cost and ease of implementation for identified systems | |
| | 5 | The City and VPD should establish an appropriate budget to ensure the proper maintenance and security for evidence and recovered property. | 1. | Evidence of analysis of staffing needs for property/evidence storage, including when and where demand peaks | |
| | | | 2. | Assessment of the budget needed to maintain a secure, efficient property system | |
| | | | 3. | Budget projects for annual and a five year plan that includes build out for security, staffing, retention, management and destruction of property and electronic management of said system | |
| | | | 4. | Evidence of budget discussions specific to evidence storage with the City in developing a budget plan for implementation | |

| | | Recommendation Topic: Recruitment & Hiring | | | |
|---|---|---|---|---|---|
| # | Initial Recommendation | | Compliance Measures | Proofs | |
| 4 | The Department should explore ways to expose officers to a range of possible work experiences by changing to a rotational system for designated special assignments. | 1 | Identify and define the specialty units within the VPD and task forces that advance career paths and develop officer skills. | 1. Define specialty assignment – including internal, external and training assignments<br>2. Conduct a history assessment of existing Detective, Sgt., Lt. and Capt. to assess what units they have worked in and when during their career at VPD<br>3. Use the history assessment to identify commonalities in assignments in prior service areas<br>4. Identify the most common prior specialty assignments for each rank | |
| | | 2 | Establish term limits for any assignment to a specialty unit that address both retention and rotation. | 1. Policy defines term limits for all specialty assignments<br>2. Provide staggered rotation into and out of specialty assignments | |
| | | 3 | Develop a transparent process for assignment to specialty units that fosters skills identification, career development and equity for VPD staff. | 1. Develop an application process for specialty assignment<br>2. Provide open application for all eligible personnel with specific requirements that align with the knowledge, skills and abilities for each assignment<br>3. Provide consistent process for all personnel assigned to any specialty assignment consistent with Recommendation #6<br>4. Publicly report the demographics of individuals in specialty assignment<br>5. Ensure internal postings of the transfer in and out of specialty assignments | |
| 5 | The Department should commit to strengthening the range and responsiveness of its workforce by continuing to focus on racial, gender, and ethnic diversity in its recruiting efforts. | 1 | Provide and analyze the demographic makeup of the department. | 1. Develop and report on the demographic makeup at the department to also include breakdown by rank, time on job and unit of assignment<br>2. Conduct annual analysis of trends to determine whether additional focus is needed on ensuring diversity<br>3. Identify hiring goals based upon analysis | |
| | | 2 | Establish workforce goals that provide for inclusion and equity for hiring and for advancement in the VPD. | 1. Develop a workforce strategy with a goal of inclusion<br>2. Establish hiring goals that reflect diversity support in recruiting<br>3. Assess promotional policies to support the assignment goals of Recommendation 4 to ensure appropriate career development for diverse VPD officers | |
| | | 3 | Develop a recruitment strategy based upon the inclusion goals for the VPD. | 1. Develop a recruitment strategy that has focus on diversity and inclusion<br>2. Review hiring practices to assess the progression of diverse candidates from application through hiring | |
| | | 4 | Staff the recruiting process to support the recruiting goals. | 1. Assess the need for full-time and part-time recruiters<br>2. Ensure diversity in the recruiting team<br>3. Task recruiters with specific outreach based upon the recruitment strategy<br>4. Evaluate success of recruiting efforts on an annual basis | |

| | Initial Recommendation | | Compliance Measures | | Proofs | |
|---|---|---|---|---|---|---|
| | | 5 | Co... developing community ambassadors to work with the department to encourage recruitment from identified communities. | 1. | Evidence of the exploration of best practices in recruitment, including community-based ambassadors to support recruiting practices | |
| | | | | 2. | Evidence of review of implementation of community partnerships to sponsor and support candidates for recruitment | |
| | | | | 3. | Leverage community relationships to engage diverse communities on the benefits of work | |
| | | | | 4. | Decisions specific to the above reviews that reflect why or why not they went forward | |
| | | | | 5. | Evidence of the continuing evaluation of the success of such programs with ongoing improvement focus | |
| | | 6 | Consider use of the Explorers Program and a cadet program to facilitate identification of and entry for diverse candidates. | 1. | Evidence of review of the ability to incentivize the Explorers or cadet program for entry into VPD | |
| | | | | 2. | Evidence of best practice review for these programs | |
| | | | | 3. | Strategy to guide and build a hiring pipeline from these programs | |
| | | | | 4. | Evidence of specific tasking and approach | |
| | | | | 5. | Ongoing evaluation and measurement of success and barriers for such a program | |
| | | 7 | Establish a review process to evaluate and improve upon the compliance measures 1-6 in this recommendation. | 1. | Task a specific entity with reviewing the assessments for each of the above compliance measures | |
| | | | | 2. | For each of the compliance measures above, develop strategies to further the success or to address the downtrends in recruiting and advancement strategies | |
| | | | | 3. | Provide tasking on the strategies for improvement | |
| | | | | 4. | Report annually, not only on the progression of strategy, but also on the tasking for improvements | |
| 6 | The Department should find ways to provide promotional opportunities and mentoring for female officers and officers of color. | 1 | Develop a career framework strategy that focuses on employee development, equity, and inclusion for officers within VPD. | 1. | Consistent with Recommendation 4, identify the career paths for leaders in the VPD | |
| | | | | 2. | Provide equal opportunity for development of personnel with a goal of ensuring equity and diversity | |
| | | | | 3. | Identify barriers for diverse officers in advancing in VPD | |
| | | | | 4. | Assess possible improvements to facilitate continued diversity in the ranks of VPD | |
| | | | | 5. | Conduct ongoing evaluation of efforts to grow diversity and address barriers as identified | |
| | | 2 | Rotational placements (Rec#4) should be focused on ensuring diverse representation for those selected to participate in specialty assignments. | 1. | Ensure placement in specialty assignments is an open posting with equal opportunity | |
| | | | | 2. | Provide reviewers that are diverse with diverse backgrounds in determining assignments | |
| | | | | 3. | Monitor assignments to ensure ongoing equal opportunity in assignments | |
| | | | | 4. | Assess annually that transparency and equity are being achieved and take corrective action if not | |
| | | 3 | Consider using assignments to more challenging roles, such as Professional Standards, for pathways for promotion or placement in certain specialized units. | 1. | As an outcome of Recommendation #4, determine what assignments are required for a strong leader in VPD | |
| | | | | 2. | Establish a career path for future leaders that reflect this | |
| | | | | 3. | Provide access to these opportunities | |
| | | | | 4. | Ensure successful completion of assignments in these roles through performance reviews and term rotations | |
| | | 4 | Develop a mentoring program for future leaders with a focus on inclusion and equity that engages participation by leadership within VPD. | 1. | Review best practices on mentoring for future leaders | |
| | | | | 2. | Establish a future leaders mentoring program | |
| | | | | 3. | Provide specific tasking to identified roles in supporting a mentoring program | |
| | | | | 4. | Ensure diversity in the participation of any mentoring program | |
| | | 5 | Establish a review process to evaluate and improve upon the recommendation and to further refine the compliance measures. | 1. | Evidence of review of program success and challenges | |
| | | | | 2. | Evidence of the consideration of the use of employee survey to measure the perceived strengths and challenges of the program | |
| | | | | 3. | Identified corrective action to ensure continued growth and success of a mentoring program | |

| Recommendation Topic: Innovative Policing Models | | | | | | |
|---|---|---|---|---|---|---|
| | Initial Recommendation | | Compliance Measures | | Proofs | |
| 7 | As additional resources become available, VPD should develop and deploy crime prevention strategies involving problem solving and community engagement. | 1 | Develop a crime strategy that is data led and driven in partnership with community input. | 1. | Published crime strategy that seeks to address current crime trends based upon data | |
| | | | | 2. | Evidence of a crime data analysis program that delineates crime by geographic areas aligned with communities in Vallejo | |
| | | | | 3. | Evidence of ongoing analysis of the trends | |
| | | | | 4. | Public sharing of data on a quarterly basis with assessment and analysis of trends including measurement against the crime strategy | |
| | | | | 5. | Evidence of community input – through meetings, web postings and social media | |
| | | 2 | Task every level of the organization with responsibility to supporting the strategy and specific responsibility to address crime within each unit of the VPD. | 1. | Evidence that the crime strategy tasks every unit within the organization in achieving its goals | |
| | | | | 2. | Specific functions within the units are aligned with the crime strategy for visibility and awareness of shared role and goals | |
| | | 3 | Share the strategy internally and externally, identifying the goals, tasking, and metrics for success. | 1. | Strategy identifies the goals in tasking each unit | |
| | | | | 2. | Success measurements for each unit tasked are defined and measurable | |
| | | | | 3. | Ongoing assessment of performance in support of the strategy | |
| | | 4 | Track progress against priorities and report quarterly to the department and community. | 1. | Specific unit/person is responsible for assessing and reporting on the organizational progress on the crime strategy | |
| | | | | 2. | Quarterly report on updates to strategy and status as informed by data analysis | |

| | Initial Recommendation | | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| | | | | 3. Annual report on crime strategy including goals, ...ess, modification and community input | |
| | | 5 | As additional resources become available, incorporate them into the existing strategies and report upon their impact. | 1. Evidence of plan to expand strategy goals as resources increase<br>2. Plan includes and adapts for professional staff, community access and community engagement<br>3. Written plan for role expansions and/or responsibilities in addressing crime as resources increase | |
| B | As additional resources become available, VPD should consider assigning officers to neighborhoods and beats and empower them to devise crime prevention strategies to keep their assigned neighborhoods safe. | 1 | Ensure the strategy arising out of recommendation 7 includes a community driven focus, one that provides voice and decision in driving policing strategy. | 1. Crime strategy incorporates community voice as derived from the engagement in development<br>2. Evidence of the analysis of data and its geographical overlay with the identified communities of Vallejo<br>3. Evidence of community engagement on goals for safety and police response | |
| | | 2 | Evaluate barriers to implementation of neighborhood strategies. | 1. Review of best practices in geographical policing and whether they can be implemented in Vallejo<br>2. Identification of barriers to implementing community based policing<br>3. Review of technology systems for any potential barriers in community based policing<br>4. Review of deployment and investigation strategies for any potential barriers to community based policing | |
| | | 3 | Identify strategies to address the barriers. | 1. Evidence of a holistic assessment of barriers<br>2. Evidence of review of all barriers with solutions developed<br>3. If staffing is an issue, evidence of strategies that could be implemented near-term to address<br>4. Ongoing review of barriers and implementation as part of the annual report on Crime Strategy | |
| | | 4 | Implement the crime strategy across the VPD communities (R#7) and ensure community focus and engagement. | 1. Evidence of implementation of the Crime Strategy and the compliance measures in this Recommendation<br>2. Evidence of direct community engagement in planning and implementation | |
| | | 5 | Develop long-term planning for strategies not currently achievable due to staffing, budget, or other issues. | 1. Evidence of implementation in an "as-is" state – based upon existing resources<br>2. Evidence of long-term strategy, based upon growth in personnel<br>3. Evidence of ongoing review of goals and barriers for implementation | |

