# EXHIBIT "EE"

## Greg Nyhoff Deposition Transcript

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3   _____

 4

 5   NEFTALI MONTERROSA, et al., )
                                 )
 6                  Plaintiffs,  )
                                 )
 7   v.                          )No. 2:20-cv-01563
                                 )
 8   CITY OF VALLEJO, et al.     )
                                 )
 9                  Defendants.  )
     _____

10

                     DEPOSITION OF JEFF NYHOFF
11   _____

12                        10:00 a.m.

                        October 27, 2023

13

14

15

16

17

18

19

20                      File #6280194

21

22

23

24

25        Reported By:  Judy Robinson, CCR #2171
```

Page 2

```
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF, NEFTALI MONTERROSA:
 3    JOHN J. COYLE
      AMANDA LORENTSON
 4    MCELDREW PURTELL
      123 South Broad Street, Suite #2250
 5    Philadelphia, Pennsylvania 19109
      267.656.7118
 6    jcoyle@mceldrewpurtell.com
 7
      FOR THE DEFENDANT, OFFICER TONN:
 8
      JACOB GRAHAM
 9    ANGELO KILDAY & KILDUFF
      601 University Avenue, Suite #150
10    Sacramento, California 95825
      916.564.6100
11    bkilday@akk-law.com
12
      FOR THE DEFENDANT, CITY OF VALLEJO, AND DEPONENT, LEE
13    HORTON:
14    KATELYN KNIGHT
      CITY OF VALLEJO
15    555 Santa Clara Street
      Vallejo, California 94590
16    707.648.4388
      katelyn.knight@cityofvallejo.net
17
18    Also Present:  Slater Bleichner-Jones, Law Clerk for
                     Angelo Kilday & Kilduff
19
20
21
22
23
24
25
```

Page 3

1                          I N D E X

2    WITNESS              EXAMINATION              PAGES

3    JEFF NYHOFF

4

5                         BY MR. COYLE ............. 5-80

6

7

8

9

10                       E X H I B I T S

11

12   NO.   PAGE          DESCRIPTION

13   1      23           Deposition Transcript

14   2      64           Video

15   3      68           Attorney General Bonta's

                         Stipulated Judgment Document

16

17

18

19

20

21

22

23

24

25

Page 4

1        BE IT REMEMBERED that the deposition upon oral

2    examination of JEFF NYHOFF was taken on October 27,

3    2023, at 10:00 a.m., at 125 South 309th Street,

4    Federal Way, Washington, 98003, before Judith A.

5    Robinson, CCR, Notary Public in and for the State of

6    Washington, residing at Federal Way, Washington.

7            Whereupon, the following proceedings were

8    had, to-wit:

9                REPORTER:  And good morning, Counsel --

10    or excuse me -- good afternoon, Counsel.

11            Just before we proceed with the

12    deposition today, I just wanted to make you aware I

13    am a licensed reporter of 24 years in the state of

14    Washington and will need a joint agreement and

15    stipulation from all parties in order to swear in the

16    witness under the federal rules.

17            Can I please get your verbal agreement,

18    beginning with the noticing attorney?

19                MR. COYLE:  John Coyle.  I agree.

20                MS. KNIGHT:  Agreed.

21                MR. GRAHAM:  Agreed.

22                * * * * * *

23                GREG NYHOFF

24            having been first duly sworn

25                on oath was examined

```
                                              Page 5

 1                   and testified as follows:
 2                   MR. COYLE:  Thank you, Judy.
 3                    E X A M I N A T I O N
 4    BY MR. COYLE:
 5         Q.    Good morning, Mr. Nyhoff.  My name's
 6    John Coyle.  I'm from the law firm of McelDrew
 7    Purtell, based out of Philadelphia.  We're here today
 8    for your deposition in the matter of The Estate of
 9    Sean Monterrosa versus the City of Vallejo, et al.
10                   Sir, have you ever had your deposition
11    taken before?
12         A.    Yes.
13         Q.    Okay.  About how many times?
14         A.    Three times.
15         Q.    So you generally know how this is going
16    to go, but I just want to go through a series of
17    instructions make sure we're on the same page, make
18    sure this goes quickly and smoothly as possible, all
19    right?
20         A.    Okay.
21         Q.    First and foremost you're under oath
22    and we're on the record.  So just like in a court of
23    law you're obligated to tell the truth; do you
24    understand that?
25         A.    Yes.
```

Page 6

1      Q.     The court reporter's taking a written

2   record of everything we say here today, so I want you

3   to keep two things in mind.  First, things like

4   uh-huh, un-uh, nods of the head, shrugs of the

5   shoulders, they don't translate well to a written

6   record, so you have to use things like yes or no.

7      A.     Yes.

8      Q.     Second, it's very much human nature to

9   anticipate my question, you want to jump in and

10  answer it, but that can lead to a really jumbled

11  record.  So try to let me finish my question before

12  you begin your answer, and I'll likewise do the same,

13  okay?

14     A.     Okay.

15     Q.     Okay.  The other thing is you have to

16  verbalize all your responses.

17     A.     Okay.  All right.

18     Q.     Sir, we don't want you to guess about

19  anything here today.  If you don't remember

20  something, you can't recall something, that's

21  perfectly acceptable.  Say, I don't remember, or I

22  don't know.

23     A.     Okay.

24     Q.     If you're going to estimate something,

25  be it a timeframe, a distance, whatever that may be,

```
 1    just let us know you're estimating; fair enough?
 2           A.      Yes.
 3           Q.      If you don't understand my question,
 4    it's confusing or it's jumbled, or whatever it may
 5    be, you just let me know and I'll do my best to
 6    rephrase it.  But if you do answer my question, I'm
 7    going to assume you understood it, okay?
 8           A.      Okay.
 9           Q.      We're going to be jumping around
10    timeframes a little bit here today, and I think
11    that's kind of unavoidable.  So if at any point in
12    time you're confused about the timeframe I'm talking
13    about, or anything like that, please let me know, all
14    right?
15           A.      Okay.
16           Q.      We should be here a couple hours, but
17    definitely not all day.  So if at any point in time
18    you need to take a break to use the restroom, stretch
19    your legs, whatever it may be, just let me know and
20    we'll take a break.  I only ask if a question's
21    pending you answer it before we take a break, al
22    right?
23           A.      All right.
24           Q.      All right.
25                   I don't mean any offense, then, by this
```

Page 8

1    question but I do ask everyone:  Is there any reason,

2    physical or mental condition, prescription

3    medications, drugs, alcohol, anything like that, that

4    could impact your ability to be truthful and accurate

5    here today?

6            A.    No.

7            Q.    Okay, great.  Let's get started then.

8                  What's your full name for the record?

9            A.    It's Gregory Allen Nyhoff.

10           Q.    And your date of birth, sir?

11           A.    January 15, 1960.

12           Q.    And what's your highest level of

13   education you've completed?

14           A.    Bachelor's Degree.

15           Q.    And where did you get that?

16           A.    Calvin college, Grand Rapids, Michigan.

17           Q.    And what year?

18           A.    1982.

19           Q.    Are you currently employed?

20           A.    No.

21           Q.    Are you retired?

22           A.    No.

23           Q.    When was the last time you held

24   employment?

25           A.    With the city of Vallejo.

Page 9

1          Q.      When did that employment end?

2          A.      July 2021.

3          Q.      Why did that employment end?

4          A.      The city and I mutually agreed to

5     separate.

6          Q.      Was -- were there conversations held

7     with city officials about that decision?

8                  MS. KNIGHT:  I'll just object to the

9     extent it calls for attorney-client communications or

10    deliberative process privilege.

11                 Greg, I don't want you to talk about

12    anything closed session.  So if you can answer it

13    without closed session or attorney-client information

14    you can.  I'm not sure that you can, though.

15                 WITNESS:  Can we just say that the city

16    council had to approve the separation agreement, so

17    indeed there was communications between the city and

18    I.

19    BY MR. COYLE:

20         Q.      Did these communications stem from any

21    particular event or occurrence?

22         A.      No.  I -- I -- I left for medical

23    reasons.

24         Q.      Okay.  When did you first begin with

25    the city of Vallejo?

Page 10

1              A.      January 2018.

2              Q.      And were -- was the entirety of your

3     time with Vallejo in the role as city manager?

4              A.      Yes.

5              Q.      Can you give me sort of a brief

6     synopsis of your employment history from when you

7     left Calvin College in '82 up until your time at

8     Vallejo?

9              A.      Sure.

10                     So I have over 30 years of experience

11    working with municipal government, over 25 of those

12    as a city manager.

13                     I started back in the '80s with a

14    special district in Highlands Ranch, Colorado.

15                     Moved to Michigan where I was a city

16    manager of a small city, Montague, Michigan.

17                     Then I moved to Colorado where I was a

18    city manager of Fountain, Colorado.

19                     Went to the city of Colorado Springs,

20    Colorado for about two years.

21                     Then moved to California and was a city

22    manager of Modesto, California.

23                     After that I was city manager in Oxnard,

24    California.

25                     And then moving to Vallejo, California

Page 11

1    became the city manager here.

2         Q.    When you joined in Vallejo in

3    January 2018, was there any type of on-boarding

4    process to get you up to speed on issues that are

5    going on in the city?

6         A.    None specifically.  I -- I do a lot of

7    research myself prior to even applying for positions,

8    and so most of what I did in learning about the city

9    would have been my own research, and then once I got

10   here spent time with the department heads and

11   understand their operations.

12        Q.    In your research leading up to joining

13   Vallejo, did you discover any issues or concerns

14   about anything going on with the police department?

15             MS. KNIGHT:  Objection, vague and

16   ambiguous.

17   BY MR. COYLE:

18        Q.    You can answer, sir.

19        A.    Yeah.  It was -- it appeared to me that

20   there had been a number of officer-involved shootings

21   that were of concern to the community, and basically

22   that was all.  I think what I saw was the need to --

23   to really evaluate that and then build -- build some

24   community trust or community confidence in the police

25   department.  It's one of those things that I could

Page 12

1    see pretty clearly in the very beginning that there

2    was -- there was concern over that.

3             And also when it came to financing

4    through the bankruptcy that they had significant

5    reduction in staff and had not built that back up to

6    close to even what it was prior to bankruptcy.

7        Q.    Were there any particular police

8    shootings that captured your attention prior to

9    joining Vallejo?

10       A.    No.

11       Q.    So just a general concern for the

12   number and the community's response?

13       A.    Yes.

14       Q.    When you began you mentioned there was

15   a need to evaluate that.  What steps did you take to

16   evaluate, you know, this sort of concern regarding

17   police shootings?

18       A.    I would say that specifically in

19   regards to the police shootings I didn't look at any

20   of those in any specificity.  I was looking more

21   overarching and how do we move forward with the

22   police department and with the entire city.  So I

23   really didn't have conversations that were specific

24   to officer-involved shootings.

25       Q.    Mr. Nyhoff, what steps did you take to

Page 13

```
 1   review this for a more overarching approach?

 2          A.    Well, I think -- I think that I would

 3   have to say it -- it occurs over time.

 4               You know, first and foremost one of the

 5   big issues that I saw quite quickly was the number of

 6   claims against the city and the fact that the city

 7   didn't have any risk management.  The city attorney's

 8   office had to double as risk management and do the --

 9   do the duties of the city attorney's office.  And so

10   those number of claims came to my attention as

11   something of concern to me.

12               I had -- the other part of that, then,

13   is to try to get to know some of the community and

14   find out their real -- their -- they might have me be

15   able to find out personally and hear them directly

16   talk to me about the police department and what their

17   concerns might be.

18          Q.    What type of concerns were expressed to

19   you by community members when you first took on the

20   job?

21          A.    There -- there was a lot of support for

22   Police Chief Bidou and the police department.

23          Q.    There was a lot of support.  Were there

24   any concerns?

25          A.    Amongst those that I spoke with, I
```

Page 14

1    would say not that I can recall with any specificity.

2        Q.    You mentioned the city didn't have any

3    risk management department.  What -- what did you

4    envision a proper risk management department's role

5    related to police claims?

6        A.    So it would be for them not to evaluate

7    internal affairs' investigations but to really

8    monitor the number of claims we're seeing and are

9    there trends within those claims that -- that might

10   be causing us to need additional training to go into

11   the buildings and make sure that they're safe.

12           Not really to dig deep into policies and

13   procedures but to, you know, make sure we keep track

14   of those claims and see if we can see some type of

15   trend in where we're seeing is it a lack of training?

16   Is it a lack of policies?  What is it that is causing

17   these number of claims?  And then work through my

18   office and Chief's office to see what kind of

19   programs we can put together to move forward and

20   correct those if there needed to be corrected.

21       Q.    So tracking sort of maybe a certain

22   officer has a large number of claims or there's a

23   certain type -- or a certain number of, say,

24   taser-type claims, those are the sort of trends you

25   would envision the risk management department

Page 15

1   tracking?

2          A.      Yeah, not necessarily that.  I mean, I

3   wasn't looking for the officer involved, I was

4   looking for trends of what type:  Is it use of force?

5   Is it traffic accidents?  What might be -- is it, you

6   know, officer-involved shootings?  What are the

7   trends we need to focus on here?

8                  And, you know, ultimately I saw it as a

9   very large expense to the city, and that's something

10  we needed to cut back if at all possible because we

11  needed to use all the revenue we could to supply

12  services for the community.

13         Q.      When you arrived there was nothing in

14  place to track these types of trends?

15         A.      You know, I would say the city

16  Attorney's Office did that, and I don't quite recall

17  if they had that or not.

18         Q.      Sir, in March of 2020 were you the

19  subject of an investigation ordered by Vallejo City

20  Council?

21                 MS. KNIGHT:  Objection, privacy.

22                 Let's see.  Yeah, privacy, and I think

23  -- I'm going to instruct the witness not to answer,

24  John, unless you've got a real good basis for

25  relating to this case.

Page 16

1              MR. COYLE:  Well, it's -- I'm -- I'm

2    probing the witness's credibility here.

3              My understanding is that the

4    investigation and the subsequent separation from

5    unethical decision-making practices, of fraud and

6    corrupt dealings, which both would trigger, you know,

7    cross-examination with some credibility and the

8    weight of his testimony.

9              MS. KNIGHT:  Okay.  I'm going to object

10   and instruct him not to answer on privacy grounds for

11   any investigations, anything sort of personnel

12   related to him, and that he's not a defendant not

13   relevant to this case, I will allow you to ask him if

14   he was asked to leave because of any sort of, you

15   know, findings of misconduct or because of the

16   results of an investigation.  I think that's fair.

17             MR. COYLE:  Okay.  Well, and I don't

18   necessarily agree with that but we can address that

19   later.

20             MS. KNIGHT:  Do you want to ask him

21   that question and get the answer?

22             MR. COYLE:  Sure.  Just give me one

23   sec.

24             MS. KNIGHT:  Sure.

25   BY MR. COYLE:

Page 17

1          Q.       Sir, you gave deposition testimony in a

2    lawsuit brought by Slater Matzke, correct?

3          A.       Correct.

4          Q.       Do you remember testifying in that

5    deposition that the basis for your separation was

6    handling the badge bending investigation as well as

7    the Mare Island Development Project?

8          A.       Can you repeat that question?

9          Q.       Sure.  Do you remember testifying,

10   giving a deposition in that case?

11         A.       Yes.

12         Q.       Okay.  Do you remember giving testimony

13   that your separation from the city of Vallejo stemmed

14   from your handling of the badge bending investigation

15   as well as your involvement in the Mare Island

16   Development Project?

17         A.       No.

18         Q.       You don't recall that testimony?

19         A.       No.

20         Q.       Okay.  All right.  We'll circle back to

21   that.

22                  Was your agreed separation from Vallejo

23   related at all to your handling of the badge bending

24   investigation and/or the Mare Island Development

25   Project?

Page 18

```
 1          A.    I -- I left for medical reasons.

 2          Q.    Okay.  Sir, as part of your separation

 3    agreement you're paid by the city of Vallejo actually

 4    to prep for testimony and then to testify in

 5    proceedings involving the city of Vallejo, correct?

