personally 13:15
personnel 16:11 25:23
perspective 26:4
philadelphia 2:5 5:7
phone 66:22,24 67:1
physical 8:2
picture 30:21
placate 49:4
place 15:14 63:8 76:4
placed 22:13,14 22:15,15,16
places 27:25
plaintiff 2:2
plaintiffs 1:6
plan 50:20
planning 54:12
play 46:6,19 47:1
playing 61:20
please 4:17 7:13 80:19,22
point 7:11,17 26:17 30:19 36:9 43:15 48:24
police 11:14,24 12:7,17,19,22 13:16,22,22 14:5 19:6

21:10 23:10,18 24:5,16,17,19 24:24 25:1,24 25:25 26:2,6 26:14 28:4,16 31:11 32:1,4 32:12,19 33:5 33:19 34:8,11 34:23 35:22 37:21 38:7,12 38:19 41:3,11 42:2,6 43:3 45:10 47:7,20 48:10 50:4,22 52:19 53:11,12 54:9 57:4 58:5 59:3 60:17 64:2 65:16,24 68:13 70:5 72:22 73:2,3,5 73:19,20,21 76:20 77:10,23 78:2,13,18
policies 14:12 14:16 24:18 27:7 50:16,19 63:8 66:1,5,16 69:15 70:13,23 71:6,9 72:22 73:7
policy 71:20,21 73:22 74:2
policymaking 72:5

position 33:5 40:24 41:6 76:5
positions 11:7
positive 31:9 64:20
possible 5:18 15:10
posters 22:13 22:13
posts 22:16
potential 49:18 53:1 54:9 73:14 77:2
power 47:19
powerpoint 79:4
practice 33:24
practices 16:5 63:2 70:6,10 70:13,23 73:7
precedes 61:18
predates 61:17
premium 55:12
premiums 23:21 50:14 53:2,19 54:7 54:20 55:9 74:8
prep 18:4
preparation 18:9,12
prescription 8:2

present 2:18 18:19
presentation 79:16
presentations 79:4
presented 52:4 79:19
presenting 53:9
president 28:4 28:7,10,13,15 30:10,15
presidents 30:11,13
press 68:15 70:8
pressuring 78:7
pretty 12:1
primary 79:18
prior 11:7 12:6 12:8 19:15 32:13 36:15 47:13 50:6 57:14 67:2 80:9
privacy 15:21 15:22 16:10
privilege 9:10 19:17,18,20 20:9 60:8 75:6
privileged 20:1 67:16
pro 74:16,20,22

**probably** 36:25 48:9 58:11 60:25 61:1
**probing** 16:2
**problem** 75:11
**problems** 52:25 73:14
**procedure** 63:2
**procedures** 14:13 24:18 27:7 50:16 66:2,5,16 69:16 70:13,24 71:6 72:22 73:22
**proceed** 4:11
**proceeded** 52:19
**proceedings** 4:7 18:5
**process** 9:10 11:4 35:8 50:9 51:15 59:16 66:21 72:18 75:6
**processes** 72:18
**produce** 22:23
**product** 19:18
**professional** 71:22
**programs** 14:19
**project** 17:7,16 17:25

**proper** 14:4 43:14 63:2
**proposal** 51:25
**protective** 80:11
**provide** 69:12
**public** 4:5 18:19 19:8 21:16 22:6,6 50:21,25 51:1 52:5,6 58:17 59:12 64:3 65:15 73:11 78:9 79:5,10 79:13,17 83:8 83:20
**public's** 79:19
**publically** 21:4
**published** 19:11,15
**pull** 64:12
**purpose** 46:11 46:17 57:16
**pursued** 36:17 73:24
**purtell** 2:4 5:7
**push** 75:2
**put** 14:19 19:25 51:24 59:3,5 63:8 75:23 78:20
**putting** 63:2

### q

**quasi** 73:9,9
**question** 6:9,11 7:3,6 8:1 16:21 17:8 21:2,7 27:7 47:5 48:1 53:16 63:17 77:5
**question's** 7:20
**questions** 31:7 47:2 62:1 77:19 80:6,8
**quick** 21:24
**quickly** 5:18 13:5
**quite** 13:5 15:16 23:13 27:24,24 51:19

### r

**r** 2:1 59:24 83:1
**racist** 31:15,19
**raise** 34:2
**raised** 36:18 54:10 63:17
**raising** 21:3,8 40:7 54:19
**ranch** 10:14
**range** 18:24
**ranking** 25:24 42:2,6
**rapids** 8:16
**rare** 30:18
**rate** 18:7
**rates** 54:25

**reach** 60:19 65:2 67:25 68:7
**reaching** 50:6 67:2,4
**reaction** 77:7 79:19
**read** 49:24 59:7 82:6
**real** 13:14 15:24 24:16
**realize** 56:9
**really** 6:10 11:23 12:23 14:7,12 73:13 75:24
**reason** 8:1 22:24 39:3 41:9 49:12,14 49:18 51:3 57:21 66:14
**reasons** 9:23 18:1 22:11 51:2,14 62:4
**rebuild** 24:3 31:5
**recall** 6:20 14:1 15:16 17:18 19:14 28:8,11 30:24 32:23,23 33:22 39:9 40:16 45:5,9 45:25 56:23 58:6 60:22,23 66:25 78:3,7

| | | | |
|---|---|---|---|
| 78:10,11 | **reforms** 26:24 | 62:12 | **research** 11:7,9 |
| **recently** 68:10 | **regard** 41:18 | **remembered** | 11:12 |
| **recognize** | **regarding** | 4:1 | **reserve** 80:10 |
| 23:10 47:7 | 12:16 18:17 | **renne** 58:16 | **residing** 4:6 |
| **recollect** 25:16 | 22:6 23:25 | **repair** 37:4 | 83:21 |
| 74:25 | 59:18 68:13 | **repaired** 38:3 | **resigned** 56:14 |
| **recollection** | **regards** 12:19 | **repeat** 17:8 | **resolve** 43:18 |
| 31:13 32:5,20 | 25:1 33:5 34:8 | 40:12 74:18 | **resolved** 39:4 |
| 33:9,17 37:5 | 45:14 50:15 | **rephrase** 7:6 | **response** 12:12 |
| 44:17,25 55:10 | 52:7 | 67:20,22 77:4 | 37:9 38:6 |
| 56:18 57:13,25 | **registered** 28:3 | **report** 18:16 | **responses** 6:16 |
| 64:23 77:14 | **regular** 76:25 | 19:10,13,15 | **responsibilities** |
| 79:1 | **related** 14:5 | 20:6 26:6 | 73:18 |
| **recommendat...** | 16:12 17:23 | 36:13 38:13 | **responsibility** |
| 19:5 26:8 | 19:23 21:9 | 45:6 49:25 | 73:23 |
| 59:22 71:15 | 26:8,10 34:11 | 50:3,25 54:5 | **restroom** 7:18 |
| 72:8 | 68:23 | 59:18 62:3 | **result** 69:2 |
| **recommended** | **relates** 31:8 | 64:21,24 72:13 | **results** 16:16 |
| 55:13 | **relating** 15:25 | **reported** 1:25 | 59:4 |
| **record** 5:22 6:2 | 21:10 | **reporter** 4:9,13 | **resurfaced** |
| 6:6,11 8:8 19:1 | **relations** 24:3 | 61:6 69:4 | 35:24 45:1 |
| 19:2 22:3 23:3 | 58:4 | 80:17,20,23 | **retain** 59:23 |
| 61:23 77:21 | **relationship** | 83:7 | 74:11 |
| **recording** | 28:21 | **reporter's** 6:1 | **retained** 57:3 |
| 46:20 49:11 | **relative** 83:13 | **reporting** 40:1 | 74:22 |
| **rectifying** | **release** 68:15 | 55:25 | **retaining** 55:14 |
| 52:25 | 70:8 79:4,22 | **reports** 54:23 | **retention** 74:16 |
| **red** 62:5 | **released** 78:9 | **represent** 34:6 | 74:20 |
| **reduction** 12:5 | 80:2 | 47:24 | **retired** 8:21 |
| **refer** 72:3 | **relevant** 16:13 | **representatives** | 76:12 |
| **referring** 62:7 | **remember** 6:19 | 55:6 | **retrospect** 44:5 |
| **reflected** 72:14 | 6:21 17:4,9,12 | **request** 19:25 | **reveal** 75:5 |
| **reform** 26:5 | 20:12,23 28:6 | **requested** 75:2 | **revenue** 15:11 |
| 59:6 62:6 | 32:25 41:17,20 | **required** 23:24 | **review** 13:1 |
| 71:10 | 45:23 55:8 | 25:23 37:4 | 18:12,15 24:13 |

38:20 50:3
59:13 70:5,9
71:23 72:18
**reviewed**  18:16
18:16,18 19:10
**reviewing**
56:10 71:6
**right**  5:19 6:17
7:14,22,23,24
17:20 23:7
29:18 46:19,24
49:19 58:11,12
69:6 77:20,20
80:10
**rights**  47:8
**risk**  13:7,8 14:3
14:4,25 23:13
23:19 55:5,6
59:15,19 74:14
**robinson**  1:25
4:5 83:6,20
**role**  10:3 14:4
24:21,23 29:16
42:12 73:2
**rough**  80:24
**rules**  4:16

**s**

**s**  2:1 3:10 57:6
58:18 59:10
**sacramento**
2:10
**safe**  14:11
**safety**  18:19
19:9

**sakai**  58:17,22
59:10
**sakia**  57:6,8,9
57:17
**sampayan**
32:21 33:8,10
33:11 34:17
65:8 66:7 68:6
77:25
**santa**  2:15
**satisfy**  37:8
**saw**  11:22 13:5
15:8 31:10
**saying**  43:8
54:23 78:25
79:1,20
**says**  20:18 38:1
69:1 70:9
**scratch**  24:22
**screen**  68:20
**seal**  83:17
**sean**  5:9
**seattle**  83:21
**sec**  16:23
**second**  6:8 29:4
34:15 58:12
60:14 66:7
69:18
**secondly**  41:4
76:4
**seconds**  61:17
61:24
**sections**  80:10
**see**  12:1 14:14
14:14,18 15:22

20:15 21:14
27:3 31:10
46:22 52:6
58:9,12 66:14
68:20 72:15
80:2
**seeing**  14:8,15
19:14 46:22
**seems**  49:13
**seen**  19:1 64:24
**segue**  56:3
**selected**  76:7
**send**  61:9 66:22
80:24
**sent**  66:24
**separate**  9:5
**separation**  9:16
16:4 17:5,13
17:22 18:2
21:19
**series**  5:16
**serve**  41:2
73:20
**services**  15:12
**session**  9:12,13
75:8
**set**  66:7 83:17
**settlement**  62:6
**settlements**
62:4,9,14 63:9
63:20 74:7
**seven**  18:11
**several**  25:8
51:21

**shared**  44:13
**sharing**  31:18
**sheets**  41:19
**shocked**  77:13
**shooting**  52:3
**shootings**  11:20
12:8,17,19,24
15:6 26:10
34:11
**short**  33:17
**shortfalls**  74:2
74:2
**shortly**  32:9
56:13
**shoulders**  6:5
**show**  20:14
58:7 61:4
68:15
**showed**  78:22
**shrugs**  6:4
**shutting**  40:11
**side**  59:19 72:6
**signature**  83:19
**significant**  12:4
23:21 54:18
**significantly**
54:19
**silence**  40:15
40:20
**similar**  27:24
**simply**  31:24
38:17 66:6
67:14 75:19,23
**sir**  5:10 6:18
8:10 11:18

15:18 17:1
18:2 23:7 28:1
30:6,19 35:20
48:16 50:2
56:9 58:7
61:22 68:20
74:15 77:16
80:6,15
**situation** 42:15
65:14 80:4
**six** 18:11
**skip** 21:1
**skipped** 56:9
**slater** 2:18 17:2
20:20 25:3,4
76:25 77:8
**slides** 78:20,22
78:24 79:3
**sloan** 58:16
**small** 10:16
**smoothly** 5:18
**snowball** 62:23
**snowballing**
63:1
**solutions** 73:15
**solving** 74:11
**somebody**
23:14
**sorry** 25:21
29:6,8 33:15
36:5 40:12
43:20 61:23
68:1 74:17
76:2 77:4

**sort** 10:5 12:16
14:21,24 16:11
16:14 20:1
26:1 33:20
65:10
**sound** 38:5
46:22
**sounds** 20:3
56:7 81:2
**source** 47:12
50:23
**sources** 69:22
**south** 2:4 4:3
**speak** 29:18,19
29:23 42:14
79:15,23
**speaking** 26:23
49:3
**special** 10:14
**specific** 12:23
55:6 59:2
66:13 72:12
**specifically**
11:6 12:18
25:16 28:8,12
45:25 56:23
60:12,23
**specificity**
12:20 14:1
**speculation**
35:18 46:13
68:3 70:16
**speed** 11:4 78:8
**spelling** 57:10

**spent** 11:10
23:12
**spiked** 19:3
**spoke** 13:25
**spread** 33:24
**springs** 10:19
**ss** 82:2 83:3
**staff** 12:5
**staffing** 51:5,6
**stand** 26:23
**standards**
71:22
**start** 34:18
46:25 51:1
**started** 8:7
10:13 44:24
**starting** 61:13
61:16
**starts** 62:25
**state** 4:5,13
82:1 83:3,8,20
**stated** 34:24
44:18,19 49:19
**statement**
38:23 48:23
73:12
**statements**
47:3
**states** 1:1 71:3
**stem** 9:20
**stemmed** 17:13
50:11
**step** 41:7
**steps** 12:15,25
24:12 34:18

38:24 42:10
**stipulated** 3:15
68:12 71:14
**stipulation**
4:15
**stop** 63:1,3
**stopped** 38:11
48:14 61:24
**stopping** 61:13
**straightening**
37:15
**straub** 29:11
29:13,21
**street** 2:4,15
4:3
**stress** 22:25
39:14
**stretch** 7:18
**struggling**
76:19
**subgroups**
76:21 77:2,10
77:15 78:2
**subject** 15:19
75:6 77:18
**subsequent**
16:4 49:24
51:3
**substance**
67:18
**sufficient** 38:5
**suggestion**
66:18,19,20
**suite** 2:4,9

