1       A.   When I met with him to let him know that, he

2   asked me the same questions that Slater would ask, is,

3   Why me?  Why not her?

4            And certainly the fact that he was so agitated

5   about how the meeting went with Judy, I just -- I sensed

6   that certainly he was aggravated and agitated that it

7   was him and not her.

8       Q.   And, again, my question was:  Did you observe

9   him become more agitated after you informed him he was

10  being placed on leave?

11      A.   Only during a conversation, brief conversation,

12  that he was agitated, that the fact that he was being --

13           (Stenographer clarification.)

14           THE WITNESS:  -- being put on leave and not

15  her, Judy.

16      Q.   (By Mr. Strauss)  You'd seen him be agitated

17  before, hadn't you?

18           MS. SHESTON:  About this?  Generally?

19      Q.   (By Mr. Strauss)  In general?

20      A.   Yes.

21      Q.   And he calmed down at some point; right?  He

22  didn't stay agitated for the rest of the time you knew

23  him?

24      A.   No, he didn't.

25      Q.   So why did you think in this instance, that his

1    agitation would be an ongoing problem?

2        A.    So there were a few incidents where he was

3    agitated during conversations about negotiations.  And

4    as time went on and some -- he disagreed with me very

5    adamantly or vehemently, as time went on, I felt that he

6    began withholding more information from me, less

7    communicative.

8            He continued to generally do his job, but I was

9    concerned about this escalating sentiment I was getting

10   from them, that they were unhappy with me, when it came

11   to my role as city manager.

12       Q.    Okay.

13           So are you saying that your observation of

14   Will, in particular, being agitated over concerns he had

15   with projects he was working on with you, led you to

16   believe that his agitation over the LaTanya/Judy

17   Shepard-Hall incident would become a bigger problem?

18       A.    Yes, I was concerned that, especially in light

19   of the fact that Judy Shepard-Hall was a -- a protected

20   minority, that if that same type of behavior that I

21   started to see in him towards me went that direction, it

22   would cost the City a whole lot in liability if a

23   lawsuit came forward.

24       Q.    Did Judy Shepard-Hall sue the City, to your

25   knowledge?

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1       A.   Yes.

2       Q.   And did she accuse you of anything in her

3   lawsuit?

4       A.   Yes.

5       Q.   What did she accuse you of?

6       A.   Discrimination.

7       Q.   And are you being paid to cooperate in that

8   case?

9       A.   Yes.

10      Q.   And is that case ongoing?

11      A.   Yes.

12      Q.   Do you know where -- what's happening in that

13   case as of right now?  Have you testified -- let me

14   withdraw that.

15           Have you testified in that case?

16      A.   No.

17      Q.   Have you been notified that your deposition

18   will be taken?

19      A.   No.

20      Q.   Did -- to your knowledge, did Judy Shepard-Hall

21   accuse Will Morat of discrimination in that lawsuit?

22      A.   I don't know.  I don't -- I'm not aware of

23   that.

24      Q.   But you are aware she accused you of

25   discrimination?

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1      A.    Yes.

2      Q.    Okay.

3            Now, couple minutes ago, you told me about your

4   concerns about Will Morat being agitated in

5   conversations with you about deals he was working on;

6   right?

7      A.    **Correct.**

8      Q.    And I think you -- you included Slater Matzke

9   in that, as they were both agitated; right?

10     A.    **They were -- they were a -- a couple specific**

11  **ones were they were both on the telephone with me, the**

12  **other one was in the office.**

13     Q.    Okay.

14           Was there more than one occasion where you

15  observed either one of them being agitated about you in

16  connection with the development deal?

17     A.    **I think their -- I mean, their agitation was**

18  **towards my decision.**

19     Q.    Okay.

20           But is it -- is it more than one decision or is

21  this something that happened several times?

22     A.    **There are a couple times that I can recall**

23  **specifically.**

24     Q.    Okay.

25           I'd like to know everything you could remember

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    about those times.

2           So what's the first one you remember?

3       A.    There were the two of them that I can very

4    specifically recall, I can't remember, they were similar

5    in timelines, I can't remember which one comes first or

6    second, but the --

7           (Stenographer clarification.)

8           THE WITNESS:  -- the Nimitz, N-i-m-i-t-z, the

9    owners of the -- of the -- of Mare Island.  And they had

10   been discussing with the Southern Land Corporation, out

11   of Nashville, joining the development team or becoming

12   the developer of Mare Island.  And I had been notified

13   that they would like to -- Southern Land Company wanted

14   to come and introduce themselves to City councilmembers

15   individually.

16          And so we arranged that, and I -- I told Will

17   and Slater that, and they became quite upset at me,

18   that -- and told me that they needed to see who -- that

19   they needed to meet the Southern Land Company before the

20   City councilmembers met them.

21      Q.    (By Mr. Strauss)  Okay.

22          Do you have any time frame as to when this

23   incident happened?

24      A.    I'm not good with dates, but the timeline was

25   very -- very soon after that, they announced their

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    partnership.  So I don't recall.

2        Q.   2020?  2019?

3        A.   It probably would have been late 2019 or early

4    2020.

5        Q.   Okay.

6             So their concern was that they wanted to meet

7    the new SLC people on the scene before they met with the

8    Council?

9        A.   Yes.

10       Q.   Did they say why they were concerned about

11   that?

12       A.   Yes.

13       Q.   What did they say?  And if it's one individual

14   versus the other, or if you lump them together, let me

15   know.

16       A.   I think they both felt --

17       Q.   Okay.

18       A.   -- the same way.

19       Q.   That's my understanding.

20       A.   What they told me was -- is that Southern Land

21   Corporation needed to know that the people they needed

22   to deal with were Slater and Will and not the elected

23   officials.

24       Q.   Okay.

25             Did they say why they felt that way?

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1        A.    No, not specifically.  But you -- but, you

2    know, no.  I mean, that -- they would be the -- Slater

3    and Will were the lead negotiators and would be

4    continuing to be that.

5        Q.    Okay.

6        A.    I told them to honor the request of the

7    Southern Land Company.  And they were like, You have to

8    get us into that meeting before they talk to them that

9    we can tell them that the City Council -- that they

10   should be having conversations and discussions with Will

11   and Slater, not with the City councilmembers.

12           They were quite upset when I told them I would

13   get them into a meeting, as I would, to meet the

14   Planning department, Economic Development department,

15   and everybody else, but they were quite upset.

16           And what concerned me about that was the fact

17   that they felt like -- almost felt like they were above

18   the City councilmembers, Will and Slater, to kind of

19   get -- I felt their intentions was to tell them, You

20   need to deal with us, not the City councilmembers, and

21   they specifically wanted to introduce themselves to the

22   City councilmembers as far as who they were and show

23   them some of their brochures and so forth.  And Will and

24   Slater were very upset that I did not allow them to go

25   first.

1      Q.   Does the City Council have any direct role in

2    those negotiations?

3      A.   They do not have a direct role.

4      Q.   So it was just a matter of timing they were

5    concerned about?

6      A.   Let's just say Southern Land Company, at this

7    point in time, was not part of any negotiations.

8    Because they weren't -- it was Nimitz Group only.  And

9    so, you know, Will and Slater were Economic Development,

10   and I understand their desire to be engaged in this, but

11   my decision to honor Southern Land's desire to introduce

12   themselves to Council before, upset them.

13     Q.   Okay.

14          What did they do to lead you to that conclusion

15   that they were upset?

16     A.   They were adamant.

17     Q.   They strenuously objected?

18     A.   Strenuously objected.  Thank you for that.

19     Q.   What did they do?  What did they actually do,

20   though?

21     A.   Well, it -- so they're just having the

22   conversation with me that this -- this developer needs

23   to know that not to go to Council, but to go to them.

24   And, you know, these developers and Southern Land are --

25   they're large developers; they're not developers that we

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    might see doing a small project and locally in Vallejo.
2    And so they understand that it's the city manager and
3    his staff, that's where the negotiations happen.  But
4    you also have to build a relationship with your elected
5    officials because, ultimately, that's who makes the
6    decision.
7            And so they just -- they kept pushing me on it.
8    That's when I say frustrated, agitated, whatever that
9    might be, is they didn't accept it and say, Well, that
10   makes sense.
11           So some of the pushback I was gotten, but
12   that's a certain instance.
13   Q.   And how did that agitation that you observed in
14   connection with this discussion about Southern Land
15   compare to the agitation sometime later, I take it,
16   where Will was agitated about Judy Shepard-Hall and the
17   incident with LaTanya?  What -- how were they related,
18   in your mind?
19   A.   I would say I can understand Will being
20   agitated about being placed on administrative leave.
21   Basically someone has two ways, either to accept that or
22   you start debating and arguing it.
23           And so that one -- this one was, in my opinion,
24   incidental when it came to the operations of the City
25   and roles and they were very forceful in trying to say

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

```
1    it needed to be them before the City councilmembers.
2            And honestly, I answer to City councilmembers
3    and there is a relationship that needs to happen, and
4    typically, a developer of this magnitude, of the project
5    scale, will want to build a relationship with the City
6    councilmembers as well.  And that was their desire.
7            So what I would say is the -- the -- I mean,
8    there's different levels of aggravation.  And I was
9    surprised to see the pushback when it came to this
10   simple decision, in my mind, to say, They want to meet
11   with Council.
12           (Stenographer clarification.)
13           THE WITNESS:  -- with City Council.
14       Q.   (By Mr. Strauss)  In connection with that
15   decision regarding Southern Land, did either Will or
16   Slater tell you they thought something improper,
17   immoral, illegal, unethical was going on?
18       A.   Not that I recall.
19       Q.   Okay.
20           By the way, did Will accept his administrative
21   leave?  Did he go home or did he stay and refuse to
22   leave the premises?
23       A.   He accepted.
24       Q.   Okay.
25           He never came back?
```

```
 1        A.   Not that I'm aware of.

 2        Q.   What was the plan when he was on administrative

 3   leave?  To conclude the investigation and then if,

 4   assuming he wasn't found to have done something wrong,

 5   bring him back?

 6        A.   Certainly to evaluate the -- that particular

 7   instance.  So I looked at it as an isolated incident.

 8        Q.   Right.

 9             There was no decision made that he was going to

10   be terminated --

11        A.   No.

12        Q.   -- before any investigation; right?

13        A.   No.  Correct.

14        Q.   And did you ever see the results of an

15   investigation?

16        A.   I did not see the results of the investigation.

17        Q.   Do you know if the investigation ever happened?

18        A.   I -- I don't recall for sure --

19             (Stenographer clarification.)

20             THE WITNESS:  -- that the investigation

21   happened.

22        Q.   (By Mr. Strauss)  Did you decide to terminate

23   Will Morat for reasons completely unrelated to this

24   LaTanya/Judy Shepard-Hall incident because it had not

25   yet been investigated as of the time you fired him?
```

1           MS. SHESTON:  Lacks foundation.  Vague and

2    ambiguous.

3           THE WITNESS:  Can you repeat the question.

4    Q.   (By Mr. Strauss)  Sure.  Let me break it down.

5           You made the decision to terminate Will Morat;

6    correct?

7    A.   Correct.

8    Q.   As of the time you made the decision, had you

9    received the results of any HR investigation into his

10   conduct with respect to the LaTanya/Shepard-Hall

11   incident?

12   A.   I don't believe I did.

13   Q.   So is it fair to conclude that that incident

14   had nothing to do with your decision to terminate him?

15   A.   That incident was concerning to me.

16   Q.   But you were keeping an open mind, waiting for

17   the investigation to happen; right?

18   A.   Correct.

19   Q.   So what role, if any, did it play in your

20   decision to terminate?

21   A.   My decision to terminate -- terminate him --

22   that incident was one small piece, and had that been the

23   only incident, it would have been investigation

24   completed and acted upon just that one.

25          But there had been a lot of issues pertaining

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    to development, Economic Development, so to say.  I

2    eliminated that incident completely out of my mind,

3    would not be true.  So yes, it played a small piece in

4    the overall decision, but the things that had been

5    happening over time --

6            (Stenographer clarification.)

7            THE WITNESS:  Incidents that were happening

8    over that time --

9            (Record read.)

10           THE WITNESS:  -- led up to my decision to

11   terminate him.

12       Q.   (By Mr. Strauss)  All right.

13           Had you ever placed any other employee on

14   administrative leave other than Mr. Morat, while working

15   for Vallejo?

16       A.   I don't believe I have.  I terminated, but not

17   placed anybody on administrative leave.

18       Q.   Other than Mr. Matzke and Mr. Morat, you've

19   terminated other employees?

20       A.   Correct.

21       Q.   How many?

22       A.   Three or four.

23       Q.   Okay.

24           Do you have particular people in mind?  Not

25   asking for any names.

