**EXHIBIT "GG"**
**Transcript**
*California v. Milano*, **Superior Court of Solano County,**
**Case No. VCR 233208**
**March 22, 2022, morning session**

```
 1              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  IN AND FOR THE COUNTY OF SOLANO

 3                 HONORABLE DANIEL HEALY, PRESIDING

 4                          --oOo--

 5   THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                            )
 6                                          )
          Plaintiff,                        )
 7   vs.                                    )
                                            )
 8   DOMINIC JAMES MILANO,                  )CASE NO.VCR233208
                                            )
 9        Defendant.                        )
                                            )
10   _____)

11                          -oOo-

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13              TUESDAY, MARCH 22, 2022

14            MORNING SESSION - PAGES (1-91)

15                          -oOo-

16

17

18

19

20

21

22

23

24

25

26

27              STACIE CURTIS, CSR, RPR
                Official Court Reporter
28              CSR License No. 13987
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

```
 1              MASTER INDEX - VOLUME 1 (PAGES 1 - 91)

 2                      A P P E A R A N C E S

 3                             -oOo-

 4  For the Plaintiff:            BRUCE TIMOTHY FLYNN
                                  DEPUTY DISTRICT ATTORNEY
 5                                675 TEXAS STREET, SUITE 4500
                                  FAIRFIELD, CA 94533
 6

 7  For the Defendant:           NICHOLAS EWING FILLOY
                                  AND TRACY MICHELLE KRAUSE
 8                                DEPUTY PUBLIC DEFENDERS
                                  355 TUOLUMNE ST, SUITE 2200
 9                                VALLEJO, CA 94590

10  For the City of Vallejo:     KATELYN M. KNIGHT
                                  ATTORNEY AT LAW
11                                555 SANTA CLARA STREET
                                  VALLEJO, CA 94590
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

```
1          MASTER INDEX - VOLUME 1 (PAGES 1 - 91)

2                          SESSIONS
                                                        PAGE
3    MARCH 22, 2022

4         Morning Session                                6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

```
 1              MASTER INDEX - VOLUME 1 (PAGES 1 - 91)

