# EXHIBIT "GG"

## Transcript

## *California v. Milano*, Superior Court of Solano County, Case No. VCR 233208

## March 22, 2022, Afternoon Session

```
1            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                         COUNTY OF SOLANO

3                   THE HONORABLE DANIEL HEALY, JUDGE

4                            ---oOo--

5    THE PEOPLE OF THE STATE OF CALIFORNIA,

6                         Plaintiff,

7    vs.                                    No.  VCR233208

8    DOMINIC MILANO,

9                         Defendant.
                                              /
10

11

12                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

13              MARCH 22, 2022 - AFTERNOON SESSION

14

15                            ---oOo---

16

17                   A P P E A R A N C E S

18

19   For the People:          BRUCE FLYNN,
                               Deputy District Attorney
20                             County of Solano
                               Vallejo, CA 94590
21

22   For the Defendant:       NICK FILLOY and
                               TRACY KRAUSE,
23                             Deputy Public Defenders
                               Vallejo, CA 94590
24

25   For the City of Vallejo:  KATELYN KNIGHT,
                               Assistant City Attorney
26                              CA 94590

27   Reported by:

28            CHRISTINE L. WESNER
              Certified Shorthand Reporter
              No. 10767
```

**CERTIFIED ORIGINAL**

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1                              SESSIONS

 2    MARCH 22, 2022                    PAGE

 3         Afternoon Session                4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1   MASTER INDEX – AFTERNOON SESSION

 2   CHRONOLOGICAL ORDER OF WITNESSES

 3

 4

 5   FOR THE DEFENDANT:                PAGE

 6   KENT TRIBBLE

 7        Continued Direct Examination by Mr. Filloy    4
          Cross-examination by Mr. Flynn               20
 8        Redirect Examination by Mr. Filloy            25

 9   JOSHUA COLEMAN

10        Direct Examination by Mr. Filloy       32

11

12

13                        EXHIBITS

14   FOR THE PEOPLE:

15   NO.   DESCRIPTION            ID    EVID

16   NO EXHIBITS

17

18   FOR THE DEFENDANT:

19   NO.    DESCRIPTIONID    EVID

20   NO EXHIBITS

21

22

23                     ---oOo---

24

25

26

27

28
```

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1  MARCH 22, 2022                        AFTERNOON SESSION
 2                      ---oOo---
 3      THE PEOPLE OF THE STATE OF CALIFORNIA versus DOMINIC
 4  MILANO.
 5      The above-entitled cause came regularly this day for
 6  hearing before the Honorable DANIEL HEALY, Judge.
 7      THE PEOPLE OF THE STATE OF CALIFORNIA were represented by
 8  BRUCE FLYNN, Deputy District Attorney for Solano County.
 9      The Defendant, was present and represented by NICK FILLOY
10  and TRACY KRAUSE, Deputy Public Defenders for Solano County.
11      The City of Vallejo was represented by KATELYN KNIGHT,
12  Assistand City Attorney.
13      CHRISTINE L. WESNER, RPR, CSR No. 10767, was present and
14  acting as an Official Shorthand Reporter for the County of
15  Solano.
16      The following proceedings were then and there had, to
17  wit:
18                  P R O C E E D I N G S
19      THE COURT:  Back on the record in Mr. Milano's case, all
20  parties, counsel are still present.  Kent Tribble is still
21  under oath.
22      Mr. Filloy.
23      MR. FILLOY:  Thank you, judge.
24                  CONTINUED DIRECT EXAMINATION
25  BY MR. FILLOY:  Q.  Good afternoon, Mr. Tribble.
26  A.  Good afternoon.
27  Q.  So, going back to what we were discussing this morning, I
28  want to be -- I want to make sure I'm understanding the
```

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

 1 | progression of this thing.
 2 |    As far as you know, were you the person who brought the
 3 | tradition of badge bending to Vallejo, or started it in
 4 | Vallejo?
 5 | A. Yes, sir, it was I.
 6 | Q. Okay.
 7 | A. If it's okay, I would like to correct an earlier
 8 | statement. I had more time to review over lunch, I think I
 9 | could clarify.
10 |    THE COURT: Sure, go ahead.
11 | BY MR. FILLOY: Q. What's that?
12 | A. The meeting that Dan Golinveaux and I had in Concord at
13 | the Peppermill, it was Dan that bent my badge and he was
14 | letting me know that he appreciated my efforts, despite how
15 | bad I felt about my performance.
16 | Q. That brings me back to the issue, I think you were saying
17 | in the initial shooting where Mr. Golinveaux bent your badge
18 | in Concord, that you had been issue where you fired at
19 | someone with a rifle in close range, right?
20 | A. Yes, sir.
21 | Q. So the issue you felt bad about was the individual hit?
22 | A. Yes, he was hit by several different rounds and later I
23 | found out one was mine.
24 | Q. Did he die?
25 | A. No, he did not.
26 | Q. Okay. So, that was, I think what I was understanding
27 | that you had information from the hospital records that
28 | suggested that your rounds had not hit him?

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1  A. That's correct.
 2  Q. But, because they were AR rounds, or something like that?
 3  A. If I'm following where you're going, the AR platform was
 4  relatively new back then to law enforcement and the type of
 5  projectile that was being fired by us was not same as the
 6  military.  These rounds typically fragment and most of the
 7  time don't penetrate through a human torso.
 8  Q. They fumble?
 9  A. No, they actually break apart.
10  Q. They actually break up?
11  A. I believe it was that -- this is conjecture on my part.
12  I believe it was because of that that no projectile was found
13  in that person, which was why I was told that I missed
14  completely, at seven yards.
15  Q. Okay.  So, you were kind of beating yourself up about
16  that when you thought that that was what happened, that you
17  missed and not performed?
18  A. That's correct.
19  Q. Okay.  So, there was something in your recognizing in
20  Komoda and McLaughlin that they were beating themselves up in
21  a similar way; is that it?
22  A. Yeah.
23  Q. Okay.  Now, when you indicated that you bent Josh Coleman
24  and Mark Galios's badge after the Starbucks shooting in south
25  Vallejo --
26  A. Yes, sir.
27  Q. -- were they -- was that a similar situation where you
28  felt they were beating themselves up about their tactical
```

People vs MILANO, DOMINIC JAMES
VCR233208                           March 22, 2022

1   performance?

2   A.  Not so much that, is that they were pretty shaken and I

3   don't recall what the time period was between when this

4   occurred and when I bent their badges.  They were really

5   shaken by the fact that had that suspect's AR not jammed,

6   they would probably one or both be dead.  I don't know if

7   you've seen that video.  They were pretty shaken up about

8   that.

9       Then, they -- I mean, these are all hard things to go

10  through, so they second guess themselves all the time about

11  how they did.  They go over it.  You have to go through a

12  lengthy interview.  Again, frequently sometimes when the full

13  story's not known, press isn't super supportive and these

14  guys, they performed, when I watched that video, as well as

15  any police officer I've ever seen in any high-stress incident

16  has ever performed.  Despite the fact that they were both

17  sitting ducks.  And they didn't even -- their suspect didn't

18  get killed in the event, but they managed to take a guy that

19  had, I believe shot somebody else in another town, I believe

20  it was a baby, and then tried to shoot them, and the only

21  reason that he didn't get them was because his gun jammed and

22  they managed to take him into custody.  He's still alive.

23      So, to me, those were the up sides of what they were

24  dealing with and they were getting a lot of negative stuff

25  and I think their suspect was even acquitted.

26  Q.  But, so to your recollection, it wasn't -- your bending

27  the badge wasn't that they were being self-critical about

28  their performance?

 1  A.  Every officer is, you know, I don't know specifically.  I

 2  think they did strike the suspect a few times, I think one of

 3  the rounds hit the suspect in the head and the round -- I

 4  mean, he survived.  And whether -- if you can understand it

 5  or not, sometimes people question the equipment we have, if

 6  it's working or not, if it didn't penetrate the car or if

 7  when it strikes it doesn't do what it's supposed to do.  So

 8  you get a lot of things that you start questioning, right,

 9  your equipment, your use of it, your distance, all that kind

10  of thing.

11  Q.  So, you know, maybe back to my question.  Like, you don't

12  necessarily recollect if those guys were specifically being

13  self-critical the way Komoda and McLaughlin were?

14  A.  I think they had a lot of apprehensions just about the

15  whole incident, right.  They were shaken by the fact they

16  could have been killed.  They chased a suspect, hit him

17  several times, the round didn't necessarily perform.  I just

18  try to bring the positives up to them.

19  Q.  That's what I'm trying to get to then I'm going to move

20  on to another subject.  But I just want to be clear to make

21  sure we understand.  I think you have been clear the bending

22  the badge, when you bent badges for these officers, there was

23  not a thing that was directly connected to killing, to the

24  incident being fatal?

25  A.  Not at all.

26  Q.  It wasn't a broader recognition of just survival, like

27  they had survived some hairy incident that wasn't a shooting,

28  something else?

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  A.  No.
 2  Q.  So, it was, if I'm understanding you right, it was a
 3  recognition specific to discharging your firearm as a police
 4  officer that you did your job in an appropriate manner?
 5  A.  That's correct.
 6  Q.  Okay.  And so, would you -- would it be fair to say or
 7  would you say, that you would only have given that
 8  recognition, bent somebody's badge, if you thought that the
 9  shooting that they had engaged in was okay.  That it was
10  justified that they had done a good job, right?
11  A.  Arguably, yeah.  It's not always up to me as to how the
12  thing comes out after lengthy DA's investigation and all
13  that.  But if I believe they did the job to the best of their
14  ability, that bend also is to let them know that despite all
15  that goes on after one of those things, there's somebody else
16  that kind of understands what they're going through and
17  that's what that was about.
18  Q.  If you thought that somebody had done an officer-involved
19  shooting that was questionable, you thought maybe wasn't a
20  good shooting, would have bent their badge for that?
21  A.  I don't recall doing that ever.
22  Q.  Do you think you would have?
23  A.  I don't think so.
24  Q.  Okay.  We talked about you were involved in being on the
25  Critical Incident Review Board at times when you were in the
26  Vallejo Police Department?
27  A.  Yeah, a few time I was.
28  Q.  Okay.  And did you also assist in the actual

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  investigation the police investigation of officer-involved

2  shootings when they happened at the time they happened?

3  A.  Very rarely.  I think I was involved in one of those, or

4  two.

5  Q.  Okay.  You indicated you didn't recall whether or not you

6  were on the Critical Incident Review Board and reviewed

7  Komoda and McLaughlin's shooting that you bent their badge

8  for?

9  A.  I don't.

10 Q.  Would it refresh your recollection to look at a copy of

11 that critical incident review?

12 A.  Sure.

13    MR. FILLOY:  Judge, can I approach the witness?

14    THE COURT: You may.

15 BY MR. FILLOY:  Q.  I'll just hand you this document.  You

16 can look over it, review it and let us know when you have

17 finished reviewing it.

18 A.  Yes, this -- I don't remember this, per se, but this

19 meeting is written up, it appears, by Ted Postolaki, the way

20 these use reports, review boards work is the meeting comes

21 together with the representatives of each facette of the

22 department, there's a discussion, round table, so to speak,

23 then one person is assigned to write the report.  It appears

24 to me that this one was written by Postolaki regarding our

25 review of the incident.

26 Q.  So were you, in fact, on that review board?

27 A.  Yes, sir.

28 Q.  What was your role?

1  A.  Wait.  Wait.  Pardon me.  Yeah, I was there as use of

2  force.

3  Q.  And do you recall being involved in that review now that

4  you've looked at that?

5  A.  That still, offhand, I don't remember that review.

6  Q.  When was the meeting or review that you engaged in on of

7  the shooting; when did that occur?

8  A.  According to this it occurred on May 10th of 2018.

9  Q.  Of 2018?

10  A.  Yeah.

11  Q.  Is that -- if I can direct you to --

12  A.  Okay.  Yes.  I think right here.

13  Q.  That's the date of the incident, but down at the bottom,

14  I'm pointing him to the second paragraph of the first page of

15  the narrative.

16  A.  November 2016.

17  Q.  Right.  So, would November 2016 where it says the CR is

18  convened, is that the date that you all meet and get together

19  and review the incident?

20  A.  Yes.

21  Q.  Okay.  Then what's your role in the review after that?

22  A.  Well, in this one, nothing.  It was Ted Postolaki's job

23  to write it up.

24  Q.  Was your contribution to that review, as far as you

25  remember it that the ammunition was under performing it?

26  A.  As I stated earlier, we had a concern because the -- I

27  don't know if any of the projectiles penetrated the skin of

28  the vehicle, other than through the outer surface of the

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1  sheet metal.
 2  Q.  But that document, the review that you were involved in
 3  the investigation of this shooting by a review board, that
 4  occurred after you bent Komoda and McLaughlin's badges,
 5  right?
 6  A.  I don't know.
 7  Q.  Okay.  Do you recall if there were other incidents where
 8  you bent officer's badges where you were also involved in the
 9  investigation of the shooting?
10  A.  Well, no, I don't.  And there's -- let me explain that.
11  That's not -- as far as I'm interpreting your word of
12  "investigation" there, I'm thinking of the actual DA's
13  investigation of the shooting that they do, all the evidence
14  collection, all of that.
15      When you talk about the Critical Incident Review Board,
16  to me that's a separate thing.  That's internal review of the
17  incident to see where we need to fix things or if everything
18  is going right.  Which one of those are you talking about?
19  Q.  So, that's a good question.  So let me break that out and
20  clarify.
21      The critical incident review as you put it, that's
22  internal, not internal affairs investigation, it's an
23  internal department review of the incident, right?
24  A.  Yes, it's for the department to look at, analyze, be
25  critical of themselves and decide what needs to be done.
26  Q.  Internal affairs investigation of an incident might only
27  be initiated by the chief, or somebody if, like, something
28  the critical incident review found was wrong?
```

1  A.  Well, not necessarily because generally with any fatal

2  incident protocol case the internal affairs guys will come in

3  and start right then.

4       So, with a shooting most of the time, most of the time

5  the professional standards division of internal affairs will

6  have somebody there from the very get, when it comes to

7  officer-involved shootings.

8  Q.  If an incident is not fatal, though, are you saying

9  there's an internal investigation ongoing that is separate

10 from the CRI?

11 A.  Yeah.  So, the way the department works, it's evolved

12 since '03 to when I left.  But every use of force is sent --

13 there's like a what they call a use of force reporting sheet,

14 for lack of a better term, now it's all digital.  But, IA

15 gets a copy of every report where force is used.  Then they

16 have to kind of like go through a clearing house whether

17 they're going invest or not, when it starts get into serious

18 less lethal and lethal uses of force, they all get reviewed.

19 So the Critical Incident Review Board doesn't necessarily

20 kick off the IA's.  I mean, there may be a circumstance where

21 that happens, but I don't know of one.

22 Q.  The review bored does have a section in the paperwork to

23 review and final approval by the chief based on their

24 recommendation, right?

25 A.  Yes.

26 Q.  And if the board or the chief found that it was a

27 shooting that was not approved, right, if the recommendation

28 was we don't approve or the review finds something wrong with

1  it, that could that result in an internal affairs action or

2  would that be --

3  A.  I personally believe internal affairs action would have

4  occurred before that, with a shooting for sure.  Because they

5  come out for most shootings.

6  Q.  Is it some of the same guys that are doing the internal

7  affairs investigation as are doing the critical incident

8  reviews?

9  A.  I think, if you look at that, there's a representative

10  from professional standards.

11  Q.  So professional standards would be essentially like

12  internal affairs?

13  A.  Yes.

14  Q.  What most people think of as that?

15  A.  Yeah.

16  Q.  There's a representative from that on the Critical

17  Incident Review Board?

18  A.  Yes.

19  Q.  So they're interconnected in that way?

20  A.  Yes, sir.

21  Q.  All right.  Did you ever sit on one of these where a

22  shooting use of force was not approved, that you recall?

23  A.  I sat on a few where the training modifications were

24  recommended.  In fact, I think a couple where we needed to

25  address training.  But none where it was to be referred over

26  to IA for investigation.

