**EXHIBIT "HH"**

**Kent Tribble Deposition Transcript**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                        -  -  -

 4      NEFTALI MONTERROSA, et al.,    :   CIVIL ACTION

                    Plaintiffs        :

 5                                     :

                 v.                    :

 6                                     :

        CITY OF VALLEJO, et al.,       :   NO.

 7                  Defendants         :   2:20-CV-01563

 8                        -  -  -

                  November 8, 2023

 9                        -  -  -

10             Oral deposition of KENT TRIBBLE, 555

11      Santa Clara Street, Vallejo, California, taken

12      remotely via Zoom, beginning at

13      10:10am PST/1:10pm EST, and reported

14      stenographically by Denise A. Ryan, a

15      Professional Shorthand Reporter and Notary

16      Public.

17

18                        -  -  -

19

20

21

22

                  VERITEXT LEGAL SOLUTIONS

23                  MID-ATLANTIC REGION

              1801 Market Street - Suite 1800

24            Philadelphia, Pennsylvania 19103
```

Page 2

1    A P P E A R A N C E S:
     (All Appearances via Zoom)

2

3

         McELDREW PURTELL
4        BY:  AMANDA JONAS LORENTSON, ESQUIRE
              CORMICK McLAUGHLIN, ESQUIRE
5        123 South Broad Street, Suite 2250
         Philadelphia, PA  19109
6        Phone:  215.545.8800
         Email:  alorentson@mceldrewpurtell.com
7                cmclaughlin@mceldrewpurtell.com
         Attorneys for Plaintiffs

8

9

         CITY OF VALLEJO
10       OFFICE OF THE CITY ATTORNEY
         BY:  KATELYN M. KNIGHT, ESQUIRE
11       555 Santa Clara Street
         Vallejo, CA  94590
12       Phone:  707.648.4388
         Email:  katelyn.knight@cityofvallejo.net
13       Attorneys for Defendant City of Vallejo
         and the witness, Kent Tribble

14

15

         ANGELO, KILDAY & KILDUFF
16       BY:  JACOB J. GRAHAM, ESQUIRE
         601 University Avenue, Suite 150
17       Sacramento, CA  95825
         Phone:  916.564.6100
18       Email:  jgraham@akk-law.com
         Attorneys for Defendant Jarrett Tonn

19

20

21    ALSO PRESENT:

22       Slater Bleichner-Jones, Law Clerk
         Angelo, Kilday & Kilduff

23

24

Page 3

1                              -  -  -
                          I N D E X
2                              -  -  -
3

    Testimony of:  KENT TRIBBLE

4

5    By Ms. Lorentson . . . . . . . . . . . 6, 192
6    By Ms. Knight. . . . . . . . . . . . . .190
7    By Mr. Graham. . . . . . . . . . . . . .191
8
                              -  -  -
9                         E X H I B I T S
                              -  -  -
10

    EXHIBIT
11   NUMBER              DESCRIPTION              PAGE
12
    (None marked)
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1            DEPOSITION SUPPORT INDEX

2

3      Direction to Witness Not to Answer

4      Page Line     Page Line     Page Line

5                    -- none --

6

7      Request for Production of Documents or

8      Information

9      Page Line     Page Line     Page Line

10     181   13

11

12     Stipulations

13     Page Line     Page Line     Page Line

14                   -- none --

15

16     Question Marked

17     Page Line     Page Line     Page Line

18                   -- none --

19

20

21

22

23

24

KENT TRIBBLE

Page 5

1              THE COURT REPORTER:  The

2       attorneys participating in this

3       deposition acknowledge that I am not

4       physically present in the deposition

5       room, and that I will be reporting this

6       deposition remotely.

7              They further acknowledge that,

8       in lieu of an oath administered in

9       person, I will administer the oath

10      remotely.

11             The parties and their counsel

12      further agree that the witness may be

13      in a state where I am not a Notary and

14      stipulate to the witness being sworn in

15      by an out-of-state Notary.

16             If any party does have an

17      objection to this manner of reporting,

18      please state so now.

19             (No response.)

20             THE COURT REPORTER:  Hearing

21      none, we can proceed.

22                    -   -   -

23             KENT TRIBBLE, after having been

24      first duly sworn/affirmed remotely by

KENT TRIBBLE

Page 6

1          Denise A. Ryan, Notary Public, and
2          pursuant to agreement of counsel, was
3          examined and testified as follows:
4                       -  -  -
5                      EXAMINATION
6                       -  -  -
7     BY MS. LORENTSON:
8          Q.     Hi, Mr. Tribble, my name is
9     Amanda Lorentson, I am an attorney at McEldrew
10    Purtell, and I'm representing the Estate of
11    Sean Monterrosa.
12               I am going to be asking you some
13    questions today about your time working at
14    Vallejo Police Department primarily, but my
15    first question is, have you ever had your
16    deposition taken before?
17         A.     Well, good morning, Ms.
18    Lorentson, and the answer to that would be yes.
19         Q.     And how many times and what was
20    the context?
21         A.     I don't recall the number of
22    times exactly, but at least a couple of times
23    regarding an officer-involved shooting where I
24    think the suspect's name was McCoy.  I had a

KENT TRIBBLE

Page 7

1    federal one way back in early 2000s regarding a

2    long-term federal investigation of Alpha

3    Chemical in Concord.

4                    There were probably a couple in

5    Concord.  There was one where there was a large

6    lawsuit regarding Concord PD's sexual

7    discrimination internally I had to go to a

8    couple of times.  Maybe a couple of force ones

9    that I've been involved in, officer-involved

10   shootings.

11                   So I couldn't give you the exact

12   number, but it's been several.

13        Q.      So, you know, the rules are,

14   you're familiar with them obviously but just,

15   you know, because I do repeat them every time,

16   you know, I'm not asking you to guess.  If you

17   don't know something, that's fine to tell me

18   you don't know.

19                   You're doing a great job so far,

20   but every time I ask you a question, you just

21   need to give me a verbal response.  You can of

22   course shake your head or nod your head, but I

23   do need you to say yes or no to my questions.

24                   If at any point you need a

KENT TRIBBLE

Page 8

1    break, please, you know, feel free to ask for

2    one.  However, I would ask that if there is a

3    question pending, you answer the question

4    before you take a break.  Is that okay?

5            A.      Oh, absolutely.

6            Q.      Okay.  And, yeah, I'm just going

7    to ask you some questions and to the best of

8    your knowledge please let me know what you do

9    or do not remember.

10                   In preparation for today, what,

11   if anything, did you review materialwise?

12           A.      I reviewed briefly testimony I

13   gave in Judge Healy's court regarding -- I

14   don't remember the name of the suspect, but

15   that was an officer-involved shooting.  I think

16   I gave that testimony about a year and a half

17   ago.  I'm not entirely sure on that.

18                   I reviewed a couple of

19   interviews I did or depositions I did with a

20   Mr. Buena regarding a separate shooting.  I

21   think the suspect's name in that was McCoy.

22   And I reviewed a Use of Force Review Board,

23   Critical Incident Review Board report that I

24   had authored back in '15, I think, 2015.

KENT TRIBBLE

Page 9

1          Q.       And who was the subject of that
2     Critical Incident Report?
3          A.       The officers, I can remember the
4     name of the officers.
5          Q.       Yeah.
6          A.       That would be Officers Jarrett
7     Tonn, T-O-N-N, I believe, and Gary Jones.  I
8     don't remember the name of the suspect in that.
9          Q.       And that was a Critical Incident
10    Use of Force Report that you authored, not one
11    that you were the subject of?
12         A.       No; it was one that I was part
13    of the Review Board, the panel of experts that
14    look at the incident.
15         Q.       You no longer work for the City
16    of Vallejo in any capacity, correct?
17         A.       That is correct.
18         Q.       Do you have any contract
19    provision with the City of Vallejo that
20    compensates you for your time today?
21         A.       No, but I would like to if you
22    know how I can pull that off.
23         Q.       Some people do, so you might
24    want to ask.

KENT TRIBBLE

Page 10

```
 1            A.      (Witness laughs.)
 2            Q.      Okay.  And you separated from
 3     the City of Vallejo at what point?
 4            A.      I retired on my birthday when I
 5     turned 50, which is when you reach retirement
 6     age.
 7            Q.      And what year was that?
 8            A.      That was '21, and I think -- so
 9     my birthday was the 26th of February.  I was on
10     an operating table.  I think my official
11     retirement date for tax and pension purposes is
12     the 27th, but my last day on the Vallejo books,
13     so to say, was my birthday when I turned 50.
14            Q.      Okay.  Are you currently working
15     for any other Police Department or are you
16     currently employed in any way?
17            A.      No, ma'am.
18            Q.      Well, I am jealous.  It sounds
19     nice.
20            A.      Yes, it does.
21            Q.      So I do have some questions for
22     you, but I guess I just wanted to start off
23     with a report.  I'm going to apologize, I might
24     ask you questions that are a little bit silly,
```

KENT TRIBBLE

Page 11

```
 1    but, you know, I'm just trying to wrap my head
 2    around this case.  Do you remember having an
 3    interview with Giordano Consulting
 4    Investigations regarding badge bending?
 5            A.      Yes, ma'am, I do.
 6            Q.      And what were you told the
 7    purpose of your interview was?
 8            A.      It was to gather information on
 9    the origins of bending badges and I think to
10    probably gather as much information about
11    people involved in that event.
12            Q.      Were you ever given a copy of
13    the investigation findings or anything?
14            A.      No, I was not.
15            Q.      Do you know of anybody that you
16    work with was?
17            A.      I do not.
18            Q.      Did you ever learn or find out
19    any of the conclusions that were made as a
20    result of the investigation?
21            A.      I have not.
22            Q.      So if, for example, you were
23    determined to be at fault or had violated
24    policy and your peers were not found to have
```

KENT TRIBBLE

Page 12

```
1      violated policy, that's not something that
2      anyone would have informed you about?
3               A.      No.
4               Q.      Okay.  How many interviews did
5      you have with Giordano?
6               A.      I believe just one.
7               Q.      Were you ever asked to clarify
8      any inconsistencies or any questions regarding
9      your interview?
10              A.      Not that I recall.
11              Q.      If you had been asked to clarify
12     any inconsistencies or questions regarding your
13     interview, would you have complied with a
14     second interview?
15              A.      I'd have to have conferred with
16     my legal representative at the time, because
17     there is an issue regarding -- so an Internal
18     Affairs investigation requires full and
19     complete cooperation or it's deemed
20     insubordination.
21                      To attain that they have to give
22     you a Lybarger admonition, which means you're
23     still invoking your right to remain silent so
24     that you're protected against being forced to
```

KENT TRIBBLE

Page 13

```
 1      make statements that could be held against you

 2      criminally, but you still have to make those

 3      statements administratively or you can be

 4      terminated for insubordination.

 5                  So post separation, retirement,

 6      I don't know that I would be protected by a

 7      Lybarger admonition and so I don't know that --

 8      I don't know whether or not I would have agreed

 9      to be compelled to give a statement because I

10      wouldn't be protected by Lybarger.  So I'd have

11      to talk to an attorney.

12                  I personally have no problem

13      cooperating with whatever the investigation

14      is --

15           Q.      Right.

16           A.      -- but I would still refer to an

17      attorney before I made that decision.

18           Q.      Of course.

19                  And when was your interview in

20      relation to your retirement?

21           A.      It was the day before I went

22      into surgery, so it would have been February

23      25th, one day before my last day on the books.

24                  So, I mean, I guess
```

KENT TRIBBLE

Page 14

```
 1        theoretically I could have probably not given

 2        the statement and walked away --

 3               Q.      Right.

 4               A.      -- but I chose to cooperate.

 5               Q.      Of course.  Did you ever talk to

 6        anyone else that participated in the

 7        investigation about the investigation, not an

 8        attorney but any other -- any of your peers?

