KENT TRIBBLE

Page 100

1                    So when I talk to you about
2       modifying stuff, I don't want to talk -- like
3       I'm not trying to talk down to you, but I got
4       to try to make you understand the same things
5       that I understand.
6            Q.       Yeah.
7            A.       So modifying a trigger is as
8       simple as knowing how to take a weapon apart
9       beyond a standard field strip, which is what
10      you do to clean it, and actually taking the
11      internal trigger and hammer and/or striker lock
12      mechanisms and swapping them out.  Now, there
13      are a lot of aftermarket products that are as
14      simple as you take your gun apart, you remove
15      one piece by taking two pins out and then you
16      put in a similar but oftentimes more highly
17      polished or finely-tuned identical piece and
18      the weapon will operate more smoothly.
19                    That's not forbidden in our
20      policy, but it is set up so the only people
21      that are authorized to do that are department
22      armorers, because department armorers are
23      qualified to do it.  We're not gunsmiths but
24      we're qualified to change out parts.  We're not

KENT TRIBBLE

Page 101

1    authorized to weld or fix broken parts, we only

2    can replace them, right, but we also are

3    qualified to replace drop-in aftermarket parts

4    if need be and if approved.

5            So when I inspected McMahon's

6    rifle and found that he had modified his own

7    trigger by putting in a different trigger

8    group, whether it's drop-in or a couple of

9    pins, I was most concerned with whether he was

10   qualified to have done that work, so I asked

11   him if he were a department armorer or an

12   armorer certified for the Colt M4 or any

13   variants, which is what type of rifle he had,

14   and he told me that he was.

15           So then I wasn't so worried

16   about the trigger modification but I became

17   more interested in getting him onto our armorer

18   staff because we were very shorthanded, and as

19   a result of being shorthanded sometimes things

20   like missing that endplate on his Glock

21   happened.

22           Now, I wanted him to come onto

23   the armorer staff so we would have more

24   personnel to do better inspections and assist

Page 102

```
 1    with weapons maintenance.  So I asked him to
 2    drop in my box all of his qualifications as
 3    armorer so I could get them on file and put him
 4    on the team.  So that's what happened with
 5    that.
 6              Did I answer your question?
 7         Q.      You did, yeah.
 8              So when you were inspecting his
 9    weapon, how did you know that the trigger had
10    been modified?  Did it look different?
11         A.      Well, it was not a Colt M4.  I
12    don't remember what exactly the brand was of
13    his rifle, but it was a clone.  They call them
14    clones because they're identical in
15    manufacturing, just made by a different
16    company.
17              And I recognized that the
18    trigger, he had a flat trigger, which is often
19    used in competition, sometimes used in the
20    field by different operators, but usually not
21    stock on an off-the-shelf patrol rifle.  And
22    just by the visual inspection alone I suspected
23    that it was an aftermarket trigger; and when I
24    asked him, he said it was and that he put it in
```

KENT TRIBBLE

Page 103

1    his rifle.

2         Q.       When you have the flat -- you

3    said the flat trigger, does it fire differently

4    or like is it harder to fire, easier to fire,

5    slow, faster?  What's the difference?

6         A.       It's neither.  It's simply a

7    different feel on the tip of your finger, and

8    some people prefer a flat trigger and some

9    people prefer a curved trigger, but I don't

10   think that it does anything by the shape of the

11   trigger that actually assists in its operation,

12   it's just individual preference.

13        Q.       You were talking about how you

14   were interested in getting McMahon on -- you

15   know, as one of the people who inspected the

16   weapons because you -- you know, like you felt

17   like maybe it would have caught like more

18   things, like the endplate.  Did you feel that

19   when you were in that role, that position at

20   Vallejo, that you had adequate support to do

21   your job effectively?

22        A.       I think that in Vallejo, based

23   on the unfortunate circumstance of how many

24   officers we had versus the workload, which I

KENT TRIBBLE

Page 104

1      think if you compared the department at least
2      at the time that I worked there, we had one of
3      the smallest numbers of officers per capita of
4      most cities probably in the country, and of the
5      personnel that were there, most of us had
6      numerous collateral duties, "collateral"
7      meaning like I was on the SWAT team, I was in
8      charge of training the SWAT team, I was on the
9      range master -- I had the range master position
10     for a while, which meant I was responsible for
11     all the weapons, their maintenance, their
12     procurement, their inspections, and the
13     personnel that were to do it.
14              For a while I was part of the
15     bike patrol team that, you know, we had to do
16     that as a collateral duty on an overtime basis.
17     I used to also assist as the canine coordinator
18     in joint capacity with my brother.  I was one
19     of the weaponless defense instructors and had
20     to coordinate the training with that.  I was on
21     the Critical Review Incident Board teams.  I
22     had to go to the -- and I am not -- I am not an
23     anomaly when it comes to that level of
24     responsibility for most employees at the Police

KENT TRIBBLE

Page 105

1    Department.

2              So I'm not saying we didn't have

3    the support, I'm saying we really didn't have

4    the personnel to get all those jobs done as

5    well as I would have liked to.

6         Q.    Okay.

7         A.    So in my assignments, when I

8    found problems, most of the time I didn't look

9    at the officer as at fault, I looked at for how

10   I could improve what I knew we were doing so

11   that that problem wouldn't continue.

12        Q.    Well, one of the things that

13   struck me is when you were talking about your

14   experience with your first officer-involved

15   shooting in Concord and how you were

16   commiserating with a fellow officer who had a

17   similar experience and then you witnessed that

18   in other officers at Vallejo.

19              Did Vallejo have the mental

20   health treatment or some sort of like person

21   that the officers could talk to for support

22   when they were involved in those, you know,

23   traumatic life-and-death experiences?

24        A.    Absolutely, they did.  And

KENT TRIBBLE

Page 106

```
 1      through no fault of the department is it a
 2      difficult experience.  I don't care who you
 3      are, whether you work for a Police Department
 4      or not or you're in the military, the situation
 5      of being put where either you may lose your
 6      life, an innocent person you're trying to
 7      protect may lose their life or even the suspect
 8      you're trying to take in peacefully, if they
 9      cooperate, may lose their life as a result of
10      whatever the suspect's actions are, which
11      aren't in your control, that's a -- for lack of
12      a better -- without trying to sound like a
13      drama queen, that's a harrowing experience.
14              Q.      Yeah.
15              A.      And the department does its
16      best, they give you a chance to speak with a
17      psychologist, and they have -- nowadays they
18      have critical incident debriefs that all the
19      people that are involved, including dispatchers
20      and/or even medics sometimes, can take, you
21      know, take part in.  But the problem with the
22      whole situation that causes the stress, I
23      think, in one of my -- in my personal opinion,
24      is that you're not as free to talk to anybody
```

Page 107

 1    as most other people would be because of
 2    litigation, ongoing investigations, and, you
 3    know, you don't want to be tampering with other
 4    folk's statements and interviews don't always
 5    get done immediately and the case is still
 6    under investigation for months, so you really
 7    don't have many people you can talk to.
 8              And then you wind up in
 9    situations like this, where 23 years later I'm
10    still discussing officer-involved shooting.  A
11    lot of us won't even talk to the people at home
12    about it for fear of getting them subpoenaed
13    into court.  Not that you're going to say
14    anything wrong, you just don't want other
15    people to have to deal with all of the stuff
16    that we're going to want to -- that we don't
17    want to but we willingly participate in, like
18    this interview.
19              So it's hard.  And I don't know
20    that any level of mental health assistance
21    would mitigate that, because that's just a
22    challenge that has to be dealt with.  I don't
23    think in any way that that makes -- you know, I
24    think there is plenty of opportunities for

KENT TRIBBLE

Page 108

```
 1      officers to get mental health help and in my

 2      personal opinion there always has been.

 3            Q.      Do you think that the level of

 4      responsibilities that individual officers had,

 5      you know, very extensive according to what you

 6      were saying, do you think that that puts a --

 7      has any impact on an officer's ability to do

 8      their job the best they can?

 9                  MS. KNIGHT:  Objection, calls

10            for speculation, vague, ambiguous.

11      BY MS. LORENTSON:

12            Q.      You can still answer.

13            A.      I never saw an officer conduct

14      themselves in any way that was less than the

15      best of their abilities, but I do believe that

16      the nature of the department staffing levels

17      and workload was very taxing.

18            Q.      There were some notes about, you

19      know, your efforts surrounding that, and can

20      you tell me like what, if anything, you did to

21      try and address the staffing concerns at

22      Vallejo?

23                  We just talked about Ryan

24      McMahon, adding him onto the unit that
```

KENT TRIBBLE

Page 109

1    inspected guns, but beyond that.

2                A.        Well, the department had several

3    staff meetings regarding recruitment and

4    personnel.  There was -- I mean, a lot of

5    this -- a lot of this started really post 2012

6    when -- well, the city went bankrupt in 2007ish

7    and we lost a ton of officers as a result of

8    that and the city's contract disputes and/or

9    failure to have contracts, pay cuts, those were

10   all obstacles to us recruiting and retaining

11   personnel.

12                And of those that stayed, the

13   mandatory overtime that occurred daily on every

14   squad also became a deterrent for people to

15   want to come work here.  We addressed those

16   issues in staff meetings almost every meeting

17   with trying to come up with new recruitment and

18   retention strategies.

19                But I do believe based on all my

20   training in supervisor schools that that is not

21   a unique problem to the City of Vallejo, that

22   has been a problem, and you see it in the news

23   all the time now, especially post the George

24   Floyd stuff, good luck retaining and recruiting

KENT TRIBBLE

Page 110

```
 1    people that want to do this job based on the
 2    nature of the perception of it and the exposure
 3    to liabilities that it brings versus the
 4    benefits you get out of it.
 5            Q.      When you brought up at staff
 6    meetings, you know, the solutions and the ways
 7    that you could improve the staffing issues,
 8    were the people in the leadership positions
 9    receptive?
10            A.      Absolutely.  Absolutely.  I just
11    don't think -- I think given -- again, I don't
12    want to say anything out of speculation.  My
13    belief is given the situation of society's
14    perception and treatment of police officers and
15    the individual experience of Vallejo police
16    officers with the pay cuts and benefits cuts, I
17    think that the people that wanted to retain and
18    recruit officers were more than hopeful but I
19    feel like their hands were a little tied.
20            Q.      Understood.  So we've heard a
21    lot of talk about a Taco Bell incident.  What
22    happened at Taco Bell?
23            A.      An armed suspect was shot and
24    killed by the Vallejo Police Department.
```

KENT TRIBBLE

Page 111

1          Q.      There was -- I will admit to you

2    the depositions are running together for me,

3    but there was one individual that talked about

4    rumors involving some supervisors and Netflix.

5    Have you heard about that?

6          A.      Netflix?

7          Q.      Uh-huh.

8          A.      I have no idea what you're

9    talking about.

10         Q.      So there was a witness who had

11   talked about an allegation that when the Taco

12   Bell shooting was occurring or before it had

13   occurred, at some critical point, there was an

14   inability to reach certain supervisors because

15   they were watching television at the

16   headquarters.

17         A.      I am unaware of any such

18   allegation.

19              MS. KNIGHT:  Hey, Amanda, it's

20         about lunchtime over here.  If you

21         don't have a lot, I would want to power

22         through, but if you think you're going

23         to have, you know, an hour plus, then

24         now might be a good time to --

KENT TRIBBLE

Page 112

```
 1                    MS. LORENTSON:  Oh, we'll take a

 2            lunch break.

 3                    MS. KNIGHT:  Thank you.

 4                    THE WITNESS:  Okay.  Thank you.

 5                         -  -  -

 6                    (Whereupon there was a luncheon

 7            recess from 12:25pm PST/3:25pm EST to

 8            1:00pm PST/4:00pm EST.)

 9                         -  -  -

10      BY MS. LORENTSON:

11            Q.     All right.  So I can't remember

12      where we left off, but I've been unfairly

13      bouncing around anyway, so I guess it doesn't

14      really matter.

15                         -  -  -

16                    (Discussion held off the

17            record.)

18                         -  -  -

19      BY MS. LORENTSON:

20            Q.     Let's see, Mr. Tribble, you

21      separated from Vallejo or retired in 2021.

22      What were the terms of your separation?  Was

23      this you retired, getting retirement benefits

24      or were there any terms you negotiated with the
```

KENT TRIBBLE

Page 113

1    city when you left?

