```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4   DEYANA JENKINS, AN INDIVIDUAL,    )
                                       )
 5             PLAINTIFF,              )
                                       )
 6       VS.                           ) CASE NO. 2:19-CV-01896
                                       )            TLN-DB
 7   CITY OF VALLEJO, A MUNICIPAL      )
     CORPORATION; ANDREW BIDOU, IN HIS )
 8   INDIVIDUAL CAPACITY AS CHIEF OF   )
     POLICE; COLIN EATON, IN HIS       )
 9   INDIVIDUAL CAPACITY AS POLICE     )
     OFFICER FOR THE CITY OF VALLEJO;  )
10   JORDON PATZER, IN HIS INDIVIDUAL  )
     CAPACITY AS POLICE OFFICER FOR THE)
11   CITY OF VALLEJO AND DOES 1-50,    )
     INCLUSIVE,                        )
12                                     )
               DEFENDANTS.             )
13   _____)

14

15

16          REMOTE DEPOSITION OF JOHN WHITNEY

17          TUESDAY, MAY 13, 2025, 10:04 A.M.

18

19

20

21

22   STENOGRAPHICALLY REPORTED BY:

23   LAURY WASOFF, CSR NO. 10995

24   JOB NO.:     318815

25
```

1

```
 1                 UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF CALIFORNIA

 3


 4   DEYANA JENKINS, AN INDIVIDUAL,    )
                                       )
 5              PLAINTIFF,             )
                                       )
 6        VS.                          ) CASE NO. 2:19-CV-01896
                                       )              TLN-DB
 7   CITY OF VALLEJO, A MUNICIPAL      )
     CORPORATION; ANDREW BIDOU, IN HIS )
 8   INDIVIDUAL CAPACITY AS CHIEF OF   )
     POLICE; COLIN EATON, IN HIS       )
 9   INDIVIDUAL CAPACITY AS POLICE     )
     OFFICER FOR THE CITY OF VALLEJO;  )
10   JORDON PATZER, IN HIS INDIVIDUAL  )
     CAPACITY AS POLICE OFFICER FOR THE )
11   CITY OF VALLEJO AND DOES 1-50,    )
     INCLUSIVE,                        )
12                                     )
                DEFENDANTS.            )
13   _____)

14

15

16

17

18

19

20

21          REMOTE DEPOSITION OF JOHN WHITNEY,

22   taken on Tuesday, May 13, 2025 at 10:04 A.M. via Zoom

23   videoconference before Laury Wasoff, Certified Shorthand

24   Reporter, in and for the State of California.

25
```

                                                              2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            NOLD LAW
              BY:  MELISSA C. NOLD, ESQ.
 5            521 Georgia Street
              Vallejo, California 94590
 6            (707) 644-4004
              melissa@noldlaw.com
 7

 8               - and -

 9

10            POINTER & BUELNA, LLP
              TY CLARKE, ESQ. (NOT PRESENT)
11            155 Filbert Street
              Suite 208
12            Oakland, California 94607
              (510) 929-5400
13            tclarke@lawyersftp.com

14

15    FOR THE DEFENDANTS:

16            BERTRAND FOX ELLIOT OSMAN & WENZEL
              BY:  SHEILA CRAWFORD, ESQ.
17            2749 Hyde Street
              San Francisco, California 94109
18            (415) 353-0999
              scrawford@bfesf.com

19

20

21

22

23

24

25
```

                                                            3

```
 1                          I N D E X

 2   WITNESS:  JOHN WHITNEY


 3

 4   EXAMINATION BY:                                     PAGE

 5          MS. NOLD                                  5, 214

 6          MS. CRAWFORD                                 155

 7

 8

 9                          EXHIBITS

10                      (None offered.)

11

12

13                   UNANSWERED QUESTIONS

14                         (None.)

15

16

17                   INFORMATION REQUESTED

18                         (None.)

19

20

21

22

23

24

25
```

                                                              4

```
 1                TUESDAY, MAY 13, 2025, 10:04 A.M.

 2

 3       THE COURT REPORTER:  Good morning.  My name is Laury

 4   Wasoff.  I am a licensed Certified Shorthand Reporter in

 5   the State of California.  My CSR license number is

 6   10995.  I will be producing a transcript of these

 7   proceedings that is automatically admissible in court.

 8

 9                       JOHN WHITNEY,

10          the witness herein, having been first duly

11            sworn remotely, testified as follows:

12

13                        EXAMINATION

14   BY MS. NOLD:

15       Q.   Good morning, Mr. Whitney.  We met before at a

16   deposition just like this one on Zoom a couple of years

17   ago.  You're being called today based on your knowledge

18   of the case that we're here for and other information

19   related to the Vallejo Police Department and your

20   capacity as a police captain.  Is that your

21   understanding of why you're here today?

22       A.   Yes, ma'am.

23       Q.   And you were notified by the attorney

24   representing you in a civil suit to notify you to be

25   here today.  Is that correct?
```

                                                              5

1    2015, I was the detective captain.  I was also the

2    professional standards captain and I was the emergency

3    service unit captain.  It was basically to supervise

4    those units and all the different duties that go into

5    each of those three different sections, running the

6    tactical teams within the emergency service unit.  In

7    investigations, it was responsible for detectives, the

8    street team, and the evidence section and liaisoning

9    with all the task force supervisors and some of the

10   federal agencies.  And then in professional standards

11   was to make sure the internal affairs investigations

12   were being conducted correctly and deal with the hiring

13   process and reviewing backgrounds and polygraphs and

14   things of that nature as they came across my desk.  I

15   also worked as the liaison to the mayor's office and

16   fielded a lot of the calls from city council members

17   when they had questions about things that were going on

18   inside the police department.

19       Q.   So it sounds like you did a little bit of

20   everything.

21       A.   Yes.  And I forgot.  I was also in charge of

22   the community -- I think back then it was called the

23   community engagement section, something like that.  It

24   was the community services that used to be down at

25   2 Florida.  I supervised them as well and did a lot of

15

```
 1    the community engagement things at night and on the

 2    weekends.

 3        Q.   I think you said August of 2019 is when your

 4    employment with the city of Vallejo ended.  Correct?

 5        A.   Yes.

 6        Q.   Why did your employment with the city of

 7    Vallejo end?

 8        A.   The city terminated me.

 9        Q.   And why did they terminate you?

10        A.   On the paperwork it said for deleting items off

11    my cell phone.  But it was -- that's not what I took as

12    why they terminated me.

13        Q.   And what did you take as why they terminated

14    you?  What was your belief as to why they terminated

15    you?

16        A.   I believe they terminated me for whistle

17    blowing on anything badge bending and other issues going

18    on inside the police department that I had reported to

19    the city manager, the mayor, and the city attorney.

20        Q.   I want to go back a little bit in time.  When

21    did that happen that you whistle blew about the badge

22    bending and other issues?

23        MS. CRAWFORD:  Objection.  Vague.

24            Go ahead.

25        THE WITNESS:  Badge bending and a lot of the issues
```

16

1    that I reported were in around April of 2019.

2         Q    BY MS. NOLD:  In your lawsuit you described two

3    incidents related to what I understood to be the whistle

4    blowing that lead to your termination.  One was the

5    badge bending and the other was a Tasing incident where

6    the victim was not named.  Correct?

7         A.   Correct.

8         Q.   And there were other issues, but those two were

9    in your complaint specifically.  Right?

10        A.   That's correct, yes.

11        Q.   And we discussed it on the prior record, but

12   the Tasing incident in your lawsuit with the unnamed

13   victim was my client, Deyana Jenkins.  Is that your

14   understanding?

15        A.   That's correct, yes.

16        Q.   How did you come to know what happened to my

17   client, Deyana Jenkins, when you first found out about

18   it?

19        A.   I was also working as the public information

20   officer for the city of Vallejo, and during that time an

21   email had come in from a reporter -- I believe he worked

22   for The Chronicle at the time -- named Otis Taylor.  And

23   he was inquiring about a traffic stop involving

24   Ms. Jenkins and why she was stopped.  I believe he asked

25   for the probable cause for the stop and the reason why

17

1   force was used.  And I can't remember some of the other

2   questions he asked in his email.  And once I had learned

3   about that there was an issue, I got a copy of the body

4   camera footage from that traffic stop and the reports

5   and reviewed everything from that stop.

6           From there I had discovered that Mr. Taylor was

7   contacting the city mayor's office and other council

8   members, trying to find out information about the

9   traffic stop.

10   Q.   So to my understanding, you received this email

11   from Mr. Taylor while you were acting in the capacity as

12   a public information officer.  As I understand it, the

13   job is to respond to media requests and things like

14   that.  So one person who's doing it versus having

15   different people in different divisions.  Am I correct?

16   A.   The way we ran it is I was the head public

17   information officer.  A sergeant named Jeff Tai, who I

18   believe now is a lieutenant, worked for me, and he would

19   handle some of the littler inquiries, and I think he

20   handled also our social media pages.  But when something

21   bigger would come in, I would handle it.  Especially

22   when it rose to the level of there's a lot more to this

23   than just answering a quick question.  It's giving us

24   some insight on something that happened that up to that

25   point I didn't know anything about.

                                                            18

1       Q.    During that inquiry when Mr. Taylor originally

2    contacted you, did you have the understanding that

3    Ms. Jenkins was related to William McCoy who had been

4    killed a couple months before that?

5       A.    I did not know at the time.  I don't believe I

6    knew right at the time.  I had found out shortly after.

7    I don't think I put it together when I was looking at

8    the email, though.  I did figure it out later.

9       Q.    At some point you came to that understanding.

10   You just are not sure about when in the sequence?

11      A.    Yes.

12      Q.    So Mr. Taylor brought your attention to it and

13   you reviewed the footage of the incident yourself.

14   Correct?

15      A.    Correct.

16      Q.    Was there anybody else that reviewed that with

17   you that was part of that investigation?

18      A.    As far as the investigation, the chief of

19   police was in Idaho that week, so I was the acting chief

20   of police.  I had contacted him to let him know what was

21   on the video and what had occurred and the inquiries

22   into it, and he said to contact Greg Nyhoff, the city

23   manager, and make sure he's aware of it.  I guess --

24   well, I don't want to guess.  So I made arrangements to

25   meet with Mr. Nyhoff and show him the videos of the

19

1    traffic stop.

2        Q.   And did you meet with Mr. Nyhoff to show him

3    the videos?

4        A.   Yes.  We met one-on-one and I showed him the

5    videos from the traffic stop.

6        Q.   When you reviewed the incident with

7    Ms. Jenkins, did you believe that that incident was an

8    excessive force incident?

9        A.   I believed it was, that it was what I would --

10   what is termed unnecessary force.

11       Q.   And prior to reviewing that, part of your job

12   was related IA-related things.  That wasn't outside of

13   your wheelhouse.  It was in the scope of what you were

14   supposed to be doing at that time.  Right?

15       MS. CRAWFORD:  Objection.  Vague.

16       THE WITNESS:  At that time I was not assigned to

17   professional standards, but at that time I was assigned

18   as the acting chief of police and was looking into an

19   issue that had occurred and wanted to make sure it was

20   handled properly.  So it was within my purview to review

21   those videos as the acting chief of police.

22       Q    BY MS. NOLD:  Okay.  And just to be clear, I'm

23   not suggesting it wasn't appropriate for you.  But you

24   weren't technically over IA because you were acting

25   chief of police at that time, but you still would have

                                                            20

 1    had responsibility just as a captain in general to

 2    assess an issue that was brought to your attention or

 3    you became aware of it.  Right?

 4        A.   Correct.

 5        MS. CRAWFORD:  Objection.  Vague.

 6        THE WITNESS:  That's correct.  At that time I was

 7    the acting chief of police and a police captain.  I was

 8    no longer at that point, though, in charge of

 9    professional standards.  That wouldn't have been a

10    normal part of my job.  But as the acting chief of

11    police and a captain responsible for making sure the

12    police department is doing the right thing, then yes,

13    that is -- I am allowed to do something like that,

14    review videos.

15        Q    BY MS. NOLD:  And so you reviewed the videos.

16    You had concerns about the force.  You contacted

17    Chief Bidou, who was on vacation.  You were acting as

18    interim.  He told you to contact the city manager, Greg

19    Nyhoff, and you sat for a meeting with Mr. Nyhoff.  Is

20    that accurate up to that point?

21        A.   Yes.

22        Q.   Tell me about the conversation with Mr. Nyhoff.

23    You said you met him one-on-one.  Did you meet him at

24    his office?  Did he come to you?

25        A.   I met him in his office.  I brought a laptop

1    computer with me to play the videos for him so he could

2    see exactly what had occurred and what we were dealing

3    with so it wouldn't have been a shock should it become

4    something that's played on the news.

5         Q.   Do you know or do you recall if you guys also

6    had the cell phone videos from the people inside of the

7    car as part of your review to show what wasn't on the

8    body camera or do you remember?

9         A.   I believe I had seen the video prior to seeing

10   the actual body camera footage.  I don't remember if I

11   played him the cell phone video.  The body camera

12   footage appeared to be a lot clearer, though.

13        Q.   Right.  Better quality to be able to -- and

14   closer, from what I understood, to the action, if that's

15   the right word.

16        A.   It showed better footage of the officer's view

17   versus the occupants of the vehicle filming the

18   officers.

19        Q.   And do you remember what the response was from

20   Mr. Nyhoff?  Did he give you any directions?  At that

21   point he was essentially your boss.  Right?

22        A.   That's correct.  And he made it very clear that

23   he was my boss and I was to do what he told me to do.

24   And he was very angry about what he saw in the video.

25   He had made a comment that had he been stopped for the

                                                        22

1    same circumstance, he didn't believe he would be removed

2    from the car and that he simply would have his name ran,

3    not having his driver's license with him, and being sent

4    on his way.  He referred to himself, they wouldn't have

5    treated a 55-year-old white man in the same way.  And he

6    said he wanted an investigation into it.  And he was

7    very angry because this video came out at the same time

8    other things were coming out in the media, and he wanted

9    to know what Chief Bidou was doing with "his" police

10   department.  Mr. Nyhoff was referring to the police

11   department as his police department and wanted to know

12   what else was going on inside the police department.

13       Q.   The city manager is responsible for hiring and

14   firing the chief of police.  Correct?

15       A.   In the city of Vallejo, yes.  In 2019, yes.  I

16   don't know what the rules are now.

17       Q.   It's still the same.

18            So at that point essentially it is his police

19   department.  Right?  Because if something goes bad, it's

20   on him and it's going to be his head that rolls because

21   he is the only one who can do anything about the

22   department at that time in the city.  Right?  As far as

23   hiring and firing people?

24       A.   Yes, that's correct.

25       Q.   So he was upset and he was demanding an

23

1    investigation.  Is that your understanding?

2        A.    Yes.

3        Q.    And how did that meeting end?  Was the

4    understanding that you were going to go procure an

5    investigation, that that was your directive, that you

6    should go to the investigation?  Or did he get that

7    specific of who would do what?  Do you remember?

8        A.    He simply said he wanted an investigation.  And

9    so when I was done with that meeting, I had contacted

10   Chief Bidou by phone and let him know that Mr. Nyhoff

11   wanted an investigation into the traffic stop and the

12   use of force.

13       Q.    What did Chief Bidou say?

14       A.    Chief Bidou wasn't happy with it.  He wanted us

15   to kind of handle it separately.

16            And if I can back up for a second, I forgot one

17   thing that Mr. Nyhoff said at the conclusion that would

18   kind of make more sense of this.  Mr. Nyhoff wanted a

19   meeting set up where I would play the videos for

20   himself, the mayor -- Mayor Bob Sanpayan at the time --

21   and the city attorney, who was Claudia Quiatana at the

22   time.  He wanted the videos played for them the next day

23   so we could come up with a game plan on how we were

24   going to move forward with both the media and the

25   investigation.  And I had passed that on to Chief Bidou,

24

1    who was not happy with the amount of involvement in this

2    investigation.

3        Q.   He was not happy about Nyhoff's involvement in

4    the investigation?

5        A.   I don't think -- no.  It was he was not happy

6    about -- Nyhoff is who he told me to go show the videos

7    to.  He was not happy that Mayor Sanpayan and

8    Ms. Quiatana were also involved in this and it was

9    becoming bigger than he thought it should have been.

10       Q.   What happened next in the sequence of

11   investigating this incident?

12       A.   As far as the investigation, there was a

13   decision made that we would conduct an investigation.

14   And then shortly after that I was placed on

15   administrative leave, so I don't know if an

16   investigation ever took place or whatever happened with

17   any of that.

18       Q.   When the decision was made to conduct the

19   investigation, whose decision was that or whose

20   collaborative decision?

21       A.   It was a collaborative decision that came out

22   of the meeting with -- there was more people involved in

23   that meeting the next day.  It also included

24   Captain Joseph Iacono, who came in to give his opinion

25   on the use of force.

1      A.   Yes.  I have no idea if it was ever done or

2   completed or the findings.  I know nothing about it.

3      Q.   How long after the meetings with Nyhoff and

4   others were you put on leave?

5      A.   I went on a vacation for a couple weeks.  I

6   actually attended training and went on vacation.  I was

7   recalled -- on May 22 I was recalled back to the police

8   department while I was attending training and was served

9   with an IA.  And then I can't remember the exact day I

10  was placed on leave.  I believe it was the following

11  week.  But without my notes, I don't know.

12     Q.   Okay.  That's fine.  I'm just trying to get an

13  idea of the sequence of time.

14          When you had the conversation with Mr. Nyhoff,

15  you talked about Ms. Jenkins, is that also when you

16  revealed the badge bending information that you had, or

17  was that in a separate, different meeting?

18     A.   No.  It was in that meeting.

19     Q.   And do you recall -- so you talked about the

20  Jenkins incident as obviously a separate thing to deal

21  with.  What do you recall telling him about the badge

22  bending?

23     A.   I told him that officers were bending their

24  badges to mark shootings they were in and that it needed

25  to stop.  In law enforcement we don't keep score of

29

1    people we shoot.  And he was very angry about that.

2    Yelling.  And then he wanted to know of other things

3    that were going on inside the police department.  I know

4    I shared a few other things with him.  It wasn't just

5    those two incidents.  But as I sit here today, I can't

6    remember exactly what other things I shared with him.

7    It was more than two, though.

8             And he was very angry, and he pointed at the

9    chair in his office and said "Andrew," referring to

10   Chief Andrew Bidou, "sat there this week and told me

11   everything was fine in the police department, that

12   nothing was going on."  And that's what he said.  "I

13   want to know what's going on with my police department."

14       Q.   At that time was it your understanding that

15   everything was fine in the police department?

16       A.   No.

17       MS. CRAWFORD:  Objection.  Vague.

18       THE WITNESS:  I did not think everything was fine in

19   the police department.  I thought, in my opinion, the

20   police department was a mess, and I told Mr. Nyhoff that

21   I thought that the police department needed to be

22   rebuilt from the top down, that the leadership was not

23   doing what they were supposed to be doing.

24             And I shared with him -- oh, no.  I didn't

25   share with him at that time.  But yeah, I had -- I

30

    1    thought the police department needed some serious

    2    repairs and that it wasn't being ran the way it should

    3    have been ran.

    4        Q    BY MS. NOLD:  What did you share with him later

    5    that you were about to say?

    6        A.   In a later conversation I shared with him that

    7    I was in the process of trying to leave the city of

    8    Vallejo and that I had been applying for other agencies

    9    just to get out of that environment.

    10       Q.   And what was it that made you want to leave

    11   specifically?

    12       A.   I didn't like how things were being handled as

    13   far as when we had complaints from the community or we

    14   had internal affairs investigations of our own that they

    15   weren't being investigated properly, that they were

    16   being covered up.  And I remember having a conversation

    17   with Chief Bidou.  He said he just had to make it to 50,

    18   and then after that it would be my problem to fix.  And

    19   I just didn't like how things were being handled.  And

    20   at that point it felt like, because I had been removed

    21   from the professional standards side of my position,

    22   that things were being hidden from me even more and I

    23   wasn't being included in conversations that a captain

    24   should be.  So I felt at that point it was probably best

    25   for me to go work for another agency to finish my career

                                                                    31

1   someplace else.

2        Q.   What kind of things did you think were being

3   hidden from you?

4        A.   There was citizen complaints or internal

5   affairs investigations that were going directly to the

6   lieutenant and the sergeant of professional standards.

7   There were IAs being conducted I knew nothing about.

8             I had learned of a filing cabinet that they

9   referred to as informal resolutions and they weren't

10  being included in the internal affairs folder.  It was a

11  whole separate section of internal affairs

12  investigations that I knew absolutely nothing about.

13  And when I started learning things like that, it struck

14  me as we're hiding things when we're supposed to go to

15  Pitchess motions and reveal all these items.  Are these

16  going as well or do we have two separate IA files and

17  why are we doing this?

18            So when I started learning with things like

19  that, I could tell that we certainly weren't doing

20  things correctly and the way industry requires them to

21  be done.  There was nothing I could do to fix it, so I

22  felt the best way for me and my family was just to

23  leave.

24       Q.   Did you feel if you stayed and try to fix it,

25  you would have been in danger or your family would have

1   been in dangerous?

2       A.   Chief Bidou had brought me in at one point in

3   the springtime.  I can't remember the exact month.  But

4   he had told me that I better stop asking questions if I

5   liked my job.  And he wanted to know if I could get a

6   job someplace making the same amount of money with the

7   same retirement.  And I took that as a very big warning

8   to stop asking questions and just to go along with the

9   flow.  So I felt like that was a very threatening

10  meeting without him coming right out and saying "If you

11  don't stop, I'll fire you.  I'll find a reason."

12      Q.   So once you started making inquiries about

13  concerns that you thought were inappropriate in IA,

14  that's when Bidou reminded you how well you were paid

15  and how hard it would be to find a comparable job

16  elsewhere?

17      MS. CRAWFORD:  Objection.  Misstates testimony.

18  Vague and ambiguous.

19      THE WITNESS:  The time, I don't know exactly when.

20  It was sometime in the spring of 2019.  But it was

21  somewhere related to when I started discussing other

22  issues going on inside the police department.

23      Q    BY MS. NOLD:  When you had mentioned the filing

24  cabinet, the Pitchess cabinet, it's my understanding --

25  let me know if this is also your understanding --

33

     1    Captain Jason Potts and maybe others had a separate

     2    distinct cabinet referred to as the Pitchess cabinet

     3    whereas there was a whole other system of claims and

     4    complaints and formal complaints and things that were

     5    coming in that were never making it to court, that were

     6    never being turned over to civil plaintiffs and things

     7    like that.  It's my understanding it went on like that

     8    for quite some time.  Is that what you're talking about?

     9         A.   Yes.

    10         MS. CRAWFORD:  Objection.  Calls for speculation.

    11         THE WITNESS:  Jason Potts, when he was a sergeant in

    12    internal affairs, actually showed me the cabinet where

    13    they kept everything, and it was separate from the

    14    cabinet that sat across from then admin and analyst Joni

    15    Brown, who worked in internal affairs at the time.  Two

    16    separate cabinets.

    17         Q    BY MS. NOLD:  Did Joni Brown know about the

    18    cabinet?

    19         MS. CRAWFORD:  Calls for speculation.

    20         THE WITNESS:  I don't know.

    21         Q    BY MS. NOLD:  And that's all I want to know.

    22    Maybe you discussed it with her or had some reason to

    23    know if she knew about it.

    24         A.   I have no idea what she knew.

    25         Q.   So Potts showed you the cabinet.  I guess at

                                                                        34

