1          UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF

3              CALIFORNIA

4   _____

5   NEFTALI MONTERROSA, et al.,

6        Plaintiffs,

7     v.                Civil Action No.

8   CITY OF VALLEJO, et al.,     2:20-cv-01563

9        Defendants.

10  _____

11  VIDEOCONFERENCE DEPOSITION OF CORPORATE DESIGNEE FOR

12        CITY OF VALLEJO - ROBERT KNIGHT

13  DATE:        Wednesday, July 10, 2024

14  TIME:        1:35 p.m.

15  LOCATION:    Remote Proceeding

16            Vallejo Police Department

17            111 Amador Street

18            Vallejo, CA 94590

19  REPORTED BY:  Melissa Dominguez

20  JOB NO.:     6780519

21

22

23

24

25

1              A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS NEFTALI MONTERROSA AND NORA

3    MONTERROSA:

4         JOHN COYLE, ESQUIRE (by videoconference)

5         McEldrew Purtell

6         123 South Broad Street, Suite 2250

7         Philadelphia, PA 19109

8         jcoyle@mceldrewyoung.com

9         (215) 367-5151

10

11   ON BEHALF OF DEFENDANT CITY OF VALLEJO; AND ROBERT

12   KNIGHT:

13        KATELYN M. KNIGHT, ESQUIRE (by videoconference)

14        Vallejo City Attorney's Office

15        555 Santa Clara Street

16        Vallejo, CA 94590

17        katelyn.knight@cityofvallejo.net

18        (707) 648-4388

19

20

21

22

23

24

25

1              A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANT JARRETT TONN:

3         DERICK KONZ, ESQUIRE (by videoconference)

4         Angelo, Kilday & Kilduff Attorneys at Law

5         601 University Avenue, Suite 150

6         Sacramento, CA 95825

7         dkonz@akk-law.com

8         (916) 564-6100

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2   EXAMINATION:                                    PAGE

3        By Mr. Coyle                                 6

4

5                     E X H I B I T S

6   NO.               DESCRIPTION                   PAGE

7   Exhibit 1      Notice of Corporate Designee

8                  Deposition of Robert Knight        10

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2                THE REPORTER:  Good afternoon.  My name

3    is Melissa Dominguez; I am the reporter assigned by

4    Veritext to take the record of this proceeding.  We

5    are now on the record at 1:35 p.m.

6                This is the deposition of Robert Knight

7    in the matter of Neftali Monterrosa et al. vs. City of

8    Vallejo et al. on July 10, 2024, at 111 Amador Street,

9    Vallejo, California 94590.

10                I am a notary to take acknowledgments

11   and administer oaths in the state of New York.

12   Parties agree that I will swear in the witness

13   remotely.

14                Additionally, absent an objection on

15   the record before the witness is sworn in, all parties

16   and witness understand and agree that any certified

17   transcript produced from the recording of this

18   proceeding:

19                     - is intended for all uses permitted

20                       under applicable procedural and

21                       evidentiary rules and laws in the

22                       same manner of a deposition recorded

23                       by stenographic means; and

24                     - shall constitute written stipulation

25                       of such.

1          At this time, will everyone in

2   attendance please identify yourself for the record and

3   whom you are with.

4               MR. COYLE:  John Coyle on behalf of the

5   plaintiff, Neftali and Nora Monterrosa.

6               MS. KNIGHT:  Katelyn Knight on behalf

7   of Deponent, Deputy Chief Bob Knight, and for the City

8   of Vallejo.

9               MR. KONZ:  I'm Derick Konz for

10  Defendant Tonn, T-O-N-N.

11              MR. KNIGHT:  Did you introduce me?  Or

12  do I need to introduce myself as well?

13              MS. KNIGHT:  You don't need to

14  introduce yourself.

15              THE REPORTER:  Mr. Knight, if you could

16  please raise your right hand.

17  WHEREUPON,

18                  ROBERT KNIGHT,

19  called as a witness and having been first duly sworn

20  to tell the truth, the whole truth, and nothing but

21  the truth, was examined and testified as follows:

22              THE REPORTER:  You may proceed.

23                  EXAMINATION

24  BY MR. COYLE:

25      Q    Good morning, Mr. Knight.  My name's John

1   Coyle.  We're here today for your deposition in the

2   matter of Neftali and Nora Monterrosa vs. The City of

3   Vallejo and Jarrett Tonn.

4           You're being offered today as a corporate

5   designee witness.  That means you're speaking on

6   behalf of the City of Vallejo for a number of topics.

7           Before we get into that -- and I'll show you

8   the topics we're going to talk about -- I just want to

9   do some background and some instructions.

10          So have you ever had your deposition taken

11  before?

12      A    Yes.

13      Q    How many times?

14      A    Hard to say.  I'd -- I'd say definitely more

15  than five, maybe -- maybe less than a dozen.

16  Somewhere -- somewhere in there.

17      Q    Okay.  So you've heard these instructions

18  before, but I'm going to go through them again just to

19  make sure we're on the same page.  So first and

20  foremost, you're under oath, just like in a court of

21  law.  You're obligated to tell the truth.  Do you

22  understand that?

23      A    Yes.

24      Q    Second, the court reporter's taking a

25  written record of everything we say here today.  So I

1    want you to keep two things in mind:  First, things

2    like "Uh-huh," "Uh-uh," nods of the head, shrugs of

3    the shoulders, they don't translate to a written

4    record.  So try to use words like "yes" and "no";

5    okay?

6          A     Okay.

7          Q     Second, very much human nature to anticipate

8    my question, want to jump in and answer it.  But that

9    can lead to a very jumbled record.  So try to wait

10   until I've done my question to begin your answer.  And

11   I'll extend the same courtesy; okay?

12         A     Okay.

13         Q     If at any point in time I interrupt you or

14   you want to add something, just let me know.  It's not

15   my intention to interrupt you.  I want to hear

16   everything you have to say today; all right?

17         A     Sounds good.

18         Q     Okay.  Now, because you're a corporate

19   deponent, that means you're speaking on behalf of the

20   City.  So we don't want you to guess at things.  We

21   only want to know what you actually know; all right?

22   So try not to guess or estimate.  Just speak from

23   things you have knowledge about; all right?

24         A     Okay.

25         Q     Okay.  If you need to take a break at any

1  time -- I don't think we'll be here too terribly long.
2  Probably a couple hours, tops.  But if you need to
3  take a break to use the restroom, grab a cup of
4  coffee, whatever it may be, we can take a break
5  whenever you want.  Just let me know.
6         The only thing I ask is, if I've asked a
7  question, and it's pending, you answer it before we
8  take a break; fair enough?
9      A    Fair.  Yeah.  We might have to take a break
10 or two.  I'm getting older, so in the morning, I'll
11 have to take a bathroom break or two, so ...
12     Q    No problem.  No problem at all.
13        I don't mean any offense by this question,
14 but is there any reason -- be it prescription
15 medication, drugs, alcohol, physical or psychological
16 condition -- that you can't testify truthfully and
17 accurately here today?
18     A    No.
19     Q    Great.  All right.  So your full name for
20 the record?
21     A    Robert Knight, K-N-I-G-H-T.
22     Q    And let's just go through some background.
23 What's the highest level of education you've
24 completed?
25     A    Highest level.  I have a Bachelor of Arts

1   degree in sociology.

2       Q    Where is that from and when?

3       A    Sacramento State, the illustrious California

4   State University of Sacramento.  And I think that was

5   1998.

6       Q    You're currently employed with the Vallejo

7   Police Department as the deputy chief?

8       A    Correct.

9       Q    How long have you been with the Vallejo PD?

10      A    I am -- since 1999.  So I'm just shy of my

11  25-year anniversary year coming up in a few weeks.

12      Q    Okay.  So I'm going to show you -- I'm going

13  to share my screen.  Let me know if you can see it.

14              THE REPORTER:  -- share screen

15  option -- okay.  Go ahead.

16              THE WITNESS:  I do notice that when you

17  look to the left it gets a little harder to hear you.

18  So I don't know.  Just -- just be aware of that.

19  BY MR. COYLE:

20      Q    Can you see my screen, sir?

21      A    Yes.

22      Q    We're going to mark this as Exhibit 1.

23              (Exhibit 1 was marked for

24              identification.)

25              It's the notice of corporate designee

1  directed to you.  And there's a couple topics here.

2  Counsel's indicated you're being offered for

3  Categories 1, 2, 8, 11, 16, 17, 18, and 19.  So I just

4  want you to read through these, and let me know when

5  you need me to scroll the ...

6      A    Okay.  If you could scroll down.  Okay.

7  Yes.

8      Q    Okay.  Do you feel prepared to testify on

9  these topics?

10      A    Yes.

11      Q    Okay.  Great.  Let's jump right into it.  So

12  I want to start with Categories 1 and 2.  They

13  overlap.  So the processes, procedures, and records

14  generated from administrative reviews of use of force,

15  critical incidents, and those generated by citizens or

16  internally generated complaints, to include what types

17  of records exist as to Officer Tonn.

18          So I want to start generally with -- let's

19  talk about what type of processes and procedures and

20  records are generated from the administrative review

21  of the use of force.

22          Now, I know from yesterday's deposition that

23  any time force is used, it's reviewed by the

24  supervisor, sent to professional standards, and then

25  reviewed and logged in IAPro.

1          Is that the extent of the process, or are

2     there other reports or processes that stem from that?

3          A     It depends.  So, yeah, this -- this Category

4     1 and 2 -- it's -- there's kind of a lot to unpack

5     there.  So, you know, kind of -- I'm going to take

6     your -- kind of your cue on how in-depth you want to

7     go.

8               So, yes, there is the -- there is the

9     general, day-to-day officer-use-of-force review

10    process that we have now.  There's a process that we

11    had in the past.  That's for, you know, the everyday

12    takedown, control hold, strike, which happen, clearly,

13    more frequently.

14              Then you have a kind of separate, not

15    dissimilar but a more comprehensive process as you get

16    into, clearly, application of deadly force:

17    implication of County protocols, joint administrative

18    and criminal investigations.  Hopefully that makes

19    sense.

20              There's -- there's kind of different levels

21    of these and kind of up to you how -- how in-depth you

22    want me to go into each one.

23         Q     Sure.  So we got a lot of testimony

24    yesterday about how the processes work, how the, you

25    know, administrative and criminal investigations for a

1  critical incident go hand in hand and the CIRB and

2  those type of things.

3         So what I really want to sort of focus on is

4  the data and how that's sort of kept and reviewed.  So

5  when these day-to-day use-of-force reviews occur, is

6  that logged in anywhere?

7     A    Yes.

8     Q    And that's the IAPro system?

9     A    Yes.  We use, like many other agencies, use

10 the IAPro system to track a variety of administrative

11 functions of the department.

12    Q    Okay.  So if I were to login to, let's say,

13 Officer Tonn -- he's specified -- here -- and we look

14 at his IAPro report, what is included in that report?

15    A    There can be a lot of things included.  It's

16 customizable in terms of what you want to look at.

17        We have something that's -- and what I --

18 what I briefly reviewed prior to testifying here

19 today -- what we call, for a slang term, a, quote-

20 unquote, "Pitchess log," which would be a log that we

21 bring to court if there's a Pitchess motion filed on

22 an officer.

23        That will include things like complaints,

24 internal investigations -- I see you taking some

25 notes -- internal investigations, any other thing that

1   are required -- any other -- or any other files that

2   are allegations of misconduct.

3         It's generally complaints, external

4   complaints from citizens, and internal investigations,

5   which are both administrative investigations.

6     Q   Okay.  And, so, you reviewed Officer Tonn's

7   log.  Can you tell me how many citizen's complaints --

8   I'm not looking for the specifics -- but how many

9   citizen's complaints were filed against him?

10     A   Yeah.  I -- I didn't get the -- the Pitchess

11   log does not aggregate them, so I don't know that

12   number.  I'd have to go back and count them.  But

13   there did -- there was complaints.  I know this is

14   going to come up later --

15             THE WITNESS:  And I know I talk fast,

16   so I'm trying to talk really slow, Melissa.

17             There is two types of complaints.

18   There is a citizen's complaint, and there is an

19   inquiry resolution complaint.  So when you see the --

20   the letters in front of a particular file "CC," that's

21   a citizen complaint; "IR" is an inquiry resolution.

22             That denotes the disposition of the

23   investigation, but they're both complaints.  Those are

24   contained in the Pitchess.

25             As you can imagine, an inquiry

1    resolution complaint, those are complaints that are

2    clearly unfounded, frivolous in nature that can be

3    dispelled through, you know, for example, body camera

4    footage, and a citizen alleges something that we can

5    quickly refute did not actually occur.

6              That would be a complaint, of course,

7    pursuant to the law, but it would be classified as an

8    IR.  As you can imagine, there's a lot more of those

9    than actual CCs.  And there's even fewer IAs, which

10   would be internally generated administrative

11   investigations.

12   BY MR. COYLE:

13       Q    Okay.

14             MS. KNIGHT:  -- just an objection for

15   privacy.  I think when we conducted discovery, we

16   narrowed this down to force-related complaints,

17   inquiry resolutions, and then ones on veracity.  And I

18   don't remember a time limitation.  I don't think it's

19   going to matter for this one.

20             I don't mind kind of talking in general

21   about, you know, I guess the number of different

22   things.  But when we're getting into specifics, I

23   think we had agreed that the force ones were the

24   relevant ones.

