1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11
12

NEFTALI MONTERROSA, *individually and as successor in interest to decedent* SEAN MONTERROSA, et al.,

No.  2:20-cv-01563-DAD-SCR

13

Plaintiffs,

ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

14

v.

(Doc. Nos. 104, 105)

15

CITY OF VALLEJO, et al.,

16

Defendants.

17

18      This matter is before the court on two motions for summary judgment, one filed on behalf

19  of defendant Officer Jarrett Tonn (Doc. No. 104) and the other filed on behalf of defendant City

20  of Vallejo (the "defendant City") (Doc. No. 105).  On December 5, 2024, the pending motions

21  were taken under submission on the papers pursuant to Local Rule 230(g).  (Doc. No. 110.)  For

22  the reasons explained below, the court will deny both of defendants' motions for summary

23  judgment.

24                                    **BACKGROUND**

25      This case arises from the lethal shooting of Sean Monterrosa ("decedent Monterrosa" or

26  "the decedent") by Vallejo Police Department ("VPD") Officer Jarrett Tonn on June 1, 2020.

27  /////

28  /////

**A.**      **Factual Background**[1]

     1.      June 2, 2020 Shooting

On June 2, 2020, shortly after midnight, police officer Lee Horton observed what appeared to be a group of people breaking into the Walgreens store at 1050 Redwood Street in Vallejo, California. (CDUF ¶ 3.) Officer Horton called for assistance and three detectives—defendant Tonn and detectives Bretton Wagoner and Wesley Pittman—from VPD's specialized crime reduction unit responded in an unmarked police truck. (CDUF ¶ 4; TDUF ¶¶ 3, 10–12.) Those detectives had earlier that night responded to a report of a looting at a gun store and the report of a shooting at a dispensary. (TDUF ¶ 8.)

After their arrival, Officer Horton instructed the three detectives to enter the parking lot of the Walgreens from the south while he would enter from the north. (TDUF ¶ 12.) The detectives approached the parking lot in an unmarked truck driven by Detective Wagoner, with Detective Pittman sitting in the front passenger seat, and defendant Tonn sitting in the middle backseat. (TDUF ¶¶ 10, 13; CDUF ¶ 6.) As the detectives turned into the Walgreens parking lot, Officer Horton observed one of the persons outside the Walgreens acting as a lookout and holding what appeared to be a weapon. (CDUF ¶ 7.) Officer Horton communicated over the radio to the detectives that the people in the Walgreens parking lot were "armed, possibly armed." (TDUF ¶ 14; CDUF ¶¶ 8, 9.) As the detectives' truck entered the parking lot, detective Wagoner activated its red and blue police lights. (TDUF ¶ 15; CDUF ¶ 10.)

Many of the events that occurred after this point were captured to some extent by the detectives' body-worn cameras. (Doc. No. 104-7.) None of the body-worn camera footage captured audio of the shooting itself. (*Id.*) A review of Detective Wagoner's body-worn camera

---

[1] This factual background is undisputed, except where otherwise noted, and is derived from the undisputed facts as stated by defendant Tonn and as responded to by plaintiffs (Doc. No. 111 at 30–36 ("TDUF")); the undisputed facts as stated by the defendant City and responded to by plaintiffs (*id.* at 36–50 ("CDUF")); plaintiffs' statement of disputed material facts in opposition to the motions for summary judgment (*id.* at 51–61 ("PDMF")); as well as the exhibits attached to the pending motions. Defendants did not provide an itemized response to plaintiffs' statement of disputed material facts though the defendant City did raise an evidentiary objection, addressed by the court below, regarding evidence submitted on summary judgment in support of plaintiffs' *Monell* liability claim.

footage establishes that the detectives turned right into the Walgreens parking lot at 12:36:25 AM

on June 2, 2020.  (Doc. No. 104-7, Exh. C, "WV.")  Detective Wagoner activated the police lights

on the unmarked truck seven seconds later at 12:36:32 AM.  (WV at 00:10.)  The truck continued

moving towards the right side of the Walgreens where a drive-through for the pharmacy was

located.  (WV at 00:13.)

      The officers observed several individuals running from the Walgreens and getting into

two cars parked in the parking lot.  (TDUF ¶ 16; CDUF ¶ 11.)  Among them was decedent

Monterrosa, who ran from the Walgreens towards a black sedan.  (CDUF ¶ 12.)  Review of

Detective Pittman's body-worn camera footage shows that decedent Monterrosa was stooped

down next to a black sedan as the officers approached the back of that vehicle.  (Doc. No. 104-7,

Exh. B at 00:14, "PV.")  Defendant Tonn saw decedent Monterrosa attempt to get into the sedan.

(TDUF ¶ 19; CDUF ¶ 14.)  Defendant Tonn saw that decedent Monterrosa was carrying an object

around his waistband protruding approximately three inches from his body, and which appeared

to defendant Tonn to look like the handle of a firearm.  (TDUF ¶¶ 21, 22.)  The parties dispute

whether defendant Tonn saw this object at this moment, though plaintiffs do not assert at what

alternative point defendant Tonn observed it.  (TDUF ¶ 21.)

      The police truck stopped and defendant Tonn immediately opened fire from the backseat

of the truck, through the windshield, and at decedent Monterrosa.  (WV at 00:14; TDUF ¶ 26;

CDUF ¶ 19.)  Defendant Tonn fired his M4 rifle five times.  (TDUF ¶¶ 26, 27; Doc. No. 111-1 at

99; WV at 00:15.)  One of the bullets fired by defendant Tonn hit decedent Monterrosa in the

back of his head.  (TDUF ¶ 30; CDUF ¶ 20.)  The black sedan pulled out of the parking lot and

the body-worn camera footage shows a person's body lying face down at the far end of the

Walgreens drive-through.  (Doc. Nos. 111-1 at 94 (defendant Tonn testifying that the sedan

pulled out of the parking lot); 111-10 at 52 (showing the position of decedent Monterrosa's

body); PV at 00:17.)  The time which elapsed from when defendant Tonn fired the first shot to

when he fired his last shot was 1.04 seconds.  (TDUF ¶ 27; CDUF ¶ 28.)  Approximately 8

seconds elapsed from the time at which the detectives turned right into the Walgreens parking lot

to when defendant Tonn fired his first shot.  (WV at 00:06–00:14.)

1    Defendants assert that, before the lethal shot was fired, decedent Monterrosa stepped away

2    from the sedan and suddenly turned towards the detectives.  (TDUF ¶ 20; CDUF ¶¶ 14, 15.)

3    Defendants further assert that the decedent moved his hand toward his waistband before any shots

4    were fired by defendant Tonn.  (TDUF ¶ 29; CDUF ¶ 16.)  Plaintiffs dispute both of these factual

5    assertions, arguing that expert evidence regarding where the decedent and sedan were located

6    when the detectives pulled into the parking lot and where the decedent fell to the ground renders

7    it impossible for him to have stopped and turned.  (Doc. No. 111 at 38–39.)  In particular,

8    plaintiffs cite to expert reports from:  (1) William Neale, an expert in accident reconstruction,

9    video analysis, visualization, and forensic engineering (Doc. No. 111-10); (2) Dr. Douglas

10   Young, an expert in kinesiology (Doc. No. 111-14); (3) the Vallejo Police Department autopsy

11   report (Doc. No. 111-16); and (4) Matthew Noedel, an expert in forensic ballistics analysis (Doc.

12   No. 111-21).  (Doc. No. 111 at 34–35.)  Plaintiffs also maintain that Mr. Noedel's trajectory

13   analysis indicates that the decedent would have been standing upright when he was shot.  (Doc.

14   No. 111 at 35.)  None of the body-worn camera footage evidence before the court on summary

15   judgment clearly depicts decedent Monterrosa's actions prior to the shooting.  (Doc. No. 104-7,

16   Exhs. A–C.)  Defendants state, and plaintiffs do not dispute, that it is possible in 1.04 seconds, the

17   time between the first and final shots, for a person to turn their head away and expose their back

18   to a shooter because research has shown that such a task takes an average of 0.73 seconds.

19   (TDUF at ¶ 31; CDUF at ¶¶ 29, 30.)[2]

20       2.    VPD Practices Regarding Use of Force

21       Plaintiffs assert that prior to 2011, the VPD did not have any formal use of force review

22   system.[3]  (PDMF ¶ 25.)  Following 2011, the VPD created a Critical Incident Review Board

23   ("CIRB") which could be convened by the Chief of Police to review an officer's use of force.

24   (Doc. No. 111-26 at 15, 18.)  Defendants assert that, along with the possibility for CIRB review,

25   

26   [2]  Neither party has expressed any position on which bullet fired by defendant Tonn hit the
     decedent or resulted in his death.

27   
28   [3]  As noted above, defendants did not provide an itemized response to plaintiffs' counter-
     statement of disputed material facts.

4

1    every use of force "goes through a supervisory review and then a review by the Internal Affairs

2    Sergeant," with the CIRB only being convened to "raise potential policy violations[.]"  (Doc. No.

3    118 at 8.)  Plaintiffs contend that, during the period between 2011 and 2020, the CIRB would

4    draft brief memoranda for the Chief of Police to review to determine what policy changes should

5    be instituted and that the Chief of Police at times would fail to read those brief memoranda.

6    (PDMF ¶¶ 28–31.)  Plaintiffs assert that no officer in the VPD had been disciplined for a police

7    shooting or other critical incident in the past 20 years.  (PDMF ¶ 32.)

8         Plaintiffs also contend that in 2003, a practice of "badge bending" began in the VPD.

9    (PDMF ¶ 45.)  Plaintiffs describe this practice of badge bending as being one designed to

10   "celebrate" police shootings.  (Id.)  Officer Kent Tribble, the originator of this practice, was

11   promoted during his tenure to Lieutenant and served as a member of the CIRB panel.  (PDMF ¶¶

12   53, 54.)  Plaintiffs contend that badge bending was a well-known practice of the VPD among the

13   leadership of the Department, the Vallejo City Manager, and the mayor of Vallejo.  (PDMF ¶ 51.)

14   Plaintiffs also state that police chiefs of the VPD had been aware of the badge bending practice,

15   failed to investigate that practice, and failed to discipline officers for their participation in that

16   practice.  (PDMF ¶¶ 51, 52.)