| | Recommendation Topic: Body Worn Cameras | | | | |
|---|---|---|---|---|---|
| | Initial Recommendation | | Compliance Measures | Proofs | |
| 9 | The Department should use the adoption of a new, stricter activation requirement as the foundation for a new approach to its body-worn camera technology. | | VPD needs to fully define its BWC policy to: | | |
| | | 1 | Establish clear requirements for activation predicated upon best practices, the use of BWC as a routine standard, and emerging technology (e.g., camera activated when door opened, or lights/siren turned on). | 1, Policy that directs when activation is to occur and how<br>2. Evidence of review of best practices<br>3. Evidence of review and consideration of technology for automated activation<br>• Evidence to include meetings, agendas, minutes, and actions taken to consideration of the best practice inclusion for the policy. | |
| | | 2 | Establish training for equipment use and a training record. | 1. Protocol for recording training requirements and how officers are identified as requiring training.<br>2. Copy of curriculum and training.<br>3. Record of training being delivered | |
| | | 3 | Provide a routine schedule for equipment inspection with mandated supervisory oversight. | 1. Establish schedule in policy that requires equipment inspection with affixed responsibility and time requirements.<br>2. Evidence of supervisory review of inspection (through written documentation) | |
| | | 4 | Establish that failure to activate is subject to discipline.<br>A) Establishes a framework focused on training and education for initial infractions.<br>B) Provides for escalating discipline and more serious discipline outcomes for willing failure to activate BWC or destruction/damage of BWC equipment.<br>C) Establishes clear language regarding failure to activate and that it will form the basis for discipline up to and including termination | 1. Policy identifies that failure to activate is basis for discipline up to and including termination.<br>2. Training curriculum designed to remediate minor infractions.<br>3. Policy that directs increasing discipline for failure to activate, willful failure or destruction.<br>4. Documentation of actions taken – e.g., training, or disciplinary outcomes. | |
| | | 5 | Audit system to validate use and review for training and leadership. | 1. Policy on mandated review and randomized review with assigned duty and responsibility.<br>2. Evidence that such review occurs – reports, etc. | |

| | | | | |
|---|---|---|---|---|
| | | | 3. Provide clear directives on what incidents must be reviewed and those that would be subject to a different review/audit process (e.g., serious bodily injury, OIS, taser).<br>B) Creates an audit plan to support compliance with policy and procedures independent of direct supervisory engagement. | 3. Audit plan to support audit/spot check.<br>4. Audit plan to ensure that supervisory review is occurring.<br>5. Implementation of audit plan or plan to implement. | |
| | | 6 | Develop strategy for IT review and equipment renewal planning to support the policy. | 1. Evidence of long-term planning for IT support of BWC.<br>2. Discussion with budget owner for long-term planning for IT replacement for BWC.<br>3. Documented strategy for replacement; audit functions; review functions. | |
| 10 | The Department should implement a graduated program of accountability to ensure that officers are complying with the expectations of the new policy. | Concurrent with Recommendation (9) and Compliance Measures (4) and (5): | | | |
| | | 1 | Establish a strategy that guides officer's use of BWCs, and is based upon policy, training, and accountability. | 1. Documented strategy that includes all components – policy, training, accountability, to implementation of BWC.<br>2. Strategy for training and accountability.<br>3. Policy that reflects the strategy.<br>4. Publication of the strategy to the VPD communities (ideally with input received). | |
| | | 2 | Provides strategy for ongoing IT support and equipment renewal planning to support the policy. | 4. See Recommendation 9 Compliance Measure 6 for reference.<br>5. Documented strategy for long-term maintenance and support for improved BWC technology. | |
| | | 3 | Strategy includes a plan to use BWC footage as a cross-compliance measure for other mandatory policies (i.e., LA OIG found that reviewing BWC footage showed that RIPA data collection, incident reports, and other paperwork were not being completed accurately by officers). | 3. See Recommendation 9 Compliance Measure 6 for reference.<br>4. Documented review and analysis of cross-compliance areas/issues that BWC would support for VPD (notes, meetings, agendas, research).<br>5. Inclusion of cross-compliance goals and focus on the strategy.<br>6. Policy that supports strategy to include specific responsibility for action in support of the cross-compliance goals.<br>7. Documentation that the strategy implementation is occurring – logs, investigations, data reporting etc. | |
| | | 4 | Establish affixed supervisory responsibility and time frames for review in support of the BWC policy. | 5. Specific policy requirements for supervisory review of BWC – routine, audit, and cross-compliance.<br>6. Training on accessing and using the BWC equipment review.<br>7. Support that review is occurring (logs, reports, etc.). | |
| 11 | The Department's management should consider body-worn camera recordings as, among other things, a forum for identifying performance and training issues and addressing them constructively and progressively - and not through automatic formal discipline for minor issues. | 1 | Establish that the BWC audit and review will support identification of performance issues and inform both individual and department-wide training for use of force and best practices for engagement. | 1. Consistent with Strategy developed in Recommendation 10, policy that specifically identifies that performance review will be part of the BWC program.<br>2. Specific protocols for the formal and informal audit of BWC for performance and training issues. | |
| | | 2 | Provide for use of recurring issues in activation or use to inform training, including remedial training for failure to activate and strategies to ensure camera focus is maintained. | 6. Provide protocol and process that translate audit outcomes into training materials.<br>7. Task the VPD training unit with developing curriculum and training materials for use at roll call.<br>8. Task the VPD training unit for developing training materials for remedial training (See Recc #9 CM#2 & CM#4).<br>9. Evidence of ongoing review and alignment of strategy and practice. | |
| | | 3 | Provide for identification of solutions related to technical issues with BWC use to be incorporated into training. | 8. Evidence of review of activation and use issues – failure to use, equipment failure and other.<br>9. Documentation of discussions, meetings and actions taken to develop strategies to address issues identified.<br>10. Development of training curriculum and materials in response.<br>11. Record of delivery of training.<br>12. Evidence of protocol to include ongoing review and improvement. | |
| | | 4 | Highlight good practices, if possible, identified through internal review and national best practice, to incorporate into training on use of force and de-escalation. | 8. Protocol and practices established in CM#1 also to identify good practices.<br>9. Affixed responsibility for identifying good practice examples.<br>10. Use of good practice examples in training – if not within VPD then from national sources.<br>11. Evidence of training curriculum that includes with good practice examples. | |

| | | | Recommendation Topic: OIS and Critical Incident Review | | |
|---|---|---|---|---|---|
| # | Initial Recommendation | | Compliance Measures | Proofs | |
| 12 | The Department should ensure that officers involved in a shooting are interviewed - either criminally or administratively - prior to the end of the shift in which the shooting occurred. | 1 | Develop a policy and procedure(s) regarding criminal investigation of OIS incidents. | 1. Review of best practices for criminal investigation of OIS incidents.<br>2. Defined protocols for OIS investigations for fatal incidents and non-fatal.<br>3. Policy and processes for the criminal investigation process for an OIS that meet best practice and standards for law enforcement.<br>4. Process for the timing and documentation of both the criminal and administrative interviews following an OIS.<br>• Process that addresses the timely sharing of information with VPD when criminal interviews are conducted by Solano County.<br>• Policy requirement for the interviews to occur prior to the end of shift.<br>• Defined protocols and approvals for any extension in time of either interview.<br>5. Evidence that interviews are occurring in accordance with policy. | |
| | | 2 | Develop a policy and procedure(s) regarding administrative investigation of OIS incidents. | 1. Review of best practices for administrative investigation of OIS incidents.<br>2. Clearly written protocols for administrative OIS investigations.<br>3. Policy and processes for the administrative investigation process for an OIS that meet best practice and standards for law enforcement.<br>4. Process for the timing and documentation of both the administrative interviews following an OIS.<br>• Process that addresses the timely sharing of information with VPD when criminal interviews are conducted by Solano County.<br>• Policy requirement for the initial interview to occur prior to the end of shift and no later than 24 hours.<br>• Defined protocols and approvals for any extension in time of either interview.<br>5. Evidence that interviews are occurring in accordance with policy. | |
| | | 3 | Criminal Investigative policy requires officers be interviewed prior to end of shift (Chief will decide whether any exception listed applies to same day interview but needs to be supported with a citation or document). | 1. Published policy that specifies an officer involved in an OIS is to be interviewed before end of shift and by whom.<br>2. Specific delineation of any variances.<br>3. Evidence that such interviews occur.<br>4. Evidence of ongoing review and audit to ensure interviews occur before end of shift.<br>5. Evidence of remedial action should they not. | |
| | | 4 | Administrative policy requires officers be interviewed prior to end of shift. | 1. Published policy that specifies an officer involved in an OIS is to be interviewed under administrative rights before end of shift and by whom.<br>2. Policy requirement for the initial interview to occur prior to the end of shift and no later than 24 hours.<br>3. Policy exceptions defined with command approval required.<br>4. Evidence that such interviews occur.<br>5. Evidence of ongoing review and audit to ensure interviews occur before end of shift.<br>6. Evidence of remedial action should they not. | |
| | | 5 | Establish review or audit process to determine if policy and procedure(s) followed (VPD to document interim auditing plan and corrective actions from any deficiencies uncovered as well as the permanent auditing plan). | 1. Audit plan to ensure adherence to the provisions for OIS investigations and interviews.<br>2. Specific tasking for ongoing review and audit to ensure interviews occur before end of shift.<br>3. Specified actions in response to failure to interview, including command review.<br>4. Evidence of the review. | |
| | | 6 | Evidence of corrective or remedial action if deficiencies are found (VPD to document interim auditing plan and corrective actions from any deficiencies uncovered as well as the permanent auditing plan). | 1. Supervisory training on CM#3.<br>2. Ongoing review and audit to ensure interviews occur before end of shift.<br>3. Evidence of the review.<br>4. Evidence of remedial action should they not. | |
| 13 | The Department should obtain a pure statement in an interview setting from officers involved in a shooting prior to their initial viewing of any recorded evidence from the incident and work to change any County-wide protocols that conflict with best practices. | 1 | Develop policy requiring officer statement taken before officer's review of recorded evidence in OIS incidents. | 1. Policy requirement that the initial officer statement is taken prior to the video review by the involved officer.<br>2. Defined supervisory responsibility and ownership for ensuring this policy is complied with.<br>3. Tasking the assigned responding supervisor with ensuring the video is not viewed by the officer while on scene.<br>4. Audit for compliance.<br>5. Requirement for remedial action for policy non-compliance and evidence of same if non-compliance is identified. | |
| | | 2 | Ensure policy or protocol clearly defines what "pure statement" means. | 1. Define "pure statement."<br>2. Policy articulates the goal of "pure statement."<br>3. Policy guidance to ensure the officer(s) involved do not | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | look at the BWC or other video prior to giving a statement. | |
| | | 3 | Establish VPD long-term review or audit process of investigations to determine if policy and procedure(s) followed. | 1. Supervisory training on CM#1 & 2.<br>2. Ongoing review and audit to ensure interviews occur before video review occurs.<br>3. Evidence of the statement occurring before review.<br>4. Documentation and discussion with Solano when interviews occur after or during the video review. | |