 6          A.    Correct.

 7          Q.    Okay.  At a rate of $128 per hour?

 8          A.    Correct.

 9          Q.    Okay.  How many hours of preparation

10    for this deposition did you have?

11          A.    About six or seven hours.

12          Q.    During that preparation did you review

13    any documents or materials?

14          A.    Yes.

15          Q.    What did you review?

16          A.    I reviewed the OIR report.  I reviewed

17    the -- my deposition regarding the Captain Whitney

18    case.  And I reviewed my -- the emergency order,

19    public safety emergency order that I present and was

20    approved by city council.

21          Q.    What emergency order was that?

22          A.    It was passed in October of 2020.

23          Q.    Okay.  And what did it deal with?

24          A.    A range of issues.  It was -- we were

25    -- we were calling for the emergency because we had
```

Page 19

```
 1   seen a -- what I think was a record number of
 2   homicides throughout the city and record number of
 3   crimes.  Crime had spiked during that period of time.
 4              We -- I felt the need for us to move
 5   forward on some of the OIR recommendations that the
 6   chief, the police department were working on and I
 7   also felt that there was a fiscal constraint due to
 8   what the pandemic had done to call for a public
 9   safety emergency.
10        Q.    And the OIR report you reviewed, that
11   was the one that the final draft was published, looks
12   like -- what did I do with it?  I think May 2020?
13        A.    Yeah, the report is dated May of 2020.
14        Q.    Do you recall seeing drafts of that
15   report prior to the final draft being published?
16              MS. KNIGHT:  I'm going to object on
17   attorney-client privilege there, John.  The city
18   council did waive privilege on the final product.
19   But there -- the agreement with the OIR group was
20   with our office and attorney-client privilege
21   attached, and I don't believe any -- there was any
22   waiver on any of the drafts or any discussions
23   related to that.
24              MR. COYLE:  Okay.  Well, we'll make a
25   formal request for all the draft.  I'll put that in
```

Page 20

1   writing here and then we can sort out the privileged

2   nature of those drafts later.

3           MS. KNIGHT:   Sounds good.

4   BY MR. COYLE:

5           Q.     Did you have conversations with the

6   folks from OIR report about the tenor or the language

7   they were using in those drafts?

8           MS. KNIGHT:   Same objection.

9   Attorney-client privilege.  I'm instructing the

10  witness not to answer.

11  BY MR. COYLE:

12          Q.     Do you remember testifying earlier that

13  your decision to leave the city was based on a

14  medical issue?  I want to show you your deposition

15  transcript from the Matzke matter; do you see this

16  document?

17          A.     Yes.

18          Q.     Okay.  It says:  "Videotaped deposition

19  of Gregory Nyhoff, Wednesday, July 19th, 2023 in the

20  matter of Slater Matzke and a few others versus the

21  city of Vallejo?

22          A.     Yes.

23          Q.     Do you remember giving deposition

24  testimony in that matter on that date?

25          A.     Yes.

Page 21

```
 1        Q.    I'm going to skip ahead here to page
 2   39, line 20.  Question is:  "You told me that there
 3   was some media folks who were raising issues, I
 4   guess, both publically and at city council meetings
 5   that led in some way to your decision to leave the
 6   city; is that fair?"  And the answer was:  "Yes."
 7              Question follow-up was:  "And do you --
 8   what were the issues that they were raising?  What
 9   were they related to?"  And you answered:  "They were
10   relating to the police department in my oversight
11   there, badge -- badge bending, and there were a
12   couple challenges to the term agreement on Mare
13   Island."
14              Do you see that?
15        A.    Yes.
16        Q.    So is it fair to say that public
17   attention to your handling of badge bending as used
18   and Mare Island was also a motivating factor behind
19   your separation from the city?
20              MS. KNIGHT:  Do we need to take a break
21   to delve more into the medical --
22              WITNESS:  Yes.
23              MS. KNIGHT:  Okay.
24              John, could we have a quick break?
25              MR. COYLE:  Sure.  Take five minutes?
```

Page 22

1              MS. KNIGHT:  Yeah, that should be more

2      than enough on this.

3                     (Off the record.)

4      BY MR. COYLE:

5          Q.     Your deposition transcript was whether

6      public controversy or public media regarding the

7      badge bending investigation and Mare Island issue

8      motivated, at least in part, your decision to leave

9      the city.

10         A.     So, so -- so I left for medical

11     reasons.  And I guess to connect the dots here the --

12     there was a group called Vessels of Vallejo that had

13     placed posters out, cartoon posters making me look

14     like the devil, and they placed it on my doorstep,

15     they placed it on my neighbor's doorstep, they placed

16     it on light posts, placed it on a couple buildings,

17     couple electrical boxes throughout the city, and it

18     had to do and it mentioned the firing of Captain

19     Whitney and the badge bending and the call to fire

20     me.

21              There were other media outlets.  A

22     couple of them, Open Vallejos is one of them, that

23     would falsely produce information, which is what I am

24     getting to is the medical reason I left for was

25     partially the stress of those things.

Page 23

1        Q.      Understood.

2                MR. COYLE:   Just for the clarity of the

3    record, Judy I'm going to mark this deposition

4    transcript as Nyhoff 1.

5                    (Exhibit No. 1 was marked.)

6    BY MR. COYLE:

7        Q.      All right, sir.  I would like to go

8    back to your first year, we'll say January 2018 to

9    December 2018.  During that timeframe did you

10   recognize any issues with the police department that

11   you felt needed to be addressed?

12       A.      I think -- so that first year I spent

13   quite a bit of time looking at the risk management.

14   And I actually, you know, brought somebody in to give

15   some evaluation of -- of -- of some of that

16   information.

17               And, you know, a lot of claims had to do

18   with the police department.  There had been a number

19   of payouts, and also the -- our insurance risk

20   coverage insurance we were having conversations with

21   them about significant increases in our premiums, in

22   our -- in our co-pays.

23               And so broadly, yes, I had concerns that

24   I felt required us to look into some type of

25   assessment regarding those liabilities.

Page 24

1           I think the other concern, or something

2    I felt was necessary to improve on, was just our

3    community relations and try to rebuild some trust.

4    Although I found most people very supportive of the

5    police department, I still felt that there was need

6    for us to try to do more community outreach to build

7    trust back in the department.

8           Q.    Based on your experience, did you think

9    there was an outsized number of excessive force-type

10   claims being made against the city?

11          A.    Based on my experience, yes.

12          Q.    Did you take any steps to look at the

13   Department's review of use of force for critical

14   incidents during that first year?

15          A.    I did not.  The -- although I'm over

16   the police department, the only real part I have is

17   the police chief, and then all internal

18   investigations, policies and procedures, those are

19   all under the authority of the police chief.  So I

20   did not look at those, no.

21          Q.    As a city manager did you have any role

22   in hiring, firing decisions -- well, scratch that.

23   Let me just say:  Did you have any role in

24   termination or discipline decisions with the police

25   department?

Page 25

1           A.      Only in regards to the police chief.

2           Q.      So there was testimony in -- in the

3    John Whitney matter by Slater Matzke, do you know who

4    Slater Matzke is?

5           A.      Yes.

6           Q.      Who is Mr. Matzke?

7           A.      He was an employee -- a consulting

8    employee or consultant with the city for several

9    years and ultimately became an employee of the city

10   working mostly with economic development.  Worked

11   with me under my office.

12          Q.      He worked in your office?

13          A.      Yes.

14          Q.      When did he begin working full time in

15   your office?

16          A.      I don't recollect specifically.  It

17   would be -- I -- I think it's -- beginning of 2020 --

18   hold on.  20 -- 2021 or end of 2020.

19                  Mr. Matzke testified in his deposition

20   in the Whitney matter that he told you that your

21   approval -- or I'm sorry, you told him, you, Mr.

22   Nyhoff, told Mr. Matzke that your approval was

23   required for personnel decisions affecting

24   high-ranking police officers.  Is that limited just

25   to police chief or does that also apply to captains

Page 26

1    and things of that sort?

2            A.      Only the police chief.

3            Q.      It appears to me, just from a general

4    perspective, your time between January 2018 and July

5    of 2021, there was some efforts to make reform within

6    the police department.  There was the OIR report,

7    there was a number of other things, and there's some

8    of those recommendations or efforts related to

9    oversight and accountability of officers, including

10   related to excessive force and deadly shootings.

11   Would you agree with that?

12           A.      Yes.

13           Q.      We've heard testimony from other

14   individuals that oftentimes the Vallejo Police

15   Officers Association inhibited some of those efforts.

16   Would you agree with that?

17           A.      May I ask just for a point of

18   clarification?  You said "testimony".  You don't mean

19   any, like, formal deposition, or anything like that,

20   you just mean general?

21           Q.      Yeah.  Well, we heard from Captain

22   Horton yesterday and he testified that generally

23   speaking that sometimes the VPOA would stand in the

24   way of some of the reforms they were trying to

25   implement.  Would you agree with that?

Page 27

1      A.    I would say that I have by a number of

2  years working with labor organizations and labor

3  groups and I don't -- I -- I don't see them, they

4  weren't any different than what I'd say I experienced

5  in other cities.  They -- they are always going to

6  take a look at whatever changes you want to make in

7  policies and procedures and question it.

8           So I would say not anything different.

9  Not anything that -- that a labor organization

10  wouldn't normally do or has normally done in my

11  experiences.

12      Q.    Did you have any perception at all that

13  the VPOA had greater access to you and city council

14  or greater influence to you and city council than

15  other labor organizations have had in the past?

16      A.    I would say they absolutely didn't have

17  anymore access to me than any other city I have been

18  in.  It might have actually been less here.

19           City council members, I don't think it

20  was -- I don't think it was excessive.  All the

21  cities, all my experiences I've had there's always

22  conversations between elected officials and the

23  leaders of the different labor organizations.  So I

24  -- I felt it was quite normal, quite similar to what

25  I experienced in other places.

Page 28

```
 1          Q.     Sir, do you know Michael Nichelini?
 2          A.     Yes.
 3          Q.     Okay.  He was the ^ registered and I
 4    believe still is Vallejo police officers president.
 5          A.     Yes.
 6          Q.     Do you remember when he was appointed
 7    president?
 8          A.     I -- I do not recall specifically.  But
 9    I know when I first got here Matt Mustard was the
10    president of the association.  So I -- I believe it
11    was maybe midway.  Maybe 2019.  I don't recall
12    specifically, but I worked with Matt Mustard.  He was
13    the president when I first got here.
14          Q.     And when Nichelini was originally
15    president of the VPOA, he was a lieutenant with the
16    police department?
17          A.     During my tenure here, yes, he was a
18    lieutenant.
19          Q.     And he has since been terminated?
20          A.     That -- he was terminated, yes.
21          Q.     What was your relationship like during
22    your tenure at Vallejo with Mr. Nichelini?
23          A.     We had very, very few conversations.
24    So very minimal.  Minimal.
25          Q.     Do you know Mr. Nichelini's wife?
```

Page 29

1          A.     Yes.

2          Q.     Who's that?

3                 MS. KNIGHT:  Michelle.

4                 WITNESS:  Yeah, I know.  One second.

5     So Kate, I can hear the -- was that just the voice

6     coming through the wall?  Sorry, I can hear voice so

7     I just wanted to make sure.

8                 MS. KNIGHT:  Yeah.  Sorry, the walls

9     are a little thin.

10                WITNESS:  Got it.

11                So Michelle Straub.

12    BY MR. COYLE:

13         Q.     Michelle Straub also worked for the

14    city of Vallejo, correct?

15         A.     Correct.  She worked for my office.

16         Q.     What was her role?

17         A.     She was my administrative assistant.

18         Q.     So your right-hand woman, so to speak?

19         A.     So to speak, yes.

20         Q.     Did Mr. Nichelini ever come into your

21    office and visit Ms. Straub?

22         A.     Occasionally, yes.

23         Q.     During that time period did you speak

24    with him at all?

25         A.     A couple times, yes.

Page 30

```
 1        Q.     Was he one of the few Vallejo officers
 2   that had access to your office?
 3               MS. KNIGHT:  Objection, vague.
 4   Ambiguous.
 5   BY MR. COYLE:
 6        Q.     You can answer, sir.
 7        A.     The --  well, first of all, you know, I
 8   hold value in, you know, being open to any employee
 9   that, you know, comes up to my office wants to say hi
10   to me.  He was the president of the labor group, and
11   so all the presidents of the labor group would have
12   -- well, I call it greater access, but very few times
13   did I ever meet with the presidents of that.  So I --
14   I -- when you say that he had a greater ability to
15   come into my -- access to my office as the president,
16   I always welcomed them if they wanted to come in and
17   talk to me, and sometimes I would ask them to come
18   talk to me, but it was on rare occasions.
19        Q.     Sir, at some point in time in 2020
20   Mr. Nichelini circulated an email from his work
21   account with a picture of the Vallejo badge with a
22   swastika on it; is that correct?
23        A.     As to the timing I'm not sure, but
24   that's correct, I do recall that email.
25        Q.     Did that act cause you any concern?
```

Page 31

```
 1          A.    Yes.
 2          Q.    How -- in what way did it cause concern
 3    to you?
 4          A.    Well, I -- you know, one of the things
 5    that -- that was important to me is try to rebuild
 6    trust, and so anything that would cause concern or
 7    questions in any area of the community.  And so that
 8    swastika is not a symbol that -- that relates to
 9    anything positive at all, in my opinion.  And when I
10    saw that I was concerned that I would see that from
11    the police department and did have a conversation
12    with the chief, which he then in turn, my
13    recollection is he investigated it.
14          Q.    Did, in your interactions with
15    Mr. Nichelini, did you find him to be a racist or
16    white supremacist?
17          A.    No.
18          Q.    Did the sharing of that image give you
19    concern that he might be a racist or white
20    supremacist?
21          A.    No.
22          Q.    Why not?
23          A.    I had no personal interaction with him
24    to believe that he was that.  My concern simply is
25    why would he use that emblem, and I wasn't aware of
```