[supervising - three]                                                           Page 22

| | | | |
|---|---|---|---|
| **supervising** 73:2 | **sworn** 4:24 47:14 | **taser** 14:24 | 71:7 |
| **supervision** 72:17 | **symbol** 31:8 | **taylor** 78:4,13 | **things** 6:3,3,6 11:25 22:25 |
| **supervisor** 38:15 | **symbolize** 34:7 | **team** 59:2,5 | 26:1,7 31:4 |
| **supervisors** 71:17 72:1 | **synopsis** 10:6 | **tell** 5:23 36:19 40:9,13 42:13 | 34:5 36:25 |
| **supervisory** 72:18 | **systems** 70:5,10 | 46:1 57:8 | 43:23 47:9 |
| **supply** 15:11 | **t** | 67:18 | 48:11 56:11 |
| **support** 13:21 13:23 51:9 71:9 | **t** 3:10 5:3 83:1 83:1 | **tenor** 20:6 | 63:12 68:25 72:9,10 |
| **supportive** 24:4 54:1 | **take** 7:18,20,21 12:15,25 21:20 | **tenure** 28:17,22 | **think** 7:10 |
| **supremacist** 31:16,20 | 21:25 24:12 27:6 34:18 | **term** 21:12 | 11:22 13:2,2 15:22 16:16 |
| **sure** 5:17,18 9:14 10:9 | 37:3 42:10 51:6 56:4 61:7 | **terminated** 28:19,20 | 19:1,12 23:12 24:1,8 25:17 |
| 14:11,13 16:22 16:24 17:9 | 65:19,25 66:15 | **termination** 24:24 | 27:19,20 34:6 |
| 21:25 29:7 30:23 32:15 | **taken** 4:2 5:11 35:1,9,22,25 | **terms** 60:16 | 43:2,24 44:5 44:11,18 45:13 |
| 36:14 41:14 46:3 52:20 | 36:7 37:19 43:13 45:19 | **testified** 5:1 25:19 26:22 | 50:10 52:19 56:10 61:1 |
| 63:1 73:19 77:6,17 | **talk** 9:11 13:16 30:17,18 32:16 | 77:8 | 62:8,11,12 63:21,25 64:6 |
| **surprised** 55:4 76:24 77:11 | 37:15 50:2 56:12 62:2 | **testify** 18:4 | 65:13 66:9 67:16 69:12 |
| **suspicion** 78:1 | 65:22 75:9 78:17 | **testifying** 17:4 17:9 20:12 | 72:7,16 75:23 78:15 |
| **swastika** 30:22 31:8 | **talked** 47:6 61:5 65:24 | **testimony** 16:8 17:1,12,18 | **third** 51:3 |
| **swear** 4:15 | 66:4 74:6 77:23 | 18:4 20:24 25:2 26:13,18 | **thorough** 55:19 |
| | **talking** 7:12 36:24 61:18 | 52:16 63:15 76:24 77:7,12 | **thought** 36:25 37:11 38:10,19 |
| | **tapes** 79:22 80:1 | 77:13 82:10 | 42:20 52:3 55:21 56:24 |
| | | **thank** 5:2 80:16 81:3 | 71:7 72:14 75:24 |
| | | **thanks** 80:14 | **three** 5:14 64:4 |
| | | **thin** 29:9 | |
| | | **thing** 6:15 38:1 44:3 45:11 62:24 66:13 | |

**[ticker - understanding]**                                  Page 23

**ticker**  47:1
**time**  7:12,17
  8:23 10:3,7
  11:10 13:3
  19:3 23:13
  25:14 26:4
  29:23 30:19
  32:6,17,20
  34:15 36:2
  39:14,15,15
  41:12,19 43:16
  44:9,21 48:24
  56:3,5,5,13
  57:4 64:5
  69:19 70:20
  71:24 76:16
  80:14
**timeframe**  6:25
  7:12 23:9
  32:24 33:4
**timeframes**
  7:10
**timeline**  64:20
**times**  5:13,14
  29:25 30:12
  40:22
**timing**  30:23
  32:8
**today**  4:12 5:7
  6:2,19 7:10 8:5
  76:19 80:14,25
**together**  14:19
  42:16 59:3,6
**told**  21:2 25:20
  25:21,22 32:5

35:9,22 36:2,7
36:20 37:2,18
38:8,9 40:25
41:17 43:25
45:19 75:10
**tolerated**  47:21
  47:25
**tonn**  2:7
**took**  13:19
  38:17,24
**top**  66:7
**towards**  59:6
**town**  45:23
  46:20,24 61:5
**track**  14:13
  15:14
**tracking**  14:21
  15:1
**traffic**  15:5
**train**  63:7
**trained**  72:21
  72:24 73:6
**training**  14:10
  14:15 50:16,18
  63:2
**transcribed**
  83:10
**transcript**  3:13
  20:15 22:5
  23:4 61:12
  82:6,9 83:11
  83:12
**transcripts**
  80:25

**translate**  6:5
**transparency**
  52:7
**transparent**
  79:24
**trend**  14:15
**trends**  14:9,24
  15:4,7,14
  73:14 74:7,10
**trigger**  16:6
  38:4
**trouble**  46:21
**troubling**  32:10
**true**  43:10 82:9
  83:11
**trust**  11:24
  24:3,7 31:6
  43:25 50:21
  51:1 56:22
  65:15
**trusting**  43:9
**truth**  5:23
**truthful**  8:4
**try**  6:11 13:13
  24:3,6 31:5
  51:11
**trying**  26:24
  33:24 64:12
**turn**  31:12
**two**  6:3 10:20
  40:21 42:5,15
  43:21 51:2
  66:3 76:1
**type**  11:3 13:18
  14:14,23,24

15:4 23:24
24:9 33:23
34:18 37:16
45:16 51:7
64:9 66:12
73:10 79:7
**types**  15:14
  69:16

**u**

**u**  59:24
**uh**  6:4,4
**ultimately**  15:8
  25:9 73:19
**um**  43:19
**un**  6:4
**unable**  42:20
**unavoidable**
  7:11
**under**  4:16
  5:21 24:19
  25:11 36:15
  42:1 47:13,14
  47:19,19,25
  52:2 70:10
  71:13 73:3
  80:11 82:5
  83:7,10
**undersigned**
  82:5
**understand**
  5:24 7:3 11:11
  33:24 41:14
  54:13
**understanding**
  16:3 36:16

69:11 73:1,9
**understands**
79:13
**understood** 7:7
23:1 34:7
53:15
**unequivocally**
43:24
**unethical** 16:5
**unfairly** 76:6
**uniformly**
70:11,22
**united** 1:1
**university** 2:9
**unreasonable**
71:16,19 72:1
**update** 50:19
**updated** 63:8
66:1 73:22
**use** 6:6 7:18
15:4,11 24:13
31:25 32:1,4
71:10,20,21
72:23
**used** 21:17
57:14 79:4
**uses** 73:21
**using** 20:7
**usual** 64:7
**utilized** 32:7

**v**

**v** 1:7
**vague** 11:15
30:3 43:4 53:3
54:11 63:14

67:5 73:16
**vallejo** 1:8 2:12
2:14,15 5:9
8:25 9:25 10:3
10:8,25 11:2
11:13 12:9
15:19 17:13,22
18:3,5 20:21
22:12 26:14
28:4,22 29:14
30:1,21 32:13
32:19 42:2
43:3 50:4,22
58:23 68:23
70:21 71:24
**vallejos** 22:22
**value** 30:8
**verbal** 4:17
**verbalize** 6:16
**verifications**
65:17
**versus** 5:9
20:20
**vessels** 22:12
**video** 3:14 46:6
46:20 47:4
48:14 61:7,9
61:10,12,20
79:15
**videos** 78:13,18
78:18,23
**videotaped**
20:18
**violate** 71:20

**visit** 29:21
**voice** 29:5,6
**voters** 51:10
**vpd** 70:11,21
71:15,19
**vpd's** 71:21
**vpoa** 26:23
27:13 28:15

**w**

**wait** 69:4
**waive** 19:18
**waiver** 19:22
**walk** 50:4
**wall** 29:6
**walls** 29:8
**want** 5:16 6:2,9
6:18 9:11
16:20 20:14
27:6 32:16
41:5 46:6 48:1
50:2 56:12
58:7 61:4,7
68:15,24 75:9
75:17 76:4
77:7 79:24
**wanted** 4:12
29:7 30:16
40:23,24 54:1
63:4 66:7,16
**wants** 30:9
**washington** 4:4
4:6,6,14 82:1
83:3,9,20
**way** 4:4,6 21:5
26:24 31:2

51:5 52:18
62:20 63:12
66:14
**ways** 72:20
**we've** 26:13
56:2 59:5 62:5
**wear** 47:22,23
**wednesday**
20:19
**weight** 16:8
**welcome** 40:4
**welcomed**
30:16
**went** 10:19
34:22 37:16
51:10
**whereof** 83:17
**white** 31:16,19
**whitney** 18:17
22:19 25:3,20
33:2,6 34:13
36:18 38:1,4
39:19,20 40:11
40:15,20,22
44:9,13 56:15
56:22
**whitney's**
39:24
**wide** 33:24
**wife** 28:25
**williams** 32:10
32:13 44:25
45:24 61:18
**wise** 79:16

**[wit - zoom]**                                                          Page 25

| | |
|---|---|
| **wit** 4:8 | **works** 64:4 |
| **witness** 3:2 | 73:11 |
| 4:16 9:15 | **worn** 78:19,23 |
| 15:23 20:10 | **worse** 48:12 |
| 21:22 29:4,10 | **wow** 76:19 |
| 39:3 43:6 | **writing** 20:1 |
| 46:16 49:17 | **written** 6:1,5 |
| 52:18 53:4,7 | **wrong** 57:10 |
| 54:14 57:25 | **x** |
| 60:11 63:16 | **x** 3:1,10 5:3 |
| 65:7 67:7,12 | **y** |
| 68:4 70:17 | **yeah** 11:19 |
| 71:1 73:18 | 15:2,22 19:13 |
| 75:5,12 80:16 | 22:1 26:21 |
| 83:17 | 29:4,8 34:20 |
| **witness's** 16:2 | 46:16 66:15 |
| **woman** 29:18 | 67:21 |
| **word** 38:17 | **year** 8:17 23:8 |
| **words** 62:14 | 23:12 24:14 |
| 63:4 72:12 | 48:9 55:11 |
| **work** 14:17 | **years** 4:13 |
| 30:20 38:7 | 10:10,20 25:9 |
| 58:22 59:6 | 27:2 55:8 |
| 66:16 69:21 | 78:14 |
| **worked** 25:10 | **yesterday** |
| 25:12 28:12 | 26:22 80:18 |
| 29:13,15 51:25 | **z** |
| 53:9 59:14 | **zoom** 58:14 |
| 78:5 | |
| **working** 10:11 | |
| 19:6 25:10,14 | |
| 27:2 39:18 | |
| 42:16 51:24 | |
| 53:7 55:2 71:5 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.

DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SOLANO

IN RE MATTER OF:              )
                             )
SLATER MATZKE; JOANNA ALTMAN; )
and WILLIAM MORAT,            )
                             )
          Plaintiffs,        )
                             )
     vs.                     )   CASE NO. FCS056066
                             )
CITY OF VALLEJO; GREG NYHOFF; )
RANDY RISNER; ANNE CARDWELL; )
HEATHER RUIZ; and DOES 1-50,  )
inclusive,                   )
                             )
          Defendants.        )
                             )

VIDEOTAPED DEPOSITION OF GREGORY A. NYHOFF

OAKLAND, CALIFORNIA

WEDNESDAY, JULY 19, 2023

VOLUME I

PAGES 1 - 236

```
┌─────────────────┐
│    EXHIBIT      │
│                 │
│       1         │
│   _____   │
└─────────────────┘
```

Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
Realtime Systems Administrator
California CSR License #11600
Oregon CSR License #21-0005
Washington License #21009491
Nevada CCR License #980
Texas CSR License #10725

Job No.:  87529

```
 1              VIDEOTAPED DEPOSITION of GREGORY A. NYHOFF,

 2    taken before Heather J. Bautista, CSR No. 11600, a

 3    Certified Shorthand Reporter for the state of

 4    California, with principal office in the county of Santa

 5    Clara, commencing on Wednesday, July 19, 2023,

 6    9:59 a.m., at 1999 Harrison Street, Suite 1600, Oakland,

 7    California 94612.

 8

 9

10    APPEARANCES OF COUNSEL:

11

12         For Plaintiffs:

13              Gwilliam Ivary Chiosso Cavalli & Brewer
                BY:  RANDALL E. STRAUSS, ESQ.
14                   J. GARY GWILLIAM, ESQ.
                1999 Harrison Street
15              Suite 1600
                Oakland, California 94612
16              Phone:  (510) 832-5411 / Fax:  (510) 832-1918
                rstrauss@giccb.com
17              ggwilliam@giccb.com

18
           For Defendants:
19
                Best Best & Krieger LLP
20              BY:  STACEY SHESTON, ESQ.
                500 Capitol Mall
21              Suite 1700
                Sacramento, California 95814
22              Phone:  (916) 325-4000 / Fax:  (916) 325-4010
                stacey.sheston@bbklaw.com
23

24    ALSO PRESENT:  Ryan Duncan, Videographer
                     Brittany Smith
25
```

1                    INDEX OF EXAMINATION

2                                                    PAGE

3    GREGORY A. NYHOFF

4        EXAMINATION BY MR. STRAUSS                   5

5

6

7                        --o0o--

8

9

10              Instructed Not to Answer

11                     Page Line

12                      13    5

13                      32    7

14                     197  6

15

16

17                        --o0o--

18

19

20        NO EXHIBITS WERE MARKED FOR THIS VOLUME

21

22

23                        --o0o--

24

25

```
 1                    Wednesday, July 19, 2023
 2                         9:59 a.m.
 3                         --oOo--
 4          THE VIDEOGRAPHER:  Good morning.  We're on the
 5   record.  This is the beginning of Media No. 1 in the
 6   deposition of Greg Nyhoff, in the matter of Slater
 7   Matzke, et al., versus City of Vallejo, et al., Case No.
 8   FCSO56066, held at 1999 Harrison Street, Suite 1600, in
 9   Oakland, California.  This deposition is being taken on
10   July 19th, 2023, and the time is 9:59 a.m.
11          The court reporter is Heather Bautista.  I am
12   Ryan Duncan, the videographer, on behalf of First Legal
13   Depositions, located in Los Angeles, California.  This
14   deposition is being videotaped at all times, unless
15   specified to go off the video record.
16          Would all present please identify themselves,
17   beginning with the noticing attorney.
18          MR. STRAUSS:  Randy Strauss, representing all
19   Plaintiffs.  My partner, Gary Gwilliam, is in the room,
20   along with paralegal, Brittany Smith.
21          MS. SHESTON:  Stacey Sheston of Best Best &
22   Krieger, representing the defendants.
23          THE VIDEOGRAPHER:  All right.
24          The court reporter can go ahead and swear in
25   our deponent.
```

 1              THE STENOGRAPHER:  Good morning.

 2              My name is Heather Bautista, and I am a

 3      certified stenographer licensed by the State of

 4      California.  My license number is 11600.

 5              This deposition and any transcript produced

 6      therefrom will be handled pursuant to California Code of

 7      Civil Procedure Section 2025.

 8              As the deposition officer, I will be retaining

 9      my duties and responsibilities under the Code.