July 19, 2023

1       A.   Do you want their names?

2            MS. SHESTON:  He says he's not asking for

3   names.  I think what he's asking is are you thinking of

4   particular instances?  So it's kind of a yes-or-no

5   question.

6            THE WITNESS:  Yes.

7       Q.   (By Mr. Strauss)  Okay.

8            So when you say three or four, are there -- you

9   can visualize who these people are?  You know who they

10  are?

11      A.   Yes.

12      Q.   Okay.

13           When were they terminated?  Were they all

14  before Morat and Matzke?

15      A.   Yes.

16      Q.   How -- over what time frame?

17      A.   The -- within the first year.

18      Q.   Okay.

19           Were any of them at the director level?

20      A.   Yes.

21      Q.   Can you tell me the reasons why you made the

22  decision to terminate these individuals.  Take them one

23  at a time.  I'm not asking names, just generally what

24  was the -- what was the reason?

25           MS. SHESTON:  So if you can answer that by

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    describing the nature of a concern or performance issue

2    or something.

3            MR. STRAUSS:  Yeah.

4            MS. SHESTON:  Without giving up enough

5    information that the person is identifiable, let's do

6    that.

7            MR. STRAUSS:  And trust me, I won't have any

8    idea who they are if that was in your first year.

9            **THE WITNESS:  Withholding information from me**

10   **and from the City Council.  Very poor customer service.**

11   **Not good -- causing friction within the leadership team.**

12   **And then just some inability to move, to get their work**

13   **accomplished accurately.**

14       Q.  (By Mr. Strauss)  All right.

15           And you just listed four reasons.

16           Are those four distinct individuals or do some

17   of these apply to the same person?  More than one?

18           MS. SHESTON:  In other words, is there overlap?

19           **THE WITNESS:  On some of them, yes.**

20           MR. STRAUSS:  Thank you.  Okay.

21       Q.  (By Mr. Strauss)  Were any of these individuals

22   below the director level?

23       **A.  No, but they answered directly to me.**

24       Q.  So they were either a director or an assistant

25   to you?

**GREGORY A. NYHOFF, VOLUME I**

**July 19, 2023**

1      A.    Yes.

2      Q.    Okay.

3            And was HR involved in any of the decisions to

4    terminate them?

5      **A.    They provided me guidance and assistance and**

6    **counseling.**

7      Q.    Were any of them investigated by HR prior to

8    the termination?

9      **A.    No.**

10           MR. STRAUSS:  Okay.  All right.

11           You okay going a few more minutes and then we

12    can break and talk about a lunch break?

13           MS. SHESTON:  Sure.

14           **THE WITNESS:  Yes.**

15           MR. STRAUSS:  Okay with you?  How about you

16    guys?

17      Q.    (By Mr. Strauss)  So we were talking about

18    instances where Will and Slater were agitated about

19    decisions you made, and you gave me one example

20    regarding Southern Land Company.  I got the impression

21    that there was at least one other incident that you were

22    thinking of.

23           Am I correct?

24      **A.    Yes.**

25      Q.    Well, tell me about that incident.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
 1        A.   So the Nimitz Group made a decision to
 2   terminate two people from the staff, that being Nate and
 3   Stacy, and I cannot remember their last names, but they
 4   were the lead negotiators for Nimitz through most of
 5   this process.  They were working with the owners and
 6   kind of managing the project in the early days.  And
 7   there was a decision made by the ownership team to
 8   terminate those two employees.
 9             And it was quite apparent to me that over time,
10   that Will and Slater and Shannon, because that was the
11   negotiating team, had -- had -- had a really good --
12   good relationship with them, which is great.  So did I.
13             And so I was informed that they were let go,
14   and I went and told Will and Slater that they were let
15   go.  They seemed to be quite shocked about that, which
16   is understandable, as was I, but -- so we had some brief
17   discussion, and I said I know nothing about it, you
18   know, why or anything; it was a decision of the company
19   to do that.
20             So probably within 24 hours, they started to
21   indicate to me, Well, businesses are asking what
22   happened with Will and Slater, and they started
23   saying --
24             MS. SHESTON:  Asking about Will and Slater or
25   asking --
```

1              THE WITNESS:  No.  They were talking about
2    those two, Nate and Stacy --
3        Q.   (By Mr. Strauss)  Yeah.
4        A.   -- and their termination.
5              So Nate and Stacy were -- like, they were the
6    communication people with Nimitz, along with the
7    gentleman by the name of Brian Nagy.  Everybody knew
8    those three people that were on Mare Island businesses.
9              So Will and Slater were very concerned about
10   the -- about being able to answer the questions as to
11   why these two were let go.
12             And so later that afternoon, I just -- I got a
13   phone call, and those two were on the phone, and I was
14   in my vehicle, and they said, We're getting a lot of
15   questions, Southern Land Company needs to get out a
16   press release, they need to put something out that says
17   why they were terminated, and that they're terminated,
18   because there's questions out there.
19             And so I said, That's very understandable.  But
20   Brian Nagy, who was actually there when Lennar was
21   there, prior to the Nimitz Group, who was the business
22   liaison with everybody, he had moved over to Nimitz
23   Group, or Southern Land, whichever it was, I don't know
24   for sure, but he would be the contact for any of those
25   businesses, because they all knew him.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1             As far as answering the question, I didn't have

2    an answer for it, and it wasn't ours to put out, or nor

3    was it mine to demand of the owners of that company to

4    put out a press release.

5             So we probably spent 25 minutes on the phone,

6    and I multiple times told them, We're not putting out a

7    press release, we're going to honor the wishes of the

8    company, and that's their decision; it is not ours, we

9    have nothing to do with this, and so we're going to

10   leave it alone.

11            And they were adamant and for 20 minutes, they

12   argued with me about the fact that it wasn't going to be

13   enough to tell them to talk to Brian Nagy and the

14   company needed to put out a press release.

15            And I -- that, I found that, once again, this

16   extreme pushback and agitation over something that was

17   not our decision to make, wasn't our decision, about a

18   company to do something, when, indeed, there was a

19   spokesman on the island, Brian Nagy, who they all knew,

20   and that's who I finally instructed them, Just tell the

21   businesses to go talk to Brian Nagy, period.

22            And because they wouldn't stop arguing with me.

23   And it surprised me and shocked me, that kind -- that

24   level of pushback on what seemed to be -- I understood

25   their concern about the businesses asking questions, but

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    the fact that they were demanding a press release on it,

2    versus just saying, you know, Go talk to Brian Nagy.

3            So I had to basically -- I had to tell them,

4    That is how you are to respond to these businesses,

5    because they kept saying, What are we supposed to say?

6            So I was shocked at that.  And a little

7    follow-up that -- so I could -- it was very clear they

8    were very unhappy with my decision to say that's how

9    you're going to message that to the businesses who have

10   questions of you, that it was within two days later,

11   meeting with Mayor Sampayan, and he said, I saw Slater

12   in the hallway and -- and I asked him, So what do you

13   think about Nate and Stacy, you know, being removed from

14   Southern Land, because the mayor knew them as well; they

15   were quite well-known.

16           And, you know, as someone who works directly

17   for me, I would have expected, you know, him to say, You

18   probably -- you should discuss that with Greg.  Or

19   explain to them what I had -- how I had got to the

20   conclusion that said, You need to go talk to Brian Nagy,

21   because he's -- that's who is with Southern Land.

22           And Slater told the mayor, Why don't you go

23   talk to Brian Nagy.

24           And I found that almost, I thought, Why would

25   you tell the mayor that?  I understand I told you to

1    tell the businesses to do that, but why would you tell

2    the mayor to go talk to Brian Nagy, when the mayor can

3    just talk to me?

4        Q.   Did you know reasons why they were let go?

5        A.   I did not.

6        Q.   Okay.

7        A.   And so that was another incident of, as -- as

8    things escalated it, it was -- our relationships was

9    very good working together.  We -- we worked through a

10   lot of term sheets.  And understand, I -- I did have

11   input to put into those, even though they did the

12   majority of the work.  They -- Will, Slater, and --

13       Q.   Shannon?

14       A.   -- Shannon.

15            So that incident, again, was -- it felt very

16   challenging.  They were challenging me, saying, You're

17   not doing the right thing or something here.

18            And probably the last one is that -- is the

19   whole conversation about substantially.

20            Do you want me to talk about that now or that's

21   a story that --

22            MR. STRAUSS:  Why don't we go off the record.

23            THE VIDEOGRAPHER:  All right.

24            The time is 12:39 p.m. and we are going off the

25   video record.

```
1              (Recess taken from 12:39 p.m. to 1:15 p.m.)

2              THE VIDEOGRAPHER:  The time is 1:15 p.m. and we

3     are back on the video record.

4         Q.   (By Mr. Strauss)  All right.

5              Welcome back, Mr. Nyhoff.

6         A.   Thank you.

7         Q.   Ready for more?

8         A.   Absolutely.

9         Q.   Appreciate that.

10             So before the break, just before the break, you

11    were about to tell me the saga of the word

12    "substantially."  And I can phrase that hopefully in the

13    form of an admissible question, if you'd like.

14             Did you have some -- experience some agitation

15    on the part of Mr. Morat or Mr. Matzke regarding the

16    word "substantially" in a contract?

17        A.   Yes.  Yes.

18        Q.   What happened?

19             MS. SHESTON:  Belated objection to the use of

20    the word "contract" as vague and ambiguous.

21        Q.   (By Mr. Strauss)  I'm going to substitute the

22    word negotiation.

23        A.   Okay.

24             So, again, Will Slater and Shannon are the

25    negotiators, and so they had been negotiating for
```

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
1    probably a couple months, a few months, and it appeared
2    that, you know -- so I would get briefed, and we'd talk
3    about some of the terms of it, and they'd go back and
4    work through it from the City Attorney's Office.  So it
5    was going, seemed to be going very, very well, the
6    negotiations with -- it was Nate and Stacy.
7            So I went over to their headquarters building,
8    just -- I just was going to stop by and see if Dave
9    Phinney was there; he wasn't, but Nate and Stacy were
10   upstairs.  I went up there and just asked them how it's
11   going.  Just, I hadn't heard anything, good, bad or
12   otherwise.
13           And Nate said that it wasn't going okay.  And
14   the fact of the matter is he could not recommend this
15   agreement with the words "100 percent, complete," that
16   were -- which were what Will and Slater were
17   negotiating.
18           And he explained why -- why he was -- why he
19   was concerned with that, because it's a multimillion
20   dollar deal, part of it's the land, the sale of the
21   land, there's going to be a lot of expenses in cleaning
22   up properties.
23           And he said at 100 percent means that if you
24   don't have a punch list left on a $40 million project or
25   a tree not planted in the landscaping, the City, based
```

GREGORY A. NYHOFF, VOLUME I

1    on "100 percent," could take it all back, including

2    whatever they built.  And he said, I can't accept that.

3             And so I asked him, I said, What are you --

4    what terminology would you accept?

5             And he said, Well, substantially complete.

6    That way, if we have minor items that aren't complete,

7    the City has no -- you know, we can agree that

8    substantially complete is appropriate.

9             And so I thought that was reasonable; it made

10   sense to me.  I'd done a lot of -- I hadn't been the

11   negotiator on the teams, but I'd worked with a lot of

12   businesses and "substantial" versus "100 percent" is

13   quite normal because it's -- when you're in that big of

14   an agreement that's going to be going on for probably

15   30, 40 years, having 100 percent something is always

16   going to be a little difficult, especially when there's

17   so much unknowns, things might come up.  And his concern

18   was the City has the ability to take everything they did

19   and -- and take it under ownership.

20            So I brought Will and Slater in and I said,

21   Just talked to Nate, and Nate is concerned and said he

22   can't support this without the word "substantially."

23            And so Will -- Will explained his position --

24   and I keep saying Will because he's the -- he's the one

25   who spoke most often about the technical, specific side;

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1   that, you know, that 100 percent means we guarantee,

2   they're going to have to guarantee it gets done, and

3   then in his mind, that was the best for the City.

4          And I understood that, and so I explained the

5   substantial -- substantially complete, which means

6   almost complete, almost 100 percent, but the fact of the

7   matter that I understood the request by Nimitz Group,

8   that they were concerned that 100 percent was too rigid,

9   and it didn't allow some flexibility for either party to

10  say, You know what, you've made substantially complete,

11  and agree to that.

12         They were -- they stood strong on their

13  position on that and said, We think it needs to be 100

14  percent.  And we discussed it, and pretty much that was

15  the end of that conversation, but we brought it back up

16  soon after.  And I raised it to Will again, and I said,

17  I need you to put the word 'substantially' complete in

18  there.  I think that's appropriate.  I think it's common

19  in development projects of this magnitude.  And so I

20  want to see that word in there.