 2

 3                WITNESSES IN CHRONOLOGICAL ORDER

 4
    FOR THE DEFENDANT:                                    PAGE
 5

 6       MATTHEW KOMODA

 7            Direct by Mr. Filloy                         31

 8            Cross by Mr. Flynn                           55

 9            Redirect by Mr. Filloy                       58

10            Recross by Mr. Flynn                         60

11         MATTHEW KENT TRIBBLE

12            Direct by Mr. Filloy                         62

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                          March 22, 2022

```
 1              MASTER INDEX - VOLUME 1 (PAGES 1 - 91)

 2

 3                            EXHIBITS

 4  COURT EXHIBIT:

 5  NO.      Description                      ID        EVD

 6  1        DOCUMENT                         30

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1  MORNING SESSION

 2                      TUESDAY, MARCH 22, 2022

 3                            -oOo-

 4      THE PEOPLE OF THE STATE OF CALIFORNIA versus DOMINIC JAMES

 5  MILANO.

 6      The above-entitled matter came on regularly this date in the

 7  Superior Court of California, County of Solano, before Honorable

 8  DANIEL HEALY, Judge, presiding.

 9      THE PEOPLE OF THE STATE OF CALIFORNIA were represented by

10  BRUCE TIMOTHY FLYNN, Deputy District Attorney for Solano County.

11      The Defendant, DOMINIC JAMES MILANO, was present and

12  represented by NICHOLAS EWING FILLOY and TRACY MICHELLE KRAUSE,

13  Deputy Public Defenders for Solano County.

14      KATELYN KNIGHT, attorney at law, was present and represented

15  the City of Vallejo.

16      STACIE CURTIS, CSR, RPR, Official Court Reporter, was present

17  and acting.

18      The following proceedings were had and taken, to wit:

19                   P R O C E E D I N G S

20                            -oOo-

21      THE COURT: All right.  Let's call Mr. Milano.

22      All right.  Mr. Milano appears here with Mr. Filloy and Ms.

23  Krause.

24      Mr. Flynn for the People.

25      Ms. Knight is here from the City of Vallejo.

26      So continuing along this case, which has been part Pitchess,

27  part -- we set today as a 402 to explore and define what, if

28  anything, a jury may be entitled to hear about any of this stuff.
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                      March 22, 2022

1      The -- I guess -- well, first, there was some e-mails that
2  bounced back and forth that I saw that my assistant showed me
3  regarding what we discussed this hearing involving.  And Mr.
4  Filloy had presented a really lengthy witness list.  And Ms.
5  Knight had responded, which was -- well, my recollection of what I
6  indicated initially is that I was -- I thought that Officer Komoda
7  was clearly relevant to this case, that -- that Officer Tribble --
8  Kent Tribble was theoretically relevant because of the
9  interconnection with the Komoda events.  And the rest of it I said
10  I'm still struggling or not quite seeing.
11      So I think what I said let's hear from those two witnesses
12  and then we can walk through and see what we think about the rest
13  of them.  I think that was my position.
14      Now, since then, Ms. Knight indicated a little while ago --
15  and I think I heard this a day or two ago -- I'm not sure when it
16  happened, but I just heard that the -- in a separate -- in a case
17  going on next door, the Cortez case, that -- oh, and what happened
18  when we were -- last time I directed the City to release some
19  stuff to Mr. Flynn.  The things that I indicated to be disclosed
20  in this case, which had to do with basically Komoda and Tribble
21  and then McLaughlin and Stephanie McDonough, I think a little bit
22  more than that.
23      But, anyway, apparently it turns out the entirety of it all
24  has now been released to the district attorney.
25      MR. FILLOY:  Has it been released under protective order, or
26  has it just been released to the district attorney?
27      MS. KNIGHT:  So it was released under protective order such
28  that the district attorney -- anything they provided to the

1 defense in the Cortez case could only be used in that case;

2 however, the judge did not bind the District Attorney's Office

3 from making disclosures as needed in their other cases.

4      THE COURT:  All right.  So this case has now obtained the

5 status of that other case in report where there is involving some

6 other officers -- Mustard and some others -- where it's kind of

7 being handed out, being presented.

8      And we're being asked to sign protective orders.  What's

9 happened -- what has happened in this case -- I assume this case

10 may evolve to that sort of status, is in open court it gets

11 presented, the district attorney presents it to the defense, and

12 then we're asked to sign a protective order.

13      MS. KNIGHT:  We'll see, Your Honor.  I mean, our position is

14 this is Pitchess information and so it's business as usual.

15 Certainly if the District Attorney's Office reviews it and finds

16 some information that they feel is Brady, they're free to make

17 that disclosure.  I -- personally, I don't think it's Brady, but

18 that's up to them.

19      THE COURT:  All right.  Well, let's do this:  Mr. Filloy has

20 presented three questions he wants answered in his latest reply

21 brief as to:  What is this report?  Is it a public record?  I --

22      MR. FILLOY:  I think --

23      THE COURT:  Right?  You're looking at me funny.

24      MR. FILLOY:  Right.

25      THE COURT:  I'm looking at your list of requested rulings.

26      MR. FILLOY:  Yes.  Yes.  There you go.

27      THE COURT:  Number one:  The defense requests a ruling that

28 the recordings, transcripts, and reports produced as part of the

1  badge-bending investigation are public records pursuant to 832.7.

2      MR. FILLOY: (b). Yeah.

3      THE COURT:  Which is kind of an interesting issue because if

4  I do make such a ruling, it seems to me that under the statutory

5  scheme, I don't just willy-nilly release stuff.  If I make a

6  finding the City doesn't release it, I think you have to bring a

7  specific action to enforce the Public Records Act.

8      MR. FILLOY: I --

9      THE COURT:  I think our friends in Open Vallejo have done

10  that a few times, but I think that's -- I think they know the

11  drill.  I think that's the mechanism for doing all that.

12      Even if I were to say it's an open record, I don't think

13  that's -- as much as I would love for that to occur, it can be out

14  and I can be done with it, I don't think that's how this thing

15  works.

16      MR. FILLOY: Well, Judge, I -- I disagree.  If it's a public

17  record, I can subpoena it.

18      THE COURT: Right.

19      MR. FILLOY: I mean, I don't need -- because I have criminal

20  subpoena power, I represent criminal defendants who have Sixth

21  Amendment rights, then I can just subpoena -- which I've done,

22  like, multiple times in this case now -- subpoena the

23  badge-bending records, and I get them.

24      Let me just -- you know, the -- going through the process

25  that the public has to go through, the public has the public's

26  interest; they don't have Mr. Milano's interest, who is facing the

27  rest of his life in prison and has all the criminal rights that

28  are afforded him under the U.S. Constitution.

1    They've got to go through this process that's very lengthy.

2  And if somebody doesn't want to give them something, they gotta

3  file a civil suit, they gotta do all that stuff because they don't

4  have a heightened right to the information.

5    THE COURT:  But the heightened right for the information is

6  premised on the relevance analysis; right?  You have a heightened

7  right to -- I've already said I've already released them to you.

8  If it's related to -- if it's related to --

9    MR. FILLOY: Well, hold on --

10    THE COURT: -- to Mr. Milano, then, yeah.  If it's related to

11  McMahon --

12    MR. FILLOY: Well --

13    THE COURT:  -- then that's a whole different thing, seems to

14  me.

15    MR. FILLOY:  You know, when a lawyer subpoenas something,

16  right, they do so, you know, hopefully in good faith; right?  They

17  don't just subpoena random things that they'd like to look at.

18  They subpoena things that are, you know, relevant to the case.

19    And unless it's a privileged document, you know, Mr. Milano

20  has a Sixth Amendment right through compulsory service of process.

21  He just gets that information unless there's HIPPA privilege or

22  Pitchess privilege or something like that.  The Court doesn't

23  review it in camera, we don't go through a relevance inquiry.

24    I just subpoena documents all the time in court that I think

25  may contain relevant information for my client, and often times

26  they don't; right?  I mean, often times I think there might be

27  something relevant in somebody's school records or in some medical

28  records or something or in, you know, a loss prevention agent's

1  report that I subpoena from a store.  Then I get it and go, oh,

2  there's nothing really in there.  But I have a duty to investigate

3  everything I think could be, you know, informational.

4       So my point is it could be relevant.  So my point is that,

5  you know, I subpoenaed this stuff; if it's not privileged, then I

6  get it; right?

7       And the idea that criminal defendants who have appointed

8  counsel and the defendants are going to have to go through the

9  civil PRA lawsuit procedure, I think that's ridiculous.  And I

10  think that -- I think that's absolutely ridiculous, and there's no

11  legal basis to say that at all.

12       I had an experience in this case, which highlights how that

13  is just a punch to delay disclosures.  It was with the City of

14  Oakland, not the City of Vallejo.  I subpoenaed some information

15  relating to some of these officers, you know, employment that

16  were, you know -- I'm sorry -- we did a Public Records Act request

17  for some of this information.  Then I subpoenaed the information

18  not -- you know, not privileged information relating to some of

19  these officers that were previously Oakland police officers.

20       And when I subpoenaed it, this lady from the Oakland City

21  Attorney's Office calls me up.  Ms. Krause and I are sitting there

22  on speakerphone with her.  And she says, "Well, our position is if

23  you issue this SDT, we're going to file a motion to quash because

24  our position is that it's a public record and you gotta do a

25  Public Records Act request."

26       And I said, "Ma'am, if it is a public record, I can subpoena

27  it."

28       She said, "Well, we're going to file a motion to quash."

1    I said, "Before you do that, you should know that Ms. Krause
2 filed a Public Records Act request for this information eight
3 months ago and sent several follow-up letters," at which point the
4 lady from Oakland City Attorney's Office shut up and sent the
5 records; right?
6    Because that is just another delay tactic; right?  Saying we
7 gotta go through the PRA process, absolutely not.  I have criminal
8 subpoena power as somebody that represents Mr. Milano, just like I
9 do on all my clients' cases.  And I subpoena things that I think
10 could be relevant.  And if they're not privileged, people have a
11 duty under the law to bring them to the Court and the Court just
12 gives them to me unless there's some kind of actual legal
13 objection to privilege.
14    So, I mean, if they're public records, how do I not get to
15 just subpoena them?
16    THE COURT: All right.  Well, let's do this:  I think this is
17 an academic -- it seems to me I released everything that is
18 relevant to a large degree. But let me do this:  Let's back up
19 here and then we will get rolling.
20    The -- I guess option one is it's Pitchess, which has this
21 particular definition about investigation of specific officers.
22    Option number two, it's some generalized City-driven
23 investigation in the office culture and practices, which I don't
24 know what that is.  You would think it would be public at some
25 point, but -- Public Record Act, but I don't know.
26    MR. FILLOY: Only -- only when -- when a Court in this
27 county, such as Your Honor, orders it released and compels them to
28 release it.  That is the only time that the City Attorney's Office

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1 will be able to release that information to the public and stop

2 having to come to court every day.  Because if they ever release

3 that -- any of this information in the badge-bending

4 investigation, Judge, without being ordered to do so by a Court,

5 the Vallejo Police Officers' Association and every single police

6 officer who was mentioned in that report in any kind of negative

7 way is going to sue the City of Vallejo into oblivion.

8         So only when somebody with judicial immunity orders it

9 disclosed is it ever going to be released as a public record.

10        THE COURT:  In this --

11        MR. FILLOY:  In fact, Ms. Knight said that to you last time

12 we were here.  The Court asked her, "When is this report going to

13 be released as public record?"

14        She said, "Never."

15        THE COURT:  Well, let me keep going.  In this case, I am

16 struggling to see -- you know, the officers who have been harmed

17 the most are all the officers who did nothing wrong and are yet

18 being continuously besmirched by virtue of the fact that this

19 thing is being held privately.

20        MR. FILLOY:  I agree with you.

21        THE COURT:  That seems to me.

22        MR. FILLOY:  I agree with you.

23        THE COURT:  But the people who -- whom the Court identified

24 as having some culpability, they're not suing --

25        MR. FILLOY:  But, Judge --

26        THE COURT:  I don't see them suing anybody.

27        But, anyway, let me do this:  Ms. Knight, so help me out with

28 this. So what do you think -- I keep going back, and I went with

 1 | our research attorneys, we went around last week trying to figure

 2 | out what do we think this thing is.

 3 |     MS. KNIGHT:  Your Honor -- yeah.

 4 |     THE COURT:  I don't know what this thing is.

 5 |     MS. KNIGHT:  I looked at this very closely, and as much as I

 6 | would love to say it's a public record, my analysis -- the

 7 | language does not allow that.  It's very clearly a peace officer

 8 | personnel record, it's an internal affairs investigation into

 9 | potential policy violations for purposes of imposing discipline.

10 | It doesn't get much clearer than that.

11 |     THE COURT:  Let me ask you this then:  Why does it spend so

12 | much time on management?  There's -- there's 20 pages here, and

13 | this will all -- at some point in time, this will all come out if

14 | Officer Whitney's thing keeps going.

15 |     But I don't -- what is -- what is it about all of the Bidou,

16 | Whitney -- what is it about all of that that has anything to do

17 | with any officer's file?  What does the -- what does conduct

18 | associated with collective unbending of badges without -- not

19 | identified?

20 |     Like, if someone is -- I'm letting in Komoda in a minute.

21 | But let's assume this whole kind of generalized discussion of:

22 | Well, we heard about badge bending, so, therefore, we did A, B,

23 | and C -- and I'm being kind when I said, "They did A, B, and C."

24 | But let's assume they -- they, for purposes of discussion, the

25 | management does something, how is that Pitchess?

26 |     MS. KNIGHT:  Well, Your Honor, those interviews and looking

27 | into that background was part of the investigation to determine

28 | whether any officers had bent their badges, whether that violated

1 any policy.  It was a necessary part of the investigation.

2      And so I don't think that it's possible to piecemeal it and

3 say all right, well, it's a protected peace officer personnel

4 record as to only the discussions about these officers but not any

5 of the background investigation into, you know, what the chief

6 knew and when he knew it.

7      And also that was necessary to determine statute of

8 limitations purposes, who knew what when and whether any

9 discipline could be imposed on the various officers.

10      THE COURT:  So, now, has the city council read this report?

11      MS. KNIGHT:  They have not.

12      THE COURT:  Why has the Vallejo City Council not been given

13 copies of this report?

14      MS. KNIGHT:  So, Your Honor, that gets a little bit into

15 attorney/client stuff, but I can tell you just generally that the

16 Charter does not vest with the city council authority for

17 management of the police department.  It's specifically vest

18 management of the city and its department and employees and the

19 city manager.

20      And then there's a separate provision in the code that says

21 city manager appoints the Vallejo police chief who is responsible

22 for managing that department.

23      There are some issues where with peace officer personnel

24 records, there is a case that held if you provide those records,

25 individuals who do not have a legitimate business need to know,

26 there is some liability there.  And officers have been allowed to

27 sue for invasion of privacy under those circumstances.

28      And so, you know, certainly some information can be

1 communicated internally, but because they're not actively involved

2 in that management, they don't have a legitimate need to see that

3 report.

4     THE COURT:  I just don't understand how -- and I'm getting a

5 little off, but I'm going to try to keep Mr. Filloy ringed in on

6 this -- in this same area as I go off the reservation a little bit

7 here.  I -- I just don't see how the community benefits from any

8 of this.  I don't -- it seems to me just the opposite.  It seems

9 to me that the community is suffering grievous harm because of

10 something that, to a certain extent, has been readily identified,

11 it seems to me to a large extent at this point has been contained,

12 and yet remains this specter of silence and -- just lends itself

13 to the community not understanding what happened here, which just

14 exacerbates the protests and the lack of confidence and all of

15 that.  And if the city council can't even itself engage in that

16 analysis, I just don't know -- I -- I just don't know what that

17 is.  Anyway.

18     MS. KNIGHT:  Well, Your Honor, I think the direction the

19 legislature is going is that in a few years here, everything's

20 coming out is my guess.  We're not going to be doing Pitchess

21 motions anymore.

22     But at this point, again, there's -- there are some

23 protections in place, there is some language in place, and we're

24 obligated to comply.

25     THE COURT: All right.  So, Mr. Flynn, have you -- have you

26 read all this? Have you read the 150-page report?

27     MR. FLYNN: I did briefly yesterday afternoon, Judge.  I -- I

28 can tell you that it is true that we did receive a packet.  I

1  didn't receive it personally.  I am on the Brady committee.

2  Members of the Brady committee will be reviewing the entire

3  report, listening to all the interviews, going through all the

4  documents that's part of determining whether there is any Brady

5  material in any of the officers who were interviewed or

6  participated in the investigation, not only for purposes, I

7  believe, of the Cortez case but any other case where it pops up.

8  But that has not been done yet.  We are still in the process of

9  trying to set up a meeting for the committee to discuss what is in

10 the report.

11     THE COURT:  Okay.  All right.  So let me do this:  Let's --

12 and then we can get rolling here.  For purposes of Mr. Filloy's

13 questions, question number one:  A ruling that the recordings,

14 transcripts, and reports produced as part of the badge-bending

15 investigation are public records pursuant to 832.7.

16     What I think is this report is this hybrid and I think there

17 are -- there is some information in there that is relevant to

18 officer-involved shootings, and there's little morcels of that

19 embedded in 150 pages of I don't know what that is.  I -- it's an

20 odd -- it's an odd report.  It's an odd thing.

21     There are certain names in that report -- Officer Tribble,

22 who we're going to hear from today; Officer McMahon, McLaughlin,

23 Mr. Komoda -- Officer Komoda.  There are a handful of names for

24 which your Brady committee is going to have to disclose this

25 stuff.

26     There are things in there that I think what you will struggle

27 with is -- and we've ran into this issue with the infamous Dr.

28 Hogan (phonetic) report a number of years ago.  It's -- it's

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

1 gossip and unexplored opinion, and I don't even know what that

2 stuff is. I mean, I ruled in the Dr. Hogan case I ruled that the

3 gossip was just gossip and therefore was not really relevant or

4 anything.

5      Now, why all this gossip is in this report, I do not know,

6 but there's a lot of that. And I think that's what you're going

7 to struggle with. So I don't know.

8      I don't think there's a simple answer to what this report is.

9 I think it's an interesting question is: Does this report

10 intentionally blur the lines to -- for some

11 administrator-reliability purpose? I do not know that, and that's

12 not our question today.

13      But for purposes of today's analysis, I mean, again, I'm not

14 sure if this thing is a public record or not, but I'm not going to

15 find it is a public record that would compel me to disclose it

16 today. I'm doing that in part because it seems to me -- and this

17 would be subject to review after we hear from our first couple

18 witnesses -- but it seems to me I've already released everything

19 that is relevant to Mr. Milano out of that report.

20      And I know Mr. Filloy is chomping at the bit because he

21 thinks there is some nugget of meaningful stuff there in this

22 report. And, you know, McMahon is not going to like listening to

23 this report, but other than him, the rest of this is just nothing

24 there.

25      The -- again, your question number two: Are relevant to

26 Mr. Milano. I've already ruled everything involving Officer

27 Komoda is relevant to Mr. Milano -- at least for purposes of

28 further discovery. I've not ruled that any of this is relevant at

1 trial. But I think I've already done that.

2     The -- now, this issue of I know you're saying I haven't read

3 every transcript of every witness and so therefore there may be

4 nuggets of things in there that I just have missed because of by

5 virtue of the time of not having done all that.  And I'm always

6 open to -- as I did in this case, I'm open to modifying my views

7 as we go.  But I am not seeing that.  I think most of this is a --

8 I don't see -- after we hear from these two today, maybe I'll

9 change my mind -- that the Pitchess process is constitutionally

10 deficient.

11     MR. FILLOY:  As applied to the Vallejo Police Department.

12     THE COURT:  And --

13     MR. FILLOY:  And that --

14     THE COURT: I think it's absurd.  I think it's -- every

15 couple years -- I'm a giant fan of Kafka.  And I -- every couple

16 years I go back through and do a deep Kafka dive and reread

17 things, and I've done that over the last three months.  And -- and

18 there's this particular short story that Kafka tells that they

19 actually retell in the trial, and it's captioned "Before the Law."

20 It's a great little story.

21     This has this "Before the Law" feel to it, like it is all

22 designed to never let you through that door until the door is

23 closed.  But I -- this feels like that to me.

24     But having said that, it seems to me that what's the path

25 we're on right now is the right path to be on, and that is

26 exploring information that is relevant to the persons involved in

27 Mr. Milano's case.  So I leave that for another -- I think I leave

28 all that discussion for another day.

 1    MR. FILLOY: Right. Well, at least after we do these

 2 hearings after we see what we get.

 3    THE COURT: Yeah. That's right.

 4    MR. FILLOY: I did want to just logistically -- Your Honor, I

 5 do have a witness subpoenaed for this afternoon -- I told him --

 6 we told him not to come until this afternoon -- that he is on

 7 vacation tomorrow I think I'd like to get to today.

 8    THE COURT: Who is that?

 9    MR. FILLOY: Josh Coleman. I mean, if there is one person

10 that's just definitely going to be a relevant, material, direct

11 witness in this, it's Mr. Coleman.

12    THE COURT: How so?

13    MR. FILLOY: Well, so, Judge, we're -- we're now in the --

14 we're now going to do the 402, so I am going to start talking

15 about the facts of what the offers of proof are now that -- and

16 this is previously disclosed privileged information because, you

17 know, now we're --

18    THE COURT: All right.

19    MR. FILLOY: -- doing the hearing.

20    THE COURT: I forgot to ask you this question.

21    MR. FILLOY: Right.

22    THE COURT: But let's do that.

23    MR. FILLOY: Let's do what?

24    THE COURT: Let's do what you're saying you need to do.

25    MR. FILLOY: Okay. Right. So I think at this point, Judge,

26 probably -- so when Tribble and McLaughlin and Komoda, the thing

27 their statements are in all in agreement on is that right after

28 their first shooting in 2016 -- August 31st, I think, of 2016 --

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1 that Tribble tells them to come to the Relay; right?  And that

2 it's at the Relay that they have this conversation and discussion.

3 The nature of what this is, according to Tribble versus Komoda and

4 McLaughlin, are very, very different, right, in terms of their

5 reporting what the conversation is about.  But everybody agrees

6 they go to the Relay, they meet him there, and he bends the

7 badges; right?

8     THE COURT: "He" being Tribble?

9     MR. FILLOY: Tribble.  Tribble bends their duty badges --

10    THE COURT: And after -- Mr. Flynn, this is what I was

11 curious about.  Are you up on any of this?

12    MR. FLYNN: Yes.

13    THE COURT: All right.

14    MR. FILLOY:  Komoda and McLaughlin both say that there is a

15 fourth police officer there; right?  Komoda cannot remember,

16 according to him, who it is -- who is the fourth police officer

17 that is there at the Relay with Kent Tribble when this happens.

18 But David McLaughlin says, and has no problem in his interview

19 remembering, it was Josh Coleman.  Josh Coleman was sitting there,

20 he was sitting there with Tribble already when we walked in and

21 Josh Coleman was present when Tribble bent their badges.  So he

22 can shed a lot of light on what this conversation really was

23 about, about -- you know, if their account of this is true.

24     But then Josh Coleman is also, according to Kent Tribble,

25 present in a bar, I think -- or it's a little bit vaguer in that

26 one where they are -- present in a bar, probably the Relay, with

27 Kent Tribble -- because he called Kent Tribble over there one

28 night -- this is later on. He gets there.  Josh Coleman and Zach

1  Jacobson are there.  And Tribble watches Coleman bend Zach

2  Jacobson's badge after he's been in an officer-involved shooting;

3  right?

4      Now, Zach Jacobson is asked point-blank by Robert Giordano

5  about:  You were in a bar and Josh Coleman bent your badge in

6  front of Kent Tribble, Zach Jacobson says that's 100 percent

7  false, didn't happen; right?

8      Zach Jacobson says, "I got my badge bent after the Angel

9  Ramos killing, my first shooting, by Terry Poyser in the locker

10 room at the Vallejo Police Department.  And that is the only time

11 my badge has been bent.  After that I bent Ryan McMahon's badge in

12 the locker room after he killed Ronnell Foster."

13     In between those two events, right, is the Barboa shooting --

14 the second shooting for Jacobson, the second shooting for Komoda,

15 the second shooting for McLaughlin.  Nobody wants to admit that

16 there's multiple bendings for multiple shootings.  Okay.

17     Jacobson, 100 hundred percent false, it never happened.

18     Kent Tribble has this really detailed recollection about this

19 incident that he gives.  He says, "Josh Coleman was there."

20     We can ask Josh Coleman, "Did this happen?"

21     THE COURT: All right.  Well, let's break this down.

22     MR. FILLOY:  Because it if happened, it's the bending after

23 Barboa and probably Komoda and McLaughlin's badges were bent too

24 after that.

25     THE COURT:  As to the being present during the exchange

26 between Tribble and Komoda, that kinda makes some sense.  But

27 Poyser and Jacobson and who's doing what and additional --

28     MR. FILLOY:  You gotta let me flush that out for you, Judge.

 1      THE COURT:  Okay.

 2      MR. FILLOY:  Right?  All of these people that are

 3 interviewed -- whose interviews I've got -- now, Jake Estrada was

 4 one of the Barboa shooters.  He left the Vallejo Police

 5 Department, wasn't interviewed, made no statement about this that

 6 I know of, have him subpoenaed for tomorrow; right?

 7      Everybody very conveniently has -- and in their statement,

 8 right, everybody has this conveniently in their statement that

 9 after the Barboa shooting, which happens in August of 2017, no

10 badge bending.  Badge bending never came up, never, you know,

11 happened, nobody is -- it's a very, very convenient reality

12 because three of the guys in that shooting, it was their second

13 shooting.  The other two people, they say no, they don't have to

14 admit they ever had their badge bent at all.

15      But according to Jacobson, he had his badge bent, in January

16 of 2017 after the Angel Ramos shooting, by Terry Poyser.  And then

17 he's bending McMahon's badge in February or March of 2019 after

18 McMahon kills Ronnell Foster.  So right in between the two of them

19 there's a shooting; right?

20      I made a little chart here -- timeline here I'll give just as

21 a visual aid -- hand this to the Court here -- about the

22 progression of shootings that happened; right?

23      8/31/16, Komoda and McLaughlin have this shooting; right?

24 Everybody reports there's badge bending after that shooting.

25      10/16/16, Galios and Coleman are in the Starbucks shooting.

26 Kent Tribble says he bent Galios' and Coleman's badges after the

27 Starbucks shooting.

28      1/23/17, Jacobson kills Angel Ramos.  Jacobson says Terry

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

1 Poyser bent his badge after that shooting.

2    We got two other shootings, which both involve Jarrett Tonn,
3 May 31st and July 15th of 2017.  One of them is -- also involved
4 Sean Kenney and Jared Jaksch and Kevin Barreto; one of them is
5 just Tonn.

6    We don't know if -- we don't receive any information about
7 any badge bending after those shootings, but we -- but Tribble
8 does say that he thinks he bent Tonn's badge with Gary Jones
9 previously; right?

10    2017, badge bending denied.  In August of 2017, Jeffrey
11 Barboa.

12    February, 2018, badge bending reported.

13    November, 2018, Mr. Milano gets shot, badge bending denied.

14    February, 2019, according to the interviews disclosed to me,
15 Willy McCoy gets killed and there's badge bending after that.

16    So it's pretty interesting that the Barboa shooting occurring
17 right in the middle of all this -- of all these instances of badge
18 bending, it's, like, there's five shooters, nothing.

19    That timeline --

20    THE COURT:  What do you mean "nothing"?

21    MR. FILLOY:  No badge bending, it never came up.

22    And what's interesting is that the timeline here would
23 suggest by Kent Tribble's statement, by Zach Jacobson's statement,
24 and by partly McLaughlin's statement, the 2018 -- sometime in 2018
25 was really when the cleanup, the heads-up that there -- that, you
26 know, you gotta fix your badges started happening.

27    I mean, McLaughlin says this in his interview.  He says with
28 some months after Barboa that I came in and we -- you know, the

1 word was, you know, from some shift supervisor, sergeant,

2 something, you know, your bent badges, you better fix your badge.

3 Jacobson says the same thing; right?

4     So the Barboa shooting is before the cleanup really starts

5 happening in 2018.  The cleanup in 2018 is happening because

6 SB1421 is coming.

7     Everything that Tribble says about the timeline makes sense

8 with what Jacobson says about the timeline.  And it makes sense

9 with part of what McLaughlin says about the timeline; right?  But

10 Komoda and McLaughlin give these very, very self-serving

11 statements, like the most self-serving statements ever.  They say,

12 "We're victims of badge bending.  Basically, we didn't get consent

13 to it. We didn't have notice of it.  We bent it back right away.

14 We didn't like it"; right?

15     They deny what Tribble says, which, again, works with this

16 timeline, which is in 2018, he went back to Komoda and McLaughlin

17 says, "Bend your badges back, man.  You know, we gotta clean all

18 that up."

19     THE COURT:  Let's focus here.

20     MR. FILLOY:  Right.

21     THE COURT:  I -- I understand your argument.  And if we were

22 litigating -- if this were the city council --

23     MR. FILLOY:  Uh-huh.

24     THE COURT:  -- or finder of fact for them, then a lot of

25 that -- every one of those things appears as a reasonable

26 analysis. I guess the question is reeling this back to:  What

27 does any of this have to do with Mr. Milano? Get back to

28 Komoda --

1    MR. FILLOY:  Komoda is lying.

2    THE COURT:  Like I said --

3    MR. FILLOY:  He is lying about what happened.

4    THE COURT: You can question Komoda.  You can question --

5    MR. FILLOY:  Right.

6    THE COURT:  -- Tribble.  I -- and then I guess we see where

7 we go.

8    I -- I -- as to Coleman, I -- you can call him out of order.

9 It does seem to me that the thing about him being present with

10 Tribble and Komoda, that maybe has some relevance.

11    But this overall -- the organizational history of badge

12 bending in general and/or, quote, covering it up, I -- that is

13 beyond --

14    MR. FILLOY:  I don't think --

15    THE COURT:  -- these --

16    MR. FILLOY:  I don't think that you're getting where I'm

17 going, Judge.  That is all evidence that Komoda is lying.

18    THE COURT.  Okay.  Well --

19    MR. FILLOY:  He's lying about having bent his badge back, you

20 know, two days later and then never heard anything about it again

21 until the -- you know, the article.

22    THE COURT: All right.  Well, let's do something --

23    MR. FLYNN:  It appears to me --

24    THE COURT:  I just want --

25    MR. FLYNN: I want to say something.  It appears to me a lot

26 of this is pure innuendo and speculation.  And under 352, we'd be

27 asking to keep all of this out, not only because it would take an

28 undue amount of time at trial to produce this evidence but there's

1 nothing in here that suggests that Komoda lied about anything.

2 And the Court has already read the report that Komoda's been

3 exonerated on this.

4      THE COURT:  Well, let me -- let me -- all right.

5      MR. FILLOY:  Which really goes to that third ruling --

6      THE COURT:  Hang on.  That was -- that was a bridge too far.

7      Let me -- let me do this: A, I'm not ruling on any of this

8 being admissible in front of a jury.  There will be all kinds of

9 discussion about: Is this prejudicial?  Is it 352?  What does it

10 really mean?

11     The reason why I'm letting you inquire of both Komoda and

12 Tribble, that will create a firsthand record, not secondhand,

13 thirdhand hearsay, through the -- through the -- this report

14 writing. So that's why we're going to do this.  And then we will

15 see.

16     But, again, it's gotta be back to -- it's gotta be back to

17 having some relevance to this case, not the generalized thing of

18 the -- of the City of Vallejo.

19     I -- so, Mr. Flynn, I have read the report.  I am not rely --

20 I'm only relying on that report for the purposes of laying out the

21 roadmap of what can possibly move forward.

22     MR. FLYNN:  Agreed.

23     THE COURT:  The exoneration -- the thing about anyone being

24 exonerated, I'm really troubled by that assertion.  The -- I will

25 indicate -- we had -- I had a couple of in camera hearings with

26 Mr. Giordano. And I read a draft.  And he indicated in his

27 earlier draft, he characterized certain persons -- certain

28 officers who had their badges bent as victims.  And I told him

1 that was insane, that that's how you end up on the front page of

2 the New York Times.

3      It may be that officers are passive and that they were not

4 the initiators or even intended to have their badge bent, but

5 under any reasonable analysis of responsible and ethical police

6 conduct, once it happens, the obligation of any officer is to undo

7 it, not embrace it; and to the extent it violates rules of the

8 department, report it and fix it.  Shouldn't have to wait for an

9 investigation to reveal it.

10      And, ultimately, cutting to the chase here, that is -- to be

11 honest with you, it is remarkably absent from the Giordano report,

12 we want police officers -- this town deserves police officers who

13 say: What kind of culture is that?  It might be perceived as

14 glorifying violence.

15      That's what a police officer does:  Hey, this is wrong, I

16 question this, this is not who we are, I -- I'm not going to fall

17 back on a characterization of myself as a victim.

18      And I -- that report astounds me and that -- that

19 characterization remains in the report that you have read.  And it

20 is a depressing and troubling characterization that besmirches

21 90 percent of the police officers who clearly recognize how their

22 culture should be.

23      So, anyway, I wasn't going to go there, but you kind of went

24 there with that exoneration thing.  I don't -- I'm not relying on

25 the Giordano report as exonerating anyone who is accused of doing

26 something.  I do think it accurately reflects the fact that

27 90 percent of the police officers had nothing to do with this --

28 this thing, and it's a pox on all their houses, including the

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                     March 22, 2022

1 POA's house that they do not -- that they are sacrificing the
2 majority of their officers for the protection of a few who aren't
3 even officers anymore.

4      All right. Having said that, let's do this:  I said we'd do
5 Komoda, we'll do -- I'll let you do Coleman this afternoon at some
6 point for that limited purpose.  Anything more than that, we're
7 going to have to discuss.  I'm going to take the morning break.
8 We'll come back in 15 minutes.  We'll do Komoda -- I assume it's
9 Komoda then Tribble.

10     We didn't really finish the discussion as to Ms. Knight's
11 point.  I'm not -- I'm struggling why we're going to need the
12 other officers, but I guess we'll have that discussion as we --

13     MS. KNIGHT:  And, Your Honor, are you prepared to rule on my
14 motion to quash before we start testimony?  Or will you need to
15 wait until after?  Are you prepared to rule on my motion to quash
16 before we hear testimony for Darst and Cardwell?  Or will you
17 need -- decide that after we hear testimony?

18     MR. FILLOY:  Judge, I'm going to ask that you defer on that.

19     THE COURT:  Yeah.  Let's defer that.  Actually, I was waiting
20 for you to -- today was -- I guess today was kind of like my
21 wife's favorite show, they have reveal day.  I was thinking this
22 was reveal day then we were going to revisit these things.  Let me
23 defer and we shall see.

24     MR. FLYNN:  How long, Judge?  10:15?

25     THE COURT:  Yeah, 10:15.

26     (Recess.)

27     THE COURT:  All right.  Are we ready to roll?

28     Let's go back on the record in Mr. Milano's case.  He's

1 present, our counsel are all present.

2      I indicated we would conduct the 402 --

3      MR. FILLOY: Mr. Milano is not present, Judge.

4      THE COURT:  Oh, I'm sorry.

5      And let me do this: I'll mark you -- you presented a chart.

6      MR. FILLOY: Mark as a Court exhibit.

7      THE COURT: I'll mark it Court Exhibit 1.

8      (Court Exhibit 1 was marked for identification.)

9      THE COURT: All right.  I'm sorry for that.  Now Mr. Milano

10 appears.  Counsel are all present.

11     All right.  Continue with our hearing, we indicated Mr.

12 Filloy would call a couple witnesses for purposes of a 402 hearing

13 to determine what might be relevant and admissible at trial.

14     So, Mr. Filloy.

15     MR. FILLOY: Call Matt Komoda.

16     THE COURT:  Okay.

17     MR. FILLOY:  Judge, I think Ms. Knight probably shouldn't be

18 at counsel table at this point in time.

19     MS. KNIGHT:  I'm happy to sit over there if that makes you

20 feel better.

21     MR. FILLOY: I mean, I don't want -- I think her time in the

22 course of objection is probably largely done here.

23     THE COURT: Well, maybe.  But I'm not sure where we're going.

24 I'm all right either way.

25     If something comes up that would be subject to some kind of

26 objection, Ms. Knight can certainly make it.  I -- I'm not -- I'm

27 assuming that for -- the circumstance wouldn't come up, but let's

28 see.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

 1      Anyway, Officer Komoda, welcome.  Come on up.
 2                      MATTHEW KOMODA,
 3   Called as a witness was sworn and testifies as follows:
 4      THE CLERK:  Do you solemnly swear the testimony you're about
 5   to give will be the truth, the whole truth, and nothing but the
 6   truth, so help you God?
 7      THE WITNESS: Yes.
 8      THE CLERK:  Thank you.  Have a seat.
 9      Please state your full name, and spell your last name for the
10   record.
11      THE WITNESS:  Matt Komoda, K-O-M-O-D-A.
12      THE CLERK:  Thank you.
13      THE COURT:  Mr. Filloy.
14                      DIRECT EXAMINATION
15   **Q. BY MR. FILLOY:  Mr. -- sorry, Corporal.  Corporal Komoda, how**
16   **are you employed?**
17   A. I'm a police officer with the City of Vallejo.
18   **Q.  In order to become a police officer, did you attend a police**
19   **academy?**
20   A. Yes.
21   **Q.  When and where did you do that?**
22   A. Oakland, California in 2006.
23   **Q.  Did you attend a separate police academy at a different time?**
24   A. I went to a Napa academy in -- years ago.  I forget what year
25   it was.  I think I was about 21 or so.
26   **Q.  Did you -- did you complete the Napa police academy in 1998?**
27   A. I'm not sure what year it was, but yeah.  I completed the
28   academy in Napa.

 1  Q.  **You completed the whole thing; right?**
 2  A.  Yes.
 3  Q.  **Okay.  Between 1998 and 2006, did you seek employment as a**
 4  **law enforcement officer?**
 5  A.  Yeah.
 6  Q.  **Was there anything keeping you from being a police officer**
 7  **until 2006?**
 8      MR. FLYNN:  Objection.  Relevance.
 9      THE COURT:  What's the relevance of --
10      MR. FILLOY:  Well, if I can just -- few more questions, we
11  can get there.
12      THE COURT:  All right.  Go ahead.  One or two questions then
13  we'll see.  I'm not sure what the relevance would be, but keep
14  going.
15  Q.  **BY MR. FILLOY:  Were you able to obtain your full POST**
16  **certification after attending the Napa police academy in 1998?**
17  A.  You mean after working as a police officer?
18  Q.  **Yeah.**
19  A.  I got my basic from the academy in Napa.  That's it.
20  Q.  **When you were in the police academy in Napa, did you handle**
21  **any discharge of firearm?**
22  A.  Yes.
23  Q.  **Were you committing any kind of crime by doing that?**
24      MR. FLYNN:  Objection.  Relevance.
25      THE COURT:  As phrased, sustained.  The question:  Did he
26  discharge a firearm?
27      MR. FILLOY:  In the police academy in Napa.
28      THE COURT:  Okay.  Well, he answered that question.  I guess

1  his characterization is probably irrelevant, I don't know.

2  **Q. BY MR. FILLOY:  Was there some reason that you did not work**

3  **as a police officer for eight years until 2006?**

4  A.  I'm not sure specifically.

5      MR. FLYNN: Objection.  Once again, objection.  Relevance as

6  to --

7      THE COURT:  Yeah.

8      MR. FLYNN: -- this pertaining to the trial.

9      THE COURT:  Let me sustain at this point.  Let's move to the

10  main issues.

11  **Q. BY MR. FILLOY:  When did you become a Vallejo police officer?**

12  A.  I think it was 2014.

13  **Q.  Have you been continuously employed as a police officer in**

14  **the City of Vallejo since that time?**

15  A.  Yes.

16  **Q. When did you get promoted from officer to corporal?**

17  A.  Probably about three years ago.

18  **Q.  And at some point during your employment with the Vallejo**

19  **Police Department in the course of working there, did you become**

20  **aware of the practice of badge bending?**

21  A.  Yes.

22  **Q.  And when did that occur?**

23  A.  After a shooting I was involved in.

24  **Q.  Was that -- when was that shooting?**

25  A.  I'm not sure what year it was.

26  **Q.  Was it August 31st of 2016?**

27  A.  It could have been.  I don't have that specific date.

28  **Q.  Was it the first shooting that you were involved in in the**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1  City of Vallejo?

2  A.  Yes.

3  Q.  Who else was involved in that shooting with you?

4  A.  David McLaughlin.

5  Q.  Did both of you discharge your firearms in that shooting?

6  A.  Yes.

7  Q.  And was anyone struck in that shooting?

8  A.  No.

9  Q.  So how long after that shooting did you learn about the

10 practice of badge bending?

11 A.  I think it was probably a couple days after.

12 Q.  Within a day or two?

13 A.  Couple days, I'm guessing.

14 Q.  All right.  Less than a week?

15 A.  I believe so.

16 Q.  Okay.  And what occurred that started the chain of events,

17 you becoming aware of this?

18 A.  Kent Tribble asked to meet myself and David McLaughlin at a

19 bar called the Relay and told us to bring our badges.  We thought

20 that was weird.

21 Q.  Was this after you had completed your -- or excuse me.  Did

22 you complete a shooting interview after that shooting?

23 A.  Yes.

24 Q.  And was this after you completed that?

25 A.  Yes.

26 Q.  Who performed that shooting interview?

27 A.  I don't know.

28 Q.  Was it Terry Poyser and Kyle Wylie?

1  A. I don't remember who interviewed me.

2  **Q. Would it refresh your recollection to look at the police**

3  **report regarding the investigation of that shooting?**

4      MR. FLYNN: Objection. Relevance as to who did the

5  investigation.

6      THE COURT: Well, I'll allow this question.

7      You can --

8      MR. FILLOY: May I approach?

9      THE COURT: Yeah. You can approach.

10 **Q. BY MR. FILLOY: Just ask you to have a look at that document.**

11 **Take as long as you need. Let us know when you reviewed it.**

12 A.  It appears it was Detective Wylie and Detective Poyser who

13 states in the report.

14 **Q. Does that document refresh your recollection as to the date**

15 **the incident occurred?**

16 A. Let me look at the date.

17     September 1st about 356 hours he conducted an interview. So,

18 yeah. Let's see what time the -- yeah. I'm not sure what time

19 the shooting occurred, but he stated at 356 in the morning on the

20 first of September that he conducted an interview.

21 **Q. Did -- to your recollection, did that interview happen the**

22 **same night as the shooting?**

23 A. Yes.

24 **Q. So the invitation to the bar would have been maybe the 2nd,**

25 **maybe the 3rd of September, maybe the 4th, something like that?**

26 A. Yeah. Like I said, I don't remember what date it was. It

27 was a couple days after.

28 **Q. Okay. And what did -- was it that point was he sergeant or**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1 lieutenant, Tribble?

2 A.  I think he was a sergeant.

3 Q.  At that point Sergeant Tribble, what did he indicate to you

4 specifically when he asked you to come to the bar?

5 A.  He just asked us to bring a badge.

6 Q.  Said, "Just bring a badge," nothing else?

7 A.  "Bring your badge."

8 Q.  Okay.  And did you bring a badge to the Relay?

9 A.  I sure did.

10 Q.  Did you come alone or with Officer McLaughlin?

11 A.  I'm not sure if we walked over there together or not, but we

12 were there at the same time, yes.

13 Q.  Did you guys go from the police department there -- to there?

14 A.  Yes.

15 Q.  Okay.  Were you at the end of your shift, or were you on

16 admin leave?

17 A.  I'm assuming I was on admin leave because it was a couple

18 days after.

19 Q.  Do you recall then why you were at the department?

20 A.  No, I don't recall.

21 Q.  When you arrived at the Relay bar, was Sergeant Tribble

22 there?

23 A.  Yes.

24 Q.  And you were with David McLaughlin; right?

25 A.  Yes.

26 Q.  And there was a fourth person, a fourth Vallejo police

27 officer there; is that accurate?

28 A.  I believe there was.  I don't remember who it was.

1  Q.  Okay.  Was it Josh Coleman?  Does that jog your recollection?

2  A.  It might have been.  Like I said, I don't remember who was

3  there.

4  Q.  Can you exclude Josh Coleman as being the guy who was there?

5  A.  No, I cannot.

6  Q.  Okay.  What occurred at this meeting at the Relay bar with

7  Sergeant Tribble, David McLaughlin, and this other officer?

8  A.  He -- Kent Tribble grabbed our badges and grabbed ahold of

9  one corner of the badge said, "Hey, this is -- you were involved

10 in a critical incident.  You did what you had to do and you

11 handled it professionally and you guys came out of it okay."

12     And then he bent one of the prongs on the badge.

13 Q.  Which prong on the badge was it?

14 A.  It was one of the lower two.  I don't know which one it was.

15 Q.  By "lower two," you mean the ones to the bottom -- or points

16 for the bottom of the star?

17 A.  Yes.

18 Q.  As it sits on your chest?

19 A.  Yes.

20 Q.  And does the police badge star that you're talking about, is

21 it a metal badge?

22 A.  I think it's made out of silver.

23 Q.  Silver?

24 A.  I believe.

25 Q.  All right.  Does it look basically like the cloth badge

26 that's on your chest right now?

27 A.  Yes.

28 Q.  And that's a seven-pointed star?

1  A. Let's see.  One, two, three, four, five -- yes.  Seven.

2  Seven points.

3  **Q.  And does that refer -- that type of badge, does that refer to**

4  **a specific way as, like, the duty badge or your dress badge?**

5  A.  No.  It's just referred to as a badge.

6  **Q. Okay.  And was that the badge that -- the sterling silver**

7  **badge that you were issued when you became a Vallejo police**

8  **officer?**

9  A.  Yes.

10 **Q. And does it have, like, some sort of a hook or safety catch**

11 **on the back of it?**

12 A.  It has a pin on the back, yes.

13 **Q. A pin?**

14 A.  Yeah.  Like a safety pin type.

15 **Q.  Okay.**

16 A.  Yeah.

17 **Q.  And when he bent it, did he do that with his -- with his**

18 **fingers?  Just with his hands?**

19 A.  Yes.

20 **Q.  Did he bend yours and McLaughlin's badge at the same time?**

21 A.  Well, he needed two hands for a badge, so he did one at a

22 time.

23 **Q.  What I'm asking is did he take yours, bend it, give it back,**

24 **then take McLaughlin's?  Or did he take both at the same time?**

25 A.  I don't remember.

26 **Q.  How far back did he bend the point of the badge?**

27 A.  I'm not sure.  Not very far.

28 **Q.  Okay.  And what did he say to you, explain to you that this**

1 was about?

2 A.  Didn't I answer that already?

3 **Q.  I couldn't quite --**

4     THE COURT:  You --

5     MR. FILLOY:  -- hear his full answer.

6     THE COURT:  You can go ahead and answer.

7     THE WITNESS:  Okay.  He stated that we were involved in a

8 critical incident, you handled it professionally, you came out of

9 it okay.

10 **Q.  BY MR. FILLOY:  Was he referring to the shooting?**

11 A.  I believe so, yes.

12 **Q.  Okay.  Did you guys discuss the shooting at that date?**

13 A.  No.

14 **Q.  And did he explain to you that this was a tradition that was**

15 **done at the Vallejo Police Department, or did you have the**

16 **impression it was just for you guys?**

17 A.  He didn't say one way or the other.  We didn't ask.

18 **Q.  Okay.  And how long were you there, do you think, at the**

19 **Relay bar with -- with Sergeant Tribble?**

20 A.  Not long.  I believe we had a couple beers and we left.

21 **Q.  Okay.  So did he ask your consent before he bent the badge?**

22 A.  He did not.

23 **Q.  Did he give you any indication that he was going to bend the**

24 **badge whenever he took it from you?**

25 A.  He did not.

26 **Q.  Did you have any notice from any source that that was going**

27 **to occur?**

28 A.  None at all.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