27  Q.  Did you ever bend Sanjay Ramrakha's badge?

28  A.  I believe I did, I'm not a hundred percent sure, but I

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  think I did.
 2  Q.  Would that have been quite a long time ago, early 2000's?
 3  A.  Oh, yeah.
 4  Q.  So, I'm going to go to the first incident when you were
 5  confronted by Horton in 2016 about badge bending, or around
 6  2016, not holding you necessarily to you had a year but
 7  sometime around that time frame.
 8      How, after being confronted by him that first time, did
 9  you take any action to tell people to fix their badges or to
10  get rid of, correct the tradition of badge bending at VPD
11  after that first incident?
12  A.  Not necessarily, no.  I was taken aback a little bit,
13  that's all.
14  Q.  So, after the second time in 2018 when Horton approached
15  you and you said it was a much -- he was more upset, maybe
16  more formal conversation, you took -- did you take some
17  corrective action with regards to badge bending after that
18  conversation in 2018?
19  A.  I did.  I contacted a few people.  I believe it was
20  Komoda, McLaughlin, David McLaughlin, and I think Sergeant
21  Jeremy Huff.
22  Q.  So, did you contact Officers Komoda and McLaughlin to
23  indicate to them that they needed to fix their badges that
24  you had bent, to bend the badges back?
25  A.  Yes.  And I think I went as far as to tell them, "anybody
26  else that's got these, you have to make sure it's done with.
27  It's over with".  And I let them know the captain told me so.
28  Q.  Do you recall were they together when you told them this

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  or were they two separate incidents?
 2  A.  I don't recall.
 3  Q.  But definitely those two guys?
 4  A.  I know I got to those two guys and Sergeant Huff.
 5  Q.  Then, did you actually go and double check with Komoda
 6  and McLaughlin that they had corrected that issue and fixed
 7  the badges?
 8  A.  I did not.
 9  Q.  Did you give an interview to Mr. Giordano, a lengthy
10  interview in the badge bending investigating?
11  A.  Yes.
12  Q.  And were you honest and forthcoming in that?
13  A.  Yes, I was, to the best of my ability.
14  Q.  Do you recall telling Mr. Giordano that you had in fact
15  gone back and double checked with Komoda and McLaughlin that
16  they had corrected their issues?
17  A.  No, I actually -- if I could see that, I would like to
18  see it.  But I remember telling Mr. Giordano I had no doubt
19  whatsoever they would have followed an order.
20     MR. FILLOY:  Judge, I'm going to ask to let him review
21  the transcript, if Mr. Flynn will submit on it, otherwise we
22  have to get the tape recording out.
23     MR. FLYNN:  Which page?
24     THE COURT:  You can refresh your recollection with
25  anything.
26  BY MR. FILLOY:  Q.  I'm going to show you, Mr. Tribble, a
27  portion of the transcript of your interview with Mr.
28  Giordano, and this, for the record, is Page 51 of the

1  transcript I was provided by the City of Vallejo.  I just

2  double checked with Mr. Flynn, he's on the same page.

3  A.  Yeah, I guess I did.  I know there's a section in here

4  where I said I didn't have any doubt they would follow an

5  order and I'm trying to figure out here if this is after the

6  first or second time I spoke to Horton.  Yeah, without the

7  review, I did not remember that.

8  Q.  Does reviewing that refresh your recollection?

9  A.  Yes.

10 Q.  You did double check, after you had told Komoda and

11 McLaughlin to fix their badges, you checked that they had in

12 fact fixed them, they said they had?

13 A.  Yes.

14 Q.  That would have been in the 2018 time frame because

15 that's when you took the corrective action after the second

16 incident report, right?

17 A.  With Horton, right?

18 A.  Yes.

19 Q.  You indicated, you got the word to Jeremy Huff, about

20 trying to fix the badges?

21 A.  Yep.

22 Q.  Was that designed to have Sergeant Huff tell other

23 people?

24 A.  Yes, sir.

25 Q.  Did you do that because Sergeant Huff has any particular

26 sort of characteristic that you thought would be good for

27 that?

28 A.  Sergeant Huff has been there for quite awhile and is

People vs MILANO, DOMINIC JAMES
VCR233208                                   March 22, 2022

1  pretty connected with everybody at the sergeant level and

2  below.  Once you become a lieutenant you're a little more

3  detached.  I thought he would be pretty good at throwing that

4  out there.

5  Q.  So when you say Sergeant Huff was a connected on the

6  sergeant level, you mean he was sociable with folks he talked

7  to everybody, was outgoing, new all the young guys?

8  A.  Yeah.

9  Q.  Okay.  And so I'm assuming if you told him to get the

10 word out about it, he was already aware of the tradition of

11 badge bending?

12 A.  I don't remember if he was aware or not at that point.

13 Q.  Do you recall if you had bent his badge previously?

14 A.  I don't.  I know that he had been involved in an

15 officer-involved shooting.

16 Q.  So, sometime in 2018 you go, you contact Komoda and

17 McLaughlin and you say "Fix the badges.  Put them back".  At

18 some point you double check with them that they have done so,

19 you tell Huff to kind of put it out there, right?

20 A.  That's correct.

21 Q.  As this was going on, at some point were you aware that

22 there was going to be an inspection of these badges?

23 A.  I think that was around 2019.

24 Q.  Were you aware of that inspection prior to it occurring?

25 A.  Yeah, I had heard there was going to be a badge

26 inspection at the next staff meeting, or something like that.

27 Q.  Did someone inspect your badge?

28 A.  Jeremy Huff.

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

1  Q.  Jeremy Huff inspected your badge?

2  A.  Yes.

3  Q.  He was a subordinate of yours at that time, correct?

4  A.  Correct.

5  Q.  Okay.  So, was it just sergeants that were tasked to

6  inspect everybody's badge?

7  A.  Yes.

8  Q.  When you found out that there was an inspection coming,

9  did you talk to anybody about that after hearing it?

10  A.  Yeah, at some point I talked to Lieutenant Steve Cheatham

11  and asked him what the inspections were about.

12  Q.  And what did he say?

13  A.  Pardon my language, it was off the cuff, but it was

14  apparently, "guys are f-ing with their badges".

15  Q.  Was -- did you, at one point, have a conversation with

16  Mark Thompson about the issue of badge bending?

17  A.  I did.

18  Q.  Was that prior to these inspection occurring?

19  A.  I don't recall.  I think it was.

20  Q.  Was it subsequent to the Taco Bell shooting in 2019?

21  A.  Yes.

22  Q.  Okay.

23     MR. FILLOY:  Judge, I don't think I have anything further

24  for Mr. Tribble at this time.  I would keep him subject to

25  recall.

26     THE COURT:  Okay.  Mr. Flynn.

27     MR. FLYNN:  Just a few questions, your Honor.

28  ///

```
 1                    CROSS-EXAMINATION
 2  BY MR. FLYNN:  Q.  Mr. Tribble, with respect to your role as
 3  use of force expert in the 2016 shooting incident involving
 4  officers Matt Komoda and David McLaughlin, what was your
 5  particular role in that review?
 6  A.  As a use of force expert, it's to determine if the level
 7  of force used by the officers was within department policy
 8  and also both in the use of force and firearms division to
 9  evaluate what our training and equipment are doing, if there
10  needs to be any improvements.
11  Q.  Were you asked to render an opinion as to the use of
12  force in that particular case?
13  A.  I felt -- I don't recall getting a specific opinion as to
14  the legality of it, but it was within department policy the
15  way I saw it.  Because you have a outcome that has to be
16  agreed upon, I think there's four categories.  One is
17  training, another one is procedural, another one is referral
18  to IA, and I can't recall what the fourth one is, but in this
19  case -- oh, one of them is approved, right.  I think this one
20  was approved but I had some questions about the ammunition
21  that we were using.
22  Q.  In order for you to participate in this review, were
23  there materials that you had to review?
24  A.  What are they?
25  Q.  Yes.
26  A.  Evidence of the case.  You get the videotape, you get the
27  reports, all the stuff that the investigators do.
28  Q.  As the use of force expert in this particular critical
```

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  incident report, did you watch the video more than once?

 2  A.  I believe I did.  I think I watched it prior to when we

 3  had access to the -- I think -- I believe it was called Coban

 4  dash cam system, you could review stuff as a supervisor

 5  before a formal critical incident review.

 6  Q.  Did this incident occur before or after the Vallejo

 7  Police Department started using body cams?

 8  A.  You know, I don't recall.  I can't remember whether I saw

 9  it on dash cam or body cam.  I know it was pretty clear on

10  what I saw.

11  Q.  And as you sit here today, can you remember whether or

12  not any time that you reviewed that video of that incident

13  involving officers Matt Komoda and David McLaughlin, if

14  either one of those officers sat with you during the viewing

15  of that videotape?

16  A.  I don't recall.  I don't think I did it in private.

17  Q.  Now, with Officer Komoda, after you bent his badge, after

18  the August 31st, 2016 shooting incident that he was involved

19  in, after you returned the badge to him, did you ever see

20  that badge again?

21  A.  I think so, yeah.

22  Q.  When was that?

23  A.  There was a K-9 demonstration, I think it was prior to

24  the second time I got pulled into the office, that he was

25  wearing it on his vest and it was bent.

26  Q.  Did you ever see anyone else on duty wearing a bent

27  badge?

28  A.  I don't recall that, no.

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  Q.  Was the bending of badge ever meant to be a public
 2  acknowledgment that you were involved in a critical shooting
 3  or shooting event as a police officer?
 4  A.  Public to people that didn't already know about this
 5  thing, is that what you're asking?
 6  Q.  Yes.
 7  A.  No, not at all.
 8  Q.  Now, with respect to Officer Matt Komoda, after the
 9  August 31st, 2016 shooting event where you bent his badge,
10  did you ever bend his badge for any other shooting he was
11  involved in?
12  A.  No.
13  Q.  Would there be any reason to bend his badge for a
14  subsequent shooting?
15  A.  No, the way -- no.  The way this worked it didn't have to
16  do with anything other than the fact that you were willing to
17  do your job that one time, no matter how it came out and if
18  there were subsequent involvements, there were no additional
19  points bent.
20  Q.  Okay.
21     MR. FLYNN:  I don't think I have any further questions,
22  judge.
23     THE COURT:  Let me ask you, sir.  You used the word
24  "mature" at one point and said you didn't bend your
25  lieutenant's badge, then something along the lines of because
26  it didn't look mature, or you didn't think it was mature,
27  something to that effect.
28     THE WITNESS:  Yes, sir.  Well, I guess you could say in

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

1  most people's opinion I probably matured a little late, but

2  as I was going through this career, there was one way I was

3  looking at things, I was looking at it like I was helping

4  people out because these things are really hard on people, on

5  all sides of them.  And a lot of times, you know, as a guy

6  that's been through it, you want to help another guy or gal

7  get through it.  I let them know there's at least someone

8  there, but especially the further I get away from my career,

9  I can look back and see that I was very myopic in some of the

10 things that I was doing because here I'm thinking I'm helping

11 people, I'm not paying attention to the bigger picture of the

12 kind of exposure I'm giving, not only myself but them and the

13 department with what I'm thinking is doing a good things.

14     So, I think as I got higher in rank and a little more

15 experience under my belt, I started seeing that probably

16 wasn't a really good idea.  If that answers your question.

17     THE COURT:  I guess what, in hindsight, what do you see

18 as the problem with this badge bending?

19     THE WITNESS:  Number one, I created a liability for, not

20 only myself, my co-workers and the department for the

21 perception of it.

22     And Number 2, it could damage the public.  I mean there's

23 already a tenuous public trust of the police and my behavior

24 did not do anything to help that.  And for that, I'm

25 sincerely sorry.

26     THE COURT:  Did you ever have any discussions with

27 Officer Poyser about badge bending?

28     THE WITNESS: I did.

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1     THE COURT:  What's the genesis of those discussions?

 2     THE WITNESS:  The genesis of those discussions was post,

 3  I think April last year is when I was told the report was

 4  done or whatever.  I wasn't supposed to have any

 5  conversations with anybody until the report was done.  I

 6  discussed what was going on with me because Terry and I have

 7  hunted together and he's about really one of the only people

 8  I talk to post-work.

 9     THE COURT:  I mean, did you know that he had been

10  identified as someone who might have bent badges earlier?

11     THE WITNESS:  No, I did not.  I actually -- you know, he

12  was checking up on me because for a long time I wasn't doing

13  very well.  And it wasn't until I told him what was going on

14  with me that he had -- that I even had known that his badge

15  had been bent.

16     THE COURT:  So to the extent that he might have bent

17  badges, you don't have any knowledge about what caused him to

18  engage that practice?

19     THE WITNESS:  No, I don't.

20     THE COURT:  Have you had any discussions with Officer

21  McLaughlin about badge bending?

22     THE WITNESS:  No, sir.

23     THE COURT:  So if he was engaging in this sort of thing

24  enthusiastically, you have no idea what might have caused him

25  to learn this practice?

26     THE WITNESS:  Well, -- it goes back to the thing about

27  maturity.  In hindsight my -- hey, we don't discuss this

28  because we don't want to try to earn this thing, that was a

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

1  big concern.  Believing that that can actually occur is

2  pretty naive and foolish and in my personal opinion reckless

3  on my part.  And for other guys to go off and start doing

4  this, only exacerbates the problem I already started.

5       THE COURT:  You had no direct -- that seems exactly

6  right, it seems he went off the rails in a couple different

7  ways.  You have no knowledge, you didn't bend his badge?

8       THE WITNESS:  I did not.

9       THE COURT:  Didn't discuss it with him?

10       THE WITNESS:  I did not.

11       THE COURT:  The meaning of such a thing?

12       THE WITNESS:  I did not.

13       THE COURT:  You recognize how this thing can evolve to

14  some --

15       THE WITNESS:  Sir --

16       THE COURT:  -- collateral places.

17       THE WITNESS:  I believe I have caused a lot of undue

18  stress, maybe further problems for people by the recklessness

19  of my behavior.  And that is something I have to deal with.

20  I try to use it as a learning point for myself and everybody

21  else.

22       THE COURT: Mr. Filloy.

23       MR. FILLOY:  Briefly, based on the question by the Court

24  and Mr. Flynn.

25                    REDIRECT EXAMINATION

26  BY MR. FILLOY:  Q.  So, in the discussion the judge was just

27  referencing with Detective, former Detective Terry Poyser,

28  did you become aware at some point that he had also been

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  bending people's badges?

2  A.  No.

3  Q.  Okay.  So you didn't have any -- you don't have any

4  knowledge of that?

5  A.  No.

6  Q.  Okay.  And when you're talking about maturing, so on and

7  so forth, did you in fact, at some point, bend your

8  lieutenant badge?

9  A.  Yes, I did.

10 Q.  What happened with that?

11 A.  So, I was -- I was having a rough time in that part of my

12 career.  I had an incident occur in Bend, Oregon that got

13 highly publicized.  I had some personal issues going on and

14 work seemed to be very adversarial between my command staff

15 and myself.  And having had the Lieutenant -- captain, pardon

16 me, Horton come in and accuse me of having a bent badge when

17 I didn't, it bothered me.  It added to some of the things I

18 was already feeling.  And this is conjecture on my part,

19 probably well deserved based on my incident in Bent, Oregon,

20 but I felt like there was a lot of additional pressure on me

21 and some kind of suspicion.  And one night I was at home, not

22 dealing with things well, and I started drinking and I said,

23 well, if they're going to accuse me of having a bent badge,

24 I'll bend it.  And that's what I did.

25 Q.  So the second time that Horton confronted you in 2018,

26 was your badge actually bent, or had you bent it back?

27 A.  I had bent it back, but I believe there was probably a

28 crack in it.

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  Q.  Because you're familiar with this, sometime when the tip

2  of the badge is bent, the enamel or paint cracks or become

3  disfigured in a way that's noticeable, even if you bent it

4  back?

5  A.  Yes.

6  Q.  You think maybe that Horton could see that?

7  A.  Probably, yeah.

8  Q.  Yeah.  I think based on those questions the judge was

9  asking you about mature and what occurred with you in some of

10  your insights as to looking back on it, looking back now do

11  you recognize now, with everything that's happened, that the

12  practice did in fact create an incentive for our young

13  officers to shoot?

14  A.  I don't believe that because I haven't seen a situation

15  where it looked like -- I've been gone for two years, but I

16  haven't seen a situation where it looked like any of our

17  shootings were unjustified.

18      MR. FILLOY:  Okay.  I don't think I have anything else

19  right now, judge.

20      THE COURT:  Mr. Flynn, anything further?

21      MR. FLYNN:  No, your Honor.

22      THE COURT:  Thank you, sir.  I know that was tough.

23  Thank you.

24      THE WITNESS:  No, that's okay.

25      THE COURT:  I appreciate that.

26      THE WITNESS:  For what it's worth, I apologize.

27      THE COURT:  Thank you, sir.

28      MR. FILLOY:  Call Officer Coleman, unless you want to

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  take a break.
 2      THE COURT:  Let's talk about that for a minute.  So I
 3  suppose this issue of who else is at the Relay on that day,
 4  that is open.  So, I suppose for that.  What else would be --
 5  you remember Adam Clayton Powell in all of this, right?
 6      MR. FILLOY:  Yeah, I'm not --
 7      THE COURT:  I remember all that, that he was making
 8  reference to.  I remember all that.
 9      MR. FILLOY:  I'm not trying to get into that.  There's a
10  couple things with Officer Coleman, which is the nature of
11  the communication and what this was about and about Komoda
12  and McLaughlin beating themselves up about their performance,
13  the nature of what this was is quite different from
14  Mr. Tribble, as it was described by Officer Komoda, who
15  denies that he was ever beating himself up for feeling like
16  he didn't perform because the bullets didn't hit or didn't
17  have any conversations with that.  I think officer -- also,
18  Officer McLaughlin, who I plan on calling tomorrow, he says
19  Coleman was there.  I think Coleman can clarify what this
20  interaction actually was.  He also may be able to clarify if
21  he ever saw, after that, that Komoda's badge was still bent.
22  I just heard Mr. Tribble say something I had never heard
23  before, which goes further in my argument about the fact that
24  Officer Komoda is lying about having bent it back within
25  days.  He said he saw, at some later point, Officer Komoda in
26  the office with that duty badge on his chest in 2017 and it
27  was bent.  So, I think Officer Coleman can clarify as to
28  that.