 9               A.      Yeah, no, just my attorney and

10        the city attorneys.

11               Q.      Of course.  And by "my

12        attorney," do you mean a -- was Mike Rains your

13        attorney or was it outside counsel you had

14        retained?

15               A.      It was Harry Stern, who is a

16        part of Rains, Lucia & Stern I believe is the

17        name of their firm.  So Rains is also in

18        that -- I guess that firm.

19               Q.      Okay.

20               A.      But my attorney was Harry Stern.

21               Q.      Okay.  So I just want to kind of

22        jump right into it.  I can get into like, you

23        know, other specifics later, but in your

24        statement and, you know, in your participation
```

KENT TRIBBLE

Page 15

```
 1      in the investigation, do you believe that you
 2      were truthful in what you alleged to have
 3      happened at the Vallejo Police Department and
 4      at Concord PD?
 5              A.      Yes, ma'am, to the best of my
 6      ability.
 7              Q.      And if there were any
 8      allegations by other officers who were a part
 9      of the investigation who were still actively
10      employed by Vallejo at the time who made
11      comments or caused the investigators to believe
12      that you were lying or fabricating, would you
13      have wanted an opportunity to address those
14      allegations?
15                      MS. KNIGHT:  Objection, vague,
16              ambiguous, incomplete hypothetical, but
17              you can --
18                      MS. LORENTSON:  Okay.  I can go
19              back.  I can make it less vague and
20              ambiguous.
21      BY MS. LORENTSON:
22              Q.      After you gave your interview,
23      if there were people who were the subject of
24      the conversation you had, so if you said John
```

KENT TRIBBLE

Page 16

```
 1      Smith bent someone's badge and John Smith said,
 2      "Nope, I never bent anyone's badge, he is
 3      lying," would you have wanted an opportunity to
 4      respond to that or have a second interview if
 5      your peers were given second interviews?
 6                    MS. KNIGHT:   The same
 7            objections.
 8      BY MS. LORENTSON:
 9            Q.      That's okay.  You can answer.
10            A.      Yeah, sure, I'd want to get to
11      the bottom of what the misunderstanding is.
12            Q.      Right.  Okay.  So I was hoping
13      to clarify that today because, you know, I have
14      gone through your interview and then some of
15      the responses by your colleagues who were given
16      the chance to address what you had said, but I
17      see that you were not given the same
18      opportunity to rebut or agree or confer.
19                    So let's just like start at the
20      top, can you tell me the first time that you
21      heard about badge bending at any Police
22      Department?
23            A.      Sure.  That would have been
24      sometime in I believe the Year 2000, after May,
```

KENT TRIBBLE

Page 17

1    that I had the discussion with then Officer

2    Daniel Golinveaux, that's spelled

3    G-O-L-I-N-V-E-A-U-X.  And the only reason I

4    give that is in all the stuff that I've read

5    it's usually misspelled.

6            Q.      Thank you.

7            A.      I had a conversation with him at

8    a place called The Pepper Mill in Concord, I

9    guess you would call it North Concord, some

10   time that year, probably several months after

11   May.

12           Q.      And what was the nature of that

13   conversation?  What was said?

14           A.      That I believe was the inception

15   or origin of the act of bending a badge.

16           Q.      Okay.  Well, tell me what

17   happened.  Like what happened at The Pepper

18   Mill?

19           A.      At The Pepper Mill I had a --

20   well, it was not infrequent that Golinveaux and

21   I would eat at The Pepper Mill and I think we

22   were both off duty and at that time we had a

23   beer with whatever we were eating, and we were

24   discussing my involvement in an

KENT TRIBBLE

Page 18

1     officer-involved shooting in Concord in May, I

2     don't remember, I think it was 18th of the Year

3     2000, and we were discussing that, because

4     Officer Golinveaux had been involved in a

5     similar incident earlier, I don't know how many

6     years, but prior to that.

7               Q.     Can I clarify?  By "similar

8     incident," what do you mean by "similar

9     incident"?

10              A.     An officer-involved shooting.

11              Q.     Okay.

12              A.     Pardon me.

13              Q.     And, you know, you had been in

14    an officer-involved shooting.  Had somebody

15    died in that shooting?

16              A.     My officer-involved shooting in

17    May?

18              Q.     Uh-huh.

19              A.     Nobody died.

20              Q.     Okay.  By "officer-involved

21    shooting" do you mean just a discharge of a

22    weapon or someone is shot in the middle of some

23    altercation with the police?

24              A.     Well, I guess you could call an

KENT TRIBBLE

Page 19

```
 1    officer-involved shooting something other than
 2    an engagement with an armed adversary, but when
 3    I say that it's regarding engagement with an
 4    armed adversary.
 5            Q.    Okay.  And then a discharge of
 6    weapons and either the subject -- is the
 7    subject of -- well, let me say that again, does
 8    an officer-involved shooting always involve the
 9    discharge of an officer's rifle?
10            A.    Oh, no.  We have several
11    different firearms available to us, depending
12    on the circumstance for --
13            Q.    Probably my misunderstanding of
14    guns.  So does an officer-involved shooting
15    involve a discharge of a weapon always?
16            A.    Yeah, a firearm --
17            Q.    Okay.  Okay.
18            A.    -- specifically, yes.
19            Q.    Thank you.  And could an
20    officer-involved shooting be a shooting in
21    which an officer fires at someone and it does
22    not hit the suspect or, you know, the criminal
23    perpetrator at all?
24            A.    Yes, ma'am.
```

KENT TRIBBLE

Page 20

```
 1          Q.      Okay.  So you're involved in an
 2     officer-involved shooting and then what
 3     happens?  Like the same incident, you're at The
 4     Pepper Mill, what happens with your badge?
 5          A.      So at some point in that
 6     conversation we basically chose to acknowledge
 7     each other's basically journey or -- I don't
 8     know how to say, our involvement or experience
 9     through that event, and it's a very traumatic
10     event, and it's one that frequently the only
11     people that can relate to you are other folks
12     that have been through similar events, so it
13     was a form of recognizing each other for doing
14     basically the best we could in such a traumatic
15     event.
16          Q.      Was your badge bent?
17          A.      It was not bent prior to that.
18     I think we bent each other's badges.
19          Q.      Okay.  There is a notation from
20     your interview that says that you and your
21     colleague had agreed that if you were going to
22     bend badges in the future, it had to be kept
23     entirely secret.  What does that mean?
24          A.      Well, it was simply a precaution
```

KENT TRIBBLE

Page 21

```
 1      that -- this was something we were doing kind
 2      of supporting each other but we also know
 3      that -- and this, what we're doing right here,
 4      is a perfect example of it, we knew that this
 5      is not something we wanted to be happening I
 6      guess for lack of a better term willy-nilly,
 7      that it's not something that should ever be
 8      talked about because, much like it has been,
 9      once it became common knowledge there would be
10      many negative misconceptions about it.  So we
11      wanted to be very guarded with whom we would
12      share that information.
13              Q.      Whose idea was it for it to be
14      kept secret, you or -- gosh, and I'm going to
15      mispronounce his name -- Golinveaux?
16              A.      You can call him Dan.
17              Q.      All right.  You or Dan, whose
18      idea was it to keep it a secret?
19              A.      Dan works.
20              Q.      Okay.
21              A.      I don't know.  I think it was a
22      mutual agreement.
23              Q.      Okay.
24              A.      Because we -- it's not like one
```

KENT TRIBBLE

Page 22

```
 1      of us came to the other with this, this idea,
 2      hey.  I think we were discussing the events and
 3      it was borne out of that by both of us.
 4              Q.      Considering that 2000 was, you
 5      know, a very different time than 2020, you
 6      know, the whole I guess, you know, the cultural
 7      shift, what-have-you, why in 2000 did you have
 8      that concern?  Had there been other things that
 9      had been misinterpreted by the press or the
10      public that were traditions or just, you know,
11      practices similar to badge bending?
12              A.      Well, I can't speak from
13      personal knowledge.  I mean, I remember -- I'm
14      old enough to remember the Rodney King incident
15      and the giant shift in public trust of the
16      police back then and, you know, maybe some of
17      it was well placed or guided, but I think based
18      on my experience a lot of it was misdirected as
19      well, and as officers, even coming up through
20      the academy, you learn to try to do as little
21      or as much as possible to avoid creating
22      avenues of misconception that can be used in
23      arguments against the police's, you know,
24      conduct or culture.
```

KENT TRIBBLE

Page 23

```
 1                  So even at that time, prior to
 2      all this stuff that's gone on since basically
 3      around 2012 to 2020, there have been shifts in
 4      what I perceive as the public's perception of
 5      the police.
 6          Q.      Is there anything similar to
 7      badge bending that you're aware of, like
 8      another -- that I could kind of -- I'm very
 9      familiar with badge bending as a concept,
10      right, so this case is the first time I've
11      heard of it, but is there something else that
12      is like a tradition that's analogous to this in
13      the Police Department?
14                  MS. KNIGHT:  Objection, vague,
15              ambiguous.  Which police department?
16      BY MS. LORENTSON:
17          Q.      At any police department you've
18      been in.  And if it's vague, I can rephrase,
19      but if you can answer, please do.
20          A.      I am not aware of any other
21      event or act that's similar to this.
22          Q.      How did the idea of badge --
23      like bending the tip of the badge, like what
24      was the significance about bending the badge as
```

KENT TRIBBLE

Page 24

1    opposed to like inscribing something in it or

2    like, I don't know --

3         A.     Well, with all due respect,

4    you're asking me to remember a conversation

5    that occurred over a couple of beers over 23

6    years ago now.

7         Q.     Sure.

8         A.     The best I can recall is that,

9    you know, in that conversation I was -- I think

10   the best way to describe it is I was reaching

11   out to Officer Golinveaux about some negative

12   feelings I had about myself and my own

13   performance in that event that I was involved,

14   and in discussing and working out the issues

15   that I had with my own performance we spoke

16   about his event and then the performance of

17   different officers in that event, and that some

18   performed very well and others, for lack of a

19   better term, failed to come up to an

20   expectation that we would want from most

21   officers, yet in his event all the officers

22   that were even present were recognized with I

23   believe a Distinguished Service Medal, and we,

24   neither one of us, thought that that was

KENT TRIBBLE

Page 25

1    appropriate to recognize officers that failed

2    basically in our opinion to do the job that

3    they are required to do or expected to do while

4    others did at great sacrifice to themselves or

5    great risk to themselves.

6              So I think the whole idea about

7    the badge was that much like a medal or a

8    ribbon, the military actually has something

9    called the Combat Action Ribbon that's for

10   combat-involved personnel, the badge is worn on

11   your uniform like a ribbon or a medal would be

12   if you were in a dress uniform or even in the

13   field with a field ribbon.  But the bend is so

14   imperceptible that in the idea of being guarded

15   about who would know or see, if you were really

16   looking for it, the way we did it, you might be

17   able to see, but if you didn't have any idea of

18   that, you wouldn't see it.  So to us it

19   wouldn't have made a difference to anyone else,

20   except for people that have received that.

21              Does that make sense to you?

22        Q.     It does.  Kind of like a badge

23   of honor or something.

24        A.     I don't know that I would call

KENT TRIBBLE

Page 26

1    it a badge of honor.  I would call it a

2    badge -- a way of denoting that you did your

3    job at the risk of all that comes with being in

4    that engagement and all the things that follow,

5    using this interview as an example.

6            Q.      So to go back to the incidence

7    when you and Dan are both sharing experiences,

8    when some of your peers were awarded with

9    medals and like they -- you know, I'm not

10   familiar with the incidents, but like just

11   accepting the fact that they had, you know,

12   failed to do what their expectation were, you

13   know, put themselves in harm's way like you and

14   your peer had done, does that mean that they,

15   you know, just didn't -- that they were like in

16   hiding or that they were not like actively

17   involved or they let you guys take the heat for

18   what happened?  What does that mean?

19           A.      Well, it could mean all of

20   those, but in this particular incident with

21   Officer -- then Officer Golinveaux, I think he

22   retired a corporal, one of the officers that

23   was awarded the Distinguished Service Medal

24   actually fled from the engagement and was

KENT TRIBBLE

Page 27

```
 1    located later, much later, hiding in a bush
 2    several blocks away from the engagement, and
 3    that officer was awarded a Distinguished
 4    Service Medal, and to us that was frustrating.
 5              Q.    Did the people that awarded him
 6    a medal, did they know that he had fled and hid
 7    in a bush?
 8              A.    I can't speak with direct
 9    knowledge of that, but everybody in the Police
10    Department did because it was something that
11    got out rather quickly, and that person was
12    found in I believe kind of a grid search,
13    because I don't think their radio was even with
14    them or on.  But this is me speaking --
15              Q.    Of course.
16              A.    -- not from direct, direct
17    knowledge --
18              Q.    That's okay.
19              A.    -- and I want to be very clear
20    about that because I --
21              Q.    Sure.  I'm just trying to get
22    your understanding.  So when you perceived that
23    this person who fled got a medal and then why
24    do you think that you weren't recognized for
```

KENT TRIBBLE

Page 28

```
 1    your active involvement in this incident?