2            A.      No, ma'am.  I simply turned 50

3    and thought it was about time I get to have a

4    weekend or a night off or a holiday to be with

5    my family after 27 years of not.

6            Q.      You know, and I don't mean any

7    disrespect by asking this question but I forgot

8    to ask when we started, during the break did

9    you have the opportunity or did you review any

10   documents?

11           A.      No, I did not.  I ate a burger.

12           Q.      Okay.  Good.  And did you

13   discuss the substance of your deposition with

14   anybody?

15                   MS. KNIGHT:  Other than counsel.

16                   THE WITNESS:  No.

17   BY MS. LORENTSON:

18           Q.      Okay.  Without getting into what

19   you discussed with counsel, did you discuss

20   your deposition with counsel?

21                   MS. KNIGHT:  Objection,

22              attorney-client privilege.  I think the

23              substance of discussions are off

24              limits.  If you would like, you can ask

KENT TRIBBLE

Page 114

1          him if he talked to me without touching

2             the subject and how long.

3                MS. LORENTSON:  I think that

4             speaks for itself.

5     BY MS. LORENTSON:

6          Q.     Okay.  So who is Travis

7     Aspegren?  Now I know I'm mispronouncing that,

8     but do you know who that is?

9          A.     You're asking me?

10         Q.     Yes.

11         A.     Travis Aspegren I think is --

12         Q.     Yes, Aspegren, yes.

13         A.     Yep.  He was an employee with

14    the Vallejo Police Department.

15         Q.     What was his role as an

16    employee?

17         A.     I know he was a patrol officer

18    for a while.  I think he may have been an FTO

19    but I'm not sure, which would be a field

20    training officer.

21                I don't remember if he was

22    actually on the SWAT team or not.  I know when

23    he worked for Benicia PD and we were a joint

24    team, he was on the SWAT team, because it was a

KENT TRIBBLE

Page 115

```
 1    regional team comprised of Vallejo and Benicia,

 2    and I don't remember if he got back on to it

 3    when he was in Vallejo.

 4           Q.      You know, just to paint broadly

 5    with -- you know, paint the testimony that

 6    you've given so far with broad strokes, is it

 7    fair to say that whenever you bent someone's

 8    badge, they were present for that, so the

 9    individual officer was present when you bent

10    their badge?

11           A.      Yes.

12           Q.      So if Travis talked about a

13    practice of hanging uniforms on lockers after a

14    fatal shooting and that the badges would be

15    somehow -- his words were, "someone would bend

16    the badges somehow during the middle of the

17    night," who do you believe would be the

18    officers that were engaging in that?  Have you

19    heard about that too?

20           A.      This is the first time I've ever

21    heard anything like that.

22           Q.      Do you have any reason to doubt

23    that that's true?

24           A.      I don't know -- the only reason
```

KENT TRIBBLE

Page 116

1    I could doubt that that's true is that I have
2    never heard of it, but I would never even begin
3    to allude that Travis Aspegren would be
4    untruthful, so.
5           Q.      Now, Travis also testified -- he
6    was interviewed by Giordano.  Curiously enough,
7    his interview does not appear in the report and
8    I don't believe we have been provided
9    affirmatively with the audio.  We were able to
10   find it.  But there is a note that he said
11   before the article went out, before all of the
12   news, he said that some officers viewed the
13   badge bending as a notch on their belt for a
14   fatal shooting.
15          Is that something you've heard
16   by officers that may have taken a different
17   view of badge bending than you did?
18          A.      No.
19          Q.      So have you ever heard anyone
20   describe it being a notch on a belt for a fatal
21   shooting?
22          A.      No.  If I -- if anything like
23   that I heard or read, it would have probably
24   been in a newspaper article that came out about

KENT TRIBBLE

Page 117

```
 1     this where that illusion was made, and I -- it
 2     was nowhere near correct.  That's when I
 3     remember hearing something about it being
 4     fatal.
 5              Q.      If Travis said that he heard the
 6     notch in the belt for a fatal shooting before
 7     the article ran, because of your, you know,
 8     your extensive experience in the department,
 9     who could I speak to to see if I could verify
10     or disprove that?  Do you have any idea of who
11     might know?
12              A.      I don't, other than anybody he
13     worked with.
14              Q.      Do you know who he worked with?
15              A.      I can't remember off the top of
16     my head.
17                     MS. LORENTSON:  Katelyn, correct
18               me if I'm wrong, you never provided us
19               with his statement, right?  It was
20               redacted in the report.
21                     MS. KNIGHT:  You know, I don't
22               remember offhand that specific one.  I
23               feel like this may have been part of a
24               later supplement, but I don't have a
```

KENT TRIBBLE

Page 118

1      specific memory at this point.

2             MS. LORENTSON:  Because I think

3      that the -- the only way I would say I

4      would find that, interestingly, was

5      going in through the emails at the end

6      and the audio link is linked in the

7      emails, and so I was lucky enough to be

8      able to find that.

9             So we have all of the materials

10     from August of 2021, and I don't

11     believe that we received a copy -- so

12     I'd just like to put on the record a

13     request for the copy of his interview,

14     whatever notes or documents, because

15     obviously it's information that's, you

16     know, news to me and Mr. Tribble as

17     well that I would like to be able to

18     look into.

19            MS. KNIGHT:  Okay.  Yeah, I

20     mean, I think these were subpoenaed

21     records from Mr. Giordano.  We did have

22     a chance to look through those at the

23     time of the subpoena.  I don't believe

24     that was withheld.  I'm certainly happy

KENT TRIBBLE

Page 119

1                to double-check it for you.

2                        MS. LORENTSON:  Yeah, you

3                understand with the controversy

4                surrounding documents being deleted and

5                everything, I need to dot all my I's

6                and cross my T's.

7        BY MS. LORENTSON:

8                Q.        So, Mr. Tribble, we were given

9        three versions of -- well, actually, four

10       drafts of the Giordano report, and, you know,

11       that came out to be about 3,000 pages.  Looking

12       at the comparisons to the final report that we

13       were given and also the initial drafts, there

14       were several shifts in the way that the reports

15       were written and I'm hoping that you can give

16       me some clarity, if you can.  If you can't,

17       that's fine.

18                        One of the shifts I noticed

19       between the first draft and the final draft was

20       that there were findings of fault against -- in

21       the later drafts the findings of fault were

22       against former employees like Ryan McMahon and

23       Terry Poyser.  Do you have any understanding as

24       to those people's like position in Vallejo, if

KENT TRIBBLE

Page 120

1    they were people that were respected, not

2    respected?  I'm just trying to understand why

3    those statements were made as the reports

4    evolved.

5              MS. KNIGHT:  Objection,

6         foundation, speculation, compound.

7              MS. LORENTSON:  It doesn't

8         matter.  He can answer.

9              THE WITNESS:  I have no idea.

10        I've only seen one piece of one of the

11        versions of the report, which was my

12        interview.

13   BY MS. LORENTSON:

14        Q.     Yeah.

15        A.     I don't know which version that

16   was from.  But I've gotten two in both

17   depositions so far, and they are the same.

18        Q.     Okay.

19        A.     That's all I know.

20        Q.     That's okay.  No; honestly, like

21   I'm just trying to figure out stuff.

22              So Kyle Wylie, all the

23   allegations against him were sustained, but

24   what had happened in the report from the

KENT TRIBBLE

Page 121

1      initial draft to the final draft was that the
2      sections about him were rewritten, including
3      removing dates and identifying where badge
4      bending happened.  And, you know, interestingly
5      his story aligned very similarly with yours.
6                     Do you have any idea as to
7      Kyle's standing in the Police Department or
8      what his position was when this would have been
9      happening in 2021?
10                    A.      I always held Kyle in a very
11     high regard, and when he worked for me or with
12     me, maybe on a different team but the same
13     days, he was one of the members that I could
14     always count on to be reliable and competent
15     and professional.  That's my own experience
16     with him.  And I never had any knowledge of him
17     having anything to do with badge bending until
18     I heard it in Judge Healy's courtroom.
19                    Q.      So Kyle Wylie you said, you
20     know, you had never heard of any allegations
21     about him bending badges, and they sustained
22     all of the violations against him, but then
23     people like David McLaughlin and Matt Kamoda,
24     who admitted to having their badges bent, they

KENT TRIBBLE

Page 122

1    were exonerated of any department violations.

2                         As someone who through his roles

3    had to be a part of, you know, like you sat on

4    the Critical Incident Review Board, I'm

5    assuming you had to look at violations,

6    potential violations, do you have any

7    understanding as to why the charges or like the

8    violations were exonerated against Matt and

9    David even though their badges were bent just

10   like Kyle's was, just like Jarrett Tonn's?

11                         MS. KNIGHT:  Objection,

12              speculation.

13                         MS. LORENTSON:  That's fine.

14   BY MS. LORENTSON:

15         Q.      You can answer.

16                         MS. KNIGHT:  And she is correct,

17              you can always answer unless I instruct

18              you not to.

19                         THE WITNESS:  I'm just listening

20              to you two ladies tell me what to do.

21              Somebody tell me what to do.

22   BY MS. LORENTSON:

23         Q.      To give you clarity, Mr.

24   Tribble, I am trying to figure out if this was

KENT TRIBBLE

Page 123

```
 1        a fair and unbiased report, and I have -- I
 2        mean, obviously we've gone through the things
 3        where people were given secondary interviews
 4        and you were not and you were charged with
 5        multiple violations and other people who had
 6        their badges bent were not, and so I'm trying
 7        to figure out why certain people were found to
 8        have violated policy and then the exact same
 9        conduct other people aren't, and so I'm just
10        trying to figure out if you can help me
11        understand the politics in the Vallejo Police
12        Department to understand that better, because I
13        have no frame of reference.
14             A.    It would be purely conjecture on
15        my part.  I have a belief, but, again, that's
16        conjecture and it's based on my personal
17        experience and opinion with what has been going
18        on over at the Police Department, so.
19             Q.    Well, I would like to hear your
20        personal belief based on your personal
21        experience.
22             A.    I believe that the impetus and
23        objective of this entire investigation was to
24        begin the process of replacing the command
```

KENT TRIBBLE

Page 124

1    staff at the Vallejo Police Department.  I saw

2    that with the bringing in the Department of

3    Justice to reevaluate everything that had

4    already been reevaluated.

5             In my experience, you don't

6    bring that in for standard officer misconduct,

7    you usually would call on them to do an

8    overhaul basically of the command staff.

9    That's probably where some of the jokes about

10   tapped wires, you know, whatever, came from.

11            I have no information about the

12   sustained findings on any of these, even on

13   myself, until you told me.  And, quite frankly,

14   I have no objection to that in regards to me

15   because even though I don't believe had this

16   not reached the level of press notoriety and

17   some of the unfortunate contemporaneous actual

18   events that occurred, I still believe that

19   extremely bad judgment, extremely poor

20   decisionmaking on my part, there was no malice,

21   there was no ill intent, there was no -- behind

22   any of it, so I don't mind the sustained

23   problem -- or sustained allegations against me,

24   I don't think they're as large, the violations,

KENT TRIBBLE

Page 125

1    as they are perceived to be or portrayed to be.

2                    I don't necessarily think anyone

3    besides me, and I believe I told Giordano this,

4    should have been found -- unless they were

5    doing something I don't know about, should have

6    been found in violation at all.  I did this, I

7    own this, as far as Vallejo PD goes.  It all

8    falls on my shoulders, and none of this would

9    have happened if it weren't for me and my poor

10   decisions.  So I'm okay with that.