```
 1    some point were you ever in professional standards,

 2    working in professional standards when Potts was in

 3    professional standards at the same time?

 4        A.   I was the captain of professional standards.

 5    Back in May of 2015, at some point during my time as the

 6    professional standards captain, Jason Potts was the

 7    internal affairs sergeant, and that's when he had showed

 8    me this cabinet.

 9        Q.   And you mentioned there was two cabinets.  So

10    what was your understanding was in the first cabinet?

11        A.   The cabinet in Ms. Brown's office was the

12    internal affairs files, and then the cabinet inside

13    Jason Potts's office was referred to as the informal

14    resolution internal affairs or the complaints cabinet.

15        Q.   So to make sure I'm understanding, the cabinet

16    in Ms. Brown's office were the things that actually went

17    for Pitchess motions and for court-related things, and

18    the one in Potts's office were the ones that were the

19    informal resolutions or the ones that didn't make it to

20    the actual file in Brown's office?

21        MS. CRAWFORD:  Calls for speculation.

22        THE WITNESS:  Correct.

23        Q    BY MS. NOLD:  And you're not -- that's not

24    based on speculation.  That's based on what Mr. Potts

25    told you directly.  Right?
```

1        A.    Correct.

2        Q.    Was there ever a time when you were in IA that

3    you were asked to present those files at a Pitchess

4    motion?

5        A.    No.  I typically did not go to Pitchess

6    motions.  It was usually Ms. Brown or Sergeant Potts.

7        Q.    Based on your understanding, the information --

8    some of the information that was in that alternative

9    file were complaints of misconduct and excessive force

10   and things like that that, if things were being handled

11   differently, should have been going to court, should

12   have been getting turned over to the judge.  Right?

13       A.    I don't know exactly which -- what was the

14   topics of everything in that folder, but it is my

15   understanding for Pitchess that everything in an

16   officer's folder is supposed to go to court for the

17   judge to review in camera and make a determination of

18   whether or not he turns it over to the party that is

19   filing the Pitchess motion.

20       Q.    Was it your understanding that some of the

21   records that didn't make it to the court should have

22   been -- the judge should have been making the call

23   whether those were turned over, not the IA guys?

24       A.    Yes.  A judge is supposed to make those

25   decisions, not police officers.

1    Q.   So an example, say there's a criminal case.

2   Right?  That's mostly what you guys were doing.  Not

3   related to civil litigation.  The majority of it related

4   to Pitchess motions.  Right?  The things you're actually

5   turning over?

6    A.   Yes.  The majority of the things that we turn

7   over there are Pitchess.  There is a civil side of

8   professional standards that works with the city

9   attorney's office.

10    Q.   So, for example, a murder case or something,

11   you know, accusing the officer of racial profiling,

12   excessive force, the judge -- the defendant's lawyer can

13   make a motion and ask for all this potential negative

14   information that they may be able to use to defend the

15   bad guy.  Right?  My understanding is that the

16   department would turn over anything that might be

17   relevant to the inquiry.  If somebody accuses an officer

18   of being racist or excessive force, things the judge

19   gets to see, if he thinks those are relevant, the guy

20   gets to potentially use those to show that the cop is a

21   bad guy versus a credible guy.  Is that your

22   understanding of what the Pitchess process is for?

23    A.   Yes.

24    Q.   And if I'm understanding, it sounds like it's

25   your understanding that some of the information that

37

```
 1    should lawfully be turned over to criminal defendants

 2    wasn't getting done?

 3        A.   That's correct.  The files in that informal

 4    resolution cabinet were not being turned over.

 5        Q.   To your understanding, how long did this go on

 6    for?

 7        A.   I don't know when it started.  I only know when

 8    I discovered it, when Sergeant Potts showed me the

 9    cabinet.

10        Q.   So that was somewhere around maybe 2015?

11        A.   It was between 2015 and whenever Sergeant Potts

12    promoted to lieutenant.  He was in that office at the

13    time he showed it to me.  I couldn't even tell you the

14    exact month or year.  It was just sometime while he was

15    the internal affairs sergeant.

16        Q.   And up to the time you left in mid-2019, you

17    don't have any knowledge of them stopping that practice

18    of having the alternative cabinet?

19        A.   I'm not aware of it, no.

20        Q.   Who do you know as far as people that were in

21    the room and in the conversations about the cabinet, who

22    else knew about that?

23        A.   I only had my conversation with Sergeant Potts,

24    so I don't know who else would have known that that was

25    going on.  From what I can recall, I only talked to
```

38

1    Potts.

2         Q.   And Potts left in what?  2019?  2020?

3         A.   I have no idea when he left the department.  I

4    stopped keeping track of all of that years ago.

5         Q.   When you left, he was still there.  Right?

6         A.   When I left, he was a patrol lieutenant.

7         Q.   When you were having the conversation with

8    Mr. Nyhoff where you were talking about the practice of

9    badge bending, do you remember at that time if you told

10   him about like when you first became aware of badge

11   bending?  I mean, was it years before 2019?

12        A.   We had had a conversation.  I told him when I

13   first learned about it when we were having -- we had a

14   big string of officer-involved shootings.  I was a

15   lieutenant at the time.  I shared with him that I

16   discovered it then and that I thought the practice had

17   ended, that Chief Bidou and then Captain Horton had put

18   a stop to it, and then I discovered that it had come

19   back in 2019.  I don't know if it ever stopped or

20   stopped and started or it just kept going.  I have no

21   idea.  I wasn't privy to who was involved in badge

22   bending at the time other than the two people I knew

23   about.

24        Q.   And that was McCarthy and McMahon?

25        A.   Yes.  There's two McCarthys.  So it's Joseph

                                                            39

 1                  (Recess.)

 2        Q    BY MS. NOLD:  So we're back on the record.  The

 3   same rules still apply.  You're still under oath.

 4            Before we left for the break, we had talked a

 5   little bit about the badge bending and when you became

 6   aware of the initial -- had an initial awareness.  Do

 7   you remember at that time, was there any compilation of

 8   creating or having a policy to explicitly prohibit

 9   officers from bending their badges?

10        A.   If you're referring to back in 2014 when I

11   first learned about it, no.  It was simply a

12   conversation between Chief Bidou and Captain Lee Horton

13   that I was in the hallway with where he simply told

14   Captain Horton to deal with it.

15        Q.   But at that point to what your understanding

16   was in 2019, you just assumed it had been dealt with?

17        A.   Yes.  I was a lieutenant at the time.  Back

18   then I didn't question my captain or my chief.

19        Q.   It was above your pay grade.  Right?

20        A.   Yes.  At that time I was an administrative

21   patrol sergeant.  I didn't deal with issues like that.

22   It was just something I was made aware, passed it on to

23   my supervisor, and hoped it would be handled correctly.

24        Q.   When you talked earlier about your letting

25   Chief Bidou know that you were expressing interest in

                                                              42

 1    key terms like "hostile work environment" and things of

 2    that nature.

 3         Q.   Outside of Lee Horton, had you ever had any of

 4    those sort of complaints filed against you prior?

 5         A.   No, never.

 6         Q.   Did you have any concerns related to

 7    recruitment and hiring of Vallejo police officers?

 8         A.   I felt some of the backgrounds that were coming

 9    through, there were issues in them, and I thought we

10    should pass on certain employees who back then were

11    hired.  But I wasn't the ultimate decision-maker.  I

12    would give my opinion to the chief and then he would

13    make the ultimate decision whether or not a person would

14    pass backgrounds and be sent on to psychological exams

15    and medical exams for final hiring.

16         Q.   So fair to say there were things that raised

17    red flags for you but that didn't raise red flags for

18    people above you?

19         A.   We had issues that I felt were dishonesty.  I'm

20    trying to remember some of the background issues.  A lot

21    of them were just dishonesty in the process.  Not

22    disclosing certain things in their backgrounds and then

23    they were discovered on polygraph examinations.  And I

24    felt like if they're already being dishonest at this

25    point in their careers before even getting started, I

                                                              44

1   didn't think it was a good idea to get started with

2   them.  And usually in the process we tell them to be

3   completely 100 percent honest.  There are so many things

4   now that when I started, you couldn't get in law

5   enforcement and now you can.  So just be honest because

6   that's the biggest part of our job.  If you hide

7   something or are dishonest or anything like that, then

8   it causes you issues later in your career.

9          Some of the backgrounds came through with

10  things that I felt like they weren't the ideal

11  candidate.  I thought it better to not hire anybody than

12  hire somebody for the wrong reasons and have issues with

13  them later in their career and after a year you're

14  pretty much stuck with them unless they do something

15  that rises to the level that you terminate them or they

16  leave on their own.

17     Q.  Were you ever aware of any other issues related

18  to hiring?  For example, officers that were being hired

19  with test scores that wouldn't allow them to be hired

20  elsewhere?

21     MS. CRAWFORD:  Calls for speculation.  Vague.

22     THE WITNESS:  I don't think there was necessarily

23  test scores.  Or entry-level officers that we had had,

24  that we had hired to send to the academy were usually

25  our cadets or explorers, so we didn't have to worry

45

1    read it?

2        A.   As I sit here today, I can't think of anything

3    off the top of my head.  It's been almost six years

4    since I've worked there.

5        Q.   Fair enough.  If there's something that might

6    refresh your recollection or anything, let me know if

7    there's anything that pops up.  I know there was a lot.

8            Do you remember a time when -- you're familiar

9    with the local reporters, local TV, like ABC, NBC, the

10   local affiliates.  Right?

11       A.   Yes.

12       Q.   So like in the Bay Area.  And we have ABC7.

13   Right?  And there's a reporter named Dan Noyes.  He's a

14   news guy.  Years ago, it's understanding from command

15   staff members, told this reporter on the record

16   something they knew to be untrue about an internal

17   affairs investigation being completed for an incident

18   related to Steve Darden where he was essentially

19   punching a crime victim named Blake Robles.  Do you know

20   the incident I'm talking about?

21       A.   Yes, I'm familiar with that.

22       Q.   So it was kind of an embarrassing incident,

23   went on the news, made everybody look kind of like

24   jerks.  Right?

25       A.   Yes.

                                                              50

1     Q.   At the time somebody leaked a video of the

2   incident with Mr. Robles and leaked it to the media and

3   that came out in the media unbeknownst to the department

4   without any notice.  Is that how you remember that

5   happening?

6     A.   Yes.

7     Q.   And so then there were media people kind of

8   crawling around, asking questions, because it was, as I

9   recall, pretty concerning for the community because this

10   was a guy who was a crime victim who seemed like he had

11   been a victim of excessive force, and people wanted to

12   know what happened and what was being done about it.  Is

13   that fair to say?

14     A.   Yes.

15     Q.   And it's my understanding that Lee Horton and

16   others told the media on the record -- there's videos

17   and transcripts of this -- that they were doing an

18   internal affairs investigation into that incident with

19   Darden, that they were doing interviews and they were

20   taking it very seriously.  Is it your understanding that

21   they actually didn't take it seriously, that they

22   laughed about that incident and they never IA'd it?  Do

23   you have any knowledge of that?

24     MS. CRAWFORD:  Objection.  Calls for speculation.

25   Assumes facts not in evidence.  Vague.

51