25             MR. COYLE:  Yeah.

1  BY MR. COYLE:

2      Q    I'm really only interested in force and

3  dishonesty as a whole.

4           But can you explain to me, sort of, how

5  something is categorized as an inquiry resolution

6  complaint versus a citizen's complaint?  Is it the

7  result of the investigation that gets it classified

8  that way, or is there some type of tracking when they

9  first come in?

10     A    Yeah.  So the -- the classifications -- so

11  the complaint comes in.  So there's an allegation from

12  an outside entity, a citizen or a civilian that

13  alleges some type of misconduct or policy violation.

14          There will be an initial intake, an

15  assessment of that complaint, and then it is generally

16  classified into one of those two categories.

17          There, essentially, is no difference in --

18  in the -- in the actual process, per se, other than if

19  an -- if there is a complaint that, as I had stated,

20  is clearly false, frivolous, or unfounded on its face,

21  and there's unequivocal evidence of that, that -- that

22  complaint investigation will be a little shorter.

23          It won't be as long.  It will be classified

24  as such and disposed much quicker.

25          If you have a citizen complaint that is

1   generated that is -- there's no unequivocal evidence

2   that it's false, frivolous, or unfounded, if there is

3   some dispute of fact or some aspect that you can't

4   prove, you would have to then do a more thorough

5   citizen complaint investigation.  And that will be a

6   little bit of a longer format and -- and whatnot.

7         Those citizen complaint, the difference is,

8   kind of as you stated, the aftereffect.  Those citizen

9   complaint investigations do go through a full approval

10  routing process all the way to the chief of police,

11  whereas an inquiry resolution, the routing approval

12  process stops at the lieutenant division commander.

13     Q   Okay.  Is that the professional standards

14  lieutenant?

15     A   Yes.

16     Q   Okay.  When you log into IAPro, you know,

17  you mentioned that every use of force gets logged in

18  there, at least as an entry.  Does it tabulate the

19  total number of uses of force in an officer's career?

20     A   I'm not sure.  It does -- so every use of

21  force is also given -- and that's kind of something

22  you'll notice I'll go back to several times in this

23  deposition -- is every incident is given a specific

24  number on -- for use of force, they're given a number

25  "t" as in "Tom," "a" as in "Adam," TA.

1    So every use of force is given a TA number.

2  Yes.  You could run a report on a particular employee

3  and give from a particular date to a particular date,

4  and it will give you a list of all of the TA reports

5  that have been generated for that particular officer.

6    I didn't do that here today.  I don't know

7  if it actually gives you the number or if you just

8  have to get the list and count them.  You know, I'm --

9  I'm not as familiar with that process.  But you can

10  get the information is my point.

11    Q    Okay.  So as it relates to Detective Tonn,

12  specifically with regard, as we mentioned, to uses of

13  forces and complaints weighing on his credibility or

14  his honesty, were there any citizen's complaints in

15  his IAPro?

16    A    I'm sure there was, yeah.  There -- there

17  was a four-year -- a four-year Pitchess log that we

18  did -- that we generated.  I'm happy to go through

19  that if you wanted me to skim through it.  I don't --

20  but, again, I did not -- it's a four-year Pitchess

21  log.  I don't have the -- the aggregate numbers.

22                    MR. COYLE:  Katelyn --

23                    THE WITNESS:  But I do have the -- I do

24  have the material.

25                    MR. COYLE:  Katelyn, is this the log

1    that you're going to be producing?

2              MS. KNIGHT:  So I can go ahead and

3    produce it limited to force and veracity.  I can tell

4    you I did a skim before the deposition, and the only

5    uses of force I found were the officer-involved

6    shootings and then the two incidents that you already

7    know of of Mychael Nelson and the Felix whatever his

8    name was.

9              MR. COYLE:  Yeah.

10             MS. KNIGHT:  I can produce under

11   protective order the log with the use-of-force and

12   veracity-related incidents.

13             MR. COYLE:  Okay.  That'd be great.

14   Thank you.  That lets us sort of skip ahead a little

15   bit.

16   BY MR. COYLE:

17        Q    We don't -- we've done a lot of work on

18   prior incidents already, and I don't think you'll add

19   much in terms of detail just from your review of the

20   IAPro log.

21             So let's talk about Category 8, "operations,

22   processes, programs, reviews, protocols, and audits

23   for the City on the following topics."  So what I'm

24   really looking at here is I want to understand how the

25   City looks at this data, these internal affairs

1    investigations.

2            You know, is it just a one-off review of it?

3    Are they amalgamated into some type of report?  You

4    know, how is the data used and reviewed by the

5    department?

6      A    Right.  Again, also, kind of a lot to unpack

7    here.  So every internal affairs investigation, as I

8    had stated, is given its own unique number.  Each of

9    those cases is tracked.

10           Each of those cases is completed by an

11   investigative entity, usually our internal affairs

12   unit, which we have one sergeant assigned to that at

13   all times.

14           And then each internal affairs investigation

15   is then placed into a file and routed through what we

16   call the, quote, "approval routing process" --

17   "approval routing process."

18           That is which the investigator reviews the

19   file to sign off that it's accurate with the report,

20   all the attachments that they created.  The

21   professional standards lieutenant does a managerial

22   lieutenant review.

23           It's then given to a captain of police.

24   What -- what captains it goes to has changed a couple

25   times over the years.  It's always gone to, at least,

1  a bureau captain.  In the past, at times, it would go

2  to both bureau captains.  Ultimately, then, it will go

3  to the chief of police.

4          Under our current command structure, which

5  did not exist in 2020 -- there was no deputy chief of

6  police.  But it currently does go to the deputy chief

7  of police.

8          So, again, my point being the review and

9  process is multilayered.  And it goes through -- up

10  through to include the chief of police.

11      Q   Okay.  Outside of this initial review and

12  approval, does the City have any type of program where

13  they do, you know, like a selective audit of internal

14  affairs investigation where they, you know, pull five

15  at random or something like that and go back and

16  double-check as a sort of quality-control-type

17  situation?

18      A   Got you.  Not per se.  And, again, John,

19  I'll just preface and kind of, maybe, disclaimer and

20  ask.  Some of the things I can testify to are

21  significant amount of -- significant improvements that

22  we've made over the last three or four years.  Or do

23  you want me to testify to what it was during the time

24  of Tonn's hire to 2020, if that makes sense?

25      Q   Everything we want to know is from Tonn's

1  hire to the date of the shooting, June 2, 2020.  I'm
2  well aware of all the improvements that have taken
3  place.

4      A    Got it.  Okay.  So as it relates to audits
5  of these particular files, there was a couple things
6  that we did.  There is a monthly IA stats report that
7  was generated every month.

8          That tracked things like the amount of
9  internal investigations; the amount of complaints,
10  both citizen's complaints and inquiry resolution, as
11  we just talked about; the number of officer-involved
12  collisions; the number of use of force; the number of
13  Pitchess motions we've received; the number of Public
14  Records Act requests we've received.

15          And this was a monthly report that was
16  generated and produced at all command staff meetings.

17          To your point, any analysis or trend
18  identification would be done at the command staff
19  meetings in person with departmental members of the
20  rank of sergeant and above.

21          There is a -- the only trend analysis that
22  occurs in this monthly report is a trend analysis up
23  or down in comparison to the same period last year.
24  So there is a slight trend analysis of how we fared
25  compared to last year.

1        During that time of 2014 to 2020, that was

2    our main mechanism of doing that.  One of the other

3    things that, when I was the professional standards

4    lieutenant, I implemented -- but we're really getting

5    to the skirt of June of 2020.  I don't -- it -- it

6    occurred at some point in June of 2020.  I don't

7    remember when.

8        We did institute another process that still

9    lives on and that is a major, kind of, piece of a lot

10   of our police reforms -- is -- we call it the "open

11   case meetings."

12       Those are a meeting that we have -- it

13   varied.  There were times we did it every two weeks.

14   I think it's done monthly now.  But it is a time when

15   the professional -- a professional standards division

16   staff comes together, and they discuss all of the open

17   cases.

18       When I say "cases," I mean every open

19   internal investigation, IA; every open CC; IR; every

20   open collision review, officer-involved collision;

21   every open Critical Incident Review Board review.

22       And those -- each case is gone through to

23   have a status check of where we're at, what are the

24   next steps, what are we missing, what's pending, that

25   type of thing.

1          I do -- although it doesn't entail kind of
2     like a randomized audit, as you described, I do
3     consider that an audit function.  It's kind of you're
4     auditing everything that's open at the time.
5          So at -- and, again, it's going to be
6     cutting it close.  I don't know if it happened prior
7     to the June of 2020 incident or after, but it happened
8     in that same year.
9          But it wasn't -- it wasn't prompted by
10    anything that occurred in this incident.  It was
11    something that we have been, kind of, long planning
12    what the mechanism is to look and make sure we're not
13    missing things.
14     Q     Okay.  So turning attention sort of
15    specifically to the critical incident reviews, during
16    the time period of 2014 to 2020 --
17              THE REPORTER:  Sorry, Mr. Coyle, can
18    you get a little bit closer to the mic?  You're fading
19    out a little bit.
20              MR. COYLE:  My apologies.
21              THE REPORTER:  "2014," you said?
22              MR. COYLE:  2014 to June of 2020.
23    BY MR. COYLE:
24     Q     Was there any, you know, process, you know,
25    guidance on how long a case should take before it gets

1    to the Critical Incident Review Board?

2         A    No.  There was no -- in -- in the Critical

3    Incident Reivew Board process and policy, there was no

4    time-bound timelines.  I would describe it as more --

5    there was triggering events that had to occur or be

6    completed prior to the convening of the Critical

7    Incident Review Board, if that answers your question.

8         Q    Yeah.  Can you explain to me what those

9    events are?

10        A    There's going to be -- there's going to be a

11   couple of events.

12             In the Critical Incident Review Board policy

13   and process at that time, there was an ability for the

14   chief of police to hold off on convening said board

15   until the completion of the criminal investigation,

16   which would be done by, at that time, the -- our --

17   our criminal investigators as well as the DA's office

18   criminal investigators and then, ultimately, the

19   district attorney's decision.

20             There -- there was something called -- I

21   believe it was -- you know, for lack of a better term,

22   called a "clearance letter" that would generally --

23   the investigation would occur to determine criminal

24   culpability on either party, either the suspect or the

25   officer.  And then there would be some type of letter

1  that would be generated.

2          Oftentimes, the preference would be to wait

3  until that -- that determination or letter was

4  produced prior to convening the board, because that

5  would be vital information that the department would

6  want the board to look at and review and assess prior

7  to convening.

8          As you can imagine, through changing of

9  district attorneys and processes and elections, those

10 things did not always occur timely.  And those --

11 those reports from the DA did not always come timely.

12          So that was something that would sometimes

13 delay the implementation of our Critical Incident

14 Review Board or --

15          THE WITNESS:  Melissa, I will call it

16 the "CIRB."  We generally call it a CIRB, C-I-R-B.  So

17 you'll hear me kind of use that term as a short.

18          THE REPORTER:  Thank you.

19 BY MR. COYLE:

20    Q    Now, I know that there was a sort of

21 wholesale review of the department by the OIR Group

22 that wrapped up around June -- or around 2020 that

23 looked at the critical incident review processes and a

24 myriad of other issues.

25          Other than that review, during that 2014-to-

1    2020 time frame, were there any other, sort of,

2    reviews of the critical incident review process that

3    were conducted?

4         A    Yes.

5         Q    Okay.  Can you explain what those were?

6         A    Yeah.  These -- these reviews or assessments

7    were -- were internally done.  These were much more --

8    much more informal in nature.

9              These were discussions about the assessment

10   of the Critical Incident Review Board process, things

11   that were, I think, very good about it, things that

12   were -- that it was deficient in, one of -- one of

13   which being what you just talked about:  the

14   timeliness issue and how we move forward for agency

15   improvement and assessment of the incident at a

16   department level when we are holding off on another

17   entity -- i.e., the district attorney -- to provide,

18   you know, vital information.  So there was a lot of

19   discussions that were had around that.

20             There was discussions -- internal

21   discussions and debates about the -- the policy at the

22   time related to CIRB and the administrative findings

23   that you had to select.  At -- at -- the policy at the

24   time, there was four, essentially, options:

25   administrative approval, administrative disapproval --

1  I believe it was decision -- tactics and decision-

2  making, and policy -- something like policy or

3  training issues.

4          What it -- what -- what kind of happened

5  over the years is, as different board members started

6  to come into the department -- as you know, the board

7  is comprised of command staff folks, internal affairs

8  administrative folks, and training and subject matter

9  experts.  Those people, as you understand, change over

10  the years.

11          As those years went on, you know, we kind of

12  looked at this process and said, "Why does it have to

13  be -- why does it have to be one of those four things,

14  you know?"  Sometimes, there's things that you may

15  want to know in each of those categories.

16          So those kind of constructive discussions

17  and debates occurred.  Clearly, as I sit here and

18  testify today, there's no -- there's no record of

19  those.  There's no written report of those.

20          But those discussions did occur over time,

21  mainly because -- and I'll give you a name -- mainly

22  because the captain at the time, Lee Horton, knew the

23  complete lineage of the Critical Incident Review

24  Board:  when we implemented it, the lineage of what --

25  what the process was we mimicked off of some different

1   agencies, and what its intent was.