17        In the summer of 2019, VPD Chief Shawny Williams retained the OIR Group to perform

18   a comprehensive evaluation of the Department, including their CIRB and internal affairs

19   processes.  (PDMF ¶¶ 35, 36.)  The OIR Group issued a report making 45 recommendations on

20   how to improve the VPD, including eight recommendations specifically designed to improve the

21   CIRB process.  (PDMF ¶ 42.)  On June 5, 2020, the California Department of Justice and the

22   defendant City entered into an agreement to review and implement the OIR Group's

23   recommendations.  (Doc. No. 112-6 at 2; Doc. No. 118 at 7.)

24   **B.    Procedural History**

25        On August 6, 2020, plaintiffs Neftali Monterrosa and Nora Monterrosa—individually and

26   as co-successors in interest to decedent Monterrosa—Michelle Monterrosa, and Ashley

27   Monterrosa filed the complaint initiating this civil action.  (Doc. No. 1.)  On February 11, 2021,

28   the previously-assigned district judge granted defendants' motion to dismiss the claims brought

5

1    by plaintiffs Michelle Monterrosa and Ashley Monterrosa without leave to amend and granted

2    defendants' motion to strike a portion of plaintiffs' prayer for relief with leave to amend.  (Doc.

3    No. 33.)  On March 11, 2021, plaintiffs Neftali Monterrosa and Nora Monterrosa, individually

4    and as co-successors in interest to decedent Monterrosa, filed their second amended complaint

5    ("SAC").  (Doc. No. 34.)  In that SAC, plaintiffs assert the following five claims against one or

6    more of the defendants:  (1) a 42 U.S.C. § 1983 claim for use of excessive force in violation of

7    the Fourth Amendment against defendant Tonn; (2) a 42 U.S.C. § 1983 *Monell* claim for policy

8    and training failures brought against the defendant City; (3) a 42 U.S.C. § 1983 claim for a

9    violation of substantive due process under the Fourteenth Amendment brought against defendant

10    Tonn; (4) a claim under California Civil Code § 52.1 ("the Bane Act") brought against all

11    defendants; and (5) a wrongful death claim based on battery and negligence against all

12    defendants.  (Doc. No. 34 at ¶¶ 29–48.)  On August 25, 2022, this action was reassigned to the

13    undersigned.  (Doc. No. 55.)

14        On November 15, 2024, defendant Tonn and the defendant City filed the pending motions

15    seeking summary judgment in their favor.  (Doc. Nos. 104, 105.)  On December 6, 2024,

16    plaintiffs filed a joint response to those pending motions.  (Doc. Nos. 111, 112.)  On January 10,

17    2024, defendants filed their replies thereto.  (Doc. Nos. 117, 118.)

18        Defendants Tonn and the City both move for summary judgment in their favor as to

19    plaintiffs' Fourth Amendment claim on the basis that defendant Tonn's shooting of decedent

20    Monterrosa was reasonable as a matter of law.  (Doc. Nos. 104-1 at 11–13; 105 at 10–13.)

21    Defendant Tonn also moves for summary judgment as to plaintiffs' Fourth Amendment claim on

22    the basis that he is entitled to qualified immunity because there is no clearly established precedent

23    that the use of lethal force in this situation was unconstitutional.  (Doc. No. 104-1 at 13–14.)

24    Defendants Tonn and the City both move for summary judgment in their favor as to plaintiffs'

25    Fourteenth Amendment claim on the basis that defendant Tonn did not act with a purpose to harm

26    when he shot decedent Monterrosa, and defendant Tonn further argues that he is entitled to

27    qualified immunity as to this claim.  (Doc. Nos. 104-1 at 14–15; 105 at 13–15.)  Defendants Tonn

28    and the City also move for summary judgment as to plaintiffs' state law claims on the same

6

1    grounds as they move for summary judgment as to plaintiffs' Fourth and Fourteenth Amendment

2    claims, namely that defendant Tonn use of force was reasonable and that he did not act with a

3    purpose to harm.  (Doc. Nos. 104-1 at 15–16; 105 at 18–19.)  Finally, the defendant City moves

4    for summary judgment in its favor as to plaintiffs' *Monell* claim on the basis that plaintiffs have

5    failed to come forward on summary judgment with evidence of a custom or practice of failing to

6    train or discipline officers sufficient to raise a genuine dispute of material fact as to that municipal

7    liability claim.  (Doc. No. 105 at 15–18.)  The court addresses each of these arguments with

8    respect to plaintiffs' various claims below.

9         First, in connections with the pending motions, the parties have filed requests to seal

10   records offered as evidence.  In this regard, on December 6, 2024, plaintiffs filed a notice of

11   motion to seal two exhibits Bates stamped as COV 000050–000096 which plaintiffs sought to

12   attach to their response to defendants' motions for summary judgment.  (Doc. No. 113.)  On

13   March 28, 2025, the court denied that request to seal without prejudice to its refiling.  (Doc. No.

14   119.)  On March 31, 2025, plaintiffs filed a renewed request to seal those same documents and on

15   June 13, 2025, the court denied that motion without prejudice to its refiling by defendants.  (Doc.

16   Nos. 119, 120, 123.)  On June 26, 2025, the defendant City filed a notice of request to seal

17   documents regarding the same documents as were the subject of plaintiffs' requests to seal.  (Doc.

18   No. 124.)

19        Below, the court addresses and grants the defendant City's request to seal these two

20   exhibits, after setting forth the legal standards applicable to resolution of defendants' pending

21   motions for summary judgment.

22                              **APPLICABLE LEGAL STANDARD**

23   **A.    Summary Judgment**

24        Summary judgment is appropriate when the moving party "shows that there is no genuine

25   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

26   Civ. P. 56(a).

27        In summary judgment practice, the moving party "initially bears the burden of proving the

28   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

                                          7

1  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

2  may accomplish this by "citing to particular parts of materials in the record, including

3  depositions, documents, electronically stored information, affidavits or declarations, stipulations

4  (including those made for purposes of the motion only), admissions, interrogatory answers, or

5  other materials[,]" or by showing that such materials "do not establish the absence or presence of

6  a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

7  fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at

8  trial, "the moving party need only prove that there is an absence of evidence to support the non-

9  moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also*

10  Fed. R. Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

11  judgment should be entered against a party who fails to make a showing sufficient to establish the

12  existence of an element essential to that party's case, and on which that party will bear the burden

13  of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

14  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

15  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

16  whatever is before the district court demonstrates that the standard for the entry of summary

17  judgment . . . is satisfied."  *Id.* at 323.

18      If the moving party meets its initial responsibility, the burden then shifts to the opposing

19  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

20  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

21  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

22  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

23  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

24  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

25  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

26  summary judgment.").  The opposing party must demonstrate that the fact in contention is

27  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

28  /////

8

1  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

2  non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

3      In the endeavor to establish the existence of a factual dispute, the opposing party need not

4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6  trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

7  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

8  order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

9  omitted).

10      "In evaluating the evidence to determine whether there is a genuine issue of fact," the

11  court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v.*

12  *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

13  obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

14  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

15  Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

16  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

17  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

18  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

19  **B.    Qualified Immunity**

20      Government officials are immune "from liability for civil damages insofar as their

21  conduct does not violate clearly established statutory or constitutional rights of which a

22  reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also*

23  *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (same) (quoting *Reichle v. Howards*, 566

24  U.S. 658, 664 (2012)); *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (qualified immunity

25  "shield[s] an officer from personal liability when an officer reasonably believes that his or her

26  conduct complies with the law").  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set

27  forth a two-part inquiry for determining whether qualified immunity applies.  First, a court must

28  ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show

1    the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If so, the court

2    must ask whether the constitutional right was "clearly established." *Id.* This second inquiry must

3    be undertaken in the specific context of the case. *Id.* The Supreme Court has since removed any

4    requirement that the *Saucier* test be applied in a rigid order, holding "[t]he judges of the district

5    courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

6    which of the two prongs of the qualified immunity analysis should be addressed first in light of

7    the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

8        For a right to be "clearly established," its "contours must be sufficiently clear that a

9    reasonable official would understand that" his or her actions violated that right. *Hope v. Pelzer*,

10   536 U.S. 730, 739 (2002) (internal quotation marks omitted); *see also Wesby,* 583 U.S. at 63;

11   *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("A Government official's conduct violates clearly

12   established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are]

13   sufficiently clear' that every 'reasonable official would [have understood] that what he is doing

14   violates that right.'") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "To meet this

15   standard the very action in question need not have previously been held unlawful." *Tarabochia v.*

16   *Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (internal citation and quotation marks omitted); *see*

17   *also Hope,* 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates

18   established law even in novel factual circumstances."); *Mullenix v. Luna,* 577 U.S. 7, 12 (2015)

19   ("We do not require a case directly on point, but existing precedent must have placed the statutory

20   or constitutional question beyond debate.") (internal quotation marks omitted) (quoting *al-Kidd*,

21   563 U.S. at 741); *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019). This inquiry must

22   be undertaken in light of the specific context of the particular case, rather than as a broad general

23   proposition. *Mullenix*, 577 U.S. at 12. This is especially the case in the context of alleged Fourth

24   Amendment violations, where the constitutional standard of "reasonableness" requires a fact-

25   specific inquiry. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (*en banc*). Thus, the

26   court must determine whether "existing case law [would] have put 'every reasonable official' on

27   notice that their conduct was unconstitutional." *Martinez v. High*, 91 F.4th 1022, 1031 (9th Cir.

28   2024); *see also Mullenix*, 577 U.S. at 12 ("Put simply, qualified immunity protects 'all but the

10

1    plainly incompetent or those who knowingly violate the law.'") (quoting *Malley v. Briggs*, 475

2    U.S. 335, 341 (1986)).

3    **C.    Request to Seal**

4          As noted above, the defendant City has filed a notice of request to file under seal the same

5    exhibits as to which plaintiffs have previously unsuccessfully sought sealing.

6          All documents filed with the court are presumptively public.  *San Jose Mercury News,*

7    *Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits

8    of pretrial discovery are, in the absence of a court order to the contrary, presumptively public.").

9    "Historically, courts have recognized a 'general right to inspect and copy public records and

10    documents, including judicial records and documents.'"  *Kamakana v. City & Cnty. of Honolulu*,

11    447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589,

12    597 & n.7 (1978)).[4]

13          Two standards generally govern requests to seal documents.  *Pintos v. Pac. Creditors*

14    *Ass'n*, 605 F.3d 665, 677 (9th Cir. 2010).