| Recommendation Topic: Admin Review Process | | | | | |
|---|---|---|---|---|---|
| # | Initial Recommendation | | Compliance Measures | Documentation Included (but not limited to): | |
| 14 | The Department should change its protocol for reviewing critical incidents by empowering the Professional Standards Division, working in conjunction with the Critical Incident Review Board, to conduct a holistic review and evaluation of all critical incidents to encompass the performance of involved personnel (including non-force users) as well as issues of policy, training, tactics, supervision, equipment, and/or incident aftermath. | Draft new policy for CIRB to include: | | | |
| | | 1 | Responsibility for Professional Standards to manage the overall review. | 1. Evidence of community engagement on CIRB policy.<br>2. Publish CIRB policy.<br>3. Task PSB with responsibility for managing the CIRB process. | |
| | | 2 | Authority for the CIRB, through the Chief, to direct and task resources across VPD based upon CIRB findings and recommendations. | 1. CIRB policy empowers the PSB/CIRB to request follow on action items through the Chief.<br>2. Authority for CIRB to request additional investigation.<br>3. Process to track tasking and outcomes.<br>4. Process for escalating response for delinquent returns.<br>5. Evidence of remedial action/management of process. | |
| | | 3 | Defined role and responsibility for Training Division input and review. | 1. Formal role for Training Manager on CIRB to inform whether actions were supported by and consistent with training.<br>2. Process to incorporate CIRB findings and recommendations to inform training, through curriculum updates or roll call development.<br>3. Mechanism for TD reporting to CIRB of improvements resulting from CIRB review.<br>4. Evidence of training development and delivery of training based on CIRB recommendations. | |
| | | 4 | Holistic review of all factors including supervision, communications, equipment, training, policy, and adherence to protocols. | 1. Review template to cover all areas for review for every CIRB.<br>2. Evidence of consistent approach and review of all factors.<br>3. Documentation as to the review and findings via the template.<br>4. Evidence of continuous improvement to the template as issues are identified through CIRB meetings. | |
| | | 5 | Review of on-scene management and coordination. | 1. Policy requirements for scene management to include specific tasking and supervisor responsibilities.<br>2. CIRB reviews all relevant scene actions, including policy and protocol provisions for on-scene management.<br>3. Evidence of continuous improvement, through training, policy and protocol.<br>4. Evidence of improvements implemented. | |
| | | 6 | Established timeline guidance for initial assessment, schedule for review, reporting, tasking, and compliance with CIRB findings requirements. | 1. Standardized approach for notification and convening of CIRB.<br>2. CIRB protocols include:<br>  a. Set timelines for initiation post-event, tasking, reporting and compliance.<br>3. Tasked responsibility for management of the process.<br>4. Timeline supports community participation in the CIRB to ensure opportunity to engage. (e.g., sufficient notice, evening hours if required, etc.) | |
| | | 7 | Establish a process for tasking and return on recommendations. | 1. Consistent with CM#2, policy guidance on tasking for recommendations coming out of the CIRB.<br>2. Process for tasking – identification, assignment, action and return.<br>3. Command oversight of CIRB to drive participation and to ensure timely return.<br>4. Annual reporting on recommendations and outcomes of the CIRB tasking process. | |
| | | 8 | Defined role and responsibility for community input and review in CIRB decisions, particularly as they relate to the organization rather the individual officer. | 1. Specific role for the CIRB community member to include expectations, role and access to CIRB information.<br>2. Confidentiality requirements and public information parameters for the community member(s).<br>3. Defined role and process for community member participation in the CIRB. (e.g., roster for by case or appointment for a period of time).<br>4. Sufficient community members to cover support for the CIRB and to facilitate participation.<br>5. Defined qualifications, application process and selection process for the community member.<br>6. Transparent selection and reporting on the selection of community members for CIRB. | |
| | | 9 | Develop a reporting process that fosters transparent reporting to the community. | 1. Public reporting, using the CIRB template, that complies with legal requirements.<br>2. Set timeframe and cadence for CIRB reports following an OIS.<br>3. Evidence of the consideration of using a public venue for the initial sharing of the report. | |
| | | 10 | Defined role and responsibility for the newly | 1. Evidence of open access to all meetings and records to the IPA. | |

| | | | | | |
|---|---|---|---|---|---|
| | | ide.  ...PA in the CIRB process. | 2.<br>3.<br>4. | Defined role and protocol for IPA engagement . CIRB given the independence of the IPA.<br>Evidence of review of using a formal agreement with the IPA and its role with the CIRB.<br>Publication of the agreement and/or policy for the IPA role with CIRB. | |
| 15 | The Department should guide the CIRB's analysis by requiring specific findings in each of the following categories: pre-event planning and decision-making, tactics, and post-event response (including timely transition to rescue mode). | CIRB policy should include requirements that: | | | |
| | | 1 | Define specific phases of the critical incident and topic areas for review. | 1. Defined phases for review with identified topic areas.<br>2. Template that drives review of the defined phases and topic areas for each incident reviewed by CIRB. | |
| | | 2 | Develop a standard reporting template that will guide consistent review of critical incidents to include pre-event planning; decision making; tactics; post-event response; and review tasking. | 1. Consistent with Recommendation #14, use of standard template for CIRB review.<br>2. Consistent with CM #1, published template. | |
| | | 3 | Require distinct review and decision outcomes for each reporting area. | 1. Evidence of separate summary, finding and recommendation sections for each area of review by CIRB.<br>2. Documentation of the actions taken by area of review. | |
| | | 4 | After the convening of a CIRB, engage in after action review of the effectiveness of the reporting template. | 1. Each CIRB provides an overall review of the process and the template.<br>2. Where deficiencies are noted, the recommendations identify the improvements needed.<br>3. Evidence of review of implementation of improvements. | |
| 16 | The Department should provide the CIRB with greater flexibility to tailor its outcome recommendations across a range of possible categories, rather than limiting it to a blanket finding about the incident. | Ensure the CIRB policy requires: | | | |
| | | 1 | Review for all possible issues arising from any action or outcome related to the event. This is consistent with the recommendation for a template for review (see 15). | 1. Consistent with Recommendation 14, a template that addresses key policy, protocol and operational issues for review.<br>2. Template focuses on the range of response requirements and organizational issues.<br>3. Evidence that review identifies ongoing improvement opportunities for the review process.<br>4. Evidence of implementation, as warranted, of improvements to the review process. | |
| | | 2 | Review beyond the individual(s) in the actual OIS incident to ensure a review of the organizational issues. | 1. Consistent with CM#1, evidence of an organizational perspective to the review rather than just the specific actions of the involved officer(s).<br>2. Evidence of assessment of organizational areas to include supervision, training, communications, policy and equipment.<br>3. Evidence of specific and detailed findings and, where warranted, recommendations for improvements.<br>4. Evidence of tracking and implementation of recommendations. | |
| | | 3 | Distinct findings and evaluation for each action, area or issue reviewed. | 1. Template requires specific findings and recommendations for each area of review.<br>2. Identify the finding and recommendations, as aligned with the review facts and discussion, from each area of review.<br>3. Task the specific actions required under the recommendation and finding. | |
| | | 4 | Ensure that the opinions or votes of each member are recorded in the CIRB report. | 1. Template records the opinions or votes of each member of the CIRB relative to recommendations and findings.<br>2. The CIRB report and recommendations to the Chief include the opinions or votes of each member, including the dissenting opinions. | |
| 17 | The Department should consider ways to conduct its critical incident review in time-appropriate phases, beginning with an initial debrief and issue-spotting and continuing to a more thorough examination of administrative issues including officer performance. | CIRB Policy and Protocols should: | | | |
| | | 1 | Define the timelines for review of the underlying critical incident. | 1. Time frames for each phase of a Critical Incident (CI) Review.<br>2. Time frames are codified in the appropriate policy.<br>3. Evidence of monitoring for adherence to the timeframes.<br>4. Evidence of corrective action as needed. | |
| | | 2 | Establish requirements for levels of review, e.g., initial triage, immediate after action, investigative and administrative within the standards and protocols for VPD. | 1. CIRB protocols allow for quicker action as appropriate, based upon issue identification and the nature of the CI.<br>2. Review template provides for determination whether action is required at each phase of the CI review.<br>3. Evidence of monitoring for recommendations and CI review actions. | |
| | | 3 | Distinguish between the management and CIRB responsibility for addressing officer actions in the immediate after-effect of the critical incident. | 1. Ensure policies define the role, authority and responsibility of supervisors for corrective action in the event of policy violations and other misconduct identified during a CI initial response and investigation.<br>2. Clearly defined responsibility for recommended action in the event a review identifies officer misconduct or policy violation.<br>3. Defined internal investigation process to address officer misconduct or policy violation as the result of a CI investigation or CIRB review. | |
| | | 4 | Allow for open discussion regarding officer improvement, intervention | 1. Evidence of review of applicable law, bargaining agreements and policies to ensure focus on transparent discussion of organizational actions in | |