```
 1   its meaning or the use of it by the police department
 2   in the past.
 3         Q.    Are you aware of it now its meaning or
 4   the use of it by the police department in the past?
 5         A.    My recollection is that I was told that
 6   it had to do with some -- some -- some time in the
 7   history when they had utilized that emblem.
 8         Q.    Did you find the timing of
 9   Mr. Nichelini circulating this image shortly after
10   the hiring of Chief Williams to be troubling at all?
11         A.    No.
12         Q.    How many black police chiefs has
13   Vallejo had prior to Mr. Williams?
14         A.    I -- I had heard that he was the first
15   one, but I don't know that for sure.
16         Q.    I want to talk to you a little bit
17   about badge bending.  When was the first time you
18   were made aware that badge bending might be occurring
19   in the Vallejo Police Department?
20         A.    My recollection is the first time I
21   heard of it was from Mayor Sampayan.
22         Q.    And when was that?
23         A.    I don't recall -- I don't recall the
24   timeframe.
25         Q.    Do you remember sometime between
```

Page 33

1  February and July of 2019 having a meeting with John
2  Whitney about badge bending?
3         A.    I -- I -- I -- I believe that's the
4  accurate timeframe, but I did have a meeting in
5  regards to the interim police position with Chief
6  Whitney where he mentioned badge bending, yes.
7         Q.    Okay.  Was that before or after you had
8  heard about it from Mayor Sampayan?
9         A.    My recollection is it was after --
10 after I had heard from Mayor Sampayan.
11        Q.    When Mayor Sampayan first brought it to
12 your attention what did he say?
13        A.    I said I would look into it and get
14 back to him.
15        Q.    Well, I'm sorry.  What did he say to
16 you?
17        A.    My recollection was a short comment
18 that he said he had heard from someone that there was
19 badge bending within the police department.
20        Q.    Did he give any sort of color about why
21 badges would be bent or why it might be a concern?
22        A.    Not that I recall.
23        Q.    Did he describe this as some type of
24 wide-spread practice?  I'm trying to understand why
25 -- why a badge being bent could just be damaged, why

Page 34

1  it garnered the mayor's attention and he felt it

2  important to raise it to your attention?

3        A.     In my experience I have learned that

4  there have been departments throughout the country,

5  certainly in my area, that do certain things that may

6  represent something.  And so I think him as a mayor

7  understood that, that that might symbolize something

8  in regards to this -- these police officers and it

9  would be important for us to look into that.

10        Q.     Did he indicate at all to you that he

11  believed it was related to police shootings?

12        A.     No.

13        Q.     When you met with John Whitney and he

14  mentioned the badge bending to you, was that the

15  second time you had heard of it?

16        A.     Yes.

17        Q.     After your meeting with Mayor Sampayan,

18  did you take any steps to start any type of

19  investigation into the badge bending?

20        A.     Yeah, so -- so maybe just to clarify

21  that-- so after -- so after I met with the mayor,

22  after he mentioned that to me, I went directly to

23  Chief Bidou, the police chief, and I asked him about

24  that.  And he concurred and stated that, yes, that

25  that did happen but it was -- it had already been

Page 35

1    taken care of it and it was sometime in the past.

2           Q.     Did he indicate that there was an

3    investigation that had been done?

4           A.     No.

5           Q.     Did you ask him?

6           A.     No.

7           Q.     You weren't curious to find out what

8    the extent or breadth of this process was?

9           A.     When he told me it had been taken care

10   of I made the assumption that whatever was necessary,

11   investigations, disciplinary action, whatever,

12   counseling, whatever may have needed to occur or

13   should have occurred.

14          Q.     And we know now that nothing occurred

15   at that ^ , correct?

16                 MS. KNIGHT:   Objection, foundation.

17   Misstates -- misstates evidence.   Calls for

18   speculation.

19   BY MR. COYLE:

20          Q.     You can -- you can answer, sir.

21          A.     What I would say is that it -- the --

22   the police chief told me it had been taken care of,

23   which I made the assumption then that it was done and

24   no longer occurring, and when it resurfaced later on

25   then, yes, obviously it had not been taken care of or

Page 36

1   handled.

2        Q.    As of the time that Chief Bidou told

3   you it had been handled there had been no formal

4   investigation, correct?

5        A.    Could you ask that again.  I'm sorry.

6        Q.    When you had this first conversation

7   with Chief Bidou and he told you it had been taken

8   care of, there had been no formal investigation up to

9   that point, correct?

10       A.    Not that I was aware of.

11       Q.    Okay.  Is it fair to say the first

12  formal investigation was the Giordano investigation

13  and report?

14       A.    Again, I'm not sure what actually

15  happened prior to under Chief Bidou, but yes, that is

16  my understanding since I was here that the chief and

17  I pursued that investigation into the badge bending.

18       Q.    When John Whitney raised the matter to

19  your attention again what did he tell you?

20       A.    He told me that -- we were discussing

21  Chief Bidou was leaving, so I was just having a

22  general discussion with him about his -- whether he

23  would be interested in applying for the chief's job.

24  And so he was talking to me about a number of -- of

25  things that he thought -- he probably would do

Page 37

1    differently, and he said there was badge bending that

2    had occurred and Chief Bidou -- he told Chief Bidou.

3    Chief Bidou asked him to go take a box and collect

4    them and I believe required the officers to repair

5    them and that was the extent of my recollection of

6    that conversation.

7            Q.    Did you find -- in hearing that that

8    was Chief Bidou's instructions, did it satisfy you

9    that that was an appropriate response to this badge

10   bending?

11           A.    I would say that what I thought was the

12   fact that immediately once they found out about these

13   badges that were bent it was sometime ago that they

14   collected them and made the officers pay for

15   straightening them out, and we didn't talk about what

16   type of investigation went into that.

17                 And so, again, I won't go back to what

18   the chief told me.  I made the assumption when he

19   said it had been handled and taken care of that

20   appropriate investigation and -- and -- and their

21   police department looking into it and ensuring that

22   it didn't continue had been done.

23           Q.    So I guess what I'm confused about

24   here, first, he assured you the issue had been

25   handled and it had been handled in the past, and then

Page 38

1  Mr. Whitney comes to you and says we have this thing

2  going on.  The chief instructed me to collect all the

3  badges and get them repaired.  When you hear that

4  from Mr. Whitney, does that trigger anything in your

5  mind to say that doesn't sound like a sufficient

6  response?

7         A.    I work directly with the police chief,

8  and when he told me it had been handled my assumption

9  was that it was.  And when he told me it had been in

10 done in the past it's not something that I thought

11 was actively being done anymore, it had been stopped.

12        Q.    Okay.  But you're the police chief's

13 direct report, correct?

14        A.    That's correct.

15        Q.    So you're his supervisor, correct?

16        A.    Correct.

17        Q.    So you just simply took him at his word

18 and decided to move on?

19        A.    I thought the police chief had done the

20 appropriate investigation and review of the matter

21 and had ensured that it was completed and done and no

22 longer was occurring.

23        Q.    But outside of the chief's statement to

24 you, you took no individual personal steps to assure

25 that that was the case?

Page 39

```
 1              MS. KNIGHT:  Objection, asked and
 2   answered.  Go ahead.
 3              WITNESS:  I had no reason in my mind to
 4   look into a case that had already been resolved and
 5   dealt with by the chief.
 6   BY MR. COYLE:
 7        Q.    Did Captain Horton ever bring badge
 8   bending to your attention?
 9        A.    Not that I recall.
10        Q.    What was your impression of Captain
11   Horton?
12        A.    You know, I dealt with them so little,
13   either him or the -- either of the Captains.  I know
14   that he had been on stress leave for some time, but
15   from time to time he would be the interim chief.  I
16   had no -- I had no negative impressions of him based
17   on my little knowledge or little experience of
18   actually working with him.
19        Q.    How about John Whitney, what was your
20   impression of Mr. Whitney?
21        A.    Again, I had very little interaction
22   with him.  Again, I had no negative impressions based
23   on my experience with him.
24        Q.    Did you believe in Mr. Whitney's
25   actions in following up on the badge bending and
```

Page 40

1    reporting on the misconduct was not in the best

2    interest of the city?

3        A.    I -- I -- I -- I listened to all of his

4    comments and I welcome comments to improve the

5    department or concerns about the department as I

6    would from other in the department.  So I had

7    absolutely no concerns about him raising those

8    issues.

9        Q.    Did you ever tell Mr. Matzke that your

10   decision to bring on Chief Allio was motivated in

11   part by shutting off or dealing with John Whitney?

12       A.    I'm sorry, can you repeat that?

13       Q.    Did you ever tell Mr. Matzke that your

14   decision to bring on Chief Allio was motivated in

15   part to deal with or silence John Whitney?

16       A.    I don't recall having a conversation

17   with Mr. Matzke about that.

18       Q.    Well, was your decision to bring in

19   Chief Allio motivated in part by your desire to

20   silence the concerns of Mr. Whitney?

21       A.    Absolutely not.  And so the two

22   captains were at times Horton and Whitney, and I

23   wanted them both to have the opportunity if they

24   wanted to apply for the position to do so.  But they

25   were also, based on what the chief had told me, they

Page 41

1    had claims and counterclaims against each other.

2                    And so having either one of them serve

3    as a police chief, both from the fact they were

4    appeared not to be getting along well; and secondly,

5    as I didn't want either one of them to have the --

6    shall we say the -- the position of chief that would

7    maybe give them a -- a step up in -- in any

8    application of candidacy for the chief themselves.

9                    So the main motivating reason was is

10   they were appeared not be getting along, and I

11   couldn't afford to have the leadership of the police

12   department at odds at such a critical time.

13        Q.    You said claims and counterclaims

14   against each other.  I'm not sure I understand what

15   that means.  Could you elaborate?

16        A.    Just one of the -- what the chief had

17   told me there was some claims, and I don't remember

18   which one did it.  One was in regard to someone was

19   lying on their time sheets one of them, and I can't

20   remember what the counterclaim was.  But they were

21   making some internal claims against each with the

22   chief.

23        Q.    Were those claims investigated by

24   internal affairs?

25        A.    I don't know the answer to that.

Page 42

1      Q.      So under the chief are the Captains the

2   next highest ranking people in the Vallejo Police

3   Department?

4      A.      Yes.

5      Q.      Did you have any concern that two of

6   the four highest ranking individuals in the police

7   department were -- were openly bickering and accusing

8   each other of misconduct?

9      A.      Yes, that's concerning.

10      Q.      Did you take any steps to investigate

11   or address that issue?

12      A.      Again, I would say that my role and my

13   authority has no oversight.  I will tell you that I

14   did speak to the chief just that he needed to deal

15   with that situation.  We needed those two to be

16   working together.

17      Q.      Did it create any concern about the

18   chief's ability to adequately lead the department?

19      A.      No.  It did not give me concern that he

20   was unable to lead the department because I thought

21   that he was going to have -- he was going to be

22   dealing with that, and I believe that he did.

23      Q.      Looking back now, the benefit of

24   hindsight, you know that Chief Bidou didn't

25   adequately address the badge bending issue and -- and

Page 43

1   you have those bickering captains in the department,

2   do you think Chief Bidou was competent in leading the

3   Vallejo Police Department?

4                  MS. KNIGHT:  Objection, vague.

5   Ambiguous.

6                  WITNESS:  The -- the -- first of all,

7   I'll just address the badge bending.  Because his

8   saying that that was dealt with to me, and me

9   trusting that, I found out after he had left that

10  that wasn't true, and in my mind that was -- that was

11  extremely concerning that that should have been done,

12  and especially because of the fact that I believed

13  him that he had taken care of that and done the

14  proper investigation.

15                 So again, he had left at that point in

16  time, but not following up on that causes me concern

17  that that was a critically important issue to

18  resolve.

19                 Um --

20      Q.     Okay -- I'm sorry, go ahead.

21      A.     And then the bickering between the two

22  captains it did, you know, it's -- it's -- it is

23  cause for concern in those individual things.  But I

24  think the badge bending was unequivocally would cause

25  me to lose trust in him based on what he told me.

Page 44

1    The arguing and bickering between captains and

2    lieutenants, you know, those are just a normal part

3    of operations.  One thing Chief Bidou did have was a

4    lot of confidence from the community.

5         Q.    So in retrospect, do you think Chief

6    Bidou was competently leading the department?

7         A.    Yes.

8         Q.    After your conversation with John

9    Whitney about badge bending, when was the next time

10   it was brought to your attention?

11        A.    Well, I think that -- so I did, you

12   know, at least let Chief Bidou know that -- that

13   Captain Whitney had those concerns, shared that

14   conversation with him.

15              And then there was -- there had been --

16   there was no more conversation about the badge

17   bending.  In my recollection it wasn't until one of

18   the officers stated in the media, I think it was

19   McMann, stated in the media that there -- that he had

20   been part of badge bending, or something to that

21   effect.  So that was the next time I heard it, which

22   was months, many months later.

23        Q.    Was that before or after Chief Allio

24   started with the department?

25        A.    My recollection is Chief Williams was

Page 45

1    here when that issue resurfaced.

2           Q.      When Chief Allio joined the department,

3    did you and him have any conversations about badge

4    bending?

5           A.      Not that I recall.

6           Q.      Did he report to you that on his first

7    day of the job Captain Horton brought badge bending

8    to his attention?

9           A.      Not that I recall.

10          Q.      Would you expect a new police chief,

11   being informed of such a thing, to bring that to your

12   attention?

13          A.      I think that what I would expect of the

14   new chief to do was -- was evaluate it in regards to

15   its, you know, what did he mean by that?  Do some

16   type of investigation or have some kind of discussion

17   with the department and find out its credibility or

18   whether it had been something done in the past and it

19   had been taken care of, as I was told it was.

20          Q.      In your estimation, was the badge

21   bending a celebration of the death of a human being?

22          A.      No.

23          Q.      Do you remember giving a town hall with

24   Chief Williams on October 1st of 2020?

25          A.      I don't recall that specifically.  Can

Page 46

```
 1   you tell me where it was maybe?  We did go to a few
 2   of those meetings.
 3          Q.    Sure.  It was Friendship Missionary
 4   Baptist Church.
 5          A.    Okay, yes.
 6          Q.    I want to play for you a video clip
 7   from that.
 8          A.    Okay.
 9          Q.    And then circle back about that.
10                Well, before I do that what, in your
11   estimation, what was -- what was the purpose behind
12   badge bending?
13                MS. KNIGHT:  Objection, speculation,
14   lack of foundation.
15                Go ahead.
16                WITNESS:  Yeah, I -- I don't know what
17   -- what the purpose of that would be.  I don't know.
18   BY MR. COYLE:
19          Q.    Okay.  All right.  I'm going to play a
20   video for you.  It's the recording of that town hall.
21                Let me know if you have any trouble
22   seeing or hearing the sound.  Can you see that?
23          A.    Yes.
24          Q.    All right.  So this is the town hall I
25   just mentioned and we're going to start in at 53:36
```

Page 47

```
 1    on the ticker, and I'm going to play some of the
 2    introductory questions of discussion before you give
 3    statements.
 4                    (Beginning of video.)
 5                    "Question:  Let's move onto another
 6    issue that's been talked about a lot, bent badges,
 7    and we recognize that, again, the police officers
 8    bill of rights doesn't allow you all to say certain
 9    things.  But this bent badges issue came about when?
10                    "Answer:  I ordered an official inquiry
11    into this badge bending when I was first notified
12    about it by a news source.  The actual incident is
13    currently under investigation.  It occurred prior to
14    me being sworn in.  It could have -- so that's under
15    investigation.  The facts need to be determined about
16    that.
17                    But I will say this, it's despicable.
18    The celebrating of a killing of a human being, if
19    that is done under the power of authority or under,
20    you know, -- by -- by a police officer in our
21    department it's despicable, it will not be tolerated.
22    Any anyone who does that does not deserve to wear our
23    patch.  They should not be allowed to wear our badge
24    and represent our community, so that will be
25    tolerated.  That is currently under investigation.
```

Page 48

1              Question:  Okay.  Ms. ^ , did you want
2     to add something to that?
3              Answer:  I do certainly because it is a
4     very -- well, first of all, it is despicable, and
5     most despicable to me that there appears to be some
6     evidence that it has continued, even while I've been
7     here.
8              So for me it was mentioned to me
9     probably a year and a half ago that there was bent
10    badges, and so I -- I approached the police chief
11    because to me there's -- there's very few things that
12    are worse than that.  You're celebrating the death of
13    a human being."
14              (Stopped video.)
15    BY MR. COYLE:
16         Q.    Sir, were you able to hear that?
17         A.    Yes.
18         Q.    Can you hear yourself say there's --
19    that badge bending was celebrating the death a human
20    being?
21         A.    Yes.
22         Q.    Okay.  So do you not no longer agree
23    with that statement?
24         A.    I -- I would say at that point in time
25    there hadn't been an investigation given, and

Page 49