10              Please raise your right hand so I can swear you

11      in.

12                      GREGORY A. NYHOFF,

13      having been first duly sworn, was examined and testified

14                      as follows:

15          **THE WITNESS:  Yes.**

16          THE STENOGRAPHER:  Thank you.

17          Please state your full name for the record.

18          **THE WITNESS:  Gregory Alan Nyhoff.**

19          THE STENOGRAPHER:  Thank you.

20          Counsel, you can begin.

21          MR. STRAUSS:  Thank you.

22                      DIRECT EXAMINATION

23      BY MR. STRAUSS:

24          Q.  Good morning, Mr. Nyhoff.

25          **A.   Good morning.**

1      Q.   I introduced myself off the record.  I'm Randy

2   Strauss.  I represent the plaintiffs in the case.

3           I think you've been depose -- deposed before in

4   this very room?

5      **A.   Only time.**

6      Q.   Okay.

7           That was my next question.

8           Is that the one and only time you've been

9   deposed?

10     **A.   Yes.  Yes.**

11     Q.   Did you do anything to prepare for today's

12   deposition?

13     **A.   No, other than I went back through the Notice**

14   **of Deposition.**

15     Q.   Okay.

16           Any conversations you've had with your

17   attorneys are privileged, I'm not entitled to know the

18   content of -- of those conversations; okay?  So any

19   question I ask you today, just keep that in mind.  All

20   right?

21           So the only document you looked at to prepare

22   for today was the Notice of Deposition?

23     **A.   Yes.**

24     Q.   Okay.

25           And did you understand that to ask you to look

1   for any documents?

2       A.   No.

3       Q.   Okay.

4            Did you take the time to go back and review any

5   documents from your time working at the City of Vallejo?

6       A.   No.

7       Q.   Did you speak to anyone other than attorneys to

8   refresh your recollection?

9       A.   No.

10      Q.   Did you do anything to refresh your

11  recollection about events that might pertain to this

12  case?

13      A.   No.

14      Q.   Have you ever seen the lawsuit that my clients

15  filed against the City of Vallejo?

16           MS. SHESTON:  You're referring to the complaint

17  document?

18           MR. STRAUSS:  I am.

19           THE WITNESS:  Yes.

20      Q.   (By Mr. Strauss)  When was the last time you

21  saw that?

22           MS. SHESTON:  Don't guess, but if you can give

23  him an estimate, he's entitled to that.

24           THE WITNESS:  Yeah.  It would -- was before I

25  actually left, and I left in July of 2021.

1        Q.   (By Mr. Strauss)  Okay.

**2        A.   So it would be prior to that.**

3        Q.   All right.

4             So it's been sometime.  I want to make sure

5   we're on the same page in terms of the deposition

6   process.

7             You understand you're under oath here today?

**8        A.   Yes.**

9        Q.   And, obviously, that obligates you to tell the

10  truth?

**11       A.   Yes.**

12       Q.   Okay.

13            The court reporter is doing her best to take

14  down everything we say here today.  She's asked us to

15  speak slowly and one at a time, and we'll do our best to

16  do that; right?

**17       A.   Yes.**

18       Q.   Okay.

19            If at any time, I ask you a question that's not

20  clear to you, will you please let me know?

**21       A.   Yes.**

22       Q.   Sometimes I -- I jumble my words or I ask -- I

23  get lost in my own questions.

24            If you answer my question, is it fair that I

25  assume you heard it and understood it?

1      A.    Yes.

2      Q.    Okay.  Very good.  All right.

3            What's your educational background?

4      A.    I have my Bachelor's of Arts degree from Calvin

5      College in Michigan.

6      Q.    When did you get that?

7      A.    1982.

8      Q.    Okay.

9            Any further education beyond that?

10     A.    Not specifically to any college, but lots of

11     conferences and --

12           (Stenographer clarification.)

13     Q.    (By Mr. Strauss)  What was your degree in?

14     A.    Business administration.

15     Q.    Okay.  All right.

16           Now, I understand you've been a city manager

17     of -- of more than one location; correct?

18     A.    Correct.

19     Q.    What was the first city manager job you had?

20     A.    Montague, Michigan.

21     Q.    When was that?  Roughly?

22     A.    I'd say it's around -- sorry, I'm doing a

23     little math.

24     Q.    Sure.  Take your time.  And an estimate is

25     fine.

```
 1        A.    Mid '90s.
 2              (Stenographer clarification.)
 3              THE WITNESS:  Mid 1990s.
 4        Q.    (By Mr. Strauss)  What type of work, if any,
 5   did you do before the first city manager job?
 6        A.    Before that, I was the operations manager at
 7   the Highlands Ranch Metropolitan District, and then an
 8   assortment of -- of jobs.  I owned my own business in
 9   Denver, Colorado, and worked for an investment firm and
10   a couple other short-term side jobs.
11        Q.    How long were you the city manager of Montague,
12   Michigan?
13        A.    Seven or eight years.
14        Q.    And what was your next position after that?
15        A.    I moved to Fountain, Colorado, where I became
16   the city -- where I was the city manager there.
17        Q.    How long were you the city manager there?
18        A.    Eight years.
19        Q.    What was your next position after that?
20        A.    Yeah.  So then I moved to the City of Colorado
21   Springs as an assistant city manager for almost two
22   years.
23        Q.    Okay.
24              And is it fair to say Colorado Springs is a
25   larger city than the other two?
```

1      A.    Yes.  Colorado Springs was 400,000 population.

2      Q.    Sure.

3            And that was two years, you said?

4      A.    Yes.

5      Q.    And what was your next position after that?

6      A.    City of Modesto, California, city manager.

7      Q.    What years were you the city manager in

8   Modesto?

9      A.    I say the Great Recession was 2008, so right

10   around the six years, 2002, 2000 -- probably 2004 to

11   2010, approximately.

12      Q.    Okay.  Okay.

13            Do you recall who the mayor was when you were

14   at Modesto?

15      A.    Mr. Ridenour, Mayor Ridenour, and then Mayor

16   Marsh.

17      Q.    My parents live there, so I was just curious.

18            Any of these jobs that you've mentioned so far,

19   were you terminated from?

20      A.    No.

21      Q.    All of them you left voluntarily?

22      A.    Yes.

23      Q.    Okay.

24            Where did you go after the city of Modesto?

25      A.    City of Oxnard, California.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    Q.   And you were city manager there?

2    A.   Yes.

3    Q.   Over what time period?

4    A.   I have to be --

5         (Stenographer clarification.)

6         THE WITNESS:  It was four years.

7         MS. SHESTON:  You can estimate.

8    Q.   (By Mr. Strauss)  I assure you, I'm not going

9    to make an issue if you're inaccurate, as long as it's

10   your best estimate.

11   A.   I'm trying to go backwards now to get to --

12   Q.   I understand.

13   A.   So 2014, somewhere around there.

14   Q.   Okay.

15   A.   Does that make sense with the other one?

16   Q.   It does.

17        What was your next position after that?

18   A.   City of Vallejo, city manager.

19   Q.   Over what time period were you City of Vallejo

20   city manager?

21   A.   2017/2018, I started there.  Can't remember

22   which year it was.

23   Q.   Okay.

24        And that lasted until July of '21?

25   A.   Yes.

1      Q.   Okay.

2           And why did you leave in July of '21?

3      **A.   Left for medical reasons.**

4      Q.   Okay.

5           Did a doctor tell you that you were disabled

6      from working?

7           MS. SHESTON:  Well, I'm going to object on

8      medical privacy grounds.  You don't need to answer the

9      specifics about your medical condition and doctor's

10     advice.

11     Q.   (By Mr. Strauss)  Do you still have whatever

12     medical issue was impacting you in 2021?

13     **A.   I have not been back to the doctor, and so I**

14     **would say no.**

15     Q.   Have you had any employment since you left the

16     City of Vallejo?

17     **A.   No.**

18     Q.   Where do you live now?

19     **A.   Mount Vernon, Texas.**

20     Q.   Okay.

21          What brought you to Mount Vernon, Texas?

22     **A.   Partly family, and then partly warmer and no**

23     **snow.  And then, just, we liked what we saw there as far**

24     **as the quality of life.**

25     Q.   All right.

1          And you do not work at the present time?

2     A.   I do not.

3     Q.   And have not worked since you left Vallejo?

4     A.   I have not.

5     Q.   Have you attempted to seek employment since you

6     left Vallejo?

7     A.   I have not.

8     Q.   Do you live with anybody?

9     A.   I live with my wife and my son and

10    daughter-in-law.

11    Q.   Okay.

12         Does your wife work?

13    A.   No.

14    Q.   Okay.

15         When you were the city manager in Vallejo, who

16    did you report to?

17    A.   The mayor and City Council.

18    Q.   Okay.

19         And were they the entities that oversaw your

20    work and -- and provided your performance reviews?

21    A.   Correct.

22    Q.   And they had the ability to hire and fire you?

23    A.   Correct.

24    Q.   Did you take an oath of office as a city

25    manager?

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

```
 1       A.   Yes.

 2       Q.   Do you know what the source of that oath of

 3  office is?

 4            MS. SHESTON:  Calls for speculation, but you

 5  can answer if you know.

 6            THE WITNESS:  What was your question again?

 7       Q.   (By Mr. Strauss)  Do you know where that --

 8       A.   Source?

 9       Q.   -- where that oath comes from?  Is it embodied

10  in the City charter?

11       A.   Well, yeah.  City charter is --

12            (Stenographer clarification.)

13            THE WITNESS:  I'm -- I think -- I believe

14  it's -- I think it's the constitutional, regular oath of

15  office.

16       Q.   (By Mr. Strauss)  Okay.

17            Constitution of the State of California or the

18  United States?

19            MS. SHESTON:  Same objection.

20            THE WITNESS:  I don't know.

21       Q.   (By Mr. Strauss)  Okay.  That's fine.

22            Do you remember what the oath was?

23            MS. SHESTON:  You mean the specific words?

24            MR. STRAUSS:  Yeah.

25            THE WITNESS:  Few of them.  To faithfully
```

1    uphold the laws of the -- of the City of Vallejo.

2       Q.   (By Mr. Strauss)  Okay.

3            When you refer to the rules of the City of

4    Vallejo, is there anything specific you have in mind?

5    In other words, where would I find the rules of the City

6    of Vallejo?

7       A.   The municipal codes, the police codes, all the

8    codes that the City Council had adopted in the past,

9    which would include any policies and procedures,

10   including personnel policies.

11      Q.   Were there also administrative rules?

12      A.   Yes.

13      Q.   And did you have access to them?

14      A.   Yes.

15      Q.   Did you ever actually take the time to review

16   these various rules that you've described?

17      A.   Yes.

18           MS. SHESTON:  Vague and ambiguous.

19           Give me a minute before you answer each

20   question.  Thanks.

21      Q.   (By Mr. Strauss)  And how did you go about

22   doing that?

23      A.   Prior to working for the City, I reviewed them.

24      Q.   And what specifically did you review?

25           MS. SHESTON:  Vague and ambiguous.  Overbroad.

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1          Go ahead.

2          **THE WITNESS:  So personnel policies and**

3    **procedures.**

4          Q.  (By Mr. Strauss)  Okay.

5          Were there any ethical obligations, as you

6    understood it, that you had to follow as city manager?

7          **A.  Yes.**

8          Q.  And where would those -- where would you find

9    those, if you wanted to look for them?

10         **A.  As a city manager, we, as part of our National**

11   **City Manager's Association, have a Code of Ethics, which**

12   **we abide by and follow.**

13         Q.  Was there any legal obligation to abide by

14   those Code of Ethics, as you understood it?

15         **A.  No.**

16         MS. SHESTON:  Objection calls for a legal

17   conclusion.

18         Q.  (By Mr. Strauss)  Do you know if the City

19   expected you to abide by those ethical obligations?

20         MS. SHESTON:  Vague and ambiguous.  Calls for

21   speculation.

22         Go ahead.

23         **THE WITNESS:  I don't -- I don't -- they --**

24   **they expected me to be an ethical city manager.**

25         Q.  (By Mr. Strauss)  Did anyone from the City

1    Council or the mayor ever specifically discuss with you

2    any of those ethical obligations?

3        **A.    No.**

4        Q.    Okay.

5            When you were city manager at the various

6    locations prior to Vallejo, did you have occasions to be

7    involved in development deals involving city land?

8        **A.    Yes.**

9        Q.    Is -- is that part of the normal course of --

10    of duties of a city manager?

11        **A.    Yes.**

12        Q.    And is that something that frequently comes up

13    where you interact with developers for city-owned land?