21         And Will looked at me and said he will not do

22  the presentation with that word in there.

23    Q.   (By Mr. Strauss)  Okay.

24         And when did this happen?  We can't help you.

25    A.   I know.  I was just thinking.

1          MS. SHESTON:  Well, if you can -- if you can

2     give an estimate or tie it to something else, that would

3     be great.  If you really can't, that's okay, too.  Just

4     say so.

5          THE WITNESS:  It -- well, I -- putting on

6     administrative leave was a pretty hard line timeline, so

7     it was -- it was months before that.

8          Q.   (By Mr. Strauss)  Okay.

9          A.   And it would be months before -- you know.  So

10    probably six months, maybe more, kind of that

11    original -- we were in the original conversations and

12    meetings to try to come up with an agreement.

13          So I asked him, What do you mean by that?  You

14    won't do the presentation if I -- if I tell you I want

15    that word in there?

16          And he said, I'm not going to do the

17    presentation.

18          And I felt, wow, you know, at the end of the

19    day, it's my responsibility here on this term agreement,

20    what I present to City Council.  I felt it was fair, and

21    I felt it was common, and I was surprised to see his

22    pushback and to say to me, Well, then I'm not going to

23    do the presentation.  I thought it was almost

24    insubordinate.

25          So I told him, You know what, then I'll just

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    have to find somebody else to do it.  In other words,

2    we're going to go forward with this project with that

3    word in there.  If you won't do it, then I will find

4    somebody else to do it.

5          But then I took -- so I was -- I didn't want

6    that kind of -- I didn't feel comfortable with how we

7    left that.  So I ended up asking -- and this is one of

8    these situations where you talked earlier, we discussed

9    the getting a second opinion.

10          So I said, You know what, I'm going to ask the

11    city attorney, Claudia Quintana, and Randy Risner, the

12    assistant city attorney, to meet with Shannon, Will,

13    Slater, and I.  And we'll ask them, you know, Is that a

14    term of -- of concern, substantially, or not?

15          And so I ended up bringing us all together and

16    discussed it with the Attorney's Office, and both the

17    city attorney and the assistant city attorney said yes,

18    it's very common; we don't have any problem with that.

19    As so after that, you know, it all went away as far as a

20    conversation about the word "substantially."

21          But until I did that, and just really surprised

22    me, and felt very insubordinate for him to look at me as

23    the city manager and his direct boss and tell me he

24    wouldn't do that, especially on such a big project, for

25    one word, that wasn't very far off 100 percent, versus

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

 1   substantially complete.

 2           So it was just one of those -- another

 3   situation where the pushback, and the, almost, You know

 4   what, it's not your decision to make, Greg, it's ours,

 5   and if you don't agree with us, then we're just not

 6   going to do it.

 7           That was kind of another incident, as we've led

 8   up to, even the -- even the administrative leave.

 9      Q.   Okay.  Thank you for that.

10           So who made the presentation, if anybody?

11      A.   Yeah, so, I mean, Will made the presentation,

12   and so only after I brought up the City Attorney's

13   Office into the situation was it all seemed fine.  There

14   was no more conversation about the word "substantially"

15   versus "100 percent."  So we moved forward after that.

16      Q.   They both dropped it after that?

17      A.   Yeah.  And I think Shannon was probably --

18   agreed with them because she was part of the negotiating

19   team on the "100 percent."

20      Q.   I was going to ask you that:  Did Shannon

21   Eckmeyer express an opinion whether "substantially" was

22   an appropriate term for the contract?

23      A.   I don't recall her doing that.  It wasn't --

24   you know, it wasn't a legal decision.  It was more a

25   policy decision --

1          Q.   You don't remember her expressing -- I'm sorry.
2     I talked over you.
3               You don't remember Shannon Eckmeyer expressing
4     the view that it was not in the best interest of the
5     City to use the term "substantially"?
6          A.   I don't recall her saying that.
7          Q.   Did either Will or Slater ever drill down
8     and -- and tell you exactly where they had concerns
9     about the use of the word "substantially"?  What they
10    thought might happen if that word was used?
11         A.   They -- they did explain to me their reasoning
12    behind it, yes.
13         Q.   What did they share with you?
14         A.   They -- they shared that Vallejo was known for
15    its lack of success in projects and putting "100
16    percent" on there would assure that the project would
17    get done.
18         Q.   Okay.
19              Did they refer to any specific projects that
20    were in the past that had failed because they didn't
21    have "100 percent" in it?
22         A.   I don't recall any specific ones, but certainly
23    their comment about the Modesto -- Modesto -- Vallejo
24    had failed on other projects; that putting "100 percent"
25    in there would ensure that.

1      Q.   Were you aware of other projects that had

2   failed?

3          MS. SHESTON:  For whatever reason?

4          MR. STRAUSS:  Yeah.

5          **THE WITNESS:  Well, I think -- when I got to**

6   **Vallejo, I would call an --**

7          (Stenographer clarification.)

8          **THE WITNESS:  Lennar's ownership of the project**

9   **a failure.**

10     Q.   (By Mr. Strauss)  Did anyone ever share with

11   you the belief that Lennar's ownership failed because of

12   terms that were used in the contract?

13     **A.   You know, we had so many conversations about**

14   **that, and I would concur that there were many failures,**

15   **I don't recall specific conversations.  I remember we**

16   **had conversations about the terms of the agreement, but**

17   **I don't remember specific conversations about them.**

18     Q.   Did either Slater or Will ever share with you

19   their concern that the word "substantially" was

20   ambiguous enough to lead to litigation in the future?

21     **A.   They did state --**

22          (Stenographer clarification.)

23          **THE WITNESS:  -- state their opinions.**

24     Q.   (By Mr. Strauss)  What did they say?

25     **A.   They said "100 percent" is a clear-cut number;**

1    "substantially complete" is -- is more vague and allows

2    room for negotiating and potentially some form of

3    lawsuit at the end.

4        Q.   Did you ever see a term sheet reduced to

5    writing that used the "100 percent" term, something that

6    they were proposing?

7        A.   Say -- ask me that.

8        Q.   Did you ever actually see something in writing

9    that they proposed that said 100 percent completion?

10       A.   No.

11       Q.   Okay.

12       A.   I don't believe I did.

13       Q.   When you met with Nate and Stacy, is it?

14       A.   Yes.

15       Q.   Did you tell them, Okay, I'll agree to the

16   substantially, let me go back and talk to my team?

17       A.   I told them I would go back and talk to my

18   team.

19       Q.   You didn't agree with it?

20       A.   No.

21       Q.   Had you, yourself, ever been -- ever worked on

22   an agreement that actually contained that "substantially

23   complete" language before this?

24            MS. SHESTON:  In Vallejo or ever?

25            MR. STRAUSS:  Ever.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
 1            THE WITNESS:  I would say I don't ever
 2   remember -- first of all, I didn't -- I never worked on
 3   the agreements other than the negotiating terms.
 4            So projects of this magnitude, I would say
 5   never put 100 percent on there.  There's too many
 6   variables.  On a small project, we might say 100 percent
 7   complete.  But on the bigger projects, no.
 8            And typically what happened when you do put 100
 9   percent on there, there's a renegotiation that happens
10   because it's -- it's -- just too many variables on a
11   project like that, so -- yeah.
12       Q.   (By Mr. Strauss)  I think you skipped ahead to
13   a question I haven't asked yet, but I was going to.
14            Have you ever been part of a negotiation where
15   the language "substantially complete" had been used?
16       A.   I don't recall those specific words --
17       Q.   Okay.
18       A.   -- being in the agreement.
19       Q.   Are you certain that it was Will and -- that
20   Will and Slater wanted the terms to say "100 percent
21   complete," as opposed to -- to some other language?
22       A.   I am not, but they were arguing for it, so that
23   was -- the deduction I made, is they were arguing for
24   the 100.  And Nate said that's what --
25            (Stenographer clarification.)
```

```
 1           MR. STRAUSS:  Said they were arguing for.
 2      Q.   (By Mr. Strauss)  Right?
 3      A.   Correct.
 4      Q.   But you wouldn't take the word of -- from
 5  somebody on the other side of the table as to what the
 6  City's position was; you'd want to go to Will and Slater
 7  and find out exactly what they were asking for; right?
 8      A.   Which is what I did.
 9      Q.   Sure.
10           You wouldn't take Nate and Stacy's word for it?
11      A.   No.
12      Q.   Okay.
13           You understood they were in a -- at least -- in
14  theory, adversarial position?
15      A.   I had never heard that it was an issue until
16  I -- until Nate came out with it.
17      Q.   Okay.
18           Did you ever hear Will or Slater say, We need
19  to have identifiable benchmarks in the agreement, as
20  opposed to 100 percent complete?
21           MS. SHESTON:  Vague and ambiguous.  Lacks
22  foundation.
23           Go ahead.
24           THE WITNESS:  I -- I did.  And we -- we put
25  those, a lot of benchmarks in there.  It was one of the
```

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    things that we -- that's -- we did demand and

2    collectively agree on those benchmarks, and Will and

3    Slater were the ones negotiating what those benchmarks

4    would be for a completion of certain steps in the

5    project.

6              So yes, the 100 percent conversation never came

7    up until the very end.  It was like -- everything else

8    had worked out, except for that one concern that Nate

9    expressed to me.

10    Q.  (By Mr. Strauss)  And the -- the term sheet

11    that resulted from this dialogue that had substantially

12    complete language, is that the final term sheet that was

13    submitted to the City Council?

14    A.    My recollection is yes.

15    Q.    Had the City Council approved the term sheet as

16    of the time that you had left your employment with

17    Vallejo?

18    A.    Yes.

19    Q.    And was that ever renegotiated or changed after

20    you left -- after you left, to your knowledge?

21    A.    When I left, it was recognized that the

22    representatives from Nimitz, once the Southern Land

23    Company came on board, that especially when it came to

24    the soils reports that were required to, you know,

25    develop on this property were there, but they were

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    grossly misunderstood and there was going to be no way

2    for them to be able to achieve that.

3                And so yes, it was renegotiated.  I don't -- I

4    don't recall if it was right before I left that a

5    renegotiated term sheet was done or not.  I know we were

6    working on it -- or Gillian was working on it with City

7    Attorney's Office.

8         Q.   And Will and Slater were long gone by that

9    point?

10        A.   Yes.

11        Q.   Did Will or Slater ever use the phrase

12   "shredding the term sheet" to you?

13        A.   I certainly heard that term, but I don't think

14   that they -- it would have been after their

15   employment --

16        Q.   Okay.

17        A.   -- that I heard it.  But maybe one of them said

18   it or told somebody that.  I just heard that word.

19        Q.   Do you remember what context you heard it in

20   and what they were referring to?

21        A.   Actually, I never talked to Will and Slater

22   afterwards.  It would be part of the public conversation

23   and discussion, that people were calling in and saying,

24   Oh, you know, they shredded the term -- the old term

25   sheet.

1          There was a few people in the audience that

2     felt that it was the wrong thing to do and voiced their

3     opinion.  To -- to -- to amend the agreement.

4          MS. SHESTON:  Keep your voice up, if you would

5     please.

6          THE WITNESS:  All right.

7          MS. SHESTON:  She's going to start throwing

8     things at us.

9          THE WITNESS:  Okay.

10         Here we go.

11     Q.   (By Mr. Strauss)  And shredding the term sheet,

12     is that -- is it your understanding that this was in

13     connection with this renegotiation after the soils

14     report came back?

15     A.   Yeah, I -- I've heard those words stated.  I

16     mean, the bottom line to that is that people use that

17     terminology because a lot of the things that were in the

18     first version of the term sheet were removed from the

19     second.

20     Q.   Okay.

21         Did you ever have any conversations with

22     Shannon Eckmeyer where she gave you legal advice or a

23     legal opinion and you told her, I want a different

24     opinion, I want different advice?

25     A.   Yes.  And the -- we -- we talked about that

**GREGORY A. NYHOFF, VOLUME I**

1    earlier, that in -- there were a couple times when these

2    agreements that we were discussing, there were

3    provisions in there, that, again, legal advice on very

4    specific laws pertaining to the City or the State or the

5    federal, those are -- those are un -- those are

6    interpreted, they're to be followed.

7           But sometimes City regulations or zoning or

8    land use regulations can be interpreted in a different

9    way.

10          So yes, there were a couple of times I asked

11   her or suggested she get a second opinion, an outside

12   consultant, similar to what I did when I asked Claudia

13   and Randy to join our conversation about the "100

14   percent."  That was not a legal question specifically,

15   but it was a policy question.

16      Q.   That you wanted legal advice on?

17      A.   Well, typically all those agreements are going

18   to get legal advice on it, so --

19      Q.   Sure.

20      A.   -- yes.

21      Q.   Did you ever say to Shannon, words to the

22   effect of, Change your advice or I'll find somebody who

23   will?

24      A.   There was probably at least one instance where

25   I was frustrated at us not getting to yes, and I had 30

1    years of experience in this business that I knew that

2    it -- it -- if she would just look at it and maybe talk

3    to another person, another consulting firm, whether or

4    not, you know, there's another option here to get to

5    yes, versus to say no.

6            And so I -- I was frustrated on this one

7    occasion that I told her -- I told her, If you won't --

8    you know, if you don't -- if you won't look at this and

9    look for a different, you know, in- -- input into it,

10   then -- I mean, I can't go out and hire somebody over

11   the City Attorney's Office, so it's well known that

12   Claudia Quintana would have to do that, the city

13   attorney.  I wasn't going to go hire somebody because I

14   can't do that.  Only the City Attorney's Office, so I

15   would go speak with Claudia about getting another one if

16   that's what I felt was necessary.

17       Q.   Do you remember when that conversation took

18   place?

19       A.   I do not.

20       Q.   Do you remember what the issue was?

21       A.   I don't recall that.

22       Q.   Okay.

23            Earlier, you told me that with respect to Will

24   and making the presentation, you used similar language,

25   Do it or I'll find somebody else who will; is that --

1          MS. SHESTON:  Objection.  Misstates his

2    testimony.  Lacks foundation.

3          Go ahead.

4    Q.  (By Mr. Strauss)  Do you agree that's what you

5    said to Will?

6    **A.  Yes.**

7    Q.  Did you ever use similar words to anybody else

8    other than those two instances you just told me about?

9          MS. SHESTON:  Lacks foundation.

10          Go ahead.

11          **THE WITNESS:  No.  Because, actually, I don't**

12    **think it was -- anybody ever told me no, they won't --**

13    **wouldn't do something that they needed to do as their**

14    **job.**

15    Q.  (By Mr. Strauss)  Okay.

16          Excuse me.  Let's talk about Joanne Altman for

17    a minute.

18          You knew her?

19    **A.  Yes.**

20    Q.  What was her position when you were the city

21    manager?

22    **A.  Well, you helped me remember that I promoted**

23    **Will, but I think she was assistant to the city manager.**

24    **That's what she was when I -- when I left, so.**

25    Q.  Okay.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
1        A.   Assistant to the city manager.

2        Q.   And what were her duties, in general?

3        A.   The position, again, when I got there, was, you

4   know, special projects mostly, or things that were

5   assigned to them.

6             So what I -- my recollection when I first came

7   is she was in charge of communications, and she was

8   known as the cannabis czar for the City, amongst going

9   to some of the committee meetings and --

10            (Stenographer clarification.)

11            THE WITNESS:  -- citizen community meetings.

12       Q.   (By Mr. Strauss)  Did she have a role in

13  Communications?

14       A.   Yes.

15       Q.   What was her role?

16       A.   She was the -- she, basically, was the person

17  in charge of Communications for the City, for -- not for

18  the police department or the fire department, but for

19  the City, we call general.

20       Q.   Did she apply to be assistant city manager?

21       A.   Yes, she did.

22       Q.   Who made the decision to hire her or somebody

23  else?

24       A.   Ultimately, I made the decision to hire the --

25  who I hired for the assistant city manager, but it went
```