```
 1  Q.  Okay.  Were you displeased that he bent your badge?
 2  A.  We weren't happy about it.
 3  Q.  By "we," you mean you and Officer McLaughlin?
 4  A.  Yes.
 5  Q.  Did you discuss it after it occurred?
 6  A.  Yes.
 7  Q.  Where -- when was that?
 8  A.  I believe we were walking back to the parking lot after
 9  having a couple beers.
10  Q.  What did that conversation consist of, essentially?
11  A.  That we felt it was weird; didn't like the way it looked.  We
12  only wear our metal badges when we're coming to court, wearing our
13  full uniforms, or to ceremonies.  And it looks unprofessional.
14  Q.  So you had a discussion you felt that the badge -- bending
15  the tip of it was unprofessional?
16  A.  Yes.
17  Q.  Had you -- did you express to Sergeant Tribble after this
18  shooting at any point that you felt very bad about your own
19  performance tactically in the shooting?
20  A.  No.
21  Q.  Did you hear Officer McLaughlin express to Sergeant Tribble
22  that you -- the two of you felt bad about your tactical
23  performance in the shooting?
24  A.  I don't think so.
25  Q.  Did you express to anyone in the Vallejo Police Department
26  that you felt bad about your tactical performance in that
27  shooting?
28  A.  Not that I can recall.
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

1  Q.  Did you hear Officer McLaughlin or aware of him expressing
2  that to anyone?

3  A.  Not -- I don't know.  I don't recall him saying it.

4  Q.  Did you ever express that you guys were embarrassed that you
5  hadn't hit anyone?

6  A.  I don't think so.

7  Q.  Were -- was Sergeant Kent Tribble at that time your
8  supervisor?

9  A.  Um, I don't know who the supervisor was actually.  I don't
10 remember.  I know I think Lieutenant Darden was working overtime
11 that day, I believe.  But other than that, I don't know.

12 Q.  Do you recall a conversation with Sergeant Tribble where he
13 indicated that the fact that you had -- you and McLaughlin had not
14 hit anyone was his fault for bad training?

15 A.  I don't think so.

16 Q.  Do you recall any discussions about the fact that you guys --
17 that you and Officer McLaughlin had shot the metal of the car as
18 opposed to through a window at which it could hit?

19 A.  I'm sorry, can you repeat it?

20 Q.  Do you recall any discussion training-wise in the department
21 about the facts that you and Officer McLaughlin had aimed for the
22 center mass of people by shooting into the metal of the car doors
23 instead of shooting through the windows at what you could see?

24 A.  I don't know if that happened.

25 Q.  Were you aware that there was a critical incident review
26 process of that officer-involved shooting?

27 A.  I believe that's commonplace.

28 Q.  Were you consulted during that process?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

 1  A.  No.

 2  Q.  Were you provided a copy of the critical incident review when

 3  it was completed?

 4  A.  No.

 5  Q.  Were you counselled in any way regarding that?

 6  A.  I don't think so.

 7  Q.  Were you aware that Sergeant Tribble was the use-of-force

 8  expert on that Critical Incident Review Board for that shooting?

 9  A.  I'm not sure if he was or not.

10  Q.  Were you ever made aware of his contention, or anyone's

11  contention at the Vallejo Police Department, that you and Officer

12  McLaughlin had used underperforming ammunition in that shooting?

13  A.  I don't know.

14      THE COURT:  What a concept:  Underperforming ammunition.

15  Q.  BY MR. FILLOY:  Can you describe how far back you think the

16  point of the badge was bent?  Like, was it a few millimeters or,

17  like, you know, a quarter inch?

18  A.  Like you asked earlier, I said it was very minimal.  I don't

19  know what it was.

20  Q.  Did Sergeant Tribble say anything to you during that

21  conversation that was more specific than that you had acted well

22  under pressure?

23  A.  Not that I can recall.

24  Q.  What did you do regarding the badge you had that was now

25  bent?

26  A.  I bent it back.

27  Q.  How did you bend it back?

28  A.  With my hands.

1  Q.  **When did you do that?**

2  A.  Pretty soon after.

3  Q.  **Was it a matter of, like, a few days or a week?  Or were you**

4  **talking months or couple years?**

5  A.  No, I think it was no more than a week.

6  Q.  **No more than a week?**

7  A.  I can't remember.

8  Q.  **Are you --**

9  A.  It was pretty short.

10 Q.  **Are you aware of whether -- what Officer McLaughlin did, if**

11 **anything, regarding that badge?**

12 A.  I'm not sure what he did.  I know we didn't like it and he

13 talked about bending it back.  But whether he did or did not, I

14 don't know.

15 Q.  **Later on after this had occurred, in August of 2017, were --**

16 **did you participate in the killing of Jeffrey Barboa?**

17 A.  I was involved in the shooting of Jeffrey Barboa, yes.

18 Q.  **Did Mr. Barboa die?**

19 A.  He did.

20 Q.  **And how many other officers were involved in that shooting?**

21 A.  I think there was five total, I believe.

22 Q.  **Was Officer McLaughlin involved also in that shooting?**

23 A.  He was.

24 Q.  **And discharged his firearm?**

25 A.  He did.

26 Q.  **And was Stephanie McDonough involved in that shooting?**

27 A.  Yes.

28 Q.  **Discharged her firearm as well?**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022

 1  A.  I believe so.

 2  Q.  Was Officer Zach Jacobson involved in that shooting?

 3  A.  Yes.

 4  Q.  Did he discharge his firearm?

 5  A.  I believe so.

 6  Q.  And Officer Jake Estrada, was he involved in that shooting?

 7  A.  Yes.

 8  Q.  Did he discharge his firearm?

 9  A.  I believe so.

10  Q.  And were you aware of any badge bending occurring in the wake

11  of the Barboa shooting?

12  A.  Not at all.

13  Q.  Did you and the other shooters from the Barboa shooting go

14  out for drinks afterwards?

15  A.  I believe we met at the, um, POA, the Police Officers'

16  Association hall, and had a couple beers.  It was a stressful

17  situation and needed to unwind.

18  Q.  Was that the same night?

19  A.  I'm not sure.

20  Q.  Maybe next day?

21  A.  I'm not sure.

22  Q.  Do you know if it was after you had your shooting interviews?

23  A.  I believe so, yes.

24  Q.  Were your shooting interviews done in Richmond?

25  A.  No.  They were done in Vallejo actually.

26  Q.  Done in Vallejo?

27  A.  Yeah.

28  Q.  Was the shooting itself in Richmond?

1  A.  Yes.

2  **Q.  And when you say that you all went out to the POA hall for**

3  **drinks, is the POA hall a place that's, you know, a public**

4  **institution?  Or is it only for Vallejo police officers?**

5  A.  Only for Vallejo police officers.

6  **Q.  And who all was present in the POA hall when that was**

7  **occurring?**

8  A.  I don't know who was there.

9  **Q.  Okay.  Not any of them?**

10  A.  Not any of who?

11  **Q.  You don't remember specifically any of the people that were**

12  **there?**

13  A.  I believe -- I know I think Dave was there, McLaughlin.  I

14  think Jake Estrada was there.  Other than that, I don't know.

15  There was -- yeah.  I think they were all there, but been so long

16  I can't remember.

17  **Q.  Do you recall at the -- after the Barboa shooting when you**

18  **were on scene there that a Vallejo police officer showed up who**

19  **gathered all five shooters around himself and gave a hand signal**

20  **to cut the body cameras?**

21  A.  No.

22      MR. FLYNN:  Objection.  Relevance.

23      THE WITNESS:  I don't remember that.

24      THE COURT:  I don't know.  Overruled.

25  **Q.  BY MR. FILLOY:  Do you recall that?**

26  A.  I don't recall that.

27  **Q.  Do you recall if Sean Kenney was present on scene and**

28  **gathered all the shooters?**

1  A. Yeah, I don't know.

2  Q.  Do you recall if Sean Kenney was present in the POA hall when

3  you guys had drinks?

4  A. I don't recall.

5  Q. Okay.  Subsequent to the Barboa shooting, were you approached

6  by Kent Tribble and told -- at some point after that -- were you

7  at some point after that approached by Kent Tribble and told you

8  needed to bend your badges back?

9  A. No.

10  Q.  Did Officer McLaughlin ever report to you being approached by

11  Kent Tribble and told him to bend his badge back?

12  A. He never told me anything like that.

13  Q. Did he ever report to you that anyone told him to bend his

14  badge back?

15  A. He didn't tell me anything of the sort.

16  Q. Did anyone ever tell you to bend your badge back?

17  A. No.

18  Q.  In 2018 were you made aware that badge bending was an issue

19  in general in the police department and needed to be corrected?

20  A. I think the first time I heard about it was when that news

21  article came out, whatever year that was.  I think it was 2020, I

22  think.

23  Q. At some point did you -- did you have your badge inspected at

24  the Vallejo Police Department in a lineup?

25  A.  They asked us to provide our badges in lineup, and they took

26  a look at it and kept on moving.

27  Q. When was that?

28  A. I don't know.

1  Q. Prior to the article coming out?

2  A. Yeah, it was.

3  Q. Maybe 2019?

4  A. I don't know what year it was.

5  Q. When the -- when your badge was bent, was the paint or enamel

6  on it cracked in any way?

7  A. No.

8  Q. You were able -- were you able to bend it back to a state

9  where you thought no disfigurement?

10  A. Yes.

11  Q. Did you give an interview to Robert Giordano during an

12  internal investigation in the badge bending in the Vallejo Police

13  Department?

14  A. Yes.

15  Q. Was that in March of 2021?

16  A. It was recent. I don't know what month.

17  Q. Okay. Were you fully honest and forthcoming in that

18  interview?

19  A. Yes.

20  Q. Did you bring a metal Vallejo police badge to that interview?

21  A. I believe I brought two.

22  Q. Did you receive any instruction prior to the interview about

23  bringing badges or producing them at the interview?

24  A. He asked me to bring it, the investigator did.

25  Q. Okay. Did he -- well, what did he specifically ask you to

26  bring?

27  A. My badge.

28  Q. Like, any and all badges? Or a specific one?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

```
 1  A. I don't remember the specific terms.  I brought -- I believe
 2  I brought my corporal badge and my police officer badge.
 3  Q. Okay.  So you think you brought -- brought -- because by the
 4  time the interview happened, you were corporal; right?
 5  A. Yes.
 6  Q.  And you think you brought your corporal duty badge and your
 7  police officer duty badge?
 8  A. I think I did.
 9  Q. Okay.  How many metal police badges do you have in your
10  possession of the Vallejo Police Department?
11  A.  Two.
12  Q. Only two?
13  A. Oh, no.  I have another one that has a bolt in the back at my
14  house.
15  Q.  How about flat badges, do you have those?
16  A.  I do have a flat badge, yes.
17  Q.  Those are also metal?
18  A.  Yes.
19  Q.  How many of those do you have?
20  A.  Just one.
21  Q.  Do you have a corporal one?
22  A.  No.
23  Q.  Just an officer one?
24  A.  Yes.
25  Q.  Never tried to get a corporal one?
26  A.  I didn't want to spend the money on it.
27  Q.  So the badges that you showed Mr. Giordano in that interview,
28  were -- was one of them the badge that had been bent?
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

```
 1  A.  Yes.
 2  Q.  But you actually have another identical duty badge as an
 3  officer that you didn't bring?
 4  A.  Well, it's not a duty badge.  It has a bolt in the back of
 5  it.  I can't wear it.
 6  Q.  That would be a duty badge -- an officer duty badge with what
 7  they call "post to mount"?
 8  A.  I'm not sure what the title is for it.
 9  Q.  It's got a little bolt on the back?
10  A.  Yeah.  Like I said, had a bolt in the back.
11  Q.  It swings out, right, with a bolt in the back?
12  A.  It doesn't swing out.  The bolt comes straight out with a
13  nut --
14  Q.  Okay.
15  A.  -- that's in the back of it.
16  Q.  And did you order that badge in June of 2018?
17  A.  I'm not sure when I ordered it.
18  Q.  Okay.  Do you know when you received it?
19  A.  I don't.
20  Q.  At some point did you -- when you want to order a badge, how
21  do you do that?
22  A.  You go to the chief's office.
23  Q.  Okay.  And who do you tell?
24  A.  Usually chief's secretary.
25  Q.  Okay.  So would that have been Shellyne Darst?
26  A.  I'm not sure.  I think she was still working there at the
27  time, but I don't know.
28  Q.  Why did you want the badge with the bolt?
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

```
 1  A.  So I can put it in a shadow box.
 2  Q.  And did you modify that badge in any way?
 3  A.  No.
 4  Q.  Did you modify -- other than the bending of the tip back, did
 5  you modify your original officer duty badge in any way?
 6  A.  Not at all.
 7  Q.  Was either your flat badges ever bent?
 8  A.  I only have one flat badge.
 9  Q.  Oh, sorry.  Yeah.
10  A.  But, no, it was not.
11  Q.  It was not?
12  A.  No.
13  Q.  Okay.  When you ordered that badge with the bolt, were you
14  subsequently contacted about the fact you were going to need to
15  have to pay for it yourself?
16  A.  Yes.
17  Q.  When was that after you initially ordered it?
18  A.  I'm not sure if it was after or before.
19  Q.  Okay.  But you recall being contacted about the fact you need
20  to pay for it yourself?
21  A.  Yeah.  They told me I had to pay for it, yes.
22  Q.  Who told you?
23  A.  I don't know.
24  Q.  Okay.  Do you recall it being -- like, it having to be
25  separated out on a separate invoice?
26  A.  I don't recall that at all.  But I had to pay for it.
27  Q.  Did you pay the badge company, or did you pay the Vallejo
28  Police Department?
```

1  A. I believe it was the badge company.

2  Q. Okay.  Just, like, call them and give your credit card number

3  or something?

4  A. Yeah, that's usually how it works, yes.

5  Q. Did you speak to anyone about badge bending other than David

6  McLaughlin prior to the article -- the Open Vallejo article coming

7  out?

8  A. No.

9  Q. Do you consider yourself to be a victim of badge bending?

10  A. Yes.

11      MR. FLYNN:  Objection.  Relevance.

12      THE COURT:  Overruled.

13  Q. BY MR. FILLOY:  When you had the lineup at some point where

14  your badge was inspected, was there any indication or discussion

15  from either management, other officers about why that was

16  happening?

17  A. Not that I'm aware of.

18  Q. So you didn't know the inspection was coming?

19  A. No.

20  Q. Who was it that inspected your badge in that lineup?

21  A. That's a good question.  I have no idea.

22  Q. Which badge did you have at the time of the lineup that would

23  be inspected?

24  A. Um, I believe it was my regular police officer badge.

25  Q. The one that had been bent?

26  A. Yeah.  Previously bent, yes.

27  Q. Are you certain that you brought both two metal police badges

28  to your interview with Robert Giordano?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1  A.  I'm pretty sure.

2  Q.  Subsequent to the shooting involving Mr. Milano in this case,

3  was badge bending ever discussed or brought to your attention in

4  the aftermath of that shooting?

5  A.  No.

6  Q.  Was it explained to you by Tribble in any way that the act of

7  badge bending was connected to, in fact, being in a shooting, like

8  pulling the trigger on a gun?

9  A.  That's not how I remember it.  But, like I said, he told us

10 we were in a critical incident and, you know, handled ourselves

11 professionally.

12 Q.  So your information about the practice was limited,

13 obviously, because just, you know, occurred in the one

14 conversation this one time.  Would it be fair to say that at that

15 point, your impression might have been that it could have been

16 traditionally related to any type of critical incident?

17 A.  I didn't elaborate on it.  I just -- that's how I remember it

18 was told to me.

19 Q.  Were you aware of the critical incident review that was

20 performed on the Barboa shooting?

21 A.  No.

22 Q.  Did you ever receive a copy of that or read it?

23 A.  I don't think so.  Not that I remember.

24 Q.  Were you criticized or counseled or disciplined by anybody in

25 the department regarding that -- that shooting?

26 A.  No.

27 Q.  Did you have, you know, any training that you were directed

28 or suggested to go to because of that shooting?

 1  A.  No.

 2  Q.  **What was your working relationship with Kent Tribble at the**

 3  **time that the Relay incident occurred?**

 4  A.  What do you mean?

 5  Q.  **I mean, did he regularly supervise you?  Did he train you?**

 6  **Did you know him well? not well?**

 7  A.  It's a small department, we get a chance to know people

 8  pretty well. He was my sergeant at one point.  I don't know what

 9  year it was.  He was also a firearms instructor at the police

10  department, so he did participate in some instruction.

11  Q.  **Were you trained in firearm usage by him?**

12  A.  Yes, I believe so.

13  Q.  **Were you ever trained in something by him known as the**

14  **"zipper drill"?**

15  A.  They talked about a zipper drill.

16  Q.  **And what's that?**

17      MR. FLYNN:  Objection.  Relevance.

18      MR. FILLOY:  On the 1103 issue.

19      THE COURT:  Yeah.  Overruled.  I mean, we're -- we're in the

20  outer tangents here. But overruled.

21      THE WITNESS:  I believe it was a technique, if I remember

22  this correctly because it's been years, where if you're forced to

23  be in a shooting that you work your rounds up that way.  That way

24  if he has body armor, you can defeat the body armor and neutralize

25  the threat before you're killed.

26  Q.  **BY MR. FILLOY:  So if I'm understanding you, like in a**

27  **situation where you have very limited time to react, as you are**

28  **bringing the firearm up to begin shooting before it's fully up and**

1 pointed straight in front of your face?

2  A. Well, it's pointed at the threat.  You're not just going to

3 start firing at the ground.

4  **Q. Right.  But you fire as you bring the gun up, pointing at**

5 **another person, not waiting until you get it fully in front of**

6 **your face and stabilized?**

7  A. I don't remember the exact drill.  It's been years.  But it's

8 the point where you are working your rounds up to defeat the

9 possible -- the possibility of body armor.

10  **Q.  Does it sometimes involve shooting one-handed?**

11  A.  It could.

12  **Q.  Did you ever have any further conversation with Kent Tribble**

13 **ever about the badge bending at the Relay or this investigation?**

14  A.  Not that I can remember, no.

15  **Q.  Did you ever have any further conversation with Officer**

16 **McLaughlin about it?**

17  A.  I think the only time we talked about it was after the

18 article came out.

19  **Q.  At some point did you become aware that he had, according to**

20 **him, also bent his badge back into its original position?**

21  A.  I believe that was after the article came out.

22  **Q.  It was after the article came out?**

23  A.  I believe so.

24  **Q.  That was not a thing that you two had determined at the time**

25 **that you did it to do together?**

26  A.  No, we didn't do it together.

27  **Q. You simply independently did it?**

28  A.  Yes.  Yes.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1    Q.  Did you ever have any subsequent negative interaction with
2  Kent Tribble?

3  A.  Not that I can recall, no.

4    Q.  Do you recall anything -- the fourth officer who was at the
5  Relay with you when the badges were bent, do you recall anything
6  that that person did or said?

7  A.  Not at all.

8    Q.  Um, during the Barboa shooting, were the cars -- the patrol
9  cars that you were in at that time equipped with 37s?

10  A.  I believe some cars had them.  I don't -- mine didn't.

11   Q.  Yours did not have a 37?

12  A.  I don't think so.

13       MR. FILLOY:  Okay.  I don't think I have anything further at
14  this time.  I'd keep him subject to re-call.

15       THE COURT:  Okay.  Mr. Flynn, do you have any questions?

16       MR. FLYNN:  Just a few, Your Honor.

17                     CROSS-EXAMINATION

18   Q. BY MR. FLYNN:  Well, Officer Komoda, the badge that was bent
19  by Sergeant Tribble, did you ever wear that on a uniform?