 1     Much more importantly, as to Officer Jacobsen's badge
 2  being bent by Josh Coleman in front of Kent Tribble,
 3  Mr. Tribble was not sure which shooting that was for.  He
 4  said he thought it was for the one in Vallejo, which would
 5  have been earlier.  He also said it would have been quite a
 6  while after he bent Coleman and Galios' badges.  Coleman and
 7  Galios was October of 2016.  He didn't know how long
 8  afterwards he bent the badges.  The Angel Ramos shooting was
 9  January, a couple months later, was January of 2017.  And he
10  seemed to be fairly sketchy on time.  I'm trying to discern
11  if Jacobsen's badge was bent twice for the same shooting, but
12  I actually think that the Jacobsen, that that bending story
13  Mr. Tribble is telling involving Josh Coleman, is
14  representative of the Barboa shooting.  I think that other
15  people in the Barboa shooting had their badges bent.
16     THE COURT:  Let's focus a little.  I mean, it seems to me
17  the fact that we're struggling, you identifying specific
18  things due to the volume of these events is a thing of
19  concern, but I don't see further litigating specific
20  incidents in that volume having any particular relevance.
21     Now, the issues -- I get the issues involving Officer
22  Komoda are there.  You've identified two areas of inquiry
23  with Officer Coleman, now.  I guess that's all right because
24  it all relates directly to his testimony and his alleged
25  involvement in this thing.  The stuff with Jacobsen and these
26  other folks and -- there were incidents asked about Poyser,
27  all of that.  It just seems to me that that is all -- there
28  may be a place in time for that broader discussion, but I'm

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1  not feeling that this place is it.

 2      MR. FILLOY:  I mean, everything about the story that -- I

 3  mean, maybe Josh Coleman is going to come in here and say

 4  that never happened.  I never bent Matt Jacobsen's badge or

 5  maybe he is going say that was about the Angel Ramos

 6  shooting, but if it was about the Barboa shooting, that's

 7  pretty significant since all the Barboa shooters say nothing

 8  happened after the Barboa shooting.  It's right in the middle

 9  of a bunch of shootings where badge bending did happen.  It

10  involves a bunch of guys that it's their second shooting.

11  Nobody wants there to be multiple points bent for multiple

12  shootings.  Everybody knows that looks real bad.

13      THE COURT:  As opposed to?

14      MR. FILLOY:  I'm not saying it looks good otherwise, but

15  when you look through these interviews I have heard that is

16  the thing in Giordano's feeding into people over and over

17  again, it wasn't about killing, there weren't multiple bends

18  for multiple shootings, right?  He's hitting that over and

19  over and over again.  This whole thing with Jacobsen goes

20  directly against it and I think it's representative of the

21  Barboa shooting and I think Josh Coleman may know if other

22  people had their badges bent for that.

23      THE COURT:  We can bring in Coleman, do you need a --

24  I'll take a 10 minute break.  We can bring in Coleman.  Let

25  me take a 10 minute break.  We'll do that.  You can bring him

26  out.  You can ask him about the issues directly related to

27  Komoda.  As to the rest of it, we will see.

28      Two things here for purposes of today's analysis, the

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

```
 1  volume of all of this obviously is a troubling thing.  I
 2  don't think dialing down on the specificity of that volume
 3  advances this discussion here today.  So, I think just going
 4  into these other officers, these specific events and when
 5  they exactly occurred in two bends versus one bend, unless
 6  something new and different comes up.  It seems to me that's
 7  not necessary.
 8      MR. FILLOY:  I think it's extremely significant if he
 9  lied about it.
10      THE COURT:  It it's relevant to Komoda, maybe it's
11  relevant.  Other than that, I don't know.  But the other
12  thing is I don't -- the fact that in hindsight folks,
13  including both your witnesses today, describe in more sober
14  terms something they perhaps described in -- engaged in with
15  more enthusiasm and bravado, I'm not sure how much that at
16  that point matters.  I mean, I think it's pretty clear.  I've
17  read the transcripts that both of these guys give.  I think
18  it's pretty clear that, certainly right there with Kent
19  Tribble there was a degree of reflection and remorse, which
20  by definition is going to change the nature of his
21  description.  While it's not necessarily relevant to Officer
22  Komoda, I don't think it's a bad thing that he reflected that
23  degree of remorse and reflection today.  So I don't know.
24      Let's play it by ear.  We'll do Coleman and then we'll
25  keep going.  The universe here is being pretty defined.  If I
26  were you, I would start zeroing in on things that may have
27  something specifically to do with Komoda or this event.
28  Because the rest of it is going to be left to an entirely
```

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  different jury and population to assess what it all means,
2  but I don't think Mr. Milano's jury is going need to go down
3  this road.
4      Let me take the break.  We'll come back in 10 minutes and
5  we'll keep going.
6                      (Break taken.)
7      THE COURT:  Mr. Milano appears, counsel appears, Officer
8  Coleman is back.  Good afternoon.  Let's swear him in.
9
10                     JOSHUA COLEMAN,
11                having been duly sworn, was
12                examined and testified as follows:
13
14     THE WITNESS:  I do.
15     THE CLERK:  Please state your full name, spelling your
16  last for the record.
17     THE WITNESS:  Joshua Coleman, C-O-L-E-M-A-N.
18     THE COURT:  Mr. Filloy.
19                 DIRECT EXAMINATION
20  BY MR. FILLOY:  Q.  Deputy Coleman?
21  A.  Yes, sir.
22  Q.  Good afternoon.
23  A.  Thank you.  Good afternoon to you, too.
24  Q.  Deputy, what do you for a living?
25  A.  I'm employed as a deputy sheriff for the County of Napa
26  Sheriff's Office.
27  Q.  Before that, where were you employed?
28  A.  I was employed for the City of Vallejo as a Vallejo

 1 police officer.

 2 Q.  How long were a Vallejo police officer?

 3 A.  I was a Vallejo police officer from 2012, early 2012 to

 4 May, 2018.

 5 Q.  Were you a Vallejo police officer prior to 2012 at any

 6 point?

 7 A.  Yes, sir.

 8 Q.  When was that?

 9 A.  I began my employment with the City of Vallejo in 2003

10 when I was 20 years old, as a police cadet.  I continued as a

11 police trainee, then I was sworn in 2007, I believe, and was

12 employed as a police officer until 2009.

13 Q.  Then did you go elsewhere to be employed as a police

14 officer, then return to the City of Vallejo?

15 A.  That's correct.

16 Q.  During your time as a police officer in the City of

17 Vallejo, were you involved in some officer-involved

18 shootings?

19 A.  Yes, sir.

20 Q.  How many?

21 A.  Four.

22 Q.  And at some point during your employment with the City of

23 Vallejo as a police officer, did you become aware of the

24 tradition of badge bending?

25 A.  I became aware yes, sir.  Yes.

26 Q.  And when did you first become aware of the tradition of

27 badge bending?

28 A.  2003, I don't know the date.  I was involved in a

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1  critical incident with a barricaded subject.  I'm sorry, did
 2  I say 2003, '13.  And I was asked to come across the street
 3  from the Police Department to the Relay bar by then Sergeant
 4  Tribble.
 5  Q.  Okay.  Sergeant Kent Tribble?
 6  A.  He's a lieutenant now, retired.
 7  Q.  He was the sergeant in 2013 when he asked you to come
 8  across to the Relay bar?
 9  A.  Correct.
10  Q.  That was after the shooting incident involving a William
11  Hines?
12  A.  Yes, sir.
13  Q.  Was that your first shooting incident?
14  A.  Yes, sir.
15  Q.  And what occurred at the Relay bar, if you went?
16  A.  So, I had just finished my interview, my interview for
17  the officer-involved shooting, to give my statement.  I
18  received a text message from Kent Tribble.  He said, "When
19  you're done, come across the street and bring your badge".
20  So, I walked across the street.  I walked into the Relay
21  club, I found Kent Tribble sitting at a table, along with
22  officer -- I'm sorry, he was a corporal at the time, Dustin
23  Joseph.  Kent Tribble sat me down, poured me a beer then
24  began to tell me about how it would be nice if there was a
25  way that you can recognize people you work with for being
26  people that you can trust in moments of chaos and you can
27  trust with your life.  At which point he asked me for my
28  badge and he bent one of the tips on my badge.

People vs MILANO, DOMINIC JAMES
VCR233208                        March 22, 2022

 1  Q.  What badge was it?  Was it like a silver duty badge?

 2  A.  Yes, sir.

 3  Q.  And did he bend Officer Joseph's as well?

 4  A.  No, Corporal Joseph was just sitting there.

 5  Q.  Corporal Joseph, he was involved in that shooting of

 6  Mr. Hines with you?

 7  A.  Yes, he was.

 8  Q.  As well as Ritzie Tolentino?

 9  A.  That's correct.

10  Q.  Officer Tolentino was not present?

11  A.  He was not.

12  Q.  It was just Joseph and Tribble?

13  A.  Correct.

14  Q.  Did he explain anything further about the significance of

15  this, other than what you just said?

16  A.  He then -- yes.  He continued stating that this was a

17  tradition that and his brother Todd Tribble started in

18  Concord.  He told me that it's less to do with me being in an

19  actual shooting and more to do with the manner in which I

20  conduct myself around the department as a professional.  It

21  had more to do with how I handled myself afterwards

22  emotionally, et cetera, and how other people in the

23  department see me, or perceive me.  And he stated that I was

24  not supposed to talk about it.  He said, "Don't say anything

25  about this to anybody else.  Me and my brother are the only

26  ones who can bend someone's badge".

27  Q.  So, it was a positive recognition but in your

28  understanding it was not necessarily because of the shooting

People vs MILANO, DOMINIC JAMES
VCR233208                            March 22, 2022

```
 1  or it related to the shooting?
 2  A.   It was a very, I think I'm risking myself saying dubious,
 3  I believe would be the term, feeling that I had about this
 4  circumstance because of my history with Kent Tribble.
 5       The first time I met Kent Tribble, on a ride along
 6  working in the Vallejo Police Department, he put a gun to my
 7  head because I didn't put my seat belt on, as a cadet.  So
 8  moving forward in my lifetime with the Vallejo Police
 9  Department, I viewed Kent Tribble as a person that was -- I
10  was very afraid of, to be frank.  I was 20 years old when
11  that happened.  I was making $11, $10, I believe, an hour
12  working for the cadet program.  I'm from Vallejo, or lived in
13  Vallejo.  I was struggling making it through college and
14  needed the job.  So I said nothing about these circumstances
15  and eventually made myself, or gained the position of being a
16  sworn police officer for the City of Vallejo.
17       The entire time working in the City of Vallejo I viewed
18  Kent Tribble as someone who was a reckless person, but he was
19  also somebody that people who were higher in the department
20  respected.  So, eventually he became my sergeant, and after
21  working in law enforcement for a period of time, I recognized
22  that he was on the SWAT team, he was basically the decision
23  maker about who could be on the SWAT team, who could get into
24  specialized units, et cetera.  So when he chose to be a
25  person that recognized me as meeting this specific criteria
26  of courage or courageousness, a piece of me felt happy,
27  although that is a very sick, twisted way to perceive this.
28  It just has to do with growing up as a young person in this
```

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

1  profession and having to endure some of the things that I did
2  in my career.
3  Q.  So, I think you're saying it was a somewhat conflicted
4  feeling?
5  A.  It was conflicted.
6  Q.  Okay.  And did Officer Dustin Joseph, did he say anything
7  or do anything in this event, other than just sit there?
8  A.  No.  Corporal Joseph is somebody that I have a very high
9  esteem for in my entire time at the Vallejo Police
10  Department.  I've never seen him do anything that I believe
11  to be outside the bounds of anything.  So, again, to have him
12  there and both of these people that I respect essentially
13  telling me that they trust me, it was a, again, like I told
14  you, a strange mixed feeling.  I recognized it in that moment
15  as more of an informal medal process, because the Vallejo
16  Police Department does have medals.
17      I do look back on it now, as an almost 40 year old male,
18  looking back on it now, I think this was almost eight years
19  ago or more, that that was not something they should have
20  been happening, especially by a sergeant in the Vallejo
21  Police Department.
22  Q.  So, your experience was some sort of a recognition award
23  you had a conflicted feelings about it?
24  A.  Correct.
25  Q.  After that occurred, when was the next time that you were
26  aware of, or experiencing something around badge bending?
27  A.  When the article came out about badge bending through one
28  of the local news stories.

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1  Q.  So, I'll make it quick.  Subsequent to in 2013 were you
 2  involved in another shooting at the Blue Rock Bar?
 3  A.  I was.
 4  Q.  Involving a guy named Ridgeway?
 5  A.  Yes.
 6  Q.  Was your badge bent after that shooting?
 7  A.  No.
 8  Q.  Was your badge bent after the shooting of Raphael Martin
 9  in 2014?
10  A.  No.  During that my only interaction with Kent Tribble on
11  that shooting was after that shooting occurred, which was an
12  incredibly stressful moment, I was still in shock and Kent
13  came up to me, grabbed me by my shoulder, started shaking me
14  in the street telling me that I "stole his dinner", in
15  quotes.
16  Q.  Do you mean that he was stating that you stole his
17  dinner, that should have been his shoot?
18  A.  Correct.
19  Q.  That he was angry that you had shot Mr. Martin instead of
20  him?
21  A.  He was visibly shaking me, almost spitting on my face
22  telling me I stole his dinner.
23  Q.  Am I getting the meaning of that right?
24  A.  Yes, you are.
25  Q.  Okay.  And you and Mark Galios were involved in a
26  shooting in 2016 at Starbucks in south Vallejo?
27  A.  Correct.
28  Q.  Did Kent Tribble bent you and Mark Galios' badges after
```

1  that shooting?

2  A.  No.

3  Q.  Did anybody approach you about badge bending after that

4  shooting?

5  A.  No.

6  Q.  Did Mr. Galios ever indicate that Kent Tribble bent his

7  badge after that shooting?

8  A.  No.

9  Q.  So, if I say to you, you and Mark Galios got your badges

10  bent after the Starbucks shooting by Kent Tribble, hundred

11  percent false?

12  A.  Hundred percent false.

13  Q.  Okay.  Did you bend Zack Jacobsen's badge in a bar in

14  front of Kent Tribble?

15  A.  No.

16  Q.  Did you bend Zack Jacobsen's badge at all?

17  A.  No.

18  Q.  Were you ever present when his badge was bent?

19  A.  No.

20  Q.  Were you ever present in a bar with him and Kent Tribble?

21  A.  I believe I was present in a bar with him and Kent

22  Tribble, yes.  By themselves, no.

23  Q.  Were you present when anybody else's badge was bent?

24  A.  No.  If I can --

25  Q.  Go ahead.

26  A.  I'm really fighting to control my emotions about this

27  whole thing, because I didn't ask -- I did not ask for this

28  to happen to me the first time.  And I didn't ask -- I didn't

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

1  create the circumstance to be here in court talking about it

2  today.  So, this is very upsetting for me to sit here and

3  talk about something, especially if there are falsehoods

4  being attributed to me and my involvement in this.

5  Q.  You're answering truthfully?

6  A.  I'm absolutely answering truthfully, yes.

7  Q.  If I say in August, September 2016 you, Josh Coleman,

8  were present in a bar, the Relay, with Matt Komoda, David

9  McLaughlin and Kent Tribble and you were there when Kent

10 Tribble bent their badges after they had been in a shooting

11 --

12 A.  That's not true.

13 Q.  Hundred percent false?

14 A.  Hundred percent false.

15 Q.  Did not happen?

16 A.  Did not happen.

17     Kent Tribble told me on the day that I -- Kent Tribble is

18 I very scary person.  When he was my sergeant, his rule

19 number one when he would have his briefings is, do not fuck

20 your buddies.  And the day he told me, "I'm bending your

21 badge.  Never talk about it".  I never talked about it again.

22 I didn't mention it to anybody.  I never bent anybody's

23 badge.  I haven't been around anybody or when a badge bending

24 was occurring.  I have no idea who else's badges have been

25 bent.  I just know that mine was bent by Kent Tribble in

26 2013.

27 Q.  Were you ever advised by anyone in the department to fix

28 that badge?

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

1  A. Okay. So, yes. I was. So, my earlier statement about

2  not knowing anything about it until the article came out

3  would be inaccurate.

4      So, yes.  I believe it was 2017 or so, maybe '16, Kent

5  saw me in the hallway and muttered something to me about,

6  "They know about the badges.  Fix your badge", or something

7  like that.

8  Q.  Okay.  This was like in -- you left in what month of

9  2018?

10 A.  I left in May of 2018.

11 Q.  So prior to that?

12 A.  I think so.  It was about two years prior to that.

13 Q.  Like in 2016?

14 A.  I'm estimating somewhere around there.

15 Q.  It wasn't in 2018?

16 A.  No.

17 Q.  Okay.  I understand you don't know exactly when it

18 happened, maybe some significant period of time before you

19 left?

20 A.  Correct.

21 Q.  He said something to the effect, they know about the bent

22 badges?

23 A.  He approached me.  So, Kent Tribble is an alcoholic, he

24 used to show up to work every single day with his hands

25 shaking and everything.  His nickname on our team was John

26 Wayne, because he had this John Wayne persona about how he

27 would carry on business.  People did not have a very high

28 level of esteem and at this point in my career I was older, I

1 didn't have a high level of esteem for him.  But still being

2 a lieutenant, or being yeah, I was -- he had already gotten

3 promoted to being a lieutenant.  I still had high level of

4 anxiety dealing with him.

5      So when he approached me and was like, "they know about

6 the badges", I was like, okay.  In fact, from my prospective

7 at that time, I did not do anything wrong.  I didn't break a

8 law.  At the time -- reading the policy manual now I could

9 see there may be a policy violation but at the time I didn't

10 think it was a serious a egregious offense.  I wasn't the

11 supervisor that did this.  He was the supervisor.  So I

12 ignored it and moved on with my life.

13 Q.  So when he said that to you, maybe 2016 in the hallway,

14 "They know about the badges.  Fix it", you then fix the

15 badge?

16 A.  I believe that I had already fixed my badge before then.

17 When he bent it, he broke one of the letters in my name or,

18 not my name, in the, I think it says "police".  One of the

19 letters cracked so it could never really, truly be fixed, but

20 I --

21 Q.  You're talking about the enamel on the top there cracked?

22 A.  The black lettering had like popped out, so I just bent

23 it back.  But it's never really -- I can still see it to this

24 day.

25 Q.  You still have that badge?

26 A.  Absolutely.  Yes.

27 Q.  By that time you had you become a corporal?

28 A.  Yeah, I was already promoted.

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