 2            A.      I never said that I was not

 3    recognized for --

 4            Q.      Oh, okay.  I'm sorry.  Were you

 5    recognized?

 6            A.      I don't know if it was prior to

 7    the bending of my badge or after, but, yes, I

 8    received what was called a Distinguished

 9    Service Medal.

10            Q.      So if I'm understanding, the

11    Distinguished Service Medals in that instance

12    were just given to everyone that was a part of

13    it, regardless if they did anything or not?

14                    MS. KNIGHT:  Objection,

15                misstates testimony.

16                    MS. LORENTSON:  Well, I'm trying

17                to -- that's what I said, I'm trying to

18                understand.

19                    THE WITNESS:  Yes, ma'am, I

20                can't speak to that medal's history.

21    BY MS. LORENTSON:

22            Q.      Sure.

23            A.      I can speak to my knowledge of

24    it with Officer Golinveaux's event and mine.
```

KENT TRIBBLE

Page 29

1          Q.      That's exactly what I'm asking.

2          A.      Okay.  In mine, everybody I am

3    aware of that was involved in the engagement

4    was awarded the Distinguished Service Medal.  I

5    had no problem with that because everybody

6    involved in my engagement did remarkably well

7    for people in our capacity.  It was an honor to

8    be able to serve with people like that.  I had

9    no problem with, with them being, you know,

10   recipients of that medal.

11              I don't know at the time that

12   Golinveaux and I met that I had been recognized

13   that way and I don't know that that was a

14   concern.  The main concern was that I had

15   really significant performance-related

16   questions about myself.

17         Q.      Uh-huh.

18         A.      And then through discussing that

19   with then Officer Golinveaux, we arrived at a

20   way to basically show appreciation for each

21   other being willing to endure and commit

22   ourselves to the type of circumstances those

23   are.

24         Q.      That is helpful context.  Thank

KENT TRIBBLE

Page 30

```
1    you.
2              When you would offer to bend
3    somebody's badge, when you would bend someone's
4    badge, in your interview you discussed that you
5    would want to make sure it was another person
6    who would not be offended by it.  Can you
7    explain that statement for me?
8         A.        Absolutely.  I would imagine,
9    much like any other workplace, there are
10   several different types of personalities.  We
11   had in both places that I worked, there are
12   people, oftentimes former military, that have
13   this commitment to the appearance of their
14   uniform that's above and beyond what is the
15   norm.  I mean, we've got people that will shine
16   their boots to a mirror reflection daily.  I
17   was one of those guys when I was new.  As I got
18   older, that subsided.
19              In Concord there was a practice,
20   I don't know what it was born from, but similar
21   to the shining of the boots, we would shine our
22   badges, which were then metal badges of gold or
23   brass, a yellow metal color, and those of us
24   that shined them daily with a rag and Brasso or
```

KENT TRIBBLE

Page 31

```
 1    whatever kind of polish paste, over the years

 2    the badges actually took a different appearance

 3    because they slowly abraded down and some of

 4    the paint would come off of the seal in the

 5    middle and they would actually turn really,

 6    really, really like mirror shiny metal.  When

 7    they originally started, they were heavily

 8    engraved.  That was just a practice.

 9                I remember once in Concord I was

10    ordered to get a new badge because my

11    supervisor errantly assumed that I had taken a

12    buffing wheel to it, when that wasn't the case.

13    I simply had polished it every day, and, you

14    know, so the badge -- there are people that

15    would take offense to that, like the supervisor

16    that ordered me to get a new badge, and then

17    there are people that took pride in the way

18    they cared for their gear in a different way,

19    if that makes sense to you.

20                So there are those that would

21    perceive the bending of the badge as some form

22    of disrespect or dishonorable treatment of the

23    uniform and then there are those that would

24    take pride in the personal -- the personal
```

KENT TRIBBLE

Page 32

```
 1      effort they put into their gear, if that makes
 2      sense to you.
 3             Q.      Of course.  Was the motivation
 4      to keep this, you know, kind of something that
 5      was not widely shared also because there was a
 6      concern that if someone knew about this
 7      practice, that it might motivate them to shoot
 8      to get their badge bent?
 9             A.      Well, I -- yes, that's a thing
10      that -- you know, it's not like we ever make a
11      decision, even at that young age, where we
12      don't consider the possibilities of outcomes as
13      a result of a decision.  That would have been
14      one of the considerations.
15                     But far more -- far more likely
16      than I believe any officer would conduct an act
17      that significant for something as insignificant
18      as a mark or a bend on a badge, I don't believe
19      that would occur.  I've been in the events and
20      that -- that's not something that runs through
21      your mind when you're in an event like that.
22                     However, the public's perception
23      of such an act could be negatively twisted and
24      used against officers.  I think that was more
```

KENT TRIBBLE

Page 33

```
 1    the concern.
 2           Q.      Did you ever have to correct a
 3    police officer who may have acted in a way in
 4    order to get his badge bent or to seek his
 5    badge bent in a way that you thought was
 6    inappropriate?
 7           A.      I -- I am not aware of any
 8    officer that had ever done anything seeking a
 9    bent badge.
10           Q.      Okay.  Can you tell me, like
11    this initial badge bending occurs and then were
12    there any other times that you bent someone's
13    badge while at Concord PD?
14           A.      Yes, a couple, maybe several,
15    like two or three.  The one that I remember
16    specifically was my brothers's.
17           Q.      Todd?
18           A.      Yes, ma'am.
19           Q.      Okay.  And what happened with
20    Todd?
21           A.      Todd, the best of my estimate,
22    sometime about a year, between a year and two
23    years after my engagement in Concord, he was
24    involved in an officer-involved shooting, and
```

KENT TRIBBLE

Page 34

```
 1      it was regarding that event that I bent his

 2      badge.

 3              Q.      And the other individual, like

 4      do you know, just generally, what had happened

 5      with the other bent badge at Concord?

 6              A.      If I -- and I do believe I bent

 7      a couple more, I don't know exactly who,

 8      because there were several shootings at Concord

 9      as well.  But it would be the same

10      circumstance, it would be post the event,

11      sometime in an environment where there weren't

12      too many other people, and then I would bend

13      their badge.

14                      And to be clear, you had

15      mentioned, and I'm not trying to be nitpicky,

16      but you had mentioned offering to bend a badge

17      in something that you said, I never once

18      offered to bend a badge for anybody.  This was

19      an act where errantly and regrettably I would

20      ask to see a badge and then bend it without

21      their consent and then explain what I had did

22      when I handed -- what I had done when I handed

23      it back to them.

24                      So nobody voluntarily or
```

KENT TRIBBLE

Page 35

```
 1     willfully gave me a badge to be bent.  I just
 2     want to be clear about that.
 3          Q.     When did your -- if you could
 4     pinpoint the time, when did your perception on
 5     that shift?  So I would assume that there was a
 6     period of time where you felt like this was --
 7     you know, there was nothing wrong with it, you
 8     were doing it because it was supporting a
 9     fellow officer, but then a shift occurred when
10     you, you know, you just said right now
11     "errantly and regrettably."  When did you have
12     that change in the way you perceived it?
13          A.     Well, there was -- there was two
14     different times where I backed off.  I mean, I
15     want to put this in perspective too for you
16     guys, this is not like what we thought about
17     every day when we went to work.  This was --
18     this was never Item Number One on the list of
19     priorities going to work as a police officer
20     anywhere that I've ever worked.
21                 This is an unfortunate thing
22     that happened that got blown up into this big
23     thing, and it's my fault.  I take full
24     responsibility.
```

KENT TRIBBLE

Page 36

```
1                  But my perspective shifted like,
2       I don't know, 20 -- I say 20.  Let me say 2000,
3       late 2000s, I was put into a unit voluntarily
4       called the Crime Suppression Unit and that
5       unit's assignment was primarily handling high
6       risk operations at the street level and
7       conducting narcotics investigations and search
8       warrants and, you know, as their enforcement
9       wing and apprehending, doing the enforcement
10      work for the investigation sections, which was
11      really so limited that all it handled were what
12      we call Part 1 felonies, violent crimes
13      involving rape, murder and/or robbery.
14                  So that unit was highly active
15      in armed -- what we would call not necessarily
16      shootings but armed takedowns, right, high
17      threat takedowns of armed individuals, and in
18      some of those events there had been
19      officer-involved shootings and it became
20      something that, you know, when I was newer, it
21      was a -- it seemed to be a less likely event,
22      but as I got older, it just -- I guess you
23      would call it, it just became something that I
24      didn't think was a big deal that people were
```

KENT TRIBBLE

Page 37

```
 1      having problems with and I just kind of didn't

 2      do it for a while as an officer in that unit.

 3                   And then in 2013 when I became a

 4      supervisor and I rotated back to the patrol

 5      level, I'm not -- I'm not trying to make it

 6      sound like patrol officers are lesser than the

 7      officers that were in the Crime Suppression

 8      Unit, but they had a different assignment, and

 9      so what seemed to be commonplace everyday

10      occurrence, getting out of cars, taking down

11      armed suspects, you know, sometimes having to

12      be involved in officer-involved shootings,

13      whether it was here or with outside agencies at

14      the local, state and federal level.

15                   That was a pretty common thing

16      for us in the Crime Suppression Unit.  Not

17      necessarily the shooting part, but the armed

18      conflict part.  In patrol it's a lot less.