11                   I don't know the reason behind

12   the other findings, but my belief is that there

13   was -- there was and may still be a drive to

14   completely alter the composition of the Vallejo

15   Police Department from the top down, and --

16        Q.     By who?

17        A.     Probably the -- probably the

18   city itself, meaning City Hall, city

19   management.  I am not -- that's way above my

20   pay grade.  These are all opinions and

21   conjectures on my part.

22        Q.     Oh, I understand.

23        A.     But that's what I believe.

24        Q.     And by replace, do you mean like

KENT TRIBBLE

Page 126

1    replace the leadership, like the captain, like

2    are you talking about people like Bidou or I

3    guess --

4              A.      Well, Bidou is no longer there.

5              Q.      Right.

6              A.      Neither is the chief that they

7    brought in that initiated all this stuff.

8              Q.      Elio?  Elia?

9              A.      No, I don't know if he was the

10   one that initiated it.  It was the last guy,

11   the -- I don't remember his name.

12             Q.      Whitney Horton?

13             A.      No; Whitney was never a chief.

14             Q.      Oh.

15             A.      I do believe he is one of the

16   precipitating factors of this whole thing, but.

17                     THE WITNESS:  Who was the name

18              of the last chief prior to whoever is

19              working now?

20                     MS. KNIGHT:  Williams.

21                     THE WITNESS:  Williams, I

22              believe he was specifically brought in

23              to alter the structure of the command

24              staff at the Vallejo Police Department,

KENT TRIBBLE

Page 127

1           and I think he did his job and then he
2           was -- he departed shortly thereafter.
3           All conjecture on my part.
4   BY MS. LORENTSON:
5           Q.      Yeah, I understand, I
6   understand.
7                   I'm going to represent to you
8   that the reason why -- I agree with you that
9   there is probably an ulterior reason for this
10  report being made.  The reason that was given
11  was that it was meant to do a full and complete
12  inspection and determination into what did or
13  did not happen in regards to badge bending, and
14  so, you know, that's the reason that was given.
15  Whether or not that's accurate, I, you know, I
16  think that's -- you have spoken on that just
17  now.
18          A.      Well, yeah, and if you don't
19  mind, if you don't mind to help clarify part of
20  what I'm saying is the people that you told me
21  had been sustained, myself included, were all
22  of the rank level, either a sergeant or maybe a
23  lieutenant or a captain, I don't know, but not
24  the lower level line officers.

KENT TRIBBLE

Page 128

```
 1                    And there could be two reasons
 2      for that, right, there could be the drive to
 3      revamp the command staff structure, right, but
 4      there could also be this aspect, is when a
 5      ranking officer does something with a lower
 6      rank officer, that lower rank officer is at a
 7      disadvantage, right, to stand up or push back.
 8      So in some ways it could be looked at like it
 9      was a greater violation for someone that should
10      know better and be a better leader, myself, I
11      mean, specifically, should have been a better
12      leader.  So that the violation may have more
13      magnitude with the ranking officer, if that
14      makes sense to you.  The junior or lower
15      ranking officer, they're kind of at a
16      subordinate level, you know.
17                    And in none of these cases that
18      I participated in did anyone have a choice on
19      whether their badge was bent.  They could react
20      however they wanted, but none of them had a
21      choice and none of them voluntarily gave me a
22      badge to be bent and none of them ever
23      expressed a desire for that to occur.
24            Q.      Didn't Josh Coleman talk to Vice
```

KENT TRIBBLE

Page 129

1    and say that he went to you to have his badge

2    bent affirmatively?

3          A.      Did Josh Coleman what?  I'm

4    sorry.

5          Q.      I think that Coleman had gone

6    to -- had participated in an interview with

7    Vice News and it made it seem like he had

8    sought you out to have his badge bent.

9          A.      I never saw the interview with

10   Vice News.  I never -- they asked me for one, I

11   never provided one, knowing that we still had

12   all of this to do, you know.

13         Q.      Sure.

14         A.      So I don't know anything about

15   what you're talking about, but I do know that

16   in the incident that I remember bending Josh

17   Coleman's badge, I summoned him, and, again,

18   would never have mentioned it to him until

19   after I did it.

20         Q.      What are your thoughts on the

21   Vallejo Police Officers Association?

22                 MS. KNIGHT:  Objection, vague,

23            ambiguous, relevance.  Go ahead.

24   BY MS. LORENTSON:

KENT TRIBBLE

Page 130

1        Q.      Are you a member?  Excuse me;
2     were you a member when you were -- is it
3     compulsory, like everyone is a member?
4        A.      Well, it's compulsory to -- yes
5     and no.  I mean, if you want to have access to
6     legal defense, then you have to be a member,
7     because that's what the account is with, that's
8     my understanding of it, which is why most
9     people are association members.
10              I don't know that they ever
11     really did anything that I am aware of that's
12     helped or hurt the police officers.  I know
13     there is a lot of -- those guys were always
14     involved in some kind of contractual
15     disagreements or whatever with the city.  It
16     never seemed to be an amicable relationship
17     between them and the city.
18        Q.      Do you know why there was
19     contract issues between the city and the VPOA?
20        A.      You know, only the things that I
21     heard, which are not direct involvement in any
22     of the negotiations.
23        Q.      What interaction, if any, did
24     you have with Michael Nichelini?

KENT TRIBBLE

Page 131

1          A.      Well, Michael Nichelini was an

2     employee of the Police Department.

3          Q.      And that his father was a former

4     member of the Police Department, right?

5          A.      Yeah, his father was the chief

6     that was running the department when I was

7     hired.

8          Q.      There was an incident that we

9     were told about where, in an email, that

10    Michael had -- that Mr. Nichelini had taken a

11    photograph of a badge that had a -- a Vallejo

12    badge that had a swastika engraved in it and

13    had sent it to his dad and it made its rounds

14    in the Police Department.  Is that an email

15    that you had ever seen or you had to address in

16    any way?

17         A.      I don't believe I ever had to

18    address that, but I did hear about that and/or

19    see it somewhere in the news or something.

20         Q.      Do you have any understanding as

21    to why that photo would be shared?

22         A.      I would only say to defame the

23    Police Department, because my understanding is

24    that the date that that badge was issued, the

KENT TRIBBLE

Page 132

```
 1    swastika hadn't even become a thing with the
 2    Nazis because it was prior to the Nazi
 3    activities in, what, the '30s or '40s.  That
 4    badge was prior to that.  So I don't -- that's
 5    all I ever heard about that, so.
 6              Q.      Yeah, but what did you hear
 7    about the -- have you heard anything about why
 8    Nichelini shared that?  He shared that
 9    recently, it wasn't something that was -- you
10    know, obviously wasn't around in the '30s or
11    '40s.  He shared it recently.
12              A.      Yeah, I don't know that he
13    shared that.  I know that a lot of things in my
14    personal belief were, quote-unquote, leaked to
15    the press in an effort to defame the
16    department.  I don't know how that came to be,
17    that picture, so.  I wish I could tell you.
18              Q.      What do you mean, leaked to
19    defame the department?
20              A.      I think information showed up in
21    like in the report against the badge bending
22    thing, I think a lot of incorrect information
23    was provided to the press from somebody, and I
24    don't know who, but in an effort to initiate
```

KENT TRIBBLE

Page 133

1      this whole investigation.  Because like I have

2      told you, most of the reporting in those press

3      pieces was inaccurate and nobody had ever had

4      an in-depth conversation with me, who was the

5      origin of all of this, and I had to watch --

6      I'm not playing the victim here, but because of

7      the way things work with these things, I had to

8      watch all of this unfold before I was ever

9      given an opportunity for an interview and in

10     subsequent depositions.

11               So I watched a bunch of

12     information that wasn't entirely accurate in my

13     opinion be portrayed as true, and that had to

14     come from somewhere, you know, so.

15          Q.    Who do you believe it came from?

16               MS. KNIGHT:  Objection, calls

17          for speculation.

18     BY MS. LORENTSON:

19          Q.    That's fine.  You can speculate.

20     Do you have any -- like who do you believe it

21     came from?

22          A.    Okay.  So just to -- you have

23     seen my interview with Giordano, correct?

24          Q.    Yes.

KENT TRIBBLE

Page 134

```
 1              A.      Okay.  So similar to that
 2      interview, I would say -- and, again, I was
 3      really, really adamant about making sure he
 4      understood this was my personal belief but
 5      there is not a foundation in direct knowledge,
 6      would just call this being a cop and having
 7      been around for a while, my belief is most of
 8      the source of this information came from a
 9      former captain named John Whitney.
10              Q.      And why do you believe that?
11              A.      I believe that John Whitney
12      was -- well, I know he was terminated, I do not
13      know why and I don't think I could discuss it
14      if I did based on personnel rules, but I can
15      tell you I don't know why.
16              Q.      Okay.
17              A.      I do know that prior to his
18      departure from the Police Department
19      information about officers involved in
20      shootings, officers involved in use of force
21      and myself personally had been released to the
22      press after I had conversations with Captain
23      Whitney, concerned about this type of
24      information being misconstrued by the press.
```

KENT TRIBBLE

Page 135

```
 1                    So based on my interactions with
 2      him and the subsequent airing of the same
 3      things I brought up as concerns that should be
 4      paid attention to, I narrowed it down to, well,
 5      this is the person I think that probably may
 6      have supplied this to the press.
 7                    I know that former Captain
 8      Whitney had either a neighbor or a very good
 9      friend that was a reporter.  I had seen him
10      with her at the department many times.  And I
11      know that prior to his departure all of our
12      phones in the command staff that I'm aware of
13      were ordered in for inspection, and I don't
14      know the depth of that inspection, but I know I
15      gave mine up willingly, even though it was my
16      personal phone, without any alterations, handed
17      it over, they had it for three days.
18                    The administrative order said
19      that my email connection had to be modified but
20      then they told me it was so bad it needed four
21      days, and shortly after that Whitney was
22      terminated.  I don't -- I don't know, but my
23      belief is there was information that was
24      considered confidential by the Police
```

KENT TRIBBLE

Page 136

1   Department that's not for public release that

2   was being released by that captain.  That's a

3   conjecture on my part based on the

4   circumstances.

5            And then post his termination

6   more negative press about Vallejo PD started

7   ramping up.

8        Q.    I took Mr. Whitney's deposition

9   in this case, and he shared with me that there

10  were some issues with the department that you

11  guys disagreed on but then there were others

12  that you agreed on.  Do you think that that's

13  an accurate statement, that there were --

14  putting aside how he handled it, if he did, do

15  you agree that there were some departmental

16  problems that you both agreed needed to be

17  addressed, you know, understanding you may have

18  disagreed on how they were addressed?

19            MS. KNIGHT:  Objection,

20        mischaracterizes testimony.  Go ahead.

21            MS. LORENTSON:  No, it doesn't.

22            THE WITNESS:  I'm not aware of

23        that.  The interactions I had with

24        Whitney -- first of all, I was his

KENT TRIBBLE

Page 137

1          subordinate for a good portion of my

2          tenure, both on the SWAT team and the

3          range staff and as an instructor, he

4          was one of my primary supervisors, and

5          in many cases we had what you would

6          consider staff meetings for whichever

7          the discipline was, armoring, use of

8          force, I never had much to do with the

9          driving guys, bike patrol, SWAT.

10              So we, we frequently had

11          meetings on, you know, the state of the

12          unit at the time and things that may

13          need to be improved or not improved.  I

14          don't remember us ever butting heads

15          over something serious as like an

16          officer's lethal use of force.  So I

17          don't know what he is talking about

18          there.

19     BY MS. LORENTSON:

20          Q.    And the fact that you agreed on

21     certain issues?

22          A.    I think that we agreed on

23     several issues.