```
 1          THE WITNESS:  It's a two-part answer.  As far as the

 2   investigation, I was told that the investigation that

 3   was conducted wasn't into Sergeant Darden.  Or he was

 4   Officer Darden at the time.  It was into discovering who

 5   released the video to the media.

 6          And the second part of your question of people

 7   laughing at briefing, yes, that occurred at the time.

 8   The video was played in briefing and people laughed

 9   about it.

10      Q    BY MS. NOLD:  My understanding, despite telling

11   the public that the department took it seriously, the

12   department didn't take it seriously at all.  Right?

13      MS. CRAWFORD:  Objection.  Vague.  Calls for

14   speculation.

15      THE WITNESS:  I don't believe they did.  The

16   investigation wasn't into the actual act.  It was into

17   trying to determine who leaked it.

18      Q    BY MS. NOLD:  They were more concerned about

19   the whistleblower than Steve Darden taking a guy, leg

20   sweeping him, pushing him backwards onto his head on the

21   ground and kneeled on his chest.  That wasn't the

22   concern.  They were looking to figure out who had leaked

23   or whistle blew that action to the media?

24      MS. CRAWFORD:  Same objections.

25      THE WITNESS:  That was my understanding after
```

1   talking to chief Joseph Kreins about the incident.

2        Q    BY MS. NOLD:  What do you recall about the

3   conversation with Chief Kreins?

4        A.   Chief Kreins said that they -- that Captain --

5   he was, I believe, a lieutenant at the time -- Lee

6   Horton was conducting an investigation.  It was

7   determined that he was looking into who leaked the video

8   versus the actual incident itself.  I believe the

9   incident, from the time it occurred to the time that it

10  was released in the news, it was over a year.  So at

11  that point even if they determined Officer Darden had

12  done anything wrong, that it wouldn't have been able to

13  be -- he would not have been disciplined as a result

14  because it had exceeded the 12-month statute of

15  limitations established by POBAR.

16       Q.   Do you know if they ever found the leak?

17       A.   The person who leaked it?

18       Q.   Yes.

19       A.   Yes.

20       Q.   And who was it?

21       A.   It was an admin analyst who has long since

22  retired named Craig Flater.  It was explained to me by

23  Chief Kreins.  Captain Horton was never told that it was

24  Craig Flater who had leaked the video because

25  Chief Kreins was scared that he would tell Steve Darden,

53

1   asked did I know who did it and was I ever told who did

2   it.  So I just kept it to myself.

3        Q.   When you say Darden sort of has a reputation,

4   it's kind of more than a reputation.  Right?  He has

5   been involved with five or six shootings.  Right?

6   Officer-involved shootings, some high number like that?

7        A.   I think that's accurate.  He had a very high

8   number of shootings but also a lot of complaints from

9   coworkers.  I know coworkers who left the department

10  because when he became supervisor, they just couldn't

11  work for him anymore.  I had several officers in my

12  office.  One I remember pretty distinctly being so

13  upset, she just wanted to quit that day.

14            So a lot of different incidents with him, anger

15  management issues.  Since the day I started there, I saw

16  things.  And it's just something that -- I believe he's

17  in his mid-50s now.  Hopefully he grew out of it, but

18  he's always had issues of being angry and violent.  And

19  I think Lee Horton described him perfectly as saying

20  he's like a bull in a china shop.  He doesn't know when

21  to stop.

22       Q.   Fair to say the Vallejo police never tried to

23  stop him either?

24       MS. CRAWFORD:  Objection.  Vague.  Speculation.

25       THE WITNESS:  There was internal affairs

55

1    investigations I was aware of.  But I don't think they

2    put the right effort in to do it.  He had to go to anger

3    management back in 2019 for an incident.  But other than

4    that, I just think it was a lot of informal discussions

5    with him.

6            And I know I had one discussion with him when I

7    was a captain.  And I supervised him for a year, and we

8    would talk and try to keep him under control.  But,

9    yeah, I don't know what to say.  It was never, in my

10   opinion, addressed correctly and he just got promoted.

11   A lot of times a lot of departments will do that.  They

12   will promote what they call their problem children with

13   the hopes that they will either correct themselves or

14   they're off the streets and issues with them don't

15   happen.

16        Q    BY MS. NOLD:  Fair to say you're less likely as

17   a sergeant, lieutenant, captain, whatever, to get

18   involved in shootings because you're not actually in the

19   mix that directly.  Right?

20        A.   That's correct.  Lieutenants are usually in the

21   office.  Very rarely in the streets unless it's a

22   critical incident.  Sergeants are out on the streets a

23   little bit more for the city of Vallejo.  Or at least

24   they were when I was there.  But as far as -- yeah, they

25   should be less involved in regular calls for service.

                                                              56

1      Q.   Usually lieutenants, sergeants, they aren't

2   there.  They come afterwards, but they're usually not

3   there getting licks in.

4      A.   Yeah.

5   MS. CRAWFORD:  Wait.  Was that a question?

6   MS. NOLD:  Let me just strike that last part of the

7   question.

8      Q.   Mr. Whitney, you mentioned informal resolution.

9   Can you tell me, what would be the difference between an

10   informal resolution and a formal IA?  What would that

11   look like?

12      A.   The formal IA, typically you had a member of

13   the community -- or I'm sorry.  A formal complaint would

14   involve a member of the community who was calling and

15   wanting to know what the resolution was, trying to find

16   out what was going on.  And so that eliminated the

17   chance of it being informal.

18          The other side of complaints is the internal

19   affairs, which it's an IA, which is separate.  A lot of

20   people put the two of them together, but a citizen

21   complaint and an IA are separate, yet they're handled

22   the exact same say.  It's just how they're numbered.

23          And an IA is generated from the department.  So

24   usually an internal affairs investigation,

25   self-generated, they would always find a resolution or a

1    finding.  And then the citizen complaint that the member

2    of the community continued to follow up on, those would

3    typically have a finding.

4             Informal resolutions came about when a member

5    of the community would file a complaint and then they

6    would not follow up on it.  Sometimes they would be

7    assigned out to sergeants instead of internal affairs

8    handling it and the sergeants didn't follow up on them.

9    They just put them in a desk drawer and waited the 12

10   months, or they would call them once, no answer, and

11   then they would just interview the officer really quick,

12   make an informal finding, and it would go in the

13   informal finding filing cabinet.  So it wasn't like --

14   it's almost like an incomplete IA or something that

15   members of the community didn't follow up on.  But back

16   then I think there was a practice from the ACLU to

17   follow up on them after a year.  So I was trying to make

18   sure that we did them all exactly the same so when

19   somebody came a year later, we wouldn't be in a bad

20   position of we didn't actually do the internal affairs

21   investigation or the citizen complaint.

22        Q.   So the goal was to keep them from timing out

23   before the one year and nothing could be done about it.

24   Right?

25        A.   Yes.  If they time out after a year, you can't

                                                              58

1    do anything other than during the pandemic, I think they

2    added six more months to it to make it an 18-month time

3    period.  And I'm not aware -- I'm pretty sure that went

4    away, but I don't know for sure.  But the timing prior

5    to the pandemic when I worked there was one year.

6        Q.   And was it your understanding that it would be

7    on hold or freeze in time if there was any officers

8    being sued related to it?  Were you aware of that?

9        A.   I was not aware that they would stop the

10   timing.  It's my understanding that once the department

11   is aware of the issue or the complaint has been filed or

12   the internal affairs issue has been discovered, you have

13   one year from that date to conduct the investigation and

14   a finding answer of discipline on the member of the

15   department during that time period.

16       Q.   So you don't recall ever being in training

17   where the exceptions to that rule is if somebody has a

18   civil litigation pending -- I'm not asking you whether

19   that's true or false.  I'm just saying you never

20   received that part of the information to know that you

21   actually had much longer than a year in cases where

22   there's pending litigation?

23       A.   No.  I wasn't aware of that, no.

24       Q.   Were you ever responsible for creating press

25   releases related to critical incidents related to

59

```
 1    Vallejo Police Department?

 2         MS. CRAWFORD:  Vague as to time.

 3         THE WITNESS:  As a lieutenant and captain,

 4    occasionally I would do certain press releases that I

 5    was more involved in than the public information

 6    officer.  Typically the PIO would handle those things,

 7    but sometimes I would write them based on what I knew

 8    about the incident.

 9         Q    BY MS. NOLD:  Are you ever aware of something

10    happening in your presence of anybody intentionally

11    putting information in press releases that they knew to

12    be untrue at the time it was published?

13         A.   Not that I can recall today.

14         Q.   Nothing stands out?

15         A.   No.  Not right now, no.

16         Q.   And you were never asked to, for example, you

17    know, an incident happened, an unarmed person was shot,

18    you were never asked to put out a press release that

19    that person was, I don't know, armed with a knife and

20    stabbing somebody?  Nothing like that that you knew at

21    the time wasn't true?

22         A.   No, I was never asked to do that.

23         Q.   When did the city start using the IAPro

24    software?

25         MS. CRAWFORD:  Calls for speculation.
```

                                                                            60

1          THE WITNESS:  I know that we were doing it in 2015

2     when I was a captain in professional standards.  I don't

3     know when they started using it to begin with.

4          Now that I think about it, when I was a

5     sergeant in 2007, they were using it.  I think it was

6     called -- I don't know if it was called IAPro back then.

7     I don't know exactly because back then there was

8     different portions of it.  You could have like the 148

9     arrest section tracking, a 647 tracking system, and the

10    use-of-force tracking system.  I know they were using

11    that in '07 and '08 when I was a sergeant.  I don't know

12    what it turned into over the years or when they actually

13    started using it.

14         Q     BY MS. NOLD:  And it's my understanding that

15    there was a time they would have been using a different

16    version of it, IAPro2.  Is it your understanding they

17    did ever use a different version of it or do you know

18    that much?

19         A.    I don't know the difference between version 1

20    and 2.  I just know what tracking they were using

21    because they would let the sergeants know at the end of

22    the year "Hey, you have an officer who has done this

23    many 148 arrests and the average on your team is this."

24    Or I believe a big part of it back then was Taser usage

25    and they kept track of who had the most tasings in the

                                                                     61