2          And when we would get Critical Incident

3   Review Boards that would be convened, and then we

4   would get a draft report, and Captain Horton would see

5   those different categories or options and little bit

6   of, you know -- aside from, obviously, administrative

7   disapproval.

8          If there was administrative disapproval, I

9   think we'd have a different conversation in terms of

10  what the board found.

11         But if you talk about, specifically,

12  administrative approval, training and policy issues,

13  and tactics and decision-making, when we would have

14  CIRB reports that would come back with different

15  comments on each one, you know, Captain Horton would

16  say, "Hey, time-out.  We're supposed to, collectively

17  as a board, come up with one finding or option, and

18  we'd have to vote on it.  And that has to be the one."

19         So I think, in a way, those of us, like

20  myself, that were coming up in the department, looking

21  at this process, you know -- and always looking for

22  different areas, rooms for improvement or

23  adjustment -- we found and started asking those

24  questions like, "Hey, why do we have to pigeonhole

25  ourselves into this -- these -- these different

1   findings?"

2           So those discussions occurred over a period

3   of time.  The -- if you, probably like you have,

4   looked at different CIRB reports over the years, you

5   may see some variance in, kind of, the way they were

6   constructed and written.

7           And, obviously, some of this lineage, I'm

8   going back to even pre-2014 in terms of that morphing

9   of the process.

10          I know that was kind of an involved answer,

11  but I think it's kind of important to lay historical

12  context.

13      Q    No.  I appreciate that.  So these internal

14  discussions are happening.  And, certainly, they're

15  reflected somewhat in notes that occur in the CIRB

16  report that's finalized.  You know, there's

17  discussions happening and things like that.

18          But did any of these discussions lead to any

19  sort of written policy change or change to the

20  structure of the CIRB reports?

21      A    I skimmed over the different Critical

22  Incident Review Board policies over the years.  And to

23  answer your question specifically, it does not look

24  like it caused much actual policy change in terms of

25  the written policy.

1          I think there were some different

2     interpretations about what was best for the

3     department, of kind of infusing some more agency

4     improvement, decision-making considerations, training,

5     and tactics training.

6          But in the actual written word of the

7     policy, I would say, prior to 2020, no.  Since then,

8     yes.  I mean, we have a completely different process

9     now.  But, again, that's, you know, not -- you know,

10    like you had said, not really within the scope of

11    this.

12          But prior to 2020, it stayed fairly

13    consistent, if not the same, in terms of the policy.

14    Q    And sort of piggybacking on that question

15    about audits of internal affairs investigations, were

16    there any type of systems for auditing the CIRB

17    reviews, you know, going back a couple years and

18    looking at, you know, how CIRB reviews were done?

19          Was there any type of audit or QC or

20    anything like that that occurred, other than these

21    sort of informal discussions?

22    A    Not per se.  I mean -- I mean, you got to --

23    you got to know, kind of, these -- these incidents are

24    fairly low frequency.

25          So you're not -- you're not dealing with a

1    high volume of -- of incidents to where you can do,

2    you know, substantial, kind of, trend analysis and

3    things like that.  You're dealing with a fairly --

4    fairly -- in the scheme of things, a fairly rare

5    incident.

6            So, you know, no.  Other than -- I would --

7    I would classify what we were doing less audit-based

8    and trend-analysis-based and more tracking-based, if

9    that's makes -- keeping track of what -- how many

10   there's been, what step of the process they are --

11   they're in, ensuring that they were completed and

12   reviewed thoroughly and then filed away and then

13   kept -- kept appropriately and brought to court and

14   Pitchess and any other type of examination that was

15   required.

16           So does that make sense?  It's like less --

17   less audit and analysis and more tracking

18   documentation.

19      Q    Understood.  This next topic here,

20   "Disciplinary Action," this is something that I don't

21   really have my hands around conceptually.

22           You know, can you explain to me sort of

23   how -- I assume an investigation, whether it's an

24   internal affairs or a CIRB, leads to some type of

25   administrative disapproval finding.  Can you tell me

1   how the disciplinary process proceeds there?

2        A     Can you repeat just the last part?  I heard

3   everything you said, and then you said "Can you

4   explain" -- and I couldn't hear that part.

5        Q     How the disciplinary process proceeds from a

6   administrative disapproval.  You know, how is the

7   decision made whether a counseling memo's appropriate,

8   whether a ten-day suspension's appropriate, whether

9   termination's appropriate?

10       A     Right.  In general -- so, in general,

11  the -- and, again, I'm speaking generality, right, and

12  then you can talk about specific instances of, you

13  know -- it -- it's -- the process is going to be the

14  same or similar.

15            But, obviously, as you can -- as you can

16  understand, the -- the outcome is -- is much more

17  severe when you talk about a discourtesy, internal

18  affairs investigation of discourtesy, versus a -- any

19  type of discipline that could result from a -- an

20  officer-involved fatality; right?

21            So let's -- I just want to kind of

22  disclaimer that those two things are similar in

23  process, and I think that's something that's important

24  to me as, obviously, the PMK here today and have

25  been -- having been part of this process of the

1  department -- is those processes should be as similar

2  as absolutely possible.

3          So I think if you're speaking -- and

4  probably best to -- to start in general terms, which

5  is an internal -- or let's call it an -- let me back

6  up, back up and slow down.

7          When we talk about this process, terms are

8  important, in my opinion.  So whether you have a

9  citizen's complaint, whether you have an internal --

10  inquiry resolution, whether you have an internal

11  affairs investigations -- which we commonly call -- if

12  you hear, quote-unquote, an "IA" -- I just want to be

13  clear that, in all of these processes, these are all

14  administrative investigations.

15          And POBR Government Code 3300, all of those

16  concepts apply.  So the process is governed,

17  essentially, by that.

18          Now, there's going to be varying levels of

19  degrees related to how complex we go and how vast and

20  comprehensive the investigations are, depending on the

21  nature of the allegations.  But those things are all

22  the same.

23          So from a high level, there is some type of

24  investigation or inquiry, administrative inquiry or

25  investigation.  That will produce -- and if discipline

1   is going to result from that review, inquiry, or

2   investigation, there is a review process through the

3   chief of police.

4           And if the decision is made that discipline

5   is appropriate, you have a couple of steps.  How you

6   do that process that I just described -- one thing

7   that I found, in my experience, the one consistency is

8   that it is inconsistently done throughout the

9   industry.

10          There's different ways that people do

11  administrative investigations of certain types.

12  There's certain departments that do every case the

13  exact same way; these are often large departments that

14  have vast internal affairs divisions with multiple

15  investigators.

16          Then you have some departments that are very

17  small that don't even have an internal affairs

18  investigator that just bear this burden on

19  supervisors, and they have no standardized process.

20          I -- I find us being kind of in the middle.

21  And I think we have a fairly good process.  Once that

22  administrative investigation is completed, whatever

23  that investigation report looks like, discipline -- if

24  discipline is going to result -- the -- then this is

25  where it gets more standardized, 'cause there's labor

1  laws involved -- a notice of intent to discipline is

2  issued to the employee.

3         That -- that employee has the option to have

4  some type of pre-disciplinary hearing, depending on

5  the level of discipline.  They can have a Skelly

6  hearing, depending on if it is a lower level of

7  discipline that's intended.

8         Some departments -- we do have an

9  administrative process for things such as written

10  reprimands.

11         Once that -- once that notice of intent to

12  discipline -- called a "NOID," N-O-I-D, is what we

13  call it -- and that pre-discipline review process

14  occurs, we can then issue what's called a NOD, N-O-D,

15  "notice of discipline."  That notice of discipline is

16  then the final discipline from the department.

17         And then, depending on the severity of the

18  discipline, as you guys know as attorneys, you have

19  the arbitration process, et cetera, et cetera, that

20  goes from there through civil service.

21         So that's kind of a general, overall

22  process.  When you embark on a due process of -- of

23  the discipline process, you have to have supporting

24  documents of your investigation to support the

25  discipline that you imposed.  What those reports look

1  like are done very differently by -- by different
2  agencies.
3          We have the system which I had just talked
4  to you about about -- through IAPro and having those
5  unique numbers.  The -- the reports that we produce,
6  for example, when an officer is involved in a
7  collision -- I'm giving you a hypothetical example.
8          If an officer's involved in a collision, we
9  do what's called a "collision review."  That produces
10 a type of administrative investigative report that
11 looks very different than a citizen complaint
12 investigative report.  But the premise is the same:
13 proving the -- that there was a policy violation that
14 occurs that will support the intended discipline.
15 Hoping that kind of makes sense.
16         I think what we can do, at some point, is
17 you obviously break off into, then, officer-involved
18 shootings or officer-involved fatalities that take on
19 a -- a whole -- not a different but a much more robust
20 and comprehensive process that could, ultimately, at
21 the end of the day, if said administrative
22 investigations or reviews trigger the discipline
23 process, then that secondary process that I just
24 described would be similar or the same.
25    Q    So just a question about -- when the chief

1    decides that he does want to implement discipline, is

2    it his discretion as to whether it's a counseling

3    memo, a five-day suspension, termination?  Is that a

4    discretionary thing, or are there certain parameters

5    that --

6         A    At -- okay.  At the time, 2014 to 2020, the

7    chief of police was the decider of discipline within

8    our department.  Now, that is done, clearly, as a

9    department head in consultation with human resources

10   and city attorney's office.  But, ultimately -- and,

11   you know, obviously, his -- his or her boss, the city

12   manager, in consultation.

13        However, the notice of intent to discipline

14   and the level of discipline that's decided is the

15   chief of police's decision.  The "notice of intent to

16   discipline" memo that's given to the employee is from

17   the chief of police.

18        And at the time -- at the time of this

19   incident, there -- we had no what some places call a

20   "discipline matrix," what we currently call a

21   "corrective action guideline," which is more what

22   you're describing, John.

23        I -- at the time, though, we did not have

24   that.  It was based upon what's reasonable, what is

25   not disparate as -- as it relates to other similar

1    incidents that have occurred.  So there's a disparate

2    treatment analysis.

3            There's kind of a -- what's in their

4    personnel file, what's their prior history.  I -- so I

5    don't want to necessarily call it "arbitrary."

6            But I -- I would call it -- that it is a --

7    you know, kind of a decision that's made based on

8    several factors to include past discipline, severity

9    of the allegation, and, you know, those type of

10   things.

11           Hopefully, that kind of answers what you're

12   talking about.

13       Q    It does.  It does.  I want to switch over to

14   the early warning systems, you know, early detection,

15   you know, both for uses of force and deadly force.

16   But let's start with uses of force.

17           From 2014 to 2020, was there any program or

18   process in place for early warning, flagging officers

19   that may be susceptible to using excessive force based

20   on any type of rubric?

21       A    Yes and no.  So -- and I'll explain.  I do

22   have probably a little bit of -- a little bit above-

23   average knowledge -- knowledge on what I call "early

24   intervention systems."  Some -- some are called "early

25   warning systems."

1          Through our IAPro use-of-force entry

2    software -- so IAPro is the company that is our -- our

3    software system.  Within the IAPro company, they offer

4    software that we currently use and used at the time,

5    which is -- you have the ability to purchase software

6    called BlueTeam.  I don't know if you -- you've heard

7    that term, hopefully, during this process.

8          There's a software system that is owned by

9    IAPro that is called BlueTeam.  That is the mechanism

10   in which our officers, supervisors, managers input,

11   review, route electronically our use of force.

12          In -- in the BlueTeam software, it does have

13   the capability of having a early intervention system.

14   It -- within it, it's called "EI system."  At the time

15   of this incident in 2014 to 2020, during that time, we

16   did have and implement the BlueTeam software and did

17   have the early intervention capability within the

18   software.

19          However, at that time, we did not have a

20   policy.  We did not have a procedure.  We had not made

21   the decision as a department of what the individual

22   threshold is.

23          So when you talk about an early warning

24   system or an early intervention system, you have to

25   set departmental thresholds for use of force,

1  complaints, pursuits, arrest.  I mean, you can -- you

2  can decide the gamut of what your early intervention

3  system thresholds include, what the numbers are.

4          We have had those discussions, in fact.  And

5  we provided Chief Williams, at the time, a PowerPoint

6  presentation -- this was after the Monterrosa incident

7  in 2020 -- about what the capabilities of the BlueTeam

8  EI system was, what we would have to do, and the

9  decisions we would have to make.

10          But at the time -- so the -- the plain

11  answer to your question is, yes, we have the

12  capability in the software; however, we did not have

13  the infrastructure, the system, the policy, the

14  thresholds in place to implement it.  So it was a

15  feature that we had in the system that was not

16  activated.

17      Q    Understood.  Is there any type of program or

18  policy in place -- you know, I call it an "early

19  warning" -- or I think you said an "early intervention

20  system" -- for deadly force?

21          And what I mean by that is were there any

22  systems in place where officers who had used deadly

23  force once or twice or three times within a certain

24  time period would -- it would trigger additional

25  training or additional retraining?  Anything like

1   that?

2        A     No.  So, again, kind of going back to my --

3   my discussion about the early intervention systems,

4   those things could be tracked.  Again, we had -- we

5   had not unlocked that software.

6             So those specific type of incidents are not

7   tracked in any different type of way.  They're not --

8   they're not tracked and/or reviewed or any separate

9   entities implemented as part of a system.