15          > [J]udicial records attached to dispositive motions [are treated]
      > differently from records attached to non-dispositive motions.  Those
16      > who seek to maintain the secrecy of documents attached to
      > dispositive motions must meet the high threshold of showing that
17      > "compelling reasons" support secrecy.  A "good cause" showing
      > under Rule 26(c) will suffice to keep sealed records attached to non-
18      > dispositive motions.

19    *Kamakana*, 447 F.3d at 1180 (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122,

20    1135–36 (9th Cir. 2003)).  The reason for these two different standards is that "[n]ondispositive

21    motions are often unrelated, or only tangentially related, to the underlying cause of action, and, as

22    a result, the public's interest in accessing dispositive materials does not apply with equal force to

23    non-dispositive materials."  *Pintos*, 605 F.3d at 678 (internal quotation marks omitted).

24          Under the "compelling reasons" standard applicable to dispositive motions, such as a

25    motion for summary judgment:

26    ───────────────

27    [4]  Pursuant to Federal Rule of Civil Procedure 5.2(d), a court "may order that a filing be made
      under seal without redaction."  However, even if a court permits such a filing, it may "later unseal
      the filing or order the person who made the filing to file a redacted version for the public record."
28    Fed. R. Civ. P. 5.2(d).

1

2

3

4

> [T]he court must conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture.

5    *Id.* at 1178–79 (internal quotation marks and citations omitted). The party seeking to seal a

6    judicial record bears the burden of meeting the "compelling reasons" standard. *Id.* at 1178.

7         While the terms "dispositive" and "non-dispositive" motions are often used in this

8    context, the Ninth Circuit has clarified that the "compelling reasons" standard applies whenever

9    the motion at issue "is more than tangentially related to the merits of a case." *Ctr. for Auto Safety*

10   *v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016).

11        "In general, 'compelling reasons' sufficient to . . . justify sealing court records exist when

12   such 'court files might . . . become a vehicle for improper purposes,' such as the use of records to

13   gratify private spite, promote public scandal, circulate libelous statements, or release trade

14   secrets." *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 598). "The mere fact that the

15   production of records may lead to a litigant's embarrassment, incrimination, or exposure to

16   further litigation will not, without more, compel the court to seal its records." *Id.* Finally, "[t]he

17   'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were

18   previously filed under seal or protective order." *Id.* at 1178–79.

19                              **DISCUSSION**

20   **A.    Request to Seal**

21        The request to seal at issue was filed in relation to exhibits attached to an opposition to a

22   motion for summary judgment and therefore is governed by the "compelling reasons" standard.

23   *Kamakana*, 447 F.3d at 1179 (holding that motions for summary judgment and attachments

24   thereto are dispositive motions). The defendant City contends that the documents which they

25   now seek to have filed under seal pertain to personnel investigations of Vallejo Police

26   Department officers. (Doc. No. 124 at 1–2.) It argues that there are compelling reasons to seal

27   those documents because it will protect the privacy interests of the subject officers, complainants,

28   and witnesses, while ensuring the integrity of those personnel investigations in the future. (*Id.* at

12

2.)  As will be evident, the court does not rely on these materials in resolving the pending motions

for summary judgment.  Therefore, the public interest in access to those materials is minimal.

*Lesnik v. Eisenmann SE*, No. 16-cv-01120-LHK, 2021 WL 2093062, at *2 (N.D. Cal. Feb. 12,

2021) (finding the public interest in access to materials to be minimal where those materials were

not relied upon by the court).  Accordingly, the court will grant defendant's request to seal.  *See*

*King v. Nat'l Gen. Ins. Co.*, No. 15-cv-00313-DMR, 2024 WL 4455527, at *2 (N.D. Cal. Oct. 8,

2024) (granting requests to seal where the court did not rely on the information the parties sought

to seal); *J.P. ex rel. Villanueva v. County of Alameda*, No. 4:17-cv-05679-YGR, 2021 WL

5415268, at *7 n.13 (N.D. Cal. Nov. 19, 2021) (same).

**B.**    **Plaintiffs' Federal Claims**

Defendants move for summary judgment as to plaintiffs' federal claims brought against

defendant Tonn under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth

Amendment, as well as for violating the Due Process Clause of the Fourteenth Amendment.

(Doc. Nos. 104, 105.)  In addition, the defendant City moves for summary judgment in its favor

as to plaintiffs' § 1983 *Monell* claim brought against it for failure to adequately train its police

officers.  (Doc. No. 105.)

Under § 1983, a private right of action exists against anyone who, "under color of" state

law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "Section 1983 does not create

substantive rights; it merely serves as the procedural device for enforcing substantive provisions

of the Constitution and federal statutes."  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991)

(citing *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979)).

As noted above, state officials are entitled to qualified immunity from a § 1983 suit unless

"(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their

conduct was 'clearly established at the time.'"  *Wesby*, 583 U.S. at 62–63 (quoting *Reichel*, 566

U.S. at 664).  Here, all defendants move for summary judgment in their favor on the grounds that

defendant Tonn acted reasonably and therefore did not violate decedent Monterrosa's

constitutional rights.  Because the first prong of defendant Tonn's qualified immunity argument

1    presents this same issue, the court considers first whether defendants have demonstrated that there

2    is no genuine dispute of material fact regarding the reasonableness of defendant Tonn's use of

3    force before considering whether the unlawfulness, if any, of his actions was clearly established.

4              1.    Fourth Amendment Excessive Use of Force (Claim One)

5                    a.    *Whether a Constitutional Right Was Violated*

6              Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

7    houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

8    no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

9    Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

10   which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see*

11   *also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

12   Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

13   or show of authority, in some way restrains the liberty of a citizen.").

14             Plaintiffs' § 1983 claim for the excessive use of force in violation of the Fourth

15   Amendment is governed by an "objective reasonableness standard."  *Graham v. Connor*, 490

16   U.S. 386, 388 (1989) (internal quotation marks omitted).  This standard requires a "careful

17   balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

18   interests against the countervailing governmental interests at stake."  *Id.* at 396 (quoting

19   *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  The calculus "must embody allowance for the fact

20   that police officers are often forced to make split-second judgments—in circumstances that are

21   tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

22   situation."  *Id.* at 396–97.  Reasonableness in this context is to be judged "from the perspective of

23   a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.

24             "[T]he reasonableness of force used is ordinarily a question of fact for the jury."  *Liston v.*

25   *County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997), *as amended* (Oct. 9, 1997).  Indeed,

26   the Ninth Circuit has repeatedly recognized that "summary judgment should be granted sparingly

27   in excessive force cases."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014); *see*

28   *also Seidner v. de Vries,* 39 F.4th 591, 601 (9th Cir. 2022); *Est. of Lopez ex rel. Lopez v. Gelhaus,*

                                                        14

871 F.3d 998, 1006 (9th Cir. 2017); *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016); *Green v. City of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014); *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Thus, while it is true that officers "are often forced to make split-second judgments," "it is equally true that even where some force is justified, the amount actually used may be excessive."  *Santos*, 287 F.3d at 853 (citations omitted).  In the final analysis, "[f]orce is excessive when it is greater than is reasonable under the circumstances."  *Id.* at 854 (citing *Graham*, 490 U.S. at 395).

Here, on one side of the *Graham* balancing scale, the "nature and quality of the intrusion" was the most intrusive possible:  Defendant Tonn used deadly force by shooting the decedent with his rifle.  *Garner*, 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched."); *see also Seidner*, 39 F.4th at 596 (finding that shooting a firearm is by definition deadly force).

On the other side of the *Graham* scale is the countervailing governmental interests at stake.  In *Graham*, the Supreme Court listed several factors to be considered in determining the government's interest in the force used:  (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  "In deadly force cases[] where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 538 (9th Cir. 2010) (internal quotation marks and alteration omitted) (quoting *Garner*, 471 U.S. at 11–12).  Accordingly, the threat element is the most important consideration, and "[a]n officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Gonzalez*, 747 F.3d

at 793 (internal quotation marks omitted).  For purposes of the pending summary judgment motions, defendants must show based upon the evidence presented that a reasonable jury would necessarily find that defendant Tonn "perceived an immediate threat of death or serious physical injury at the time he shot [the decedent] in the head."  *Id.* at 794.

Defendants argue that defendant Tonn reasonably perceived that the decedent was armed with a gun in his waistband and that the decedent had made a furtive movement which defendant Tonn interpreted as him reaching for a gun.  (Doc. Nos. 104-1 at 10–12; 105 at 11–12.)  Specifically, defendants contend that although decedent Monterrosa had a hammer in his front pocket with a protruding wooden handle, defendant Tonn reasonably perceived the hammer to be a gun while looking through the windshield of the police truck in which he was seated in the back seat.  (Doc. Nos. 104-1 at 11; 105 at 11–12.)  Defendants further contend that decedent Monterrosa had turned towards the police truck and reached his hand towards his waist, which defendant Tonn reasonably interpreted as the decedent reaching for a gun.  (Doc. Nos. 104-1 at 11–12; 105 at 12.)  Plaintiffs do not dispute for purposes of the pending motions whether defendant Tonn was reasonable in perceiving the hammer as a gun handle.  However, plaintiffs argue that there is a dispute of fact between the parties as to whether the decedent made any furtive movement.  (Doc. No. 111 at 16–17, 32–33 (plaintiffs denying that decedent Monterrosa spun in the direction of the officers); 33–34 (plaintiffs denying that decedent Monterrosa made a grabbing motion towards his waist).)  Plaintiffs argue that from the evidence presented on summary judgment a reasonable jury could conclude that decedent Monterrosa was turned away from the officers and fleeing when he was shot in the back of the head.  (*Id.* at 17.)

With respect to defendant's argument that the evidence establishes the decedent turned toward officers and was reaching toward his waist, "[a]n immediate threat might be indicated by a furtive movement, harrowing gesture, or serious verbal threat."  *Calonge v. City of San Jose*, 104 F.4th 39, 46 (9th Cir. 2024) (internal quotation marks and citation omitted).  "It would be unquestionably reasonable for police to shoot a suspect . . . if he reaches for a gun in his waistband, or even if he reaches there for some other reason.  . . .  Conversely, if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be

1    unreasonable for the officers to shoot him[.]" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th

2    Cir. 2014) (emphasis in original).  Accordingly, if defendants established on summary judgment

3    that there was no genuine dispute of material fact that decedent reached for his waistband, then

4    the court would be compelled to conclude that defendant Tonn's actions were objectively

5    reasonable as a matter of law.