| | | | | | |
|---|---|---|---|---|---|
| | plan. ...oals for training for involved parties. | | | response to CIs.<br>2. Established template that drives discussion on the interventions and remedial actions taken in response to the CI.<br>3. Evidence of review and discussion.<br>4. Evidence of tasking for any recommendations that derive.<br>5. Evidence of follow up and completion of the task. | |
| | | 5 | Create a mechanism for ongoing evaluation and improvement of the CIRB processes associated with this recommendation. | 1. Protocol for after action evaluation of CIRB reviews to be led by PSB.<br>2. Process for evaluation of tasking and outcomes arising out of the CIRB process.<br>3. Collation of the ongoing improvement actions, as identified in Recommendations 12- into a single annual review.<br>4. Evidence of ongoing improvement through update/modifications to the CIRB process. | |
| 18 | The Department should set specific goals in writing for the timely completion of different phases of the critical incident review process, to make sure that the appropriate responses and remediations are occurring in as meaningful and productive a way as possible. | CIRB Protocols should: | | | |
| | | 1 | Establish timelines for each phase of the CI review process. | 1. Timelines for each phase of the CI review that are consistent with Recommendation 14 CM#6 and Recommendation 17 CM#1. | |
| | | 2 | Assign responsibility for tasking findings and recommendations for remediation. | 1. PSB responsible for tasking follow on actions as consistent with Recommendation 14 and Recommendation 16. | |
| | | 3 | Affix responsibility for ensuring action upon taskings and recommendations. | 1. Process that defines oversight and coordination of the tasking for recommendations.<br>2. PSB responsible for monitoring the implementation of recommendations and completion of tasking.<br>3. Evidence the process is implemented.<br>4. Evidence of corrective actions for failure to accomplish and/or outcomes from the tasking. | |
| | | 4 | Account for actions in response to taskings by the CIRB with established chain of command responsibility. | 1. Internal chain of command review and responsibility for taskings arising from CIRB, consistent with Recommendation 12 CM#5, Recommendation 14 CM#7 and Recommendation 18 CM#3.<br>2. Timebound process is timebound with set guidelines for taking action in response to the CIRB recommendations.<br>3. Process for review and remediation for failure to act. | |
| | | 5 | Develop a communications strategy and publication process for both internal and external audiences on CIRB actions. | 1. Plan and strategy to ensure disclosure of CIRB actions are supported by policy and action.<br>2. Time limits for release of CIRB reports, both for in-person and digital release.<br>3. Evidence of monitoring adherence to transparency goals.<br>4. Evidence of remedial action for failure to timely complete or post CIRB reviews. | |
| 19 | The Department should develop a separate administrative investigative package, including separate administrative interviews of involved personnel. | 1 | Establish a policy that clearly defines the contents and process, including the administrative interview process, for the administrative investigation of an incident that is compliant with the law. | 1. Policy and protocol for the administrative investigations of OIS incidents and other CI.<br>2. Protocol and template for the specific documents and actions required to complete comprehensive administrative investigations.<br>3. Requirement for administrative interviews to be conducted for each involved officer.<br>4. Evidence of monitoring of the policy requirements.<br>5. Evidence of corrective/remedial action for failure to follow policy. | |
| | | 2 | Ensure policy addresses isolation of the administrative statement during the investigation, storage, and retention of the investigative file. | 1. Protocol and policy that specifically address isolation of the administrative statement.<br>2. Defined responsibility for ensuring the statement isolation, storage and retention of file.<br>3. Evidence of monitoring of the policy requirements.<br>4. Evidence of corrective/remedial action for failure to follow policy. | |
| | | 3 | Establish protocols on control and management of internal administrative investigations files. | 1. Control process to ensure appropriate security for the administrative statement.<br>2. Process addresses how the statement is managed within the investigative file and how the information is shared.<br>3. Audit practice that ensures policy and protocols are followed.<br>4. Evidence of corrective action as needed for failure to follow policy relative to file controls. | |
| | | 4 | Establish how and when the CIRB and other internal processes access internal administrative investigations. | 1. Policy addresses what administrative investigative documents will be shared with CIRB.<br>2. Specific admonishment for the dress the legality of sharing the administrative statement prior to conclusion of the investigation.<br>3. Establish process that will audit and control the sharing of administrative investigative information. | |
| | | 5 | Provide annual audit to ensure compliance with policy. | 1. Consistent with CM#3 & 4, establish audit controls that ensure the security and integrity of administrative investigations.<br>2. Provide annual audit of administrative investigative files.<br>3. Provide evidence of improvements and corrective actions, if any, arising out of the audit. | |
| 20 | The CIRB should play a direct role in the identification and resolution of individual policy | Consistent with the role of the CIRB and Recommendations (14) and (18), the VPD should establish a protocol supported by policy that: | | | |
| | | 1 | Establishes template for identification of, reporting of and resolution of identified | 1. CIRB protocol provides for the identification of potential policy violations by individual officers and supervisors by CIRB. | |

| | | | | | |
|---|---|---|---|---|---|
| | violations or other performance issues associated with a critical incident. | | pou...  ations, consistent with Recommendations 15 and 16. | 2. Template and process for identifying the poten. violation and the request for additional investigation. 3. Timebound internal investigation and response to the CIRB about the outcomes of the individual policy violation. 4. Annual review of the reporting of potential violations and the investigative outcomes. 5. Action, as required, to address deficiency in the process. | |
| | | 2 | Establishes template for identification of, reporting of and resolution of identified performance issues, consistent with Recommendations 15, 16 and 17. | 1. CIRB protocol provides for the identification of potential performance issues by individual officers and supervisors. 2. Template and process for identifying the performance issue. 3. Timebound internal review and response to the CIRB about the outcomes. 4. Annual review of the reporting of performance issues and the investigative outcomes. 5. Action, as required, to address deficiency in the process | |
| 21 | VPD and the City should clarify the role of legal counsel in the CIRB process, so that input on questions of law and liability does not come at the expense of rigorous analysis and necessary remedial measures. | 1 | Review the role and reason for the CAO to attend an internal review process as conducted by the CIRB. | 1. Analysis of the reason for the CAO to attend the CIRB. 2. Defined actions expected of the CAO for the CIRB. 3. Definition of the CAO role currently and anticipated in the future. 4. Ensure CIRB decisions are based on rigorous analysis of the issues 5. Decisions include and recommend remedial action when necessary. | |
| | | 2 | Determine whether the CAO will be involved – if they are involved, the following will need to be considered: | 1. Analysis and decision whether to retain the CAO based on the transparency and improvement goals of the CIRB and the role of the CAO. 2. Determination of whether the CAO continues as a member of the CAO. 3. Determine whether the CAO will be involved in CIRB deliberations and decisions. 4. Written justification for the decision to retain, or not, the CAO. 5. Written description of what role the CAO will hold on the CIRB. | |
| | | 3 | Establish the specific need and scope of engagement for the CAO at the CIRB. | 1. If the CAO retains a position on the CIRB, define the specific role, scope and authority of the CAO as a member of CIRB. | |
| | | 4 | Consider whether the need for legal review/support is better served by another legal representative or through a specific engagement process. | 1. If the CIRB requires legal support, evaluate whether the CAO or another legal professional could support the CIRB role/objectives. 2. If the role of the CAO defined as providing legal advisory for the CIRB, make a factual determination as to whether serving on the CIRB is the best way to address this need. | |
| | | 5 | Consider whether recusal from certain portions of the CIRB work would support a holistic review of critical incidents. | 1. Provide evidence of review as the benefit/detriment of the removal of the CAO from the CIRB in its entirety or partially. 2. Establish policy that reflects the decision for the CAO role. 3. b. establish protocol governing circumstances and process for CAO recusal from CIRB discussions in entirety or partially. | |