```
 1   listening to the chief's comments about that I echoed
 2   his comments.
 3        Q.    So you're just speaking off the cuff
 4   here?  This is to placate the audience?
 5        A.    No.  No.
 6        Q.    So why would you say you're celebrating
 7   the death of a human being if that's not what you
 8   meant?
 9        A.    Because it could be why they bent the
10   badges; and if so, it's despicable.
11        Q.    Well, in this recording you certainly
12   don't equivocate about whether that was the reason.
13   It seems to me that, at least at this moment, you
14   believe that to be the reason.
15             MS. KNIGHT:  Objection, misstates
16   evidence, argumentative.
17             WITNESS:  In looking back at this, the
18   potential that that was the reason, and as the chief
19   stated right before I made these comments that's his
20   comments what he felt that it may or may was, or was
21   that I -- I would echo that; and I would say to this
22   day it is absolutely despicable if that was the
23   meaning behind them bending their badges.
24        Q.    Have you read the subsequent ^ data
25   report on badge bending?
```

Page 50

1          A.      No.

2          Q.      Sir, I want to talk to you about your

3     decision to bring in the OIR report to do a review of

4     the Vallejo Police Department.  Can you walk me

5     through what concerns existed and what decisions were

6     had prior to reaching out to OIR to do that

7     investigation?

8          A.      Okay.  Is it -- I mean, it's a fairly

9     lengthy process of going through that.

10              I think first and foremost in -- in my

11     decision to -- to have an assessment done stemmed

12     most directly from the fact that the city had so many

13     claims against it and the liability was very high and

14     our premiums were being escalated, and I felt that we

15     needed to have an assessment done in regards to

16     policies procedures training, whatever was necessary,

17     done independently so that if we needed to do

18     training differently, hiring differently, if we

19     needed to change policies and update them, whatever

20     it was, we could have a plan to do that.

21              And I also felt that the public trust

22     was very low in the Vallejo Police Department, and

23     then having an independent source do an assessment,

24     do an analysis of the department and then making the

25     report public would be something very important,

1    again, to start building trust with the public.  So

2    those two main reasons.

3                I guess the third reason subsequent to

4    that, or a little bit to that too was I felt that

5    there was staffing needs, and I felt the best way to

6    kind of take a look at the staffing needs might be to

7    perform some type of independent assessment that

8    would look at what the most critical needs were

9    within the department and so that we could support

10   those.  And we -- we eventually went to the voters

11   with a ballot measure to try to build the department

12   to be able to manage it better than what it had been

13   done.

14               And so the -- those were the reasons.

15   The process was I, as the city manager, don't have

16   the authority to do that assessment or enter into an

17   agreement to do that assessment.  That's the decision

18   of the chief and the city attorney's office.  And so

19   there were quite a few conversations about its need,

20   what -- what exactly the parameters of it would be,

21   and so forth.  And so that happened for several

22   months.

23               And then the city attorney's office,

24   working with me and the chief, they -- they put out

25   the proposal there for the OIR group.  I had worked

Page 52

1    with the OIR group back in the city of Oxnard.  They

2    had done an analysis under the chief's office of an

3    officer-involved shooting and I thought their

4    analysis was very good.  They presented to the

5    public.  It was not only a good analysis but it was

6    also good so that the public could see our openness,

7    transparency in regards to some of these issues.

8          Q.    You said you don't have the authority.

9    Is your authority constrained by law or charter or

10   what?

11         A.    Charter municipal ordinances, yes.

12         Q.    So the only people that had the

13   authority to hire an OIR group was the city

14   attorney's office?

15              MS. KNIGHT:  Objection, misstates

16   testimony.  Calls for a legal conclusion.

17              Go ahead.

18              WITNESS:  That certainly was the way we

19   proceeded with it.  I think that the police chief

20   could have asked for that assessment, but I'm sure

21   they would have consulted with the city attorney's

22   office before they did that.

23   BY MR. COYLE:

24         Q.    Were there concerns that identifying

25   and rectifying the problems in the department could

Page 53

1    exacerbate your potential liability exposure and

2    premiums?

3              MS. KNIGHT:  Objection, vague and

4    ambiguous, and I also just caution the witness to

5    avoid any attorney-client conversations.

6              But you can answer outside of those.

7              WITNESS:  I felt that in working with

8    the OIR group that they did an excellent job when I'd

9    worked with them in Oxnard in presenting the case and

10   information that would help me to make changes, and

11   help the police chief to make changes and give us an

12   overall idea of what area within the police

13   department did we need to improve.

14   BY MR. COYLE:

15        Q.   Understood.

16              My question was whether you had any

17   concern that bringing in the OIR group to conduct

18   this investigation could lead to increased liability

19   exposure or higher insurance premiums?

20        A.   I -- well, I did not -- I didn't have

21   that concern.  Because I felt it was so important for

22   us to get this independent assessment, so I did not

23   have a concern.

24              Was there -- was there a chance that

25   that may occur?  I would say yes, but I was not

Page 54

1    concerned.  I wanted the assessment, very supportive

2    of the assessment being done so that we could better

3    manage the department.

4         Q.    So you -- when you were discussing the

5    motivations behind, you know, getting this report,

6    you mentioned liabilities were high and insurance

7    premiums were increasing.  When you say liabilities

8    were high, does that mean in your assessment that

9    potential civil exposure from police cases was

10   raised?

11              MS. KNIGHT:  Objection, vague,

12   ambiguous as to planning and --

13              If you understand you can answer.

14              WITNESS:  I would say the number of

15   claims that were out there and appeared to be

16   continuing in my first few months there.

17              And then the concern obviously we were

18   paying out -- we had paid out significant levels to

19   where our insurance carrier was significantly raising

20   our premiums and deductibles.

21   BY MR. COYLE:

22        Q.    Did your insurance carrier have any

23   conversations with you or reports to you saying that

24   you need to address this issue or -- or, you know,

25   your insurance rates are going to go up?

1          A.     I didn't deal with them directly.  They

2    were working for the city attorney's office.

3                 My very limited conversation with them

4    was they were surprised and felt it necessary that we

5    get risk management department, or certainly

6    representatives, someone specific to deal with risk

7    management brought into the city.

8          Q.     Do you remember what years your

9    premiums were increasing?

10         A.     My recollection it was the very first

11   year I was here was when the conversations were being

12   had about insurance premium increases.

13         Q.     Were you the one that recommended

14   retaining OIR group?

15         A.     Yes.

16         Q.     Did you find them to be

17   well-credentialed?

18         A.     Yes.

19         Q.     Did you find them to be thorough?

20         A.     Yes.

21         Q.     So would it be fair to say you thought

22   they were going to do a good job?

23         A.     Yes.

24         Q.     Do you believe they did a good job in

25   their reporting?

Page 56

1          A.     Yes.

2                 MR. COYLE:  We've been going for about

3      an hour and a half.  Good segue time.  Why don't we

4      take 15 -- why don't we just say we'll be back at

5      2:45 my time.  So is that 11:45 your time?  Let's

6      just say 11:45.

7                 MS. KNIGHT:  Sounds good.

8      BY MR. COYLE:

9          Q.     Sir, I realize I skipped over something

10     that I think may be important as I was reviewing some

11     things on the break.

12                I want to talk to you about Chief

13     Bidou's time with the department shortly before he

14     resigned.  Did the chief ever -- you mentioned he

15     discussed bickering between Whitney and Horton, did

16     he ever come to you and say that, you know, he needed

17     another captain?

18         A.     My recollection is yes.

19         Q.     You eventually hired Joseph Iacono?

20         A.     Yes.

21         Q.     During that conversation, did he

22     express he felt he couldn't trust Horton or Whitney?

23         A.     I don't recall that specifically.  I --

24     I would say he did have some concerns that he thought

25     having another captain would assist in his ability to

Page 57

1    manage.

2          Q.     Other than the OIR group, you also

3    retained a number of other individuals during the

4    time period to look at the police department and the

5    issues they were having.  Do you know an individual,

6    Charles Sakia, S-A-K-I-A?

7          A.     Yes.

8          Q.     Can you tell me who Mr. Sakia was?

9          A.     Sakia?

10         Q.     I might have the spelling wrong in my

11   notes.  I apologize.

12         A.     He was a labor attorney.  He was an

13   attorney, and my recollection is labor.  I had

14   actually used him in a prior city with the city --

15   with the city of Oxnard.

16         Q.     What was the purpose of bringing

17   Mr. Sakia in?

18                MS. KNIGHT:  And I'm just going to

19   object to the extent that that calls for

20   attorney-client communications.

21                Greg, if you have him for any reason

22   other than in his capacity as an attorney you can

23   answer, but he may have just been -- he may have just

24   been brought on in a legal capacity.

25                WITNESS:  My recollection is that he

Page 58

1  was brought in to assist us with some of the laboring

2  negotiations in the labor agreement.

3  BY MR. COYLE:

4       Q.    Was he brought in to discuss relations

5  at all of the police department?

6       A.    Not that I recall.

7       Q.    Sir, I want to show you again what we

8  marked as Exhibit 1.  This is going to be page 47 of

9  that document.  Can you see that there?

10      A.    No.

11      Q.    Probably can't right now but give me a

12  second.  All right, there we go.  Can you see it now?

13      A.    Yes.

14      Q.    Do you need me to zoom in at all?

15      A.    No.

16      Q.    Okay.  So you're assessing Renne Sloan

17  Sakai, and you said it was a public management group,

18  and there was Mr. Bob Deis, D-E-I-S, he was a

19  consultant there?

20      A.    Yes, Bob Deis.

21      Q.    And you indicated that this group

22  involving Mr. Deis, Mr. Sakai was brought in to work

23  for the city of Vallejo?

24      A.    Yes.

25      Q.    And then you discussed:  "What was he

Page 59

1    brought in to do?"  And your answer was:  "One of the

2    specific items was he was brought in as a team that

3    we put together as we began the assessment of police

4    department; and as far as once we got the results of

5    that, he then became part of our team that we've put

6    together to work towards reform."

7              Did I read that correctly?

8        A.    Yes.

9        Q.    Okay.  So this group involving Mr.

10   Sakai and Mr. Deis, D-E-I-S, were involved in the

11   assessment of the department?

12       A.    So the -- the group, the public

13   management group was involved in my initial review.

14   They brought someone from the firm in and I worked

15   through Mr. Deis to give me an assessment of the risk

16   management.  So that was the early on process.  They

17   didn't have anything to do with the assessment

18   regarding, for instance, what the OIR report did.  So

19   they did that on the risk management side, and then I

20   brought them in, Bob Deis directly, on to assist in

21   the -- to assist the chief in moving forward those

22   recommendations of OIR.

23       Q.    Did you also retain someone named

24   Christopher Boucher, B-O-U-C-H-E-R?

25       A.     I believe the city attorney's office

Page 60

```
 1   does, yes.  Or did.
 2          Q.     You were involved in the hiring of Mr.
 3   Boucher?
 4          A.     No.
 5          Q.     Do you know who Mr. Boucher was brought
 6   in for?
 7                 MS. KNIGHT:  Again, I'll just object to
 8   the extent it's an attorney-client privilege matter.
 9                 If you have any knowledge outside of
10   that.
11                 WITNESS:  I don't have knowledge
12   specifically.
13                 MR. COYLE:  I'll be back here in just a
14   second.
15   BY MR. COYLE:
16          Q.     In terms of your operation with the
17   police department, was that limited to the OIR group?
18          A.     Yes.
19          Q.     When was the decision made to reach out
20   to the California Department of Justice?
21          A.     You know, I -- I -- I -- I -- I don't
22   -- I don't recall when it was.  I -- I -- I could
23   estimate.  I don't recall specifically when it was.
24          Q.     Well, an estimation's fine.
25          A.     It would have been probably late 2019.
```

Page 61

1  Maybe -- probably late 2019.  Well, let me think

2  again.

3              You know, that early in 2020, so.

4       Q.    I want to show you another clip from

5  that town hall that we talked without earlier.

6              REPORTER:  And John, during these clips

7  do you want me to take down anything on the video?

8              MR. COYLE:  No.  No.  We'll just --

9  I'll mark the video as an attachment but will send

10  you the download file of the video.

11              MS. KNIGHT:  John, if you could note

12  for the transcript, though, what part of the video

13  you are starting and stopping that would be helpful

14  for us.

15              MR. COYLE:  Absolutely.

16              I'm starting here at 32 minutes and 33

17  seconds, and there was a discussion that predates

18  this or precedes this where Mr. Williams is talking

19  about his interactions with city council.

20              (Video Playing.)

21  BY MR. COYLE:

22       Q.    Okay, sir, were you able to hear that?

23              MR. COYLE:  I'm sorry.  For the record,

24  I stopped at 34 minutes and 18 seconds.

25  BY MR. COYLE:

Page 62

1           Q.      I have some questions.

2                   You mentioned in there that you talk

3       about the OIR report and some of the investigations

4       and the reasons for them and then these settlements

5       that we've been having, and you go on to say the red

6       flags to make reform mandatory.  What settlement are

7       you referring to?

8           A.      I think there's a -- there's a general,

9       you know, as the settlements would occur I would be

10      briefed on those.

11                  I think one of them in particular was, I

12      think Foster that I just happened to remember was one

13      of the larger ones.  But generally just the number of

14      settlements; in other words, we were paying out money

15      when it came to these claims.

16          Q.      And -- and what did that -- what about

17      the fact that you were paying out money on these

18      claims indicate to you, if anything?

19          A.      Well, it -- it indicates that something

20      has to change.  Something has to change in the way

21      we're doing business there.

22                  Not -- you know, sometimes you can get a

23      snowball effect that once -- once something happens

24      the next one ends up claiming the same thing and

25      you're going to pay out again, and so it starts

Page 63

1    snowballing.  We needed to stop that and make sure we

2    were putting proper practices and procedure training,

3    whatever was necessary, to stop the need to pay all

4    those claims; in other words, you wanted to be

5    absolutely certain, or as certain as you could be

6    dealing with people who are employees of yours, that

7    you did everything you could to train them adequately

8    and put updated policies in place so that those claim

9    numbers would go down and those settlements would go

10   down.

11        Q.    So would it be fair to say that it was

12   indicating to you that the way you were doing things

13   before wasn't good enough?

14             MS. KNIGHT:  Objection, vague and

15   ambiguous.  Misstates testimony.

16             WITNESS:  It -- I guess what -- what I

17   say is it raised a flag as to me to question why.

18   Why is it that these are so high?

19             So it appears something is causing the

20   city to have all these claims and settlements and,

21   you know, I'm going to be very careful not to think

22   that I know the answers to where those lie, and so

23   it's why I bring in the OIR group, or any assessment

24   group to look at that.

25             And I think it's important to know,

Page 64

```
 1   too, that not only did we do the assessment on the
 2   police department because of these liability claims,
 3   we did one with the fire department and the public
 4   works department.  We initiated all three of those at
 5   the same time.
 6            Q.     So fair to say that you didn't think
 7   business as usual could carry forward?
 8            A.     Absolutely not.
 9            Q.     There had to be some type of change to
10   mitigate these issues?
11            A.     Yes.
12                   MR. COYLE:  I'm trying pull up a
13   document.
14                      (Exhibit No. 2 was marked.)
15                   MR. COYLE:  Let me go back to the DOJ
16   issue.
17                   You say late '19 early 2020 was when
18   the conversation with the DOJ began.
19            A.     I believe that's correct.  I'm not
20   absolutely positive on the timeline there.
21            Q.     That was when the OIR report was still
22   pending, correct?
23            A.     My recollection is yes, that's correct.
24            Q.     Had you seen drafts of the OIR report
25   before you contacted the Department of Justice?
```

Page 65

1          A.     I don't believe so.

2          Q.     Who was in charge that led you to reach

3     out to the Department of Justice?

4                 MS. KNIGHT:  Objection, lacks

5     foundation.

6                 Go ahead.

7                 WITNESS:  The initial contact was Mayor

8     Sampayan and myself.

9     BY MR. COYLE:

10         Q.     Can you explain to me what the sort of

11    genesis of that -- of that conversation was?  How did

12    the DOJ become an option for you?

13         A.     I -- I think that, you know, when you

14    have a situation where you certainly don't -- well, I

15    felt that the public trust was very low for the

16    police department, and so you're going to look for

17    independent verifications or assessments or

18    evaluations so that you can say, look, we had the OIR

19    group take a look at this, the Department of Justice

20    look at this.

21                But in this particular case the outreach

22    was to talk to them about funding, additional funding

23    that might be available for the city to hire more

24    police officers; and the conversation we talked to a

25    little bit about having them come in and maybe take a

Page 66

 1    look at our policies, were they the most updated?
 2    And procedures.
 3              So those were the two main issues.  We
 4    talked to them about funding and coming in and taking
 5    a look at policies and procedures.
 6         Q.    So is it simply you and -- and Mayor
 7    Sampayan wanted a second set of eyes on top of the
 8    OIR group?
 9         A.    I think -- I mean, there was obviously
10    a number of people calling out for that for us to
11    have the Department of Justice come in.  We weren't
12    -- I wasn't -- we weren't looking for some type of
13    very specific thing other than funding was our main
14    reason to call them to see if there was a way for
15    funding.  And then, yeah we added to it take a look
16    at policies and procedures, because we wanted to work
17    with them.
18         Q.    Was that at your suggestion or their
19    suggestion?
20         A.    That was at our suggestion.
21         Q.    And how did that process begin, did you
22    send them a letter or was it a phone call?
23         A.    We had both of those.  So we had a
24    phone call with them and we sent a letter.  I'm not
25    -- I don't recall which one came first.  I believe it

1  was the phone call and then the letter.

2        Q.    Prior to reaching out to the DOJ, had

3  you made the city council at large aware that you

4  would be reaching out to the DOJ?

5              MS. KNIGHT:  Objection, vague.

6  Ambiguous.

7              WITNESS:  No.

8  BY MR. COYLE:

9        Q.    Did you let the city attorney's office

10  know?

11             MS. KNIGHT:  Objection,

12  attorney-client.  Instruct the witness not to answer.

13             MR. COYLE:  I'm not asking what he said

14  or what the communications was, I'm simply asking

15  whether he notified the city attorney's office.  I

16  don't think that's privileged.

17             MS. KNIGHT:  Well, you're asking about

18  the substance of that communication.  Did you tell

19  them that this was going to happen or not?  So.

20             MR. COYLE:  Okay, I'll rephrase.

21             MS. KNIGHT:  It just -- yeah.

22             MR. COYLE:  I'll rephrase it.

23  BY MR. COYLE:

24        Q.    Was the city attorney's office aware of

25  your intention to reach out to the district attorney

Page 68