14        **A.    Yes.**

15        Q.    Okay.

16            Are there any laws or regulations that you're

17    aware of that constrain you in how you go about working

18    on development deals?

19            MS. SHESTON:  Vague and ambiguous.  Calls for

20    speculation.

21            Are you talking about California or his whole

22    career in several different states or?

23            MR. STRAUSS:  Let's limit it to California.

24            MS. SHESTON:  Okay.

25            **THE WITNESS:  Can you repeat the question.**

```
1         Q.   (By Mr. Strauss)  Yeah.
2              So when -- when you were acting as a city
3     manager in the state of California, and are working on
4     private development deals, are there any
5     laws/regulations that you're aware of that govern your
6     behavior?
7              MS. SHESTON:  Calls for a legal conclusion.
8              Go ahead.
9              THE WITNESS:  Certainly the laws of the state
10    and the municipal codes, as it pertains to working with
11    outside developers of any kind pertaining to my behavior
12    and actions in regards to working with developers.
13        Q.   (By Mr. Strauss)  Is a city manager in
14    California required to act in the best interest of the
15    City?
16             MS. SHESTON:  Calls for a legal conclusion.
17             Go ahead.
18             THE WITNESS:  Yes.
19        Q.   (By Mr. Strauss)  And what is the source of
20    that obligation, if you know?
21             MS. SHESTON:  Same objection.
22             THE WITNESS:  When I'm hired to -- as a city
23    manager, I have the responsibility to oversee all the
24    operations of the City and work with the City Council to
25    achieve their goals.  And so I view those as my
```

1    obligations to the community.

2        Q.   (By Mr. Strauss)  Is that written down

3    somewhere in some law or regulation or administrative

4    code or anything of the sort?

5            MS. SHESTON:  Calls for speculation.

6            But if you can -- if you know, go ahead.

7            THE WITNESS:  When I was -- what I was trying

8    to remember is if the City had a code of ethics at the

9    time when I started.  Certainly I believe we did have

10   one.  So that would be the -- one of -- one of the

11   documents that we follow.

12       Q.   (By Mr. Strauss)  Okay.

13           That code of ethics was never rescinded, was

14   it?

15       A.   No.

16       Q.   You said "when I started," so I just wanted to

17   clarify that it was in place the entire time you were

18   there?

19       A.   Yes.

20       Q.   Okay.

21           Is there a way for you to briefly tell me what

22   your responsibilities were as city manager of Vallejo?

23       A.   Yes.  I -- responsible for all of the

24   operations of the City, which are Police, Fire, Public

25   Works, Planning, Housing; all of those.  Oversee the

 1   personnel of the City.  Answer directly to the City

 2   Council as a majority.  And I work in the best interests

 3   of the community.

 4       Q.   Okay.

 5            And Vallejo had a city attorney's office as

 6   well?

 7       A.   That's correct.

 8       Q.   Was that an independent entity from the

 9   organization you oversaw?

10            MS. SHESTON:  Calls for a legal conclusion.

11            Go ahead.

12            THE WITNESS:  They were in-house attorneys

13   hired by the City.

14       Q.   (By Mr. Strauss)  Did you oversee them?

15       A.   The city attorneys?

16       Q.   Yes.

17       A.   Yes.

18       Q.   Were you responsible for hiring and firing

19   anyone in the City Attorney's Office?

20       A.   Except for the City Attorney's Office, I did

21   not have authority to hire and fire or manage them.

22   They're independent.

23       Q.   All right.

24            A minute ago, I think you said you oversaw the

25   City Attorney's Office.

```
 1              Is that -- is that accurate?

 2      A.   No.  I did not -- I do not oversee the City

 3   Attorney's Office.

 4      Q.   Did City Attorney's Office interact with you in

 5   performing your duties as city manager?

 6      A.   Yes.

 7      Q.   In what way?

 8           MS. SHESTON:  Vague and ambiguous, calls for a

 9   narrative.

10           Go ahead, if you can give him a fairly concise

11   answer.

12           THE WITNESS:  In most -- in all things that

13   require legal documents, preparing City Council agendas,

14   weekly meetings with the city attorney.  So a very

15   regular basis, we would have communications, and they

16   were -- they were -- they reviewed all the documents

17   and --

18           (Stenographer clarification.)

19           THE WITNESS:  -- council packets.

20      Q.   (By Mr. Strauss)  Did you rely on the city

21   attorneys to provide with legal advice?

22      A.   Yes.

23      Q.   And did you ever turn to outside counsel for

24   legal advice?  In Vallejo?

25      A.   I did not.
```

1       Q.   Did somebody else that you're thinking of?

2       **A.   The City Attorney's Office sometimes would hire**

3    **outside counsel.**

4       Q.   Okay.

5            Did you ever ask the City Attorney's Office to

6    hire outside counsel?

7       **A.   I did not ask the city attorney.**

8            (Stenographer clarification.)

9            **THE WITNESS:  I did not ask the city attorney,**

10   **Claudia Quintana, to hire outside counsel.**

11      Q.   (By Mr. Strauss)  Was she the only city

12   attorney during your tenure at Vallejo?

13      **A.   No.  There were -- no.**

14      Q.   Okay.

15           Was she the city attorney when you left

16   Vallejo?

17      **A.   No.**

18      Q.   Who was the city attorney?

19      **A.   Veronica Nebb.**

20      Q.   Okay.

21           Did you ever ask Veronica Nebb to hire outside

22   counsel?

23      **A.   No.**

24      Q.   Did you ever ask any city attorney to hire

25   outside counsel?

```
 1           MS. SHESTON:  Point of clarification:  Are you
 2   referring to the named city attorney or anybody in the
 3   office when you say "city attorney"?
 4       Q.   (By Mr. Strauss)  Well, I appreciate that.
 5   Let's broaden it out.
 6           Did you ever ask any lawyers in the city
 7   attorney's Office to hire outside counsel?
 8       A.   Yes.  There were a couple times that I would
 9   ask them to consider outside legal counsel to get a
10   second opinion.
11       Q.   Do you recall any of those circumstances?
12       A.   It would be with Shannon.  I can't recall her
13   last name.
14       Q.   Eckmeyer?
15       A.   Yes.  Shannon Eckmeyer.  There were a couple
16   times throughout negotiations on all the projects,
17   because she was the lead city attorney in Economic
18   Development and Planning, that we discussed and I
19   discussed with her what I thought in my opinion would be
20   a good idea to get a second opinion.
21       Q.   Are you aware that Shannon Eckmeyer has been
22   deposed in this case?
23       A.   Yes.
24       Q.   Have you read her transcript?
25       A.   No.
```

1       Q.   Okay.

2            When you said that you were discussing projects

3    with Shannon Eckmeyer, are you talking about development

4    deals?

5            MS. SHESTON:  Vague and ambiguous as to the

6    term "development deals."

7       Q.   (By Mr. Strauss)  What kind of projects were

8    you referring to?

9       A.   **That was probably the major part of that**

10   **because she was -- again, the main attorney in handling**

11   **development projects and negotiating agreements.  She**

12   **also did the work for the planning department, so she**

13   **would be maybe discussing land-use ordinances or those**

14   **types of things.**

15      Q.   Do you remember any specific instances where

16   you asked Ms. Eckmeyer to get a second opinion from an

17   outside counsel?

18      A.   **I don't recall the specifics.**

19      Q.   Do you recall receiving advice from

20   Ms. Eckmeyer that you felt was incorrect and wanted a

21   second opinion?

22           MS. SHESTON:  Objection.  Compound.

23           Go ahead.

24           **THE WITNESS:  So the economic development**

25   **portion of this were negotiation --**

 1              (Stenographer clarification.)

 2              THE WITNESS:  -- agreements.

 3              And so -- so I would review those, we would

 4      discuss certain components of those, and sometimes they

 5      were interpretive in nature, and so I would question

 6      those.

 7              I can -- I remember it rarely, having that

 8      conversation with her in all the work we did together,

 9      but there were a couple times when I did ask her to --

10      that I -- that I thought she could review that

11      particular requirement or regulation, and what we were

12      trying to do was get to a "yes" with whoever was doing

13      the development, that she should seek some additional

14      input into that.

15      Q.   (By Mr. Strauss)  And do you have any more

16      specific recollection of what the issues were than what

17      you just told me?

18      A.   I do not.

19      Q.   Do you know if outside counsel was ever, in

20      fact, retained as a result of those conversations?

21      A.   Not that I'm aware of.

22      Q.   Okay.

23              Do you recall any instance where outside

24      counsel was hired to give a second opinion when you were

25      city manager in Vallejo?

1          MS. SHESTON:  About anything or about Shannon?

2          MR. STRAUSS:  About anything.

3          **THE WITNESS:  Yes.**

4     Q.  (By Mr. Strauss)  What -- is there one

5     particular instance or -- or several?

6     **A.   No.   One instance was in regards to an**

7     **assessment on the police department.**

8     Q.   Okay.

9          Who was the outside counsel that was hired?

10    **A.   Well, the city attorney had a number of outside**

11    **counsels that they worked with, and so this particular**

12    **one that city attorney actually asked to bring into a**

13    **meeting was Charles Sakai; Sakai is the name of the law**

14    **firm.  But that's the one time I do remember bringing**

15    **in --**

16    Q.   Was this generally related to the police

17    shooting controversies?

18    **A.   Generally, it was in regards to the entire**

19    **operations, but certainly the shootings had a**

20    **significant part or role to play in the decision for the**

21    **assessment.**

22    Q.   Okay.

23         If I were to ask you to briefly describe what a

24    typical day is like as the city manager of Vallejo,

25    would you be able to do that?

```
 1              MS. SHESTON:  Objection.  Vague and ambiguous
 2    as to the term "typical."
 3         Q.   (By Mr. Strauss)  Is there such a thing?
 4         A.   No.  Typically, there is a -- I'm booked for
 5    the entire day with calendar meetings.
 6         Q.   Okay.
 7         A.   And that could range from any of the
 8    operational -- any of the operations that the City
 9    conducts for the community.
10         Q.   Did you interact directly with developers in
11    relation to potential development deals?
12              MS. SHESTON:  In Vallejo?
13         Q.   (By Mr. Strauss)  In Vallejo?
14         A.   On occasion.
15         Q.   Is that something you frequently did?
16         A.   No.
17         Q.   Okay.
18              If you were to communicate electronically with
19    somebody in your capacity as city manager, did you have
20    any City e-mail account?
21         A.   Yes.  Yes.
22         Q.   Okay.
23              Did you also maintain personal e-mail accounts?
24         A.   I had a -- I had a personal e-mail, yes.
25         Q.   Did you ever use that to conduct City business?
```

 1     A.   No.

 2     Q.   Okay.

 3     A.   Not that I recall.

 4     Q.   Do you remember what your e-mail address was,

 5  your personal one, when you were at City of Vallejo?

 6          MS. SHESTON:  Can we agree that it's going to

 7  be subject to the protective order?

 8          MR. STRAUSS:  Certainly.

 9          THE WITNESS:  It was -- I think it was

10  gnyhoff@gmail.com.

11     Q.   (By Mr. Strauss)  Okay.

12          Do you still maintain that?

13     A.   No.

14     Q.   Do you recall what your official City e-mail

15  address was?

16     A.   Gregnyhoffci -- cityofvallejo.com.  Can't

17  remember if it's abbreviated or not.

18     Q.   Did you have a personal cell phone while you

19  were city manager?

20     A.   Yes.

21     Q.   Did you conduct City business using that

22  personal cell phone?

23     A.   Rarely.

24     Q.   Did you exchange text messages using that cell

25  phone for City business?

```
 1      A.    On occasion.
 2      Q.    Do you recall what that phone number was?
 3            MS. SHESTON:  Same?  We can stipulate that it's
 4   subject to the protective order?
 5            MR. STRAUSS:  Absolutely.
 6            THE WITNESS:  I do not.
 7      Q.    (By Mr. Strauss)  Do you still have that same
 8   cell phone?
 9      A.    I have the same cell phone.  My current number,
10   which I actually had two numbers, I switched numbers
11   while I was in Vallejo, which my current phone number
12   that I did use part of the time was 719-464-8278.
13      Q.    Okay.
14            Do you remember when you started using that
15   while in Vallejo?
16      A.    It would be approximately during the last year
17   while I was there.
18      Q.    Did you also have a City-provided cell phone?
19      A.    Yes.
20      Q.    And did you use that more frequently to conduct
21   City business?
22      A.    Absolutely.
23      Q.    And did you text people using that cell phone
24   for City business?
25      A.    Yes.
```

1      Q.   Do you remember what that phone number was?

2      **A.   No.**

3      Q.   And I take it you no longer have access to that

4   telephone?

5      **A.   Correct.**

6      Q.   Okay.

7           You signed a severance agreement when you left

8   the City of Vallejo?

9      **A.   Yes.**

10     Q.   Did you understand that you had legal claims

11   against the City of Vallejo at the time you left?

12          MS. SHESTON:  Calls for a legal conclusion.

13          Go ahead.

14          **THE WITNESS:  Can you rephrase that question.**

15     Q.   (By Mr. Strauss)  Did you believe that you had

16   a legal claim against the City of Vallejo around the

17   time that you left?

18          MS. SHESTON:  Same objection.

19          Go ahead.

20          **THE WITNESS:  Yes.**

21     Q.   (By Mr. Strauss)  And do you recall what the

22   nature of that claim was?

23          MS. SHESTON:  Same objection.

24          Go ahead.

25          Except to the extent it might call for legal

**GREGORY A. NYHOFF, VOLUME I**
July 19, 2023

1    advice you got from some lawyer.  I mean, if your

2    understanding is only arising out of that conversation,

3    that's probably off limits.  So with that admonishment.

4            **THE WITNESS:  There's confidentiality clauses**

5    **in that agreement.**

6            MS. SHESTON:  Okay.

7       Q.   (By Mr. Strauss)  Well, that's fine, but in

8    your own mind, did you think that you had some reason to

9    sue the City of Vallejo around the time you left?

10           MS. SHESTON:  Same objections.  Calls for a

11   legal conclusion.  And if it calls for the disclosure of

12   attorney-client privileged information, you should not

13   answer that.