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1   through a process of directors also interviewed prior

2   and made recommendations to me.

3      Q.   Was it the -- Anne Cardwell who got hired for

4   that position?

5           (Stenographer clarification.)

6      Q.   (By Mr. Strauss)  Anne Cardwell.

7      A.   Correct.

8      Q.   Did Ms. Cardwell come from outside the City?

9      A.   Yes.

10     Q.   Was there any particular reason why you didn't

11   think Joanne Altman was the best fit for that position?

12     A.   So -- yeah, I put together a process so that,

13   you know -- for instance, department heads had the

14   opportunity to give me feedback on that as well, and

15   they provided feedback that did not include her as their

16   recommendation on who to hire.

17          And so some of the feedback from them, and I

18   would have to concur, was that she was -- she was a

19   little standoff-ish and a little -- sometimes could be

20   arrogant in her opinion of things, and that she wasn't

21   ready for the -- didn't feel like she worked together as

22   a team member very well at times.

23          And so I would agree, that I didn't feel that

24   the maturity there to operate at the level of assistant

25   city manager was there yet.  And so ultimately, I made

```
 1   the decision to hire Anne, who had been an assistant
 2   city manager prior, too.
 3       Q.   Did Anne have more experience in City
 4   government than Joanne?
 5       A.   As an assistant city manager.
 6       Q.   What about just in terms of any position in the
 7   City; do you remember?
 8            MS. SHESTON:  Just total cumulative experience
 9   as a City employee?
10            MR. STRAUSS:  Yeah.
11            THE WITNESS:  I don't recall how many years she
12   had.
13       Q.   (By Mr. Strauss)  Okay.
14            Did -- did you think Joanne was good at her
15   job?
16       A.   I thought she was adequate at her job.
17       Q.   Did you have any specific criticisms of her job
18   performance up until the time she was terminated?
19       A.   I didn't -- I did not -- so the latter part
20   of -- prior to her termination, was she was under the
21   direction of Anne Cardwell, and she was under the
22   direction of Teri Killgore, who was the former assistant
23   city manager.
24            So I didn't have the day-to-day interaction
25   with her, but I would say about her that she -- I
```

```
 1    would -- I would -- I would rate her as an okay when it
 2    came to doing public communications.
 3              So, again, doing this for as long as I have,
 4    I've seen a lot of public communications in the past,
 5    and so I would try to help her work through those and
 6    sometimes change them, or recommend that she change
 7    them.  Generally for the -- the projects we assigned
 8    her, she did an adequate job.
 9       Q.   Did you ever put any criticisms of her job
10    performance in writing?
11       A.   No.
12       Q.   Are you aware of Anne Cardwell putting
13    anything --
14       A.   No.
15       Q.   -- in writing?
16       A.   No.
17       Q.   Something I'm confused about, among many, is
18    this change where Anne Cardwell became her direct
19    supervisor and she was out of your chain of command.
20              Is that what happened?
21       A.   She was out of my direct chain of command.
22    I'm -- my recollection is she was out of my chain of
23    command with Killgore, with the former assistant city
24    manager, as well.  So yes, she basically took direction
25    from Anne Cardwell.
```

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      Q.   Okay.

2           But you were her ultimate supervisor because

3      you supervised Anne Cardwell?

4      A.   **Other than the City Attorney's Office and**

5      **Police employees, yes, I am the ultimate authority**

6      **there.**

7      Q.   My understanding is that you personally made

8      the decision to terminate Matzke and Slater, and then

9      Anne Cardwell made the decision to terminate Altman.

10          Is that -- is that a correct understanding?

11     A.   **So Anne was -- so we had discussed with the**

12     **City Attorney's Office, you know, a lot of the specifics**

13     **of coming up with that decision.  So ultimately, that's**

14     **my responsibility and authority to make that**

15     **determination, and Anne would make the recommendation as**

16     **her direct supervisor.**

17     Q.   Well, you recall signing a declaration under

18     penalty of perjury regarding the decisions to terminate

19     my three clients?

20     A.   **Probably three years ago.**

21     Q.   Sure.

22          And I'll show it to you eventually.

23     A.   **We're going to get there.**

24     Q.   Yeah, we'll get there.

25          But my understanding from that document is that

1    Joanne Altman was fired by Anne Cardwell.

2            And you're now telling me that's not exactly

3    accurate?

4        A.   Well, again, ultimately, I'm the one who has to

5    sign off at the end of the day and -- over all

6    employees, so -- yeah.

7        Q.   Okay.

8            Anne Cardwell made a recommendation to you to

9    terminate Joanne Altman?

10       A.   Yes.  Again, ultimately that's my --

11           (Stenographer clarification.)

12           THE WITNESS:  I'm the only one with the

13   authority to do that.

14       Q.   (By Mr. Strauss)  When did she make a

15   recommendation to you?

16       A.   We probably spent a week or so prior to the

17   actual termination date discussing it with legal

18   counsel, and the two of us.

19       Q.   Okay.

20           They were terminated in April of 2020; is that

21   your recollection?

22       A.   Yes.

23       Q.   Okay.

24           So it was a week or so before that happened

25   that she -- Anne Cardwell made a recommendation to you?

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1     A.    Yes.

2     Q.    And what did she tell you?

3     A.    She recommended termination and I think -- so

4    obviously she worked with her the entire time, so I

5    don't recall what those specific things were on a

6    day-to-day basis, but there were two things that -- from

7    me directly that -- that concerned me.

8          The first one was when I actually hired Anne

9    Cardwell for the city manager job.  She was -- Joanna

10   was on the same floor as me, and so she made the

11   decision and became public.

12         She came in to the door -- my doorway, and she

13   looked at me and said, I have reviewed Anne Cardwell's

14   reference, I have more experience with her than she

15   does, and this job was mine.  And she walked out of the

16   room.

17   Q.    I think you said when you hired her for the

18   city manager position?

19   A.    I'm sorry, the assistant city manager.  Thanks

20   for correcting me.

21         So there was that and --

22   Q.    Hold on.

23         Did you ever make Anne Cardwell aware of that

24   comment?

25   A.    I don't believe so.

July 19, 2023

```
1      Q.   Okay.

2           Because if you -- we return to my question, I'm

3      asking you what Anne Cardwell said to you to recommend

4      the termination --

5      A.   Yeah, I'm sorry.

6      Q.   -- of Joanne Altman?

7      A.   So what she did tell me is via the --

8      Christina, who is in the Public Communications

9      department, working for Joanna, she told me that

10     Christina had come to Anne and said, Joanna had said

11     that, Just to let you know, Christina, Greg and Anne are

12     trying to destroy the City.

13          And those would be two specific moments where I

14     would find someone working very directly for me, to, you

15     know, walk in my door, say this to me, and for Anne to

16     relay that information.

17     Q.   Hold on.  I want to understand what you just

18     told me.

19          So Christina is who?

20     A.   She was in the -- she worked in Public

21     Communications.

22     Q.   What's her last name?

23     A.   I don't recall.

24     Q.   Okay.

25          And --
```

1      A.   She worked for Joanna.

2      Q.   Okay.

3      A.   Under Anne.

4      Q.   And you know what Christina had to say to Anne

5  because Anne told you?

6      A.   Correct.

7      Q.   During the time period when she was making a

8  recommendation to terminate?

9      A.    No, before that.  So as far as -- so -- yes.

10  So as far as what Anne made recommendations for me, I

11  don't recall the specifics of the conversation, as far

12  as what she had done.  I left -- you know, I -- my -- my

13  directors and assistants, they ran the supervisory role.

14  I didn't ask for all the specific information.

15  Sometimes I just had to say, Okay, understood, and make

16  the decision.

17      Q.   All right.

18          So is that what happened here, Anne Cardwell

19  came to you and said, I want to fire Joanne Altman,

20  didn't give you any specifics or reasons and you said,

21  Go ahead?

22          MS. SHESTON:  Misstates testimony.  Lacks

23  foundation.

24          Go ahead.

25          THE WITNESS:  So the assistant city manager and

1    I met very regularly, and there's an ongoing

2    conversation about things that -- that would be of

3    concern to her about certain employees, especially those

4    that worked directly there.

5           And so we had a number of those discussions.

6    I can't recall any of the specifics of those, but

7    certainly one of the things we did was we gave Joanna

8    feedback after -- after she didn't get the

9    recommendation of the directors, which she agreed and

10   asked for, and then we hired her a coach in order to try

11   to, you know, increase that -- increase her experience,

12   her -- her -- some of this demeanor issue that she

13   had -- or I don't know if people just had difficulty --

14   "rubbed them the wrong way," I think was the word they

15   used, to work on that.  So we offered her a coach for

16   that.

17          So you can hear some of those things that Anne

18   and I would have discussed or actually seen in person.

19   Q.   (By Mr. Strauss)  Okay.

20          So, again, I want to -- I want to try to

21   understand this as best as you can tell me.

22          You personally observed Joanne complain about

23   not being hired as assistant city manager; right?  As

24   you've described?

25   A.   Complaint would be -- yes.

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

```
1        Q.   She was upset?

2        A.   Yes.

3        Q.   And she let you know it?

4        A.   Yes.

5        Q.   And you never told Anne Cardwell about that

6   conversation?

7        A.   I probably did.

8        Q.   Why do you say you probably did?  What does

9   that mean?

10       A.   Because I thought it would be important --

11            (Stenographer clarification.)

12            THE WITNESS:  I thought it would be important

13   when Anne first came in that she understood that Joanna,

14   who would be working under her, was very upset that Anne

15   got the job.  I do believe I had that conversation with

16   Anne when she first came on board.

17       Q.   (By Mr. Strauss)  Do you have a recollection of

18   having that conversation or are you just speculating?

19       A.   To the best of my recollection.

20       Q.   Okay.

21            I'm just pressing you because earlier you told

22   me you hadn't -- you didn't tell her, so I'm trying to

23   know what your best recollection is.

24            As you sit here now, do you have a specific

25   recollection of having that conversation?
```

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      A.   I do not.