20  A.  As it was bent?

21   Q.  Yes.

22  A.  No.

23   Q.  Do you take pride in the way your uniform looks?

24  A.  I do.

25   Q.  Why did you decide to bend your badge back to its original
26  position?

27  A.  Because I didn't like the way it looked.  Didn't sound
28  professional to me.  I only wear my uniform when I -- full uniform

1 in special occasions, and I want to look professional.

2 **Q. When you work on patrol, do you wear any type of metal badge**

3 **at all?**

4 A.  I don't.

5 **Q. Do you wear a badge similar to the one that you're wearing**

6 **now on your vest, a cloth badge?**

7 A.  Yes.  This is my duty uniform.

8 **Q.  Other than speaking to Dave McLaughlin and your interview**

9 **of -- with Robert Giordano, did you ever discuss your badge being**

10 **bent with anyone else?**

11 A.  I think after the article came out we talked about it, said

12 that's weird.  And I believe Jason Bahou said his was as well, but

13 that's -- that's it.

14 **Q. Did you at any time after your badge was bent by Sergeant**

15 **Tribble ever bend the badge of any other Vallejo police officer?**

16 A.  No.

17 **Q.  After your badge was bent by Sergeant Tribble, how did you**

18 **feel about that?**

19 A.  I thought it was weird.  I didn't like it.  Didn't like the

20 way it looked like.

21 **Q. Did you consider a rule violation in any way?**

22 A.  No because we were able to fix it.

23 **Q.  And other than Dave McLaughlin, Sergeant Tribble, and another**

24 **officer you don't remember, was -- was there any other officers**

25 **from Vallejo PD present at the time you had your badge bent?**

26 A.  I don't think so.

27 **Q.  When Sergeant Tribble bent your badge at the Relay bar, were**

28 **there other people around other than officers?**

1  A.  There were, like, normal bar patrons, I believe.

2  **Q.  When Sergeant Tribble was talking to you about bending your**

3  **badge and then bending your badge, what kind of tone of voice was**

4  **he using during that time?**

5  A.  He was just speaking to us normally.

6  **Q.  At the time that you had gone to the Relay bar that night**

7  **after that shooting in 2016, were you having any type of emotional**

8  **issues concerning that shooting?**

9  A.  That was the one at the Relay?

10  **Q.  Yes, sir.**

11  A.  Yeah.  Any time you're forced to do something like that, it

12  sucks. Nobody wants to do that.  Yeah.  It really bothered me.

13  **Q.  What did you believe Sergeant Tribble's motive was in bending**

14  **your badge at that time?**

15  A.  I'm not sure what it was.

16  **Q.  Did it help you in any way to deal with the situation?**

17  A.  No, I don't know.  I didn't even really think about it.

18  **Q.  And other than that time when Sergeant Tribble bent your**

19  **badge at the Relay, was your badge bent on any other occasion?**

20  A.  No.

21  **Q.  And I think you already answered this question, but let me**

22  **just ask it one more time:  You were involved in the shooting with**

23  **Mr. Milano that's the subject of this case; correct?**

24  A.  Yes.

25  **Q.  And was your badge ever bent based --**

26  A.  No.

27  **Q.  -- on that?**

28  A.  No, it was not.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                            March 22, 2022

1  Q.  And the two subsequent shootings that you were involved in

2  after the shooting in August of 2016, did you ever seek out

3  anybody to bend your badge after being involved in those

4  shootings?

5  A.  No.

6      MR. FLYNN:  I don't have any further questions, Judge.

7      THE COURT: Mr. Filloy, anything further?

8                  REDIRECT EXAMINATION

9  Q.  BY MR. FILLOY:  Who did Jason Bahou say bent his badge?

10 A.  He didn't --

11     MR. FLYNN:  Objection.  Speculation.

12     THE COURT:  He answered he didn't know, so that was all

13 right.

14     MR. FILLOY: Nothing further at this time.  Subject to

15 re-call.

16     THE COURT: So let me ask a couple questions.  We discussed

17 the universe of conversations you had with regarding this badge

18 bending thing.  Now, at any point in time in the general assembly,

19 in morning call, anything like that, was this topic ever raised to

20 you in a group?  Like, hey, by the way, this badge bending thing

21 is going on, anything like that?

22     THE WITNESS: No.

23     THE COURT:  At any meeting of the POA, did anyone ever say,

24 hey, by the way, this badge bending thing is out there and no

25 discussion?

26     THE WITNESS:  As far as I remember, didn't come out until

27 that news article, as far as I remember.

28     THE COURT: Okay.  Then after the article came out, do you

 1 remember any discussions generally among your fellow -- not the

 2 specific ones we asked about -- but just kind of generally, either

 3 meeting in general assembly or at a POA meeting or anything where

 4 folks said, hey, let's talk this through, what are we being

 5 accused of?  What is, in fact, the truth?

 6     THE WITNESS:  No.  Never even talked like that.  It was

 7 mainly just nobody ever heard of the practice.

 8     THE COURT:  Okay.  So after Tribble does this, did you go to

 9 anyone -- and you said you thought it was weird?

10     THE WITNESS:  Yeah.

11     THE COURT:  Did you go to anyone and raise any questions

12 about what was going on with Tribble?

13     THE WITNESS:  I did not.

14     THE COURT:  Okay.  And I guess why not?

15     THE WITNESS:  I didn't really think about it.

16     THE COURT:  Okay.  All right.

17     Mr. Filloy, anything further?

18     MR. FILLOY:  Based on the Court's questions.

19 **Q. BY MR. FILLOY:  Did you ever look around and notice if any**

20 **other Vallejo police officers' badges were bent?**

21 A. No, I did not.

22 **Q. Did you ever even try to discern that?**

23 A. Most of the officers when on duty wear the cloth.

24 **Q.  There are functions where you guys wear your metal duty**

25 **badges; is that accurate?**

26 A. It is accurate, yes.

27 **Q. Never occurred to you to look to see if any of them were bent**

28 **during those events?**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

```
 1  A.  Not at all.
 2       MR. FILLOY:  Nothing further.
 3                    RECROSS EXAMINATION
 4  Q.  BY MR. FLYNN:  At the time that Sergeant Tribble bent your
 5  badge in 2016, what was your rank at the time?
 6  A.  I was an officer.
 7  Q.  And how long had you been with the PD up until that point?
 8  A.  I'm sorry, it was in '16?
 9  Q.  Yes, sir.
10  A.  So couple years.
11  Q.  And did you consider Sergeant Tribble to be a superior?
12  A.  Yes.
13       MR. FLYNN:  Okay.  No further questions.
14       THE COURT:  And, actually, let me ask -- I guess let me ask
15  this question:  Forgetting about the specific allegation of badge
16  bending, have you attended any other events, barbecues, parties at
17  bars, social gatherings with fellow police officers where there
18  has been any sort of celebration of shootings?
19       THE WITNESS:  No.
20       THE COURT:  Anything further?
21       MR. FILLOY:  No.
22       THE COURT:  Mr. Flynn, anything further?
23       MR. FLYNN:  No, Your Honor.
24       THE COURT:  Okay.  All right.  I guess subject to re-call.
25  I'm not sure how we're rolling.  But thank you --
26       THE WITNESS:  Yes, sir.
27       THE COURT:  -- for coming in and --
28       THE WITNESS:  Would you like me to stay here in the hallway
```

```
 1  or --
 2      THE COURT:  I don't --
 3      MR. FILLOY:  I don't think that's probably necessary at this
 4  point.
 5      THE COURT:  If someone --
 6      MR. FILLOY:  We can contact --
 7      THE COURT:  -- has your phone number -- your cell --
 8      MR. FLYNN:  You're on duty?
 9      THE COURT:  Are you on or off today?
10      THE WITNESS:  I'm on until five o'clock.
11      THE COURT:  All right.  So you'll be around town?
12      THE WITNESS:  Yes, sir.
13      THE COURT:  All right.  Good enough.
14      MR. FLYNN:  I have his cell number, Judge, I can call.
15      THE COURT:  Good enough.
16      MR. FILLOY:  It's not necessary for anyone to wait in the
17  hallway, as far as I'm concerned.
18      THE COURT:  As long as he's on duty, he can go back.  We'll
19  let him know if we need anything.
20      All right.  Ready for your next witness?
21      MR. FILLOY:  Want to call Kent Tribble.
22      THE COURT: Yeah.
23      Need a minute?
24      MS. KNIGHT:  He's in the hall.  Want me to grab him?
25      MR. FILLOY:  Sure.
26                        KENT TRIBBLE,
27  Called as a witness was sworn and testifies as follows:
28      THE CLERK:  Please raise your right hand.
```

1      Do you solemnly swear the testimony you're about to give will

2  be the truth, the whole truth, and nothing but the truth, so help

3  you God?

4      THE WITNESS:  I do.

5      THE CLERK:  Thank you.  Have a seat.

6      If you'll please state your full name, and spell your last

7  name for the record.

8      THE WITNESS:  Yes.  My name is Michael Kent Tribble,

9  T-R-I-B-B-L-E.

10      THE COURT:  Mr. Filloy.

11                        DIRECT EXAMINATION

12  **Q. BY MR. FILLOY:  Mr. Tribble, how were you employed prior to**

13  **your retirement?**

14  A.  I was a City of Vallejo Police Department lieutenant.

15  **Q.  And for how long were you employed as an officer by the City**

16  **of Vallejo?**

17  A.  Roughly 18 years.

18  **Q.  Do you recall what year it was you started there?**

19  A.  Yes, sir.  It was March of 2003.

20  **Q.  And were you a police officer prior to that somewhere else?**

21  A.  Yes.

22  **Q.  And where was that?**

23  A.  That was the City of Concord.

24  **Q.  And how long had you been a police officer there?**

25  A.  About eight years.

26  **Q.  Was that your first job as a law enforcement officer?**

27  A.  Yes.

28  **Q.  During your time at the Vallejo Police Department, were you**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

 1 involved in some officer-involved shootings?

 2 A.  Yes.

 3 Q.  And when did you become aware of the practice of badge

 4 bending?

 5 A.  The practice of badge bending started in about 2000 in the

 6 City of Concord when I worked there.

 7 Q.  And how did you come to learn about that?

 8 A.  I sat down at a restaurant with a fellow officer from the

 9 City of Concord.  He had been involved in a prior officer-involved

10 shooting, and that's when the first bend occurred.

11 Q.  Had -- did this occur -- when this occurred, had you recently

12 been in an officer-involved shooting in Concord?

13 A.  Yes, sir.  I was involved in one in May of 2000, I believe.

14 Q.  Was that the impetus for that happening?

15 A.  Yes.

16 Q.  And who was that officer?

17 A.  That was Officer Dan Collinvoe (phonetic).

18 Q.  And so who was present when that occurred?

19 A.  It was just Dan Collinvoe and I.

20 Q.  And you were at a restaurant or a bar; is that --

21 A.  Yes.  I believe it was the Peppermill.

22 Q.  And can you tell us what -- what occurred with regard to your

23 badge being bent?

24 A.  Yeah.  For a little bit of background, I had been involved

25 in -- I had recently been involved in an officer-involved

26 shooting, and I was having a really rough time with my performance

27 in that incident.  Because at first I was advised that at the

28 close distance that I was at with the suspect -- the armed

 1 suspect, that was -- that I had missed entirely with my rifle.

 2 And I think the distance was roughly seven yards.  And --

 3 **Q.  I'm sorry, so I couldn't hear what you said.  You missed with**

 4 **your what?**

 5 A.  With my rifle.

 6 **Q.  Oh, okay.**

 7 A.  And that was -- that was rough on me.  I went like that for

 8 several months.  I think I got word back that they never found the

 9 projectile at the hospital.  And I believe because of the way I

10 was feeling, that the reason Dan and I came up with this bending

11 of the badge thing was it was a way to signify that even -- no

12 matter what your performance was, you tried to do your job and you

13 didn't fail to do your job. And that was it.  That's what it was

14 about.

15 **Q.  When he bent your badge, did he tell you that he was going to**

16 **do that before doing it?**

17 A.  No, we discussed it before we did it, yeah.

18 **Q.  And so he explained the process to you or symbolism of what**

19 **it was?**

20 A.  Well, yeah.  I think it was just -- it was a way to signify

21 the fact that we would stand up and do our job. And I think it

22 wasn't just his idea.  I think we both kinda came up with it, you

23 know.

24 **Q.  So it wasn't -- are you saying it wasn't something he had**

25 **done before?  It was kind of a joint idea between you or --**

26 A.  I think so, yeah.

27 **Q.  Okay.  And did he bend it with his fingers or pliers?  Or how**

28 **did you do that?**

```
 1  A.  I don't know that he bent it or I bent it.
 2  Q.  Okay.  So you're not sure if he was just there?  You bent --
 3  A.  We were -- we were having, like, a dinner or lunch and
 4  discussing it.
 5  Q.  So may have actually been your idea or --
 6  A.  No, it wasn't my idea.  We kind of came up with it.
 7  Q.  Okay.  Was it specifically about being in a shooting?
 8  A.  Yes.
 9  Q.  Okay.  Um, so after that occurs in Concord -- and I'm
10  assuming it was a metal duty badge -- police badge?
11  A.  Yes.
12  Q.  Okay.  Like one you wear on your dress uniform?
13  A.  Yes.
14  Q.  And did you leave it bent for the remainder of time you were
15  a Concord police officer?
16  A.  Um, yeah.  I had a couple badges.  Back then, we had a -- it
17  was pretty popular to polish your badge every day, kinda like
18  boots.  And a lot of the badges would get worn down, so they kinda
19  didn't look the way they did when they were issued.
20      I remember at one point I got told to get a new badge because
21  mine wore down so much, so I probably got a new badge and bent
22  that one too.  Or I don't know if I did bend that one.
23  Q.  So did you -- did you -- did you bend all of the metal badges
24  you had in your possession, like, at one point?  Or did you just,
25  like, bend that one?
26  A.  Are you talking about through my career or just --
27  Q.  No.
28  A.  -- that day?
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

1  Q.  I'm talking about you probably had -- I understood you to be
2  saying you had more than one metal badge at a time, different
3  kinds?  Or was I misunderstanding that?
4  A.  Well, over the course of my career, I've accumulated several
5  badges depending on the department and/or the rank.  And then
6  there's belt badges, which are -- they're, like, flat badges that
7  go in wallets and there's badges -- a lot of guys wear the same
8  badge they wear on their shirt on their belt.
9      I tended to take whatever badge that I had that was either
10 over-polished or bent and have a backup badge that was for maybe,
11 like, funeral or, you know, something like that.
12 Q.  When you're talking about the belt badge, are you talking
13 about a flat badge?
14 A.  Most people will use the same kind of badge that you wear on
15 your chest on your belt.  Just either take it off and put it in
16 the holder. I would usually always have two.  Honestly, I forget
17 stuff, so I leave my dress badge at the -- at the station.
18 Q.  So the badge you were talking about that you would wear on
19 your chest normally, the duty badge, is that one concave?
20 A.  Yes.
21 Q.  Okay.  And in -- the flat badge is literally flat; right?
22 A.  Yes.  Those ones go in wallets so they can usually -- need to
23 be flatter.
24 Q.  Did you ever bend any of the flat badges?
25 A.  No.
26 Q.  Were you ever aware of anyone ever bending the flat badge?
27 A.  No.
28 Q.  So when you came to the City of Vallejo, you got issued a

1 Vallejo police badge, I'm assuming?

2 A. Yes, sir.

3 Q. And did you bend that badge upon getting it?

4 A. Not upon getting it -- well, you know what, I don't know.  I

5 know it got bent.

6 Q. Okay.  Did you at some point engage in badge bending in the

7 City of Vallejo Police Department?

8 A. Yes, I did.

9 Q. Okay.  And did you bend other police officers' badges?

10 A. Yes, sir.

11 Q.  Okay.  When did that start happening?

12 A. That happened shortly after I arrived in 2003.  I landed at

13 work in March, and I think I was involved in an officer-involved

14 shooting in August of the same year.

15 Q. And so did you bend your -- your badge or other people's

16 badges after that shooting?

17 A.  I did.

18 Q.  Okay.  And just your badge or --

19 A. I don't know -- I think maybe I bent my badge at that time or

20 it might have been bent before because I had come over already

21 with that from Concord.  But perhaps I bent mine.  I don't

22 remember when mine got bent.

23      But I know I bent Officer Jensen's, and I am not sure whether

24 or not I bent Sergeant Gordon's.

25 Q.  Okay.  And -- because they were involved in that shooting in

26 2003?

27 A.  Yes, sir.

28 Q.  Okay.  And subsequent to that, did you bend other Vallejo

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                  March 22, 2022

1 police officers' badges after they had been in shootings?

2 A.  Yes.

3 Q.  On how many occasions, approximately?

4 A.  I have -- I couldn't tell you the exact number.  But it was

5 several.  Trying to think.

6 Q.  Well, if you don't know, then --

7 A.  Yeah.  It was -- it was more than sixish.  I don't know.

8 More than six for sure.

9 Q.  And did -- you rose in rank over time in the Vallejo Police

10 Department from officer to corporal to sergeant to lieutenant; is

11 that right?

12 A.  Yes, sir.

13 Q.  Okay.  And did you bend the -- when you were promoted rank,

14 I'm assuming you got a new badge; right?

15 A.  Yes, sir.

16 Q.  Okay.  And did you bend the badges when you got them for the

17 promotion?

18 A.  I would, yes, except for when I got my lieutenant badge.  I

19 didn't initially bend that.

20 Q.  Okay.  Not -- but the other ones when you got them -- you

21 would when you initially got them bend the tip?

22 A.  Yeah.  It was -- I mean, if it makes it sound more clear, it

23 was kinda, like, just carryover to the next badge.

24 Q.  Right.  Do you recall an incident -- an officer-involved

25 shooting incident occurring in and around August of 2016,

26 involving David McLaughlin and Matthew Komoda that you were aware

27 of?

28 A.  Oh, yeah.

1  Q.  Okay.  You recall the incident?

2  A.  I mean, I wasn't at the incident.  I may have seen video of

3  the incident.  I definitely am aware of the incident, so --

4  Q.  And did you have any interaction with Komoda and McLaughlin

5  around badge bending due to that incident?

6  A.  Oh, yeah.

7  Q.  And how did that occur?

8  A.  Well, um, that probably occurred -- I don't know the exact

9  location.  I think it probably would have occurred at the bar

10 across the street from our parking lot.

11 Q.  Is that the Relay?

12 A.  The Relay, yes, sir.

13 Q.  Um, I know that in similar fashion to my first shooting, in

14 their engagement they fired at a vehicle that was coming at them

15 multiple times.  And none of the rounds penetrated the vehicle.

16 And I don't even think the suspect was hit at all.

17      And it seemed to be bothering them -- wasn't bothering them

18 that the suspect was okay, it was bothering them was that the

19 rounds -- two things:  You know, the rounds didn't go through the

20 car door and that they didn't successfully stop the suspect.

21 That's -- that's what I read as I was -- I think they were working

22 for me at the time.

23      So in similar fashion to getting to feel a little more

24 positive about their engagement, I bent their badges and told them

25 what it was about.  It was the fact they did their jobs.

26 Q.  So if I'm understanding you correctly, Officers Komoda and

27 McLaughlin had expressed to you that they were disappointed in

28 themselves regarding their tactical performance?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

1  A.  I think they were beating themselves up a bit, yeah.

2  **Q. And that that -- would you recall if it was Komoda or**

3  **McLaughlin or both of them that express this to you?**

4  A.  I don't remember which one necessarily, but I know the were

5  really concerned about the fact that none of the projectiles

6  penetrated the car.  And I actually explained to them too at some

7  point that I felt that that was my fault.

8  **Q.  Do you recall if this -- them expressing to you that they**

9  **felt bad about their tactical performance or they felt bad that**

10 **the bullets had not hit the target, was that at the Relay bar or**

11 **was that before that happened?**

12 A.  That may well have been -- I remember watching the video and

13 us having a -- I don't remember if one of them or both of them but

14 us having some -- we watched the video and we saw where the

15 projectiles landed and the fact that none of them went through.

16 And that -- that actually brought up some concerns about the

17 rounds that we were firing and the training that I had been giving

18 because, I mean, this is where I feel like I kinda failed them.

19    We used to teach a thing called "center of mass."  I think

20 that's still pretty popular.  But I feel like if I had been a

21 little better at my instruction, I would have been teaching them

22 center of what they could see so they wouldn't have been trying to

23 shoot through metal.  And I know I expressed that to them.

24 **Q.  So if I'm understanding you correctly, they express**

25 **displeasure or disappointment with themselves in a way that they**

26 **acted and they felt bad because, you know, if you're a police**

27 **officer shooting at someone, you want to hit what you're shooting**

28 **at.  But the bullets had not gone -- they struck the side -- the**

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1 metal side of the car and not hit the targets; right?
2  A. That's correct.  I mean, here's the thing, nobody wants to go
3 kill anybody.  Nobody -- but it's -- a difficult situation is when
4 this job requires that you actually get involved in an engagement
5 like that, you want to feel like you can successfully do what is
6 required of you.
7     And, oftentimes, I would say almost -- in my experience,
8 almost every time an officer is involved in something like that,
9 they go into some serious critical reflection.  A lot of times it
10 gets pretty negative.  And, you know, no offense, the press, media
11 doesn't usually help.  It can be really hard on folks, so --
12  **Q. Right.  Yeah.  I mean, so you're saying it's not about the**
13 **failing to kill someone, it's the idea that if you're in a**
14 **position where you have to be shooting, you want to execute what**
15 **you're doing properly and hit what you are aiming at; right?**
16  A. Well, not even necessarily hit it.  The fact that you'll
17 actually stand up and engage instead of freeze or, in some cases,
18 I've seen run.
19  **Q. So they -- they felt bad about this, and then you recall**
20 **specifically having some kind of a conversation with them where**
21 **you expressed that you felt you had trained them improperly as a**
22 **firearms instructor by focusing too much on aim at center mass; is**
23 **that --**
24  A. I recall doing that, yeah.
25  **Q.  And was that discussion at the Relay or was that some other**
26 **point?**
27  A. I don't know where that one was.  But also went to some of
28 our firearms instructors because we try to learn from each event

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                                March 22, 2022

1 and sometimes requires modifying our training.

2 **Q.  And were you their firearms instructor, Komoda and**
3 **McLaughlin?  Had you instructed them?**

4 A.  I believe so, yeah.

5 **Q. And so you kind of, in trying to make them feel better in**
6 **analyzing the situation, said, "Well, you know, this is partly an**
7 **issue of should have been training to shoot first at what you can**
8 **see to hit, not just at the center mass"?**

9 A.  That's correct.

10 **Q.  Because by center mass, when you explain that, you're**
11 **referring to the center mass, the torso of the human; right?**

12 A.  That's correct.  So in my experience, I've been a firearms
13 instructor since, I believe, about 2007.  And I've been on SWAT
14 teams since 1998ish. I've been at the range a lot.  And I've seen
15 the evolution of training, especially since the wars in -- after
16 '01.

17    Center mass was always a really big thing driven into police
18 officers.  And the way at flat-range training goes, it typically
19 on is a silhouette target with no obstruction and they get used to
20 the center mass being somewhere near the sternum; right?

21    My belief is that that projected into their incident where
22 they -- even though there's a human in the car and is obstructed
23 by the metal, they're so used to training center mass because that
24 is what we drive into them, they probably went for the torso,
25 right, hoping to punch through the metal.  Now, this is all
26 speculation on my part.  But I analyze these things too.

27    And what I figured was probably a better move -- and I'm sure
28 I discussed it with them and other firearms instructors -- was for

1  us to start shooting at what they saw that was available, if that

2  makes sense to you, if they were in a position where they required

3  to shoot.

4  **Q.  You said you watched the video with Komoda and McLaughlin,**

5  **the dash camera or the body camera?**

6  A.  I think it was dash cam.

7  **Q.  Dash cam of the shooting?**

8  A.  I believe so, yeah.

9  **Q.  Was that right after it occurred before the Relay meet-up or**

10 **was that some time later?**

11 A.  I don't know how it was in relation to the Relay meet-up.

12 But I do know that we did watch a video at one point.

13 **Q.  Okay.  And you were with them?**

14 A.  I don't remember if I was with one or both or either.  I

15 tended, because of my position, to get shown videos of most of the

16 shootings that occurred.

17 **Q.  Did you serve on what is known as the CRI or Critical**

18 **Incident Review Board at the Vallejo Police Department?**

19 A.  I have on occasion, yes.

20 **Q.  And what is a critical incident review?**

21 A.  So the Critical Incident Review Board, to the best of my

22 understanding, is whenever we have an officer-involved shooting or

23 any -- I think sometimes with the driving, but I didn't get

24 involved with the driving ones -- any kind of fatal with a

25 collision as well, but usually an officer-involved fatal-incident

26 protocol type of case, they have a review board.  And it wasn't

27 the internal investigation, it was -- that's separate.  But it was

28 a panel of various ranks:  Captain, one of the people from IA, and

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                         March 22, 2022

1 a couple of sergeants.

2      And usually the sergeants were subject-matter experts in
3 whatever the incident was.  And I, at the time, was considered a
4 subject-matter expert in the use of firearms in the course of our
5 employment.

6 Q.  Okay.  Was it use of -- just use of firearms?  Was it use of
7 force?

8 A.  Use of force as well for me.

9 Q.  Use of force overall?

10 A.  Yes.

11 Q.  All kinds of force?

12 A.  Yes.

13 Q.  And so we should clarify that.  Critical incident review, is
14 that something that is done on all the officer-involved shootings
15 and some types of other incidents?

16 A.  Well, there is -- I'm not really sure prior to my promotion
17 to sergeant, but I think those started -- I think those started
18 after I got to the City of Vallejo.  I don't know when they
19 started, but it was a practice that they were doing when I was a
20 sergeant.  Did I answer your question?

21 Q.  Yeah.  You became a sergeant in 2013?

22 A.  Somewhere around 2013.

23 Q.  Right.  Was it around that time they started this critical
24 incident review process?

25 A.  Might have been a little before that.  I don't know.

26 Q.  And so the critical incident review -- I mean, after they
27 started doing them, right --

28 A.  Yes.

1  Q.  -- that was something that was done on all officer-involved

2  shootings?

3  A.  I'm fairly sure it was.

4  Q.  Okay.  Was it done on other incidents as well?

5  A.  Oh, yeah.

6  Q.  Like, for instance, an incident that maybe wasn't a shooting

7  but where somebody got a great bodily injury or died or something

8  like that?

9  A.  Yeah.  I think -- I think in some of those cases, yeah.  I

10  don't recall doing any of them.

11  Q.  Okay.  Do you recall that you were on the critical review

12  board for this shooting with Komoda and McLaughlin?

13  A.  I don't think I was.  I really don't.

14  Q.  Do you recall whether or not you had any input into that

15  review at all?

16  A.  No, I don't.  I know that at some point I recommended we

17  reexamine the projectiles or the bullets that we were issuing.  I

18  don't -- I don't remember, I just don't.

19  Q.  So do you recall -- so you do recall that maybe you had some

20  input due to that incident at -- you know, because you were in

21  management, regarding the ammunition they used underperformed and

22  not penetrated the vehicle?

23  A.  Well, that was one of our concerns, yes.

24  Q.  Have you visited or viewed the scene where the shooting had

25  occurred at Mason and Alhambra?

26  A.  I don't think so.

27  Q.  Okay.  You're not familiar with that particular scene?

28  A.  Vaguely.  I haven't been around here for a couple years.

1 Q. Okay.  So turning to the actual bending of the badge at the

2 Relay bar, did you invite Komoda and McLaughlin there?  Did you

3 tell them to meet you there? How did that happen?

4 A. I don't remember.  I know that it wasn't uncommon for us to

5 go to that location after the workweek on a regular basis.  So, I

6 mean, I don't know how we wound up there, to be honest with you.

7 Q.  But was this very shortly after the shooting had occurred?

8 A. I don't know.

9 Q. Okay.  Don't really remember when it was?

10 A. No.

11 Q. Okay.  And other than Komoda and McLaughlin, was there

12 another Vallejo police officer there present?

13 A. I can't remember.

14 Q. Okay.  Do you recall at all if anyone else might have been

15 present?

16 A.  If there was anyone else present, it would -- I believe it

17 would only have been somebody else that had already had a badge

18 bent.

19 Q.  So it would have been -- if somebody else was present when

20 you were bending someone's badge, that would have only been

21 someone who had already been recognized in that way?

22 A. Right.  Or, you know, be more clear, maybe present and aware.

23 There may have been times where there were a few people there but

24 maybe I pulled these two guys off to the side and quietly did

25 something not in the -- I guess not so in a way that the people

26 that weren't involved would be aware, if that makes sense.

27 Q. Okay.  But it's -- if somebody else was there and aware of

28 what you're doing when you are bending a badge, that would have

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

1 been someone who already been recognized by having their badge

2 bent?

3 A. Yes, sir.

4 Q. Okay. Is there any way in your mind you can narrow down the

5 time frame? Like, can you exclude that it was a day after? Day

6 or two after the shooting? Don't know?

7 A. I couldn't tell you.

8 Q. Okay. So do you recall if you asked them to come to the

9 Relay?

10 A. I may have. I don't --

11 Q. So did you indicate to them in some way, do you recall, if

12 they should bring their badges?

13 A. I don't know if I would have had. Most guys bring their

14 badges all the time. I mean, because most guys wear their badges

15 after work.

16 Q. Wear the metal badges?

17 A. On their belts usually, yeah.

18 Q. Okay. So it might have been a belt badge or a badge somebody

19 would wear on their chest that you --

20 A. Well, a lot of people, yes. I think I previously stated I

21 used to buy a couple, but a lot of guys would just take the one

22 they wear on their chest off and put it on their belt.

23 Q. Okay. You don't remember if you asked them to bring their

24 badges or not?

25 A. I may have. I don't know.

26 Q. And so what happened when they got there to the bar?

27 A. We probably had a couple of drinks.

28 Q. Right.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                  March 22, 2022