```
 1  Q.  So you didn't wear that badge on a regular occasion?
 2  A.  No.
 3  Q.  Okay.  Other than Kent Tribble telling to you fix the
 4  badge, you ever remember, during your employment at the
 5  Vallejo Police Department, anybody else giving you any
 6  directive or saying anything to you about the bent badges?
 7  A.  No.
 8  Q.  Have you had any contact with members of the Vallejo
 9  Police Department about the badge bending issue since the
10  story broke?
11  A.  Yes.
12  Q.  Who was that?
13  A.  Everybody I know.  Everybody's talked about it.  I've
14  talked to -- yeah, I mean, if you're asking specifically
15  about the Vallejo Police Department, I've talked to pretty
16  much everybody about the bent badges thing.
17  Q.  Were you contacted to give an interview by Mr. Giordano?
18  A.  I was.
19  Q.  Did you not give one?
20  A.  Yes, I did not.  At the time my agency head, Sheriff
21  Robertson, informed me that I was noticed as a subject in an
22  internal investigation, internal affairs investigation.  He
23  also informed me that he was unaware of the legal aspects of
24  compelling a person who is not employed by an agency that is
25  conducting an internal affairs investigation as to whether or
26  not he should compel me or not.  He noticed me and advised me
27  to contact my attorney.  I contacted attorney Mike Rains and
28  asked him if I needed to give an interview.  Attorney Mike
```

People vs MILANO, DOMINIC JAMES
VCR233208                           March 22, 2022

 1 | Rains basically told me I was under no legal authority or
 2 | obligation to and so I looked at it as I experienced a lot of
 3 | trauma working for the Vallejo Police Department and I left
 4 | that in order to go to a different organization and I didn't
 5 | want to rehash any of those things and I didn't intend on
 6 | talking about it until I was asked to speak the truth today.
 7 | So, here I am.
 8 |    MR. FILLOY:  I don't think I have anything further for
 9 | Officer Coleman.
10 |    As someone who started here in 2006, despite the
11 | performance today, I would stipulate that Kent Tribble was is
12 | a very scary person.
13 |    THE COURT: All right.
14 |    Mr. Flynn. Any questions?
15 |    MR. FLYNN:  I don't think so your Honor.  No.
16 |    THE COURT:  This event you described involving the gun
17 | when you were young, when you were a cadet, did you report
18 | that to anybody?
19 |    THE WITNESS:  I didn't, sir.  Honestly, it's something
20 | that has troubled me my whole career.
21 |    THE COURT:  So this -- so how many police chiefs through
22 | your career in Vallejo did we have, would you say?
23 |    THE WITNESS:  Lieutenant Nichelini, Lieutenant -- I'm
24 | sorry, not lieutenant, Chief Nichelini, Chief Rains, Chief
25 | Bidou.  I did not work for Chief Williams.
26 |    THE COURT:  Were you ever -- throughout the course of
27 | your career, when you're hearing all about these badge
28 | bending things, did you ever attend a morning staffing or any

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

```
 1  meeting of the troops where anyone mentioned anything about
 2  this badge bending.
 3      THE WITNESS:  I didn't hear about badge bending at all
 4  until -- until, I'm sorry, your question was about -- you
 5  said?
 6      THE COURT:  Any staffing meeting did anyone ever bring it
 7  up in a meeting, "by the way, you shouldn't be doing this" or
 8  anything like that?
 9      THE WITNESS:  No.
10      THE COURT:  Okay.  Anything further?
11      THE WITNESS:  But to be fair, I don't go to staff
12  meetings.  I was an officer and I was a corporal, so staff
13  meeting would be lieutenant and above.
14      THE COURT: All right.
15      Mr. Filloy, anything further?
16      MR. FILLOY:  I don't think I have anything further at
17  this time for this witness.
18      THE COURT:  Thank you.  Thank you for coming in.
19      THE WITNESS:  Thank you, your Honor.
20      THE COURT:  I did not see that coming.
21      MR. FILLOY:  He was very forthcoming.
22      THE COURT:  So let's -- there was some value to that.  I
23  actually think there's been value to all of this.  But let's
24  zero in on that which we are looking to do here.
25      MR. FILLOY:  So, I have a bunch of witnesses subbed for
26  tomorrow.  You're probably going to want to talk about what
27  is what.
28      THE COURT:  A lot of this, it seems to me is not relevant
```

People vs MILANO, DOMINIC JAMES
VCR233208                                                March 22, 2022

 1 | to this case.  So let's walk through and I guess an offer of
 2 | proof.  You've talked about both McLaughlins.
 3 |     MR. FILLOY:  No, just David McLaughlin.  Ryan is not
 4 | involved in this in any way, that I know of.
 5 |     THE COURT:  David McLaughlin.
 6 |     MR. FILLOY:  I mean, David McLaughlin says Coleman was
 7 | there when this happened, not that impeaching Coleman is
 8 | important to me.  But McLaughlin also kind of dates this time
 9 | line of 2018, they're getting told bend badges back, clean
10 | this up.  Then Komoda says, you know, he knows nothing about
11 | -- he can speak to the things that Tribble said.  I also
12 | wanted to hear if he impeaches or supports Komoda's
13 | assertions that he never questioned his performance, or was
14 | upset about this and the question of whether or not --
15 |     THE COURT:  Who never questioned whose performance?
16 |     MR. FILLOY:  I mean, Kent Tribble says, you know, in the
17 | interview he said today, McLaughlin and Komoda were beating
18 | themselves all up because, you know, the bullet didn't
19 | perform, they didn't perform well tactically.  Komoda's like,
20 | "Nope, I never said that.  That never happened".  That's
21 | really 1103 thing, right.  I mean, kind of goes to your
22 | propensity for violence if what you're upset about after a
23 | shooting is that you didn't hit anybody.  So there's that.
24 |     There's also this, you know, the strange issue that
25 | Komoda and McLaughlin both, within days, independently,
26 | without discussing it, decided to bend their badges back.
27 | And, you know, McLaughlin is a, you know, he's a percipient
28 | witness to this event and some of what he says doesn't mesh

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1   with Komoda.

 2      THE COURT:  The badge bending event happened at the
 3   relay?

 4      MR. FILLOY:  Yeah.

 5      THE COURT:  Wheat else?  Who else?  You said Stephanie
 6   McDonough.

 7      MR. FILLOY:  Stephanie McDonough, you know, she basically
 8   backs up everything that McLaughlin says.  Giordan's
 9   interview with her is kind of is minimal.  There's a lot of
10   stuff he doesn't go into.  I want to see if she can also
11   corroborate this time line.  I also want to ask her if there
12   was any badge bending after Barboa, because I think there was
13   and I don't know that these folks are necessarily going to
14   necessarily say the same thing under oath like they said in
15   the interviews.

16      THE COURT:  So let's see.  We established lots of that
17   here.  What's the relevance of the specific timing of any of
18   it at this point?

19      MR. FILLOY:  If they were -- if they bent badges after
20   Barboa, that was multiple bends for multiple shootings, we're
21   talking about racking up points.  It's direct impeachment of
22   Komoda's statement that he bent his back.  It's really pure
23   1103 Ingstrum as to propensity for violence.

24      THE COURT:  Be more specific.  Komoda doing other bends,
25   maybe.  Everybody else, what's the relevance of whether or
26   not anybody else -- we already got -- I was a little torn.  I
27   was waiting for someone to ask, I thought about asking
28   Tribble if he could give us an itemized list of everyone he

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

1  recalls bending, but mercifully none of us asked that

2  question.

3      MR. FILLOY:  I thought I would have got objected to.

4      THE COURT:  The implication is he bent a bunch of them.

5  So the volume thing, it's established already.  The timing of

6  it, unless it's something relevant to Komoda, I'm not sure.

7      But McDonough, who else?

8      MR. FILLOY:  Jake Estrada has never given a statement,

9  that I know of.

10     THE COURT:  What might he give a statement of?

11     MR. FILLOY:  He was one of the Barboa shooters.  He might

12 tell us if he was in the POA hall with Komoda as Komoda said

13 afterwards since the POA hall we know because of the McCoy

14 shooting is sometimes the scene of drinking and badge

15 bending, you know.  So he might tell us if that went down and

16 who was there, if Komoda was involved in some badge bending

17 at the POA hall after the Barboa shooting.  But apparently

18 Komoda says they were there.

19     THE COURT: Who else?

20     MR. FILLOY:  Well, so one of the direct impeachment

21 witnesses that I need to call is Robert Giordano.  It's

22 because Robert Giordano interviews Matt Komoda.  Matt Komoda

23 was very clear with me today.  "I brought two badges, both of

24 my badges, to the interview with Giordano".

25     I said, "I believe you brought two, right, the corporal

26 badge and the officer duty badge".  I asked him again, he

27 said, "No, I'm pretty sure I brought two", right.  You read

28 -- I mean, it's not -- here's the thing, these are audio

People vs MILANO, DOMINIC JAMES
VCR233208                           March 22, 2022

1  interviews, right.  But it sure, sounds like from the snippet
2  of the badge bending report you gave me early on, and from
3  the audio interview, that he just shows him one badge,
4  because -- and I want to know which badge it was.  He says,
5  you know, he says, "Okay.  I can see your badge. Oh, yeah
6  it's not bent".  Then in his report, in the summary, he says,
7  "he showed me a metal badge".  One, not two.  I don't think
8  he showed Giordano two badges.  I think that is not true.  I
9  think he showed him his corporal badge that he got after all
10  of this was all over and it never would have been bent.  He
11  didn't it get until March of 2019.
12      The other officers, when Giordano is interviewing them,
13  like McLaughlin brings both badges.  Giordano says, "he's got
14  two metal badges here".  He's pretty specific about that
15  stuff, actually.
16      So, I think I need to call him to ask him that question.
17      THE COURT:  Him the question of?
18      MR. FILLOY:  Does Komoda show you two metal badges or one
19  and what badge did?  It say corporal or officer.  Because the
20  corporal badge would have never been bent.
21      THE COURT:  Why is that?
22      MR. FILLOY:  Because he didn't get it until like -- it
23  wasn't even ordered until March 2019.  I don't think he got
24  it until June of 2019, or something like that.  That was
25  after the inspection and McCoy and all, you know, everything.
26  Nobody was bending any badges after, you know, the McCoy
27  shake down happened.  Which I think happened in March or
28  April of 2019.

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

1    THE COURT: All right. Who else?

2    MR. FILLOY: Well, so, I want to call Sanjay Ramrakha to

3 talk about what happened in the Barboa shooting. That more

4 goes to the issue of 1103 because they made criticisms of the

5 use of force. So I plan on calling him as 1103 witness at

6 the trial, because I have to deal with the fact with the jury

7 that they're going to know that Matt Komoda is, after

8 shooting Mr. Milano, is still a police officer. They're

9 going to assume he was cleared, which he was, of the shooting

10 and I intend to show that jury that he was cleared by an

11 institution that has, for a couple of decades now,

12 incentivized and glorified violence, and in fact has a status

13 incentive baked into their institutional traditions about it.

14    So, that kind of seguway into I have some other witnesses

15 subpoenaed for tomorrow where, judge, if you look at that

16 third point you were talking about with me this morning, that

17 I have asked the Court to make a finding that Pitchess

18 deficient, constitutionally deficient remedy as applied to

19 the Vallejo Police Department, I can make a pretty lengthy

20 record with witnesses about the inadequacy of that system in

21 terms of creating and maintaining internal affairs documents,

22 reviewing and training and of disciplining and proper use of

23 force.

24    I mean, you know, I think a lot of people have figured

25 out now, I mean, I have been referencing when they got

26 badges. I have all of the invoices and emails, all of the

27 ones that they had to give me by the time I came to subpoena

28 them. I have all the invoices and emails from the Ed Jones

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1   badge company relating to orders for Vallejo Police

2   Department badges from the middle of 2021 dating all the way

3   back to 2010.  And if you want to go down this road with me

4   on my third point there, which I am asking the Court to find

5   that this is investigation by Mr. Giordano was done in bad

6   faith, that the entire internal affairs system of the Vallejo

7   Police Department operated in bad faith for a long time, I

8   have some witnesses to call and we can talk about what those

9   badge records show, which is multiple rounds of concerted

10  efforts to conceal this practice, in my opinion.

11      THE COURT:  Including Komoda?

12      MR. FILLOY:  Well, I think you heard the evidence as to

13  Komoda today.  There's this in the middle of 2018 when all of

14  the people involved in this say that they're getting word,

15  fix their badges, don't have a bent badge, right.  I had to

16  remind him of it. "Oh, that's right I have the one with the

17  bolt".  Well, he orders a new officer duty badge, it's

18  identical to his officer duty badge that he was issued back

19  in 2014 that Kent Tribble apparently bent, except it has a

20  different back.  It has a bolt on back instead of a safety

21  catch, which is what they normally have on the back.

22      THE COURT:  Let me do this.  Let me share something with

23  Ms. Knight.  So that, what he just said is one of those

24  things that I became aware of sometime ago and in fact it's

25  the reason why I amended my discovery order.  So now that

26  that that's out on the table, and what -- I indicated that I

27  felt kind of unwise in hindsight, after reading the Giordano

28  report the first time, and a lot of it is consistent,

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  certainly the Kent Tribble narrative, a lot is consistent
2  with that, but nowhere in that report, and it didn't dawn on
3  me to think about this until Mr. Filloy presented this
4  information.  Nowhere in that report is any effort on the
5  part of Mr. Giordano to even reach out to the badge vendor.
6      And there's only one badge vendor.  It just -- it dawned
7  on me what an incredible omission that is.  That if I'm doing
8  an inquiry into practices in terms of replacing and repairing
9  badges and it turns out there's only one vendor, why would I
10 not have reached out as part of my investigation to that
11 vendor.  And there's some references, and I'm not feeling
12 like going there in this hearing, but there's interesting
13 issues about multiple persons buying multiple badges and
14 Stephanie McDonough buying badges for, paying for
15 McLaughlin's badges because she has to use her credit card.
16 There's all this interesting stuff.  I don't know how
17 interesting it is, but I guess -- what is that?  Is this the
18 first you're hearing of any of this?  Why would Giordano not
19 have reached out to the badge vendor if what I'm looking to
20 do is to investigate practices of officers and their badges?
21     MS. KNIGHT:  Well, your Honor, I thought he had reached
22 out to the badge vendor, if nothing else because he got a