19                   So when I rotated back to patrol

20      as a supervisor, I had some guys and ladies I

21      think that had been involved in officer-

22      involved shootings and some of them I saw

23      having the same internal struggles that I did,

24      whether it was with their performance or how
```

KENT TRIBBLE

Page 38

1    the public was perceiving the event or the

2    consequences or ramifications of the aftermath

3    of such an event, I saw officers that reminded

4    me of me back in 2000, and so I did the same

5    thing for them that Golinveaux and I came up

6    with, that in retrospect much misguided effort

7    to help them get through the event, as a show

8    of support.

9              And I say "misguided" because,

10   using this interview as an example and all the

11   others, not looking at the big picture of the

12   negative effects that I exposed them to by

13   doing this for them.  I was looking

14   shortsightedly at helping another officer out,

15   letting them know somebody had been through it

16   and understands.

17             And then I backed off it

18   again -- I know this is getting long-winded.

19   I'm sorry.

20        Q.    That's okay.

21        A.    I think I'm losing you.

22        Q.    You're not.  I would talk twice

23   as long if I was the witness.  So you're brief

24   in my opinion.

KENT TRIBBLE

Page 39

1          A.        Okay.  Thank you.

2          Q.        Yeah.

3          A.        I backed off again in about 2016

4     because Captain Horton had come into the

5     office, my watch commander's office, I was a

6     relatively new watch commander, and reading

7     through all of the statements, you know, I may

8     have been a sergeant acting as watch commander

9     before the actual promotion occurred because

10    there is usually a little lag, sergeants on

11    graveyards have to work watch commander duties

12    quite frequently, but, regardless, Horton had

13    come into the office at some point and he

14    mentioned noticing something wrong with my

15    badge and he never wanted to see it again, and

16    I know that the badge I was wearing at that

17    time had not been bent, so I said, "I don't

18    know what you're talking about," and then he

19    just stormed out of my office.

20               But he wasn't mad, it was

21    just -- it felt like he was trying to get a

22    point across without discussing it, and I left

23    it alone but I kind of paid attention to the

24    fact that, okay, maybe someone has talked about

KENT TRIBBLE

Page 40

```
 1        this thing.  And so I didn't really have much
 2        more involvement with it then.
 3                    But then I got even more
 4        concerned about it because about 20 -- I think
 5        maybe one or two other guys I had done that for
 6        post that interaction, but in 2018 or so I ran
 7        into Captain Horton in the administrative side
 8        of the building, which is the south end of what
 9        used to be the Police Department, I don't know
10        if it still is, but, and Captain Horton was a
11        little more disturbed and confrontational and
12        he ordered me into his office, told me he
13        didn't want to hear any, pardon my language,
14        but B.S., and that he knew -- it was something
15        to the effect of he knew about badge bending,
16        what it meant, and he didn't want to ever see
17        it again or heads would roll, he wanted me to
18        fix it.  That was basically the gist of what I
19        got, and it was kind of one of those
20        shut-up-and-listen type meetings, so.  It was
21        brief, but that was it.
22                    I -- I didn't think that he
23        really knew what he was talking about based on
24        his level of anger, because my perception was
```

KENT TRIBBLE

Page 41

1    he believed it was about killing people and I
2    offered to clarify it with both him and the
3    chief because I didn't -- that was not correct,
4    and the source of the whole thing was me, so
5    the only person that actually knew all the
6    information I believed at the time was me.  So
7    I wanted to go in and clear it up since there
8    seemed to be a misunderstanding, but I was told
9    not to.  I was told to fix it or heads would
10   roll was I think was a quote.
11          Q.     As you sit here today, do you
12   know why Horton was so upset by it?  Were you
13   given the opportunity to explain to him what it
14   meant?
15          A.     I tried to give him a brief
16   explanation but he kind of cut me off and said
17   he didn't want to hear any bullshit.  And I
18   don't know exactly what it was that triggered
19   him.  I had had the perception that perhaps he
20   had seen some on the street.
21                 If he had mentioned it in 2016
22   and then came back at 2018, but this, again,
23   this is -- what do you call it, speculation?
24                 MS. KNIGHT:  Yeah, speculation.

KENT TRIBBLE

Page 42

1              Yeah, don't speculate.  Just what you

2              know.

3                    THE WITNESS:  I don't know.

4      BY MS. LORENTSON:

5              Q.    And just -- the badge bending is

6      always associated I think like the -- sorry;

7      I'm losing my space.

8                    "The badge bending directly

9      relates to pulling the trigger in a shooting

10     and it was only given to people that pulled the

11     trigger in recognition for them not running

12     from the fight," is that an accurate statement

13     from your interview with Giordano?

14             A.    I believe it was, but it's also

15     not -- I mean, I think already with you I've

16     been able to give a broader explanation.  But,

17     yes, that statement is accurate but it's not

18     entire, if that makes sense.  It's not an

19     entire explanation.

20             Q.    So the first time you bent a

21     badge in Vallejo was in March of 2003.  Who

22     were the officers that were involved in that,

23     if you remember?

24             A.    Well, all due respect, ma'am, I

KENT TRIBBLE

Page 43

```
 1    think that's incorrect.
 2            Q.      Oh, okay.  I'm sorry.
 3            A.      I think because I was hired or
 4    came on to the job with Vallejo in March of
 5    2003.
 6            Q.      Okay.
 7            A.      So that date is not correct.  I
 8    believe the correct date would be sometime
 9    after August of 2003.
10            Q.      And that incident involved Joe
11    McCarthy and Eric Jensen?
12            A.      Yes, ma'am.
13            Q.      Okay.  And did you bend their
14    badges privately or publicly?  Like where did
15    that occur?
16            A.      Well, I don't recall ever
17    bending Joe McCarthy's badge.
18            Q.      Okay.
19            A.      And if I recall correctly, he
20    never fired a weapon of a firearm type in that
21    engagement.  Officer Jensen, on the other hand,
22    did.  So when I respond to your question, I'm
23    specifically speaking about Officer Jensen.
24            Q.      Sure.
```

KENT TRIBBLE

Page 44

```
 1            A.      I don't recall exactly where
 2      that occurred.  It likely occurred at one of
 3      two places, one would be the Relay Club, which
 4      was the bar across the street from our parking
 5      lot, or it may have occurred at what was called
 6      the PAL office, Police Activities League
 7      office, I can't remember what street it's on,
 8      but it was where the association -- pardon
 9      me -- association meetings were held on a
10      monthly basis.
11                  That I don't think you could
12      consider a public place because it was key
13      access only.  The Relay Club is a public
14      building.  So, I mean, I guess you could call
15      it a public place.  But it was never done like
16      on public display, if that makes sense.  It was
17      done privately between the people involved.
18            Q.      So the incident begins with
19      McCarthy and Jensen and then at some point, I'm
20      just looking at the notes from the interview,
21      there was a struggle and then a subsequent
22      shooting that involved you and Sergeant Steve
23      Gordon, and that you both shot the suspect,
24      killing him; is that accurate?
```

KENT TRIBBLE

Page 45

```
 1          A.      That is accurate.  There was
 2     another officer involved in that, the
 3     conclusion of that event, and that was Officer
 4     Coburn --
 5          Q.      Okay.
 6          A.      -- whose weapon was discharged
 7     first in that portion of the engagement as the
 8     suspect tried to disarm Officer Coburn.  His
 9     own firearm went off in his holster as he
10     wrestled with the suspect and the suspect
11     gained access to his firearm.
12          Q.      And then in that incident you
13     bent your own badge and then who else's badges
14     were bent?
15          A.      Okay.  So to be clear --
16          Q.      Yeah.
17          A.      -- I am not sure --
18          Q.      Okay.
19          A.      -- whether my badge had already
20     been bent by me or it was bent post that event,
21     because I had already bent my badge in
22     Concord -- or, yes, Concord, and as this thing
23     went through time, I carried the bend that
24     allegedly started in Concord, which did start
```

KENT TRIBBLE

Page 46

1    in Concord, throughout whatever badge I had

2    wherever I went as a police officer and

3    whatever rank I held.  I think there is a

4    couple badges I never did it for.  I was either

5    too lazy or I didn't think about it, but.

6            So I may have carried that over

7    from Concord is what I'm trying to say.  I

8    don't know at what point mine was bent, but I

9    know that I bent Officer Jensen's as a result

10   of that event.

11           Q.    So the distinction in between

12   McCarthy, his badge was not bent because he

13   fired his Taser instead of his firearm.  Why

14   was the -- I guess like why didn't he get a

15   bent badge because he fired his Taser?

16           A.    I am -- I'm not sure I heard you

17   correctly.

18           Q.    Yeah, yeah.  So McCarthy -- you

19   said that McCarthy never fired a weapon so he

20   didn't get his badge bent, I think he just

21   fired a Taser.  So what's the difference in the

22   Taser versus the firearm?

23           A.    Okay.  Well, first of all, a

24   Taser is a less than lethal tool that we have

KENT TRIBBLE

Page 47

```
 1    to subdue violent suspects.  Its use is far
 2    more common than lethal force, which is a
 3    firearm.
 4                It's not as if he didn't do his
 5    job to the level where he would be recognized,
 6    in fact, he did a phenomenal job because in any
 7    engagement with an armed suspect to have what
 8    they call force options is ideal so that there
 9    is an opportunity to de-escalate prior to
10    engaging with lethal force, and the way I
11    recall it that's exactly what occurred, Officer
12    McCarthy fired his Taser first.  The problem
13    was it had no effect, so the armed suspect
14    turned and engaged both officers with gunfire.
15                The difference in the bending of
16    the badge recognizes that due to the fact that
17    Tasers are less than lethal and far more
18    commonly used in violent engagements, they
19    don't carry the same significance weight,
20    Monday morning quarterbacking, negative press,
21    psychological trauma to both the suspect, his
22    family, the officer, his family, the agency,
23    and the public, that firing a firearm does in
24    the line of duty.  They are not looked at the
```

KENT TRIBBLE

Page 48

```
 1     same, if that makes sense.
 2              Q.      It does, yes.
 3                      Let's see, you say, you go on to
 4     talk about there was a shooting that possibly
 5     involved Sanjay Ramrakha and Jeremie Patzer in
 6     2005, 6 or 7 where there was a -- the shooting
 7     as occurring at the Relay Bar.  Can you tell me
 8     about your memory of that and, you know, what
 9     officers had their badges bent, if any?
10              A.      Yes.  So there is a couple
11     things I need to clear up about that statement,
12     and I don't know -- I think when I reviewed
13     that statement, I don't -- I think there was a
14     misunderstanding, either I miscommunicated, it
15     was not the Relay Bar.
16              Q.      Okay.
17              A.      It was a different bar on
18     Tuolumne Street that I don't remember the name
19     of, and I don't even know if it exists anymore.
20                      But that's the only incorrect
21     thing there, other than I believe now, in
22     retrospect, I don't believe Officer Ramrakha
23     even fired his weapon at that event.  I think I
24     misstated the facts when I talked to Giordano,
```

KENT TRIBBLE

Page 49

```
 1    because I wasn't even there.  I was actually
 2    out on an injury and received the information
 3    via telephone from one of the parties that had
 4    been there.
 5             Q.      And what party was that that
 6    gave you the information about who was there?
 7             A.      I think it was Officer
 8    Ramrakha -- then Officer Ramrakha; I don't know
 9    what rank he holds now -- had notified me that
10    that event had occurred, because that was the
11    team that I had been assigned to, and had I not
12    been out on an injury I would have been with
13    them probably.
14             But the only one I'm certain of
15    that was the shooter, so to speak, in that
16    event is Officer Patzer.  I think there was
17    another officer, but I don't think it was
18    Sanjay Ramrakha.
19             Q.      Even though he called you to
20    tell you that he was a part of it?
21             A.      Well, there were several
22    officers there.  So when I say "a part of it,"
23    I don't mean he fired his weapon.  I think
24    there was probably five or six officers from
```

KENT TRIBBLE

Page 50

1    that team there, and only I think two fired.

2            Q.      So when you bent Ramrakha's

3    badge, did he say, "Oh, no, no, I wasn't

4    involved, I shouldn't have my badge bent"?

5            A.      I don't think in that statement

6    I say I was certain I bent Sanjay Ramrakha's

7    badge.  I said I think I may have.

8                    And looking back now, I'm not

9    even sure that I did.

10           Q.      It says that you do not remember

11   if Ramrakha and Jeremie were both present when

12   he bent their badges or if he did it

13   individually with them.

14           A.      Right.  But I don't know that

15   I'm accurate in saying that I bent Ramrakha's

16   badge.

17                   So the way I have to explain

18   this to you is, when I'm being interviewed

19   about this stuff, I'm trying to give you the

20   best information I can and as much information

21   as I can.

22           Q.      Absolutely.

23           A.      But I'm also reaching across 20

24   years.

KENT TRIBBLE

Page 51

```
 1              Q.      Sure.