24          Q.    Yeah.  And was one of those

KENT TRIBBLE

Page 138

```
 1      issues the instances involving officer-related
 2      use of force?
 3              A.      I think in most of those we saw
 4      eye to eye, yeah.  And I think that if there
 5      was -- so when it comes to review of these
 6      things, if there is a different opinion among
 7      the people that are actually looking at this,
 8      they're not pointing fingers at each other
 9      saying you're wrong, you're wrong.  What those
10      meetings do is sometimes somebody sees
11      something in a video that the other person
12      doesn't and it gives the people that have to
13      review it a chance to all go over it and speak
14      their peace and get as much information out of
15      the incident as they can, then come to a
16      consensus.
17              So, yeah, I would say on most
18      use-of-force things, at the end of the day most
19      people are in consensus.
20              Q.      Did you ever, in any of the
21      roles you had at Vallejo, push for additional
22      training for officers?
23              A.      Many times.
24              Q.      In what areas did you feel that
```

KENT TRIBBLE

Page 139

1     there was a need for additional training?

2            A.       Firearms in particular and SWAT

3     and canine.  I believed these are -- these are

4     the incidents in the police job -- you got

5     to -- without sounding insulting, you got to

6     remember there is so much more to police work

7     than what I'm talking about, but these things

8     that I'm talking about are those things that

9     they call high risk/low frequency incidents,

10    and the reason you really need to train those

11    is it's not like you go to work every day and

12    do these things every day and become very

13    proficient through actual practical application

14    on a daily basis, but these things, when they

15    do occur, they have a great, great potential

16    for injury, harm to the public, harm to the

17    officer, and, you know, sometimes catastrophic

18    results, and that includes high speed pursuit

19    driving, use-of-force application at above

20    intermediate level, and, you know, specifically

21    lethal force, in whichever form that comes, and

22    then there is also places, like repelling, you

23    know, when we're doing SWAT stuff, that happens

24    very rarely, if ever, but I've done it a couple

KENT TRIBBLE

Page 140

1      times, and if you're doing it ever, you need to
2      be proficient.
3                  So in all those disciplines I
4      always push for more training, because with the
5      workload we have, the department met the
6      standards set forth by the state for training
7      but I don't think it's enough to do things at a
8      high risk level, and I just would always -- it
9      never hurts to have more training in those,
10     those disciplines.
11          Q.      When you say that, you know,
12     you've -- it's commendable, you've taken a lot
13     of ownership and, you know, blamed -- you know,
14     said, you know, this is the badge bending
15     thing, I own this, but you're aware that other
16     people were bending badges besides you, right?
17          A.      I am now, but I also believe
18     that that wouldn't have occurred if I hadn't
19     invented the whole thing with Golinveaux,
20     right.  So I still claim ownership of that, as
21     a secondary layer of my misconduct.
22          Q.      One witness told me that there
23     was a habit among some officers, not all, but
24     some officers where they had a practice of

KENT TRIBBLE

Page 141

1    saying that the suspect was armed when the

2    suspect was not arm.  An example that was given

3    to me was a high-speed chase at night and over

4    the radio the pursuing officer said, you know,

5    furtive movements, suspect is armed, when the

6    witness said there is clearly no way they could

7    have known that that person was armed because

8    it was in the dark and in a car pursuit.

9              Had you ever had to address any

10   issues with officer use of the radio and what

11   they were saying while in pursuit or in one of

12   these incidents?

13        A.    I mean, that's a pretty broad

14   question because you're asking me if ever, and

15   I think there is more than one time that what

16   you're describing has occurred and it's been

17   discussed.  The only time I actually had to be

18   involved in any kind of documentation of such

19   event would have been just recently with

20   Officer McMahon.

21        Q.    And what was that with Officer

22   McMahon?

23              THE WITNESS:  The personnel

24        stuff doesn't matter, correct?

KENT TRIBBLE

Page 142

```
 1                    Oh, I'm sorry for looking --
 2             MS. KNIGHT:  We'll cover it with
 3        a protective order.
 4             THE WITNESS:  Okay.
 5             Yeah, so at one point when Mr.
 6        McMahon's performance was -- he was
 7        under my purview as a lieutenant, he
 8        was an officer, some concerns had been
 9        brought up from different avenues
10        toward me.  One of them regarded a
11        pursuit I believe that he was in where
12        he said the officer -- the person he
13        was pursuing was armed and then -- and,
14        again, this is secondhand information
15        from -- I believe it was from Sergeant
16        Wylie, but then upon later review that
17        suspect either was found not to be
18        armed, which doesn't mean he wasn't
19        armed when the officer said he was, it
20        just means at the time he was contacted
21        he was found not to be armed, but I
22        think the issue was that, if I recall
23        correctly, was that Officer McMahon
24        denied having said that the suspect was
```

KENT TRIBBLE

Page 143

```
 1              armed on the radio, and I think that
 2              was the cause for concern.
 3                     And that's the only case that
 4              closely reflects the question you asked
 5              me, if I got it right.
 6    BY MS. LORENTSON:
 7              Q.     It does.  Were there any other
 8    instances that you're aware of of an officer
 9    claiming that a suspect was armed over the
10    radio and it turned out to be that they weren't
11    armed?
12              A.     I think that -- well, see, you
13    got to -- you have to be really careful with
14    the definition of "armed," because it's not the
15    same across the board, and there is -- I don't
16    know the accuracy of this statement, because
17    use of force was what my venue was.
18              Q.     Right.
19              A.     Use of force, I was supposed to
20    stay current on it, I was supposed to --
21    oftentimes in the -- what do they call it?  The
22    FBI's UCRS, Universal Crime Reporting
23    Statistics, right, and some reports of
24    different departments, they all say that a
```

Page 144

1    suspect is not armed if there is a gun near the

2    suspect but it's not in his hand, and that's

3    not an unarmed suspect.  Any time where there

4    is a gun in play, that suspect is to be

5    considered armed because he has access to it.

6              There are a lot of times where

7    people say the suspect was unarmed when he is

8    actually driving a 3,000 pound vehicle at an

9    officer and that's a weapon, so he is armed.

10             So I want to be very clear that

11   the termed "armed" versus "unarmed" is a loaded

12   term.  There is a lot of different

13   interpretations --

14        Q.    No pun intended.

15        A.    I'm sorry?

16        Q.    I said, "No pun intended" to say

17   it's a loaded term.

18        A.    Oh, yeah, that's pretty good, I

19   like that.

20             But, yeah, it's a tricky

21   question because it's not defined the same by

22   all the entities out there.

23        Q.    Let me clarify, I am curious to

24   know if in your role at the Vallejo Police

KENT TRIBBLE

Page 145

```
 1      Department, if you were aware of instances
 2      which an officer said a suspect, like you just
 3      said with McMahon to use as an example, where
 4      an officer says something on the radio in a
 5      use-of-force incident that turns out not to be
 6      accurate?
 7            A.        I think that that has happened,
 8      yes, and I think that what happens frequently,
 9      and without giving a specific result, but -- I
10      can give a specific result, I was involved in
11      an officer-involved shooting, I don't know what
12      year it was, 2012 I guess, and it was a reverse
13      hot robbery operation, and where we already
14      knew based on prior knowledge of the suspect's
15      MO, for lack of a better term, that armed
16      suspects would show up at this sting operation
17      and attempt an armed takedown of an alleged
18      marijuana dealer.  That alleged marijuana
19      dealer was an undercover officer.
20                We had already been through
21      several of these investigations, and the person
22      that was a suspect in one of the prior ones was
23      identified by phone number as the one trying to
24      set up this next large volume marijuana deal
```

KENT TRIBBLE

Page 146

1   but we had high suspicion it would turn into a
2   robbery, so we sent the team out there that was
3   trained up on doing a reverse robbery sting.  I
4   was involved in that.
5                   The suspect prior to accessing a
6   weapon made all the movements and had all the
7   characteristics of somebody that carries a
8   weapon.  We know this because police officers
9   carry weapons both on duty and generally off in
10  a concealed capacity and we know what it looks
11  like when people have concealed weapons,
12  whether you can actually see the weapon or not,
13  and we know how their bodies move because we
14  have done it thousands of times at the range
15  when they're moving with a weapon and trying to
16  keep it secure in their waistband or their
17  pocket or whatnot or even the weight of the
18  jacket, the way it moves.
19                  So in this case, the robbery
20  case, the suspect had not yet accessed his
21  weapon but we initiated the arrest attempt
22  prior to the production of the weapon and he
23  fled and he fled in a manner where I could see
24  the hand movements and the jacket movements by

KENT TRIBBLE

Page 147

1    the weight that was in his pocket that I
2    identified as a suspect probably having a gun
3    and being armed and we responded accordingly.
4                    That is an example of when the
5    gun is not yet seen and somebody says in a
6    pursuit that the suspect is armed, it looks
7    like he is reaching for a gun.  Now that
8    suspect was shot but got away that day, and
9    there is no way to verify other than my
10   statement, my witness statement, and I believe
11   at the time Sergeant Cuello's witness
12   statement, that that is what the suspect had
13   and did.  We both at some point saw a glimmer
14   of what appeared to be the handgun.  And that
15   suspect fled out of our ability to capture.
16                   He was recovered later at a
17   hospital without a gun, but a couple of days
18   after that a search warrant was conducted on
19   his vehicle, the clothes he was wearing,
20   including the gunshot wound evidence that
21   occurred during our exchange was on his
22   clothing, and ammunition for a firearm was
23   found in his girlfriend's place, but I don't
24   know that a gun was recovered.

Page 148

```
 1                    So I know that's really
 2       long-winded, but that's an example of what
 3       you're talking about, and that's not terribly
 4       uncommon but it's one of the things we're very
 5       careful about because we try not to set
 6       officers up for a mistake-of-fact shooting.
 7                    A mistake-of-fact shooting is
 8       when they see something that appears to be a
 9       weapon and in the split second they have to
10       identify the threat and respond accordingly
11       they may have made a mistake.
12              Q.    And what do you do in training
13       to prevent that from happening?
14              A.    Well, there is a bunch of things
15       that we do.  We train threat identification is
16       number one and a huge one.  It's very difficult
17       to do in a high-speed environment, in a fluid,
18       not static environment.  But by varying targets
19       up with different things in their hands,
20       different types of threats, even by commands at
21       the firing line, whether we say "basketball" or
22       "chainsaw" or whatever, the officer has to
23       discriminate between what would or could be a
24       threat before they respond.  And that's how we
```

KENT TRIBBLE

Page 149

1    train for that.

2                    We also, when I was leaving, as

3    an armorer, and I honestly don't know where

4    they are with this in the program yet, but a

5    huge advantage has come to the police

6    departments via the military really.  That's

7    one of the things I was at, that shot show that

8    we were talking about earlier, where it was red

9    dot polygraphic optics on pistols had become

10   very useful and their main advantage that I was

11   an advocate for and really proposed to the

12   Police Department, and Chief Williams seemed to

13   be on board while I was working there, was that

14   with a red dot optic on your handgun it does a

15   tremendous, tremendous thing for the safety of

16   the suspects, the officers and the public at

17   large, and I'll describe it to you.