```
 1    city, No. 2, No. 3, and so you would look to see if it
 2    was one of your officers.  Then you could determine they
 3    need to go back to training or they're just involved in
 4    more incidents or maybe they just need some lessons on
 5    how to talk with people and not Tase as many people.
 6         Q.   And did you ever have an opportunity to review
 7    the IA entries while you were working?  Not make them
 8    but review the ones that had been made by others?
 9         MS. CRAWFORD:  Vague as to time.
10         THE WITNESS:  When I was the captain on professional
11    standards and was shown the entries on one or two
12    officers.  I never watched anybody enter it, and I never
13    entered it myself.  So I know that entries were made and
14    I had access to the system.  I just never actually
15    watched anybody do it or make entries myself.
16         Q    BY MS. NOLD:  Did you ever review -- you said
17    you reviewed a couple.  Did you ever actually review,
18    skim through it, for example?
19         A.   I reviewed one officer's -- I guess it would be
20    their -- it was a printout of all the entries made, and
21    I just kind of had questions on if the entries were a
22    little vague on what was going on or they were
23    one-sentence or two-sentence entries back then and I
24    thought they should have a little more detail so
25    somebody who has no idea of what they're actually
```

1    reading can get a better understanding of what that

2    internal affairs was or that citizen's complaint entry

3    was.

4        Q.   And I've reviewed lots and lots of entries now

5    in the IA system and a lot of the entries were missing

6    substantive information.  The officer's name, the

7    victim's name, the date, you know.  Like you said, what

8    happened.  Some of the things I know who the people are

9    because they're my clients and things like that.  But

10   the system has whatever the person who entered it

11   decided to put in there.  You made the observation that

12   some of those things don't give enough context to

13   actually understand what the entry was about.  Right?

14       A.   Correct.

15       Q.   Do you recall seeing entries where there were

16   incidents or hearing about entries where there were

17   incidents involving known command staff members who

18   weren't named although they knew at the time who the

19   officer was who was involved in the incident?

20       MS. CRAWFORD:  Objection.  Vague.

21       THE WITNESS:  I only -- I reviewed two officers'

22   printouts, and they were, in my opinion, not very

23   detailed.  And sometimes when I knew what something was,

24   I was like where's witness officers' names here or

25   people who were involved or there was a little bit more

63

 1   to this.  So I just felt like the entries weren't very

 2   detailed.  But I didn't review every one.  I only

 3   reviewed two of them.

 4        Q    BY MS. NOLD:  And correct me if I'm wrong.  The

 5   omissions or errors, these weren't like high-level

 6   things.  Right?  These were things where there was like

 7   boxes to put in information and there wasn't information

 8   or there was too little information put in to actually

 9   understand unless you have some kind of personal

10   knowledge what the incident was.  Right?

11        A.   The detail sections were very vague.  And

12   usually the citizen complaint or the IA number was there

13   and sometimes there was witness officers.  Sometimes

14   there wasn't.  I think it's whoever was making the

15   entries, it was their decision.

16        Q.   But you weren't one of these people making the

17   entries.  Right?  Just that you observed that with your

18   own eyes on those two that you reviewed?

19        A.   Yes.  I didn't believe the entries were as

20   detailed as they should have been.

21        Q.   And do you remember who those officers were,

22   the two that you reviewed?

23        A.   Yes.  One of them was my file, because I was

24   going to a Pitchess for myself and, as the officer, sat

25   in the chambers with the judge.  And the other one was

                                                              64

1    Steve Darden.

2        Q.   It's my understanding that Darden had, up until

3    the time that you were there, roughly 43, 44 entries of

4    various complaints, things like that.  Does that number

5    sound accurate to you?

6        MS. CRAWFORD:  Calls for speculation.

7        THE WITNESS:  I can't remember how many entries.  I

8    just remember it was probably more than 50 pages that I

9    was handed to review.

10       Q    BY MS. NOLD:  Fair enough.  And obviously you

11   weren't counting them.  Right?

12       A.   No.

13       Q.   But you recall a voluminous amount.  You

14   believe at least 50 pages of documents?

15       A.   At least 50 pages.

16       Q.   Is this 50 pages of IAPro printout?

17       A.   Yes.

18       Q.   And is it your understanding that IAPro

19   printouts individually are what?  No more than two pages

20   per entry?

21       A.   I don't know exactly how many pages one entry

22   takes.  It's been a long time since I looked at one.

23       Q.   Fair enough.  And you know, I don't know.

24   Sometimes people just have things in their head, just

25   memories of different things.

1          So you have no idea whether there was an IAPro

2     entry related to Ms. Jenkins?

3          A.   No.  I have no idea.

4          Q.   Based on what the department had been doing

5     prior to that, would you assume that there was?

6          MS. CRAWFORD:  Objection.  Calls for speculation.

7     Vague.

8          THE WITNESS:  There should have been.  I don't know

9     if there was one or not.

10         Q    BY MS. NOLD:  That's what I was driving at.

11    There should have been, but you can't say one way or

12    another because you weren't there much longer after?

13         A.   Correct.

14         Q.   Can you tell me about the rumor between the

15    Vallejo Police Officer Association and Chief Bidou

16    related to not investigating incidents of misconduct?

17         MS. CRAWFORD:  Objection.  Vague.  Not proportional

18    to the needs of the litigation.  Calls for speculation.

19         THE WITNESS:  It wasn't so much as far as an

20    agreement when it comes to investigating general use of

21    force.  The agreement told to me by Chief Bidou was that

22    we would not use body cameras to initiate an

23    investigation should it be discovered through a review

24    that an officer used force.  Or if there was any

25    misconduct, that the cameras would not be used for

                                                              66

```
 1    initiating an internal affairs investigation.  I am not

 2    aware of anything in general of a use-of-force agreement

 3    between the union and Chief Bidou.

 4        Q    BY MS. NOLD:  Okay.  It's your understanding

 5    it's specific to how body worn camera footage would be

 6    used as evidence of misconduct, and your understanding

 7    is it wouldn't be used as evidence of misconduct at that

 8    time?

 9        A    It would not be used to initiate an internal

10    affairs investigation based on camera footage reviewed

11    by a supervisor.

12        Q.   So as long as somebody from the outside

13    reported it, it could in theory be used, but if it was

14    just through internal review, through use-of-force

15    review, things like that, that those things wouldn't

16    result in a disciplinary investigation?

17        A.   They wouldn't result in starting an

18    investigation.

19        Q.   And when he told you about that agreement, do

20    you remember about when that was?  Do you remember what

21    year that was?

22        A.   It was during an incident -- trying to remember

23    the two officers' names.  Lieutenant Cheatham, Steve

24    Cheatham, had received a phone call from

25    San Francisco PD in regards to domestic violence that
```

```
 1          Q.   And then did you turn in your gun and badge?

 2          A.   They took my gun and badge from me when I was

 3     placed on administrative leave.  They took my captain's

 4     car and gun, badge, and ID.  And they detained me for

 5     several hours.  They served me with paperwork saying I

 6     had no peace officer powers and I had to be available

 7     Monday through Friday.  I had to call in daily to clear

 8     whatever I was going to do that day with the chief's

 9     secretary or administrative assistant.  And I was pretty

10     much stuck at home and not allowed to contact anybody at

11     the police department or the city.  I could not go to

12     any city building, communicate with anybody in the city

13     for any reason.  And then to the point where they tried

14     to restrict my movements to attend an awards ceremony up

15     at POST.  It went to the night before finally getting

16     approved to go to this awards ceremony.

17          So from May 22, served with the IA, and then

18     shortly after that on admin leave, and then pretty much

19     on house arrest until Chief Joseph Allio released me

20     from having to do that.

21          Q.   I understand it was a pretty hard time for you?

22          A.   Oh, very much so.  We made a lot of family and

23     life changes in order to -- I knew what was happening

24     and I knew what they were going to do, and so we were

25     making arrangements for everything, including
```

70

1    interviewing for jobs at other agencies and jobs with

2    companies outside of law enforcement.

3        Q.   At the time did you have concerns that you were

4    going to be blackballed?

5        MS. CRAWFORD:  Objection.  Vague.  Argumentative.

6        THE WITNESS:  I had a lot of concerns about that.

7    And most of them came true.  Emails were sent to my next

8    employer, and I would receive phone calls from agencies

9    saying "Hey, we were interested, but we receive a phone

10   call with details about you and we just can't move

11   forward with you at this time."  Several agencies,

12   Contra Costa agencies and Napa County and Yolo County

13   that I was in the process of trying to get hired and was

14   just either given reasons that didn't match my resume

15   why I wasn't hired or at least the ones who were honest

16   that said they received phone calls or they had talked

17   to people at the Vallejo Police Department that told

18   them reasons not to hire me.  So I was struggling to get

19   employment after that.

20       Q    BY MS. NOLD:  You did eventually get back into

21   law enforcement in the Bay Area.  Right?

22       A.   Yes.  I was hired by the El Cerrito Police

23   Department.

24       Q.   Are you still working there?

25       A.   No.  I retired last -- it was officially March

```
 1    of '24 I officially retired.
 2         Q.    Got in enough of your years to be able to
 3    retire?
 4         A.    I had meant to go to 55, but I suffered a
 5    significant injury that required surgery.  It was an
 6    injury that they wanted to do a surgery and I refused,
 7    and as a result I was forced to retire.
 8         Q.    What rank did you retire as?
 9         A.    I was an officer.
10         Q.    So you spent what?  29 years?
11         A.    I think it was -- yeah, it would be 29.  One of
12    the agencies wasn't PERS, so I always forget to count
13    it.  But it was about 29 years.
14         Q.    29 years, you worked yourself up from the
15    bottom up to the second in command, which was
16    essentially stripped from you, and essentially you
17    retired as a low ranking member of a different agency.
18    Are you bitter about that?
19         A.    Not anymore.  I mean, I was for a long time
20    every time I put on my patrol officer's uniform.  But my
21    lawsuit settled and I moved on in both career and life
22    and trying to put the city of Vallejo behind me, which
23    it's been behind me for several years until a couple
24    weeks ago.
25         Q.    I'm sorry that we're having to drag you back
```

72

1    through this.  I know the last deposition was difficult.

2    I know this is difficult.  So I appreciate you sitting

3    through something that you could have just probably

4    figured out a way to wiggle out of.  So we appreciate

5    that.

6           When you testified before, you talked about

7    some things that happened after you whistle blew, which

8    included some incidents where you felt like you had been

9    intimidated.  And one of the incidents you talked about

10   was related to Steve Darden.  Could you remind me about

11   the circumstances with Mr. Darden after the whistle

12   blowing in May or April of 2019?

13      MS. CRAWFORD:  Objection.  Vague.  Not proportional

14   to the needs of the litigation.

15          Go ahead.

16      THE WITNESS:  So I had left city of Vallejo and I

17   was working for El Cerrito at the time, and I was in the

18   gym.  We both worked out at the same gym.  And I

19   remember distinctly I was doing the elliptical with this

20   senior citizen gentleman.  We always somehow ended up on

21   the elliptical together.  And I looked across the gym

22   and saw Steve staring at me.  And I ignored it and

23   looked down, and the gentleman next to me pointed it out

24   and said "Hey, that guy is staring at you.  Do you know

25   who that guy is?"  And I explained to him "Yeah, he's a

73

1   police officer with the city of Vallejo."  And he said

2   "Well, you shouldn't have to put up with that."  He

3   wanted to go to the front counter with me to report that

4   this person wouldn't stop staring at me.  And I said

5   "No, you don't want to get involved in this."

6           So I grabbed my stuff and was getting ready to

7   leave, and he met me in the hallway right outside the

8   locker room as I was leaving and just stared at me,

9   scowled at me as I was walking by him.  And we didn't

10  have any conversation, but at that point I decided to go

11  ahead and end my gym membership because I go to the gym

12  to relax and enjoy myself, not to be bullied and

13  intimidated by a thug that has a badge.

14      Q    BY MS. NOLD:  Would it be fair to say that

15  Mr. Darden, his physical presence and scowl would be

16  enough to cause you some fear?

17      A    Yes.  And he knew where I lived and he knew my

18  wife.  And so, I mean, I didn't feel safe, so I thought

19  the best thing for me to do was end my gym membership.

20          And then at that point my wife and I pretty

21  much stayed in our house.  We didn't go and do anything

22  around town or go to dinner anymore because we didn't

23  want to run into him.

24      Q.   Was there any time during that period of time

25  where you noticed that you were being surveilled or

74

1    followed?  Did anything like that occur?

2         A.   We had --

3         MS. CRAWFORD:  What is the time frame?  You said

4    period of time, Counsel.  I missed the time frame we're

5    talking about.

6         MS. NOLD:  Sure.

7         Q.   During 2019, after you left.  After you whistle

8    blew.

9         MS. CRAWFORD:  Thank you.

10        THE WITNESS:  We had set up cameras at our house

11   that mainly poked out into our porch.  And we lived in

12   an HOA community which was on the outskirts of town.

13   You really have no reason to go up there unless you know

14   somebody.  And we would get cars that would pull up in

15   front of our house and sit for a little bit and then

16   drive away at all hours.  So that was concerning.  All

17   our neighbors knew what was going on and all had

18   cameras.  And then we had a license plate reader

19   installed in the neighborhood.

20             So I think after the license plate reader was

21   out there and everybody could see it and you couldn't

22   get in the neighborhood without passing it, that's when

23   things slowed down for us.  But we had a lot of people

24   coming by our house.  So that's when we had installed a

25   few more cameras and made sure everything was being

75

1   recorded and shared.  That way, if anything happened,

2   somebody would at least have an investigative lead to

3   start with.

4        Q    BY MS. NOLD:  At the time did you have concerns

5   that somebody from the department or somebody in

6   retaliation for what you had disclosed was going to

7   cause you physical harm or kill you?

8        A.   I was concerned.  Up to that point in my career

9   I actually didn't carry a gun off duty.  Just never felt

10  the need.  And from that point on I was carrying a gun

11  anytime I was anywhere in the city or going to and from

12  work.  So I was worried.  And just I didn't know what

13  they were going to do next.

14        I had a very horrible letter sent to my house,

15  and then I had email sent to my chief of police from the

16  union president at the time and, from what the chief of

17  police at El Cerrito told me, a lot of inquiries into

18  what I was doing, PRA requests that he chose not to

19  share with me and people trying to figure out what I was

20  doing and what I was doing at the police department.

21        Q.   You talked about it before.  I know this was

22  difficult, the deposition where we talked about the

23  letter that you received.  And from my recollection, it

24  had some references to your wife, some personal things

25  that would have been potentially embarrassing, personal

76

1    in nature, and things that you believed that that

2    personal information, that that was being received by

3    you because of the whistle blowing.  Right?

4        A.   Oh, very much so.  They had referred to things

5    that not a lot of people would know about.  But

6    everything they wrote about my wife was not true.  It

7    was simply a letter I think just to bully and intimidate

8    and threaten her and to try to keep me from pursuing my

9    lawsuits.  And I think everybody at the police

10   department knew I was very close with my family, and I

11   think they were just trying to cause harm to my family.

12             So the letter was turned over to my attorney.

13   I moved forward from it, but it's something I'll never

14   forget.  But the first thing they wrote, they put some

15   specific details in there that led me to believe who it

16   was.

17       Q.   Who do you think it was?

18       A.   Based on the reference to people who worked at

19   the courthouse and certain procedures and supervisors, I

20   believe it was Jason Potts, because his wife worked at

21   the courthouse where my wife worked and it referred to

22   certain people that unless you worked in the courthouse,

23   even attorneys wouldn't know who these people are.  And

24   then there was a word he liked to use.  He had a word he

25   liked to use all the time and he used it in the letter.

1  And I can't remember what it is as I sit here right now.

2  "Salacious" was the word.  That was his favorite word.

3  He used it almost daily.  And so he used it in there

4  describing things about my wife.  But then he referred

5  to certain people that only his wife would know who they

6  are.

7    Q.  Do you still live in California?  I don't want

8  you to tell me where you live.  I'm just asking do you

9  still live in California?

10    A.  Yes, I still live in California.

11    Q.  Do you intend to stay in California or do you

12  plan to locate someplace where you feel safer?

13    A.  We recently were served at our house by

14  somebody representing the city of Vallejo.  And I know

15  there's -- where we live now has gotten out.  And my

16  house is actually not in my name, so how they found us

17  is an interesting puzzle.

18        We have been discussing leaving the state, but

19  we're afraid that wherever we go, that the city of

20  Vallejo's never going to leave us alone.  So we have

21  taken certain security measures here at this house in

22  order to protect ourselves.  And so just in case

23  somebody decides they want to come this far out to find

24  us, we will be protected and it will all be memorialized

25  in video.

                                                           78

1      Q.   Fair to say it's hard to see yourself safe from

2    the police?

3      MS. CRAWFORD:  Vague.  Argumentative.  Assumes

4    facts.  Not proportional to the needs of litigation.

5         Go ahead.

6      THE WITNESS:  The police department has tools that

7    they can use to find our addresses, such as TLO and

8    Lexus Nexus.  They don't have to use CLETS if they don't

9    want to.  So they pay for these services.  So to hide

10   from the police is not possible.  I have hoped over the

11   years that some of these officers grow up or get over it

12   and move on in life, but I don't know what's going to

13   happen.

14     Q    BY MS. NOLD:  Still waiting?

15     A.   I think I'll be waiting a while.

16     Q.   Other than you, do you know anybody who was

17   intimidated or deterred from trying to disclose

18   misconduct or do anything that you would consider to be

19   a variety of whistle blowing?

20     MS. CRAWFORD:  Compound.  Calls for speculation.

21   Vague.

22     THE WITNESS:  I know of two things.  One I think was

23   just in the newspaper.  Not the newspaper.  On the

24   internet a week or two ago.  One of the former deputy

25   chiefs -- I think I only read a paragraph of it, but it

79

1   was something similar, that he was trying to report

2   wrongdoing and he was terminated for whistle blowing.

3          And then the only other form of intimidation I

4   knew of is I believe the young lady's name is a Lisa

5   Sadler, if I remember her correctly, and that she was at

6   some club in the city of Suisun and said that an officer

7   had come up and intimidated her in the club about a

8   lawsuit or a complaint that she had filed against the

9   city of Vallejo.

10      Q.   As you sit here, that's what comes to mind?

11      A.   Those are the two I can think of as I sit here

12   right now.

13      Q.   Do you know if anybody ever investigated the

14   allegations from Ms. Sadler that she was confronted by a

15   Vallejo police officer at a bar and they threatened her?

16   Do you remember if that was ever investigated?

17      A.   I don't know if it was investigated or not

18   properly.

19      Q.   But you didn't have any direct interaction with

20   that investigation.  Right?

21      A.   No, I did not.

22      Q.   You just recall that incident from something

23   you had become aware of involving Ms. Sadler?

24      A.   The only part of that investigation I know of

25   is that an investigator went to the club to try to pull