10            Now, let me just -- I think it's worth kind

11  of clarifying that, you know, things such as officer-

12  involved shootings are a fairly low-frequency, high-

13  risk event, if you will.

14            So although we didn't have a software system

15  in place, I don't want to give the impression as the

16  PMK that those things -- as a department, we were just

17  kind of tone-deaf to those things, if that makes

18  sense.

19            Like, those are things that we're aware of.

20  Those are things that we would review.  There is some

21  processes that could be triggered through a CIRB board

22  review, things that maybe a subject matter expert

23  could say, "Hey, I think, based upon this incident,

24  everything was justified.  However, I think this

25  individual employee could benefit from blank

1   training."

2          Probably, as I testify here today, when you

3   look back on processes, the area we had for

4   improvement in that area is "Where is that tracked?

5   Where is it documented?  Who keeps track that it

6   occurred?  When did it occur?"  Those are things that

7   we've since improved.

8          But, again, looking back at that time, that

9   is kind of the -- one of the things that we had done

10  but don't have really good records about.  And I will

11  finish with saying, you know, we are a fairly small-

12  sized department in the scheme of the greater area and

13  the metropolitan areas that we're -- we're in.

14         And I just want to, you know, kind of make

15  it clear that, being a department of our size, these

16  type of things are easier to track.

17         And I know that -- you know, I'm kind of

18  being slightly joking -- as attorneys, I get that "if

19  it's not written down in some kind of document, you

20  know, we don't like it."  And informal processes are

21  hard to prove after the fact.  I -- you know, I'm

22  fully aware of that, and I -- and I'm -- and I

23  recognize that.

24         But in departments of our size, that is not

25  uncommon or is not "not industry standard" to kind of

1    do some of these things informally because we are so

2    small, and we are able to kind of keep track of trends

3    or different things we are seeing.

4           That doesn't mean that we haven't now vastly

5    improved our -- our processes, I think, which is

6    important.  But back then, I just want to make sure

7    that I'm clear that those are -- those are things that

8    were done, things that were discussed, but we did

9    probably not do a good job of documenting and tracking

10   that.

11      Q    Okay.  So you mentioned, briefly, you know,

12   there could be a subject matter expert who says, "Hey,

13   this officer should go get some additional training on

14   this."

15          So those decisions were made, sort of, on a

16   case-by-case basis.  There wasn't any type of, you

17   know, formal policy that after you're involved in a

18   police-involved shooting, you go requalify at the

19   range and retake the use-of-force class or anything

20   like that?

21      A    Correct.  The only thing that -- you know,

22   the only thing that was kind of standardized was a

23   mental-wellness psychology standpoint is that is

24   something that we pretty much blanketly, across the

25   board, have always done is, when an officer is

1  involved in an officer-involved shooting -- regardless

2  if it was fatal or nonfatal -- they would be put off

3  on routine administrative -- administrative leave and

4  would not -- generally would not come back -- not

5  "generally" -- would not come back to full duty until

6  they spoke to a police psychologist, were deemed by

7  that psychologist to be fit for duty.

8          I know that's not exactly what you're

9  referring to.  But that would be kind of a

10  standardized process.

11          In terms of physical police training, that

12  would be something that was on a case-by-case basis.

13  But as I sit here today, there's not a -- an example

14  that I can think of -- that's not to say it didn't

15  occur -- that I can think of that -- that we as a

16  department would have actually said, "Nope.  That

17  officer can't -- can't come back until they physically

18  do X, Y, Z."

19     Q   Understood.  And, so, I guess that sort of

20  answers -- your last two answers sort of answers the

21  issues in Category 11 about formal collection analysis

22  of data related to officer-involved shooting

23  incidents.

24          Am I correct that you're tracking the

25  number, where they are in this CIRB process, but

1    there's no, sort of, large-scale data because --

2    analytics because there just aren't that many?

3         A    Probably fair.  We -- we have also -- we

4    also had -- again, this is definitely more tracking in

5    nature, to your point.

6         We had an officer-involved shooting log, you

7    know, that would track the -- the officer involved,

8    the date of incident, the suspect's name, the case

9    number, whether it was fatal or nonfatal.

10        So -- that's not exactly what you're talking

11   about, but if you were to look at said log over the

12   past ten years as a police administrator, an internal

13   affairs investigator, you could look at that, and that

14   would denote, "Hey, this officer's name comes up two

15   times, three times."

16        So although that's not exactly what you're

17   talking about, it is a form or mechanism thereof of

18   tracking that -- it's much more tracking in nature.

19   But it would be a mechanism that you would get to

20   review the information on one document all in front of

21   you.

22        And that is something that we've produced,

23   you know -- I don't -- say "produce."  That is

24   something that we have maintained over the years

25   pretty consistently.

1      Q    Okay.  All right.  I think now's a good time

2    to take five or ten minutes, a little bathroom break.

3           I think some of the next few categories, the

4    remaining categories, are things you've already

5    covered.  So I just want to go back through my notes

6    and then look at these categories and -- you know, I

7    don't think we're going to have too much longer.

8           So why don't we just take about ten minutes.

9    Does that makes sense?

10     A    Sounds good.

11              THE REPORTER:  Off the record at

12   2:26 p.m.

13              (Off the record.)

14              THE REPORTER:  Okay.  Back on the

15   record.  2:36 p.m.

16              You may proceed.

17   BY MR. COYLE:

18     Q    So before I get into it, I just have to ask:

19   Any relation to Katelyn?  Long-lost cousins or just an

20   English settling area there in Vallejo?

21     A    Yeah.  We -- we've -- we've done the

22   research, and there's no relation.

23     Q    Okay.

24           So I'm looking at the topics, and I think

25   we've sort of covered Topics 17 and 18.

1          And I think I know the answer to 16, but --

2   pull it back up -- so I think 16, you know, "The

3   evaluation, assessment, review, or reform of the

4   critical incident review or Critical Incident Review

5   Board as well as any differences in the operation of

6   the board or the review from 2014 through June of

7   2020."

8          Am I correct that we kind of covered that

9   with our discussion about sort of the discussions

10  about what things were being reviewed and different

11  sort of focuses of different leaders as they moved

12  through?

13      A    Yeah.  I think, in general, I think -- I

14  think -- I hope you get the general concept of -- of

15  kind of what I've -- what we've talked about.

16      Q    But I'm correct that there were no policy --

17  I think you mentioned this.  There was no policy

18  changes to the way the critical incident review

19  process worked?

20      A    No.  When I looked at all -- kind of the

21  various iterations of our policy manual, that policy

22  has stayed fairly consistent, if not the same.

23      Q    All right.  So, then, we're onto the last

24  topic.  And that's sort of generalized, and I am sure,

25  you know, some of the things we've already discussed,

1    you know, feed into this. "Oversight and
2    accountability structures in place at the VPD from
3    June of 2010 to June of 2020." So that's a ten-year
4    period there.

5            What I'm looking for is, you know, are there
6    any type of oversight/accountability-type structures
7    in place, outside of, you know, command staff and the
8    things we've already discussed? You know, is there
9    anything else that was in place, in existence that we
10   haven't touched on today?

11       A    I -- I think it's worth -- well, it's
12   definitely within the time frame, so I kind of will
13   start with most current, and maybe we can kind of work
14   our way back to which is more of the traditional
15   organizational structure that you just talked about.

16           We did have the OIR Group report, an
17   assessment of our department for areas for
18   improvement. You've already referenced that, I think,
19   earlier in the deposition. That occurred in May of
20   2020.

21           I believe the report I have -- the PDF is
22   dated May 22nd of 2020. Not exactly sure, but that --
23   but that's the date I have that's on the PDF. So --
24   but it definitely is prior to this incident.

25           That was a pretty substantial, thorough

1    review of our department in terms of strengths that we

2    have, areas in need of improvement, opportunities to

3    improve, and different things like that.  So that was

4    something that's been somewhat of a guiding document

5    as we've moved forward.

6            But as you -- as you get kind of prior to

7    that, the -- the oversight and accountability

8    structures become more traditional, if you will:  a

9    chief of police, a city attorney, a city manager,

10   incidents, and review of said incidents.

11           You have a layer of independent review of

12   critical incidents, such as a district attorney's

13   office, and a joint investigation with a district

14   attorney and criminal investigators of your

15   department.

16           And you kind of go back more towards -- more

17   towards those traditional oversight and accountability

18   models.

19   Q    So what type of role -- what circumstances

20   or what type of roles did the city attorney, the city

21   manager play in, you know, the oversight of the

22   department?  Was it just, you know, the general -- you

23   know, city manager is the police chief's boss?  Or

24   were there times when they were brought in on specific

25   topics or specific areas to discuss?

1          MS. KNIGHT:  Without getting into

2   attorney-client privileged information.  But you can

3   speak generally about, you know, when guidance is

4   sought habitually or by policy or ...

5          THE WITNESS:  Yep.  Okay.

6          Yeah.  I can speak in general.  There

7   is one thing that I think that's worth starting with,

8   which is -- Vallejo is -- I don't want to say

9   "unique."

10          But it is -- it is a city that is a

11   strong city manager city with a city attorney that

12   does not work for the city manager -- does not report

13   to or work for -- does not work or report for the

14   police chief.

15          It is a separate entity that gives

16   legal guidance and legal advice to different

17   departments -- human resources, the police department,

18   the fire department, public works.  And that entity of

19   the city attorney works with the city manager, not

20   for, if that makes sense.

21          So I think, in general terms, the

22   oversight and accountability aspect would be a

23   legal -- legal guidance or, you know, the police

24   department, for lack of a better term, would be one --

25   one of the city attorney's clients to give, kind of,

1    legal guidance.

2              But as I had talked about before, you

3    know, the chief of police, you know, is the decider

4    of, you know, various things within their own

5    department.  So hopefully that answers your question.

6    BY MR. COYLE:

7        Q    Okay.  So what about the city manager?  When

8    is the city manager involved?  Is it just sort of an

9    ongoing conversation with the chief?  Or is there

10   specific times where you say, "Hey, we want to look at

11   how we're doing, X, Y, and Z," and the city manager

12   gets brought in?

13       A    I think probably the simplest way to

14   describe that is it's not unlike any boss-subordinate

15   relationship, where, you know, your boss gives you

16   certain autonomy to do certain things, especially in

17   city government where a police chief would, in theory,

18   have specialized experience or expertise in running

19   the department where a city manager may not have that

20   exact expertise.

21             But, you know, I wouldn't say, also, it's

22   not uncommon for a police chief to run things by their

23   boss, the city manager, and get their take on things.

24   And, ultimately, it is -- the city manager does run

25   the city in our -- in our city of government, type of

1    government.

2              So, yeah, I think it's just kind of a -- you

3    know, it's just a -- a boss-subordinate-type

4    relationship that you have that -- those type of

5    communication discussions.

6         Q    Okay.  And that OIR Group, that was sought

7    out and funded by the City?

8         A    Yes.

9         Q    Okay.

10             MR. COYLE:  All right.  I don't have

11   any further questions.  Katelyn or Derick may have

12   some.

13             MS. KNIGHT:  I do not.

14             Derick?

15             MR. KONZ:  Nope.  No questions.

16   Thanks.

17             MR. COYLE:  Easy-peasy.

18             Thanks for your time today, Mr. Knight.

19   I appreciate it.

20             THE REPORTER:  Hang on just one second.

21   We're off the -- oh, actually, let me ask.

22             Mr. Coyle, you said you needed this

23   expedited.  I just want to get it on the record.  How

24   many business days do you need this transcript by?

25             MR. COYLE:  What's expedited?  Two?

1    Friday?

2                    THE REPORTER:  Friday?

3                    MR. COYLE:  Perfect.

4                    THE REPORTER:  And, Mr. Konz, are you

5    ordering a copy?

6                    MR. KONZ:  No thanks.

7                    THE REPORTER:  Okay.  And then before

8    everyone leaves, I did have one or two spellings.  Let

9    me go off the record.  Hold on -- full screen.

10                   Off the record.  2:44 p.m.

11                   (Signature reserved.)

12                   (Whereupon, at 2:44 p.m., the

13                   proceeding was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF DEPOSITION OFFICER

2                  I, MELISSA DOMINGUEZ, the officer before

3       whom the foregoing proceedings were taken, do hereby

4       certify that any witness(es) in the foregoing

5       proceedings, prior to testifying, were duly sworn;

6       that the proceedings were recorded by me and

7       thereafter reduced to typewriting by a qualified

8       transcriptionist; that said digital audio recording of

9       said proceedings are a true and accurate record to the

10      best of my knowledge, skills, and ability; that I am

11      neither counsel for, related to, nor employed by any

12      of the parties to the action in which this was taken;

13      and, further, that I am not a relative or employee of

14      any counsel or attorney employed by the parties

15      hereto, nor financially or otherwise interested in the

16      outcome of this action.

17                                  MELISSA DOMINGUEZ

18                          Notary Public in and for the

19                                  State of New York

20

21      [X] Review of the transcript was requested.