6          In support of their contention that decedent Monterrosa reached to his waistband,

7    defendants cite the deposition testimony of the officers and paramedics on scene.  (Doc. Nos.

8    104-2 at 5; 105-4 at 4.)  The court observes that the testimony relied upon by defendants is not

9    fully consistent as to the direction that decedent Monterrosa was facing and where his hands were

10   positioned when he was shot.  Detective Tonn testified at deposition that decedent Monterrosa

11   "turned and spun back around towards his truck, . . . and then he moved his hands down and

12   grabbed the object as he was facing us in kind of a half-crouching/kneeling position."  (Doc. No.

13   105-1 at 40.)  However, detective Pittman did not describe a grabbing motion by decedent in his

14   deposition testimony, but rather testified that decedent Monterrosa had what appeared to be a

15   firearm already in his hand when he faced the officers.  (*Id.* at 49.)  Paramedics White and Hill,

16   who observed the incident with the assistance of a camera mounted on an overhead drone, both

17   testified that decedent Monterrosa's hands were either above him or at his midsection throughout

18   the encounter with police.  (*Id.* at 78, 81–82, 88.)  The testimony offered by defendants in this

19   regard is, at best, unclear about the position decedent Monterrosa was in when defendant Tonn

20   shot him as is the evidence of the position of decedent's hands.  Viewing this evidence most

21   favorably for plaintiffs, defendants have failed to carry their burden of showing that there is no

22   genuine dispute of fact regarding whether decedent Monterrosa was reaching for his waistband

23   when he was shot, since various witnesses have described his hands as being in different positions

24   including possibly over his head.  *See S.T. ex rel. Niblett v. City of Ceres*, 327 F. Supp. 3d 1261,

25   1277 n.16 (E.D. Cal. 2018) (finding that, where the officers' testimony regarding how the

26   decedent was angled when they shot at him conflicted with the physical evidence of where the

27   decedent was shot, summary judgment was not appropriate because a jury would have to

28   determine the credibility of the officers' testimony); *see also Calonge*, 104 F.4th at 44 (finding

1  that the court must assume that the decedent did not make a threatening gesture where two

2  officers testify that they observed the decedent move his elbow before being shot but two other

3  officers also observed him and stated that they did not see that motion); *George v. Morris*, 736

4  F.3d 829, 833–34 (9th Cir. 2013) (denying summary judgment where the officers' testimony did

5  not agree as to what the decedent had been doing prior to his being shot by officers and noting

6  that a decedent's version of events may be "constructed circumstantially from competent expert

7  and physical evidence, as well as inconsistencies in the testimony law enforcement.").

8         Moreover, plaintiffs contend that the officers' deposition testimony offered by defendants

9  on summary judgment is inconsistent with the scientific evidence before the court on summary

10  judgment.  In this regard, plaintiffs cite to Mr. Neale's rebuttal expert report, in which he opines,

11  based on his examination of the officers' body-worn camera footage, a three-dimensional

12  reconstruction of the site of the shooting, and the observed initial and final positions of decedent

13  Monterrosa in that footage, that the decedent was running away from the officers when he was

14  shot.  (Doc. No. 111-12 at 5–8.)  Plaintiffs also cite to Mr. Noedel's expert report in which he

15  analyzed the trajectories of the bullets fired at decedent and concluded that when the decedent

16  was shot his head was facing 180 degrees away from defendant Tonn.  (Doc. No. 111-21 at 7.)

17  Plaintiffs also have presented Dr. Young's report, in which he opines that "Detective Tonn's

18  perception of the movements and timing of Mr. Monterrosa were inaccurate" because the

19  decedent's reaction times would indicate that he had already begun running away when defendant

20  Tonn shot him in the back of the head.  (Doc. No. 111-14 at 28.)  A reasonable jury could credit

21  these expert opinions and question the reliability of the officers' testimony that decedent

22  Monterrosa was facing the officers and reaching towards his waistband at the time he was shot.

23  *See Gelhaus*, 871 F.3d at 1008–09 (concluding that a reasonable jury could find that the decedent

24  had not pointed a gun at the defendant officers based, in part, on the plaintiffs' experts' three-

25  dimensional models of the decedent's posture); *Banks v. Mortimer*, 620 F. Supp. 3d 902, 927

26  (N.D. Cal. 2022) (finding that a reasonable jury could reject the contention that the decedent was

27  pointing a weapon at the defendant officer based on the physical evidence and the expert

28  conclusions of a "ballistics and biomechanical reconstruction expert" that the officer's testimony

1    was inconsistent with that evidence); *Vargas v. County of Los Angeles*, No. 19-cv-03279-PSG-

2    AS, 2021 WL 248668, at *8–9 (C.D. Cal. Jan. 5, 2021) (finding that a jury could conclude based,

3    in part, upon the plaintiff's expert reconstruction of the shooting that the decedent had not drawn

4    a weapon and aimed it at the defendant officers).

5            Defendant Tonn argues that Mr. Neale's expert opinion cannot create a triable issue of

6    fact because it relies on an assumption that decedent Monterrosa traveled 10 feet, and because no

7    evidence before the court on summary judgment supports such an assumption.[5]  (Doc. No. 117 at

8    3–4.)  The court finds this argument unavailing.  A review of Mr. Neale's expert report reflects

9    that his conclusion regarding how far decedent Monterrosa ran was based on his reconstruction of

10   the shooting.  (Doc. No. 111-10 at 21.)  Mr. Neale describes in great detail in his report the

11   materials that he reviewed, including the officers' body-worn camera footage, aerial footage of

12   the Walgreen's, and an in-person three-dimensional laser scanning of the area, to create this

13   reconstruction.  (*Id.* at 5–8.)  It is clear then that there is an evidentiary basis for Mr. Neale's

14   opinion in this regard.  (*Id.*); *see also Hyer v. City and County of Honolulu*, 118 F.4th 1044,

15   1056–57 (9th Cir. 2024) (holding that the district court erred when excluding an expert opinion

16   where the expert described in his expert report the data upon which he was basing his opinion);

17   *Sheeler v. Eldridge*, No. 4:22-cv-00313-AKB, 2024 WL 2959193, at *6 (D. Idaho June 12, 2024)

18   (declining to exclude an expert's opinion where the expert relied on assumptions on the distances

19   between the various officers and the plaintiff at the time of the shooting because "disagreement

20   with an expert's assumptions does not provide a basis for excluding his testimony.").

21           The defendant City's argument that plaintiffs' expert reports "do not preclude" decedent

22   Monterrosa turning to the detectives and moving his hand towards his waistband is similarly

23   unpersuasive.  (Doc. No. 118 at 2–5.)  Plaintiffs are not required to come forward with evidence

24

---

25   [5]  Defendant Tonn raised this argument for the first time in his reply and accordingly the court
     need not consider it.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court
26   need not consider arguments raised for the first time in a reply brief.")  Moreover, "[t]he correct
     way to raise challenges to the substance of an expert's opinion or qualifications is through fully-
27   briefed *Daubert* motions—not in a footnote or a reply brief."  *Banks*, 620 F. Supp. 3d at 927 n.7.
     Nevertheless, the court has considered defendant Tonn's argument in this regard and concludes it
28   is without merit.

1   "precluding" defendants' version of events in order to survive a motion for summary judgment.

2   Instead, it is enough that a reasonable jury could conclude based on the evidence presented,

3   including the experts' opinion, that the decedent was fleeing when he was shot and that the

4   experts' testimony calls into question the credibility of the officers' testimony.  (*See, e.g.,* Doc.

5   No. 111-14 at 28–29) (Dr. Young opining, based on biological constraints on reaction times, that

6   defendant Tonn's perceptions were inaccurate and that the decedent "was either turning or

7   moving away from the CRT vehicle" when he was shot).  As the Ninth Circuit has observed

8   under similar circumstances: "Here, because the record contains reasons to doubt whether [the

9   officer] actually saw [the decedent] reach for his waistband, the decision similarly should be left

10  to the jury."  *Est. of Elkins v. Pelayo*, 737 F. App'x 830, 833 (9th Cir. 2018) ("Excessive force

11  cases involving officer shootings, especially when an *unarmed suspect has been fatally shot in the*

12  *back by police*, are often fact-specific and generally inappropriate for resolution by summary

13  judgment.") (emphasis added);[6] *see also Gomez v. Fachko*, No. 19-cv-05266-LHK, 2021 WL

14  1721067, at *10–11 (N.D. Cal. Apr. 30, 2021) (denying summary judgment where the plaintiff

15  had presented video footage, police photographs, and an expert reconstruction of the shooting to

16  support his contention that the defendant officer shot the plaintiff while the plaintiff posed no

17  immediate threat to the officer or others); *Banks*, 620 F. Supp. 3d at 927 (finding that a reasonable

18  jury could conclude on the basis of expert evidence that the decedent had been actively fleeing

19  from the defendant officer when he was shot and therefore summary judgment was not

20  appropriate).

21          Accordingly, the court concludes that whether decedent Monterrosa was facing the

22  officers and reaching for his waistband before he was shot and killed, or whether he was instead

23  running away from officers, is a disputed material fact.  Therefore, the court cannot determine as

24  a matter of law, based on the evidence before it on summary judgment, that defendant Tonn's use

25  of force was reasonable.  *Cruz*, 765 F.3d at 1079 ("To decide this case a jury would have to

26  /////

27  

28  ───────────────
    [6] Citation to the unpublished Ninth Circuit opinions cited throughout this order is appropriate
    pursuant to Ninth Circuit Rule 36-3(b).

1    answer just one simple question:  Did the police see Cruz reach for his waistband?  If they did,

2    they were entitled to shoot; if they didn't, they weren't.").