| Recommendation Topic: Other Uses of Force | | | | | |
|---|---|---|---|---|---|
| | Initial Recommendation | | Compliance Measures | Proofs | |
| 22 | The Department should develop a protocol for standardizing a specific and documented supervisorial evaluation of every use of force. | 1 | Develop a protocol and policy for reporting force incidents. | 1. Evidence of standard and best practice review for reporting force incidents. 2. Policy for reporting force incidents, including officers who observe force. 3. Protocol for reporting force incidents, including officers who observe force. | |
| | | 2 | Require officers on scene at the time of incident to complete a UOF report based upon their observations of the incident. | 1. Develop a reporting standard/template for use of force. 2. Policy requirement that officers are to report their use of force before end of shift. 3. Policy requirement that all officers are required to report their observations of use of force by other officers by the end of shift. | |
| | | 3 | Provide training and policy support for the use of force reporting format. | 1. Provide training for use of force reporting for officers and supervisors. 2. Confirm training conducted and attended. 3. Adjust training as needed based upon CM#7. | |
| | | 4 | Require all involved officers to complete a use of force report on their own. | 1. Policy requirement for all officers to document force. 2. Define remedial measures for failure to comply. | |
| | | 5 | Require all officers on the scene to provide reports on their observations of the use of force. | 1. Policy requirement that all officers on the scene of a UOF incident provide a written report on their observations. | |
| | | 6 | Task each level of supervision with the appropriate review and approval of the officer use of force report, including collection of all required reports. | 1. Policy defines the role and responsibility for each line of supervision in the review of UOF. 2. Consider establishing a UOF reporting checklist for supervisors to ensure complete packages when reporting UOF. 3. Task each supervision rank with verifying accuracy and completion of submitted reports. 4. Provide a review summary report for each level of | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | review that requires supervisory action and sig. for approval or return for further work. | |
| | | 7 | Provide for quarterly and annual audit and review of reporting for adherence to policy requirements. | 1. Establish a review practice and protocol for review and auditing UOF reporting to include reporting compliance, training compliance and supervisory engagement. (See 23.3)<br>2. Provide routine analysis and/or auditing quarterly.<br>3. Provide an annual report regarding overall compliance with UOF reporting requirements.<br>4. Conduct qualitative reviews of supervisory decisions relative to UOF reporting. | |
| | | 8 | Develop a continuing improvement focus that addresses anomalies, issues, and trends. | 1. Task PSB with responsibility for assessing and measuring compliance with the UOF reporting requirements.<br>2. Provide evidence of review of compliance with reporting<br>3. Provide evidence of review of compliance with quarterly audit.<br>4. Provide evidence of remedial action, if any, to include training modifications. | |
| 23 | The Department should ensure that the assistance of the Force Options team with officer report-writing does not become a tool for retroactive justification of questionable force deployments or a basis for truncating appropriate scrutiny. | Consistent with the update of any Use of Force protocols or policies, and the actions of Recommendations (12) and (22): | | | | |
| | | 1 | Establish requirements for officers to independently and in their own words complete their own reports regarding use of force. | 1. Policy requirement that officers not rely on a template and use their own words. without assistance from FO team<br>2. Policy requires a supervisory review to ensure sufficiency of the report.<br>3. Requirements for remediation for failure to adhere to policy. | |
| | | 2 | Ensure training on how to complete the reports for officers and supervisors. | 1. Develop training on how to complete reports to address constitutional/legal requirements and in compliance with UOF policy<br>2. Provide the above training and require full attendance.<br>3. Maintain records of attendance.<br>4. Remediation for failure to attend. | |
| | | 3 | Task PSB with providing audit standards for review, quarterly and annually, to ensure adherence and to identify knowledge gaps and corrective action. | 1. Evidence of review of audit/review standards for UOF reporting.<br>2. Protocol for audit/review of UOF reporting.<br>3. Evidence that review occurs.<br>4. Outcome reporting from review/audit.<br>5. Evidence of tasking and corrective action. | |
| 24 | The Department's analysis of each use of force should include affirmative managerial determinations as to whether the force was in policy, and whether training, tactical, or other considerations were identified. | 1 | Establish policy for consistent protocols and practices in the review of use of force incidents. | 1. Policy requires each supervisor to assess whether UOF is in policy or not.<br>2. Report requires supervisor to make determination whether in policy or not.<br>3. Remedial or corrective action when necessary | |
| | | 2 | Provide training for supervisors on force incident review. | 1. Training (22.3, 23.2) provides support to supervisors on assessing whether within policy.<br>2. Require all supervisors attend training.<br>3. Remediation for failure to train. | |
| | | 3 | Require supervisors to make an initial determination on the use of force incident and whether it complies with law, policy, and training. | 1. Mandate adherence to policy that supervisors make initial determination relative to the use of force incident with reference to law, policy, and training compliance.<br>2. Ensure report requires affirmative decisions regarding whether UOF is compliant with law, policy, and training.<br>3. Corrective action for failure of supervisor to follow policy. | |
| | | 4 | Ensure that the CIRB review includes the adherence to policy and the sufficiency of the supervisory determination for compliance with policy. | 1. Checklist and template for CIRB review<br>2. CIRB template to include whether supervisor made a determination of compliance.<br>3. CIRB template to include whether the CIRB agrees with the decision of the supervisor.<br>4. Remediation where CIRB does not find the supervisor's determination to be sufficient and this is supported by the Chief.<br>5. CIRB review decision forwarded to COP with recommendation whether or not supervisor's decision sufficient<br>6. Evidence of remedial or corrective action to correct deficiency | |
| | | 5 | Ensure that PSB audits all UOF reports to ensure consistency and sufficiency of supervisory review. | 1. Consistent with 23.3, ensure PSB provides audit protocol that assesses supervisory compliance.<br>2. Evidence of routine review.<br>3. Evidence of remediation as required. | |
| 25 | Each use of force should be reviewed and evaluated to determine whether de-escalation techniques were considered or implemented prior to the application of force, and/or why they were not. | 1 | Establish policy requiring review of each UOF incident, to include supervisory roles and responsibilities. | 1. Policy establishes review roles and responsibilities for each level of supervision.<br>2. Policy specifically requires review of de-escalation.<br>3. Training on de-escalation requirements for supervisors. | |
| | | 2 | Supervisors must review each UOF to determine whether de-escalation was possible prior to UOF. | 1. Review specifically requires evaluation of every single de-escalation action taken by the officer using force for each use of force.<br>2. Determination whether it was feasible to use de-escalation prior to each use of force<br>3. Determination whether de-escalation occurred prior to each use of force.<br>4. Reporting required and reasons as to why de-escalation was not used, if not, for each use of force. | |
| | | 3 | Identification of which de-escalation tactics were available prior to UOF and how they were reviewed (either by CIRB or other supervisory review). | 1. Report template allows for easy identification and reporting of de-escalation options and whether they were utilized – either as de-escalation or prior to each use of force.<br>2. Supervisory review, and as needed, discussion with the involved officer as to the use of de-escalation for each | |

| # | Initial Recommendation | # | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| | | | | use of force. | |
| | | | | 3. Training for supervisors on how to review, discuss and coach on de-escalation. | |
| | | 4 | Evidence and citation of corrective or remedial action if UOF deficiencies are found. | 1. Policy standards and requirements for de-escalation actions and decisions by officers. 2. Policy standards for supervisory review. 3. Evidence of supervisory review that appropriately identifies the need for de-escalation and takes appropriate remediation. | |
| | | 5 | Evidence of corrective or remedial action if review is deficient or does not occur and ensuring supervisors are conducting the reviews they are supposed to, such as checking that the Axon video reviews are occurring. | 1. Audit/review of supervisory review actions for de-escalation. 2. Audit/review of supervisory review of BWC. 3. Evidence of remediation and/or continuous improvement to include specific findings, taskings and outcomes. | |
| 26 | The Department should incorporate its current policies for supervisory review, including detailed evidence gathering by supervisors where applicable, into this process. | 1 | Consistent with Recommendation 22 and 24, VPD should ensure its policies define the roles of supervisors. | 1. Evidence of standard and best practice review for supervisory review of use of force reporting and practices, including evidence collection and identification. 2. Established policy and role for supervisory review, including evidence collection. | |
| | | 2 | Establish protocols for evidence collection roles based on type of incident and type of evidence. | 1. Protocol describes when and what evidence is appropriate for supervisory collection. 2. Task chain of command review with validating evidence collection is appropriate. 3. Evidence of audit for adherence to collection requirements. | |
| | | 3 | Train to protocols. | 1. Curriculum for supervisory UOF evidence collection. 2. Training for supervisors on UOF evidence collection. 3. Proof of compliance with training attendance. | |
| | | 4 | Monitor for continuous improvement of the protocols. | 1. Established review framework. 2. Review to ensure evidence is being appropriately collected. 3. Process for identification of any gaps/errors. 4. Specific tasking for timebound review for process improvement. 5. Evidence, if any, for process improvements. | |
| 27 | The Department should create formal mechanisms for documenting and tracking any action items that emerge from this process to ensure appropriate follow-through. | 1 | Consistent with all policy and protocols, require record of the tasking of any recommendation and the reporting on the outcomes. This will include the recommendations of the CIRB, any internal review of the UOF reporting and review and any future programs that analyze and identify recommendations for improvement. | 1. Identify a keeper of the record for all process improvements associated with UOF reporting. 2. Identify a keeper of the record for all CIRB recommendations. 3. Identify a keeper of the record for any internal reviews of UOF reporting. 4. Require PSB to create a tracking sheet for all CIRB recommendations, including who is responsible for implementing a recommendation, timeframe for implementation, and status (incomplete/in progress/complete)? | |
| | | 2 | Task PS with auditing adherence to the reviews, their timing and their subsequent tasking, reporting and outcome measurements. Such audits should be conducted on an annual basis. | 1. Protocol or policy tasks PSB with audit of reviews and tasking arising out of the control sheet in 1d. 2. Evidence that such audits/reviews have occurred on an annual basis. 3. Evidence of remediation and process improvements as relevant. | |
| | | 3 | Ensure sufficient administrative support to continue to review and improve practices around UOF following the initial recommendation process and the subsequent audit of the process. | 1. Evidence of review of available administrative support for PSB to conduct the annual reviews/audits. 2. Administrative support plan to assist PSB in these reviews. 3. Evidence of follow-through regarding gaps or improvements identified through the reviews. | |