```
 1   -- or I'm sorry -- to the Department of Justice?
 2                  MS. KNIGHT:  Objection, calls for
 3   speculation.
 4                  WITNESS:  I don't believe they were.
 5   BY MR. COYLE:
 6       Q.     Other than yourself and Mayor Sampayan,
 7   who was aware of your intention to reach out to the
 8   DOJ?
 9       A.     I'm not aware of anybody.
10       Q.     Are you aware that recently the
11   Department of Justice has announced their intention
12   to enter into a stipulated judgment with the city
13   regarding police issues?
14       A.     I had heard that.
15       Q.     I want to show you the press release
16   from Attorney General Bonta.
17                  MR. COYLE:  Mark this as an Exhibit 3.
18                    (Exhibit No. 3 was marked.)
19   BY MR. COYLE:
20       Q.     Can you see my screen, sir?
21       A.     Yes.
22       Q.     And this came in about 12 days ago
23   related to the judgement that's pending with Vallejo.
24                  I want to ask your opinion on a couple
25   of things that were included in here.
```

Page 69

```
 1              It says when the MOU expired, and that's
 2   obviously the MOU that came down as a result of
 3   (fading).
 4              REPORTER:  Wait, hold on.  You
 5   completely faded out, John.
 6              MR. COYLE:  All right.  Let me back up
 7   a little bit.
 8   BY MR. COYLE:
 9       Q.    After you invited the DOJ to come in,
10   the city and the DOJ entered into a memorandum of
11   understanding on MOU, correct?
12       A.    I think that -- so for me to provide
13   clarity.
14              So the first conversation we had with
15   them was to come in and look at policies and
16   procedures in an informal basis and also what types
17   of funding might be available to us.
18              And so the second -- and it had been --
19   and it was some time, it was months that we didn't
20   hear anything, and basically said we can't fund you
21   but we can work with the chief to maybe help find you
22   some other sources of funding, and so the
23   conversation ended there.  And they ended up
24   contacting us, which that began the conversation
25   about the agreement we had with them.
```

Page 70

1          Q.      Okay.  So eventually an MOU is agreed

2    to?

3          A.      Correct.

4          Q.      And then as part of that MOU, the DOJ

5    continues to review the police department's systems

6    and practices, correct?

7          A.      Correct.

8          Q.      Okay.  In a press release the attorney

9    general's office says:  "During the review of the

10   systems and practices under the MOU, DOJ concluded

11   that VPD failed to uniformly and adequately enforce

12   the law based in part because of defective or

13   inadequate policies, practices, or procedures."

14              In your opinion, do you agree with that?

15              MS. KNIGHT:  Objection, calls for

16   speculation.  Foundation.

17              WITNESS:  I -- I -- I do not know

18   whether that's accurate or not.

19   BY MR. COYLE:

20         Q.      Well, during your time at the city of

21   Vallejo, do you believe that the VPD failed to

22   uniformly and adequately enforce the law based in

23   part because of defective policies, practices, or

24   procedures?

25              MS. KNIGHT:  Same objections.

Page 71

1              WITNESS:  I would say to you that I was

2    not aware that they were -- failed to enforce the law

3    as this letter states.

4              I would say that I had a number of

5    conversations with the DOJ who was working with us,

6    and they were reviewing our policies and procedures,

7    which I thought was a good thing for the city to have

8    and have their input, and at the end of the day to be

9    able to adopt policies that they would support and we

10   could use them as backing for our reform.

11   BY MR. COYLE:

12        Q.    It goes on to say:  "Additionally,

13   under the agreement --" and this is the -- the new

14   stipulated judgment agreement, I -- I believe --

15   "the VPD will implement additional recommendations

16   including to address unreasonable force by holding

17   officers and supervisors accountable for not

18   identifying, adequately investigating, or addressing

19   force as unreasonable or otherwise contrary to VPD

20   policy.  A ^ nepharious use of force that may violate

21   law, or VPD's use-of-force policy so their

22   professional standards division, internal affairs,

23   for further investigation and review."

24              During your time at Vallejo, do you

25   believe that there was a failure in the department to

Page 72

1  address unreasonable force by holding supervisors and

2  officers accountable?

3       A.    You know, I would refer to the --

4  because again, I have no -- I have no authority to be

5  engaged into the policymaking or decisions in the law

6  enforcement side.

7            But certainly with OIR, I think what we

8  learned was there was some recommendations certainly

9  that there were some good things that we were doing

10  and there were some things that we should be doing

11  better, and there was just a number of areas.

12            So these specific words I would say what

13  I do believe it was, I believe that the OIR report

14  was very good and I thought it reflected what we

15  would see there.

16            So I think, you know, they did find some

17  -- some gaps in some of the supervision --

18  supervisory process and review processes.  They did

19  find some gaps and listed those and they listed the

20  ways to improve that.

21            Again, I am not -- I'm not trained

22  within actual policies and procedures of police

23  operations and use of force and all of those.  I'm

24  aware of them, but I'm not trained in them to make an

25  expert comment on that.

Page 73

1        Q.      Okay.  So if I'm understanding your

2   role in supervising the -- the police department, the

3   police department was under your authority, correct?

4        A.      By charter I have -- I -- I am over the

5   police department, yes.

6        Q.      Okay.  So you're not trained or capable

7   of looking at the policies or practices of the

8   department; fair to say?

9        A.      But understanding it's a quasi -- quasi

10  military-type of organization, and so it's different

11  than a public works department.  So, yes, I would

12  agree with your statement.

13       Q.      Okay.  So your oversight is really

14  identifying potential problems and trends and then

15  finding solutions to fix them; is that fair?

16               MS. KNIGHT:  Objection, vague and

17  ambiguous.

18               WITNESS:  You know, my responsibilities

19  are to ultimately make sure that the police

20  department and the police chief serve the community

21  as a good police department and one that uses the

22  most updated policy procedures, all of the above.

23               So I do feel the responsibility, which

24  is why I pursued that assessment.  Even having a

25  conversation with the Department of Justice that

Page 74

1    there was -- there were gaps, whether they were

2    created by budget shortfalls or policy shortfalls, or

3    whatever it would have been, which is why we asked

4    for that assessment.  We needed to address it,

5    period.

6         Q.    So we talked earlier you identified

7    these trends; increase in settlements, increase in

8    claims, increase in insurance premiums, correct?

9         A.    Yes.

10        Q.    And when you identified those trends

11   your idea for solving it was to retain the OIR group

12   and then ask the DOJ to investigate, correct?

13        A.    Yes.  And to bring on new employees to

14   be -- to create the risk management department here.

15        Q.    Sir, were you involved at all in the

16   retention of Cold Pro Media?

17        A.    I'm sorry, that last part broke up.

18   Can you repeat that?

19        Q.    Were you involved at all in the

20   retention of Cold Pro Media?

21        A.    I don't believe so.

22        Q.    Do you know who retained Cold Pro

23   Media?

24        A.    It's been a while, so my memory is not

25   -- I don't recollect who they were, so no.

Page 75

1          Q.     When city council found out you

2    requested DOJ to get involved was there push back

3    from council members?

4                 MS. KNIGHT:   I'll just object and

5    caution the witness not to reveal any communication

6    subject to delivery process privilege.

7                 So to the extent there was a closed

8    session or something about that those communications

9    are not available.  If you want to talk about what

10   they told you individually in your meetings, no

11   problem.

12                WITNESS:  There was some concern.

13   BY MR. COYLE:

14         Q.     What was the concern?

15         A.     That the mayor and I had not

16   communicated with the city attorney first.

17         Q.     Did they want to explain to you why

18   that was a concern?

19         A.     Simply because the city attorney is the

20   attorney and the attorney general is an attorney.

21         Q.     Why was Chief Allio hired as an interim

22   chief?

23         A.     Well, so simply put, I did not think

24   that there was a -- a -- I thought it was really

25   important to not have a break in having a chief

Page 76

1    there, and as we discussed earlier between the two

2    assistant -- or the deputy -- I'm sorry, the

3    captains, there was some -- some friction going on

4    there; and secondly, that I didn't want to place

5    either of them in a chief's position in an interim

6    basis which may unfairly elevate one or the other

7    into perhaps being selected as the chief.

8        Q.    There was never the idea in your mind

9    of hiring Chief Allio on a permanent basis?

10       A.    Absolutely not.

11       Q.    Why not?

12       A.    Because he had retired.

13       Q.    Oh, so he made it clear to you that he

14   wasn't interested in becoming permanent chief?

15       A.    Correct.

16       Q.    Okay.  During your time with the city,

17   in your conversations with any of the chiefs or with

18   city council members, did anyone express to you --

19   express to you -- wow, I'm struggling today --

20   express to you any concerns that there were police

21   gangs or subgroups of bad officers within the

22   department?

23       A.    No.

24       Q.    Would you be surprised by the testimony

25   of Slater Matzke that there were regular

Page 77

1  conversations amongst yourself and city council
2  members about the potential for subgroups and gangs
3  within the department?
4          A.     Can you rephrase the -- I'm sorry, can
5  you ask that question again?
6          Q.     Sure.
7                 I want to get your reaction to testimony
8  from Slater Matzke.  He testified that there were --
9  there was commonly conversations amongst city council
10 members with you about police gangs and subgroups
11 within the department.  Are you surprised by that
12 testimony?
13         A.     I'm shocked by that testimony.  I've
14 never had any recollection of that, any of those
15 considerations about gangs or subgroups.
16         Q.     Okay.  Sir, give me about five minutes
17 to go through my notes and make sure I've covered
18 everything and we might be done.  Well, subject to
19 anymore questions.  Just give me a couple minutes
20 here and I'll be right back with you, all right?
21                (Off the record.)
22 BY MR. COYLE:
23         Q.     We just talked about police gangs and
24 groups and I limited that to yourself and city
25 council.  Did Mayor Sampayan ever have any

Page 78

```
 1   conversations with you about his suspicion about
 2   police gangs or subgroups?
 3          A.     Not that I recall, no.
 4          Q.     Do you know who Greg Taylor is?  He
 5   worked in IT.
 6          A.     Yes.
 7          Q.     Do you recall anyone pressuring him to
 8   edit footage and change frame speed, or anything like
 9   that, before being released to the public?
10          A.     I -- I -- I don't recall that.  I don't
11   recall that.
12          Q.     Did you have any conversation with
13   Mr. Taylor about his editing of police videos?
14          A.     You know, that's years ago now.  I
15   think if I could maybe just clarify that.
16          Q.     Okay.
17          A.     So when you talk about editing the
18   police videos, so along with the videos themselves
19   that are on the body-worn cameras, you know, there
20   are slides and what order you put them in and then
21   there's sometimes there's dialogue that comes up.
22   And so editing slides that -- that -- that showed the
23   videos of the body-worn cameras, we did have
24   conversations about editing those slides and what we
25   were saying about them.  But not -- I have no
```

Page 79

1    recollection of ever saying we should edit the

2    footage itself.

3         Q.    When you say "the slides," you mean the

4    PowerPoint presentations that were used to release to

5    the public?

6         A.    Yes.

7         Q.    And what type of conversation did you

8    have about editing those?

9         A.    You know, mostly -- mostly for me had

10   to do to with, you know, what's the public

11   perception?  Are we -- do we need to say something

12   more about this particular incident so that the

13   public better understands what is actually happening

14   here?  Mostly that was it.  Or the order, or should

15   we say something?  Should we let the video speak for

16   itself?  It's just more presentation- wise when

17   you're communicating with the public.

18        Q.    So your primary concern was the

19   public's reaction to what was being presented?

20        A.    Yes.  Both, you know, from us saying

21   more than what we needed to say perhaps, or in my

22   particular opinion, the release of the tapes were

23   mostly to speak for themselves and to -- and so we

24   would want to be able to be transparent and educated.

25   It wasn't any particular desire for them to believe

Page 80

1   something or not believe something.  The tapes were

2   being released so that people could see what actually

3   happened, and to the best of our ability explain the

4   situation.

5                MR. COYLE:  I don't have any further

6   questions, sir.  Ms. Knight may and Mr. Graham may.

7                MS. KNIGHT:  I do not have any

8   questions.

9                As with the prior depositions we'll

10  reserve the right to mark sections of these

11  depositions confidential under the protective order.

12               Jacob, do you have anything?

13               MR. GRAHAM:  No, none from me.

14               MR. COYLE:  Thanks for your time today,

15  sir.

16               WITNESS:  Thank you, Mr. Coyle.

17               REPORTER:  And John, would you like the

18  same order as yesterday?

19               MR. COYLE:  Yes, please.

20               REPORTER:  And Katelyn, same order for

21  you as well?

22               MS. KNIGHT:  Yes, please.

23               REPORTER:  Okay.

24               I'll send you rough drafts later on

25  today and you will get the final transcripts in 10

Page 81

1    business days.

2                     MR. COYLE:  Sounds good.

3                     MS. KNIGHT:  Thank you.

4                     (The deposition of Greg Nyhoff was

5    concluded at 12:44 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

1   STATE OF WASHINGTON )

2                       ) SS.

3   COUNTY OF KING      )

4

5       I, the undersigned, declare under penalty of

6   perjury that I have read the foregoing transcript,

7   and I have made any corrections, additions, or

8   deletions, that I was desirous of making; that the

9   foregoing is a true and correct transcript of my

10  testimony contained therein.

11

12          EXECUTED this _____ day of _____

13  2023 at _____, _____.

14

15

16                    _____

17

18                    GREG NYHOFF

19

20

21

22

23

24

25

Page 83

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON )
                         )SS.
 4    COUNTY OF KING     )

 5

 6          I, Judith A. Robinson, Certified Court

 7    Reporter and an officer of the Court under my

 8    commission as a Notary Public, in and for the State

 9    of Washington, do hereby certify that the foregoing

10    deposition was transcribed under my direction; that

11    the transcript of the deposition is a full, true and

12    correct transcript to the best of my ability; that I

13    am neither attorney for, nor a relative or employee

14    of any of the parties to the action or any attorney

15    or Counsel employed by the parties hereto, nor

16    financially interested in its outcome.

17       IN WITNESS WHEREOF, I have hereunto set my hand
      and affixed my official seal this 4th day of
18    November, 2023.

19

20                      Judith A. Robinson, Notary Public
                        in and for the State of Washington
21                      residing at Seattle.
                        My Commission expires November 4,
22                      2024.
                        CCR License #2171

23

24

25
```