14           **THE WITNESS:  Then I will not answer that.**

15      Q.   (By Mr. Strauss)  Okay.

16           Did you believe that you had any legal claims

17   against the City of Vallejo that had anything to do with

18   any allegations made by my three clients in this

19   lawsuit?

20           MS. SHESTON:  Same objections.

21           But go ahead.

22           **THE WITNESS:  No.**

23      Q.   (By Mr. Strauss)  Okay.

24           So whatever legal claims you felt you had

25   against the City of Vallejo were unrelated to the claims

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1   of my clients?

2           MS. SHESTON:  Same objections.

3           Go ahead.

4           **THE WITNESS:  Yes.**

5       Q.  (By Mr. Strauss)  Okay.

6           Is the City of Vallejo providing you with an

7   attorney in relation to this case?

8       **A.  Yes.**

9       Q.  And is that pursuant to the settlement

10  agreement that you reached with them?

11          MS. SHESTON:  Calls for a legal conclusion.

12          Go ahead.

13          **THE WITNESS:  I don't -- I don't recall**

14  **specifically if it is in the separation agreement.**

15      Q.  (By Mr. Strauss)  Okay.

16          Are you being paid for your time today as a

17  witness?

18      **A.  Yes.**

19      Q.  And -- and you're being paid by the City of

20  Vallejo?

21      **A.  Yes.**

22      Q.  At what rate?

23      **A.  The same rate I was paid when I left.**

24      Q.  What's your best estimate of what that is?

25      **A.  $125 an hour.**

1       Q.   And are they paying you for anything you do

2    related to this case?

3            MS. SHESTON:   Vague and ambiguous.

4            **THE WITNESS:  No.**

5       Q.   (By Mr. Strauss)  What is your -- what is your

6    understanding of what you're being paid for by the City

7    of Vallejo, as it relates to this case?

8       **A.   They will reimburse me for the time I spend in**

9    **preparation and in deposition, and a portion of the**

10   **travel time I spend to get here.**

11      Q.   And is it your understanding that is pursuant

12   to the settlement agreement you signed with the City?

13      **A.   Yes.**

14      Q.   Okay.

15           Is that something that you asked for in your

16   negotiation?

17      **A.   Yes.**

18      Q.   Do you know who, on behalf of the City, was

19   involved in negotiating your separation agreement?

20           MS. SHESTON:  Calls for speculation.

21           But if you know, go ahead.

22           **THE WITNESS:  My attorney, personal attorney,**

23   **was working with the city attorney, Veronica Nebb.**

24           (Stenographer clarification.)

25           **THE WITNESS:  Veronica Nebb.**

```
1       Q.   (By Mr. Strauss)  That's N-e-b-b?

2       A.   Correct.

3       Q.   And what's the name of your personal attorney?

4       A.   I honestly do not remember his name.

5       Q.   Is it R. Craig Scott?

6       A.   Yes.  Thank you.

7       Q.   Okay.  All right.

8            Do you know where his office is?

9       A.   I have not -- I'm not sure.

10      Q.   How did you find him?

11      A.   He was someone who had assisted other city

12      attorneys, so I saw him in a publication.

13      Q.   Okay.

14           Did anyone from the City of Vallejo ask you to

15      leave your employment as city manager?

16      A.   Anyone, I'm sorry?

17      Q.   Anyone working for the City of Vallejo?

18      A.   No.

19      Q.   Any elected official for the City of Vallejo?

20      A.   No.

21      Q.   Prior to your health issue that you told me

22      about, did you have any conversations with anybody about

23      leaving your employment with the City of Vallejo?

24           MS. SHESTON:  Other than counsel.  If you spoke

25      to counsel, legal counsel, I mean.
```

1          MR. STRAUSS:  With an "s," not a "c."

2          MS. SHESTON:  Right.

3          **THE WITNESS:  I don't recall ever having a**

4    **conversation with anybody --**

5          (Stenographer clarification.)

6          **THE WITNESS:  -- about leaving.**

7      Q.   (By Mr. Strauss)  So is it your position that

8    the sole and only reason why you left your city manager

9    position at Vallejo was because of your health issues?

10     **A.   No, that was not the sole reason.**

11     Q.   What other reasons were there?

12     **A.   I was -- the new mayor and I were, shall we**

13   **say, not on the same page, and there was a lot of local**

14   **media folks and a group of people that were kind of**

15   **outspoken within the community that -- that had**

16   **discussed a lot of untruths and were making that public**

17   **about me on a regular occasion, especially during City**

18   **Council meetings.**

19     Q.   Who was the new mayor you're referring to?

20     **A.   Mayor McConnell.**

21     Q.   When did he become mayor?  I'm assuming it's a

22   he.

23     **A.   Yes.**

24          **2020.**

25     Q.   Okay.

1      A.    January, probably, 2020.

2      Q.    And what issues did you have with Mayor

3  McConnell that you were referring to?

4      A.    I am pausing because of, again, the

5  confidentiality agreement that I signed in regards to

6  discussing some of these.

7            I will just say, generally, he had a far

8  different perspective on the role of the city manager

9  and my -- and my direction, so we -- we didn't have many

10 meetings and our communication was very limited.

11     Q.    Did you -- if I call your issues

12 "disagreements," is that a fair characterization?

13     A.    Yes.

14     Q.    All right.

15           Were any of your disagreements with Mayor

16 McConnell related to any land development negotiations?

17     A.    Certainly as all councilmembers, including the

18 mayor, have their own opinion on development projects,

19 but certainly he had his opinions.  I don't -- there

20 was -- I mean, there were perhaps a couple of

21 disagreements, but typically, I don't work directly for

22 the mayor; I work for the entire council.

23           So just -- we didn't have a lot of discussion

24 about those, but from the deas, you would be able to

25 hear his disagreements or other opinions regarding

1    **development agreements that we were proposing.**

2        Q.   And I just want to be clear and make sure I'm

3    understanding what you're telling me:  Part of the

4    reason why you left the City of Vallejo is because you

5    had some disagreements with the new mayor; is that fair?

6        **A.   Yes.**

7        Q.   And one of those disagreements involved

8    differences of opinion regarding development deals?

9        **A.   No.**

10       Q.   Okay.

11           Did your disagreements with Mayor McConnell

12   have anything to do with the development of Mare Island?

13       **A.   No.**

14       Q.   Did your disagreements with Mayor McConnell

15   have anything to do with my three clients?

16       **A.   No.**

17       Q.   Okay.

18           Did your disagreements with Mayor McConnell

19   have anything to do with any personnel issues?

20       **A.   Yes.**

21       Q.   What can you tell me about that?  What were the

22   issue?

23           MS. SHESTON:  I'm going to object on

24   third-party privacy grounds to the extent it calls for

25   you to speak about other employees in the -- of the City

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

```
1  who have their own personnel privacy protection, so I'm
2  not sure you can answer that question except in a broad
3  way.
4      Q.   (By Mr. Strauss)  You're talking about
5  employees of the City?
6      A.   Broadly, when it came to personnel, the Charter
7  very specifically stated that City Council was not to
8  interfere with the daily operations or the employees of
9  the City, and we had disagreements about that on a
10 number of occasions.
11     Q.   Was this related to the police department or
12 some other department?
13     A.   General City --
14          (Stenographer clarification.)
15          THE WITNESS:  The general City, overall.
16     Q.   (By Mr. Strauss)  But not anything related to
17 my clients?
18     A.   Nothing specifically.
19     Q.   Okay.
20          You told me that there were some media folks
21 who were raising issues I guess both publicly and at
22 City Council meetings that led, in some way, to your
23 decision to leave the City; is that fair?
24     A.   Yes.
25     Q.   And do you -- what were the issues that they
```

 1  were raising?  What were they related to?

 2      A.  They were related to the police department and

 3  my oversight there, badge --

 4          (Stenographer clarification.)

 5          THE WITNESS:  -- badge bending.  There was a --

 6  a -- a couple challenges to the term agreement on Mare

 7  Island.

 8      Q.  (By Mr. Strauss)  Okay.

 9          And is that something that any of my clients

10  were working on, that term agreement?

11      A.  Yes.

12      Q.  Mr. Matzke and Mr. Morat, specifically?

13      A.  Yes.

14      Q.  Did Ms. Altman have anything to do with working

15  on that?

16      A.  Not that I'm aware of.

17      Q.  Okay.

18          Can you be more specific about what terms were

19  controversial in those development -- in that

20  development agreement.

21          MS. SHESTON:  Vague as to time.

22      Q.  (By Mr. Strauss)  What were you referring to?

23      A.  In general, the -- the part I would remember

24  most is about the terms as far as giving the land away

25  on Mare Island to a developer and the timelines that

1    were required to do specific things.

2        Q.    Giving the land away, is that something that

3    the media was raising or is that actually what was

4    happening?

5        MS. SHESTON:  Vague and ambiguous.  Lacks

6    foundation.

7        Go ahead.

8        THE WITNESS:  So in this particular project,

9    which is the redevelopment of an old naval site, which

10   basically is built on a very, very -- well, the -- the

11   dredging material from the river itself, so it's very

12   unstable.  And so the actual cost in order to prepare

13   the land, or if there were buildings on the land that

14   were dilapidated or old, were very significant.

15       So when evaluating the cost or price for that

16   land, you had to take into account the cost was going to

17   be to actually make it developable-ready.  And so no, I

18   would say not free, but you -- but it ended up being a

19   minimal cost, just because the cost to actually prepare

20   it to develop and deal with sea-level rise was very

21   significant.

22       Q.    (By Mr. Strauss)  Okay.

23       And let me see if I understand, and you can

24   correct me if I'm wrong.  Are you saying that for this

25   particular project, there -- it was so expensive to

1    develop the land, that in order to attract a developer,

2    it had to be sold at a discount, and that would be a net

3    benefit to the City?  Is that close?

4        A.   Yes.

5        Q.   And what was the controversy that the media was

6    raising about that?

7        A.   I think it was just the amount that they --

8    they thought it should be much more.

9        Q.   Okay.

10           And there's been some discussion, both in this

11   lawsuit and in what I've read in the Press, about a term

12   sheet that talks about "substantially complete."

13           Are you familiar with that?

14       A.   Yes.

15       Q.   And is that one of the controversies that was

16   being raised, as you described it, by the media?

17       A.   Not of significance.  It was -- it was one that

18   I had heard, either through public meetings, people

19   mentioning, or the media later on.

20       Q.   Is that specific issue anything that led to

21   your decision to leave Vallejo?

22       A.   No.

23           MS. SHESTON:  Vague and ambiguous.

24           I don't understand the question.  Did you

25   understand the question?

1              THE WITNESS:  The question was:  Did that

2    specific verbiage on that term sheet of "substantially

3    complete" one of the reasons I left, and the answer was

4    no.

5              MS. SHESTON:  Okay.

6        Q.   (By Mr. Strauss)  You know Slater Matzke?

7        A.   Yes.

8        Q.   When did you meet him?

9        A.   When I first started at Vallejo.

10       Q.   Was he working there at the time?

11       A.   As a contract employee.

12       Q.   Okay.

13       A.   Consultant.

14       Q.   What was he doing?

15       A.   He was assisting with economic development.

16   Yeah, he was working on development.

17       Q.   And at some point, did you make a decision to

18   hire him as a full-time employee?

19       A.   Yes.

20       Q.   And when -- when was that?  Best estimate?

21       A.   Late 2020 or early 2021.

22       Q.   And what was his position?

23       A.   Special advisor to the city manager.

24       Q.   In general, what were his duties?

25       A.   Continue assisting with the economic

1  development of the City, contacts with business owners

2  and companies and marketing --

3          (Stenographer clarification.)

4          THE WITNESS:  -- our city.

5      Q.   (By Mr. Strauss)  Did you feel he was qualified

6  for that position?

7      A.   Yes.

8      Q.   What were his qualifications, as you understood

9  it?

10     A.   So I never did see his official resume, so the

11  qualifications for it was based on experiences that --

12  that I had with him and his strength, and certainly

13  working with businesses, corporations, and then

14  marketing.  So he was good at that.  And my general

15  understanding of it, he had some knowledge of -- of

16  business -- business operations or finances.

17     Q.   Okay.

18          Did he work on development deals for the City

19  of Vallejo?

20     A.   My answer would be yes, but to clarify that --

21  because Will -- Will was the one who worked directly for

22  me and was overseeing that, so I'm making that -- my

23  belief was that it was yes, because those two worked

24  very closely together.

25     Q.   And speaking with Mr. Matzke, for the moment,

1    did he work closely with you?

2           MS. SHESTON:  On anything?

3           MR. STRAUSS:  Yeah.

4           MS. SHESTON:  Vague and ambiguous as to the

5    term "closely," but go ahead.

6           **THE WITNESS:  Yeah.  As close as other**

7    **directors or leadership team --**

8           (Stenographer clarification.)

9           **THE WITNESS:  Close as I was to the other**

10   **members of the leadership team.**

11      Q.   (By Mr. Strauss)  How often or how frequently

12   would you meet with Mr. Matzke?