2      Q.   Did you put anything in writing about that

3   incident?

4      A.   No.

5      Q.   Did you tell anybody else about it?

6      A.   I don't recall telling anybody else about that.

7      Q.   Did you tell anyone in HR about it?

8      A.   I don't recall.

9      Q.   Okay.

10          But you think you might have shared it with

11   Anne Cardwell because you thought she had a right to

12   know?

13     A.   I thought it was important for Anne to know

14   that Joanna was upset that she didn't get the job, and

15   she said she saw Joanne's resume and said it wasn't as

16   good as hers.

17     Q.   Is there anything improper about Ms. Altman

18   seeing that resume?

19     A.   No.

20     Q.   Okay.

21          Did Ms. Altman ever raise this issue again with

22   you?  That she was upset she didn't get the position

23   because she felt she was better qualified?

24     A.   No.

25     Q.   And you gave her some coaching as a result of

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    that incident?

2        A.    No.  She received coaching from when she went

3    through the interview process and the directors

4    interviewed her on what things she could have done

5    better.

6        Q.    Got it.  Okay.

7             So how did that incident play a role, to your

8    understanding, in your decision to terminate Joanne

9    Altman?

10       A.    So, first and foremost, Anne's recommendation

11   was the most important part of that, but certainly

12   the -- the telling a employee working for the

13   organization that we're trying to -- Anne and I are

14   specifically trying to destroy the City was extremely --

15       Q.    Well, we'll get to that.  That's a different

16   incident.

17            MS. SHESTON:  But let him answer your question.

18   If he's saying that played a part in his thinking.

19       Q.    (By Mr. Strauss)  Go ahead.

20       A.    So those -- those items, when you're -- you

21   know, speaking to a subordinate and telling them that

22   someone you directly work for -- or directly work for my

23   office is -- both of us -- assistant and city manager,

24   are trying to destroy the City, you're -- in my opinion,

25   you're making a very strong statement about your support

1    for those people.

2        Q.    Okay.

3              So let's then -- I want to go over this

4    Christina comment again, just to make sure I understand.

5              It was related to you by Anne Cardwell;

6    correct?

7        A.    Correct.

8        Q.    And what did she tell you Christina said?

9        A.    That Joanna said that, Greg and Anne are trying

10   to destroy the City.  And that was the extent of it.

11       Q.    Okay.

12             And did you talk to Christina yourself about

13   that comment?

14       A.    No.

15       Q.    Did you speak with Joanne Altman about that

16   comment?

17       A.    No.

18       Q.    Why not?

19       A.    Because I had already seen how agitated and

20   angry with my decision to hire Anne instead of her, that

21   I just made the assumption that that's how she felt

22   about me and her, even though her daily work didn't --

23   she still took care of her daily day-to-day job.  So I

24   chose not to discuss that with her.

25       Q.    And when was Anne hired?

1          MS. SHESTON:  If you can give him an estimate

2    or tie it to some other event, that's great, but don't

3    guess.

4          **THE WITNESS:  It's going be a guess.**

5      Q.  (By Mr. Strauss)  Was it a year before?  Two

6    years before?

7      **A.  I'm guessing it's a year before I -- over a**

8    **year before I left.  I'm sure they have a record of it.**

9      Q.  I'm sure they do, too.

10         Well, again, my clients were terminated in

11   April of '20.

12         Was Anne Cardwell hired within a year of April

13   of '20?

14     **A.  I don't know for sure.  I can't recall that**

15   **specific date.**

16     Q.  Okay.

17         Did anybody, to your knowledge, put in writing

18   anything concerning this comment that Christina related

19   to Anne Cardwell?

20     **A.  I don't know.**

21     Q.  Do you know if HR was notified of that comment?

22         MS. SHESTON:  Calls for speculation.

23         Go ahead.

24         **THE WITNESS:  I'm -- I'm -- I don't know.  I**

25   **don't have no information about that.**

1        Q.   (By Mr. Strauss)  Okay.

2             Did anyone relate to you any context of -- of

3    how that comment came about?

4             MS. SHESTON:  The comment to Christina?

5             MR. STRAUSS:  Yeah.  The -- yes, exactly.

6             **THE WITNESS:  No.**

7        Q.   (By Mr. Strauss)  Do you have any understanding

8    as to if the comment was, in fact, made, what -- why

9    Joanna made it?

10       **A.   No.**

11       Q.   To your knowledge, did anybody do any

12   investigation to find out what that was about?

13       **A.   No, I don't believe so.**

14       Q.   Are you aware of that comment being made more

15   than one time?

16       **A.   No.**

17       Q.   Okay.

18             When Anne Cardwell made the recommendation to

19   you that Joanna be terminated, did she specifically

20   reference the Christina comment?

21       **A.   My recollection of it as one component of the**

22   **conversation is yes --**

23       Q.   Okay.

24       **A.   -- it did come up.**

25       Q.   Do you remember what she actually said during

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    the conversation?

2            MS. SHESTON:  About the Christina comment?

3            MR. STRAUSS:  Correct.

4            **THE WITNESS:  She was concerned that we had**

5    **somebody working for us that's spreading word to our**

6    **other employees that city manager and assistant city**

7    **manager are trying to destroy the City.**

8        Q.   (By Mr. Strauss)  And are you able to give me

9    any time frame as to when the Christina comment happened

10   in relation to your conversation with Anne Cardwell

11   where she recommended Joanna be fired?

12           MS. SHESTON:  I see you plumbing the depth of

13   your memory.  If you can give him an estimate or tie it

14   to some event, that's great, but don't -- don't just

15   make a guess.

16           MR. STRAUSS:  He wouldn't do that.

17           **THE WITNESS:  I am -- so I can say with --**

18   **quite confidently that that -- I shouldn't even --**

19   **that -- well, the City did an investigation on me.**

20       Q.   (By Mr. Strauss)  Right.

21       A.   **So it was prior -- it was several months prior**

22   **to that, would be my window of conversation in regards**

23   **to that comment.  Several months.**

24       Q.   Well, did Anne Cardwell say anything to you

25   during the recommendation to terminate Joanna Altman

1   regarding what Joanna Altman had told the investigators

2   of you?

3           MS. SHESTON:  Vague and ambiguous.

4           I want to make sure I understood the question.

5   Did Anne tell Greg, in the conversation about

6   termination, anything that Joanna had said to the

7   investigators; is that --

8           MR. STRAUSS:  My question was clearer than I

9   thought it was.  Yeah, that's exactly it.

10          MS. SHESTON:  Okay.

11          **THE WITNESS:  No.**

12     Q.   (By Mr. Strauss)  Okay.

13          Did Anne reference the incident where Joanna

14   came to you and said she was better qualified when Anne

15   was recommending Joanna's termination?

16     **A.   No.**

17     Q.   Is there anything else you can tell me about

18   the conversation between you and Anne Cardwell where

19   Anne recommended terminating my client, Ms. Altman, that

20   you haven't already said?

21          MS. SHESTON:  Subject to the fact that there

22   were lawyers in the room and he's not asking about that.

23   It's what did Anne say.  If you can recall.

24          **THE WITNESS:  Now, again, it's -- it's -- you**

25   **know, when you're an ongoing operation, it's -- I can't**

1  remember the conversation, that specific moment we were

2  just discussing.

3          I will say that one of the common conversations

4  were about trust, and so when you make a comment like

5  you're -- me and Anne are trying to destroy the City,

6  you -- to another employee, there's a little trust that

7  they have that support for you.

8          So I -- I can't recall the specifics of her

9  recommendation, because it's more of an ongoing

10  conversation of -- of that, certainly someone making

11  that statement causes quite a bit of concern.

12  Q.   (By Mr. Strauss)  Okay.

13          Was the decision to terminate Slater and Will

14  made at the same time as the decision to terminate

15  Joanna?

16  A.   You know what, it evolved over a couple weeks'

17  time because we were in quite a bit of discussion with

18  the City Attorney's Office in regard to specifics of,

19  you know, the fact that they're all at-will employees;

20  that, you know, is there any concerns because they did

21  file -- they did make a claim about me.

22          So just had a whole lot of conversation about

23  prior -- you know, what our concerns were as the

24  operating folks, and then legal conversations.

25          So I would say to you, no, that they weren't

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    made at the same moment in time, but in a window of

2    time, yes.

3        Q.   What claim had they made about you?

4        A.   I shouldn't say a claim.  I should say an

5    investigation.  So --

6            MS. SHESTON:  I think you've answered the

7    question.

8        Q.   (By Mr. Strauss)  So at that point in time, you

9    believe that an investigation was made into you as a

10   result of something that my clients had said?

11       A.   So at the conclusion of the investigation is

12   when we made the decision.

13       Q.   Right.

14       A.   So what was your question again?  More

15   specifically?

16       Q.   Did you understand that that investigation was

17   conducted as a result of something my clients had said?