```
 1  A. And then we probably discussed the incident.
 2  Q. And discussed it in what sense?
 3  A.  Well, kind of thing that it occurred and how they performed
 4  and I probably bent their badges and explained it to them.
 5  Q. Okay.  So when you bent their badges, what did you do?
 6  A. Um, I think in -- you know, this is where I'm not too proud
 7  of myself.  These guys really didn't have a chance to object
 8  because what I would do is ask them to see their badges.  And then
 9  I'd bend the tip, the point, and hand it back to them and
10  explained what I did and why I did it.
11  Q.  So when you would bend people's badges, you never gave them
12  the option of refusing because you didn't tell them what was
13  happening?
14  A.  That's correct.
15  Q. So you'd ask them to just see their badge?
16  A.  Yeah.
17  Q.  And then you bend it?
18  A.  Yeah.
19  Q.  And how did you do that?  With your hands?
20  A.  I used my right hand and I just place my thumb on the seven
21  o'clock point of the star if you're looking at it from the front,
22  which would be the point that's toward, I guess, the sternum,
23  lower left.  And I just bend it slightly inward and hand it back
24  to them and explain why I did that and what it meant.
25  Q.  Were you aware during the course of this -- because it sounds
26  like you did this over a long period of time, this badge bending?
27  A. Oh, yeah.
28  Q. Yeah.  From 2003 until 20 -- sometime after 2016?
```

```
 1  A.  In Vallejo, yeah.
 2  Q.  And did anybody else bend their badges other than you?
 3  A.  I know of one for certain and another that I'm pretty sure,
 4  yeah.
 5  Q.  Okay.  Was -- do you recall whether or not Josh Coleman might
 6  have been with you at the Relay bar when you bent Komoda and
 7  McLaughlin's badges?
 8  A.  I don't think he was.
 9  Q.  And do you recall if Josh Coleman was present with you in a
10  bar on another occasion where a badge was bent?
11  A.  Oh, yeah.
12  Q.  And whose badge was that that was bent?
13  A.  I bent his.
14  Q.  You bent Coleman's badge?
15  A.  Yes, I did.
16  Q.  And was there anybody else there?
17  A.  I -- I believe Mark Galios was there.
18  Q.  And was that subsequent to Mark Galios and Josh Coleman being
19  in a shooting together?
20  A.  Yes, it was.
21  Q.  Was there anybody else present?
22  A.  I don't know.
23  Q.  Okay.  And do you recall when that was?
24  A.  It was a little while after their involvement in the
25  officer-involved shooting down on Magazine Street.
26  Q.  At the Starbucks?
27  A.  At the Starbucks.
28  Q.  Was that -- that was subsequent to the bending of Komoda and
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                          March 22, 2022

1  McLaughlin's badges?

2  A.  I'm fairly certain it was.

3  Q.  Were you present in a bar on another occasion where Josh

4  Coleman bent another police officer's badge?

5  A.  Yes, I was.

6  Q.  And was that subsequent to you having bent his badge?

7  A.  Yes, it was.

8  Q.  Some -- quite some time later?

9  A.  Yes.

10  Q.  And whose badge was that that he bent?

11  A.  That was Officer Zach Jacobson.

12  Q.  Was this possibly in late 2017 or early 2018?

13  A.  Yeah.  It was sometime around there.

14  Q.  Okay.  And was that subsequent to Officer Jacobson having

15  been in a shooting?

16  A.  Yes, sir.

17  Q.  Was that subsequent to him having been in a shooting -- the

18  shooting of Jeffrey Barboa down in Richmond?

19  A.  No, I don't believe so.

20  Q.  Okay.

21  A.  I think if -- you're talking about Zach Jacobson?

22  Q.  Uh-huh.

23  A.  I didn't even know he was involved in the one in Richmond.  I

24  know that he was involved in one in, like, central Vallejo.

25  Q.  And -- but this -- but this bending -- was Coleman bending

26  his badge, right, not you bending his badge?

27  A.  It was.  It is actually -- it was not expected.

28  Q.  What do you mean when you say it was not expected?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

1  A. Well, by this point I had become a lieutenant.  And I had
2  already been made aware that I believed my captain was aware of
3  the practice because he had come in and said he knew -- like, he
4  told me to fix my badge when I was a lieutenant.  And I actually
5  hadn't bent my badge.  And he was pretty vague he said, "What's
6  wrong with your badge?"
7       And I said, "I don't know what you're talking about."
8       Because I hadn't bent that one when I became a lieutenant;
9  right?
10      And he said, "I know what that is.  Fix it.  I don't ever
11 want to see it again."
12      So I became a little apprehensive, like, what the heck?  And
13 also having become a lieutenant, I also felt like I should try to
14 be a little more mature.  And I don't know how long it was after I
15 became a lieutenant and after I had that interaction with Captain
16 Horton, but I got a phone call from Coleman and he said, "Hey,
17 let's go meet Zach over at the Relay."
18      And I said -- I asked him why, and to get him a beer so --
19 for his OIS.  So I went over there.  Because there was a lot of
20 times that people that didn't have their badges bent would still,
21 you know, just go have a beer and decompress, you know.  It's
22 pretty fricken stressful.
23      So, anyway, I went over there and met Coleman and Zach.  Zach
24 was off duty.  And Coleman bent his badge similarly to the
25 fashion, the way I did it, which is where he asked him to see it
26 and he bent it. Kind of threw me back a little bit.  It's another
27 place where I feel like I failed in my role as a leader because
28 what I should have done was said, hey, we don't do that anymore.

1 But I kinda just froze.  And, you know, because I did it to

2 Coleman. And it just didn't -- yeah.  I just failed to do my job.

3 **Q.  So when did you become a lieutenant?**

4 A.  I think it was the end of 2016.

5 **Q.  So the -- this incident where Coleman then bends Jacobson's**

6 **badge in front of you, that was some significant time after you**

7 **had bent Coleman's badge?**

8 A.  I believe so, yeah.

9 **Q. Wasn't, like, the next month or something?**

10 A.  I don't think so.

11 **Q. Okay.  And you're not actually -- you're not totally sure**

12 **what shooting it was for?**

13 A.  I -- I was under the impression it was -- you know, I didn't

14 really ask. This one, like I said, I froze.  So I didn't get into

15 a whole lot of conversation.  I didn't know it was coming.

16     And then my assumption was it was for the -- I thought that

17 he was involved in one in north Vallejo off of -- what's the name

18 of that street?  It's north of Tennessee.

19 **Q.  It was one in Vallejo?**

20 A.  I think there was one in Vallejo.

21 **Q.  Right.  But you don't -- but you don't know for sure --**

22 **because you weren't the one that called the meeting; right?**

23 A.  No.  I didn't see it coming.

24 **Q.  And you don't know when it was?**

25 A.  No.  I know it was at night.

26 **Q.  Does late 2017 or 2018 sound right?**

27 A.  Sometime around there.

28 **Q.  Yeah.  Okay.  Now, back up to what you were talking about a**

1 minute ago about being approached by your senior officer about

2 badge bending; right?  Did that happen more than one time?

3 A.  Yes.

4 Q.  Okay.  How many times?

5 A.  Twice.

6 Q.  Okay.  And was it the same superior both times?

7 A.  Yes.

8 Q.  Was that Captain Horton?

9 A.  Yes.

10 Q.  And so do you know when -- around when the first time he

11 approached you about this was?

12 A.  It was shortly after my promotion.  So a few months after my

13 promotion.  I couldn't tell you exactly when that is.  I think

14 maybe 2017ish.

15 Q.  So you think it was subsequent to you bending Komoda and

16 McLaughlin's badges?

17 A.  I don't think so.  I'm not sure.

18 Q.  Okay.  May have been before that?

19 A.  Before.

20 Q.  Okay.

21 A.  It could have been.

22 Q.  What was it that Horton said to you about -- regarding badge

23 bending?

24 A.  The first time?

25 Q.  Yes, the first time.

26 A.  The first time he walked into my office, I was relatively --

27 I don't know, I was new at the watch commander position.  And he

28 walked in.  We were talking about something.  And he looked at my

1 badge and he says, "What's wrong with your badge?"

2     And I said, "I don't know what you're talking about."

3 Because I really hadn't bent it.  I know it may sound foolish, I

4 was trying to be a little better role model, I guess.

5     Then he said he knew what it was about and that he didn't

6 ever want to see it again and walked out.

7     And so now I'm going, well, okay. Something's up.  So --

8 **Q.  That was the first time?**

9 A.  Yeah.

10 **Q.  Okay.  And you recall you probably just become a lieutenant**

11 **or not --**

12 A.  Fairly recently.

13 **Q.  Okay.  So when you were speaking earlier in this examination**

14 **about having multiple badges, right, did you -- did you get sort**

15 **of replacement badges after one had been bent so that you wouldn't**

16 **be wearing a bent badge, like, in a public ceremony or something?**

17 A.  Well, yes and no on that.  Because when I first -- like, back

18 in Concord, it was not uncommon for guys to polish their badges so

19 far down that you couldn't see any of the paint that was on them.

20 That was just a thing.

21     And then some of the uniformed guys, like Honor Guard guys

22 and whatnot, would complain about it.  So a lot of guys had two

23 badges; right?  They wear one for certain kinds of occasions and

24 another for formal events.

25     When it came to the bending for me, originally we didn't --

26 or I didn't think much about people wearing them in public on

27 their uniforms until later on and especially after Horton made

28 that statement.

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

```
 1      But I always liked to have two badges for two reasons because
 2  I liked to have one that was kind of not screwed up so that I
 3  could wear it to formal events.  And the other one that was daily
 4  or on the belt, got thrown in gym bags and get all dinged up, and,
 5  quite frankly, sometimes forgotten and left at home, so I'm glad I
 6  had another badge.
 7  Q.  When you promoted from officer to corporal in Vallejo and
 8  then corporal to sergeant, did that happen in very quick
 9  succession?
10  A.  I mean, sure.  Relatively, I think it was -- I may have been
11  a corporal for several months to maybe up to six.
12  Q.  When you became a sergeant and got a sergeant badge, did you
13  bend that badge?
14  A.  At some point, yes.
15  Q.  Did you subsequently order another sergeant badge?
16  A.  Yeah.
17  Q.  Was that so you, like you said, have two of them?
18  A.  You can have a beater that would --
19  Q.  Right.
20  A.  -- usually have to bend and then you have the formal.
21  Q.  But at that time when you ordered the second sergeant badge,
22  it wasn't to conceal the other badge was bent?  Or was -- it was
23  just to have two of them?
24  A.  I think it was, like, to conceal if need be and to have two
25  of them.
26  Q.  Okay.
27  A.  You know.
28  Q.  Do you recall in that time frame, 2013 -- I mean, by that
```

1 time there must have been a number of guys who had bent badges?

2 A.  Yeah.

3 Q.  Okay.  Do you recall any -- any discussion, necessity, sense

4 of necessity to conceal the badge-bending practice around that

5 time in 2013?

6 A.  No.

7 Q.  Did you, um, ever communicate to other officers that they

8 should get replacement badges or badges they can wear that weren't

9 bent so that it wouldn't become a public issue?

10 A.  I don't think so.  I know that when Zach Jacobson got his

11 badge bent, I told him don't ever let anyone see that.  Because

12 that was after I had been approached by Captain Horton.  And I

13 should have done more as a supervisor.  Again, I failed there.

14      But at that time most of us -- no offense to you, sir -- but

15 most of us were wearing the duty vest that that gentleman over

16 there is wearing and didn't have a metal badge on it at all; it

17 was a cloth badge.  So very few, if any, people that wore a hard

18 badge on their uniforms.

19 Q.  So the metal badge and duty badge was not something that you

20 guys were wearing very often other than if they wear on their belt

21 or they were in some kind of formal occasion?

22 A.  That's correct.

23 Q.  Okay.  Now, the second time that you were approached by

24 Horton about badge bending, was that around 2018?

25 A.  I believe so.  Yeah.

26 Q.  Do you know if it was early 2018? late?

27 A.  No, I don't.

28 Q.  Okay.  And can you describe what -- what was that

1 conversation?

2 A. That conversation was less casual.

3 Q. **Where did it occur?**

4 A.  On the admin side of the building, which I guess you would

5 call the south end.

6 Q. **Did he summon you there, or did he --**

7 A.  No, I ran into him.

8 Q.  **Okay.  And was it just the two of you?**

9 A.  Yes.

10 Q. **And what -- what did he communicate to you?  What happened in**

11 **that conversation?**

12 A.  He told me to get in his office.  And then he said something

13 to the effect, "Listen, no bull shit.  I want to -- I'm going to

14 talk to you about the badge bending.  And I don't want to hear any

15 bull shit excuses or reasons or explanations."  That's the way it

16 went down.

17 Q.  **Okay.  So he said he wanted to talk you, don't want to hear**

18 **any BS; right?**

19 A.  Yes.

20 Q.  **Did you say okay?**

21 A.  I said okay.

22 Q.  **And then what did he say?**

23 A.  He told me -- again, he did -- he didn't tell me what he

24 thought he knew, but he told me he knew what it was all about and

25 he didn't ever want to see it again.  He saw some out on the

26 street, and I needed to make sure it wasn't ever going to happen

27 again or heads were going to roll.

28 Q.  **Can I -- can I clarify that?  When you said he didn't say**

1 that he -- what it was, but he said that he knew what it was all

2 about?

3   A.  Yeah.  Yes.

4   Q.  So he didn't say it was about being in officer-involved

5 shootings?

6   A. Well, I'm fairly certain he knew that.  But my impression was

7 that he thought it was about killing people.

8   Q.  Okay.

9       THE COURT: Hold on a second.  That was all a little vague.

10 The "it" you're talking about is badge bending?

11      THE WITNESS: Yes, sir.

12      THE COURT: All right.  And then the discussion is, like,

13 what brought that about?

14      MR. FILLOY: Yeah.  I'm going to try to clarify.

15      THE COURT: That was all -- that was all -- that was all a

16 little vague.

17  Q. BY MR. FILLOY:  So when he approached you about badge

18 bending, did he say to you anything about shooting or killing that

19 made you think he thought it was about killing people?

20  A. That was my impression.  I don't know if he mentioned killing

21 people. I don't think he did.  That was my impression, though.

22 Because after the first meeting, he said he knew what it was about

23 and he never wanted to see it again.

24      The second one was a little more angry.  So I can't remember

25 if he said he thought it was about killing people or not.  I don't

26 think he did.  But that's what my impression was.

27  Q.  Okay.  Do you know if he said anything about what he

28 factually thought it was about?

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022

 1 │ A. At this point, I can't remember.  He might have.

 2 │ **Q. Did you try to describe to him what it was about?**

 3 │ A. I told him it wasn't what he was thinking.

 4 │ **Q. Okay.  But you did -- you didn't actually describe?**

 5 │ A. Oh, I didn't go into as much depth as I got to with the

 6 │ investigator and this internal investigation because we had, like,

 7 │ one of those "two and a half minute, shut up and listen"

 8 │ conversations from him.

 9 │    But I told him it wasn't what he thought it was, assuming he

10 │ thought it was about killing people.  I told him it was about guys

11 │ doing their jobs and not running from a real tense, kinda, you

12 │ know, engagement.

13 │ **Q. What was it, in fact, about?  Shoot -- being in shootings,**

14 │ **though?**

15 │ A. Yes, it was.  It was -- it was about whether -- you know,

16 │ right, wrong, or indifferent, a lot of people don't know if when

17 │ they get to that point in -- if and when they get to that point in

18 │ their career that they'll actually perform or they'll freeze.  And

19 │ that's what it was about.

20 │ **Q.  What -- was it ever -- in your experience, your knowledge --**

21 │ **was this recognition of the badge being bent ever given to an**

22 │ **officer who had been in some kind of critical incident that wasn't**

23 │ **a shooting?**

24 │ A. No.  This was about discharge of a firearm.

25 │ **Q.  Okay.**

26 │    THE COURT:  You're not going to finish before noon, are you?

27 │    MR. FILLOY:  I guess not.

28 │    THE COURT:  Yeah.  Can we do this:  I gotta get ready for a

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022

 1 Zoom meeting at noon.  Can we take a break, come back at 1:30?

 2     MR. FILLOY:  Sure.

 3     MR. FLYNN:  Sure.

 4     THE COURT:  All right.  Yeah.  So I'm thinking the same thing

 5 I was thinking before. Maybe Coleman for this initial thing.  The

 6 rest of it, I'm still not seeing.  But we'll have this discussion

 7 at 1:30.