23 sample badge from them to examine for what it looks like, how
24 it bends.  My recollection is that there was a point where he
25 was looking at records of orders, but it's been a long time
26 since I looked at the report.  I don't remember how much of
27 that was discussed or made it in there.
28     THE COURT:  Yeah, I'm not sure it's mentioned at all, is

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

 1 | my recollection.
 2 |    MR. FILLOY:  Actually, judge, Chief Williams reached out
 3 | at one point to the Ed Jones company to asks them for some
 4 | records, I think.  One of the witnesses I have subpoenaed to
 5 | testify tomorrow is Elizabeth Ruska, the former owner of the
 6 | Ed Jones badge company.
 7 |    THE COURT:  There's a particular email?
 8 |    MR. FILLOY: Yes.
 9 |    THE COURT:  I recall, but I don't remember which of your
10 | witnesses is in on it.
11 |    MR. FILLOY:  Well, a lot of emails is between Shaleen
12 | Darst and Elizabeth Ruska.  I think the one that you're
13 | referring to from Ms. Ruska to the Police Department actually
14 | maybe went to Angela Knight and basically saying, "I want to
15 | have a phone conversation with Chief Williams".  They said,
16 | "About what" and she said, "About a letter we just received"
17 | and then she gets a reply back.  Says, "Well he's referring
18 | me to have you speak on the phone with Ann Cardwell", who was
19 | at that time the assistant city manager.
20 |    Now, according to Ms. Ruska --
21 |    THE COURT:  Was there not a communication implying that
22 | Ed Jones should not respond?
23 |    MR. FILLOY:  Well, yeah.  Ms. Ruska says they refused to
24 | provide them any records and when Mr. Mauer and I asked her
25 | about why that was, that she would refuse to provide records,
26 | it was a very vague answer.  It was sort of like trade
27 | secrets, competition, prices, you know.  It seemed odd.  She
28 | said well, why don't -- why don't-- they have the records,

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

 1  right.  She said, "The Vallejo Police Department should have

 2  these records, invoices, or whatever emails".  I'm not that

 3  surprised that they don't have them anymore.  Especially

 4  based on what I received.  But, I don't know why this lady,

 5  whose family have had this very lucrative business

 6  relationship with the City of Vallejo for 50 years, if they

 7  wanted invoices would refuse them.  I don't know why the City

 8  of Vallejo would keep on doing business with somebody who

 9  refused.

10      THE COURT:  Or why they would give them to you without a

11  subpoena.

12      MR. FILLOY:  Well, I did subpoena these records.  I

13  subpoenaed one set in another case, then the client, when the

14  case was over had released that portion of the legal file to

15  me.  And I subpoenaed them multiple occasions during this

16  case, but the new guy who owns the Ed Jones company now,

17  Mr. Headley was extremely cooperative.  He just he actually

18  let my investigator -- one of the sets of records, go down

19  there and just go through the files.  Then he actually

20  released more to me without a subpoena.  I send him that

21  subpoena and he said can I send them to you.  I said, "Sure

22  I'll withdraw my subpoena if you want to send them to me

23  instead".

24      THE COURT:  I do not know what that is.  Again, in

25  hindsight I thought why did you not think of this when I was

26  reading this thing.  Obviously if you're wondering about

27  people's practices with badges, the badge vendor would seem

28  kind of relevant.  So, anyway.  I don't know what to make of

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1  that.

 2      Let me ask Mr. Flynn -- here's what I'm thinking.  I'm

 3  thinking there's a number of issues here that are of general

 4  interesting and concern to the public and community, but

 5  they're not necessarily relevant to Mr. Milano's case.

 6      MR. FLYNN:  That's my opinion as well.

 7      THE COURT:  All right.  Let me tell you tentatively what

 8  I think.  I think you ought to be allowed to call Officer

 9  McLaughlin to testify directly as to the event involving

10  Officer Komoda.

11      The Stephanie McDonough thing, I'm not seeing that that

12  seems tangential, not going to be relevant unless something

13  new happens.

14      As to Estrada, I think I should allow you to ask him

15  questions about did he ever witness badge bending at the POA.

16  Because that would be a particular potentially relevant

17  thing, given everything we've heard today.  Kind of

18  generalized discussion, I think is irrelevant.

19      The Ramrakha 1103 stuff I'm just not seeing any of that

20  at this point.  I don't need to do a 402 to have a discussion

21  about 1103.  We're still going to have to have this

22  discussion at some point before we go to trial, but it would

23  be relevant to Mr. Milano.  It would be what did Mr. Milano

24  know, what might Mr. Milano had seen to make some of this

25  stuff relevant in a more direct way.  And I'm going to have

26  to go back and reread through the prelim about the idea of

27  propensity evidence involving Officer Komoda, because this

28  was a whole group of officers.

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1    Frankly, I remember a lot more about his driving.

2    MR. FILLOY:  Are you talking about the Milano case

3  particularly?

4    THE COURT:  I remember more about Komoda's driving than

5  the positioning when shots were fired.

6    MR. FILLOY:  The shoot out just happens between Milano

7  and Komoda, with Komoda being the only person to actually --

8  he says that Mr. Milano fired first.

9    Duncan and Simpson, they pull up, the shootings is

10  already going on.  They both say they're not there when the

11  scene starts.

12    THE COURT:  I have to read all of that.  I do find it a

13  little ironic that Adam Clayton Powell came up today because

14  I don't think Officer Coleman understands why that case

15  happened they way it did and the problems associated with

16  specific intent crimes.  Which I think was the full

17  explantation of that verdict.  But that's neither here nor

18  there.

19    I think as to Giordano, you're probably entitled to ask

20  how many badges did Komoda show him.  If you want to ask him

21  about the Ed Jones thing, I'm curious.  I don't know that

22  that's relevant.

23    MR. FILLOY:  I think, judge, as I've said, we have all of

24  these motions discovery motions pending.  One is that the

25  badge -- these badge bending records are public records under

26  832.7, that's a legal call, right.  I've also demanded them

27  under the Sixth Amendment and I said I believe the whole

28  entire Pitchess process, you know, is simply constitutionally

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  deficient as applied to the Vallejo Police Department because
2  they operated in bad faith.  I want to make that record by
3  talking to witnesses about it.  I want to make that record by
4  talking to Mr. Giordano, who let me tell you, I'm pretty sure
5  he didn't get these badge records and I have a lot of
6  questions about why he investigated this thing the way he
7  did.
8       THE COURT:  Well, I guess some of that.  I've got little
9  mixed feelings about.  Maybe I'll ask Mr. Flynn to answer
10  this question.  Seems like -- you've read the report.  So I
11  have read this report.  It seems to me, I know I said this a
12  couple weeks ago, it seems to me that the totality of what is
13  relevant has already been disclosed to you in that report.
14  That there's a universe of several things.  One, there's
15  probably many dozens of pages of people denying any knowledge
16  of this thing, just saying it's stupid.  There's probably 20
17  officers who, that's the totality of their statement.  Then
18  there is a lot of discussion, page and pages of discussion of
19  management.  This thing with Horton is interesting.  Whitney
20  never came up today.  But there's a fascinating --
21       MR. FILLOY:  I have him subpoenaed for tomorrow, too,
22  judge.
23       THE COURT:  There's pages and pages of fascinating stuff
24  about Whitney, Horton and Iacono.  I'm not sure that's
25  relevant to anything.  It's like management, HR stuff.  Then
26  there's just some efforts and opinions.  Last 15 pages, 20
27  pages are opinions and findings and I don't find those
28  admissible or relevant.

People vs MILANO, DOMINIC JAMES
VCR233208                            March 22, 2022

1    So, I guess Mr. Flynn bearing the burden of Brady as part

2  of this, obviously you could disclose whatever you think, if

3  I'm missing something.  But that's my sense of where we are.

4    MR. FLYNN:  That's correct.  What I told you this morning

5  was that we're going to be meeting as an office to discuss

6  whether there's any Brady that comes out of this

7  investigation and if so we would turn that over to the

8  defense.

9    THE COURT:  There's clearly Kent Tribble Brady.  There's

10  clearly Ryan McMann Brady.  I don't have to worry about

11  either of those things here.  There's clearly Brady with

12  those two officers.  Anyway, so --

13    MR. FILLOY:  Tomorrow McLaughlin, Estrada and Giordano.

14    THE COURT:  McLaughlin, Estrada and Giordano.  Ann

15  Cardwell, Shaleen Darst, is that all about Ed Jones stuff?

16    MR. FILLOY:  So, yeah.  Ann Cardwell, Shaleen Darst,

17  Elizabeth Ruska, that's a whole different discussion I don't

18  know if you want me to launch in to now.  But I don't know if

19  they might have any specific information about Komoda, like

20  there's there email about Komoda's new duty badge in June of

21  2018 with the bolt on it, where the invoice for it comes in

22  and there's an email from Shaleen Darst that says, "I can't

23  have that on a City invoice.  That needs to be separated out

24  as a non-City item on a separate invoice".  So, that relates

25  directly to Komoda.  That's about his badge order.  I don't

26  know if he was trying to have somebody pay for that, have the

27  City pay for that for him or, you know, he was all vague

28  about that today when I asked him was he contacted about

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022

1  needing to pay for this himself.

2      THE COURT:  That's the same thing as the Stephanie

3  McDonough stuff.

4      MR. FILLOY:  If the McLaughlin, Stephanie McDonough thing

5  that was a flat badge, I think that was a present from

6  McDonough to McLaughlin.

7      THE COURT:  Wasn't it all at some point in time the City

8  says they have to start to tighten up on how we're billing

9  these things.  That's what I interpreted that they did.

10     MR. FILLOY:  That did happen.  That particular one, I

11 think -- there were always officers buying badges with their

12 own money that were like Christmas presents, things like

13 that, presents for other people.  I've got to say I can't

14 make a good faith assertion on that one -- when I first

15 looked at it, it looks suspicious.  I don't know that that --

16 I mean, it could be, but I don't know that -- I have pretty

17 good reason to believe that went a present from McDonough to

18 McLaughlin.

19     There's a good question about whether these flat badges

20 were ever bent, because there's really questionable orders

21 for flat badges.  Sometime back from 2015, but apparently

22 there were other people, other than Mr. Tribble, doing the

23 bending.  So, I don't know.

24     THE COURT:  Let me say -- let me indicate -- let's do

25 what I just indicated.  I do not see any reason, at this

26 point, to hear from Ann Cardwell or Shaleen Darst or that

27 other stuff.  That's not to say there aren't issues of

28 concern there.  It just seems there is no issue relevant to

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1  Mr. Milano's case.

 2      So, McLaughlin, Estrada, Giordano.  I guess we'll see

 3  what comes of that.  You can ask him about the badges that

 4  were presented.  I guess we'll see what comes of the rest of

 5  this.

 6      MS. KNIGHT:  Your Honor, for the Ed Jones thing, I'm

 7  inclined to agree with you.  I'm very curious about it, but I

 8  don't know that it's relevant to Mr. Milano's case.  If the

 9  only questions you want out of Mr. Giordano are really how

10  many badges did Matt Komoda bring to his interview, was it

11  his police or corporal badge, I can get a declaration from

12  him and not have to drag him all the way down here.

13      MR. FILLOY:  No.  Let's have him come in.

14      THE COURT:  Is he under subpoena?

15      MR. FILLOY:  Yes.

16      THE COURT:  He can come in quick.  I've got mixed

17  feelings about it.  I'm not sure it's relevant to Komoda,

18  either, just so we're clear, that was stuff that caused me to

19  reconsider my earlier motion, was that thing about what are

20  we thinking here.  How would we not have contacted the vendor

21  to get every officer's totals.  How did we not get that.

22      MR. FILLOY:  I will tell you something really

23  interesting, judge, because Ms. Knight just brought it up a

24  little while ago.  He said Giordano got a sample badge,

25  right, to show -- to use or bend tore show these guys,

26  there's this one email like late in 2021 where somebody at

27  the VPD emails over there and says, "Chief Williams wants to

28  buy a blank badge with no number on it and he's going to pay

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

1  for it personally".  Then they clarify the material and it
2  turns out he wants the chrome badge.  The chrome version.
3  The cheap chrome version.

4      The chrome badges, in my opinion, when you look way back
5  earlier in these records, are some of the things that the
6  officers ordered so that they could have a badge that looked
7  right to wear in public.  So, I don't know if maybe
8  Mr. Giordano knows more about that whole chrome badge
9  cover-up thing than is in the report.

10     THE COURT:  Let's say he can be here to answer those
11 questions and maybe we can have more discussion about this
12 other stuff.

13     I have got to admit, I wonder what he was thinking by not
14 going down that road.  So I don't know.  We'll play that by
15 ear.  Again, none of this is to say -- there may be important
16 places, our media friends, maybe the grand jury, maybe, there
17 may be a lot of interesting places where some of this stuff
18 could get drawn out.  I think we've hit that fork in the road
19 where there's what is relevant to Mr. Filloy and there's
20 everything else.  I'm glad we did this hearing today.  I
21 thought there was a lot of value in the Coleman thing.  I did
22 not see that coming.  I am glad we did those three witnesses.
23 I think that helped to bring some daylight to all of this.
24 But I've got to start whittling this in a little bit and it's
25 always subject to revisit.

26     Let's say 8:30 tomorrow.  This should not take long,
27 assuming it is not going to take long to ask those questions.

28     MS. KNIGHT:  All three of those witnesses should be here

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022

 1 | tomorrow?

 2 |     THE COURT:  McLaughlin, Estrada and Giordano.  I'm not

 3 | granting a motion to quash yet.

 4 |     MR. FILLOY:  Are you saying they don't have to be here?

 5 |     THE COURT:  I'm struggling finding why we need to go down

 6 | that road in this case.

 7 |     MS. KNIGHT:  I just want to know how long I have to keep

 8 | them on the hook, your Honor.  They're very stressed out.

 9 |     THE COURT:  I get that.  If you had released this report

10 | publicly six months ago, we would have none of these things.

11 |                    (Proceedings were concluded.)

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

People vs MILANO, DOMINIC JAMES
VCR233208                              March 22, 2022