 2              A.      And I've been aware of numerous

 3      officer-involved shootings at both agencies.

 4      I've been present for a few.  I'm not entirely

 5      sure I get everything right because you're

 6      talking about 20 years of me trying to remember

 7      it 23, you know, years later, and you're

 8      talking about multiple events.

 9                      And when I interview with

10      Giordano, I know he is trying to investigate

11      this thing, I'm trying to give him every bit of

12      information that I can, whether I may have or

13      did, I wanted him to have all the information

14      he could.

15                      I think there were a couple of

16      times where I may have stated that I may have

17      bent an officer's badge where I could have been

18      incorrect, because I've been around so many

19      officer-involved shootings, either as a member

20      of the team that did it when I wasn't present,

21      a person that was present when I wasn't the,

22      quote-unquote, actor is what they call the

23      people involved in the actual shooting or

24      whether I just heard about it and it was an
```

KENT TRIBBLE

Page 52

```
 1    agency thing, and I think there was one where I
 2    may have bent an officer's badge that involved
 3    a shooting that wasn't even in our agency.
 4                So I guess what I'm trying to
 5    say is I'm trying to give all of you all the
 6    information --
 7        Q.      Oh, absolutely.
 8        A.      -- but I don't know that I would
 9    recall it as specifically as an individual
10    officer that had one event occur regarding
11    bending their badge by me, I think that they
12    would remember that probably a little better
13    than I do trying to remember all the things.
14        Q.      Sure.  And to clarify, you know,
15    your interview is by far and away the most
16    comprehensive, right, so I know you were trying
17    to be as helpful and provide as much
18    information as you can.  I appreciate you
19    showing up here today.
20                What I am, you know, trying to
21    ascertain is when you said that Sanjay Ramrakha
22    was involved in off-duty shooting, he certainly
23    was there, correct, in 2005, 6 or 7, right?
24        A.      I believe he was there because I
```

KENT TRIBBLE

Page 53

1    received the call from him.

2            Q.        Right.  So he calls you and then

3    some years later you're interviewed in 2021 by

4    Giordano and the facts still are in your head

5    that Ramrakha was present and he was the one

6    that called you, and it's not just that you

7    vaguely know he was there, but you have a

8    distinct memory of him being there or him

9    telling you he was there and then at the time

10   you remembered bending his badge.

11            My question to you is, was it

12   suggested to you at any point that there were

13   inaccuracies in your statement and were you

14   asked to ever correct those?

15            A.        I think I realized there may

16   have been some inaccuracies in my statement

17   when I was on the stand in Healy's courtroom,

18   the Honorable Judge Healy, I apologize, because

19   I had not heard about any of the other

20   statements involved in this investigation, I

21   had not discussed this event with any of the

22   other parties that I believed would be

23   interviewed.  So when I was on the stand in

24   Judge Healy's office and I heard some different

KENT TRIBBLE

Page 54

1    perspectives on the history of this, I realized

2    I may have not remembered as clearly as I

3    thought I had in some instances or I may have

4    misinterpreted some things that I thought I saw

5    in this investigation.  So that was the first

6    time.

7            Q.      Okay.  But were you ever

8    instructed that you had misinterpreted or were

9    you ever told by somebody that you had

10   misinterpreted these -- anything that was in

11   your statement?

12           A.      No; the only thing that I saw

13   was really the press write-up of the open court

14   hearing regarding an officer-involved shooting

15   of a suspect whose name I cannot remember by an

16   Officer Matt Kamoda, and I believe there were

17   other officers involved too but I don't know

18   who they were.

19           Q.      Well, I'll get back to your

20   statement briefly.  I'm sorry; I am a little

21   long-winded.  But, you know, in your statement

22   you mentioned a few individuals whose badges

23   that you talked about bending, and I want to

24   just read to you what they had said in response

KENT TRIBBLE

Page 55

1    to your statements and I want your opinion on

2    whether or not what they have said is valid and

3    then to let me know why.

4              So, let's see, let's start

5    with -- did you ever give a statement saying

6    that you may have bent Mark Galios's badge?

7         A.    Yes, I did give that statement.

8         Q.    Yep.  And have you ever been

9    provided with Galios's statement before or a

10   summary of it?

11        A.    No, I have not.

12        Q.    Okay.  So I want to let you know

13   what the summary says that you haven't been

14   able to see yet.  "Galios provides some

15   information relevant to the investigation.  He

16   has known Kent since 2014.  Kent has always had

17   an alcohol problem.  Kent freely admits he is a

18   heavy drinker and there was an incident in

19   Bend, Oregon, where he got into a fight with

20   several people at a bar, an indication of a

21   drinking issue.  The last time Galios saw Kent

22   was May 29 or June 1, 2020, when they were

23   dealing with riots in Vallejo because of the

24   George Floyd killing.  Kent was at the PG that

KENT TRIBBLE

Page 56

1    night wearing a Hawaiian T-shirt with a rifle

2    slung over his shoulder, sweating profusely,

3    talking about how he was going to shoot anybody

4    that came through the front door.  Kent's

5    behavior was very odd and scared Galios and he

6    thought Kent might actually shoot someone if

7    they came through the front door.  Galios did

8    not see the situation as dire as Kent did.

9    Shortly after that, Kent went off on leave and

10   eventually retired."

11              Is that an accurate statement by

12   Mark Galios?

13        A.      I remember that event.  I don't

14   remember that exchange at all.

15        Q.      Right.  I assumed.

16              Would you be I guess surprised

17   to find out that after you gave your statement

18   and there was an inconsistency between you

19   saying you bent Mark's badge and him saying you

20   didn't, that he was afforded the opportunity of

21   a second interview to correct that

22   misconception?  Were you provided with that

23   same opportunity?

24              MS. KNIGHT:  Objection, asked

KENT TRIBBLE

Page 57

```
 1            and answered.  Go ahead.
 2       BY MS. LORENTSON:
 3            Q.     So you weren't, right?
 4            A.     No, I was not.
 5            Q.     No one gave you a chance to
 6       correct it, okay, or to address it or to
 7       address very serious allegations about your
 8       character, right?
 9            A.     No.
10            Q.     No, okay.  In your initial
11       interview at least, and we can get through like
12       what you may have like -- you know, what might
13       have faded away or like what you might remember
14       differently now, but at least in your initial
15       interview with Giordano you said that Jarrett
16       Tonn was someone whose badge you had bent,
17       correct?
18            A.     I believed I may have bent
19       Jarrett Tonn's, yes.
20            Q.     Okay.  So Jarrett Tonn, in his
21       first interview, said that you did not bend his
22       badge and then he was given an opportunity to
23       give a second interview, and in his second
24       interview he said:  "Tonn said if Kent Tribble
```

KENT TRIBBLE

Page 58

```
 1      told me" -- "told me," as in Giordano -- "that
 2      he bent Tonn's badge, he was lying.  No one has
 3      ever bent his badge.  Tonn never talked to Kent
 4      about badge bending.  He reiterated that he had
 5      not heard of badge bending until 2019 or 2020
 6      when the first rumblings came out about the
 7      department.  Tonn had no idea why Kent would
 8      lie about this but did offer some information
 9      that might be relevant.  Tonn saw a mutual
10      friend of his and Kent's, ran into Kent in
11      Petaluma earlier this year.  This friend is a
12      law enforcement officer at another agency.
13      This friend called Tonn because he was
14      concerned about Kent's mental health.  Kent
15      was, quote-unquote, not all there and acting
16      paranoid.  The friend's agency provided mental
17      health help to officers from other agencies and
18      he wanted to let Tonn know that they would help
19      Kent if needed.  A co-worker of Kent and Tonn's
20      told Tonn a story of odd exchanges he had with
21      Kent.  A co-worker said that they were having a
22      conversation with Kent when Kent said he needed
23      to call him back on a different line because
24      his phone may be being tapped.  Kent also told
```

KENT TRIBBLE

Page 59

```
 1      his co-worker that he was talking to him on a,

 2      quote-unquote, burner phone.  Tonn said a few

 3      other people that both Kent and Tonn know ran

 4      into Kent at a Las Vegas shot show and Kent was

 5      talking about Chinese people following Delta

 6      soldiers and Navy Seals trying to spread COVID.

 7      This group also felt Kent was paranoid.  Tonn

 8      said it was common knowledge at the PD that

 9      Kent had an alcohol problem."

10                  If you had known about these

11      statements, would you have wanted an

12      opportunity to rebut them or give a second

13      interview as Jarrett Tonn had been given the

14      chance?

15                  MS. KNIGHT:  Objection,

16          incomplete hypothetical.

17      BY MS. LORENTSON:

18          Q.      Okay.  Were you ever told that

19      these allegations, very serious allegations

20      about your mental health and your character

21      were being recorded by Jarrett Tonn?  Were you

22      ever notified about that?

23          A.      No, I was not.

24          Q.      And this statement came in a
```

KENT TRIBBLE

Page 60

1      second interview by Jarrett Tonn.  So your

2      statement conflicted with Mr. Tonn's first

3      statement and then he was given the chance to

4      rebut it.

5                    Does that surprise you that you

6      were not given that opportunity and he was?

7            A.      No, it does not surprise me.

8            Q.      Why?

9            A.      Based on the previous statement

10     I made to you regarding the protections of

11     Lybarger and my separation from service and

12     then basically a compelled statement in an

13     interview without being employed by an agency.

14           Q.      If this statement was taken

15     while you were still employed by Vallejo, would

16     you have wanted a chance to rebut that

17     statement with still the protections in place?

18                    MS. KNIGHT:  Objection,

19              incomplete hypothetical.  You can

20              answer.

21                    THE WITNESS:  I don't know.  I

22              would have had to confer with my

23              attorney, Harry Stern.

24     BY MS. LORENTSON:

KENT TRIBBLE

Page 61

```
 1              Q.      Were you aware that there were
 2      findings of misconduct in relation to this
 3      report?
 4              A.      No, I am not.
 5              Q.      As someone who has, you know,
 6      spent their career as a law enforcement
 7      officer, would you have wanted to know that
 8      there were findings of misconduct against you
 9      or against other persons in the report?
10                      MS. KNIGHT:  Objection,
11               relevance, incomplete hypothetical.
12      BY MS. LORENTSON:
13              Q.      Okay.  Would you have wanted to
14      know that there were allegations of misconduct
15      against you in this report?
16              A.      I think it was fairly obvious
17      that there were allegations of misconduct of me
18      at the onset of the investigation because of
19      the notification of interview, they
20      specifically named the allegations you're being
21      investigated for.  So that is no surprise to
22      me.
23              Q.      Would you have wanted to know
24      the findings?
```

KENT TRIBBLE

Page 62