18                    When you are using a handgun,

19   for the last 26, 7, maybe even longer than

20   that, years, as a firearms instructor, SWAT guy

21   and a police officer primarily trained with a

22   pistol, with iron sights to effectively use

23   your pistol in the safest manner so that you

24   didn't have errant rounds that hurt somebody

KENT TRIBBLE

Page 150

```
 1      that was an unintentional involved party or a

 2      hostage or an innocent of any type, you had to

 3      really focus on the front sight of your firearm

 4      to get an accurate shot off.

 5                  The problem with that is, and

 6      I'm no doctor but I know from experience, you

 7      can't clearly see about 2-1/2 feet from your

 8      body and something that's 20 feet from your

 9      body at the same time.  So if you're required

10      to actually focus on a front sight to get an

11      accurate shot off, that takes your focus off of

12      your adversary or your intended target.

13                  Now, because your focus has gone

14      to a 2-1/2-foot distance and not at a 10 to 12

15      or 20 or 40-yard distance that you're now

16      supposed to be engaging, it's a lot harder to

17      identify whatever it is in the waistband, the

18      pocket or the hand or what's coming up in your

19      direction than it is with a red dot sight,

20      because these red dot holographic sights, we've

21      had them on our rifles for a long time, since

22      the mid-'90s but the technology has become

23      reliable enough for handguns, that system

24      allows you to keep both eyes focused on
```

KENT TRIBBLE

Page 151

1      whatever it is your intended target is, and the

2      holograph just shows up while your eyes are

3      focused on the intended target.  That allows

4      for a better identification of the movements,

5      the body attitude, and the objects in or around

6      the suspect's hands and what he is doing with

7      those hands or she for that matter.

8                    So to me there is no argument

9      anymore against equipping officers' pistols

10     with red dot sights because that allows them to

11     be able to focus on whatever it is they're

12     dealing with and it reduces the potential for

13     mistaking a cell phone, anything else that

14     would fairly -- be fairly innocuous to a

15     handgun or a blunt object or a bladed weapon,

16     because it allows the officers to see more

17     clearly.

18                    It also improves their

19     performance at the range.  I don't exactly know

20     why.  But older officers with less, I don't

21     know, acute eyes, mine are gone, I think mine

22     went around 10 years ago, and getting worse,

23     it's harder to pick up the sights as quickly as

24     it is when we were in our 20s, and these red

KENT TRIBBLE

Page 152

1    dot optics tend to help those officers perform

2    better.  I don't know the physiology behind

3    that.  I think it probably has something to do

4    with what I said earlier.

5              But to me there is no argument

6    not to be equipping the duty weapons with red

7    dot sights.  It's just -- I've been pushing for

8    that for a long time.  I think the only

9    obstacle is finances and equipment

10   manufacturers.  As far as I know, when I left,

11   there weren't a whole lot of holster

12   manufacturers that produced optic equipped

13   pistol holsters that had the degree of safety

14   and retention that we require as police

15   officers.

16        Q.      Understood.  I read to you

17   portions of Jarrett Tonn's statement to

18   Giordano.  Were you ever his supervisor at any

19   point?

20        A.      I believe so, yes.

21        Q.      You said that there was one

22   incident that you were involved with with him

23   where you reviewed something through the

24   Critical Incident Review Board, and that was an

KENT TRIBBLE

Page 153

```
 1      officer-involved shooting with Jarrett Tonn and
 2      Gary Jones, right?
 3              A.      Yes.
 4              Q.      Well, what was the outcome of
 5      that critical incident review?
 6              A.      I think it was a consensus that
 7      it had administrative approval.
 8              Q.      And what was the -- just the
 9      very basic broad strokes facts of that
10      incident?
11              A.      Okay.  I believe Jarrett Tonn
12      and Gary Jones were partnered up in a two-man
13      car.  I think at the time most of our guys had
14      to be in two-man cars, gals.  They were in an
15      area where they had prior knowledge of a
16      suspect either -- I think it was through
17      informant information, that there was a suspect
18      that was on patrol, that had a stolen car and
19      was armed, because someone had seen him
20      brandish the weapon earlier, either that day or
21      in close time to the event that we're talking
22      about here.
23                      They identified the suspect in
24      the car passing them on some road, I don't
```

KENT TRIBBLE

Page 154

```
 1      know, on the east side of town, I can't
 2      remember specifically, they flipped a U-turn to
 3      catch up to the suspect, they got him stopped
 4      on a street just off of the main drag they had
 5      been on, and that suspect at the termination of
 6      the brief pursuit threw his car into reverse
 7      and -- or the car went into reverse, came back
 8      at the officers and struck their vehicle as
 9      they were getting out.
10                  They engaged the suspect with
11      gunfire, perceiving the collision as a threat
12      of great bodily injury, and I don't -- I think
13      he may have sustained minor injuries and then
14      taken into custody.  There was a passenger in
15      that vehicle and that passenger was not struck
16      by gunfire at all.
17           Q.    And Tonn, however, he fired his
18      weapon, correct?
19           A.    Todd?
20           Q.    Tonn.
21           A.    Tonn, okay.  Yes, I believe so.
22      I believe Tonn fired I think it was 17 or 18
23      rounds and I think Gary Jones fired one.
24           Q.    So if Tonn represented that he
```

KENT TRIBBLE

Page 155

```
1      did not fire his gun during that incident,

2      would that be an inaccurate statement?

3             A.     I don't -- I don't know how that

4      he would have said that.  I think it's on

5      video, unless in that review we actually have

6      the actors mistaken for who they are, but I

7      think we watched the video and I think that the

8      report was written and the consensus was four

9      or five command staff officers.

10            Q.     Yeah, so that was one of the

11     things I wanted to ask, because there is a --

12     when I'm looking at the findings from this

13     report, and, again, you know, we both talked

14     about our thoughts, but the Critical Incident

15     Review Log provided by the city to Mr. Giordano

16     lists the only person being involved as Gary

17     Jones and that Tonn did not fire his weapon,

18     well, according to Tonn, that's why he is not

19     listed in the Critical Incident Log entry

20     below.  Tonn explained that while he was with

21     Jones, riding in the same car, he did not fire

22     his weapon and that you did not have the facts

23     correct when you said that you bent his badge

24     in a shooting, because Tonn did not fire his
```

KENT TRIBBLE

Page 156

1    gun.  But you saw the video, right?

2         A.     Yep.  So I think I have

3    mentioned this before, when I interviewed with

4    Giordano, I think I was associating the

5    potential that I did bend their badge, because

6    at some time they did work for me, I associated

7    it with the Motel 6 thing up north, when I

8    couldn't keep up and they ran and chased the

9    suspect to a car dealership lot, the guy tried

10   to run Gary Jones over and Jarrett Tonn was

11   present.

12              I don't know -- all I'm saying

13   is maybe that's what he is talking about.

14   Because when I first interviewed with Giordano,

15   I didn't even remember this other one until I

16   interviewed much later with Buena, this one

17   that we're talking about down with Gary Jones

18   and Tonn and the suspect in the stolen car.

19              So I -- maybe there is a

20   miscommunication there like there was with me

21   with Giordano.  Are you following me on that?

22        Q.     Yeah, I don't think so.  I don't

23   think that's the problem.

24        A.     Okay.

KENT TRIBBLE

Page 157

```
 1          Q.      Yeah, it's interesting because
 2     there are multiple representations, but in one
 3     of the findings that led to them dismissing
 4     your testimony, saying that you were not
 5     credible, was that the city provided a list of
 6     the shootings and said that Tonn was not the
 7     person who fired his weapon, it was Jones.  And
 8     so I -- that would be inaccurate, right?
 9          A.      I think that's inaccurate, but,
10     I mean, the simple answer for me would be just
11     go look at the video.
12          Q.      Sure.  So it's an inaccurate
13     statement according to you.  So then if the
14     city provided an incident log that said that
15     Mr. Ramrakha was not part of that shooting in
16     2005, the one that we talked about at or around
17     Relay, is it possible then that that's
18     inaccurate, that he was a part of it?
19          A.      No, because I -- I think that's
20     less likely.  Because now that you brought up
21     the names, I kind of remember, it was Brent
22     Pucci that was with Jeremie Patzer that was
23     involved in that.  Pucci left the department a
24     long time ago.
```

KENT TRIBBLE

Page 158

```
 1          Q.      Maybe a good reason to stick his
 2      name in there, right?
 3          A.      Well, I remember that Brent was
 4      involved in that -- or I think I do.  You know
 5      what, I don't know.  I'm trying to help you as
 6      best I can.
 7          Q.      I know you are, and I think that
 8      you testified as best you could in front of Mr.
 9      Giordano.  I'm just trying to figure out why he
10      discredited everything you said, and I think --
11      well, I'll leave you to -- you could probably
12      guess what I think, but.
13              There is additionally -- one of
14      the issues I've had in this case, Mr. Tribble,
15      is obtaining documents, and I know that you are
16      familiar, that there have been articles about
17      it, et cetera, but there is some crucial
18      evidence from our case that no longer exists,
19      and I am wondering if, you know, you have any
20      knowledge as to officers being instructed by
21      anyone from the city to either destroy evidence
22      or delete emails or to, you know, use various
23      applications, such as WhatsApp or Signal, to
24      communicate when there is a lawsuit involved.
```

KENT TRIBBLE

Page 159

```
 1              And, again, I'm not saying
 2    anything about your habits or behaviors, but
 3    have you been asked or have other officers
 4    you're aware of been asked by not officers to
 5    delete or destroy or just to not have documents
 6    available?
 7         A.    If I'm understanding your
 8    question, you're asking me if I know if
 9    non-sworn people --
10         Q.    Uh-huh.
11         A.    -- have directed sworn officers
12    to destroy evidence or conceal evidence?
13         Q.    In terms of litigation.  So if
14    there is a -- in a litigation or investigation,
15    are you aware of instances in which persons
16    from the city or the attorneys office have
17    asked officers to delete emails or text
18    messages or to get rid of things that have been
19    sought through those investigations or those
20    lawsuits?
21         A.    No.  That would be criminal
22    conduct.
23         Q.    Yes.  Are you aware of any
24    allegations or rumors about that at all?
```

KENT TRIBBLE

Page 160

```
 1          A.      Well, I don't remember what the
 2     source was, but we're back to John Whitney, and
 3     I know that when I turned my phone in for
 4     examination, like we spoke about earlier, I
 5     think that happened in April of 2019, maybe it
 6     was April of 2018, but I think it was 2019,
 7     because I was at a two-week Krav Maga
 8     instructor course, and I had to give up my
 9     phone, and it didn't matter because I was busy
10     getting beat up by all the young guys, but my
11     phone was gone for four days, and that was
12     shortly after a lot of that negative press came
13     out I think we discussed, where I came up with
14     my beliefs about the information from him, and
15     there wasn't a -- I don't remember the name of
16     the defendant, but there was a defendant where
17     we had all been subpoenaed for our phones like
18     six months prior to this, and that happens like
19     regularly, where we get subpoenaed for whatever
20     documents we have on our phones relating to
21     this case.
22               The information that I had,
23     quote-unquote, through the grapevine is that
24     Whitney didn't turn in his phone or he did but
```

KENT TRIBBLE

Page 161

```
 1     he did it in a way that allowed there to be
 2     documents removed from it before it got turned
 3     in.  I don't know.  That's thirdhand
 4     information.  I don't even know if it's
 5     accurate.
 6                    I know when they gave me the
 7     notice to turn my phone in for email
 8     adjustments or whatever, I just handed it to
 9     them.  Anything that's on my phone, you know,
10     may not be flattering to me but it's not
11     criminal, so.
12            Q.     When you were interviewed by
13     Giordano, you stated that when you were looking
14     at the badges and you had gone to collect them
15     after you had a badge inspection, that you and
16     Huff had a conversation in which you decided
17     that you were going to inspect the badges for
18     damage or that at the staff meeting badges
19     would be inspected for damage and those badges
20     would be turned in to be replaced, but that a
21     conversation between the two of you was had to
22     retract that decision and then to replace the
23     original -- oh, gosh, I'm making no sense.  I'm
24     really sorry.  It is not lunchtime where we
```

KENT TRIBBLE

Page 162

```
 1    are.
 2          A.      Sorry.
 3          Q.      A conversation with you and Huff
 4    was had over the bent badges, and initially,
 5    according to your statement, the decision was
 6    to collect and then return to the officers
 7    fixed or new badges.  Is that accurate?
 8          A.      No, that's not.
 9          Q.      Okay.  Tell me what the
10    conversation was.  I'm interested in what you
11    and Huff decided, if anything, in terms of the
12    officers inspecting their badges on their own
13    or replace them on their own or if it was going
14    to be the department replacing them.  What is
15    true to that then?
16          A.      Okay.  So the first thing I
17    would try to correct is that was not a decision
18    made by Sergeant Huff or I.
19          Q.      Okay.
20          A.      That decision came from a staff
21    meeting where the sergeants were to go out and
22    inspect the badges of their troops and then
23    they were to identify any of the badges that
24    were malformed in any way, no specific
```

KENT TRIBBLE

Page 163

1    description given, those badges were to be

2    turned in and no questions asked and then they

3    needed to be repaired or replaced.