```
 1    video.  And that's the only thing I know about it.
 2        Q.   The incident where Mr. Darden intimidated you,
 3    what gym were you at?
 4        A.   I believe it's -- I think it was still called
 5    the same.  It's In-Shape, Browns Valley.  I think it's
 6    called like In-Shape at Browns Valley or something like
 7    that.  It's on Browns Parkway in the city of Vacaville.
 8        Q.   There's not a Vallejo gym that the department
 9    used at any point recently.  Right?
10        A.   Recently I'm not aware of.  I know they had a
11    gym out at Mare Island that used to be a firehouse
12    but -- I think it's turned back into a firehouse, but I
13    don't know.  I haven't been on Mare Island in six, seven
14    years.
15        Q.   Okay.  While you were working for Vallejo
16    Police Department, did you ever see or discover anything
17    that you wanted to report but didn't report because you
18    were afraid?
19        MS. CRAWFORD:  Objection.  Vague.
20        THE WITNESS:  I think pretty much everything that I
21    thought should have been reported or investigated, I did
22    report.  And I think that's why I ended up in the
23    position I'm in.
24        Q    BY MS. NOLD:  Okay.  Fair enough.  And so
25    anything that you were aware of, you did report or
```

81

1    attempt, at least, to report?

2         A.    Everything that I believe I thought was wrong

3    or needed to be investigated, I reported to my

4    supervisor, whether it was Captain Horton when I was a

5    lieutenant or Chief Bidou when I was a captain.

6         Q.    When you testified in the McCoy matter, you

7    mentioned specifically an incident involving Mr. Michael

8    Nichelini and a man named Carlos Yescas.  Do you know

9    what incident I'm talking about?

10        A.    Yes, actually.  I recall something similar.

11   Now I remember that.

12        Q.    And as I understand it, that was how

13   Mr. Nichelini became aware of who the reporter Otis

14   Taylor was, that he later became aware of Mr. Taylor

15   writing an article.  I believe -- sorry.  Go ahead.

16        A.    Sorry.  I don't know when Mr. Nichelini knew

17   who Otis Taylor was.  That's when I first heard that

18   name and learned who he was.

19        Q.    Fair enough.  We don't know when Mr. Nichelini

20   read the article or got that information.

21        A.    I'm not aware.  I don't keep in contact with

22   him.

23        Q.    Yeah.  You guys weren't friends, to my

24   understanding.  Right?

25        A.    We were coworkers.  I was a supervisor for

82

```
 1   Patzer.

 2        Q.   Was there a Jason Patzer that worked there that

 3   you recall?

 4        A.   I heard that name.  I don't believe he's a

 5   police officer.  I believe there's maybe a firefighter

 6   by that name.  I don't know if they're all related,

 7   though.  There is a Patzer family from Vallejo.  So I

 8   don't know.  I know there's a lot of different members,

 9   though.

10        Q.   So Jeremy was the former officer who is

11   Jordon's dad, and that would be on his legacy badge,

12   would be Jeremy's number in small?

13        A.   Yes.

14        Q.   That person doesn't have to be deceased.

15   Correct?

16        A.   No, not at all.

17        Q.   Do you remember a time when Chief Bidou was

18   trying to get Kelly Trujillo to come in and sit for the

19   critical incident reviews and attempt to make them

20   attorney-client privileged as opposed to publicly

21   releasable public documents?

22        MS. CRAWFORD:  Objection.  Calls for speculation.

23   Vague.

24        THE WITNESS:  No.  That was an actual technique that

25   was used to involve Mrs. Trujillo in everything.  Not
```

                                                                           89

1   just those meetings but emails and text group messages.

2   And if you removed her for any reason, he would make

3   sure he added her back in.  I tested it a couple times

4   by removing her and seeing what would happen, and he

5   would put her right back into the messages.  I believe

6   it was right around 2018, 2019 that that practice

7   started.

8       Q    BY MS. NOLD:  An incident review is something

9   that once it's completed, it's publicly releasable.

10  Right?

11      A.   I'm not aware of the PRA laws.  I believe so,

12  but I don't know.

13      Q.   I don't expect you to be an expert in things

14  you don't do or didn't do.  And obviously the law may be

15  different now than it was at the time when you were

16  looking at it.  But it wasn't just your understanding.

17  They actually engaged in the practice of trying to

18  involve the city attorney's office, specifically

19  Ms. Trujillo, who is now sitting on the bench in Solano

20  County, to use her presence to try to make things

21  attorney-client privileged that would not have been

22  otherwise?

23      MS. CRAWFORD:  Objection.  Calls for speculation.

24      THE WITNESS:  No.  It was specifically talked about

25  that we needed to leave her in everything so everything

90

1    was attorney-client privileged and could never be

2    publicly released.

3        Q    BY MS. NOLD:  And she was on the emails and in

4    the meetings, so she was compliant to the extent that

5    she was there, she was attempting to make those

6    privileged.  Right, to your understanding?

7        MS. CRAWFORD:  Calls for speculation.

8        THE WITNESS:  I don't know what her thought process

9    was.  But all I know is we were told to make sure that

10   any emails or texts that we sent to each other, that she

11   was either in the email group or she was in the text

12   group.  We always had to make sure to add her.

13       Q    BY MS. NOLD:  And did Ms. Trujillo or anyone

14   else from that office ever direct you to destroy

15   evidence or conceal records in evidence?

16       MS. CRAWFORD:  I'll object to the extent there is

17   any communication with Ms. Trujillo and she was the

18   assistant city attorney, so it would be privileged.

19       Q    BY MS. NOLD:  I'm asking for things that

20   wouldn't be privileged which are things that would be

21   criminal in nature.  Asking you to do something that you

22   knew or you believed you weren't supposed to do.  That

23   would be something like hiding evidence, concealing

24   something.  So not anything where you were having a

25   privileged conversation.  But if you were discussing

91

1    something like concealing records, that is ongoing and

2    that would not be subject to attorney-client privilege.

3    So anything like that that wouldn't be subject based on

4    you knowing it was wrong or illegal at the time or

5    believing it might be wrong or illegal at the time.

6         A.   Not that I can think of as I sit here today.

7         Q.   You mentioned earlier when you talked about

8    legacy badges, Herman Robinson.  Is he still working for

9    the police department?

10        A.   Yes, he is.  He is still a lieutenant with the

11   police department.

12        Q.   He's been there what?  48, 40-something, high

13   40s, almost 50 years?

14        A.   I believe he was sworn in in the neighborhood

15   of 52, 53 years in his career between the city of

16   Vallejo and Berkeley Police Department.

17        Q.   That's where he started?

18        A.   Yes.  In fact, he started at Vallejo PD in

19   September of 1973.  So 52 years he's been with -- he's

20   coming up on 52 years.  So it's 51 right now with the

21   police department.

22        Q.   Are you guys friends?

23        A.   Yes, we are.

24        Q.   That seemed so specific to know when he was

25   there.

1      You maintain a relationship with Mr. Robinson?

2      A.   We had for a while.  We're still friends.

3  Don't take that as we're not.  He had realized that I

4  didn't want to talk about the city of Vallejo anymore

5  and he felt that communicating with him reminded me of

6  the city.  So we went somewhere in the neighborhood of

7  almost five, six months where we didn't talk, and then

8  he sent me some birthday wishes and we talked for a

9  little bit that week.

10     Q.   Been a while since you had a talk?

11     A.   We talked about a month ago.  But prior to that

12 it had been almost six months.  You know, no texting

13 other than he sent me a text to let me know that a judge

14 had passed away that I knew.  Other than that, we really

15 didn't have any communication since before Christmas of

16 last year.

17     Q.   Did Mr. Robinson, Lieutenant Robinson ever

18 share with you being the victim of anti-black

19 discrimination when he worked for the Vallejo Police

20 Department?

21     MS. CRAWFORD:  Objection.  Not proportional to the

22 needs of litigation.  Calls for speculation.  Vague.

23     THE WITNESS:  Yes.  Lieutenant Robinson and

24 I, especially when I was a lieutenant and captain, we

25 had hours' long conversations in regards to just being

 1   friends and our lives.  But a lot of the conversations

 2   he did talk about was his coming into law enforcement

 3   and how he was mistreated and called racial slurs, even

 4   by supervisors and somebody that I was -- I guess they

 5   were family friends.  And he talked about how this had

 6   happened to him and a lot of the things that he faced

 7   over his career.  He was a sitting sergeant for 27 years

 8   and couldn't promote to lieutenant despite having a

 9   bachelor's degree from UC Berkeley and being very hard

10   working.  And that really soured him, and rightfully so.

11   And I think he went almost 47 years and never received a

12   single medal from the Vallejo Police Department in his

13   entire career.  Never any kind of award or nothing.  No

14   recognition at all for all of his time there.

15          So being one of his close friends, I did what I

16   could to remedy that for him.  I believe it was in 2019.

17      Q.   Was that the parking spot?

18      A.   Yes.  I don't know if the picture is still on

19   his Facebook, but there's a picture of the two of us for

20   his parking spot.  We used to have another employee park

21   there named Katie Hoetes.  She had like 53 years with

22   the city, so we got her a parking spot.  So Ms. Hoetes

23   passed away, and I thought it was only fitting that the

24   next senior member of the city receive that spot.  So he

25   got that parking spot and I nominated him for officer of

                                                          94

1    this officer continues to have collisions with the

2    department vehicles.  I know that one would stay in

3    there.  So I didn't want to leave my answer incorrect.

4    And I'm sorry I stepped on your last question.

5        Q.   Oh, no.  I think you ended up answering.  I

6    don't know what you know, so we have to kind of figure

7    out what you know during this deposition.

8             Did you ever work with Colin Eaton?

9        A.   I didn't work with him.  I was one of his

10   academy instructors.  I think that's when I had my most

11   interaction with him.  And then he was hired, but I

12   didn't really have any -- other than seeing him in the

13   hallway, I didn't -- typically an officer would not come

14   into a captain's office in any way whatsoever unless

15   there was something really wrong going on.  I might say

16   hi to him in the hallway or see him in briefings when I

17   would go to briefings, but I didn't, like, work with

18   him.

19       Q.   Based on your knowledge, up until the day that

20   you reviewed the incident with Ms. Jenkins, you didn't

21   have any knowledge or concerns or anything that you

22   personally had with Mr. Eaton?

23       A.   Actually, yes.  There were two incidents that

24   caused me concern that we had asked investigations to be

25   conducted on, and to my knowledge they were never done.

                                                          99

```
1          Q.   And those are incidents related specifically to

2     Mr. Eaton?

3          A.   Yes.

4          Q.   And were these incidents that occurred before

5     the incident with Ms. Jenkins or afterwards or do you

6     know?

7          A.   I believe they both occurred prior.

8          Q.   And do you recall what those incidents were?

9          A.   One was at Springstowne Center -- I don't know

10    if it's still called that -- on Springs Road.  It was

11    where they had the Islands marketplace.  You're probably

12    familiar with that.  And then there's a small bank

13    terminal in the parking lot and an ATM machine.  And

14    there was a gentleman who was sitting in his car and

15    watching people going to and from the terminal, and then

16    Officer Eaton was watching him.  And once everybody was

17    done, he was getting ready to get out of his car.  He

18    was contacted by Officer Eaton.  And he was reaching for

19    something in his car, and he was dragged out of his car

20    when he started to reach for something.  It was later

21    discovered that the gentleman was actually reaching for

22    his prosthetic leg in order to put it on and to walk to

23    the ATM machine.  And force was used to pull him out of

24    the car, and then it was discovered that he had a

25    prosthetic leg.  And so then that information was passed
```

100

1   on to me by the lieutenant.

2        Q.   Do you remember what lieutenant passed that on?

3        A.   Yeah.  It was Lieutenant Herman Robinson.

4        Q.   Did Officer Robinson -- or Lieutenant Robinson.

5   Excuse me.  Did he observe that happening or did

6   somebody report it to him or do you know?

7        A.   It was my understanding from talking to him, if

8   I recall correctly -- he could probably tell you the

9   story better than me -- that he had gone to the scene

10  and was -- he was very angry on how this gentleman was

11  treated.  The gentleman was black, and obviously

12  Lieutenant Robinson is as well.  He didn't believe the

13  gentleman was treated fairly, and that just a little

14  discussion could have mitigated that.  If he said "What

15  are you reaching for?" and he said "My leg so I can

16  walk, get out of the car," that it could have been

17  handled differently.  And Lieutenant Robinson was very

18  angry about that.

19       Q.   Correct me if I'm wrong.  It sounds like you're

20  saying that Lieutenant Robinson thought there might be a

21  racial motivation to it?

22       MS. CRAWFORD:  Calls for speculation.  Vague.

23       THE WITNESS:  Lieutenant Robinson I don't believe

24  said anything like that, but he made a point to tell me

25  that the gentleman was black.

                                                           101

1    Q    BY MS. NOLD:  And do you remember what the

2    other incident was?

3    A.    Yes.  It occurred at the 7-Eleven on Tennessee

4    Street.  I think it's Tennessee and Tuolumne.  I don't

5    know if it's still there.  It was at 1208 Tennessee.

6    And there was a woman who pulled into a handicap parking

7    spot.  She did not have her placard.  I don't know if

8    she actually was issued one or used one.  And she got

9    out of her car.  She was contacted by Officer Eaton.  He

10   demanded her ID.  And this is according to

11   Lieutenant Robinson who was the watch commander that

12   night.  Demanded her ID.  She refused and simply said

13   "Write my car a ticket."  And I don't know what happened

14   in the middle, but she was taken into custody.  And

15   Lieutenant Robinson went out to the scene to try to

16   figure out what was going on.  I cannot recall if she

17   was actually arrested or what the final outcome was.

18   Q.    Both of those were incidents that you thought

19   would or should be investigated.  Right?

20   A.    I believe so.  It showed a pattern.  The woman

21   was an older black female.  And they were very close in

22   time.  And it again caused Lieutenant Robinson concern

23   on what Officer Eaton was doing and how he was

24   communicating with people.

25   Q.    And both of those incidents were incidents that

102

1  you became aware of because of Lieutenant Robinson's

2  concerns and sharing those concerns with you?

3       A.   Yes.  Lieutenant Robinson would typically write

4  a very detailed memo in regards to these, and then he

5  would make copies and throw them in everybody's mailbox.

6  Or to correct myself, he would throw them in mailboxes

7  of people who could deal with internal affairs --

8  sergeant, lieutenants, the captains and chief of police.

9  He didn't throw them in everyone's mailbox.

10      Q.   So for clarity, it wasn't that he was creating

11 a mailer and distributing it.  He was putting it in the

12 mailboxes of people he thought could do something about

13 it?

14      A.   That would deal with it.

15      Q.   Yeah.  The appropriate people to send those

16 things to and not the staff of the department?

17      A.   Correct.

18      Q.   Do you remember members of the Tribble family

19 who worked for the Vallejo Police Department?

20      A.   My understanding, it was just the two.  Robert

21 Gordon Tribble, who went by the name Todd Tribble.  And

22 then Michael Kent Tribble, who went by the name of Kent.

23      Q.   Did you ever work with one of their sons that

24 was with the department, I believe?  It may have been

25 after you left.  I'm not sure.

103

1    prostitutes, and she found out about it and essentially

2    reported it to the department, something like that?

3         MS. CRAWFORD:  Speculation.  Vague.  Not

4    proportional to the needs of the litigation.

5         THE WITNESS:  I don't know the details of the

6    investigation.  It's my understanding that that portion

7    of his investigation took place before I actually worked

8    there.  Other parts of his investigation took place

9    while we were working together.

10        Q    BY MS. NOLD:  But that was investigated, to

11   your understanding.  Right?

12        MS. CRAWFORD:  Same objection.

13        THE WITNESS:  My understanding was the there was an

14   investigation.  But I was a brand-new officer.  Had no

15   involvement with that whatsoever.

16        Q    BY MS. NOLD:  It was above your pay grade at

17   the time.  Correct?

18        A.   Well above.

19        Q.   Have you had any meetings or conversations

20   about terminating Sean Kenney?

21        A.   No.  There was no conversations about actually

22   terminating him.  It was more where to put him to cause

23   the least amount of issues.

24        Q.   Was this before or after he shot and killed

25   three men in a five-month period?

                                                          106

1      MS. CRAWFORD:  Objection.  Not proportional to the

2  needs of litigation.  Vague.  Calls for speculation.

3      THE WITNESS:  It was afterwards.

4     Q   BY MS. NOLD:  Fair to say the department was

5  concerned about the amount of officer-involved shootings

6  he had been in in a very short period of time?

7     A.   Yeah.  There was a lot of concern with

8  Officer Kenney, both the shootings and just his general

9  behavior.

10     Q.  He was never terminated.  Correct?

11     A.   No.  He took a medical retirement when he left

12  the department, so technically he was retired.

13     Q.  Did you personally observe any racist comments

14  made by Matt Mustard?

15      MS. CRAWFORD:  Objection.  Vague.

16      THE WITNESS:  No, I didn't.  I'm trying to think.  I

17  can't recall as I sit here today, no.

18     Q   BY MS. NOLD:  Were you ever aware of comments

19  that you didn't hear where it was alleged that

20  Mr. Mustard had used racial slurs?

21      MS. CRAWFORD:  Objection.  Vague, calls for

22  speculation, and disproportional to the needs of the

23  litigation.

24      THE WITNESS:  Yes, I was made aware of comments that

25  Detective Mustard -- or Sergeant Mustard at the time had

107

 1    made towards his coworker Corporal Jason Scott.

 2        Q    BY MS. NOLD:  And did that happen while you

 3    were still there?

 4        A.   No.  I was told about it after.

 5        Q.   You heard about that after you separated from

 6    the department.  Is that correct?

 7        A.   Yes.  Corporal Scott and I had done things away

 8    from work after I had left the department, and he had

 9    told me what was going on.

10        Q.   So Detective Scott himself had disclosed what

11    happened?

12        A.   Yes.

13        Q.   It's my understanding that Detective Scott

14    was -- is an African-American man and he was working in

15    the detective division at the time it happened.  Was

16    that your understanding?

17        A.   Yes.  I put him in there permanently at the

18    start of 2019 as the detective corporal.

19        Q.   Was he the principal detective for the Vallejo

20    Police Department?

21        A.   No, he was not.

22        Q.   Do you know if he was the first black detective

23    for the department?

24        A.   I don't know --

25        MS. CRAWFORD:  Calls for speculation.

                                                           108