22

23

24

25

1          CERTIFICATE OF TRANSCRIBER

2               I, KASSIE YOUNG, do hereby certify that this

3     transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

                                    KASSIE YOUNG

15

16

17

18

19

20

21

22

23

24

25

| & |
| --- |
| **&** 3:4 |

| 0 |
| --- |
| **01563** 1:8 |

| 1 |
| --- |
| **1** 4:7 10:22,23 |
| 11:3,12 12:4 |
| **10** 1:13 4:8 5:8 |
| **11** 11:3 45:21 |
| **111** 1:17 5:8 |
| **123** 2:6 |
| **150** 3:5 |
| **16** 11:3 48:1,2 |
| **17** 11:3 47:25 |
| **18** 11:3 47:25 |
| **19** 11:3 |
| **19109** 2:7 |
| **1998** 10:5 |
| **1999** 10:10 |
| **1:35** 1:14 5:5 |

| 2 |
| --- |
| **2** 11:3,12 12:4 |
| 22:1 |
| **2010** 49:3 |
| **2014** 23:1 |
| 24:16,21,22 |
| 26:25 30:8 |
| 38:6 39:17 |
| 40:15 48:6 |
| **2020** 21:5,24 |
| 22:1 23:1,5,6 |
| 24:7,16,22 |
| 26:22 27:1 |
| 31:7,12 38:6 |

39:17 40:15
41:7 48:7 49:3
49:20,22
**2024** 1:13 5:8
**215** 2:9
**2250** 2:6
**22nd** 49:22
**25** 10:11
**29440** 56:14
**2:20** 1:8
**2:26** 47:12
**2:36** 47:15
**2:44** 54:10,12

| 3 |
| --- |
| **30709** 55:16 |
| **3300** 34:15 |
| **367-5151** 2:9 |

| 5 |
| --- |
| **555** 2:15 |
| **564-6100** 3:8 |

| 6 |
| --- |
| **6** 4:3 |
| **601** 3:5 |
| **648-4388** 2:18 |
| **6780519** 1:20 |

| 7 |
| --- |
| **707** 2:18 |

| 8 |
| --- |
| **8** 11:3 19:21 |

| 9 |
| --- |
| **916** 3:8 |
| **94590** 1:18 |
| 2:16 5:9 |

| 95825 3:6 |
| --- |

| a |
| --- |
| **ability** 25:13 |
| 40:5 55:10 |
| 56:7 |
| **able** 44:2 |
| **above** 22:20 |
| 39:22 |
| **absent** 5:14 |
| **absolutely** 34:2 |
| **accountability** |
| 49:2,6 50:7,17 |
| 51:22 |
| **accurate** 20:19 |
| 55:9 56:5 |
| **accurately** 9:17 |
| **acknowledg...** |
| 5:10 |
| **act** 22:14 |
| **action** 1:7 |
| 32:20 38:21 |
| 55:12,16 56:8 |
| 56:12 |
| **activated** 41:16 |
| **actual** 15:9 |
| 16:18 30:24 |
| 31:6 |
| **actually** 8:21 |
| 15:5 18:7 |
| 45:16 53:21 |
| **adam** 17:25 |
| **add** 8:14 19:18 |
| **additional** |
| 41:24,25 44:13 |

**additionally**
5:14
**adjustment**
29:23
**administer**
5:11
**administrative**
11:14,20 12:17
12:25 13:10
14:5 15:10
27:22,25,25
28:8 29:6,8,12
32:25 33:6
34:14,24 35:11
35:22 36:9
37:10,21 45:3
45:3
**administrator**
46:12
**advice** 51:16
**affairs** 19:25
20:7,11,14
21:14 28:7
31:15 32:24
33:18 34:11
35:14,17 46:13
**aftereffect** 17:8
**afternoon** 5:2
**agencies** 13:9
29:1 37:2
**agency** 27:14
31:3
**aggregate**
14:11 18:21

| | | | b |
|---|---|---|---|
| **agree** 5:12,16 | **apologies** 24:20 | **assessments** 27:6 | |
| **agreed** 15:23 | **applicable** 5:20 | **assigned** 5:3 | **b** 4:5 26:16 |
| **ahead** 10:15 19:2,14 | **application** 12:16 | 20:12 | **bachelor** 9:25 |
| **akk** 3:7 | **apply** 34:16 | **assume** 32:23 | **back** 14:12 17:22 21:15 |
| **al** 1:5,8 5:7,8 | **appreciate** 30:13 53:19 | **attachments** 20:20 | 29:14 30:8 31:17 34:5,6 |
| **alcohol** 9:15 | **appropriate** | **attendance** 6:2 | 42:2 43:3,8 |
| **allegation** 16:11 39:9 | 33:7,8,9 35:5 | **attention** 24:14 | 44:6 45:4,5,17 |
| **allegations** 14:2 34:21 | **appropriately** 32:13 | **attorney** 27:17 50:9,14,20 | 47:5,14 48:2 49:14 50:16 |
| **alleges** 15:4 16:13 | **approval** 17:9 17:11 20:16,17 | 51:2,11,19 55:14 56:10 | **background** 7:9 9:22 |
| **amador** 1:17 5:8 | 21:12 27:25 29:12 | **attorney's** 2:14 25:19 38:10 | **based** 32:7,8,8 38:24 39:7,19 |
| **amalgamated** 20:3 | **arbitrary** 39:5 | 50:12 51:25 | 42:23 |
| **amount** 21:21 22:8,9 | **arbitration** 36:19 | **attorneys** 3:4 26:9 36:18 | **basis** 44:16 45:12 |
| **analysis** 22:17 22:21,22,24 | **area** 43:3,4,12 47:20 | 43:18 | **bathroom** 9:11 47:2 |
| 32:2,8,17 39:2 45:21 | **areas** 29:22 43:13 49:17 | **audio** 55:8 56:3 | **bear** 35:18 |
| **analytics** 46:2 | 50:2,25 | **audit** 21:13 24:2,3 31:19 | **behalf** 2:2,11 3:2 6:4,6 7:6 |
| **angelo** 3:4 | **arrest** 41:1 | 32:7,17 | 8:19 |
| **anniversary** 10:11 | **arts** 9:25 | **auditing** 24:4 31:16 | **believe** 25:21 28:1 49:21 |
| **answer** 8:8,10 9:7 30:10,23 | **aside** 29:6 | **audits** 19:22 22:4 31:15 | **benefit** 42:25 |
| 41:11 48:1 | **asked** 9:6 | **autonomy** 52:16 | **best** 31:2 34:4 55:10 56:6 |
| **answers** 25:7 39:11 45:20,20 | **asking** 29:23 | **avenue** 3:5 | **better** 25:21 51:24 |
| 45:20 52:5 | **aspect** 17:3 51:22 | **average** 39:23 | **bit** 17:6 19:15 24:18,19 29:5 |
| **anticipate** 8:7 | **assess** 26:6 | **aware** 10:18 22:2 42:19 | 39:22,22 |
| | **assessment** 16:15 27:9,15 48:3 49:17 | 43:22 | |

**blank** 42:25
**blanketly** 44:24
**blueteam** 40:6
  40:9,12,16
  41:7
**board** 23:21
  25:1,3,7,12,14
  26:4,6,14
  27:10 28:5,6
  28:24 29:10,17
  30:22 42:21
  44:25 48:5,6
**boards** 29:3
**bob** 6:7
**body** 15:3
**boss** 38:11
  50:23 52:14,15
  52:23 53:3
**bound** 25:4
**break** 8:25 9:3
  9:4,8,9,11
  37:17 47:2
**briefly** 13:18
  44:11
**bring** 13:21
**broad** 2:6
**brought** 32:13
  50:24 52:12
**burden** 35:18
**bureau** 21:1,2
**business** 53:24

**c**

**c** 2:1 3:1 5:1
  26:16

**ca** 1:18 2:16 3:6
**california** 1:3
  5:9 10:3
**call** 13:19
  20:16 23:10
  26:15,16 34:5
  34:11 36:13
  38:19,20 39:5
  39:6,23 41:18
**called** 6:19
  25:20,22 36:12
  36:14 37:9
  39:24 40:6,9
  40:14
**camera** 15:3
**capabilities**
  41:7
**capability**
  40:13,17 41:12
**captain** 20:23
  21:1 28:22
  29:4,15
**captains** 20:24
  21:2
**career** 17:19
**case** 23:11,22
  24:25 35:12
  44:16,16 45:12
  45:12 46:8
**cases** 20:9,10
  23:17,18
**categories** 11:3
  11:12 16:16
  28:15 29:5
  47:3,4,6

**categorized**
  16:5
**category** 12:3
  19:21 45:21
**cause** 35:25
**caused** 30:24
**cc** 14:20 23:19
**ccs** 15:9
**certain** 35:11
  35:12 38:4
  41:23 52:16,16
**certainly** 30:14
**certificate** 55:1
  56:1
**certified** 5:16
**certify** 55:4
  56:2
**cetera** 36:19,19
**change** 28:9
  30:19,19,24
**changed** 20:24
**changes** 48:18
**changing** 26:8
**check** 21:16
  23:23
**chief** 6:7 10:7
  17:10 21:3,5,6
  21:10 25:14
  35:3 37:25
  38:7,15,17
  41:5 50:9
  51:14 52:3,9
  52:17,22
**chief's** 50:23

**cirb** 13:1 26:16
  26:16 27:22
  29:14 30:4,15
  30:20 31:16,18
  32:24 42:21
  45:25
**circumstances**
  50:19
**citizen** 14:21
  15:4 16:12,25
  17:5,7,8 37:11
**citizen's** 14:7,9
  14:18 16:6
  18:14 22:10
  34:9
**citizens** 11:15
  14:4
**city** 1:8,12 2:11
  2:14 5:7 6:7
  7:2,6 8:20
  19:23,25 21:12
  38:10,11 50:9
  50:9,20,20,23
  51:10,11,11,11
  51:12,19,19,25
  52:7,8,11,17,19
  52:23,24,25,25
  53:7
**cityofvallejo....**
  2:17
**civil** 1:7 36:20
**civilian** 16:12
**clara** 2:15
**clarifying**
  42:11

**class** 44:19
**classifications**
16:10
**classified** 15:7
16:7,16,23
**classify** 32:7
**clear** 34:13
43:15 44:7
**clearance**
25:22
**clearly** 12:12
12:16 15:2
16:20 28:17
38:8
**client** 51:2
**clients** 51:25
**close** 24:6
**closer** 24:18
**code** 34:15
**coffee** 9:4
**collection**
45:21
**collectively**
29:16
**collision** 23:20
23:20 37:7,8,9
**collisions** 22:12
**come** 14:14
16:9 26:11
28:6 29:14,17
45:4,5,17
**comes** 16:11
23:16 46:14
**coming** 10:11
29:20

**command** 21:4
22:16,18 28:7
49:7
**commander**
17:12
**comments**
29:15
**commonly**
34:11
**communication**
53:5
**company** 40:2
40:3
**compared**
22:25
**comparison**
22:23
**complaint**
14:18,19,21
15:1,6 16:6,6
16:11,15,19,22
16:25 17:5,7,9
34:9 37:11
**complaints**
11:16 13:23
14:3,4,7,9,13
14:17,23 15:1
15:16 18:13,14
22:9,10 41:1
**complete** 28:23
**completed** 9:24
20:10 25:6
32:11 35:22
**completely**
31:8

**completion**
25:15
**complex** 34:19
**comprehensive**
12:15 34:20
37:20
**comprised** 28:7
**concept** 48:14
**concepts** 34:16
**conceptually**
32:21
**concluded**
54:13
**condition** 9:16
**conducted**
15:15 27:3
**consider** 24:3
**considerations**
31:4
**consistency**
35:7
**consistent**
31:13 48:22
**consistently**
46:25
**constitute** 5:24
**constructed**
30:6
**constructive**
28:16
**consultation**
38:9,12
**cont'd** 3:1
**contained**
14:24

**context** 30:12
**control** 12:12
21:16
**convened** 29:3
**convening** 25:6
25:14 26:4,7
**conversation**
29:9 52:9
**copy** 54:5
**corporate** 1:11
4:7 7:4 8:18
10:25
**correct** 10:8
44:21 45:24
48:8,16
**corrective**
38:21
**counsel** 55:11
55:14 56:7,10
**counsel's** 11:2
**counseling** 33:7
38:2
**count** 14:12
18:8
**county** 12:17
**couple** 9:2 11:1
20:24 22:5
25:11 31:17
35:5
**course** 15:6
**court** 1:1 7:20
7:24 13:21
32:13
**courtesy** 8:11

**cousins** 47:19
**covered** 47:5
  47:25 48:8
**coyle** 2:4 4:3
  6:4,4,24 7:1
  10:19 15:12,25
  16:1 18:22,25
  19:9,13,16
  24:17,20,22,23
  26:19 47:17
  52:6 53:10,17
  53:22,25 54:3
**created** 20:20
**credibility**
  18:13
**criminal** 12:18
  12:25 25:15,17
  25:18,23 50:14
**critical** 11:15
  13:1 23:21
  24:15 25:1,2,6
  25:12 26:13,23
  27:2,10 28:23
  29:2 30:21
  48:4,4,18
  50:12
**cue** 12:6
**culpability**
  25:24
**cup** 9:3
**current** 21:4
  49:13
**currently** 10:6
  21:6 38:20
  40:4