3                    b.    *Clearly Established*

4           Even if a reasonable jury could find that the defendant officer violated the decedent's

5    Fourth Amendment right against the use of excessive force, the officer would be entitled to

6    judgment in his favor on qualified immunity grounds if the constitutional right was not clearly

7    established at the time of the encounter.  *See C.V. ex rel. Villegas*, 823 F.3d at 1257.  As stated

8    above, "[a] Government official's conduct violates clearly established law when, at the time of

9    the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

10   official would [have understood] that what he is doing violates that right.'"  *Ashcroft*, 563 U.S. at

11   741 (alterations in original) (quoting *Anderson*, 483 U.S. at 640); *see also Wesby*, 583 U.S. at 63–

12   64.  "We do not require a case directly on point, but existing precedent must have placed the

13   statutory or constitutional question beyond debate."  *Ashcroft,* 563 U.S. at 741; *see also Jessop*,

14   936 F.3d at 940.

15          It is not appropriate for courts to define clearly established law at a high level of

16   generality; instead, the inquiry "must be undertaken in light of the specific context of the case, not

17   as a broad general proposition."  *Mullenix*, 577 U.S. at 12(citation omitted); *see also Wesby*, 583

18   U.S. at 64.  "Such specificity is especially important in the Fourth Amendment context, where . . .

19   [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here

20   excessive force, will apply to the factual situation the officer confronts."  *Mullenix*, 577 U.S. at 12

21   (internal quotation marks and citation omitted); *see also Peck*, 51 F.4th at 891.

22          In this case, plaintiffs have pointed to evidence that raises a disputed issue of material fact

23   regarding whether decedent reached for his waistband just before he was shot by officer Tonn.

24   As indicated above, viewing the evidence before the court on summary judgment in the light most

25   favorable to plaintiff, a reasonable jury could find that decedent did not reach for his waistband.

26   If a jury were to so find, defendant Tonn's deployment of deadly force was clearly in violation of

27   established law.  The Ninth Circuit has repeatedly held that officers cannot use deadly force

28   against a suspect who does not threaten them with a weapon, even when they are actively fleeing.

21

1     *Calonge*, 104 F.4th at 46 (holding that officers were not entitled to summary judgment on

2     qualified immunity grounds where it was disputed whether the decedent had reached for his

3     waistband before being shot and noting that "[e]very precedent" the court cited in its analysis

4     "was decided well before October 31, 2019"); *see also Curnow ex rel. Curnow v. Ridgecrest*

5     *Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding that officers could not use deadly force to

6     shoot a fleeing armed suspect who was not pointing a gun at the officers and was not facing

7     them); *Est. of Elkins*, 737 F. App'x at 833 (reversing the grant of summary judgment where a

8     reasonable jury could conclude based upon the evidence before the court that a fleeing armed

9     suspect "was not reaching for his waistband or that, even if he was, the use of deadly force in this

10    case was excessive.").

11         Defendant Tonn contends that the Ninth Circuit has held that the use of deadly force is

12    appropriate whenever an officer reasonably perceives an immediate threat.  (Doc. No. 104-1 at

13    13–14.)  He relies upon the Ninth Circuit's decision in *George v. Morris* in support of this

14    proposition.  However, in that case, the court acknowledged that "[i]f the person is armed—or

15    reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal

16    threat might create an immediate threat" but ultimately concluded based upon the evidence

17    submitted on summary judgment that "we can neither credit the deputies' testimony that Donald

18    turned and pointed his gun at them, nor assume that he took other actions that would have been

19    objectively threatening."  *George*, 736 F.3d at 838.  Indeed, the court found that its holding in this

20    regard "should be unsurprising" because "[i]f the deputies shot the [armed] decedent without

21    objective provocation . . ., with his gun trained on the ground, then a reasonable jury could

22    determine that they violated the Fourth Amendment."  *George*, 736 F.3d at 839 (affirming the

23    district court's denial of summary judgment on qualified immunity grounds where it was disputed

24    whether the decedent had pointed a gun at the officers).

25         Defendant Tonn's motion for summary judgment on qualified immunity grounds as to

26    plaintiffs' excessive use of force claim ultimately turns on whether the decedent reached for his

27    waistband and posed what could reasonably be viewed as a threat to the officers.  As explained

28    above, the factual issues surrounding that question are disputed.  Accordingly, defendants are not

1    entitled to summary judgment on qualified immunity grounds as to plaintiffs' excessive use of

2    force claim. *Gelhaus*, 871 F.3d at 1021 ("Because Gelhaus's entitlement to qualified immunity

3    ultimately depends on disputed factual issues, summary judgment is not presently appropriate.").

4    Defendants' motions for summary judgment as to plaintiff's Fourth Amendment excessive use of

5    force claim will be denied.

6          2.       Fourteenth Amendment Substantive Due Process (Claim Three)

7          Defendants next move for summary judgment in their favor as to plaintiffs' claim that

8    defendant Tonn violated their substantive due process rights under the Fourteenth Amendment.

9    (Doc. Nos. 104-1 at 14–15; 105 at 13–15.)  In their SAC, plaintiffs assert that defendant Tonn

10   "deprived Plaintiffs of their right to a familial relationship with Decedent" and that he "acted with

11   an intent to harm."  (Doc. No. 34 at ¶ 41.)

12         A higher standard of proof applies to plaintiff's claim brought under the Fourteenth

13   Amendment than that which governs their Fourth Amendment claim. *Ochoa v. City of Mesa*, 26

14   F.4th 1050, 1057 (9th Cir. 2022) ("[I]t may be possible for an officer's conduct to be objectively

15   unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard

16   that governs substantive due process claims [under the Fourteenth Amendment].").  The Ninth

17   Circuit recognizes that a parent has constitutionally protected liberty interest in the

18   companionship and society of their child under the Due Process Clause of the Fourteenth

19   Amendment. *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008).  Substantive due process is

20   violated when government conduct "can properly be characterized as arbitrary, or conscience

21   shocking." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).  Here, the parties agree

22   that whether defendant Tonn's actions shock the conscience should be evaluated under the

23   "purpose to harm" standard that is to be employed when an officer does not have an opportunity

24   for actual deliberation.  (Doc. Nos. 104-1 at 14–15; 105-1 at 13–15; 111 at 19); *see also Porter*,

25   546 F.3d at 1137 (stating that the "purpose to harm" standard is employed when actual

26   deliberation is not practical).

27         "[W]here a law enforcement officer makes a snap judgment because of an escalating

28   situation, his conduct may only be found to shock the conscience if he acts with a purpose to

                                        23

1    harm unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546,

2    554 (9th Cir. 2010).  One such example is "where an officer uses force to bully a suspect or get

3    even." *Id.* (internal quotation marks omitted).  "The purpose to harm standard is a subjective

4    standard of culpability." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).

5    "[A]lthough most meritorious purpose to harm claims will involve evidence of ulterior motive or

6    bad intent separate and apart from evidence of an unreasonable use of force, we decline to hold

7    that such evidence is required as a matter of law.  In some cases, a use of force might be so

8    grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm."

9    *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019).

10          Defendants argue that there is no evidence before the court on summary judgment that

11    defendant Tonn used deadly force for a purpose unrelated to a legitimate law enforcement

12    objective.  (Doc. Nos. 104-1 at 14–15; 105 at 14–15.)  Plaintiffs respond that whether defendant

13    Tonn had a purpose to harm is a question that should be left to the jury because the evidence

14    shows, in the light most favorable to plaintiffs, that decedent Monterrosa was fleeing and had his

15    back turned to defendant Tonn when he was shot.  (Doc. No. 111 at 18–19.)

16          Here, the evidence before the court establishes that defendant Tonn fired his rifle from the

17    back seat of an unmarked police car hitting decedent in the back of the head.  A review of Officer

18    Wagoner's body-worn camera footage shows that defendant Tonn fired a mere eight seconds after

19    the unmarked police car in which he was a passenger entered the Walgreen's parking lot,

20    approximately four seconds after the police car's lights were activated, and approximately one

21    second after the police car came to a stop.  As found above, a reasonable jury could conclude

22    from the evidence that when defendant Tonn fired, the unarmed decedent was running away from

23    the unmarked police car and did not make any furtive movement.  The Ninth Circuit has

24    previously concluded that a reasonable jury could find that an officer's use of deadly force against

25    a fleeing suspect did not further a legitimate law enforcement objective.  *Est. of Elkins*, 737 F.

26    App'x at 833.  District courts in this circuit have similarly found that evidence of an officer

27    shooting a fleeing suspect who did not pose an immediate threat to them is sufficient to create an

28    inference that the officer acted with a purpose to harm.  *See S.T. ex rel. Niblett*, 327 F. Supp. 3d at

24

1   1281 ("Taking the facts in the light most favorable to Plaintiff, a reasonably [sic] jury could find

2   that there was no legitimate law enforcement purpose for shooting Thompson who was fleeing

3   from the officers—an individual the officers encountered mere seconds before and who was not

4   armed."); *see also Nash-Perry v. City of Bakersfield*, No. 1:18-cv-01512-JLT, 2021 WL 3883681,

5   at *19 (E.D. Cal. Aug. 31, 2021) (denying summary judgment as to the plaintiffs' Fourteenth

6   Amendment claim because it was disputed whether the decedent was turning away from or

7   pointing a weapon at the defendant officers when he was shot); *Brown v. Grinder*, No. 2:13-cv-

8   01007-KJM-KJN, 2019 WL 280296, at *14 (E.D. Cal. Jan. 22, 2019) (denying summary

9   judgment because a reasonable jury could find that the defendant officers had acted with a

10  purpose to harm by shooting an unarmed, fleeing suspect); *F.C. ex rel. Rios v. County of Los

11  Angeles*, No. 10-cv-00169-CAS-RZ, 2010 WL 5157339, at *6 (C.D. Cal. Dec 13, 2010) (denying

12  summary judgment because a reasonable jury could find that the defendant officers had acted

13  with a purpose to harm by shooting the decedent in the back when he had turned to run and had

14  not reached for a weapon).  Similarly here, there are disputed issues of material fact regarding

15  whether the decedent was fleeing or had reached towards his waistband.