**Recommendation Topic: Complaints / Allegations of Misconduct**

| # | Initial Recommendation | # | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| 28 | The Department should build on its intermittently successful efforts to make complaint notification letters as detailed and useful to recipients as possible. | 1 | Establish protocol and policy for engagement with complainants regarding police misconduct within the first 48 hours of reporting and monthly thereafter until the investigation is closed. | a. Protocol requires "receipt" to complainant that provides the tracking information for the complaint. b. Protocol requires first contact with complainant within 48 hours of complaint. c. Protocol requires a timeline and checklist that includes monthly updates to the complainant until conclusion of the complaint investigation. d. Evidence of tracking of the engagement with complainant throughout the investigation from initiation through completion of the investigation. e. Evidence of review of feasibility of the implementation of an online portal for members of the public to prepare, submit, and track their complaints – even as a future goal. | |
| | | 2 | Develop a letter template for each phase of the investigation – receipt, request for interview, ongoing update and closing. | a. Letter template to ensure timely, consistent contact with complainants. b. Letter template explains the overall investigation process, the classification, the disposition categories and what they mean, how investigations are reviewed, and the options available to the department for corrective action – e.g., training, discipline, termination. c. Publication of the template and explanation of the process, as part of the initiation letter and on the VPD website. | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | d. | Requirement that the letter is sent at each phase and has the relevant information for each phase. | |
| | | | | e. | Closing letter provides complainant with the investigation determination and investigative steps taken as well as the conclusion of the investigation. | |
| | | | | f. | Tasking to a specific party with sending letter – administrative or investigator. | |
| | | | | g. | Supervisory responsibility for ensuring compliance. | |
| | | 3 | Monitor adherence to the outreach requirements and task supervisor with accountability. | a. | Commander PSB is tasked with ensuring compliance with letter protocols. | |
| | | | | b. | Evidence of compliance review. | |
| | | | | c. | Evidence of remediation for any identified gaps. | |
| | | 4 | Audit annually to ensure policy adherence. | a. | Protocol/policy requiring annual review of compliance with requirements for engagement with complainants. | |
| | | | | b. | Evidence of tasking within PSB for annual audit/review of compliance – letters on record and contained within the complaint file. | |
| | | | | c. | Evidence of review outcomes and remediation as appropriate – e.g., training, discipline, policy adjustment. | |
| 29 | The Department should compile and periodically publicly produce aggregate data about the number of civilian complaints received, the number of internal investigations conducted, and the number and type of uses of force to offer greater insight into the nature and effectiveness of its accountability measures. | 1 | Develop the data tracking for complaints that allow for identification of number, type, and outcome and to include data demographics that are searchable. | a. | Develop protocol that identifies complaints by identification number, type, and outcome. | |
| | | | | b. | Capture complaint classification across the range of complaints, e.g. use of force, bias, profiling, search and seizure. | |
| | | | | c. | Protocol includes demographic data for complainants and involved officers. | |
| | | | | d. | Database provides for searches by identification number, type, outcome, complainants, or officer(s). | |
| | | 2 | Track Use of Force complaints to include to identification of type of use of force and outcome from the force application. | a. | Protocol requires tracking UOF to include force used by - type for each officer that used force and outcome from the force application. | |
| | | | | b. | Program that allows search by type and by officer. | |
| | | 3 | Track Racial and Profile Identifying complaints to include identification of type of complaint, demographics and outcome from the encounter. | a. | Task PSB commander with establishing overall review for types of complaints, common actions leading to complaints and outcomes of investigations. | |
| | | | | b. | Evidence of analysis. | |
| | | | | c. | Evidence of actions, if any, taken in response to include training, policy or investigation changes. | |
| | | | | d. | Evidence of continuing improvement as a matter of analysis and review, to include training, policy or practice modifications. | |
| | | 3 | Establish systems to monitor and assess complaints for opportunities for improvement, training, and reduction in the overall complaints received by the VPD. | a. | Task PSB commander with establishing overall review for use of force complaints, to include types of calls leading to force outcomes, officer/civilian factors, common actions leading to complaints and outcomes of investigations. | |
| | | | | b. | Evidence of analysis by PSB. | |
| | | | | c. | Task the CIRB with review of the analysis conducted by the PSB. | |
| | | | | d. | Evidence of analysis by CIRB. | |
| | | | | e. | Evidence of actions, if any, taken in response to include training, policy or investigation changes. | |
| | | | | f. | Evidence of continuing improvement as a matter of analysis and review, to include training, policy or practice modifications. | |
| | | 4 | Establish systems to monitor and assess complaints for opportunities for improvement, training, and reduction in the need for use of force. | a. | Task PSB with bi-annual assessment for CM#3 & #4. | |
| | | | | b. | Task CIRB with review of the assessment. | |
| | | | | c. | Evidence of recommendations/outcomes/improvements. | |
| | | | | d. | Task PSB with publishing an annual report on the outcomes of the review process. | |
| | | | | e. | Evidence of publication of the annual report. | |
| | | | | f. | Evidence of continuing improvement as a matter of analysis and review, to include training, policy or practice modifications. | |
| | | 5 | Provide bi-annual assessment and review, with corrective action. Report annually on complaint trends, overall and specific to use of force, and the actions taken by the VPD in response. | a. | Develop protocol for reporting UOF. | |
| | | | | b. | Task PSB with assessing UOF trends on quarterly basis. | |
| | | | | c. | Identify and implement remediation and corrective action as required. | |
| | | | | d. | Public report on UOF trends and actions in response on quarterly basis. | |
| | | 6 | Provide quarterly reporting and analysis on UOF and Racial and Identity Profiling complaint trends and actions in response. | a. | Develop protocol that identifies complaints by identification number, type, and outcome. | |
| | | | | b. | Capture complaint classification across the range of complaints, e.g. use of force, bias, profiling, search and seizure. | |
| | | | | c. | Protocol includes demographic data for complainants and involved officers. | |
| | | | | d. | Database provides for searches by identification number, type, outcome, complainants, or officer(s). | |
| 30 | The Department should develop written internal deadlines to complete an investigation and review process and require supervisory approval for deviation from those deadlines | 1 | Establish internal investigations protocol and policy that directs investigative standards, progression, and supervisory review. | 1. | Evidence of best practice review for internal investigations for application to VPD. | |
| | | | | 2. | Internal investigations protocol outlines practice and policy for the progression of the investigation. | |
| | | | | 3. | Protocol defines specific standards for each internal investigation. | |
| | | | | 4. | Policy and protocol ensures investigators are educated and trained in its use prior to conducting internal investigations. | |
| | | | | 5. | Protocol defines conflict, requires conflict certification for any investigator to ensure no potential for bias. | |
| | | | | 6. | Protocol precludes members engaged in the advocacy for VPD officers at disciplinary hearings from | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | conducting investigations | |
| | | | 7. | Protocol defines specific requirements for each level of supervision when reviewing investigations. | |
| | | 2 | Establish timelines for each phase of the investigation to include monthly updates for active investigations. | 1. Protocol has defined timelines for each phase of an internal investigation including intake, initial complainant contact, internal interviews, submission of the investigation and each level of internal review.<br>2. Protocol establishes monthly update requirement.<br>3. Consider using a reporting template for monthly reporting to facilitate supervisory review. | |
| | | 3 | Require supervisory review for adherence to timelines. | 1. Develop tracking mechanism that identifies each phase of the investigation and date completed.<br>2. Ensure supervisors are reviewing for compliance with time requirements.<br>3. Evidence of review.<br>4. Evidence of remediation where appropriate. | |
| | | 4 | Provide standards and approval requirements for deviation from timelines. | 1. Protocols define standards and approvals within timelines.<br>2. Policy defines potential remediation and outcomes for failure to meet investigative and supervisory review timelines. | |
| | | 5 | Audit progression of investigations and address deficiencies as appropriate. | 1. Evidence of review for compliance.<br>2. Evidence of remediation or process improvement as needed. | |
| 31 | The Department should evaluate its individual misconduct investigations to ensure that all relevant issues are identified and pursued to a reasonable extent, including a written standard requiring formal interviews with witness officers. | 1 | Consistent with Rec#30, establish an investigative template for internal investigations. | 1. Template used for internal investigations,<br>2. Evidence it is in use. | |
| | | 2 | Establish policy and protocol to require formal interviews of accused officers. | 1. Policy requires formal interviews of officers who are alleged to have engaged in misconduct.<br>2. Investigative template requires interviews and tracks for the interviews.<br>3. Evidence that such interviews are occurring.<br>4. Evidence of remediation or process improvement as needed. | |
| | | 3 | Establish policy and protocol to require formal interviews of witness officers. | 1. Policy requires formal interviews of officers who are alleged to have witnessed use of force and serious misconduct.<br>2. Investigative template requires interviews and tracks for the interviews.<br>3. Evidence that such interviews are occurring.<br>4. Evidence of remediation or process improvement as needed. | |
| | | 4 | Train to the template and policy requirements. | 1. Curriculum and training developed for template and its use.<br>2. Training delivered.<br>3. Compliance with attendance at the training.<br>4. Evidence of ongoing process review and improvement as necessary. | |
| | | 5 | Require supervisory review for investigations through use of a review checklist. | 1. Develop template for supervisory review of investigations.<br>2. Train supervisors to the template.<br>3. Ensure adherence to the template. | |
| | | 6 | Monitor and review for adherence with remediation as required. | 1. Task responsibility for monitoring review and remediation.<br>2. Task responsibility measuring outcomes associated with review and remediation.<br>3. Monitor adherence to the process.<br>4. Provide annual report on outcomes. | |
| 32 | The Department should evaluate its levels of discipline for sustained policy violations to ensure that the proper amount of remediation is occurring. | 1 | Consider establishing a discipline matrix or other management process to ensure consistent application of discipline, inclusive of training and remediation. | 1. Review best practices on disciplinary standards/matrices and for complaints and investigations<br>2. Policy that addresses community and departmental goals for effective investigations and disciplinary processes.<br>3. Identify and list standards for consistent corrective action - application.<br>4. Include training and other remediation as part of the defined corrective action and standards. | |
| | | 2 | Analyze disciplinary outcomes to ensure no disparate outcomes based on type of infraction and range of discipline. | 1. Pending any collective bargaining issues, take steps to internally review the range in discipline for similar and aligned actions.<br>2. Task specific role to assess variances to identify trends, patterns and issues.<br>3. Develop protocol to consistently align discipline issued. (This could be reviewer role, supervisory or matrix or other approach). | |
| | | 3 | Audit the issuance of discipline to ensure standards and consistency. | 1. Protocol establishes annual audit/review of discipline issued.<br>2. Review examines consistency and trends.<br>3. Review is tasked with identifying any disparity. E.g., the review includes officer demographics, complainant demographics, nature of complaint, etc.<br>4. Task specific role with requiring corrective action when issues are identified.<br>5. Require follow through on tasking to ensure corrective action is taken. | |
| | | 4 | Annual review and publication of disciplinary statistics to ensure transparency, sufficiency, and procedural justice. | 1. Policy/protocol requires annual review of discipline trends.<br>2. Specific role/unit tasked with accumulating disciplinary data and reporting on it.<br>3. VPD publishes annual report on discipline trends, including breakdowns by type of complaints, type of discipline, and officer demographics. | |

**Recommendation Topic: Other Review Protocols**

| | Initial Recommendation | | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| 33 | The Department should continue to use the civil claims process as a vehicle for assessment of its own performance and should refrain from allowing liability concerns impede the rigor and thoroughness of this process. | 1 | Establish and task responsibility for review of civil claims at the City and VPD for misconduct claims, type of complaints and frequency of complaints – including by type and officers involved. | 1. Defined role and responsibility for both VPD command member and CAO to oversee review civil complaints for frequency of complaints, members and behaviors<br>2. Evidence of meeting to address complaints<br>3. Evidence of outcome of review – e.g., analysis and recommendations. | |
| | | 2 | Identify independent internal review protocols, standards, and reporting for VPD to identify risk issues, including training and policy concerns. | 1. Evidence that VPD established its own internal review protocol for civil complaints – focused on identifying conduct and risk issues.<br>2. Evidence of a format or template that drives the review process.<br>3. Evidence that review includes training and policy concerns.<br>4. Evidence of analysis and recommendations arising out of the analysis. | |
| | | 3 | Ensure the CIRB has full authority to review and make recommendations for VPD critical incidents independent of the civil litigation stance of the City. | 1. CIRB policy gives CIRB authority for review and recommendations based upon case factors.<br>2. Specific statement in policy that CIRB will not be limited in its review based upon civil litigation concerns. | |
| | | 4 | Develop a process for VPD improvements based upon the review and risk assessment that allows for corrective actions independent of the litigation posture of the City. | 1. Evidence of a role and tasking for action based upon internal review of civil litigation<br>2. Evidence of the review and recommendations (see 33.1.3, 33.2.4).<br>3. Evidence of action taken in response to the recommendations and tasking. | |
| | | 5 | Establish tasking, deadlines and reporting of actions taken in response to the internally generated recommendations. | 1. Evidence that recommendations are timebound.<br>2. Evidence that recommendations are tasked and that actions are followed up and monitored for completion. | |
| | | 6 | Establish annual review process for evaluation of issues arising from civil litigation and improvements. | 1. Task command individual with responsibility for overseeing the overall improvement process.<br>2. Annual analysis and review that tracks civil litigation trends and outcomes. | |
| | | 7 | Include community engagement perspectives, as addressed in R#39, in the annual report of the continuous improvement loop of litigation review to provide voice to the community. | 1. Annual reporting on actions taken to correct risk issues.<br>2. Recognition of any connectivity between community concerns and litigation – and how the VPD addressed the issues in its improvement process.<br>3. Reporting of community outcomes arising from the problem-solving process established in R#39. | |