[& - additional]                                                          Page 1

| & | | |
|---|---|---|
| **&**   2:9,18 | | |

**0**

**01563**   1:7

**1**

**1**   3:13 23:4,5
  58:8
**10**   80:25
**10:00**   1:12 4:3
**11:45**   56:5,6
**12**   68:22
**123**   2:4
**125**   4:3
**128**   18:7
**12:44**   81:5
**15**   8:11 56:4
**150**   2:9
**17662**   83:19
**18**   61:24
**19**   64:17
**19109**   2:5
**1960**   8:11
**1982**   8:18
**19th**   20:19
**1st**   45:24

**2**

**2**   3:14 64:14
**20**   21:2 25:18
**2018**   10:1 11:3
  23:8,9 26:4
**2019**   28:11
  33:1 60:25
  61:1

**2020**   15:18
  18:22 19:12,13
  25:17,18 30:19
  45:24 61:3
  64:17
**2021**   9:2 25:18
  26:5
**2023**   1:12 4:3
  20:19 82:13
  83:18
**2024**   83:22
**2171**   1:25
  83:22
**2250**   2:4
**23**   3:13
**24**   4:13
**25**   10:11
**267.656.7118**
  2:5
**27**   1:12 4:2
**2:20**   1:7
**2:45**   56:5

**3**

**3**   3:15 68:17,18
**30**   10:10
**309th**   4:3
**32**   61:16
**33**   61:16
**34**   61:24
**39**   21:2

**4**

**4**   83:21
**47**   58:8

**4th**   83:17

**5**

**5-80**   3:5
**555**   2:15

**6**

**601**   2:9
**6280194**   1:20
**64**   3:14
**68**   3:15

**7**

**707.648.4388**
  2:16

**8**

**80s**   10:13
**82**   10:7

**9**

**916.564.6100**
  2:10
**94590**   2:15
**95825**   2:10
**98003**   4:4

**a**

**a.m.**   1:12 4:3
**ability**   8:4
  30:14 42:18
  56:25 80:3
  83:12
**able**   13:15
  48:16 51:12
  61:22 71:9
  79:24
**above**   73:22

**absolutely**
  27:16 40:7,21
  49:22 61:15
  63:5 64:8,20
  76:10
**acceptable**   6:21
**access**   27:13,17
  30:2,12,15
**accidents**   15:5
**account**   30:21
**accountability**
  26:9
**accountable**
  71:17 72:2
**accurate**   8:4
  33:4 70:18
**accusing**   42:7
**act**   30:25
**action**   35:11
  83:14
**actions**   39:25
**actively**   38:11
**actual**   47:12
  72:22
**actually**   18:3
  23:14 27:18
  36:14 39:18
  57:14 79:13
  80:2
**add**   48:2
**added**   66:15
**additional**
  14:10 65:22
  71:15

**additionally** 71:12

**additions** 82:7

**address** 16:18 42:11,25 43:7 54:24 71:16 72:1 74:4

**addressed** 23:11

**addressing** 71:18

**adequately** 42:18,25 63:7 70:11,22 71:18

**administrative** 29:17

**adopt** 71:9

**affairs** 14:7 41:24 71:22

**affecting** 25:23

**affixed** 83:17

**afford** 41:11

**afternoon** 4:10

**ago** 37:13 48:9 68:22 78:14

**agree** 4:19 16:18 26:11,16 26:25 48:22 70:14 73:12

**agreed** 4:20,21 9:4 17:22 70:1

**agreement** 4:14 4:17 9:16 18:3 19:19 21:12 51:17 58:2

**ahead** 21:1 39:2 43:20 46:15 52:17 65:6

**akk** 2:11

**al** 1:5,8 5:9 7:21

**alcohol** 8:3

**allen** 8:9

**allio** 40:10,14 40:19 44:23 45:2 75:21 76:9

**allow** 16:13 47:8

**allowed** 47:23

**amanda** 2:3

**ambiguous** 11:16 30:4 43:5 53:4 54:12 63:15 67:6 73:17

**analysis** 50:24 52:2,4,5

**angelo** 2:9,18

**announced** 68:11

**answer** 6:10,12 7:6,21 9:12 11:18 15:23 16:10,21 20:10 21:6 30:6 35:20 41:25 47:10 48:3

53:6 54:13 57:23 59:1 67:12

**answered** 21:9 39:2

**answers** 63:22

**anticipate** 6:9

**anybody** 68:9

**anymore** 27:17 38:11 77:19

**apologize** 57:11

**appeared** 11:19 41:4,10 54:15

**appears** 26:3 48:5 63:19

**application** 41:8

**apply** 25:25 40:24

**applying** 11:7 36:23

**appointed** 28:6

**approach** 13:1

**approached** 48:10

**appropriate** 37:9,20 38:20

**approval** 25:21 25:22

**approve** 9:16

**approved** 18:20

**area** 31:7 34:5 53:12

**areas** 72:11

**arguing** 44:1

**argumentative** 49:16

**arrived** 15:13

**asked** 16:14 34:23 37:3 39:1 52:20 74:3

**asking** 67:13,14 67:17

**assessing** 58:16

**assessment** 23:25 50:11,15 50:23 51:7,16 51:17 52:20 53:22 54:1,2,8 59:3,11,15,17 63:23 64:1 73:24 74:4

**assessments** 65:17

**assist** 56:25 58:1 59:20,21

**assistant** 29:17 76:2

**association** 26:15 28:10

**assume** 7:7

**assumption** 35:10,23 37:18 38:8

**assure** 38:24

**assured** 37:24

| | | | |
|---|---|---|---|
| **attached** 19:21 | 36:10 67:3,24 | **ballot** 51:11 | **bending** 17:6 |
| **attachment** | 68:7,9,10 71:2 | **bankruptcy** | 17:14,23 21:11 |
| 61:9 | 72:24 | 12:4,6 | 21:17 22:7,19 |
| **attention** 12:8 | **b** | **baptist** 46:4 | 32:17,18 33:2 |
| 13:10 21:17 | | **based** 5:7 20:13 | 33:6,19 34:14 |
| 33:12 34:1,2 | **b** 3:10 59:24 | 24:8,11 39:16 | 34:19 36:17 |
| 36:19 39:8 | **bachelor's** 8:14 | 39:22 40:25 | 37:1,10 39:8 |
| 44:10 45:8,12 | **back** 10:13 | 43:25 70:12,22 | 39:25 42:25 |
| **attorney** 3:15 | 12:5 15:10 | **basically** 11:21 | 43:7,24 44:9 |
| 4:18 9:9,13 | 17:20 23:8 | 69:20 | 44:17,20 45:4 |
| 19:17,20 20:9 | 24:7 33:14 | **basis** 15:24 | 45:7,21 46:12 |
| 53:5 57:12,13 | 37:17 42:23 | 17:5 69:16 | 47:11 48:19 |
| 57:20,22 60:8 | 46:9 49:17 | 76:6,9 | 49:23,25 |
| 67:12,25 68:16 | 52:1 56:4 | **becoming** | **benefit** 42:23 |
| 70:8 75:16,19 | 60:13 64:15 | 76:14 | **bent** 33:21,25 |
| 75:20,20,20 | 69:6 75:2 | **began** 12:14 | 37:13 47:6,9 |
| 83:13,14 | 77:20 | 59:3 64:18 | 48:9 49:9 |
| **attorney's** 13:7 | **backing** 71:10 | 69:24 | **best** 7:5 40:1 |
| 13:9 15:16 | **bad** 76:21 | **beginning** 4:18 | 51:5 80:3 |
| 51:18,23 52:14 | **badge** 17:6,14 | 12:1 25:17 | 83:12 |
| 52:21 55:2 | 17:23 21:11,11 | 47:4 | **better** 51:12 |
| 59:25 67:9,15 | 21:17 22:7,19 | **believe** 19:21 | 54:2 72:11 |
| 67:24 | 30:21 32:17,18 | 28:4,10 31:24 | 79:13 |
| **audience** 49:4 | 33:2,6,19,25 | 33:3 37:4 | **bickering** 42:7 |
| **authority** 24:19 | 34:14,19 36:17 | 39:24 42:22 | 43:1,21 44:1 |
| 42:13 47:19 | 37:1,9 39:7,25 | 49:14 55:24 | 56:15 |
| 51:16 52:8,9 | 42:25 43:7,24 | 59:25 64:19 | **bidou** 13:22 |
| 52:13 72:4 | 44:9,16,20 | 65:1 66:25 | 34:23 36:2,7 |
| 73:3 | 45:3,7,20 | 68:4 70:21 | 36:15,21 37:2 |
| **available** 65:23 | 46:12 47:11,23 | 71:14,25 72:13 | 37:2,3 42:24 |
| 69:17 75:9 | 48:19 49:25 | 72:13 74:21 | 43:2 44:3,6,12 |
| **avenue** 2:9 | **badges** 33:21 | 79:25 80:1 | **bidou's** 37:8 |
| **avoid** 53:5 | 37:13 38:3 | **believed** 34:11 | 56:13 |
| **aware** 4:12 | 47:6,9 48:10 | 43:12 | **big** 13:5 |
| 31:25 32:3,18 | 49:10,23 | | |

[bill - chief]                                                    Page 4

**bill** 47:8
**birth** 8:10
**bit** 7:10 23:13
  32:16 51:4
  65:25 69:7
**bkilday** 2:11
**black** 32:12
**bleichner** 2:18
**boarding** 11:3
**bob** 58:18,20
  59:20
**body** 78:19,23
**bonta** 68:16
**bonta's** 3:15
**boucher** 59:24
  60:3,5
**box** 37:3
**boxes** 22:17
**breadth** 35:8
**break** 7:18,20
  7:21 21:20,24
  56:11 75:25
**brief** 10:5
**briefed** 62:10
**bring** 39:7
  40:10,14,18
  45:11 50:3
  63:23 74:13
**bringing** 53:17
  57:16
**broad** 2:4
**broadly** 23:23
**broke** 74:17
**brought** 17:2
  23:14 33:11

44:10 45:7
55:7 57:24
58:1,4,22 59:1
59:2,14,20
60:5
**budget** 74:2
**build** 11:23,23
  24:6 51:11
**building** 51:1
**buildings** 14:11
  22:16
**built** 12:5
**business** 62:21
  64:7 81:1

**c**

**c** 2:1 59:24 83:1
  83:1
**california** 1:2
  2:10,15 10:21
  10:22,24,25
  60:20
**call** 19:8 22:19
  30:12 66:14,22
  66:24 67:1
**called** 22:12
**calling** 18:25
  66:10
**calls** 9:9 35:17
  52:16 57:19
  68:2 70:15
**calvin** 8:16
  10:7
**cameras** 78:19
  78:23

**candidacy** 41:8
**capable** 73:6
**capacity** 57:22
  57:24
**captain** 18:17
  22:18 26:21
  39:7,10 44:13
  45:7 56:17,25
**captains** 25:25
  39:13 40:22
  42:1 43:1,22
  44:1 76:3
**captured** 12:8
**care** 35:1,9,22
  35:25 36:8
  37:19 43:13
  45:19
**careful** 63:21
**carrier** 54:19
  54:22
**carry** 64:7
**cartoon** 22:13
**case** 15:25
  16:13 17:10
  18:18 38:25
  39:4 53:9
  65:21
**cases** 54:9
**cause** 30:25
  31:2,6 43:23
  43:24
**causes** 43:16
**causing** 14:10
  14:16 63:19

**caution** 53:4
  75:5
**ccr** 1:25 4:5
  83:22
**celebrating**
  47:18 48:12,19
  49:6
**celebration**
  45:21
**certain** 14:21
  14:23,23 34:5
  47:8 63:5,5
**certainly** 34:5
  48:3 49:11
  52:18 55:5
  65:14 72:7,8
**certified** 83:6
**certify** 83:9
**challenges**
  21:12
**chance** 53:24
**change** 50:19
  62:20,20 64:9
  78:8
**changes** 27:6
  53:10,11
**charge** 65:2
**charles** 57:6
**charter** 52:9,11
  73:4
**chief** 13:22
  19:6 24:17,19
  25:1,25 26:2
  31:12 32:10
  33:5 34:23,23

| | | | |
|---|---|---|---|
| 35:22 36:2,7 | **city** 1:8 2:12,14 | 14:22,24 23:17 | **colorado** 10:14 |
| 36:15,16,21 | 5:9 8:25 9:4,7 | 24:10 41:1,13 | 10:17,18,19,20 |
| 37:2,2,3,8,18 | 9:15,17,25 | 41:17,21,23 | **come** 29:20 |
| 38:2,7,19 39:5 | 10:3,12,15,16 | 50:13 54:15 | 30:15,16,17 |
| 39:15 40:10,14 | 10:18,19,21,23 | 62:15,18 63:4 | 56:16 65:25 |
| 40:19,25 41:3 | 11:1,5,8 12:22 | 63:20 64:2 | 66:11 69:9,15 |
| 41:6,8,16,22 | 13:6,6,7,9 14:2 | 74:8 | **comes** 30:9 |
| 42:1,14,24 | 15:9,15,19 | **clara** 2:15 | 38:1 78:21 |
| 43:2 44:3,5,12 | 17:13 18:3,5 | **clarification** | **coming** 29:6 |
| 44:23,25 45:2 | 18:20 19:2,17 | 26:18 | 66:4 |
| 45:10,14,24 | 20:13,21 21:4 | **clarify** 34:20 | **comment** 33:17 |
| 48:10 49:18 | 21:6,19 22:9 | 78:15 | 72:25 |
| 51:18,24 52:19 | 22:17 24:10,21 | **clarity** 23:2 | **comments** 40:4 |
| 53:11 56:12,14 | 25:8,9 27:13 | 69:13 | 40:4 49:1,2,19 |
| 59:21 69:21 | 27:14,17,19 | **clear** 76:13 | 49:20 |
| 73:20 75:21,22 | 29:14 40:2 | **clearly** 12:1 | **commission** |
| 75:25 76:7,9 | 50:12 51:15,18 | **clerk** 2:18 | 83:8,21 |
| 76:14 | 51:23 52:1,13 | **client** 9:9,13 | **commonly** 77:9 |
| **chief's** 14:18 | 52:21 55:2,7 | 19:17,20 20:9 | **communicated** |
| 36:23 38:12,23 | 57:14,14,15 | 53:5 57:20 | 75:16 |
| 42:18 49:1 | 58:23 59:25 | 60:8 67:12 | **communicating** |
| 52:2 76:5 | 61:19 63:20 | **clip** 46:6 61:4 | 79:17 |
| **chiefs** 32:12 | 65:23 67:3,9 | **clips** 61:6 | **communication** |
| 76:17 | 67:15,24 68:12 | **close** 12:6 | 67:18 75:5 |
| **christopher** | 69:10 70:20 | **closed** 9:12,13 | **communicati...** |
| 59:24 | 71:7 75:1,16 | 75:7 | 9:9,17,20 |
| **church** 46:4 | 75:19 76:16,18 | **cold** 74:16,20 | 57:20 67:14 |
| **circle** 17:20 | 77:1,9,24 | 74:22 | 75:8 |
| 46:9 | **cityofvallejo....** | **collect** 37:3 | **community** |
| **circulated** | 2:16 | 38:2 | 11:21,24,24 |
| 30:20 | **civil** 54:9 | **collected** 37:14 | 13:13,19 15:12 |
| **circulating** | **claim** 63:8 | **college** 8:16 | 24:3,6 31:7 |
| 32:9 | **claiming** 62:24 | 10:7 | 44:4 47:24 |
| **cities** 27:5,21 | **claims** 13:6,10 | **color** 33:20 | 73:20 |
| | 14:5,8,9,14,17 | | |