13          MS. SHESTON:  Vague as to time.

14          Go ahead.

15          **THE WITNESS:  The majority of the time would be**

16   **with Mr. Morat and Mr. Matzke, because the highest**

17   **priority that the City had, in my mind and Council's**

18   **mind, was economic development.  So that was extremely**

19   **important for me to pursue with diligence for the**

20   **community.**

21          **So it would depend what was going on at the**

22   **time, if things were -- if there was a lot of things**

23   **evolving into, for instance, policy decisions, versus**

24   **just the day-to-day working with developers to pursue**

25   **more economic development and job creation.**

```
 1      Q.   And was Mr. Matzke working with Mr. Morat on
 2   the Mare Island project?
 3      A.   Again, they -- they were -- when I would meet,
 4   they would be together.  But Mr. Morat was the person
 5   that was the lead on doing the agreements, communicating
 6   that with me.
 7      Q.   Okay.
 8           And by doing the agreements, do you mean that
 9   they were negotiating directly with developers to help
10   reach an agreement with the City?
11      A.   Yes.  That was their main -- that was their
12   main role.
13      Q.   Okay.  Got it.
14           Do you remember Mr. Matzke attending his
15   grandmother's funeral?
16      A.   Yes.
17      Q.   Was there some concern you had about him taking
18   time to go to that funeral?
19      A.   Yes.
20      Q.   What was your concern?
21      A.   My concern is that he was -- at that particular
22   time, he was very upset with what -- my putting Will
23   Morat on administrative leave, and he was very upset
24   with me, and my concern was that he was leaving because
25   he was very upset leaving the city.
```

1           So I only had a question, and I asked it of the
2   City Attorney's Office, did he go to his funeral, to his
3   grandmother's funeral.
4       Q.   Were you able to confirm that he had, in fact,
5   gone to his funeral?
6       A.   Yes.
7       Q.   Was that the end of that issue, as far as you
8   were concerned?
9       A.   Yes.
10      Q.   Okay.
11           Do you know somebody named Bob Deis or Deis,
12  D-e-i-s.
13      A.   Yes.
14      Q.   Who is that?
15      A.   He was a consultant with -- they changed names.
16  It was -- I think in the beginning, it was Renne Sloan
17  Sakai, and then I don't -- they changed; they split up
18  their operations.  Public management group, it was.  So
19  he was a consultant there.  I also knew him as a city
20  manager in City of Stockton, when I was in City of
21  Modesto.
22      Q.   Was he brought in to work for City of Vallejo
23  at some point?
24      A.   Yes.
25      Q.   When was that?

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      A.   I don't recall.

2      Q.   What was he brought in to do?

3      A.   He was -- one of the specific items was he was

4    brought in as a team that we put together as we began

5    the assessment of the police department, and as far as

6    once we got the results of that, that he then became

7    part of our team that we put together to work towards

8    reform.

9      Q.   Was he ever asked to do anything in connection

10   with Mr. Matzke's work?

11     A.   Not that I recall.

12     Q.   When you thought Mr. Matzke might be leaving

13   the City to go to his grandmother's funeral, did you ask

14   Mr. Deis to do anything with respect to Mr. Matzke's

15   role?

16     A.   Not that I recall.

17     Q.   Okay.

18          So we talked about Mr. Morat a little bit.

19          What was his title with the City?

20          MS. SHESTON:  Vague as to time.

21     Q.   (By Mr. Strauss)  When you were city manager?

22          MS. SHESTON:  Same objection.

23          THE WITNESS:  Assistant to the city manager.

24     Q.   (By Mr. Strauss)  Was that true the entire time

25   you were city manager?

1      A.    Yes.

2      Q.    What was the -- did he have specific duties as

3  your assistant?

4      A.    His duties evolved over time, so he was

5  assistant, too, so a lot of the things initially were

6  projects that he was working on or certain components.

7  I did ask him to oversee the Housing Authority at one

8  point in time.  But in the last probably year and a half

9  I focused him on economic development.

10     Q.    Did he have a specific title related to

11  economic development?

12     A.    No.

13     Q.    And he reported directly to you?

14     A.    Yes.

15     Q.    Was he qualified for his position?

16     A.    Technically and experience-wise, no; however,

17  he was someone who got things done and learned quickly.

18     Q.    Okay.

19         Did you ever promote him while you were city

20  manager?

21     A.    No.

22     Q.    Do you remember that he was an administrative

23  analyst at some point and you promoted him to be the

24  assistant to the city manager?

25     A.    Yes.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      Q.   Okay.

2           Going back to Mr. Matzke for a second, did you

3    ever have any concerns about him in his job performance

4    prior to the time when you began to think about

5    terminating him?

6      **A.   Yes.**

7      Q.   And how often or when did that happen?

8           MS. SHESTON:  When did he start having

9    concerns?

10          MR. STRAUSS:  Yeah.

11          MS. SHESTON:  Don't guess, but if you can give

12   him an estimate, he's entitled to that.

13          **THE WITNESS:  Yeah.  My estimate would be, is**

14   **several months prior to, and I don't remember the dates**

15   **that we -- I put Will Morat on administrative leave, but**

16   **it was several months before that.**

17     Q.   (By Mr. Strauss)  And what were the concerns

18   you had about Mr. Matzke?

19     **A.   Mr. Matzke and Mr. Morat were pretty much**

20   **always tied together, so their behaviors would be very**

21   **consistent.**

22          **So one of the projects -- and I put them both**

23   **together -- we had a project for a multifamily**

24   **development on the City's parking garage, and the**

25   **business wanting to do the housing side of that was**

1    Factory OS.

2            So Will and Slater -- because, again, put them

3    together, not part of those meetings -- were negotiating

4    with the developer.  And so understanding our parking

5    garage was funded by the Transit Authority, it was for

6    our ferry system.

7            And so Will and Slater were negotiating that,

8    trying to come up with a term sheet or some agreement

9    with them to do that project.

10           And so when they did come back and discuss the

11   project with the Public Works department director and

12   the Planning director, they had negotiated something in

13   the words -- in the opinion of the Public Works

14   director, that were "undoable," because we had certain

15   requirements of certain spaces we had to develop as part

16   of an agreement we had with them, plus we had $10

17   million were tied to us -- our future development of "X"

18   number of spaces.

19           And they came back with an agreement that had

20   less than that, which then ensued in a debate between

21   the Public Works department and that agreement and --

22   and Will and Slater's interpretation of that agreement.

23   They felt that it could be less than what the Public

24   Works director, Terrance Davis, believed that it was.

25           And so there was quite a debate about that

1    because the project manager of the City -- the garage,

2    was the Public Works director, and he had no input.

3    There was no communication between Will and Slater with

4    the Public Works director while they were negotiating

5    that.

6            And so they -- as was the case in the Planning

7    director, there was no communications there.  So there

8    was a lot of friction --

9        Q.   Um-hum.

10       A.   -- and certainly disruption in the team by the

11   fact that they did this all on their own with their own

12   interpretation of what requirements were necessitated in

13   that -- in that negotiation.

14       Q.   Okay.

15           And we began this because I asked you what

16   concerns you had about Mr. Matzke.

17           Am I -- is it fair to say that you had the same

18   concerns about Mr. Morat, because they were working

19   together on this?

20       A.   Yes.

21       Q.   And was that situation ever resolved?

22       A.   Yes.

23       Q.   How was it resolved?

24       A.   I -- I -- I asked them to get together and --

25   because Will and Slater had moved this project into an

1    understanding by the developer that this is what it
2    would be.  I had to pause it and ask for them to work
3    together to give me a couple options in regards to some
4    of which had points likely that Will and Slater had and
5    then some of the requirements that the Public Works
6    director found.
7            So at the end of that, it did -- we did -- my
8    recollection is that we came up with --
9            (Stenographer clarification.)
10           THE WITNESS:  -- a term -- a term sheet
11    agreement.
12    Q.    (By Mr. Strauss)  And that project moved
13    forward after that?
14    A.    No.
15    Q.    Okay.
16           Why not?
17    A.    One of the -- one of the other issues
18    associated with this is that this project's ongoing
19    during -- during this time that we had this two-week
20    pause -- or a couple weeks before that, I had placed
21    Will Morat on administrative leave.
22           And so LaTanya, I can't remember her -- another
23    employee with the Economic Development Department, and
24    Slater, I asked them to go over to talk to the Factory
25    OS people to ask them -- you know, to explain to them

1    why we were pausing this, and so that they understood

2    that -- why -- what Will and Slater believed, I think

3    they believed, was a term sheet would likely be changed

4    because of these requirements we had.

5            And so Will and LaTanya went over there and --

6    not Will and LaTanya, I'm sorry -- Slater and

7    LaTanya went over there, and when Slater came back, he

8    just told me, They're very upset and want to talk to you

9    directly.

10           So I called them, and it was a matter of ten

11   minutes of explaining what I did, and they were very

12   supportive of what we were doing.

13           After that point in time, I think the

14   negotiations continued, and I don't -- I can't remember

15   at what point we were when I left, but it -- it

16   hasn't -- well, it didn't -- it didn't -- it was

17   continuing in negotiations.  But I don't know -- I can't

18   remember the status of it when I left.

19       Q.   Is -- is that project known as anything other

20   than the parking garage development project?

21       A.   Not that I recall at that time.

22       Q.   Okay.

23           Did you take any action as a result of your,

24   call it disappointment with Mr. Morat and Mr. Matzke's

25   handling of that negotiation?

1       A.    In regards to?

2       Q.    To them?

3       A.    **Their performance?**

4       Q.    Yes.

5       A.    **Nothing other than counseling them.**

6       Q.    Okay.

7             And did that play any role in the decision, in

8       your mind, to terminate them?

9       A.    **Yes.**

10      Q.    Explain how.

11      A.    **There was quite a concern from the other team**

12      **members on the leadership team, specifically the**

13      **Planning director, but the Public Works director as**

14      **well, that they were having difficulty working with Will**

15      **and Slater and that they were not communicating with the**

16      **rest of the team.**

17      Q.    Okay.

18            Did -- did you put anything in writing as a

19      result of those concerns?

20      A.    **No.**

21      Q.    Did you consult with the HR Department about

22      that?

23      A.    **No.**

24      Q.    Didn't put anything in their personnel file?

25      A.    **No.**

1        Q.   Didn't discipline them in any way?

2        A.   No.

3        Q.   So how did -- how did these events, or these

4   concerns, play into the decision to terminate them?

5        A.   There was a -- there was a -- one -- one

6   component of it.  So you have not just the fact that

7   they negotiated something that we couldn't live by, we

8   would have lost significant money with, but they also

9   did the negotiations without the input of certainly the

10  Public Works director, who was responsible for that, and

11  for the agreement to which required specific parking

12  spaces, but also the Planning director, and that seemed

13  to be a growing trend with them, which was less

14  communications about what they were doing on projects

15  than what other leadership team members felt, and

16  sometimes going beyond what -- delving into the areas

17  which would normally be a decision of a Planning

18  director or a Public Works director.

19           And including me becoming more concerned over

20  time that they were being less communicative with me as

21  far as status reports.  So one thing I did do was

22  require a once-a-week status meeting with them to

23  hopefully provide a lot more communication opportunities

24  for them to explain to me what was going on with these

25  projects.

1      Q.   When did you institute that?

2      A.   My timelines aren't by dates, but I -- it was

3   something that -- I'm going to say it was -- the problem

4   probably grew over the last -- for about eight months

5   probably.  It steadily got more intense probably over

6   the last eight months --

7           (Stenographer clarification.)

8           THE WITNESS:  That started about eight months

9   prior to their being dismissed, and then it got more

10   intensified as time went on.

11      Q.   (By Mr. Strauss)  Okay.

12           But you instituted a program where they met

13   with you more regularly to discuss what they were

14   working on; right?

15      A.   Correct.

16      Q.   And did they attend those meetings?

17      A.   Yes.

18      Q.   And were they communicative during those

19   meetings?

20      A.   In my opinion is, it was better.

21      Q.   Okay.

22      A.   But certainly not to my expectations.  I had to

23   ask them a lot of questions on various projects in order

24   to get information from them.

25      Q.   And they answered your questions?

1      A.   They did answer my questions.

2      Q.   And you counseled them specifically about how

3   they had gone about negotiating the parking garage

4   project?

5      A.   In regards to their -- their responsibility to

6   work with the Public Works director and the Planning

7   director, yes.

8      Q.   Okay.

9           And did -- did they change their behavior as a

10  result of that?

11     A.   I would say for a short -- for a period of

12  time, yes.  So it was that -- it was several months

13  before Will got placed on administrative leave, so there

14  wasn't a long period of time between that event and Will

15  being put on administrative leave.

16     Q.   And Will was put on administrative leave for

17  issues having nothing to do with what we've just been

18  discussing; correct?

19     A.   Correct.

20     Q.   Okay.

21          MS. SHESTON:  You're just using it as a

22  benchmark in time; right?

23          THE WITNESS:  Correct.

24     Q.   (By Mr. Strauss)  So this issue of them kind of

25  going off on their own and not communicating what they

 1   were doing, that's what your concern was; is that a fair

 2   way of characterizing it?

 3       A.   Yes, at that point in time.

 4       Q.   Did you ever tell anyone that that behavior was

 5   one of the reasons why you decided to terminate them?

 6       A.   Did I tell anyone?

 7       Q.   Yeah.

 8            MS. SHESTON:  Other than counsel discussions,

 9   legal counsel.

10            THE WITNESS:  Legal counsel discussions.

11       Q.   (By Mr. Strauss)  Did you tell anyone else?

12       A.   Specifically about?

13       Q.   That you determined that one of the reasons why

14   they needed to be let go was because of this

15   communication issue?

16       A.   Other than legal counsel, no.

17       Q.   Okay.

18            Why is it that you didn't put anything in

19   writing regarding your concerns about this behavior?

20            MS. SHESTON:  Lacks foundation.

21            Go ahead.

22            THE WITNESS:  I had communications with legal

23   counsel in regards to that.

24       Q.   (By Mr. Strauss)  When?

25            MS. SHESTON:  Don't guess, but if you can give

1  him an estimate --

2          (Stenographer clarification.)

3          MS. SHESTON:  If you can give him an estimate,

4  he's entitled to that.

5          **THE WITNESS:  Most of those communications**

6  **would be after Will got put on administrative leave.  So**

7  **I didn't put anything in writing because I hoped that**

8  **they would -- would act on the counseling that I**

9  **provided them.**

10     Q.  (By Mr. Strauss)  Will never came back from

11  administrative leave, did he?

12     **A.  He did not.**

13     Q.  So did you have any opportunity to evaluate him

14  as to whether he was acting on your counseling?

15     **A.  Very little time.**

16     Q.  What time did you have?

17     **A.  I about three months.**

18     Q.  And he was improving in those three months,

19  wasn't he?

20          MS. SHESTON:  Lacks foundation.

21          Go ahead.

22          **THE WITNESS:  So I would say there was minor**

23  **improvement when it came to meeting me on a weekly**

24  **basis.  They had the meetings, but I still had to ask**

25  **them lots of questions in order to get status on the**

1    number of projects.