18       A.   So Joanna -- so Heather Ruiz, HR director, came

19   to me and said that Michelle Straub had gone to her,

20   because Joanna had gone to Michelle Straub.  Michelle

21   Straub is my administrative assistant.

22       Q.   Right.

23       A.   And what Heather relayed to me about what

24   Joanna said was that Joanna was trying to get some

25   support because they had a six-to-one vote of the City

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
 1    Council to remove me, and that a -- and that a
 2    closed-session meeting would be called the next Tuesday
 3    by Councilmember Dew.
 4          (Stenographer clarification.)
 5          MR. STRAUSS:  That's D-e-w.
 6          MS. SHESTON:  D-e-w.
 7          THE WITNESS:  Yes.
 8    Q.   (By Mr. Strauss)  So this is a conversation you
 9    had with Michelle Straub?
10    A.   No.
11    Q.   I'm sorry.  Heather Ruiz told you this?
12    A.   Yes.
13    Q.   Got it.
14          Was this before the -- to your knowledge --
15    before the investigation commenced?
16    A.   Yes.
17    Q.   Okay.  All right.
18          So where did this conversation take place?  Was
19    it a telephone call or did she come to your office or
20    how did this happen?
21    A.   Heather?
22          MS. SHESTON:  The one between him and Heather?
23          MR. STRAUSS:  Yes.
24          THE WITNESS:  My office.
25    Q.   (By Mr. Strauss)  Okay.
```

1           And so give me a little bit more detail about

2    what happened.

3           Did Michelle make a -- I'm sorry.  Did Heather

4    make an appointment to talk to you or did she drop by?

5      A.   I -- I don't recall whether -- I -- she

6    probably just dropped by.

7      Q.   And she said, I've got to tell you something I

8    just learned from your assistant?

9      A.   She said that Michelle was very concerned about

10   a conversation that she just had with Joanna, thought

11   that I should be made aware of it.

12     Q.   Okay.

13     A.   And the fact of the matter was, she told me

14   that -- that there was a vote of six to one to terminate

15   me from the councilmembers and a special meeting would

16   be called on Tuesday.  And there wasn't any more

17   information in regards to what that was.  That was just

18   the statement.

19     Q.   How many councilmembers were there?

20     A.   Seven.

21     Q.   How many were needed to vote to terminate you?

22     A.   Four.

23     Q.   So sounds like they already had the votes to

24   terminate, if this is true?

25     A.   Clearly, yes.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      Q.   Okay.

2      A.   Six to one would be --

3      Q.   More than four?

4      A.   And she did say and they were working on Hakeem

5   Brown.

6           (Stenographer clarification.)

7           THE WITNESS:  Hakeem Brown.  Councilmember

8   Hakeem Brown.

9           MS. SHESTON:  Hakeem, H-a-k-e-e-m.

10     Q.   (By Mr. Strauss)  And obviously this concerned

11   you?

12     A.   Very much.

13     Q.   You did not want to be terminated?

14     A.   Probably more concerning was the fact that the

15   week prior to, I had had the City Council provide me the

16   first -- the draft of their performance evaluation of

17   me, which was very good.

18           So, actually, it confused me significantly why

19   someone would say that at the same time I'm -- I've got,

20   in writing, a performance evaluation that's very good.

21   So, yeah.

22     Q.   Yeah.  Makes sense.  Okay.

23           And Michelle Straub was your

24   secretary/administrative assistant?

25     A.   Yeah, executive secretary, yes.

1        Q.   Executive secretary.

2             Was she working at the time?  I've heard that

3    she may have been on some sort of medical leave.

4        A.   **She was working at the time.**

5             MS. SHESTON:  At the time of the Heather

6    conversation that we're talking about?

7             MR. STRAUSS:  Yes.

8             MS. SHESTON:  That point?

9        Q.   (By Mr. Strauss)  Had she been on a medical

10   leave before that?

11       A.   **I don't remember if it's before or after, so**

12   **I'm going to -- she was on medical leave.**

13       Q.   But you're clear that at least as of the time

14   of this conversation, she was working?

15       A.   **Yes.**

16       Q.   Was she there that day?

17       A.   **My recollection is yes.**

18       Q.   Did you talk to her about this?

19       A.   **No.**

20       Q.   Why not?

21       A.   **I didn't -- I -- when something like that comes**

22   **up, it's not something I want to talk about and -- nor**

23   **discuss any further with her.  This timeline would be**

24   **likely, you know, after she said Joanna said I'm trying**

25   **to destroy the City, and because I'd just done an**

1    evaluation and I hear it's a six-to-one vote against me,

2    I made a decision I'm not going to have a conversation

3    with people about this.  Let's see what happens, see if

4    any of this comes to fruition.

5          And the time period was very short because

6    their claim was Tuesday night, Councilmember Dew was

7    going to ask for a closed session.

8    Q.   Do you remember what day this was?  Monday?

9    Friday?  Thursday?

10   A.   It was probably latter part of the week.

11   Q.   Okay.

12   A.   Of the week before the Tuesday meeting.

13   Several days.

14   Q.   Did you do anything to find out if this

15   information was, in fact, true?

16   A.   I did not.

17   Q.   Okay.

18          So you told me you had already seen, I think

19   you said, a draft performance evaluation?

20   A.   Yes.

21   Q.   Can you explain to me how your performance

22   evaluation process worked.  In other words, why was

23   there a draft?

24   A.   The City Council, they independently do a

25   performance evaluation, each of them has a sheet

1   together, and then they combine those numbers.  And

2   they -- what they do is they give it to me, and then I

3   have a chance to provide any feedback, if I disagree

4   with any of that, and then they would finalize it after

5   that.

6         So I got the draft to look at, and then it

7   would be -- I would be coming back to them within the

8   next two Council meetings to discuss if I had any

9   questions, and come up with my type goals and areas of

10  improvement for them.

11  Q.   Okay.  Thank you.

12        So shortly before this conversation with

13  Heather, you had received the draft?

14  A.   Yes.

15  Q.   Had you started working on any --

16        (Stenographer clarification.)

17  Q.   (By Mr. Strauss)  -- response?

18  A.   I had read through it, but I hadn't been

19  working on any response.  My recollection was -- is I

20  would go back when I had got those completed.  But it

21  seemed to me it was -- would have been the Tuesday.  It

22  was like we -- I got it the Tuesday before the Friday

23  that this conversation happened.

24  Q.   But it was generally positive review, so

25  probably not too much for you to comment on?

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1       A.   No.  I mean, yes, it was a very positive
2    review.
3       Q.   Okay.  Good.  All right.
4            Have you ever talked to Michelle Straub about
5    these events?
6            MS. SHESTON:  Vague and ambiguous as to "these
7    events."
8       Q.   (By Mr. Strauss)  This conversation she had
9    with Joanna?
10      A.   I don't recall that I -- that I did.
11      Q.   Did anyone ever tell you why Joanna was looking
12   for votes to have you terminated?
13      A.   No.
14      Q.   Okay.
15      A.   It was actually shocking to hear.
16      Q.   Okay.
17           So was there a regular Council meeting the next
18   Tuesday?
19      A.   Yes.
20      Q.   Did you attend?
21      A.   Yes.
22      Q.   And was there any conversation regarding you or
23   these -- this supposed termination during that meeting?
24      A.   Not during the public meeting; however, the
25   mayor called me into his office the next morning to tell

1   me that the Council had decided in closed session to

2   conduct an investigation into some complaints -- some

3   complaints from a few employees.

4       Q.   Okay.

5            Which mayor was that?

6       A.   **Sampayan.**

7       Q.   Sampayan.

8            Do you get to attend closed session?

9       A.   **Most of the time, yes.  Almost all the time.**

10      Q.   Okay.

11           Were you -- do you remember being asked to

12   leave because you were -- you were going to be a topic

13   of the closed session?

14      A.   **I -- you know, I don't recall whether they**

15   **actually had a closed session or one of the**

16   **councilmembers asked the mayor to put one on the agenda.**

17   **I cannot remember specifically.**

18      Q.   Okay.

19           But in any event, you weren't there when they

20   discussed this?

21      A.   **No.**

22      Q.   And it's the next day the mayor called you in

23   and said they're going to do an investigation because of

24   complaints from employees?

25      A.   **Correct.**

1     Q.   Did he tell you who they were?

2     A.   **No.**

3     Q.   Did you have a sense of who they were?

4     A.   **Yes.**

5     Q.   Who did you think it was?

6     A.   **Joanna, because that's what she said was going**

7     **to happen.**

8     Q.   Okay.

9          Good -- probably a good supposition.

10    A.   **It was implied that it was -- the three of**

11    **those were very close, so the implication was it was the**

12    **three of them, but no one specifically gave any names.**

13    **Joanna was the only one I knew for sure.**

14    Q.   But in your mind, you thought the other two

15    were my other two clients?

16    A.   **Yes.**

17    Q.   Slater Matzke and Will Morat?

18    A.   **Yes.**

19    Q.   All right.

20         Did the mayor say anything about what about you

21    was going to be investigated?

22    A.   **He did not.**

23    Q.   Did you have any clue as to what about you was

24    going to be investigated?

25    A.   **I did not.  So honestly, I was very upset**

1   because the week before, I had a very good evaluation.

2       Q.   Right.  I imagine.

3       A.   I was upset.  But I will tell you, the decision

4   of Council -- and I told them that, I told the mayor

5   that at the end of that conversation, that he's doing

6   the right thing, because we investigate claims of

7   employees -- on all other employees and so he should do

8   that with me.

9       Q.   And they certainly had the right to do that?

10      A.   Absolutely.

11      Q.   Did you ever become aware that an investigation

12  had been launched?

13      A.   I -- there was no specific information when it

14  started or who they were interviewing.  I -- so I knew

15  nothing about what was going on, other than an --

16           (Stenographer clarification.)

17           THE WITNESS:  Interviewing me.

18      Q.   (By Mr. Strauss)  And you were interviewed in

19  the investigation; yes?

20      A.   Now that I say that, I've been interviewed in

21  other investigations.  I don't recall for sure if they

22  actually did.

23      Q.   During your time working for City of Vallejo,

24  were you ever interviewed by any investigator?

25      A.   In re- -- be more specific; in regards to a

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

```
1    complaint or --

2        Q.   Yeah.

3        A.   -- about me?

4        Q.   About anything.  Then we'll talk about you.  I

5    just want to get the lay of the land first.

6        A.   In Modesto?  Is that what you asked me?  In

7    Modesto?

8        Q.   Vallejo.

9        A.   Oh, Vallejo.

10       Q.   I'm interested in Modesto, but not in this

11   lawsuit.

12       A.   Yes.  Yeah, I have been.  I'm sorry.  Thank

13   you.

14       Q.   That's fine.

15            How many times have you been interviewed by an

16   investigator?

17            MS. SHESTON:  About an employee complaint issue

18   in Vallejo?

19            MR. STRAUSS:  Correct.

20            THE WITNESS:  Two, for sure, if not three.

21       Q.   (By Mr. Strauss)  Okay.

22            The two for sure, do you remember when they

23   were?