 8     All right.  Thank you.

 9     THE WITNESS:  Thank you.

10     THE COURT:  See you all then.

11     MR. FILLOY:  1:30, Judge?

12     THE COURT:  Yeah.  1:30.

13     (Lunch recess.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                        March 22, 2022

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                          March 22, 2022

```
 1                    CERTIFICATE OF COURT REPORTER

 2                              -oOo-

 3      I, STACIE CURTIS, CSR, RPR, hereby certify that I am a

 4  Certified Shorthand Reporter and that I reported verbatim in

 5  shorthand writing the following proceedings completely and

 6  correctly to the best of my ability:

 7      COURT:            SUPERIOR COURT OF CALIFORNIA
                          COUNTY OF SOLANO
 8

 9      JUDGE:            HONORABLE DANIEL HEALY

10      ACTION:           PEOPLE OF THE STATE OF CALIFORNIA,
                          PLAINTIFF
11                        VS.
                          DOMINIC JAMES MILANO,
12                        DEFENDANT
                          CASE NO. VCR233208
13
        DATE:             TUESDAY, MARCH 22, 2022
14

15      I further certify that I have caused said shorthand writing

16  to be transcribed into typewriting by Computer-Aided

17  Transcription, and that Pages 1 through 91, inclusive, constitute

18  an accurate and complete transcription of all of my shorthand

19  writing for the date specified.

20

21      DATED:   FRIDAY, APRIL 1, 2022

22

23

24                                    _____
                                      STACIE CURTIS, CSR, RPR
25                                    Official Court Reporter
                                      CSR License No. 13987
26

27

28
```

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022                    Master Index

---

### SESSIONS

---

**3/22/2022**

MARCH 22, 2022
Morning Session                                                6

---

### EXAMINATIONS - CHRONOLOGICAL

---

**3/22/2022**

**MATTHEW KOMODA**
Direct by Mr. Filloy                                          31
Cross by Mr. Flynn                                            55
Redirect by Mr. Filloy                                       58
Recross by Mr. Flynn                                         60

**MATTHEW KENT TRIBBLE**
Direct by Mr. Filloy                                         62

---

### EXAMINATIONS - ALPHABETICAL

---

**KOMODA, MATTHEW**
Direct by Mr. Filloy                                          31
Cross by Mr. Flynn                                            55
Redirect by Mr. Filloy                                       58
Recross by Mr. Flynn                                         60

**TRIBBLE, MATTHEW KENT**
Direct by Mr. Filloy                                         62

---

### EXHIBITS

---

EXHIBIT 1 - DOCUMENT                          ID    30

04-01-2022 3:15PM
Superior Court of the State of California
County of Solano

Case 2:20-cv-01563-DAD-SCR    Document 112-12    Filed 12/06/24    Page 96 of 110
PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                        March 22, 2022                        Index: (b)..armed

**(**

**(b)** 9:2

**-**

**-ooo-** 6:3,20

**0**

**01** 72:16

**1**

**1** 30:7,8
**1/23/17** 23:28
**10/16/16** 23:25
**100** 22:6,17
**10:15** 29:24,25
**1103** 53:18
**15** 29:8
**150** 17:19
**150-page** 16:26
**15th** 24:3
**16** 60:8
**18** 62:17
**1998** 31:26 32:3,16
**1998ish** 72:14
**1:30** 90:1,7,11,12
**1st** 35:17

**2**

**20** 14:12 78:28
**2000** 63:5,13
**2003** 62:19 67:12,26 78:28
**2006** 31:22 32:3,7 33:3
**2007** 72:13
**2013** 74:21,22 85:28 86:5

**2014** 33:12
**2016** 20:28 33:26 57:7 58:2 60:5 68:25 78:28 82:4
**2017** 23:9,16 24:3,10 43:15 80:12 82:26
**2017ish** 83:14
**2018** 24:12,13,24 25:5, 16 46:18 49:16 80:12 82:26 86:24,26
**2019** 23:17 24:14 47:3
**2020** 46:21
**2021** 47:15
**2022** 6:2
**21** 31:25
**22** 6:2
**2nd** 35:24

**3**

**31st** 20:28 24:3 33:26
**352** 26:26 27:9
**356** 35:17,19
**37** 55:11
**37s** 55:9
**3rd** 35:25

**4**

**402** 6:27 20:14 30:2,12
**4th** 35:25

**8**

**8/31/16** 23:23
**832.7** 9:1 17:15

**9**

**90** 28:21,27

**A**

**above-entitled** 6:6
**absent** 28:11
**absolutely** 11:10 12:7
**absurd** 19:14
**academic** 12:17
**academy** 31:19,23,24, 26,28 32:16,19,20,27
**account** 21:23
**accumulated** 66:4
**accurate** 36:27 59:25, 26
**accurately** 28:26
**accused** 28:25 59:5
**act** 9:7 11:16,25 12:2,25 52:6
**acted** 42:21 70:26
**acting** 6:17
**action** 9:7
**actively** 16:1
**actual** 12:12 76:1
**additional** 22:27
**admin** 36:16,17 87:4
**administrator-reliability** 18:11
**admissible** 27:8 30:13
**admit** 22:15 23:14
**advised** 63:27
**affairs** 14:8
**afforded** 9:28
**aftermath** 52:4
**afternoon** 16:27 20:5,6 29:5
**agent's** 10:28
**agree** 13:20,22
**Agreed** 27:22
**agreement** 20:27

**agrees** 21:5
**ahead** 32:12 39:6
**ahold** 37:8
**aid** 23:21
**aim** 71:22
**aimed** 41:21
**aiming** 71:15
**Alhambra** 75:25
**allegation** 60:15
**allowed** 15:26
**Amendment** 9:21 10:20
**ammunition** 42:12,14 75:21
**amount** 26:28
**analysis** 10:6 14:6 16:16 18:13 25:26 28:5
**analyze** 72:26
**analyzing** 72:6
**and/or** 26:12 66:5
**Angel** 22:8 23:16,28
**angry** 88:24
**anymore** 16:21 29:3 81:28
**anyone's** 42:10
**apparently** 7:23
**appears** 6:22 25:25 26:23,25 30:10 35:12
**applied** 19:11
**appointed** 11:7
**appoints** 15:21
**apprehensive** 81:12
**approach** 35:8,9
**approached** 46:5,7,10 83:1,11 86:12,23 88:17
**approximately** 68:3
**area** 16:6
**argument** 25:21
**armed** 63:28

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                    March 22, 2022                    Index: armor..bothering

**armor** 53:24 54:9

**arrived** 36:21 67:12

**article** 26:21 46:21 47:1
51:6 54:18,21,22 56:11
58:27,28

**assembly** 58:18 59:3

**assertion** 27:24

**assistant** 7:2

**Association** 13:5
44:16

**assume** 8:9 14:21,24
29:8

**assuming** 30:27 36:17
65:10 67:1 68:14 89:9

**assumption** 82:16

**astounds** 28:18

**attend** 31:18,23

**attended** 60:16

**attending** 32:16

**attention** 52:3

**attorney** 6:10,14 7:24,
26,28 8:11

**Attorney's** 8:2,15
11:21 12:4,28

**attorney/client** 15:15

**attorneys** 14:1

**August** 20:28 23:9
24:10 33:26 43:15 58:2
67:14 68:25

**authority** 15:16

**aware** 33:20 34:17
41:1,25 42:7,10 43:10
44:10 46:18 51:17
52:19 54:19 63:3 66:26
68:26 69:3 76:22,26,27
78:25 81:2

---

**B**

**back** 7:2 12:18 13:28
19:16 25:13,16,17,26,
27 26:19 27:16 28:17
29:8,28 38:11,12,23,26
40:8 42:15,26,27 43:13

46:8,11,14,16 47:8
48:13 49:4,9,10,11,15
50:4 54:20 55:25 61:18
64:8 65:16 78:9,23
81:26 82:28 84:17 90:1

**background** 14:27
15:5 63:24

**backup** 66:10

**bad** 40:18,22,26 41:14
70:9,26 71:19

**badge** 14:22 22:2,5,8,
11 23:10,14,15,17,24
24:1,7,8,10,12,13,15,
17,21 25:2,12 26:11,19
28:4 33:20 34:10 36:5,
6,7,8 37:9,12,13,20,21,
25 38:3,4,5,6,7,20,21,
26 39:21,24 40:1,14
42:16,24 43:11 44:10
46:11,14,16,18,23 47:5,
12,20,27 48:2,6,7,16,28
49:2,4,6,16,20,28 50:2,
5,8,13,27 51:1,5,9,14,
20,22,24 52:3,7 54:13,
20 55:18,25 56:2,5,6,9,
14,15,17,25,27 57:3,14,
19,25 58:3,9,17,20,24
60:5,15 63:3,5,23
64:11,15 65:10,17,20,
21 66:2,8,9,10,12,13,
14,17,18,19,21,26 67:1,
3,6,15,18,19 68:14,18,
23 69:5 76:1,17,20,28
77:1,18 78:15,26 79:10,
12,14 80:4,6,10,26
81:4,5,6,24 82:6,7 83:2,
22 84:1,16 85:6,12,13,
15,21,22 86:11,16,17,
18,19,24 87:14 88:10,
17 89:21

**badge-bending** 9:1,23
13:3 17:14 86:4

**badges** 14:18,28 21:7,
9,21 22:23 23:26 24:26
25:2,17 27:28 34:19
37:8 40:12 46:8,25
47:23,28 48:9,15,27
50:7 51:27 55:5 59:20,
25 65:16,18,23 66:5,6,
7,24 67:9,16 68:1,16
69:24 77:12,14,16,24
78:4,5,8,11 79:2,7 80:1
81:20 83:16 84:14,15,

18,23 85:1 86:1,8

**bags** 85:4

**Bahou** 56:12 58:9

**bar** 21:25,26 22:5 34:19
35:24 36:4,21 37:6
39:19 56:27 57:1,6
63:20 69:9 70:10 76:2
77:26 79:6,10 80:3

**barbecues** 60:16

**Barboa** 22:13,23 23:4,9
24:11,16,28 25:4 43:16,
17,18 44:11,13 45:17
46:5 52:20 55:8 80:18

**Barreto** 24:4

**bars** 60:17

**based** 57:25 59:18

**basic** 32:19

**basically** 7:20 25:12
37:25

**basis** 11:11 76:5

**beater** 85:18

**beating** 70:1

**beer** 81:18,21

**beers** 39:20 40:9 44:16

**begin** 53:28

**belief** 72:21

**believed** 81:2

**belt** 66:6,8,12,15 77:18,
22 85:4 86:20

**belts** 77:17

**bend** 22:1 25:17 38:20,
23,26 39:23 42:27 46:8,
11,13,16 47:8 55:25
56:15 58:3 63:10 64:27
65:22,23,25 66:24 67:3,
9,15,28 68:13,16,19,21
78:9,11,17,23 79:2
85:13,20

**bending** 14:22 22:22
23:10,17,24 24:7,10,12,
13,15,18,21 25:12
26:12 33:20 34:10
40:14 43:13 44:10
46:18 47:12 50:4 51:5,9

18,23 85:1 86:1,8

52:3,7 54:13 57:2,3,13
58:18,20,24 60:16 63:4,
5 64:10 66:26 67:6 69:5
76:1,20,28 78:26 79:28
80:25,26 83:2,15,23
84:25 86:24 87:14
88:10,18

**bendings** 22:16

**bends** 21:6,9 82:5

**benefits** 16:7

**bent** 14:28 21:21 22:5,
8,11,23 23:14,15,26
24:1,8 25:2,13 26:19
27:28 28:4 37:12 38:17
39:21 40:1 42:16,25,26
47:5 48:28 50:7 51:25,
26 54:20 55:5,18,20
56:10,14,17,25,27
57:18,19,25 58:9 59:20,
27 60:4 63:23 64:15
65:1,2,14,21 66:10
67:5,19,20,21,22,23,24
69:24 76:18 77:2 78:4,5
79:6,10,12,13,14 80:4,
6,10 81:5,8,20,24,26
82:7 84:3,15,16 85:22
86:1,9,11 89:21

**besmirched** 13:18

**besmirches** 28:20

**Bidou** 14:15

**big** 72:17

**bind** 8:2

**bit** 7:21 15:14 16:6
18:20 21:25 63:24 70:1
81:26

**blur** 18:10

**board** 42:8 73:18,21,26
75:12

**bodily** 75:7

**body** 45:20 53:24 54:9
73:5

**bolt** 48:13 49:4,9,10,11,
12,28 50:13

**boots** 65:18

**bothered** 57:12

**bothering** 69:17,18

**bottom** 37:15,16

**bounced** 7:2

**box** 50:1

**Brady** 8:16,17 17:1,2,4, 24

**break** 22:21 29:7 90:1

**bridge** 27:6

**briefly** 16:27

**bring** 9:6 12:11 34:19 36:5,6,7,8 47:20,24,26 49:3 54:4 77:12,13,23

**bringing** 47:23 53:28

**brought** 47:21 48:1,2, 3,6 51:27 52:3 70:16 88:13

**BRUCE** 6:10

**BS** 87:18

**building** 87:4

**bull** 87:13,15

**bullets** 70:10,28 75:17

**business** 8:14 15:25

**buy** 77:21

                    C

**California** 6:4,7,9 31:22

**call** 6:21 26:8 30:12,15 49:7 51:2 58:19 61:14, 21 81:16 87:5

**called** 21:27 31:3 34:19 61:27 70:19 82:22

**calls** 11:21

**cam** 73:6,7

**camera** 10:23 27:25 73:5

**cameras** 45:20

**captain** 73:28 81:2,15 83:8 86:12

**captioned** 19:19

**car** 41:17,22 69:20 70:6 71:1 72:22

**card** 51:2

**Cardwell** 29:16

**career** 65:26 66:4 89:18

**carryover** 68:23

**cars** 55:8,9,10

**case** 6:26 7:7,16,17,20 8:1,4,5,9 9:22 10:18 11:12 13:15 15:24 17:7 18:2 19:6,27 27:17 29:28 52:2 57:23 73:26

**cases** 8:3 12:9 71:17 75:9

**casual** 87:2

**catch** 38:10

**celebration** 60:18

**cell** 61:7,14

**center** 41:22 70:19,22 71:22 72:8,10,11,17,20, 23

**central** 80:24

**ceremonies** 40:13

**ceremony** 84:16

**certification** 32:16

**chain** 34:16

**chance** 53:7 78:7

**change** 19:9

**characterization** 28:17,19,20 33:1

**characterized** 27:27

**chart** 23:20 30:5

**Charter** 15:16

**chase** 28:10

**chest** 37:18,26 66:15, 19 77:19,22

**chief** 15:5,21

**chief's** 49:22,24

**chomping** 18:20

**circumstance** 30:27

**circumstances** 15:27

**city** 6:15,25 7:18 9:6 11:13,14,20 12:4,28 13:7 15:10,12,16,18,19, 21 16:15 25:22 27:18 31:17 33:14 34:1 62:14, 15,23 63:6,9 66:28 67:7 74:18

**City-driven** 12:22

**civil** 10:3 11:9

**clarify** 74:13 87:28 88:14

**clean** 25:17

**cleanup** 24:25 25:4,5

**clear** 68:22 76:22

**clearer** 14:10

**CLERK** 31:4,8,12 61:28 62:5

**client** 10:25

**clients'** 12:9

**close** 63:28

**closed** 19:23

**closely** 14:5

**cloth** 37:25 56:6 59:23 86:17

**code** 15:20

**Coleman** 20:9,11 21:19,21,24,28 22:1,5, 19,20 23:25 26:8 29:5 37:1,4 79:5,9,18 80:4, 25 81:16,23,24 82:2,5 90:5

**Coleman's** 23:26 79:14 82:7

**collective** 14:18

**Collinvoe** 63:17,19

**collision** 73:25

**commander** 83:27

**committee** 17:1,2,9,24

**committing** 32:23

**commonplace** 41:27

**communicate** 86:7 87:10

**communicated** 16:1

**community** 16:7,9,13

**company** 50:27 51:1

**compel** 18:15

**compels** 12:27

**complain** 84:22

**complete** 31:26 34:22

**completed** 31:27 32:1 34:21,24 42:3

**comply** 16:24

**compulsory** 10:20

**concave** 66:19

**conceal** 85:22,24 86:4

**concept** 42:14

**concerned** 61:17 70:5

**concerns** 70:16 75:23

**Concord** 62:23 63:6,9, 12 65:9,15 67:21 84:18

**conduct** 14:17 28:6 30:2

**conducted** 35:17,20

**confidence** 16:14

**connected** 52:7

**consent** 25:12 39:21

**considered** 74:3

**consist** 40:10

**Constitution** 9:28

**constitutionally** 19:9

**consulted** 41:28

**contact** 61:6

**contacted** 50:14,19

**contained** 16:11

**contention** 42:10,11

**Continue** 30:11

**continuing** 6:26

**continuously** 13:18 33:13

**convenient** 23:11

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                    March 22, 2022                    Index: conveniently..discussion

**conveniently** 23:7,8

**conversation** 21:2,5,
22 40:10 41:12 42:21
52:14 54:12,15 71:20
82:15 87:1,2,11

**conversations** 58:17
89:8

**copies** 15:13

**copy** 42:2 52:22

**corner** 37:9

**corporal** 31:15 33:16
48:2,4,6,21,25 68:10
85:7,8,11

**correct** 57:23 71:2
72:9,12 78:14 86:22

**corrected** 46:19

**correctly** 53:22 69:26
70:24

**Cortez** 7:17 8:1 17:7

**council** 15:10,12,16
16:15 25:22

**counsel** 11:8 30:1,10,
18

**counseled** 52:24

**counselled** 42:5

**county** 6:7,10,13 12:27

**couple** 18:17 19:15
27:25 30:12 34:11,13
35:27 36:17 39:20 40:9
43:4 44:16 58:16 60:10
65:16 74:1 75:28 77:21,
27

**court** 6:7,16,21 8:4,10,
19,23,25,27 9:3,9,18
10:5,10,13,22,24 12:11,
16,26 13:2,4,10,12,15,
21,23,26 14:4,11 15:10,
12 16:4,25 17:11 19:12,
14 20:3,8,12,18,20,22,
24 21:8,10,13 22:21,25
23:1,21 24:20 25:19,21,
24 26:2,4,6,15,18,22,24
27:2,4,6,23 29:19,25,27
30:4,6,7,8,9,16,23
31:13 32:9,12,25,28
33:7,9 35:6,9 39:4,6
40:12 42:14 45:24

51:12 53:19 55:15 58:7,
12,16,23,28 59:8,11,14,
16 60:14,20,22,24,27
61:2,5,7,9,11,13,15,18,
22 62:10 88:9,12,15
89:26,28 90:4,10,12

**Court's** 59:18

**covering** 26:12

**cracked** 47:6

**create** 27:12

**credit** 51:2

**CRI** 73:17

**crime** 32:23

**criminal** 9:19,20,27
11:7 12:7

**critical** 37:10 39:8
41:25 42:2,8 52:10,16,
19 71:9 73:17,20,21
74:13,23,26 75:11
89:22

**criticized** 52:24

**CROSS-
EXAMINATION** 55:17

**CSR** 6:16

**culpability** 13:24

**culture** 12:23 28:13,22

**curious** 21:11

**CURTIS** 6:16

**cut** 45:20

**cutting** 28:10

---

**D**

**daily** 85:3

**Dan** 63:17,19 64:10

**DANIEL** 6:8

**Darden** 41:10

**Darst** 29:16 49:25

**dash** 73:5,6,7

**date** 6:6 33:27 35:14,
16,26 39:12

**Dave** 45:13 56:8,23

**David** 21:18 34:4,18
36:24 37:7 51:5 68:26

**day** 7:15 13:2 19:28
29:21,22 34:12 41:11
44:20 65:17,28 77:5

**days** 26:20 34:11,13
35:27 36:18 43:3

**deal** 57:16

**decide** 29:17 55:25

**decompress** 81:21

**deep** 19:16

**defeat** 53:24 54:8

**Defendant** 6:11

**defendants** 9:20 11:7,
8

**Defenders** 6:13

**defense** 8:1,11,27

**defer** 29:18,19,23

**deficient** 19:10

**define** 6:27

**definition** 12:21

**degree** 12:18

**delay** 11:13 12:6

**denied** 24:10,13

**deny** 25:15

**department** 15:17,18,
22 19:11 22:10 23:5
28:8 33:19 36:13,19
39:15 40:25 41:20
42:11 46:19,24 47:13
48:10 50:28 52:25 53:7,
10 62:14,28 66:5 67:7
68:10 73:18

**depending** 66:5

**depressing** 28:20

**depth** 89:5

**Deputy** 6:10,13

**describe** 42:15 86:28
89:2,4

**deserves** 28:12

**designed** 19:22

**detailed** 22:18

**Detective** 35:12

**determine** 14:27 15:7
30:13

**determined** 54:24

**determining** 17:4

**die** 43:18

**died** 75:7

**difficult** 71:3

**dinged** 85:4

**dinner** 65:3

**direct** 20:10 31:14
62:11

**directed** 7:18 52:27

**direction** 16:18

**disagree** 9:16

**disappointed** 69:27

**disappointment** 70:25

**discern** 59:22

**discharge** 32:21,26
34:5 44:4,8 89:24

**discharged** 43:24,28

**discipline** 14:9 15:9

**disciplined** 52:24

**disclose** 17:24 18:15

**disclosed** 7:19 13:9
20:16 24:14

**disclosure** 8:17

**disclosures** 8:3 11:13

**discovery** 18:28

**discuss** 17:9 29:7
39:12 40:5 56:9

**discussed** 7:3 52:3
58:16 64:17 72:28 78:1,
2

**discussing** 65:4

**discussion** 14:21,24
19:28 21:2 27:9 29:10,
12 40:14 41:20 51:14
58:25 71:25 86:3 88:12
90:6

**discussions** 15:4
41:16 59:1

**disfigurement** 47:9

**displeased** 40:1

**displeasure** 70:25

**distance** 63:28 64:2

**district** 6:10 7:24,26,28
8:2,11,15

**dive** 19:16

**document** 10:19
35:10,14

**documents** 10:24 17:4

**DOMINIC** 6:4,11

**door** 7:17 19:22 69:20

**doors** 41:22

**draft** 27:26,27

**dress** 38:4 65:12 66:17

**drill** 9:11 53:14,15 54:7

**drinks** 44:14 45:3 46:3
77:27

**drive** 72:24

**driven** 72:17

**driving** 73:23,24

**due** 69:5 75:20

**duty** 11:2 12:11 21:9
38:4 48:6,7 49:2,4,6
50:5 56:7 59:23,24
61:8,18 65:10 66:19
81:24 86:15,19

                E

**e-mails** 7:1

**earlier** 27:27 42:18
84:13

**early** 80:12 86:26

**effect** 87:13

**elaborate** 52:17

**embarrassed** 41:4

**embedded** 17:19

**embrace** 28:7

**emotional** 57:7

**employed** 31:16 33:13
62:12,15

**employees** 15:18

**employment** 11:15
32:3 33:18 74:5

**enamel** 47:5

**end** 28:1 36:15 82:4
87:5

**enforce** 9:7

**enforcement** 32:4
62:26

**engage** 16:15 67:6
71:17

**engagement** 69:14,24
71:4 89:12

**entire** 17:2

**entirety** 7:23

**entitled** 6:28

**equipped** 55:9

**essentially** 40:10

**Estrada** 23:3 44:6
45:14

**ethical** 28:5

**event** 71:28

**events** 7:9 22:13 34:16
59:28 60:16 84:24 85:3

**everything's** 16:19

**evidence** 26:17,28

**evolution** 72:15

**evolve** 8:10

**EWING** 6:12

**exacerbates** 16:14

**exact** 54:7 68:4 69:8

**examination** 31:14
58:8 60:3 62:11 84:13

**exchange** 22:25

**exclude** 37:4 77:5

**excuse** 34:21

**excuses** 87:15

**execute** 71:14

**exhibit** 30:6,7,8

**exonerated** 27:3,24

**exonerating** 28:25

**exoneration** 27:23
28:24

**expected** 80:27,28

**experience** 11:12 71:7
72:12 89:20

**expert** 42:8 74:4

**experts** 74:2

**explain** 38:28 39:14
72:10 78:24

**explained** 52:6 64:18
70:6 78:4,10

**explanations** 87:15

**explore** 6:27

**exploring** 19:26

**express** 40:17,21,25
41:4 70:3,24

**expressed** 69:27 70:23
71:21

**expressing** 41:1 70:8

**extent** 16:10,11 28:7

                F

**face** 54:1,6

**facing** 9:26

**fact** 13:11,18 25:24
28:26 41:13,16 50:14,
19 52:7 59:5 64:21
69:25 70:5,15 71:16
89:13

**facts** 20:15 41:21

**factually** 88:28

**fail** 64:13

**failed** 70:18 81:27 82:2
86:13

**failing** 71:13

**fair** 52:14

**fairly** 75:3 80:2 84:12
88:6

**faith** 10:16

**fall** 28:16

**false** 22:7,17

**familiar** 75:27

**fan** 19:15

**fashion** 69:13,23 81:25

**fatal** 73:24

**fatal-incident** 73:25

**fault** 41:14 70:7

**favorite** 29:21

**February** 23:17 24:12,
14

**feel** 8:16 19:21 30:20
56:18 69:23 70:18,20
71:5 72:5 81:27

**feeling** 64:10

**feels** 19:23

**fellow** 59:1 60:17 63:8

**felt** 40:11,14,18,22,26
70:7,9,26 71:19,21
81:13

**figure** 14:1

**figured** 72:27

**file** 10:3 11:23,28 14:17

**filed** 12:2

**Filloy** 6:12,22 7:4,25
8:19,22,24,26 9:2,8,16,
19 10:9,12,15 12:26
13:11,20,22,25 16:5
18:20 19:11,13 20:1,4,
9,13,19,21,23,25 21:9,
14 22:22,28 23:2 24:21
25:20,23 26:1,3,5,14,
16,19 27:5 29:18 30:3,
6,12,14,15,17,21 31:13,
15 32:10,15,27 33:2,11
35:8,10 39:5,10 42:15
45:25 51:13 53:18,26
55:13 58:7,9,14 59:17,
18,19 60:2,21 61:3,6,
16,21,25 62:10,12
88:14,17 89:27 90:2,11