```
 1

 2

 3  STATE OF CALIFORNIA    )
                          )
 4  COUNTY OF SOLANO      )

 5

 6            CERTIFICATE OF OFFICIAL REPORTER

 7      I, CHRISTINE L. WESNER, an Official Shorthand Reporter

 8  for the County of Solano do hereby certify:

 9      THAT on March 22, 2022, I reported in shorthand writing

10  the proceedings had in the matter of PEOPLE OF THE STATE OF

11  CALIFORNIA versus DOMINIC MILANO, No. VCR233208;

12      THAT I thereafter caused my said shorthand writing to be

13  transcribed into longhand typewriting;

14      THAT the foregoing Pages 1 through 63 are a full, true,

15  correct and accurate transcription of my said shorthand

16  writing and a correct and verbatim record of the proceedings

17  so had and taken, as aforesaid.

18

19  DATED this 1st day of April, 2022.

20

21

22

23

24            CHRISTINE L. WESNER, RPR, CSR #10767
              Official Shorthand Reporter
25            Vallejo, California

26

27

28
```

**$**

**$10**  36:11

**$11**  36:11

**-**

**---ooo---**  3:23 4:2

**0**

**03**  13:12

**1**

**10**  30:24,25 32:4

**10767**  4:13

**10th**  11:8

**1103**  46:21 47:23 50:4,5 55:19,21

**13**  34:2

**15**  57:26

**16**  41:4

**2**

**2**  23:22

**20**  3:7 33:10 36:10 57:16,26

**2000's**  15:2

**2003**  33:9,28 34:2

**2006**  44:10

**2007**  33:11

**2009**  33:12

**2010**  51:3

**2012**  33:3,5

**2013**  34:7 38:1 40:26

**2014**  38:9 51:19

**2015**  59:21

**2016**  11:16,17 15:5,6 20:3 21:18 22:9 29:7 38:26 40:7 41:13

**2017**  28:26 29:9 41:4

**2018**  11:8,9 15:14,18 17:14 18:16 26:25 33:4 41:9,10,15 46:9 51:13 58:21

**2019**  18:23 19:20 49:11, 23,24,28

**2021**  51:2 60:26

**2022**  2:2 4:1

**22**  2:2 4:1

**25**  3:8

**3**

**31st**  21:18 22:9

**32**  3:10

**4**

**4**  2:3 3:7

**40**  37:17

**402**  55:20

**5**

**50**  54:6

**51**  16:28

**8**

**832.7**  56:26

**8:30**  61:26

**A**

**aback**  15:12

**ability**  9:14 16:13

**above-entitled**  4:5

**absolutely**  40:6 42:26

**access**  21:3

**accuse**  26:16,23

**acknowledgment**  22:2

**acquitted**  7:25

**acting**  4:14

**action**  14:1,3 15:9,17 17:15

**actual**  9:28 12:12 35:19

**Adam**  28:5 56:13

**added**  26:17

**additional**  22:18 26:20

**address**  14:25

**admissible**  57:28

**admit**  61:13

**advances**  31:3

**adversarial**  26:14

**advised**  40:27 43:26

**affairs**  12:22,26 13:2,5 14:1,3,7,12 43:22,25 50:21 51:6

**afraid**  36:10

**afternoon**  2:3 3:1 4:1, 25,26 32:8,22,23

**agency**  43:20,24

**agree**  60:7

**agreed**  20:16

**ahead**  5:10 39:25

**alcoholic**  41:23

**alive**  7:22

**alleged**  29:24

**allowed**  55:8

**amended**  51:25

**Amendment**  56:27

**ammunition**  11:25 20:20

**analysis**  30:28

**analyze**  12:24

**Angel**  29:8 30:5

**Angela**  53:14

**angry**  38:19

**Ann**  53:18 58:14,16 59:26

**answering**  40:5,6

**answers**  23:16

**anxiety**  42:4

**anybody's**  40:22

**anymore**  54:3

**apologize**  27:26

**apparently**  19:14 48:17 51:19 59:21

**appears**  10:19,23 32:7

**applied**  50:18 57:1

**appreciated**  5:14

**apprehensions**  8:14

**approach**  10:13 39:3

**approached**  15:14 41:23 42:5

**approval**  13:23

**approve**  13:28

**approved**  13:27 14:22 20:19,20

**April**  24:3 49:28

**AR**  6:2,3 7:5

**areas**  29:22

**Arguably**  9:11

**argument**  28:23

**article**  37:27 41:2

**asks**  53:3

**aspects**  43:23

**assertion**  59:14

**assertions**  46:13

**assess**  32:1

**assigned**  10:23

**assist**  9:28

**Assistand**  4:12

**assistant**  53:19

**assume**  50:9

**assuming**  18:9 61:27

**attend**  44:28

**attention**  23:11

People vs MILANO, DOMINIC JAMES
VCR233208                        March 22, 2022                    Index: attorney..change

**attorney** 4:8,12 43:27, 28

**attributed** 40:4

**audio** 48:28 49:3

**August** 21:18 22:9 40:7

**authority** 44:1

**award** 37:22

**aware** 18:10,12,21,24 25:28 33:23,25,26 37:26 51:24

**awhile** 17:28

_____

**B**

_____

**baby** 7:20

**back** 4:19,27 5:16 6:4 8:11 15:24 16:15 18:17 23:9 24:26 26:26,27 27:4,10 28:24 32:4,8 37:17,18 42:23 46:9,26 47:22 51:3,18,20,21 53:17 55:26 59:21 61:4

**backs** 47:8

**bad** 5:15,21 30:12 31:22 51:5,7 57:2

**badge** 5:3,13,17 6:24 7:27 8:22 9:8,20 10:7 14:27 15:5,10,17 16:10 18:11,13,25,27 19:1,6, 16 21:17,19,20,27 22:1, 9,10,13,25 23:18,27 24:14,21 25:7 26:8,16, 23,26 27:2 28:21,26 29:1,11 30:4,9 33:24,27 34:19,28 35:1,26 37:26, 27 38:6,8 39:3,7,13,16, 18,23 40:21,23,28 41:6 42:15,16,25 43:1,4,9 44:27 45:2,3 47:2,12 48:14,16,26 49:2,3,4,5, 7,9,19,20 51:1,9,15,17, 18 52:5,6,19,22,23 53:6 54:27 55:15 56:25 57:5 58:20,25 59:5 60:11,24, 28 61:2,6,8

**badges** 7:4 8:22 12:4,8 15:9,23,24 16:7 17:11, 20 18:17,22 19:14 24:10,17 26:1 29:6,8,15

**baked** 50:13

**bar** 34:3,8,15 38:2 39:13,20,21 40:8

**Barboa** 29:14,15 30:6, 7,8,21 47:12,20 48:11, 17 50:3

**barricaded** 34:1

**based** 13:23 25:23 26:19 27:8 54:4

**basically** 36:22 44:1 47:7 53:14

**bearing** 58:1

**beating** 6:15,20,28 28:12,15 46:17

**beer** 34:23

**began** 33:9 34:24

**behavior** 23:23 25:19

**Believing** 25:1

**Bell** 19:20

**belt** 23:15 36:7

**bend** 9:14 14:27 15:24 22:10,13,24 25:7 26:7, 12,24 31:5 35:3,26 39:13,16 46:9,26 60:25

**bending** 5:3 7:26 8:21 15:5,10,17 16:10 18:11 19:16 22:1 23:18,27 24:21 26:1 29:12 30:9 33:24,27 37:26,27 39:3 40:20,23 43:9 44:28 45:2,3 47:2,12 48:1,15, 16 49:2,26 55:15 56:25 59:23

**bends** 30:17 31:5 47:20,24 52:24

**bent** 5:13,17 6:23 7:4 8:22 9:8,20 10:7 12:4,8 15:24 18:13 21:17,25, 26 22:9,19 24:10,15,16

**26:16,19,23,26,27 27:2, 3 28:21,24,27 29:2,6,8, 11,15 30:4,11,22 34:28 38:6,8,28 39:6,10,18,23 40:10,22,25 41:21 42:17,22 43:6,16 47:19, 22 48:4 49:6,10,20 51:15,19 59:20

**Bidou** 44:25

**big** 25:1

**bigger** 23:11

**billing** 59:8

**bit** 15:12 61:24

**black** 42:22

**blank** 60:28

**Blue** 38:2

**board** 9:25 10:6,26 12:3,15 13:19,26 14:17

**boards** 10:20

**body** 21:7,9

**bolt** 51:17,20 58:21

**bored** 13:22

**bothered** 26:17

**bottom** 11:13

**bounds** 37:11

**Brady** 58:1,6,9,10,11

**bravado** 31:15

**break** 6:9,10 12:19 28:1 30:24,25 32:4,6 42:7

**briefings** 40:19

**Briefly** 25:23

**bring** 8:18 30:23,24,25 34:19 45:6 60:10 61:23

**brings** 5:16 49:13

**broader** 8:26 29:28

**broke** 42:17 43:10

**brother** 35:17,25

**brought** 5:2 48:23,25, 27 60:23

**BRUCE** 4:8

**buddies** 40:20

**bullet** 46:18

**bullets** 28:16

**bunch** 30:9,10 45:25 48:4

**burden** 58:1

**business** 41:27 54:5,8

**buy** 60:28

**buying** 52:13,14 59:11

_____

**C**

_____

**C-O-L-E-M-A-N** 32:17

**cadet** 33:10 36:7,12 44:17

**CALIFORNIA** 4:3,7

**call** 13:13 27:28 48:21 49:16 50:2 51:8 55:8 56:26

**called** 21:3

**calling** 28:18 50:5

**cam** 21:4,9

**cams** 21:7

**captain** 15:27 26:15

**car** 8:6

**card** 52:15

**Cardwell** 53:18 58:15, 16 59:26

**career** 23:2,8 26:12 37:2 41:28 44:20,22,27

**carry** 41:27

**case** 4:19 13:2 20:12, 19,26 46:1 54:13,14,16 55:5 56:2,14 60:1,8 62:6

**catch** 51:21

**categories** 20:16

**caused** 24:17,24 25:17 60:18

**cetera** 35:22 36:24

**change** 31:20

chaos 34:26

characteristic 17:26

chased 8:16

cheap 61:3

Cheatham 19:10

check 16:5 17:10 18:18

checked 16:15 17:2,11

checking 24:12

chest 28:26

chief 12:27 13:23,26 44:24,25 53:2,15 60:27

chiefs 44:21

chose 36:24

CHRISTINE 4:13

Christmas 59:12

chrome 61:2,3,4,8

CHRONOLOGICAL 3:2

circumstance 13:20 36:4 40:1

circumstances 36:14

city 4:11,12 17:1 32:28 33:9,14,16,22 36:16,17 53:19 54:6,7 58:23,27 59:7

clarify 5:9 12:20 28:19, 20,27 61:1

Clayton 28:5 56:13

clean 46:9

clear 8:20,21 21:9 31:16,18 48:23 60:18

cleared 50:9,10

clearing 13:16

CLERK 32:15

client 54:13

close 5:19

club 34:21

co-workers 23:20

Coban 21:3

Coleman 3:9 6:23 27:28 28:10,19,27 29:2, 6,13,23 30:3,21,23,24 31:24 32:8,10,17,20 40:7 44:9 46:6,7 56:14 61:21

collateral 25:16

collection 12:14

college 36:13

command 26:14

communication 28:11 53:21

community 55:4

company 51:1 53:3,6 54:16

compel 43:26

compelling 43:24

competition 53:27

completely 6:14

conceal 51:10

concern 11:26 25:1 29:19 55:4 59:28

concerted 51:9

concluded 62:11

Concord 5:12,18 35:18

conduct 35:20

conducting 43:25

conflicted 37:3,5,23

confronted 15:5,8 26:25

conjecture 6:11 26:18

connected 8:23 18:1,5

consistent 51:28 52:1

constitutionally 50:18 56:28

contact 15:22 18:16 43:8,27

contacted 15:19 43:11, 27 58:28 60:20

continued 3:7 4:24 33:10 35:16

contribution 11:24

control 39:26

convened 11:18

conversation 15:16,18 19:15 53:15

conversations 24:5 28:17

cooperative 54:17

copy 10:10 13:15

corporal 34:22 35:4,5 37:8 42:27 45:12 48:25 49:9,19,20 60:11

correct 5:7 6:1,18 9:5 15:10 18:20 19:3,4 33:15 34:9 35:9,13 37:24 38:18,27 41:20 58:4

corrected 16:6,16

corrective 15:17 17:15

corroborate 47:11

counsel 4:20 32:7

County 4:8,10,14 32:25

couple 14:24 25:6 28:10 29:9 50:11 57:12

courage 36:26

courageousness 36:26

court 4:19 5:10 10:14 16:24 19:26 22:23 23:17,26 24:1,9,16,20, 23 25:5,9,11,13,16,22, 23 27:20,22,25,27 28:2, 7 29:16 30:13,23 31:10 32:7,18 40:1 44:13,16, 21,26 45:6,10,14,18,20, 22,28 46:5,15 47:2,5, 16,24 48:4,10,19 49:17, 21 50:1,17 51:4,11,22 52:28 53:7,9,21 54:10, 24 55:7 56:4,12 57:8,23 58:9,14 59:2,7,24 60:14,16 61:10 62:2,5,9

cover-up 61:9

CR 11:17

crack 26:28

cracked 42:19,21

cracks 27:2

create 27:12 40:1

created 23:19

creating 50:21

credit 52:15

CRI 13:10

crimes 56:16

criteria 36:25

critical 9:25 10:6,11 12:15,21,25,28 13:19 14:7,16 20:28 21:5 22:2 34:1

criticisms 50:4

Cross-examination 3:7 20:1

CSR 4:13

cuff 19:13

curious 56:21 60:7

custody 7:22

D

DA's 9:12 12:12

damage 23:22

Dan 5:12,13

DANIEL 4:6

Darst 53:12 58:15,16, 22 59:26

dash 21:4,9

date 11:13,18 33:28

dates 46:8

dating 51:2

David 15:20 20:4 21:13 40:8 46:3,5,6

dawn 52:2

dawned 52:6

day 4:5 28:3 40:17,20 41:24 42:24

daylight 61:23

**days** 28:25 46:25

**dead** 7:6

**deal** 25:19 50:6

**dealing** 7:24 26:22 42:4

**decades** 50:11

**decide** 12:25

**decided** 46:26

**decision** 36:22

**declaration** 60:11

**Defendant** 3:5,18 4:9

**Defenders** 4:10

**defense** 58:8

**deficient** 50:18 57:1

**defined** 31:25

**definition** 31:20

**degree** 31:19,23

**demanded** 56:26

**demonstration** 21:23

**denies** 28:15

**denying** 57:15

**department** 9:26 10:22 12:23,24 13:11 20:7,14 21:7 23:13,20 34:3 35:20,23 36:6,9,19 37:10,16,21 40:27 43:5, 9,15 44:3 50:19 51:2,7 53:13 54:1 57:1

**deputy** 4:8,10 32:20, 24,25

**describe** 31:13

**description** 3:15 31:21

**DESCRIPTIONID** 3:19

**deserved** 26:19

**designed** 17:22

**detached** 18:3

**Detective** 25:27

**determine** 20:6

**dialing** 31:2

**die** 5:24

**digital** 13:14

**dinner** 38:14,17,22

**direct** 3:7,10 4:24 11:11 25:5 32:19 47:21 48:20 55:25

**directive** 43:6

**directly** 8:23 29:24 30:20,26 55:9 58:25

**discern** 29:10

**discharging** 9:3

**disciplining** 50:22

**disclose** 58:2

**disclosed** 57:13

**discovery** 51:25 56:24

**discuss** 24:27 25:9 58:5

**discussed** 24:6 52:27

**discussing** 4:27 46:26

**discussion** 10:22 25:26 29:28 31:3 55:18, 20,22 57:18 58:17 61:11

**discussions** 23:26 24:1,2,20

**disfigured** 27:3

**distance** 8:9

**District** 4:8

**division** 13:5 20:8

**document** 10:15 12:2

**documents** 50:21

**DOMINIC** 4:3

**don't--** 53:28

**double** 16:5,15 17:2,10 18:18

**doubt** 16:18 17:4

**dozens** 57:15

**drag** 60:12

**drawn** 61:18

**drinking** 26:22 48:14

**driving** 56:1,4

**dubious** 36:2

**ducks** 7:17

**due** 29:18

**duly** 32:11

**Duncan** 56:9

**Dustin** 34:22 37:6

**duty** 21:26 28:26 35:1 48:26 51:17,18 58:20

---

**E**

**ear** 31:24 61:15

**earlier** 5:7 11:26 24:10 29:5 41:1 60:19 61:5

**early** 15:2 33:3 49:2

**earn** 24:28

**Ed** 50:28 53:3,6,22 54:16 56:1 58:15 60:6

**effect** 22:27 41:21

**effort** 52:4

**efforts** 5:14 51:10 57:26

**egregious** 42:10

**Elizabeth** 53:5,12 58:17

**else's** 39:23 40:24

**email** 53:7 58:20,22 60:26

**emails** 50:26,28 53:11 54:2 60:27

**emotionally** 35:22

**emotions** 39:26

**employed** 32:25,27,28 33:12,13 43:24

**employment** 33:9,22 43:4

**enamel** 27:2 42:21

**endure** 37:1

**enforcement** 6:4 36:21

**engage** 24:18

**engaged** 9:9 11:6 31:14

**engaging** 24:23

**enthusiasm** 31:15

**enthusiastically** 24:24

**entire** 36:17 37:9 51:6 56:28

**entitled** 56:19

**equipment** 8:5,9 20:9

**essentially** 14:11 37:12

**established** 47:16 48:5

**esteem** 37:9 41:28 42:1

**estimating** 41:14

**Estrada** 48:8 55:14 58:13,14 60:2 62:2

**evaluate** 20:9

**event** 7:18 22:3,9 31:27 37:7 44:16 46:28 47:2 55:9

**events** 29:18 31:4

**eventually** 36:15,20

**everybody's** 19:6 43:13

**EVID** 3:15,19

**evidence** 12:13 20:26 51:12 55:27

**evolve** 25:13

**evolved** 13:11

**exacerbates** 25:4

**Examination** 3:7,8,10 4:24 25:25 32:19

**examine** 52:23

**examined** 32:12

**EXHIBITS** 3:13,16,20

**experience** 23:15 37:22

**experienced** 44:2

People vs MILANO, DOMINIC JAMES
VCR233208                                March 22, 2022                          Index: experiencing..heard