```
 1              A.      I would have, yes.
 2              Q.      And were you ever provided by,
 3      you know, anybody the opportunity before today
 4      to look at the findings to know what the report
 5      had found?
 6              A.      I have never been offered that
 7      opportunity.
 8              Q.      All right.  David McLaughlin,
 9      did you ever bend David McLaughlin's badge?
10              A.      I remember bending David
11      McLaughlin's badge, yes.
12              Q.      And you said that in your
13      statement, right?
14              A.      Yes, ma'am.
15              Q.      And David McLaughlin's badge was
16      bent somewhere after you were promoted to a
17      sergeant in 2013?
18              A.      I believe so, yes.
19              Q.      And David McLaughlin was
20      involved in a shooting?
21              A.      Yes.
22              Q.      And Matt Kamoda was also
23      involved in that same shooting, right?
24              A.      Yes.
```

KENT TRIBBLE

Page 63

1          Q.      And his badge was also bent?

2          A.      Yes.

3          Q.      Okay.  So in the report -- as

4     you know, we were told before your interview

5     that they told you what types of allegations

6     might be raised against you, right?

7          A.      I'm sorry; I may have --

8          Q.      I'm sorry; that wasn't a good

9     question.  Before you interviewed with Mr.

10    Giordano, you were told that there were certain

11    ethics violations that were part of the

12    investigation?

13         A.      Yes.  Again, back to the notice

14    of intent to interview, they list the things

15    they're investigating.

16         Q.      So David McLaughlin was someone

17    who was under investigation for bending his

18    badge and he was exonerated of that finding.

19    However, I want to state -- well, actually, let

20    me tell you what they sustained in terms of

21    you, because they did not give you the similar

22    breaks that they gave your peers.

23                 So for Kent Tribble, in terms

24    of, let's see, standards of conduct relating to

KENT TRIBBLE

Page 64

1    badge bending, that was sustained.  It was

2    sustained in terms of a violation of any other

3    on or off duty conduct with any member who

4    knows or recently should have known is

5    unbecoming of an officer in the department, is

6    contrary to good order, efficiency, moral or

7    tends to reflect unfavorably on the department,

8    that was sustained.  You were found to have --

9    it was sustained that you violated your

10   supervisor's responsibilities.

11              Those are the findings.  So

12   three violations of the Law Enforcement Code of

13   Ethics and Standards of Conduct.  At any point

14   were you informed of that?

15       A.     No, I was not.

16       Q.     So then I want to go through the

17   individuals who, you know, participated in the

18   interview and you recalled various people that

19   were involved in the badge bending who were

20   exonerated.  David McLaughlin, he was found to

21   have been exonerated on having his badge bent

22   or of being somebody who knows of conduct that

23   is unbecoming of a member of the department.

24   Matt Kamoda, he was exonerated on the

KENT TRIBBLE

Page 65

1      unbecoming conduct and also on bending his

2      badge.

3                    Just for the sake of

4      completeness, Jason Bahou, is that someone

5      whose badge you bent or knew who had his badge

6      bent?

7             A.     I don't recall bending his badge

8      at all.

9             Q.     Okay.  What about Jeremy Huff?

10            A.     I don't recall bending his

11     badge.

12            Q.     Mark Galios?

13            A.     I do recall bending Mark

14     Galios's badge.

15            Q.     Mark Galios was exonerated on

16     those counts.

17                    Jason Scott, do you remember

18     bending his badge?

19            A.     No recollection of bending Jason

20     Scott's badge.

21            Q.     Do you have any recollection of

22     Jason Scott ever having a bent badge?

23            A.     I do not.

24            Q.     Okay.  Jarrett Tonn, do you have

KENT TRIBBLE

Page 66

1    a recollection of him having a bent badge or

2    you bending his badge?

3           A.      I thought that I did, yes.  I

4    don't know if that's correct, but I thought

5    that I did.

6           Q.      But two years ago when you gave

7    this interview with Giordano, you thought you

8    did it two years ago, right?

9           A.      I thought that I likely did.  I

10   think in there I said "I may have," if I recall

11   correctly reviewing that transcript.

12          Q.      Right.  And Jarrett Tonn was

13   exonerated on those counts.

14                  Todd Tribble was exonerated on

15   the failure to promptly or fully report

16   activities.

17                  Terry Poyser, do you know who

18   that is?

19          A.      Yes.

20          Q.      And who is that?

21          A.      Terry Poyser was an employee of

22   the Vallejo Police Department who served both

23   as an officer and as a detective, and retired

24   as a detective I believe.

KENT TRIBBLE

Page 67

1          Q.      In what year did Terry retire,
2     do you know?
3          A.      I don't, because I know that he
4     was out on a back injury for a while and then
5     retired, like myself, yeah, while out on
6     injury.  But he retired prior to me, probably
7     2020.
8          Q.      Right.  So it's fair to say when
9     Poyser was interviewed, he was no longer an
10    active member of the Vallejo Police Department,
11    right?
12         A.      I would --
13         Q.      In 2021, if he was interviewed
14    in 2021, he was retired when he was
15    interviewed, right?
16         A.      Oh, I would believe so, yes.
17         Q.      Okay.  The finding against him
18    for having a bent badge was sustained, but --
19    let's see, you said that you were -- similarly
20    to Poyser, when you gave your interview and the
21    findings against you were sustained, you were
22    all but retired, right, you had like a couple
23    days left?
24         A.      I was interviewed one day prior

KENT TRIBBLE

Page 68

```
1      to my last day on the books with the Vallejo
2      Police Department.
3                      MS. KNIGHT:  Hey, Amanda, can I
4               take a break?  It's been a little over
5               an hour.
6                      MS. LORENTSON:  I have 10 more
7               minutes before we take a break.  I just
8               want to get through this section, and
9               then we can.
10     BY MS. LORENTSON:
11              Q.     Lee Horton, do you know what
12     year Lee Horton separated from the Vallejo
13     Police Department?
14              A.     I'm sorry; I've got one bad ear,
15     so.
16              Q.     That's okay.
17                     MS. KNIGHT:  Can you make it
18               another 10 minutes?
19                     THE WITNESS:  I can use a
20               restroom break, yeah, I can make it 10
21               minutes I think.
22                     I'm sorry, ma'am.
23     BY MS. LORENTSON:
24              Q.     No, that's okay.
```

KENT TRIBBLE

Page 69

```
 1                Let's see, Lee Horton, do you
 2     know if he was employed by the Vallejo Police
 3     Department when he was interviewed in 2021?
 4           A.      No; that would be speculation on
 5     my part.  I know he was out on an injury for
 6     quite some time, and I don't know when he
 7     retired.
 8                MS. LORENTSON:  Katelyn, what
 9           year did Mr. Horton separate from
10           Vallejo PD?
11                MS. KNIGHT:  That's a good
12           question.  I think it was sometime in
13           2021, but he certainly would have been
14           out from mid-2020 forward.
15                MS. LORENTSON:  Let me just
16           confirm.
17                MS. KNIGHT:  I don't think the
18           witness is going to have that answer
19           though.
20                MS. LORENTSON:  That's okay.
21           I'm just trying to figure out if Lee
22           Horton was another person who
23           allegations were sustained against
24           while he was either retired or out, but
```

KENT TRIBBLE

Page 70

```
 1              I can figure that out on my own.
 2        BY MS. LORENTSON:
 3              Q.      Ryan McMahon, did you bend his
 4        badge?
 5              A.      No, I did not.
 6              Q.      Do you know if his badge was
 7        bent by anybody?
 8              A.      Not directly, no.
 9              Q.      Had you ever heard a rumor about
10        that or anything?
11              A.      I had heard a rumor about him
12        mentioning badge bending.
13              Q.      And what was the rumor that you
14        heard about his mentioning badge bending?
15              A.      I had heard that he at some
16        point after an officer-involved shooting in I
17        think that's the McCoy one, in Taco -- it was a
18        shooting at Taco Bell with several officers,
19        and I heard post that event at some gathering
20        he had mentioned badge bending.
21              Q.      And were you there when he had
22        mentioned badge bending or no?
23              A.      No.
24              Q.      Okay.  So it looks like -- well,
```

KENT TRIBBLE

Page 71

1     it looks like Ryan McMahon was out on leave at
2     the time.
3                   MS. LORENTSON:  Is that
4          accurate, Katelyn, or had he separated
5          in 2021?
6                   MS. KNIGHT:  I do not recall off
7          the top of my head.
8                   MS. LORENTSON:  Okay.
9     BY MS. LORENTSON:
10          Q.      But the findings against him, I
11    believe he was on leave or had separated, were
12    sustained and then again of course all three
13    findings against you were sustained.
14                  And, you know, I'm trying to,
15    one, assess what happened, then also the
16    accuracy, you know, and the fairness of this
17    report, and so that's kind of why I'm trying to
18    ask some of my questions, but we have like
19    seven more minutes, okay.
20                  Tell me your recollection about
21    Jarrett Tonn having his badge bent, if it was
22    bent.
23          A.      Well, so, again, I have to -- I
24    went over my interview with Giordano --

KENT TRIBBLE

Page 72

```
 1              Q.      Yeah.
 2              A.      -- my testimony in Healy's
 3      courtroom, and subsequent interviews with Buena
 4      I think --
 5                      MS. KNIGHT:  Buena.
 6                      THE WITNESS:  -- another
 7              attorney like yourself, regarding the
 8              Taco Bell shooting and badge bending.
 9                      As I looked through those, I
10              know that when I interviewed with
11              Giordano, I tried to give him
12              everything I possibly could, anybody I
13              may have bent the badge for, not
14              knowing -- just tried to give him
15              everything he could run down, because I
16              know what his job was.  Right?
17      BY MS. LORENTSON:
18              Q.      Yeah.
19              A.      And, honestly, had I chose not
20      to help him with his job, I could have just not
21      interviewed.
22              Q.      Absolutely, yep.
23              A.      So I tried to give him
24      everything I had or could have had.
```

KENT TRIBBLE

Page 73

1            And up until that time I
2    believed I was responsible for any badge that
3    was bent, and I'm definitely responsible for
4    the bending of a badge as it relates to an
5    officer-involved shooting.  As far as I know, I
6    don't know of anywhere else that that has
7    occurred other than from what Golinveaux and I
8    came up with back in 2000.
9            So as I'm reading all these
10   different interviews, I noticed with Giordano,
11   I talked about a shooting that Tonn had been
12   involved in where I was actually present, at
13   North Vallejo by a Motel 6, where an armed
14   suspect -- or I don't know if he was armed at
15   the time, but he fled from us in the hotel, I
16   couldn't keep up, Tonn and Jones caught up to
17   him in a parking lot, at a car dealership I
18   think, and he tried to run one of them over and
19   they engaged him with gunfire.
20           When I spoke with Giordano, I
21   was thinking that I perhaps bent their badges
22   as a result of that.  I didn't even remember
23   that later when I interviewed with Buena
24   sometime after the Healy trial, that it might

KENT TRIBBLE

Page 74

```
 1    have been as a result of the officer-involved

 2    shooting where they saw a suspect known to them

 3    driving a stolen car and when they went to take

 4    him off in a car stop, he ran his vehicle

 5    backward into their vehicle, causing injury to

 6    them and precipitating a response of gunfire.

 7                Looking back, I'm not sure that

 8    it was the one or the other or that it

 9    happened.  I just thought that I may have done

10    that because I know those guys worked for me.

11         Q.      Did Jarrett Tonn have a bent

12    badge during your time working at the Vallejo

13    Police Department regardless of if you bent it

14    or somebody else bent it, to the best of your

15    recollection?

16         A.      I thought I had bent his badge,

17    but I never saw him wear a bent badge.

18         Q.      But you have a recollection, a

19    memory, and I honestly don't care what shooting

20    it was or what incident, but you have a memory

21    of bending his badge?

22         A.      I thought he may have been one

23    of the people that I had bent badges for.