4                    That's what I was told to do at

5    a staff meeting, that staff meeting I believe

6    Sergeant Huff was present for as well, and then

7    we tried to follow suit with those orders.

8         Q.      Then how did it come to be that

9    the officers were told to repair their own

10   badges?  Who told them that?

11        A.      I don't know.

12        Q.      So as far as you know, the

13   badges were collected and the department had

14   them fixed?

15                MS. KNIGHT:  Objection,

16          speculation.

17                THE WITNESS:  I don't know.  I

18          wasn't involved in that process.

19   BY MS. LORENTSON:

20        Q.      All right.  What, if anything,

21   do you know about Sean Monterrosa?  Like what

22   did you know at the time?

23                Let's say that, before there was

24   a lawsuit, like contemporaneous, what did you

KENT TRIBBLE

Page 164

1    know, when were you aware of what had happened?

2        A.    I need to be clear, Sean

3    Monterrosa, is this the gentleman that was

4    involved with Tonn at --

5        Q.    Yes.

6        A.    -- like the shopping thing

7    during a looting?

8        Q.    Yes.

9        A.    Okay.  I became aware of that

10   probably shortly after it occurred.  I think it

11   occurred while I was off duty, and I don't know

12   when I returned to work.  I know in that time

13   period there were more than one deaths in my

14   own family and I was out for a couple of

15   different periods of time.

16            I don't know looking back

17   exactly where that lines up with when I was off

18   and when I came back and when I was off again

19   and when I came in and when I finally went out

20   all together, but it was close.  It was

21   somewhere in the late spring, maybe early

22   summer of 2020, I believe.

23       Q.    And what did you hear?  How?

24   From who?

KENT TRIBBLE

Page 165

1          A.      I don't remember if it was from

2    whoever the on-duty watch commander was, I

3    can't recall, usually it was Darden, but I

4    heard that Tonn had been involved in one of the

5    looting responses that precipitated an

6    officer-involved shooting, and I don't remember

7    getting that name particularly.

8               Most of the time we don't know

9    the names that well, especially if we're not

10   there --

11         Q.      Okay.

12         A.      -- until it hits the paper.

13              Because, again, once you have an

14   officer-involved shooting, all the involved

15   parties are pretty much ordered not to talk to

16   anybody about it because the thing has to be

17   investigated.  So we're very careful as

18   noninvolved people, trying to reach out, we

19   say, hey, let so and so know I'm glad he is

20   okay, you don't have to talk to me about it at

21   all.

22              That's it.  So that's kind of

23   what I know about that event.  I know there was

24   an officer-involved shooting in response to a

KENT TRIBBLE

Page 166

```
 1    looting report somewhere in North Vallejo, and
 2    according to the papers the suspect -- this is
 3    one of those incidents where they call him
 4    unarmed but he technically was not unarmed if
 5    what I know about his case is true, because he
 6    had an object, some kind of blunt object tool
 7    in his waistband that looked like a firearm,
 8    so.
 9                 That's based on newspaper
10    reports.  That's not based on any legitimate
11    information from the Police Department, so.
12    But that's what I believe.
13         Q.      You're aware of where Jarrett
14    Tonn was physically located when the shooting
15    occurred, right, that he was in a vehicle?
16         A.      I know that he was in a vehicle,
17    yes, at least based on what I was told.
18         Q.      Yes.  Well, I'll represent to
19    you that that's accurate and that he fired
20    through the windshield of the vehicle.  Is that
21    something that you ever trained an officer to
22    do?
23         A.      Absolutely.
24         Q.      In what instances?
```

KENT TRIBBLE

Page 167

1          A.        In what instance did I train?

2          Q.        When did you train officers that

3    it was okay to shoot through the windshield of

4    a car at someone?

5          A.        That training came about earlier

6    in the 2010s, I don't know, '12, '13, '14.  I

7    don't know if you're familiar with it, but down

8    south there is something called the Dorner

9    case.

10         Q.        No.

11         A.        Okay.  So kind of when this

12   whole thing switched to as negative interaction

13   with the public as the police have had in the

14   last 10 or 15 years, one of the big things that

15   was happening was officer ambushes, meaning

16   officers being called to locations and being

17   open fired upon as they arrived in their

18   vehicles and/or tried to get out of their

19   vehicles.  That was a common thing for a couple

20   years, officer ambushes.

21                   When I originally brought up the

22   idea, because in SWAT training, which we had

23   yearly multi-agency regional trainings in

24   Sacramento put on by the FBI to get all the

KENT TRIBBLE

Page 168

1    teams onto a certain level like across the
2    country, and the FBI is the federal agency that
3    kind of helps do that, counter-ambush drills
4    were brought to us some time about that --
5    about that time period, and counter-ambush
6    drills were basically they're brought back to
7    us from all the stuff that was happening
8    overseas, and they basically addressed officers
9    being engaged with gunfire as they were
10    basically stuck in their vehicles, because that
11    was starting to happen in police in the United
12    States, and in the Dorner case it happened
13    several times, I believe several officers were
14    killed by Dorner down south, who had been a
15    police officer himself or a police officer
16    reserve, so he knew all their tactics and
17    training.
18                So we had a lot of victims to
19    that kind of attack.  So I brought this up to
20    John Whitney and Lee Horton and the command
21    staff, as being one of the senior members of
22    the police department's range training and
23    instructor staff.  I believe that Megan
24    Sheridan was actually punched getting out of

KENT TRIBBLE

Page 169

1    her car once too, I don't remember, but this

2    all had to do with officers being able to

3    defend themselves from unorthodox platforms

4    because that's where they're starting to be put

5    into positions of lethal engagements.

6              We met some resistance

7    originally with teaching this training.  One

8    comment by then Commander Horton was he thought

9    it was too dangerous to train the officers

10   because of the confined space and the

11   limitations that a car presents.  We had to

12   discuss that a few times before I got

13   authorization to go get taught myself by

14   professionals and then bring that training back

15   to the department, that happened sometime

16   around 2012, 2014, and then it became a common

17   training event later in the teens, '15, '16,

18   '17.

19              So, yes, that did become a

20   common part of firearms instruction, because

21   officer ambushes started to ramp up in the

22   early teens of this millennium, and then the

23   Dorner case kind of punctuated it with how bad

24   it can be.  And then I know there was a case in

KENT TRIBBLE

Page 170

1    Dallas where I think six cops were shot

2    responding to a call.

3                    Anyway, there was a year that I

4    can't even count how many officers were shot

5    and killed in their cars.  So it became an

6    unorthodox but a highly necessary approach to

7    dealing with this new threat.

8                    And in that engagement that I

9    was in in 2012, I engaged a suspect from a

10   vehicle, because it needed to be done.

11                   You know, so if we're going to

12   have that occur in real life, my belief was we

13   needed to train officers to do it safely so

14   they didn't hurt themselves and/or unnecessary

15   collaterals involved in the situation.

16           Q.     Understood.  Before you departed

17   from the Vallejo Police Department you had -- I

18   guess your role was -- can you correct me if

19   I'm wrong, like it was something dealing with

20   excessive force, like you were the go-to guy,

21   you were specialized in like reviewing that.

22   What was that qualification that you had?  I'm

23   sorry.

24           A.     Well, I would object to the

KENT TRIBBLE

Page 171

1      term -- I don't know if I'm allowed to, but I

2      would object to the term "excessive force."

3            Q.      Well, I'm sorry --

4            A.      I was --

5            Q.      I apologize; use of force.

6            A.      Yeah, I was a use-of-force

7      expert --

8            Q.      Okay.

9            A.      -- considered by the department

10     based on my training and my experience in the

11     field, and I kind of was channeled into that

12     throughout my whole career based on my

13     assignments as a SWAT team member, SWAT team

14     leader, SWAT team commander, canine

15     coordinator.  The only thing that wasn't --

16     that I didn't have to be extremely adept at,

17     because I'm no good at it, is the driving part.

18     So they never made be a driving instructor or,

19     you know, an expert, but --

20           Q.      In the use of force -- sorry.

21           A.      -- I had to get a bunch of

22     training in so I could help evaluate, review,

23     and hopefully modify and improve the training

24     that existed.

KENT TRIBBLE

Page 172

1          Q.       In what years were you the

2     use-of-force officer?

3          A.       I was trained to be a

4     use-of-force instructor by the City of Vallejo

5     Police Department in 2007.  I was actually

6     trained in Sacramento by the Sacramento

7     Regional Safety Office, conducted by the

8     Sheriff's Department out there.

9          Q.       And in that role did you have

10    the opportunity to train or -- well, to train

11    Jarrett Tonn?

12         A.       In that role but not at that

13    location, yes, as my tenure in the Vallejo

14    Police Department I'm sure at some point I gave

15    him that training.

16         Q.       I just wanted to go through,

17    there was an article that was written, I think

18    this might be what you were talking about,

19    like, you know, talking about personal

20    information publicly, and can you tell me what

21    happened with Enrique Cruz?  That was I think

22    in 2012.

23         A.       Enrique Cruz, can you

24    elaborate --

KENT TRIBBLE

Page 173

1          Q.      That was someone who was sitting

2     on a bench inside of his jail cell.

3          A.      Oh, yeah, yeah, I can explain

4     that one.  Actually, so can the police report

5     and the complete video, which was never

6     released to my knowledge.

7               So that incident is documented

8     in a police report.  I don't know the case

9     numbers.  It should be fully retrievable.  It

10    was examined by the use-of-force guys over at

11    the Professional Standards Building because

12    everything in the force goes over to them, it's

13    routed to them, and it's looked at.

14              That was the result of what is

15    called a felony strip search being conducted,

16    and what the public was shown or whatever was

17    leaked to the press, in my opinion, was not the

18    complete set of facts, it was a small clip of

19    the video, it did not include audio, and I know

20    for a fact, having been the watch commander,

21    that those cells have their videos constantly

22    running on a loop.  So the whole incident was

23    recorded but only a clip was released.  Audio

24    was recorded, because we had to be reminded

KENT TRIBBLE

Page 174

```
 1     several times to watch out for what you say in
 2     the hallways because the mics are so good in
 3     the cells, they'll pick up personal
 4     conversations, don't say stupid stuff, you
 5     know.
 6                    None of that stuff got out.
 7     Only the clip of me taking the suspect into
 8     custody was released.
 9                    Now, if that whole video had
10     been released and anybody had read the police
11     report, it would have clearly shown and stated
12     and we would have heard audibly the strip
13     search -- the felony strip search admonition to
14     the suspect, and that admonition goes something
15     to the effect of this is done when you conduct
16     a felony strip search, and if I recall the
17     facts of that case correctly, he had been
18     involved in a felony car pursuit that may or
19     may not have involved a weapon and/or drugs.
20                    So I was conducting the felony
21     strip search, which means I was not the only
22     one there, there was a witness outside the
23     door, I believe that shows up in the video, but
24     prior to conducting a strip search you give an
```

KENT TRIBBLE

Page 175

1       admonition to the suspect saying, "Look, we're

2       doing this strip search because we have reason

3       to believe you may either have contraband

4       and/or a weapon on your person that I need to

5       recover.  Until we complete this strip search I

6       have to assume that you're armed, so I need you

7       to follow the instructions that are given and

8       make no movements that are not instructed.  If

9       you do make any movements that are not

10      instructed, I'm going to have to, for my safety

11      and yours, assume that you're trying to access

12      a weapon and I'm going to need to take you into

13      custody by whatever force necessary so that

14      neither one of us has to get hurt."  Right?