```
 1        THE WITNESS:  I don't know who the first black

 2   detective was.  I know Steve Darden was a detective at

 3   one time and -- oh, I forgot.  There was another

 4   detective in there at the same time.  Oh, no.  He was a

 5   little bit after Scott.

 6        Q    BY MS. NOLD:  Was it your understanding from --

 7   well, tell me what Corporal Scott told you what happened

 8   with Mr. Mustard.

 9        MS. CRAWFORD:  Same objections.

10        THE WITNESS:  He told me that Sergeant Mustard

11   referred to him as "boy" at work and kind of talked

12   about that he was there working late on a case and

13   Corporal Scott had gone out and bought pizzas for

14   everybody who was working late because it was on his

15   case.  He brought the pizzas into the conference room

16   and that Matt Mustard had told him he couldn't eat

17   anything and referred to him as "boy" and told him he

18   didn't care if there was only scraps left when he got

19   done but he had to write the search warrant before he

20   was allowed to eat.

21        Q    BY MS. NOLD:  Was it your understanding from

22   Detective Scott that he filed some sort of a formal

23   grievance related to being called "boy" and other

24   comments he considered to be racist in nature?

25        A.   Yes, he did file a complaint, from what I know.
```

109

1      Q.   Was it your understanding from him that after

2   filing the complaint, the city didn't do anything about

3   it and that he left as a result?

4      MS. CRAWFORD:  Objection.  Calls for speculation.

5   Not proportional to the litigation.  Vague.

6      THE WITNESS:  He told me he was leaving because they

7   wouldn't -- even after somewhat of an investigation was

8   conducted, he wanted to just go someplace else.  He

9   didn't want to be mistreated when he came to work, so he

10  chose to go work for another agency.  Because even after

11  everything was discovered, Sergeant Mustard was still a

12  supervisor and increasing his frequency going to his

13  office at the property evidence section.

14     Q    BY MS. NOLD:  You're saying Mustard was

15  increasing his contact with Scott after that?

16     A.   According to Corporal Scott, yes.

17     Q.   Other than that incident, can you think of

18  anything offhand, incidents where you observed

19  Sergeant Mustard acting in a way that you deemed

20  inappropriate?

21     MS. CRAWFORD:  Objection.  Vague.

22     THE WITNESS:  There's a few incidents.  I remember

23  we were both working patrol.  And it was a while ago.

24  Probably 2003, 2002 time.  And we went to a house party

25  and we were trying to -- there was a vacant house, and

110

```
 1        Q.   No, that's fine.

 2             And Scott still chose to leave because he

 3   didn't believe that the issue had been resolved.  Right?

 4       MS. CRAWFORD:  Calls for speculation.  Misstates

 5   testimony.

 6       THE WITNESS:  The conversations that I had with

 7   Corporal Scott following my departure and subsequently

 8   working for another agency was that the second I had

 9   been placed on administrative leave, things changed and

10   he felt like he wasn't protected anymore, and so he

11   filed his complaint.  He actually called me and asked me

12   how you file a complaint.  He didn't want to do it

13   because he thought it would be a career ender for him,

14   but he said he couldn't take it anymore.

15             I told him how to do it and to make sure it

16   doesn't get swept under the rug, or hope it doesn't.

17   And he did file a complaint.  I know some investigation

18   was conducted.  I don't know what the findings were or

19   any discipline, if any.  But he said even after that he

20   was still working for Sergeant Mustard.  He felt like

21   nothing had changed, and so he decided he was going to

22   leave the police department and seek employment

23   elsewhere.

24       Q    BY MS. NOLD:  And it's my understanding that he

25   did leave.  Correct?
```

113

1          A.    Yes.    He works for another agency.    Or he did.

2    I don't know if he is still there now.    We haven't kept

3    in contact over the past few years.

4          Q.    Is it your understanding that Detective Mustard

5    wanted to keep black officers out of the detective

6    bureau?

7          MS. CRAWFORD:    Objection.    Calls for speculation.

8    Vague.    Not proportional to the needs of the litigation.

9               Go ahead.

10         THE WITNESS:    I don't know if it was that or he

11   simply did not like Corporal Scott.

12              There was another black officer working in

13   investigations at the time that I just recalled.

14         Q    BY MS. NOLD:    Do you know who that was offhand?

15         A.    His first name is Craig.    And I worked with him

16   a lot.

17         Q.    Long?

18         A.    Craig Long, yes.    Craig Long was the detective

19   working in there.    He was brand-new.    I believe he was

20   brand-new in January, the same time I put Corporal Scott

21   in there.    I don't believe Detective Long is with the

22   department anymore.

23         Q.    I don't think so.

24              Were you ever made aware after you left that --

25   strike that question.

                                                          114

1        A.    I don't believe the car stop in January of 2019

2   was ever properly investigated.

3        Q.    When you say that, you mean Carlos Yescas?

4        A.    Yes.  Other than that, as I sit here right now,

5   I can't think of anything that should have been

6   investigated that wasn't in regards to Michael

7   Nichelini.

8        Q.    What about were you ever aware of something

9   concerning Officer Schillinger who wasn't -- that was

10  brought to your attention?

11       MS. CRAWFORD:  Objection.  Vague.  Calls for

12  speculation.  Not proportional to the needs of the

13  litigation.

14       THE WITNESS:  The things that involved

15  Detective Schillinger took place I believe after I had

16  left.

17       Q    BY MS. NOLD:  And you're referring to him, my

18  understanding, being put on leave for lying in

19  relationship to the incident with Jason Scott and Matt

20  Mustard, something like that?

21       MS. CRAWFORD:  Same objections.

22       THE WITNESS:  I don't know about the dishonesty

23  portion.  The only part I know from Corporal Scott is

24  that Detective Schillinger drove by Jason Scott's home,

25  which is well outside of the city of Vallejo or Solano

1    County, on a day when Officer Scott had called in sick.

2    And he saw him drive by his house and wanted -- asked

3    me, having no longer worked there, if it's proper for

4    somebody to drive by an officer's house who calls in

5    sick to verify they're and go probably nearly an hour

6    and ten minutes outside of Vallejo's jurisdiction to do

7    it.

8         So I told him I don't know the answer to that

9    and he would have to -- if he needed to file a complaint

10   or do something, personnel would have to deal with that.

11   Q    BY MS. NOLD:  Is that something -- you were no

12   longer working for the city of Vallejo.  Right?

13   A    I was no longer working for the city.  He would

14   just ask me questions on how to deal with things.

15   Q    During the time that you were working there,

16   were the Vallejo police officers using -- I don't know

17   how to describe it.  Words they were using were

18   alternatives to racial slurs?  One of those terms is the

19   word "spoonies."  Have you ever heard that in reference

20   to black people?

21   A    I have heard the term "spoon."  I haven't heard

22   "spoonies."  But "spoon" was a comment that I had

23   learned early on working there.  And it made no sense to

24   me, but it was just something that they would say.

25   Q    Was that in reference to black people

                                                            121

1    tennis with the chief of police that even if the chief

2    is taking you to go play tennis, it doesn't mean that

3    you can just not do your duties during that time.  We

4    don't get to just go play tennis or whatever we want

5    during our day that we're supposed to be doing our job.

6           Other than that, just I always worried about

7    his level of experience when he would be put into

8    certain positions and how well he had performed.

9    Q    BY MS. NOLD:  Did anything particular stand out

10   in your mind, situations where his lack of experience

11   were highlighted?

12   MS. CRAWFORD:  Same objections.

13   THE WITNESS:  I think putting him in internal

14   affairs when he really didn't have the experience in

15   conducting those types of investigations was not the

16   greatest idea.  I felt like there were other candidates

17   at the time who would have done a better job and maybe

18   were less connected to the chief of police.

19   Q    BY MS. NOLD:  Were you aware of concerns

20   related to the superior court where there were certain

21   judges that wouldn't let certain officers appear in

22   their courtrooms?  Are you familiar with what I'm

23   talking about?

24   MS. CRAWFORD:  Objection.  Vague.  Calls for

25   speculation.

125

1        THE WITNESS:  I'm only aware of one judge who was

2    adamant an officer not testify in her courtroom.

3        Q    BY MS. NOLD:  Do you know who that is?

4        A.   It was Judge Ramona Garrett.

5        Q.   Was it Officer Jason Potts?

6        A.   No.  It was my understanding it was

7    Officer Steve Darden.

8        Q.   Do you know what the circumstances were that

9    led her to make that proclamation?

10       A.   She had reviewed the video of Officer Darden

11   striking -- I can't remember the name.  The soldier on

12   video that ended up on the news and that his police

13   report did not match what he had -- what he wrote did

14   not match what was in the video.  And she felt he was

15   dishonest and she did not want him testifying in her

16   courtroom ever again.

17       Q.   She thought he had or was going to perjure

18   himself?

19       MS. CRAWFORD:  Calls for speculation.

20       THE WITNESS:  She just -- my understanding was she

21   did not want him in the courtroom because she felt his

22   report was not honest.  I don't recall anything about

23   perjury or anything like that.

24       Q    BY MS. NOLD:  Do you remember I believe it was

25   the same judge not allowing Jason Potts in the courtroom

                                                            126

1   because she heard an audio of him using the "N" word in

2   relationship to a car stop and wouldn't allow him in a

3   courtroom after that?

4       A.    I have never heard of that, no.

5       Q.    Outside the conversations that you had with

6   Jason Potts about the Pitchess cabinet, the informal

7   resolution cabinet, have you ever had a conversation

8   about those distinctions in internal affairs with

9   anybody else that was in internal affairs besides Jason

10  Potts?

11      A.    No.  I simply took my concerns for all of that

12  to the chief of police.

13      Q.    Because at that point there was nobody above

14  you on the food chain besides the chief of police.

15  Right?  You didn't have a direct supervisor outside of

16  the chief.  Right?

17      A.    Correct.

18      Q.    So that was the proper chain of command when

19  you did that.  Right?

20      A.    Yes.

21      Q.    Is it frowned upon when you jump the chain of

22  command?  For example, if you're an officer and you

23  don't talk to the sergeant or lieutenant and you go talk

24  to the chief, that would be considered inappropriate.

25  Right?

127

1    Right?  You saw a guy was bleeding out and you helped

2    him out, and you're supposed to do that.  Right?

3        A.   That's what we're trained to do.

4        Q.   You didn't feel like you did anything

5    exceptional?

6        A.   No.  He was shot and bleeding, and it was my

7    job to hold my hand on his wound until the ambulance

8    showed up.

9        Q.   When you talked to Officer Bull about the Tili

10   shooting, did he ever express any concerns about what

11   Officer Crutcher had done that day or anything about his

12   concerns about whether it was a bad shooting?

13       MS. CRAWFORD:  Same objections.

14       THE WITNESS:  No.  We didn't really have

15   conversations about that.

16       Q    BY MS. NOLD:  More exclusive to his feeling bad

17   about the connection to the family and however that

18   impacted him internally?

19       A.   Yes.  That was pretty much it.

20       Q.   Does the name Enrique Jimenez sound familiar to

21   you?

22       A.   It does sound familiar to me.  I believe he was

23   a homicide victim in the city of Vallejo, if I'm

24   remembering correctly.

25       Q.   Yeah, he was.  You didn't investigate that

                                                          138

```
 1   shooting, did you?

 2       A.   I was the -- I believe I was the secondary on

 3   that.  Ted Postolaki was the detective in charge if it

 4   was the one that took place in the old Yardbirds parking

 5   log next to the old -- I'm guessing it's old Howard

 6   Johnson's if it's still there off of Admiral Callaghan.

 7   So Detective Postolaki was primary, and I was

 8   Detective Postolaki's partner at the time, so I helped

 9   him with the investigation.

10       Q.   So you were one of the detectives?

11       A.   Yes.  The initial detectives that went to the

12   scene, yes.

13       Q.   Were you present when they brought in two

14   brothers who were suspected of killing Mr. Jimenez?

15       MS. CRAWFORD:  Same objections.

16       THE WITNESS:  Yes, I was.

17       Q   BY MS. NOLD:  And that was Daniel and Daryl

18   Venegas?

19       A.   I remember they were brothers and last name

20   Venegas.  The first names sound familiar.  I can't be

21   100 percent sure that's them.  Close, though.  I want to

22   say that's correct, but I'm not 100 percent sure.