**customizable**
  13:16
**cutting** 24:6
**cv** 1:8

**d**

**d** 4:1 5:1 36:12
  36:14
**da** 26:11
**da's** 25:17
**data** 13:4 19:25
  20:4 45:22
  46:1
**date** 1:13 18:3
  18:3 22:1 46:8
  49:23
**dated** 49:22
**day** 12:9,9 13:5
  13:5 33:8
  37:21 38:3
**days** 53:24
**deadly** 12:16
  39:15 41:20,22
**deaf** 42:17
**dealing** 31:25
  32:3
**debates** 27:21
  28:17
**decide** 41:2
**decided** 38:14
**decider** 38:7
  52:3
**decides** 38:1
**decision** 25:19
  28:1,1 29:13
  31:4 33:7 35:4

38:15 39:7
  40:21
**decisions** 41:9
  44:15
**deemed** 45:6
**defendant** 2:11
  3:2 6:10
**defendants** 1:9
**deficient** 27:12
**definitely** 7:14
  46:4 49:12,24
**degree** 10:1
**degrees** 34:19
**delay** 26:13
**denote** 46:14
**denotes** 14:22
**department**
  1:16 10:7
  13:11 20:5
  26:5,21 27:16
  28:6 29:20
  31:3 34:1
  36:16 38:8,9
  40:21 42:16
  43:12,15 45:16
  49:17 50:1,15
  50:22 51:17,18
  51:24 52:5,19
**departmental**
  22:19 40:25
**departments**
  35:12,13,16
  36:8 43:24
  51:17

**depending**
  34:20 36:4,6
  36:17
**depends** 12:3
**deponent** 6:7
  8:19
**deposition** 1:11
  4:8 5:6,22 7:1
  7:10 11:22
  17:23 19:4
  49:19 55:1
**depth** 12:6,21
**deputy** 6:7 10:7
  21:5,6
**derick** 3:3 6:9
  53:11,14
**describe** 25:4
  52:14
**described** 24:2
  35:6 37:24
**describing**
  38:22
**description** 4:6
**designee** 1:11
  4:7 7:5 10:25
**detail** 19:19
**detection** 39:14
**detective** 18:11
**determination**
  26:3
**determine**
  25:23
**difference**
  16:17 17:7

differences 48:5

different 12:20 15:21 28:5,25 29:5,9,14,22,25 30:4,21 31:1,8 35:10 37:1,11 37:19 42:7 44:3 48:10,11 50:3 51:16

differently 37:1

digital 55:8 56:3

directed 11:1

disapproval 27:25 29:7,8 32:25 33:6

disciplinary 32:20 33:1,5 36:4

discipline 33:19 34:25 35:4,23,24 36:1,5,7,12,13 36:15,15,16,18 36:23,25 37:14 37:22 38:1,7 38:13,14,16,20 39:8

disclaimer 21:19 33:22

discourtesy 33:17,18

discovery 15:15

discretion 38:2

discretionary 38:4

discuss 23:16 50:25

discussed 44:8 48:25 49:8

discussion 42:3 48:9

discussions 27:9,19,20,21 28:16,20 30:2 30:14,17,18 31:21 41:4 48:9 53:5

dishonesty 16:3

disparate 38:25 39:1

dispelled 15:3

disposed 16:24

disposition 14:22

dispute 17:3

dissimilar 12:15

district 1:1,2 25:19 26:9 27:17 50:12,13

division 17:12 23:15

divisions 35:14

dkonz 3:7

document 43:19 46:20 50:4

documentation 32:18

documented 43:5

documenting 44:9

documents 36:24

doing 23:2 32:7 52:11

dominguez 1:19 5:3 55:2 55:17

double 21:16

dozen 7:15

draft 29:4

drugs 9:15

due 36:22

duly 6:19 55:5

duty 45:5,7

**e**

e 2:1,1 3:1,1 4:1 4:5 5:1,1

earlier 49:19

early 39:14,14 39:18,23,24 40:13,17,23,24 41:2,18,19 42:3

easier 43:16

eastern 1:2

easy 53:17

education 9:23

ei 40:14 41:8

either 25:24,24

elections 26:9

electronically 40:11

embark 36:22

employed 10:6 55:11,14 56:8 56:11

employee 18:2 36:2,3 38:16 42:25 55:13 56:10

english 47:20

ensuring 32:11

entail 24:1

entities 42:9

entity 16:12 20:11 27:17 51:15,18

entry 17:18 40:1

es 55:4

especially 52:16

esquire 2:4,13 3:3

essentially 16:17 27:24 34:17

estimate 8:22

et 1:5,8 5:7,8 36:19,19

evaluation 48:3

event 42:13

events 25:5,9
  25:11
everyday 12:11
evidence 16:21
  17:1
evidentiary
  5:21
exact 35:13
  52:20
exactly 45:8
  46:10,16 49:22
examination
  4:2 6:23 32:14
examined 6:21
example 15:3
  37:6,7 45:13
excessive 39:19
exhibit 4:7
  10:22,23
exist 11:17 21:5
existence 49:9
expedited
  53:23,25
experience 35:7
  52:18
expert 42:22
  44:12
expertise 52:18
  52:20
experts 28:9
explain 16:4
  25:8 27:5
  32:22 33:4
  39:21

extend 8:11
extent 12:1
external 14:3

**f**

face 16:20
fact 17:3 41:4
  43:21
factors 39:8
fading 24:18
fair 9:8,9 46:3
fairly 31:12,24
  32:3,4,4 35:21
  42:12 43:11
  48:22
false 16:20 17:2
familiar 18:9
fared 22:24
fast 14:15
fatal 45:2 46:9
fatalities 37:18
fatality 33:20
feature 41:15
feed 49:1
feel 11:8
felix 19:7
fewer 15:9
file 14:20 20:15
  20:19 39:4
filed 13:21 14:9
  32:12
files 14:1 22:5
final 36:16
finalized 30:16
financially
  55:15 56:11

find 35:20
finding 29:17
  32:25
findings 27:22
  30:1
finish 43:11
fire 51:18
first 6:19 7:19
  8:1 16:9
fit 45:7
five 7:15 21:14
  38:3 47:2
flagging 39:18
focus 13:3
focuses 48:11
folks 28:7,8
following 19:23
follows 6:21
footage 15:4
force 11:14,21
  11:23 12:9,16
  13:5 15:16,23
  16:2 17:17,19
  17:21,24 18:1
  19:3,5,11
  22:12 39:15,15
  39:16,19 40:1
  40:11,25 41:20
  41:23 44:19
forces 18:13
foregoing 55:3
  55:4 56:4
foremost 7:20
form 46:17

formal 44:17
  45:21
format 17:6
forward 27:14
  50:5
found 19:5
  29:10,23 35:7
four 18:17,17
  18:20 21:22
  27:24 28:13
frame 27:1
  49:12
frequency
  31:24 42:12
frequently
  12:13
friday 54:1,2
frivolous 15:2
  16:20 17:2
front 14:20
  46:20
full 9:19 17:9
  45:5 54:9
fully 43:22
function 24:3
functions 13:11
funded 53:7
further 53:11
  55:13 56:9

**g**

g 5:1 9:21
gamut 41:2
general 12:9
  15:20 33:10,10
  34:4 36:21

48:13,14 50:22
51:6,21
**generality**
33:11
**generalized**
48:24
**generally** 11:18
14:3 16:15
25:22 26:16
45:4,5 51:3
**generated**
11:14,15,16,20
15:10 17:1
18:5,18 22:7
22:16 26:1
**getting** 9:10
15:22 23:4
51:1
**give** 18:3,4
28:21 42:15
51:25
**given** 17:21,23
17:24 18:1
20:8,23 38:16
**gives** 18:7
51:15 52:15
**giving** 37:7
**go** 7:18 9:22
10:15 12:7,22
13:1 14:12
17:9,22 18:18
19:2 21:1,2,6
21:15 34:19
44:13,18 47:5
50:16 54:9

**goes** 20:24 21:9
36:20
**going** 7:8,18
10:12,12,22
12:5 14:14
15:19 19:1
24:5 25:10,10
30:8 31:17
33:13 34:18
35:1,24 42:2
47:7
**good** 5:2 6:25
8:17 27:11
35:21 43:10
44:9 47:1,10
**governed** 34:16
**government**
34:15 52:17,25
53:1
**grab** 9:3
**great** 9:19
11:11 19:13
**greater** 43:12
**group** 26:21
49:16 53:6
**guess** 8:20,22
15:21 45:19
**guidance** 24:25
51:3,16,23
52:1
**guideline** 38:21
**guiding** 50:4
**guys** 36:18

**h**

**h** 4:5 9:21
**habitually** 51:4
**hand** 6:16 13:1
13:1
**hands** 32:21
**hang** 53:20
**happen** 12:12
**happened** 24:6
24:7 28:4
**happening**
30:14,17
**happy** 18:18
**hard** 7:14
43:21
**harder** 10:17
**head** 8:2 38:9
**hear** 8:15 10:17
26:17 33:4
34:12
**heard** 7:17 33:2
40:6
**hearing** 36:4,6
**hereto** 55:15
56:11
**hey** 29:16,24
42:23 44:12
46:14 52:10
**high** 32:1 34:23
42:12
**highest** 9:23,25
**hire** 21:24 22:1
**historical** 30:11
**history** 39:4

**hold** 12:12
25:14 54:9
**holding** 27:16
**honesty** 18:14
**hope** 48:14
**hopefully** 12:18
39:11 40:7
52:5
**hoping** 37:15
**horton** 28:22
29:4,15
**hours** 9:2
**huh** 8:2
**human** 8:7 38:9
51:17
**hypothetical**
37:7

**i**

**i.e.** 27:17
**ia** 22:6 23:19
34:12
**iapro** 11:25
13:8,10,14
17:16 18:15
19:20 37:4
40:1,2,3,9
**ias** 15:9
**identification**
10:24 22:18
**identify** 6:2
**illustrious** 10:3
**imagine** 14:25
15:8 26:8
**implement** 38:1
40:16 41:14

implementati... 26:13
implemented 23:4 28:24 42:9
implication 12:17
important 30:11 33:23 34:8 44:6
imposed 36:25
impression 42:15
improve 50:3
improved 43:7 44:5
improvement 27:15 29:22 31:4 43:4 49:18 50:2
improvements 21:21 22:2
incident 13:1 17:23 23:21 24:7,10,15 25:1,3,7,12 26:13,23 27:2 27:10,15 28:23 29:2 30:22 32:5 38:19 40:15 41:6 42:23 46:8 48:4,4,18 49:24

incidents 11:15 19:6,12,18 31:23 32:1 39:1 42:6 45:23 50:10,10 50:12
include 11:16 13:23 21:10 39:8 41:3
included 13:14 13:15
inconsistently 35:8
independent 50:11
indicated 11:2
individual 40:21 42:25
industry 35:9 43:25
informal 27:8 31:21 43:20
informally 44:1
information 18:10 26:5 27:18 46:20 51:2
infrastructure 41:13
infusing 31:3
initial 16:14 21:11
input 40:10
inquiry 14:19 14:21,25 15:17

16:5 17:11 22:10 34:10,24 34:24 35:1
instances 33:12
institute 23:8
instructions 7:9,17
intake 16:14
intended 5:19 36:7 37:14
intent 29:1 36:1,11 38:13 38:15
intention 8:15
interested 16:2 55:15 56:12
internal 13:24 13:25 14:4 19:25 20:7,11 20:14 21:13 22:9 23:19 27:20 28:7 30:13 31:15 32:24 33:17 34:5,9,10 35:14,17 46:12
internally 11:16 15:10 27:7
interpretations 31:2
interrupt 8:13 8:15
intervention 39:24 40:13,17

40:24 41:2,19 42:3
introduce 6:11 6:12,14
investigation 14:23 16:7,22 17:5 20:7,14 21:14 23:19 25:15,23 32:23 33:18 34:24,25 35:2,22,23 36:24 50:13
investigations 12:18,25 13:24 13:25 14:4,5 15:11 17:9 20:1 22:9 31:15 34:11,14 34:20 35:11 37:22
investigative 20:11 37:10,12
investigator 20:18 35:18 46:13
investigators 25:17,18 35:15 50:14
involved 19:5 22:11 23:20 30:10 33:20 36:1 37:6,8,17 37:18 42:12 44:17,18 45:1 45:1,22 46:6,7

52:8
**ir** 14:21 15:8
23:19
**issue** 27:14
36:14
**issued** 36:2
**issues** 26:24
28:3 29:12
45:21
**iterations**
48:21

**j**

**jarrett** 3:2 7:3
**jcoyle** 2:8
**job** 1:20 44:9
**john** 2:4 6:4,25
21:18 38:22
**joint** 12:17
50:13
**joking** 43:18
**july** 1:13 5:8
**jumbled** 8:9
**jump** 8:8 11:11
**june** 22:1 23:5
23:6 24:7,22
26:22 48:6
49:3,3
**justified** 42:24

**k**

**k** 9:21
**kassie** 56:2,15
**katelyn** 2:13
6:6 18:22,25
47:19 53:11

**katelyn.knight**
2:17
**keep** 8:1 44:2
**keeping** 32:9
**keeps** 43:5
**kept** 13:4 32:13
32:13
**kilday** 3:4
**kilduff** 3:4
**kind** 12:4,5,6
12:14,20,21
15:20 17:8,21
20:6 21:19
23:9 24:1,3,11
26:17 28:4,11
28:16 30:5,10
30:11 31:3,23
32:2 33:21
35:20 36:21
37:15 39:3,7
39:11 42:2,10
42:17 43:9,14
43:17,19,25
44:2,22 45:9
48:8,15,20
49:12,13 50:6
50:16 51:25
53:2
**knew** 28:22
**knight** 1:12
2:12,13 4:8 5:6
6:6,6,7,11,13
6:15,18,25
9:21 15:14
19:2,10 51:1