16          Accordingly, defendants' motions for summary judgment in their favor on plaintiffs'

17  Fourteenth Amendment claim will also be denied.[7]

18          3.    *Monell* Liability (Claim Two)

19          The defendant City moves for summary judgment in its favor as to plaintiffs' 42 U.S.C.

20  § 1983 claim brought pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

21  (Doc. No. 34 at 10.)  In their operative second amended complaint, plaintiffs predicate their

22

23  [7]  Defendant Tonn separately argues, without citation to authority, that he is entitled to qualified
    immunity on plaintiff's Fourteenth Amendment claim because it is not clearly established that his
24  actions would constitute a violation of the Fourteenth Amendment.  (Doc. No. 104-1 at 15.)  The
    court finds this argument unpersuasive.  The Ninth Circuit has consistently held that it is clearly
25  established that shooting a person with a purpose to harm unrelated to a legitimate law
    enforcement objective violates due process.  *Porter*, 546 F.3d at 1140; *see also A.D.*, 712 F.3d at
26  455 ("After [*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)] and [*Moreland v. Las Vegas
    Metropolitan Police Department*, 159 F.3d 365 (9th Cir. 1998)], no reasonable officer could fairly
27  have believed that it was constitutional to shoot a civilian with the subjective purpose to harm
    unrelated to a legitimate objective.").
28

1    *Monell* claim against the defendant City on a theory that the defendant City did not properly train

2    VPD officers and "maintained deficient customs in the use of force." (Doc. No. 34 at 10; see also

3    Doc. Nos. 105 at 15–18; 111 at 19–21.) Plaintiffs assert that the deficient customs adopted by

4    the defendant City include: permitting officers with a demonstrated pattern of employing

5    excessive force, including defendant Tonn, to continue to do so without remediation, retraining,

6    or discipline; failing to require the use of less lethal weapons against subjects who do not impose

7    an imminent threat of serious harm; failing to require the use of de-escalation techniques;

8    destruction of evidence for purposes of covering up the misconduct of VDP officers; and the

9    condoning, encouraging, and tacit authorization of a pattern and practice of misconduct and

10    engaging in the violation of the civil rights of individuals. (Doc. No. 34 at 10–11.)

11          The defendant City first objects to the court considering any evidence presented in support

12    of plaintiffs' *Monell* claim on summary judgment on the grounds that the evidence was not

13    properly disclosed during the discovery phase of the litigation in violation of Federal Rule of

14    Civil Procedure 26. (Doc. No. 118 at 5–6.) The defendant City alternatively argues that, even if

15    that evidence is considered, plaintiffs have failed to come forward with any evidence that would

16    support a finding of a City policy which encouraged the use of excessive force. (Doc. No. 118 at

17    5–9.) In opposition, plaintiffs argue that there is evidence that the defendant City failed to create

18    a formalized use of force review system, became aware of police officers celebrating police

19    shootings by "bending badges" in 2016 and failed to investigate and discipline officers for

20    engaging in that practice, and failed to adequately train defendant Tonn in particular after his

21    previous uses of deadly force.[8] (Doc. No. 111 at 19–21.)

22                    a.    *Federal Rule of Civil Procedure 26 Objection*

23          The court will first address the defendant City's evidentiary objection. The City argues

24    that plaintiffs did not disclose the evidence they would rely upon in support of their *Monell* claim

25    in their initial disclosures and that the court should therefore not consider that evidence. (Doc.

26    _____

27    [8] Plaintiffs also cite to an expert report purportedly prepared by a police practices expert, Mr. Fernandez. (*See* Doc. No. 111 at 53–54.) However, plaintiffs did not attach this expert report to their opposition to the defendant City's motion for summary judgment. Because no such report is before the court, it obviously has not been considered.

28

26

1   No. 118 at 5–6.)  In their opposition, plaintiffs contend that they served amended disclosures

2   which identified the pertinent witnesses and that the documents which supported their claims

3   "were in the custody and control of the City of Vallejo."  (Doc. No. 111 at 46–47.)  Plaintiffs also

4   attached their amended initial disclosures to their opposition.  (Doc. No. 111-20.)  Reviewing the

5   amended disclosures reveals that plaintiffs provided a list of witnesses who would testify

6   regarding the underlying shooting, "policies, discipline, training, and supervision of VPD," and

7   "badge bending and CIRB investigations."  (*Id.* at 2–4.)  In reply as to this issue, the defendant

8   City states only that the amended disclosures were served after the close of fact discovery and

9   "did not identify additional facts or documents supporting Plaintiffs' *Monell* cause of action."

10  (Doc. No. 118 at 6.)

11          Federal Rule of Civil Procedure 26(e) requires a party to supplement its disclosure "if the

12  party learns that in some material respect the disclosure or response is incomplete or incorrect,

13  *and* if the additional or corrective information has not otherwise been made known to the other

14  parties during the discovery process[.]"  Fed. R. Civ. P. 26(e).  The defendant City does not claim

15  that it was unaware of the evidence in support of their *Monell* claim which plaintiffs have

16  presented in their opposition to the defendant City's motion for summary judgment.  Much of that

17  evidence is deposition testimony taken during the discovery phase of this litigation.  The

18  defendant City was clearly aware of that evidence.  *Gonzales v. City of Lake Havasu City*, No. 17-

19  cv-08205-PCT-GMS, 2019 WL 6726295, at *3 (D. Ariz. Dec. 11, 2019) (finding that Rule 26(e)

20  did not require supplemental disclosures of new information revealed in a deposition); *see also*

21  *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 501 F. Supp. 3d 886, 896

22  (E.D. Cal. 2020) (finding that the objecting party was aware of "additional facts" that the

23  defendant sought to rely upon because those facts stemmed from depositions that counsel for the

24  objecting party participated in); *see also Sessions v. Hunt*, No. 3:23-cv-01108-SI, 2024 WL

25  3540579, at *2 (D. Or. July 24, 2024) ("Even assuming this document was not otherwise made

26  known to Plaintiff in supplemental initial disclosures or discovery responses, it was specifically

27  discussed during Plaintiff's deposition testimony and thus no evidentiary sanction is warranted.").

28  /////

1    Because the evidence the defendant City objects to was disclosed during discovery in this

2    case, the court overrules its objection in this regard.[9]

3                    b.    *Monell Liability—Deliberate Indifference: Failure to Train And*

4                          *Supervise*[10]

5          "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in

6    other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."

7    *Crowe v. County of San Diego*, 608 F.3d 406, 445 (9th Cir. 2010) (quoting *Monell*, 436 U.S. at

8    691); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  To prevail on their

9    *Monell* claim against the city, plaintiffs "must demonstrate that an 'official policy, custom, or

10   pattern' on the part of [the city] was 'the actionable cause of the claimed injury.'"  *Tsao v. Desert*

11   *Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533

12   F.3d 1010, 1022 (9th Cir. 2008)); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247

13   (9th Cir. 2016) (stating that to establish municipal liability under § 1983, a plaintiff must show a

14   direct causal link between the municipal policy or custom and the alleged constitutional

15   violation).

16         "The Ninth Circuit recognizes four theories that establish municipal liability under

17   *Monell*:  (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise,

18   or discipline; or (4) a decision or act by a final policymaker."[11]  *Porter v. County of Solano*,

19   _____

20   [9]  To the extent that the defendant City contends that plaintiffs were required to disclose the facts,

21   witnesses, and documents that they would rely upon in support of their *Monell* claim with
     additional precision, the objection is unsupported by citation to authority and not well-taken.

22   Moreover, plaintiffs had sought for production of documents from the defendant City related to
     the "practice of badge bending by union members" and had stated in two separate unopposed

23   motions to compel—which were granted by the assigned magistrate judge—that such evidence
     was relevant to their *Monell* claim.  (Doc. Nos. 59 at 5; 63; 68 at 5; 72.)

24

25   [10]  "The same standards that apply to Plaintiff's failure to train claim apply to Plaintiff's failure to
     supervise or discipline claims.  For these reasons, the court analyzes these claims together."

26   *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 936, n.4 (S.D. Cal. 2022).

27   [11]  "Cases often refer to the fourth theory as 'ratification' by a final policymaker."  *Thurston v.*
     *City of Vallejo*, No. 2:19-cv-01902-KJM-CKD, 2021 WL 1839717, at *3 (E.D. Cal. May 7,

28   2021).

No. 2:21-cv-01473-KJM-JDP, 2025 WL 621545, at *28 (E.D. Cal. Feb. 26, 2025) (internal quotation marks omitted) (quoting *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019)). "To establish municipal liability under *Monell*, [plaintiffs] must prove that (1) [they] were deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [their] constitutional right[s]; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

To prevail on a *Monell* claim premised on a failure to train, a plaintiff must establish "(1) [] a constitutional violation; (2) [] a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021). "As the Supreme Court held in *Connick v. Thompson*, '[a] pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train.'" *Godfrey v. Trujillo*, No. 25-cv-03462-AMO, 2025 WL 2391445, at *10 (N.D. Cal. Aug. 18, 2025) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see also Laurel v. County of Alameda*, No. 24-cv-04427-RFL, 2025 WL 2402674, at *6 (N.D. Cal. Aug. 19, 2025) (finding that the plaintiffs had alleged a failure to train partially on the basis of a pattern of similar incidents).[12]

The Ninth Circuit has expanded upon how a § 1983 plaintiff may establish a failure to train theory of entity liability as follows:

> [A] local government can fail to train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such

---

[12] "[A] custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (citations and internal quotations omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after the shakedown, the prison officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error.").

that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989).

\* \* \*

We have recognized that a § 1983 plaintiff may prove the second type of *Monell* liability, deliberate indifference, through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations." *Hunter v. [County] of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). Thus, it is sufficient under our case law to prove a "custom" of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity. *Id.* at 1233 ("We have long recognized that a custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.") (internal quotation marks and citations omitted); *Larez [v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)] ("[T]here was evidence of a departmental policy or custom of resorting to the use of excessive force. The jury could find such policy or custom from the failure of Gates to take any remedial steps after the violations."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("McRorie alleges that guards seriously injured him and twenty-eight other prisoners during the shakedown and that Sergeant Dunn was acting under orders of his superiors. If proved, these acts reflect a [policy or custom].") ; *see also Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027–28 (9th Cir. 2015) (recognizing that a plaintiff could present a "failure to discipline *Monell* theory" based on evidence "that the city had a policy or custom of failing to investigate and discipline officers who had allegedly committed prior instances of excessive force.").

*Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018); *see also Alter ex rel. Alter v. County of San Diego*, 635 F. Supp. 3d 1048, 1060 (S.D. Cal. 2022). In other words, a plaintiff can prevail on a failure to train theory of *Monell* liability by demonstrating that a municipal actor had adopted a "policy of inaction in light of notice that this will cause constitutional violations[.]" *Conso v. City of Eureka*, No. 21-cv-04480-RMI, 2022 WL 409958, at *10 (N.D. Cal. Feb. 10, 2022).