**Recommendation Topic: OIS Community Outreach / Transparency**

| | Initial Recommendation | | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| 34 | The Department should develop a "family liaison" protocol in which, after a shooting or other critical incident, a designated individual will focus on providing family members with information and updates about medical status and subsequent procedural matters. | | Consistent with the OIS and UOF protocols: | | |
| | | 1 | Develop policy and protocol for a family liaison program that is predicated upon timely and appropriate notifications to the family members of subjects injured or killed by a member of the VPD. | 1. Evidence of a best practice review for Liaison Programs.<br>2. Policy and protocol that identifies responsibilities for timely notification, appropriate notification and liaison with families of persons injured or killed by a VPD member.<br>3. Command member tasked with responsibility to ensure protocols are implemented upon such an event. | |
| | | 2 | Consider use of professional staff rather than sworn staff for the role of family liaison. | 1. Evidence of the review of the use of professional staff for such incidents.<br>2. Formal determination as to why or why not professional staff will be used for such incidents.<br>3. If professional staff are used – evidence of training and protocols that support coordination. | |
| | | 3 | Task specific duties, responsibilities and communication protocols for the role and key stakeholders to the investigation to ensure coordination around outreach and contact with subject family members and communications with the media to ensure notifications align with public information. | 1. Protocols that establish roles and responsibilities for family contacts arising out of an action by a VPD member that kills or injures another.<br>2. Specific role and responsibility tasked for media coordination.<br>3. Specific role and responsibility tasked for family liaison.<br>4. Requirements for internal cooperation between family liaison and investigators.<br>5. Command member tasked with overseeing coordination. | |
| | | 4 | Provide ongoing review of the process for improvement. | 1. Evidence of review of such incidents to ensure program goals are met and to identify opportunities for improvement.<br>2. Evaluation of each incident for communication and coordination.<br>3. Evidence of continuing review for improvement opportunities. | |
| 35 | The Chief should plan to offer to meet with family members in the aftermath of an officer-involved shooting as a way of acknowledging loss and sending a broader | | Consistent with the OIS and UOF protocols: | | |
| | | 1 | Designate the Chief or a command point of contact to meet with the family of those subjects injured or killed as the result of a VPD officer's actions. | 1. Policy that tasks Chief or command designee to meet with families of persons injured or killed by VPD member.<br>2. Policy establishes processes for coordination between Chief and Family Liaison. (Consistent with 34.1)<br>3. Established goal in conducting such meetings. | |

| | | | | |
|---|---|---|---|---|
| | message of empathy and accountability to the community. | 4. | Ongoing review of outcomes of such meeting, ensure continuous improvement. | |
| | | 2 | Coordinate meeting through the Family Liaison. | 1. Evidence of coordination between family liaison and Chief ahead of such meetings. | |
| 36 | The Department should review its information-sharing protocols after officer-involved shootings to ensure that its approach is giving proper weight to accuracy, consistency, and objectivity. | | Consistent with the OIS and UOF protocols: | | |
| | | 1 | Establish a communication protocol and policy, including roles and responsibilities, following an OIS or critical incident. | 1. Evidence of review of best practices for law enforcement communication following critical incidents.<br>2. Policy establishes roles and responsibilities for outreach to family, media, community and other stakeholders following a critical incident.<br>3. Policy is predicated upon sharing information rather than withholding information.<br>4. Policy has set timeframes for communicating information in a manner that is consistent and is consistently applied.<br>5. Policy establishes the town hall approach for OIS that identifies a set, continuous time following the OIS that a town hall will occur.<br>6. Policy establishes the town hall approach for other critical incidents as deemed appropriate by the Chief. | |
| | | 2 | Share communication strategy with internal and external stakeholders, for relevant feedback. | 1. Communication strategy is drafted and shared with internal and external stakeholders.<br>2. Comments are sought and evaluated.<br>3. Evidence of review in drafting final strategy/policy<br>4. Ongoing engagement with stakeholders following critical incidents to ensure strategy goals are met. | |
| | | 3 | Align messages with VPD goals and vision for transparency and building community trust. | 1. Strategy specifically identifies organizational goals in informing stakeholders and community following a critical incident.<br>2. Evidence of draft speaking points, memos, protocols for publishing information following a critical incident.<br>3. Evidence of specific strategy for sharing information at key junctures – early (evolving), follow-on (within a set time frame), update (as information develops) and closing. | |
| | | 4 | Share information in a timely and ongoing manner. | 1. Evidence of communication – memos, press releases, etc.<br>2. Communication is happening within relevant time frames. | |
| | | 5 | Continual improvement/feedback loop for strategy and compliance with strategy. | 1. Evidence of continuing review for improvement opportunities.<br>2. Evidence of modifications to policy or protocol as a result of the review. | |
| 37 | The Department should schedule community meetings within days of an officer-involved shooting as part of its standard response. | 1 | Establish policy and protocol for community information sharing following a critical incident in line with a Town Hall format. | 1. Consistent with 36.1, establish the Town Hall approach to post-OIS communication.<br>2. Task specific roles with publication of the Town Hall, release of information and coordination of questions prior to and during the Town Hall.<br>3. Establish a time bound time frame less than 2 weeks after the event.<br>4. Policy includes the guidelines for public comment and questions to ensure consistent practice. | |
| | | 2 | Validate policy with community advisory board. | 1. Evidence that the Town Hall strategy was shared with the CAB.<br>2. Evidence that the Town Hall strategy was shared with the community consistent with Recommendation 36.2. | |
| | | 3 | Identify key stakeholders and roles for the event. | 1. Policy establishes a consistent practice with defined roles and responsibilities to include the Chief, operations, investigators, media relations and other personnel as deemed warranted. | |
| | | 4 | Host and publicize the event in the community where OIS occurred. | 1. Establish a routine cadence for when the Town Hall will be hosted.<br>2. Publicize these dates and policy to ensure public awareness of when these will occur.<br>3. Following an OIS ensure publication of the date of the Town Hall across traditional and social media | |
| | | 5 | Seek to hold such meetings no later than two weeks following the incident. | 1. Evidence that policy and practice follow a two week time frame following an OIS or other designated critical incident. | |
| | | 6 | Provide transparent factual representation of the events that occurred. | 1. Evidence of a script that follows a consistent process in providing all known facts at the time of the Town Hall.<br>2. Protocol provides for disclosure, consistent with law, should fully disclose all known, relevant information.<br>3. Protocol allows for public comment, consistent with policy.<br>4. Protocol allows for public questions, consistent with policy.<br>5. Protocol requires publication of the Town Hall on department media sites for those who could not attend. | |
| | | 7 | Monitor and track the policy and town halls for continuing improvement. | 1. Evidence of ongoing after-action review of Town Halls.<br>2. Evidence of remediation as needed to improve process. | |
| 38 | The Department should strive to exceed the newly established requirements for transparency regarding officer-involved shootings, | 1 | Establish a timebound policy and protocol for community information sharing following a critical incident. | 1. Policy stresses disclosure over retention in the release of information.<br>2. Evidence of consideration whether the policy should extend to other critical incidents.<br>3. Consistent with Recommendation 36, establish the timeframes for when and how information will be | |

| | | | Compliance Measures | Proofs | |
|---|---|---|---|---|---|
| | by releasing video evidence as soon as it is practicable and by offering detailed explanations to the public about the scope, nature, and outcomes of its internal reviews. | 2 | Implement a policy that seeks to meet the goal of disclosure with the goal of disclosing video and body worn camera video within 10 days of the incident. Failure to disclose should require public posting as to the reason for delay and the expected release date. | disclosed.<br>1. Evidence of review of best practices in release of BWC.<br>2. Policy identifies goals in disclosing BWC based upon preferred time range.<br>3. Policy requires release of raw, unaltered footage.<br>4. Policy establishes a time frame for release with 10 days of the officer-involved shooting.<br>5. Policy requires that the reasons for failure to meet the timeline will be publicly disclosed along with anticipated disclosure date.<br>6. Command member tasked with monitoring process until released. | |
| | | 3 | Educate VPD members, the City stakeholders, and the community regarding the VPD policies and practices for production of BWC under all types of requests. | 1. Policy identifies the role and need for public education regarding BWC and what are its strengths and limitations.<br>2. Policy tasks specific person/unit with developing educations materials for public and internal stakeholders regarding the value of BWC and its release.<br>3. Evidence that internal BWC training includes how it is retained and released and the conditions where it is applicable. | |
| | | 4 | Provide update as to the outcome at periodic levels, consistent with investigation progression. | 1. Policy identifies the role responsible for updates relative to an OIS.<br>2. Policy identifies when and at what timeframes information will be released.<br>3. Policy specifies that critical investigative phases will be reviewed to determine the information to be disclosed, e.g., arrest or decision to not arrest, seeking charges or not, filing of charges or the declination, etc. | |
| 39 | The Department and other City officials should consider new and less contentious ways of dealing with its critics, particularly in the context of pending litigation, and should work to ensure that its litigation posture does not interfere with the rigor and objectivity of its administrative reviews. | 1 | Consistent with R#33, ensure community engagement strategies that inform and address the community's concerns regarding recurring issues identified within the civil complaints filed against the VPD. | 1. Evidence that VPD review processes are robust and not limited by litigation concerns but rather improvement of operations.<br>2. Evidence of strategies that seek to engage and inform the community relative to VPD review practices.<br>3. Evidence that information is consistently shared with community and other stakeholders consistent with VPD policies – irrespective of litigation concerns.<br>4. Evidence of ongoing discussion with CAB and other stakeholders regarding sufficiency of communication. | |
| | | 2 | Consider the use of community facilitators for discussions and problem-solving around recurring issues that identify potential misconduct by VPD officers within civil litigation complaints. | 1. Evidence of review and identification of community stakeholders that are not traditionally partners to the VPD.<br>2. Evidence of assessment of strategies to more fully engage these community stakeholders.<br>3. Evidence of consideration of the use of community facilitators in engaging community on problem-solving on recurring issues that drive civil litigation. | |
| | | 3 | Track requests and outcome with reporting on actions taken in response. | 1. Evidence of reported outcomes and subsequent actions following such engagements.<br>2. Use of CIIRB reviews to inform process<br>3. Evidence of public reporting by VPD of the actions resulting from such events. | |
| | | 4 | Provide for annual reporting and analysis that identifies and addresses the concerns raised during engagement strategies and actions taken in response to the VPD's civil litigation review. | 1. Consistent with Recommendation 33, ensure annual reporting on civil litigation review includes community input and sentiment to their perceptions of the actions giving rise to litigation. | |
|  | **Recommendation Topic: Transparency & Community Engagement** | | | | |
| | **Initial Recommendation** | | **Compliance Measures** | **Proofs** | |
| 40 | The Department should enhance the clarity and accessibility of its website in terms of required information and should consider ways to further utilize the site as a vehicle for informing and engaging the public. | 1 | Survey and discuss with community representatives what they feel are effective communications from and with the VPD, including the website and other digital means. | 1. Develop a survey that will be used to ask the community about what they want to see from VPD for engagement.<br>2. Use the survey for online and in person discussions to assess what the community identifies as effective communication. (Consistent with Recommendation 42).,<br>3. Provide a summary of the sentiments of the community. | |
| | | 2 | Develop a strategy for improved customer experience and communication through the VPD website, as informed by the community engagement and VPD goals. | 1. Use the community sentiment to inform an engagement strategy.<br>2. Strategy is focused on improved customer experience<br>3. Strategy tasks specific roles with responsibility for implementation, oversight and evaluation.<br>4. Strategy aligns with VPD's community engagement goals. | |
| | | 3 | Ensure the website, and other communication vehicles provide the opportunity to and encourages public comment and engagement on key policies and actions of the VPD. | 1. Updated communication vehicles based upon strategy and community input.<br>2. Evidence of community input into and assessment of policy revisions.<br>3. Evidence of adherence to the communication strategy as measured by agendas, opportunities for input, active communication. | |
| | | 4 | Provide for communication specific to the CRI on the VPD website and for the intranet to share successes and key events with CRI stakeholders. | 1. Establish a CRI link on the VPD website.<br>2. Establish a CRI link on the internal VPD website.<br>3. Evidence of updated and shared information on the links that relates to CRI or reform. | |