| | | | |
|---|---|---|---|
| **community's** 12:12 | **condition** 8:2 | **conversation** 31:11 36:6 | 19:18 21:4 27:13,14,19 |
| **competent** 43:2 | **conduct** 53:17 | 37:6 40:16 | 61:19 67:3 |
| **competently** 44:6 | **confidence** 11:24 44:4 | 44:8,14,16 55:3 56:21 | 75:1,3 76:18 77:1,9,25 |
| **completed** 8:13 38:21 | **confidential** 80:11 | 64:18 65:11,24 69:14,23,24 | **counsel** 4:9,10 83:15 |
| **completely** 69:5 | **confused** 7:12 37:23 | 73:25 78:12 79:7 | **counseling** 35:12 |
| **concern** 11:21 12:2,11,16 | **confusing** 7:4 | **conversations** 9:6 12:23 20:5 | **counterclaim** 41:20 |
| 13:11 24:1 30:25 31:2,6 | **connect** 22:11 | 23:20 27:22 28:23 45:3 | **counterclaims** 41:1,13 |
| 31:19,24 33:21 42:5,17,19 | **considerations** 77:15 | 51:19 53:5 54:23 55:11 | **country** 34:4 |
| 43:16,23 53:17 53:21,23 54:17 | **constrained** 52:9 | 71:5 76:17 77:1,9 78:1,24 | **county** 82:3 83:4 |
| 75:12,14,18 79:18 | **constraint** 19:7 | **correct** 14:20 17:2,3 18:5,6,8 | **couple** 7:16 21:12 22:16,17 |
| **concerned** 31:10 54:1 | **consultant** 25:8 58:19 | 29:14,15 30:22 30:24 35:15 | 22:22 29:25 68:24 77:19 |
| **concerning** 42:9 43:11 | **consulted** 52:21 | 36:4,9 38:13 38:14,15,16 | **court** 1:1 5:22 6:1 83:6,7 |
| **concerns** 11:13 13:17,18,24 | **consulting** 25:7 | 64:19,22,23 69:11 70:3,6,7 | **coverage** 23:20 |
| 23:23 40:5,7 40:20 44:13 | **contact** 65:7 | 73:3 74:8,12 76:15 82:9 | **covered** 77:17 |
| 50:5 52:24 56:24 76:20 | **contacted** 64:25 | 83:12 | **coyle** 2:3 3:5 4:19,19 5:2,4,6 |
| **concluded** 70:10 81:5 | **contacting** 69:24 | **corrected** 14:20 | 9:19 11:17 16:1,17,22,25 |
| **conclusion** 52:16 | **contained** 82:10 | **corrections** 82:7 | 19:24 20:4,11 21:25 22:4 |
| **concurred** 34:24 | **continue** 37:22 | **correctly** 59:7 | 23:2,6 29:12 30:5 35:19 |
| | **continued** 48:6 | **corrupt** 16:6 | 39:6 46:18 |
| | **continues** 70:5 | **council** 9:16 15:20 18:20 | 48:15 52:23 53:14 54:21 |
| | **continuing** 54:16 | | |
| | **contrary** 71:19 | | |
| | **controversy** 22:6 | | |

56:2,8 58:3
60:13,15 61:8
61:15,21,23,25
64:12,15 65:9
67:8,13,20,22
67:23 68:5,17
68:19 69:6,8
70:19 71:11
75:13 77:22
80:5,14,16,19
81:2
**create** 42:17
74:14
**created** 74:2
**credentialed**
55:17
**credibility** 16:2
16:7 45:17
**crime** 19:3
**crimes** 19:3
**critical** 24:13
41:12 51:8
**critically** 43:17
**cross** 16:7
**cuff** 49:3
**curious** 35:7
**currently** 8:19
47:13,25
**cut** 15:10
**cv** 1:7

**d**

**d** 3:1 58:18
59:10
**damaged** 33:25

**data** 49:24
**date** 8:10 20:24
**dated** 19:13
**day** 7:17 45:7
49:22 71:8
82:12 83:17
**days** 68:22 81:1
**deadly** 26:10
**deal** 18:23
40:15 42:14
55:1,6
**dealing** 40:11
42:22 63:6
**dealings** 16:6
**dealt** 39:5,12
43:8
**death** 45:21
48:12,19 49:7
**december** 23:9
**decided** 38:18
**decision** 9:7
16:5 20:13
21:5 22:8
40:10,14,18
50:3,11 51:17
60:19
**decisions** 24:22
24:24 25:23
50:5 72:5
**declare** 82:5
**deductibles**
54:20
**deep** 14:12
**defective** 70:12
70:23

**defendant** 2:7
2:12 16:12
**defendants** 1:9
**definitely** 7:17
**degree** 8:14
**deis** 58:18,20
58:22 59:10,15
59:20
**deletions** 82:8
**deliberative**
9:10
**delivery** 75:6
**delve** 21:21
**department**
11:10,14,25
12:22 13:16,22
14:3,25 19:6
21:10 23:10,18
24:5,7,16,25
26:6 28:16
31:11 32:1,4
32:19 33:19
37:21 40:5,5,6
41:12 42:3,7
42:18,20 43:1
43:3 44:6,24
45:2,17 47:21
50:4,22,24
51:9,11 52:25
53:13 54:3
55:5 56:13
57:4 58:5 59:4
59:11 60:17,20
64:2,3,4,25
65:3,16,19

66:11 68:1,11
71:25 73:2,3,5
73:8,11,20,21
73:25 74:14
76:22 77:3,11
**department's**
14:4 24:13
70:5
**departments**
34:4
**deponent** 2:12
**deposition** 1:10
3:13 4:1,12 5:8
5:10 17:1,5,10
18:10,17 20:14
20:18,23 22:5
23:3 25:19
26:19 81:4
83:10,11
**depositions**
80:9,11
**deputy** 76:2
**describe** 33:23
**description**
3:12
**deserve** 47:22
**desire** 40:19
79:25
**desirous** 82:8
**despicable**
47:17,21 48:4
48:5 49:10,22
**determined**
47:15

**[development - evaluate]**

**development** 17:7,16,24 25:10
**devil** 22:14
**dialogue** 78:21
**different** 27:4,8 27:23 73:10
**differently** 37:1 50:18,18
**dig** 14:12
**direct** 38:13
**direction** 83:10
**directly** 13:15 34:22 38:7 50:12 55:1 59:20
**disciplinary** 35:11
**discipline** 24:24
**discover** 11:13
**discuss** 58:4
**discussed** 56:15 58:25 76:1
**discussing** 36:20 54:4
**discussion** 36:22 45:16 47:2 61:17
**discussions** 19:22
**distance** 6:25
**district** 1:1,2 10:14 67:25

**division** 71:22
**document** 3:15 20:16 58:9 64:13
**documents** 18:13
**doing** 62:21 63:12 72:9,10
**doj** 64:15,18 65:12 67:2,4 68:8 69:9,10 70:4,10 71:5 74:12 75:2
**doorstep** 22:14 22:15
**dots** 22:11
**double** 13:8
**download** 61:10
**draft** 19:11,15 19:25
**drafts** 19:14,22 20:2,7 64:24 80:24
**drugs** 8:3
**due** 19:7
**duly** 4:24
**duties** 13:9

**e**

**e** 2:1,1 3:1,10 5:3 58:18 59:10,24 83:1 83:1
**earlier** 20:12 61:5 74:6 76:1

**early** 59:16 61:3 64:17
**eastern** 1:2
**echo** 49:21
**echoed** 49:1
**economic** 25:10
**edit** 78:8 79:1
**editing** 78:13 78:17,22,24 79:8
**educated** 79:24
**education** 8:13
**effect** 44:21 62:23
**efforts** 26:5,8 26:15
**either** 39:13,13 41:2,5 76:5
**elaborate** 41:15
**elected** 27:22
**electrical** 22:17
**elevate** 76:6
**email** 30:20,24
**emblem** 31:25 32:7
**emergency** 18:18,19,21,25 19:9
**employed** 8:19 83:15
**employee** 25:7 25:8,9 30:8 83:13
**employees** 63:6 74:13

**employment** 8:24 9:1,3 10:6
**ended** 69:23,23
**ends** 62:24
**enforce** 70:11 70:22 71:2
**enforcement** 72:6
**engaged** 72:5
**ensured** 38:21
**ensuring** 37:21
**enter** 51:16 68:12
**entered** 69:10
**entire** 12:22
**entirety** 10:2
**envision** 14:4 14:25
**equivocate** 49:12
**escalated** 50:14
**especially** 43:12
**estate** 5:8
**estimate** 6:24 60:23
**estimating** 7:1
**estimation** 45:20 46:11
**estimation's** 60:24
**et** 1:5,8 5:9
**evaluate** 11:23 12:15,16 14:6 45:14

evaluation
  23:15
evaluations
  65:18
event  9:21
eventually
  51:10 56:19
  70:1
evidence  35:17
  48:6 49:16
exacerbate
  53:1
exactly  51:20
examination
  3:2 4:2 16:7
examined  4:25
excellent  53:8
excessive  24:9
  26:10 27:20
excuse  4:10
executed  82:12
exhibit  23:5
  58:8 64:14
  68:17,18
existed  50:5
expect  45:10,13
expense  15:9
experience
  10:10 24:8,11
  34:3 39:17,23
experienced
  27:4,25
experiences
  27:11,21

expert  72:25
expired  69:1
expires  83:21
explain  65:10
  75:17 80:3
exposure  53:1
  53:19 54:9
express  56:22
  76:18,19,20
expressed
  13:18
extent  9:9 35:8
  37:5 57:19
  60:8 75:7
extremely
  43:11
eyes  66:7

**f**

f  83:1
fact  13:6 37:12
  41:3 43:12
  50:12 62:17
factor  21:18
facts  47:15
faded  69:5
fading  69:3
failed  70:11,21
  71:2
failure  71:25
fair  7:1 16:16
  21:6,16 36:11
  55:21 63:11
  64:6 73:8,15
fairly  50:8

falsely  22:23
far  59:4
february  33:1
federal  4:4,6,16
feel  73:23
felt  19:4,7
  23:11,24 24:2
  24:5 27:24
  34:1 49:20
  50:14,21 51:4
  51:5 53:7,21
  55:4 56:22
  65:15
file  1:20 61:10
final  19:11,15
  19:18 80:25
financially
  83:16
financing  12:3
find  13:14,15
  31:15 32:8
  35:7 37:7
  45:17 55:16,19
  69:21 72:16,19
finding  73:15
findings  16:15
fine  60:24
finish  6:11
fire  22:19 64:3
firing  22:18
  24:22
firm  5:6 59:14
first  4:24 5:21
  6:3 9:24 13:4
  13:19 23:8,12

24:14 28:9,13
  30:7 32:14,17
  32:20 33:11
  36:6,11 37:24
  43:6 45:6
  47:11 48:4
  50:10 54:16
  55:10 66:25
  69:14 75:16
fiscal  19:7
five  21:25
  77:16
fix  73:15
flag  63:17
flags  62:6
focus  15:7
folks  20:6 21:3
follow  21:7
following  4:7
  39:25 43:16
follows  5:1
footage  78:8
  79:2
force  15:4 24:9
  24:13 26:10
  71:16,19,20,21
  72:1,23
foregoing  82:6
  82:9 83:9
foremost  5:21
  13:4 50:10
formal  19:25
  26:19 36:3,8
  36:12

[forth - heard]                                                    Page 10

**forth** 51:21
**forward** 12:21
  14:19 19:5
  59:21 64:7
**foster** 62:12
**found** 24:4
  37:12 43:9
  75:1
**foundation**
  35:16 46:14
  65:5 70:16
**fountain** 10:18
**four** 42:6
**frame** 78:8
**fraud** 16:5
**friction** 76:3
**friendship** 46:3
**full** 8:8 25:14
  83:11
**fund** 69:20
**funding** 65:22
  65:22 66:4,13
  66:15 69:17,22
**further** 71:23
  80:5

**g**

**gangs** 76:21
  77:2,10,15,23
  78:2
**gaps** 72:17,19
  74:1
**garnered** 34:1
**general** 3:15
  12:11 26:3,20
  36:22 62:8

68:16 75:20
**general's** 70:9
**generally** 5:15
  26:22 62:13
**genesis** 65:11
**getting** 22:24
  41:4,10 54:5
**giordano** 36:12
**give** 10:5 16:22
  23:14 31:18
  33:20 41:7
  42:19 47:2
  53:11 58:11
  59:15 77:16,19
**given** 48:25
**giving** 17:10,12
  20:23 45:23
**go** 5:16,16
  14:10 23:7
  37:3,17 39:2
  43:20 46:1,15
  52:17 54:25
  58:12 62:5
  63:9,9 64:15
  65:6 77:17
**goes** 5:18 71:12
**going** 5:15 6:24
  7:7,9 11:5,14
  15:23 16:9
  19:16 21:1
  23:3 27:5 38:2
  42:21,21 46:19
  46:25 47:1
  50:9 54:25
  55:22 56:2

57:18 58:8
  62:25 63:21
  65:16 67:19
  76:3
**good** 4:9,10 5:5
  15:24 20:3
  52:4,5,6 55:22
  55:24 56:3,7
  63:13 71:7
  72:9,14 73:21
  81:2
**government**
  10:11
**graham** 2:8
  4:21 80:6,13
**grand** 8:16
**great** 8:7
**greater** 27:13
  27:14 30:12,14
**greg** 4:23 9:11
  57:21 78:4
  81:4 82:18
**gregory** 8:9
  20:19
**grounds** 16:10
**group** 19:19
  22:12 30:10,11
  51:25 52:1,13
  53:8,17 55:14
  57:2 58:17,21
  59:9,12,13
  60:17 63:23,24
  65:19 66:8
  74:11

**groups** 27:3
  77:24
**guess** 6:18 21:4
  22:11 37:23
  51:3 63:16

**h**

**h** 3:10 59:24
**half** 48:9 56:3
**hall** 45:23
  46:20,24 61:5
**hand** 29:18
  83:17
**handled** 36:1,3
  37:19,25,25
  38:8
**handling** 17:6
  17:14,23 21:17
**happen** 34:25
  67:19
**happened**
  36:15 51:21
  62:12 80:3
**happening**
  79:13
**happens** 62:23
**head** 6:4
**heads** 11:10
**hear** 13:15 29:5
  29:6 38:3
  48:16,18 61:22
  69:20
**heard** 26:13,21
  32:14,21 33:8
  33:10,18 34:15
  44:21 68:14

**hearing** 37:7
  46:22
**held** 8:23 9:6
**help** 53:10,11
  69:21
**helpful** 61:13
**hereto** 83:15
**hereunto** 83:17
**hi** 30:9
**high** 25:24
  50:13 54:6,8
  63:18
**higher** 53:19
**highest** 8:12
  42:2,6
**highlands**
  10:14
**hindsight** 42:24
**hire** 52:13
  65:23
**hired** 56:19
  75:21
**hiring** 24:22
  32:10 50:18
  60:2 76:9
**history** 10:6
  32:7
**hold** 25:18 30:8
  69:4
**holding** 71:16
  72:1
**homicides** 19:2
**horton** 2:13
  26:22 39:7,11
  40:22 45:7

  56:15,22
**hour** 18:7 56:3
**hours** 7:16 18:9
  18:11
**huh** 6:4
**human** 6:8
  45:21 47:18
  48:13,19 49:7

**i**

**iacono** 56:19
**idea** 53:12
  74:11 76:8
**identified** 74:6
  74:10
**identifying**
  52:24 71:18
  73:14
**image** 31:18
  32:9
**immediately**
  37:12
**impact** 8:4
**implement**
  26:25 71:15
**important** 31:5
  34:2,9 43:17
  50:25 53:21
  56:10 63:25
  75:25
**impression**
  39:10,20
**impressions**
  39:16,22
**improve** 24:2
  40:4 53:13

  72:20
**inadequate**
  70:13
**incident** 47:12
  79:12
**incidents** 24:14
**included** 68:25
**including** 26:9
  71:16
**increase** 74:7,7
  74:8
**increased**
  53:18
**increases** 23:21
  55:12
**increasing** 54:7
  55:9
**independent**
  50:23 51:7
  53:22 65:17
**independently**
  50:17
**indicate** 34:10
  35:2 62:18
**indicated** 58:21
**indicates** 62:19
**indicating**
  63:12
**individual**
  38:24 43:23
  57:5
**individually**
  75:10
**individuals**
  26:14 42:6