2          Several of the other leadership team members

3    had made complaints about them in the past.  And so I

4    can't recall during that short period of time whether or

5    not there was any additional complaints.

6    Q.  (By Mr. Strauss)  When was the very first time

7    that you had the thought that you may need to terminate

8    Matzke or Morat?

9          MS. SHESTON:  And if it's different as to the

10   two of them, specify that, if you can.

11         THE WITNESS:  Yeah.  So Mr. Morat would be --

12   again, I'm using timelines of when he got placed on

13   administrative leave -- would be several months prior to

14   that date, that -- that time frame, when I felt that

15   Mr. Morat was not performing the duties that -- that

16   were essential to economic development.

17         In essence, he was creating problems with a

18   couple of the owners of the businesses or projects that

19   we had.  He was -- it was told to me by one that he was

20   rude at times in -- during the negotiations.  And some

21   of the projects where we were making claims or they were

22   making claims that were moving forward very well, were

23   actually not making the progress that they should have

24   been making.

25         So that's -- Slater would be at the time that I

1    placed Will on administrative leave.

2        Q.   (By Mr. Strauss)  Okay.

3            So I asked you when you first had the thought

4    that you might need to terminate them.

5            In your mind, where were you at in that

6    decision-making process when you heard that Mr. Morat

7    was creating problems with developers during

8    negotiations?  Was that just a thought that this might

9    have to happen in the future or something more concrete

10   than that?

11           MS. SHESTON:  Vague and ambiguous.

12           You can answer if you -- if you understand.

13           THE WITNESS:  Mr. Morat had -- there were

14   several other things that caused me concern that were

15   actually prior to him going on -- me putting him on

16   administrative leave.

17           The -- the request for qualifications for the

18   Mare Island Preserve was something he wanted to take

19   responsibility for, and months and months went by and

20   that never happened.

21           So when I questioned him during briefings, he

22   finally told me that he decided that we were going to

23   just keep the Preserve, the City was going to keep it,

24   and we would maintain it.

25           And it concerned me because that's not, first

1    of all, what we had told the public and what we told

2    Council we were preparing this RFQ.  Secondly, that was

3    not his decision to make.  Certainly a recommendation

4    could be made from him, but he made that decision, so he

5    discontinued his efforts under the RFQ.

6           The -- another project was the Blue Rock, the

7    golf course up there.  So that's a project that had

8    opposition from Syar Industries, which is the quarry

9    just above it.  And Will was, from their negotiations,

10   pushing a very hard line on Mr. Syars [sic] and that

11   corporation's need to be a partner engaged in that

12   conversation at least so that we could make them

13   comfortable with the development as to us.

14          And that's where I learned from the Luis Group

15   on a separate meeting that he felt Will was sometimes

16   rude and was unreasonably negotiating terms.  And what

17   actually happened then was the Syar -- Jim Syar, the

18   owner, basically walked away from the table of

19   discussion and just said, If you proceed with that,

20   we'll sue you.

21          And so I actually sat down with Will, and

22   Slater was there, and said, Would it help for me to try

23   to meet with Mr. Syar and try to work through this?

24          And they said, No, we're -- we've got it --

25   we've got it handled.

1          So that -- we ended up with the County even

2    stepping in trying to be of assistance to negotiate some

3    type of agreement we could have between those.  And,

4    again, when I left, that had not been worked out.

5          A little tidbit, the truth and honesty is a big

6    issue.  So there was a time when the Chamber of Commerce

7    director came to me and told me that -- they said that,

8    "Will's your assistant city manager?"

9          I said, "No, let's be clear.  That was not my

10   assistant city manager.  He was assistant to the city

11   manager."

12         And so I asked Will, "Will, are you out telling

13   people that?"  Because he certainly was -- I think he

14   had aspirations to -- to rise to that level.  And he

15   said absolutely not.  He didn't know where that came

16   from.

17         And I don't even know how it came up, but I

18   happened to run across him in LinkedIn where I noticed

19   that his title on LinkedIn was "assistant city manager,"

20   not "assistant to the city manager."

21         So, again, a question of truth and openness

22   and -- and communications was developing --

23         (Stenographer clarification.)

24         THE WITNESS:  -- in several areas.

25         MS. SHESTON:  Counsel, if you're getting to a

 1   place where we could take a comfort break, that would be

 2   super.

 3          MR. STRAUSS:  I was thinking the same thing.

 4   Maybe one more question?

 5          MS. SHESTON:  Sure.

 6      Q.   (By Mr. Strauss)  Did you ever put any of these

 7   concerns in writing?

 8      **A.   No.**

 9          MR. STRAUSS:  Let's go off the record.

10          THE VIDEOGRAPHER:  All right.

11          The time is 11:21 a.m.  We are going off the

12   video record.

13          (Recess taken from 11:21 a.m. to 11:34 a.m.)

14          THE VIDEOGRAPHER:  Time is 11:34 a.m. and we

15   are back on the video record.

16      Q.   (By Mr. Strauss)  Welcome back.

17          Are you okay to continue?

18      **A.   Yes.**

19      Q.   And I may as well try to remind you, too, try

20   to keep your voice up if you can.

21      **A.   Thank you.**

22      Q.   Of course.

23          So we were talking about concerns you had with

24   Mr. Morat, and one of the things you told me was that he

25   was -- came to your attention that he was rude during

1  negotiations with developers; correct?

2      A.   One of the developers in particular, when I

3  asked them how the meetings were going, they made that

4  statement to me.

5      Q.   Was that Mr. Syar?

6      A.   No.

7      Q.   Who was that?

8      A.   Jeff Luis with the Luis Group.

9      Q.   Which project was that?

10     A.   The Blue Rock, slash, Syar project.

11          (Stenographer clarification.)

12          THE WITNESS:  Syar project.

13     Q.   (By Mr. Strauss)  Got it.  Thank you.

14          Anybody else tell you that?

15     A.   Not -- not in the development or business

16  environment.

17     Q.   Did you do anything with that information?

18     A.   No.

19     Q.   Okay.

20          Just sort of kept it in your mind?

21     A.   Yes.

22     Q.   Okay.

23          You told me that another concern you had was

24  that deals were not being made -- progress was not being

25  made on deals as you thought it should be; correct?

1        A.    I think that where I was frustrated was the

2    fact that they would lead me to believe and that we

3    would do presentations in front of the community that,

4    Oh, we got this project going, that project and this

5    project, when in reality, there were still some very

6    critical components of those agreements that had to be

7    worked out.

8              And I'm of the belief that, you know, until you

9    are somewhat confident that you're going to be able to

10   work something out, you don't make it sound like we got

11   all these great projects going.

12             So they led me to believe that these were

13   moving forward and they were just close to being worked

14   out on several occasions and they weren't.

15       Q.    Which projects are you talking about?

16       A.    Seka Hills, which is the building down near the

17   ferry terminal.  I think the garage was -- or the --

18   yeah, the garage/housing project was what I believed

19   moving on a fast-track to actually get done, even after

20   we had to stop it and pause it.

21             And a lot of what I learned came after I put

22   Will on leave and had to become the acting, shall we

23   say, Economic Development director; that that project

24   was not nearly as far along when it came to the status

25   of the owners moving forward with that project.

```
 1              Blue Rock, when they told me that they didn't
 2    need my help and everything was going fine, that was not
 3    accurate.
 4              And so I think just a lot of it was that --
 5    gave me the impression that everything was fine, things
 6    were moving along very well, and they weren't.
 7       Q.   Any other projects specifically that you were
 8    concerned about?
 9       A.   I would -- well, I mentioned the request for
10    qualifications requirement or project that Will had was
11    also something that just was delayed and delayed and
12    delayed.  And then finally, after even telling me
13    they've been working on it, they're working with this
14    group and that group to work that through, then he just
15    decided to drop --
16              (Stenographer clarification.)
17              THE WITNESS:  -- he dropped the project of
18    doing the requests for qualifications and just said,
19    We're going to maintain it.
20              And those are the ones I can recollect.
21       Q.   (By Mr. Strauss)  Okay.
22              And on learning this information, that they
23    were not moving forward with projects as you thought
24    they should be, did you do anything?
25       A.   Well, on learning that information?
```

1      Q.   Yeah.

2      A.   I think that's a -- it's somewhat of -- of it's

3   ongoing, but certainly after Will had left, put on

4   administrative leave, what I ended up doing was placing

5   other department heads as heads or leader -- lead

6   contacts with different projects.  For instance, the

7   garage project was a co-project between Terrance and --

8           (Stenographer clarification.)

9           THE WITNESS:  -- Gillian Hayes, the Planning

10  director.  The Blue Rock was Gillian Hayes became the

11  lead on that one.  And so I had to disperse out some of

12  those.  That's where I learned much more details from

13  those folks giving me input on where the negotiations

14  were.

15     Q.   (By Mr. Strauss)  So just by the fact that Will

16  wasn't there any longer because he was on leave, you

17  needed to bring somebody in to work on these projects

18  with Slater; is that correct?

19     A.   Slater and whoever from the department.

20  LaTanya had a couple of these projects.  Yes, that's

21  where they would be, so they would be the lead, and

22  Slater would be involved in that, along with LaTanya on

23  several of these projects.

24     Q.   And Slater was continuing in the role that he

25  had previously done?

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    A.   Yes.

2    Q.   And so when you -- sounds like you've got more

3    information after Will went out about the status of

4    these projects; right?

5    A.   Correct.

6    Q.   And did you do anything with respect to

7    Slater's shortcomings on these projects when you learned

8    about them?

9    A.   I think that -- again, I'm going to say that

10   Slater and Will were in all of the conversations and

11   meetings.  And it wasn't Slater's role to be doing

12   the -- the -- you know, actually pushing the projects

13   forward.

14        So I saw Will as the one who would give me the

15   specifics of the information, and I saw him as the one

16   actually responsible for these projects not being on

17   schedule.  Honestly, the rudeness comment would have to

18   be Will.  Slater was usually very well articulate in his

19   presentations.  So most of that was Will.

20        So Slater, I viewed as he was someone who could

21   speak the business in Economic Development language with

22   people.  He was very good at making the contacts and

23   really promoting the City.

24   Q.   So these shortcomings that you've been telling

25   me about Slater, you didn't necessarily blame

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    Mr. Matzke?

2             I'm sorry.  I mixed that up.

3             You've been telling me about Mr. Morat's

4    problems.

5             And is it fair to say you didn't necessarily

6    blame Mr. Matzke for what Mr. Morat had been doing?

7       A.   Specific to the actual status of projects --

8       Q.   Okay.

9       A.   -- and where he would report they are.

10      Q.   Okay.

11      A.   Some of the friction caused within the

12   department, within the -- within the -- within the

13   City-wide leadership organization, both of them were --

14   had -- had -- I received complaints from both of them.

15      Q.   All right.

16            Before the break, you told me that you had some

17   concerns that Mr. Matzke might need to be terminated;

18   that came to your attention after Will was placed on

19   administrative leave.

20            Do you remember that testimony?

21      A.   Yes.

22      Q.   What did you mean by that?

23      A.   Mr. Matzke was extremely upset over my decision

24   to put Will on administrative leave.

25      Q.   Did he tell you why?

```
1       A.   He told me it should be Judy Shepard-Hall put
2    on leave and not Will, and that the HR director hadn't
3    done enough with LaTanya's complaints earlier.  And,
4    again, that Judy should be the one placed on leave, not
5    Will.
6       Q.   Okay.
7            And what about that caused you concern?
8       A.   What caused me concern is that I explained to
9    him that there would be an investigation, and that to
10   stay calm and just let it go, because he was very upset.
11   And I had to repeat that multiple times to him.  And he,
12   I believe, refused to accept that as a solution to his
13   being extremely agitated and angry about that.
14      Q.   What did you observe to lead you to believe
15   that he wasn't accepting your instructions to stay calm?
16      A.   First of all, after that day, his demeanor
17   completely changed.  Communications, working with
18   others, he completely became a negative person, which
19   was not Slater.
20           So I think I had asked him if he would become
21   interim director, and in essence, he ended up telling me
22   that he would only do that if Will's administrative
23   leave only lasted a couple days.
24           And I said it will be -- it has to wait, you
25   know, to go through the process of doing a investigation
```

1    into that, and I'm not going to be doing that in two

2    days.  That's just not going to happen.  Which

3    frustrated him with me.  He indicated that Will was

4    Economic Development, that Economic Development would

5    fail without Will.

6         Later on, when I asked him basically the final

7    time to say, Would you be the interim for me in the

8    absence, he told me no, because he can't do two jobs at

9    once.  And those were all with a very disrespectful way

10   of -- of telling me that, kind of like, You made the

11   wrong decision and you're going to pay for it.

12   Q.   And in your own mind, when did you first decide

13   to terminate Slater Matzke?

14   A.   Well, I didn't decide -- I didn't decide to

15   terminate him until I decided to terminate him.

16   Q.   When was that?

17   A.   April.

18   Q.   Okay.

19        And he was, in fact, terminated in April of

20   2020; correct?

21   A.   That's my recollection, yes.

22   Q.   When -- when was Will placed on administrative

23   leave?  Are you able to fix a time frame for that?

24   A.   I -- I can't.  I don't remember that.  I don't

25   want to guess at that one.

1       Q.   That's fine.  It's in the record.

2            So let's talk about Will's administrative

3   leave.

4            Who made the decision to put him on

5   administrative leave?

6       **A.   I did.**

7       Q.   Why?

8       **A.   So it's a personnel matter related to a**

9   **different incident.**

10      Q.   Okay.

11      **A.   Is that --**

12      Q.   It's all right.

13      **A.   Okay.**

14      Q.   It's all out there.  LaTanya; right?

15      **A.   Am I well trained in personnel matters?**

16           **So your question, again?  I'm sorry.**

17      Q.   Why did you place him on administrative leave?

18      **A.   So probably eight months to a year before that**

19   **day, Judy had -- Judy Shepard-Hall had initiated a**

20   **complaint against Will for discrimination, and a lot of**

21   **it had to do with LaTanya in the sense that Will**

22   **would -- Will had been the Housing Authority director on**

23   **an interim basis, and then Judy Shepard-Hall came in.**

24           **And so some of the complaints were that Will**

25   **was still -- would take LaTanya out to lunch and still**

1    communicating with her, and Judy felt that was very

2    undermining and actually discrimination against her, so

3    we did an investigation.