24       A.   I don't recall the specific dates.  They were

25   both complaints by Judy Shepard-Hall.
```

```
 1        Q.   And these were complaints about you?
 2        A.   Correct.
 3        Q.   And we talked a little about -- a little bit
 4   about this earlier.  Do you know the specifics of the
 5   complaints?
 6        A.   I did not know the specifics of the complaints.
 7        Q.   Okay.
 8             And those -- is it your understanding that
 9   those com- -- two complaints that were being
10   investigated are the subject of the lawsuit that's now
11   pending?
12        A.   I -- I don't know any of the substance of those
13   two complaints, but they were both --
14        Q.   Okay.
15        A.   -- unsubstantiated.
16        Q.   All right.
17             And do you know who conducted the
18   investigation?
19        A.   Can't recall.  I can't recall the firm that did
20   that.
21        Q.   You believe the City hired outside
22   investigators?
23        A.   Yes.  Human Resources with -- in conjunction
24   with City Attorney's Office usually did that.
25        Q.   Now, you said there may have been a third?
```

1        A.    I'm just trying to recall.  I can't

2   specifically recall the -- being -- well, we call it an

3   investigator, but being interviewed by the person

4   investigating the claim --

5              (Stenographer clarification.)

6              THE WITNESS:  I can't recall -- trying to find

7   the -- who interviewed me, or if I actually had an

8   interview with the person that did the investigation

9   into the claim that the City Council investigated

10  against me.

11       Q.    (By Mr. Strauss)  Do you know who that person

12  was who did that investigation?

13       A.    I know that the city attorney hired Boucher --

14  Chris Boucher, that law firm.  That's all I know.

15       Q.    Do you know Chris Boucher, B-o-u-c-h-e-r?

16       A.    Yes.

17       Q.    How do you know him?

18       A.    He -- he had done work for the City -- or

19  this -- this is where I was introduced to him, but since

20  then, he did some other work for City Attorney's Office.

21             So I got to know him through some of -- some of

22  those other issues that we dealt with.

23       Q.    Okay.

24             You confused me a little bit with your answer.

25             You met him sometime before he did work for

1    City of Vallejo?

2        A.    I did not.

3        Q.    Okay.

4        A.    I believe that the City Attorney's Office hired

5    him to either conduct the or oversee the investigation.

6    I'm not sure.  But that's where I -- that's where I was

7    introduced to him for the first time.

8        Q.    And what I don't understand is which

9    investigation you're referring to.

10           The investigation of you or some earlier one?

11       A.    The City Council investigation into me.

12       Q.    Got it.

13           So the first time you ever met Christopher

14    Boucher was sometime after the City Council retained him

15    to investigate you?

16           MS. SHESTON:  Objection.  Vague and ambiguous.

17    Misstates his testimony.

18           He said he wasn't sure what Boucher actually

19    did, whether he did the investigating or whatever, so --

20       Q.    (By Mr. Strauss)  Fair enough.  Let me try and

21    rephrase that to be more accurate.

22           Is it true that the first time you met

23    Christopher Boucher was after the City Council launched

24    their investigation of you?

25       A.    My recollection is that I met him because he

1    conducted a -- a course for the employees of the City.

2        Q.   Okay.

3        A.   I think that that's -- I think he did one of

4    those for us, and that's how I at least knew who he was

5    when he -- who he was when he came.  Sorry.

6        Q.   If you're going to lean, lean that way.

7        A.   Yeah.

8        Q.   Did you attend that course?

9        A.   Yes.

10        Q.   Do you know what it was about?

11        A.   I don't recall what it was about.  I'm --

12    I'm -- yeah, I don't recall.

13        Q.   Was it a good presentation?

14        A.   It was.

15        Q.   Okay.

16             Did it have something to do with HR issues?

17        A.   Yes.  Yeah.

18        Q.   Okay.  All right.

19             And then did you have any encounters with

20    Mr. Boucher from that time up until he was somehow

21    involved in the City Council's investigation of you?

22        A.   No.

23        Q.   Okay.

24             So do you recall when you were introduced to

25    him again in connection with the investigation of you?

1      A.   I do not, no.  Not the first time.

2      Q.   Did you meet him before you understood the

3   investigation was completed?

4      A.   I -- I -- I can't -- it's been three-some

5   years.  I'm thinking --

6      Q.   I understand.

7      A.   -- I cannot remember the specific -- them

8   specifically interviewing me or who it was if they did

9   interview me.  The first time -- the first time I recall

10   with him being part of the conversation was a Zoom

11   conversation where he was -- he and Randy were informing

12   me of the -- of the outcome of the lawsuit.

13      Q.   That's the first conversation you can actually

14   remember?

15      A.   I can recall, yes.

16      Q.   Okay.

17           Do you know if you had any conversations with

18   him before that?

19      A.   I --

20      Q.   About the investigation?

21      A.   It would only be an interview -- it would only

22   be to interview me in regards to it.

23      Q.   And you're not clear whether he interviewed you

24   or not?

25      A.   I'm not.

GREGORY A. NYHOFF, VOLUME I
July 19, 2023

1      Q.   Do you know the name Linda Daube, D-a-u-b-e?
2    You're looking like you might.
3      A.   Name's familiar.  I -- well, I'm thinking that
4    that name pops into the investigation side of who's
5    asking questions.
6      Q.   Do you believe you were interviewed by Linda
7    Daube?
8      A.   You know, I can't remember being interviewed by
9    Chris.  It's not jumping into my mind, so it would be
10   highly more likely of being interviewed by Linda, now
11   that you say that.  I didn't know who Linda was, and
12   so -- I believe that is who interviewed me.
13     Q.   Okay.
14          So we've been talking about this from different
15   angles.
16          Do you now believe you actually were
17   interviewed during the investigation?
18     A.   Yes.
19     Q.   Okay.
20     A.   I do.
21     Q.   All right.
22     A.   Most likely it was Linda.
23          MR. STRAUSS:  Okay.  All right.
24          Let's go off the record.
25          THE VIDEOGRAPHER:  All right.

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1              The time is 2:25 p.m.  We are going off the

2     video record.

3              (Recess taken from 2:25 p.m. to 2:34 p.m.)

4              THE VIDEOGRAPHER:  The time is 2:34 p.m.  We

5     are back on the video record.

6              MS. SHESTON:  Counsel, the witness would like

7     to clarify one previous response from right before we

8     broke.

9              MR. STRAUSS:  Okay.

10             **THE WITNESS:  Yeah, so I walked out trying to**

11     **think about the conversation about whether I was**

12     **interviewed by any investigator, and I cannot recollect**

13     **that I was.  So I just -- I don't want to say something**

14     **that I believe I was.  I was all over the place on that**

15     **one.**

16        Q.   (By Mr. Strauss)  A little bit.

17        **A.   I do not -- I do not recall being**

18     **interviewed --**

19        Q.   Okay.

20        **A.   -- by an investigator in that claim.**

21             MR. STRAUSS:  And, Counsel, we -- you have not

22     produced any interviews by the witness, and if one

23     exists, I would expect it to be produced.  So I'd ask

24     you to reconfirm.

25             MS. SHESTON:  I don't believe one exists.

1          MR. STRAUSS:  Okay.

2      Q.   (By Mr. Strauss)  So when I mentioned the name

3   Linda Daube, there was a glimmer of recognition that I

4   observed.

5          Where do you know that name from?

6      **A.   I -- I believe -- well, I know that I saw it as**

7   **part of one of the -- Open Vallejo, it was a media**

8   **piece, that name came out as far as having conversations**

9   **with Slater or Will, that she was an -- was doing the**

10  **interviews or something to that effect.**

11     Q.   And just to be clear, are you now telling me

12  that you are certain you were not interviewed during the

13  investigation or you just don't remember?

14     **A.   I'm saying I do not recall being interviewed by**

15  **the investigator.**

16     Q.   Okay.

17         Let me try it this way:  Do you recall being

18  asked any questions related to any concerns that anyone

19  had about your job performance?

20     **A.   Can you repeat that.**

21     Q.   Yeah.

22         Do you recall being asked questions related to

23  concerns that employees had about your job performance?

24     **A.   I don't recall anybody asking me questions**

25  **about that.**

1        Q.    Did anyone ever confirm to you that it was my

2   three clients who had initiated this investigation?

3        **A.    I -- not that I can recall.**

4        Q.    Okay.

5              That's not something Mr. Boucher ever shared

6   with you?

7              MS. SHESTON:  Well, if it came up in the

8   context of attorney-client conversation, I'm going to

9   object on that front, but if it came up about the

10  investigation itself, because we've had a limited

11  waiver, you can answer that part.

12             MR. STRAUSS:  Well, that's a fine distinction

13  for the witness to try to make.

14        Q.   (By Mr. Strauss)  Did Mr. Boucher ever share

15  that with you, that it was my clients who were involved?

16             MS. SHESTON:  Well, that's a different

17  question, "were involved."

18             Same objection.

19             But go ahead.

20             **THE WITNESS:  I don't recall him ever divulging**

21  **that directly to me, but I think from the very beginning**

22  **when Joanna made the statement, that it was she and**

23  **they, as in Will and Slater, the three of them, had**

24  **proceeded on this.**

25             **So I don't recall anybody saying specifically,**

**GREGORY A. NYHOFF, VOLUME I**

July 19, 2023

1    but from that very first interaction Joanna had, I think

2    my recollection is, is that information of those would

3    be those were the three who were doing it collectively.

4        Q.   (By Mr. Strauss)  And this information from

5    Joanna is what you learned through Heather Ruiz?

6        A.   Yes.  Yes.

7        Q.   Okay.

8             And so throughout this entire investigation

9    process, at least in your mind, it was clear my three

10   clients were behind it?

11       A.   Joanna was clear.  The other two, I think she

12   said they.  Just out of the association of the three of

13   them were always together, always did a lot, and seems

14   the things that would have been happening previously

15   with some of the behaviors of those two, I guess I came

16   to that deduction, that it was likely that those were

17   the other two.  I don't know if anybody ever confirmed

18   who they -- all of them were.

19       Q.   Were there any other suspects?

20            MS. SHESTON:  Object to the term "suspects" as

21   vague and ambiguous.  And argumentative.

22            Go ahead.

23       Q.   (By Mr. Strauss)  I can give you a more benign

24   term, if you like.  I was jesting.

25       A.   No.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      Q.   There was no one else who you thought might be

2   behind the investigation of the complaints that led to

3   the investigation of you?

4      **A.   No.  And the only one I knew for sure was**

5   **Joanna.**

6      Q.   Okay.

7           Was Shannon Eckmeyer gone from the City as of

8   the time of this investigation?

9      **A.   My recollection is yes.**

10     Q.   Did you ever discuss with her yourself, her

11   reasons for leaving the City?

12     **A.   Can -- what was the question again?**

13     Q.   Did you ever discuss with Shannon, yourself,

14   her reasons for leaving the City.

15     **A.   I -- I had a conversation with her about how I**

16   **was sad to see her leave, but I don't recall anything**

17   **specific to why she was leaving the City or her**

18   **commenting on that.**

19     Q.   Is it your understanding that she voluntarily

20   left?

21     **A.   Yes.**

22     Q.   Do you recall anything specific about that

23   conversation, other than your saying you were sad she

24   was leaving?

25     **A.   No.  I -- that's -- I remember telling her I**

1    was sorry that she was leaving, wish that she would

2    stay.

3        Q.   Do you know if anyone did an exit interview

4    with her?

5        A.   I don't know that.

6        Q.   Do you know if exit interviews were ever done

7    at the City?

8        A.   I know -- my recollection's some were.  I don't

9    know any specifics of that, but some were.

10        Q.   Do you know who would conduct them if they were

11    done?

12        A.   I believe the Human Resources Department would

13    do that.

14        Q.   Did anyone other than Shannon herself ever

15    share with you why she was leaving?

16        A.   No.

17        Q.   Okay.

18             When I say the name Linda Daube, does a visual

19    image spring up in your mind of what she might look

20    like?

21        A.   No.

22        Q.   Okay.

23             So if I'm understanding right, you met

24    Christopher Boucher at a presentation that he put on

25    that you attended for the City, and then you spoke to

1    him again at the end of the investigation process?

2         A.   Yes, that's my recollection.

3         Q.   And not any time in between?

4         A.   I -- certainly not about the investigation.  I

5    was trying to think he did -- he did do some other work

6    for us in regards to some of the police-related issues

7    and some of the personnel matters we had there.  I don't

8    think those were happening simultaneously.  But he did

9    help us with some of the police-brutality matters.

10        Q.   Thank you for reminding me of that, because I

11   think you had mentioned other work he had done.

12             Do you know if that was done before the

13   investigation, after the investigation, during the

14   investigation?

15        A.   I -- I don't know.  That's not the hire I make.

16   The city attorney makes the decision whether to hire

17   them.  I'm thinking timeline-wise that we had the police

18   issues going on for quite a significant amount of time,

19   that I -- that's where I could have first saw him, but I

20   don't recall that specific timeline.

21        Q.   Okay.

22             Did you interact with him in connection with

23   his work on the police cases?

24        A.   We didn't typically -- I mean, we had -- so we

25   had a team of people, from HR, to Police, to certainly

1    City Attorney's Office, and Mr. Deis was helping to move

2    that forward.

3           So there was a team of six or seven people that

4    would go on Zoom usually once a week, and we would just

5    discuss what's going on in the police department, what

6    kind of cases there are.  Usually they related to

7    personnel matters.  So he would be there --

8           (Stenographer clarification.)

9           THE WITNESS:  He would be part of the meeting.

10   Q.   (By Mr. Strauss)  Was he part of that team?

11   A.   Yes.  Not as frequent, as I think he was on

12   request by the City Attorney's Office, but he would

13   attend some of them.

14   Q.   Do you know what his role was in connection

15   with the police cases?

16   A.   My recollection is he was just basically there

17   to provide input, and as far as just when we went

18   through and discussed where all those cases were going,

19   what type of -- of -- you know, action might be

20   appropriate, what steps the Union may take, that he was

21   part of -- it was more like a strategy meeting, strategy

22   conversation.  So there was no specific role that I can

23   recall.  I would say City Attorney's Office was the one

24   who hired and specified what his role would be there.

25   Q.   Do you know who specifically within the City

1    Attorney's Office hired him?

2        A.   Oh, boy.  Again, it's a timeline issue.  I know

3    that Randy Risner was in the meeting.  I can't remember

4    if it was in the interim or whether Veronica had already

5    come on board.  I want to think it might have -- it

6    was -- I don't know.  I would be speculating.  I'd be

7    guessing.  I would be guessing.

8            MS. SHESTON:  Don't do that.

9            MR. STRAUSS:  Don't do that.

10           MS. SHESTON:  Nobody wants that.

11           **THE WITNESS:  I can't recall that time frame.**

12       Q.   (By Mr. Strauss)  Are you aware of some

13   personal relationship between Risner and Boucher,

14   friendship or --

15       **A.   No.**

16       Q.   -- other association?

17       **A.   No.**

18       Q.   Do you know the Lieutenant John Whitney?

19           (Stenographer clarification.)

20           MR. STRAUSS:  John Whitney, W-h-i-t-n-e-y.

21           **THE WITNESS:  Yes.**

22       Q.   (By Mr. Strauss)  You're aware he has a claim

23   against the City?

24       **A.   Yes.**

25       Q.   Are you being paid to testify in that case, if

1    called?

2        A.    Yes.

3        Q.    Okay.  All right.

4            So when Mr. Boucher spoke with you about the

5    results of the investigation, what did he tell you?

6        A.    So first of all, the -- the person that

7    discussed it with me was the city attorney.  I

8    believe -- I'm pretty sure it was the acting city

9    attorney, which would be Randy Risner.

10       Q.    Okay.

11       A.    Mr. Boucher was accompanying him, and it was on

12   Zoom.  And so what the -- the city attorney told me in

13   that meeting was that, Good news for you, Greg, that the

14   investigation was unsubstantiated and -- and that's been

15   provided -- information's been provided to the City

16   Council in regards to the findings of it, and that was

17   the extent of -- he told me that, You are not going to

18   get a copy of it.

19            And that pretty much ended as far as that

20   meeting when it came to telling me what it was; you

21   know, what the -- just gave me the summation of the

22   investigation as unfounded, what the claims were, and

23   that was it.

24       Q.    What were the claims?

25       A.    I don't know.

1      Q.   He didn't tell you what the claims were?

2      **A.   He did not.**

3      Q.   Okay.

4           I misunderstood what you just said.

5           So other than saying, Good news, Greg, the

6      claims are unsubstantiated -- unsubstantiated, did he

7      say anything else?  Did anyone say anything else?

8           MS. SHESTON:  Other than what he already

9      testified to --

10          MR. STRAUSS:  Correct.

11          MS. SHESTON:  -- that you're not getting a copy

12     of the report?

13          MR. STRAUSS:  Yeah.

14          **THE WITNESS:  Again, what I would say, over**

15     **time, we discussed none of the specifics of the**

16     **investigation, but steps, you know, as far as the**

17     **city -- assistant city manager and I were -- decisions**

18     **we were making in regards to their future employment,**

19     **Will, Slater, and Joanna.**

20     Q.   (By Mr. Strauss)  Okay.

21          Does that mean there were discussions about

22     whether or not to terminate them?

23     **A.   Yes.**

24     Q.   Okay.

25          And when did those conversations take place?

1    Within days?  Weeks?  When was it?

2         A.    Within a couple weeks.

3         Q.    Who was involved in those discussions?

4         A.    Anne, City Attorney Risner, and Chris was part

5    of a number of them.

6         Q.    Okay.

7               Who initiated those conversations?

8         A.    I did.  Seeking legal advice.

9         Q.    What did you want advice about?

10        A.    If there was any potential liabilities in what

11   decision -- you know, decision I -- I might make; did it

12   appear to them whether the justification for it was --

13   they could say that seems supportive; the fact that

14   they're at-will employees, what does that really mean?

15              So general questions, just as to trying to

16   formulate a decision; should there be lower levels of

17   discipline?  Just those types of questions you're going

18   to have when you're looking at a situation like this.

19        Q.    Okay.

20              So even before you reached out to an attorney,

21   you were thinking in your mind the possibility of

22   terminating my clients?

23        A.    Yes.  Yes.

24        Q.    Why?

25        A.    We talked about a number of those issues and

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    what I felt were to the point of insubordination and not

2    being communicative.  All of those, there was concerns

3    about how they were doing their job, and actually

4    concerns even prior to the investigation on me, that

5    appeared to me that they were purposefully leaving me

6    out of conversations and undermining my authority as a

7    city manager in some of their actions that they took.

8        Q.   You recall describing the reasons why they were

9    terminated in a declaration you signed under penalty of

10   perjury?

11       A.   I don't.

12       Q.   Do you remember signing that declaration under

13   penalty of perjury?

14       A.   Before I left.

15       Q.   All right.

16            And do you remember that in that declaration,

17   you were describing the reasons why you made a decision

18   to terminate them?

19            MS. SHESTON:  If you remember it, great, tell

20   him what you remember.  If you don't, it is what it is.

21            THE WITNESS:  Those were some really tough

22   days, and I don't recall.  I signed multiples and the

23   final separation agreement for several people, and so I

24   don't recall, haven't looked at them since, so

25   apologies, I don't know.

1       Q.   (By Mr. Strauss)  That's all right.

2            So by tough days, you mean this is the time

3    you're separating and health problems and other issues?

4       **A.   Correct.**

5       Q.   That's what you're talking about?

6       **A.   Correct.**

7       Q.   Okay.

8            I understand.

9            Well, let me drill down a little bit about what

10   you just said, and I just want to find out what you

11   remember about it; okay?

12      **A.   Okay.**

13      Q.   So you said that after the investigation was

14   concluded and it was unsubstantiated, and before you

15   reached out to counsel for advice, you were thinking

16   about terminating my clients for a couple of reasons,

17   and one of which, the first one you said, was leaving

18   you out of conversations; correct?

19      **A.   Yes.  But can I clarify that we're talking**

20   **about them three together, and they all have different**

21   **situations that came into play in the evaluation.  So**

22   **certainly Will and Slater, that I worked directly with,**

23   **that was one of the concerns.**

24      Q.   Okay.

25           What do you mean when you say it came into play

**GREGORY A. NYHOFF, VOLUME I**
July 19, 2023

1    in the evaluation?

2        A.    So my decision whether to terminate them or

3    not, those were all different components or pieces

4    that -- that I evaluated when I made the final decision.

5            (Stenographer clarification.)

6            THE WITNESS:  Final decision on their

7    termination.  Will and Slater's and Joanne's.

8        Q.   (By Mr. Strauss)  And to be clear, when you use

9    the word "evaluation," you're not speaking of an

10   investigation or a performance evaluation; you're

11   talking about your personal evaluation of their work?

12       A.   Correct.

13       Q.   Okay.

14       A.   And the situation.

15       Q.   All right.

16           And so leaving you out of conversations

17   referred to Slater and Will, but not Joanna?

18       A.   Correct.

19       Q.   Okay.

20           And did you tell me this morning what you meant

21   by that or is there something more to that?

22       A.   No, I -- so much of that had to do with the

23   lack of communication and -- with them not keeping me

24   informed of projects.  That's one of the components of

25   that.

GREGORY A. NYHOFF, VOLUME I
July 19, 2023

1              (Stenographer clarification.)

2              **THE WITNESS:  Components of that.**

3              MR. STRAUSS:  Let's go off the record for a

4      second.

5              THE VIDEOGRAPHER:  All right.

6              The time is 2:53 p.m. and we are going off the

7      video record.

8              (Recess taken from 2:53 p.m. to 2:55 p.m.)

9              THE VIDEOGRAPHER:  All right.

10             The time is 2:55 p.m. and we are back on the

11     video record.

12     Q.    (By Mr. Strauss)  And, Mr. Nyhoff, I appreciate

13     we're talking about events that happened two years ago,

14     and you're doing your best to remember them, and I

15     understand that, and thank you for that.

16             So we're talking about your thought process in

17     terminating my clients.

18             And you told me that Slater and Will were

19     leaving you out of conversations, and this is something

20     that you'd been thinking about for a while?

21     **A.    Well, yes, all those projects that we've**

22     **discussed earlier, that -- that's just a component of**

23     **the conversation.  I think the Judy issue is a component**

24     **of the -- of my decision-making analysis.  The -- the**

25     **lack of work being with the other leadership team and**

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1    trying to have a cohesive leadership team, that they

2    were breaking apart.  A lot of those.  And each one was

3    independently evaluated.

4        Q.    Up until this time when the investigation of

5    you has been completed, you hadn't asked anyone about

6    whether or not you could terminate my clients, had you?

7        A.    I -- I had conversations with the City

8    Attorney's Office.

9        Q.    When?

10        A.    Maybe it wasn't during the investigation, maybe

11    it was during the -- it was actually after.  So -- to be

12    specific here, this is during the investigation, but --

13    trying to think of timelines --

14        Q.    Yeah.

15        A.    -- because Slater Matzke turned into a whole

16    different person once Will got put on administrative

17    leave, and I don't recall which window when he was -- it

18    was probably during the investigation, because I would

19    communicate with the City Attorney's Office in regards

20    to some performance issues in regards to him

21    understanding, just saying, I know I'm under

22    investigation, it's not something -- or please advise

23    when it comes to some of these -- some of the things he

24    was doing during that period of time in his role.

25        Q.    Okay.

1          What was he doing?

2     A.   I talked a little bit about that with Factory

3   OS, for instance.  Talked about that with the mayor, for

4   instance.  We -- he was disruptive during the -- some of

5   the staff meetings.  He actually, at one point in time,

6   told LaTanya, among the other ones, to go talk to the

7   Economic Development director, if you want some -- on a

8   decision, or he wants some input into that.

9          And so he made a complete -- it was 180 percent

10  different than who Slater was, and it was directed, in

11  my opinion, against me, to make me look worse, to make

12  me look less -- less as a city manager as I needed to in

13  front of the rest of the employees.

14         So that was going on.  I had to take, again,

15  the parking garage project.  I had to have two people

16  co-lead that, two other directors, because I no longer

17  had trust that Slater was going to do what's in the best

18  interest of the City or -- or me.  Because these

19  failures would reflect on me, and I actually felt that

20  that was his intention, certainly because of his -- so

21  angry and -- and upset about me putting Will on

22  administrative leave.

23    Q.   Okay.

24         So during the time that you were aware you were

25  under investigation for a complaint that you believe

1    was, in part, initiated by Slater Matzke, you reached

2    out to the city attorney to discuss terminating him?

3        A.   No.  I -- no, I reached -- well, let me put it

4    this way.  I reached out for advice from my legal

5    counsel.  In regards to these situations, some of these

6    situations that I was just talking about.

7        Q.   Who are you talking about, who is your legal

8    counsel?

9        A.   Randy Risner.

10       Q.   So you reached out to the acting city attorney?

11       A.   Correct.

12       Q.   About terminating Slater Matzke?

13       A.   No.

14       Q.   About what?

15       A.   Seeking advice.

16       Q.   And was it during that discussion the

17   possibility of terminating him raised?

18       A.   No.

19       Q.   Okay.

20            What were you seeking advice to do?

21       A.   How best to manage the situation when I'm under

22   investigation.  And it was quite evident from his

23   behavior that he was part of that claim.  And I was very

24   cautious, and only would take any steps when it came to

25   any type of disciplinary action if that was necessary

1    that the city attorney felt comfortable in approving.

2            Any time you're under investigation, you're

3    not -- I mean, you just -- obviously, you've got a claim

4    against you and you're going to -- I understand, as Judy

5    makes a claim against me, I -- one thing that I'm not

6    going to do is take any inappropriate action without

7    legal counsel.

8        Q.    Okay.

9            And you said something that I didn't quite

10    understand.

11            You said "part of that claim," referring to

12    Slater Matzke.

13            What did you mean by that?  What claim are you

14    talking about?  We can have the answer read back.

15        A.    Can you help me with that.

16            (Record read.)

17            MS. SHESTON:  So what's the question now, I'm

18    sorry?

19        Q.    (By Mr. Strauss)  What were you referring to

20    when you said "part of that claim"?

21            MS. SHESTON:  Okay.  Thanks.

22            THE WITNESS:  So the -- the claim, which is the

23    same with Judy as this claim, is basically the

24    investigation.  So they're claiming something that I've

25    done is inappropriate, and so that would be my