Filloy's 17:12

find 18:15

finder 25:24

finding 9:6

finds 8:15

fingers 38:18 64:27

finish 29:10 89:26

fire 54:4

firearm 32:21,26 43:24, 28 44:4,8 53:11,28 89:24

firearms 34:5 53:9 71:22,28 72:2,12,28 74:4,6

fired 69:14

firing 54:3 70:17

firsthand 27:12

fix 24:26 25:2 28:8 56:22 81:4,10

flat 48:15,16 50:7,8 66:6,13,21,24,26

flat-range 72:18

flatter 66:23

flush 22:28

Flynn 6:10,24 7:19 16:25,27 21:10,12 26:23,25 27:19,22 29:24 32:8,24 33:5,8 35:4 45:22 51:11 53:17 55:15,16,18 58:6,11 60:4,13,22,23 61:8,14 90:3

focus 25:19

focusing 71:22

folks 59:4 71:11

follow-up 12:3

foolish 84:3

force 74:7,8,9,11

forced 53:22 57:11

forget 31:24 66:16

Forgetting 60:15

forgot 20:20

forgotten 85:5

formal 84:24 85:3,20 86:21

forthcoming 47:17

forward 27:21

Foster 22:12 23:18

found 64:8

fourth 21:15,16 36:26 55:4

frame 77:5 85:28

frankly 85:5

free 8:16

freeze 71:17 89:18

fricken 81:22

friends 9:9

front 22:6 27:8 28:1 54:1,5 78:21 82:6

froze 82:1,14

full 31:9 32:15 39:5 40:13 55:28 62:6

fully 47:17 53:28 54:5

functions 59:24

funeral 66:11

funny 8:23

## G

Galios 23:25 79:17,18

Galios' 23:26

Gary 24:8

gathered 45:19,28

gatherings 60:17

gave 45:19 78:11

general 26:12 46:19 58:18 59:3

generalized 12:22 14:21 27:17

generally 15:15 59:1,2

gentleman 86:15

get all 85:4

giant 19:15

Giordano 22:4 27:26 28:11,25 47:11 48:27 51:28 56:9

give 10:2 23:20 25:10 31:5 38:23 39:23 47:11 51:2 62:1

giving 70:17

glad 85:5

glorifying 28:14

God 31:6 62:3

good 10:16 51:21 61:13,15

Gordon's 67:24

gossip 18:1,3,5

gotta 10:2,3 11:24 12:7 22:28 24:26 25:17 27:16 89:28

grab 61:24

grabbed 37:8

great 19:20 75:7

grievous 16:9

ground 54:3

group 58:20

Guard 84:21

guess 7:1 12:20 16:20 25:26 26:6 29:12,20 32:28 59:14 60:14,24 76:25 78:22 84:4 87:4 89:27

guessing 34:13

gun 52:8 54:4

guy 37:4

guys 23:12 36:13 37:11 39:12,16 41:4,16 46:3 59:24 66:7 76:24 77:13, 14,21 78:7 84:18,21,22 86:1,20 89:10

gym 85:4

## H

half 89:7

hall 44:16 45:2,3,6 46:2 61:24

hallway 60:28 61:17

hand 23:21 45:19 61:28 78:9,20,23

handed 8:7

handful 17:23

handle 32:20

handled 37:11 39:8 52:10

hands 38:18,21 42:28 78:19

Hang 27:6

happen 22:7,20 35:21 76:3 83:2 85:8 87:26

happened 7:16,17 8:9 16:13 22:17,22 23:11, 22 26:3 41:24 48:4 67:12 70:11 77:26 87:10

happening 24:26 25:5 51:16 63:14 67:11 78:13

happy 30:19 40:2

hard 71:11 86:17

harm 16:9

harmed 13:16

heads 87:27

heads-up 24:25

HEALY 6:8

hear 6:28 7:11 17:22 18:17 19:8 29:16,17 39:5 40:21 41:1 64:3 87:14,17

heard 7:15,16 14:22 26:20 46:20 59:7

hearing 7:3 20:19 30:11,12

hearings 20:2 27:25

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                                March 22, 2022                    Index: hearsay..job

**hearsay** 27:13

**heck** 81:12

**heightened** 10:4,5,6

**held** 13:19 15:24

**hey** 28:15 37:9 58:20,24
59:4 81:16,28

**highlights** 11:12

**HIPPA** 10:21

**history** 26:11

**hit** 41:5,14,18 69:16
70:10,27 71:1,15,16
72:8

**Hogan** 17:28 18:2

**hold** 10:9 88:9

**holder** 66:16

**home** 85:5

**honest** 28:11 47:17
76:6

**Honestly** 66:16

**Honor** 8:13 12:27 14:3,
26 15:14 16:18 20:4
29:13 55:16 60:23
84:21

**Honorable** 6:7

**hook** 38:10

**hoping** 72:25

**Horton** 81:16 83:8,22
84:27 86:12,24

**hospital** 64:9

**hours** 35:17

**house** 29:1 48:14

**houses** 28:28

**human** 72:11,22

**hundred** 22:17

**hybrid** 17:16

**I**

**IA** 73:28

**idea** 11:7 51:21 64:22,
25 65:5,6 71:13

**identical** 49:2

**identification** 30:8

**identified** 13:23 14:19
16:10

**immunity** 13:8

**impetus** 63:14

**imposed** 15:9

**imposing** 14:9

**impression** 39:16
52:15 82:13 88:6,20,21,
26

**improperly** 71:21

**inch** 42:17

**incident** 22:19 35:15
37:10 39:8 41:25 42:2,8
52:10,16,19 53:3 63:27
68:24,25 69:1,2,3,5
72:21 73:18,20,21 74:3,
13,24,26 75:6,20 78:1
82:5 89:22

**incidents** 74:15 75:4

**including** 28:28

**independently** 54:27

**indication** 39:23 51:14

**indifferent** 89:16

**individuals** 15:25

**infamous** 17:27

**information** 8:14,16
10:4,5,21,25 11:14,17,
18 12:2 13:1,3 15:28
17:17 19:26 20:16 24:6
52:12

**informational** 11:3

**initial** 90:5

**initially** 7:6 50:17
68:19,21

**initiators** 28:4

**injury** 75:7

**innuendo** 26:26

**input** 75:14,20

**inquire** 27:11

**inquiry** 10:23

**insane** 28:1

**inspected** 46:23 51:14,
20,23

**inspection** 51:18

**instance** 75:6

**instances** 24:17

**institution** 45:4

**instructed** 72:3

**instruction** 47:22
53:10 70:21

**instructor** 53:9 71:22
72:2,13

**instructors** 71:28
72:28

**intended** 28:4

**intentionally** 18:10

**interaction** 55:1 69:4
81:15

**interconnection** 7:9

**interest** 9:26

**interesting** 9:3 18:9
24:16,22

**internal** 14:8 47:12
73:27 89:6

**internally** 16:1

**interview** 21:18 24:27
34:22,26 35:17,20,21
47:11,18,20,22,23 48:4,
27 51:28 56:8

**interviewed** 17:5 23:3,
5 35:1

**interviews** 14:26 17:3
23:3 24:14 44:22,24

**invasion** 15:27

**investigate** 11:2

**investigation** 9:1
12:21,23 13:4 14:8,27
15:1,5 17:6,15 28:9
35:3,5 47:12 54:13
73:27 89:6

**investigator** 47:24
89:6

**invitation** 35:24

**invite** 76:2

**invoice** 50:25

**involve** 24:2 54:10

**involved** 16:1 19:26
24:3 33:23,28 34:3 37:9
39:7 43:17,20,22,26
44:2,6 57:22 58:1,3
63:1,9,13,24,25 67:13,
25 71:4,8 73:24 76:26
80:23,24 82:17

**involvement** 79:24

**involving** 7:3 8:5 18:26
52:2 68:26

**irrelevant** 33:1

**issue** 9:3 11:23 17:27
19:2 46:18 53:18 72:7
86:9

**issued** 38:7 65:19
66:28

**issues** 15:23 33:10
57:8

**issuing** 75:17

**J**

**Jacobson** 22:1,4,6,8,
14,17,27 23:15,28 25:3,
8 44:2 80:11,14,21
86:10

**Jacobson's** 22:2
24:23 82:5

**Jake** 23:3 44:6 45:14

**Jaksch** 24:4

**JAMES** 6:4,11

**January** 23:15

**Jared** 24:4

**Jarrett** 24:2

**Jason** 56:12 58:9

**Jeffrey** 24:10 43:16,17
80:18

**Jensen's** 67:23

**job** 62:26 64:12,13,21
71:4 82:2

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                        March 22, 2022                        Index: jobs..mature

**jobs** 69:25 89:11

**jog** 37:1

**joint** 64:25

**Jones** 24:8

**Josh** 20:9 21:19,21,24, 28 22:5,19,20 37:1,4 79:5,9,18 80:3

**judge** 6:8 8:2 9:16 13:4, 25 16:27 20:13,25 22:28 26:17 29:18,24 30:3,17 58:6 61:14 90:17

**judicial** 13:8

**July** 24:3

**June** 49:16

**jury** 6:28 27:8

---

**K**

**K-O-M-O-D-A** 31:11

**Kafka** 19:15,16,18

**KATELYN** 6:14

**keeping** 32:6

**Kenney** 24:4 45:27 46:2

**Kent** 7:8 21:17,24,27 22:6,18 23:26 24:23 34:18 37:8 41:7 46:6,7, 11 53:2 54:12 55:2 61:21,26 62:8

**Kevin** 24:4

**kill** 71:3,13

**killed** 22:12 24:15 53:25

**killing** 22:9 43:16 88:7, 18,19,20,25 89:10

**kills** 23:18,28

**kind** 8:6 9:3 12:12 13:6 14:21,23 28:13,23 29:20 30:25 32:23 57:3 59:2 64:25 65:6 66:14 71:20 72:5 73:24 78:3 81:26 85:2 86:21 89:22

**kinda** 22:26 64:22

65:17,18 68:23 70:18 82:1 89:11

**kinds** 27:8 66:3 74:11 84:23

**knew** 15:6,8 81:3 84:5 87:24 88:1,6,22

**Knight** 6:14,25 7:5,14, 27 8:13 13:11,27 14:3, 5,26 15:11,14 16:18 29:13 30:17,19,26 61:24

**Knight's** 29:10

**knowledge** 89:20

**Komoda** 7:6,9,20 14:20 17:23 18:27 20:26 21:3,14,15 22:14, 23,26 23:23 25:10,16, 28 26:1,4,10,17 27:1,11 29:5,8,9 30:15 31:1,2, 11,15 55:18 68:26 69:4, 26 70:2 72:2 73:4 75:12 76:2,11 79:6,28 83:15

**Komoda's** 27:2

**Krause** 6:12,23 11:21 12:1

**Kyle** 34:28

---

**L**

**lack** 16:14

**lady** 11:20 12:4

**landed** 67:12 70:15

**language** 14:7 16:23

**large** 12:18 16:11

**largely** 30:22

**late** 80:12 82:26 86:26

**latest** 8:20

**law** 6:14 12:11 19:19,21 32:4 62:26

**lawsuit** 11:9

**lawyer** 10:15

**laying** 27:20

**leader** 81:27

**learn** 34:9 63:7 71:28

**leave** 19:27 36:16,17 65:14 66:17

**left** 23:4 39:20 78:23 85:5

**legal** 11:11 12:12

**legislature** 16:19

**legitimate** 15:25 16:2

**lends** 16:12

**lengthy** 7:4 10:1

**letters** 12:3

**letting** 14:20 27:11

**liability** 15:26

**lied** 27:1

**lieutenant** 36:1 41:10 62:14 68:10,18 81:1,4, 8,13,15 82:3 84:10

**life** 9:27

**light** 21:22

**limitations** 15:8

**limited** 29:6 52:12 53:27

**lines** 18:10

**lineup** 46:24,25 51:13, 20,22

**list** 7:4 8:25

**listen** 87:13 89:7

**listening** 17:3 18:22

**literally** 66:21

**litigating** 25:22

**location** 69:9 76:5

**locker** 22:9,12

**logistically** 20:4

**long** 29:24 34:9 35:11 39:18,20 45:15 60:7 61:18 62:15,24 78:26 81:14

**looked** 14:5 40:11 55:27 56:20 83:28

**loss** 10:28

**lot** 18:6 21:22 25:24 26:25 40:8 65:18 66:7 69:10 71:9 72:14 77:20, 21 81:19 82:15 84:22 89:16

**love** 9:13 14:6

**lower** 37:14,15 78:23

**lunch** 65:3 90:13

**lying** 26:1,3,17,19

---

**M**

**made** 23:5,20 37:22 42:10 46:18 81:2 84:27 88:19

**Magazine** 79:25

**main** 33:10

**majority** 29:2

**make** 8:16 9:4,5 30:26 72:5 87:26

**makes** 22:26 25:7,8 30:19 68:22 73:2 76:26

**making** 8:3

**man** 25:17

**management** 14:12,25 15:17,18 16:2 51:15 75:21

**manager** 15:19,21

**managing** 15:22

**March** 6:2 23:17 47:15 62:19 67:13

**mark** 30:5,6,7 79:17,18

**marked** 30:8

**Mason** 75:25

**mass** 41:22 70:19 71:22 72:8,10,11,17,20, 23

**material** 17:5 20:10

**Matt** 30:15 31:11

**matter** 6:6 43:3 64:12

**Matthew** 31:2 68:26

**mature** 81:14

Superior Court of the State of California
County of Solano

PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022                    Index: Mccoy..officers

Mccoy 24:15

Mcdonough 7:21
43:26

Mclaughlin 7:21 17:22
20:26 21:4,14,18 22:15
23:23 24:27 25:9,10,16
34:4,18 36:10,24 37:7
40:3,21 41:1,13,17,21
42:12 43:10,22 45:13
46:10 51:6 54:16 56:8,
23 68:26 69:4,27 70:3
72:3 73:4 75:12 76:2,11

Mclaughlin's 22:23
24:24 38:20,24 79:7
80:1 83:16

Mcmahon 10:11 17:22
18:22 23:18

Mcmahon's 22:11
23:17

meaningful 18:21

meant 78:24

mechanism 9:11

media 71:10

medical 10:27

meet 21:6 34:18 76:3
81:17

meet-up 73:9,11

meeting 17:9 37:6
58:23 59:3 82:22 88:22
90:1

Members 17:2

mentioned 13:6 88:20

met 44:15 81:23

metal 37:21 40:12
41:17,22 47:20 48:9,17
51:27 56:2 59:24 65:10,
23 66:2 70:23 71:1
72:23,25 77:16 86:16,
19

Michael 62:8

MICHELLE 6:12

middle 24:17

Milano 6:5,11,21,22
10:10,19 12:8 18:19,26,
27 24:13 25:27 30:3,9

52:2 57:23

Milano's 9:26 19:27
29:28

millimeters 42:16

mind 19:9 77:4

mine 55:10 65:21
67:21,22

minimal 42:18

minute 14:20 61:23
83:1 89:7

minutes 29:8

missed 19:4 64:1,3

misunderstanding
66:3

model 84:4

modify 50:2,4,5

modifying 19:6 72:1

money 48:26

month 47:16 82:9

months 12:3 19:17
24:28 43:4 64:8 83:12
85:11

morcels 17:18

morning 6:1 29:7
35:19 58:19

motion 11:23,28 29:14,
15

motions 16:21

motive 57:13

mount 49:7

move 27:21 33:9 72:27

moving 46:26

multiple 9:22 22:16
69:15 84:14

Mustard 8:6

_____

N

names 17:21,23

Napa 31:24,26,28
32:16,19,20,27

narrow 77:4

nature 21:3

necessarily 70:4 71:16

necessity 86:3,4

needed 8:3 38:21
44:17 46:8,19 87:26

negative 13:6 55:1
71:10

neutralize 53:24

news 46:20 58:27

NICHOLAS 6:12

night 21:28 35:22 44:18
57:6 82:25

noon 89:26 90:1

normal 57:1

north 82:17,18

notice 25:13 39:26
59:19

November 24:13

nugget 18:21

nuggets 19:4

number 8:27 12:22
17:13,28 18:25 51:2
61:7,14 68:4 86:1

nut 49:13

_____

O

Oakland 11:14,19,20
12:4 31:22

object 78:7

objection 12:13 30:22,
26 32:8,24 33:5 35:4
45:22 51:11 53:17
58:11

obligated 16:24

obligation 28:6

oblivion 13:7

obstructed 72:22

obstruction 72:19

obtain 32:15

obtained 8:4

occasion 57:19 73:19
79:10 80:3 86:21

occasions 56:1 68:3
84:23

occur 9:13 33:22 39:27
63:11 69:7 87:3

occurred 34:16 35:15,
19 37:6 40:5 43:15
52:13 53:3 59:27 63:10,
11,18,22 69:8,9 73:9,16
75:25 76:7 78:3

occurring 24:16 44:10
45:7 68:25

occurs 65:9

odd 17:20

offense 71:10 86:14

offers 20:15

office 8:2,15 11:21
12:4,23,28 49:22 83:26
87:12

officer 7:6,7 13:6 14:7,
14 15:3,23 17:21,22,23
18:26 21:15,16 28:6,15
31:1,17,18 32:4,6,17
33:3,11,13,16 36:10,27
37:7 38:8 40:3,21 41:1,
17,21 42:11 43:10,22
44:2,6 45:18 46:10
48:2,7,23 49:3,6 50:5
51:24 54:15 55:4,18
56:15,24 60:6 62:15,20,
24,26 63:8,16,17 65:15
67:23 68:10 70:27 71:8
76:12 80:11,14 83:1
85:7 89:22

officer's 14:17 80:4

officer-involved 17:18
22:2 41:26 63:1,9,12,25
67:13 68:24 73:22,25
74:14 75:1 79:25 88:4

officers 8:6 11:15,19
12:21 13:16,17 14:28
15:4,9,26 17:5 27:28
28:3,12,21,27 29:2,3,12
43:20 45:4,5 51:15
56:24,28 59:23 60:17
69:26 72:18 86:7

**officers'** 13:5 44:15 59:20 67:9 68:1

**Official** 6:16

**oftentimes** 71:7

**OIS** 81:19

**one-handed** 54:10

**open** 8:10 9:9,12 19:6 51:6

**opinion** 18:1

**opposed** 41:18

**opposite** 16:8

**option** 12:20,22 78:12

**order** 7:25,27 8:12 26:8 31:18 49:16,20 85:15

**ordered** 13:4 49:17 50:13,17 85:21

**orders** 8:8 12:27 13:8

**organizational** 26:11

**original** 50:5 54:20 55:25

**originally** 84:25

**outer** 53:20

**over-polished** 66:10

**overruled** 45:24 51:12 53:19,20

**overtime** 41:10

——————

**P**

**packet** 16:28

**pages** 14:12 17:19

**paint** 47:5 84:19

**panel** 73:28

**parking** 40:8 69:10

**part** 6:26,27 8:28 14:27 15:1 17:4,14 18:16 25:9 72:26

**participate** 43:16 53:10

**participated** 17:6

**parties** 60:16

**partly** 24:24 72:6

**passive** 28:3

**path** 19:24,25

**patrol** 55:8 56:2

**patrons** 57:1

**pay** 50:15,20,21,26,27

**PD** 56:25 60:7

**peace** 14:7 15:3,23

**penetrated** 69:15 70:6 75:22

**people** 6:4,9,24 12:10 13:23 23:2,13 41:22 45:11 53:7 56:28 66:14 73:28 76:23,25 77:20 81:20 84:26 86:17 88:7, 19,21,25 89:10,16

**people's** 67:15 78:11

**Peppermint** 63:21

**perceived** 28:13

**percent** 22:6,17 28:21, 27

**perform** 89:18

**performance** 40:19, 23,26 63:26 64:12 69:28 70:9

**performed** 34:26 52:20 78:3

**period** 78:26

**person** 20:9 36:26 54:5 55:6

**personally** 8:17 17:1

**personnel** 14:8 15:3, 23

**persons** 19:26 27:27

**pertaining** 33:8

**phone** 61:7 81:16

**phonetic** 17:28 63:17

**phrased** 32:25

**piecemeal** 15:2

**pin** 38:12,13,14

**Pitchess** 6:26 8:14

10:22 12:20 14:25 16:20 19:9

**place** 16:23 45:3 78:20 81:27

**pliers** 64:27

**POA** 44:15 45:2,3,6 46:2 58:23 59:3

**POA's** 29:1

**point** 11:4 12:3,25 14:13 16:11,22 20:25 29:6,11 30:18 33:9,18 35:28 36:3 38:26 40:18 42:16 46:6,7,23 49:20 51:13 52:15 53:8 54:8, 19 58:18 60:7 61:4 65:20,24 67:6 70:7 71:26 73:12 75:16 78:9, 21,22 81:1 85:14 89:1, 17