**experiencing** 37:26

**expert** 20:3,6,28

**explain** 12:10 35:14

**explantation** 56:17

**exposure** 23:12

**extent** 24:16

**extremely** 31:8 54:17

___

**F**

___

**f-ing** 19:14

**face** 38:21

**facette** 10:21

**fact** 7:5,16 8:15 10:26 14:24 16:14 17:12 22:16 26:7 27:12 28:23 29:17 31:12 42:6 50:6, 12 51:24

**fair** 9:6 45:11

**fairly** 29:10

**faith** 51:6,7 57:2 59:14

**false** 39:11,12 40:13,14

**falsehoods** 40:3

**familiar** 27:1

**family** 54:5

**fascinating** 57:20,23

**fatal** 8:24 13:1,8

**feeding** 30:16

**feeling** 26:18 28:15 30:1 36:3 37:4,14 52:11

**feelings** 37:23 57:9 60:17

**felt** 5:15,21 6:28 20:13 26:20 36:26 51:27

**fighting** 39:26

**figure** 17:5

**figured** 50:24

**file** 54:14

**files** 54:19

**Filloy** 3:7,8,10 4:9,22, 23,25 5:11 10:13,15

16:20,26 19:23 25:22, 23,26 27:18,28 28:6,9 30:2,14 31:8 32:18,20 44:8 45:15,16,21,25 46:3,6,16 47:4,7,19 48:3,8,11,20 49:18,22 50:2 51:12 52:3 53:2,8, 11,23 54:12 56:2,6,23 57:21 58:13,16 59:4,10 60:13,15,22 61:19 62:4

**final** 13:23

**find** 51:4 56:12 57:27

**finding** 50:17 62:5

**findings** 57:27

**finds** 13:28

**finished** 10:17 34:16

**firearm** 9:3

**firearms** 20:8

**fired** 5:18 6:5 56:5,8

**fix** 12:17 15:9,23 17:11, 20 18:17 40:27 41:6 42:14 43:3 51:15

**fixed** 16:6 17:12 42:16, 19

**flat** 59:5,19,21

**Flynn** 3:7 4:8 16:21,23 17:2 19:26,27 20:2 22:21 25:24 27:20,21 44:14,15 55:2,6 57:9 58:1,4

**focus** 29:16

**folks** 18:6 29:26 31:12 47:13

**follow** 17:4

**foolish** 25:2

**force** 11:2 13:12,13,15, 18 14:22 20:3,6,7,8,12, 28 50:5,23

**fork** 61:18

**formal** 15:16 21:5

**forthcoming** 16:12 45:21

**forward** 36:8

**found** 5:23 6:12 12:28 13:26 19:8 34:21

**fourth** 20:18

**fragment** 6:6

**frame** 15:7 17:14

**frank** 36:10

**Frankly** 56:1

**frequently** 7:12

**friends** 61:16

**front** 29:2 39:14

**fuck** 40:19

**full** 7:12 32:15 56:16

**fumble** 6:8

___

**G**

___

**gained** 36:15

**gal** 23:6

**Galios** 29:7 38:25 39:6, 9

**Galios'** 29:6 38:28

**Galios's** 6:24

**gave** 49:2

**general** 55:3

**generalized** 55:18

**generally** 13:1

**genesis** 24:1,2

**Giordan's** 47:8

**Giordano** 16:9,14,18, 28 43:17 48:21,22,24 49:8,12,13 51:5,27 52:5,18 56:19 57:4 58:13,14 60:2,9,24 61:8 62:2

**Giordano's** 30:16

**give** 16:9 31:17 34:17 43:17,19,28 47:28 48:10 50:27 54:10

**giving** 23:12 43:5

**glad** 61:20,22

**glorified** 50:12

**Golinveaux** 5:12,17

**good** 4:25,26 9:10,20 12:19 17:26 18:3 23:13, 16 30:14 32:8,22,23 59:14,17,19

**grabbed** 38:13

**grand** 61:16

**granting** 62:3

**group** 55:28

**growing** 36:28

**guess** 7:10 17:3 22:28 23:17 29:23 46:1 52:17 57:8 58:1 60:2,4

**gun** 7:21 36:6 44:16

**guy** 7:18 23:5,6 38:4 54:16

**guys** 7:14 8:12 13:2 14:6 16:3,4 18:7 19:14 25:3 30:10 31:17 60:25

___

**H**

___

**hairy** 8:27

**hall** 48:12,13,17

**hallway** 41:5 42:13

**hand** 10:15

**handled** 35:21

**hands** 41:24

**happen** 30:9 39:28 40:15,16 59:10

**happened** 6:16 10:2 26:10 27:11 30:4,8 36:11 41:18 46:7,20 47:2 49:27 50:3 56:15

**happening** 37:20

**happy** 36:26

**hard** 7:9 23:4

**head** 8:3 36:7 43:20

**Headley** 54:17

**HEALY** 4:6

**hear** 45:3 46:12 59:26

**heard** 18:25 28:22

People vs MILANO, DOMINIC JAMES
VCR233208                        March 22, 2022                    Index: hearing..Jeremy

30:15 51:12 55:17

**hearing** 4:6 19:9 44:27
52:12,18 61:20

**helped** 61:23

**helping** 23:3,10

**hey** 24:27

**high** 37:8 41:27 42:1,3

**high-stress** 7:15

**higher** 23:14 36:19

**highly** 26:13

**hindsight** 23:17 24:27
31:12 51:27 54:25

**Hines** 34:11 35:6

**history** 36:4

**hit** 5:21,22,28 8:3,16
28:16 46:23 61:18

**hitting** 30:18

**holding** 15:6

**home** 26:21

**honest** 16:12

**Honestly** 44:19

**Honor** 19:27 27:21
44:15 45:19 52:21 60:6
62:8

**Honorable** 4:6

**hook** 62:8

**Horton** 15:5,14 17:6,17
26:16,25 27:6 57:19,24

**hospital** 5:27

**hour** 36:11

**house** 13:16

**HR** 57:25

**Huff** 15:21 16:4 17:19,
22,25,28 18:5,19,28
19:1

**human** 6:7

**hundred** 14:28 39:10,
12 40:13,14

**hunted** 24:7

**I**

**IA** 13:14 14:26 20:18

**IA's** 13:20

**Iacono** 57:24

**ID** 3:15

**idea** 23:16 24:24 40:24
55:26

**identical** 51:18

**identified** 24:10 29:22

**identifying** 29:17

**impeaches** 46:12

**impeaching** 46:7

**impeachment** 47:21
48:20

**implication** 48:4

**implying** 53:21

**important** 46:8 61:15

**importantly** 29:1

**improvements** 20:10

**inaccurate** 41:3

**inadequacy** 50:20

**incentive** 27:12 50:13

**incentivized** 50:12

**incident** 7:15 8:15,24,
27 9:25 10:6,11,25
11:13,19 12:15,17,21,
23,26,28 13:2,8,19
14:7,17 15:4,11 17:16
20:3 21:1,5,6,12,18
26:12,19 34:1,10,13

**incidents** 12:7 16:1
29:20,26

**inclined** 60:7

**including** 31:13 51:11

**incredible** 52:7

**incredibly** 38:12

**independently** 46:25

**INDEX** 3:1

**individual** 5:21

**informal** 37:15

**information** 5:27 52:4
58:19

**informed** 43:21,23

**Ingstrum** 47:23

**initial** 5:17

**initiated** 12:27

**inquiry** 29:22 52:8

**insights** 27:10

**inspect** 18:27 19:6

**inspected** 19:1

**inspection** 18:22,24,
26 19:8,18 49:25

**inspections** 19:11

**institution** 50:11

**institutional** 50:13

**intend** 44:5 50:10

**intent** 56:16

**interaction** 28:20
38:10

**interconnected** 14:19

**interesting** 52:12,16,
17 55:4 57:19 60:23
61:17

**internal** 12:16,22,23,26
13:2,5,9 14:1,3,6,12
43:22,25 50:21 51:6

**interpreted** 59:9

**interpreting** 12:11

**interview** 7:12 16:9,10,
27 34:16 43:17,28
46:17 47:9 48:24 49:3
60:10

**interviewing** 49:12

**interviews** 30:15 47:15
48:22 49:1

**invest** 13:17

**investigate** 52:20

**investigated** 57:6

**investigating** 16:10

**investigation** 9:12
10:1 12:3,9,12,13,22,26
13:9 14:7,26 43:22,25
51:5 52:10 58:7

**investigator** 54:18

**investigators** 20:27

**invoice** 58:21,23,24

**invoices** 50:26,28
54:2,7

**involved** 9:24 10:3
11:3 12:2,8 18:14 21:18
22:2,11 33:17,28 35:5
38:2,25 46:4 48:16
51:14

**involvement** 29:25
40:4

**involvements** 22:18

**involves** 30:10

**involving** 20:3 21:13
29:13,21 34:10 38:4
44:16 55:9,27

**ironic** 56:13

**irrelevant** 55:18

**issue** 5:16,18,21 16:6
19:16 28:3 43:9 46:24
50:4 59:28

**issued** 51:18

**issues** 16:16 26:13
29:21 30:26 52:13 55:3
59:27

**item** 58:24

**itemized** 47:28

**J**

**Jacobsen** 29:12,25
30:19

**Jacobsen's** 29:1,11
30:4 39:13,16

**Jake** 48:8

**jammed** 7:5,21

**January** 29:9

**Jeremy** 15:21 17:19
18:28 19:1

**job** 9:4,10,13 11:22 22:17 36:14

**John** 41:25,26

**Jones** 50:28 53:3,6,22 54:16 56:21 58:15 60:6

**Joseph** 34:23 35:4,5, 12 37:6,8

**Joseph's** 35:3

**Josh** 6:23 29:2,13 30:3, 21 40:7

**Joshua** 3:9 32:10,17

**judge** 4:6,23 10:13 16:20 19:23 22:22 25:26 27:8,19 50:15 53:2 56:23 57:22 60:23

**June** 49:24 58:20

**jury** 32:1,2 50:6,10 61:16

**justified** 9:10

**K**

**K-9** 21:23

**KATELYN** 4:11

**Kent** 3:6 4:20 29:2 31:18 34:5,18,21,23 36:4,5,9,18 38:10,12,28 39:6,10,14,20,21 40:9, 17,25 41:4,23 43:3 44:11 46:16 51:19 52:1 58:9

**kick** 13:20

**killed** 7:18 8:16

**killing** 8:23 30:17

**kind** 6:15 8:9 9:16 13:16 18:19 23:12 26:21 46:8,21 47:9 50:14 51:27 54:28 55:17

**Knight** 4:11 51:23 52:21 53:14 60:6,23 61:28 62:7

**knowing** 41:2

**knowledge** 24:17 25:7 26:4 57:15

**Komoda** 6:20 8:13 10:7 12:4 15:20,22 16:5,15 17:10 18:16 20:4 21:13,17 22:8 28:11,14,24,25 29:22 30:27 31:10,22,27 40:8 46:10,17,25 47:1,24 48:6,12,16,18,22 49:18 50:7 51:11,13 55:10,27 56:7,20 58:19,25 60:10, 17

**Komoda's** 28:21 46:12,19 47:22 56:4 58:20

**KRAUSE** 4:10

**L**

**lack** 13:14

**lady** 54:4

**language** 19:13

**late** 23:1 60:26

**launch** 58:18

**law** 6:4 36:21 42:8

**learn** 24:25

**learning** 25:20

**left** 13:12 31:28 41:8, 10,19 44:3

**legal** 43:23 44:1 54:14 56:26

**legality** 20:14

**lengthy** 7:12 9:12 16:9 50:19

**lethal** 13:18

**letter** 53:16

**lettering** 42:22

**letters** 42:17,19

**letting** 5:14

**level** 18:1,6 20:6 41:28 42:1,3

**liability** 23:19

**lied** 31:9

**lieutenant** 18:2 19:10 26:8,15 34:6 42:2,3

44:23,24 45:13

**lieutenant's** 22:25

**life** 34:27 42:12

**lifetime** 36:8

**lines** 22:25

**list** 47:28

**litigating** 29:19

**lived** 36:12

**living** 32:24

**local** 37:28

**long** 15:2 24:12 29:7 33:2 51:7 52:25 61:26, 27 62:7

**looked** 11:4 27:15,16 44:2 52:26 59:15 61:6

**lot** 7:24 8:8,14 23:5 25:17 26:20 44:2 45:28 47:9 50:24 51:28 52:1 53:11 56:1 57:5,18 61:17,21

**lots** 47:16

**lucrative** 54:5

**lunch** 5:8

**lying** 28:24

**M**

**made** 36:15 50:4 52:27

**maintaining** 50:21

**make** 4:28 8:20 15:26 38:1 50:17,19 54:28 55:24 57:2,3 59:14

**maker** 36:23

**making** 28:7 36:11,13

**male** 37:17

**managed** 7:18,22

**management** 57:19,25

**manager** 53:19

**manner** 9:4 35:19

**manual** 42:8

**March** 2:2 4:1 49:11,23,

27

**Mark** 6:24 19:16 38:25, 28 39:9

**Martin** 38:8,19

**MASTER** 3:1

**material** 61:1

**materials** 20:23

**Matt** 20:4 21:13 22:8 30:4 40:8 48:22 50:7 60:10

**matter** 22:17

**matters** 31:16

**mature** 22:24,26 27:9

**matured** 23:1

**maturing** 26:6

**maturity** 24:27

**Mauer** 53:24

**Mccoy** 48:13 49:25,26

**Mcdonough** 47:6,7 48:7 52:14 55:11 59:3, 4,6,17

**Mclaughlin** 6:20 8:13 15:20,22 16:6,15 17:11 18:17 20:4 21:13 24:21 28:12,18 40:9 46:3,5,6, 8,17,25,27 47:8 49:13 55:9 58:13,14 59:4,6,18 60:2 62:2

**Mclaughlin's** 10:7 12:4 52:15

**Mclaughlins** 46:2

**Mcmann** 58:10

**meaning** 25:11 38:23

**means** 32:1

**meant** 22:1

**medal** 37:15

**medals** 37:16

**media** 61:16

**meet** 11:18

**meeting** 5:12 10:19,20 11:6 18:26 36:25 45:1, 6,7,13 58:5

meetings 45:12

members 43:8

mention 40:22

mentioned 45:1 52:28

mercifully 48:1

mesh 46:28

message 34:18

met 36:5

metal 12:1 49:7,14,18

middle 30:8 51:2,13

Mike 43:27,28

Milano 4:4 32:7 50:8
  55:23,24 56:2,6,8

Milano's 4:19 32:2
  55:5 60:1,8

military 6:6

mine 5:23 40:25

minimal 47:9

minute 28:2 30:24,25

minutes 32:4

missed 6:13,17

missing 58:3

mixed 37:14 57:9 60:16

modifications 14:23

moment 37:14 38:12

moments 34:26

money 59:12

month 41:8

months 29:9 62:10

morning 4:27 44:28
  50:16 58:4

motion 60:19 62:3

motions 56:24

move 8:19

moved 42:12

moving 36:8

multiple 30:11,17,18
  47:20 51:9 52:13 54:15

muttered 41:5

myopic 23:9

N

naive 25:2

named 38:4

Napa 32:25

narrative 11:15 52:1

nature 28:10,13 31:20

necessarily 8:12,17
  13:1,19 15:6,12 31:21
  35:28 47:13,14 55:5

needed 14:24 15:23
  36:14 43:28

needing 59:1

negative 7:24

news 37:28

nice 34:24

Nichelini 44:23,24

NICK 4:9

nickname 41:25

night 26:21

non-city 58:24

noticeable 27:3

noticed 43:21,26

November 11:16,17

number 23:19,22 40:19
  55:3 60:28

O

oath 4:21 47:14

objected 48:3

obligation 44:2

occasion 43:1

occasions 54:15

occur 11:7 21:6 25:1
  26:12

occurred 7:4 11:8 12:4
  14:4 27:9 31:5 34:15

37:25 38:11

occurring 18:24 19:18
  40:24

October 29:7

odd 53:27

offense 42:10

offer 46:1

offhand 11:5

office 21:24 28:26
  32:26 58:5

officer 7:15 8:1 9:4
  21:17 22:3,8 23:27
  24:20 27:28 28:10,14,
  17,18,24,25,27 29:1,21,
  23 31:21 32:7 33:1,2,3,
  5,12,14,16,23 34:22
  35:3,10 36:16 37:6 44:9
  45:12 48:26 49:19 50:8
  51:17,18 55:8,10,27
  56:14

officer's 12:8 60:21

officer-involved 9:18
  10:1 13:7 18:15 33:17
  34:17

officers 8:22 15:22
  20:4,7 21:13,14 27:13
  31:4 49:12 52:20 55:28
  57:17 58:12 59:11 61:6

Official 4:14

older 41:28

omission 52:7

ongoing 13:9

open 28:4

operated 51:7 57:2

opinion 20:11,13 23:1
  25:2 51:10 55:6 61:4

opinions 57:26,27

opposed 30:13

order 3:2 16:19 17:5
  20:22 44:4 51:25 58:25

ordered 49:23 61:6

orders 51:1,17 52:25
  59:20

Oregon 26:12,19

organization 44:4

outcome 20:15

outer 11:28

outgoing 18:7

owner 53:5

owns 54:16

P

pages 57:15,18,23,26,
  27

paint 27:2

paperwork 13:22

paragraph 11:14

pardon 11:1 19:13
  26:15

part 6:11 25:3 26:11,18
  52:5,10 58:1

participate 20:22

parties 4:20

pay 58:26,27 59:1 60:28

paying 23:11 52:14

pending 56:24

penetrate 6:7 8:6

penetrated 11:27

people 3:14 4:3,7 8:5
  14:14 15:9,19 17:23
  22:4 23:4,11 24:7 25:18
  29:15 30:16,22 34:25,
  26 35:22 36:19 37:12
  41:27 50:24 51:14
  57:15 59:13,22

people's 23:1 26:1
  54:27

Peppermill 5:13

perceive 35:23 36:27

percent 14:28 39:11,12
  40:13,14

perception 23:21

percipient 46:27

Case 2:20-cv-01563-DAD-SCR     Document 112-13     Filed 12/06/24     Page 73 of 77
People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022                    Index: perform..recognize