24         Q.      Do you have a recollection of
```

KENT TRIBBLE

Page 75

1    where you would have bent his badge or where

2    you did bend his badge?

3            A.      It would have most likely been

4    at the Relay Club, which was the bar across the

5    street.

6            Q.      Yeah, you know, I'm just trying

7    to -- I'm just trying to figure out here,

8    because, you know, you're very -- you know,

9    you've given very helpful, a lot of information

10   in this interview, and I just am trying to

11   understand why some persons were -- well, how

12   about, do you have an understanding as to why

13   some people, even people who had already or

14   were on leave or were towards the end of their

15   time at Vallejo, why certain people were given

16   an opportunity to do a second interview to

17   clear up inconsistencies and you weren't?

18           A.      That would be speculation on my

19   part, but if she will allow me to give what I

20   believe is the reason --

21           Q.      Sure.

22           A.      -- I am more than happy to

23   restate.

24                   MS. KNIGHT:  Only if it's based

KENT TRIBBLE

Page 76

```
 1                on some facts.  So, you know, feel free
 2                to tell her, you know, if someone said
 3                something to you that gives you an
 4                impression, if you have information
 5                that gives you an impression.
 6                     THE WITNESS:  The only thing I
 7                know is that I remember my attorney,
 8                Harry Stern, specifically talking about
 9                the criminal exposure of giving a
10                statement, a compelled statement post
11                separation from service not protected
12                by Lybarger.  That's -- that's the only
13                facts that I have, and I don't know if
14                I'm even supposed to say that because
15                of attorney-client, but that's --
16                that's the basis of anything I think
17                why nobody contacted me after I
18                separated.
19           BY MS. LORENTSON:
20                Q.    Who else would be able to verify
21           that Jarrett Tonn's badge was bent?
22                A.    I thought Gary Jones and he were
23           present, because even in both of those, they
24           were both there.
```

KENT TRIBBLE

Page 77

```
 1            Q.     Is there anybody else that I can
 2     use to verify that his badge was bent?
 3            A.     I don't believe so.
 4            Q.     Do you know if there were ever
 5     any photographs taken when you bent, if you
 6     bent Jarrett Tonn's badge?
 7            A.     I don't recall that.
 8            Q.     Was it commonplace to take
 9     photos to commemorate bending a badge at any
10     point at Vallejo?
11            A.     Not that I recall.
12            Q.     Do you know anyone who took a
13     photo, regardless if it was commonplace or not,
14     of their badge being bent or that, you know,
15     ceremony or just the gathering of people?
16            A.     No, I do not.
17                   MS. LORENTSON:  All right.  I
18              think we're about at that 10 minutes,
19              so what about we get back in 10?  Is
20              that enough, Katelyn?
21                   MS. KNIGHT:  Yeah, 10 should be
22              enough.
23                   MS. LORENTSON:  Okay.  Cool.
24                        -  -  -
```

KENT TRIBBLE

Page 78

1              (Whereupon there was a recess in
2          the proceeding.)

3                      -   -   -

4      BY MS. LORENTSON:
5              Q.      Mr. Tribble, I'm just trying to
6      just look through this report, and it's pretty
7      long, and maybe Ms. Knight could help me
8      because she has probably a lot more knowledge
9      of it than I do, but do you know if Jeremie
10     Patzer was ever subjected to or had an
11     interview conducted in this matter in the
12     Giordano report?  Because I can't seem to find
13     one.  Where am I missing it?
14             A.      Are you asking me --
15             Q.      I'm asking Katelyn.
16             MS. KNIGHT:  I don't think so.
17          He was long gone by the time Giordano
18             was doing the investigation.
19             MS. LORENTSON:  Okay.
20     BY MS. LORENTSON:
21             Q.      So the two people you -- I want
22     to go back to that shooting that occurred in
23     2005, 6 or 7 with Ramrakha and Patzer, at least
24     according to your statement to Giordano.

KENT TRIBBLE

Page 79

1              So Sanjay Ramrakha had an

2      interview taken and he denied ever having his

3      badge bent or, you know, any knowledge

4      generally of people having their badges bent,

5      and then Jeremie Patzer, as you just heard, his

6      interview was never conducted.

7                  The Critical Incident Log lists

8      Brent Pucci and Jeremie Patzer as being the two

9      individuals who were involved in a shooting

10     December 10, 2005, involving someone named Eric

11     Adams, a nonfatal shooting.  Is that about like

12     the time that you remember that phone call and

13     hearing about that incident at the time

14     involving Sanjay Ramrakha?

15          A.      If I understand your question

16     correctly, that sounds like it could be right.

17          Q.      Right.  I'm just trying to

18     establish the general timeline.

19                  Okay.  If --

20          A.      Do you remember the actual year

21     that that happened?

22          Q.      Yes, December 10, 2005.

23          A.      Okay.

24          Q.      And that lines up with it being

KENT TRIBBLE

Page 80

1     around that time of the year in your memory?

2             A.      Yeah, and my -- and my injury,

3     because I was out for quite a while.

4             Q.      If Ramrakha was involved in this

5     incident -- well, let me go back, as part of

6     your job at Vallejo, did you ever have the

7     responsibility of reviewing or helping create

8     Critical Incident Logs?

9             A.      Okay.  I'm going to try to

10    answer that.  I've never heard the term

11    "Critical Incident Log."  I have heard "Watch

12    Commander's Log," which as a lieutenant or a

13    sergeant acting as a watch commander I had to

14    produce daily, which noted significant events

15    in patrol or even in detectives that occurred

16    that day.  That's a Watch Commander's Log.

17                    Critical Incident Review Boards

18    are what I'm thinking maybe you're referring

19    to.  I don't know if I'm correct.

20            Q.      No.  So if a Critical Incident

21    Log was created, that's a term of art that's

22    not used internally, it was like some sort of

23    external product or list that was made.  I'm

24    just trying to determine if that's something

KENT TRIBBLE

Page 81

1    that you knew -- if you knew of when you were

2    working there, if it's something that was not a

3    commonly kept thing by the officers themselves;

4    that's all.

5          A.      That's news to me.  This is the

6    first time I've ever heard of that.

7          Q.      Okay.  It appears that Mr.

8    Giordano fact checked your statement about

9    Sanjay Ramrakha being involved in the shooting

10   by looking at a Critical Incident Review Log

11   provided by the City of Vallejo that lists not

12   really much information, just the officers and

13   the date and ID number, kind of like the person

14   who was involved named "Adam, Eric, nonfatal

15   shooting."

16               Is there a -- well, you had

17   familiarity with sitting on a Critical Incident

18   Review Board, right?

19         A.      That's correct.

20         Q.      Would there ever be persons that

21   you investigated an incident and you determined

22   that there were more people than had initially

23   been reported that should be included in that

24   Critical Incident Review?

KENT TRIBBLE

Page 82

1              So were the reports ever

2     incomplete or was someone's name left off a

3     report, either intentionally or

4     unintentionally?

5          A.      Well, two things about that

6     question, one, a Critical Incident Review is

7     not the investigation of the shooting.  The

8     investigation of the shooting takes place by

9     two different entities, one is -- and sometimes

10    more than that.  I think all the shootings post

11    2000 in both this county and Contra Costra have

12    been reinvestigated by the DOJ, but I could be

13    wrong.

14              But the initial two agencies

15    that investigate officer-involved shootings

16    are, one, the DA's office and, two, the Police

17    Department, and within the Police Department

18    there is two different investigations, there is

19    the criminal side, which investigates all the

20    conduct, officers and suspect, and then the

21    Internal Affairs investigation about the use of

22    force.

23              So I guess in a sense there is

24    three, because you've got the DA's and the

KENT TRIBBLE

Page 83

1      Police Department's criminal side, and then

2      you've got the Department's Internal Affairs

3      Division that starts their investigation from

4      the moment the event occurs.

5                    Critical Incident Review Boards

6      are conducted far after those investigations

7      are initiated and I believe even after they're

8      concluded in most cases, and they're done as a

9      way for the department to examine what

10     happened, how the events can be learned from

11     and improved upon internally, whether it's we

12     need to modify training or procedures or if

13     there were -- there is a -- basically four

14     categories, I think one was procedural, meaning

15     we needed to adjust our procedures, two was

16     training I think was one of them, three was

17     it's either approved or disapproved, like we

18     don't like the way this thing happened, and I

19     don't remember what the other one was, but it

20     was more of an internal reflection of the

21     department and what we can learn from the event

22     and how we can improve.

23                    And oftentimes when the

24     shootings were considered justified by those

KENT TRIBBLE

Page 84

1       other investigative bodies, we would still find

2       problems with either our training or equipment

3       and try to make improvements in that regard.

4                    So that's kind of what that

5       Critical Incident Review Board is about.  It's

6       not an investigation per se of the actual event

7       in terms of criminal conduct or, you know, at a

8       surface level some procedure stuff, but

9       anything that had to do with conduct

10      violations, that's tackled by professional

11      standards, which is what IA is called now, so.

12                   Does -- that's what those are.

13          Q.       That makes sense.

14                   I didn't get a chance to ask you

15      this, but, you know, I read to you the summary

16      of Jarrett Tonn's second interview.  Is there

17      any accuracy to the allegation by Jarrett Tonn

18      that you had communicated to co-workers or to

19      friends that you thought your phone was being

20      tapped?

21          A.       I don't recall that.  I know

22      that when I learned of -- let's see, at some

23      point they talked about bringing the Department

24      of Justice in to reinvestigate everything.

KENT TRIBBLE

Page 85

```
 1    There had been -- I think probably post that
 2    decision and the mention of the badge bending
 3    in the press, I didn't want to talk to anybody
 4    about any of this basically because of this
 5    situation we're in now, where I knew down the
 6    road everybody involved is going to be asked
 7    who they talked to, what did they say, this,
 8    that and the other, and knowing that they were
 9    going to reinvestigate all of the shootings
10    from -- at that time I wasn't sure -- I don't
11    think I was aware they were going to go back to
12    2000 in Contra Costa, but I believe that based
13    on the history, that I was going to be the
14    subject of a lot of these investigations.  So I
15    was very careful about what I said to anybody.
16          Q.    Did anyone ever communicate to
17    you in 2000, 2001 that they were concerned
18    about your mental health?
19          A.    2001?
20          Q.    Yeah.
21          A.    No.
22          Q.    Okay.  Excuse me; 2021.  I'm
23    sorry; 2020 or 2021.  That's when Tonn says
24    that people were concerned about your mental
```

KENT TRIBBLE

Page 86