15      That instruction is given.  That's called the

16      strip search admonition.

17                  That instruction was given on

18      that video that should have had audio and that

19      instruction was documented in a police report

20      that nobody ever referenced.

21                  What you saw on the clip was an

22      argumentative, belligerent suspect that had

23      been warned several times to calm down and quit

24      moving around and not to make any movements or

KENT TRIBBLE

Page 176

1    he is going to have to be taken into custody,

2    and then he got up in a lunging toward me

3    manner and I took him into custody using

4    reasonable force.

5                    It was examined by the people

6    that examine applications of force, it was

7    commonly knowledged and documented.  In my

8    personal opinion it was leaked to the press

9    minus all those other details to make me look

10   bad.

11                   And no matter how you use force,

12   it doesn't look good.  And, to be honest,

13   nobody enjoys using force.  It sucks.  It

14   requires more documentation, more critical

15   circumspect of an already difficult job, and a

16   lot of times you get hurt, so.  People don't

17   even think about that, but that's the truth.

18        Q.      But there was no finding of

19   fault or anything by the Vallejo Police

20   Department --

21        A.      No.

22        Q.      -- is what you said, okay.

23                   Prior to your departure from the

24   Vallejo PD there was a fatal shooting involving

KENT TRIBBLE

Page 177

1    you and Kevin Smith in August of 2003.  What
2    was that incident?
3            A.      That's exactly what you said it
4    was, there was a -- I didn't remember the name.
5    I still -- for some reason I don't remember his
6    name too well, but that was a car stop I had
7    nothing to do with but I was working on duty at
8    the time, it went south, meaning the suspect
9    resisted, produced a firearm, evaded less
10   lethal force to be taken into apprehension and
11   engaged the officers with gunfire, fled into a
12   children's park a block and a half or so away
13   through some residential area, one of the
14   junior officers tried to take him into custody
15   and was overpowered by the suspect.  That
16   suspect then accessed that junior officer's
17   firearm, the firearm discharged in that
18   officer's holster.
19                    I remember that officer
20   screaming, "He has got my gun, he has got my
21   gun," and then that suspect was engaged by both
22   Sergeant Gordon and myself with gunfire, and I
23   believe he was deceased on scene.
24            Q.      Was there any finding of fault

KENT TRIBBLE

Page 178

1       by the Vallejo Police Department as a result of
2       the investigation?
3               A.      No.
4               Q.      Okay.  Let's see, there was an
5       incident in 2010 involving Guy Jarreau, Jr.
6       Can you tell me what happened there?
7               A.      Yes.  My partner and I at that
8       time, that was Corporal Mark Nicole, had just
9       left a -- we had already talked about the
10      robbery sting operation that occurred in 2012.
11      Well, we had just left a similar operation that
12      turned out not to be a robbery so nothing
13      happened but we were set up for it in case it
14      did, and we were driving back from the location
15      of that failed sting operation and we drove by
16      a tattoo parlor, I think it was a tattoo
17      parlor, somewhere on Sonoma Boulevard there in
18      Central Vallejo, noticed a large group of
19      people, we were in a non-marked but patrol
20      vehicle, like a Crown Victoria that was a dark
21      color, I don't remember if it was black or gray
22      or something, but we went, so that nobody would
23      see us, we went around the corner and into a
24      vacant parking lot, because we had our tactical

KENT TRIBBLE

Page 179

1    gear on for this sting operation, and I
2    remember we were taking all of our gear off,
3    which included long rifles, heavy plates,
4    helmets, all that stuff, because we anticipated
5    an armed conflict in the robbery sting.
6                    We got rid of all that, put it
7    in the trunk, and in what we called an alert
8    tone, which signifies an emergency incident
9    going on, came across the radio, and it was a
10   report of a man with a gun at the exact
11   location we had just passed that was like a
12   block and a half from us, and we responded.
13                   We tried to coordinate a
14   response with the other element of our sting
15   operation, which was a different van full of
16   guys in the same unit, we tried to coordinate
17   it so that we could arrive at the same time but
18   we had communication issues with Nextels and
19   car radios and Channel 1 and the Channel 2 that
20   we frequently use for special operations.
21                   So we wound up -- Mark Nicole
22   and I wound up arriving there first, and Mark
23   was stuck with the vehicle control and I was on
24   the passenger side, so I was the first one out.

KENT TRIBBLE

Page 180

```
 1    As I stepped out, I was in a modified police

 2    uniform, I had a vest on that identified me as

 3    a police officer, you see a lot of cops wearing

 4    them nowadays, but I had a vest on over like

 5    khaki clothes, khaki BDUs, so to speak, with a

 6    badge and all the police stuff that you see on

 7    police guys and gals, the holstered weapon and

 8    the whole nine.

 9                    I remember coming out of the

10    vehicle knowing it's an armed suspect, I had

11    the description of the suspect and I had just

12    seen that suspect about two minutes prior, so I

13    identified him immediately, and as I stepped

14    out of the vehicle I had my pistol in my hand

15    already because it was an armed conflict I was

16    about to engage in, I remember telling the

17    people at the scene, everybody get down, don't

18    move, and this one guy -- everybody complied,

19    but this one guy who had matched the suspect

20    description looked at me and he slowly started

21    walking away, which is really kind of weird

22    because most time people try to run, and as he

23    turned into the alley I saw the handle of a

24    pistol in his back pocket.
```

KENT TRIBBLE

Page 181

```
 1              I have been around pistols a
 2     long time, I can identify from 20 feet or yards
 3     a pearl handled pistol, if you can imagine it
 4     had an actual pearl handled pistol, and as he
 5     ducked into the alleyway, and the report had
 6     been that he had already been brandishing the
 7     weapon so I was concerned with safety of the
 8     public.  There is a lot of residences as you go
 9     down that alleyway.  Also concerned for myself
10     because I knew it was kind of a one-on-one
11     thing.
12              Mark Nicole was stuck trying to
13     renegotiate the position in the vehicle.  It
14     was heavy traffic.  I knew the guy knew I was
15     there and I knew he knew I was following him,
16     and I was concerned that as I turned the corner
17     to get my eyeballs on him, we might be engaged
18     in a gunfight, but I also didn't want him to
19     get out of the area before we could set up a
20     primer because apparently he had already been
21     brandishing this thing, and it was like 2:00 or
22     3 o'clock in the afternoon, it was high
23     traffic, people getting out of school.  I think
24     it was a school day.
```

KENT TRIBBLE

Page 182

```
 1              So I was going over scenarios in
 2      my head as I was approaching this corner and I
 3      knew he knew I was chasing him because we made
 4      eye contact, and I had told myself, you know
 5      what -- I got on the Nextel as I was chasing
 6      him trying to tell people where to go to cut
 7      him off because I didn't want him getting out
 8      of there, and I told myself, look, what I
 9      expect and what I hope is that I see this guy
10      going and it's nothing but feet and elbows, you
11      know, and he is trying to be feet and he runs
12      into another cop and they get him off safely,
13      right, but what I need to be prepared for is
14      based on him just strolling into this alley, he
15      didn't look like he was going to be very far,
16      so now I got to be concerned he's got a
17      position of advantage on me, when I come around
18      this corner, I'm going to get shot.  So I came
19      up with a quick plan in my head, which is one
20      of the things they try to train us to do, and I
21      knew there was vehicles and a traffic jam on
22      the other side of me at this alley, so if I was
23      to receive gunfire, it wasn't just an
24      opportunity for me to get shot and killed, it
```

KENT TRIBBLE

Page 183

1    was an opportunity for people in the vehicles

2    behind me to get shot and killed, but at some

3    point you got to put your Kevlar in between you

4    and other people, and that's just the way it

5    is.

6              So I made a decision to approach

7    that corner with very heavy footfalls so that

8    he could predict me turning that corner, if he

9    was nearby, which I did, and then I paused a

10   second and then instead of turning the corner

11   at the normal height of my human body, being

12   about 6 foot, 6 foot 1, I squatted down to

13   about a 4 foot and did what they call a quick

14   peek, because if he was going to engage me, I

15   wanted him to have a minimal target to hit and

16   I didn't want my head to be in the place a head

17   shot would normally go, so I turned quickly

18   around the corner slowly, and I had already

19   told myself what I hope was to see him trying

20   to go over a fence and then I could tell my

21   buddies where to get him at, but if he is not

22   running and he is a few feet away and he has

23   still got a weapon in his hand, there is pretty

24   much one reason he is going to be doing that,

KENT TRIBBLE

Page 184

```
 1     and when I turned that corner with a quick peek
 2     he was doing exactly what I feared that he was
 3     going to do, he was turning on me and he was
 4     pulling a pearl handled revolver out of his
 5     waistband.  So I fired twice.
 6                    I don't think the first round
 7     hit him, but I'm pretty sure the second one
 8     did, because he went down, and then I
 9     approached him and I had a conversation with
10     him.
11            Q.     And, wait, so but -- okay.  So
12     you had a conversation with him?
13            A.     Yeah.
14            Q.     Okay.
15                   MS. KNIGHT:  Do you need a
16              minute?
17                   THE WITNESS:  Yeah, I could use
18              a minute.
19                   MS. KNIGHT:  Yeah, can we take a
20              quick break, Amanda?
21                   MS. LORENTSON:  Of course.
22              Sure.
23                   MS. KNIGHT:  We just need like
24              five minutes.
```

KENT TRIBBLE

Page 185

```
 1                         -  -  -
 2                  (Whereupon there was a recess in
 3            the proceeding.)
 4                         -  -  -
 5      BY MS. LORENTSON:
 6            Q.      There was an investigation into
 7      this shooting incident with Guy Jarreau, right?
 8            A.      Yes, ma'am.
 9            Q.      And then there was a lawsuit
10      that followed.  In the lawsuit his family
11      claimed that he was holding a green cup when he
12      was shot and had his hands in the air.  Is that
13      inaccurate then?
14            A.      Yes.
15            Q.      Where would the green cup, hands
16      in the air thing come from?
17            A.      I don't know.  To my knowledge,
18      the only people there was myself and Guy
19      Jarreau.  I believe sometime later a witness
20      was located that saw the whole thing, but.
21                    He did have a cup in one hand
22      and his other hand was on a gun that got -- it
23      was coming out of his waistband, so.
24            Q.      So he has one hand up in the air
```

KENT TRIBBLE

Page 186

1      with a cup and in the other hand he is reaching

2      for a gun behind his back or he is pointing his

3      gun?

4           A.      Well, I never said he had his

5      hand up in the air with a cup.

6           Q.      Okay.

7           A.      I know that when I fired my

8      weapon, he had his right hand in a shooting

9      position on his pistol and it was being pulled

10     out of his right hip waistband or maybe from

11     his right hip pocket in my direction when I

12     decided to fire to prevent him from getting

13     that weapon up and on to me to discharge

14     rounds.  It could have killed me or the person

15     behind me in their vehicles.

16               That cup I noticed, because all

17     of my attention was on that hand with the gun

18     in it, and his location and proximity when I

19     turned that corner versus someone that would be

20     trying to flee, because he was only about 10

21     yards and I gave him plenty of time to be 30,

22     40 yards away, I focused on that right hand on

23     that gun, it was coming up out of the waistband

24     the way I've seen it happen over 1,000 times at

KENT TRIBBLE

Page 187

1    the range, I decided to fire.

2              It wasn't until he hit the

3    ground that I noticed the cup in his left hand

4    hit the ground, and I couldn't even tell you

5    it's green.  I don't know if that's accurate.

6         Q.    You said that you had a

7    conversation with him, but what was the nature

8    of the conversation?