23       Q.   You understood them to be brothers?

24       A.   Yes.

25       Q.   Were you in the room when they were being
```

139

1    interrogated?

2         MS. CRAWFORD:  Same objections.

3         THE WITNESS:  Yes, I was in the room during their

4    interrogation or interview.

5         Q    BY MS. NOLD:  Were they in the room together?

6         MS. CRAWFORD:  Same objections.

7         THE WITNESS:  I don't believe so.  That would not be

8    proper in any way.

9         Q    BY MS. NOLD:  It would not make sense.

10   Correct?

11        A.   No.  And I would not have wanted that.  You

12   never interview people together because then they do

13   this story collaboration thing and it's not their

14   statement.  It's like a group statement.

15        Q.   Because the goal is to separate people out and

16   find out what they individually know and then try to

17   figure out what actually happened based on everybody's

18   different perspectives.  Right?

19        A.   Correct.

20        Q.   While the men that were suspected of killing

21   Enrique Jimenez were in the interview room, did they

22   mention something about a relationship that their mother

23   had with Steven Darden?

24        MS. CRAWFORD:  Same objections.

25        THE WITNESS:  Yes, they did.

1      Q    BY MS. NOLD:  You know what I'm talking about,

2    don't you?

3      A.    I do now, yes.

4      Q.    And please correct me if I'm wrong.  Obviously

5    I wasn't there.  Based on the information that -- based

6    on this interaction -- I know you're not the person who

7    told me.  Right?  But it's my understanding that

8    Mr. Jimenez was killed on the 100 block of Admiral

9    Callaghan.  I think you said it used to be a Yardbird.

10   He was in the parking lot waiting for a ride, like going

11   to work, waiting for somebody to pick him up at, like,

12   5:00 o'clock in the morning, and allegedly these two

13   brothers who had a beef with him from some prior gang

14   affiliation years ago or whatever the underlying thing

15   was, that they saw him there and went up and killed him

16   over some old beef.  It was known that they had a beef,

17   that they bragged about killing him and, when they were

18   brought in as suspects, that they said something to the

19   effect of "You've got to let us go because we know about

20   Steve Darden stealing time and having an affair" and

21   doing all these things that they were trying to use as

22   leverage to try to get themselves out of being suspects

23   in a murder investigation.  Is that your understanding

24   of what happened?

25      MS. CRAWFORD:  Objection.  Assumes facts.  Calls for

1    speculation.  Not proportional.

2         THE WITNESS:  That is correct.

3         Q    BY MS. NOLD:  And as a result of the

4    information that they provided, which included the name

5    of the woman that Mr. Darden was allegedly involved

6    with, alleged that at times when he was supposed to be

7    working, that he would come to Vallejo and park his car

8    and then go spend time with this woman while out on sick

9    leave.  Is that your understanding of what they

10   disclosed?

11        A.   They didn't disclose exactly that.  It's just

12   they had disclosed that he was having an affair with

13   their mother.  The other side of it was discovered later

14   through informal investigation.

15        Q.   Okay.  They provided the information that he

16   was at the house.  Right?  And then through some manner

17   of investigation, it was determined that he was using

18   sick leave during the times that the brothers had said

19   he was at their house.  Is that correct?

20        A.   That's correct.

21        Q.   And then at the time when that information came

22   into the interview, that Jason Potts or somebody else in

23   the interview ceased the interview and stopped it.  Is

24   that accurate?

25        A.   It was not Jason Potts who stopped the

                                                              142

1  interview.

2      Q.    Charles Bartlett?

3      A.    His name was Kevin Bartlett.  He was our

4  sergeant at the time.

5      Q.    Kevin Bartlett.  Okay.  Thank you.  Was there

6  also a Charles Bartlett, Officer Charles Bartlett that

7  you recall?

8      A.    If there was, he was there for a brief minute.

9  We hired some officers that only lasted maybe a month

10  and didn't like the agency and went back to their former

11  agencies.  I don't know if that was one of those

12  officers.  But I never worked with a Charles Bartlett

13  that I know of.

14      Q.    But you identified the person in that interview

15  with those suspects was an Officer Kevin Bartlett,

16  Detective Kevin Bartlett?

17      A.    Yeah.  He was the detective sergeant.  Myself

18  and Detective Postolaki, Ted Postolaki were conducting

19  the interview, and we were stopped by Detective Sergeant

20  Kevin Bartlett.

21      Q.    Stopped the interview and let the suspects go.

22  Right?

23      A.    Yes.  And then our DVD at the interview was

24  seized by Detective Bartlett.

25      Q.    Seized and destroyed, to your understanding?

                                                           143

1          MS. CRAWFORD:  Calls for speculation.

2          THE WITNESS:  I don't know what happened to it.  We

3     never got it back.

4          Q    BY MS. NOLD:  To my understanding, it sounds

5     like somebody tried to get an IA or get -- you know,

6     reported it, trying to get somebody to look into what

7     happened, but Lee Horton put Darden out on a 12-week

8     FMLA and said it would violate his HIPAA rights to do an

9     IA.  Does that sound right?

10         MS. CRAWFORD:  Calls for speculation.  Vague.  Not

11    proportional.

12         THE WITNESS:  By the time everything had come out, I

13    was back to being a patrol sergeant because we had come

14    out of bankruptcy.  So I was repromoted to sergeant.

15    And I inquired about it because Officer Darden again

16    worked for me.  And I was told that he was being placed

17    on this 12-week FMLA leave and that no IA was to take

18    place; that it was being handled by Horton himself who

19    was the lieutenant of professional standards at the

20    time.  So that was my last involvement in it.

21         Q    BY MS. NOLD:  Did you ever consider reporting

22    that to anybody?

23         A    I was a sergeant at the time, and the

24    environment at Vallejo, if I had reported that, I would

25    have been looking for a new job in 2011, 2012, not in

                                                              144

1   2019.  So until I became a captain and really saw how

2   much was not being reported is until I really started

3   doing things.  But you just didn't do that.  It was in

4   the environment and the culture.  And had I reported it,

5   my career would have been over and it would have been

6   bad.  Just as bad as it was in 2019.  You just didn't do

7   it.

8          I made my inquiries, and that was the end of

9   it.  I suspected that our lieutenant at the time who

10  then became captain might actually do something with it,

11  but never ever happened.

12      Q    BY MS. NOLD:  Who was that?

13      A.   Ken Weaver was our detective lieutenant.  And

14  shortly thereafter he was promoted to captain when Joe

15  Kreins became our chief.  And I figured he would do

16  something with it.  And I never heard anything after

17  that.

18      Q.   As far as we know, the two people that killed

19  Mr. Jimenez are still -- I mean, locally they're still

20  around.  As far as you know, there was never an

21  investigation to confirm whether or not those two men

22  killed Mr. Jimenez?

23      MS. CRAWFORD:  Objection.  Assumes facts.  Misstates

24  testimony.  Vague.  Calls for speculation.

25      THE WITNESS:  At that point myself and

```
 1   Detective Postolaki didn't know how to move forward.  We

 2   had interviewed another witness that we hoped would

 3   actually put them there, and they were reluctant to

 4   cooperate.  And so we were kind of stuck at that point

 5   because we couldn't move forward.  We didn't know what

 6   was going on on the outside.  We were both officers at

 7   the time.  We had both been demoted as a result of

 8   bankruptcy and were back in detectives.  So we had no --

 9   there was nothing we could do.  We moved on to our next

10   case because we were told not to talk about it and we

11   left it at that.

12       Q    BY MS. NOLD:  With respect to you, the reason

13   why is you were afraid.  Right?

14       A.   Oh, yeah.  It's just there were so many things

15   that went on at that police department.  You know, I

16   still had little kids and a family and I had to provide

17   for my family and I didn't want any issues.  I certainly

18   didn't want to go back to patrol and not have anybody

19   cover me in a traffic stop.  So you did what you had to

20   do to survive that place.

21       MS. NOLD:  Let me take a five.  I think I have a

22   couple more questions.  I just want to do a quick

23   review.

24            (Recess.)

25       Q    BY MS. NOLD:  Okay, Mr. Whitney.  You're still
```

146

1    under oath.  The same admonishments still apply.

2         I just want to make sure I have clarity on

3    everybody who was in the room on the day that the

4    suspects were brought in related to the murder of

5    Enrique Jimenez.  You, yourself, you were in the room.

6    Ted Postolaki.  Kevin Bartlett.  Jason Potts.  Was Lee

7    Horton in the room as well?

8         A.   So in the actual room was one of the Venegas

9    brothers, myself, and Ted Postolaki.  Everybody else

10   would have been in another room watching through a video

11   feed.  Nobody else was in the room with us.  It was our

12   case.  It was our interview.  And so if anybody is

13   watching, they would have been in another room.

14        Q.   Thank you for the clarity.  So you two were in

15   the room, but other people were able to observe, listen

16   and see what was happening in real time basically?

17        A.   Yes.  There was camera systems set up inside

18   the police department where you could watch an

19   interview.  Also if you enter in -- it's like a very

20   old-school way of doing it, but you enter these codes

21   into a program and then you can watch on a computer

22   whether you were at the police department or not.  So

23   you could watch the interview if you wanted to.

24        Q.   So in theory, a supervisor could be at home and

25   checking in to see what was going on, logging into the

                                                            147

1   system to do that?

2       A.   I don't know if back then you could do it from

3   home.  I believe you had to be at a terminal in the city

4   of Vallejo.  It was like a program that was on the

5   desktop back then.  It wasn't like a -- I don't think

6   Zoom was a thing back then or what the technology behind

7   Zoom is now.  But there was a program that you could log

8   in.  It was like a hit or miss thing.  But I don't think

9   you could do it from home.

10      Q.   Okay.  But it's your understanding that someone

11  in the same building -- there were others there

12  observing?

13      A.   I'm only aware of Detective Sergeant Bartlett.

14  I can't recall Potts or Horton being part of that.  I

15  just can't remember that far back.

16      Q.   Okay.  It was your understanding that Horton

17  had some involvement in the IA side of it.  Right?  In

18  the aftermath?

19      A.   The part I know about was that -- because Steve

20  Darden worked for me when all of this took place.  Was

21  that he went out on a 12-week FMLA time off and that no

22  IA was going to take place and no further discussion on

23  why he was out on FMLA would take place because it fell

24  under HIPAA guidelines.  And that was pretty much the

25  end of it.

148

 1        Q.   Is it your understanding prior to -- I don't

 2   know if it was before or after the interview.  Like, for

 3   example, the department searched the house of the

 4   victim, for example.  Like they did a search warrant.

 5   Right?  They ransacked the refrigerator of the guy who

 6   got killed.  Were you involved in that portion of it as

 7   far as, like, you know, getting warrants?  You know what

 8   I'm talking about?

 9        A.   Yes.  That exact comment just refreshed my

10   memory that yes, Jason Potts was very much part of the

11   investigation.

12             I went to the house to -- the victim's house to

13   secure it from the inside while we waited for a search

14   warrant.  And yes, that's the one that Jason Potts

15   helped himself to corn dogs in the freezer because he

16   was hungry.

17        Q.   So you were there?

18        A.   Yes.  He was there.  As soon as you talked

19   about securing the house, I recalled that yes, we were

20   both there and he was eating corn dogs out of the

21   victim's freezer.

22        Q.   So at the time it probably seemed wildly

23   inappropriate.  Right?

24        A.   Oh, you don't touch nothing.  When you secure a

25   house from the inside, you stand there.  You don't touch

                                                              149

1    nothing.  You don't move around.  You don't look for

2    anything.  A search warrant is not there and you don't

3    contaminate anything.  If you have to stand in the entry

4    room and stand for four hours, so be it.  But you

5    certainly don't go through somebody's freezer and start

6    eating their food.

7        Q.    Did that happen before or after the interview

8    of the suspects?

9        A.    It happened before.  I believe it happened the

10   same day as the homicide because we were called in early

11   for it because, as you said, it did happen in the early

12   morning hours while he was going to work.  We were

13   called in for -- it's normal, if not routine, to start

14   with the victim's residence if you have no other

15   evidence at the scene so can you move -- it's called

16   moving backwards in their life.  What was the first

17   thing they did before they were killed.  And it's they

18   slept at home.  So what is there and where do we go from

19   there?  So that was our first thing to do.  And because

20   Detective Ted Postolaki was primary, he would offer the

21   search warrant for that house.  So my job was simply --

22   as the secondary was just to stand there and make sure

23   the scene wasn't disturbed.

24       Q.    And that was the thing that stood out to you

25   was Potts eating food out of the refrigerator.  Right?

1          A.   It was wildly inappropriate to sit and eat

2     somebody else's food who had just been murdered.  And it

3     was -- I just remember how it made me feel.  You're

4     eating his food.  He just died a few hours ago, he was

5     murdered, and you're sitting there eating his food in

6     his kitchen?  And I remember him sitting on the couch

7     just eating the corn dog.  It was just "What are you

8     doing?"  Crazy.

9          Q.   It's your understanding that was Mr. Jimenez's

10    mother's house?  Do you recall that being his mother's

11    house and she was in custody at the time?

12         A.   I can't recall.  I know there's another

13    gentleman that lived there, and I don't remember if it

14    was his mom's house or not.  It was a long time ago, in

15    2011, I believe.  I can't remember.

16         Q.   Do you recall from that situation, do you

17    recall there being some existing bad blood between the

18    Jimenez family and the Vallejo Police Department?

19         MS. CRAWFORD:  Calls for speculation.

20         THE WITNESS:  Not that I can recall.

21         Q    BY MS. NOLD:  Okay.  And obviously things going

22    on, all sorts of things that may have not had anything

23    to do with you that you wouldn't have taken notice of

24    because they were outside of what you were doing?

25         A.   Yes.  If there were issues, I can't recall

151

1       Q.   And how long did you serve as acting chief when

2   he was out of state?

3       A.   He was also the acting fire chief of the city

4   of Vallejo when Chief McArthur retired, and I believe

5   that was like a nine-month period, and the majority of

6   the time he was the acting fire chief, I was the acting

7   police chief.  On paper I was the acting police chief.

8            Out of town?  I can't give you an exact number.

9   More than six weeks that I know of when he got his

10  vacation home.  I want to say it's more, but I'm not

11  sure.

12      Q.   You testified earlier that you were the acting

13  chief around April of 2019 when Chief Bidou was out on

14  vacation.  Do you remember that?

15      A.   Yes.

16      Q.   Is that what you're referring to, that he was

17  out for six weeks at that time, or is this something

18  different?

19      A.   Oh, no.  I'm talking about cumulative time.  I

20  think he was only out a couple weeks during that time.

21  But when he bought his vacation home and was getting

22  close to retirement, he was spending more time there.

23      Q.   That's quite the vacation.  A six-week vacation

24  sounds glorious.  I would love to be able to do that.

25  But I understand.  It was cumulative time.  Thank you.

                                                          178

1     A.   Yes.

2     Q.   You talked earlier about this file cabinet that

3    was located in -- was it Sergeant Potts's office?

4    Lieutenant Potts?

5     A.   It was Sergeant Potts.  That's when I first

6    found out about it.

7     Q.   And when was that that you first found out

8    about it?

9     A.   I couldn't tell you the exact date or even the

10    year.  I just know Jason Potts was an internal affairs

11    sergeant at the time.  It had to be early during my time

12    as a professional standards captain because I was

13    learning all the different things that go on in

14    professional standards.

15     Q.   I think I wrote down May of 2015 was when you

16    became captain of professional standards.  So is that

17    around the time you would estimate you first learned

18    about the file cabinet in Sergeant Potts's office?

19     A.   I don't know if it would be that exact time.

20    It's so long ago.  We're talking ten years ago.  I don't

21    think it would have been right of May of '15 but

22    somewhere shortly after that, before Jason Potts

23    promoted to lieutenant.

24     Q.   Then what happened with that file cabinet?  If

25    he moved on, who was in charge of the file cabinet?

179

1    A.   I have no idea what they ended up doing.  I

2  talked to Chief Bidou about it and he said just leave

3  everything as is.  And so I knew better back then.

4  Don't rock the boat.  Don't question anything.  And so I

5  didn't.

6    Q.   So you were the captain of professional

7  standards and Sergeant Potts was under you.  Correct?

8    A.   Yes.

9    Q.   Why couldn't you tell him to stop doing it?

10    A.   A lot of times what would happen is internal

11  affairs would just go directly to the chief with things.

12  To be honest, when you're working for Chief Bidou, you

13  didn't make that decision.  I just told him what was

14  going on and waited for him to provide guidelines, and

15  he said leave everything as is.  If I would have ordered

16  all that change, it just would have been changed back.

17  So back then I didn't fight things.  I just dealt with

18  it.

19    Q.   So after you were captain of professional

20  standards in 2015 and then you said you were doing that

21  until about spring 2018, during that entire time was

22  this file cabinet that you thought contained information

23  that should have been part of potential Pitchess

24  motions, whatnot -- I think you testified earlier that

25  it should have been being provided in different

180

```
 1    instances.  That whole time you were captain of

 2    professional standards was it continuing to happen in a

 3    way that you believed was improper?