53:13,18
**know** 8:14,21
8:21 9:5 10:13
10:18 11:4,22
12:5,11,25
14:11,13,15
15:3,21 17:16
18:6,8 19:7
20:2,4 21:13
21:14,25 24:6
24:24,24 25:21
26:20 27:18
28:6,11,14,15
29:6,15,21
30:10,16 31:9
31:9,17,18,23
32:2,6,22 33:6
33:13 36:18
38:11 39:7,9
39:14,15 40:6
41:18 42:11
43:11,14,17,17
43:20,21 44:11
44:17,21 45:8
46:7,23 47:6
48:1,2,25 49:1
49:5,7,8 50:21
50:22,23 51:3
51:23 52:3,3,4
52:15,21 53:3
**knowledge**
8:23 39:23,23
55:10 56:6
**konz** 3:3 6:9,9
53:15 54:4,6

**l**

**labor** 35:25
**lack** 25:21
51:24
**large** 35:13
46:1
**law** 3:4 7:21
15:7
**law.com** 3:7
**laws** 5:21 36:1
**lay** 30:11
**layer** 50:11
**lead** 8:9 30:18
**leaders** 48:11
**leads** 32:24
**leave** 45:3
**leaves** 54:8
**lee** 28:22
**left** 10:17
**legal** 51:16,16
51:23,23 52:1
**letter** 25:22,25
26:3
**letters** 14:20
**level** 9:23,25
27:16 34:23
36:5,6 38:14
**levels** 12:20
34:18
**lieutenant**
17:12,14 20:21
20:22 23:4
**limitation**
15:18

limited 19:3
lineage 28:23
  28:24 30:7
list 18:4,8
little 10:17
  16:22 17:6
  19:14 24:18,19
  29:5 39:22,22
  47:2
lives 23:9
location 1:15
log 13:20,20
  14:7,11 17:16
  18:17,21,25
  19:11,20 46:6
  46:11
logged 11:25
  13:6 17:17
login 13:12
long 9:1 10:9
  16:23 24:11,25
  47:19
longer 17:6
  47:7
look 10:17
  13:13,16 24:12
  26:6 30:23
  36:25 43:3
  46:11,13 47:6
  52:10
looked 26:23
  28:12 30:4
  48:20
looking 14:8
  19:24 29:20,21

31:18 43:8
47:24 49:5
looks 19:25
  35:23 37:11
lost 47:19
lot 12:4,23
  13:15 15:8
  19:17 20:6
  23:9 27:18
low 31:24
  42:12
lower 36:6

## m

m 2:13
made 21:22
  33:7 35:4 39:7
  40:20 44:15
main 23:2
maintained
  46:24
major 23:9
make 7:19
  24:12 32:16
  41:9 43:14
  44:6
makes 12:18
  21:24 32:9
  37:15 42:17
  47:9 51:20
making 28:2
  29:13 31:4
manager 38:12
  50:9,21,23
  51:11,12,19
  52:7,8,11,19,23

52:24
managerial
  20:21
managers
  40:10
manner 5:22
manual 48:21
mark 10:22
marked 10:23
material 18:24
matrix 38:20
matter 5:7 7:2
  15:19 28:8
  42:22 44:12
mceldrew 2:5
mceldrewyou...
  2:8
mean 9:13
  23:18 31:8,22
  31:22 41:1,21
  44:4
means 5:23 7:5
  8:19
mechanism
  23:2 24:12
  40:9 46:17,19
medication
  9:15
meeting 23:12
meetings 22:16
  22:19 23:11
melissa 1:19
  5:3 14:16
  26:15 55:2,17

members 22:19
  28:5
memo 38:3,16
memo's 33:7
mental 44:23
mentioned
  17:17 18:12
  44:11 48:17
metropolitan
  43:13
mic 24:18
middle 35:20
mimicked
  28:25
mind 8:1 15:20
minutes 47:2,8
misconduct
  14:2 16:13
missing 23:24
  24:13
models 50:18
monterrosa 1:5
  2:2,3 5:7 6:5
  7:2 41:6
month 22:7
monthly 22:6
  22:15,22 23:14
morning 6:25
  9:10
morphing 30:8
motion 13:21
motions 22:13
move 27:14
moved 48:11
  50:5

**multilayered** 21:9

**multiple** 35:14

**mychael** 19:7

**myriad** 26:24

**n**

**n** 2:1 3:1 4:1 5:1 6:10,10 9:21 36:12,14

**name** 5:2 9:19 19:8 28:21 46:8,14

**name's** 6:25

**narrowed** 15:16

**nature** 8:7 15:2 27:8 34:21 46:5,18

**necessarily** 39:5

**need** 6:12,13 8:25 9:2 11:5 50:2 53:24

**needed** 53:22

**neftali** 1:5 2:2 5:7 6:5 7:2

**neither** 55:11 56:7

**nelson** 19:7

**new** 5:11 55:19

**nod** 36:14

**nods** 8:2

**noid** 36:12

**nonfatal** 45:2 46:9

**nope** 45:16 53:15

**nora** 2:2 6:5 7:2

**notary** 5:10 55:18

**notes** 13:25 30:15 47:5

**notice** 4:7 10:16,25 17:22 36:1,11,15,15 38:13,15

**now's** 47:1

**number** 7:6 14:12 15:21 17:19,24,24 18:1,7 20:8 22:11,12,12,13 45:25 46:9

**numbers** 18:21 37:5 41:3

**o**

**o** 5:1 6:10 36:12,14

**oath** 7:20

**oaths** 5:11

**objection** 5:14 15:14

**obligated** 7:21

**obviously** 29:6 30:7 33:15,24 37:17 38:11

**occur** 13:5 15:5 25:5,23 26:10 28:20 30:15

43:6 45:15

**occurred** 23:6 24:10 28:17 30:2 31:20 39:1 43:6 49:19

**occurs** 22:22 36:14 37:14

**offense** 9:13

**offer** 40:3

**offered** 7:4 11:2

**office** 2:14 25:17 38:10 50:13

**officer** 11:17 12:9 13:13,22 14:6 18:5 19:5 22:11 23:20 25:25 33:20 37:6,17,18 42:11 44:13,25 45:1,17,22 46:6,7 55:1,2

**officer's** 17:19 37:8 46:14

**officers** 39:18 40:10 41:22

**oftentimes** 26:2

**oh** 53:21

**oir** 26:21 49:16 53:6

**okay** 7:17 8:5,6 8:11,12,18,24 8:25 10:12,15

11:6,6,8,11 13:12 14:6 15:13 17:13,16 18:11 19:13 21:11 22:4 24:14 27:5 38:6 44:11 47:1,14,23 51:5 52:7 53:6 53:9 54:7

**older** 9:10

**once** 35:21 36:11,11 41:23

**ones** 15:17,23 15:24

**ongoing** 52:9

**open** 23:10,16 23:18,19,20,21 24:4

**operation** 48:5

**operations** 19:21

**opinion** 34:8

**opportunities** 50:2

**option** 10:15 29:17 36:3

**options** 27:24 29:5

**order** 19:11

**ordering** 54:5

**organizational** 49:15

**outcome** 33:16 55:16 56:12

outside 16:12
  21:11 49:7
overall 36:21
overlap 11:13
oversight 49:1
  49:6 50:7,17
  50:21 51:22
own 20:8 52:4
owned 40:8

**p**

p 2:1,1 3:1,1
  5:1
p.m. 1:14 5:5
  47:12,15 54:10
  54:12
pa 2:7
page 4:2,6 7:19
parameters
  38:4
part 33:2,4,25
  42:9
particular
  14:20 18:2,3,3
  18:5 22:5
parties 5:12,15
  55:12,14 56:8
  56:11
party 25:24
past 12:11 21:1
  39:8 46:12
pd 10:9
pdf 49:21,23
peasy 53:17
pending 9:7
  23:24

people 28:9
  35:10
perfect 54:3
period 22:23
  24:16 30:2
  41:24 49:4
permitted 5:19
person 22:19
personnel 39:4
philadelphia
  2:7
physical 9:15
  45:11
physically
  45:17
piece 23:9
pigeonhole
  29:24
piggybacking
  31:14
pitchess 13:20
  13:21 14:10,24
  18:17,20 22:13
  32:14
place 22:3
  39:18 41:14,18
  41:22 42:15
  49:2,7,9
placed 20:15
places 38:19
plain 41:10
plaintiff 6:5
plaintiffs 1:6
  2:2

planning 24:11
play 50:21
please 6:2,16
pmk 33:24
  42:16
pobr 34:15
point 8:13
  18:10 21:8
  22:17 23:6
  37:16 46:5
police 1:16 10:7
  17:10 20:23
  21:3,6,7,10
  23:10 25:14
  35:3 38:7,17
  44:18 45:6,11
  46:12 50:9,23
  51:14,17,23
  52:3,17,22
police's 38:15
policies 30:22
policy 16:13
  25:3,12 27:21
  27:23 28:2,2
  29:12 30:19,24
  30:25 31:7,13
  37:13 40:20
  41:13,18 44:17
  48:16,17,21,21
  51:4
possible 34:2
powerpoint
  41:5
pre 30:8 36:4
  36:13

preface 21:19
preference 26:2
premise 37:12
prepared 11:8
  56:3
prescription
  9:14
presentation
  41:6
pretty 44:24
  46:25 49:25
prior 13:18
  19:18 24:6
  25:6 26:4,6
  31:7,12 39:4
  49:24 50:6
  55:5
privacy 15:15
privileged 51:2
probably 9:2
  30:3 34:4
  39:22 43:2
  44:9 46:3
  52:13
problem 9:12
  9:12
procedural
  5:20
procedure
  40:20
procedures
  11:13,19
proceed 6:22
  47:16

proceeding
  1:15 5:4,18
  54:13 56:4
proceedings
  55:3,5,6,9 56:6
proceeds 33:1,5
process 12:1,10
  12:10,15 16:18
  17:10,12 18:9
  20:16,17 21:9
  23:8 24:24
  25:3,13 27:2
  27:10 28:12,25
  29:21 30:9
  31:8 32:10
  33:1,5,13,23,25
  34:7,16 35:2,6
  35:19,21 36:9
  36:13,19,22,22
  36:23 37:20,23
  37:23 39:18
  40:7 45:10,25
  48:19
processes 11:13
  11:19 12:2,24
  19:22 26:9,23
  34:1,13 42:21
  43:3,20 44:5
produce 19:3
  19:10 34:25
  37:5 46:23
produced 5:17
  22:16 26:4
  46:22

produces 37:9
producing 19:1
professional
  11:24 17:13
  20:21 23:3,15
  23:15
program 21:12
  39:17 41:17
programs
  19:22
prompted 24:9
protective
  19:11
protocols 12:17
  19:22
prove 17:4
  43:21
provide 27:17
provided 41:5
proving 37:13
psychological
  9:15
psychologist
  45:6,7
psychology
  44:23
public 22:13
  51:18 55:18
pull 21:14 48:2
purchase 40:5
pursuant 15:7
pursuits 41:1
purtell 2:5
put 45:2

**q**

qc 31:19
qualified 55:7
quality 21:16
question 8:8,10
  9:7,13 25:7
  30:23 31:14
  37:25 41:11
  52:5
questions 29:24
  53:11,15
quicker 16:24
quickly 15:5
quote 13:19
  20:16 34:12

**r**

r 2:1 3:1 5:1
  26:16
raise 6:16
random 21:15
randomized
  24:2
range 44:19
rank 22:20
rare 32:4
read 11:4
really 13:3
  14:16 16:2
  19:24 23:4
  31:10 32:21
  43:10
reason 9:14
reasonable
  38:24

received 22:13
  22:14
recognize
  43:23
record 5:4,5,15
  6:2 7:25 8:4,9
  9:20 28:18
  47:11,13,15
  53:23 54:9,10
  55:9 56:5
recorded 5:22
  55:6
recording 5:17
  55:8 56:4
records 11:13
  11:17,20 22:14
  43:10
reduced 55:7
referenced
  49:18
referring 45:9
reflected 30:15
reform 48:3
reforms 23:10
refute 15:5
regard 18:12
regardless 45:1
reivew 25:3
related 15:16
  19:12 27:22
  34:19 45:22
  55:11 56:7
relates 18:11
  22:4 38:25

**relation** 47:19
47:22
**relationship**
52:15 53:4
**relative** 55:13
56:10
**relevant** 15:24
**remaining** 47:4
**remember**
15:18 23:7
**remote** 1:15
**remotely** 5:13
**repeat** 33:2
**report** 13:14,14
18:2 20:3,19
22:6,15,22
28:19 29:4
30:16 35:23
37:10,12 49:16
49:21 51:12,13
**reported** 1:19
**reporter** 5:2,3
6:15,22 10:14
24:17,21 26:18
47:11,14 53:20
54:2,4,7
**reporter's** 7:24
**reports** 12:2
18:4 26:11
29:14 30:4,20
36:25 37:5
**reprimands**
36:10
**requalify** 44:18