Here, plaintiffs allege and argue that the City failed to adequately train, supervise, and discipline officers regarding the use of excessive force. (Doc. No. 111 at 19, 21.) In support of this theory, plaintiffs identify a failure to investigate officers following use of excessive force and the purported culture of encouraging the use of excessive force as evidenced by the practice of "badge bending" within the Department which plaintiffs contend is evidence that the City

1  defendant was on notice that the use of excessive force was being encouraged within the VPD.

2  (*Id.* at 19–21.)

3          In summary, plaintiffs' argument is that the City adopted a policy of inaction in the face of

4  a culture within the VPD that encouraged constitutional violations, thus amounting to a failure to

5  train. *See, e.g., Caldwell v. City of San Francisco*, No. 12-cv-01892-DMR, 2020 WL 7643124, at

6  *14 (N.D. Cal. Dec. 23, 2020) (finding that the plaintiff's allegation that the defendant failed to

7  adequately investigate citizen complaints was a "policy of inaction" that required the plaintiff to

8  demonstrate deliberate indifference under a failure to train standard); *see also Johnson v. City of*

9  *Vallejo*, 99 F. Supp. 3d 1212, 1220–21 (E.D. Cal. 2015) (considering, in the context of a *Monell*

10  failure to train claim, evidence of a pattern of prior instances involving the use of excessive force

11  by police officers and a failure by the defendant City to investigate those incidents); *K.J.P. v.*

12  *County of San Diego*, 621 F. Supp. 3d 1097, 1127 (S.D. Cal. 2022) ("Failure to train can be the

13  basis of municipal liability under several circumstances. . . .  Second, the existence of a pattern of

14  tortious conduct by inadequately trained employees may tend to show that the lack of proper

15  training, . . . is the moving force behind the plaintiff's injury.").

16          Plaintiffs first argue that the defendant City failed to meaningfully review use of force

17  complaints and failed to discipline officers for engaging in the use of excessive force.  (*Id.* at 19–

18  21.)  Plaintiffs contend that the CIRB system that the defendant City employed to review use-of-

19  force complaints was "perfunctory and pointless," citing to the deposition of the Chief of Police

20  at which he testified that he would at times not read the report summaries he received.  (Doc. No.

21  111 at 20; *see also* Doc. No. 111-28 at 37 ("And so, you know, did I read each of these or was I

22  even given these?  Probably not.")).  Plaintiffs also cite to the deposition testimony of Officer

23  Horton, in which he testified that he could not recall any instances where an officer was

24  suspended or terminated for excessive use of force.  (Doc. No. 111-26 at 22–23.)  Indeed, the OIR

25  report cited by plaintiffs notes that the VPD had developed an "us against the world" mindset, an

26  "apparent reticence when it came to finding fault" regarding excessive use of force, and that even

27  where the internal review system identified specific concerns regarding officer performance there

28  was a lack of "concrete actions [sic] items and subsequent corroboration."  (Doc. No. 112-5 at 8,

31

1  36.)  Plaintiffs have also submitted evidence that defendant Tonn was involved in at least two

2  prior instances in which he employed deadly force and was not disciplined or reprimanded in

3  connection with those incidents.  (Doc. Nos. 112-18, 112-20, 112-21, 112-22; 104-7, Exh. 7A at

4  131–32.)

5        The defendant City first argues that plaintiffs have failed to introduce evidence of prior

6  constitutional violations by defendant Tonn or findings of constitutional violations regarding the

7  conduct of other officers in the department.  (Doc. No. 118 at 6–7.)  Defendant states that "a

8  *Monell* claim cannot be established by reference to prior complaints that did not result in any

9  adverse finding[.]"  (*Id.* at 7.)  The City's argument in this regard misses the mark.  Plaintiffs'

10  failure to train theory of liability is supported by their contention that the City's internal review

11  system was so ineffectual that police officers believed they could violate the constitutional rights

12  of civilians without any repercussion.  *Doe ex rel. Tanis v. County of San Diego*, 576 F. Supp. 3d

13  721, 740 (S.D. Cal. 2021) ("Under Ninth Circuit precedent, a § 1983 plaintiff may prove

14  deliberate indifference on a failure-to-train claim through evidence of a failure to investigate and

15  discipline employees in the face of widespread constitutional violations.") (internal quotation

16  marks omitted) (quoting *Rodriguez*, 891 F.3d at 803).  Evidence of similar allegations of

17  excessive force that went unaddressed by the imposition of disciplinary action are sufficient at the

18  summary judgment stage to establish that a reasonable jury could conclude that the City had a

19  practice of failing to investigate its employees.  *See Caldwell*, 2020 WL 7643124, at *16–17

20  (denying the defendants' motion for summary judgment because a reasonable jury could conclude

21  that the low rates of complaints resulting in discipline of officers was evidence of deliberate

22  indifference by the defendant notwithstanding the lack of evidence that past complaints resulted

23  in adverse findings); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)

24  ("The jury was entitled to conclude that [evidence that police officers were rarely disciplined]

25  supported the Larezes' theory that the LAPD's disciplinary and complaint processes . . .

26  contributed to the police excesses complained of because the procedures made clear to the

27  officers that . . . they could get away with anything.").  The defendant City's argument that prior

28  complaints did not result in adverse findings or discipline is therefore unpersuasive:  Plaintiffs'

32

1    theory is based on the reasonable inference drawn from a lack of discipline that officers felt

2    emboldened to commit constitutional violations.

3            Regarding that lack of discipline, plaintiffs point to the OIR Report which found: "We

4    noted several examples of cases in which the Department properly established that allegations

5    were sustained by the evidence and that a consequence was warranted.  However, the *nature* of

6    that consequence was at times surprisingly minor." (Doc. No. 112-5 at 52)  Such external reports

7    concluding that internal reviews failed to adequately respond to the use of excessive force can

8    support an inference of inaction in response to constitutional violations.[13]  *See Rodriguez*, 891

9    F.3d at 803 (noting that the plaintiffs' citation to an independent report which found that the

10   defendants had created a culture of excessive use of force in a jail supported a finding of *Monell*

11   liability under a deliberate indifference theory).  As noted above, plaintiffs cite Officer Horton's

12   deposition testimony regarding the lack of serious discipline imposed against officers who

13   engaged in excessive use of force and Chief Bidou's deposition testimony with respect to his

14   failure to consistently review internal review summaries of police uses of force.  (Doc. No. 111-

15   26 at 22–23.)  A reasonable jury could conclude from this evidence that the defendant City

16   engaged in a pattern of failing to investigate officers' use of force which amounted to deliberate

17   indifference.  *See Quair v. County of Kings*, No. 1:20-cv-01793-KJM-SKO, 2025 WL 1593088,

18   at *14 (E.D. Cal. June 5, 2025) (finding that a reasonable jury could conclude that the police

19   department had failed to train officers based in part on evidence that the defendant had not

20   disciplined officers after any police shooting in the prior five years); *see also Price v. Sery*, 513

21   F.3d 962, 965, 972–73 (9th Cir. 2008) (reversing the district court's grant of summary judgment

22   where the plaintiff had provided evidence that no officer had been "successfully disciplined" for

23

24   _____

     [13]  The defendant City raises several arguments regarding what inferences can appropriately be
25   drawn from the OIR report and testimony pertaining to the CIRB review process.  (Doc. No. 118
     at 7–8.)  However, these arguments only serve to highlight that there is a dispute of material fact
26   regarding whether officers faced appropriate discipline for excessive use of force and whether the
     CIRB review process provided adequate supervision and training.  *See Caldwell*, 2020 WL
27   643124, at *15–16 (finding that a reasonable jury could conclude from the low percentage of use
     of force cases in which an officer was disciplined and expert testimony regarding that low
28   percentage that the investigative process was inadequate).

1    twenty years); *County of Solano*, 2025 WL 621545, at *30 (denying the defendants' motion for

2    summary judgment where the plaintiffs presented evidence that the defendants failed to

3    investigate and discipline officers for the excessive use of force from which a reasonable

4    factfinder could find a custom of tolerating excessive force existed).

5            As discussed above, the defendant City argues that plaintiffs have failed to provide

6    evidence that VPD officers engaged in a pattern of excessive force.  (Doc. No. 118 at 6–7.)

7    Plaintiffs argue that VPD was aware of a culture within the Department where constitutional

8    violations involving the use of excessive force were celebrated and encouraged as evidenced by

9    officers' participation in a badge bending ritual and nonetheless failed to put a stop to that

10    practice and the culture it evidenced, thereby adopting a policy of inaction despite notice.  (Doc.

11    No. 111 at 20–21.)  In this regard, plaintiffs cite to the deposition testimony of Vallejo City

12    Manager Greg Nyhoff, who testified that at one point in time he understood that the officers in

13    the Vallejo Police Department would bend badges to "celebrat[e the] killing of a human being."

14    (Doc. No. 112-9 at 47–49.)  Plaintiffs also cite to the trial transcript in the case of *California v.*

15    *Milano*, No. VCR233208 (Solano County Super. Ct.), in which Officers Komoda and Tribble

16    testified that badges were bent when a police officer shot a civilian.  (Doc. No. 112-12 at 39)

17    ("He—Kent Tribble grabbed our badges and grabbed ahold of one corner of the badge said, 'Hey,

18    this is—you were involved in a critical incident.  You did what you had to do and handled it

19    professionally and you guys came out of it okay.'  And then he bent one of the prongs on the

20    badge."); (Doc. No. 112-12 at 69–70) (Officer Tribble testifying that he bent other officers'

21    badges because they were involved in a shooting).  Officer Tribble testified that this practice

22    began in 2003.  (Doc. No. 112-12 at 69.)  Plaintiffs also cite to Officer Horton's deposition, in

23    which he testified that he was informed of the badge bending practice in 2016 by the chief of

24    police's executive secretary and that he discussed the practice with the chief in 2019.  (Doc. No.