| # | Recommendation | | Action | Evidence / Criteria | |
|---|---|---|---|---|---|
| | | 5 | Create or update relevant policies regarding use of the website to ensure consistency in the sharing of relevant and critical investigative information. | 1. Policy that drives how websites are managed.<br>2. Tasking for maintaining updated information.<br>3. Policy requires timebound review of material and refresh of websites. | |
| | | 6 | Monitor access and use for improvement opportunities, including other social media tools. | 1. Tasked individual for engaging on social media/website.<br>2. Evaluation, tracking and reporting on comments and recommendations received.<br>3. Identification of ongoing concerns and review of communication vehicles for improvement.<br>4. Continuous improvement loop that informs and updates strategy and VPD members on concerns, improvements and recommended actions. | |
| | | 7 | Provide ongoing survey, at least bi-annually, to allow users and public to provide feedback. | 1. Evidence that the survey, used in CM#1, is an ongoing instrument that is used to inform and build communication vehicles.<br>2. Evidence of bi-annual opportunity for community input.<br>3. Maintain visibility on the VPD's actions and responses to community responses. | |
| 41 | VPD should engage community members at the interview stage of its promotional process. | 1 | Review best practices regarding community participation in promotional processes. | 1. Evidence of review of best practice in promotion processes.<br>2. Documentation of assessment of specific practices around community participation in promotions. | |
| | | 2 | Develop policy for community participation with input of key stakeholders to the VPD and the City of Vallejo. Define role and level of participation. | 1. Policy that provides a role for community engagement in the promotion process consistent with the position in question.<br>2. Policy reflects input of stakeholders.<br>3. The participation of community is identified publicly. | |
| | | 3 | Recruit community participation in the process. | 1. Evidence of strategy in recruiting community participation in the promotion process.<br>2. Evidence of VPD recruitment of community participation. | |
| | | 4 | Monitor feedback and participation for continuing improvement. | 1. Policy tasks specific individual with evaluation of the community participation process.<br>2. Ongoing review of participation post-promotion process.<br>3. Evidence of discussions with community regarding the participation processes.<br>4. Evidence of continuous improvement and review. | |
| 42 | VPD should devise additional ways to solicit and encourage feedback from all its communities regarding the performance of the Department. | 1 | Engage and seek input from community members, including the CAB, about ways the VPD could improve interaction and performance with its communities. Consider use of survey, community meetings and public comment sections on the website to gather the data. | 1. Consistent with Recommendation 40, evidence that the VPD has engaged broadly across the community about how to improve interaction.<br>2. As part of the communications strategy, assess areas for approvement on an annual basis.<br>3. Evidence of continuous improvement focus and resulting improvements. | |
| | | 2 | Address community concerns over inequity through policy, assessment and continuous monitoring and training. | 1. Develop and implement a Bias-Free Policing Policy.<br>2. Share broadly with the community for input and review.<br>3. Assess recommended changes and report on whether they will be implemented.<br>4. Provide training to officers on new policy, including roll-call and in-service.<br>5. Assess data, both through RIPA reporting and internal analysis, to determine progress, challenges and barriers for bias-free policing.<br>6. Report annually on the outcomes of the analysis in a public community meeting with opportunity for comment.<br>7. Continue to work with the community to improve and update practices for review. | |
| | | 3 | Develop a strategy to address and resolve the comments received, with a goal of improving performance. | 8. Evidence of the strategy from Recommendation 40 to collect and address the comments of community.<br>9. Evidence of strategy focused on improving interactions.<br>10. Assessment of outcomes of strategy. | |
| | | 4 | Consider use of business cards with officer information for public information and provide link to survey. | 1. Evidence of review and discussion regarding use of business cards.<br>2. Written evidence of decision and justification.<br>3. Policy that addresses use if approved.<br>4. Remediation for failure to distribute cards if not used. | |
| | | 5 | Report back to the community on actions and improvements taken in response to their comments. | 1. Evidence of ongoing engagement with community relative to strategy and other engagement opportunities that seek input.<br>2. Evidence of changes in practices as a result of comments. | |
| | | 6 | Provide for ongoing review and update of public comment and direction for police service goals. | 1. Posting of comments, review and actions.<br>2. Evidence of discussion regarding community input, review and actions. | |
| 43 | VPD should devise a feedback loop for its criminal justice partners (including the District Attorney, Sheriff, Judges, Public Defenders, Juvenile Justice Administrators, Probation Officers, and Social Workers) regarding the performance of its | 1 | Establish a routine meeting cadence with identified CJ stakeholders. | 1. Evidence of routinely scheduled meetings with CJ partners and appropriate VPD staff with decision authority or experience. | |
| | | 2 | Follow agenda items for discussion and ensure minutes with tasking regarding issues discussed. | 1. Evidence of established agendas and minutes from meetings.<br>2. Evidence of tasking and reporting back on tasked items within the minutes. | |
| | | 3 | Identify and task action items for VPD improvement. Ensure | 1. Evidence of VPD follow through on tasked items.<br>2. Actions as appropriate to address tasked items. | |

| | officers and Department as a whole. | | ongoi... ew and coordination internally with policy, training, and operations. | | |
|---|---|---|---|---|---|
| | | 4 | Ensure discussion around challenges and successes with the whole of the VPD team. | 1. Evidence that concerns and praise raised by CJ partners is shared with VPD team, e.g., Chief's letters, roll call training, etc. | |

| Recommendation Topic: Independent Oversight | | | | | |
|---|---|---|---|---|---|
| # | Initial Recommendation | | Compliance Measures | Proofs | |
| 44 | VPD should develop a way to obtain feedback and input from its community when contemplating major policy changes or public safety strategies. | 1 | Concurrent with R#7, 39 & 42, establish practice and policy to ensure community input on the development of VPD policies, particularly those that have direct community affect. | 1. Policy for VPD defines the role and priority for the need for community engagement for policy changes and strategy implementation. 2. VPD provides for open comment on all policy changes. 3. VPD defines what is a major policy change or strategy implementation and defines the specific community engagement that will occur. 4. VPD practice engages the community when implementing major changes in policies or public safety strategies especially those that directly affect the community. | |
| | | 2 | Ensure ongoing community engagement for policy review and updates. | 1. Specific tasking to individual or role for ensuring community engagement for policy review. 2. Plan/protocol for such engagement. 3. Evidence of ongoing community engagement regarding policy and resource decisions within VPD. | |
| | | 3 | Establish feedback process for the community stakeholder engagement to identify whether there is procedural justice and voice within the community. | 1. Defined process for community feedback. 2. Tasked role/resource to evaluate and act upon feedback. 3. Reporting to the community about actions taken in response to feedback. 4. Policy defines the specific process for community feedback, to include:   i. the time for public comment,   ii. the process for analyzing and addressing comments,   iii. specific determination as to why a comment is not accepted   iv. and VPD posting within 60 days of the close of the public comment timeframe of all actions taken in response to public comments. | |
| | | 4 | Evaluate engagement strategies in a continuous improvement loop to ensure continued diverse engagement across communities and VPD stakeholders. | 1. Annual review of engagement strategies to include factors such as number of persons engaged, issues addressed and feedback received. 2. Evaluation of participation in VPD outreach. 3. Evidence of improvement actions taken. | |
| 45 | VPD should work with City leadership to create a model of independent oversight specifically tailored to meet the needs of Vallejo. | 1 | Survey the community to learn of concerns and goals for oversight of the VPD. | 1. Evidence of community engagement, including survey, to learn of concerns and goals for oversight of VPD. 2. A plan that directs the survey and outreach. 3. Evaluation of sufficiency of outreach. 4. Corrective action to include evidence of review of actual outreach, diverse community participation and modifications to outreach plan as required. | |
| | | 2 | Develop a framework for independent review based upon the input and goals of the VPD and its communities. | 1. Framework for independent oversight of VPD reflects information resulting from f community engagement effort. 2. Evidence that VPD's community engagement and community input is assessed and informs the framework. 3. Framework includes a defined process for community input. | |
| | | 3 | Share the framework with the community and seek input on the proposed framework. | 1. Defined process to give the community opportunity for input on draft oversight framework. to include:   i. the time for public comment,   ii. the process for analyzing and addressing comments,   iii. specific determination as to why a comment is not accepted, and   iv. VPD posting within 60 days of the close of the public comment timeframe of all actions taken in response to public comments. 2. Evidence of modifications made to framework in response, if appropriate. | |
| | | 4 | Work with the VPD members to address concerns relative to independent oversight. | 1. Defined process to accept comments from VPD members regarding concerns over independent oversight. 2. Evidence of the review and analysis of concerns raised. 3. Evidence of VPD internal discussions and feedback regarding the decisions and all actions taken in response to VPD member comments. | |
| | | 5 | Ensure the division between the VPD's need for formal oversight and the litigation strategies for civil matters. | 1. Framework allows independence for oversight entity. 2. Policy and practice require independent oversight reporting without edit or engagement by City prior. | |
| | | 6 | Develop a strategic plan for implementation of independent review that includes timebound investigations, review periods and public dissemination. | 1. Plan for implementation of independent monitor. 2. Evidence of review of input. 3. Plan includes time limitations for investigation, review and public dissemination. | |