  57:3
**influence** 27:14
**informal** 69:16
**information**
  9:13 22:23
  23:16 53:10
**informed** 45:11
**inhibited** 26:15
**initial** 59:13
  65:7
**initiated** 64:4
**input** 71:8
**inquiry** 47:10
**instance** 59:18
**instruct** 15:23
  16:10 67:12
**instructed** 38:2
**instructing**
  20:9
**instructions**
  5:17 37:8
**insurance**
  23:19,20 53:19
  54:6,19,22,25
  55:12 74:8
**intention** 67:25
  68:7,11
**interaction**
  31:23 39:21
**interactions**
  31:14 61:19
**interest** 40:2
**interested**
  36:23 76:14
  83:16

**interim**  33:5
  39:15 75:21
  76:5
**internal**  14:7
  24:17 41:21,24
  71:22
**introductory**
  47:2
**investigate**
  42:10 74:12
**investigated**
  31:13 41:23
**investigating**
  71:18
**investigation**
  15:19 16:4,16
  17:6,14,24
  22:7 34:19
  35:3 36:4,8,12
  36:12,17 37:16
  37:20 38:20
  43:14 45:16
  47:13,15,25
  48:25 50:7
  53:18 71:23
**investigations**
  14:7 16:11
  24:18 35:11
  62:3
**invited**  69:9
**involved**  11:20
  12:24 15:3,6
  52:3 59:10,13
  60:2 74:15,19
  75:2

**involvement**
  17:15
**involving**  18:5
  58:22 59:9
**island**  17:7,15
  17:24 21:13,18
  22:7
**issue**  20:14
  22:7 37:24
  42:11,25 43:17
  45:1 47:6,9
  54:24 64:16
**issues**  11:4,13
  13:5 18:24
  21:3,8 23:10
  40:8 52:7 57:5
  64:10 66:3
  68:13
**items**  59:2

**j**

**j**  2:3
**jacob**  2:8 80:12
**january**  8:11
  10:1 11:3 23:8
  26:4
**jcoyle**  2:6
**jeff**  1:10 3:3 4:2
**job**  13:20 36:23
  45:7 53:8
  55:22,24
**john**  2:3 4:19
  5:6 15:24
  19:17 21:24
  25:3 33:1
  34:13 36:18

  39:19 40:11,15
  44:8 61:6,11
  69:5 80:17
**joined**  11:2
  45:2
**joining**  11:12
  12:9
**joint**  4:14
**jones**  2:18
**joseph**  56:19
**judgement**
  68:23
**judgment**  3:15
  68:12 71:14
**judith**  4:4 83:6
  83:20
**judy**  1:25 5:2
  23:3
**july**  9:2 20:19
  26:4 33:1
**jumbled**  6:10
  7:4
**jump**  6:9
**jumping**  7:9
**justice**  60:20
  64:25 65:3,19
  66:11 68:1,11
  73:25

**k**

**k**  57:6
**kate**  29:5
**katelyn**  2:14
  80:20
**katelyn.knight**
  2:16

**keep**  6:3 14:13
**kilday**  2:9,18
**kilduff**  2:9,18
**killing**  47:18
**kind**  7:11 14:18
  45:16 51:6
**king**  82:3 83:4
**knight**  2:14
  4:20 9:8 11:15
  15:21 16:9,20
  16:24 19:16
  20:3,8 21:20
  21:23 22:1
  29:3,8 30:3
  35:16 39:1
  43:4 46:13
  49:15 52:15
  53:3 54:11
  56:7 57:18
  60:7 61:11
  63:14 65:4
  67:5,11,17,21
  68:2 70:15,25
  73:16 75:4
  80:6,7,22 81:3
**know**  5:15 6:22
  7:1,5,13,19
  12:16 13:4,13
  14:13 15:6,8
  15:15 16:6,15
  23:14,17 25:3
  28:1,9,25 29:4
  30:7,8,9 31:4
  32:15 35:14
  39:12,13 41:25

[know - management]                                                    Page 13

42:24 43:22
44:2,12,12
45:15 46:16,17
46:21 47:20
54:5,24 56:16
57:5 60:5,21
61:3 62:9,22
63:21,22,25
65:13 67:10
70:17 72:3,16
73:18 74:22
78:4,14,19
79:9,10,20
**knowledge**
    39:17 60:9,11

**l**

**labor**   27:2,2,9
    27:15,23 30:10
    30:11 57:12,13
    58:2
**laboring**   58:1
**lack**   14:15,16
    46:14
**lacks**   65:4
**language**   20:6
**large**   14:22
    15:9 67:3
**larger**   62:13
**late**   60:25 61:1
    64:17
**law**   2:18 5:6,23
    52:9 70:12,22
    71:2,21 72:5
**law.com**   2:11

**lawsuit**   17:2
**lead**   6:10 42:18
    42:20 53:18
**leaders**   27:23
**leadership**
    41:11
**leading**   11:12
    43:2 44:6
**learned**   34:3
    72:8
**learning**   11:8
**leave**   16:14
    20:13 21:5
    22:8 39:14
**leaving**   36:21
**led**   21:5 65:2
**lee**   2:12
**left**   9:22 10:7
    18:1 22:10,24
    43:9,15
**legal**   52:16
    57:24
**legs**   7:19
**lengthy**   50:9
**letter**   66:22,24
    67:1 71:3
**level**   8:12
**levels**   54:18
**liabilities**   23:25
    54:6,7
**liability**   50:13
    53:1,18 64:2
**license**   83:22
**licensed**   4:13

**lie**   63:22
**lieutenant**
    28:15,18
**lieutenants**
    44:2
**light**   22:16
**likewise**   6:12
**limited**   25:24
    55:3 60:17
    77:24
**line**   21:2
**listed**   72:19,19
**listened**   40:3
**listening**   49:1
**little**   7:10 29:9
    32:16 39:12,17
    39:17,21 51:4
    65:25 69:7
**longer**   35:24
    38:22 48:22
**look**   12:19
    22:13 23:24
    24:12,20 27:6
    33:13 34:9
    39:4 51:6,8
    57:4 63:24
    65:16,18,19,20
    66:1,5,15
    69:15
**looking**   12:20
    15:3,4 23:13
    37:21 42:23
    49:17 66:12
    73:7

**looks**   19:11
**lorentson**   2:3
**lose**   43:25
**lot**   11:6 13:21
    13:23 23:17
    44:4 47:6
**low**   50:22
    65:15
**lying**   41:19

**m**

**m**   5:3
**made**   24:10
    32:18 35:10,23
    37:14,18 49:19
    60:19 67:3
    76:13 82:7
**main**   41:9 51:2
    66:3,13
**make**   4:12 5:17
    5:17 14:11,13
    19:24 26:5
    27:6 29:7
    53:10,11 62:6
    63:1 72:24
    73:19 77:17
**making**   16:5
    22:13 41:21
    50:24 82:8
**manage**   51:12
    54:3 57:1
**management**
    13:7,8 14:3,4
    14:25 23:13
    55:5,7 58:17
    59:13,16,19

| | | | |
|---|---|---|---|
| 74:14 | **mceldrewpur...** | 22:18 33:6 | **montague** |
| **manager** 10:3 | 2:6 | 34:14,22 46:25 | 10:16 |
| 10:12,16,18,22 | **mcmann** 44:19 | 48:8 54:6 | **monterrosa** 1:5 |
| 10:23 11:1 | **mean** 7:25 15:2 | 56:14 62:2 | 2:2 5:9 |
| 24:21 51:15 | 26:18,20 45:15 | **met** 34:13,21 | **months** 44:22 |
| **mandatory** | 50:8 54:8 66:9 | **michael** 28:1 | 44:22 51:22 |
| 62:6 | 79:3 | **michelle** 29:3 | 54:16 69:19 |
| **march** 15:18 | **meaning** 32:1,3 | 29:11,13 | **morning** 4:9 |
| **mare** 17:7,15 | 49:23 | **michigan** 8:16 | 5:5 |
| 17:24 21:12,18 | **means** 41:15 | 10:15,16 | **motivated** 22:8 |
| 22:7 | **meant** 49:8 | **midway** 28:11 | 40:10,14,19 |
| **mark** 23:3 61:9 | **measure** 51:11 | **military** 73:10 | **motivating** |
| 68:17 80:10 | **media** 21:3 | **mind** 6:3 38:5 | 21:18 41:9 |
| **marked** 23:5 | 22:6,21 44:18 | 39:3 43:10 | **motivations** |
| 58:8 64:14 | 44:19 74:16,20 | 76:8 | 54:5 |
| 68:18 | 74:23 | **minimal** 28:24 | **mou** 69:1,2,11 |
| **materials** 18:13 | **medical** 9:22 | 28:24 | 70:1,4,10 |
| **matt** 28:9,12 | 18:1 20:14 | **minutes** 21:25 | **move** 12:21 |
| **matter** 5:8 | 21:21 22:10,24 | 61:16,24 77:16 | 14:19 19:4 |
| 20:15,20,24 | **medications** | 77:19 | 38:18 47:5 |
| 25:3,20 36:18 | 8:3 | **misconduct** | **moved** 10:15 |
| 38:20 60:8 | **meet** 30:13 | 16:15 40:1 | 10:17,21 |
| **matzke** 17:2 | **meeting** 33:1,4 | 42:8 | **moving** 10:25 |
| 20:15,20 25:3 | 34:17 | **missionary** | 59:21 |
| 25:4,6,19,22 | **meetings** 21:4 | 46:3 | **municipal** |
| 40:9,13,17 | 46:2 75:10 | **misstates** 35:17 | 10:11 52:11 |
| 76:25 77:8 | **members** 13:19 | 35:17 49:15 | **mustard** 28:9 |
| **mayor** 32:21 | 27:19 75:3 | 52:15 63:15 | 28:12 |
| 33:8,10,11 | 76:18 77:2,10 | **mitigate** 64:10 | **mutually** 9:4 |
| 34:6,17,21 | **memorandum** | **modesto** 10:22 | **n** |
| 65:7 66:6 68:6 | 69:10 | **moment** 49:13 | **n** 2:1 3:1 5:3,3 |
| 75:15 77:25 | **memory** 74:24 | **money** 62:14 | **name** 8:8 |
| **mayor's** 34:1 | **mental** 8:2 | 62:17 | **name's** 5:5 |
| **mceldrew** 2:4 | **mentioned** | **monitor** 14:8 | **named** 59:23 |
| 5:6 | 12:14 14:2 | | |

nature  6:8 20:2
necessarily
  15:2 16:18
necessary  24:2
  35:10 50:16
  55:4 63:3
need  4:14 7:18
  11:22 12:15
  14:10 15:7
  19:4 21:20
  24:5 47:15
  51:19 53:13
  54:24 58:14
  63:3 79:11
needed  14:20
  15:10,11 23:11
  35:12 42:14,15
  50:15,17,19
  56:16 63:1
  74:4 79:21
needs  51:5,6,8
neftali  1:5 2:2
negative  39:16
  39:22
negotiations
  58:2
neighbor's
  22:15
neither  83:13
nepharious
  71:20
never  76:8
  77:14
new  45:10,14
  71:13 74:13

news  47:12
nichelini  28:1
  28:14,22 29:20
  30:20 31:15
  32:9
nichelini's
  28:25
nods  6:4
normal  27:24
  44:2
normally  27:10
  27:10
notary  4:5 83:8
  83:20
note  61:11
notes  57:11
  77:17
noticing  4:18
notified  47:11
  67:15
november
  83:18,21
number  11:20
  12:12 13:5,10
  14:8,17,22,23
  19:1,2 23:18
  24:9 26:7 27:1
  36:24 54:14
  57:3 62:13
  66:10 71:4
  72:11
numbers  63:9
nyhoff  1:10 3:3
  4:2,23 5:5 8:9
  12:25 20:19

23:4 25:22
81:4 82:18

**o**

o  5:3 59:24
oath  4:25 5:21
object  9:8 16:9
  19:16 57:19
  60:7 75:4
objection  11:15
  15:21 20:8
  30:3 35:16
  39:1 43:4
  46:13 49:15
  52:15 53:3
  54:11 63:14
  65:4 67:5,11
  68:2 70:15
  73:16
objections
  70:25
obligated  5:23
obviously
  35:25 54:17
  66:9 69:2
occasionally
  29:22
occasions  30:18
occur  35:12
  53:25 62:9
occurred  35:13
  35:14 37:2
  47:13
occurrence
  9:21

occurring
  32:18 35:24
  38:22
occurs  13:3
october  1:12
  4:2 18:22
  45:24
odds  41:12
offense  7:25
office  13:8,9
  14:18,18 15:16
  19:20 25:11,12
  25:15 29:15,21
  30:2,9,15
  51:18,23 52:2
  52:14,22 55:2
  59:25 67:9,15
  67:24 70:9
officer  2:7
  11:20 12:24
  14:22 15:3,6
  47:20 52:3
  83:7
officers  25:24
  26:9,15 28:4
  30:1 34:8 37:4
  37:14 44:18
  47:7 65:24
  71:17 72:2
  76:21
official  47:10
  83:17
officials  9:7
  27:22

**oftentimes**
  26:14
**oh**  76:13
**oir**  18:16 19:5
  19:10,19 20:6
  26:6 50:3,6
  51:25 52:1,13
  53:8,17 55:14
  57:2 59:18,22
  60:17 62:3
  63:23 64:21,24
  65:18 66:8
  72:7,13 74:11
**okay**  5:13,20
  6:13,14,15,17
  6:23 7:7,8,15
  8:7 9:24 16:9
  16:17 17:12,20
  18:2,7,9,23
  19:24 20:18
  21:23 28:3
  33:7 36:11
  38:12 43:20
  46:5,8,19 48:1
  48:22 50:8
  58:16 59:9
  61:22 67:20
  70:1,8 73:1,6
  73:13 76:16
  77:16 78:16
  80:23
**once**  11:9 37:12
  59:4 62:23,23
**ones**  62:13

**open**  22:22
  30:8
**openly**  42:7
**openness**  52:6
**operation**
  60:16
**operations**
  11:11 44:3
  72:23
**opinion**  31:9
  68:24 70:14
  79:22
**opportunity**
  40:23
**option**  65:12
**oral**  4:1
**order**  4:15
  18:18,19,21
  78:20 79:14
  80:11,18,20
**ordered**  15:19
  47:10
**ordinances**
  52:11
**organization**
  27:9 73:10
**organizations**
  27:2,15,23
**originally**
  28:14
**outcome**  83:16
**outlets**  22:21
**outreach**  24:6
  65:21

**outside**  38:23
  53:6 60:9
**outsized**  24:9
**overall**  53:12
**overarching**
  12:21 13:1
**oversight**  21:10
  26:9 42:13
  73:13
**own**  11:9
**oxnard**  10:23
  52:1 53:9
  57:15

**p**

**p**  2:1,1
**p.m.**  81:5
**page**  3:12 5:17
  21:1 58:8
**pages**  3:2
**paid**  18:3 54:18
**pandemic**  19:8
**parameters**
  51:20
**part**  13:12 18:2
  22:8 24:16
  40:11,15,19
  44:2,20 59:5
  61:12 70:4,12
  70:23 74:17
**partially**  22:25
**particular**  9:21
  12:7 62:11
  65:21 79:12,22
  79:25

**parties**  4:15
  83:14,15
**passed**  18:22
**past**  27:15 32:2
  32:4 35:1
  37:25 38:10
  45:18
**patch**  47:23
**pay**  37:14
  62:25 63:3
**paying**  54:18
  62:14,17
**payouts**  23:19
**pays**  23:22
**penalty**  82:5
**pending**  7:21
  64:22 68:23
**pennsylvania**
  2:5
**people**  24:4
  42:2 52:12
  63:6 66:10
  80:2
**perception**
  27:12 79:11
**perfectly**  6:21
**perform**  51:7
**period**  19:3
  29:23 57:4
  74:5
**perjury**  82:6
**permanent**
  76:9,14
**personal**  31:23
  38:24