4        Q.   Discrimination on the basis of what?

5        A.   I don't recall.

6        Q.   Okay.

7             Judy Shepard-Hall a member of any protected

8    class that you're aware of?

9        A.   She's a female African-American.

10       Q.   Okay.

11            Was that the basis of her complaint?

12       A.   I don't recall.

13       Q.   Okay.

14            So when you say "we" did an investigation of

15   her complaints, who's "we"?

16       A.   So Human Resources would be the people that do

17   the -- that would look into that complaint.

18       Q.   Was Heather Ruiz head of HR at the time?

19       A.   Correct.

20       Q.   Okay.

21       A.   Correct.

22            And so that was completed, and we learned some

23   of these issues that related to this.  And so I -- we --

24   I and Heather Ruiz met with Will and counseled him and

25   said it needs to stop, especially your -- your contacts

1    with LaTanya and -- and interfering with Judy's roles

2    and responsibilities; and told him he needed to stop and

3    we would evaluate further if it continued or happened

4    again, as far as type of disciplinary action.  So it was

5    counseling.

6         Q.   Let me pause you there.

7              Was there anything put in writing with respect

8    to the findings of the complaints against Mr. Morat?

9              (Stenographer clarification.)

10        Q.   (By Mr. Strauss)  Morat.

11        A.   I don't know that.  I think that -- I don't

12   believe that.  If so, it would be part of the Human

13   Resources/Heather Ruiz file.

14        Q.   Did somebody reach a conclusion that Mr. Morat

15   had violated the law and discriminated against Judy

16   Shepard-Hall?

17        A.   I don't recall specifically.

18        Q.   Was Will Morat disciplined for discriminating

19   against Judy Shepard-Hall?

20             MS. SHESTON:  Vague as to the term

21   "disciplined."

22             Go ahead.

23             THE WITNESS:  We counseled him.

24        Q.   (By Mr. Strauss)  You talked to him?

25        A.   Correct.

1     Q.   Did you put a note in his file that he had been
2     counseled?
3     **A.   Not that I'm aware of.**
4     Q.   What was your role, if any, into that
5     investigation of Judy Shepard-Hall's complaints?
6     **A.   None.**
7     Q.   How did you learn the results of that
8     investigation?
9     **A.   Human Resources director.**
10    Q.   Heather Ruiz?
11    **A.   Correct.**
12    Q.   What did she tell you?
13    **A.   Well, I should clarify that.  I -- I can't**
14    **remember the exact complaint on discrimination.**
15    Q.   All right.
16    **A.   I know that the findings were -- had to do a**
17    **lot with his interference and engaging him in -- in**
18    **meeting with LaTanya and providing her input, and then**
19    **her relaying that to Judy Shepard-Hall.  So LaTanya and**
20    **Judy Shepard-Hall, that was a -- that was -- they were**
21    **in conflict with each other as well.**
22    Q.   Sure.
23         This was about a year prior to the
24    administrative leave?
25    **A.   I'm thinking that, yes.**

1       Q.   So at that time, a year prior, what was -- was

2    there any reporting relationship between Will and Judy

3    Shepard-Hall?

4       **A.   No.**

5       Q.   Was there any reporting relationship between

6    LaTanya and Will Morat?

7       **A.   No.**

8       Q.   They were former -- formerly reporting?

9       **A.   That's correct.**

10      Q.   And so now LaTanya's reporting to Judy

11    Shepard-Hall?

12      **A.   Correct.**

13      Q.   And Judy Shepard-Hall was concerned that Will

14    was still -- was it going to lunch with Tanya?  What was

15    the interaction that she was concerned about?

16      **A.   That he was -- he was providing his opinion on**

17    **how the department should operate.**

18      Q.   And that was inappropriate in your view?

19      **A.   Yes.**

20      Q.   Why?

21      **A.   Because it was undermining Judy's ability to do**

22    **her job with a direct subordinate of her.**

23      Q.   Okay.

24           And as a result of that HR investigation, was

25    there a conclusion reached that he, in fact, was

1   undermining Judy Shepard-Hall?

2       A.   I don't recall the specifics of that, but

3   certainly in my mind, that was a concern; that was

4   validated; that -- that Judy's concern was real; that

5   Will had been discussing the operations of the Housing

6   Authority and making, I don't want to say

7   recommendations, but certainly suggestions to LaTanya.

8            And so we -- so we counseled him that that

9   needed to stop and the relationship with LaTanya just

10  needed to stop, as far as taking her out to lunch and

11  discussing Housing Authority at that time.

12      Q.   Is it LaTanya or Tanya?

13      A.   LaTanya.

14      Q.   That's what I thought.  I thought I heard you

15  say Tanya and doubted myself.

16      A.   Speak up.

17      Q.   All right.

18           So did you and Heather Ruiz verbally counsel

19  Will Morat about the situation?

20      A.   Yes.

21      Q.   And you told him what?

22      A.   Told him that he needed to discontinue doing

23  that as far as meeting with her and discussing the

24  Housing Authority issues.  And I did tell him I thought

25  it was inappropriate for him to be taking her out to

1    lunch on a regular basis, especially in her role as the

2    Housing -- being right under Judy Shepard-Hall.  And so

3    I told him he needed to discontinue that, and certainly

4    be respectful of Judy.

5        Q.    Okay.

6             And he followed those instructions up until the

7    point you had to put him on administrative leave?

8        A.    Yes.

9        Q.    Okay.

10            So during this time frame, a year prior to the

11   administrative leave up until the administrative leave,

12   were you aware that LaTanya was making complaints

13   against Judy Shepard-Hall?

14       A.    Yes.  I mean, I had been told that by others.

15       Q.    What type of complaints did you learn of?

16       A.    I don't recall specifics of what her complaints

17   are.  I heard it through Will and Slater and in talking

18   to the -- Heather Ruiz, the HR director.  All three of

19   those mentioned some type of complaints.

20       Q.    Okay.

21            And do you recall there was a specific

22   complaint that was made that led up to the

23   administrative leave?

24       A.    Can you --

25       Q.    Yeah.

1          Are you familiar that -- with the fact that

2     LaTanya made a specific complaint about Judy

3     Shepard-Hall that Will got involved with that led to his

4     administrative leave?  Just in general?

5          A.   I -- I placed Will on administrative leave and

6     that was -- it was not --

7               (Stenographer clarification.)

8               THE WITNESS:  I was not aware of that and the

9     complaint was not an issue.

10         Q.   (By Mr. Strauss)  Okay.

11              Are you aware of HR investigating complaints

12    that LaTanya made against Ms. Shepard-Hall?

13         A.   I was told it was -- her complaints were

14    reviewed --

15         Q.   When?

16         A.   -- through Heather.

17         Q.   When in this time?

18              MS. SHESTON:  When was he told or when were

19    they reviewed?

20         Q.   (By Mr. Strauss)  When were you told?

21         A.   I -- my best recollection, it was more than

22    just at this period of time, and then prior to that,

23    that I was informed there were complaints.

24              And I think -- yeah.

25         Q.   Did anyone ever share with you the results of

1    any of those complaints?  Whether they were

2    investigated, whether any findings were made?

3        A.   My recollection is that Heather mentioned that

4    there were.  There were issues on, actually, all three

5    sides when it came to Will, as well, that there was no

6    one person.  They all had -- they all had parts or

7    pieces of it that needed to be changed or should have

8    been changed.

9        Q.   When did Ms. Ruiz tell you that?

10       A.   I don't know specifically, but it was before

11   putting Will on administrative leave, and it was months

12   before.  Because I don't recall much conversation.

13            I think a lot of it -- a lot of the time period

14   would be when I agreed to move LaTanya over to Economic

15   Development to try to relieve that -- the friction and

16   conflict there over to Will Morat in Economic

17   Development.

18            And so in that window of time, I believe, is

19   when we had the conversation about all parties here are

20   of some fault.

21       Q.   Okay.

22            And so at some point in time, you, again, made

23   Will Morat LaTanya's direct supervisor, as opposed to

24   Judy Shepard-Hall?

25       A.   They requested that I move -- that I allow that

1    to occur and I concurred.

2        Q.   And when did that happen?

3        A.   I don't --

4        Q.   Okay.

5            So we began this journey when I asked you why

6    did you place Will Morat on administrative leave and --

7        A.   Correct.

8        Q.   -- you said, Well, it goes back to the HR

9    investigation a year or so before?

10       A.   Correct.

11       Q.   And what's the connection?

12       A.   So we had that counseling session, and then --

13   so my understanding of this -- a particular incident

14   occurred where Judy Shepard-Hall was holding a meeting

15   and invited Mr. Morat, Will, to it.  And Mr. Morat

16   showed up with LaTanya, who wasn't invited to the

17   meeting.

18           And my understanding is they -- Will and Judy

19   went out into the hall where she explained that to him,

20   and he became very frustrated and agitated, and he went

21   back in the room and he and LaTanya both left the

22   meeting.

23       Q.   Okay.

24       A.   And then I was told by one of the individuals

25   in that room that he came back and started talking about

1    the problems with Judy.  And then later, we received an

2    e-mail of him outlining Judy being discriminatory first

3    against LaTanya.

4            And without knowing all these details, I

5    felt -- I felt strongly that I needed to stop this

6    situation, which was basically -- what do you call it --

7    recurrence or a building on top of what was already a

8    problem, and his public -- or his discussing with other

9    employees, his personnel issues with Judy, I found

10   extremely inappropriate.  And so I placed him on

11   administrative leave until we could investigate it, and

12   I would be able to find out the facts of that decision.

13       Q.   Okay.

14            And earlier you had been told by Heather Ruiz

15   that this was sort of a three-headed problem with the

16   three folks involved; right?

17       A.   Correct.

18       Q.   And did you consider placing Judy Shepard-Hall

19   on administrative leave?

20       A.   Yes.

21       Q.   Okay.

22            Why did you not do that?

23       A.   Because I felt that, first of all, Will was --

24   in the specific instance that we already investigated,

25   Will was found that he needed to -- he needed to be

1    counseled for it.  So he was already on notice of that.

2            But when he actually went back in the room and

3    started discussing a personnel matter and his issues

4    with Judy with other employees, and then to actually put

5    it in writing afterwards, I felt that was extremely

6    inappropriate.  And at that moment, I made the decision

7    because of those actions, I would put him on

8    administrative leave.

9    Q.   Okay.

10   A.   Those two -- we say in the neutrality of who

11   was at fault here, those two actions, where he went out

12   and started the discussing that LaTanya is the one

13   that's discriminated against and started making those

14   public accusations, I felt that was -- that that was

15   inappropriate for him to do that in regards to another

16   employee.

17           He should have gone to Human Resources, he

18   should have gone to the City Attorney's Office, and not

19   ended up going to -- to them -- to the employees that

20   were in the room.

21   Q.   Who was in the room?

22   A.   Well, I think the person I heard it from was

23   Gillian Hayes, the Planning director was in the room.

24   Q.   Is it true that everyone in the room other than

25   LaTanya was at the director level?

1      A.   I don't know.

2      Q.   Were there -- was there anyone there that

3    you're aware of who was not a director?

4      A.   I don't know.

5      Q.   You don't think it's appropriate for directors

6    to discuss personnel issues between themselves?

7           MS. SHESTON:  Vague and ambiguous.  Overbroad.

8    Lacks foundation.

9           Go ahead.

10          THE WITNESS:  Generally, I would say no to

11   cross over into the other departments or other neutral

12   parties.  I think that there were other lower-level

13   employees in that room as well.  I'm just not confident

14   that there was.

15          So I think that it's -- you can talk about

16   employees, but certainly personnel matters should be

17   handled through the Human Resources group or through the

18   City Attorney's Office or me.

19     Q.   Before placing Will Morat on administrative

20   leave, who in HR did you consult with?

21     A.   Heather Ruiz.

22     Q.   What did you discuss with her?

23     A.   Discussed the particular verbal communications,

24   but even more the written communication; that it was

25   inappropriate for him to put out e-mail in regards to

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    his opinion of Judy's position as Housing Authority

2    director.

3        Q.   Which of you raised the suggestion of putting

4    him on administrative leave?

5        A.   I don't recall which of us.  I made the

6    decision.

7        Q.   Did she concur in that decision, as far as you

8    understood?

9        A.   Yes.

10       Q.   Did you consult with any lawyers before putting

11   him on administrative leave?

12       A.   I don't recall.

13       Q.   Okay.

14            And what was the purpose of him being on

15   administrative leave?

16       A.   So that we could investigate the incident.

17       Q.   Was it meant to be a disciplinary action or you

18   just wanted him out of the way to investigate?

19       A.   I didn't -- it was -- it was absolutely not a

20   disciplinary action.  It was simply to get the facts of

21   what happened from everybody; Judy, Will, and certainly

22   those who were present in the room as well.

23       Q.   Was it a paid leave?

24       A.   Yes.

25       Q.   Was he supposed to do any work while he was on

1    leave?

2        A.    No.

3        Q.    Why couldn't you investigate without putting

4    him on administrative leave?

5        A.    Because I was concerned of all the things that

6    had been adding up to this moment in time and that I

7    didn't feel that I could trust him to stick to the

8    issues related to economic development, and there would

9    be further issues with other departments.

10            His requirement to do his job, he needed to be

11   working with all sorts of other department heads and

12   Planning, City Attorney's Office, and I was not

13   comfortable with him continuing to have that presence in

14   the organization at that time.

15       Q.    What were you concerned he might do if he was

16   not removed from the workplace?

17       A.    I was concerned that he was obviously very

18   agitated and angry about the incident, and I'm sure

19   he -- well, I'm sure -- I'm quite sure he was much more

20   agitated on the fact that being on administrative leave,

21   and I was not comfortable with him working within the

22   organization with that level of agitation.

23       Q.    Are you saying that you observed him become

24   more agitated after you told him he was on

25   administrative leave?