```
 1   definition of a claim --

 2       Q.   (By Mr. Strauss)  Okay.

 3       A.   -- to initiate that investigation.

 4       Q.   Okay.

 5            And so you decided you weren't going to take

 6   any action against Slater Matzke until after that claim

 7   was over?

 8       A.   I was seeking advice from legal counsel in

 9   regards to action or steps that I might take to --

10            (Stenographer clarification.)

11            THE WITNESS:  -- correct the behavior.

12       Q.   (By Mr. Strauss)  And you concluded that you

13   were not going to terminate him until after the

14   investigation was over; right?

15       A.   Yes.

16       Q.   Had you had any conversations where you were

17   seeking advice about what to do about Slater before the

18   investigation into you had been launched?

19            MS. SHESTON:  Well, vague and ambiguous as to

20   time.

21       Q.   (By Mr. Strauss)  So let me try and clarify.

22            You're notified by Mayor Sampayan?

23       A.   Sampayan.

24       Q.   Thank you.

25            -- that they're investigating you?
```

1      A.    Yes.

2      Q.    Prior to that moment, had you ever gone to

3  anyone asking for advice about whether or not you could

4  terminate Slater Matzke?

5      A.    So after Will got put on leave, several

6  occasions, I had discussions with the city attorney's

7  Office about his -- his behavior and what -- what --

8  what his reaction to that was.

9          MS. SHESTON:  "His" being Slater?

10          THE WITNESS:  Slater's reaction to that, and

11  what -- how I interpreted those reactions, as being

12  upset and actually being insubordinate.

13      Q.   (By Mr. Strauss)  Did you ask whether or not

14  you could terminate him before the mayor told you you

15  were under investigation?

16      A.    So I would say I had conversations with legal

17  counsel in regards to all levels of discipline.

18      Q.    Had you taken any steps whatsoever to terminate

19  Slater Matzke prior to learning that you were under

20  investigation?

21      A.    No.

22      Q.    Okay.

23          Same true of Will Morat?

24      A.    Will Morat was -- we had counseled him early

25  on, but other than that, no.

GREGORY A. NYHOFF, VOLUME I

July 19, 2023

1      Q.   Okay.

2           Is the same also true -- and by no, you mean

3  you had not taken any steps to terminate Will Morat

4  prior to learning that you were under investigation?

5      A.   Correct.

6      Q.   Okay.

7           Is that also correct with respect to Joanne

8  Altman?

9      A.   Yes.

10     Q.   Okay.

11          And then shortly after you had been told that

12  you had -- that the complaints against you had been

13  unsubstantiated, that's when you first took affirmative

14  steps to initiate the termination of my clients?

15     A.   Yeah, once -- once there was unsubstantiated

16  findings, then we started discussing what are our next

17  steps here.

18     Q.   And what role did the fact that they had

19  initiated an investigation against you play in your

20  taking steps to terminate them?

21     A.   I think it would be -- it -- the role it played

22  was the fact that several of the comments leading up

23  was -- I was losing trust in them.  And so that's for

24  all three of them, different scenarios prior to the

25  investigation, during the investigation, and then

1  afterwards; it was these three individuals work for the

2  city manager's office, and can I trust them as at-will

3  employees to act -- to change those things that had

4  happened beforehand, and can I trust them?

5         So there was conversations about the trust

6  factor that's necessary between an employee and

7  employer.

8  Q.   Did -- was all trust between you and my clients

9  severed because they initiated an investigation of you?

10 A.   Well -- well, if I would -- I would state it as

11 this:  Is there's one thread left because that trust was

12 being lost over months for Will; Slater was turned very

13 much against me in the last several months during the

14 investigation; and Joanna had indeed gone to my

15 executive assistant and also said that I'm trying to

16 destroy the City, along with my assistant.

17        So I would say yes, the trust was -- was

18 being -- had been lost, for the most part, and this --

19 might perhaps say is a thread, final thread, that said,

20 What are we going to do now?  And I had to make a

21 decision with the three at-will employees.

22 Q.   Okay.

23        Did you ever learn that they were told they had

24 to be completely honest in answering the investigator's

25 questions on threat of termination?