**point-blank** 22:4

**pointed** 54:1,2

**pointing** 54:4

**points** 37:15 38:2

**police** 11:19 13:5 15:17,21 19:11 21:15, 16 22:10 23:4 28:5,12, 15,21,27 31:17,18,23, 26 32:6,16,17,20,27 33:3,11,13,19 35:2 36:13,26 37:20 38:7 39:15 40:25 42:11 44:15 45:4,5,18 46:19, 24 47:12,20 48:2,7,9,10 50:28 51:24,27 53:9 56:15 59:20 60:17 62:14,20,24,28 65:10, 15 67:1,7,9 68:1,9 70:26 72:17 73:18 76:12 80:4

**policy** 14:9 15:1

**polish** 65:17 84:18

**pops** 17:7

**popular** 65:17 70:20

**position** 7:13 8:13 11:22,24 54:20 55:26 71:14 73:2,15 83:27

**positive** 69:24

**possession** 48:10 65:24

**possibility** 54:9

**possibly** 27:21 80:12

**post** 32:15 49:7

**potential** 14:9

**power** 9:20 12:8

**pox** 28:28

**Poyser** 22:9,27 23:16 24:1 34:28 35:12

**PRA** 11:9 12:7

**practice** 33:20 34:10 52:12 59:7 63:3,5 74:19 81:3 86:4

**practices** 12:23

**prejudicial** 27:9

**premised** 10:6

**prepared** 29:13,15

**present** 6:11,14,16 21:21,25,26 22:25 26:9 30:1,3,10 45:6,27 46:2 56:25 63:18 76:12,15, 16,19,22 79:9,21 80:3

**presented** 7:4 8:7,11, 20 30:5

**presents** 8:11

**presiding** 6:8

**press** 71:10

**pressure** 42:22

**pretty** 24:16 43:2,9 52:1 53:8 65:17 70:20 71:10 79:3 81:5,22

**prevention** 10:28

**previously** 11:19 20:16 24:9 51:26 77:20

**pride** 55:23

**prior** 47:1,22 51:6 62:12,20 63:9 74:16

**prison** 9:27

**privacy** 15:27

**privately** 13:19

Case 2:20-cv-01563-DAD-SCR    Document 112-12    Filed 12/06/24    Page 106 of 110
PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022                    Index: privilege..relying

**privilege** 10:21,22
12:13

**privileged** 10:19 11:5,
18 12:10 20:16

**problem** 21:18

**procedure** 11:9

**proceedings** 6:18

**process** 9:24 10:1,20
12:7 17:8 19:9 41:26,28
64:18 74:24

**produce** 26:28

**produced** 8:28 17:14

**producing** 47:23

**professional** 55:28
56:1

**professionally** 37:11
39:8 52:11

**progression** 23:22

**projected** 72:21

**projectile** 64:9

**projectiles** 70:5,15
75:17

**promoted** 33:16 68:13
85:7

**promotion** 68:17 74:16
83:12,13

**prong** 37:13

**prongs** 37:12

**proof** 20:15

**properly** 71:15

**protected** 15:3

**protection** 29:2

**protections** 16:23

**protective** 7:25,27 8:8,
12

**protests** 16:14

**protocol** 73:26

**proud** 78:6

**provide** 15:24 46:25

**provided** 7:28 42:2

**provision** 15:20

**public** 6:13 8:21 9:1,7,
16,25 11:16,24,25,26
12:2,14,24,25 13:1,9,13
14:6 17:15 18:14,15
45:3 84:16,26 86:9

**public's** 9:25

**pulled** 76:24

**pulling** 52:8

**punch** 11:13 72:25

**pure** 26:26

**purpose** 18:11 29:6

**purposes** 14:9,24 15:8
17:6,12 18:13,27 27:20
30:12

**pursuant** 9:1 17:15

**put** 50:1 66:15 77:22

_____

**Q**

**quarter** 42:17

**quash** 11:23,28 29:14,
15

**question** 17:13 18:9,
12,25 20:20 25:26 26:4
28:16 32:25,28 35:6
51:21 57:21 60:15
74:20

**questions** 8:20 17:13
32:10,12 55:15 58:6,16
59:11,18 60:13

**quick** 85:8

**quietly** 76:24

**quote** 26:12

_____

**R**

**raise** 59:11 61:28

**raised** 58:19

**Ramos** 22:9 23:16,28

**ran** 17:27 87:7

**random** 10:17

**range** 72:14

**rank** 60:5 66:5 68:9,13

**ranks** 73:28

**re-call** 55:14 58:15
60:24

**react** 53:27

**read** 15:10 16:26 19:2
27:2,19,26 28:19 52:22
69:21

**readily** 16:10

**ready** 29:27 61:20
89:28

**real** 89:11

**reality** 23:11

**reason** 27:11 33:2
64:10

**reasonable** 25:25 28:5

**reasons** 85:1 87:15

**recall** 36:19,20 40:28
41:3,12,16,20 42:23
45:17,25,26,27 46:2,4
50:19,24,26 55:3,4,5
62:18 68:24 69:1 70:2,8
71:19,24 75:10,11,14,
19 76:14 77:8,11 79:5,
9,23 84:10 85:28 86:3

**receive** 16:28 17:1 24:6
47:22 52:22

**received** 49:18

**recent** 47:16

**recently** 63:11,25
84:12

**recess** 29:26 90:13

**recognition** 89:21

**recognize** 28:21

**recognized** 76:21 77:1

**recollection** 7:5 22:18
35:2,14,21 37:1

**recommended** 75:16

**record** 8:21 9:12,17
11:24,26 12:25 13:9,13
14:6,8 15:4 18:14,15
27:12 29:28 31:10 62:7

**recordings** 8:28 17:13

**records** 9:1,7,23 10:27,
28 11:16,25 12:2,5,14
15:24 17:15

**RECROSS** 60:3

**REDIRECT** 58:8

**reeling** 25:26

**reexamine** 75:17

**refer** 38:3

**referred** 38:5

**referring** 39:10 72:11

**reflection** 71:9

**reflects** 28:26

**refresh** 35:2,14

**refusing** 78:12

**regard** 63:22

**regular** 51:24 76:5

**regularly** 6:6 53:5

**related** 10:8,10 52:16

**relating** 11:15,18

**relation** 73:11

**relationship** 53:2

**Relay** 21:1,2,6,17,26
34:19 36:8,21 37:6
39:19 53:3 54:13 55:5
56:27 57:6,9,19 69:11,
12 70:10 71:25 73:9,11
76:2 77:9 79:6 81:17

**release** 7:18 9:5,6
12:28 13:1,2

**released** 7:24,25,26,27
10:7 12:17,27 13:9,13
18:18

**relevance** 10:6,23
26:10 27:17 32:8,9,13,
24 33:5 35:4 45:22
51:11 53:17

**relevant** 7:7,8 10:18,
25,27 11:4 12:10,18
17:17 18:3,19,25,27,28
19:26 20:10 30:13

**rely** 27:19

**relying** 27:20 28:24

**remainder** 65:14

**remains** 16:12 28:19

**remarkably** 28:11

**remember** 21:15 35:1,
26 36:28 37:2 38:25
41:10 43:7 45:11,16,23
48:1 52:9,17,23 53:21
54:7,14 56:24 58:26,27
59:1 65:20 67:22 70:4,
12,13 73:14 75:18 76:4,
9,13 77:23 88:24 89:1

**remembering** 21:19

**repeat** 41:19

**replacement** 84:15
86:8

**reply** 8:20

**report** 8:5,21 11:1 13:6,
12 15:10,13 16:3,26
17:3,10,16,20,21,28
18:5,8,9,19,22,23 27:2,
13,19,20 28:8,11,18,19,
25 35:3,13 46:10,13

**reported** 24:12

**Reporter** 6:16

**reporting** 21:5

**reports** 8:28 17:14
23:24

**represent** 9:20

**represented** 6:9,12,14

**represents** 12:8

**request** 11:16,25 12:2

**requested** 8:25

**requests** 8:27

**required** 71:6 73:2

**requires** 71:4 72:1

**reread** 19:16

**research** 14:1

**reservation** 16:6

**responded** 7:5

**responsible** 15:21
28:5

**rest** 7:9,12 9:27 18:23

90:6

**restaurant** 63:8,20

**retell** 19:19

**retirement** 62:13

**reveal** 28:9 29:21,22

**review** 10:23 18:17
41:25 42:2,8 52:19
73:18,20,21,26 74:13,
24,26 75:11,15

**reviewed** 35:11

**reviewing** 17:2

**reviews** 8:15

**revisit** 29:22

**Richmond** 44:24,28
80:18,23

**ridiculous** 11:9,10

**rifle** 64:1,5

**rights** 9:21,27

**ringed** 16:5

**roadmap** 27:21

**Robert** 22:4 47:11
51:28 56:9

**role** 81:27 84:4

**roll** 29:27 87:27

**rolling** 12:19 17:12
60:25

**Ronnell** 22:12 23:18

**room** 22:10,12

**rose** 68:9

**rough** 63:26 64:7

**roughly** 62:17 64:2

**rounds** 53:23 54:8
69:15,19 70:17

**RPR** 6:16

**rule** 29:13,15 56:21

**ruled** 18:2,26,28

**rules** 28:7

**ruling** 8:27 9:4 17:13
27:5,7

**rulings** 8:25

**run** 71:18

**running** 89:11

**Ryan** 22:11

---

**S**

**sacrificing** 29:1

**safety** 38:10,14

**sat** 63:8

**SB1421** 25:6

**scene** 45:18,27 75:24,
27

**scheme** 9:5

**school** 10:27

**screwed** 85:2

**SDT** 11:23

**Sean** 24:4 45:27 46:2

**seat** 31:8 62:5

**secondhand** 27:12

**secretary** 49:24

**seek** 32:3 58:2

**self-serving** 25:10,11

**senior** 83:1

**sense** 22:26 25:7,8
73:2 76:26 78:2 86:3

**separate** 7:16 15:20
31:23 50:25 73:27

**separated** 50:25

**September** 35:17,20,
25

**sergeant** 25:1 35:28
36:2,3,21 37:7 39:19
40:17,21 41:7,12 42:7,
20 53:8 55:19 56:14,17,
23,27 57:2,13,18 60:4,
11 67:24 68:10 74:17,
20,21 85:8,12,15,21

**sergeants** 74:1,2

**serve** 73:17

**service** 10:20

**SESSION** 6:1

**set** 6:27 17:9

**seven-pointed** 37:28

**shadow** 50:1

**shed** 21:22

**Shellyne** 49:25

**shift** 25:1 36:15

**shirt** 66:8

**shit** 87:13,15

**shoot** 70:23 72:7 73:3
89:13

**shooters** 23:4 24:18
44:13 45:19,28

**shooting** 20:28 22:2,9,
13,14,15 23:9,12,13,16,
19,23,24,25,27 24:1,16
25:4 33:23,24,28 34:3,
5,7,9,22,26 35:3,19,22
39:10,12 40:18,19,23,
27 41:22,23,26 42:8,12
43:17,20,22,26 44:2,6,
11,13,22,24,28 45:17
46:5 52:2,4,7,20,25,28
53:23,28 54:10 55:8
57:7,8,22 58:2 63:10,
12,26 65:7 67:14,16,25
68:25 69:13 70:27
71:14 73:1,7,22 75:6,
12,24 76:7 77:6 79:19,
25 80:15,17,18 82:12
88:18 89:23

**shootings** 17:18 22:16
23:22 24:2,7 58:1,4
60:18 63:1 68:1 73:16
74:14 75:2 88:5 89:13

**short** 19:18 43:9

**shortly** 67:12 76:7
83:12

**shot** 24:13 41:17

**show** 29:21

**showed** 7:2 45:18
48:27

**shown** 73:15

**shut** 12:4 89:7

**side** 70:28 71:1 76:24
87:4

Case 2:20-cv-01563-DAD-SCR    Document 112-12    Filed 12/06/24    Page 108 of 110
PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                              March 22, 2022                    Index: sign..technique

**sign** 8:8,12

**signal** 45:19

**significant** 82:6

**signify** 64:11,20

**silence** 16:12

**silhouette** 72:19

**silver** 37:22,23 38:6

**similar** 56:5 69:13,23

**similarly** 81:24

**simple** 18:8

**simply** 54:27

**single** 13:5

**sir** 57:10 60:9,26 61:12 62:19 63:13 67:2,10,27 68:12,15 69:12 77:3 80:16 86:14 88:11

**sit** 30:19

**sits** 37:18

**sitting** 11:21 21:19,20

**situation** 44:17 53:27 57:16 71:3 72:6

**sixish** 68:7

**Sixth** 9:20 10:20

**slightly** 78:23

**small** 53:7

**social** 60:17

**Solano** 6:7,10,13

**solemnly** 31:4 62:1

**somebody's** 10:27

**someone's** 76:20

**Something's** 84:7

**sort** 8:10 38:10 46:15 60:18 84:14

**sound** 55:27 68:22 82:26 84:3

**sounds** 78:25

**source** 39:26

**south** 87:5

**speak** 51:5

**speakerphone** 11:22

**speaking** 56:8 57:5 84:13

**special** 56:1

**specific** 9:7 12:21 33:27 38:4 42:21 47:28 48:1 59:2 60:15

**specifically** 15:17 33:4 36:4 45:11 47:25 65:7 71:20

**specter** 16:12

**speculation** 26:26 58:11 72:26

**spell** 31:9 62:6

**spend** 14:11 48:26

**stabilized** 54:6

**STACIE** 6:16

**stand** 64:21 71:17

**star** 37:16,20,28 78:21

**Starbucks** 23:25,27 79:26,27

**start** 20:14 29:14 54:3 67:11 73:1

**started** 24:26 34:16 62:18 63:5 74:17,19,23, 27

**starts** 25:4

**state** 6:4,9 31:9 47:8 62:6

**stated** 35:19 39:7 77:20

**statement** 23:5,7,8 24:23,24 84:28

**statements** 20:27 25:11

**states** 35:13

**station** 66:17

**status** 8:5,10

**statute** 15:7

**statutory** 9:4

**stay** 60:28

**Stephanie** 7:21 43:26

**sterling** 38:6

**sternum** 72:20 78:22

**stop** 13:1 69:20

**store** 11:1

**story** 19:18,20

**straight** 49:12 54:1

**street** 69:10 79:25 82:18 87:26

**stressful** 44:16 81:22

**struck** 34:7 70:28

**struggle** 17:26 18:7

**struggling** 7:10 13:16 29:11

**stuff** 6:28 7:19 9:5 10:3 11:5 15:15 17:25 18:2, 21 66:17

**subject** 18:17 30:25 55:14 57:23 58:14 60:24

**subject-matter** 74:2,4

**subpoena** 9:17,20,21, 22 10:17,18,24 11:1,26 12:8,9,15

**subpoenaed** 11:5,14, 17,20 20:5 23:6

**subpoenas** 10:15

**subsequent** 46:5 52:2 55:1 58:1 67:28 79:18, 28 80:6,14,17 83:15

**subsequently** 50:14 85:15

**successfully** 69:20 71:5

**succession** 85:9

**sucks** 57:12

**sue** 13:7 15:27

**suffering** 16:9

**suggest** 24:23

**suggested** 52:28

**suggests** 27:1

**suing** 13:24,26

**suit** 10:3

**summon** 87:6

**superior** 6:7 60:11 83:6

**supervise** 53:5

**supervisor** 25:1 41:8,9 86:13

**suspect** 63:28 64:1 69:16,18,20

**sustain** 33:9

**sustained** 32:25

**SWAT** 72:13

**swear** 31:4 62:1

**swing** 49:12

**swings** 49:11

**sworn** 31:3 61:27

**symbolism** 64:18

**T**

**T-R-I-B-B-L-E** 62:9

**table** 30:18

**tactic** 12:6

**tactical** 40:22,26 69:28 70:9

**tactically** 40:19

**talk** 59:4 87:14,17

**talked** 43:13 53:15 54:17 56:11 59:6

**talking** 20:14 37:20 43:4 57:2 65:26 66:1, 12,18 80:21 81:7 82:28 83:28 84:2 88:10

**tangents** 53:20

**target** 70:10 72:19

**targets** 71:1

**teach** 70:19

**teaching** 70:21

**teams** 72:14

**technique** 53:21

Case 2:20-cv-01563-DAD-SCR   Document 112-12   Filed 12/06/24   Page 109 of 110
PEOPLE vs MILANO, DOMINIC 03/22/22
VCR233208                         March 22, 2022                      Index: tells..viewed

tells 19:18 21:1

tended 66:9 73:15

Tennessee 82:18

tense 89:11

terms 21:4 48:1

Terry 22:9 23:16,28 34:28

testifies 31:3 61:27

testimony 29:14,16,17 31:4 62:1

theoretically 7:8

thing 9:14 10:13 13:19 14:2,4,14 17:20 18:14 20:26 25:3 26:9 27:17, 23 28:24,28 32:1 54:24 58:18,20,24 64:11 70:19 71:2 72:17 78:3 84:20 90:4,5

things 7:19 10:17,18 12:9 17:26 19:4,17 25:25 29:22 69:19 72:26

thinking 29:21 89:3 90:4,5

thinks 18:21 24:8

thirdhand 27:13

thought 7:6 34:19 47:9 56:19 59:9 82:16 87:24 88:7,19,25,28 89:9,10

threat 53:25 54:2

threw 81:26

thrown 85:4

thumb 78:20

time 7:18 10:24 12:28 13:11 14:12,13 19:5 22:10 26:28 30:18,21 31:23 33:14 35:18 36:12 38:20,22,24 41:7 46:20 48:4 49:27 51:22 52:14 53:3,27 54:17,24 55:9,14 56:14,25 57:4, 6,11,14,18,22 58:14,18 60:4,5 62:28 63:26 65:14 66:2 67:19 68:9 69:22 71:8 73:10 74:3, 23 77:5,14 78:26 80:8

82:6 83:2,10,24,25,26 84:8 85:21,28 86:1,5, 14,23

timeline 23:20 24:19, 22 25:7,8,9,16

times 9:10,22 10:25,26 28:2 69:15 71:9 76:23 81:20 83:4,6

TIMOTHY 6:10

tip 40:15 50:4 68:21 78:9

title 49:8

today 6:27 17:22 18:12, 16 19:8 20:7 29:20 61:9

today's 18:13

told 20:5,6 27:28 34:19 46:6,7,11,12,13 50:21, 22 52:9,18 65:20 69:24 81:4 86:11 87:12,23,24 89:3,9,10

tomorrow 20:7 23:6

tone 57:3

Tonn 24:2,5

Tonn's 24:8

topic 58:19

torso 72:11,24

total 43:21

totally 82:11

town 28:12 61:11

TRACY 6:12

tradition 39:14

traditionally 52:16

train 53:5

trained 53:11,13 71:21

training 41:14 52:27 70:17 72:1,7,15,18,23

training-wise 41:20

transcript 19:3

transcripts 8:28 17:14

trial 19:1,19 26:28 30:13 33:8

Tribble 7:7,8,20 17:21 20:26 21:1,3,8,9,17,20, 21,24,27 22:1,6,18,26 23:26 24:7 25:7,15 26:6,10 27:12 29:9 34:18 36:1,3,21 37:7,8 39:19 40:17,21 41:7,12 42:7,20 46:6,7,11 52:6 53:2 54:12 55:2,19 56:15,17,23,27 57:2,18 59:8,12 60:4,11 61:21, 26 62:8,12

Tribble's 24:23 57:13

trigger 52:8

troubled 27:24

troubling 28:20

true 16:28 21:23

truth 31:5,6 59:5 62:2

TUESDAY 6:2

turning 76:1

turns 7:23

type 38:3,14 52:16 56:2 57:7 73:26

types 74:15

typically 72:18

U

U.S. 9:28

Uh-huh 25:23 80:22

ultimately 28:10

unbending 14:18

uncommon 76:4 84:18

underperformed 75:21

underperforming 42:12,14

understand 16:4 25:21

understanding 16:13 53:26 69:26 70:24 73:22

understood 66:1

undo 28:6

undue 26:28

unexplored 18:1

uniform 55:19,23,28 56:7 65:12

uniformed 84:21

uniforms 40:13 84:27 86:18

universe 58:17

unprofessional 40:13, 15

unwind 44:17

usage 53:11

use-of-force 42:7

usual 8:14

V

vacation 20:7

vague 81:5 88:9,16

Vaguely 75:28

vaguer 21:25

Vallejo 6:15,25 9:9 11:14 13:5,7 15:12,21 19:11 22:10 23:4 27:18 31:17 33:11,14,18 34:1 36:26 38:7 39:15 40:25 42:11 44:25,26 45:4,5, 18 46:24 47:12,20 48:10 50:27 51:6 56:15, 25 59:20 62:14,16,28 66:28 67:1,7,28 68:9 73:18 74:18 76:12 79:1 80:24 82:17,19,20 85:7

vehicle 69:14,15 75:22

versus 6:4 21:3

vest 15:16,17 56:6 86:15

victim 28:17 51:9

victims 25:12 27:28

video 69:2 70:12,14 73:4,12

videos 73:15

viewed 75:24

views 19:6

violated 14:28

violates 28:7

violation 56:21

violations 14:9

violence 28:14

virtue 13:18 19:5

visited 75:24

visual 23:21

voice 57:3

---

**W**

---

wait 28:8 29:15 61:16

waiting 29:19 54:5

wake 44:10

walk 7:12

walked 21:20 36:11
  83:26,28 84:6

walking 40:8

wallets 66:7,22

wanted 87:17 88:23

wars 72:15

watch 73:12 83:27

watched 70:14 73:4

watches 22:1

watching 70:12

wear 40:12 49:5 55:19,
  28 56:2,5 59:23,24
  65:12 66:7,8,14,18
  77:14,16,19,22 84:23
  85:3 86:8,20

wearing 40:12 56:5
  84:16,26 86:15,16,20

week 14:1 34:14 43:3,5,
  6

weird 34:20 40:11
  56:12,19 59:9

whatnot 84:22

Whitney 14:16

Whitney's 14:14

wife's 29:21

Willy 24:15

willy-nilly 9:5

window 41:18

windows 41:23

wit 6:18

witnesses 7:11 18:18
  30:12

word 25:1 64:8

wore 65:21 86:17

work 33:2 53:23 56:2
  67:13 77:15

worked 63:6

working 32:17 33:19
  41:10 49:26 53:2 54:8
  69:21

works 9:15 25:15 51:4

workweek 76:5

worn 65:18

wound 76:6

writing 27:14

wrong 13:17 28:15
  81:6 84:1 89:16

Wylie 34:28 35:12

---

**Y**

---

yards 64:2

year 31:24,27 33:25
  46:21 47:4 53:9 62:18
  67:14

years 16:19 17:28
  19:15,16 31:24 33:3,17
  43:4 53:22 54:7 60:10
  62:17,25 75:28

yesterday 16:27

York 28:2

---

**Z**

---

Zach 21:28 22:1,4,6,8

24:23 44:2 80:11,21
  81:17,23 86:10

zipper 53:14,15

Zoom 90:1

Superior Court of the State of California
County of Solano