**perform** 8:17 28:16 46:19

**performance** 5:15 7:1, 28 8:12 44:11 46:13, 15

**performed** 6:17 7:14, 16

**performing** 11:25

**period** 7:3 36:21 41:18

**person** 5:2 6:13 10:23 36:9,18,25,28 40:18 43:24 44:12 56:7

**persona** 41:26

**personal** 25:2 26:13

**personally** 14:3 61:1

**persons** 52:13

**phone** 53:15,18

**picture** 23:11

**piece** 36:26

**Pitchess** 50:17 56:28

**place** 29:28 30:1

**places** 25:16 61:16,17

**plan** 28:18 50:5

**platform** 6:3

**play** 31:24 61:14

**POA** 48:12,13,17 55:15

**point** 18:12,18,21 19:10,15 22:24 25:20, 28 26:7 28:25 31:16 33:6,22 34:27 41:28 47:18 50:16 51:4 52:24 53:3 55:20,22 59:7,26

**pointing** 11:14

**points** 22:19 30:11 47:21

**police** 7:15 9:3,26 10:1 21:7 22:3 23:23 33:1,2, 3,5,10,11,12,13,16,23 34:3 36:6,8,16 37:9,16, 21 42:18 43:5,9,15 44:3,21 50:8,19 51:1,7 53:13 54:1 57:1 60:11

**policy** 20:7,14 42:8,9

**popped** 42:22

**population** 32:1

**portion** 16:27 54:14

**position** 36:15

**positioning** 56:5

**positive** 35:27

**positives** 8:18

**post** 24:2

**post-work** 24:8

**Postolaki** 10:19,24

**Postolaki's** 11:22

**potentially** 55:16

**poured** 34:23

**Powell** 28:5 56:13

**Poyser** 23:27 25:27 29:26

**practice** 24:18,25 27:12 51:10

**practices** 52:8,20 54:27

**prelim** 55:26

**present** 4:9,13,20 35:10 39:18,20,21,23 40:8 59:5,17

**presented** 52:3 60:4

**presents** 59:12,13

**press** 7:13

**pressure** 26:20

**pretty** 7:2,7 18:1,3 21:9 25:2 30:7 31:16,18,25 43:15 48:27 49:14 50:19 57:4 59:16

**previously** 18:13

**prices** 53:27

**prior** 18:24 19:18 21:2, 23 33:5 41:11,12

**private** 21:16

**problem** 23:18 25:4

**problems** 25:18 56:15

**procedural** 20:17

**proceedings** 4:16 62:11

**process** 37:15 56:28

**profession** 37:1

**professional** 13:5 14:10,11 35:20

**program** 36:12

**progression** 5:1

**projectile** 6:5,12

**projectiles** 11:27

**promoted** 42:3,28

**proof** 46:2

**propensity** 46:22 47:23 55:27

**proper** 50:22

**prospective** 42:6

**protocol** 13:2

**provide** 53:24,25

**provided** 17:1

**public** 4:10 22:1,4 23:22,23 55:4 56:25 61:7

**publicized** 26:13

**publicly** 62:10

**pull** 56:9

**pulled** 21:24

**pure** 47:22

**purposes** 30:28

**put** 12:21 18:17,19 36:6,7

**Q**

**quash** 62:3

**question** 8:5,11 12:19 23:16 25:23 45:4 46:14 48:2 49:16,17 57:10 59:19

**questionable** 9:19 59:20

**questioned** 46:13,15

**questioning** 8:8

**questions** 19:27 20:20 22:21 27:8 44:14 55:15 57:6 60:9 61:11,27

**quick** 38:1 60:16

**quotes** 38:15

**R**

**racking** 47:21

**rails** 25:6

**Rains** 43:27 44:1,24

**Ramos** 29:8 30:5

**Ramrakha** 50:2 55:19

**Ramrakha's** 14:27

**range** 5:19

**rank** 23:14

**Raphael** 38:8

**rarely** 10:3

**reach** 52:5

**reached** 52:10,19,21 53:2

**read** 31:17 48:27 56:12 57:10,11

**reading** 42:8 51:27 54:26

**real** 30:12

**reason** 7:21 22:13 51:25 59:17,25

**recall** 7:3 9:21 10:5 11:3 12:7 14:22 15:28 16:2,14 18:13 19:19,25 20:13,18 21:8,16,28 53:9

**recalls** 48:1

**received** 34:18 53:16 54:4

**reckless** 25:2 36:18

**recklessness** 25:18

**recognition** 8:26 9:3,8 35:27 37:22

**recognize** 25:13 27:11

People vs MILANO, DOMINIC JAMES
VCR233208                          March 22, 2022                    Index: recognized..shooting

34:25

**recognized** 36:21,25
37:14

**recognizing** 6:19

**recollect** 8:12

**recollection** 7:26
10:10 16:24 17:8 52:24
53:1

**recommendation**
13:24,27

**recommended** 14:24

**reconsider** 60:19

**record** 4:19 16:28
32:16 50:20 57:2,3

**recording** 16:22

**records** 5:27 51:9
52:25 53:4,24,25,28
54:2,12,18 56:25 57:5
61:5

**Redirect** 3:8 25:25

**reference** 28:8

**references** 52:11

**referencing** 25:27
50:25

**referral** 20:17

**referred** 14:25

**referring** 53:13,17

**reflected** 31:22

**reflection** 31:19,23

**refresh** 10:10 16:24
17:8

**refuse** 53:25 54:7

**refused** 53:23 54:9

**regular** 43:1

**regularly** 4:5

**rehash** 44:5

**related** 30:26 36:1

**relates** 29:24 58:24

**relating** 51:1

**relationship** 54:6

**relay** 28:3 34:3,8,15,20
40:8 47:3

**released** 54:14,20 62:9

**relevance** 29:20 47:17,
25

**relevant** 31:10,11,21
45:28 48:6 54:28 55:5,
12,16,23,25 56:22
57:13,25,28 59:28 60:8,
17 61:19

**remedy** 50:18

**remember** 10:18 11:5,
25 16:18 17:7 18:12
21:8,11 28:5,7,8 43:4
52:26 53:9 56:1,4

**remind** 51:16

**remorse** 31:19,23

**render** 20:11

**repairing** 52:8

**replacing** 52:8

**reply** 53:17

**report** 10:23 13:15
17:16 21:1 24:3,5 44:17
49:2,6 51:28 52:2,4,26
57:10,11,13 61:9 62:9

**Reporter** 4:14

**reporting** 13:13

**reports** 10:20 20:27

**representative** 14:9,
16 29:14 30:20

**representatives** 10:21

**represented** 4:7,9,11

**reread** 55:26

**respect** 20:2 22:8
37:12

**respected** 36:20

**respond** 53:22

**rest** 30:27 31:28 60:4

**result** 14:1

**retired** 34:6

**return** 33:14

**returned** 21:19

**review** 5:8 9:25 10:6,
11,16,20,25,26 11:3,5,
6,19,21,24 12:2,3,15,
16,21,23,28 13:19,22,
23,28 14:17 16:20 17:7
20:5,22,23 21:4,5

**reviewed** 10:6 13:18
21:12

**reviewing** 10:17 17:8
50:22

**reviews** 14:8

**revisit** 61:25

**rid** 15:10

**ride** 36:5

**Ridgeway** 38:4

**rifle** 5:19

**risking** 36:2

**Ritzie** 35:8

**road** 32:3 51:3 61:14,18
62:6

**Robert** 48:21,22

**Robertson** 43:21

**Rock** 38:2

**role** 10:28 11:21 20:2,5

**rough** 26:11

**round** 8:3,17 10:22

**rounds** 5:22,28 6:2,6
8:3 51:9

**RPR** 4:13

**rule** 40:18

**Ruska** 53:5,12,13,20,
23 58:17

**Ryan** 46:3 58:10

———————————
**S**
———————————

**safety** 51:20

**sample** 52:23 60:24

**Sanjay** 14:27 50:2

**sat** 14:23 21:14 34:23

**scary** 40:18 44:12

**scene** 48:14 56:11

**seat** 36:7

**secrets** 53:27

**section** 13:22 17:3

**seguway** 50:14

**self-critical** 7:27 8:13

**send** 54:20,21,22

**sense** 58:3

**separate** 12:16 13:9
16:1 58:24

**separated** 58:23

**September** 40:7

**sergeant** 15:20 16:4
17:22,25,28 18:1,5,6
34:3,5,7 36:20 37:20
40:18

**sergeants** 19:5

**Session** 2:3 3:1 4:1

**SESSIONS** 2:1

**set** 54:13

**sets** 54:18

**shake** 49:27

**shaken** 7:2,5,7 8:15

**shaking** 38:13,21
41:25

**Shaleen** 53:11 58:15,
16,22 59:26

**share** 51:22

**sheet** 12:1 13:13

**sheriff** 32:25 43:20

**Sheriff's** 32:26

**shock** 38:12

**shoot** 7:20 27:13 38:17
56:6

**shooters** 30:7 48:11

**shooting** 5:17 6:24
8:27 9:9,19,20 10:7
11:7 12:3,9,13 13:4,27
14:4,22 18:15 19:20
20:3 21:18 22:2,3,9,10,

14 29:3,8,11,14,15
30:6,8,10,21 34:10,13,
17 35:5,19,28 36:1
38:2,6,8,11,26 39:1,4,7,
10 40:10 46:23 48:14,
17 50:3,8,9

**shootings** 10:2 13:7
14:5 27:17 30:9,12,18
33:18 47:20 56:9

**Shorthand** 4:14

**shot** 7:19 38:19

**shots** 56:5

**shoulder** 38:13

**show** 16:26 41:24
49:18 50:10 51:9 56:20
60:25

**showed** 49:7,8,9

**shows** 49:3

**sick** 36:27

**sides** 7:23 23:5

**significance** 35:14

**significant** 30:7 31:8
41:18

**silver** 35:1

**similar** 6:21,27

**simply** 56:28

**Simpson** 56:9

**sincerely** 23:25

**single** 41:24

**sir** 5:5,20 6:26 10:27
14:20 17:24 22:23,28
24:22 25:15 27:22,27
32:21 33:7,19,25 34:12,
14 35:2 44:19

**sit** 14:21 21:11 37:7
40:2

**sitting** 7:17 34:21 35:4

**situation** 6:27 27:14,16

**Sixth** 56:27

**sketchy** 29:10

**skin** 11:27

**snippet** 49:1

**sober** 31:13

**sociable** 18:6

**Solano** 4:8,10,15

**somebody's** 9:8

**someone's** 35:26

**sort** 17:26 24:23 37:22
53:26

**sounds** 49:1

**south** 6:24 38:26

**speak** 10:22 44:6 46:11
53:18

**specialized** 36:24

**specific** 9:3 20:13
29:17,19 31:4 36:25
47:17,24 49:14 56:16
58:19

**specifically** 8:1,12
31:27 43:14

**specificity** 31:2

**spelling** 32:15

**spitting** 38:21

**spoke** 17:6

**staff** 18:26 26:14 45:11,
12

**staffing** 44:28 45:6

**standards** 13:5 14:10,
11

**Starbucks** 6:24 38:26
39:10

**start** 8:8 13:3 25:3
31:26 59:8 61:24

**started** 5:3 21:7 23:15
25:4 26:22 35:17 38:13
44:10

**starts** 13:17 56:11

**state** 4:3,7 32:15

**stated** 11:26 35:23

**statement** 5:8 34:17
41:1 47:22 48:8,10
57:17

**stating** 35:16 38:16

**status** 50:12

**Stephanie** 47:5,7
52:14 55:11 59:2,4

**Steve** 19:10

**stipulate** 44:11

**stole** 38:14,16,22

**stories** 37:28

**story** 29:12 30:2 43:10

**story's** 7:13

**strange** 37:14 46:24

**street** 34:2,19,20 38:14

**stress** 25:18

**stressed** 62:8

**stressful** 38:12

**strike** 8:2

**strikes** 8:7

**struggling** 29:17 36:13
62:5

**stuff** 7:24 20:27 21:4
29:25 47:10 49:15
52:16 55:19,25 57:23,
25 58:15 59:3,27 60:18
61:12,17

**stupid** 57:16

**subbed** 45:25

**subject** 8:20 19:24
34:1 43:21 61:25

**submit** 16:21

**subordinate** 19:3

**subpoena** 50:27 54:11,
12,20,21,22 60:14

**subpoenaed** 50:15
53:4 54:13,15 57:21

**subsequent** 19:20
22:14,18 38:1

**suggested** 5:28

**summary** 49:6

**super** 7:13

**supervisor** 21:4 42:11

**supportive** 7:13

**supports** 46:12

**suppose** 28:3,4

**supposed** 8:7 24:4
35:24

**surface** 11:28

**surprised** 54:3

**survival** 8:26

**survived** 8:4,27

**suspect** 7:17,25 8:2,3,
16

**suspect's** 7:5

**suspicion** 26:21

**suspicious** 59:15

**SWAT** 36:22,23

**swear** 32:8

**sworn** 32:11 33:11
36:16

**system** 21:4 50:20 51:6

**T**

**table** 10:22 34:21 51:26

**Taco** 19:20

**tactical** 6:28

**tactically** 46:19

**talk** 12:15 19:9 24:8
28:2 35:24 40:3,21
45:26 50:3 51:8

**talked** 9:24 18:6 19:10
40:21 43:13,14,15 46:2

**talking** 12:18 26:6 40:1
42:21 44:6 47:21 50:16
56:2 57:3,4

**tangential** 55:12

**tape** 16:22

**tasked** 19:5

**team** 36:22,23 41:25

**Ted** 10:19 11:22

**telling** 16:14,18 29:13
37:13 38:14,22 43:3

**tentatively** 55:7

People vs MILANO, DOMINIC JAMES
VCR233208

March 22, 2022

Index: tenuous..whittling

**tenuous** 23:23

**term** 13:14 36:3

**terms** 31:14 50:21 52:8

**Terry** 24:6 25:27

**testified** 32:12

**testify** 53:5 55:9

**testimony** 29:24

**text** 34:18

**thing** 5:1 8:10,23 9:12 12:16 22:5 24:23,26,28 25:11,13 29:18,25 30:16,19 31:1,12,22 39:27 43:16 46:21 47:14 48:5,28 54:26 55:11,17 56:21 57:6,16, 19 59:2,4 60:6,19 61:9, 21

**things** 7:9 8:8 9:15 12:17 23:3,4,10,13 26:17,22 28:10 29:18 30:28 31:26 37:1 44:5, 28 46:11 51:24 57:14 58:11 59:9,12 61:5 62:10

**thinking** 12:12 23:10, 13 55:2,3 60:20 61:13

**Thompson** 19:16

**thought** 6:16 9:8,18,19 17:26 18:3 29:4 47:27 48:3 52:21 54:25 61:21

**throwing** 18:3

**tighten** 59:8

**time** 5:8 6:7 7:3,10 9:27 10:2 13:4 15:2,7,8,14 17:6,14 19:3,24 21:12, 24 22:17 24:12 26:11, 25 29:10,28 33:16 34:22 36:5,17,21 37:9, 25 39:28 41:18 42:7,8, 9,27 43:20 45:17 46:8 47:11 50:27 51:7,28 52:25 53:19 59:7

**times** 8:2,17 9:25 23:5

**timing** 47:17 48:5

**tip** 27:1

**tips** 34:28

**today** 21:11 31:3,13,23 40:2 44:6,11 46:17 48:23 51:13 55:17 56:13 57:20 58:28 61:20

**today's** 30:28

**Todd** 35:17

**told** 6:13 15:27,28 17:10 18:9 24:3,13 35:18 37:13 40:17,20 44:1 46:9 58:4

**Tolentino** 35:8,10

**tomorrow** 28:18 45:26 50:15 53:5 57:21 58:13 61:26 62:1

**top** 42:21

**tore** 60:25

**torn** 47:26

**torso** 6:7

**totality** 57:12,17

**totals** 60:21

**tough** 27:22

**town** 7:19

**TRACY** 4:10

**trade** 53:26

**tradition** 5:3 15:10 18:10 33:24,26 35:17

**traditions** 50:13

**trainee** 33:11

**training** 14:23,25 20:9, 17 50:22

**transcript** 16:21,27 17:1

**transcripts** 31:17

**trauma** 44:3

**trial** 50:6 55:22

**Tribble** 3:6 4:20,25 16:26 19:24 20:2 28:14, 22 29:2,3,13 31:19 34:4,5,18,21,23 35:12, 17 36:4,5,9,18 38:10,28 39:6,10,14,20,22 40:9, 10,17,25 41:23 43:3

**44:11 46:11,16 47:28 51:19 52:1 58:9 59:22

**troops** 45:1

**troubled** 44:20

**troubling** 31:1

**true** 40:12 49:8

**trust** 23:23 34:26,27 37:13

**truth** 44:6

**truthfully** 40:5,6

**turn** 58:7

**turns** 52:9 61:2

**twisted** 36:27

**type** 6:4

**typically** 6:6

—————————

**U**

**unaware** 43:23

**understand** 8:4,21 41:17

**understanding** 4:28 5:26 9:2 35:28

**understands** 9:16 56:14

**undue** 25:17

**units** 36:24

**universe** 31:25 57:14

**unjustified** 27:17

**unwise** 51:27

**upset** 15:15 46:14,22

**upsetting** 40:2

—————————

**V**

**vague** 53:26 58:27

**Vallejo** 4:11 5:3,4 6:25 9:26 17:1 21:6 29:4 32:28 33:2,3,5,9,14,17, 23 36:6,8,12,13,16,17 37:9,15,20 38:26 43:5, 8,15 44:3,22 50:19

**51:1,6 54:1,6,8 57:1

**vehicle** 11:28

**vendor** 52:5,6,9,11,19, 22 54:27 60:20

**verdict** 56:17

**version** 61:2,3

**versus** 4:3 31:5

**vest** 21:25

**video** 7:7,14 21:1,12

**videotape** 20:26 21:15

**viewed** 36:9,17

**viewing** 21:14

**violation** 42:9

**violence** 46:22 47:23 50:12

**visibly** 38:21

**volume** 29:18,20 31:1, 2 48:5

**VPD** 15:10 60:27

—————————

**W**

**Wait** 11:1

**waiting** 47:27

**walk** 46:1

**walked** 34:20

**wanted** 46:12 54:7

**watch** 21:1

**watched** 7:14 21:2

**Wayne** 41:26

**ways** 25:7

**wear** 43:1 61:7

**wearing** 21:25,26

**weeks** 57:12

**WESNER** 4:13

**whatsoever** 16:19

**Wheat** 47:5

**Whitney** 57:19,24

**whittling** 61:24

People vs MILANO, DOMINIC JAMES
VCR233208                                    March 22, 2022                    Index: William..zeroing

**William**  34:10

**Williams**  44:25 53:2,15
  60:27

**wit**  4:17

**withdraw**  54:22

**witnesses**  3:2 31:13
  45:25 48:21 50:14,20
  51:8 53:4,10 57:3
  61:22,28

**wondering**  54:26

**word**  12:11 17:19 18:10
  22:23 51:14

**work**  10:20 26:14 34:25
  41:24 44:25

**worked**  22:15

**working**  8:6 36:6,12,
  17,21 44:3

**works**  13:11

**worry**  58:10

**worth**  27:26

**write**  10:23 11:23

**written**  10:19,24

**wrong**  12:28 13:28
  42:7

---
                Y
---

**yards**  6:14

**year**  15:6 24:3 37:17

**years**  27:15 33:10
  36:10 37:18 41:12 54:6

**young**  18:7 27:12
  36:28 44:17

---
                Z
---

**Zack**  39:13,16

**zeroing**  31:26