```
 1      health and that you were acting paranoid and
 2      not all there.
 3            A.      That's news to me, but it -- so
 4      even the phone tapping thing --
 5            Q.      Yeah.
 6            A.      -- there is a lot of joking that
 7      goes around in the Police Department, I mean,
 8      especially since body worn cameras --
 9            Q.      Sure.
10            A.      -- and, you know, the phone
11      lines in most of the department are recorded,
12      everything that occurs in the jail cells are
13      recorded, those mics pick up stuff that happens
14      out in the hallway, so there is a lot of jokes
15      made about surveillance.
16            Q.      That aside though, if any jokes
17      or comments were made about tapping or using
18      burner phones, your phone being tapped, if Tonn
19      used that in his interview to put the
20      perception out there that you had mental health
21      issues, that would be taking the statements
22      completely out of context?
23            A.      I believe so.
24            Q.      Okay.  The other statement that
```

KENT TRIBBLE

Page 87

1    Kent said is that both -- that mutual friends

2    ran into you in Las Vegas and that you were

3    talking about Chinese people following Delta

4    soldiers -- I don't even know what a Delta

5    soldier is -- and Navy Seals trying to spread

6    COVID.  Is that true?

7         A.     I don't know who the mutual

8    friends are; that's pretty vague.  I don't

9    recall seeing anybody that knew anybody down

10   in -- I don't even recall seeing any Vallejo

11   police employees other than my former partner,

12   Kevin McCarthy, down there.

13        Q.     So if Tonn represented that you

14   were talking and spreading rumors about Chinese

15   people following soldiers, that would be

16   inaccurate?

17        A.     No; I may have said that

18   because, I mean, that's when COVID broke out

19   and there were, when I was down there, quite a

20   few Chinese people and I did have a -- there --

21   a Delta soldier is a Special Forces operator, I

22   happen to know a lot of them.

23        Q.     Yeah.

24        A.     One of them actually did mention

KENT TRIBBLE

Page 88

1    the fact that while he was talking to a

2    colleague, he noticed an out-of-place elderly

3    Chinese woman backing up to them in a

4    suspicious fashion with a notepad, and he had

5    mentioned that to me and I took him at his word

6    because, I mean, that's been his profession for

7    20 years, I would expect that he knows what he

8    is seeing.

9           Q.     All right.  So we are one and

10   one for Mr. Tonn.

11              What about Tonn saying it was

12   common knowledge at the PD that Kent had an

13   alcohol problem?

14              MS. KNIGHT:  Objection,

15         speculation.  You can answer.

16              THE WITNESS:  Yeah, I don't -- I

17         don't believe that that's the case.  I

18         mean, I was a known, quote-unquote,

19         drinker, but I never came to work

20         drunk, I never -- I don't think I

21         imbibed more than a lot of people, to

22         be honest with you.

23   BY MS. LORENTSON:

24           Q.     And so when Mark Galios -- is he

KENT TRIBBLE

Page 89

1    friends or close to Jarrett Tonn at all or was

2    he, as far as you know?

3         A.    I don't know their relationship.

4         Q.    Let's see, okay, so I've read a

5    lot of reports about Ryan McMahon having one or

6    possibly two inscriptions or markings or

7    decorations on his gun.  Can you tell me about

8    that, what your knowledge is?

9         A.    Yes, I only know of one event

10   where anything like that was discovered.

11        Q.    Did you discover it?

12        A.    Yes.

13        Q.    Okay.  And you asked him to or

14   instructed him to get rid of it, right?

15        A.    Via his lieutenant, which was my

16   peer that was in charge of his working group,

17   yes.  Actually, I had removed it prior and I

18   didn't ask, I did remove his thing and then had

19   another armorer put a stock endplate on his

20   Glock pistol that was personally owned.

21        Q.    Can you tell me about that, like

22   you seeing it and the actions you subsequently

23   took?

24        A.    Sure.  What part of it would you

KENT TRIBBLE

Page 90

1    like to know?

2           Q.      So how you saw it, what it was,

3    and then what actions you took after seeing it.

4           A.      Okay.  We'll start at the

5    beginning, I think -- I think in response to

6    the officer-involved shooting at the Taco Bell

7    where McMahon was one of the actors, which is

8    the people involved in the shooting, those guns

9    that are used in those types of events get

10   booked into evidence and then they get sent

11   to -- I'm not sure which crime lab, but it's a

12   different county, I think it might have been

13   Alameda, San Mateo County, but, regardless,

14   they get sent off to the lab and they get

15   inspected at the lab for function, I think.

16   This is conjecture.  I know they get examined

17   at the lab and then they get returned to the

18   Police Department.

19                 Prior to reissuing those weapons

20   to the officers, as one of the command staff

21   that's on the Armory Committee, I wanted to

22   inspect the weapons to make sure they were

23   passing function tests before I reissued them,

24   because I don't know to what level they get

KENT TRIBBLE

Page 91

1    disassembled by the labs.

2                    We actually found one that was

3    not reassembled correctly; I can't remember

4    whose it was.  So that's why I did that.

5                    And while I was doing that, I

6    noticed an endplate on Officer McMahon's

7    personally-owned duty pistol, not the one that

8    he is issued but one he owns himself.

9         Q.      Can I pause you for a second?

10   That's something I've been curious about.  What

11   is the difference between a personally-owned

12   duty pistol and an issued one?

13        A.      Well, the first and biggest

14   difference is the officer has to pay for the

15   personally-owned weapon.  The department does

16   not.

17                    The department issues everybody

18   the same weapon, which is nowadays I think a

19   Glock 17 9 mm.  When I first started, it was a

20   Sig Sauer P229, a 40 caliber.

21                    And so the department fills its

22   requirement to arm their officers by issuing a

23   standard pistol to everybody.

24                    At some point in my career,

KENT TRIBBLE

Page 92

```
 1    probably late 2000s, the decision was made

 2    above me but with some of my input that not all

 3    officers can operate the pistol the same based

 4    on their physical makeup, whether their hands

 5    are large or small or they're short or tall

 6    or -- it's like shoes, not everybody has the

 7    same fit with one size, right?  So we opened it

 8    up to what we called alternate duty weapons,

 9    which had to be of a certain number of approved

10    brands and a certain offering of approved

11    calipers, and they were allowed to be used if

12    the officer qualified with their personally-

13    owned weapon and that weapon was approved by

14    the range staff.  And so that change in the

15    department occurred while I was there.

16                 So the personally-owned duty

17    weapons are those alternate weapons that

18    officers purchased on their own to perform

19    their duties at a higher level or a more

20    competent or reliable level for that officer

21    individually.

22          Q.     Okay.  Understood.  So it was

23    his personally-owned but he could use it in the

24    line of duty weapon that had the -- or firearm,
```

KENT TRIBBLE

Page 93

```
 1     excuse me, that had the engraving in it?
 2            A.      Yeah, it was not engraving
 3     though, it was --
 4            Q.      Oh.
 5            A.      Well, unless I don't understand
 6     the technology correctly for the image, but
 7     it's more like a drawing on a piece of plastic,
 8     some kind of imprint logo.  It didn't seem to
 9     be engraved.
10            Q.      So tell me about you seeing it
11     and what your impressions were when you were,
12     you know, examining his firearm.
13            A.      So I looked at his weapon
14     overall primarily for function.  I didn't tear
15     it all the way down to see what each part
16     looked like, but I was doing what they call
17     function testing, and because this part is on
18     the exterior of the weapon at the rear, I
19     noticed that the endplate was not a,
20     quote-unquote, stock Glock endplate, which
21     means the way the Glock would come off the
22     shelf of, you know, the Glock factory.  It was
23     an aftermarket endplate that is exactly the
24     same functionally but it actually had an
```

KENT TRIBBLE

Page 94

1    imprint on the rear of it, and the imprint was
2    I believe what you call a Celtic Cross and I
3    believe that it had Latin words on it.
4         Q.       And you recognized that symbol,
5    right?  What did you recognize it being
6    associated with?
7         A.       Well, number one, I mean, it's a
8    Christian -- I believe a Catholic symbol, Irish
9    Catholic symbol.  I could be wrong.  I'm not a
10   theologist.  But more than that, I have seen
11   that same cross and Latin words, and I can't
12   remember, I think it was like Veritas and
13   Aequitas or something like that, I had seen
14   them with that cross largely in a movie called
15   The Boondock Saints on posters.  In New Orleans
16   there is a whole bar that has that, that has
17   T-shirts and all that stuff.  So when I saw
18   that, that's what I associated it with.
19        Q.       And when you were interviewed,
20   you talked about that being a vigilante justice
21   movie.
22        A.       That's my interpretation of what
23   the movie The Boondock Saints was about, was
24   this -- basically the story line was two

KENT TRIBBLE

Page 95

```
 1      brothers that basically went around taking care
 2      of the violent thugs in town.  So that's what I
 3      associated it with, vigilantism.
 4           Q.      And then what did you do after
 5      you saw it?
 6           A.      I removed it, and then I had an
 7      armorer, I think at that time Corporal
 8      Greenberg, that worked with and for me, go find
 9      a -- we have spare Glock parts because by that
10      time we had gone to Glock weapons, and he found
11      a spare Glock endplate that was a stock Glock
12      endplate without an imprint on it, put it on
13      the weapon, and then I typed up an email with a
14      photograph of either the whole gun or the
15      endplate, I think it might have been just the
16      endplate, and sent that email to Officer
17      McMahon's lieutenant, which I believe was Fabio
18      Rodriguez, and my captain, because he was
19      supervisor to both Fabio and I, that I
20      discovered this endplate on the Glock
21      personally owned by McMahon upon their return
22      from the crime lab and that as a range officer
23      and range -- I don't think I was range master
24      at the time yet, but as one of the higher
```

KENT TRIBBLE

Page 96

```
 1     ranking range officers I did not approve of

 2     that piece of equipment being on a weapon

 3     carried for duty by our department members.

 4              So that email was sent to Fabio

 5     and Joe Iacono, and then subsequently we had a

 6     meeting where I explained that to Officer

 7     McMahon with his lieutenant, Fabio Rodriguez.

 8         Q.    Do you think that the department

 9     took this as seriously as you did or as you had

10     wanted them to?

11         A.    I -- I didn't know that it

12     was -- this is the way I looked at that, that

13     gun had already been used in an

14     officer-involved shooting.  Much like this

15     badge bending stuff, I'm not saying that that

16     symbol represents Officer McMahon's character

17     as a vigilante at all.  In fact, I think that

18     would be an erroneous statement.  However, I am

19     aware that public conceptions and allegations

20     of misconduct and misunderstandings and

21     suspicion can be raised by anything like that,

22     just like the badge bending.  So I did not

23     think it would be appropriate to be on a weapon

24     that's used on the streets by the City of
```

KENT TRIBBLE

Page 97

```
 1    Vallejo police officers.
 2         Q.      There was some mention by a
 3    corporal in Vallejo that Ryan McMahon had a
 4    modified trigger on his rifle.  What does that
 5    mean?
 6         A.      Okay.  That's -- that's a
 7    separate event.
 8         Q.      Yeah.
 9         A.      But it's to the same level.
10              And I want to be very clear
11    about this, these are both in my mind minor
12    policy violations, because we had a policy, and
13    I want to take ownership as one of the leaders
14    of the range staff of this, this errant act,
15    because I think that in some ways we failed as
16    range instructors and a department to when we
17    transitioned to this personally-owned weapon
18    thing, we put in the policy you're not allowed
19    to modify either your personally-owned weapon
20    or -- or department issued weapon in any way
21    without range master approval.
22              But I am guilty of having done
23    that in my younger years, and it was not
24    something -- something like changing out the
```

KENT TRIBBLE

Page 98

1    sights or, you know, in some cases a trigger

2    modification.  So I'm guilty of having done the

3    same thing.  And as I got further in my career,

4    I started seeing the significance of that and

5    we didn't -- I don't think we effectively

6    inspected the weapons well enough upon yearly

7    range training, the personally-owned ones,

8    because if we did inspect the weapons closely

9    enough, that wouldn't probably have ever made

10   it to the street.

11                But I do believe that, and this

12   is conjecture on my part, when officers

13   qualify, there are range masters there and they

14   see their weapons, so I believe that some of

15   the officers believe if their weapons are seen,

16   they're approved of.

17                So I looked at it more as a way

18   to, we needed to shore up what we were doing as

19   a range staff and it needed to stop if it were

20   continuing on the street.  That's the way I

21   looked at it.  I didn't think it was some kind

22   of big policy problem or officer conduct

23   problem.

24                When the second event occurred

KENT TRIBBLE

Page 99

```
 1    with the trigger, again --
 2           Q.      Can you tell me what it means
 3    though?  How is that -- I don't have any
 4    experience with guns.  How do you modify a
 5    trigger?
 6           A.      Well, it's very easy.  I mean,
 7    so to help you understand my -- my take on all
 8    this, I'm not trying to say I'm special, but
 9    one of the things that I was trained highly in
10    was weapons use of force, firearms instruction
11    and armoring, and armoring is maintenance of
12    department and/or personally-owned weapons, and
13    I'm a certified armorer for Glock pistols, Colt
14    pistols, and all variants of the M4 carving,
15    which is standard league issued to officers as
16    rifles.
17              We have to maintain a staff like
18    that in order to keep the weapons up to proper
19    specifications for duty use.  And oftentimes
20    weapons have mechanical problems occur through
21    their use and their longevity that we have to
22    replace parts for or completely replace the
23    weapon.  That's why you have guys like me in
24    that facility -- in that discipline.
```