9         A.    They were instructions for him

10   not to get -- because when I first came upon

11   him, I was solo, so I kept my weapon trained on

12   him in case he had tried to re-access that

13   weapon, which at some course in that engagement

14   the hammer on that pistol became entangled with

15   one of his belt loops, because I remember when

16   we directed whoever responded to disarm him or

17   it might even have been -- you know, I might

18   have kicked it loose, somebody arrived to

19   handcuff him because we kept him at gunpoint,

20   and that hammer of his pistol had somehow

21   become entangled with his belt loop.

22             I kept giving him directions not

23   to put his hands down there because we'd have

24   to shoot him again, which he didn't and we

KENT TRIBBLE

Page 188

1    didn't, until he was handcuffed.  And once he

2    was handcuffed, I tried to get his name from

3    him, I tried to tell him that he would be okay

4    because we had the cop -- or the ambulance

5    coming, and I -- in my mind he had only been

6    hit once and it's very rare, you know, that one

7    torso shot from a pistol would have lethal

8    results, so I was trying to encourage him, and

9    it wasn't until later that I found out he had

10   died from his injuries.

11        Q.    Are there any other use-of-force

12   incidents that you were involved with

13   professionally?

14        A.    I can't count.  I mean, that's

15   too broad because even --

16        Q.    Okay.  Sure.  How many

17   officer-involved shootings were you personally

18   involved in?

19        A.    I guess for lack of a -- well,

20   let's call me an actor, okay --

21        Q.    Sure.

22        A.    -- because that's what they

23   called us in investigations.

24              I've been an actor in four

KENT TRIBBLE

Page 189

```
 1    officer-involved shootings, one in Concord,
 2    three in Vallejo.
 3           Q.    And then the three I believe we
 4    spoke about, that was -- I think, actually, we
 5    talked about Guy, and then you said there was
 6    one through a windshield or in a car?
 7           A.    No; I was in a vehicle, I fired
 8    from the passenger side through the open
 9    passenger window with a rifle.
10           Q.    When was that?
11           A.    2012.
12           Q.    And can you please tell me about
13    that incident?
14           A.    We have already discussed this
15    incident.
16           Q.    We did?
17           A.    Yeah.  The suspect's name was
18    David Webb, if I recall correctly, and it was
19    that reverse robbery sting we were doing.
20           Q.    Understood.  Okay.  Through the
21    car.  I didn't make the connection that was
22    through a car.
23           A.    Yeah.  It was from a vehicle, it
24    wasn't through a car.  I'm not trying to be
```

KENT TRIBBLE

Page 190

1       nitpicky but, you know --

2               Q.      I get it.

3               A.      -- words matter.

4               Q.      Of course.

5               A.      So, yeah, it was from a vehicle

6       where I was part of the arrest team and it was

7       through an open passenger side window of the

8       front seat.

9                       MS. LORENTSON:  I think I might

10              be almost done.

11                      Just so I can anticipate,

12              Katelyn or Jacob, are you going to have

13              any questions?

14                      MS. KNIGHT:  Yeah, just a few.

15                      MR. GRAHAM:  Yeah, just a

16              couple.

17                      MS. LORENTSON:  Okay.  Why don't

18              you guys go and then I'll look at my

19              notes while you're --

20                      MR. GRAHAM:  You go ahead,

21              Katelyn.

22                      MS. KNIGHT:  Thanks.

23      BY MS. KNIGHT:

24              Q.      Do you have a specific memory of

KENT TRIBBLE

Page 191

```
 1    having bent Jarrett Tonn's badge?

 2           A.      A specific memory, no, I do not.

 3           Q.      Do you have a specific memory of

 4    having bent Sanjay Ramrakha's badge?

 5           A.      No, I do not.

 6           Q.      The Critical Incident Review you

 7    were discussing earlier of the officer-involved

 8    shooting involving Tonn and Jones where officer

 9    Tonn fired his weapon, do you recall the

10    suspect in that OIS?

11           A.      I think it might be Brown is her

12    last name.

13           Q.      Jerrell Brown, does that sound

14    right?

15           A.      Yes, yes, ma'am.

16                  MS. KNIGHT:  Okay.  So those

17            were what I have.  Jacob?

18    BY MR. GRAHAM:

19           Q.      Yeah, so Katelyn asked one of my

20    questions.  The only other one I have for you,

21    Mr. Tribble, is, do you have a specific

22    recollection of witnessing Tonn's badge being

23    bent?

24           A.      No.
```

KENT TRIBBLE

Page 192

1              MR. GRAHAM:  Okay.  That's all I

2          have.  Thank you.

3              MS. LORENTSON:  I'm just looking

4          through my notes.  Bear with me for a

5          minute.

6    BY MS. LORENTSON:

7          Q.      Josh Coleman bent Zack

8    Jacobson's badge, correct?  You witnessed that?

9          A.      I thought I witnessed that, but

10   in retrospect I think I may have been

11   misinterpreting what I saw.

12         Q.      What did you see then?  What now

13   do you think that you saw?

14         A.      Well, what I saw was Coleman

15   asked -- we were at the Relay Club, Coleman was

16   on duty, I was on duty, Zack was off duty,

17   Coleman said, "Let me see your badge," he

18   looked at it, I thought he had both hands on

19   it, like I had when I bent badges, and then he

20   acknowledged a bent badge and handed it back to

21   Zack.  That's what I saw.

22              I originally thought he had bent

23   it, because I didn't know until I went to

24   Healy's courtroom that anyone else had been

KENT TRIBBLE

Page 193

1    doing any badge bending.  So I thought Zack --

2    or Josh had basically done what I did to him,

3    because everything else looked the same and his

4    hands were in the same position.

5                    It wasn't until I found out that

6    somebody else may have bent Zack's badge at

7    Healy's courtroom that I realized I might have

8    misinterpreted what I saw.

9        Q.    Okay.  I want to go back very

10    briefly to Travis Aspegren, which I know I'm

11    butchering, but my understanding of the reason

12    why he was brought in to testify or to give a

13    statement to Giordano is because he

14    acknowledged about an interaction with Ryan

15    McMahon and another individual at the firing

16    range I guess, and Ryan did not want to switch

17    guns with another individual because Ryan said

18    that his gun had two bodies on it.  Do you know

19    what that is referring to?

20        A.    I have no knowledge of that

21    exchange whatsoever.  This is the first time

22    I've ever heard of that.

23        Q.    Have you ever heard an officer

24    use that terminology, "I have a body on this

KENT TRIBBLE

Page 194

1     gun" or "There are a couple bodies on this gun"
2     or two bodies, have you ever heard anything
3     like that at all?
4              A.      Yeah.
5              Q.      Okay.  And what does that mean?
6              A.      I don't know that it's come from
7     officers or whomever used weapons in the line
8     of combat or duty, but frequently that's
9     referred to as if a gun has been used in
10    service, not necessarily whether it's been a
11    lethal use but the gun has been used by the
12    officer or combatant in the line of duty.
13             Q.      Is that something that you would
14    have addressed if you heard someone talking
15    about their gun having bodies on it?
16             A.      When I was less mature, probably
17    not, but as I got later in my career I probably
18    said, "Hey, we don't talk like that," you know,
19    "It's not a good example."
20                     And just like this case is
21    evidence of, everything can be misconstrued.
22    It's not a good idea to provide anybody
23    ammunition to allude things that are not
24    correct.

KENT TRIBBLE

Page 195

```
 1          Q.      Understood.  Misconstruing
 2     aside, as you sit here today, I know you -- you
 3     know, we've talked a lot about your belief and
 4     what some practices mean and what they don't
 5     mean and you have taken a lot of blame for the
 6     badge bending, but looking back on, you know,
 7     the badge bending procedure, do you think there
 8     are things that others in the department could
 9     have done besides yourself to stop this
10     behavior or to address it before it became this
11     problem that it has now become?
12               MS. KNIGHT:  Objection, vague,
13          speculation, incomplete hypothetical,
14          foundation.
15               MS. LORENTSON:  Okay.  Sure.
16     BY MS. LORENTSON:
17          Q.      It's very clear that at some
18     point there was some suggestion to you that
19     this was all of your fault or was that an
20     internal process, like you internally decided
21     that all of this was on you?  I really just --
22     genuinely, I would love to know.
23          A.      It may be my ego, but I do
24     believe that I was the source of this thing and
```

KENT TRIBBLE

Page 196

1    I feel like I'm responsible for all of the

2    negative consequences that it may have brought.

3         Q.      All of them, every single

4    negative consequence is --

5         A.      None of this would have occurred

6    if it had not been for my, for lack of a better

7    term, boneheaded idea with Golinveaux in a dark

8    place sometime in 2000 when a couple of guys

9    were talking about some hairy stuff they had

10   been through and how we could help each other

11   out, if I hadn't have done that and brought it

12   to the Police Department, none of this would be

13   occurring.

14        Q.      Well, but by "this," you mean

15   just like the negative publicity about badge

16   bending, that's how I'm taking what you're

17   saying, like all of the bad stuff you're

18   talking about is just the negative press,

19   right?

20        A.      That's -- that's what I'm

21   talking about, yes.

22        Q.      And so you feel that all of

23   the -- you know, your decisionmaking and

24   thought process and your choice back then to

KENT TRIBBLE

Page 197

1       bend a badge, the only negative repercussion

2       was bad press for the Police Department and

3       that's all the bad stuff you're talking about?

4                    MS. KNIGHT:  Misstates

5               testimony.  Go ahead.

6                    MS. LORENTSON:  Then he can

7               restate it.  But, Katelyn, you don't

8               need to coach him.  He is a grown man.

9                    THE WITNESS:  I'm getting gray

10              too.  Thanks.

11                   I believe everything that

12              occurred forcewise is completely

13              legitimate and would have happened in

14              this department had I ever shown up or

15              not.  I think the negative connotation

16              of the badge bending, being associated

17              with those things, is solely on me

18              because I brought that.

19      BY MS. LORENTSON:

20           Q.     But how did that association

21      happen?  Like if one is just supporting a

22      police officer that, you know, had to take --

23      if what you're saying is accurate and everyone

24      felt the same way, that it's just supporting an

KENT TRIBBLE

Page 198

```
 1      officer who had to do a really hard thing in
 2      the line of duty, then how did that cross paths
 3      with the use of force that we've been talking
 4      about?
 5                    MS. KNIGHT:  Objection,
 6              speculation, foundation.
 7                    MS. LORENTSON:  He just said it,
 8              Katelyn.  And, again, you don't need to
 9              coach him.
10                    MS. KNIGHT:  I'm not coaching.
11              I'm just providing --
12                    MS. LORENTSON:  Well,
13              speculation is actually not an actual
14              objection in California.  So I had to
15              look that up on the 45-minute lunch
16              break, but it's not a real objection.
17                    MS. KNIGHT:  Well, he is
18              required to testify to things --
19                    MS. LORENTSON:  I don't --
20              again, please do not coach your
21              witness.  I'll ask the question again.
22      BY MS. LORENTSON:
23              Q.      Your opinion is that you have
24      brought on all of this negative publicity to
```

KENT TRIBBLE

Page 199

1    the department because of the badge bending,

2    you have made a correlation to that being

3    intertwined with the excessive force.  How did

4    that correlation come to be, in your opinion,

5    based on your belief that you were a part of

6    that?

7                MS. KNIGHT:  Objection,

8            misstates testimony, foundation,

9            speculation.

10                MS. LORENTSON:  Cool.

11                THE WITNESS:  Can I answer?

12                MS. KNIGHT:  You can, yeah.  I

13            am not going to instruct you not to.

14            Go ahead.

15                THE WITNESS:  I have a -- not to

16            be rude, but I do take issue with your

17            allegation that there is any

18            correlation with excessive force,

19            because I have been around this

20            department for almost all of these

21            events that we've talked about, and

22            every one of them has not only been

23            investigated by the department but by

24            the District Attorney's Office, the