 4        A.   I don't know if they ever decided to start

 5    providing that information.  But back then they weren't

 6    providing it.  So I don't know at what point things

 7    changed where they started to provide it.

 8        Q.   Are you talking about during the window when

 9    you were captain?

10        A.   Yes.

11        Q.   So even though you were captain of the

12    professional standards bureau, you didn't know what they

13    were doing with respect to the informal resolution of

14    file cabinet materials?

15        A.   Correct.  Jason Potts had a different

16    relationship with Chief Bidou, so if I went and tried to

17    disturb that in any way, it would be done the way that

18    those two wanted it.

19             I would say that my rank of captain was simply

20    by title and not by deed.  A lot of the things I wanted

21    to do as captain I wasn't allowed to do.  And I knew

22    that.

23        Q.   Your understanding about badge bending was that

24    it was related to officer-involved shootings.  Correct?

25        A.   That's how it was explained to me, yes.
```

181

1      Q.   Did you understand it to be related to anything

2   else?

3      A.   No.  At the time it was just strictly

4   officer-involved shootings.

5      Q.   Do you have any information to lead you to

6   believe that Officer Eaton was involved in badge

7   bending?

8      A.   I have no personal knowledge of that, no.

9      Q.   Do you have any information to lead you to

10   believe that Officer Jordon Patzer was involved in badge

11   bending?

12      A.   No.

13      Q.   You testified earlier about some concerns you

14   had regarding recruitment within the Vallejo Police

15   Department, and you gave an example of you had concerns

16   regarding dishonesty with different applicants.

17      A.   Yes.

18      Q.   So my question, Mr. Whitney, is how many people

19   did this happen with where they proceeded through the

20   recruitment application process but you had concerns

21   about their fitness to be an officer?

22      A.   As I sit here today, I can recall two off the

23   top of my head.  There was other ones -- some of them I

24   was able to get them -- actually, now I remember, I was

25   able to talk the chief into disqualifying them from

                                                          182

 1   going through the process further.  But I remember three

 2   distinctly.  One, we had offered him a conditional job

 3   offer and then eventually he pulled out of the process,

 4   which I thought was good for us.  But two we had hired.

 5   I don't know if they still work there until this day.

 6       Q.   So you came up with three off the top of your

 7   head where you were saying you had a concern about them

 8   being dishonest.  Correct?

 9       A.   Yes.

10       Q.   Did you have any other concerns about their

11   ability to be police officers?

12       A.   I can't even remember the officer's name.  I

13   just remember the incident.  It was decisions that they

14   made while they were employed with the military.  I just

15   didn't think that was someone that we wanted to have

16   employed with our agency because if you did what he did,

17   you wouldn't be a police officer anymore.  So I felt

18   like if you're doing that in working for the military,

19   you probably shouldn't be doing it while working for the

20   city of Vallejo.

21       Q.   You said you came up with the three off the top

22   of your head.  One you offered a job to but then he

23   pulled out.  Two you ended up hiring.  But you had

24   previously said that you were able to talk to

25   Chief Bidou about not going forward with one of the

1   applicants that you had concerns about?

2   A.   Yeah.  The one who eventually pulled out of the

3   process, we were trying to come up with an idea of how

4   we could get them to not continue the process.  They

5   were given a conditional and scheduled for psych and

6   medical.  And I had discovered more information about

7   them, so it was -- we came up with a game plan how I

8   would talk to the candidates in order to see if we could

9   get them to withdraw from the process, which they

10  eventually did.  But had they not and they passed their

11  psych and medical, they would be working for us.

12  Because that's how conditional job offers work.  Unless

13  something comes out of their psych and medical, you

14  can't stop the process once they pass backgrounds.

15  Q.   Regarding Officer Eaton, did you have any

16  concerns about him being hired with the Vallejo Police

17  Department?

18  A.   Yes, I did have some concerns.  I actually --

19  to give you a full perspective of it, I actually

20  recruited Officer Eaton from the academy because he was

21  performing quite well.  But after reviewing his

22  background, I made the suggestion that we not move

23  forward with him.

24  Q.   And who did you make the suggestion to?

25  A.   I talked to Chief Bidou about it.

184

1    Q.   Did anyone else share your concerns about not

2    going forward with Officer Eaton?

3    A.   I can't recall at the time who else.  I think I

4    had gotten clarification on one thing with Officer Eaton

5    from someone.  And then other than that, I can't recall

6    anybody else being a part of that conversation.  Because

7    backgrounds are kept to where it's myself, the

8    background investigator, sometimes the lieutenant of

9    investigations.  Or I'm sorry.  The lieutenant of

10   professional standards.  There wasn't a large group of

11   people who read about this just in case there's

12   something and now they're an officer and there might be

13   something potentially embarrassing to them.  Nobody else

14   needs to know about that.  But I did discuss it with

15   Chief Bidou.  And my recommendation was not to move

16   forward, but his direction was to move forward with him.

17   Q.   Did you discuss why he wanted to move forward

18   with Officer Eaton?

19   A.   Yes, we did discuss it.

20   Q.   What did he say?

21   A.   That Officer Eaton was a Marine and Chief Bidou

22   was a Marine and he wants him to move forward.

23   Q.   Was that it?

24   A.   That was pretty much it.  They're both Marines

25   and Officer Eaton is going to move forward and he didn't

185

1    think the issue was that big a deal.  So I get my

2    direction from the chief of police.  If he's okay with

3    it, he signs the letter for the conditional job offer.

4    It's not me signing it.  I simply handed it over to

5    now -- well, Mr. Eaton at the time, and we moved forward

6    from there.

7        Q.   And what were your concerns about his

8    background?

9        A.   He had a thing in his background where he

10   had -- while he was a Marine, he had gotten married.

11   And it was done -- he explained it to his background

12   investigator.  I'm not going to get the details exact

13   because it's been a long time.  But it was something to

14   the effect of he had gotten married to a woman he knew

15   but was in not a real marriage with.  And the marriage

16   was so they could get separation money from the military

17   where -- so now you're separated from your spouse.  You

18   get so much money per month.  And that they were going

19   to split that money.  And if I recall correctly, they

20   never lived as husband and wife and they were just

21   strictly friends.  That they had gotten married and then

22   he had just left and gone back to whatever he was doing,

23   back to his base, and that was it.  That was strictly --

24   what was told to me, it's referred to as a Marine

25   marriage.  And I felt that it was dishonest and

186

1    defrauding the military of funds for legitimately

2    married couples when he simply got married and allowed

3    his -- I don't know if you would even call her his

4    spouse, to collect this money after he gets deployed.

5         So that was my only concern was that it struck

6    me as dishonesty and fraud to the Marines and kind of an

7    elaborate plan in order to obtain funds from the

8    military.

9    Q.   So was this something that he disclosed in his

10   background information that he had done this?

11   A.   Yes.  I remember reading it from the background

12   investigator's reports that he had disclosed this.

13   Q.   Did you ever talk to Officer Eaton about this?

14   A.   I don't believe I did.  So when I saw it --

15   typically the captain doesn't have interactions about

16   things in your background.  It's either I pass it on to

17   the chief or I take it to the chief and say "I'm

18   denying.  I want to pass on this background for this

19   issue."  Sometimes he'd read the backgrounds when I'd

20   say I'm denying it.  And then if I said I'm good with

21   this candidate, it would sit on his desk and he'd hand

22   it to me.  Sometimes he would just sign off on it and

23   hand it to me.  And if I said no, then he'd want to read

24   it.  And then he'd sign off on it and say yep, we're

25   moving forward.

187

1      So we had a discussion about it.  He wanted to

2  move forward with Mr. Eaton.

3      Q.   Did you have any concerns regarding

4  Officer Jordon Patzer when he was hired by the Vallejo

5  Police Department?

6      A.   I did not.  I actually worked with his father,

7  and I didn't see the same kind of traits initially in

8  Jordon Patzer.  And I never worked with him out on the

9  streets or anything.  So I had no concerns with his

10  background or with him.

11      Q.   Did you ever work with either Officer Eaton --

12  you just testified about Officer Patzer.  But did you

13  ever work with Officer Eaton out on the streets?

14      A.   I don't believe so.  I was a captain.  If I

15  went out on the street, it meant something really bad

16  happened.  Usually a multiple-victim homicide or an

17  officer-involved shooting.  If I was out there, we

18  weren't interacting.  He was doing his job and I was

19  doing mine.  So I wouldn't say we worked together.

20      Q.   You testified earlier about Lieutenant Steve

21  Darden and said that they typically -- "they," I'm

22  assuming being the Vallejo Police Department -- promote

23  their problem children to get them off the street.  Do

24  you recall testifying about that?

25      A.   Yes.

1   by, he just was following me with his eyes.  And I don't

2   know if you've ever met the man.  He's sizable.  And so

3   I don't want any problems with him.  So that's why I

4   stopped going to the gym.

5       Q.    Did you ever report any concerns about feeling

6   intimidated or scared by Steve Darden to anybody?

7       A.    My attorney.

8       Q.    Anyone at city of Vallejo?

9       A.    No.  Nothing would happen.

10      Q.    Any law enforcement agency at all?

11      A.    No, because back then I was the person who

12  whistle blew on the city of Vallejo Police Department.

13  Why would you report it?  I was on my own at that point.

14      Q.    Any other law enforcement agency?  Not just

15  Vallejo PD.  I mean any neighboring city.

16      A.    Oh, I had talked to the district attorney about

17  several issues going on inside the Vallejo Police

18  Department, none of which were addressed.  So me talking

19  to her about Steve Darden being a bully in the gym, that

20  was going to go nowhere.  She never holds officers

21  accountable, so I didn't expect her to do a thing.

22      Q.    You said after you separated with the city of

23  Vallejo, that you would get cars that would come to your

24  residence and park for a few moments.  Do you recall

25  testifying about that?

1    Q.   When did the Crutcher incident occur, the one

2    with Tili and Brian Crutcher?

3    A.   I don't know the exact date.  I want to say

4    either 2000 or 2001.  I was very new.  So it's been a

5    while.

6    Q.   You testified that you routinely did not report

7    things because you were afraid.  Do you recall

8    testifying about that?

9    A.   Yes.

10   Q.   If you were so afraid of reporting things

11   within the Vallejo Police Department, why didn't you

12   leave?

13   A.   I was trying to leave.  I had applied to

14   several agencies dating back to almost 2010, trying to

15   get out.  I had some agencies tell me that "You work for

16   Vallejo and it doesn't have a great reputation."

17   Q.   Who told you that?

18   A.   It was the recruiter for San Pablo PD.  I'm

19   trying to remember who it was.  it was a private firm.

20   But they just said "That's going to be troublesome for

21   you that you're from Vallejo."  I can't remember.  Gosh,

22   I can't remember the recruiter's name.  But even when I

23   was interviewing, we just had an OIS the night before

24   and he's like "Case in point.  You guys have a lot of

25   OIS's, more than any other agency, so publicly we won't

1   matter what we think.  The chief of police is the one

2   who said yes an IA is taking place or no, no IA is

3   taking place and then kind of gave us direction from

4   there, if we were going to talk to somebody, send them

5   to training, whatever we were going to do.  But the

6   chief of police made the ultimate decisions.  Neither

7   myself or Captain Horton were allowed to make that type

8   of decision.  Even though most people think we would, we

9   actually could not.

10       Q.   So going back to April of 2019, you're a

11   captain.  And based on what you just said, you may think

12   an IA should be done, but that doesn't mean it's

13   required to be done.  Correct?

14       A.   The term "required" is -- I don't know if

15   that's a fair way to say it.  I believe it should be

16   done, that an incident took place and we should

17   investigate ourselves.  If the chief decides otherwise,

18   I can't change anything.  He's the chief of police.  I

19   have no control over him.  I cannot -- I can only

20   suggest.  I cannot tell him what to do.  He's the chief.

21       Q.   Prior to this incident April 15, 2019, did you

22   believe the Vallejo Police Department had a pattern and

23   practice of allowing officers to use excessive force

24   without consequence?

25       A.   Yes.

208

1     invasion of their privacy.

2          THE WITNESS:  They're not a named defendant, but I

3     learned it through professional standards, so I would

4     actually agree with you.  It probably shouldn't be

5     discussed unless I know the person's name for sure.

6          Q     BY MS. NOLD:  That's fine.

7               Regarding the man with the missing leg that

8     Lieutenant Robinson, sounds like, did he investigate

9     that?  Like did he conduct the investigation beyond kind

10    of the write-up?  Do you know?

11         A.    No.  He would not have conducted the

12    investigation.  He just does the initial interview of

13    the patrol officer when the incident occurs.  That's not

14    generally part of the investigation.  That memo may get

15    included in the IA folder at the end, but that's not

16    considered an investigation because the officer was not

17    given their POBAR rights when they're being interviewed.

18    Especially if they could be subject to discipline.

19         Q.    But to your knowledge, there was some paper

20    created in relationship to the incident with the male

21    with the missing leg.  Right?

22         A.    I believe so.

23         MS. CRAWFORD:  Calls for speculation.

24              Go ahead.

25         THE WITNESS:  Yes, I believe so.

1    Lieutenant Robinson was very good at writing memos for

2    things that didn't even rise to any level.  So it

3    wouldn't be uncommon to get a memo or two from him every

4    morning when you came into work.

5        Q    BY MS. NOLD:  Do you know if he keeps those?

6        A.    You would have to ask him.  I don't know.

7        Q.    You were talking about the DA that you spoke to

8    about issues and didn't hold officers accountable.  Were

9    you talking about Krishna Abrams?

10       A.    Yes.

11       Q.    Did you meet with her personally?

12       A.    Yes, I did.  We met to discuss a job

13   opportunity at the DA's office, and she wanted to know

14   why I didn't want to stick around at the police

15   department and try to be the chief of police.

16       Q.    At that point what did you share with her?

17       A.    I shared with her the issues of badge bending

18   and what was going on with only the two officers that I

19   knew about at the time.  And then I shared some other

20   issues with her in regards to failed investigations.  It

21   was probably a two-hour meeting.  We spent probably a

22   half hour talking about the job and the other hour and a

23   half talking about issues inside the city of Vallejo.

24   Or inside the Vallejo Police Department.

25       MS. CRAWFORD:  Counsel, I need to remind you, I have

224

```
 1    a pretty hard stop at 5:00 to pick up my son.  Do you

 2    have any idea how much longer you're going?

 3        MS. NOLD:  I think that was the last thing I had as

 4    a follow-up.  So I think I can -- yeah, I have two,

 5    three minutes.

 6        MS. CRAWFORD:  Okay.

 7        Q    BY MS. NOLD:  So you had a two-hour meeting

 8    with Krishna Abrams and spent three-quarters of that

 9    talking about problems with the Vallejo Police

10    Department?

11        A.    Correct.

12        Q.    To your understanding, did she ever initiate

13    any sort of investigation to look into the things you

14    reported to her?

15        MS. CRAWFORD:  Calls for speculation.

16        THE WITNESS:  I don't know of any that she had done.

17        Q    BY MS. NOLD:  And fair to say the DA's office

18    never reached out to you to gather further information

19    to do a formal interview or anything like that, anything

20    on the record?

21        A.    No.  I was never contacted after that.

22        Q.    Okay.  Not even for job opportunities?

23        A.    I did interview for a position there, and I

24    made it to the top two and then the other candidate got

25    the position.
```

225