**requested**
55:21
**requests** 22:14
**required** 14:1
32:15
**research** 47:22
**reserved** 54:11
**resolution**
14:19,21 15:1
16:5 17:11
22:10 34:10
**resolutions**
15:17
**resources** 38:9
51:17
**restroom** 9:3
**result** 16:7
33:19 35:1,24
**retake** 44:19
**retraining**
41:25
**review** 11:20
12:9 19:19
20:2,22 21:8
21:11 23:20,21
23:21 25:1,7
25:12 26:6,14
26:21,23,25
27:2,10 28:23
29:3 30:22
35:1,2 36:13
37:9 40:11
42:20,22 46:20
48:3,4,4,6,18
50:1,10,11

55:21
**reviewed** 11:23
11:25 13:4,18
14:6 20:4
32:12 42:8
48:10
**reviews** 11:14
13:5 19:22
20:18 24:15
27:2,6 31:17
31:18 37:22
**right** 6:16 8:16
8:21,23 9:19
11:11 20:6
33:10,11,20
47:1 48:23
53:10
**risk** 42:13
**robert** 1:12
2:11 4:8 5:6
6:18 9:21
**robust** 37:19
**role** 50:19
**roles** 50:20
**rooms** 29:22
**route** 40:11
**routed** 20:15
**routine** 45:3
**routing** 17:10
17:11 20:16,17
**rubric** 39:20
**rules** 5:21
**run** 18:2 52:22
52:24

**running** 52:18

**s**

**s** 2:1 3:1 4:5 5:1
**sacramento** 3:6
10:3,4
**santa** 2:15
**saying** 43:11
**says** 44:12
**scale** 46:1
**scheme** 32:4
43:12
**scope** 31:10
**screen** 10:13,14
10:20 54:9
**scroll** 11:5,6
**se** 16:18 21:18
31:22
**second** 7:24 8:7
53:20
**secondary**
37:23
**see** 10:13,20
13:24 14:19
29:4 30:5
**seeing** 44:3
**select** 27:23
**selective** 21:13
**sense** 12:19
21:24 32:16
37:15 42:18
47:9 51:20
**sent** 11:24
**separate** 12:14
42:8 51:15

**sergeant** 20:12 22:20
**service** 36:20
**set** 40:25
**settling** 47:20
**several** 17:22 39:8
**severe** 33:17
**severity** 36:17 39:8
**share** 10:13,14
**shooting** 22:1 44:18 45:1,22 46:6
**shootings** 19:6 37:18 42:12
**short** 26:17
**shorter** 16:22
**shoulders** 8:3
**show** 7:7 10:12
**shrugs** 8:2
**shy** 10:10
**sign** 20:19
**signature** 54:11 55:16 56:14
**significant** 21:21,21
**similar** 33:14 33:22 34:1 37:24 38:25
**simplest** 52:13
**sir** 10:20
**sit** 28:17 45:13
**situation** 21:17

**size** 43:15,24
**sized** 43:12
**skelly** 36:5
**skills** 55:10 56:6
**skim** 18:19 19:4
**skimmed** 30:21
**skip** 19:14
**skirt** 23:5
**slang** 13:19
**slight** 22:24
**slightly** 43:18
**slow** 14:16 34:6
**small** 35:17 43:11 44:2
**sociology** 10:1
**software** 40:2,3 40:4,5,8,12,16 40:18 41:12 42:5,14
**somewhat** 30:15 50:4
**sorry** 24:17
**sort** 13:3,4 16:4 19:14 21:16 24:14 26:20 27:1 30:19 31:14,21 32:22 44:15 45:19,20 46:1 47:25 48:9,11,24 52:8
**sought** 51:4 53:6

**sounds** 8:17 47:10
**south** 2:6
**speak** 8:22 51:3 51:6
**speaking** 7:5 8:19 33:11 34:3
**specialized** 52:18
**specific** 17:23 33:12 42:6 50:24,25 52:10
**specifically** 18:12 24:15 29:11 30:23
**specifics** 14:8 15:22
**specified** 13:13
**spellings** 54:8
**spoke** 45:6
**staff** 22:16,18 23:16 28:7 49:7
**standard** 43:25
**standardized** 35:19,25 44:22 45:10
**standards** 11:24 17:13 20:21 23:3,15
**standpoint** 44:23
**start** 11:12,18 34:4 39:16

49:13
**started** 28:5 29:23
**starting** 51:7
**state** 5:11 10:3 10:4 55:19
**stated** 16:19 17:8 20:8
**states** 1:1
**stats** 22:6
**status** 23:23
**stayed** 31:12 48:22
**stem** 12:2
**stenographic** 5:23
**step** 32:10
**steps** 23:24 35:5
**stipulation** 5:24
**stops** 17:12
**street** 1:17 2:6 2:15 5:8
**strengths** 50:1
**strike** 12:12
**strong** 51:11
**structure** 21:4 30:20 49:15
**structures** 49:2 49:6 50:8
**subject** 28:8 42:22 44:12
**subordinate** 52:14 53:3

substantial
  32:2 49:25
suite  2:6 3:5
supervisor
  11:24
supervisors
  35:19 40:10
support  36:24
  37:14
supporting
  36:23
supposed  29:16
sure  7:19 12:23
  17:20 18:16
  24:12 44:6
  48:24 49:22
susceptible
  39:19
suspect  25:24
suspect's  46:8
suspension
  38:3
suspension's
  33:8
swear  5:12
switch  39:13
sworn  5:15
  6:19 55:5
system  13:8,10
  37:3 40:3,8,13
  40:14,24,24
  41:3,8,13,15,20
  42:9,14
systems  31:16
  39:14,24,25

41:22 42:3

**t**

t  4:5 6:10 9:21
  17:25
ta  17:25 18:1,4
tabulate  17:18
tactics  28:1
  29:13 31:5
take  5:4,10
  8:25 9:3,4,8,9
  9:11 12:5
  24:25 37:18
  47:2,8 52:23
takedown
  12:12
taken  7:10 22:2
  55:3,12 56:9
talk  7:8 11:19
  14:15,16 19:21
  29:11 33:12,17
  34:7 40:23
talked  22:11
  27:13 37:3
  48:15 49:15
  52:2
talking  15:20
  39:12 46:10,17
tell  6:20 7:21
  14:7 19:3
  32:25
ten  33:8 46:12
  47:2,8 49:3
term  13:19
  25:21 26:17
  40:7 51:24

termination
  38:3
termination's
  33:9
terms  13:16
  19:19 29:9
  30:8,24 31:13
  34:4,7 45:11
  50:1 51:21
terribly  9:1
testified  6:21
testify  9:16
  11:8 21:20,23
  28:18 43:2
testifying  13:18
  55:5
testimony
  12:23
thank  19:14
  26:18
thanks  53:16
  53:18 54:6
that'd  19:13
theory  52:17
thereof  46:17
thing  9:6 13:25
  23:25 35:6
  38:4 44:21,22
  51:7
things  8:1,1,20
  8:23 13:2,15
  13:23 15:22
  21:20 22:5,8
  23:3 24:13
  26:10 27:10,11

28:13,14 30:17
  32:3,4 33:22
  34:21 36:9
  39:10 42:4,11
  42:16,17,19,20
  42:22 43:6,9
  43:16 44:1,3,7
  44:8 47:4
  48:10,25 49:8
  50:3 52:4,16
  52:22,23
think  9:1 10:4
  15:15,18,23
  19:18 23:14
  27:11 29:9,19
  30:11 31:1
  33:23 34:3
  35:21 37:16
  41:19 42:10,23
  42:24 44:5
  45:14,15 47:1
  47:3,7,24 48:1
  48:2,13,13,14
  48:17 49:11,18
  51:7,21 52:13
  53:2
thorough  17:4
  49:25
thoroughly
  32:12
three  21:22
  41:23 46:15
threshold
  40:22

**thresholds**
40:25 41:3,14
**time** 1:14 6:1
8:13 9:1 11:23
15:18 21:23
23:1,14 24:4
24:16 25:4,13
25:16 27:1,22
27:24 28:20,22
29:16 30:3
38:6,18,18,23
40:4,14,15,19
41:5,10,24
43:8 47:1
49:12 53:18
**timelines** 25:4
**timeliness**
27:14
**timely** 26:10,11
**times** 7:13
17:22 20:13,25
21:1 23:13
41:23 46:15,15
50:24 52:10
**today** 7:1,4,25
8:16 9:17
13:19 18:6
28:18 33:24
43:2 45:13
49:10 53:18
**together** 23:16
**tom** 17:25
**tone** 42:17
**tonn** 3:2 6:10
7:3 11:17

13:13 18:11
**tonn's** 14:6
21:24,25
**topic** 32:19
48:24
**topics** 7:6,8
11:1,9 19:23
47:24,25 50:25
**tops** 9:2
**total** 17:19
**touched** 49:10
**towards** 50:16
50:17
**track** 13:10
32:9 43:5,16
44:2 46:7
**tracked** 20:9
22:8 42:4,7,8
43:4
**tracking** 16:8
32:8,17 44:9
45:24 46:4,18
46:18
**traditional**
49:14 50:8,17
**training** 28:3,8
29:12 31:4,5
41:25 43:1
44:13 45:11
**transcriber**
56:1
**transcript** 5:17
53:24 55:21
56:3,5

**transcriptionist**
55:8
**translate** 8:3
**treatment** 39:2
**trend** 22:17,21
22:22,24 32:2
32:8
**trends** 44:2
**trigger** 37:22
41:24
**triggered** 42:21
**triggering** 25:5
**true** 55:9 56:5
**truth** 6:20,20
6:21 7:21
**truthfully** 9:16
**try** 8:4,9,22
**trying** 14:16
**turning** 24:14
**twice** 41:23
**two** 8:1 9:10,11
14:17 16:16
19:6 23:13
33:22 45:20
46:14 53:25
54:8
**type** 11:19 13:2
16:8,13 20:3
21:12,16 23:25
25:25 31:16,19
32:14,24 33:19
34:23 36:4
37:10 39:9,20
41:17 42:6,7
43:16 44:16

49:6,6 50:19
50:20 52:25
53:3,4
**types** 11:16
14:17 35:11
**typewriting**
55:7

**u**

**uh** 8:2,2,2
**ultimately** 21:2
25:18 37:20
38:10 52:24
**uncommon**
43:25 52:22
**under** 5:20
7:20 19:10
21:4
**understand**
5:16 7:22
19:24 28:9
33:16
**understood**
32:19 41:17
45:19
**unequivocal**
16:21 17:1
**unfounded**
15:2 16:20
17:2
**unique** 20:8
37:5 51:9
**unit** 20:12
**united** 1:1
**university** 3:5
10:4

unlocked 42:5
unpack 12:4
20:6
unquote 13:20
34:12
use 8:4 9:3
11:14,21 12:9
13:5,9,9 17:17
17:20,24 18:1
19:11 22:12
26:17 40:1,4
40:11,25 44:19
used 11:23 20:4
40:4 41:22
uses 5:19 17:19
18:12 19:5
39:15,16
using 39:19
usually 20:11

**v**

v 1:7
vallejo 1:8,12
1:16,18 2:11
2:14,16 5:8,9
6:8 7:3,6 10:6
10:9 47:20
51:8
variance 30:5
varied 23:13
variety 13:10
various 48:21
52:4
varying 34:18
vast 34:19
35:14

vastly 44:4
veracity 15:17
19:3,12
veritext 5:4
versus 16:6
33:18
videoconfere...
1:11 2:4,13 3:3
violation 16:13
37:13
vital 26:5 27:18
volume 32:1
vote 29:18
vpd 49:2
vs 5:7 7:2

**w**

wait 8:9 26:2
want 7:8 8:1,8
8:14,15,20,21
9:5 11:4,12,18
12:6,22 13:3
13:16 19:24
21:23,25 26:6
28:15 33:21
34:12 38:1
39:5,13 42:15
43:14 44:6
47:5 51:8
52:10 53:23
wanted 18:19
warning 39:14
39:18,25 40:23
41:19
way 16:8 17:10
29:19 30:5

35:13 42:7
48:18 49:14
52:13
ways 35:10
we've 19:17
21:22 22:13,14
43:7 46:22
47:21,21,25
48:15,25 49:8
50:5
wednesday
1:13
weeks 10:11
23:13
weighing 18:13
wellness 44:23
went 28:11
whatnot 17:6
wholesale
26:21
williams 41:5
witness 5:12,15
5:16 6:19 7:5
10:16 14:15
18:23 26:15
51:5 55:4
word 31:6
words 8:4
work 12:24
19:17 49:13
51:12,13,13
worked 48:19
works 51:18,19
worth 42:10
49:11 51:7

wrapped 26:22
written 5:24
7:25 8:3 28:19
30:6,19,25
31:6 36:9
43:19

**x**

x 4:1,5 45:18
52:11 55:21

**y**

y 45:18 52:11
yeah 9:9 12:3
14:10 15:25
16:10 18:16
19:9 25:8 27:6
47:21 48:13
51:6 53:2
year 10:11,11
18:17,17,20
22:23,25 24:8
49:3
years 20:25
21:22 28:5,10
28:11 30:4,22
31:17 46:12,24
yep 51:5
yesterday
12:24
yesterday's
11:22
york 5:11 55:19
young 56:2,15

| z |
|---|
| **z**   45:18 52:11 |

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.