25    111-26 at 26–27.)  Despite this knowledge, the VPD did not conduct a formal investigation into

26    badge bending until after that chief of police left the Department.  (*Id.* at 41.)  Plaintiffs also point

27    to Officer Tribble's deposition, in which he testified that he believed that he had bent defendant

28    Tonn's badge.  (Doc. No. 112-14 at 58.)

1    As explained above, the Ninth Circuit has recognized that creating a "culture where

2  excessive force was encouraged" can support a finding of *Monell* liability under a theory of

3  failure to train which amounted to deliberate indifference.  *Rodriguez*, 891 F.3d at 803.  District

4  courts within the Ninth Circuit have found that the existence of a group of officers within a

5  department encouraging the excessive use of force can serve as a basis for *Monell* liability.

6  *Serrano Robles v. County of Los Angeles*, No. 2:20-cv-06648-ODW-PLA, 2022 WL 2802980, at

7  *10–11 (C.D. Cal. July 18, 2022) (denying the defendants' motion for summary judgment on the

8  plaintiffs' *Monell* claim where the plaintiffs presented evidence that within the sheriff's

9  department was a gang of deputies which rewarded members for using excessive force); *see also*

10  *Starks v. County of Los Angeles*, No. 2:21-cv-05209-ODW-GJS, 2022 WL 4131699, at *7 (C.D.

11  Cal. Sept. 12, 2022) (finding on a motion to dismiss that the plaintiff had sufficiently stated a

12  basis for *Monell* liability where she alleged that within the sheriff's department there was a gang

13  of deputies which rewarded officers for engaging in excessive force by tattooing them); *Lockett v.*

14  *County of Los Angeles*, No. 18-cv-05838-PJW, 2020 WL 5500071, at *2–3 (C.D. Cal. Aug. 23,

15  2020) (denying the defendants' motion for summary judgment on the plaintiff's *Monell* claim

16  because the plaintiff had presented evidence that there was a gang of deputies which encouraged

17  shooting suspects to gain membership); *cf. Vargas*, 2021 WL 248668, at *12 (granting summary

18  judgment as to the plaintiff's *Monell* claim where the plaintiff had shown the existence of a gang

19  of deputies with a custom of encouraging excessive force and the defendants' deliberate

20  indifference to that custom, but had failed to show that the custom proximately caused the

21  shooting in question).  Similarly, here, plaintiffs have presented evidence on summary judgment

22  which describes a practice of "badge bending" that commemorated when an officer had fired at a

23  civilian and thereby encouraged the excessive use of force by VPD officers.  (Doc. No. 112-12 at

24  91.)  Based on Officer Tribble's testimony, it appears multiple officers participated in the bending

25  of other officers' badges from 2003 until 2020.  (*Id.* at 81.)  Further, Officer Tribble was

26  promoted throughout his tenure at the VPD rather than disciplined, supporting plaintiffs'

27  contention that the Department demonstrated deliberate indifference to this practice.

28  /////

1    In reply, the defendant City argues that the testimony identified by plaintiffs that Officer

2    Tribble bent defendant Tonn's badge is insufficient and cites defendant Tonn's deposition

3    testimony and Officer Tribble's testimony that he does not recall when he bent defendant Tonn's

4    badge.  (Doc. Nos. 118 at 8; 111-1 at 75; 112-15 at 91–92.)  In advancing this argument the

5    defendant City appears to implicitly suggest that their failure to train officers upon learning of the

6    badge bending practice was not a moving force behind defendant Tonn's use of deadly force in

7    this case.  However, as discussed above, plaintiffs have cited to Officer Tribble's deposition

8    testimony that he believes he bent defendant Tonn's badge.  This is sufficient to create a genuine

9    dispute of material fact.  In resolving a motion for summary judgment, the court "must view the

10    evidence in the light most favorable to the nonmoving party[.]"  *T.W. Elec. Serv.*, 809 F.2d at 630.

11    Accordingly, the court must reject defendant's argument in this regard.

12    Viewing this evidence in the light most favorable to plaintiff, the court finds that a

13    reasonable factfinder could conclude that the City failed to adequately train, supervise, and

14    discipline officers regarding the use of excessive force and failed to investigate officers following

15    use of excessive force due to a culture within VPD of encouraging the use of excessive force.

16    Because a reasonable factfinder could conclude that there was a policy of inaction regarding the

17    excessive use of force by officers which the defendant City was aware of, the court concludes that

18    summary judgment is not appropriate as to plaintiffs' *Monell* claim.

19    Accordingly, the court will deny defendant City's motion for summary judgment as to

20    plaintiffs' *Monell* liability claim.

21    **C.    State Claims**

22    Defendants move for summary judgment in their favor as to each of plaintiffs' claims

23    brought pursuant to state law.  (Doc. Nos. 104-1 at 15–16; 105 at 18–19.)  The court will address

24    these arguments below.

25    1.    Bane Act (Claim Four)

26    All defendants argue that summary judgment should be entered in their favor on plaintiffs'

27    Bane Act claim because no reasonable jury could find, first, that defendant Tonn violated

28    decedent Monterrosa's constitutional rights, or second, that he had the specific intent to do so.

36

1   (Doc. Nos. 104-1 at 15–16, 105 at 18.)  The court has already concluded that plaintiffs have

2   demonstrated a genuine issue of material fact regarding whether defendant Tonn violated

3   decedent Monterrosa's Fourth Amendment rights and therefore rejects defendants' first argument

4   in this regard.  The court will therefore turn to whether a reasonable jury could find that defendant

5   Tonn had the specific intent to violate decedent Monterrosa's constitutional rights.

6        The Bane Act provides a right of action to "[a]ny individual whose exercise or enjoyment

7   of rights secured by the Constitution or laws of the United States, or of rights secured by the

8   Constitution or laws of [California] has been interfered with" by another person's "threats,

9   intimidation, or coercion."  Cal. Civ. Code § 52.1(b)–(c).  To prevail on a claim for violation of

10  the Bane Act, a plaintiff must show "a specific intent to violate the arrestee's right to freedom

11  from unreasonable seizure."  *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)

12  (citing *Cornell v. City of San Francisco*, 17 Cal. App. 5th, 766, 801 (2017)).  A "mere intention to

13  use force that the jury ultimately finds unreasonable—that is, general criminal intent—is

14  insufficient."  *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)).

15  Instead, "the jury must find that the defendants intended not only the force, but its

16  unreasonableness, its character as more than necessary under the circumstances."  *Id.* (internal

17  quotations omitted).  However, it is not necessary for defendants "to have been thinking in

18  constitutional or *legal terms* at the time of the incidents, because a reckless disregard for a

19  person's constitutional rights is evidence of a specific intent to deprive that person of those

20  rights."  *Id.* (internal quotations omitted).

21       The inquiry into specific intent focuses on:  (1) whether "the right at issue [was] clearly

22  delineated and plainly applicable under the circumstances of the case"; and (2) whether the

23  "defendant commit[ted] the act in question with the particular purpose of depriving the citizen

24  victim of his enjoyment of the interests protected by that right[.]"  *Sandoval v. County of Sonoma*,

25  912 F.3d 509, 520 (9th Cir. 2018) (citation omitted).  If both requirements are met, "specific

26  intent can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act'

27  but instead acted in 'reckless disregard' of the constitutional right."  *Id.* (quoting *Cornell*, 17 Cal.

28  App. 5th at 803).

1    Plaintiffs' claim against defendants for violation of the Bane Act is based on the same

2    facts alleged in support of their claims of use of excessive force in violation of the Fourth

3    Amendment and violation of their substantive due process rights under the Fourteenth

4    Amendment.  The court has already concluded that based upon the evidence presented on

5    summary judgment, a reasonable jury could conclude that defendant Tonn acted unreasonably

6    and with a purpose to harm when he shot decedent Monterrosa.  A reasonable jury could similarly

7    conclude from the same evidence that defendant Tonn acted with reckless disregard for decedent

8    Monterrosa's rights.  *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 907–08 (9th Cir. 2024)

9    ("In most cases, including this one, the existence of specific intent for a Bane Act claim is a

10   question that is properly reserved for the trier of fact.") (internal quotation marks omitted); *see*

11   *also S.T. ex rel. Niblett*, 327 F. Supp. 3d at 1283 (denying summary judgment as to the plaintiff's

12   Bane Act claim where the plaintiff had demonstrated that a reasonable juror could find the

13   defendant officers acted unreasonably and with a purpose to harm by shooting the decedent twice

14   in the back while he was fleeing).

15       Accordingly, defendants' motion for summary judgment in their favor with respect to

16   plaintiffs' Bane Act claim will be denied.

17       2.    <u>Wrongful Death:  Negligence and Battery (Claim Five)</u>

18       Defendant Tonn moves for summary judgment in his favor as to plaintiffs' state law

19   negligence and battery claims on the same grounds argued in connection with plaintiffs' § 1983

20   claims.  (Doc. No. 104-1 at 16.)  Because the court has concluded that defendants' motions for

21   summary judgment as to plaintiffs' § 1983 claims must be denied, the court similarly rejects

22   defendant Tonn's argument as to plaintiffs' state law negligence and battery claims.  *See*

23   *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1209 (E.D. Cal. 2008) (denying the defendants'

24   summary judgment motion as to the plaintiffs' battery and negligence claims because of the

25   material factual dispute as to whether the defendants used unreasonable force in violation of the

26   Fourth Amendment); *see also Young*, 655 F.3d at 1170 ("[T]he Fourth Amendment violation . . .

27   also suffices to establish the breach of a duty of care under California law.").

28   /////

38

1    Accordingly, the court will also deny defendant Tonn's motion for summary judgment as
2    to plaintiffs' negligence and battery claims.

3                                    **CONCLUSION**

4    For the reasons explained above,

5    1.    Defendant Tonn's motion for summary judgment (Doc. No. 104) is denied;

6    2.    Defendant City of Vallejo's motion for summary judgment (Doc. No. 105) is
7          denied; and

8    3.    Defendant City of Vallejo's request to seal (Doc. No. 124) is granted;

9    4.    Within ten (10) days of the entry of this order, plaintiffs shall file the documents
10         BATES stamped COV000050–COV000096 under seal; and

11   5.    The parties are directed to meet and confer on their availability, and within
12         fourteen (14) days of the docketing of this order, to contact Courtroom Deputy
13         Pete Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with several proposed
14         dates for the rescheduling of a Final Pretrial Conference and Jury Trial in this
15         action.

16   IT IS SO ORDERED.

17   Dated:   **September 19, 2025**                 _Dale A. Drozd_

18                                                   DALE A. DROZD
                                                     UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28